Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com) (pro hac vice application pending)
Steven B. Eichel (seichel@crowell.com) ( pro hac vice application pending)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Proposed Counsel for Debtors and Debtors in Possession

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| In re: EASY STREET HOLDING, LLC,  Debtors.  Address: 201 Heber Avenue  Park City, UT 84060  Tax ID Number: 35-2183713 | Case No. 09-29905  Chapter 11  Honorable R. Kimball Mosier  [FILED ELECTRONICALLY] |
|---|---|
| In re: EASY STREET PARTNERS, LLC,  Debtor.  Address: 201 Heber Avenue  Park City, UT 84060  Tax ID Number: 84-1685764 | Case No. 09-29907  Chapter 11  Honorable R. Kimball Mosier  [FILED ELECTRONICALLY] |

SLC_455323

| | |
|---|---|
| In re: ) | |
| ) | |
| EASY STREET MEZZANINE, LLC, ) | Case No. 09-29908 |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |
| Address: 201 Heber Avenue ) | |
| Park City, UT 84060 ) | Honorable R. Kimball Mosier |
| ) | |
| Tax ID Number: 20-4502979 ) | [FILED ELECTRONICALLY] |

## DECLARATION OF WILLIAM SHOAF IN SUPPORT OF FIRST-DAY MOTIONS

William Shoaf, being duly sworn, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746(2):

1.   I am one of the co-managers of Easy Street Partners, LLC ("Partners"), Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding"), debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Companies"). I am also the manager of CloudNine-Sky Lodge Management LLC, which manages the day-to-day operations of the Debtors' business, the Sky Lodge located in Park City, Utah. I am responsible for and totally familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.   Each of the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on the date hereof (the "Petition Date").

2

3. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first-day motions and applications (the "First Day Motions") filed contemporaneously herewith.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of the relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5. This Declaration is intended to provide a summary overview of the Debtors' businesses and these chapter 11 cases. Parts I through IV of this Declaration provide an overview of the Debtors' organizational structure, business, capital structure, events giving rise to the commencement of these chapter 11 cases, and the Debtors' financial outlook. Section V provides a summary of the First Day Motions which the Debtors seek to be heard on an expedited basis immediately following the commencement of these cases.

## I.   THE DEBTORS

6. The Debtors are limited liability companies and affiliates of one another. Mezzanine is the 100% owner and managing member of Partners, which owns real estate and improvements constituting the Sky Lodge in Park City, Utah. Holding is the 100% owner and managing member of Mezzanine. Michael Feder, representing Park City I, LLC, Philo

Smith, Jr., representing the Philo Smith, Jr. Trust, and William Shoaf, representing CloudNine Resorts, LLC are the co-managers of Holding. The members of Holding are Park City I, LLC, Philo Smith Jr. Trust, Alchemy Ventures Trust, and CloudNine Resorts, LLC. Park City I, Philo Smith Jr. Trust and CloudNine Resorts, LLC constitute 61.25% of the membership interests of Holding. The remaining 38.75% of Holding is held by Alchemy Ventures Trust.

7.   The Debtors maintain their corporate offices in 201 Heber Avenue, Park City, Utah 84060 and currently employ approximately ninety nine (99) full time and part-time employees (excluding insiders).

## II.   THE DEBTORS' BUSINESS

8.   The Sky Lodge is a luxury boutique hotel located in the middle of historic Main Street in Old Town Park City. It is an ultra stylish resort hotel offering all of Park City's amenities plus a restaurant offering both casual and fine dining, a bar and lounge, a bakery, the spa Amatsu, and meeting and event venues and more.

9.   The Sky Lodge is being sold as fractional ownership with a total of 176 one-eighth shares offered. There are 22 units in total. The 2 and 3 bedroom models range from 1260 to 2700 square feet for the penthouse model. Owners buy individual units and not just the rights to a stay. Cloud Nine Resorts, an affiliate of the Debtors, runs the homeowners association (HOA), manages the owner bookings and rotational intricacies of ownership. Each owner is guaranteed two ski weeks (mid Dec. – mid April) each year plus 21 other days throughout the year for their own use. Stays not used by the owner may be rented out by the hotel and proceeds are split equally with the owner.

### III. DEBT STRUCTURE

10. On March 30, 2006, Partners entered into a Loan (the "WestLB Senior Loan") and Security Agreement (collectively, the "Senior Loan Agreement") for the initial amount of $36,779,224[1] with WestLB AG ("WestLB") to purchase and develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060. The WestLB Senior Loan is secured by, among other things, security interests evidenced by the Construction and Interim Loan Deed of Trust With Security Agreement, Assignment of Leases and Rents and Fixture Filing, and a UCC Financing Statement, each filed in the Summit County, Recorder's Office, State of Utah. On February 15, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a partial principal repayment of $22,400,000 was made to WestLB from Real Estate Sales Escrow Funds[2] controlled by the Administrative Agent. The current balance of the WestLB Senior Loan is $14,379,224.

11. On March 30, 2006, Mezzanine entered into a Loan Agreement (the "Mezzanine Loan Agreement") in the initial amount of $11,250,000 (the "BayNorth Mezzanine Loan") with BayNorth Realty Fund VI, LP ("BayNorth") to develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060, which is owned by Partners. The BayNorth Mezzanine Loan is secured by a pledge of Holding's 100% interest in Mezzanine to BayNorth, and a UCC Financing Statement filed with the Secretary of State of

---

[1] The proceeds of the WestLB Senior Loan (along with the proceeds of the BayNorth Mezzanine Loan, as hereinafter defined) were used to purchase, develop and construct the Sky Lodge.

[2] As units are sold, the proceeds are swept into various escrow accounts maintained at Wells Fargo Bank under the control of WestLB as the Administrative Agent for WestLB and BayNorth (hereinafter defined).

Utah. On February 19, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a $5,600,000 disbursement[3] from the Real Estate Sales Escrow Funds controlled by the Administrative Agent was made to BayNorth, which included a partial principal repayment and accrued interest. The partial repayment paid all then current accrued interest and the remaining $1,646,871 was applied to the loan principal balance. It is the Debtors' position that the current balance of the BayNorth Mezzanine Loan including principal and accrued interest is $12,045,586.[4]

12. On March 30, 2006, WestLB, as Senior Lender, and BayNorth, as Mezzanine Lender, entered into an intercreditor agreement (the "Intercreditor Agreement") to provide, inter alia, for the relative priority of the Senior Loan Agreement between WestLB and Partners, and the Mezzanine Loan Agreement between BayNorth and Mezzanine, and administration of both loans by WestLB as the administrative agreement.

13. The original term of the WestLB Senior Loan was for three years with two one-year extensions available to Partners. The initial term of the WestLB Senior Loan ended on March 29, 2009. On September 25, 2008, Partners formally notified WestLB of its request for a conversion of the WestLB Senior Loan into an Interim Loan, as stipulated in

---

[3] This payment was incorrectly made and has led to (a) a dispute between WestLB and BayNorth under the Intercreditor Agreement (as hereinafter defined) for its return, (b) a failure of WestLB to extend the WestLB Senior Loan, (c) BayNorth alleging a default of the BayNorth Mezzanine Loan, (d) a failure by WestLB to release additional escrowed funds resulting in imposition of liens by contractors and foreclosure suits, and (d) the loss of pending sales.

[4] BayNorth claims a substantially greater amount in excess of $31 million, based upon disputed assertions of rights under a yield maintenance provision and disputed calculations, which, among other things, fail to account for the $5.6 million disbursement of BayNorth.

section 2.15 of the Senior Loan Agreement, which would extend the WestLB Senior Loan for an additional year.

### IV. EVENTS LEADING TO THE CHAPTER 11 CASES

14. On March 4, 2009, WestLB issued a letter to Partners asserting that after reviewing the disposition of the Net Sales Proceeds from sales of real estate, that it, as the Senior Lender, had been underpaid from the $28,000,000 lender distribution that occurred in February of 2008. WestLB demanded that Partners remit immediately the sum of $4,899,104 to it. Partners denied such claim because the shortfall to WestLB was the direct result of WestLB, as the Administrative Agent, authorizing a payment of $5,600,000 out of the February 2008 lender distribution to the Mezzanine Lender BayNorth. This action was in clear violation of Section 9 of the Intercreditor Agreement; however, WestLB has denied responsibility for its actions as the Administrative Agent and has been attempting to get Bay North to return the funds received on February 19, 2008. To date, Bay North has wrongfully refused, which has created the current situation as more fully set forth herein.

15. On or about March 29, 2009, WestLB entered into a forbearance agreement with Partners (the "Forbearance Agreement"), while it attempted to get BayNorth to abide by the Intercreditor Agreement and return the $5,600,000. Partners and its representative, Realty Financial Resources, understood that West LB had met with BayNorth to demand the return of the $5,600,000. These efforts were not successful.

16. On May 5, 2009, BayNorth issued to Mezzanine a notice of default on the BayNorth Mezzanine Loan. This default notice was followed by a Notice of Acceleration

SLC_455323

and Demand for Payment issued by BayNorth on June 23, 2009. On July 28, 2009, a Notice of Sale was issued by BayNorth for the membership interest of Holding to be executed on September 16, 2009. There are no payment defaults under the BayNorth Mezzanine Loan nor are any alleged.

17. WestLB has also taken the position that any funds in the Real Estate Escrow Accounts are frozen. This action precluded the final approved payment to the general contractor, which was formally submitted to WestLB on February 5, 2009. Despite repeated requests by Partners to have this payment made from the escrowed funds, WestLB has not done so to date, resulting in liens being placed on the Sky Lodge property on March 16, 2009, despite continued requests by Partners for funding. On September 8, 2009, the general contractor gave Partners verbal confirmation that a foreclosure action had been filed.

18. The actions by WestLB and BayNorth effectively precluded Partners from having any ability to operate the business in a normal and effective manner. Due to these actions and the upcoming foreclosure sale of the membership interest in Holding by Bay North, Partners and its affiliates, Mezzanine and Holding, had no option but to file for protection under Chapter 11 so that the business can be restructured and can return to profitable operations.

19. As the Debtors head into late fall & winter, the daily operations will become cash flow positive. In fact, the first quarter of 2010, will be the most profitable months at the Sky Lodge during the height of the ski season.

20. Debtors intend to file a plan of reorganization by the end of 2009 to effectively reorganize in a manner to maximize value for all of their constituents, which will be in the best interest of their creditors, members and other parties in interest.

### V. THE FIRST DAY MOTIONS

21. Contemporaneously with the filing of these petitions, the Debtors have filed several First Day Motions requesting various forms of relief. These motions and the relief sought therein are made in an effort to minimize the adverse effects that may result to the Debtors' ongoing business operations and to promote a smooth transition to operating the Debtors' business as Debtors in possession. The Debtors request that "first day" orders of the types requested in the First Day Motions be entered. The factual information in support of the First Day Motions, in addition to the information set forth above, is provided in the First Day Motions, which are all adopted and incorporated herein by reference.

22. The First Day Motions are summarized as follows:

a. Motion for Joint Administration: The Debtors seek to have their chapter 11 cases jointly administered. Joint administration of the cases will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders in each of the Debtor cases, thereby saving the Debtors' estates considerable expense and resources. The relief requested will not adversely affect creditors' rights as this Application requests only administrative, and not substantive, consolidation of the Debtors' estates

b. Application for Extension of Time to Filed Schedules and Statements of Financial Affairs: The Debtors seek an additional sixteen (16) days to file their schedules and statements of financial affairs. Due to the complexity of the Debtors' financial affairs, the large number of potential creditors and parties in interest, the intricacy of these cases, and the immediate and exigent issues confronting the Debtors to obviate any disruption to operations caused by the events immediately prior to and the filings of the

9

        petitions, it will take substantial time for the Debtors to analyze and compile the information needed to complete their Schedules and Statements. To prepare their Schedules, the Debtors must compile information from books, records, and documents relating to many of claims, assets, and numerous contracts, leases and other agreements. This information is voluminous and is located in numerous places throughout the Debtors' organization. Collecting the necessary information requires that the Debtors and their employees expend an enormous amount of time and effort.

c.   <u>Motion for Order Prohibiting Utilities from Altering Services</u>: In connection with their ongoing business operations, the Debtors obtain electricity, natural gas, water, telephone, internet and other similar services ("Utilities Services") from eight companies ("Utilities"). Accordingly, the Debtors seek an order (i) prohibiting the Utilities from altering, refusing, discontinuing service to, or discriminating against the Debtors; (ii) providing that the Debtors' creation of a segregated account in favor of the Utilities, in an amount equal to one average month of the Debtors' collective payments to the Utilities constitutes "adequate assurance of payment"; and (iii) establishing procedures for determining requests by Utilities for additional assurance.

d.   <u>Motion for An Order (A) Authorizing Continued Use of Existing Business Forms; and Waiver of Requirements under § 345(b) of the Bankruptcy Code</u>: The Debtors utilize business forms in their day-to-day operations of their businesses. To minimize expenses to their estates, the Debtors request that they be authorized to continue to use all correspondence and business forms existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession. Moreover, it would be unduly burdensome for the Debtors to change forms in connection with the hotel, restaurant and other services provided by the Debtors' business. Parties doing business with the Companies undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the size of these cases, the press releases issued by the Companies, and any other press coverage in affected areas. Moreover, parties in interest will receive direct notice of the commencement of these cases. Additionally, the Debtors intend to change their bank accounts and open new accounts at Zions First National Bank, which is on the U.S. Trustees' list of approved depositories. These accounts will be used for the operation of the Debtors' business and will not be high risk investments. The Debtors therefore believe that the requirements of § 345(b) relating to investments and deposits are inapplicable to these

SLC_455323

circumstances and should, in any event, be waived for cause. Accordingly, the Debtors seek entry of an order (a) authorizing continued use of existing business forms, and (b) a waiver of requirements under § 345(b) of the Bankruptcy Code.

e.  Motion for Authorization to Pay Pre-Petition Wages, Salaries, and Employee Benefits; Authorization to Continue the Maintenance of Employee Benefit Programs in the Ordinary Course; and Directing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations: The Companies' employ 99 employees (excluding insiders). The Companies' employees are essential to running the Companies' business postpetition, administering the Companies' assets and preserving value for the Companies, the Debtors' estates and creditors. The retention of the Companies' employees is necessary to assure a timely and efficient reorganization. Without its employees, the Companies will not be able to continue to operate its business, thereby ending any hopes for reorganization and the maximization of value of the Debtors' estates. Accordingly, the Debtors seek an order (i) authorizing (but not requiring) the Debtors, in their sole discretion: (x) to pay prepetition obligations owed to their employees, including payroll and reimbursement requests; (y) to honor, in the ordinary course of business, existing employee benefit plans and programs (including all related costs and expenses) as such policies were in effect as of the commencement of the chapter 11 cases, even if such involve payment or honoring of prepetition claims; and (z) to cause any prepetition checks given to employees to be honored and to issue new checks to replace any dishonored checks.

f.  Motion for Use of Cash Collateral: Partners seeks entry of Orders: authorizing it, pursuant to sections 105 and 363 of the United States Bankruptcy Code, to use cash collateral, including access to, and utilization of, the Partners' operating revenues and the Real Estate Sale Accounts (as defined in the Motion), (i) on an emergency and interim basis ("Interim Order") for approximately two (2) weeks in amounts as may be necessary to prevent immediate and irreparable harm to Partners' estate; and (ii) scheduling a final hearing thereon no sooner than than 15 days from the Interim Order authorizing continued use of cash collateral through December 2009. Partners proposes to provide West LB with adequate protection by granting replacement liens on any post-petition revenues to the extent of any diminution in the value of West LB's collateral on a post-petition basis. West LB will also (1) retain its existing first lien, (2) continue to be protected by an equity cushion exceeding $15 million (which is more than 100% of the amount of its lien), and (3)

11

SLC_455323

continue to be protected by virtue of continued operations in the ordinary course. Partners' inability to utilize the revenue from Sky Lodge operations and the Real Estate Sale Accounts would materially damage the value of West LB's collateral and will irreparably harm the Debtors, its creditors, members, Unit Holders and all other parties in interest. Emergency relief is needed and warranted as the funds in the Real Estate Sale Accounts aggregate $3.2 million but Partners will need only a small portion thereof until December 2009, after which Partners will generate significant positive cash flow with the advent of the ski season.

    g.    Retention Applications: The Debtors seek to retain Crowell & Moring, LLP ("C&M") and Durham Jones & Pinegar, P.C. ("DJP"), as counsel, and the Law Offices of Wrona, P.C. ("Wrona"), as special corporate counsel, *nunc pro tunc*, as of the Petition Date. The Debtors have selected C&M as their counsel because of the firm's extensive experience and knowledge, and in particular, its expertise in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code. C&M has the necessary background to advise the Debtors with respect to the legal issues they may face in these substantial corporate Chapter 11 cases. The Debtors' chose DJP as co-counsel to C&M because of DJP's expertise in the area of bankruptcy, and knowledge of local practice and rules. In addition, DJP will handle many court appearances efficiently due to its proximity to this Court. The Debtors have also selected Wrona as special corporate counsel due to Wrona's expertise in the area of corporate law, and its familiarity with the Companies and the underlying issues face the Companies. The Debtors believe that C&M, DJP, and Wrona are all well qualified and able to represent them in an efficient and timely manner. Accordingly, the Debtors request that the Court authorize the Debtors to retain and employ C&M, DJP, and Wrona.

23.    I believe that the relief requested in each of the First Day Motions is necessary and appropriate and in the best interest in the Debtors, their estates and their creditors because, among other things, the granting of the First Day Motions will minimize the adverse effects to the Debtors' ongoing business operations and help transition the Debtors' business to being operated by debtors in possession.

SLC_455323

## CONCLUSION

24. The foregoing is true to the best of my knowledge, information and belief, and I respectfully request that all of the relief requested in the First Day Motions be granted, with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: September 14, 2009

EAST STREET PARTNERS, LLC, EASY STREET MEZZANINE, LLC, AND EASY STREET HOLDING, LLC,

Debtors and Debtors in Possession

By: _____
William Shoaf,
Co-Manager

13

SLC_455323