Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT   84110-4050
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com) (pro hac vice application pending)
Steven B. Eichel (seichel@crowell.com) (pro hac vice application pending)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY   10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Proposed Counsel for Debtors and Debtors in Possession

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | |
| EASY STREET HOLDING, LLC, *et al.*, | ) ) ) ) | Bankruptcy Case No. 09-29905 Jointly Administered with Cases 09-29907 and 09-29908 |
| Address:  201 Heber Avenue                Park City, UT 84060 | ) ) ) ) | Chapter 11 Honorable R. Kimball Mosier |
| Tax ID Numbers: 35-2183713 (Easy Street Holding, LLC), 20-4502979 (Easy Street Partners, LLC), and 84-1685764 (Easy Street Mezzanine, LLC) | ) ) ) ) ) | **[FILED ELECTRONICALLY]** |

**MOTION FOR AN ORDER (1) AUTHORIZING THE DEBTORS TO PAY
PREPETITION WAGES, SALARIES, AND EMPLOYEE BENEFITS;
(2) AUTHORIZING THE DEBTORS TO CONTINUE THE MAINTENANCE OF
EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE; AND
(3) DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS
<u>FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS</u>**

Easy Street Partners, LLC ("Partners"), Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding"), debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Companies"), hereby request entry of an order (i) authorizing (but not requiring) the Debtors, in their sole discretion: (x) to pay prepetition obligations owed to their employees, including payroll and reimbursement requests; (y) to honor, in the ordinary course of business, existing employee benefit plans and programs (including all related costs and expenses) as such policies were in effect as of the commencement of the chapter 11 cases, even if such involve payment or honoring of prepetition claims; and (z) to cause any prepetition checks given to employees to be honored and to issue new checks to replace any dishonored checks; and (ii) granting such other and further relief as the Court deems to be just and proper.

While Bankruptcy Rule 6003(b) provides, in pertinent part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding ... a motion to use . . . property of the estate," the Debtors submit that expedited consideration of this Motion is needed to avoid immediate and irreparable harm. As stated below, if the Debtors are not able to immediately ensure their employees that their prepetition wages, salaries, and benefits will be paid and honored in the ordinary course of business, there may be great concern and discontent among said employees, which would undermine the Debtors' ability to operate their business and ultimately reorganize. The Debtors' payroll for the two week period from September 7, 2009 through and including September 20, 2009 for salaried employees and hourly employees totals approximately $98,000 (including payroll taxes).

2

This Motion is based on the points and authorities below, the evidence contained in the "Declaration Of William Shoaf in Support of First Day Motions" (the "Shoaf Declaration") filed on September 14, 2009, the record in these cases, and the arguments, evidence and representations that may be presented at or prior to the hearing on this Motion.

## BACKGROUND

**A.     The Chapter 11 Filings.**

1.     On September 14, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court under chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "Bankruptcy Code").  The Debtors continue to operate their business and manage their property as debtors-in-possession.

2.     No trustee or creditors' committee have been appointed in these cases.

3.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.     Background and Current Business Operations of the Debtors.**

4.     The Debtors are limited liability companies and affiliates of one another. Mezzanine is the 100% owner and managing member of Partners, which owns real estate and improvements constituting the Sky Lodge in Park City, Utah.  Holding is the 100% owner and managing member of Mezzanine.  Michael Feder, representing Park City I, LLC, Philo Smith, Jr., representing the Philo Smith, Jr. Trust, and William Shoaf, representing CloudNine Resorts, LLC are the co-managers of Holding.  The members of Holding are Park City I, LLC, Philo Smith Jr. Trust, Alchemy Ventures Trust, and CloudNine Resorts, LLC.  Park City I, Philo Smith

3

Jr. Trust and CloudNine Resorts, LLC constitute 61.25% of the membership interests of Holding. The remaining 38.75% of Holding is held by Alchemy Ventures Trust.

5.  The Sky Lodge is a luxury boutique hotel located in the middle of historic Main Street in Old Town Park City. It is an ultra stylish resort hotel offering all of Park City's amenities plus a restaurant offering both casual and fine dining, a bar and lounge, a bakery, the spa Amatsu, and meeting and event venues and more.

6.  The Sky Lodge is being sold as fractional ownership with a total of 176 one-eighth shares offered. There are 22 units in total. The 2 and 3 bedroom models range from 1260 to 2700 square feet for the penthouse model. Owners buy individual units and not just the rights to a stay. Cloud Nine Resorts, an affiliate of the Debtors, runs the homeowners association (HOA), manages the owner bookings and rotational intricacies of ownership. Each owner is guaranteed two ski weeks (mid Dec. – mid April) each year plus 21 other days throughout the year for their own use. Stays not used by the owner may be rented out by the hotel and proceeds are split equally with the owner**.**

**C.    Debt Structure.**

7.  On March 30, 2006, Partners entered into a Loan (the "WestLB Senior Loan") and Security Agreement (collectively, the "Senior Loan Agreement") for the initial amount of $36,779,224[1] with WestLB AG ("WestLB") to purchase and develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060. The WestLB Senior Loan is secured by, among other things, security interests evidenced by the Construction and Interim Loan Deed of Trust With Security Agreement, Assignment of Leases and Rents and Fixture

---

[1] The proceeds of the WestLB Senior Loan (along with the proceeds of the BayNorth Mezzanine Loan, as hereinafter defined) were used to purchase, develop and construct the Sky Lodge.

4

Filing, and a UCC Financing Statement, each filed in the Summit County, Recorder's Office, State of Utah. On February 15, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a partial principal repayment of $22,400,000 was made to WestLB from Real Estate Sales Escrow Funds[2] controlled by the Administrative Agent. The current balance of the WestLB Senior Loan is $14,379,224.

8. On March 30, 2006, Mezzanine entered into a Loan Agreement (the "Mezzanine Loan Agreement") in the initial amount of $11,250,000 (the "BayNorth Mezzanine Loan") with BayNorth Realty Fund VI, LP ("BayNorth") to develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060, which is owned by Partners. The BayNorth Mezzanine Loan is secured by a pledge of Holding's 100% interest in Mezzanine to BayNorth, and a UCC Financing Statement filed with the Secretary of State of Utah. On February 19, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a $5,600,000 disbursement[3] from the Real Estate Sales Escrow Funds controlled by the Administrative Agent was made to BayNorth, which included a partial principal repayment and accrued interest. The partial repayment paid all then current accrued interest and the remaining $1,646,871 was applied to the loan principal balance. It is the Debtors' position that the current

---

[2] As units are sold, the proceeds are swept into various escrow accounts maintained at Wells Fargo Bank under the control of WestLB as the Administrative Agent for WestLB and BayNorth (hereinafter defined).

[3] This payment was incorrectly made and has led to, among other things, (a) a dispute between WestLB and BayNorth under the Intercreditor Agreement (as hereinafter defined) for its return, (b) a failure of WestLB to extend the WestLB Senior Loan, (c) BayNorth alleging a default of the BayNorth Mezzanine Loan, (d) a failure by WestLB to release additional escrowed funds resulting in imposition of liens by contractors and foreclosure suits, and (d) the loss of pending sales.

balance of the BayNorth Mezzanine Loan including principal and accrued interest is $12,045,586.[4]

9. On March 30, 2006, WestLB, as Senior Lender, and BayNorth, as Mezzanine Lender, entered into an intercreditor agreement (the "Intercreditor Agreement") to provide, inter alia, for the relative priority of the Senior Loan Agreement between WestLB and Partners, and the Mezzanine Loan Agreement between BayNorth and Mezzanine, and administration of both loans by WestLB as the administrative agreement.

10. The original term of the WestLB Senior Loan was for three years with two one-year extensions available to Partners. The initial term of the WestLB Senior Loan ended on March 29, 2009. On September 25, 2008, Partners formally notified WestLB of its request for a conversion of the WestLB Senior Loan into an Interim Loan, as stipulated in section 2.15 of the Senior Loan Agreement, which would extend the WestLB Senior Loan for an additional year.

**D.     Events Leading to Filing of Petitions.**

11. On March 4, 2009, WestLB issued a letter to Partners asserting that after reviewing the disposition of the Net Sales Proceeds from sales of real estate, that it, as the Senior Lender, had been underpaid from the $28,000,000 lender distribution that occurred in February of 2008. WestLB demanded that Partners remit immediately the sum of $4,899,104 to it. Partners denied such claim because the shortfall to WestLB was the direct result of WestLB, as the Administrative Agent, authorizing a payment of $5,600,000 out of the February 2008 lender distribution to the Mezzanine Lender BayNorth. This action was in clear violation of Section 9

---

[4] BayNorth claims a substantially greater amount, in excess of $31 million, based upon disputed assertions of rights under a yield maintenance provision and disputed calculations which, among other things, fail to account for the $5.6 million disbursement to BayNorth.

6

of the Intercreditor Agreement; however, WestLB has denied responsibility for its actions as the Administrative Agent and has been attempting to get Bay North to return the funds received on February 19, 2008. To date, Bay North has wrongfully refused, which has created the current situation as more fully set forth herein.

12. On or about March 29, 2009, WestLB entered into a forbearance agreement with Partners (the "Forbearance Agreement"), while it attempted to get BayNorth to abide by the Intercreditor Agreement and return the $5,600,000. Partners and its representative, Realty Financial Resources, understood that WestLB had met with BayNorth to demand the return of the $5,600,000. These efforts were not successful.

13. On May 5, 2009, BayNorth issued to Mezzanine a notice of default on the BayNorth Mezzanine Loan. This default notice was followed by a Notice of Acceleration and Demand for Payment issued by BayNorth on June 23, 2009. On July 28, 2009, a Notice of Sale was issued by BayNorth for the membership interest of Holding to be sold at foreclosure on September 16, 2009. There are no payment defaults under the BayNorth Mezzanine Loan nor are any alleged.

14. WestLB has also taken the position that any funds in the Real Estate Escrow Accounts are frozen. This action precluded the final approved payment to the general contractor, which was formally submitted to WestLB on February 5, 2009. Despite repeated requests by Partners to have this payment made from the escrowed funds, WestLB has not done so to date, resulting in liens being placed on the Sky Lodge property on March 16, 2009, despite continued requests by Partners for funding. On September 8, 2009, the general contractor gave Partners verbal confirmation that a foreclosure action had been filed.

7

15. The actions by WestLB and BayNorth effectively precluded Partners from having any ability to operate the business in a normal and effective manner. Due to these actions and the upcoming foreclosure sale of the membership interest in Holding by Bay North, Partners and its affiliates, Mezzanine and Holding, had no option but to file for protection under Chapter 11 so that the business can be restructured and can return to profitable operations.

**E.    The Debtors' Employees.**

16. As of the Petition Date, the Companies employed approximately ninety nine (99) persons, excluding insiders.

17. The Companies' employees are essential to running the Companies' business postpetition, administering the Companies' assets and preserving value for the Companies, the Debtors' estates and creditors. The retention of the Companies' employees is necessary to assure a timely and efficient reorganization. Without its employees, the Companies will not be able to continue to operate its business, thereby ending any hopes for reorganization and the maximization of value of the Debtors' estates.

18. The commencement of this case has disrupted the Companies' normal operations. Unless the Companies can promptly assure their employees that the Companies will meet their employee-related obligations on schedule, the Companies believe that employee morale will disintegrate. This disintegration will lead to employee resignations, decreased productivity, damage to the business, damage to the reorganization effort, and decline in the value of the Debtors' assets.

19. In short, if the Companies do not receive authority to pay prepetition wages and to honor their obligations to employees in the ordinary course of business, they will be unable to retain necessary personnel to continue their business operations. Without these employees, it will

be impossible for the Debtors to achieve the stability necessary for the difficult transition to operating as debtors in possession. It is crucial, therefore, that the Companies promptly receive authority to honor their obligations to employees, including those set forth below.

**F.    Wages and Salaries**

20.     The Companies make payments to their hourly and salaried employees every two weeks.

21.     On September 25, 2009, Companies are scheduled to make their next payroll payment to both hourly and salaried employees, covering services from September 7, 2009 through and including September 20, 2009 for salaried and hourly employees. Based on the Petition Date of September 14, 2009, approximately one half of the wages and salaries included in the September 25 payroll payment would be considered prepetition claims.

22.     The Companies believe that the total amount of the prepetition wages and salaries covered by the September payroll will be approximately $98,000 (including payroll taxes). Accordingly, the Companies seek authorization to make payroll payments in the ordinary course, including amounts incurred prior to the Petition Date. In addition, the Companies seek authority to cause any prepetition checks given to employees to be honored and to issue new checks to replace any dishonored checks, to the extent necessary.

**G.    Vacation Benefits**

23.     The Companies' employees are employed both full time and hourly, and they are entitled to vacation benefits. Employees generally accrue between 10 and 20 vacation days per year, depending on the length of their employment.

24.     As of the Petition Date, the Companies estimate that their outstanding liability for accrued vacation time is approximately $30,000. By this Motion, the Companies seek authority,

9

in their sole discretion, to continue to honor their vacation policies in the ordinary course, including allowing employees postpetition to: (i) take vacation leave earned prepetition; and (ii) to be compensated for accrued and unused vacation leave.

### H. Employee Reimbursement

25. From time to time, the Debtors' employees require supplies. In those instances, the employee purchases the needed supplies and submits a reimbursement request at a later date. The Debtors generally refund the employees within seven days after an invoice is presented to the appropriate personnel. The Debtors also reimburse employees for reasonable expenses related to travel, including, but not limited to, meals (provided that the cost of meals is no more than $100 per day), lodging (in low to mid-priced hotels), airfare (coach or economy), mileage (if not using a company vehicle for company business), and monthly cell phones, subject to a prior approval and monthly limit. As of the Petition Date, the outstanding amount of prepetition reimbursement claims is approximately $420.

### I. Medical, Dental and Vision Benefits

26. The Companies contribute funds, or withhold funds from employees' paychecks, for various purposes, including:

   a. **Medical Plans:** The Companies provide both salaried and hourly employees with medical coverage with Aetna PPO plan, which is premium based. The employees can choose between three plans with different amounts of deductible: $500, $1,500 or $2,000. The cost of the plan varies depending on the amount of the deductible. The least expensive plan has the largest deductible. The medical plan includes coverage for hospital and physician services, prescription drugs, mental health and one routine exam per 24 months. The

10

estimated monthly payment with Aetna is $6,400. The Debtors pay 75% of the premium single rate for salaried employees and 50% of the premium rate for hourly employees. Employees seeking coverage for their spouses and family must pay 100% of the cost. The cost to an employee for medical coverage depends upon the employees' age. GBS Benefits generally administers the PPO plan, process enrollments and changes, and COBRA administration. There is no cost to the Debtors for GBS Benefits' services because that cost is paid by Aetna. As of September 9, 2009, the Company is current on payment until September 31, 2009.

      b.    **Dental Plan:** The Companies provide a dental PPO plan to their employees through Aetna Dental, which is included in the Medical Plan premium. The dental plan provides comprehensive coverage for (i) diagnostic and preventative services, (ii) basic care, such as fillings, extractions and oral surgery, (iii) major care, such as crowns, bridges, dentures, and (iii) emergency dental care. The estimated monthly payment to Aetna Dental is $6,400, which is included in the payment to Aetna set forth above. There is no separate payment for dental care. The Debtors pay 75% of the premium single rate for salaried employees and 50% of the premium single rate for hourly employees. Employees pay only one premium per month to cover both medical and dental. The premium paid by each employee varies on their age and if they are either salaried or hourly employees.

11

**J.     Workers' Compensation Benefits.**

27.    The Companies provide workers' compensation benefits programs to their employees through Sentry West. The Companies pay approximately $3,083 per month to Sentry West, which is the amount owed to Sentry West as of September 9, 2009.

## RELIEF REQUESTED

28.    The Debtors request entry of an order (i) authorizing (but not requiring) the Debtors, in their sole discretion: (x) to pay prepetition obligations owed to their employees, including payroll and reimbursement requests; (y) to honor, in the ordinary course of business, existing employee benefit plans and programs (including all related costs and expenses) as such policies were in effect as of the commencement of the chapter 11 cases, even if such involve payment or honoring of prepetition claims; and (z) to cause any prepetition checks given to employees to be honored and to issue new checks to replace any dishonored checks. The Debtors do not seek authority to pay amounts in excess of the statutory caps set forth in Bankruptcy Code Sections 507(a)(4) and 507(a)(5), and will include in the proposed order submitted as to the present motion a provision limiting authorized amounts to the statutory cap.

**A.     The Employees Are Indispensable to The Debtors' Continued Operations.**

29.    It is generally recognized that the continuation of a stable employee base and harmonious employee relations in operating chapter 11 cases is critical to reorganization. See, e.g. LTV Corp. v. Aetna Cas. & Surety Co. (In re Chateaugay Corp.), 116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990); In re Gulf Air. Inc., 112 B.R. 152, 154 (Bankr. W.D. La. 1989) ("[R]etention of skills, organization, and reputation . . . must be considered valuable assets contributing to going concern value and aiding rehabilitation . . . .")

12

30. The Companies believe that their failure to honor employee-related obligations in the ordinary course of business would create great concern and discontent among their employees, and would therefore undermine the Companies' ability to retain their employees. As set forth above, the Companies require the services of their employees to efficiently operate the Companies' business, thereby enhancing their ability to reorganize and maximize the value of the estates for creditors. Due to the employees' familiarity with the Companies' business operations, including the contracts and relationships with the Companies' vendors and owners of the units, and unique technical skills, the Companies' current employees are crucial to a successful reorganization.

31. Because of the specialized nature of the Companies' business, the Companies' business cannot be easily operated without the assistance of knowledgeable employees. If the Companies cannot promptly assure their employees of uninterrupted employment benefits as described above, their operations likely will suffer immediate and irreparable harm, due to resulting employee resentment, loss of employee goodwill, and attrition.

**B.    It Is Necessary and Appropriate to Pay Prepetition Salaries and Wages and to Continue Employee Benefits.**

32. Courts have often permitted debtors to pay prepetition wage claims in the ordinary course of business in response to a motion filed by the debtor in possession at the outset of the case. See 4 Collier on Bankruptcy ¶ 507.05[1] at 507-26 (15th ed. rev. 2005). Furthermore, the relief requested herein is routinely granted in chapter 11 cases, such as this case, that involve a work force that is critical to the Debtors' reorganization efforts. See, e.g., Burchinal v. Central Washington Bank (In re Adams Apple, Inc.), 829 F. 2d 1484, 1490 (9th Cir. 1987) (courts have permitted the payment of employee prepetition debts when necessary for

13

rehabilitation); In re Ionosphere Clubs. Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (sound business reason exists for paying employee prepetition claims where payment is necessary "to preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); Michigan Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 281 (S.D.N.Y. 1987) ("On the date of filing [of the chapter 11 petition], Judge Lifland, upon application of LTV, issued an order authorizing and empowering LTV to continue payment of petition wages and salaries, employee reimbursement expenses, and benefits.  The aggregate value of the payments authorized was estimated to exceed $250 million.")

33.     The Companies can ill-afford to lose the services of their employees during the difficult transition into chapter 11 and just as they begin their best strategy for maximizing the value those employees provide.

34.     The majority of these employees provide vital services to the owners of the units at the Sky Lodge, who have paid in advance for such services**.**  If such services are not provided to the unit owners, it is likely that they will demand refunds and refuse to pay monthly fees to the Companies, which would further undermine the Companies' financial position.  Moreover, the operations of the hotel and restaurant will be severely hampered resulting in the loss of revenues.

35.     Hence, it is essential to pay prepetiton wages and salaries and continue to honor prepetition benefit programs.  By this Motion, the Companies simply seek authorization, in their sole discretion and in the sound exercise of their business judgment, to honor their payroll, reimbursement and benefit obligations to employees in the ordinary course of business, thereby preserving the Companies' ability to continue operations.

14

36.     Moreover, to ensure that the prepetition payments made to the Debtors' employees do not bounce, all banks must honor prepetition checks for payment of prepetition employee obligations described herein.

### C.    The Relief Requested Herein Is Supported By Bankruptcy Code Sections 507(a)(4) and (a)(5)

37.     In addition to being a business necessity, the relief sought herein finds ample support in the Bankruptcy Code and applicable case authority.  To begin with, section 507(a)(4) of the Bankruptcy Code grants a priority of up to $10,950.00 for the claims of an individual for prepetition wages and commissions earned within one hundred eighty (180) days prior to the Petition Date.  Bankruptcy Code section 507(a)(5) grants priority to claims for contributions to employee benefit plans, up to an aggregate amount of $10,950.00 multiplied by the number of employees covered, less any amounts paid to such employees under section 507(a)(4).

38.     The Debtors believe that their prepetition wage claims, when combined with contributions to the employee benefits programs will not exceed the dollar limits for priority claims provided under sections 507(a)(4) and (5) (i.e., $10,950.00) for all of the Debtors' employees.[5]  Such priority claims must, in any event, be paid in full under any plan of reorganization.  See 11 U.S.C. § 1129(a)(9)(B).  Hence, their payment at this point will not prejudice other creditors, but will only benefit them by preserving the morale of individuals whose services are necessary to keep the Debtors in business.

---

[5] Because some amounts are unknown pending submission of claims, it is difficult for the Debtors to know the exact amount due each employee for the prepetition period. However, it is believed that all of the Debtors' employees are owed amounts that are under the $10,950.00 cap contained in Sections 507(a)(4) and 507(a)(5). The present motion does not seek authority to pay amounts in excess of the statutory cap. The Debtors will include in the proposed order submitted as to the present motion a provision limiting authorized amounts to the statutory cap.

SLC_454698.2

D. **Reimbursing Employee Business Expenses and Honoring Employee Benefits Programs Are Matters that Are Within the Companies' Business Judgment**

39. Continuation of a durable employee base is vital to reorganization success. As the court stated in LTV Corp. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.), 116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990):

> [E]mployee good will and contentment is an asset which is vital to the continuation of a debtor's business operation and its ability to effectively reorganize during the Chapter 11 process. [citation omitted] In granting Debtors' applications for permission to provide hardship payments to injured workers, this Court determined that the uninterrupted payment of LTV Steel workers' compensation obligations is essential to employee morale and industrial tranquility which, in turn, are critical to a successful reorganization.

Id at 898; see also In re Gulf Air. Inc., 112 B.R. 152, 154 (Bankr. W.D. La. 1989) ("[R]etention of skills, organization, and reputation . . . must be considered valuable assets contributing to going concern value and aiding rehabilitation . . . .").

40. It is also generally acknowledged that a debtor's relationship with its employees, including the terms and conditions of employment, are matters that are subject to the business judgment of the debtor and may be managed by the debtor in the ordinary course of business. The case In re All Seasons Indus., 121 B.R. 822 (Bankr. N.D. Ind. 1990), is illustrative. In All Seasons, the court considered a debtor's application to continue its prepetition compensation packages to various management personnel. In determining that the compensation of the insiders was in the ordinary course, the court provided the following analysis:

> The continued employment of existing management of a debtor-in-possession constitutes part of the operation of debtor's business and is within the ordinary course of business authorized by the Bankruptcy Code. Where postpetition operations are concerned, as long as it confines itself to operating within the ordinary course of business, a debtor-in-possession's actions are cloaked with an aura

16

> of propriety and, thus, the debtor is entitled to a presumption concerning the reasonableness of its decisions. [citations omitted] The presumption extends to all aspects of the debtor's ordinary, day-to-day operations ....
>
> * * * *
>
> This court holds that a Chapter 11 debtor-in-possession is not required to obtain specific authority from the court to employ its prepetition insider management following the petition for relief. Furthermore, a debtor-in-possession is not required to obtain court approval of the compensation for these management insiders, where these individuals will continue to be compensated upon the same terms and conditions as they were being compensated prior to the case. The continued employment and compensation of management constitutes a part of the ordinary course of the debtor's business operations, which it is entitled to continue without court approval.

Id. at 825-26 (internal citations omitted). The law is clear that employee benefits for management and rank-and-file employees should be honored.

41. Consonant with the settled law that employee relations matters are within the ordinary course of business, courts have frequently acknowledged that implementing vacation and leave policies for continuing employees is in the ordinary course. See In re Salant Corp., 53 B.R. 158, 160 (Bankr. S.D.N.Y. 1985) ("[T]he debtors have already undertaken to obtain court approval for payment of various prepetition wages and benefits that accrued and intend to honor vacation benefits earned by employees in the ordinary course of business.")

42. The relief requested to make payroll and reimbursement payments for the prepetition period and to honor employee benefit programs in the ordinary course of business is necessary to preserve employee morale and ensure that the Companies can retain the valuable and experienced employees that are the backbone of their business and reorganization goals. The relief requested will also provide an incentive for employees to continue to provide quality services to the Companies and their homeowners.

17

### E. The Debtors Do Not Seek to Assume Any Contracts, or Obligation Under Any Contract, Program, or Policy.

43. The Companies do not intend by this Motion to assume any executory contract or unexpired lease or any obligation under any contract, program, or policy described in this Motion, whether pursuant to section 365 of the Bankruptcy Code, or otherwise. Nothing contained in this Motion, and no action taken pursuant to this Motion or the order therein, shall be deemed to constitute the assumption of any executory contract or unexpired lease or any obligation under any contract, program, or policy described in their Motion, or otherwise.

### F. The Debtors Cannot Wait Twenty (20) Days Before Obtaining an Order Approving this Motion

44. The Companies acknowledge that they are requesting that the Court enter an order authorizing the Debtors to use property of the estate prior to the expiration of the twenty (20) day period mandated by Bankruptcy Rule 6003(b).

45. Bankruptcy Rule 6003(b) specifically provides that the court can disregard the twenty day period if "relief is necessary to avoid immediate and irreparable harm." The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm because the retention of the Companies' employees is essential to a successful reorganization, and without the employees performing their jobs, the Debtors' reorganization efforts would be doomed.

### NOTICE AND PRIOR MOTIONS

46. No previous request for the relief sought herein has been made to this Court or any other court.

47. No trustee, examiner, or creditors committee has been appointed in the Debtors' Chapter 11 cases. Notice of this Motion has been given to the United States Trustee for the

District of Utah, counsel for the Debtors' prepetition secured lenders, and the Debtors' twenty (20) largest unsecured creditors. Under the circumstances, the Debtors submit that no further notice is necessary or required.

**WHEREFORE**, the Debtors respectfully requests that the Court enter an order: (i) authorizing (but not requiring) the Debtors, in their sole discretion: (x) to pay prepetition obligations owed to its employees, including payroll and reimbursement requests; (y) to honor, in the ordinary course of business, existing employee benefit plans and programs (including all related costs and expenses) as such policies were in effect as of the commencement of the chapter 11 cases, even if such involve payment or honoring of prepetition claims; and (z) to cause any prepetition checks given to employees to be honored and to issue new checks to replace any dishonored checks; and (ii) granting such other and further relief as the Court deems to be just and proper. As set forth above, the Debtors do not seek authority to pay amounts in excess of the statutory caps set forth in Bankruptcy Code Sections 507(a)(4) and 507(a)(5), and will include in the proposed order submitted as to the present motion a provision limiting authorized amounts to the statutory cap.

DATED:  September 15, 2009

          DURHAM JONES & PINEGAR, P.C.

          By:  /s/ Steven J. McCardell
          Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
          Steven J. McCardell (smccardell@djplaw.com)(2144)
          DURHAM JONES & PINEGAR, P.C.
          111 East Broadway, Suite 900
          P.O. Box 4050
          Salt Lake City, UT   84110-4050
          Telephone:  (801) 415-3000/Fax:  (801) 415-3500

          and

Michael V. Blumenthal (mblumenthal@crowell.com)
  (pro hac vice application pending)
Steven B. Eichel (seichel@crowell.com)
  ( pro hac vice application pending)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Proposed Counsel for Debtors and Debtors in Possession

20