Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
Proposed Utah Counsel for Debtors and Debtors in Possession
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
Salt Lake City, UT 84111
Telephone:  (801) 415-3000 Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com) (pro hac vice application pending)
Bruce J. Zabarauskas (bzabarauskas@crowell.com) (pro hac vice application pending)
Proposed Reorganization Counsel for Debtors and Debtors in Possession
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone: (212) 223-4000/Fax:  (212) 223-4134

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: )<br><br>EASY STREET HOLDING, LLC, *et al.*, )<br><br><br><br>Address:  201 Heber Avenue )<br>Park City, UT 84060 )<br><br>Tax ID Numbers: )<br>35-2183713 (Easy Street Holding, LLC), )<br>20-4502979 (Easy Street Partners, LLC), and )<br>84-1685764 (Easy Street Mezzanine, LLC) )<br><br>EASY STREET HOLDING, LLC, )<br>EASY STREET MEZZANINE, LLC, AND )<br>EASY STREET PARTNERS, LLC )<br><br>Plaintiffs, )<br><br>- against - )<br><br>BayNorth Realty Fund VI, Limited Partnership, )<br><br>Defendant. ) | Bankruptcy Case No. 09-29905<br>Jointly Administered with Cases<br>09-29907 and 09-29908<br><br>Chapter 11<br><br>Honorable R. Kimball Mosier<br><br>[FILED ELECTRONICALLY]<br><br><br>Adv. Pro. No. _____ |

1

## COMPLAINT

Easy Street Holding, LLC ("Holding"), Easy Street Partners, LLC ("Partners"), and Easy Street Mezzanine, LLC ("Mezzanine"), debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors" or "Plaintiffs"), as and for their complaint in the above-captioned adversary proceeding, respectfully allege as follows:

## OVERVIEW OF ADVERSARY PROCEEDING

1. This adversary proceeding revolves around a luxury boutique hotel in Park City, Utah, known as the Sky Lodge, and a dispute involving the Plaintiffs (Partners, which is the owner of the Sky Lodge and its parent and grandparent companies, Mezzanine and Holding, respectively) and their lenders - WestLB AG ("WestLB") and BayNorth Real Fund VI, Limited Partnership ("BayNorth").

2. Plaintiff, Partners is indebted to WestLB in the approximate amount of $14,379,224 (the "WestLB Senior Loan"), which loan is secured by a first deed of trust on Partners' Premises (as hereafter defined), and plaintiff Mezzanine is allegedly indebted to BayNorth pursuant to a $11,125,000 mezzanine loan (the "Mezzanine Loan"), which is secured by Holding's equity interests in plaintiff Mezzanine, which is the sole owner of plaintiff Partners.

3. The Plaintiffs seek damages substantially in excess of $5,600,000 against BayNorth for unjust enrichment, money had and received, conversion, tortious interference with contract, tortious interference with existing and prospective business relationships, breach of contract, fraudulent conveyance and turnover. The Plaintiffs claims arise out of BayNorth's refusal to return $5,600,000 which was erroneously transferred to, and received by, BayNorth

2

in violation of: (i) its Mezzanine Loan Agreement with plaintiff Mezzanine; (ii) the BayNorth Note (as hereafter defined) and (iii) an Intercreditor Agreement (as hereafter defined) between WestLB and BayNorth.

4.    BayNorth's refusal to return moneys that were erroneously sent to it in violation of the aforementioned agreements resulted in, inter alia: (i) WestLB refusing to permit Partners' exercise of its contractual right to extend the March 30, 2009 maturity date of the WestLB Senior Loan; and (ii) WestLB declaring a maturity default on such loan.

5.    BayNorth then took advantage of this default, which was caused by BayNorth's refusal to return money to which it was not entitled, by then declaring a default under the Mezzanine Loan and scheduling a UCC sale of the equity interests in plaintiff Mezzanine (which are owned by plaintiff Holdings), notwithstanding that there were no monetary defaults under the Mezzanine Loan. BayNorth's actions were intentional and designed to clear the way for BayNorth to foreclose on its security interests and ultimately take control of the Sky Lodge following development and renovation of the Premises (as hereafter defined) by the Plaintiffs.

6.    BayNorth's bad faith attempt to obtain control over the Plaintiffs and the Premises (as hereafter defined) by declaring a default that was caused by BayNorth's own actions has: (i) required the Plaintiffs to seek bankruptcy protection under the Bankruptcy Code; (ii) resulted in WestLB refusing to release escrow funds under its control, which were to be used for a draw request in connection with the completion of construction and renovations at the Premises; (iii) resulted in WestLB charging plaintiff Partners with default interest under the WestLB Senior Loan; (iv) resulted in the filing of numerous mechanics liens against the

3

Premises, even though there are sufficient funds in a frozen escrow account which were
earmarked to pay such mechanics liens in full; and (v) eliminated the ability of the Plaintiffs to
sell fractional units at the Premises, as potential purchasers have been chilled from buying units
as a result of the imposition of substantial liens on the Premises.  BayNorth's bad faith and
predatory practices have resulted in substantial damages to the Plaintiffs.

### JURISDICTION AND PARTIES

7.    This Court has jurisdiction over this adversary proceeding pursuant to 28
U.S.C. §§ 157 and 1334, and venue is proper pursuant to 28 U.S.C. § 1409.

8.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2)(A), (E), (H) and (O).

9.    Plaintiff, Partners is a Utah limited liability company, and has a principal
place of business at 201 Heber Avenue, Park City, Utah.

10.    Plaintiff, Mezzanine is a Delaware limited liability company, and has a
principal place of business at 201 Heber Avenue, Park City, Utah.

11.    Plaintiff, Holding is a Utah limited liability company, and has a principal
place of business at 201 Heber Avenue, Park City, Utah.

12.    Upon information and belief, defendant, BayNorth is a Delaware Limited
Liability Partnership, with an address c/o BayNorth Capital, LLC, One Financial Center, Floor
23, Boston, Massachusetts 02111-2651.

### BACKGROUND

13.    On September 14, 2009 (the "Petition Date"), each of the Debtors filed a
voluntary petition in this Court under chapter 11 of the Bankruptcy Code.  No trustee or

4

creditors' committee has been appointed in these cases. The Debtors continue to operate their

business and manage their property as debtors-in-possession.

   14. Plaintiff, Partners is the owner and operator of the Sky Lodge in Park

City, Utah. The Sky Lodge is a luxury boutique hotel located in the middle of historic Main

Street in Old Town Park City. It is an ultra stylish resort hotel offering all of Park City's

amenities plus a restaurant offering both casual and fine dining, a bar and lounge, a bakery, a

spa, and meeting and event venues.

   15. There are 22 residential units at the Sky Lodge. Units at the Sky Lodge

are being sold as fractional shares with a total of 176 one-eighth shares offered (the "Fractional

Units"). Owners are buying interests in units at the Sky Lodge, and not just the rights to a stay.

Each Fractional Unit owner is guaranteed two ski weeks (mid-December through mid-April)

each year plus 21 other days throughout the year. Stays not used by the owner may be rented

out by the hotel and proceeds are split equally with the owner.

   16. Plaintiff, Mezzanine is the 100% owner and managing member of

Partners.

   17. Plaintiff, Holding is the 100% owner and managing member of

Mezzanine.


### THE WEST LB SENIOR LOAN

   18. On March 30, 2006, Partners entered into a Loan and Security

Agreement (the "Senior Loan Agreement") for the initial amount of $36,779,224 (the "WestLB

5

Senior Loan") with WestLB to develop a condominium hotel mixed use project (the "Project")

at 201 Heber Avenue, Park City, Utah 84060 (the "Premises").  A true and correct copy of the

Senior Loan Agreement is annexed hereto as <u>Exhibit A</u>.

19.     The WestLB Senior Loan is secured by, among other things, security

interests evidenced by a Deed of Trust With Security Agreement on the Premises, Assignment

of Leases and Rents and Fixture Filing, and a UCC Financing Statement, each filed in the

Summit County Recorder's Office, State of Utah.

20.     Article 4 of the Senior Loan Agreement is entitled "Accounts/Cash

Management."   Under Article 4 of the Senior Loan Agreement: (i) purchaser deposits for the

sale of Fractional Units were deposited into the Sky Lodge Deposit Account, which was under

the exclusive custody and control of WestLB; (ii) proceeds from the closing of sales of

Fractional Units were deposited into the Sky Lodge Sales Proceeds Account, which was under

the exclusive custody and control of WestLB; and (iii) all other revenues from the operation of

the Sky Lodge (e.g., hotel, restaurant and spa revenues) were deposited into a Lockbox Account

under the exclusive custody and control of WestLB.

21.     WestLB distributed moneys to other accounts to fund real estate tax

reserves, homeowner association dues, an interest reserve and operating expenses.  Only the

operating expense account is under the custody and control of Partners, and such account is

subject to a security interest held by WestLB.

22.     One of the accounts which was under the exclusive custody and control

of WestLB was the Real Estate Sales Escrow Account, where proceeds from the sale of

Fractional Units at the Premises were deposited.

6

23.     Under the Senior Loan Agreement, the WestLB Senior Loan was to become due on or about March 30, 2009 (the "WestLB Maturity Date"), subject to extensions of the maturity date for an additional one or two years through the conversion of the WestLB Senior Loan to an "Interim Loan" (as defined in the WestLB Senior Loan Agreement), provided, inter alia, that Partners was not in default of its obligations under the Senior Loan Agreement.

24.     As of February 19, 2008, there was approximately $28,000,000 in the Real Estate Sales Proceeds Account.

25.     On February 15, 2008, at the direction and authorization of WestLB, a partial principal repayment of $22,400,000 on the West LB Senior Loan was made to WestLB from Real Estate Sales Proceeds Account.

26.     On February 15, 2009, WestLB mistakenly authorized and directed the payment of $5,600,000 to BayNorth from the Real Estate Sales Proceeds Account.

27.     As of the Petition Date, the current balance of the WestLB Senior Loan is $14,379,224.

## THE BAYNORTH MEZZANINE LOAN

28.     On or about March 30, 2006, Mezzanine entered into a Loan Agreement (the "BayNorth Mezzanine Loan Agreement") in the initial amount of $11,250,000 (the "BayNorth Mezzanine Loan") with BayNorth.  (A true and correct copy of the BayNorth Mezzanine Loan Agreement is annexed hereto as Exhibit B.)

29.     In connection with the BayNorth Mezzanine Loan, Mezzanine executed and delivered a promissory note to BayNorth in the amount of $11,250,000, dated March 30,

7

2006 (the "BayNorth Note").  A true and correct copy of the BayNorth Note is annexed hereto

as Exhibit C.

30.     Under Article 3 of the BayNorth Note, interest accrues on the BayNorth

Mezzanine Loan at the rate of 16% compounded monthly.  The payment of such interest may

be, and was, deferred by the borrower so long as it was not in default of its obligations under

the Mezzanine Loan Agreement and Mezzanine Note.

31.     Article 4 of the BayNorth Note expressly prohibited any prepayment of

the principal balance of the BayNorth Note in whole or in part prior to the 4th anniversary of the

BayNorth Note, which is March 30, 2010.

32.     The BayNorth Mezzanine Loan is what is known in the financing

industry as a "mezzanine loan."

33.     Plaintiff, Partners (which is the owner of the Sky Lodge) is neither an

obligor, nor a guarantor of the BayNorth Mezzanine Loan or BayNorth Note.

34.     The BayNorth Mezzanine Loan and the obligations under the BayNorth

Note are not secured by any interest in the Premises.

35.     The BayNorth Mezzanine Loan and the obligations under the BayNorth

Note are secured by a pledge by plaintiff Holding of its 100% ownership interest in plaintiff

Mezzanine (the "Pledge Agreement"), as evidenced by a UCC financing statement (the "UCC

Filing") filed with the Secretary of State of Utah.  True and correct copies of the Pledge

Agreement and the UCC Filing are annexed hereto as Exhibit D and Exhibit E, respectively.

8

## THE INTERCREDITOR AGREEMENT

36.    On or about March 20, 2006, WestLB and BayNorth entered into an intercreditor agreement (the "Intercreditor Agreement").  Plaintiffs Partners and Mezzanine both signed the Intercreditor Agreement.  A true and correct copy of the Intercreditor Agreement is annexed hereto as Exhibit F.

37.    Paragraph 9 of the Intercreditor Agreement provides that, except with respect to certain exceptions which are not relevant to this case:

> the Mezzanine Lender [BayNorth] shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from the Borrower and/or from the Premises prior to the date that all obligations of the Borrower to the Senior Lenders [WestLB] under the Senior Loan Documents are paid…

> All payments or distributions upon or with respect to the Mezzanine Loan which are received by the Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of the Senior Lenders and shall be paid over to the Senior Agent in the same form as so received…

## THE IMPROPER $5,600,000 BAYNORTH TRANSFER

38.    At all times relevant to this adversary proceeding, and pursuant to the terms of the WestLB Senior Loan Agreement, the net proceeds of sale of Fractional Units at the Premises were initially deposited into the Sky Lodge Sales Proceeds Account, which was maintained under the exclusive custody and control of WestLB.

39.    On or about February 19, 2008, WestLB mistakenly transferred $5,600,000 from the Real Estate Sales Proceeds Account to BayNorth (the "BayNorth Transfer").

SLC_455854

40.     Pursuant to the WestLB Senior Loan Agreement and the Intercreditor Agreement the funds consisting of the BayNorth Transfer were required to be paid to WestLB towards satisfaction of the outstanding principal and interest under the WestLB Senior Loan Agreement.

41.     The BayNorth Transfer resulted in: (i) an erroneous payment of $1,646,871 in principal under the BayNorth Mezzanine Loan in violation of the terms of the BayNorth Note and the Intercreditor Agreement; and (ii) an erroneous payment of $3,353,129 in interest, which was being deferred by the borrower pursuant to the terms of the BayNorth Note, all of which was received by BayNorth in violation of the Mezzanine Loan Agreement, BayNorth Note and Intercreditor Agreement.

**BAYNORTH'S ACTIONS: (A) PREVENTED PARTNERS FROM CONVERTING THE WESTLB SENIOR LOAN INTO AN INTERIM LOAN AND EXTENDING THE WESTLB MATURITY DATE; AND (B) RESULTED IN A DEFAULT UNDER THE WESTLB SENIOR LOAN AGREEMENT**

42.     On September 25, 2008, Partners formally notified WestLB of the exercise of its right under section 2.15 of the WestLB Senior Loan Agreement to convert WestLB Senior Loan into an Interim Loan and extend the WestLB Maturity Date.

43.     On or about March 4, 2009, WestLB sent a letter to Partners, asserting that after reviewing the disposition of the net sales proceeds from sales of Fractional Units, it, as the Senior Lender, had been underpaid $4,899,104 from the distributions that occurred in February of 2008.

44.     This underfunding was the direct result of the erroneous payment of the BayNorth Transfer to BayNorth on account of the BayNorth Mezzanine Loan, which was in

SLC_455854

violation of the BayNorth Mezzanine Loan, the BayNorth Mezzanine Note and the Intercreditor

Agreement.

45.     Realizing the mistake that had been made in making the BayNorth

Transfer in February 2008, WestLB and the Debtors each demanded that BayNorth return the

BayNorth Transfer.

46.     Notwithstanding that BayNorth received the BayNorth Payment in

violation of the BayNorth Mezzanine Loan Agreement, the BayNorth Note and the Intercreditor

Agreement, BayNorth refused to return the BayNorth Transfer.

47.     As a result of the underpayment of the WestLB Senior Loan caused by

the erroneous BayNorth Transfer, WestLB took the position that Partners was in default of its

obligations under the WestLB Senior Loan Agreement and was not entitled to: (i) convert the

WestLB Senior Loan into an Interim Loan; and (ii) extend the WestLB Maturity Date beyond

March 31, 2009.

### THE FILING OF MECHANICS LIENS AND LOSS OF FRACTIONAL UNIT SALES CAUSED BY BAYNORTH'S REFUSAL TO REPAY THE ERRONEOUS BAYNORTH TRANSFER

48.     As a result of the alleged default under the WestLB Senior Loan, which

was caused by BayNorth's refusal to repay the BayNorth Transfer, WestLB froze the Real

Estate Sales Proceeds Account and the Real Estate Sales Deposit Account, which contain in

excess of $3,200,000, from which all contractors and professionals on the Project were to be

paid, notwithstanding that WestLB had previously authorized the payment of such contractors

and professionals prior to determining that the BayNorth Transfer had been improperly made to

SLC_455854

BayNorth. As a result, mechanic's liens have been filed against the Premises (the "Mechanic's Liens").

49.     On or about September 8, 2009, the general contractor on the Project filed an action to foreclose its mechanic's lien on the Premises.

50.     As a result of the Mechanics' Liens, the Plaintiffs have been unable to sell Fractional Units at the Premises. Potential purchasers have been chilled from buying Fractional Units because any title report issued in connection with a sale of a Fractional Unit would show that the purchase of such Fractional Unit would be subject to the claims of the holders of the Mechanics' Liens.

### THE BAYNORTH NOTICE OF DEFAULT
### AND SCHEDULED UCC SALE

51.     On May 5, 2009, BayNorth issued to Mezzanine a notice of default on the BayNorth Mezzanine Loan (the "BayNorth Notice Of Default"). A true and correct copy of the BayNorth Notice Of Default is annexed hereto as Exhibit G.

52.     The principal default alleged in the BayNorth Notice Of Default is a violation of a cross-default provision, which provides that a default under the WestLB Senior Loan Agreement is a default under the BayNorth Mezzanine Loan Agreement. However, the alleged default under the WestLB Senior Loan Agreement that BayNorth was relying upon was caused by: (i) BayNorth's receipt of the BayNorth Transfer in violation of the BayNorth Mezzanine Loan Agreement, the BayNorth Note and the Intercreditor Agreement; and (ii) BayNorth's refusal to return such erroneously transferred funds.

53.     None of the alleged defaults under the BayNorth Notice of Default were monetary defaults.

SLC_455854

54.     Mezzanine is not in default under the Mezzanine Loan Agreement or BayNorth Note.

55.     The BayNorth Notice of Default was followed by the issuance of a Notice of Acceleration and Demand for Payment, which was issued by BayNorth on June 23, 2009 (the "BayNorth Notice of Acceleration").  A true and correct copy of the BayNorth Notice of Acceleration is annexed hereto as Exhibit H.

56.     On July 5, 2009, after issuance of the BayNorth Notice of Default and BayNorth Notice of Acceleration, WestLB issued a notice of default under the WestLB Senior Loan Agreement ("WestLB Notice of Default").

57.     The alleged defaults set forth in the WestLB Notice of Default were caused by BayNorth's failure to return the BayNorth Transfer.

58.     On July 28, 2009, a Notice of Sale was issued by BayNorth, which purported to schedule a UCC sale of the ownership interests in Mezzanine on September 16, 2009.  A true and correct copy of the Notice of Sale is annexed hereto as Exhibit I.

59.     On September 14, 2009 (the "Petition Date"), each of the Debtors filed a voluntary Chapter 11 bankruptcy petition with the Bankruptcy Court.

## AS AND FOR THE PLAINTIFFS' FIRST CAUSE OF ACTION
### (Unjust Enrichment)

60.     The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 59 of this Complaint as if fully set forth herein.

SLC_455854

61.    A benefit was conferred upon BayNorth by its receipt of the BayNorth Transfer.

62.    BayNorth obtained the BayNorth Transfer on behalf of the Plaintiffs by mistake.

63.    The circumstances under which BayNorth received the BayNorth transfer make it inequitable for BayNorth to retain the BayNorth Transfer.

64.    A judgment should be entered requiring BayNorth to return the BayNorth Transfer, with interest from February 19, 2008 to plaintiff Partners pursuant to the doctrine of unjust enrichment.

### AS AND FOR THE PLAINTIFFS' SECOND CAUSE OF ACTION
**(Money Had And Received)**

65.    The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 - 64 of this Complaint as if fully set forth herein.

66.    BayNorth obtained the BayNorth Transfer on behalf of the Plaintiffs by mistake.

67.    Equity and good conscience requires that BayNorth return the BayNorth Transfer to the Debtor.

68.    A judgment should be entered requiring BayNorth to return the BayNorth Transfer, with interest from February 19, 2008, to plaintiff Partners pursuant to the doctrine of money had and received.

### AS AND FOR THE PLAINTIFFS' THIRD CAUSE OF ACTION
**(Conversion)**

14

69.     The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 - 68 of this Complaint as if fully set forth herein.

70.     BayNorth's acceptance of, and refusal to return, the BayNorth Transfer is an act of willful interference with plaintiff Partners' property.

71.     BayNorth has wrongfully exercised dominion and control over the funds constituting the BayNorth Transfer.

72.     BayNorth's acceptance of, and refusal to return, the BayNorth Transfer is without justification.

73.     BayNorth's acceptance of, and refusal to return, the BayNorth Transfer is denying plaintiff Partners of the use and possession of the funds constituting the BayNorth Transfer.

74.     BayNorth has converted the BayNorth Transfer and a judgment should be entered requiring BayNorth to return the BayNorth Transfer, with interest from February 19, 2008, to plaintiff Partners and awarding punitive damages against BayNorth.

## AS AND FOR THE PLAINTIFFS' FOURTH CAUSE OF ACTION
### (Tortious Interference With Contract)

75.     The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 74 of this Complaint as if fully set forth herein.

76.     Plaintiff Partners has a contractual relationship with WestLB pursuant to the WestLB Senior Loan Agreement and the documents executed in connection therewith.

77.     BayNorth knows that Plaintiff Partners has a contractual relationship with WestLB.

15

78.   BayNorth intentionally interfered with the contractual relationship

between Plaintiff Partners and WestLB by: (i) accepting the BayNorth Transfer in violation of

the Mezzanine Loan Agreement, BayNorth Note and the Intercreditor Agreement; (ii) refusing

to return the BayNorth Transfer; and (iii) wrongfully declaring a default under the Mezzanine

Loan Agreement and scheduling a UCC sale of the membership interests in plaintiff

Mezzanine.

79.   BayNorth's interference with the contractual relationship between

plaintiff Partners and WestLB was without justification.

80.   BayNorth's interference with the contractual relationship between

plaintiff Partners and WestLB was a calculated attempt by BayNorth to cause damage to

plaintiff Partners in the operation of its lawful business.

81.   BayNorth knew that its receipt of the BayNorth Transfer and/or failure to

return the BayNorth Transfer would, and in fact did, result in a default by plaintiff Partners

under the WestLB Senior Loan, and the inability of Partners to automatically extend the

WestLB Maturity Date for an additional year.  Notwithstanding such knowledge, BayNorth

refused to return the BayNorth Transfer.

82.   Plaintiff Partners has been injured as a result of BayNorth's tortious

interference with the contractual relationship between plaintiff Partners and WestLB.  As a

result of BayNorth's actions, inter alia: (i) WestLB refused to permit plaintiff Partners the right

to convert the WestLB Senior Loan into an Interim Loan; (ii) WestLB refused to extend the

WestLB Maturity Date; (iii) WestLB declared a default under the WestLB Senior Loan even

though such default was caused by BayNorth's actions; (iv) WestLB declared the WestLB

16

Senior Loan to be due and payable on the WestLB Maturity Date; (v) WestLB started charging

plaintiff Partners with default rate interest as a result of the defaults caused by BayNorth; (vi)

WestLB froze plaintiff Partners' accounts, preventing the payment of contractors and other

professionals at the Premises; (vii) the Mechanics Liens were filed against the Premises; and

(viii) plaintiff Partners become unable to close sales of Fractional Units at the Premises.

83.     As a result of BayNorth's tortious interference with contract, a money

judgment in an amount in excess of $5,600,000 should be entered against BayNorth.

Additionally, such judgment should include an award of punitive damages based upon

BayNorth's actions.

### AS AND FOR THE PLAINTIFFS' FIFTH CAUSE OF ACTION
### (Tortious Interference With Existing And Prospective Business Relationships)

84.     The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 83

of this Complaint as if fully set forth herein.

85.     Plaintiff Partners has an existing business relationship with purchasers of

Fractional Units at the Premises and has prospective business relationships with prospective

purchasers of Fractional Units at the Premises.

86.     BayNorth knew that plaintiff Partners had existing business relationships

with purchasers of Fractional Units at the Premises, and prospective business relationships with

prospective purchasers of Fractional Units at the Premises.

87.     BayNorth intentionally interfered with the existing business relationship

with owners of Fractional Units at the Premises and the prospective relationships with

purchasers of Fractional Units at the Premises by taking actions which resulted in the

imposition of the Mechanics Liens on the Premises.

17

88.    BayNorth's interference with the existing business relationship with owners of Fractional Units and the prospective business relationships with purchasers of Fractional Units is without justification.

89.    BayNorth's interference with the existing business relationship with owners of Fractional Units and the prospective business relationships with purchasers of Fractional Units was a calculated attempt by BayNorth to cause damage to plaintiff Partners in the operation of its lawful business.

90.    Plaintiffs have been injured as a result of BayNorth's tortious interference with the existing business relationship with owners of Fractional Units and the prospective business relationships with prospective purchasers of Fractional Units.  The imposition of the Mechanics Liens on the Premises, which was caused by BayNorth's actions, has: (i) eliminated the ability of the Plaintiffs to sell Fractional Units at the Premises, as potential purchasers have been chilled from buying units as a result of the imposition of substantial liens on the Premises; and (ii) eliminated the ability of the existing owners of Fractional Units to sell or lease their units.

91.    As a result of BayNorth's tortious interference with existing and prospective business relationships, a money judgment in an amount in excess of $5,600,000 should be entered against BayNorth.  Additionally, such judgment should include an award of punitive damages based upon BayNorth's actions.

## AS AND FOR THE PLAINTIFFS' SIXTH CAUSE OF ACTION
### (Breach of Contract)

92.    The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 91 of this Complaint as if fully set forth herein.

18

93.    Plaintiff Mezzanine has a contractual relationship with BayNorth pursuant to, inter alia, the BayNorth Mezzanine Loan Agreement and BayNorth Note.

94.    BayNorth has breached the BayNorth Mezzanine Loan Agreement and BayNorth Note by accepting, and refusing, to return the BayNorth Transfer.

95.    Plaintiff Mezzanine has performed under the terms of the BayNorth Mezzanine Loan Agreement and BayNorth Note.

96.    Plaintiff Mezzanine has been damaged by BayNorth's breaches of the BayNorth Mezzanine Loan Agreement and BayNorth Note because these breaches have: (i) required the Plaintiffs to seek bankruptcy protection under the Bankruptcy Code; (ii) resulted in WestLB refusing to release escrow funds under its control, which were to be used for a draw request in connection with the completion of construction and renovations at the Premises; (iii) resulted in the filing of the Mechanics Liens against the Premises, even though there are sufficient funds in a frozen escrow account, which were earmarked to pay such Mechanics Liens in full; (iv) resulted in WestLB charging plaintiff Partners default interest under the WestLB Senior Loan; and (v) eliminated the ability of the Plaintiffs to sell Fractional Units at the Premises, as potential purchasers have been chilled from buying units as a result of the imposition of substantial liens on the Premises.

97.    As a result of BayNorth's breach of contract, a money judgment in an amount in excess of $5,600,000 should be entered against BayNorth.

### AS AND FOR THE PLAINTIFFS' EIGHTH CAUSE OF ACTION
### (Fraudulent Conveyance 11 U.S.C. § 548)

98.    The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 97 of this Complaint as if fully set forth herein.

19

99.     Section 548(a)(i)(B) of the Bankruptcy Code provides that a debtor-in-possession may avoid a transfer that was made or occurred within two years of the Petition Date, if the debtor-in-possession, voluntarily or involuntarily:

(I)     was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

100.    The BayNorth Transfer was a transfer of property of plaintiff Partners.

101.    The BayNorth Transfer was not made for reasonably equivalent value because: (i) plaintiff Partners had no contractual relationship with BayNorth; and (ii) the BayNorth Note expressly prohibited the prepayment of any principal of the Mezzanine Loan prior to March 30, 2010, and no interest was due for payment under the BayNorth Note because plaintiff Mezzanine had deferred the payment of interest pursuant to the BayNorth Note.

102.    As a result of the BayNorth Transfer, plaintiff Partners was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Partners was an unreasonably small capital.

103.    At the time of, and as a result of, the BayNorth Transfer, plaintiff Partners intended to incur debts, or believed that it would incur debts, that would be beyond its ability to pay as it matured.

20

104.    A judgment should be entered avoiding the BayNorth Transfer under § 548 of the Bankruptcy Code.

## AS AND FOR THE PLAINTIFFS' EIGHTH CAUSE OF ACTION
### (Fraudulent Conveyance 11 U.S.C. § 544(b))

105.    The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 104 of this Complaint as if fully set forth herein.

106.    Section 544 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a pre-petition transfer of property of the debtor under state law to the extent that there exists a creditor of the debtor's estate that had standing to pursue such claim under state law in the absence of a bankruptcy proceeding.

107.    There exist unsecured creditors of plaintiff Partners that have standing to pursue state law fraudulent conveyance action against transferees of Partners' assets in the absence of a bankruptcy proceeding.

108.    Under applicable state law, a transfer may be avoided as a fraudulent conveyance where the transferor did not receive fair consideration or reasonably equivalent value for the transfer and either:

(i)     the transferor was insolvent or rendered insolvent by the transfer;

(ii)    the transferor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the transferor was an unreasonably small capital; or

(iii)   the transferor intended to incur, or believed that it would incur, debts that would be beyond the transferor's ability to pay as such debts matured.

109.    The BayNorth Transfer was a transfer of property of plaintiff Partners.

21

110.    The BayNorth Transfer was not made for fair value or reasonably equivalent value because: (i) plaintiff Partners had no contractual relationship with BayNorth; and (ii) the BayNorth Note expressly prohibited the prepayment of any principal of the Mezzanine Loan prior to March 30, 2010, and no interest was due for payment under the BayNorth Note because plaintiff Mezzanine had deferred the payment of interest pursuant to the BayNorth Note.

111.    As a result of the BayNorth Transfer, plaintiff Partners was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Partners was an unreasonably small capital.

112.    At the time of, and as a result of, the BayNorth Transfer, plaintiff Partners intended to incur debts, or believed that it would incur debts, that would be beyond its ability to pay as it matured.

113.    The BayNorth Transfer is avoidable under state law.  Therefore, the BayNorth Transfer is avoidable under § 544 of the Bankruptcy Code.

114.    A judgment should be entered avoiding the BayNorth Transfer under § 544 of the Bankruptcy Code.

### AS AND FOR THE PLAINTIFFS' NINTH CAUSE OF ACTION
#### (Turnover-11 U.S.C. § 550)

115.    The Plaintiffs repeat and re-allege the allegations contained in ¶¶ 1 – 114 of this Complaint as if fully set forth herein.

116.    The BayNorth Transfer is property of plaintiff Partners' bankruptcy estate under § 541 of the Bankruptcy Code.

22

117.   A judgment should be entered requiring BayNorth to turnover the BayNorth Transfer to plaintiff Partners under § 550 of the Bankruptcy Code.

WHEREFORE, Plaintiffs seek judgment against BayNorth as follows: (i) on the first cause of action for unjust enrichment, judgment should be entered requiring BayNorth to return the BayNorth Transfer, with interest from February 19, 2008, to plaintiff Partners; (ii) on the second cause of action for money had and received, judgment should be entered requiring BayNorth to return the BayNorth Transfer, with interest from February 19, 2008, to plaintiff Partners; (iii) on the third cause of action for conversion, judgment should be entered requiring BayNorth to return the BayNorth Transfer, with interest from February 19, 2008, to plaintiff Partners and awarding punitive damages against BayNorth; (iv) on the fourth cause of action for tortuous interference with contract, a money judgment in an amount in excess of $5,600,000 plus punitive damages should be entered against BayNorth; (v) on the fifth cause of action for tortuous interference with existing and prospective business relationships, a money judgment in an amount in excess of $5,600,000 plus punitive damages should be entered against BayNorth; (vi) on the sixth cause of action for breach of contract, a money judgment in an amount in excess of $5,600,000 should be entered against BayNorth; (vii) on the seventh cause of action for fraudulent conveyance pursuant to § 548 of the Bankruptcy Code, judgment should be entered avoiding the BayNorth Transfer; (viii) on the eighth cause of action for fraudulent conveyance pursuant to § 544 of the Bankruptcy Code, judgment should be entered avoiding the BayNorth Transfer; and (ix) on the ninth cause of action for turnover, judgment should be entered requiring BayNorth to turnover the BayNorth Transfer to plaintiff Partners under § 550 of the Bankruptcy Code.

SLC_455854

DATED:  September 15, 2009

DURHAM JONES & PINEGAR, P.C.

By:  /s/ Steven J. McCardell
Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
Steven J. McCardell (smccardell@djplaw.com)(2144)
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT 84111-4050
Telephone:  (801) 415-3000
Facsimile:  (801) 415-3500
Proposed Utah Counsel for Debtors

and

CROWELL & MORING LLP
Michael V. Blumenthal (mblumenthal@crowell.com)
(pro hac vice application pending)
Bruce J. Zabarauskas (bzabarauskas@crowell.com)
(pro hac vice application pending)
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000
Facsimile:  (212) 223-4134

Proposed Reorganization Counsel for Debtors

SLC_455854