by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Improvements to the date of the Draw Request; the cost breakdown shall also show the percentage of completion of each line item on the Project Budget, and the accuracy of the cost breakdown shall be certified by the Borrower and by the Architect; all such applications for payment shall also show all contractors and subcontractors, including Major Contractors and Major Subcontractors, by name and trade, the total amount of each contract or subcontract, the amount theretofore paid to each contractor and subcontractor as of the date of such application, and the amount to be paid from the proceeds of the Advance to each contractor and subcontractor;

(ii)    a report of the Construction Consultant, certifying to the Administrative Agent as to the value of completed construction, percentage of completion, compliance with Plans and Specifications, and whether there are sufficient funds in the Project Budget to pay remaining Total Project Costs and complete construction of the Additional Improvements;

(iii)    lien waivers from all Major Contractors and all Major Subcontractors for work done and materials supplied by them which were paid for pursuant to any prior Draw Request, if any;

(iv)    if applicable, a written request of the Borrower for any necessary changes in the Plans and Specifications, the Project Budget or the Construction Schedule;

(v)    copies of all executed Change Orders, contracts and subcontracts, and, to the extent requested by the Administrative Agent or the Construction Consultant, of all inspection or test reports and other documents relating to the construction of the Improvements not previously delivered to the Administrative Agent, if any; and

(vi)    such other information, documentation and certification as the Administrative Agent shall reasonably request.

(c)    _Amount of Advances._   In no event shall any Advance be less than ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) or exceed the full amount of Total Project Costs theretofore paid or to be paid with the proceeds of such Advance minus the applicable Retainage for each contract and subcontract. No Advance by the Lenders shall be deemed to be an approval or acceptance by the Lenders of any work performed thereon or the materials furnished with respect thereto.

(d)    _Insufficiency of Loan Proceeds/Cost Overruns._   Notwithstanding anything contained herein to the contrary, if at any time or from time to time prior to Final Completion, in the Administrative Agent's reasonable opinion, the cost of completing any line item in the Project Budget exceeds the remaining un-disbursed portion of the Loan allocated to such line item in the Project Budget (the amount of such deficiency being a _Shortfall_), no further

33

14095223_9_054291_00909

Advances of the Loan shall be made by the Lenders until the Borrower either individually or in combination: (i) deposits with the Administrative Agent the Shortfall; (ii) compensates for the Shortfall by payment of Project Costs in cash, through application of Deposits in accordance with the terms of this Agreement or other manner satisfactory to the Administrative Agent in its sole discretion and delivers to the Administrative Agent evidence thereof satisfactory to the Administrative Agent; (iii) provides the Administrative Agent with other assurance satisfactory to the Administrative Agent that the Shortfall will be funded as and when needed: (iv) to the extent permitted under Section 2.2(k), allocates the Construction Contingency to the Shortfall or (v) to the extent permitted under Section 6.2(j), reallocates cost savings from the Project Budget in respect of the Loan in accordance with the terms of this Agreement.  Any amount deposited with the Administrative Agent pursuant to clause (i) of this Section 2.2(d) shall: (A) be held by the Administrative Agent or its designee pursuant to a pledge and assignment agreement in a form reasonably satisfactory to the Administrative Agent, which agreement the Borrower shall execute and deliver to the Administrative Agent simultaneously with such deposit; and (B) constitute additional Collateral for the Loan. If the Borrower deposits cash with the Administrative Agent, such amount will be advanced to the Borrower only after all Loan proceeds have been advanced and, in the case of cash or other assurances, the same will be returned to the Borrower or terminated, as the case may be, if and when there is no longer a Shortfall in such line item by reason of (1) allocation of the Construction Contingency, (2) reallocation of costs savings (or other reallocations approved by the Administrative Agent, in its sole discretion) or (3) such amount deposited being no longer necessary in the Administrative Agent's discretion. Any reallocation of any category or line item in the Project Budget in connection with cost overruns shall be subject to the Administrative Agent's approval in the Administrative Agent's discretion except as set forth in Section 2.2(k) or Section 6.2(j); provided, that any reallocation relating to interest, general contractor fees, overhead, development fees and any fee to an Affiliate, or between the Improvements shall require the approval of the Administrative Agent, in its sole discretion.  Without limiting the foregoing, unless the Borrower otherwise cures a Shortfall in accordance with this Section 2.2(d), the borrower shall within 10 days after demand therefor by the Administrative Agent, deposit the amount of the Shortfall with the Administrative Agent in accordance with clause (i) above.

(e)    Procedure for Advances.  Each Draw Request shall be submitted to the Administrative Agent (who shall forward such document to each Lender) at least fifteen (15) days prior to the date of the requested Advance (the *Requested Advance Date*), and no more frequently than once per month. Not less than three (3) Business Days prior to the Requested Advance Date, the Administrative Agent shall deliver written notice to each Lender at the address specified by each Lender from time to time setting forth the Requested Advance Date and such Lender's Ratable Share of such Advance. The Lenders shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied. Unless otherwise notified by the Administrative Agent, each Lender may assume that all conditions to such Advance are satisfied on the Requested Advance Date. Not later than 11:00 a.m. New York time, on the date set forth in Borrower's Requisition, each Lender shall make available for the account of the Administrative Agent at its address referred to in Section 11.4, in immediately available funds, such Lender's Ratable Share of such Advance. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions in

34

Article 3, the Administrative Agent will make such funds available to the Borrower in accordance with the terms of this Article 2.

(f)    Funds Advanced.    Except as otherwise provided in this Agreement, each Advance shall be made by the Administrative Agent by wire transfer to the account of the Borrower in accordance with wiring instructions provided by the Borrower. All proceeds of all Advances shall be used by the Borrower only for the purposes for which such Advances were made. The Borrower shall not commingle such funds with other funds of the Borrower or any other Person.

(g)    Advances to General Contractor.    At the Administrative Agent's option, the Administrative Agent may make any or all Advances directly to the General Contractor for construction expenses payable or reimbursable to the General Contractor under the General Contractor's Agreement and which shall theretofore have been Approved by the Administrative Agent and for which the Borrower shall have failed to timely make payment (subject to written notice from the Administrative Agent and failure of the Borrower to cure within ten (10) Business Days of such notice) and the execution of this Agreement by the Borrower shall, and hereby does, constitute an irrevocable authorization to the Administrative Agent to advance the proceeds of the Loan directly to the General Contractor as amounts become due and payable to them. No further authorization from the Borrower shall be necessary to warrant such direct Advances to the General Contractor and all such Advances shall satisfy *pro tanto* the obligations of the Lenders hereunder and shall be secured by the Security Instrument and the other Loan Documents as fully as if made directly to the Borrower.  Notwithstanding the foregoing, the Administrative Agent shall not (i) take any of the actions permitted under this Section 2.2(g) if the Borrower is contesting such amounts in accordance with Section 6.2(f) or (ii) fund any Advance over Liens unless such Liens are adequately bonded or, if such Liens are less than FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) in the aggregate, affirmatively insured by the Title Company.

(h)    Direct Advances.    At the Administrative Agent's option, the Administrative Agent may make Advances of portions of the proceeds of the Loan (i) to any Person to which the Administrative Agent in good faith determines payment is due and (ii) to the Lenders in payment of Interest or to the Lenders or the Administrative Agent in payment of the Unused Fee or any other fees payable hereunder, and any portion of the Loan so disbursed by the Lenders shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. The execution of this Agreement by the Borrower shall, and hereby does, constitute an irrevocable authorization to the Administrative Agent to Advance the proceeds of the Loan. No further authorization from the Borrower shall be necessary to warrant such direct Advances and all such Advances shall satisfy *pro tanto* the obligations of the Lenders hereunder and shall be secured by the Security Instrument and the other Loan Documents as fully as if made directly to the Borrower.

(i)    Advances Do Not Constitute a Waiver.    No Advance shall constitute a waiver of any of the conditions of the Lenders' obligations to make further Advances nor, in the event the Borrower is unable to satisfy any such condition, shall any Advance have the effect of

35

precinding the Administrative Agent from thereafter declaring such inability to be an Event of Default hereunder.

(j)     Quality of Work.   The Lenders shall not be obligated to make any Advance or any portion thereof with respect to defective work or to any contractor that has performed work that is defective and that has not been cured, as specified in and confirmed by the report of the Construction Consultant; provided, that the Lenders may disburse all or any part of any Advance before the sum shall become due if the Administrative Agent believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

(k)     Contingency Reserve; Reallocation of Line Items.   The amount allocated as Construction Contingency in the Project Budget shall only be disbursed upon request by the Borrower and a determination by the Administrative Agent in its discretion that the amounts remaining in the Construction Contingency after the requested disbursement will be sufficient to protect the Lenders against the risk of any future overruns in Project Costs. Amounts disbursed from the Construction Contingency may be used only for Project Costs to which such Construction Contingency relates. Without limiting the foregoing, the Borrower shall be entitled to make reductions in line items in the Project Budget (and the savings may be reallocated by the Borrower) at such time as the Administrative Agent and the Construction Consultant reasonably concur that all work covered by a particular line item has been or will be completed and paid for in full and such savings are or will be realized. The Borrower shall not agree or consent to any reallocation or expenditure of the General Contractor's contingency line item pursuant to the General Contractor's Agreement without the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld.

(l)     Stored Materials.   The Lenders shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Improvements (*Stored Materials*), unless the Administrative Agent receives satisfactory evidence that: (i) the Stored Materials are components in substantially final form ready for incorporation into the Improvements; (ii) the Stored Materials are stored at the Property, in a bonded warehouse in the State of Utah, or at such other site as the Administrative Agent shall reasonably approve, and are protected against theft and damage; (iii) the Stored Materials will be paid for in full with the funds to be disbursed, and all Lien rights or claims of the supplier will be released upon full payment; (iv) the Administrative Agent shall have received, or will receive upon payment of such Advance, UCC-1 financing statements, warehouseman's receipts or other evidence satisfactory to the Administrative Agent of the Lenders' first priority security interest in such materials; (v) the Borrower shall provide proof satisfactory to the Administrative Agent that such materials are insured against loss by casualty or theft for their full replacement cost; (vi) the aggregate cost of Stored Materials stored at the Property is certified by the Construction Consultant; and (vii) the cost of Stored Materials not stored at the Property, in the aggregate at any time, is not more than FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00). In the event that the Borrower shall at any time store materials at any one location other than the Property, the cost of which exceeds the maximum amount permitted under clause (vii) above, the Borrower shall pay the excess cost of such materials with its own funds and shall not be entitled to any

36

proceeds from an Advance in respect of such excess until such time as such excess is relocated to the Property.

(m)    Retainage.  The Administrative Agent shall be entitled to withhold from the proceeds of each Construction Advance an amount (*Retainage*) equal to the greater of (a) five percent (5%) of all amounts (excluding general conditions) to be paid to each contractor or subcontractor under its applicable construction contract and subcontract, and (b) twice the fair market value of the work that has not been completed in accordance with the applicable Construction Contracts in accordance with Utah Code Annotated Subsection 13-8-5(8)(a)(ii); provided, that the Retainage being held with respect to any contractor, subcontractor or materialman may be released as of the date upon which the Construction Consultant certifies to the Administrative Agent that such contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman.  Any Retainage shall be placed by the Administrative Agent in an interest-bearing account.  Any interest accrued on any such retention shall, in accordance with Utah Code Annotated Subsection 13-8-5(4), be (i) for the benefit of General Contractor and its subcontractors, and (ii) paid after the work is completed and the conditions set forth in Section 3.4 have been satisfied.  In accordance with Utah Law, it shall be the duty of General Contractor to ensure that any interest accrued on the retention is distributed by the General Contractor to its subcontractors on a pro rata basis, and that General Contractor or any subcontractor who receives payment of retention shall pay each of its subcontractors from whom retention has been withheld each subcontractor's share of the retention received within ten (10) days from the day that all or any portion of the Retainage is received by General Contractor, or by the subcontractor from General Contractor or a subcontractor, as the case may be (except that if a retention payment received by General Contractor is specifically designated for a particular subcontractor, then payment of the retention shall be made to the designated subcontractor).  The Borrower shall cause General Contractor to provide the Borrower and the Administrative Agent with such affidavit or other evidence of compliance with the requirements of Utah Code Annotated Section 13-8-5 as the Administrative Agent shall require.  In no event shall the Administrative Agent have any obligation or liability with respect to the application of any interest earned on the Retainage.  Without limiting the foregoing, the Borrower acknowledges and agrees that any default or breach of the terms or conditions of any Construction Contract, shall be deemed to be a "default or breach of the terms and conditions of the construction contract documents, plans, or specifications governing construction of the project" within the meaning of Utah Code Annotated Subsection 13-8-5(8)(a)(i).  In accordance with such Subsection, the Administrative Agent may withhold from any Advance an amount otherwise to be applied to the payment of the applicable contractor or subcontractor, for as long as reasonably necessary, equal to the amount necessary to cure such default.

Section 2.3    Payment of Interest.  (a)  Base Rate Loans and LIBOR Loans.  The Borrower shall pay interest on the Outstanding Principal at the following rates per annum:

37

3409528_9_054291_00939

(i)    Base Rate Loans.  During Interest Periods during which the Loan or any portion thereof shall be a Base Rate Loan, with respect thereto, a rate per annum equal at all times during such Interest Periods to the sum of (A) the Base Rate in effect from time to time plus (B) the Applicable Margin.

(ii)    LIBOR Loans.  During Interest Periods during which the Loan or any portion thereof shall be a LIBOR Loan, with respect thereto, a rate per annum equal at all times to the sum of (A) the LIBO Rate for such Interest Period plus (B) the Applicable Margin.

Interest on the Outstanding Principal (including, without limitation, on each LIBOR Loan) shall be due and payable in arrears on the first Business Day of each calendar month.

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the Borrower shall pay on demand interest on (i) the Outstanding Principal and (ii) the unpaid amount of any interest, fee or other amount payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, whether before or after maturity or acceleration of the applicable Notes, at a rate per annum equal to the Default Rate.

Section 2.4    Conversion and Continuation Options.  (a)  Base Rate Loan to LIBOR Loan.  Subject to Section 2.8, the Borrower may elect pursuant to a Rate Request to convert all or any portion of any outstanding Base Rate Loan to a LIBOR Loan; provided, that no Base Rate Loan may be converted to a LIBOR Loan if any Event of Default has occurred and is continuing and the Administrative Agent has determined in its sole discretion that such a conversion is not appropriate.

(b)    LIBOR Loan to Base Rate Loan.  The Borrower may elect pursuant to a Rate Request to convert all or any portion of any outstanding LIBOR Loan to a Base Rate Loan; provided that the Borrower may not make such an election if at the time of such election an Interest Rate Protection Agreement is in effect.  Notwithstanding the foregoing, during the last thirty (30) days prior to the Maturity Date, Borrower may elect pursuant to a Rate Request to convert all outstanding LIBOR Loans to a single Base Rate Loan.

(c)    LIBOR Loan to LIBOR Loan.  Any LIBOR Loan may be continued upon the expiration date of its then current Interest Period by Borrower pursuant to a Rate Request; provided that no LIBOR Loan may be continued when any Event of Default has occurred and is continuing.  If the Borrower fails to submit a Rate Request to the Administrative Agent in accordance with the provisions of this Section 2.4(c) with respect to any outstanding LIBOR Loan, such outstanding LIBOR Loan shall automatically be continued as a LIBOR Loan.

Section 2.5    Minimum Amounts and Maximum Number of Interest Periods.  All borrowings, conversions and continuations of the Loan shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of any LIBOR Loan shall be at least equal to ONE MILLION AND 00/100 DOLLARS ($1,000,000.00).  So long as an Interest Rate Protection Agreement is in effect and payments by the Counterparty

38

under such Interest Rate Protection Agreement are based upon particular interest periods, the Borrower shall be deemed to elect that the Loan be designated as a single LIBOR Loan with an Interest Period corresponding to the interest period utilized in computations of payments due with respect to such Interest Rate Protection Agreement.

Section 2.6    Computation of Interest and Fees.  All interest and fees shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed, including the first day and excluding the last day of each Interest Period.  If the Loan is repaid on the same day on which it is made, one day's interest shall be paid on the Loan.  Any change in the Administrative Agent's "Prime Rate" or the Federal Funds Rate shall be effective as of the day on which such change in rate occurs.  Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower in the absence of manifest error.

Section 2.7    Increased Costs.  (a)  If, during any Interest Period with respect to any LIBOR Loan due to either (i) the introduction of or any change in or in the judicial or regulatory interpretation of any Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to any Lender of maintaining such LIBOR Loan (including, but not limited to, a reserve requirement), then the Borrower shall from time to time, within ten (10) days after demand therefor by the Administrative Agent, pay to the Administrative Agent additional amounts sufficient to compensate any such Lender for such increased cost; provided, that any Lender claiming additional amounts under this Section 2.7 shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Applicable Lending Office if the making of such designation would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.  A certificate as to the amount of such increased cost, submitted to the Borrower by the Administrative Agent or the affected Lender, shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    If the Administrative Agent determines that compliance with any Law or any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by any Lender or any corporation controlling any Lender and that the amount of such capital is increased by or based upon the existence of any of the Notes, then, within ten (10) days after demand therefore by the Administrative Agent, the Borrower shall pay to the Administrative Agent, from time to time as specified by the Administrative Agent, additional amounts sufficient to compensate each Lender or such corporation in the light of such circumstances, to the extent that the Administrative Agent reasonably determines such increase in capital to be allocable to the Loan; provided, that such Lender shall calculate the amounts allocable to the Loan in good faith.  A certificate as to such amounts, explaining the reason for and showing the calculation of such amounts, all in reasonable detail, submitted to the Borrower by the Administrative Agent or the affected Lender, shall be conclusive and binding for all purposes in the absence of manifest error.

39

(c)    The provisions of this Section 2.7 shall survive the payment of all amounts payable under the Notes or the other Loan Documents.

Section 2.8    Illegality or Inability to Determine LIBO Rate.    (a) Notwithstanding any other provision of this Agreement or the Notes, if the Administrative Agent or any Lender shall notify the Borrower that the introduction of or any change in or in the interpretation of any Law makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for the Administrative Agent or a Lender to perform its obligations hereunder to make or maintain any LIBOR Loan, the Interest Rate in effect for the Outstanding Principal shall automatically convert to the Base Rate plus the Applicable Margin.

(b)    If the Administrative Agent notifies the Borrower that (i) the Administrative Agent is unable to determine the LIBO Rate or (ii) due to circumstances affecting the London interbank market generally, the LIBO Rate for any Interest Period will not adequately reflect the cost to the Lenders of making or maintaining LIBOR Loans in effect for such Interest Period, the Interest Rate applicable to the Outstanding Principal shall automatically convert to the Base Rate plus the Applicable Margin, unless, in the case of clause (ii) of this Section 2.8(b), within five (5) Business Days of notice from the Administrative Agent thereof, the Borrower pays the difference in cost to the Administrative Agent of maintaining such LIBOR Loan in effect for such Interest Period.

(c)    If the illegality of or the Administrative Agent's inability to determine the LIBO Rate as described in Sections 2.8(a) or Section 2.8(b) is eliminated, the Interest Rate shall automatically convert to the LIBO Rate plus the Applicable Margin.

Section 2.9    Payment of Outstanding Principal. (a) Commencing with the first Payment Date after the third anniversary of the Closing Date, and on each Payment Date thereafter until the Maturity Date, together with its payments of Interest hereunder, the Borrower shall pay to the Administrative Agent for the ratable account of the Lenders a portion of the Outstanding Principal of the Loan equal to the Amortization Amount for such period.

(b)    The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders the Outstanding Principal of the Loan in full on the Maturity Date, together with all accrued and unpaid interest thereon to (and including) the date of repayment and all other amounts due to the Lenders or the Administrative Agent under this Agreement, the Notes or any other Loan Document.

Section 2.10    Prepayment. (a) Optional Prepayment. Upon not less than thirty (30) days' prior written notice to the Administrative Agent, the Borrower may, at any time after the first anniversary of the Closing Date, prepay in full (but not in part) the entire Outstanding Principal balance of the Loan without premium or penalty, but subject to Sections 2.10(d) and (e).

(b)    Prepayment upon Sale of Fractional Ownership Units. On each Payment Date, the Borrower shall make a prepayment of the Outstanding Principal of the Loan in an amount equal to the aggregate amount of Required Release Payments that are received in

40

connection with the sale of any Fractional Ownership Units (or interests therein) and then on deposit in the Sales Proceeds Account, including any interest earned thereon. Such prepayment shall be applied (i) first, to any outstanding Base Rate Loans, (ii) second, to any outstanding LIBOR Loans.

(c)   Mandatory Prepayment.  If, as provided in Section 4.4, the Borrower fails to achieve the Hurdle DSCR within 12 months after the occurrence of a DSCR Trigger, all amounts standing to the credit of the Debt Service Reserve Account from time to time shall be applied by the Administrative Agent to reduce the Outstanding Principal of the Loan in accordance with Section 4.4.   In addition to the foregoing and notwithstanding any other provision of this Agreement, the entire Outstanding Principal, together with all unpaid interest thereon and other amounts due to the Lenders under the Loan Documents shall become immediately due and payable upon the occurrence of any of the following:

(i)   a sale, transfer or conveyance of any interest in the Property (other than as expressly permitted by this Agreement or the other Loan Documents);

(ii)   the issuance of debt securities by Borrower; or

(iii)   a direct or indirect sale, transfer or conveyance of any interest in Borrower or Borrower's Member (other than as expressly permitted by this Agreement or other Loan Documents).

(d)   Funding Losses.  Upon demand of the Administrative Agent from time to time, the Borrower shall promptly compensate the Lenders for and hold the Lenders harmless from any actual loss, cost or expense incurred by any of them as a result of (all such amounts referenced in this Section 2.10(d) being referred to herein, collectively, as *LIBOR Breakage Costs*):

(i)   any continuation, payment or prepayment of any LIBOR Loan on a day other than the last day of the Interest Period for such LIBOR Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(ii)   any failure by the Borrower to prepay or continue any LIBOR Loan on the date or in the amount notified by the Borrower; or

(iii)   any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such LIBOR Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lender under this Section 2.10(d), each Lender shall be deemed to have funded each LIBOR Loan at the LIBO Rate by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Loan was in fact so funded.

41

34578228_9_054291_00008

(e)   <u>Prepayments Generally</u>.   Any prepayment must be accompanied by payment by the Borrower of all accrued and unpaid interest on the Outstanding Principal balance of the Loan and any Hedge Breakage.   Except as otherwise expressly permitted or required in this Agreement, the Outstanding Principal balance of the Loan may not be prepaid, in whole or in part.

Section 2.11   <u>Late Charge</u>.   Any and all regularly scheduled amounts due hereunder, under the Notes, the Security Instrument or any other Loan Document which remain unpaid more than five (5) days after the date said amount was due and payable shall incur a fee (the *Late Charge*) of five percent (5%) of said amount, which Late Charge shall be payable by the Borrower on demand by the Administrative Agent.   The Administrative Agent's rights to collect the Late Charge shall be in addition to all other rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

Section 2.12   <u>Payments</u>.   (a)   Payments and prepayments of Outstanding Principal, and interest on, the Notes and all fees, expenses and other obligations under this Agreement payable to the Administrative Agent or the Lenders shall be made without setoff or counterclaim in immediately available funds not later than 12:00 P.M. (New York City time) on the dates called for under this Agreement and the Notes to the Administrative Agent by wire transfer to the following account of the Administrative Agent (or to such other account as may be specified in writing from time to time by the Administrative Agent): Bank: JPMorgan Chase Bank (Swift ID: CHASUS33XXX), Account #: 920-1-060663, Local Clearing Code: FW021000021, Account Name: WESTLB AG, NY Branch (Swift ID: WELAUS3XXXX), Reference: Easy Street Partners, LLC.   Funds received after such time shall be deemed to have been received on the next Business Day.

(b)   The Borrower hereby authorizes the Administrative Agent, if and to the extent payment due by the Borrower under any Loan Document is not made when due (subject to any applicable grace periods) under any Loan Document, to charge from time to time against any and all of the Borrower's accounts with either the Administrative Agent or any of the Lenders any amount so due.

(c)   Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, as applicable, such payment shall be made on the next succeeding Business Day, and such extension of time in such case be included in the computation of payment of interest; <u>provided</u>, if such extension would extend beyond the end of an Interest Period, such payment shall be made on the next preceding Business Day.

(d)   All payments received by the Administrative Agent upon the Loan, while an Event of Default is continuing, may be applied to accrued interest, Outstanding Principal of the Loan, Hedge Payments, Hedge Breakage or any other Obligations evidenced or secured by the Loan Documents in such order and amounts as the Administrative Agent may in its sole discretion elect.

Section 2.13   <u>Taxes</u>.   All payments made by the Borrower to the Administrative Agent or any Lender shall be made without any setoff or counterclaim, and free and clear of, and

42

without deduction for any withholdings or on account of, any present or future income, excise and other taxes of whatever nature (other than taxes generally assessed on net income or receipts of any Lender or any franchise taxes imposed upon any Lender by the jurisdiction in which it is organized or in which it maintains an agency, it being understood that the preceding clause shall not apply to withholding taxes), or any levies, imposts, duties, charges or fees of any nature now or hereafter imposed by any Governmental Authority (collectively, *Taxes*).  If the Borrower is compelled by any Law to make any such deductions or withholdings, it will pay such additional amounts as may be necessary in order that the net amount received by the Administrative Agent or such Lender after such deductions or withholdings (including any required deduction or withholding on such additional amounts) shall equal the amount each Lender would have received had no such deductions or withholdings been made, and it will promptly provide the Administrative Agent with evidence satisfactory to the Administrative Agent that it has paid such deductions or withholdings.  Moreover, if any Taxes are directly assessed against any Lender, such Lender may pay such Taxes and the Borrower shall, within ten (10) days after the Administrative Agent's demand therefor, pay such additional amount as may be necessary in order that the net amount received by such Lender after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Lender would have received had not such Taxes been assessed.  The provisions of this Section 2.13 shall survive payment of all other amounts payable under the Loan Documents.  Each Lender shall, on or prior to the Closing Date, if required by any Law, provide the Borrower with Internal Revenue Service Form W8BEN or W8ECI, as appropriate, or any successor form prescribed by the Internal Revenue Service, certifying that such Lender is entitled to benefits under an income tax treaty to which the United States is a party that eliminates withholding tax on payments under the Notes or certifying that the income receivable pursuant to the Notes is effectively connected with the conduct of a trade or business in the United States.  If any form or document referred to in this Section 2.13 requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W8BEN or W8ECI, that each such Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

Section 2.14  Distribution to Lenders.  (a)  In the event the Administrative Agent receives current funds, in payment of principal, interest or any other sums due hereunder, on or prior to 12:00 P.M. (New York time) on any Business Day, then, on such date, the Administrative Agent will notify Lenders of the same and will distribute like funds by wire transfer of immediately available funds to the Lenders Ratably to such accounts at such places as have been designated by the respective Lenders in writing from time to time.  If such funds are received after 12:00 P.M. (New York time) on any Business Day, then the Administrative Agent shall distribute such funds no later than the next succeeding Business Day.  Upon the Administrative Agent's receipt of any other amounts payable by the Borrower or any other Person for items other than principal or Interest, the Administrative Agent shall promptly cause the payment to be applied in accordance with this Agreement.  The Administrative Agent shall promptly remit to the Lenders their Ratable Shares of any payment received from the Borrower or from another source on account of sums payable by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Lenders hereunder that the Borrower will not make such payment in full, the

43

Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each Lender shall repay to the  Administrative Agent forthwith on demand the portion of such amount distributed to such Lender for which the Administrative Agent did not in fact receive payment from or on account of the Borrower, together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender makes such repayment to the Administrative Agent, at the overnight Federal Funds Rate.

(b)    If any Lender obtains any payment (whether voluntary or involuntary, through the exercise of any right of set-off, or otherwise) on account of the Loan owing to it in excess of its Ratable Share of payments on account of the Loan obtained by all of the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in the Loan owing to them as shall be necessary to cause such purchasing Lender to share the excess payment Ratably with each of them; provided, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each other Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's Ratable Share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.14(b) may, to the fullest extent permitted by Law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor or the Borrower in the amount of such participation.

(c)    The Lenders agree, among themselves, that unless otherwise agreed to by the Administrative Agent and the Requisite Lenders, all monies collected or received by the Administrative Agent after the occurrence of an Event of Default in respect of any security for the Loan shall be applied first to (a) the fees and costs of collection and maintenance of the Collateral, and then (b) *pari passu* to (i) either Interest or principal of the Loan as recommended by the Administrative Agent and approved by the Requisite Lenders and (ii) the amounts owed under any Interest Rate Protection Agreement.

Section 2.15    Conversion of Loan.  (a) Borrower shall have the option as of the third (3rd) anniversary of the Closing Date (the *Conversion Date*) to convert the Loan into the Interim Loan, which option shall be exercisable by written notice to the Administrative Agent delivered no later than 30 days prior to the Conversion Date and shall be subject to full satisfaction of the following conditions precedent:

(i)    The Borrower shall have delivered to the Administrative Agent evidence in form and substance reasonably acceptable to the Administrative Agent, that Final Completion has occurred and that the title to the Property is free and clear of all Liens, other than Permitted Encumbrances;

44

(ii)    No Default or Event of Default shall have occurred and be continuing on the date of such notice and on the Conversion Date;

(iii)    The Borrower shall have delivered to the Administrative Agent a certificate executed by an authorized officer of the Borrower certifying in form acceptable to the Administrative Agent that each of the representations and warranties of the Loan Parties contained in the Loan Documents is true, complete and correct in all material respects as of the Conversion Date;

(iv)    The Sponsor shall have executed and delivered to the Administrative Agent a reaffirmation of its obligations under the Recourse Liability Agreement in form acceptable to the Lenders affirming that the Obligation of the Sponsor under the Recourse Liability Agreement shall extend to the Maturity Date, as extended as a consequence of the conversion of the Loan to the Interim Loan pursuant to this Section;

(v)    The Borrower and the Administrative Agent shall have entered into either (A) an extension or renewal of the Interest Rate Protection Agreement in form reasonably acceptable to the Administrative Agent extending or renewing the term of the Interest Rate Protection Agreement to the Maturity Date (as extended pursuant to this Section) or (B) a new Interest Rate Protection Agreement in form reasonably acceptable to the Administrative Agent for a term commencing on the original (or, if applicable, the then effective extended) Maturity Date through the Maturity Date (as extended pursuant to this Section);

(vi)    The Outstanding Principal shall not exceed Sixty-Five Percent (65%) of the Appraised Value of the Property then securing the Loan as determined by an Appraisal of the Property dated no later than one hundred and twenty (120) days prior to the Conversion Date;

(vii)    No event, circumstances or state of facts shall have occurred or exist resulting in a Material Adverse Effect; and

(viii)    The Borrower shall pay all of the Administrative Agent's out-of-pocket costs and expenses actually incurred by the Administrative Agent in connection with such request for conversion, regardless of whether or not such conversion is consummated.

(b)    In no event shall any Advances be made with respect to the Loan after the Conversion Date, and the Lenders shall have no obligation to fund any portion of the Loan Amount not previously Advanced prior to the Conversion Date.

Section 2.16    Interim Loan Extension.  The Borrower shall have the option as of the fourth (4th) anniversary of the Closing Date (the *Extension Date*) to extend the term of the Interim Loan for an additional twelve (12) months, which option shall be exercisable by written

45

notice to the Administrative Agent delivered no later than 30 days prior to the Extension Date and shall be subject to full satisfaction of the following conditions precedent:

        (i)     No Default or Event of Default shall have occurred and be continuing on the date of such notice and on the Extension Date;

        (ii)    The Borrower shall have delivered to the Administrative Agent a certificate executed by an authorized officer of the Borrower certifying in form acceptable to the Administrative Agent that each of the representations and warranties of the Loan Parties contained in the Loan Documents is true, complete and correct in all material respects as of the effective date of such extension;

        (iii)   The Sponsor shall have executed and delivered to the Administrative Agent a reaffirmation of its obligations under the Recourse Liability Agreement in form acceptable to the Lenders affirming that the Obligation of the Sponsor under the Recourse Liability Agreement shall extend to the Maturity Date, as extended as a consequence of the extension of the Interim Loan pursuant to this Section;

        (iv)   The Borrower and the Administrative Agent shall have entered into either (A) an extension or renewal of the Interest Rate Protection Agreement in form reasonably acceptable to the Administrative Agent extending or renewing the term of the Interest Rate Protection Agreement to the Maturity Date (as extended pursuant to this Section) or (B) a new Interest Rate Protection Agreement in form reasonably acceptable to the Administrative Agent for a term commencing on the original (or, if applicable, the then effective extended) Maturity Date through the Maturity Date (as extended pursuant to this Section);

        (v)    The Outstanding Balance shall not exceed Sixty-Five Percent (65%) of the stabilized value of the Property then securing the Loan as determined by an Appraisal of the Property dated no later than one hundred and twenty (120) days prior to the Extension Date;

        (vi)   No event, circumstance or state of facts shall have occurred or exist resulting in a Material Adverse Effect;

        (vii)  The Borrower shall pay (A) to the Administrative Agent for the ratable benefit of the Lenders, an extension fee in an amount equal to 0.25% of the then Outstanding Principal balance of the Loan and (B) to the Administrative Agent all of the Administrative Agent's out-of-pocket costs and expenses actually incurred by the Administrative Agent in connection with such request for extension, regardless of whether or not such extension is consummated; and

        (viii)  The Debt Service Coverage Ratio for the Test Period ending on the last day of the calendar month immediately preceding delivery by the Borrower of its notice to extend the term shall not be less than the Hurdle DSCR.

340NZ28_9_DOC391_68909

Section 2.17   Construction Contingency Escrow.   (a)  On or prior to the Closing Date the Borrower shall deposit with the Administrative Agent an amount equal to three million dollars ($3,000,000) (the *Construction Contingency Escrow*) which will be held by the Administrative Agent in an interest bearing account as additional security for the Debt.  The Administrative Agent shall not be required to hold the Construction Contingency Escrow in a segregated account.  Without limiting any of the other rights or remedies of the Administrative Agent provided elsewhere in this Agreement or in any of the other Loan Documents, if the Borrower shall fail to cure any Shortfall in any of the ways specified in Section 2.2(d), the Administrative Agent, without curing such Default, shall be entitled to apply any funds in the Construction Contingency Escrow at such time to such Shortfall.

(b)      So long as no Event of Default shall have occurred and be continuing:

(i)      the Administrative Agent, at the request of the Borrower, shall invest the funds in the Construction Contingency Escrow in one or more Permitted Investments, as directed by the Borrower; provided that the Administrative Agent shall not be responsible for any investment losses; and

(ii)      any funds remaining in the Construction Contingency Escrow shall be released and funded into the Lockbox Account upon Final Completion.

Section 2.18   Miscellaneous.   (a)  From and after the date hereof and until the Loan Amount has been advanced in a full, on each Payment Date the Borrower shall pay to the Agent for the ratable benefit of the Lenders the accrued Unused Fee, which shall accrue on the daily average unfunded portion of the Loan.

(b)      All administrative fees shall be paid by the Borrower to the Administrative Agent in the amounts and manner set forth in the Mandate Letter as such fees become due and payable.

(c)      Notwithstanding anything to the contrary contained in this Agreement, at all times the Administrative Agent shall be permitted to make any Protective Advance that the Administrative Agent may determine in good faith to be reasonably necessary or appropriate to protect the Collateral.

## ARTICLE 3

## CONDITIONS PRECEDENT TO

## DISBURSEMENT OF LOAN PROCEEDS

Section 3.1   Conditions Precedent to Initial Advance.   The Obligation of each Lender to make the initial Advance of the Loan (the *Initial Advance*) shall be subject to the following conditions precedent and each of such conditions shall be completed to the Administrative Agent's satisfaction:

47

(a)    Loan Documents.  The Administrative Agent shall have received an executed original of each of the Loan Documents, including, without limitation each of the following documents and items in form and substance satisfactory to the Administrative Agent:

(i)    the Notes duly executed by the Borrower;

(ii)    the Security Instrument duly executed by the Borrower;

(iii)    the Environmental Indemnity duly executed by the Borrower and the Sponsor;

(iv)    the Recourse Liability Agreement duly executed by the Sponsor;

(v)    the Pledge and Security Agreement duly executed by the Borrower;

(vi)    the Consent and Subordination of Management Agreement duly executed by the Hotel Operator and the Borrower;

(vii)    the Consent and Subordination of Development Agreement duly executed by the Developer and the Borrower;

(viii)    the Financing Statements;

(ix)    the Borrower's Certificate duly executed by the Borrower; and

(x)    Any other documents, instruments, affidavits and agreements reasonably required to be executed in connection herewith or with respect to the Loan.

(b)    Acquisition Closing.  The Borrower shall have acquired the Property substantially in accordance with the terms and conditions of the Contract of Sale.  The Contract of Sale shall not have been amended or modified, nor shall any requirement thereof, obligation thereunder or condition precedent set forth therein have been waived in a manner materially adverse to the interests of the purchaser thereunder.  The Administrative Agent shall have received a copy of the settlement statement from the acquisition of the Property certified as being true and correct by the Borrower and indicating all sources and uses of funds in connection with the acquisition of the Property.

(c)    Intentionally Omitted.

(d)    Mezzanine Loan.  The Mezzanine Loan shall have been fully funded by the Mezzanine Lender and the net proceeds of the Mezzanine Loan shall have been contributed by the Mezzanine Borrower to the Borrower to fund, in part, Acquisition Costs.  The Administrative Agent shall have received a fully executed original of the Intercreditor Agreement, together with true and complete copies of each of the Mezzanine Loan Documents.

48

(e)     Fractional Ownership Documents.  The Project shall be subject to a valid temporary registration with the Condominium Authority under the Condominium Act and the final Condominium Plat shall have been approved for recordation by the City of Park City and each other applicable Governmental Authority necessary or desirable for the establishment of the Condominium and the marketing and sale of Fractional Units (or interests therein), in each case, in accordance with applicable Law.   The Administrative Agent shall have Approved the Fractional Ownership Documents.

(f)     Organizational Documents.  The Administrative Agent shall have received certified copies of the following in respect of each of the Borrower, the Sponsor and the Borrower's Member: (i) certificate of incorporation, certificate of formation, certificate of limited partnership, certificate of authority to conduct business, or other similar document, as applicable, (ii) bylaws, partnership agreement, operating agreement or other corporate or operating agreement or document, as the case may be, (iii) resolutions or consents of each entity authorizing the consummation of the transactions contemplated hereby and by the other Loan Documents, (iv) certificate of good standing of each entity in the state in which such entity is organized, and qualified to do business and (v) incumbency certificate certifying the signatures of those individuals executing any of the Loan Documents on behalf of the Borrower, the Sponsor and the Borrower's Member, in each case, in form and substance satisfactory to the Administrative Agent.

(g)     Consents and Approvals.  The Administrative Agent shall have received copies or other evidence of all material consents, licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower and the validity and enforceability, of the Loan Documents, and such consents, licenses and approvals shall be in full force and effect.

(h)     Legal Opinions.   The Administrative Agent shall have received legal opinions from counsel satisfactory to the Administrative Agent with respect to (i) the due organization and existence of each of the Borrower, the Sponsor and the Borrower's Member, (ii) the due execution, delivery, authority, enforceability of this Agreement, the Notes, the Security Instrument, the Sponsor Documents and each of the other Loan Documents and (iii) such other matters as the Administrative Agent or its counsel may require, all such opinions shall be in form, scope and substance satisfactory to the Administrative Agent and the Administrative Agent's counsel in their sole discretion.

(i)     Payment of Fees.  The Borrower shall have paid all fees and expenses required to be paid on or prior to the Requested Advance Date by the Borrower under this Agreement, the Mandate Letter and all other Loan Documents, including, without limitation, all out-of-pocket expenses actually incurred by the Administrative Agent (including, without limitation, all attorneys' fees and disbursements, Appraisal fees, fees relating to review of all environmental, engineering, insurance and other reports, consultant fees) recording and filing fees, mortgage taxes and other fees and taxes, survey fees, title search fees, title insurance premiums, all origination fees and brokerage commissions, excluding all costs incurred in connection with the syndication of the Loan as provided herein, as applicable.

49

(j)     Insurance.  The Administrative Agent shall have received evidence of all Required Insurance satisfactory to the Administrative Agent in its reasonable discretion, and evidence of the payment of all premiums then due and payable for the existing policy period.

(k)     Title Insurance Policy.  The Administrative Agent shall have received a paid ALTA Mortgagee Policy of Title Insurance, issued by the Title Company, naming the Administrative Agent as the insured party, insuring the lien of the Security Instrument as a first lien on the Trust Property, insuring any reciprocal easements and all utility, access, support and other easements necessary for the operation of the Property, subject only to the Permitted Exceptions (the *Title Insurance Policy*).

(l)     Searches.  The Administrative Agent shall have received such UCC, bankruptcy, judgment, federal tax lien, building code violation and other searches of public records with respect to the Borrower, the Sponsor, the Borrower's Member and the Property, as the Administrative Agent has requested, showing results satisfactory to the Administrative Agent.

(m)     Survey.  The Administrative Agent shall have received a survey, dated or certified as being correct as of a date no earlier than one hundred twenty (120) days prior to the Closing Date, satisfactory to the Administrative Agent and certified by a land surveyor registered in the State of Utah.

(n)     Environmental and Engineering Reports.  The Administrative Agent shall have received a reliance letter addressed to the Administrative Agent entitling the Administrative Agent and the Lenders to rely on the Environmental Reports and an engineering report (or reports) of one or more qualified inspection firms Approved by the Administrative Agent (and either addressed to the Administrative Agent or accompanied by a reliance letter entitling the Administrative Agent and the Lenders to rely on such engineering report), indicating the environmental and engineering condition, respectively, of the Property, and in each case, satisfactory to the Administrative Agent.

(o)     Appraisal.  The Administrative Agent shall have received an Appraisal indicating an Appraised Value and otherwise in form and substance satisfactory to the Administrative Agent in all respects.

(p)     Hotel Management Agreement.  The Administrative Agent shall have received a copy of the Hotel Management Agreement, certified by the Borrower as true, complete and correct.

(q)     Development Agreement.  The Administrative Agent shall have received a copy of the Development Agreement, certified by the Borrower as true, complete and correct.

(r)     Material Operating Agreements.  The Administrative Agent shall have received executed copies of all Material Operating Agreements, each certified by the Borrower as true, complete and correct.

50

(s)  <u>Land Use and Zoning</u>.  The Administrative Agent shall have received evidence (including, without limitation, a zoning endorsement to the Title Insurance Policy in form and substance reasonably acceptable to the Administrative Agent) that the Property does and, upon Substantial Completion of the Additional Improvements, will comply with all applicable zoning, subdivision, land use, environmental and building Laws.

(t)  <u>Preliminary Project Report</u>.  The Administrative Agent shall have received the Preliminary Project Report in form and substance satisfactory to the Administrative Agent.

(u)  <u>Pre-Sale Requirement</u>.  The Borrower shall have met the Pre-Sale Requirement.

(v)  <u>Intentionally Omitted</u>.

(w)  <u>Plans and Specifications</u>.  The Administrative Agent shall have Approved any current design drawings or preliminary plans and specifications for the Project.

(x)  <u>Approved Project Budget</u>.  The Borrower shall have delivered to the Administrative Agent a preliminary Project Budget setting forth the Borrower's best estimate, based on diligent inquiry, of all Project Costs and the Administrative Agent shall have Approved such Project Budget in its discretion.

(y)  <u>Construction Schedule</u>.  The Administrative Agent shall have received a preliminary Construction Schedule from the Borrower and shall have Approved the same.

(z)  <u>Architect's Contract</u>.  The Administrative Agent shall have Approved of the Architect and the Borrower shall have delivered to the Administrative Agent fully executed copies of the Architect's Contract and any other design professional's agreements, if any, which Architect's Contract and other agreements shall be Approved by the Administrative Agent, which Approval shall not be unreasonably withheld.  The Administrative Agent shall have received an executed original of the Architect's Certificate.

(aa)  <u>Intentionally Omitted</u>.

(bb)  <u>Permits</u>.  All Existing Permits shall be in full force and effect and shall have not been revoked, terminated or modified except as Approved by the Administrative Agent.

(cc)  <u>Consent</u>.  The Administrative Agent shall have received an executed original of the Consent to Assignment from the Architect.

(dd)  <u>Legal Opinions</u>.  The Administrative Agent shall have received legal opinions from counsel satisfactory to the Administrative Agent with respect to such matters as the Administrative Agent or its counsel may require, all such opinions shall be in form, scope and substance satisfactory to the Administrative Agent and the Administrative Agent's counsel in their sole discretion.

51

Section 3.2    Conditions Precedent to Construction Advances.    In addition to the conditions precedent set forth in Section 3.1, the Obligation of each Lender to make the initial Construction Advance shall be subject to the following conditions precedent:

(a)    General Contractor's Agreement.    The Borrower and the General Contractor shall have entered into the General Contractor's Agreement in form and substance Approved by the Administrative Agent, which Approval shall not be unreasonably withheld, General Contractor and the Borrower shall have delivered to the Administrative Agent fully executed copies of such General Contractor's Agreement.  The Administrative Agent shall have received an executed original of the General Contractor's Certificate.

(b)    Construction Manager's Agreement.    The Borrower and the Construction Manager shall have entered into the Construction Manager's Agreement in form and substance Approved by the Administrative Agent, which Approval shall not be unreasonably withheld, and the Borrower shall have delivered to the Administrative Agent fully executed copies of such Construction Manager's Agreement.

(c)    Consents.    The Administrative Agent shall have received an executed original of the Consent to Assignment from each of the General Contractor and the Construction Manager.

(d)    Plans and Specifications.    The Administrative Agent shall have Approved the Plans and Specifications and shall have received two (2) complete copies of such approved Plans and Specifications, together with a certificate of a duly authorized officer of the Borrower certifying as to the completeness and the compliance with all Laws for such Plans and Specifications. The Borrower shall have delivered to the Administrative Agent a certificate duly executed on behalf of the Borrower stating that the Plans and Specifications (A) comply with all Laws, all Permits, and all restrictions, covenants and easements affecting the Property; (B) have been approved by the General Contractor and the Architect; and (C) have been approved by each Governmental Authority required to permit the construction of the Additional Improvements.

(e)    Approved Project Budget.    The Borrower shall have delivered to the Administrative Agent a final Project Budget setting forth all Project Costs and the Administrative Agent shall have Approved such Project Budget in its discretion.

(f)    Construction Schedule.    The Administrative Agent shall have received the Construction Schedule from the Borrower and shall have Approved the same.

(g)    Performance Bonds.    The Administrative Agent shall have received the Performance Bonds.

(h)    Standard Form of Contract.    The Administrative Agent and the Construction Consultant shall have received from the Borrower a copy of the standard form of contract or subcontract to be used by the General Contractor, which standard form shall be Approved by the Administrative Agent, which approval shall not be unreasonably withheld.

(i)     Preliminary Project Report.  The Administrative Agent shall have received an update to the Preliminary Project Report, reflecting the adoption of the Plans and Specifications, Project Budget and Construction Schedule, in form and substance satisfactory to the Administrative Agent.

(j)     Condominium.  (i) The final Condominium Plat shall have been recorded in the land records of Summit County, Utah; (ii) the Title Company shall have issued an endorsement to the Title Insurance Policy in the form of Exhibit AA insuring that the Condominium has been validly formed and that the Lien of the Security Instrument remains a valid and perfected Lien on the Fractional Ownership Units, subject to no additional exceptions other than the terms and conditions of the Fractional Ownership Documents and (iii) the Borrower's registration of the Project with the Condominium Authority under the Condominium Act shall have been declared final.

(k)     Bona Fide Sales Contracts.  Qualified Reservations providing for Net Sales Proceeds sufficient to meet the Pre-Sale Requirement shall have been converted in accordance with applicable Law to Bona Fide Sales Contracts with respect to which all rights of rescission or cancellation shall have expired without having been exercised.

(l)     Construction Contingency Escrow.  The Borrower shall have funded the Construction Contingency Escrow in accordance with Section 2.17.

Section 3.3     Conditions Precedent to Each Advance.  The Obligation of each Lender to make any Advance of the Loan (including the Initial Advance) shall be subject to the following conditions precedent and each of such conditions shall be completed to the Administrative Agent's satisfaction:

(a)     Representation and Warranties; Compliance with Conditions.  Each of the representations and warranties of each Loan Party contained in this Agreement, any certificate delivered pursuant hereto or any other Loan Document shall be true and correct on and as of the date of this Agreement and the Requested Advance Date with the same effect as if made on and as of such date; each Loan Party shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed; and no Default or Event of Default shall have occurred and be continuing.

(b)     "Bring-Down Certificate".  The Borrower shall provide to the Administrative Agent a certificate of the Borrower and the Sponsor that the representations and warranties made by each Loan Party in the Loan Documents or otherwise made by or on behalf of the Borrower, the Borrower's Member and the Sponsor in connection therewith or after the date thereof shall have been true, correct and complete in all material respects on the date on which made and shall continue to be true and correct in all material respects on the applicable Requested Advance Date.

(c)   Draw Request.  The Administrative Agent shall have received a Draw Request and a Rate Request complying with the provisions of this Agreement with respect to such Advance.

(d)   Construction Costs.  If any portion of the proceeds of the requested Advance will be used by the Borrower to fund Construction Costs:

(i)   Approval of Major Contractors/Major Subcontractors.  The Administrative Agent and the Construction Consultant shall have Approved all Major Contractors and Major Subcontractors who have been, or, to the extent identified by the Borrower on or prior to the Requested Advance Date, will be supplying labor or materials for the Project.

(ii)   Construction Contracts.  The Borrower shall have delivered to the Administrative Agent, and the Administrative Agent shall have Approved, (i) a list of all Trade Contractors who have been or will be supplying labor or materials for the Additional Improvements and (ii) all Construction Contracts of such Trade Contractors executed on or before the Requested Advance Date.

(iii)   Permits.  The Administrative Agent shall have received (A) copies of all Permits necessary to commence construction of the Additional Improvements as contemplated by the Plans and Specifications, including, without limitation, all relevant permits, licenses and approvals, and (B) with respect to any Permits that have not been obtained as of the applicable Requested Advance Date, a list of such Permits along with a certificate from the Borrower stating that to the Borrower's knowledge after due inquiry, such Permits are not currently obtainable based upon the status of the Project but will be readily achievable in due course in accordance with the Construction Schedule.

(e)   Certificate for Payment.  To the extent applicable (i.e., if the General Contractor has performed any work or is otherwise entitled to receive or has received a payment pursuant to the terms of its General Contractor's Agreement), the Administrative Agent shall have received a Certificate for Payment (AIA Document No. G702) containing the certification of the Architect as to the accuracy of the information set forth therein, together with invoices (to the extent such items are invoiced) or other reasonably satisfactory evidence of the cost of such item, relating to all items of Project Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Improvements to the date of the Draw Request.

(f)   Construction Consultant's Report.  The Administrative Agent shall have received a current report prepared by the Construction Consultant satisfactory to the Administrative Agent.

(g)   Lien Waivers.  The Administrative Agent shall have received duly executed lien waivers in the form set forth in Exhibit Q from all Major Contractors and Major

54

Subcontractors for all work performed, and all labor or material supplied for which payment thereof has been made prior to the date of such Advance.

        (h)    <u>Affirmation of Payment</u>. To the extent applicable (i.e., if the General Contractor has performed any work or is otherwise entitled to receive or has received a payment pursuant to the terms of its General Contractor's Agreement), the Administrative Agent shall have received a Contractor's Affidavit of Payment of Debts and Claims in the form of AIA Document G706.

        (i)    <u>Title Insurance "Date Down"</u>. The Administrative Agent shall have received a "date down" endorsement to the Title Insurance Policy and other endorsements reasonably required by the Administrative Agent, dated the date of such Requested Advance Date, insuring the Security Instrument as a first lien on the Mortgaged Property, subject only to (A) the Permitted Exceptions and (B) any other Liens consented to· in writing by the Administrative Agent.

        (j)    <u>Evidence of Sufficiency of Funds</u>. The Borrower shall deliver to the Administrative Agent evidence satisfactory to the Administrative Agent that the proceeds of the Loan, together with Borrower's Equity Investment and any Deposits made by Purchasers under Bona Fide Sales Contracts, will be sufficient to cover all Project Costs reasonably anticipated to be incurred and to satisfy the obligations of the Borrower to the Administrative Agent under this Agreement, such evidence to include an Anticipated Cost Report in the form set forth in Exhibit R prepared by the General Contractor which sets forth the anticipated costs to complete construction of the Improvements, after giving effect to costs incurred during the previous month.

        (k)    <u>Material Adverse Effect</u>. There shall be no facts or circumstances which shall have caused or could be reasonably expected to cause a Material Adverse Effect.

        (l)    <u>No Damage</u>. The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty other than de minimis damage, unless the Administrative Agent shall have received insurance proceeds sufficient in the judgment of the Administrative Agent to effect the satisfactory restoration of the Improvements and to permit the completion of the Additional Improvements prior to the Completion Date.

        (m)    <u>Major Contracts</u>. No Advance shall be made by Lenders with regard to work done by or on behalf of any Major Contractor or Major Subcontractor unless the Borrower shall have delivered to the Construction Consultant an original fully executed contract as to such Major Contractor or Major Subcontractor, each in form and substance reasonably satisfactory to the Administrative Agent.

        (n)    <u>Leases</u>. The Administrative Agent shall have received copies of each existing Lease (if any), not already provided to the Administrative Agent, certified by the Borrower as true, complete and correct.

55

(o)     Taxes.    The Borrower shall provide evidence satisfactory to the Administrative Agent and its counsel that all Taxes in respect to the Borrower or the Improvements that are due and payable have been paid subject to the Borrower's right to contest such Taxes as provided in Section 6.2(f).

(p)     No Injunction.    No Law shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of the Administrative Agent would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loan, the construction of the Additional Improvements or the consummation of the transactions contemplated hereby.

(q)     Other Documents or Deliveries.    The Borrower shall have delivered such other documents and certificates as the Administrative Agent or its counsel may reasonably require.

Section 3.4     Conditions of Final Advance.    In addition to the conditions set forth in Sections 3.1 and 3.2, each Lender's Obligation to make its Ratable Share of the final Advance in respect of Retainage pursuant to this Agreement shall be subject to the following conditions precedent:

(a)     Final Completion.    Final Completion shall have occurred in accordance with the Plans and Specifications and the Construction Consultant shall have delivered a certification to the Administrative Agent that Final Completion has occurred substantially in accordance with the Plans and Specifications.

(b)     Certificate.    The Administrative Agent shall have received the Architect's Certificate.

(c)     Lien Waivers.    The Administrative Agent shall have received duly executed final lien waivers in the form set forth in Exhibit Q from the General Contractor and all Trade Contractors who have performed work or provided materials or services, for the work so performed or the supplied labor or materials supplied.

(d)     Final Survey.    The Administrative Agent shall have received a final ALTA as-built survey (the *As-Built Survey*) acceptable to the Administrative Agent showing the as-built location of all Improvements, certified to be in conformance with the requirements set forth on Exhibit S.

(e)     Payment of Costs.    The Administrative Agent shall have received evidence satisfactory to the Administrative Agent that all sums due in connection with the construction of the Additional Improvements have been paid in full (or will be paid out of the funds requested to be advanced) and that no party claims or, following payment out of such funds, will have a right to claim any statutory or common law Lien arising out of the construction of the Improvements or the supplying of labor, material or services in connection therewith.

56

(f)    Title Insurance Policy. The Administrative Agent shall have received an endorsement to the Title Insurance Policy referencing the As-Built Survey and indicating no exceptions other than those approved by the Administrative Agent in its reasonable discretion.

(g)    Other Documents. The Administrative Agent shall have received such documents, letters, affidavits, reports and assurances, as the Administrative Agent, the Administrative Agent's counsel and the Construction Consultant may reasonably require, including, without limitation, completed AIA Form G704 (Certificate of Substantial Completion) and completed AIA Form G707 (Consent of Surety to Final Payments).

## ARTICLE 4

## ACCOUNTS/CASH MANAGEMENT

Section 4.1    Accounts/Cash Management. (a) Establishment of Accounts. The Borrower shall establish prior to the initial closing of the sale of any interest in a Fractional Ownership Unit and maintain, at the Depository, a segregated lockbox and concentration account with the name "Sky Lodge Sales Proceeds Account pledged to WestLB AG (as agent and secured party)" (the *Sales Proceeds Account*). The Borrower shall also establish prior to the Opening Date and maintain, at the Depository, (i) a segregated lockbox and concentration account with the name "Sky Lodge Lockbox Account pledged to WestLB AG (as agent and secured party)" (the *Lockbox Account*) and (ii) a segregated operating account, with the name "Sky Lodge Operating Account pledged to WestLB AG (as agent and secured party)" (the *Operating Account*). The Lockbox Account, the Operating Account, the Sales Proceeds Account and the Reserve Accounts set forth in Section 4.1(b) are hereinafter referred to as the *Accounts*. The Administrative Agent may, in its sole discretion, rename the Accounts from time to time to reflect changes in the identity of the Administrative Agent.

(b)    Accounts. The Borrower shall establish prior to the Opening Date and maintain at the Depository, the following segregated securities accounts (each, a *Reserve Account* and, collectively, the *Reserve Accounts*):

(i)    an account captioned "Sky Lodge Tax and Insurance Account pledged to WestLB AG" for the retention of collateral in respect of tax and insurance premiums for the Property (the *Tax and Insurance Account*) into which shall be funded on the Opening Date an amount determined by the Administrative Agent to be equal to the sum of one year's Taxes on the Property plus the aggregate annual insurance premium for the Required Insurance;

(ii)    an account captioned "Sky Lodge FF&E Reserve Account pledged to WestLB AG" (*FF&E Reserve Account*);

(iii)    an account captioned "Sky Lodge HOA Reserve Account pledged to WestLB AG" (the *HOA Reserve Account*);

57

(iv)   an account captioned "Sky Lodge Debt Service Reserve Account pledged to WestLB AG" (the *Debt Service Reserve Account*).

(c)   Type and Control of Accounts.   The Borrower represents, warrants, covenants and agrees that (i) each of the Accounts shall be an Eligible Account and shall be maintained as a "securities account" (as in Section 8-501(a) of the UCC); (ii) the Administrative Agent shall be entitled to exercise the rights that comprise any financial asset credited to such Accounts; (iii) the Borrower shall have no right to give entitlement orders with respect to such Accounts and, except as provided in this Agreement, no Account Collateral shall be released to the Borrower from such Accounts; and (iv) all securities or other property underlying any financial assets credited to the Accounts shall be registered in the name of the Depository or indorsed to the Depository or in blank and in no case will any financial asset credited to the Accounts be registered in the name of the Borrower, payable to the order of the Borrower or specially indorsed to the Borrower.

(d)   Dominion and Control.   The Accounts, and all funds deposited in the Accounts shall be under the sole dominion and control of the Administrative Agent and, subject to the terms of this Agreement, the Administrative Agent shall have the sole right to make or authorize withdrawals, disbursements or transfers from the Accounts and to exercise any rights of the Administrative Agent hereunder with respect to such funds.

(e)   Maintaining the Accounts.   (i) The Borrower agrees that: (A) the Accounts shall be maintained in accordance with the terms hereof and of the Depository Agreement; and (B) prior to the indefeasible re-payment in full of the Loan and indefeasible satisfaction of the Borrower's Obligations under the Loan Documents, the Depository Agreement shall not be amended, supplemented or modified without the prior written consent of the Administrative Agent. The Borrower shall not substitute any other bank as the Depository with respect to any of the Accounts (x) without the prior written consent of the Administrative Agent and (y) unless such bank shall execute and deliver to the Administrative Agent a depository agreement in form and substance reasonably acceptable to the Administrative Agent.

(ii)   So long as no Event of Default shall have occurred and be continuing, upon the written request by the Borrower (delivered not more than twice in any thirty (30) day period), the Administrative Agent shall direct the Depository to invest the funds held in the Accounts pursuant to the written direction of the Borrower, in any of the Permitted Investments, subject to the terms of the Depository Agreement. All interest or other earnings with respect to the funds held in the Accounts as a result of such investments shall be retained in the respective Accounts, shall be deemed part of the Account Collateral and shall be disbursed, invested or applied in accordance with the provisions of this Agreement. The Administrative Agent shall bear no responsibility for any loss occasioned by investment of the Account Collateral as herein provided, by any delays in investing or reinvesting the Account Collateral, or by any failure to achieve the maximum possible yield from the Account Collateral.

(f)   No Other Accounts.   The Borrower represents and warrants that there are no deposit, securities or similar accounts (other than the Accounts) maintained by the Borrower or any other Person with respect to the collection of Gross Revenues. The Borrower agrees that,

until the Loan is indefeasibly re-paid in full and the indefeasible satisfaction of the Borrower's Obligations under the Loan Documents, neither the Borrower nor any other Person shall open any accounts for the collection or holding of Gross Revenues, except for the Accounts. The foregoing shall not prohibit the Borrower from utilizing one or more separate accounts for the disbursement or retention of funds that have been transferred to the Borrower to the extent permitted under this Agreement and the other Loan Documents.

(g)    Miscellaneous Account Provisions. The Accounts shall be subject to such applicable Laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking or governmental authority, as may now or hereafter be in effect. All statements relating to the Accounts shall be issued simultaneously by the Depository to the Administrative Agent and the Borrower. The Borrower shall be the beneficial owner of the Accounts for federal and state income tax purposes and shall report all income on the Accounts. Returned items in the Lockbox Account will be charged against the Borrower in the succeeding month or, if later, when actually returned. The Administrative Agent and the Lenders shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law with respect to the Account Collateral, except for those arising as a result of their gross negligence or willful misconduct.

Section 4.2    Collection of Gross Revenues. (a) All Gross Revenues (including, without limitation, all Credit Card Receivables), which the Borrower may at any time hereafter directly or indirectly receive, in connection with the use and operation of the Property, shall be held in trust by the Borrower for the sole benefit of the Lenders, shall not be commingled with any other funds, and shall, within two (2) Business Days of receipt, be deposited directly into the Lockbox Account. The Borrower hereby acknowledges and confirms that all Gross Revenues deposited in the Lockbox Account shall at all times be held and treated in accordance with the terms hereof, and the Borrower shall not have any right or authority, whether express or implied, to make use of, or withdraw all or any portion of, such Gross Revenues. The Borrower and the Administrative Agent further acknowledge and confirm that any withdrawals of Gross Revenues from the Lockbox Account shall be made by the Administrative Agent only and any such withdrawals shall be made only in accordance with the terms, covenants and conditions of this Agreement.

(b)    The Borrower shall and shall cause the Hotel Operator to immediately notify all parties (the *Credit Card Companies*) under any existing or future Credit Card Company Agreements of the existence of this Agreement and shall direct or cause to be directed such parties in a letter in form and substance acceptable to the Administrative Agent to deliver directly into the Lockbox Account all Credit Card Receivables and any and all other payments to which the Borrower now or hereafter may be entitled under any Credit Card Company Agreement.

(c)    The Borrower shall direct all payments, whether in the form of checks, cash, drafts, money orders or any other payments of any kind whatsoever in payment of rent or any other item payable to the Borrower (collectively, *Rents*) from any tenants of the Property or any portion thereof (collectively, the *Tenants*) under any Leases, whether any such Lease is presently effective or executed after the date hereof, to be made directly to the Depository for

59

deposit into the Lockbox Account, in accordance with instructions from the Administrative Agent furnished by Depository. The Borrower covenants that concurrently with the execution of any Lease, the Borrower shall direct the Tenant thereunder in form and substance acceptable to the Administrative Agent to make all payments of Rents under such Lease directly to the Depository for deposit into the Lockbox Account. If, notwithstanding the preceding actions, the Borrower, the Hotel Operator, or any Affiliate of the Borrower comes into possession of any Rents (i) the Borrower, the Hotel Operator, or such Affiliate shall be deemed to hold such funds in trust for the Administrative Agent pursuant to the terms of this Agreement, and (ii) the Borrower shall, or shall cause the Hotel Operator or such Affiliate to cause such funds to be deposited in the Lockbox Account within two (2) Business Days after their receipt by the Borrower, the Hotel Operator or such Affiliate. Upon written request from the Administrative Agent, the Borrower shall provide such further evidence as the Administrative Agent reasonably requests that Tenants are paying all Rents directly in accordance with the foregoing, and shall take such other actions as the Administrative Agent shall reasonably request in order to accomplish the same. The Borrower shall not instruct any Tenant to pay Rents other than to Depository for deposit into the Lockbox Account, or in any way amend or supersede the foregoing instructions to a Tenant, without the prior written consent of the Administrative Agent in each instance.

(d)    If the Borrower or, in connection with the Property, the Hotel Operator or any Affiliate of the Borrower shall receive, any (i) real estate tax refunds, (ii) proceeds of any business interruption insurance or any other insurance other than fire, casualty and similar property damage insurance, (iii) damages or other payments in settlement of claims by the Borrower against third parties including any cancellation or surrender payments from Tenants or (iv) any other cash revenues from the operation of the Property, then the Borrower, the Hotel Operator or such Affiliate shall be deemed to hold such funds in trust for the Administrative Agent pursuant to this Agreement and the Borrower shall cause such funds, within two (2) Business Days of such receipt, to be remitted to the Lockbox Account, and in the case of real estate tax refunds, net of any reasonable and customary fees and disbursements of tax certiorari counsel or other third party deducted from the refund to pay such counsel's or third party's fee arrangement with the Borrower.

(e)    The provisions of this Section 4.2 constitute an assertion by the Administrative Agent of its right to collect and retain the Rents pursuant to this Agreement and the other Loan Documents, and, to the extent provided in this Section 4.2, the Borrower hereby waives any rights it may have to collect the Rents directly. The Borrower hereby confirms and reaffirms the assignments to the Administrative Agent of the Rents from the Property contained in the Security Instrument and the perfection thereof by virtue of the requirement of the direct payment of all Rents to the Lockbox Account in accordance with the provisions of this Agreement, and hereby ratifies all of the terms and conditions of such assignments. In furtherance thereof and in confirmation of the perfection of such assignments, the Borrower hereby further ratifies and confirms the grant to the Administrative Agent contained herein of a present perfected security interest in and to such Rents, as collateral for the payment, as and when due and payable, of all Obligations of the Borrower pursuant to the Loan Documents. The Borrower further (i) acknowledges that the Administrative Agent has directed the Borrower to send a notice to each of the Tenants, instructing such Tenants to pay all Rents payable under

60

L:079333_9_06434_00909

Leases to the Lockbox Account, (ii) confirms that it has transmitted or will transmit such notices to each of such Tenants, and (iii) agrees that such direction by the Administrative Agent and transmittal by the Borrower shall constitute and be deemed an affirmative act of the Administrative Agent for purposes of establishing a perfected security interest in such Rents.

(f)        Neither the Borrower nor the Hotel Operator shall terminate, amend, revoke or alter any letter delivered pursuant to Sections 4.2(b) or (e) above by amending the Credit Card Company Agreements or any Lease or otherwise without the prior written consent of the Administrative Agent.

Section 4.3        Disbursement of Funds from Lockbox Account.  From and after the Opening Date and throughout the term of the Loan, so long as no DSCR Trigger or Event of Default has occurred and is continuing, on each Payment Date the Administrative Agent shall withdraw and direct the Depository to disburse from the Lockbox Account from funds deposited herein, and the Borrower hereby consents to such disbursement, the following amounts in the following order:

(i)        into the Tax and Insurance Account, an amount (the *Tax and Insurance Deposit*) equal to (A) one-twelfth (1/12) of the amount of the annual Taxes that will next become due and payable on the Property, plus (B) one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on the Required Policies, each as estimated and determined by the Administrative Agent;

(ii)       into the FF&E Reserve Account, an amount (the *FF&E Deposit*) equal to $[_____] per month;

(iii)      into the HOA Reserve Account, an amount (the *HOA Deposit*) determined by the Administrative Agent in its reasonable judgment, sufficient to fund any common charges payable under the Fractional Ownership Documents with respect to unsold Fractional Ownership Units for the applicable period; and

(iv)       the balance, to the Operating Account on a daily basis.

Section 4.4        Disbursements after a DSCR Trigger.  (a)  In the event the Debt Service Coverage Ratio for any Test Period is determined to be less than the Hurdle DSCR, or the Borrower fails to provide sufficient evidence that the Debt Service Coverage Ratio for such Test Period is at least equal to the Hurdle DSCR for such Test Period (each being a *DSCR Trigger*), then all funds in the Lockbox Account, and all funds thereafter deposited into such Lockbox Account, shall be deposited into the Debt Service Reserve Account.  So long as no Event of Default has occurred and is continuing, the Administrative Agent shall withdraw and direct the Depository to disburse from the Lockbox Account from funds deposited herein on each Payment Date (or as soon thereafter as such funds are available), and the Borrower hereby consents to such disbursement, the following amounts in the following order:

61

(i)        to the Administrative Agent, the sum of (A) the amount of principal and interest due and payable under the Notes, and all other obligations, liabilities or sums due and payable to the Lenders under the Loan Documents (including, without limitation, Hedge Payments, Hedge Breakage, LIBOR Breakage Costs, and the Unused Fee, to be applied in accordance with this Agreement, plus (B) any other amounts payable to the Administrative Agent pursuant to this Agreement, plus (C) any amounts due to the Depository under and pursuant to the Depository Agreement or in connection with the performance of any services in connection with the Loan (the *Monthly Debt Service Amount*);

(ii)        into the Tax and Insurance Account, an amount equal to the Tax and Insurance Deposit;

(iii)        into the FF&E Reserve Account, an amount equal to the FF&E Deposit;

(iv)        into the HOA Reserve Account, an amount equal to the HOA Deposit;

(v)        to the Operating Account, an amount equal to the amount specified in the Operating Budget for such month to be expended on account of Operating Expenses through the applicable calendar month (the *Monthly Budgeted Amount*); provided that the Borrower shall have delivered to Administrative Agent at least three (3) Business Days prior to such date a certification (the *Certification*) that all Operating Expenses previously paid to date and all Operating Expenses anticipated to be expended through the end of the current calendar year are in material compliance with the Operating Budget and that the Operating Expenses, in the aggregate, do not deviate from such Operating Budget by more than five percent (5%); and

(vi)        the balance if any shall remain in the Debt Service Reserve Account and shall be disbursed in accordance with subsection (b) below.

(b)        In the event that following a DSCR Trigger, the applicable Hurdle DSCR is not achieved within twelve (12) months following the date of the DSCR Trigger, subject to Section 4.5, the Administrative Agent may transfer any balance in the Debt Service Reserve Account from time to time to the Lenders to amortize the Outstanding Principal until the Hurdle DSCR has been achieved.  However, if the Hurdle DSCR is achieved and maintained for a twelve (12) month period following the date of the DSCR Trigger, as confirmed by an Approved Accountant, all funds in the Debt Service Reserve Account will be transferred to the Lockbox Account and disbursed in accordance with Section 4.3 and the Administrative Agent will direct the Depository to no longer transfer funds from the Lockbox Account to the Debt Service Reserve Account.

Section 4.5    Disbursements During an Event of Default.  (a) From and after the occurrence and during the continuance of an Event of Default, on or before the first Business

62

Day of each calendar month thereafter (or as soon thereafter as funds are available in the Lockbox Account), the Administrative Agent shall withdraw and direct the Depository to disburse from the Lockbox Account from funds deposited herein, and the Borrower hereby consents to such disbursement, the following amounts in the following order:

      (i)     to the Administrative Agent, an amount equal to the Monthly Debt Service Amount;

      (ii)    to the Tax and Insurance Account, an amount equal to the Tax and Insurance Deposit;

      (iii)   to the FF&E Reserve Account, an amount equal to the FF&E Deposit;

      (iv)   to the HOA Reserve Account, an amount equal to the HOA Deposit; and

      (v)    any remaining amounts to the Debt Service Reserve Account.

    (b)    Notwithstanding the foregoing, upon the acceleration of the Loan following the occurrence of an Event of Default, the Administrative Agent may, in its sole discretion, apply funds in the Accounts, and funds resulting from the liquidation of Permitted Investments contained in the Accounts, toward the satisfaction of the Borrower's Obligations under the Loan Documents in such manner as the Administrative Agent shall elect in its sole discretion.

    Section 4.6   <u>Funding Reserve Accounts</u>.  To the extent that on any Interest payment date under this Agreement, Gross Revenues received by or on behalf of the Borrower during the immediately preceding calendar month were not sufficient to fund the Tax and Insurance Deposit or the FF&E Deposit or the HOA Deposit for such calendar month, the Borrower shall on such Interest payment Date pay into the Tax and Insurance Account or the FF&E Account or the HOA Reserve Account such amounts as shall be necessary to fully fund the Tax and Insurance Deposit, the FF&E Deposit and the HOA Deposit for such preceding month.  The Borrower acknowledges and agrees hereby that its obligation to fund the monthly Tax and Insurance Deposit, FF&E Deposit and the HOA Deposit is not conditional upon the Property generating adequate Gross Revenues for any particular period.

    Section 4.7   <u>Disbursements from Tax and Insurance Account</u>.  So long as no Event of Default shall have occurred and be continuing, all sums in the Tax and Insurance Account shall be held in the Tax and Insurance Account to pay said Taxes and insurance premiums with respect to the Required Insurance before the same become delinquent.  The Borrower shall be responsible for ensuring the receipt by the Administrative Agent of all bills, invoices and statements for all Taxes within ten (10) Business Days after receipt thereof, and all bills, invoices and statements for insurance premiums within thirty (30) days prior to the due date thereof, to be paid from the Tax and Insurance Account, and so long as no Event of Default has occurred and is continuing, the Administrative Agent shall cause payment to be made to the

63

Governmental Authority or other party entitled thereto directly to the extent funds are available for such purpose in the Tax and Insurance Account.

Section 4.8    Disbursements from FF&E Reserve Account.  So long as no Event of Default shall have occurred and be continuing, upon the Hotel Operator's application given to the Administrative Agent no more than once in any calendar month, the Administrative Agent shall or shall cause Depository to transfer to the Operating Account funds in the FF&E Reserve Account necessary for the renewal, replacement and addition of FF&E in accordance with the then-current Approved Operating Budget, and this Agreement.  Amounts on deposit in the FF&E Reserve Account may not be used by the Borrower to fund Project Costs in connection with the Additional Improvements.

Section 4.9    Disbursements from HOA Reserve Account.  So long as no Event of Default shall have occurred and be continuing, all sums in the HOA Reserve Account shall be held in the HOA Reserve Account to pay any common charges payable under the Fractional Ownership Documents or Condominium Documents with respect to the Commercial Units or any unsold interests in any Fractional Ownership Units before the same become delinquent.  Upon the Hotel Operator's application given to the Administrative Agent no more than once in any calendar month, the Administrative Agent shall or shall cause Depository to transfer to the Operating Account funds in the HOA Reserve Account necessary for the payment of such common charges in accordance with the terms of the Fractional Ownership Documents.

Section 4.10    Obligations Unaffected.  The Borrower's obligation to fund the foregoing accounts and make the foregoing payments under the Loan Documents shall in no way be conditioned on the existence or non-existence of funds in the Lockbox Account.  Nothing contained herein shall be construed to alter, change, modify or waive the Borrower's obligation to pay any and all amounts due and payable from time to time, as and when such amounts are due, under and pursuant to the Loan and the Loan Documents, including, without limitation, any and all payments of interest, principal, fees, costs and expenses due and payable from time to time thereunder.

Section 4.11    Withdrawals.   Except as set forth in Section 4.1(e)(ii), the Administrative Agent shall be the only party permitted to effect any disbursement or withdrawal from the Accounts and the Borrower shall not be permitted to and shall not effect or attempt to effect any disbursement or withdrawal from any of such accounts (unless otherwise permitted pursuant to the Administrative Agent's written instructions); provided, the Credit Card Companies shall be permitted to debit the Lockbox Account by Automated Clearing House electronic debit pursuant to their Credit Card Agreement and in accordance with customary practices in the industry.

Section 4.12    Creation of Security Interest in Accounts.  The Borrower hereby pledges, transfers and assigns to the Administrative Agent, and grants to the Administrative Agent, as additional security for the Obligations of the Borrower under the Loan Documents, a continuing perfected first priority security interest in and to, and a first lien upon:   (i) the Accounts and all amounts which may from time to time be on deposit in each of the Accounts; (ii) all of the Borrower's right, title and interest in and to all cash, property or rights transferred

64

to or deposited in each of the Accounts from time to time; (iii) all certificates and instruments, if any, from time to time representing or evidencing any such Account or any amount on deposit in any thereof, or any value received as a consequence of possession thereof, including all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Accounts; (iv) all monies, chattel paper, checks, notes, bills of exchange, negotiable instruments, documents of title, money orders, commercial paper, and other security instruments, documents, deposits and credits from time to time in the possession of the Administrative Agent or the Lenders representing or evidencing such Accounts; (v) all other property, held in, credited to, or constituting part of any of the Accounts; (vi) all earnings and investments held in any Account in accordance with this Agreement; and (vii) to the extent not described above, any and all proceeds of the foregoing, (collectively, the *Account Collateral*). This Agreement and the pledge, assignment and grant of security interest made hereby secures payment of all Obligations of the Loan Parties under the Loan Documents in accordance with the provisions set forth herein. This Agreement shall be deemed, *inter alia*, a security agreement within the meaning of the UCC.

Section 4.13    Certain Matters Regarding Lender following an Event of Default. The Administrative Agent may exercise in respect of the Account Collateral all rights and remedies available to the Administrative Agent hereunder or under the other Loan Documents, or otherwise available at law or in equity. If an Event of Default exists, the Administrative Agent may exercise in respect of the Account Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the UCC then in effect in the applicable jurisdiction. Without limiting the generality of the foregoing, the Borrower agrees that, upon the occurrence and during the continuance of an Event of Default, it will have no further right to request or otherwise require the Administrative Agent to disburse funds from any Account in accordance with the terms of this Agreement, it being agreed that the Administrative Agent may, at its option, (i) direct the Depository to continue to hold the funds in the Accounts, (ii) continue, from time to time, to apply all or any portion of the funds held in the Accounts to any payment(s) which such funds could have been applied to prior to such Event of Default (or to pay expenses directly), to the extent and in such order and manner as the Administrative Agent in its sole discretion may determine, or (iii) direct the Depository to disburse all or any portion of the funds held in the Reserve Accounts or other Account Collateral then or thereafter held by the Depository to the Administrative Agent, in which event the Administrative Agent may apply the funds held in the Accounts or other Account Collateral to the Obligations, in any order and in such manner as the Administrative Agent may determine in its sole discretion. If an Event of Default has occurred and is continuing, the Administrative Agent may, at any time or from time to time: (1) collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Account Collateral, or any part thereof, without notice to the Borrower and without the need to institute any legal action, make demand to or upon the Borrower or any other Person, exhaust any other remedies or otherwise proceed to enforce its rights; (2) execute (in the name, place and stead of the Borrower) any endorsements, assignments or other instruments of conveyance which may be required for the withdrawal and negotiation of the Account Collateral; or (3) exercise all other rights and remedies available to the Administrative Agent hereunder and under any of the other Loan Documents. Notwithstanding anything to the contrary contained herein: (w) the Borrower shall remain liable under the Loan Documents to the extent set forth herein and therein to

65

8409X225_9_084391_69909

perform all of its respective obligations thereunder, to the same extent as if this Agreement had not been executed; (x) the exercise by the Administrative Agent of any of its rights hereunder shall not release the Borrower from its obligations under any of the Loan Documents, nor shall it constitute an election of remedies by the Administrative Agent or a waiver by the Administrative Agent of any of its rights and remedies under the Loan Documents; (y) except as expressly set forth in this Agreement or in any of the other Loan Documents, the Administrative Agent shall not have any obligation or liability by reason of this Agreement, nor shall the Administrative Agent be obligated to perform any of the obligations or duties of the Borrower hereunder or to take any action, in each case, to collect or enforce any claim for payment assigned hereunder; and (z) the Administrative Agent shall not have to resort to using the Account Collateral before making demand upon or bringing an action against the Borrower under any Loan Document or under any guaranty given in connection with the Loan.  No failure on the part of the Administrative Agent to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right under this Agreement or the other Loan Documents. The remedies provided in this Agreement, the Notes and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

Section 4.14  <u>Representations and Warranties Regarding Account Collateral</u>. In addition to the other representations or warranties contained in this Agreement, the Borrower represents and warrants as follows:

(a)     The Borrower is the legal and beneficial owner of the Account Collateral free and clear of any Lien except for the security interests in favor of the Administrative Agent created by this Agreement and the other Loan Documents. The Borrower, at its sole expense, shall defend the Borrower's and the Administrative Agent's title and interest in and to the Account Collateral against any and all third-party attachments, executions, Liens, claims, security interests or other encumbrances of any nature, however arising. Except for the Accounts, the Borrower currently does not maintain and will not open any accounts with any bank, savings and loan company, brokerage or investment services firm or related institution.

(b)     Other than the filing of the Financing Statements and the execution and delivery of the Depository Agreement, no consent of any other Person and no authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required (i) for the pledge and assignment by the Borrower of the Account Collateral pursuant to this Agreement, (ii) for the execution, delivery or performance of this Agreement by Borrower or (iii) for the perfection or maintenance of the security interests created by this Agreement.

(c)     The pledge and assignment of the Account Collateral pursuant to this Agreement creates a valid security interest in the Account Collateral securing the payment of the Obligations of the Loan Parties under the Loan Documents.

(d)     Neither the Borrower nor the Hotel Operator, as applicable will amend, modify, assign or terminate any Credit Card Company Agreement, or enter into any new Credit Card Company Agreement, without the prior written consent of the Administrative Agent;

66

provided, that the Borrower, or Hotel Operator, as applicable, may, without the Administrative Agent's prior consent, amend, modify or terminate any Credit Card Company Agreement in accordance with industry standards for such agreements, provided such amendment, modification or termination is commercially reasonable and does not affect the Borrower's ability or obligation to deposit all Gross Revenues into the Lockbox Account within one (1) Business Day of receipt thereof.

        (e)    The Borrower will not amend, modify, assign or terminate any Leases, or enter into any new Leases, without the prior written consent of the Administrative Agent which consent shall not be unreasonably withheld, conditioned or delayed.

        Section 4.15  Covenants Regarding Account Collateral. The Borrower will not, without the prior written consent of the Administrative Agent, (a) sell, assign (by operation of law or otherwise), pledge, or grant any option with respect to, any of the Gross Revenues or any interest in the Account Collateral or (b) create or permit to exist any assignment, Lien, security interest, option or other charge or encumbrance upon or with respect to any of the Gross Revenues or any Account Collateral, except for the Liens in favor of the Administrative Agent under this Agreement and the other Loan Documents. The Borrower will give the Administrative Agent not less than thirty (30) days' prior written notice of any change in the address of its chief executive office or its principal office. The Borrower agrees that all records of the Borrower with respect to the Account Collateral will be kept at the Borrower's principal office and will not be removed from such addresses without the prior written consent of the Administrative Agent. The Borrower will not make or consent to any amendment or other modification or waiver with respect to any Account Collateral, or enter into any agreement, or permit to exist any restriction, with respect to any Account Collateral. The Borrower will, at its expense, defend the Administrative Agent's right, title and security interest in and to the Account Collateral against the claims of any Person. The Borrower will not take any action which would in any manner impair the enforceability of this Agreement or the security interests created hereby. The Borrower will not enter into any credit agreement or other borrowing facility including a line of credit or overdraft line, with Depository. Nothing contained in this Section 4.15 shall impair or otherwise limit the Borrower's obligations to timely make the payments (including interest and principal) required by the Notes and the other Loan Documents, it being understood that such payments shall be so timely made in accordance with the Loan Documents, regardless of the amounts on deposit in any Account. The Administrative Agent may, from time to time, at its sole option, perform any act which the Borrower agrees hereunder to perform and which the Borrower shall fail to perform after being requested in writing to so perform and the Administrative Agent may from time to time take any other action which Administrative Agent deems necessary for the maintenance, preservation or protection of any of the rights granted to the Administrative Agent hereunder. With respect to the powers conferred on the Administrative Agent hereunder, the Administrative Agent shall not have any duty as to the Accounts or the other Account Collateral, or any responsibility for (i) ascertaining or taking action with respect to any matters relative to the Accounts or the other Account Collateral, whether or not the Administrative Agent has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against prior parties or any other rights pertaining to the Accounts or the other Account Collateral.

34596235_9_004391_00900

Section 4.16   Further Assurances.   The Borrower agrees that on the date hereof and at any time from time to time hereafter to execute and deliver promptly all instruments and documents (including any Financing Statement filing necessary to perfect the Administrative Agent's liens on, and security interests in, the Account Collateral), and take all further action that may be necessary or reasonably desirable or that the Administrative Agent may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Administrative Agent to exercise and enforce its rights and remedies hereunder with respect to any Account Collateral.

Section 4.17   Administrative Agent's Duties.   The powers conferred on the Administrative Agent hereunder are solely to protect its interests in the Account Collateral and shall not impose any duty upon it to exercise any such powers except as expressly provided herein. Except for the safe custody of any Account Collateral in its possession, the accounting for moneys actually received by it hereunder and its obligations to direct the Depository to make disbursements hereunder, the Administrative Agent shall have no duty as to any Account Collateral as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to such Account Collateral. The Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Account Collateral in its possession if such Account Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 4.18   Cash Collateral.   In the event that the Borrower becomes the subject of a proceeding under the Bankruptcy Code, the parties hereto agree that the Account Collateral and the Rents (whether or not deposited in the Lockbox Account and whether or not then or thereafter due and payable) shall constitute "cash collateral" of the Administrative Agent under Section 363 of the Bankruptcy Code.

Section 4.19   Cash Management Fees.   All fees, costs and expenses associated with the Depository Agreement and Account Collateral shall be paid by the Borrower when due.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

The Borrower represents and warrants to the Administrative Agent and the Lenders, with respect to the Borrower and the Sponsor, as the case may be, knowing that the Administrative Agent and the Lenders will rely on such representations and warranties in making the Advances of the Loan, that, as of the date hereof or as of the date otherwise specified below or to the extent updated pursuant to other provisions in this Agreement or in the other Loan Documents as of such subsequent date:

Section 5.1   Organization, Status and Authority.   (a) The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Utah; (b) the Borrower has the power, authority and legal right to own, develop, operate, manage, sell and lease its properties and assets, carry on the business now being conducted and

68

proposed to be conducted by it, and to engage in the transactions contemplated by the Loan Documents; (c) the execution and delivery of the Loan Documents to which the Borrower is a party and the performance and observance of the provisions thereof have been duly authorized by all necessary limited liability company actions; and (d) the Borrower is a single purpose entity in compliance with the provisions of Section 6.5.

Section 5.2    Validity of Loan Documents.    The Loan Documents are in all respects valid and legally binding obligations of the Loan Parties, enforceable against the Loan Parties in accordance with their respective terms (subject to the effects of bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally), and grant to the Administrative Agent for the benefit of the Lenders a direct, valid and enforceable first Lien on and security interest in and to the Property, including any and all Personal Property acquired by the Borrower after the date of this Agreement, subject only to the Permitted Exceptions and any other matters Approved by the Administrative Agent after the date hereof.

Section 5.3    Absence of Conflicts.    The execution and delivery of the Loan Documents by each Loan Party do not, and the performance and observance by each Loan Party of its obligations thereunder will not, contravene or result in a breach of:  (a) any provision of Loan Party's certificate of incorporation, certificate of formation, limited partnership certificate, bylaws, partnership agreement, operating agreement, the LLC Agreement or any similar constituent organizational document; (b) any Laws the breach of which would reasonably be expected to have a Material Adverse Effect; (c) any decree or judgment binding on such Loan Party; or (d) any agreement or instrument binding on such Loan Party or any of its properties the breach of which would reasonably be expected to have a Material Adverse Effect.

Section 5.4    Pending Litigation.    There are no actions, suits, proceedings or investigations pending or, to the Borrower's knowledge, threatened against or affecting any Loan Party or the Property before or by any court or arbitrator or any Government Authority, which: (a) if determined adversely to any Loan Party or the Property would have a Material Adverse Effect; (b) could materially impair the value of any Collateral taken or to be taken by the Administrative Agent in connection with this Agreement or the other Loan Documents; (c) seek to restrain, enjoin or similarly prevent the consummation of or otherwise affect the transactions contemplated by this Agreement and the other Loan Documents or the construction of the Additional Improvements or use of the Property; or (d) questions the validity or legality of any such transactions, or seeks to recover damages or to obtain other relief in connection with any such transactions. To the Borrower's knowledge, there is no valid basis for any such action, suit, investigation or proceeding. No Loan Party is, in violation of any agreement, the violation of which would reasonably be expected to have a Material Adverse Effect, nor is any Loan Party in violation of any order, judgment or decree of any court, or any statute or governmental regulation to which such party is subject which would reasonably be expected to have a Material Adverse Effect.

Section 5.5    Financial Statements.    The financial statements of any Loan Party previously delivered to the Administrative Agent are true and complete and fairly present: (a) the financial condition of such Loan Party, as of the dates thereof and the results of its operations for

69

the periods covered thereby; (b) that no Material Adverse Effect has occurred in respect of the assets, liabilities or financial conditions reflected therein since the dates thereof; (c) that no additional borrowings have been made by the Borrower since the date thereof other than the borrowing contemplated hereby; and (d) that each such Loan Party is Solvent.

Section 5.6   Taxes.  All federal, state and other tax returns or valid extensions thereof of each Loan Party required by Law to be filed have been filed, all Taxes upon each Loan Party or its properties which are due and payable have been paid, and each Loan Party has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods for which such return shall have been filed.

Section 5.7   Title to Property.  The Borrower will have good and marketable title to a fee estate in the Property, including any personal property, subject to no Liens in favor of any Person other than the Administrative Agent (and other than the Permitted Exceptions), and no conditional sale contract, chattel mortgage, chattel deed of trust, security agreement, lease, financing statement or other title retention agreement has been or will be executed in favor of any Person other than the Administrative Agent with respect to any of the Personal Property. The Security Instrument, when duly executed, delivered and recorded, will constitute a valid first Lien with respect to the Property, subject only to the Permitted Exceptions.

Section 5.8   Compliance with Laws.  The Existing Improvements comply in all material respects with all applicable Laws. The Permits listed on Exhibit T are all of the Permits necessary for the commencement, continuance or completion of construction of the Additional Improvements and the use and operation of the Property as contemplated by the Loan Documents. The Borrower has obtained the Permits identified as "Existing Permits" on Exhibit T, and such Existing Permits have been validly issued by the appropriate authority and are in full force and effect. The Permits identified as "Pending Approvals" on Exhibit T are available as of right in the ordinary course of business and are anticipated to be issued as necessary to facilitate construction, ownership, use and operation of the Improvements in accordance with the planned time frames described in Exhibit T, and together with the Existing Permits constitute all of the Permits required for the construction, ownership, use and operation of the Improvements as contemplated under the terms of the Loan Documents, and all fees incidental to the issuance of such Permits are also identified on Exhibit T.

Section 5.9   Zoning.  The zoning and other land use regulations governing the Property permit the construction of the Additional Improvements thereon and the operation of the Hotel (including the restaurants and spa) as contemplated hereby, on an as-of-right basis and no variance, conditional use permit, special use permit or other similar approval which has not been obtained is required for such construction or the use of the Improvements as the Hotel.

Section 5.10   Separate Lots.  The Property is comprised of one or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot which is not a part of the Property.

Section 5.11   Assessments.  To the Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the

$4696326_9_DOCSNY_007909

Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

Section 5.12  Flood Zone.  The Land is not in an area identified by the Federal Emergency Management Agency as a special flood hazard area.

Section 5.13  Boundaries.  All of the Improvements which are located on the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Insurance Policy.

Section 5.14  Availability of Utilities.  All utility services required or necessary and sufficient for the use and operation of the Property for its intended purposes in compliance with all requirements of applicable Law, the Required Insurance policies and the Fractional Ownership Documents are presently available to the boundaries of the Property through dedicated public rights of way or through perpetual private easements, including, but not limited to, water supply, storm and sanitary sewer, gas, electric and telephone facilities, cable television and drainage.

Section 5.15  Moratoria.  To the Borrower's knowledge, there are no proposed or contemplated building moratoria or similar actions which could detrimentally affect the Borrower's right to construct or operate the Property.

Section 5.16  Access.  Access, vehicular and otherwise, to the Land, sufficient to comply with all requirements of applicable Law is provided by frontage of the Land on Lower Main Street/Heber Avenue, which is a public way.  The Improvements include parking located on the Land sufficient to comply with all requirements of applicable Law.  All curb cuts and driveway permits necessary for access to the Property from any public street are existing or have been fully approved by the appropriate Governmental Authority.

Section 5.17  Condition of the Property.  Neither the Property nor any portion thereof is now damaged or injured in any material respect as a result of any fire, explosion, accident, flood or other casualty.  There are no proceedings pending, or, to the Borrower's knowledge, threatened, to acquire by power of condemnation or eminent domain the Property, or any interest therein, or to enjoin or similarly prevent the construction or use of the Improvements.

Section 5.18  Insurance.  The Borrower has obtained and has delivered to the Administrative Agent original or certified copies of all Required Insurance, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made under any Required Insurance policies, and no Person, including the Borrower, has done, by act or omission, anything which would impair the coverage of any of the Required Insurance.

71

Section 5.19   Agreements.

(a)   Hotel Management Agreement. (i) The Hotel Management Agreement is in full force and effect; (ii) both the Borrower and, to the Borrower's knowledge, the Hotel Operator are in compliance in all material respects with their respective obligations under the Hotel Management Agreement; and (iii) all incentive fees payable to the Hotel Operator under the Hotel Management Agreement are effectively subordinate to all debt service payments due to the Lenders under this Agreement.

(b)   Development Agreement. (i) The Development Agreement is in full force and effect; (ii) both the Borrower and, to the Borrower's knowledge, the Developer are in compliance in all material respects with their respective obligations under the Development Agreement; and (iii) all incentive fees payable to the Developer under the Development Agreement are effectively subordinate to all debt service payments due to the Lenders under this Agreement.

(c)   Leases. Except as set forth on Exhibit U, there are no Leases affecting the Property as of the Closing Date. With respect to Leases set forth on Exhibit U: (i) the rent roll attached hereto as Exhibit U is true, complete and correct and the Property is not subject to any Leases other than the Leases described in Exhibit U, (ii) the Leases identified on Exhibit U are in full force and effect and there are no defaults thereunder by either party, (iii) the Borrower has delivered copies of all Leases to the Administrative Agent and the copies of the Leases delivered to the Administrative Agent are true, complete and correct, and there are no oral agreements with respect thereto, (iv) no Rent (including security deposits) has been paid more than one month in advance of its due date, (v) (A) except as set forth on Exhibit U, all work to be performed by the Borrower under each Lease has been performed as required as of the date that this representation is being made (or deemed remade pursuant to any other provision of this Agreement) and all such work has been accepted by the applicable Tenant, (B) except as set forth on Exhibit U, any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the Borrower to any Tenant as of the date that this representation is being made (or deemed remade pursuant to any other provision of this Agreement) has already been received by such Tenant, (C) except as set forth on Exhibit U, all of the obligations and duties of landlord under the Leases that are due or are to be performed (as applicable) on or prior to the date hereof have been fulfilled, and there are no pending claims asserted by any Tenant in writing for offsets or abatements against Rent or any other monetary claim, (D) except as set forth on Exhibit U, no brokerage or leasing commission or other compensation is or will be due or payable to any Person with respect to or on account of the current term of any of the Leases, other than in connection with (1) the leasing of any space pursuant to a right of first offer or first refusal or other right or option expressly set forth in the Lease, the effective date of which has not occurred as of the date hereof or (2) the failure timely to exercise, or the expiration of, any right to terminate or cancel any of the Leases and Exhibit U sets forth the commissions payable in the circumstances described in the immediately preceding clauses (1) and (2), (vi) Exhibit U sets forth all security deposits and letters of credit held by or on behalf of the Borrower under the Leases; all such security deposits held by the Borrower are held in accordance with all applicable Laws and the terms of the applicable Leases; and any security deposits or letters of credit which have previously been drawn upon or applied have

72