**EXHIBIT A**
**DESCRIPTION OF LAND**

PARCEL NO. 1

BEGINNING AT A POINT SOUTH 4.73 FEET AND WEST 49.84 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51' EAST 18.50 FEET, THENCE NORTH 31°58'04" WEST 72.72 FEET, THENCE SOUTH 58°02'07" WEST 81.41 FEET MORE OR LESS, THENCE SOUTH 32°25'56" EAST 128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 32°25'56" EAST 128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 23°38' EAST 64.90 FEET TO THE NORTHERLY LINE OF HEBER AVENUE AS DEDICATED, THENCE SOUTH 81°17' EAST 24.80 FEET ALONG SAID NORTHERLY LINE, THENCE NORTH 15°46'12" EAST 60.79 FEET TO THE POINT OF BEGINNING.

SUBJECT TO AND TOGETHER WITH A 20 FOOT RIGHT OF WAY AS CREATED IN THAT CERTAIN EASEMENT RELOCATION AGREEMENTS RECORDED DECEMBER 31, 1973 AS ENTRY NO. 244339 AND 244340 IN BOOK 368 AT PAGE NO'S 635 AND 643 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, SAID RIGHT OF WAY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS 65.21 FEET SOUTH AND 51.59 FEET WEST OF THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, SAID POINT ALSO BEING 12.0 FEET NORHTWEST OF THE SOUTHEAST CORNER OF LOT 15, BLOCK 50, OF THE PARK CITY SURVEY AND RUNNING THENCE NORTH 10°18'32" EAST 66.28 FEET, THENCE EAST 3.38 FEET, THENCE NORTH 31°58'00" WEST 77.00 FEET,T HENCE NORTH 19°54'00" EAST 66.80 FEET, THENCE CONTINUING NORTH 19°54'00" EAST 123.47 FEET, THENCE NORTH 70°06'00" WEST 20.00 FEET, THENCE SOUTH 19°54'00" WEST 200.00 FEET, THENCE SOUTH 31°58'00" EAST 73.76 FEET, THENCE SOUTH 10°44'00" WEST 63.67 FEET, THENCE SOUTH 81°17'00" EAST 20.23 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-F

PARCEL 2

BEGINNING AT A POINT 50 FEET, NORTH OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE NORTH 43.97 FEET, THENCE NORTH 66°11' WEST 142.63 FEET, THENCE SOUTH 31°58' EAST 119.75 FEET, THENCE EAST 67.1 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN EASY STREET BRASSERIE REPLAT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MARCH 12, 2003 AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO. SA-400-A

PARCEL 3

BEGINNING AT A POINT 38.85 FEET WEST OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE WEST 7.93 FEET, THENCE SOUTH 06°02' EAST 67.70 FEET, THENCE NORTH 81°17' WEST 27.0 FEET, THENCE NORTH 15°46'12" EAST 60.79 FEET, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51" EAST 18.50 FEET, THENCE SOUTH 31°58' EAST 25.40 FEET, THENCE SOUTH 19°54' WEST 3.18 FEET, THENCE SOUTH 31°54' EAST 77.00 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-406

PARCEL 4 AND 4A

LOTS 1 AND 2, EASY STREET BRASSERIE REPLAT SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED MARCH 12, 2003, AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO.'S ESB-1, AND ESB-2

PARCEL 5

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, IN PARK CITY, SUMMIT COUNTY, UTAH BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS WEST, A DISTANCE OF 35.90 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE CONTINUING WEST A DISTANCE OF 2.95 FEET, THENCE NORTH 31°58' WEST A DISTANCE OF 77.00 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 3.18 FEET, THENCE SOUTH 31°58' EAST A DISTANCE OF 80.53 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO TOGETHER WITH THE FOLLOWING DESCRIBED PROPERTY:

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN IN PARK CITY, SUMMIT COUNTY UTAH, BONDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS NORTH A DISTANCE OF 93.97 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE NORTH 66°11' WEST A DISTANCE OF 65.29 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 8.32 FEET, THENCE SOUTH 66°46'30" EAST A DISTANCE OF 193.50 FEET, THENCE SOUTH 7°16' EAST A DISTANCE OF 12.03 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 4.32 FEET, THENCE NORTH A DISTANCE OF 8.23 FEET, THENCE WEST A DISTANCE OF 18.65 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 109.15 FEET MORE OR LESS TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-425-UPL

PARCEL 6

LOT 15, BLOCK 50, PARK CITY SURVEY, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN THE PARCELS 1-5 LISTED ABOVE.

TAX PARCEL NO. EXEMPT

## EXHIBIT B
## ASSIGNMENT AND ACCEPTANCE

THIS ASSIGNMENT AND ACCEPTANCE, dated as of _____, \_\_\_\_ by and between _____, having an office at _____ (the *Assignor*), and _____, having an office at _____ (the *Assignee*).

Reference is made to the Loan Agreement, dated as of _____, 2006 (as amended, supplemented or otherwise modified from time to time, the *Credit Agreement*), between [                    ] (the *Borrower*) and WESTLB AG, a German banking corporation, acting by and through its New York Branch, as Administrative Agent for itself and such other co-lenders as may exist from time to time. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Assignor and Assignee agree as follows:

(a)    The Assignor hereby irrevocably sells and assigns to the Assignee without representation or warranty (except as provided herein), and the Assignee hereby irrevocably purchases and assumes from the Assignor without recourse to the Assignor, as of the Effective Date (as defined below), a percentage interest (the *Assigned Interest*) in and to the Assignor's rights and obligations as a Lender under the Loan Documents with respect to the Loan, as set forth on Schedule 1.

(b)    The Assignor (a) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any other Loan Document or any other instrument or document furnished pursuant thereto, other than that it has not created any adverse claim upon the interest being assigned by it hereunder and that such interest is free and clear of any such adverse claim; (b) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower, the Sponsor, or any other obligor or the performance or observance by Borrower, the Sponsor or any other obligor of any of their respective obligations under the Credit Agreement or any other Loan Document or any other instrument or document furnished pursuant hereto or thereto; and (c) attaches the Notes held by it evidencing the Loan and requests that the Administrative Agent exchange such Notes for new Notes payable to the Assignor and new Notes payable to the Assignee in the respective amounts which reflect the assignment being made hereby, as specified on Schedule 1 hereto.

(c)    The Assignee (a) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance; (b) confirms that it has received copies of the Loan Documents, together with copies of the financial statements and other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (c) agrees that it will, independently and without reliance upon the Assignor, the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking

action under the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (d) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are incidental thereto; (e) confirms that it is an Eligible Assignee; and (f) agrees that it will be bound by the provisions of the Credit Agreement and the other Loan Documents and will perform in accordance with its terms all the obligations which by the terms of the Credit Agreement or the other Loan Documents are required to be performed by it as a Lender.

(d)   The effective date of this Assignment and Acceptance shall be
_____, _____ (the *Effective Date*).

(e)   From and after the Effective Date, the Administrative Agent shall make all payments in respect of Assignee's Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee in accordance with Schedule 1, whether such amounts have accrued prior to the Effective Date or accrue subsequent to the Effective Date.  The Assignor and the Assignee shall make all appropriate adjustments in payments by the Administrative Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

(f)   From and after the Effective Date, (a) Assignee shall be a party to the Credit Agreement and the other Loan Documents and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and shall be bound by the provisions thereof, and (b) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations as a Lender under the Credit Agreement and the other Loan Documents arising after the Effective Date.

(g)   This Assignment and Acceptance shall be governed by and construed in accordance with the laws of the State of New York.

(h)   This Assignment and Acceptance may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of Schedule 1 to this Assignment and Acceptance by telecopier shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

**(Signatures on Following Page)**

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed as of the date first above written by their respective duly authorized officers on Schedule 1 hereto.

Consented To:

BORROWER:

[                                                            ]

By: _____
    Name:
    Title:


LENDER:

By: _____
    Name:
    Title:


Accepted for Recordation in the Register:

ADMINISTRATIVE AGENT:

WESTLB AG,
acting by and through its New York Branch


By: _____
    Name:
    Title:

**SCHEDULE 1**
TO ASSIGNMENT AND ACCEPTANCE
RELATING TO THE LOAN AGREEMENT, DATED AS OF [                    ],
AMONG
[                    ]
AND
WESTLB AG, NEW YORK BRANCH, AS ADMINISTRATIVE AGENT AND LENDER

Name of Assignor: _____

Name of Assignee: _____

Effective Date of Assignment:    _____ __, ____

Principal
Amount Assigned                    Commitment Percentage Assigned


ASSIGNEE:


By:    _____
       Name:
       Title:

ASSIGNOR:


By:    _____
       Name:
       Title:

**EXHIBIT C**
**FORM OF NOTE**

(See attached)

84115631_2

## PROMISSORY NOTE

Maximum principal                                                          New York, New York
amount: US $36,779,224.00                                        Dated: as of March ___, 2006

FOR VALUE RECEIVED, the undersigned, EASY STREET PARTNERS, LLC, a Utah limited liability company, having an address at 4780 Winchester Court, Park City, Utah 84098 (the *Borrower*) hereby promises to pay to WESTLB AG, New York Branch, a German banking corporation acting through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036 (the *Lender*), pursuant to that certain Loan and Security Agreement, dated of even date herewith, by and between the Borrower, WestLB AG, New York Branch, as Administrative Agent (the *Administrative Agent*), and such other co-lenders party thereto from time to time (as the same may hereinafter be amended, modified, extended and/or assigned from time to time, the *Loan Agreement*), the aggregate principal amount of up to THIRTY SIX MILLION SEVEN HUNDRED SEVENTY-NINE THOUSAND TWO HUNDRED TWENTY-FOUR AND 00/100 DOLLARS ($36,779,224.00) (the *Note Amount*) owing to the Administrative Agent and the Lenders by the Borrower pursuant to the Loan Agreement on the dates and in the amount specified in the Loan Agreement. Capitalized terms that are not defined herein have the meanings given to each in the Loan Agreement.

The Borrower promises to pay to the Lender or its registered assigns, the unpaid principal amount of the Note Amount as well as interest on the unpaid principal amount of the Note Amount from the date the Loan is advanced until such principal amount is paid in full, at such interest rates, and payable at such times and in such amounts, as are specified in the Loan Agreement.

Both principal and interest are payable in lawful money of the United States of America to the Administrative Agent, at its account as set forth in the Loan Agreement, in immediately available funds.

This Promissory Note is entitled to the benefits of the Loan Agreement. The Loan Agreement, among other things, (i) provides for the making of advances (the *Loan*) by the Lenders, to the Borrower in an aggregate amount not to exceed the Note Amount, the indebtedness of the Borrower resulting from the Loan being evidenced, in part, by this Promissory Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified. The obligations of the Borrower under this Promissory Note are secured by the Collateral as provided in the Loan Documents.

All parties now and hereafter liable with respect to this Promissory Note hereby waive presentment, demand, protest, dishonor and all other notices of any kind, except as may otherwise be set forth in the Loan Documents.

2426729_4

This Promissory Note shall be construed in accordance with, and this Promissory Note and all matters arising out of or relating in any way whatsoever to this Promissory Note (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

Notwithstanding anything to the contrary in this Promissory Note or any other Loan Document, the Lender shall not be deemed to have waived any right which the Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Loan secured by the Security Instrument (as defined in the Loan Agreement) or to require that all Collateral shall continue to secure all of the Loan owing to the Lender.

This Promissory Note may not be amended, modified, waived, changed or discharged orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, amendment or discharge is sought. This Promissory Note shall be binding upon and shall inure to the benefit of the Lender and the Borrower and their respective successors and assigns permitted hereunder or under the Loan Agreement.

The rights and recourse of the Lender under this Promissory Note are limited to the extent provided in Section 10.6 of the Loan Agreement, which Section is hereby incorporated herein by reference as if fully set forth herein.

**(SIGNATURE APPEARS ON NEXT PAGE)**

34875728_4

IN WITNESS WHEREOF, the Borrower has duly executed this Promissory Note as of the date first written above.

## BORROWER:

**EASY STREET PARTNERS, LLC,**
a Utah limited liability company

By:   **EASY STREET MEZZANINE LLC,**
     a Delaware limited liability company,
     its sole member

    By:   **EASY STREET HOLDING LLC,**
         a Utah limited liability company,
         its sole member

        By:   **AVG-SL, LLC,**
           a Utah limited liability company,
           its manager

           By: _____
              Name:  David Wickline
              Title:  Manager

**EXHIBIT D**
**FORM OF ARCHITECT'S CERTIFICATE**

March [____], 2006

WestLB AG, New York Branch, as Administrative Agent
1211 Avenue of the Americas
New York, New York 10036

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement dated as of March ____, 2006, by and between Easy Street Partners, LLC, a Utah limited liability company (the *Borrower*) and WestLB AG, a German corporation acting by and through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036, as administrative agent (including any of its successors and assigns, the *Administrative Agent*) for itself and such other co-lenders as may exist from time to time (collectively, the *Lenders* and each individually, a *Lender*) (as the same may hereinafter be amended, modified, extended and/or assigned from time to time, the *Loan Agreement*). The undersigned (the *Project Architect*) hereby certifies to the Administrative Agent, in its professional judgment, and with reference to the Improvements (as defined below) to be constructed on the Land located in Park City, Utah in accordance with the Plans and Specifications identified in Exhibit A attached hereto, as follows:

II.    Based on its review of the Plans and Specifications, to the date of this Certificate, and to its current professional knowledge, the Project Architect states to the Administrative Agent that (a) the Improvements contemplated by the Plans and Specifications (the *Improvements*) will substantially comply with all building codes, zoning ordinances and other governmental rules, laws and regulations relating to the design and use of the Improvements to the extent applicable and in effect as of the date hereof and (b) the governmental approvals, including building permits, licenses and other approvals (collectively, the *Approvals*) required for the construction of the Improvements in accordance with the Plans and Specifications have been obtained (or, with respect to the Approvals not obtained by the date of this Certificate, are capable of being obtained in the ordinary course of construction of the Improvements);

III.    Based on its review of the Plans and Specifications and the draft Project Budget attached hereto as Exhibit B, to the date of this Certificate, and to its current professional knowledge, the Project Architect states to the Administrative Agent that the Project will not involve hard costs in excess of the amount set forth in the related line items in the Project Budget; and

IV.    To its current professional knowledge, the Project Architect states to the Administrative Agent that the Plans and Specifications are consistent with the requirements of that certain Development Agreement for the Union Square Master Planned Development, Park City, Summit County, Utah, by and between CloudNine

84115621_2

Resorts, LLC and the municipality of Park City, dated as of May 12, 2005 and recorded with the Summit County Recorder on June 8, 2005 as Instrument No. 00738760.

The Project Architect's statements in this Certificate have been made and the services of the Project Architect have been performed in accordance with the standards of care and skill of the Project Architect's profession in the State of Utah for building projects of the scope and quality of the Improvements. This Certificate is made with the intent that it shall be relied on by, but only by, the Borrower, the Administrative Agent, the Lenders and their respective successors and assigns, in connection with the disbursements for the construction of the Improvements as contemplated by the Loan Documents and the Loan Agreement.

This Architect's Certificate shall be governed by the laws of the State of Utah and shall be effective as an instrument executed under seal.


## [SIGNATURE ON FOLLOWING PAGE]


84119631_2

By: _____

Name: _____

Title: _____

Utah License No.: _____

84115621_2

## EXHIBIT A

### Plans and Specifications

**(See attached)**

## EXHIBIT B

### Preliminary Project Budget

DATA REFLECTS THE SKY LODGE PRO FORMA – NOVEMBER 30TH VERSION

| | Total | Initial Cash Equity Funding | Mezz Debt | Senior Debt | Deferred Fees In Escrow | Contingent Expenses Paid From Sales | Contributed Land Equity |
|---|---|---|---|---|---|---|---|
| **Project Costs During Construction** | | | | | | | |
| Land | 9,000,000 | - | 9,000,000 | - | - | - | - |
| A&E Fees | 1,108,200 | 693,300 | 62,594 | 352,306 | - | - | - |
| Consultants & Fees | 1,330,664 | 214,109 | 116,736 | 999,849 | - | - | - |
| Infrastructure | 1,925,291 | - | - | 1,925,291 | - | - | - |
| Hard Costs | 10,787,931 | - | - | 10,787,931 | - | - | - |
| Soft Construction Costs | 2,501,511 | - | - | 2,501,511 | - | - | - |
| FF&E | 3,644,800 | - | - | 3,644,800 | - | - | - |
| Developer Fees - Cost Component | 730,404 | 28,841 | - | 701,442 | - | - | - |
| Developer Fees - Escrowed Component | 498,323 | - | - | 498,323 | (498,323) | - | - |
| Sales & Marketing Exp During Construction | 1,164,664 | 246,214 | 134,909 | 783,999 | - | - | - |
| Sales Management Fee - Cost Component | 339,000 | 99,000 | - | 240,000 | - | - | - |
| Pre-Opening/HOA Subsidy | 500,000 | - | - | 500,000 | - | - | - |
| Start-Up Operating Loss | 900,400 | 14,576 | 13,916 | 872,914 | - | - | - |
| Closing Costs & Senior Lender Fees | 2,155,054 | 369,766 | 1,689,294 | 103,994 | - | - | - |
| Senior Loan Interest | 1,792,294 | - | - | 1,792,294 | - | - | - |
| Contingency | 2,392,521 | - | - | 2,392,521 | - | - | - |
| **Total Costs Funded During Construction** | 40,941,234 | 1,700,000 | 11,200,000 | 30,788,000 | (498,323) | - | - |
| **Contingent Costs Funded From Sales & Hotel Cash Flow** | | | | | | | |
| Developer Fees - Release From Escrow | - | - | - | - | 498,323 | - | - |
| Sales Management Fee - Escrowed Sales & Marketing - Expense After Completion | 1,693,750 | - | - | - | - | 1,693,750 | - |
| End Loan Fees | 77,296 | - | - | - | - | 77,296 | - |
| Contributed Land Equity (Smith Trust) | 433,293 | - | - | - | - | 433,293 | - |
| | 1,900,000 | - | - | - | - | - | 1,900,000 |
| **Total Costs Funded From Sales** | 3,636,337 | - | - | - | 498,323 | 1,204,139 | 1,900,000 |
| **Total Project Capitalization** | 53,178,661 | 1,700,000 | 11,200,000 | 30,788,000 | - | 1,204,219 | 1,900,000 |

| | | | |
|---|---|---|---|
| **Capital Funded During Construction** | | **Loan To Value Analysis** | |
| Equity - Cash Contribution | 1,700,000 | Project Cost Before Land | 43,863,178 |
| Total Mezzanine Debt | 11,200,000 | Appraised Land Value | 18,300,000 |
| Total Senior Debt (up to $30.8 million allowed) | 30,788,000 | Escrowed Deposits | 4,500,000 |
| Contingency Funded From Deposits | - | Escrowed Fees | 1,570,000 |
| Total Capital Required During Construction | 43,788,000 | Total Asset Value | 68,633,200 |
| **Capital Funded From Sales** | | Senior Loan | 30,800,000 |
| Equity - Contingent Fees & Expenses | 1,204,200 | Mezzanine Loan | 11,200,000 |
| Equity - Contributed Land Equity (Smith Trust) | 1,900,000 | Total Debt | 42,000,000 |
| Total Capital From Sales & Cash Flow | 2,204,210 | | |
| | | Loan To Value Ratio | 73.15 |
| **Total** | 59,184,140 | | |

**EXHIBIT E**
**FORM OF COLLATERAL ASSIGNMENT OF INTEREST RATE PROTECTION
AGREEMENT**

**(See attached)**

## COLLATERAL ASSIGNMENT OF INTEREST RATE PROTECTION AGREEMENT

THIS COLLATERAL ASSIGNMENT OF INTEREST RATE PROTECTION AGREEMENT (as amended, restated, replaced, supplemented or otherwise modified from time to time, this *Assignment*), dated as of March [___], 2006, is made by EASY STREET PARTNERS, LLC, a Utah limited liability company, having an address at 4780 Winchester Court, Park City, Utah 84098 (*Assignor*), to WESTLB AG, a German banking corporation acting through its New York branch, having an address at 1211 Avenue of the Americas, 23rd Floor, New York, New York 10036, as the administrative agent (together with any successor agent appointed under the Loan Agreement (as hereinafter defined), *Assignee*) for the Lenders (as defined in the Loan Agreement).

## RECITALS

A.      Reference is made to that certain Loan and Security Agreement, dated of even date herewith, by and between Assignor, as borrower, Assignee, as administrative agent and the Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the *Loan Agreement*).

B.      Pursuant to the Loan Agreement and subject to the terms and conditions therein set forth, the Lenders have agreed to make a loan to Assignor in a principal amount of [THIRTY SIX MILLION SEVEN HUNDRED SEVENTY-NINE THOUSAND TWO HUNDRED TWENTY-FOUR AND NO/100 DOLLARS ($36,779,224.00)] (the *Loan*) or so much thereof as may have been advanced pursuant to the Loan Agreement.

C.      To evidence such indebtedness, Assignor has executed and delivered certain promissory note(s) (collectively, the *Notes*), each dated as of the date hereof, in favor of the Lenders in an aggregate principal amount equal to the Loan, which Notes have been issued pursuant to, and in accordance with the Loan Agreement.

D.      The Loan is secured, *inter alia*, by that certain Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the date hereof (the *Security Instrument*), and is intended to be recorded simultaneously herewith, made by Assignor in favor of Assignee, which Security Instrument encumbers the Property and certain other collateral;

E.      As a condition precedent to the obligations of the Lenders to make the Loan to Assignor, Assignor has agreed, in the manner hereinafter set forth, to assign to Assignee as additional security for the payment and the observance and performance by Assignor of the Obligations arising under the Notes, the Loan Agreement and the other Loan Documents all of Assignor's right, title and interest in and to the Interest Rate Protection Agreement (as hereinafter defined).

F.      Assignor has entered into that certain 1992 ISDA Master Agreement (Multi-Currency/Cross Border), with [_____] (in such capacity, the

84985885_1.DOC

*Counterparty*), the Transaction Confirmation to be entered into by Assignor and the Counterparty and the Schedule related thereto (collectively, and together with any replacement interest rate protection agreement required by Section 6.1(t) of the Loan Agreement, the *Interest Rate Protection Agreement*) and that certain Consent and Acknowledgement (*Counterparty Consent*), dated as of [_____], by and among Assignor, Assignee and the Counterparty.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, Assignor hereby assigns and transfers to Assignee, as additional security for the Obligations of Assignor under the Loan Documents, all of its right, title and interest, whether now owned or hereafter acquired, now existing or hereafter arising, and wherever located, in, to and under the Interest Rate Protection Agreement, and all of Assignor's right, title and interest in, to and under all other documents executed and/or delivered in connection with and/or secured by the Interest Rate Protection Agreement, including, without limitation, all of Assignor's right, title and interest in any collateral, demands, causes of action, bank accounts, other accounts, investment property, general intangibles and supporting obligations, and any other collateral or documents arising out of or executed or delivered with respect to the Interest Rate Protection Agreement, all rights and benefits of Assignor related to the Interest Rate Protection Agreement, and such claims and chooses in action related to the Interest Rate Protection Agreement and such documents, and all of Assignor's rights, title and interests therein and thereto, including, but not limited to, any and all rights that Assignor may now or hereafter have to any and all payments, disbursements, distributions or proceeds (collectively, the *Payments*) owing, payable or required to be delivered to Assignor on account of the Interest Rate Protection Agreement with respect to the period commencing on the date hereof and ending on the date on which Assignor shall have repaid the Loan in its entirety, together with all other amounts then required to be paid in accordance with the terms of the Loan Documents, and all proceeds of any or all of the foregoing (collectively, the *Hedge Collateral*). Assignor hereby grants to Assignee a security interest in and to the Interest Rate Protection Agreement, the Hedge Collateral and all Proceeds (as defined in the Uniform Commercial Code adopted in the State of New York (the *UCC*)) thereof, to have and to hold the same, unto Assignee, its successors and assigns, and Assignor covenants and agrees to cause all Payments to be made directly to Assignee. This Assignment constitutes additional security for the Obligations of Assignor under the other Loan Documents, subject to the terms and conditions more fully set forth herein.

### DEFINITIONS

1.      Each capitalized term used herein, unless otherwise defined herein, shall have the meaning given such term in the Loan Agreement.

CERTAIN REPRESENTATIONS REGARDING INTEREST RATE PROTECTION AGREEMENT

2.      Assignor represents and warrants that the Interest Rate Protection Agreement is in full force and effect and that the copy of each of the Interest Rate Protection Agreement and the Counterparty Consent attached hereto as Exhibit A and Exhibit B, respectively, is a true, accurate and complete copy of such agreement.

Assignor Covenants

3.      Assignor covenants and agrees that, until such time as this Assignment is terminated and released by Assignee:

(a)     Assignor shall not, without first obtaining Assignee's written consent (which consent may be granted or withheld by Assignee in its sole discretion), (i) assign, sell, pledge, hypothecate, or otherwise encumber or transfer (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration) any of its rights under the Interest Rate Protection Agreement, (ii) modify, terminate or waive any of its rights under the Interest Rate Protection Agreement (except as expressly permitted by Section 6.1(t) of the Loan Agreement) or (iii) to the extent consent from Assignor is required, consent to any assignment or transfer by the Counterparty of the Interest Rate Protection Agreement;

(b)     All amounts payable by Counterparty to Assignor under the Interest Rate Protection Agreement shall be (i) paid directly to Assignee and (ii) applied upon receipt to amounts then due and payable disbursed in accordance with the terms and provisions of the Loan Agreement; and

(c)     Assignor, at its expense, shall take all actions reasonably requested by Assignee to enforce Assignor's rights under the Interest Rate Protection Agreement in the event of a default by the Counterparty thereunder and shall not waive its right to any payment due thereunder.

ASSIGNEE INSTRUCTIONS TO COUNTERPARTY

4.      Assignor hereby authorizes and directs the Counterparty to (a) pay directly to (or as directed by) Assignee all amounts payable to Assignor under the Interest Rate Protection Agreement until such time as this Assignment is terminated or otherwise canceled and (b) if the Assignee has accelerated all or any part of the Loan and if requested by the Assignee, to terminate the Interest Rate Protection Agreement and pay the residual value to the Assignee (as such residual value is determined by the Assignee and the Counterparty) and apply it to any unpaid Obligations of Assignor under the Loan Documents. All such payments by Counterparty to Assignee shall discharge any obligation Counterparty would otherwise have to Assignor with respect thereto. Counterparty shall be entitled to conclusively rely (without any independent investigation) on any notice or instructions from Assignee in respect of this Assignment,

and in the event of any inconsistency between any notice or instructions from Assignee and any notice or instructions from Assignor, Counterparty shall be entitled to conclusively rely (without any independent investigation) on the notice or instruction from Assignee. Assignor releases Counterparty from all liability in connection with Counterparty's compliance with Assignee's written instructions. Assignor hereby agrees to indemnify, defend and hold Counterparty harmless from and against any and all claims, other than those ultimately determined to be proximately caused by the gross negligence or willful misconduct of Counterparty, and from and against any damages, penalties, judgments, liabilities, losses or expenses (including reasonable attorneys' fees and disbursements) incurred by Counterparty as a result of the assertion of any claim by any Person arising out of, or otherwise related to, any actions taken or omitted to be taken by Counterparty in reliance upon any instructions or notice provided by Assignee. Assignor and Counterparty agree that none of Agent or any Lender shall have any obligation to make any payments required to be made by Assignor under the Interest Rate Protection Agreement.

## REMEDIES OF ASSIGNEE

5.    Upon or at any time after an Event of Default has occurred (unless such Event of Default has been waived in writing by the Assignee) and while such Event of Default is continuing, the Assignee shall immediately be entitled to all sums due under the Interest Rate Protection Agreement and, if the Assignee shall have accelerated all or any part of the Loan, the Assignee shall have the right to terminate the Interest Rate Protection Agreement and recover the residual value, if any, of the Interest Rate Protection Agreement, as such residual value may be determined by the Assignee with the Counterparty and without Assignor's consent thereto. Assignee shall not be liable for any loss sustained by Assignor resulting from an early termination of the Interest Rate Protection Agreement or from the method selected by the Assignee for determining residual value.

## OTHER SECURITY

6.    The Assignee may take or release other security for the payment of the Loan, may release any party primarily or secondarily liable therefor, may grant extensions, renewals or indulgences with respect thereto and may apply any other security held by it to the reduction or satisfaction of the Obligations of Assignor under the Loan Documents without prejudice to any of its rights under this Assignment.

## CUMULATIVE REMEDIES

7.    The remedies of the Assignee in this Assignment and in the other Loan Documents, by law or in equity are cumulative and may be exercised independently, concurrently or successively in the Assignee's sole discretion and as often as occasion therefor shall arise.

**FURTHER ASSURANCES**

8.       Assignor, at its expense, agrees to take such other actions as Assignee may reasonably request to carry out the intent of this Assignment or to establish and protect the rights and remedies created or intended to be created in favor of Assignee hereunder, including, without limitation, execution and delivery of an additional or substitute collateral assignment of interest rate protection agreement in form and substance equivalent to this Assignment with respect to any subsequent or replacement interest rate protection agreement entered into by Assignor pursuant to Section 6.1(t) of the Loan Agreement.

**PAYMENT TO ASSIGNOR**

9.       So long as no Event of Default or a DSCR Trigger has occurred and is continuing, in the event the Interest Rate Protection Agreement is terminated in accordance with Section 6.1(t) of the Loan Agreement, Assignor shall be entitled to receive and retain the residual value (if any) of such Interest Rate Protection Agreement.

**MISCELLANEOUS**

10.(a)  **Notices.**  All notices under this Assignment are to be in writing and given in the manner provided in Section 11.4 of the Loan Agreement.

(b)      **Entire Agreement.**  This Assignment between the parties hereto, with respect to the subject matter hereof, supersedes all prior discussions, representations, communications and agreements (oral and written) by and between such parties in respect of such subject matter.

(c)      **Modification.**  This Assignment shall not be modified, supplemented, or terminated, nor any provisions hereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing.

(d)      **Binding Effect; Joint and Several Obligations.**  This Assignment is binding upon and shall insure to the benefit of Assignor and Assignee, and their respective successors and assigns, whether by voluntary action of the parties or by operation of Law.

(e)      **Unenforceable Provisions.**   Any provision of this Assignment or the Counterparty Consent, which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Each such invalid or unenforceable provision will be ineffective only to the extent of such invalidity or

unenforceability, and this Assignment otherwise construed to the greatest extent possible to accomplish fairly the purposes and intentions of the parties hereto.

(f)    **Governing Law.** This Assignment shall be construed in accordance with, and this Assignment and all matters arising out of this Assignment (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

(g)    **WAIVER OF JURY TRIAL.** ASSIGNOR AND ASSIGNEE EACH HEREBY WAIVES ITS RIGHT, TO THE FULL EXTENT PERMITTED BY LAW, AND AGREES NOT TO ELECT, A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS ASSIGNMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS ASSIGNOR AND ASSIGNEE.

(h)    **No Liability.** Except as expressly provided, nothing contained herein shall operate or be construed to impose any obligations upon Assignee with respect to the Interest Rate Protection Agreement.

(i)    **Termination.** Upon the payment in full and satisfaction in full of the Obligations of Assignor under the Loan Documents, this Assignment and all rights hereunder assigned to Assignee shall cease and terminate and the Interest Rate Protection Agreement shall revert to Assignor. In such event, Assignee, upon Assignor's request and at no expense to Assignee, shall execute reasonable and appropriate documentation evidencing the termination of this Assignment.

(j)    **Counterparts.** This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original and all of which together shall constitute a single instrument. Delivery of an executed counterpart of a signature page to this Assignment by telecopier shall be effective as delivery of a manually executed counterpart of this Assignment. Any delivery of a counterpart signature by telecopier shall, however, be promptly followed by delivery of a manually executed counterpart.

(k)    **Non-Recourse.** Notwithstanding anything to the contrary in this Agreement, the Notes or any other Loan Document, the liability of Assignor hereunder shall be limited to the same extent as in Section 10.6 of the Loan Agreement, which section is incorporated herein by reference as if fully set forth herein.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, Assignor and Assignee have caused this Assignment to be executed as of the date first above written.

ASSIGNOR:

**EASY STREET PARTNERS, LLC,**
a Utah limited liability company

BY:[_____]
   [_____]

By: _____
    Name:
    Title:


ASSIGNEE:

**WESTLB AG,** acting by and through its New York Branch, individually as Lender and as Administrative Agent

By:_____
   Andrew B. Stein
   Managing Director


By:_____
   Bruce F. Davidson
   Director


Signature Page to Collateral Assignment of Interest Rate Protection Agreement

# EXHIBIT A

## INTEREST RATE PROTECTION AGREEMENT

**[See attached]**

# EXHIBIT B

## CONSENT AND ACKNOWLEDGEMENT AGREEMENT

**[See attached]**

**EXHIBIT F**
**INTENTIONALLY OMITTED**

**EXHIBIT G**
**INTENTIONALLY OMITTED**

**EXHIBIT H**
**FORM OF ENVIRONMENTAL INDEMNITY**

**(See attached)**

## ENVIRONMENTAL INDEMNITY

THIS ENVIRONMENTAL INDEMNITY (this *Indemnity*), dated as of March [___], 2006, by EASY STREET PARTNERS, LLC, a Utah limited liability company, having an address at 4780 Winchester Court, Park City, Utah 84098 (the *Borrower*) and CLOUDNINE RESORTS, LLC, a Utah limited liability company, having an address at 4780 Winchester Court, Park City, Utah 84060 (the *Guarantor*, collectively, with the Borrower, as the *Indemnitors*) to and for the benefit of WESTLB AG, a German banking corporation acting by and through its New York Branch and having an office at 1211 Avenue of the Americas, New York, New York 10036, as administrative agent (the *Administrative Agent*) for itself, and such other co-lenders as may exist from time to time (collectively, the *Lenders* and each individually, a *Lender*) under the Loan Agreement (as hereinafter defined).

## WITNESSETH:

WHEREAS, the Borrower, the Lenders and the Administrative Agent have entered into that certain Loan and Security Agreement, dated as of the date hereof (as it may be amended, extended, supplemented, restated or otherwise modified, from time to time, the *Loan Agreement*; capitalized terms not otherwise defined herein shall have the meanings specified in the Loan Agreement), pursuant to which the Lenders have agreed to make the Loan to the Borrower to finance the renovation and re-positioning of the Existing Improvements, construction of the Additional Improvements and certain Project Costs of the private residence club and Hotel, subject to the terms and conditions thereof;

WHEREAS, the Loan is evidenced by those certain promissory notes in an aggregate original principal amount of S[36,779,224.00] (the *Notes*) secured by, among other things, that certain Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the date hereof, (the *Security Instrument*) encumbering, inter alia, certain real property and improvements located in Park City, Utah (the *Property*, as such defined term is more particularly described in the Loan Agreement);

WHEREAS, Guarantor is an Affiliate of the Borrower and will obtain substantial benefit from the Lenders making, and the Administrative Agent administering, the Loan; and

WHEREAS, it is a condition precedent to the effectiveness of the Loan Agreement and to the making of the Loan by the Lenders thereunder that the Indemnitors shall have executed and delivered this Indemnity; and

NOW, THEREFORE, in consideration of the premises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Indemnitors hereby agree as follows:

1. **Definitions**

As used in this Indemnity, in addition to the terms defined in the Loan Agreement, the following terms shall have the following meanings:

84683878_3

*Asbestos-Containing Material* means any material containing more than one percent (1%) asbestos.

*CERCLA* means the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. 9601, et seq.), as heretofore or hereafter amended from time to time.

*Environmental Laws* collectively means and includes all present and future Laws applicable to the Property and relating to the environment and environmental conditions or to any Hazardous Substance, Toxic Mold or Hazardous Substance Activity (including, without limitation, CERCLA, the Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 6901, et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq., the Clean Air Act, 33 U.S.C. § 7401, et seq., the Clean Air Act, 42 U.S.C. § 7401, et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601-2629, the Safe Drinking Water Act, 42 U.S.C. § 300f-300j, the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 1101, et seq., and any so-called "Super Fund" or "Super Lien" law, any similar state and local laws and regulations, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder).

*Environmental Losses* means Losses suffered or incurred by any Indemnitee arising out of or as a result of: (i) any Hazardous Substance Activity; (ii) any violation of any applicable Environmental Laws relating to the Property or to the ownership, use, occupancy, or operation thereof; (iii) any investigation, inquiry, order, hearing, action, or other proceeding by or before any governmental agency in connection with any Hazardous Substance Activity; (iv) a material breach of any covenant or representation and warranty contained herein; or (v) any Claim, whether meritorious or not, brought or asserted against any Indemnitee, regardless of when such Claim is brought or asserted, which directly relates to, arises from or is based on any of the matters described in clauses (i), (ii), (iii) or (iv) or any allegation of any such matters.

*Foreclosure Transfer* means the transfer of title and delivery of physical possession of Property at a foreclosure sale under the Security Instrument, either pursuant to judicial decree or the power of sale contained in the Security Instrument, or by deed in lieu of such foreclosure, or under the jurisdiction of a bankruptcy court.

*Hazardous Substance* means, at any time, (i) asbestos and any Asbestos-Containing Material, (ii) any substance that is listed in, or otherwise classified pursuant to, any Environmental Laws as a "hazardous substance", "hazardous material", "hazardous waste", "infectious waste", "toxic substance", "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or "EP toxicity," (iii) petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive matter, and medical waste and (iv) Toxic Mold.

*Hazardous Substance Activity* means any generation, use, installation, storage, packaging, labeling, treatment, leaching, spill, cleanup, holding, existence, release, emission, discharge, processing, abatement, removal, disposition, handling or transportation of any Hazardous Substance from, under, into or on the Property or surrounding property (but only concerning surrounding property to the extent of seepage, release, leaching, discharge, migration, disposal or

other actions from the Property to the surrounding property or from the surrounding property to the Property).

*Indemnitees* means collectively, the Administrative Agent, each Lender, and their respective successors and assigns as holders of the Notes and each of such parties' respective officers, directors, shareholders, and employees.

*Toxic Mold* means any microbial matter, biological toxins, mycotoxins, mold or mold spores, or fungus in, on, or affecting the Property of a type and quality which either (a) poses a material adverse risk to human health or environment; or (b) negatively impacts the value of the Property.

2.   Indemnity.

(a)    Each Indemnitor hereby agrees to jointly and severally indemnify, defend and hold harmless each of the Indemnitees from and against any and all Environmental Losses.

(b)    Subsection (a) of this Section 2 notwithstanding, no Indemnitor shall be required to indemnify any Indemnitee with respect to any Environmental Loss arising out of or as a result of any Hazardous Substance first generated at or otherwise brought onto the Property after a Foreclosure Transfer, after the appointment of a receiver and surrender of possession of the Property by the Borrower to such receiver or for any Environmental Loss resulting from the gross negligence or willful misconduct of any Indemnitee.

(c)    The liability of the Indemnitors under this Indemnity shall be reduced to the extent of any funds actually recovered by the Administrative Agent or the Lenders under any applicable environmental insurance policy.  To the extent permissible and so long as no Event of Default shall have occurred and be continuing, the Administrative Agent and the Lenders shall delegate to the Indemnitors the right to pursue any claims under any applicable environmental insurance policy and agree to cooperate with the Indemnitors in all reasonable respects and at the Indemnitors' cost and expense pursuing claims under any such environmental insurance policy.  To the extent the Administrative Agent or the Lenders recover any amounts under any environmental insurance policy in respect of any Environmental Loss that has already been indemnified by the Indemnitors, the Administrative Agent and the Lenders agree to pay such amounts to such Indemnitors.

3.   Representations.

Each Indemnitor hereby represents that:

(a)    Except as disclosed in the Environmental Report, (i) the Borrower has not conducted and shall not hereafter conduct and (ii) to such Indemnitor's knowledge, no prior owner or current or prior tenant or occupant of all or any portion of the Property has conducted or is conducting, any Hazardous Substance Activity at, on or under the Property (A) in violation of Environmental Laws, (B) in a manner inconsistent with the use of the Property as a private residence club and hotel resort with spa and other related facilities or (C) in a manner likely to result in liability under any Environmental Laws;

84063878_3                                          3

(b)     Except as disclosed in the Environmental Report, there is no pending, or, to each Indemnitor's knowledge, threatened litigation arising under Environmental Laws affecting the Borrower or the Property; there are no and to each Indemnitor's knowledge have been no existing or closed underground storage tanks or other underground storage receptacles for Hazardous Substances or landfills or dumps on the Property;

(c)     No Indemnitor has received any written notice of, and to each Indemnitor's knowledge, there exists no investigation, action, proceeding or claim by any Governmental Authority or by any third party which could result in any Losses, liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property, nor does any Indemnitor know of any basis for such an investigation, action, proceeding or claim;

(d)     No Indemnitor has received nor, to any Indemnitor's knowledge, information and belief, has there been issued, any notice, notification, demand, request for information, citation, summons, or order in any way relating to any actual, alleged or potential violation or liability arising under Environmental Laws;

(e)     To each Indemnitor's knowledge, the Environmental Report is not inaccurate in any material respect, and no environmental investigations, studies, audits, tests, reviews or other analysis have been conducted by or are in the possession of any Indemnitor in relation to the Property and which have not been made available to the Administrative Agent;

(f)     To each Indemnitor's knowledge, neither the Property, nor any property to which any Indemnitor has, in connection with the development, maintenance or operation of the Property, transported or arranged for the transportation of any Hazardous Substances that is listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA, on CERCLIS (as defined in CERCLA) or on any similar federal or state list of sites requiring environmental investigation or clean-up;

(g)     The Borrower (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, as applicable, (ii) is duly qualified and in good standing in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed and (iii) has all requisite power and authority (including, without limitation, all governmental licenses, permits and other approvals) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted;

(h)     The execution, delivery and performance by each Indemnitor of this Indemnity, and the performance of its obligations hereunder, are within each Indemnitor's powers, have been duly authorized by all necessary action, and do not (i) contravene any Indemnitor's organizational documents (ii) violate any Law (iii) conflict with or result in the breach of, or constitute a default under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting any Indemnitor, any of its subsidiaries or any of their properties or (iv) result in or require the creation or imposition of any Lien upon or with respect to any of the properties of any Indemnitor;

(i)    No authorization, consent or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body or any other third party, which has not been obtained or given, is required for (i) the due execution, delivery or performance by each Indemnitor of this Indemnity, or (ii) the exercise by the Indemnitees of their rights under this Indemnity;

(j)    This Indemnity has been duly executed and delivered by a duly authorized officer of each Indemnitor and constitutes a legal, valid and binding obligation of each Indemnitor, enforceable against it in accordance with its terms, subject as to enforcement of remedies to any applicable bankruptcy, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally and doctrines of equity affecting the availability of specific enforcement as a remedy;

(k)    All necessary resolutions, consents, licenses, approvals and authorizations of any person or entity required in connection with the execution, delivery and performance of this Indemnity have been duly obtained and are in full force and effect;

(l)    Each Indemnitor has, independently and without reliance upon the Indemnitees and based on such documents and information as they have deemed appropriate and the advice of their own counsel, made their own credit analysis and decision to enter into this Indemnity;

(m)    Each Indemnitor is Solvent and each Indemnitor's execution hereof does not render such Indemnitor insolvent;

(n)    There is no action, suit, investigation, litigation or proceeding affecting any Indemnitor pending or to any Indemnitor's actual knowledge threatened before any court, governmental agency or arbitrator that (i) if determined adversely to Indemnitor, would be reasonably likely to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this Indemnity;

(o)    No Indemnitor is or will be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, and the assets of each Indemnitor do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA;

(p)    No Indemnitor is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA and transactions by or with any Indemnitor are not and will not be subject to state statutes applicable to such Indemnitor regulating investments of and fiduciary obligations with respect to governmental plans;

(q)    No Indemnitor is (i) an "investment company", an "affiliated person" of, "promoter" or "principal" underwriters for or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (iii) subject to any other Law that purports to restrict or regulate their ability to borrow money;

84063878_3                                     5

(r)    Neither any Indemnitor nor to any Indemnitor's knowledge are any of its subsidiaries a party to any indenture, loan or credit agreement or any contract, lease or other agreement or instrument or subject to any charter or corporate restriction that would be reasonably likely to have a Material Adverse Effect (other than the Loan Agreement);

(s)    Each Indemnitor has filed, has caused to be filed or has been included in all tax returns (Federal, state and local) required to be filed and have paid all taxes shown thereon to be due, together with applicable interest and penalties, the failure of which would be reasonably likely to have a Material Adverse Effect; and

(t)    No bankruptcy, reorganization or insolvency proceedings are pending or contemplated either by any Indemnitor or, to the knowledge of any Indemnitor, against any Indemnitor (or its member).

4.    Covenants.

Each Indemnitor hereby covenants and agrees as follows:

(a)    The Borrower shall construct, keep, maintain and operate the Property in compliance with Environmental Laws and use reasonable efforts to require all Tenants and guests to use and occupy their respective premises at the Property in compliance with Environmental Laws and enforce such requirement in a commercially reasonable manner;

(b)    Except for such Hazardous Substances Activities that may be conducted (i) in compliance with Environmental Laws, (ii) consistent with the normal operations of the Property as a private residence club and hotel and (iii) in a manner not likely to result in liability under Environmental Laws, no Hazardous Substances Activities shall be conducted on, in, under, about or from the Property;

(c)    Borrower agrees to take and implement a response plan in form and substance acceptable to the Administrative Agent with respect to the management and abatement of any Toxic Mold becoming present at the Property at any time; and

(d)    Promptly upon the written request of the Administrative Agent (which request will only be made if an Event of Default has occurred or is continuing, or if the Administrative Agent, acting in good faith, has reason to suspect that there has been or may have been any release or threatened release of Hazardous Substances at, from or onto the Property), the Administrative Agent may obtain, at each Indemnitor's sole cost and expense, (i) an update of the Environmental Report and/or a new "Phase I" environmental site assessment report of the Property (the *New Report* (which may include a so-called "Phase II assessment" if recommended by the consultant performing such update subject to such Indemnitor's reasonable approval)); and (ii) a reliance letter (the *Reliance Letter*) in favor of the Administrative Agent and the Lenders with respect to the New Report, in each case in scope, form and content and performed by a party reasonably satisfactory to the Administrative Agent. Each Indemnitor shall cooperate with the Administrative Agent in connection with the Administrative Agent's obtaining a New Report, including without limitation, causing access to the Property to be provided to the Administrative Agent and its designees at such times as the Administrative Agent shall reasonably request.

## 5. Remedial Work.

(a)    In the event that any investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (*Remedial Work*) is required to comply with (i) any Environmental Law, any requirement of a Governmental Authority or any applicable local, state or federal law or regulation, (ii) any judicial order, or by any Governmental Authority, or (iii) pursuant to any private agreement to which each Indemnitor is a party or by which each Indemnitor has agreed to be bound or to which each Indemnitor is subject as owner of the Property because of, or in connection with, the current or future presence, suspected presence, release or suspected release of Hazardous Substances in or into the air, soil, ground water, surface water or soil vapor at, on, about, under, within or near the Property (or any portion thereof), each Indemnitor shall, as soon as is reasonably practicable (and in any event within the shorter of 30 days after written demand for performance thereof by any Indemnitee and such period of time as may be required under any applicable Environmental Law or agreement), commence, or cause to be commenced, and thereafter diligently prosecute to completion, all such Remedial Work.  All Remedial Work shall be performed by one or more contractors, approved in advance in writing by the Administrative Agent (which consent shall not be unreasonably withheld or delayed), and under the supervision of a consulting engineer approved in advance in writing by the Administrative Agent (which consent shall not be unreasonably withheld or delayed).  Each Indemnitor shall cause all contractors, engineers and other consultants engaged by each Indemnitor in connection with the Remedial Work (A) directly to keep the Administrative Agent fully apprised of all matters relating to the Remedial Work, including, without limitation, to copy the Administrative Agent on all reports and other documents as and when the same are sent to any Indemnitor and (B) to agree that the Administrative Agent and the Lenders shall be entitled to rely upon the work product of all such contractors, engineers and other consultants to the same extent that any Indemnitor is entitled to rely thereon.  All costs related to such Remedial Work shall be paid by each Indemnitor including, without limitation, reasonable out-of-pocket costs actually incurred by the Administrative Agent in connection with the monitoring or review of such Remedial Work to the extent provided by this Indemnity.

(b)    In the event (i) any Indemnitor shall fail to promptly commence as provided in Section 5, or cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, (ii) any Indemnitor shall fail to keep the Administrative Agent reasonably well apprised of the progress of the Remedial Work or (iii) the Administrative Agent concludes, in the exercise of its reasonable judgment, that any Indemnitor's handling of the Remedial Work is reasonably likely to result in greater liability than would result if the Administrative Agent were directly undertaking such Remedial Work, the Administrative Agent may, but shall not be required to, cause such Remedial Work to be performed and all reasonable costs incurred by the Administrative Agent in connection therewith shall become an Environmental Loss hereunder.

(c)    The foregoing notwithstanding, in the event that (i) any Indemnitor shall (A) in good faith, and by proper legal or administrative action, contest any requirement to perform any Remedial Work and (B) notify the Administrative Agent of such contest and (ii) such Indemnitor provides the Administrative Agent with sufficient funds during the pendency of

such contest and performance of such Remedial Work to establish an escrow for the full cost of performance of such Remedial Work, as estimated in its good faith judgment (including any fines, interest, penalties and/or costs that may become due pending the determination of such contest), then such Indemnitor shall be deemed to be in compliance with subparagraph (a) above so long as such contest operates to prevent enforcement against such Indemnitor of any criminal penalties for failure to perform the Remedial Work, or the sale or forfeiture of, the Property or any part thereof for failure to perform such Remedial Work, and is prosecuted with due diligence and continuity.

(d)     Notwithstanding any provision of this Indemnity or any other Loan Document to the contrary: (i) neither the Indemnitees nor any other person or entity shall perform any Remedial Work unless the Remedial Work is required by Section 4 or 5 and the Borrower has failed to commence such required Remedial Work within 30 days after the earlier date of either (i) the Borrower's knowledge of such matter or (ii) the Borrower's receipt of a written demand from the Administrative Agent that the Remedial Work is required or, having timely commenced the Remedial Work, the Borrower's failure to pursue consistently to completion such Remedial Work within 90 days of the earlier of the aforementioned dates.

## 6. Notice of Actions.

(a)     Each Indemnitor shall give prompt written notice to the Administrative Agent of: (i) any proceeding, inquiry or written notice, by or from any Governmental Authority or non-governmental entity commenced against or received by any Indemnitor or its agents regarding the presence or suspected presence of any Hazardous Substance at, on, about, under, within, near or in connection with the Property or any migration thereof from or to the Property; (ii) any Indemnitor having obtained knowledge of any actual or alleged violation of any Environmental Law; (iii) all pending, or to the extent any Indemnitor has actual knowledge of the same, threatened environmental claims; (iv) the actual discovery by any Indemnitor or its agents of any occurrence or condition on any property adjoining or in the vicinity of the Property that could reasonably be expected to cause the Property or any part thereof to be subject to any restrictions on ownership, occupancy, transferability, or use, or subject the owner or any person having any interest in the Property to any liability, penalty, or disability under any Environmental Law; and (v) the receipt by any Indemnitor of any written notice regarding any actual, alleged, or potential Hazardous Substance Activity at, on, about, under, within, near or in connection with the Property.

(b)     Promptly upon receipt of the same, each Indemnitor shall deliver to the Administrative Agent copies of any and all documentation related to any claim subject to indemnification pursuant to this Agreement (an *Indemnified Claim*), and any and all orders, notices, permits, applications, reports, and other written communications, documents, and instruments pertaining thereto.

(c)     Each Indemnitor shall cause the attorneys that it selects to defend any Indemnified Claim (i) directly to keep the Administrative Agent fully apprised of all matters relating to such Indemnified Claim including, without limitation, to copy the Administrative Agent on all written materials generated or received by such attorneys and (ii) to agree that the

84083878_3                                    8

(including, without limitation, by amounts paid or credit bid at a foreclosure sale, pursuant to any sale pursuant to a power of sale or by discharge in connection with a deed in lieu of foreclosure) or (v) any extension of time for performance under any Loan Document.

## 9. **Other Rights and Remedies.**

The rights of the Lenders under this Indemnity shall be in addition to any other rights and remedies of the Lenders against each Indemnitor under any other Loan Document or at law or in equity (including, without limitation, any right of reimbursement or contribution pursuant to CERCLA), and shall not in any way be deemed a waiver of any such rights.

## 10. **Payments.**

All obligations of each Indemnitor hereunder shall be payable on demand and any amount due and payable hereunder to the Indemnitees by any Indemnitor which is not paid within ten Business Days after written demand therefor from the Indemnitees shall bear interest from the date of such demand at the Default Rate.

## 11. **Obligations Absolute.**

(a)    The obligations of each Indemnitor hereunder shall remain in full force without regard to, and shall not be impaired by the following, any of which may be taken in such manner, upon such terms and at such times as the Lenders, in their sole discretion, deem advisable without the consent of, or notice to, any Indemnitor, nor shall any of the following give any Indemnitor any recourse or right of action against the Lenders:  (i) any express or implied amendment, modification, renewal, supplement, extension or acceleration of any Note, the Loan Agreement, the Security Instrument or of any other Loan Document; (ii) any exercise or non-exercise by the Administrative Agent or the Lenders of any right or privilege under any of the Loan Documents; (iii) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to any Indemnitor, or any action taken with respect to this Indemnity by any trustee or receiver, or by any court, in any such proceeding, whether or not any Indemnitor shall have had notice or knowledge of any of the foregoing; (iv) any release, waiver or discharge of any Indemnitor from liability under any of the Loan Documents (other than liability under this Indemnity) or any grant to the Lenders of a security interest, lien or encumbrance in any of Indemnitor's property; (v) any subordination, compromise, settlement, release (by operation of law or otherwise), discharge, collection, or liquidation of any of the Loan Documents or any or all of the Property, or any substitution with respect thereto; (vi) any assignment or other transfer of any of the Loan Documents, in whole or in part; (vii) any acceptance of a partial performance of any of the obligations of any Indemnitor; (viii) any consent to the transfer of any or all of the Property; (ix) any bid or purchase at any sale of any or all of the Property; (x) any payment of principal, interest or other amount under any Note; (xi) any acts of the Administrative Agent or the Lenders with respect to any Hazardous Substance other than those acts which constitute the gross negligence or willful misconduct of the Administrative Agent or Lenders; or (xii) the discharge of the Security Instrument or repayment in full of the Loan.

(b)    Each Indemnitor unconditionally waives: (i) any right to require the Administrative Agent and the Lenders to exhaust their remedies with respect to the Property or any part thereof or to pursue any other remedy whatsoever; (ii) any defense arising by reason of any invalidity or enforceability of any of the Loan Documents; (iii) any defense to the recovery by the Indemnitees against any Indemnitor of any deficiency; (iv) any defense to the recovery by the Indemnitees against any Indemnitor of any deficiency or otherwise to the enforcement of this Indemnity or any other Loan Document or any security for the Loan and any defense or benefits that may be afforded any Indemnitor by any anti-deficiency laws; (v) all rights to require the Administrative Agent or any Lender to pursue any other remedy it may have against the Borrower, or any member of the Borrower; (vi) all suretyship defenses each Indemnitor would otherwise have under the laws of Utah or any other jurisdiction; (vii) all rights and defenses arising out of an election of remedies by the Administrative Agent, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guarantied obligation, has destroyed each Indemnitor's rights of subrogation and reimbursement against the Borrower; (viii) any right to a fair value hearing to determine the size of any deficiency owing (for which each Indemnitor would be liable hereunder) following a non-judicial foreclosure sale; and (ix) all rights and defenses that each Indemnitor may have because the Loan is secured by real property. This means, among other things: (1) that the Administrative Agent may collect from each Indemnitor without first foreclosing on any real or personal property collateral pledged by the Borrower; and (2) if the Administrative Agent forecloses on any real property collateral pledged by the Borrower, (x) the amount of the Loan may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price and (y) the Administrative Agent may collect from each Indemnitor even if the Administrative Agent, by foreclosing on the real property collateral, has destroyed any right each Indemnitor may have to collect from the Borrower.  This clause (ix) is an unconditional and irrevocable waiver of any rights and defenses each Indemnitor may have because the Loan is secured by real property.  In addition to every other right set forth herein, the Indemnitees shall have all of the rights afforded them by Utah Code Ann. Section 78-37-1.5.

(c)    Without limiting the generality of the foregoing, each Indemnitor hereby waives (i) all rights and defenses arising out of an election of remedies by Indemnitees, and (ii) all rights of subrogation or contribution, whether arising by contract or operation of law (including, without limitation, any such right arising under the Bankruptcy Code) or otherwise by reason of any payment by Indemnitor pursuant to the provisions hereof.  Each Indemnitor acknowledges that the Indemnitees's appraisal of the Property is such that the Indemnitees are not willing to accept the consequences, of inclusion of the obligations under this Indemnity among the obligations secured by the Security Instrument, and that Lenders would not make the Loan but for the personal liability undertaken by each Indemnitor for the obligations under this Indemnity.

12. **Independent Actions.**

Each Indemnitor waives any right to require that any action be brought by the Administrative Agent or the Lenders against any other person, or that any other remedy under the Loan Agreement, the Notes, the Security Instrument or any other Loan Document be exercised. The Indemnitees may, at their option, proceed against any Indemnitor in the first instance to collect monies when due or obtain performance under this Indemnity, without first

34003575_3                        11

resorting to the Loan Agreement, the Notes, the Security Instrument or any other Loan Document or any other remedy under the Loan Agreement, the Notes, the Security Instrument or any other Loan Document.

### 13. Successors and Assigns.

This Indemnity shall be binding upon each Indemnitor, their respective successors and assigns and shall inure to the benefit of and shall be enforceable by the Administrative Agent, the Indemnitees, their respective successors and assigns (including, without limitation, any entity to which the Lenders may assign or sell all or any portion of their interests in the Loan). Notwithstanding anything to the contrary, no Indemnitor shall assign any of its rights or delegate any of its obligations arising hereunder without the prior written consent of the Administrative Agent. Any attempted assignment or delegation by Indemnitor without the required consent shall be void ab initio.

### 14. Notices.

Any communications concerning this Indemnity shall be in writing addressed to the applicable party at the address set forth on the first page of this Indemnity and otherwise made pursuant to Section 11.4 of the Loan Agreement.

### 15. Governing Law.

This Indemnity shall be construed in accordance with, and this Indemnity and all matters arising out of or relating in any way whatsoever to this Indemnity (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

### 16. Severability.

If any term, covenant, condition or provision of this Indemnity or the application thereof to any circumstance or to any Indemnitor shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Indemnity or the application thereof to any circumstances or to any Indemnitor other than those as to which any term, covenant, condition or provision is held invalid or unenforceable, shall not be affected thereby and each remaining term, covenant, condition and provision of this Indemnity shall be valid and shall be enforceable to the fullest extent permitted by law.

### 17. No Waiver; Remedies.

No failure on the part of the Administrative Agent or the Lenders to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. All remedies afforded to the Administrative Agent and the Lenders by reason of this Indemnity and all of the other Loan Documents are separate and cumulative remedies and each of such remedies, whether exercised by the Administrative Agent or the Lenders or not, shall not be deemed to be exclusive of any of the other remedies available to the Administrative Agent or the Lenders and shall not limit or prejudice any other legal or equitable

84063878_3                                    12