# EXHIBIT B

**Loan Agreement between**

**Easy Street Mezzanine LLC**

**as Borrower**

**and**

**BayNorth Realty Fund VI, Limited Partnership**

**as Lender**

**Dated as of March 𝒟, 2006**

105570.159654  CBB  LIBD/1814291.3                              03/29/06 02:18 pm

## Table of Contents

                                                                                            **Page**

1.  **Recitals, Definitions and Disbursement.** ...................................................................1
    1.1    The Parties and the Property .................................................................1
    1.2    The Property .................................................................................1
    1.3    The Loan .....................................................................................2
    1.4    The Senior Loan ...............................................................................2
    1.5    Development Agreement and Management Agreement ...............................2
    1.6    Consideration .................................................................................2
    1.7    Disbursement of the Loan .....................................................................2
    1.8    Definitions ...................................................................................4

2.  **Representations and Warranties.** ...............................................................................7
    2.1    Organization and Qualification of the Borrower ...........................................7
    2.2    Corporate and Governmental Authorization; No Contravention .......................7
    2.3    Validity and Binding Effect ...................................................................7
    2.4    Single Purpose Entity .........................................................................8
    2.5    Ownership .....................................................................................8
    2.6    Capitalization .................................................................................9
    2.7    Litigation .....................................................................................9
    2.8    No Defaults ...................................................................................9
    2.9    Outstanding Debt .............................................................................9
    2.10   Senior Loan Documents .....................................................................10
    2.11   Commissions .................................................................................10
    2.12   Federal Reserve Regulations and Other Matters ........................................10
    2.13   Investment Company Act .....................................................................10
    2.14   Properties and Assets .......................................................................10
    2.15   Property Compliance with Laws .............................................................11
    2.16   Approvals .....................................................................................11
    2.17   Utilities .......................................................................................11
    2.18   Moratoria .....................................................................................11
    2.19   Independent Lot .............................................................................12
    2.20   Access and Parking .........................................................................12
    2.21   Leases and Other Agreements ...............................................................12
    2.22   Material Contracts ...........................................................................12
    2.23   Title .........................................................................................12
    2.24   Flood Zone ...................................................................................13
    2.25   ILSA Compliance .............................................................................13
    2.26   Existing Unit Contracts .....................................................................13
    2.27   Existing Insurance ...........................................................................14
    2.28   Employment Practices .......................................................................14
    2.29   Taxes .........................................................................................15
    2.30   Transactions with Related Parties .........................................................15
    2.31   Bank Accounts ...............................................................................16

2.32    No Material Adverse Change; Financial Condition ..................................16
2.33    Bankruptcy ..................................................................................16
2.34    Business Purposes .........................................................................16
2.35    [Intentionally Omitted] ...................................................................16
2.36    Management Agreement ...................................................................16
2.37    Development Agreement ...................................................................16
2.38    No Foreign Person ..........................................................................16
2.39    Asset Control and Anti-Terrorism Regulations ......................................17
2.40    Disclosure ....................................................................................17

3.    Covenants ............................................................................................17
3.1    Acquisition of Property and Closing of Senior Loan; Business ....................17
3.2    Existence .......................................................................................18
3.3    Compliance With and Modification of Senior Loan Documents ....................18
3.4    Compliance With and Modification of Approvals and Material Contracts ..........18
3.5    Single Purpose Entity .......................................................................18
3.6    Employees .....................................................................................18
3.7    Transfer of Property and Change in Ownership ........................................18
3.8    Use of Funds ..................................................................................19
3.9    Related Party Contracts .....................................................................19
3.10    Material Transactions .......................................................................19
3.11    Books and Records ..........................................................................19
3.12    Payments to Contractors and Suppliers .................................................20
3.13    Reporting Requirements ....................................................................20
3.14    Other Reports .................................................................................21
3.15    Copies of Requisitions ......................................................................21
3.16    Distributions ..................................................................................21
3.17    Loans ...........................................................................................21
3.18    Budget ..........................................................................................21
3.19    Business Plan .................................................................................22
3.20    Notices Received by the Borrower ........................................................22
3.21    Notices of Events Affecting the Borrower or the Property ...........................22
3.22    Payment of Impositions; Contest Right ..................................................22
3.23    Ownership of Property and Prohibition of Certain Liens .............................23
3.24    Development and Property Management ..................................................23
3.25    Use and Compliance with Law .............................................................24
3.26    Contest of Legal Requirements ............................................................24
3.27    Construction; Alterations; Maintenance .................................................24
3.28    Removal of Property .........................................................................24
3.29    Waste ...........................................................................................25
3.30    Leases ..........................................................................................25
3.31    Casualties and Takings .....................................................................26
3.32    Insurance ......................................................................................27
3.33    [Intentionally Omitted] .....................................................................27
3.34    Borrowing ......................................................................................27
3.35    Condominium Requirements ...............................................................27

ii

3.36 Unit Contracts and Deposits .................................................................................28
3.37 Marketing Efforts...........................................................................................................28
3.38 Unit Sales......................................................................................................................28
3.39 Customer Indemnification ........................................................................................29
3.40 Compliance with ILSA ..............................................................................................30
3.41 Required Terms in Contracts ...................................................................................30
3.42 Actions Requiring Consent of the Lender .............................................................30
3.43 Key Personnel ..............................................................................................................32
3.44 Changes in Tax .............................................................................................................32
3.45 Commissions and Taxes ..........................................................................................32
3.46 Estoppel Certificates ...............................................................................................32
3.47 Replacement Documents ........................................................................................33
3.48 Bank Accounts ...........................................................................................................33
3.49 Compliance With Certain Representations.............................................................33
3.50 Limited Recourse Events and Full Recourse Events ...........................................33
3.51 Overrun Funding.........................................................................................................33
3.52 As-Built Plans ..............................................................................................................34
3.53 Bonds ..............................................................................................................................34
3.54 Development Fee, Asset Management Fee, Sales Commissions and
     Property Management Fee ........................................................................................34

4. Event of Default.....................................................................................................................35
   4.1 Event of Default...........................................................................................................35
   4.2 Notice and Cure ...........................................................................................................37
   4.3 The Lender's Remedies ..............................................................................................37
   4.4 The Lender's Right to Cure and Expenses .............................................................37
   4.5 Senior Loan Cash Management Arrangements .....................................................38

5. Miscellaneous.........................................................................................................................38
   5.1 Consultants....................................................................................................................38
   5.2 Relationship of the Borrower and the Lender........................................................38
   5.3 No Reliance on the Lender ........................................................................................38
   5.4 No Lender Obligations................................................................................................38
   5.5 Reliance...........................................................................................................................39
   5.6 Indemnification.............................................................................................................39
   5.7 Notice of Indemnification ..........................................................................................39
   5.8 Costs.................................................................................................................................39
   5.9 Survival of Covenants, Representations and Warranties .....................................40
   5.10 Severability ...................................................................................................................40
   5.11 Amendment, Waiver, Entire Agreement ................................................................40
   5.12 Descriptive Headings; Interpretation ......................................................................40
   5.13 Successors and Assigns...............................................................................................40
   5.14 Satisfaction Requirement ...........................................................................................41
   5.15 Governing Law; Choice of Law ...............................................................................41
   5.16 Consent to Jurisdiction ..............................................................................................41
   5.17 Waiver of Jury Trial.....................................................................................................41

iii

| | | |
|---|---|---|
| 5.18 | Service of Process | 41 |
| 5.19 | Notices, Etc | 42 |
| 5.20 | Counterparts; facsimile execution | 42 |
| 5.21 | Limitation on Liability of the Lender and Others | 43 |
| 5.22 | Publicity | 43 |
| 5.23 | Satisfaction of Prior Agreements | 43 |
| 5.24 | Time of the Essence | 43 |
| 5.25 | Reporting of Contingent Interest | 43 |
| 5.26 | Construction Signage | 43 |
| 5.27 | Loan and Security Agreement | 59 |
| 5.28 | Promissory Note | 59 |
| 5.29 | Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing | 59 |
| 5.30 | Environmental Indemnity | 59 |
| 5.31 | Recourse Liability Agreement | 59 |
| 5.32 | Interest Rate Protection Agreement | 59 |
| 5.33 | Collateral Assignment of Interest Rate Protection Agreement | 59 |
| 5.34 | Consent and Acknowledgement from Counterparty | 59 |
| 5.35 | Depository Agreement | 59 |
| 5.36 | Consent and Subordination of Operating Agreements | 59 |
| 5.37 | Pledge and Security Agreement | 59 |
| 5.38 | Consent to Pledge and Security Agreement (General Contractor) | 59 |
| 5.39 | Consent to Pledge and Security Agreement (Architect) | 59 |
| 5.40 | Consent to Pledge and Security Agreement (Listing Agent) | 59 |
| 5.41 | Intercreditor Agreement | 59 |
| 5.42 | UCC-1 (re: Deed of Trust) Secretary of State for the State of Utah | 59 |
| 5.43 | UCC-1 (re: Deed of Trust) fixture filing in Summit County, Utah | 59 |
| 5.44 | UCC-1 (re: Collateral Assignment of Interest Rate Protection Agreement) Secretary of State for the State of Utah | 59 |
| 5.45 | UCC-1 (re: (Pledge and Security Agreement) Department of Commerce for the State of Utah | 59 |

**Schedules**

| | |
|---|---|
| 1.1 | Legal Description of Land |
| 1.2 | Plans and Specifications |
| 1.7 | Disbursement Authorization |
| 2.5 | Ownership and Control of Borrower |
| 2.6 | Capitalization |
| 2.9 | Outstanding Debt |
| 2.9 | Financial Statements |
| 2.10 | Senior Loan Documents |
| 2.11 | Commissions |
| 2.14 | Personal Property Not Owned By the Borrower |
| 2.15 | Property Noncompliance with Laws |
| 2.16 | Approvals |
| 2.21 | Leases and other Agreements |

iv

2.22    Material Contracts
2.23    Permitted Encumbrances
2.26    Units under Agreement
2.26    Approved Form of Unit Disposition Agreement
2.26    Minimum Unit Prices
2.26    Existing Insurance
2.30    Transactions with Related Parties
2.31    Bank Accounts
2.32    Dates of Financial Statements
2.33    Bankruptcy
3.1     Construction Schedule
3.8     Use of Funds
3.9     Related Party Contracts
3.13    Format for Weekly Sales Activity Reports
3.13    Other Reporting Requirements
3.18    Construction Budget
3.19    Business Plan Requirements
3.32    Insurance Requirements
3.36    Rider of Approved Changes to Standard Form Unit Contract
3.36    Schedule of Outstanding Unit Contracts
3.38    Units to be sold to Related Parties

v

## Loan Agreement

1. **Recitals, Definitions and Disbursement.**

    1.1   **The Parties and the Property.** This Loan Agreement (as it may be amended, this "**Agreement**") is entered into as of March 30, 2006 by and between Easy Street Mezzanine LLC, a Delaware limited liability company (with its successors permitted under this Agreement, the "**Borrower**"), with an address of c/o Alchemy Ventures Group, LLC, 1816 Prospector Avenue, Suite 100, Park City, Utah 84060, and BayNorth Realty Fund VI, Limited Partnership (the "**Lender**"), with an address c/o BayNorth Capital, LLC, One Financial Center, Floor 23, Boston, MA 02111, Attention: Charles J. Flint. The Borrower is controlled, directly or indirectly, by David L. Wickline and William Shoaf (the "**Principals**") except to the extent that members of Holding (as defined below) have certain approval rights as provided in the operating agreement of Holding, a true and complete copy of which has been provided to the Lender.

    1.2   **The Property.** Easy Street Partners, LLC, a Utah limited liability company which is a wholly-owned subsidiary of the Borrower (the "**Subsidiary Owner**"), has entered into an escrow arrangement for the purchase of certain real property ((the "**Land**") and all easements, entitlements and other rights appurtenant thereto located at the corner of Lower Main Street and Heber Avenue and shown as Parcels 1 through 7, on the Record of Survey, dated March 23, 2005, prepared by Christopher R. Braun, in Park City, Utah and more particularly described in **Schedule 1.1.** The Borrower has provided an accurate and complete copy of all documents (the "Purchase Escrow Documents") related to such escrow arrangement to the Lender including, without limitation, the Escrow Agreement by and among Subsidiary Owner, CloudNine Resorts, LLC, a Utah limited liability company, and AVG-SL, LLC, a Utah limited liability company, as buyer, Utah Coal & Lumber, Inc., a Utah corporation, and Diane Jordan Smith, Trustee of the Diane Jordan Smith Trust U/A/D August 27, 1987, as seller, and Equity Title Insurance Agency, Inc., as escrow agent, dated August, 2005 and the purchase and sale agreement attached thereto for the acquisition of the Land and the Improvements thereon. The Borrower, through the Subsidiary Owner, intends to redevelop the Property, including the construction at the Property of twenty-two (22) residential condominium units (each a "**Condominium**," collectively the "**Condominium**") and to sell one-eighth (1/8) or twelve and one-half percent (12.5%) fractional ownership interests in each Condominium (each such fractional ownership interest a "**Unit**," and collectively, the fractional ownership interests, the "**Units**"). All of the Condominiums, buildings, structures and improvements now or hereafter constructed on the Land are the "**Improvements**," and together with the Land, the "**Property**." Such construction shall be undertaken by the Borrower consistent with the Development Agreement (the "**Master Agreement**") for the Union Square Master Planned Development dated May 12, 2005 between CloudNine Resorts, L.L.C., a Utah limited liability company, which is one of the beneficial owners of Easy Street Holding, LLC, a Utah limited liability company "**Holding**"), which is the sole member and the sole manager of the Borrower, and the City of Park City, Utah, as assigned to the Subsidiary Owner pursuant to an Assignment of Contract dated _____ __, 2006, pursuant to the plans and specifications identified on **Schedule 1.2** (the "**Plans and Specifications**") and pursuant to a guaranteed maximum price construction contract (the "**General Contract**") to be executed by and between CloudNine Resorts - Sky Lodge Development, LLC, a Utah limited liability company (the "**Developer**"), which is an Affiliate of

the Principals, and Jacobsen Construction Company, Inc. in form and substance approved by the Lender and to be assigned to the Subsidiary Owner.

1.3     The Loan.  This Agreement has been executed and delivered in connection with the funding of a loan (the "**Loan**") in the original principal amount of $11,250,000.00 by the Lender to the Borrower.  The Loan is evidenced by the Borrower's note (the "**Note**") dated of even date herewith and, pursuant to the Pledge Agreement (the "**Pledge Agreement**") of even date herewith, is secured by a pledge by Holding, the sole member of the Borrower (together with any other person who or which has pledged collateral to secure the Loan, a "**Pledgor**"), of all of the equity interests in the Borrower.  The Borrower and the Principals have entered into an Environmental Indemnity Agreement (the "**Environmental Indemnity Agreement**") with the Lender relating to the Property, and the Principals have entered into a Guaranty and Non-Competition Agreement (the "**Guaranty**") guaranteeing the Loan in certain circumstances and a Completion Guaranty (the "**Completion Guaranty**").  The Borrower has also delivered to the Lender a Power of Attorney (the "**Power of Attorney**").  This Agreement, the Note, the Pledge, the Environmental Indemnity, the Guaranty, the Completion Guaranty, the Power of Attorney and the other documents evidencing, guaranteeing, securing and executed in connection with the Loan, as they may be amended, are referred to as the "**Loan Documents.**"

1.4     The Senior Loan.  In connection with the funding of the Loan, the Subsidiary Owner is obtaining a construction loan (the "**Senior Loan**") in an amount up to $36,800,000 from WestLB AG a German banking corporation acting through its New York Branch (with its successors as holders of the Senior Loan, the "**Senior Lender**").  The documents evidencing, guarantying or securing and executed in connection with the Senior Loan, as they may be amended, are referred to as the "**Senior Loan Documents.**"

1.5     Development Agreement and Management Agreement.  The Subsidiary Owner has entered into a Development Agreement (the "**Development Agreement**") with the Developer providing for the construction at the Property.  The Subsidiary Owner has entered into a Property Management and Leasing Agreement (together with any replacement agreement for the management of the Property, the "**Management Agreement**") with CloudNine Resorts - Sky Lodge Management, LLC, a Utah limited liability company which is an Affiliate of the Principals (the "**Manager**"), providing for the management and leasing of the Property.  The Borrower has provided the Lender with an accurate and complete copy of the Development Agreement and the Management Agreement.

1.6     Consideration.  In consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as stated in this Agreement.

1.7     Disbursement of the Loan.  The Borrower authorizes the Lender to advance the proceeds of the Loan in accordance with Schedule 1.6.  A portion of the Loan shall be disbursed by the Lender simultaneously with the acquisition of the Land and the existing Improvements in order to fund such acquisition subject, however, to the satisfaction of the following conditions (the "**Disbursement Conditions**") to such funding and disbursement as determined by the Lender in its sole discretion:

(a)     The Senior Loan Documents have been fully executed and delivered and the Senior Lender has agreed to disburse any portion of the Senior Loan required to fund the construction of the contemplated new Improvements on the Land, subject only to such conditions as may be approved by the Lender in its sole and absolute discretion at the time of the initial disbursement of the Loan.

(b)     Each of the representations and warranties made by the Borrower, any guarantor of the Loan and any pledgor of security for the Loan, shall remain true and correct as of the date when made and shall also be true and correct on the date of such disbursement and, in each case, no representation or warranty made to the knowledge of any person shall in fact not be accurate and the Lender shall have received evidence of all of the foregoing in form and substance satisfactory to the Lender.

(c)     The Borrower shall have performed and complied with all the terms and conditions of the Loan Documents and no Event of Default shall have occurred.

(d)     The Improvements shall not have been damaged by fire, explosion, accident, flood or other casualty.

(e)     The Lender shall have received a UCC insurance policy, issued by a national title insurance company, in the amount of the Loan, in form and substance satisfactory to Lender, insuring the attachment, perfection and first priority of the Lender's lien on the Pledged Collateral.

(f)     The Lender shall have received an opinion of counsel of the Borrower or an opinion of the architect for the new Improvements to be constructed on the Land that all Approvals required to be obtained for the construction of all such new Improvements and the renovations to the existing Improvements contemplated in the Plans and Specifications, other than the issuance of the actual building permit for such Improvements and renovations, have been validly issued and are not subject to any right of appeal, and that there are no outstanding conditions to obtaining such building permit other than the submittal of final construction plans and specifications consistent in all material respects with the Plans and Specifications and payment of the applicable building permit fee.

The Lender's obligation to make the initial disbursement of the Loan shall terminate and be of no further force or effect if the Disbursement Conditions are not fully satisfied on or before March 31, 2006.  The Borrower shall be obligated to pay all reasonable costs and expenses paid or incurred by the Lender as provided in Section 5.8 notwithstanding such termination of the Lender's obligation to fund and disburse the Loan.

The Lender shall make additional disbursements of the Loan from time to time upon written requisition from the Borrower in form and substance reasonably acceptable to the Lender to fund the construction of the new Improvements consistent with the Construction Budget and the Construction Schedule subject to the continued satisfaction of each of the conditions listed above for the first disbursement of the Loan and such other conditions as may be reasonably be specified by the Lender (including, without limitation, a date-down of the Lender's UCC

insurance policy if requested by the Lender); provided, however, that (i) the Borrower shall submit each such requisition at least ten (10) business days prior to the date of disbursement requested by the Borrower, (ii) such requisition shall specify in detail all of the costs to be paid with such disbursement, with such backup documentation as the Lender may reasonably require, (iii) other than the last disbursement of the remaining balance of the Loan, such disbursement shall be in an amount not less than $500,000, (iv) the Borrower shall not submit any requisition for disbursement of Loan proceeds more than once in any calendar month, (v) all outstanding costs of the Lender required to be paid or reimbursed by the Borrower shall have been paid, and (vi) no portion of the Senior Loan shall be funded, except such portion as may be required to satisfy Senior Lender's closing costs and fees, until such time as the full amount of the Loan has been disbursed to the Borrower.

If requested by the Lender, the Borrower shall enter into a cash management agreement in form reasonably required by the Lender in connection with the disbursement of the Loan, the escrow of any amounts required under this Agreement, and the payment and distribution of revenues from the Property, subject to the rights of the Senior Lender.

1.8   Definitions.  The terms listed below are used in this Agreement with the meanings indicated or referred to below.

"Affiliate" – See Section 2.11.

"Agreement" – See Section 1.1.

"Approvals" – See Section 2.16.

"Approved Rider" - See Section 3.36.

"Anti-Terrorism Order" - See Section 2.39.

"Borrower" – See Section 1.1.

"Budget" – See Section 3.18.

"Business Plan" – See Section 3.19.

"Completion Guaranty" - See Section 1.3.

"Construction Budget" – See Section 3.18.

"Condominium" – See Section 1.2.

"Condominium Documents" – See Section 3.35.

"Construction Schedule" – See Section 3.1.

"Default Rate" – See the Note.

"Deposits" – See Section 3.51

"Developer" - See Section 1.5.

"Development Agreement" - See Section 1.5.

"Disbursement Conditions" – See Section 1.7.

"Environmental Indemnity Agreement" - See Section 1.3

"Event of Default" – See Section 4.1.

"Existing Unit Contracts" - See Section 2.26.

"Force Majeure Events" shall mean labor strikes, fires, earthquakes, floods, explosions and other casualties, acts of terrorism or war or other causes beyond the reasonable control of Borrower; provided, however, that such an event shall only constitute a Force Majeure Event if Borrower gives notice of such event to the Lender within ten (10) business days after the initial occurrence of such event, and in no event shall the lack of or inability to procure moneys to fulfill Borrower's obligations under this Agreement constitute a Force Majeure Event.  For the avoidance of doubt, a default by the Senior Lender of its obligation to disburse loan proceeds to the Borrower in accordance with the Senior Loan Documents shall constitute a Force Majeure Event.

"Guaranty" – See Section 1.3.

"Holding" – See Section 1.2.

"ILSA" – See Section 2.25.

"Improvements" – See Section 1.2.

"Indemnified Party" – See Section 5.6.

"Intercreditor Agreement" - See Section 4.1(f).

"Land" – See Section 1.2

"Leases" – See Section 2.21.

"Legal Requirements" – See Section 2.2.

"Lender" – See Section 1.1.

"Loan" – See Section 1.3.

"Loan Documents" – See Section 1.3.

"Losses" - See Section 5.6.

"Management Agreement" – See Section 1.5.

"Manager" – See Section 1.5.

"Master Agreement" – See Section 1.2.

"Material Contract" – See Section 2.22.

"Minimum Sales Price" – See Section 2.26(d).

"Mortgage" - See Section 1.3.

"Note" – See Section 1.3.

"Permitted Encumbrances" – See Section 2.23.

"Plans and Specifications" – See Section 1.2.

"Pledge Agreement" - See Section  1.3.

"Pledgor" – See Section 1.3.

"Power of Attorney" – See Section 1.3.

"Principals" – See Section 1.1.

"Property" – See Section 1.2.

"Purchase Escrow Documents" – See Section 1.2.

"Related Party" – See Section 2.30.

"Senior Lender" – See Section 1.4.

"Senior Loan" – See Section 1.4.

"Senior Loan Documents" – See Section 1.4.

"Single Purpose Entity" – See Section 2.4.

"Subsidiary Owner" – See Section 1.2.

"Taxes" - See Section 2.29.

"Units" – See Section 1.2.

"Unit Contract" – See Section 3.38.

2.      Representations and Warranties.

Whenever in this Article 2 a representation and warranty is made "to the Borrower's knowledge", it shall refer to the knowledge of David L. Wickline, William Shoaf and Steve Brown, and shall mean that such persons believe such statement to be true, have a reasonable basis for such belief and have no actual knowledge that the statement is false.  In order to induce the Lender to make the Loan, the Borrower represents and warrants to the Lender as follows:

2.1      Organization and Qualification of the Borrower.  The Borrower is a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware, with full power and authority and legal right to own, develop, operate, manage, sell and lease its properties, carry on its business as presently conducted, and to execute, deliver and perform its obligations under the Loan Documents.  The Subsidiary Owner is a limited liability company, duly organized, validly existing and in good standing under the laws of Utah, with full power and authority and legal right to own, develop, operate, manage, sell and lease its properties, carry on its business as presently conducted, and to execute, deliver and perform its obligations under the Senior Loan Documents.  The Borrower is duly qualified, registered or licensed to do business, and is in good standing, in Utah and in each other jurisdiction in which the ownership or leasing of its properties or the character of its present or intended operations makes such qualification, registration or licensing necessary, except where the failure to be so licensed or qualified would not have a Material Adverse Effect on Borrower.

"Material Adverse Effect" means any circumstance, change, event, transaction, loss, failure, effect, or other occurrence, whether individually or in the aggregate with any other circumstance, change, event, transaction, loss, failure, effect or other occurrence, which is or is reasonably likely to be materially adverse to the business, operations, properties, or conditions (financial or otherwise) of Borrower.

2.2      Corporate and Governmental Authorization; No Contravention.  The execution and delivery by the Borrower of the Loan Documents and the performance by the Borrower of each of its obligations thereunder, (i) have been duly authorized by all necessary action on the part of the Borrower; (ii) do not contravene or constitute a default under or violation of any law, legislation, rule, code, bylaw, ordinance, resolution, regulation, order or decree (collectively, "Legal Requirements") of any legislative, judicial or administrative governmental authority or the governing documents of the Borrower or the Subsidiary Owner, any agreement to which the Borrower or the Subsidiary Owner is a party or by which the Borrower or the Subsidiary Owner or any of their properties is bound, any judgment, injunction, order, decree or other instrument binding upon the Borrower or the Subsidiary Owner or any of their properties or any Senior Loan Document or Permitted Encumbrance; and (iii) do not and will not result in the creation or imposition of a lien on any asset of the Borrower or the Subsidiary Owner, except the lien securing the Loan Documents.

2.3      Validity and Binding Effect.  Each of the Loan Documents to which the Borrower, the Pledgor or any Principal is a party has been duly executed and delivered by the applicable Borrower, Pledgor or Principal, and each is a legal, valid and binding agreement of the Borrower, the Pledgor or Principal, enforceable in accordance with its respective terms,

subject to the effect of bankruptcy, insolvency or other similar laws affecting the rights of creditors generally and subject to limitations imposed by general principles of equity.

2.4    Single Purpose Entity.  The Borrower is, and at all times has been, a Single Purpose Entity.

"Single Purpose Entity" means an entity which at no time since its formation, has (i) engaged in any business or activity other than the ownership, development, operation and maintenance of the Property, and, in each case, activities incidental thereto; (ii) acquired or owned any material assets other than the Property, amounts realized through the ownership, operation or disposition of the Property and such incidental personal property as may be necessary for such ownership and operation; (iii) merged or consolidated with any person or entity, or dissolved, terminated or liquidated in whole or in part, transferred or otherwise disposed of all or substantially all of its respective assets or changed its respective legal structure; (iv) failed to preserve its respective existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or terminated or failed to comply with the provisions of its governing documents; (v) owned any subsidiary or made any investment in any entity ; (vi) commingled its respective assets with the assets of any other person or entity; (vii) incurred any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan and the Senior Loan, except for trade payables in the ordinary course of its business of owning and managing the Property; (viii) become insolvent and failed to pay its respective debts and liabilities from its assets as the same shall become due; (ix) failed to maintain its respective records, books of account and bank accounts separate and apart from those of any other person; (x) entered into any contract or agreement with any other person, whether or not affiliated or related, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with unrelated third parties; (xi) sought to be dissolved or wound up in whole or in part; (xii) maintained its respective assets in such a manner that it will be costly or difficult to segregate, ascertain, or identify its respective individual assets from those of any other person; (xiii) held itself out to be responsible for the debts of another person; (xiv) made any loans or advances to any other person, whether or not affiliated or related; (xv) failed to file its own tax returns, if applicable; (xvi) agreed to any transaction which if consummated would cause it to fail to qualify as a Single Purpose Entity; (xvii) failed either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its respective business solely in its own name in order not to mislead others as to the identity with which such other party is transacting business, or to suggest that it is responsible for the debts of any other person; (xviii) failed to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its respective contemplated business operations; or (xix) filed or consented to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or made an assignment for the benefit of creditors.

2.5    Ownership.  The identity of all direct and indirect owners of interests in the Borrower, and the percentage interests of each such owner, are as shown on Schedule 2.5. Holding is the sole member and the sole manager of the Borrower.  There are no outstanding subscriptions, options, warrants, rights, convertible or exchangeable securities or other agreements or commitments of any character obligating the Borrower, Holding or the Subsidiary

Owner to issue any securities or other equity or debt interests. For the sake of clarity, the interest of Utah Coal & Lumber, Inc. in Holding will not be issued until the first disbursement hereunder. The Borrower has not entered into any agreement to register its equity or debt securities under the Securities Act of 1933, and the rules and regulations promulgated thereunder, as amended. The Borrower is the sole member and the sole manager of the Subsidiary Owner. An accurate and complete copy of the operating agreement of each of the Borrower, the Subsidiary Owner and Holding have has been provided to the Lender.

2.6     Capitalization. As of the closing on the acquisition of the Land and existing Improvements and the funding of the Loan and the Senior Loan in connection therewith, the Borrower and the Subsidiary Owner shall have received proceeds from the issuance of debt and equity indicated on Schedule 2.6 and used such proceeds for the purposes indicated on Schedule 2.6. Except as set forth on Schedule 2.6, since the date of receipt of such proceeds, the Borrower has not, directly or indirectly, made any distributions to the holders of, or on account of, any ownership interest in it, or redeemed, retired or purchased any ownership interest in it, or made any payment for any right to redeem, retire or purchase any such interest. Schedule 2.6 also includes a complete projection of the sources and uses of funds for the acquisition of the Land and Improvements thereon and the redevelopment and stabilization thereof pursuant to the Master Agreement, the Plans and Specifications, the General Contract and as otherwise contemplated by this Agreement.

2.7     Litigation. There is no action, suit, proceeding or investigation pending or, to the Borrower's knowledge, threatened against or affecting the Borrower, the Subsidiary Owner, the Pledgor, any Principal or the Property before or by any court or arbitrator or any government authority, or which seeks to restrain, enjoin, prevent the consummation of or otherwise affect the transactions contemplated by this Agreement, the other Loan Documents, the Senior Loan Documents or the Permitted Encumbrances, or questions the validity or legality of any such transactions, or seeks to recover damages or to obtain other relief in connection with any such transactions. To the Borrower's knowledge, there is no valid basis for any such action, suit, investigation or proceeding.

2.8     No Defaults. Neither the Borrower, the Subsidiary Owner nor any Pledgor is in violation of, or in default under, any term of its governing documents or, to the Borrower's knowledge, any agreement, instrument, judgment, decree, injunction or Legal Requirement (including, without limitation, any of the foregoing relating to environmental, zoning, land use, city planning or similar matters) applicable to it or by which any of its assets is bound. Each of the Borrower, the Subsidiary Owner, each Pledgor and each Principal is in compliance with all covenants contained in this Agreement, the other Loan Documents, the Senior Loan Documents, and the Permitted Encumbrances and, to the Borrower's knowledge, there exists no event or circumstance which, with the giving of notice or passage of time, would constitute a default under this Agreement, any other Loan Document, any Senior Loan Document or any Permitted Encumbrance.

2.9     Outstanding Debt. Neither the Borrower nor the Subsidiary Owner has any debt or other obligations to pay money, whether absolute or contingent, of any nature whatsoever, whether currently due or due in the future, or obligations or liabilities other than as set forth in Schedule 2.9A. No Principal has debt or other obligations to pay money, whether absolute or

contingent, of any nature whatsoever, whether currently due or due in the future, or obligations or liabilities other than as disclosed in the financial statements delivered to the Lender and listed in **Schedule 2.9B**. Each of the Borrower, the Subsidiary Owner and each Principal is solvent and able to pay its debts as they become due.

2.10    Senior Loan Documents.  The Borrower has delivered to the Lender true and correct copies of all of the Senior Loan Documents.  All of the Senior Loan Documents are listed in **Schedule 2.10**.  The Senior Loan Documents are in full force and effect and the Borrower has not defaulted under any of the Senior Loan Documents.

2.11    Commissions.  No broker, finder, or other agent has been engaged by the Borrower, the Subsidiary Owner, any Pledgor or any Principal or any person (an "**Affiliate**") directly or indirectly controlling or controlled by or under common control with any of them in connection with the Loan or any other transaction contemplated by the Loan Documents other than as shown on **Schedule 2.11**.  The Borrower has delivered to the Lender a true and complete copy of all agreements requiring the payment of any consideration as a result of the closing of the Loan.

2.12    Federal Reserve Regulations and Other Matters.  The Borrower will not, directly or indirectly, use any of the proceeds from the Loan for the purpose, whether immediate, incidental or ultimate, of buying any "margin stock," or of maintaining, reducing or retiring any indebtedness originally incurred to purchase any stock that is currently a "margin stock," or for any other purpose which might constitute the transactions contemplated hereby a "purpose credit," in each case within the meaning of Regulation G or U of the Board of Governors of the Federal Reserve System (12 C.F.R. 207 and 221, as amended, respectively), or otherwise take or permit to be taken any action which would involve a violation of such Regulation G or Regulation U or of Regulations T or X of the Board of Governors of the Federal Reserve System (12 C.F.R. 220 and 224, as amended, respectively) or any other regulation of such Board.  No indebtedness that may be maintained, reduced or retired with the proceeds from the Loan was incurred for the purpose of purchasing or carrying any "margin stock" and the Borrower does not own any such "margin stock" or have any present intention of acquiring, directly or indirectly, any such "margin stock."

2.13    Investment Company Act.  The Borrower is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.14    Properties and Assets.  Except as disclosed in **Schedule 2.14**, the Subsidiary Owner owns the Property and all other personal property and assets, whether tangible or intangible, reasonably necessary in the conduct of the business of the Subsidiary Owner from time to time including all furniture, fixtures and equipment and all trademarks, copyrights, patents and other intellectual property necessary for or actually used in the operation of the Property.  To the Borrower's knowledge, all buildings, machinery and equipment necessary for the operation of the Property are in good repair and working order, except for ordinary wear and tear.  To the Borrower's knowledge, the current and proposed uses of any property or assets of the Borrower and the Subsidiary Owner are permitted under all Legal Requirements and any other insurance underwriters relating in any way to the Property, the Borrower, the Subsidiary Owner or any of their assets, and all Approvals, and none of the foregoing interfere with such

current or proposed uses.  No condemnation proceeding is pending or, to the Borrower's knowledge, threatened against the Borrower, the Subsidiary Owner or the Property.

2.15    Property Compliance with Laws.  Except as disclosed in Schedule 2.15, all Improvements which are in existence have been constructed and all of the planned Improvements, to the extent designed, have been designed in compliance with applicable zoning, land use, building, environmental and all other federal, state and local laws, ordinances, orders or requirements and those of any other governmental authority having jurisdiction over the Property or any portion thereof, and Borrower has no knowledge of any claim of violation of any such legal requirements.

2.16    Approvals.  To the Borrower's knowledge, the Borrower and/or the Subsidiary Owner has obtained and holds all approvals, orders, franchises, licenses, permits, registrations, certificates, qualifications, consents, authorizations, orders, determinations, filings with, or declarations by (collectively, "Approvals") from or by any court, government authority or other person required as of the date hereof, whether under Legal Requirements, contracts, Permitted Encumbrances, or otherwise, in connection with the conduct of its business as now being conducted and, except as described below in this Section 2.16, contemplated to be conducted.  The Subsidiary Owner has obtained the Approvals required for the construction, ownership, use and operation of the Improvements for the purposes contemplated under the terms of the Loan Documents which are identified as "Existing Approvals" on Schedule 2.16, and such "Existing Approvals" have been validly issued by the appropriate authority and are in full force and effect, and except as set forth on Schedule 2.16, constitute all of the Approvals required for the construction, ownership, use and operation of the Improvements as contemplated by the terms of the Loan Documents.  The Approvals required for the construction, ownership, use and operation of the Improvements identified as "Pending Approvals" on Schedule 2.16 are available as of right in the ordinary course of business and are anticipated to be issued as necessary to facilitate construction, ownership, use and operation of the Improvements in accordance with the planned time frames described in Schedule 2.16, and together with the "Existing Approvals" constitute all of the Approvals required for the construction, ownership, use and operation of the Improvements as contemplated under the terms of the Loan Documents, and all fees incidental to the issuance of such Approvals are also identified on Schedule 2.16.

2.17    Utilities.  To the Borrower's knowledge, all water, sewer, gas, electric, telephone, cable television and drainage facilities and all other utility services required or necessary for the use and operation of all or any portion of the Property for the purposes for which it is intended in compliance with all Legal Requirements and all requirements of the Board of Fire Underwriters and any other insurance underwriters relating in any way to the Property are available at the boundaries of the Land directly from public ways and will be connected pursuant to valid permits, and are available in sufficient quantities and are otherwise adequate to service the Property for the purposes for which it is intended and to permit full compliance with all Legal Requirements and all requirements of the Board of Fire Underwriters and any other insurance underwriters relating in any way to the Property.

2.18    Moratoria.  To the Borrower's knowledge, there are no proposed or contemplated building moratoria or similar actions which could detrimentally affect the Borrower's or the Subsidiary Owner's right to construct or operate the Property.

2.19    Independent Lot.  The Property forms an independent lot which does not now rely on any facilities (other than the facilities of public utility companies) located on any property not included in the Property (i) to fulfill any Legal Requirements or any requirement of the Board of Fire Underwriters or any other insurance underwriters relating in any way to the Property, or (ii) for furnishing essential building systems or utilities, including, without limitation, electrical, plumbing, mechanical, telephone, cable television and heating, ventilating and air conditioning systems.  To the Borrower's knowledge, no building, other improvement or other land not included in the Property relies on any portion of the Property to fulfill any Legal Requirements or any requirements of the Board of Fire Underwriters or any other insurance underwriters relating in any way to the Property or for the furnishing to such building or improvement of any essential building system or utility.

2.20    Access and Parking.  Access, vehicular and otherwise, to the Land, to the Borrower's knowledge, sufficient to comply with all Legal Requirements is provided by frontage of the Land on Lower Main Street/Heber Avenue, which is a public way.  The Improvements include parking located on the Land sufficient to comply with all Legal Requirements.

2.21    Leases and Other Agreements.  There is no lease, sublease, tenancy agreement, license, concession or other agreement for the use, hire or occupancy of all or any portion of the Property ("Leases") except as disclosed in the rent roll attached as Schedule 2.21.  To the Borrower's knowledge, there is no agreement providing for payment to any party of any fee, commission or other amount on account of the leasing or sale of any portion of the Property except as disclosed in Schedule 2.21.  The Borrower has delivered to the Lender true, correct and complete copies of all Leases.

2.22    Material Contracts.  Schedule 2.22 contains a complete list of all Material Contracts in existence.  The Borrower has delivered to the Lender true, correct and complete copies of all such Material Contracts.  "Material Contracts" means all contracts relating to the development, construction, ownership, improvement, operation, leasing, sale or management of the Property with aggregate obligations (or anticipated aggregate obligations) of the Borrower in excess of $25,000, other than the Unit Contracts and purchase orders entered into on market terms in the ordinary course of business as of the date of this Agreement.

2.23    Title.  The Pledgor is the sole owner of, and has good and marketable title to, the equity interests in the Borrower, as indicated in Schedule 2.5, free and clear of all liabilities, claims, debts, exceptions, options, security interests, assessments, charges, impositions, levies, taxes, liens and all other types of encumbrances.  To the Borrower's knowledge, upon the closing on the acquisition of the Land and existing Improvements the Subsidiary Owner will be the owner of, and have good and marketable title to, the Property in fee simple, free and clear of all liabilities, claims, debts, exceptions, options, security interests, assessments, charges, impositions, levies, taxes, liens and all other types of encumbrances, except for encumbrances listed in Schedule 2.23 (the "Permitted Encumbrances"), and the Subsidiary Owner has unencumbered title to all other property and assets, whether tangible or intangible, reasonably necessary in the conduct of the business of the Subsidiary Owner from time to time, subject only to the Senior Loan Documents.  The Borrower has no knowledge of any claim, pending or threatened, which challenges or would challenge title to the equity interest of the Pledgor in the Borrower, title to the equity interest of the Borrower in the Subsidiary Owner, or the ownership

by the Subsidiary Owner of the Property.  All property and assets of any kind (real or personal, tangible or intangible) of the Borrower and the Subsidiary Owner are free from all liens and encumbrances, other than the liens evidencing the Permitted Encumbrances.  Neither the Borrower, the Subsidiary Owner nor the Pledgor have signed any financing statement, as debtor or lessee, or any security agreement authorizing any secured party thereunder to file any such financing statement, except the execution by the Borrower of the Loan Documents, the execution by the Subsidiary Owner of the Senior Loan Documents, and the execution by the Pledgor of the Pledge.

2.24    Flood Zone.  Except to the extent shown on the survey of the Land provided to the Lender, the Land does not lie within a flood zone for purposes of the Federal Emergency Management Agency National Flood Insurance program or any flood plain or similar zone which subjects the Land or any structures thereon to use or other restrictions under the applicable flood zone or flood plain regulations or zoning by-law or ordinance.

2.25    ILSA Compliance.  The sale of the Units shall be exempt from or in compliance with the registration requirements under the Interstate Land Sales Full Disclosure Act ("ILSA") and any state law regulating the sale of Units including, without limitation, the Utah Timeshare and Camp Resort Act.  The Borrower shall, upon reasonable request, provide the Lender with evidence that the sale of the Units is exempt or has been registered under such laws.

2.26    Existing Unit Contracts.  There are currently no outstanding Unit Contracts other than those identified on Schedule 2.26A (the "Existing Unit Contracts"); provided, however, that the Lender acknowledges that the Borrower will execute and deliver the Existing Unit Contracts simultaneously with the funding of the first disbursement of the Loan and the closing on the acquisition of the Land.  True, correct and complete copies of all Existing Unit Contracts have been delivered to Lender.  Except as set forth above and otherwise expressly indicated on Schedule 2.26 A, with regard to the Existing Unit Contracts:

(a)    Each Existing Unit Contract is in full force and effect, is in the form of the standard form for Unit Contracts set forth in Schedule 2.26B, contains only those changes to the standard form Unit Contract as are set forth in the Approved Rider, and has no contingencies for financing, sale of residence or other matters, other than those set forth in the standard form for Unit Contracts in Schedule 2.26B.

(b)    No purchaser under any Existing Unit Contract has a right of rescission under federal, state or local laws or other defense to enforcement of any kind that has not already expired (except for the Existing Unit Contracts, all of which shall be accepted by Subsidiary Owner concurrent with the first disbursement hereunder).  No default, or event or circumstance exist which, with the passage of time or the giving of notice, or both, would constitute a default, exists under the Existing Unit Contract by either party thereto and neither party thereto has sought to terminate the Existing Unit Contract.

(c)    Each Existing Unit Contract requires the Subsidiary Owner to complete and deliver the applicable Unit within two years of the date the Existing Unit Contract was entered into, and does not limit the remedies or damages to which the buyer is

entitled if the Borrower breaches its obligation to complete and deliver the applicable
Unit.

(d)     The purchase price is not less than the minimum sales price (the
"Minimum Sales Price") set forth in Schedule 2.26C for the applicable Unit.

(e)     The purchaser under each Existing Unit Contract has made a cash Deposit
which is non-refundable except in the event of a default by the Subsidiary Owner under
the Existing Unit Contract in the amount of not less than twenty percent (20%) of the
purchase price of the applicable Unit.

(f)     All cash Deposits under Existing Unit Contracts have been deposited by
the Subsidiary Owner in an escrow account with the Senior Lender;

(g)     The aggregate brokerage commissions payable in connection with the sale
of any Unit under an Existing Unit Contract does not exceed 7% (not including the 2%
due to the Borrower's broker) of the purchase price for the Unit; and

(h)     Except as otherwise identified on Schedule 2.26A, each Existing Unit
Contract is an arm's length transaction, on market terms and conditions, reflects a fair
market sales price and commission, and no kick-backs or similar arrangements are
involved in any Existing Unit Contract.

(i)     The Existing Unit Contracts satisfy the requirements for sales of Units in
the Senior Loan Documents.

2.27    Existing Insurance. Set forth in Schedule 2.27 is a list of all insurance policies,
fidelity bonds and payment and performance bonds covering the assets, business, equipment,
properties, operations, employees, officers, partners, directors and members of the Borrower and
the Subsidiary Owner or under which the Borrower or the Subsidiary Owner may derive any
benefit, the term and deductible for each such policy, the agency and company providing such
insurance and the name of each person scheduled as having an interest therein as loss payee,
pledgee or otherwise. There is no claim by the Borrower or the Subsidiary Owner under any of
such policies or bonds. All premiums due and payable under all such policies and bonds have
been paid, and the Borrower and the Subsidiary Owner are otherwise in full compliance with the
terms and conditions of all such policies and bonds. Such policies of insurance and bonds are of
the type and in amounts customarily carried by persons conducting business similar to that
presently conducted by the Borrower. The Borrower does not know of any threatened
termination of any such policies or bonds.

2.28    Employment Practices. Neither the Borrower, the Subsidiary Owner, the
Manager nor the Developer is a party to or is in the process of negotiating any collective
bargaining or labor agreement or union contract pertaining in any way to the Property. There is
no (i) charge, complaint or suit pending or threatened against any of them regarding
employment, hiring for employment, terminating from employment, employment practices,
employment discrimination, terms and conditions of employment, safety, wrongful termination,
or wages and hours, (ii) unfair labor practice charge or complaint pending or threatened against,

or decision or order in effect and binding on any of them before or of the National Labor
Relations Board, (iii) grievance or arbitration proceeding arising out of or under collective
bargaining agreements pending or threatened with respect to any of them, (iv) strike, labor
dispute, slow-down, work stoppage or other interference with work pending or threatened against
any of them, or (v) union organizing activities or union representation question threatened or
existing with respect to any group of employees of any of them.  The Borrower and the
Subsidiary Owner do not have nor have ever had any employees.

2.29   Taxes.  The Borrower, the Subsidiary Owner, the Pledgor and each Principal has
filed or obtained extensions of all federal, state, local and foreign income, excise, franchise, real
estate, sales and use and other tax returns heretofore required by law to be filed by it.  All
material taxes, including, without limitation, all federal, state, county, local, foreign or other
income, property, sales, use, franchise, value added, employees' income withholding, social
security, unemployment and other taxes, fees, charges, water rates, sewer rates, governmental
impositions and assessments, of any nature whatsoever relating to the Property which have
become due or payable, including, without limitation, any fines or penalties with respect thereto
or interest thereon, whether disputed or not (collectively, "Taxes"), and maintenance charges
and similar charges now or hereafter levied or assessed or imposed against the Property or any
part thereof have been paid in full.  All material deposits and Taxes related to the Property, the
Borrower or the Subsidiary Owner required by law to be made, withheld, collected or provided
for, including, without limitation, deposits with respect to Taxes constituting employees' income
withholding taxes, have been duly made, withheld, collected or provided for, and have been paid
over to the proper government authority or are held by the applicable person for such payment.
No liens arising from or in connection with Taxes have been filed and are currently in effect
except for liens for Taxes which are not yet due and payable.  Neither the Borrower nor the
Subsidiary Owner has executed or filed with the Internal Revenue Service or any successor
agency or any other taxing authority any agreement or document extending, or having the effect
of extending, the period for assessment or collection of any Taxes.  Neither the Borrower nor the
Subsidiary Owner is a party to any tax sharing agreement or arrangement.  No audits or
investigations are pending or, to the Borrower's knowledge, threatened with respect to any Taxes
of the Borrower or the Subsidiary Owner.  No audits or investigations are pending or, to the
Borrower's knowledge, threatened with respect to any Taxes of any Principal, which if
determined adversely, would have a material adverse effect on the condition, financial or
otherwise, assets, business or results of operations of any Principal.

2.30   Transactions with Related Parties.  Except as set forth in Schedule 2.30, there are
no transactions, agreements or understandings existing or presently contemplated between (i) any
person directly or indirectly through one or more entities, beneficially owning an equity interest
in the Borrower, or (ii) any officer, director, or trustee of such person, or (iii) any spouse, sibling,
ancestor or descendant of such person, or (iv) any entity more than one percent (1%) of any class
of securities of which is owned by such person or any spouse, sibling, ancestor or descendant of
such person (each a "Related Party") and the Borrower, the Subsidiary Owner or any person
doing business with the Borrower or the  Subsidiary Owner.  Schedule 2.30 contains a complete
description of all fees, payments and compensation payable to any Related Party by the
Borrower or the Subsidiary Owner or any person doing business with the Borrower or the
Subsidiary Owner.

2.31    Bank Accounts.  The names, financial institution and account number for each bank account (checking, savings, lock box or collateral or otherwise) maintained by the Borrower and the Subsidiary Owner are listed in Schedule 2.31.

2.32    No Material Adverse Change; Financial Condition.  No material adverse change has occurred with respect to the Borrower, the Subsidiary Owner, or any Principal since the date of the respective financial statement for such entity or individual or the Property delivered to the Lender, which dates are set forth on Schedules 2.9A and 2.9B.  The Borrower and the Subsidiary Owner are solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to the Borrower or the Subsidiary Owner has been initiated.

2.33    Bankruptcy.  Except as described on Schedule 2.33, none of the Borrower, the Subsidiary Owner, Pledgor, any Principal, or any of their Affiliates has ever voluntarily or involuntarily filed for protection from creditors under any provision of any bankruptcy or insolvency law, nor have they had any property foreclosure actions commenced against them.

2.34    Business Purposes.  The Loan is solely for the Borrower's business purpose of financing its indirect ownership interest in the Property, and no portion of the Loan shall be used for personal, family, household or agricultural purposes.

2.35    [Intentionally Omitted]

2.36    Management Agreement.  The Management Agreement is in full force and effect with no defaults thereunder or deficiencies in the performance of obligations thereunder and there exist no amendments or modifications thereto not previously approved by the Lender.  All of the parties to the Management Agreement are in full compliance with their respective obligations thereunder.  There does not exist any condition that would materially and adversely affect the ability of the Manager to fulfill and perform all of its obligations under the Management Agreement.  The Management Agreement sets forth all of the agreements and understandings between the Subsidiary Owner and the Manager, and there are no other agreements, contracts, or other documents relating to the management of the Property.

2.37    Development Agreement.  The Development Agreement is in full force and effect with no defaults thereunder or deficiencies in the performance of obligations thereunder and there exist no amendments or modifications thereto not previously approved by the Lender.  All of the parties to such agreement are in full compliance with their respective obligations thereunder.  There does not exist any condition that would materially and adversely affect the ability of the Developer to fulfill and perform all of its obligations under the Development Agreement.  The Development Agreement sets forth all of the agreements and understandings between the Subsidiary Owner and the Developer, and there are no other agreements, contracts, or other documents relating to the Development Agreement and/or the Property.

2.38    No Foreign Person.  The Borrower is not a "foreign person" within the meaning of Sections 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

2.39    Asset Control and Anti-Terrorism Regulations. None of the Borrower, the Subsidiary Owner, Pledgor, any Principal nor any of their direct or indirect beneficial owners have engaged in any dealings or transactions, directly or indirectly, (i) in contravention of any U.S., international or other money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. §1 et seq., as amended), or any foreign asset control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (ii) in contravention of Executive Order No. 13,244, 66 Fed. Reg. 49,079 (2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time (the "Anti-Terrorism Order") or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time. None of the Borrower, Pledgor, any Principal nor any of their direct or indirect beneficial owners are a person described in Section 1 of the Anti-Terrorism Order and none of the Borrower, any Pledgor, any Principal nor any of their direct or indirect beneficial owners have engaged in any dealings or transactions, or otherwise been associated with any such person.

2.40    Disclosure. In this Agreement or in any other Loan Document, there is no untrue statement of material fact or any omission of a material fact necessary to make the statements contained herein and therein not materially misleading in light of the circumstances in which such statements were made. There is no material fact known to the Borrower, Pledgor or any Principal which has not been disclosed to the Lender in writing which has or, insofar as the Borrower, any Pledgor or any Principal can reasonably foresee, may have or will have a Material Adverse Effect on the Borrower, the Subsidiary Owner, the Property or the ability of the Borrower, the Subsidiary Owner, or any Principal to perform its obligations under the Loan Documents, the Senior Loan Documents, the Material Contracts or any Permitted Encumbrance.

3.    Covenants.

The Borrower hereby covenants and agrees for the benefit of the Lender, as set forth below:

3.1    Acquisition of Property and Closing of Senior Loan; Business. The Borrower shall use best reasonable efforts to cause the Subsidiary Owner to close on the acquisition of the Land and existing Improvements pursuant to the Purchase Escrow Documents on or before March 31, 2006 and otherwise to satisfy the conditions to the disbursement of the Loan set forth in Section 1.7 of this Agreement. The Borrower shall use best reasonable efforts to cause the Subsidiary Owner to satisfy all conditions to the initial disbursement of the Senior Loan to fund construction costs on or before April 15, 2006. The Borrower shall cause the Subsidiary Owner to operate the Property and perform all activities incidental thereto, all in accordance and

compliance with the terms of this Agreement and the other Loan Documents, the Business Plan, the Budget, and all Approvals, Legal Requirements, Senior Loan Documents and Permitted Encumbrances.  The Borrower shall not permit the Subsidiary Owner to conduct  any business or activity other than such businesses and activities as are necessary for and directly related to the operation of the Property in accordance with the Budget.  The Borrower shall cause the Subsidiary Owner to promptly commence and diligently proceed with the construction of the Improvements on the Property in accordance with the construction schedule (the "Construction Schedule") attached as Schedule 3.1, the Construction Budget and the Plans and Specifications, subject to unavoidable delays in the construction of the improvements as a result of Force Majeure Events.  The Construction Schedule shall be adjusted to reflect the construction schedule set forth in the General Contract within ten (10) days after the execution and delivery of the General Contract.

3.2    Existence.  The Borrower shall do or cause to be done all things necessary to preserve and keep in full force and effect its and the Subsidiary Owner's legal existence in accordance with their respective governing documents in effect on the date of this Agreement. The Borrower shall not modify or permit the modification of any provisions of the governing documents of the Borrower or the Subsidiary Owner without the approval of the Lender, which approval shall not be unreasonably withheld, conditioned or delayed.  The Borrower shall not permit the Subsidiary Owner to issue, or agree to issue, any additional equity interests without the Lender's prior consent.

3.3    Compliance With and Modification of Senior Loan Documents.  The Borrower shall not make or permit any material changes in the Senior Loan Documents without the prior written consent of the Lender.  The Borrower shall cause the Subsidiary Owner to comply with all covenants and other terms and conditions of all Senior Loan Documents except to the extent that the Borrower has obtained the approval of the Lender for any noncompliance.

3.4    Compliance With and Modification of Approvals and Material Contracts.  The Borrower shall not make or permit any material changes in the Approvals, the Plans and Specifications or any Material Contract without the prior written consent of the Lender, which approval shall not be unreasonably withheld, conditioned or delayed.  Except as permitted pursuant to the provisions of Section 3.42(e), the Borrower shall cause the Subsidiary Owner to comply with all covenants and other terms and conditions of all Approvals and Material Contracts except to the extent that the Borrower has obtained the approval of the Lender for any noncompliance.

3.5    Single Purpose Entity.  The Borrower will not permit the Subsidiary Owner to engage in any business or activity, or fail to take any action which would cause the Borrower or the Subsidiary Owner to no longer be a Single Purpose Entity.

3.6    Employees.  The Borrower and the Subsidiary Owner shall not hire any employees, and shall conduct their business solely through independent contractors.

3.7    Transfer of Property and Change in Ownership.  Except for the security interests created under the Senior Loan and the Loan, the Borrower shall not permit the mortgaging, pledging or hypothecation of any direct or indirect ownership interest in the Borrower or the

Subsidiary Owner or any change in the direct or indirect beneficial ownership or control of the
Borrower, the Subsidiary Owner or the Property without the consent of the Lender.  This
provision is intended to prohibit changes of ownership and control in entities owning interests in
the Borrower or the Subsidiary Owner, directly or indirectly, through one or more other entities.
Nothing herein shall prohibit disposition of furniture, fixtures and equipment replaced in the
ordinary course of business or the sale of Units pursuant to Section 3.38.

    3.8     Use of Funds.  The Borrower shall cause the Subsidiary Owner to use all funds
advanced under the Senior Loan and the Note solely for the purposes set forth in Schedule 3.8.

    3.9     Related Party Contracts.  Neither the Borrower nor the Subsidiary Owner shall
enter into any contract with, purchase goods or services from, or otherwise enter into any
transaction with any Related Party, or any person which, in connection with such transaction, has
agreed to make any payment or provide any other consideration to any Related Party, without
fully disclosing such circumstances to the Lender and obtaining the prior written consent of the
Lender which specifically identifies the approved transaction as a transaction with a Related
Party or a person which has agreed to provide consideration to a Related Party in connection
with the transaction.  The Lender has approved the agreements listed on Schedule 3.9.  Without
the prior written approval of the Lender, the Borrower shall not and shall not permit the
Subsidiary Owner to alter, or permit the alteration of, in any respect any arrangement between
the Borrower or the Subsidiary Owner and any Related Party, including without limitation,
proposing or approving any amendment or modification of any agreement listed on Schedule 3.9
or any other agreement between the Borrower or the Subsidiary Owner and any Related Party or
any person doing business with a Related Party, exercising or granting any consent, waiver,
approval or election under any such agreement, enforcing any remedies, including termination
thereof and taking any and all other actions under or with respect to any such agreement.  The
Lender shall not unreasonably withhold, condition or delay any such consent or approval
contemplated by any such agreement which has been approved in writing by the Lender, but
shall have no obligation to consent to or approve any modification or amendment of any such
agreement.

    3.10    Material Transactions.  Except for the sale of Units permitted pursuant to
Section 3.38, the Borrower shall not permit the Subsidiary Owner to enter into any transaction
which could have a material impact on the nature or the value of the Property or the
Improvements without the prior written consent of the Lender.  In that connection, the Borrower
shall provide the Lender written notice of the Borrower's proposed action.  The Lender shall
endeavor to respond to the Borrower's request within ten (10) business days of receiving such
notice and, in any event, shall advise the Borrower within such 10 business days if it needs
additional time or information in order to respond to such request and shall in all events respond
within thirty (30) days after such request or within 30 days after such later date on which Lender
has received all information it has requested in connection therewith.

    3.11    Books and Records.  The Borrower shall keep and maintain at the Property
accurate and detailed books, records and accounts with respect to all matters pertaining to the
Borrower, the Subsidiary Owner and the Property.  The Borrower shall permit and shall cause
the Subsidiary Owner to permit the Lender and its agents and representatives at all reasonable
times to access the Property and to inspect, copy, make extracts from, and have audited all such

books, records and accounts which may be kept at a location within the United States of America
different than the Property so long as the Borrower gives written notice to the Lender of the
location of such books and records. The Borrower has notified the Lender that the books and
records shall be maintained at the offices of the Borrower at its address set forth in Section 1.1.
The Borrower and the Subsidiary Owner shall maintain all of their books and records with regard
to their assets until three years after the Loan has been paid in full.

3.12    Payments to Contractors and Suppliers. The Borrower shall cause to be paid
punctually all sums becoming due for labor, materials, fixtures or equipment used or purchased
in connection with the Property, subject to the right of the Borrower or the Subsidiary Owner,
after giving prior notice to the Lender, to contest such claims in good faith by appropriate
proceedings so long as the Lender does not determine that failure to pay any such sums could
materially adversely affect the Lender. Upon the request of the Lender, the Borrower shall
furnish to the Lender and to Lender's construction consultant copies of affidavits and lien
waivers from any architect, engineer, contractor, subcontractor or supplier that has worked in any
way in connection with the Property and copies of receipted, paid invoices for non-construction
and other costs related in any way to the Property. To the extent consistent with the Lender's
customary practices or as otherwise reasonably approved by the Lender, the Lender shall
coordinate and conform its disbursement request procedures and review process with the
processes adopted by the Senior Lender so as to reduce the administrative obligations of the
Borrower.

3.13    Reporting Requirements. The Borrower shall furnish to the Lender on a weekly
basis a summary of the Unit sales and prospective sales, similar to the format set forth in
Schedule 3.13A, which summary shall include (i) a list of Units under contract or reservation,
identifying the Unit, purchase price, purchaser, amount of Deposit and specified closing date, (ii)
a log of the number of inquiries made in person, telephonically or via email or website about the
purchase of Units, (iii) a list of prospective purchasers, and (iv) such other information as the
Lender may reasonably request from time to time. From and after the date on which the
Condominium Documents creating the condominium regime at the building are filed or recorded
(the "**Filing Date**"), the Borrower shall furnish the Lender annually within sixty (60) days after
the end of each calendar year, and from time to time, upon Lender's reasonable request, a true
and complete audited statement of the annual operating expenses and income of the Property
together with forecasts for income and expenditures, and such other information concerning the
Property and the Subsidiary Owner as the Lender may reasonably request, including without
limitation, such information as the Lender deems necessary or appropriate to comply with the tax
disclosure, list maintenance and registration requirements of Sections 6011, 6111 and 6112 of
the Code and the regulations promulgated thereunder. The Borrower shall also furnish the
Lender quarterly within thirty days after the end of each calendar quarter with unaudited
financial statements of the Borrower, the Subsidiary Owner and Holding. All financial
statements shall be in a form reasonably satisfactory to the Lender, and the annual financial
statements shall be certified by an independent public accountant reasonably satisfactory to the
Lender. The Lender hereby approves PricewaterhouseCoopers LLP to perform such
certifications until the Lender gives notice to the contrary. The Borrower shall also furnish the
Lender the financial and other information set forth in Schedule 3.13B and such other
information as the Lender may from time to time reasonably request, including without
limitation, all materials related to any agreement with a Related Party. The Borrower shall

permit the Lender and its designees to inspect and audit any books, records and financial statements of the Borrower and the Subsidiary Owner at any time during normal business hours and, if requested, shall provide the Lender or its designee with copies of any of such materials. Notwithstanding the foregoing, the Lender shall not unreasonably withhold its approval of forms of reports and financial information submitted to the Lender that conform to the requirements imposed by the Senior Lender, but nothing herein shall require the Lender to accept any reports that are not consistent with the Lender's customary practices, and in all events the frequency and certifications, if any, required of such reports shall conform to the requirements in this Section.

3.14    Other Reports.  The Borrower shall submit to the Lender copies of any reports delivered to Senior Lender pursuant to the Senior Loan Documents, if different than or in addition to the reports delivered to the Lender by the Borrower under this Agreement.

3.15    Copies of Requisitions.  The Borrower shall submit to the Lender and the Lender's construction consultant simultaneously with the submission to the Senior Lender copies of all requisitions for advances under the Senior Loan Documents (each, a "Requisition").  The Borrower shall not permit the Subsidiary Owner to accept advances from the Senior Lender for any items in a Requisition to which the Lender reasonably objects with written explanation within ten (10) business days after receipt of the Requisition.

3.16    Distributions.  The Borrower shall not make directly or indirectly, any distributions to the holders of, or on account of, any ownership interest in the Borrower now or hereafter outstanding except as expressly provided in the Note, or redeem, retire or purchase any ownership interest in the Borrower now or hereafter outstanding, or make any payment for any right to redeem, retire or purchase any such interest.

3.17    Loans.  The Borrower and the Subsidiary Owner shall not loan money to any person, or become liable as guarantor, co-borrower or otherwise on the indebtedness of any other person.

3.18    Budget.  On or before November 1 of each calendar year, the Borrower shall prepare and submit for approval by the Lender a complete and detailed budget setting forth the projected income, expenses, capital expenditures and financing needs relating to the Borrower and the Subsidiary Owner and the operation and management of the Property during the balance of such year, which approval shall not be unreasonably withheld, conditioned or delayed.  The Lender shall complete its review of the proposed budget within thirty (30) days of receipt.  If the Lender does not approve a budget submitted by the Borrower within such 30-day period, the budget for the prior period with respect to operating expense items (but not capital expenditures or improvements) shall be deemed to continue in effect for the current period.  The term "Budget" refers to the budget approved by the Lender to the extent it remains in effect pursuant to this Section 3.18.  The Borrower shall submit to the Lender with each revision of the Budget such information regarding proposed capital expenditures as the Lender may reasonably request, including plans and specifications, proposed construction schedule, proposed disbursement arrangements, and description of arrangements for administration of work to be performed.  During the development and construction of the Improvements, in place of an operating budget, there shall be a budget (the "Construction Budget") for the development and construction of the Improvements, which shall also be subject to approval by the Lender, which approval shall not

be unreasonably withheld, conditioned or delayed. The Lender shall complete its review of the proposed Construction Budget within thirty (30) days of receipt. Such Construction Budget shall include an operating budget for any portion of the existing Improvements that will continue to be operated during such development and construction including, without limitation, the existing restaurants at the Property. The initial Construction Budget for the renovation of certain of the existing Improvements and the construction of new Improvements which has been approved by the Lender is attached as Schedule 3.18. The initial operating budget for the operation and management of the Property following the completion of the redevelopment of the Property shall be submitted to the Lender for its approval at least ninety (90) days prior to the anticipated completion of such redevelopment which approval shall not be unreasonably withheld, conditioned or delayed. The Lender shall use reasonable efforts to complete its review of the proposed budget within thirty (30) days of receipt.

3.19  Business Plan. On or before November 1 of each calendar year during the term hereof, the Borrower shall prepare and submit to the Lender, for the calendar year beginning on the next following January 1, a proposed overall business and management plan setting forth the overall strategic plan for managing, operating, financing, and otherwise dealing with the Property, and which shall include all information specified in Schedule 3.19. When approved in writing by the Lender, which approval shall not be unreasonably withheld, conditioned or delayed, such plan and updates thereof shall be the "Business Plan." The Borrower shall be bound by, and the Borrower shall use all commercially reasonable efforts to implement and comply with, and to cause the Subsidiary Owner to comply with, the Business Plan. Any material changes to or material deviations from the Business Plan by the Borrower or the Subsidiary Owner shall require the prior written consent of the Lender, which approval shall not be unreasonably withheld, conditioned or delayed.

3.20  Notices Received by the Borrower. The Borrower shall deliver to the Lender promptly upon receipt thereof copies of any and all notices received by or delivered by the Borrower or the Subsidiary Owner (i) under or in connection with the Senior Loan Documents, any Material Contract or any Permitted Encumbrance; (ii) with respect to any purported notice of default by the Subsidiary Owner under any Lease; and (iii) any purported violation by the Borrower or the Subsidiary Owner or the Property of any existing and future Legal Requirements. The Borrower acknowledges and agrees that the Lender shall have the right to communicate in good faith with any and all persons as to any matters related in any way to the Property or the Borrower or the Subsidiary Owner.

3.21  Notices of Events Affecting the Borrower or the Property. The Borrower agrees to give to the Lender prompt written notice of (i) any fire, explosion, accident, flood, storm, earthquake or other casualty or strike, walkout, Act of God or act of terrorism, affecting all or any portion of the Property, and (ii) any action, suit or proceeding instituted by or against the Borrower or the Subsidiary Owner or otherwise pertaining to all or any portion of the Property.

3.22  Payment of Impositions: Contest Right. The Borrower shall pay or cause to be paid, not later than ten (10) days prior to the last date upon which payment may be made without penalty or interest, all taxes, charges for water, sewer and other municipal services and assessments, and any other charges or assessments that might become a lien on the Property (collectively, "Impositions"). The Borrower shall also furnish to the Lender evidence of

payment of all Impositions at least five (5) days prior to the due date of the applicable
Impositions. The Borrower shall have the right, after giving written notice to the Lender and
subject to the conditions stated below, to contest or to cause the Subsidiary Owner to contest by
appropriate legal proceedings the amount or validity of any Imposition. In no event shall the
Borrower or the Subsidiary Owner be entitled to delay payment of any Imposition if the delay in
payment could subject any portion of the Property to possible foreclosure, or in any event, unless
the Borrower or the Subsidiary Owner deposits with the Lender or the Senior Lender a sum of
money, makes such other arrangements, or provides such other security as are reasonably
approved by the Lender to cover the amount of such Imposition plus any interest or penalty that
may become due as a result of such contest.

3.23    Ownership of Property and Prohibition of Certain Liens.  Except for personal
property subject to leases permitted below in this Section 3.23, the Borrower shall not permit any
real or personal property, whether tangible or intangible, necessary or actually used in the
conduct of business of the Borrower or the Subsidiary Owner from time to time to be owned by
anyone other than the Subsidiary Owner. The Borrower shall promptly pay or cause to be paid
when due all bills and costs for labor and materials incurred in connection with the Property and
not permit (i) the creation or continued existence, whether by voluntary action or operation of
law, of any security interest in or other encumbrance or encroachment (each, a **"Prohibited
Encumbrance"**) on the Property or any interests in the Borrower or the Subsidiary Owner other
than the Permitted Encumbrances, the lien for unpaid real estate taxes and betterment
assessments prior to the commencement of interest and penalties thereon and mechanics' liens
which are bonded over to the satisfaction of the Lender within fifteen (15) days of notice, or (ii)
the leasing of any equipment or personal property to be used by the Borrower or the Subsidiary
Owner or in connection with the construction or operation of the Property, except personal
property leases of office equipment and temporary construction equipment entered into in the
ordinary course of operating and maintaining the Property, requiring payments not to exceed
$10,000 in the aggregate.  The Borrower shall notify the Lender promptly of the existence of and
the terms of any Prohibited Encumbrance or any lease of equipment or personal property to be
used by the Borrower or the Subsidiary Owner at or in connection with the operation and
maintenance of the Property, whether now existing or hereafter arising, and shall perform all
obligations and make all payments that become due to any party in connection with a Prohibited
Encumbrance or lease of such equipment.

3.24    Development and Property Management.  The Borrower shall cause the new
Improvements to be developed by the Developer pursuant to the Development Agreement and
the Property to be managed by the Manager pursuant to the Management Agreement, each of
which shall be subordinated to the Loan in a manner satisfactory to the Lender.  In the event of
an Event of Default under this Agreement or a default on the part of the Subsidiary Owner under
the Development Agreement or the Management Agreement not cured within applicable cure
periods, the Lender (as assignee of the Subsidiary Owner's rights under the Development
Agreement and the Management Agreement) shall have the right to terminate the Development
and/or the Management Agreement, as applicable, and select a new development management
and/or property management team, as applicable, satisfactory to the Lender in its sole discretion.
The Lender hereby approves the Manager as the initial manager of the Property.

3.25   Use and Compliance with Law.  The Borrower shall not materially change nor suffer or permit any material change in the use or character of the Property without the prior written consent of the Lender.  In that connection, the Borrower shall provide the Lender written notice of the Borrower's proposed action.  The Lender shall endeavor to respond to the Borrower's request within ten (10) business days of receiving such notice and, in any event, shall advise the Borrower within such 10 business days if it needs additional time or information in order to respond to such request and shall in all events respond within thirty (30) days after such request or within 30 days after such later date on which Lender has received all information it has requested in connection therewith.  The Borrower shall not cause or permit any violation of any Legal Requirement or Approval or other public or private restriction or regulation affecting the Property or the use thereof, or take any action or permit any condition or activity which could invalidate any Approval needed for the construction, use or occupancy of the Property.  The Borrower shall not take any action to change or alter, or participate in, suffer or permit any attempt to change or alter any Legal Requirement relating to the Property.

3.26   Contest of Legal Requirements.  After prior written notice to the Lender, the Borrower or the Subsidiary Owner may, at its sole cost and expense, by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, contest the validity or application in whole or in part of any Legal Requirements, provided that (i) no Event of Default has occurred and is continuing hereunder, (ii) such proceeding shall suspend the enforcement or prosecution of such Legal Requirements against the Borrower or the Subsidiary Owner and the Property, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument or agreement affecting the Property to which the Borrower or the Subsidiary Owner is subject and shall not constitute a default thereunder, (iv) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (v) the Borrower shall have furnished such security as the Lender may require in good faith to insure that payment of any penalties or fines in connection therewith shall be made.

3.27   Construction; Alterations; Maintenance.  The Borrower shall cause the Subsidiary Owner to promptly and diligently complete the construction of the Improvements in accordance with the Senior Loan Documents, the Plans and Specifications, the Construction Budget, the Business Plan and the Construction Schedule, subject to unavoidable delays in the construction of the improvements as a result of Force Majeure Events.  The Borrower shall cause the Subsidiary Owner to maintain the Property at all times in first-class repair and condition, damage from casualty expressly excepted.  The Borrower and the Subsidiary Owner shall not at any time take or fail to take any action, or permit any condition or activity, which could materially diminish the value of the Property or invalidate any insurance required to be provided under this Agreement.

3.28   Removal of Property.  Except as contemplated by the Plans and Specifications, the Borrower and the Subsidiary Owner shall not remove or alter any of the Improvements without the Lender's prior written consent which shall not unreasonably be withheld, conditioned or delayed.  In that connection, the Borrower shall provide the Lender written notice of the Borrower's proposed action.  The Lender shall endeavor to respond to the Borrower's request within ten (10) business days of receiving such notice and, in any event, shall advise the Borrower within such 10 business days if it needs additional time or information in order to

respond to such request and shall in all events respond within thirty (30) days after such request or within 30 days after such later date on which Lender has received all information it has requested in connection therewith.  The Borrower and the Subsidiary Owner may make, without obtaining the approval of the Lender, repairs to the Property to periodically rehabilitate the Property consistent with the Budget.  The Borrower shall not permit the Subsidiary Owner to remove or alter any item of tangible personal property owned by the Borrower or the Subsidiary Owner without promptly replacing any such item with an item of equivalent utility and value. The Borrower shall cause the Subsidiary Owner to permit the Lender, and its agents and employees, upon request, to enter upon the Property for the purposes of inspecting the condition of the Property and determining the Borrower's and others' compliance with the covenants contained in the Loan Documents and the Senior Loan Documents.

3.29    Waste.  The Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take or permit the Subsidiary Owner to take any action that could reasonably be expected to invalidate or give cause for cancellation of any insurance policy required hereunder, or do or permit to be done thereon anything that may in any way impair the value of the Property or the collateral for the Loan in any material respect.  The Borrower will not, without the prior written consent of the Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

3.30    Leases.  Prior to the sale of any Units, the Borrower shall provide Lender with a proposed for of leasing agreement and lease with the Unit owners for the Lender's approval. Upon approval, Borrower shall not make any material changes thereto without Lender's consent. The Lender's consent shall be required for any lease of any commercial space at the Property, which consent shall not be unreasonably withheld, conditioned or delayed.  The Borrower shall cause the Subsidiary Owner to observe and perform all the obligations imposed upon the Subsidiary Owner under any Lease.  The Borrower shall not permit the Subsidiary Owner to accept rent or any other sum from any tenant or other occupant of all or any part of the Property for more than one month in advance, in each case without the prior written consent of the Lender.  The Borrower shall not permit the Subsidiary Owner to execute, modify, amend, accept a surrender or terminate (except termination on default), either orally or in writing, any Lease now existing or hereafter made, unless (i) such new lease is in the standard form of lease for the Property approved by the Lender without material changes, (ii) the terms of such new lease comply with the Business Plan, and (iii) the tenant under such lease is not an Affiliate.  The Borrower (i) shall not do or permit to be done anything to impair the value of any of the Leases, (ii) shall promptly send copies to the Lender of all notices of default which the Borrower or the Subsidiary Owner shall send, (iii) shall cause the Subsidiary Owner to enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; (iv) shall not permit the Subsidiary Owner to execute any other assignment of the lessor's interest in any of the Leases, except as may be contained in the Senior Loan Documents, (v) shall not permit the Subsidiary Owner to alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to any of the Leases (each, a "Lease Guaranty") or cancel or terminate any such Lease Guaranty without the prior written consent of the Lender, and (vi) shall not consent to any assignment of,

or subletting under any Leases not in accordance with their terms, without the prior written consent of the Lender.

3.31    Casualties and Takings. Provided that Senior Lender and the Lender make net insurance proceeds available, upon any casualty to the Property, the Borrower shall cause the Subsidiary Owner to promptly commence and diligently prosecute the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such fire or other casualty, with such alterations as may be approved by the Lender in good faith. The Borrower shall promptly give the Lender notice of any casualty at the Property or the actual or threatened commencement of any condemnation or eminent domain proceeding, and shall deliver to the Lender copies of any and all papers served in connection with such proceedings. If the Property or any part thereof shall be damaged or destroyed by fire or other hazard insured against, or if the Property or any portion thereof or interest therein shall be taken by eminent domain, the Borrower shall promptly give written notice thereof to the Lender and promptly cause the Subsidiary Owner to take such action as is required to collect any applicable insurance proceeds or any eminent domain award. Any proceeds from insurance or awards for any taking, as the case may be, shall be paid to the Lender, unless paid to the Senior Lender pursuant to requirements of the Senior Loan Documents. The net amount of all insurance proceeds or proceeds of a condemnation or eminent domain proceeding received by the Lender may be retained and applied by the Lender toward the repayment of the Borrower's obligations under the Note and any other Loan Documents, whether or not then due and payable, and in such order and priority as the Lender in its discretion shall deem proper or, at the discretion of the Lender, the same may be paid, either in whole or in part, to the Borrower for such purposes as the Lender shall designate. If the Lender shall receive and apply the proceeds of insurance or any eminent domain taking toward the payment of the Loan, the obligations of the Borrower evidenced by the Loan Documents shall be reduced only by the net amount of such proceeds so received and applied. The Lender agrees that no prepayment premium shall be payable in connection with any prepayment of principal of the Loan as a result of a casualty or taking by eminent domain. The Borrower hereby grants the Lender full power and authority as attorney irrevocable of the Borrower to cause the Subsidiary Owner to transfer such insurance or award, to collect and endorse any checks issued in the name of the Borrower or the Subsidiary Owner, and to retain any proceeds and to apply the same to the obligations owing under the Loan Documents. Provided that no Event of Default has occurred and the Borrower demonstrates to the Lender's reasonable satisfaction that (i) the Borrower or the Subsidiary Owner will have available to it sufficient funds to restore the Improvements in a manner reasonably approved by the Lender and in compliance with all Legal Requirements, (ii) the reconstruction of the Improvements and sale of Units can be completed prior to the maturity of the Loan, and (iii) and market conditions are sufficient to permit sale of the Units at prices and on a schedule sufficient to provide reasonable assurances to the Lender that the likelihood of payment in full of the Loan following reconstruction is at least as great as if the proceeds of the casualty or condemnation are applied to outstanding debt and the Property is then sold, then, the Lender shall disburse any such insurance proceeds or eminent domain award periodically to the Borrower for such restoration upon such terms and conditions as the Lender in good faith deems appropriate. Notwithstanding anything to the contrary set forth in this Agreement or the other Loan Documents, if the Lender concludes in its reasonable judgment that any condemnation affecting the Property will have a permanent material adverse effect on the use, value or operation of the Property for its intended purposes, then the Lender shall the right to declare the Loan to be

immediately due and payable in full on that date which is fifteen (15) days after giving notice to the Borrower to such effect.

3.32   Insurance.  The Borrower agrees, at the Borrower's sole cost and expense, to cause the Subsidiary Owner to keep the Property insured at all times while the Loan remains outstanding with policies of insurance satisfying the terms described in Schedule 3.32.  In addition, the Borrower shall cause the Subsidiary Owner to obtain such additional insurance with respect to such other insurable risks relating to the Property or the Borrower or the Subsidiary Owner as the Lender may otherwise reasonably require from time to time.  Without limiting the foregoing, the Borrower shall obtain federal flood insurance for the Improvements and such additional flood insurance as the Lender may reasonably require prior to the commencement of hotel and restaurant operations and the closing of the sale of any Units.  If requested by the Lender from time to time, the Borrower shall furnish to the Lender verification of the adequacy of such insurance by an independent insurance broker or appraiser mutually acceptable to the Lender and the Senior Lender.  If at any time the Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, the Lender shall have the right, without notice to the Borrower, to take such action as the Lender deems necessary to protect its interest in the Property, including, without limitation, obtaining such insurance coverage as the Lender in its sole discretion deems appropriate, and all expenses incurred by the Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by the Borrower to the Lender upon demand and until paid shall be secured by the collateral for the Loan and shall bear interest at the Default Rate.

3.33   [Intentionally Omitted]

3.34   Borrowing.  The Borrower shall not incur nor permit any indebtedness for money borrowed by the Borrower or the Subsidiary Owner other than the Loan and the Senior Loan.  The Borrower and the Subsidiary Owner shall not guarantee, endorse or otherwise become directly or contingently liable for any indebtedness of any other person or entity except for guarantees by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

3.35   Condominium Requirements.  The Borrower shall not file or record any documents ("Condominium Documents") for the purpose of creating a condominium, fractional ownership regime or timeshare at the Property or close on the sale of the first Unit unless and until (i) the Lender has reviewed and approved in writing the final form of the Condominium Documents; and (ii) all Legal Requirements applicable to the filing or recordation of the Condominium Documents or the sale of Units have been fulfilled, to Lender's reasonable satisfaction.  The Lender acknowledges that it has approved the form of Condominium Documents previously submitted to the Lender.  The Borrower will cause the Subsidiary Owner to do all things necessary or appropriate at all times to cause the construction, offer and sale of all the Units to be accomplished in conformity with all applicable laws and regulations.  The Borrower will cause the Subsidiary Owner to comply with all applicable Legal Requirements, the Condominium Documents and, except to the extent that the Borrower has obtained the approval of the Lender for any noncompliance, the Unit Contracts relating to the completion of the Improvements and the offer and sale of Units and, when requested to do so by the Lender, will furnish to the Lender evidence of such compliance reasonably satisfactory to the Lender.

3.36    <u>Unit Contracts and Deposits</u>.  Without the prior written consent of Lender (which consent shall not unreasonably be withheld, conditioned or delayed), Borrower shall not permit the Subsidiary Owner to materially modify or amend any Unit Contract, or cancel, terminate or surrender any Unit Contract.  In that connection, the Borrower shall provide the Lender written notice of the Borrower's proposed change(s).  The Lender shall endeavor to respond to the Borrower's request within ten (10) business days of receiving such notice and, in any event, shall advise the Borrower within such 10 business days if it needs additional time or information in order to respond to such request and shall in all events respond within thirty (30) days after such request or within 30 days after such later date on which Lender has received all information it has requested in connection therewith.  The Borrower shall cause the Subsidiary Owner to comply with all covenants and other obligations of the seller under the Unit Contracts, and shall promptly notify the Lender of all notices of default which Borrower or the Subsidiary Owner or any Related Party shall send or receive thereunder.  Except for those changes to the standard from Unit Contract identified in the rider attached hereto as **Schedule 3.36A** (the **"Approved Rider"**), the Borrower shall not permit the Subsidiary Owner to make any material modification to the standard form Unit Contract attached as **Schedule 2.26B** presented to potential purchasers without obtaining the Lender's prior written approval.  All Deposits shall be held in a money market account with the Senior Lender.  Except for the application of the Deposit made by a buyer to the payment of the Senior Loan or the Loan in connection with the closing on the sale of such buyer's Unit or payment towards sales commissions as contemplated by the Listing Agreement between the Developer and Prudential Utah Real Estate, a complete copy of which Listing Agreement has been provided to the Lender and which shall not be amended without the lender's prior written consent, no amounts shall be withdrawn from either such account without the prior written consent of the Lender.  Except as otherwise expressly provided in the standard for Unit Contract, the Borrower will not permit assignment by any purchaser under a Unit Contract of its rights or interest therein.  The Borrower shall deliver to the Lender on a weekly basis an updated schedule of outstanding Unit Contracts in form similar to **Schedule 3.36B**.

3.37    <u>Marketing Efforts</u>.  The Borrower shall cause the Subsidiary Owner to use commercially reasonable efforts to market and sell all Units at the earliest possible date at prices not less than the Minimum Sales Prices therefor, which best efforts shall include, without limitation, incurring all necessary or appropriate expenses for advertising, promotion and brokerage.  The Borrower shall not permit the Subsidiary Owner to enter into or materially amend any agreement relating to the marketing of any portion of the Property, or permit changes to any previously approved marketing team for the Property, in each case without Lender's prior written consent.

3.38    <u>Unit Sales</u>.  Except as provided below in this Section 3.38, the Borrower shall not permit the Subsidiary Owner to enter into any Unit Contract.  The Subsidiary Owner shall have the right to enter into contract for the sale of a Unit (each a **"Unit Contract"**) and perform its obligations under such Unit Contracts without the prior written approval of the Lender, so long as each of the following conditions are satisfied.

(a)    No Event of Default has occurred;

(b)    The Unit Contract is on the standard form attached as **Schedule 2.26B** and contains only those changes permitted in the Approved Rider;