(c)     The Unit Contract requires the Subsidiary Owner to complete and deliver the applicable Condominium within two years of the date the Unit Contract was entered into, and does not limit the remedies or damages to which the Buyer is entitled if the Subsidiary Owner breaches its obligations to complete and deliver the applicable Condominium;

(d)     The price is not less than the Minimum Sales Price for the applicable Unit;

(e)     The purchaser shall have made a cash Deposit which is not refundable except in the event of a default by the Borrower under the Unit Contract, in either event, in the amount of not less than twenty percent (20%) of the purchase price of the Unit, and the Unit Contract expressly permits the Subsidiary Owner to use the Deposit to fund the construction costs of the new Improvements;

(f)     Except to the extent provided in the standard form Unit Contract attached as Schedule 2.26B, the Unit Contract shall be unconditional with respect to financing contingencies, sales of residences or other matters;

(g)     The Unit Contract is not with a Related Party of the Borrower, except for the Units to be purchased by Related Parties identified on Schedule 3.38;

(h)     The purchaser shall have no right of rescission under federal, state or local laws, except for the rescission period mandated under ILSA or the Utah Timeshare and Camp Resort Act;

(i)     The Subsidiary Owner shall have entered into Condominium Documents approved by the Lender and shall have demonstrated to the Lender's satisfaction that the Subsidiary Owner has complied with all Legal Requirements applicable to the sale of Units;

(j)     The brokerage commissions payable in connection with the sale of any Unit under a Unit Contract does not exceed 7% (not including the 2% due to an Affiliate of the Principals as provided in Section 3.54) of the purchase price for the Unit; and

(k)     Except as otherwise approved on Schedule 3.38, the Unit Contract is an arm's length transaction, on market terms and conditions, reflecting a fair market sales price and commission, and no kick-backs or similar arrangements are involved in such Unit Contract.

3.39    Customer Indemnification.    The Borrower hereby agrees to protect, indemnify, defend and save harmless the Lender and its members, officers, agents, and employees from and against any and all injuries, damages, losses, liabilities and expenses of any kind or nature and from any suits, claims or demands, including legal fees and expenses, by reason of, or as a result of, the offer for sale or sale of Units or any warranty, promise or obligation of any kind whatsoever (whether express, implied, created by law or otherwise) relating directly or indirectly thereto.

3.40    Compliance with ILSA.  The Borrower shall maintain its exemption from the registration requirements of, or register and remain in compliance with, ILSA until the Note has been repaid in full and shall advise the Lender as to any fact or circumstance which may result in the Borrower having to register the sale of the Units under ILSA or any state or municipal law.

3.41    Required Terms in Contracts.   The Borrower shall include in each contract (excluding Unit Contracts) it enters into the following provision or a substantially similar provision acceptable to the Lender:

> All of the interests in Easy Street Mezzanine LLC ("Easy Street") have been pledged to the BayNorth Realty Fund VI, Limited Partnership (the "Lender") to secure its $11,250,000 loan to Easy Street evidenced by a note dated _____ ____, 2006.  The Property Owner instructs all other parties to this Agreement that, upon notice from the Lender that the Lender has either succeeded to the ownership of the interests in the Easy Street or has elected to exercise its rights under the Loan Agreement entered into by Easy Street with the Lender dated _____ ____, 2006, to direct certain activities of Easy Street, they are to comply with the instructions of the Lender.  The parties to this Agreement agree to recognize the authority of the Lender to take actions on behalf of Easy Street.

3.42    Actions Requiring Consent of the Lender.  Without limiting any other term of this Agreement, the Borrower shall not take or permit the Subsidiary Owner to take any of the following actions, whether or not consistent with the Business Plan or the Budget, without the prior approval of the Lender of the specific action, including the form of instrument, parties involved or any other matter relating to such action (which in the case of requests under items (c), (e) and (j) shall not be unreasonably withheld):

(a)    borrow money or execute any new Senior Loan Documents or amend the terms of any Senior Loan Document, except as expressly provided herein;

(b)    grant any mortgage, security interest or any lien;

(c)    except as other provided in Section 3.38, enter into an agreement to sell any portion of the Property or sell any portion of the Property other than pursuant to an agreement which has been approved by the Lender;

(d)    purchase or lease any real property other than the Property;

(e)    incur any obligation or make any expenditure which would exceed the applicable annual line item in the Budget by more than the lesser of $25,000 or ten percent (10%) of such annual line item or which would cause the total of all annual line items in the Budget to be exceeded by more than $75,000 (except that if an emergency arises which threatens imminent harm to property or injury to persons and prior communication with the Lender with respect to such emergency is not practicable, the Borrower may expend or permit the Subsidiary Owner to expend such funds as may

reasonably be necessary to avert such harm or injury as long as it gives notice to the Lender on the next business day after such expenditure of the nature of such emergency and provides such additional information as the Lender may reasonably request in connection therewith); incur any obligation or make any expenditure which would exceed the applicable line item in the Construction Budget by more than the lesser of $25,000 or five percent (5%) of such line item or which would cause the total of all line items in the Construction Budget to be exceeded by more than $ _____.  Any use of savings in line items of the Construction Budget to cover overruns in other line items in the Construction Budget shall require the prior written approval of the Lender.  Any reallocation of amounts in the contingency line item in the Construction Budget to cover shortfalls in other line items shall require the prior consent of the Lender, which consent shall not be unreasonably withheld, conditioned or delayed as long as (i) the Borrower provides the Lender with prior written notice of such reallocation and (ii) the dollar amount of such reallocation, together with all previous reallocations from the contingency line item in the Construction Budget, does not exceed the product of (x) the original amount of the contingency line item in the Construction Budget and (y) a percentage equal to the percentage of the total hard construction costs that have then been completed and paid for at such time as evidenced to the reasonable satisfaction of the Lender.

(f)      enter into any lease of the Land;

(g)      change accounting method, either for financial or tax reporting purposes;

(h)      amend or fail to obtain any insurance coverage contemplated by the insurance program described in Section 3.32 of this Agreement;

(i)      dissolve the Borrower or the Subsidiary Owner;

(j)      take any action which pursuant to this Agreement requires the approval of the Lender or which materially affects the Borrower, the Subsidiary Owner or the Property;

(k)      enter into any interest rate protection agreement, swap agreement, hedge agreement, collar agreement or any similar agreement;

(l)      acquire any interest in any entity;

(m)      enter into any Material Contract;

(n)      issue any equity interest in the Borrower, the Subsidiary Owner or the Pledgor; provided, however, that Lender's consent to the issuance of any equity interest in the Pledgor shall not be unreasonably withheld, conditioned or delayed as long as the Principals continue to own at least fifty-one percent (51%) of the equity interests in the Pledgor and otherwise continue to effectively control the Borrower, the Subsidiary Owner and the Pledgor.

The Borrower shall not permit the Subsidiary Owner to request approval from the Senior Lender for any matter which requires the approval of the Lender under any of the Loan Documents, unless the Borrower submits a request to the Lender at the same time.

3.43    Key Personnel.  Each Principal shall devote such time to the business of the Borrower and the Subsidiary Owner to actively manage such business as is reasonably required to complete the Improvements in accordance with the Construction Schedule and otherwise for the Borrower to perform its obligations under the Loan Documents and for the Subsidiary Owner to perform its obligations under the Senior Loan Documents, subject to the death or incapacity of any such Principal.

3.44    Changes in Tax.  If any law now in effect or hereafter enacted or adopted or amended imposes a tax (other than income taxes), either directly or indirectly, on the Loan or the Lender's collateral, including any law requiring revenue or other stamps to be affixed to any Loan Document, the Borrower will pay the tax, with interest and penalties thereon, if any.  If the Lender is advised by counsel chosen by it that the payment of tax by the Borrower would be unlawful or taxable to the Lender or unenforceable or provide the basis for a defense of usury, then the Lender shall have the option by written notice of not less than ninety (90) days to declare the Loan immediately due and payable.

3.45    Commissions and Taxes.  The Borrower will indemnify, defend with counsel acceptable to the Lender and hold harmless the Lender from and against (i) any and all claims, demands or liabilities for brokers', finders', or other agents' fees or commissions claimed by any broker, finder or other agent acting or claiming to be acting on behalf of the Borrower or any Affiliate in connection with this Agreement, the Loan or any other transaction contemplated by the Loan Documents, including, without limitation, any claims made by or on behalf of the Developer, and (ii) any and all liabilities with respect to any taxes (including, without limitation, interest and penalties) (other than income taxes of the Lender and its Affiliates) payable or incurred or alleged to have been incurred by the Lender, the Borrower or any Principal, or any person acting or alleged to have been acting on behalf of the Borrower or any Principal, in connection with this Agreement or the Loan.

3.46    Estoppel Certificates.  Within ten (10) days after a request by the Lender, the Borrower shall furnish the Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Loan, (ii) the unpaid principal amount of the Loan, (iii) the rate of interest of the Loan, (iv) the terms of payment and maturity date of the Loan, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, there are no defaults or events which, with the passage of time or the giving of notice or both, would constitute an event of default under any Loan Document, (vii) that each Loan Document is a legal and binding obligation and has not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, and (ix) such other matters related to the Principals, Borrower, Subsidiary Owner, Property, Loan, Senior Loan and Permitted Encumbrances as the Lender may reasonably request.  The Borrower shall from time to time deliver or cause the Subsidiary Owner to deliver to the Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees or parties to Material Contracts as

required by the Lender attesting to such facts regarding the Leases or Material Contracts as the Lender may reasonably require.

3.47   Replacement Documents.  Upon receipt of a lost document affidavit of the Lender, and the Lender's indemnity of the Borrower with respect to all claims and losses arising from the loss, theft, destruction or mutilation of any Loan Document, the Borrower will issue, in lieu thereof, a replacement Loan Document, dated the date of such lost, stolen, destroyed or mutilated Loan Document in the same principal amount thereof and otherwise in materially the same form and substance as the document replaced.

3.48   Bank Accounts.  The Borrower shall not open and shall not permit the Subsidiary Owner to open any new bank account (checking, savings, lock-box or collateral or otherwise) without providing the financial institution and account number for each such account to the Lender and obtaining the prior written approval of the Lender, which approval the Lender agrees not to unreasonably withhold or delay.

3.49   Compliance With Certain Representations.  If any representation in this Agreement is subsequently determined to be inaccurate but for the fact that it is made to the Borrower's knowledge, the Borrower shall take such action as is necessary to make the representation true and correct in all material respects without the qualification regarding the Borrower's knowledge.

3.50   Limited Recourse Events and Full Recourse Events.  The Borrower shall not permit to occur or suffer to exist any event or circumstance which constitutes a Limited Recourse Event or a Full Recourse Event, each as defined in the Guaranty.

3.51   Overrun Funding.  If the Lender reasonably determines that the aggregate cost of completing the Improvements or carrying the Property through the anticipated date on which revenue is expected to be sufficient to repay the Loan exceeds the funds available to the Borrower for such purposes, the Borrower shall arrange for additional contributions to its equity in the amount of such anticipated capital requirements, which contributions shall be made in the form of equity and not debt and shall in all events be fully subordinate to the Loan.  If the Senior Lender requires that the Subsidiary Owner have additional capital as a result of projected cost overruns, the Borrower shall arrange to make additional contributions to the Subsidiary Owner's equity in the amounts from time to time required by the Senior Lender as a condition of making further advances or abstaining from accelerating its loan.  Notwithstanding the foregoing, before the Lender requires the Borrower or the Subsidiary Owner to obtain additional contributions to its equity, the Borrower shall have the right to utilize the cash earnest money deposits (each, a "Deposit") held in escrow under the Unit Contracts to satisfy such anticipated capital requirements or to fund such cost overruns to the extent allowed under applicable laws and regulations and under the terms of the Senior Loan Documents.  In the event that the aggregate amount of such Deposits so allowed to be used is insufficient to satisfy such anticipated capital requirements, the Borrower shall arrange for additional contributions to its equity and/or the Subsidiary Owner's equity in the amounts and at the times required to satisfy such anticipated capital requirements.

3.52    As-Built Plans. Not later than ninety (90) days following the substantial completion of the construction of the Improvements, Borrower shall deliver to the Lender's construction consultant and the Lender, one (1) set each of true, accurate and complete as-built plans of the Improvements so completed and certified by at least one of the surveyor, engineer, or architect to the project or the subcontractor or general contractor which performed the work.

3.53    Bonds. The Borrower shall cause the Subsidiary Owner to acquire and maintain comprehensive completion and performance bonds from the General Contractor for the construction of the Improvements.

3.54    Development Fee, Asset Management Fee, Sales Commissions and Property Management Fee. The Borrower may pay a development fee of $1,200,000 to the Developer pursuant to the Development Agreement in accordance with this Section 3.54. Forty percent (40%) of such Development Fee shall be paid in 18 monthly installments of $26,666.67 over the anticipated 18 month construction period commencing April 1, 2006; provided, however, that if the expected date for completion of all of the contemplated Improvements on the Property as provided in an approved revision to the Construction Schedule or as otherwise reasonably determined by the Lender's construction consultant is extended beyond the date for completion of such Improvements set forth in the original Construction Schedule attached to this Agreement as Schedule 3.1, then the amount of each monthly installment of the 40% of the development fee that is paid in monthly installments shall be recalculated so as to evenly amortize such 40% of the development fee over the full period of construction, and any overpayment to the Developer based on such recalculation shall be credited against future payments of such portion of the development fee. (For example, if as of June 30, 2006 the construction period is extended from 18 months to 20 months, then the monthly installment of the development fee shall be reduced from $26,666.67 to $24,000.00 ($1,200,000 x 40% / 20 months = $24,000.00), and the $2,666.67 of excess development fees paid to the Developer for each of the months of April and May 2006 ($26,666.67 - $24,000.00 = $2,666.67) shall be credited against the $24,000.00 development fee installment payable for the month of June 2006.) Twenty percent (20%) of the Development Fee shall not be paid to the Developer, but shall instead be credited to the Borrower's Principal Account (as defined in the Note) on a monthly installment basis pari pasu with the monthly cash payments of Development Fee to the Developer provided for in the first sentence of this Section 3.54, and all such amounts so credited to the Borrower's Principal Account may be paid by the Borrower to the Developer from time to time as the Borrower is entitled to the distribution of such amounts under Sections 3.4(d) and 3.5(d) of the Note. The remaining forty percent (40%) of the Development Fee will not be paid but shall be funded into an escrow account with the Senior Lender or other bank reasonably acceptable to the Lender and in which Lender has a perfected security interest.

The Subsidiary Owner may pay sales commissions ("Developer Sales Commissions") to the Developer at the time of the closing on the sale of a Unit. The Subsidiary Owner has paid $15,000 per month beginning July 1, 2005 through and including December 1, 2005 as an advance draw against such Developer Sales Commissions. The Lender hereby approves the payment of the $15,000 monthly draw amounts which have accrued for the months of January, February and March 2006, which three months of accruals shall be paid at the time of the initial disbursement of the Loan (i.e. $45,000 total), which also shall be an advance draw against Developer Sales Commissions. The Subsidiary Owner may pay $5,000.00 per month as an

advance draw against Developer Sales Commissions for the period April 1, 2006 through September 2007, with the amount of all such draw payments credited against the Developer Sales Commissions payable upon the closing of Unit sales. The amount of the Developer Sales Commissions shall be two percent (2%) of the gross sales price of each sold Unit less (i) all advance draws previously paid against Developer Sales Commissions and less (ii) the amount, if any, by which (x) $180,000.00 exceeds (y) the remaining amount in the contingency line item in the Construction Budget following the completion of construction of all Improvements at the Property and the renovation of the existing Improvements of the Property pursuant to the Plans and Specifications and the satisfaction of all obligations under the Completion Guaranty. If there are any remaining obligations under the Completion Guaranty at the time that any Developer Sales Commissions are payable, then notwithstanding the foregoing 40% of such Developer Sales Commissions will not be paid at the time of closing but instead shall be funded into an escrow account with the Senior Lender or other bank reasonably acceptable to the Lender and in which the Lender has a perfected security interest

The forty percent (40%) of the Development Fee (and any Developer Sales Commissions, if applicable as set forth above) funded into an escrow account with the Senior Lender or other bank reasonably acceptable to the Lender as set forth above shall be released from escrow at such time as the Subsidiary Owner has received from the City of Park City a certificate of occupancy for all space within the existing and newly constructed Improvements and the Principals have no further obligations to the Lender under the Completion Guaranty.

The Subsidiary Owner may also pay (i) an asset management fee to an Affiliate of the Principals in the amount of one hundred thousand dollars ($100,000) per calendar year (appropriately pro rated for partial years) commencing on the date that the Property generates sufficient positive cash flow from operations to pay such asset management fee after the payment of all required debt service on the Senior Loan, all currently accruing Base Interest on the Loan (but without any requirement to pay previously accrued Base Interest on the Loan), and operating expenses, and (ii) property management fees to the Manager pursuant to the Management Agreement.

None of the foregoing fees payable pursuant to this Section 3.54 shall be paid for so long as (i) the Borrower or the Subsidiary Owner is in default under this Agreement, the Senior Loan Documents or any Permitted Encumbrance or (ii) the construction of the Improvements cannot be completed with the remaining funds available under the Loan and the Senior Loan Documents, as reasonably determined by the Lender.

4.    **Event of Default.**

4.1    **Event of Default.** "Event of Default" means the occurrence of any one or more of the following events:

(a)    the failure by the Borrower to pay any installment of principal, interest, or other payments required under the Note except as otherwise expressly permitted in the Note; provided, however, that such failure to pay shall not constitute a default until that day which is three (3) business days after delivery or deemed delivery of notice to Borrower and Park City I, LLC of such failure.

(b)    the failure of the Borrower to observe or perform any material agreement, covenant or obligation of it contained in this Agreement, which failure continues beyond the expiration of the applicable notice and cure period provided in Section 4.2;

(c)    the failure by the Borrower or any other party to any Loan Document other than this Agreement to observe or perform any material agreement, covenant or obligation of it contained in such Loan Document, which failure continues beyond the expiration of any applicable notice and cure period if one is provided;

(d)    the failure by the Borrower, the Subsidiary Owner or any other party to any Senior Loan Document or Permitted Encumbrance to observe or perform any material agreement, covenant or obligation of it contained therein, which failure continues beyond the expiration of any applicable notice and cure period if one is provided;

(e)    the occurrence of any event or circumstance which constitutes an "Event of Default" as defined in any other Loan Document;

(f)    the occurrence of an event or circumstance which, in the absence of the Intercreditor Agreement (the "Intercreditor Agreement") of even date herewith among the Senior Lender, the Lender, the Borrower and the Subsidiary Owner, would permit the Senior Lender to accelerate or demand payment of the indebtedness owing, or to exercise any other remedies, under any Senior Loan Document;

(g)    the occurrence of any event which requires the Lender to exercise any cure rights under the Intercreditor Agreement to avoid a default or an "Event of Default" under any Senior Loan Documents;

(h)    any representation or warranty contained in this Agreement or any other Loan Document shall have been false or misleading in any material respect when made;

(i)    the failure of the estate of any individual Principal, or of any other individual guarantor of the Loan or of any obligation under any Loan Document to assume the obligations of such individual by instrument satisfactory the Lender within 30 days after the death of such individual;

(j)    any of the Loan Documents ceases to be in full force and effect (other than as a result of termination pursuant to its terms) or such Loan Document or any of its material provisions is declared null and void or otherwise becomes unenforceable in accordance with its terms; and

(k)    if the Borrower, the Subsidiary Owner, the Pledgor or any Principal or of any other guarantor of the Loan or of any obligor of any obligation under any Loan Document (i) shall commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution,

composition or other relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (ii) shall make a general assignment for the benefit of its creditors; or (iii) shall have commenced against it any case, proceeding or other action of a nature referred to in clause (i) above which results in the entry of an order for relief or any such adjudication or appointment or remains undismissed, undischarged or unbonded for a period of sixty (60) days; (iv) shall have commenced against it any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; (v) shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i) through (iv) above; or (vi) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

4.2     Notice and Cure.  If no other notice and cure period is specifically provided with respect to a covenant contained in this Agreement, the Borrower shall be entitled to notice and (i) in the case of covenants which can be cured by the payment of money, ten (10) days from such notice to cure such covenant, and (ii) in the case of other covenants, thirty (30) days from such notice to cure failure to perform.  If a failure to perform which cannot be cured by the payment of money is susceptible of cure, but cannot be cured within thirty (30) days from notice through the exercise of reasonable diligence, then, so long as the Borrower commences cure within such thirty (30)-day period, such failure remains susceptible to cure, and the Borrower diligently pursues cure and completes such cure within sixty (60) days of receipt of notice of default, such failure shall not be deemed to create an Event of Default.  Nothing in this Section 4.2 shall apply to any Event of Default other than those specified in Section 4.1(b), or prevent failure to perform any covenant contained in any other Loan Document within any applicable notice or cure period from constituting an Event of Default hereunder, or be deemed to entitle the Borrower or the Subsidiary Owner to notice and an opportunity to cure any default under any Senior Loan Document or Permitted Encumbrance beyond any notice and cure period provided therein.

4.3     The Lender's Remedies.  If an Event of Default shall occur, the Lender shall have all rights and remedies available to it or for its benefit under the Loan Documents and otherwise at law and in equity and the Lender shall have no further obligation to perform its obligations under this Agreement.  The Borrower shall not interfere with the exercise by the Lender of any of its rights and remedies under this Agreement and the other Loan Documents and shall fully cooperate with the Lender in the exercise of the Lender's rights.

4.4     The Lender's Right to Cure and Expenses.  The Lender shall be entitled, but not obligated, to cure any failure of the Borrower, the Subsidiary Owner, any Pledgor or any Principal to perform their obligations under any Loan Document or the Senior Loan Documents without in any way releasing any of them from any of their obligations, and to commence, intervene in or otherwise participate in any legal or equitable proceeding which, in the Lender's sole judgment, affects the Property, the Loan, or the Senior Loan.  If the Lender shall become involved in any action or course of conduct with respect to the Loan, the Senior Loan, the Property, the Subsidiary Owner, or the Borrower in order to protect its interest or cure any default, to evaluate, protect or enforce any of its rights hereunder, or to otherwise recover any

indebtedness owed to the Lender, the Borrower shall, on demand, reimburse the Lender for all reasonable charges, costs and expenses incurred and expenditures made by or on behalf of the Lender in connection therewith, including, without limitation, attorneys' fees, disbursements and an additional reasonable fee to compensate the Lender for overhead and personnel salaries and wages attributable to undertaking such actions or conduct, together with interest thereon from the date payment is requested until paid at an interest rate equal to the Default Rate. All such sums shall be paid by the Borrower upon demand, together with the interest thereon.

    4.5    <u>Senior Loan Cash Management Arrangements</u>. Following an Event of Default, the Borrower shall cause the Subsidiary Owner to cause the Senior Lender to pay directly to or at the direction of the Lender any and all amounts received or held by the Senior Lender which would otherwise be paid or available to be paid to the Borrower. The Borrower shall cause the Subsidiary Owner to execute and deliver such documentation as the Lender may request to irrevocably direct the Senior Lender to comply with the Lender's instructions as contemplated by the preceding sentence, and hereby appoints the Lender its attorney-in-fact for the purpose of delivering such instructions.

**5.**    <u>**Miscellaneous**</u>

    5.1    <u>Consultants</u>. The Lender shall have the right from time to time to retain one or more third party consultants to review the Budget and to monitor the performance of the business of the Borrower and the Subsidiary Owner. The Lender's costs for any such consultants shall be paid or reimbursed by the Borrower. Initially, the Lender has agreed to use Merritt and Harris, Inc. the same construction consultant that the Senior Lender initially will use, but the Lender shall have the right to change to a different construction consultant at any time in its sole but good faith discretion. The Borrower shall cooperate and shall cause the Subsidiary Owner to cooperate with such consultants in such manner as reasonably requested by the Lender.

    5.2    <u>Relationship of the Borrower and the Lender</u>. The relationship between the Borrower and the Lender is solely that of debtor and creditor. The Lender has no fiduciary or other special relationship with the Borrower, is not a partner or joint venturer of the Borrower, and is not an agent of the Borrower. No term of any Loan Documents shall be construed as creating any relationship between the Borrower and the Lender to be other than that of debtor and creditor.

    5.3    <u>No Reliance on the Lender</u>. The Principals are experienced in the ownership and operation of properties similar to the Property, and the Borrower and Related Parties are relying solely upon such expertise in connection with the ownership and operation of the Property, and not on the Lender's expertise.

    5.4    <u>No Lender Obligations</u>. By accepting or approving anything required to be observed, performed or fulfilled or to be given to the Lender pursuant to the Loan Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, plan, specification or insurance policy, the Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by the Lender.

5.5    Reliance.  The Borrower recognizes and acknowledges that in accepting the Note, this Agreement and the other Loan Documents, the Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations of the Borrower set forth herein without any obligation to investigate the Property and notwithstanding any investigation of the Property by the Lender; that such reliance existed on the part of the Lender prior to the date hereof; that the warranties and representations are a material inducement to the Lender in accepting the Note, this Agreement and the other Loan Documents; and that the Lender would not be willing to make the Loan and accept this Agreement in the absence of the warranties and representations set forth herein.

5.6    Indemnification.  The Borrower shall indemnify and hold harmless the Lender and the advisors, employees, officers, directors, and agents of the Lender (each, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses including, without limitation, the costs of investigation and attorneys' fees and disbursements (collectively, "Losses") incurred or suffered by an Indemnified Party (i) in connection with or arising out of any breach of any warranty, or the inaccuracy of any representation made by the Borrower or the failure of the Borrower to fulfill any of its agreements, covenants or conditions contained in this Agreement or in any of the other Loan Documents, including, without limitation, any and all enforcement costs or expenses, or (ii) in connection with any proceeding against the Borrower, the Subsidiary Owner, any Principal or the Lender brought by any third party arising out of or in connection with the Loan, the Borrower, the Subsidiary Owner, the Property, or the transactions contemplated hereby or any action taken in connection herewith, and to the extent not resulting from the Lender's breach of its obligations under this Agreement, whether or not the transactions contemplated by this Agreement are consummated and whether or not any Indemnified Party is a formal party to any proceeding.  The Borrower agrees promptly to reimburse any Indemnified Party for all such Losses for which it is liable pursuant to the foregoing provisions.

5.7    Notice of Indemnification.  If any Indemnified Party is entitled to indemnification hereunder, such Indemnified Party shall endeavor to give prompt notice to the Borrower of any claim or of the commencement of any proceeding against the Borrower or any Indemnified Party brought by any third party with respect to which such Indemnified Party seeks indemnification pursuant hereto.  The failure to so notify the Borrower shall not relieve the Borrower from any obligation or liability unless the Borrower is prejudiced thereby.  No Indemnified Party shall unreasonably withhold or delay its consent to a settlement of any claim or proceeding proposed by the Borrower so long as such settlement includes a release, in form and substance satisfactory to the Indemnified Party, from all liability in respect of such claim, litigation or proceeding, such settlement does not require the admission of liability or impose any other obligations on the Indemnified Party, and the Borrower pays all amounts required to accomplish such settlement and all the expenses of the Indemnified Party in connection with the claim and any related proceeding.

5.8    ███████████████████████████████████████████████████████████████████████████ into, administering and enforcing the transactions contemplated hereby or any of the other Loan Documents and any subsequent proposal, modification, waiver or consent with respect thereto including, without limitation, all legal fees incurred by the Lender in connection therewith.  All

amounts owed to the Lender under this Section 5.8 shall bear interest at the Default Rate from the date which is ten (10) days after demand therefor from the Lender until paid.

5.9     Survival of Covenants, Representations and Warranties.  All covenants, representations and warranties contained in any Loan Documents or made in writing by or on behalf of the Borrower in connection with the transactions contemplated by the Loan Documents shall survive for the duration of any statutes of limitation applicable thereto, the execution and delivery of this Agreement, and the funding of the Loan, any investigation at any time made by the Lender or on the Lender's behalf, and any disposition of or payment on the Note.  All statements contained in any certificate or other instrument delivered to the Lender by or on behalf of the Borrower pursuant to any Loan Document shall be deemed representations and warranties of the Borrower as if made under this Agreement

5.10     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction.

5.11    Amendment, Waiver, Entire Agreement.  This Agreement may be amended, and waivers or consents to departures from the provisions hereof may be given, only in a writing signed by the party against which enforcement is sought.  This Agreement and the other Loan Documents contain the entire agreement and understanding between the Lender and the Borrower and supersede all prior agreements and understandings relating to the subject matter hereof.

5.12     Descriptive Headings; Interpretation.  The headings in this Agreement are for purposes of convenience only and shall not be used in construing or interpreting this Agreement. References to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.  References to an "Article" or "Section" are, unless otherwise specified, to an "Article" or "Section" of this Agreement, as the case may be. Notwithstanding that this Agreement was initially prepared by the Lender's counsel, this Agreement has been reviewed and negotiated by competent counsel on behalf of the Borrower. The parties to this Agreement agree that this Agreement shall not be construed against the Lender as a result of this Agreement having been so prepared.  If the Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

5.13     Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the respective parties which are contained in this Agreement shall bind and inure to the benefit of the successors and assigns of all parties originally benefited thereby.  The terms and provisions of this Agreement and the other Loan Documents shall inure to the benefit of and shall be binding upon any assignee or transferee of the Lender, and in the event of such transfer or assignment, the rights and privileges herein conferred upon the Lender shall automatically extend to and be vested in, and become an obligation of, such transferee or assignee, all subject to the terms and conditions hereof.  In connection therewith, any such transferee or assignee may disclose all documents and

information which such transferee or assignee now or hereafter may have relating to the Loan Documents, the Property, the Borrower, or the Principals or any of the business of any of them. Notwithstanding the foregoing, the Loan is personal to the Borrower and the Borrower and the Principals are prohibited from assigning or transferring their rights and obligations under this Agreement or any of the Loan Documents.

5.14   Satisfaction Requirement. If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Agreement required to be satisfactory to the Lender, except as otherwise explicitly provided herein, the determination of such satisfaction shall be made by the Lender in its sole and absolute discretion.

5.15   Governing Law; Choice of Law. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of The Commonwealth of Massachusetts, without regard to principles of conflicts of law. This Agreement shall take effect as a sealed instrument. The terms and conditions of this Agreement and the other Loan Documents were negotiated by the Lender in The Commonwealth of Massachusetts, and delivered by the Borrower and accepted by the Lender in The Commonwealth of Massachusetts, and the proceeds of the Loan were disbursed from The Commonwealth of Massachusetts.

5.16   Consent to Jurisdiction. The Borrower submits to the jurisdiction of the courts of The Commonwealth of Massachusetts and to the jurisdiction of the United States District Court for the District of Massachusetts for the purpose of any suit, action or other proceeding arising out of or based upon the Loan Documents. The Borrower waives, to the fullest extent permitted by law, any objection which it may now or hereafter have that its property is exempt or immune from attachment or execution and to the venue or jurisdiction of any such suit, action or proceeding brought in any such court, including, without limitation, that any such suit, action or proceeding brought in any such court claim has been brought in an inconvenient forum. Final judgment beyond applicable appeal rights against the Borrower in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of the Borrower. Nothing in this Agreement will be deemed to preclude the Lender from bringing an action or proceeding against the Borrower or the Principals in any court with jurisdiction, wherever located.

5.17   Waiver of Jury Trial. The Lender and the Borrower hereby waive, to the fullest extent permitted by law, the right to trial by jury in any action, proceeding or counterclaim, whether in contract, tort or otherwise, in connection with, or relating directly or indirectly to the Loan, the Property, or any guarantor of the Loan.

5.18   Service of Process. The Borrower consents to process being served in any suit, action or proceeding hereunder by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the Borrower at its address given in or pursuant to Section 5.19 or to any other address which the Borrower shall have designated by written notice to the Lender. Nothing in this Section 5.18 shall affect the rights of the Lender to serve process in any manner permitted by law.

5.19    Notices, Etc.  Any notice, demand or other communication under this Agreement shall be in writing and shall be deemed delivered on the earlier to occur of (i) receipt or (ii) the date of delivery, refusal or non-delivery indicated on the return receipt, if deposited in a United States Postal Service depository, postage prepaid, sent registered or certified mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to the party to receive the same at the address of such party set forth below.

If to the Borrower:            c/o AVG-SL, LLC
                               4780 Winchester Court
                               Park City, Utah 84098

With copies to:                Wrona & Parrish, P.C.
                               1816 Prospector Avenue
                               Suite 100
                               Park City, Utah  84060
                               Attn: S. Blake Parrish, Esq.

                               Park City I, LLC
                               c/o Michael Feder
                               379 W. Broadway
                               Suite 401
                               New York, NY 10012

                               Rhona J. Kisch, Esq.
                               Hahn & Hessen LLP
                               488 Madison Avenue
                               New York, NY 10022

If to the Lender:              BayNorth Capital, LLC
                               One Financial Center – Floor 23
                               Boston, MA  02111-2651
                               Attention:  Charles J. Flint

With a copy to:                Goodwin Procter LLP
                               Exchange Place
                               Boston, Massachusetts  02109
                               Attention:  Christopher B. Barker, P.C.

or, in each case, at such other address, or to the attention of such other officer, as the Borrower or the Lender, as the case may be, shall have furnished to the other party in writing.

5.20    Counterparts; facsimile execution.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  An executed signature page of this Agreement delivered by facsimile shall

be deemed effective and of the same force and effect as the delivery of an original executed signature to this Agreement.

5.21     Limitation on Liability of the Lender and Others.  The Borrower's sole recourse and remedy for any default on the part of any person under any Loan Document shall be limited to the interest of the Lender in the Loan.  Neither the Lender, nor any of its agents or representatives, or any officer, director, shareholder, partner, agent, principal, heir, estate, successor or assign of any of the foregoing shall have any personal liability under any Loan Document.

5.22     Publicity.  Without the Lender's prior approval, the Borrower will not issue any press release or otherwise make any public announcement naming the Lender or indicating its involvement with the Borrower or the Property.  At the Lender's request, the Borrower will place signs at the Property and otherwise cooperate with the Lender's public announcements with respect to its involvement with the Borrower and the Property.

5.23     Satisfaction of Prior Agreements.  The Loan being made pursuant to the terms hereof and of the other Loan Documents is being made in satisfaction of the Lender's obligations under its Letter of Intent dated June 13, 2005.  The terms, provisions and conditions of this Loan Agreement and the other Loan Documents supersede the provisions of such Letter of Intent.

5.24     Time of the Essence.  Time is of the essence of each provision of this Loan Agreement and each other Loan Document.

5.25     Reporting of Contingent Interest.  The Borrower and the Lender agree that (i) the Note is a debt instrument that provides for one or more contingent payments within the meaning of Treasury Regulations Section 1.1275-4, (ii) the Note is subject to the "noncontingent bond method" described in Treasury Regulations Section 1.1275-4(b), (iii) the Note is being issued in substantial part to persons for whom the inclusion of interest income in gross income is not expected to have a substantial effect on their U.S. tax liability within the meaning of Treasury Regulations Section 1.1275-4(b)(4)(i)(B), (iv) the Borrower has determined that the "comparable yield" on such Note is equal to the Base Interest Rate (as defined in the Note), (v) such determination is reasonable, (vi) the projected payment schedule attached as Schedule A to the Note and prepared by the Borrower is reasonable, and (vii) the Borrower and the Lender will prepare all tax returns, tax filings and other tax reports, including, but not limited to, their federal income tax returns, consistently with the foregoing.

5.26     Construction Signage.  The Lender shall have the right to have its name included in any signage maintained at the Property during the construction period in a manner reasonably satisfactory to the Lender.

[Remainder of page intentionally blank.]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this
Agreement as an instrument under seal as of the date and year first above written.

*The Borrower:*                    Easy Street Mezzanine LLC,
                                   a Delaware limited liability company

                                   By:  Easy Street Holding, LLC, a Utah limited liability
                                   company, its sole member and manager

                                   By:  AVG-SL, LLC, a Utah limited liability company, its
                                   Manager

                                        By: _____
                                        Name: William Shoaf
                                        Title: Manager


*The Lender:*                      BayNorth Realty Fund IV, Limited Partnership

                                   By:     BayNorth Realty Fund IV GP, Limited Partnership,
                                           its general partner

                                           By:  BayNorth Realty Fund VI, LLC, its general
                                           partner

                                           By: _____
                                           Name:
                                           Title:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as an instrument under seal as of the date and year first above written.

**The Borrower:**                   Easy Street Mezzanine LLC,
                                    a Delaware limited liability company

                                    By:  Easy Street Holding, LLC, a Utah limited liability
                                    company, its sole member and manager

                                    By:  AVG-SL, LLC, a Utah limited liability company, its
                                    Manager

                                            By:_____
                                            Name: William Shoaf
                                            Title: Manager


**The Lender:**                     BayNorth Realty Fund IV, Limited Partnership

                                    By:     BayNorth Realty Fund IV GP, Limited Partnership,
                                            its general partner

                                            By:  BayNorth Realty Fund VI, LLC, its general
                                            partner

                                            By: _____
                                            Name: Charles J. Clint
                                            Title: Vice-President

## Schedule 1.1
### Legal Description of Land

PARCEL NO. 1

BEGINNING AT A POINT SOUTH 4.73 FEET AND WEST 49.84 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH
19°54'51" EAST 18.50 FEET, THENCE NORTH 31°58'04" WEST 72.72 FEET, THENCE
SOUTH 58°02'07" WEST 81.41 FEET MORE OR LESS, THENCE SOUTH 32°25'56" EAST
128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 32°25'56" EAST 128.51 FEET,
THENCE EAST 13.75 FEET, THENCE SOUTH 23°38' EAST 64.90 FEET TO THE
NORTHERLY LINE OF HEBER AVENUE AS DEDICATED, THENCE SOUTH 81°17'
EAST 24.80 FEET ALONG SAID NORTHERLY LINE, THENCE NORTH 15°46'12" EAST
60.79 FEET TO THE POINT OF BEGINNING.

SUBJECT TO AND TOGETHER WITH A 20 FOOT RIGHT OF WAY AS CREATED IN
THAT CERTAIN EASEMENT RELOCATION AGREEMENTS RECORDED DECEMBER
31, 1973 AS ENTRY NO. 244339 AND 244340 IN BOOK 368 AT PAGE NO'S 635 AND 643
OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER,
SAID RIGHT OF WAY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS 65.21 FEET SOUTH AND 51.59 FEET WEST OF
THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, SAID POINT ALSO BEING 12.0 FEET NORTHWEST OF THE
SOUTHEAST CORNER OF LOT 15, BLOCK 50, OF THE PARK CITY SURVEY AND
RUNNING THENCE NORTH 10°18'32" EAST 66.28 FEET, THENCE EAST 3.38 FEET,
THENCE NORTH 31°58'00" WEST 77.00 FEET, THENCE NORTH 19°54'00" EAST 66.80
FEET, THENCE CONTINUING NORTH 19°54'00" EAST 123.47 FEET, THENCE NORTH
70°06'00" WEST 20.00 FEET, THENCE SOUTH 19°54'00" WEST 200.00 FEET, THENCE
SOUTH 31°58'00" EAST 73.76 FEET, THENCE SOUTH 10°44'00" WEST 63.67 FEET,
THENCE SOUTH 81°17'00" EAST 20.23 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-F

PARCEL 2

BEGINNING AT A POINT 50 FEET, NORTH OF THE SOUTHEAST CORNER OF THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP
2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING
THENCE NORTH 43.97 FEET, THENCE NORTH 66°11' WEST 142.63 FEET, THENCE
SOUTH 31°58' EAST 119.75 FEET, THENCE EAST 67.1 FEET TO THE POINT OF
BEGINNING.

EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN EASY STREET BRASSERIE REPLAT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MARCH 12, 2003 AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO. SA-400-A

PARCEL 3

BEGINNING AT A POINT 38.85 FEET WEST OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE WEST 7.93 FEET, THENCE SOUTH 06°02' EAST 67.70 FEET, THENCE NORTH 81°17' WEST 27.0 FEET, THENCE NORTH 15°46'12" EAST 60.79 FEET, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51" EAST 18.50 FEET, THENCE SOUTH 31°58' EAST 25.40 FEET, THENCE SOUTH 19°54' WEST 3.18 FEET, THENCE SOUTH 31°54' EAST 77.00 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-406

PARCEL 4 AND 4A

LOTS 1 AND 2, EASY STREET BRASSERIE REPLAT SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED MARCH 12, 2003, AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO.'S ESB-1, AND ESB-2

PARCEL 5

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, IN PARK CITY, SUMMIT COUNTY, UTAH BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS WEST, A DISTANCE OF 35.90 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE CONTINUING WEST A DISTANCE OF 2.95 FEET, THENCE NORTH 31°58' WEST A DISTANCE OF 77.00 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 3.18 FEET, THENCE SOUTH 31°58' EAST A DISTANCE OF 80.53 FEET MORE OR LESS TO THE POINT OF BEGINNING.
ALSO TOGETHER WITH THE FOLLOWING DESCRIBED PROPERTY:
A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE

AND MERIDIAN IN PARK CITY, SUMMIT COUNTY UTAH, BONDED AND
DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS NORTH A DISTANCE OF 93.97 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SAID SECTION 16, THENCE NORTH 66°11' WEST A DISTANCE OF 65.29
FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 8.32 FEET, THENCE SOUTH
66°46'30" EAST A DISTANCE OF 193.50 FEET, THENCE SOUTH 7°16' EAST A
DISTANCE OF 12.03 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 4.32 FEET,
THENCE NORTH A DISTANCE OF 8.23 FEET, THENCE WEST A DISTANCE OF 18.65
FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 109.15 FEET MORE OR LESS TO
THE POINT OF BEGINNING.

TAX PARCEL NO. SA-425-UPL

PARCEL 6

LOT 15, BLOCK 50, PARK CITY SURVEY, ACCORDING TO THE OFFICIAL PLAT
THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE SUMMIT COUNTY
RECORDER, EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN THE
PARCELS 1-5 LISTED ABOVE.

TAX PARCEL NO. EXEMPT

**Schedule 1.2**
**Plans and Specifications**

[See attached]



REVISED
PERMIT SET
FEBRUARY 23, 2006

ELLIOTT+MAHONEY
architecture

THE SKY LODGE

COVER SHEET

G-001

## Schedule 1.7
### Initial Disbursement Authorization

[3.25.06: schedule as of 3.10.06]

BayNorth Realty Fund IV, Limited Partnership
600 Atlantic Avenue – Floor 26
Boston, MA  02210
Attention:  Charles J. Flint

**Re:  $11,250,000 Mezzanine Loan to Easy Street Partners, LLC (the "Loan")**

Ladies and Gentlemen:

Please allow this letter to serve as our authorization for you to disburse proceeds of the Loan in the amount of $_____ to Easy Street Partners, LLC into the closing escrow for the acquisition of the Property pursuant to the following wire instructions.

| | |
|---|---|
| Bank: | _____ |
| | _____ |
| ABA: | _____ |
| Account #: | _____ |
| Account Name: | _____ |
| Attention: | _____ |

We are aware that certain expenses are to be paid in connection with the funding of the Loan. Please instruct the title company to pay the following expenses in connection with the funding of the Loan.

| Mezz Loan Expenses To be Paid From Closing Escrow | Payee | Amount |
|---|---|---|
| Mezzanine Lender's Counsel | Goodwin Procter LLP | $_____ |
| Mezzanine Lender's Local Counsel | _____ | $_____ |
| Mezzanine Lender's Environmental Consultant | Haley and Aldrich | $500.00 |
| Mezzanine Lender's Background Check Expense | Sutton Associates | $7,560.00 |

**Havemeyer, William M.**

From:      Tricia Napolitano [TriciaN@suttonassociates.com]
Sent:      Wednesday, March 29, 2006 10:52 AM
To:        Josh Morris
Subject:   Invoice

Josh,

The banking information is as follows:

    Northfork Bank
    2 Jericho Plaza
    Jericho NY 11753

    1992 International d/b/a Sutton Associates

    Account Number:      6824014101
    Routing Number:      021407912

The total invoice is $ 7,560.00

Thank you,

**Tricia Napolitano**
**Sutton Associates**
**Due Diligence Manager**
516-935-6650 ext. 139
trician@suttonassociates.com

3/29/2006

**The Sky Lodge**
Updated March 30, 2008

| Disbursement Schedule | | | |
|---|---|---|---|
| | Payee | Amount | Total |
| **CAPITAL USES** | | | |
| **Land Cost** | | | |
| Land Purchase | UCL / Smith Trust | 9,800,000.00 | |
| Reimbursement | UCL / Smith Trust | 20,000.00 | |
| Unpaid Rent | UCL / Smith Trust | 90,000.21 | |
| Zoom Percentage Rent | UCL / Smith Trust | 90,000.00 | |
| Taxes - Smith Parcels | | 2,084.51 | |
| Taxes - UCL Parcels | | 8,397.86 | |
| | | | 9,175,482.60 |
| | | | |
| **Due Diligence & Closing Costs** | | | |
| **Senior Lender - West LB** | | | |
| Legal Fees | Katten,Muchin,_Rosenman | 129,000.00 | |
| Consultants | Eckland Consultants | 1,280.00 | |
| Consultants | Merritt Harris | 5,500.00 | |
| Consultants | InterRisk Management | 5,000.00 | |
| Consultants | Hutchung Baird & Jones | 2,700.00 | |
| Appraisal | Cushman& Wakefield | 9,500.00 | |
| Administrative Fees | West LB NY Branch | 568,636.42 | |
| Debt Fees | Realty Financial Resources | 367,762.00 | |
| Administration Fee | West LB NY Branch | 26,000.00 | |
| | | | 1,116,378.42 |
| **Mezzanine Lender - Bay North Group** | | | |
| ▇▇▇▇ | Sutton Associates | ▇▇▇ | |
| ▇▇▇▇ | Haley & Aldrich | ▇▇▇ | |
| | | | ▇▇▇,▇▇▇.▇▇ |
| **Equity Fee** | Prime Capital Group | | ▇▇▇,▇▇▇.▇▇ |
| **Developer - Easy Street Partners** | | | |
| Counsel | Wrona & Parish, LLC | 81,893.65 | |
| Developer Re-imbursables | David Watkins | 12,427.00 | |
| Civil & Environmental Consultants | GSH | 6,700.00 | |
| Subtotal - Developer | | | 101,720.65 |
| **Development Costs** | | | |
| (Accounts Payable) | | | |
| Architectural Fees | BMA Architecture | 266,927.31 | |
| Utility Consultants | Ericksen Consulting Corporation | 1,706.63 | |
| Interior Design Fees | Chase Associates | 10,000.00 | |
| Subtotal - Development Costs | | | 278,333.94 |
| **Marketing Costs** | | | |
| (Accounts Payable) | | | |
| Collateral Materials | AD Concepts | 1,591.33 | |
| Office Supplies - Reimbursements | Carrie Sheaf | 4,600.00 | |
| Office Supplies | Chase Vardo | 1,411.34 | |
| Office Supplies | Delta Fire Systems | 241.00 | |
| Office Supplies | Nationwide Drafting | 483.39 | |
| Sales Center Telephone | Qwest | 568.98 | |
| Computer Maintenance | SBT | 614.81 | |
| Marketing - Broker / Special Events | Easy Street Broncats | 29,108.96 | |
| Design Center | Park City Signs | 269.09 | |
| Marketing Expenses | Park City Media Group, LLC | 2,976.09 | |
| Marketing Expenses | Whitney Advertising & Design, Inc | 30,570.50 | |
| Marketing Expenses | Cavalier Concepts | 322.19 | |
| Marketing Management Fee | CloudNine Resorts | 45,000.00 | |
| Subtotal - Marketing | | | 129,899.92 |
| **Restaurant Close Down Costs** | | | |
| (Costs Projected with Closing April 8) | | | |
| Vacation/Sick/Severance Payments | Easy Street Broncats | 64,167.46 | |
| Clean up Vendor A/P | Easy Street Broncats | 35,088.41 | |
| Subtotal - Restaurant Close Down | | | 100,255.89 |
| **Permit Fees** | | | |
| Permits - Estimated for April 2008 | Park City Municipal | 780,100.00 | |
| Total USES | | | ▇▇,▇▇▇,▇▇▇.▇ |
| | | | |
| **CAPITAL SOURCES** | | | |
| Easy Street Partners | | 12,126.95 | |
| Bay North Capital | | 11,360,000.00 | |
| West LB | | 1,116,378.42 | |
| Total Sources | | | 12,372,000.00 |

**Schedule 2.5**
**Ownership and Control of Borrower**

## EASY STREET PARTNERS, LLC OWNERSHIP STRUCTURE



<u>Schedule 2.6</u>
Capitalization

**See Following Page**



<u>Schedule 2.9A</u>
**Outstanding Indebtedness**

1. Construction loan from West LB AG in the principal amount of $36,779,224 pursuant to the Senior Loan Documents.

## Schedule 2.9B
### Financial Statements

Financial Statement of David Wickline dated June 15, 2005

Financial Statement of William Shoaf dated June 20, 2005

## Schedule 2.10
### Senior Loan Documents

*Loan and Security Agreement*

*Promissory Note*

*Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing*

*Environmental Indemnity*

*Recourse Liability Agreement*

*Interest Rate Protection Agreement*

*Collateral Assignment of Interest Rate Protection Agreement*

*Consent and Acknowledgement from Counterparty*

*Depository Agreement*

*Consent and Subordination of Operating Agreements*

*Pledge and Security Agreement*

*Consent to  Pledge and Security Agreement (General Contractor)*

*Consent to Pledge and Security Agreement (Architect)*

*Consent to Pledge and Security Agreement (Listing Agent)*

*Intercreditor Agreement*

*UCC-1 (re: Deed of Trust) Secretary of State for the State of Utah*

*UCC-1 (re: Deed of Trust) fixture filing in  Summit County, Utah*

*UCC-1 (re: Collateral Assignment of Interest Rate Protection Agreement) Secretary of State for the State of Utah*

*UCC-1 (re: (Pledge and Security Agreement) Department of Commerce for the State of Utah*

<u>Schedule 2.11</u>
<u>Commissions</u>

1.  A fee in the amount of $637,500 (i.e. 5%) is payable to Prime Capital Advisors, LLC for arranging the equity contribution of $1.5 million from Park City 1, LLC and the Bay North Capital Group mezzanine loan of $11.25 million, payable if and when closing and funding occurs.

2.  A fee in the amount of $367,790 (i.e. 1%) is payable to Realty Financial Resources, Inc. for arranging the Senior Loan from West LB AG, payable if and when closing and funding occurs.

### Schedule 2.14
### Personal Property Not Owned by the Borrower

The Sundance Group is the lessee of the building know as the Depot Building and operates a
restaurant by the name of Zoom.

After the Closing, the Subsidiary Owner will be the owner of the Depot Building and the fixtures
and equipment in the Depot Building, but the Sundance Group will retain ownership of the
artwork, furniture, accessories, office equipment, and all trademarks and intellectual property
rights to the Zoom name and restaurant concept.

<u>Schedule 2.15</u>
**Property Noncompliance with Laws**

The City of Park City has informed CloudNine Resorts, LLC that the kitchen at the Zoom restaurant is not in compliance with the Park City Building Code.  Such noncompliance is the responsibility of the Sundance Group under its lease of the Depot Building and not the Subsidiary Owner as the lessor of the Depot Building, but the Subsidiary owner and the Borrower have budgeted $1.8 million of the proceeds from the Senior Loan for the expansion of the Depot Building and renovation of the kitchen in the Zoom restaurant, which renovations will resolve such noncompliance.