**Schedule 2.16**
**Existing Approvals**

[Chart as of 3.9.06]

| Permit/Approval | Date of Receipt | Cost |
|---|---|---|
| PacifiCorp-Utah Power<br>    Will Serve Letter | 10/30/05 | N/A |
| Questar<br>    Will Serve Letter | 09/26/05 | N/A |
| Snyderville Basin<br>    Will Serve Letter | 10/08/05 | N/A |
| Park City Municipal Corp.<br>    Will Serve Letter | 09/26/05 | N/A |
| Telephone and cable. | Existing. | N/A |

**Required Approvals**

| Permit/Approval | Estimated Date of Receipt | Estimated Cost |
|---|---|---|
| Building Permit<br>    Submitted: 1/30/06 | 3/13/06 | Unknown. |
|  |  |  |

## Schedule 2.21
### Leases and other Agreements

Net Lease dated October 1, 2002 by and between Utah Coal and Lumber Restaurant, Inc. and Easy Street Brasserie, Inc. (Lease for Easy Street Brasserie Restaurant).   Acknowledgement dated as of March __, 2006 by and between Easy Street Brasserie, Inc. and Easy Street Partners, LLC.

Net Lease and Purchase Option Agreement dated July 31, 1995 by and between Aurora Partners Limited and Sundance Enterprises, Inc. (Lease for Zoom Restaurant)  First Amendment dated as of March __, 2006 by and between Sundance Partners. Ltd. and Easy Street Partners LLC.

<u>Schedule 2.22</u>
**Material Contracts**

Project Architect: Agreement by and between Elliott Mahoney Architecture and Cloud Nine Resorts,
Limited Liability Company dated March 1, 2005.

Interior Design:  Agreement by and between Chase Associates, LLC and Cloud Nine Resorts LLC dated
as of September 12, 2005.

Electrical Engineer:  Agreement by and between BNA Consulting, Inc and Elliott Mahoney Architecture
dated August 11, 2005.

Mechanical Engineer: Agreement by and between Quantum Group Engineering, PLC and Elliott
Mahoney Architecture dated September 6, 2005.

Civil Engineer:  Agreement by and between Canyon Engineering and Elliott Mahoney Architecture dated
August 12, 2005.

Real Estate Broker:  Agreement by and between Prudential Utah Real Estate and Cloud Nine Resorts
LLC dated June 11, 2005.

Construction Management:  Agreement by and between Millcreek Consulting and Development Inc. and
Cloudnine Resorts LLC dated as of April 1, 2006.

Development Agreement dated as of March __, 2006 by and between Easy Street Partners LLC
and Cloudnine Resorts/Sky Lodge Development Company L.L.C.


Sky Lodge Management Agreement dated as of March __, 2006 by and between Easy Street
Partners LLC and Cloudnine Resorts/Sky Lodge Management Company L.L.C.

Schedule 2.23
Permitted Encumbrances

[As of 3.23.06 – Needs blanks filled in at end.]

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceeding, whether or not shown by the records of such agency or by public record.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

3. Easements, claims of easements or encumbrances which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.

5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.

6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

7. Any adverse claim based upon the assertion that (a) Some portion of the land forms the bed or bank of a navigable river or lake, or lies below the mean high water mark thereof; (b) The boundary of the land has been affected by a change in the course or water level of a navigable river or lake; (c) The land is subject to water rights, claims or title to water and to any law or governmental regulation pertaining to wetlands.

8. Taxes for the current year are now accruing as a lien, but are not yet due and payable.

9. Said property is located within the boundaries of PARK CITY and is subject to the charges and assessments levied thereunder.

10. Said property is located within the boundaries of PARK CITY WATER SERVICE DISTRICT and is subject to the charges and assessments levied thereunder.

11. Said property is located within the boundaries of SNYDERVILLE BASIN WATER RECLAMATION DISTRICT and is subject to the charges and assessments levied thereunder.

12. Said property is located within the boundaries of PROSPECTOR LANDSCAPING AND MAINTENANCE OF SOIL COVER ORDINANCE, Recorded AUGUST 1, 1989, as Entry No. 311124, in Book 529, at Page 755, SUMMIT County Recorder's Office.

13. AN ORDINANCE AMENDING TITLE 11, CHAPTER 14, SECTION 1, OF THE MUNICIPAL CODE OF PARK CITY TO EXPAND THE AREA SUBJECT TO PROSPECTOR MINIMUM LANDSCAPING AND TOP SOIL REQUIREMENTS, Recorded AUGUST 10, 1994, as Entry No. 412146, in Book 828, at Page 394, SUMMIT County Recorder's Office.

14. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS (EXACT LOCATION NOT DISCLOSED) CREATED BY THAT CERTAIN EASEMENT, Recorded MAY 25, 1936, as Entry No. 57299 AND 57302 , in Book V, at Page 52 AND 54, SUMMIT County Recorder's Office.

15. EASEMENT FOR A PIPE LINE AS DISCLOSED BY MINING CLAIM MAP WHICH DEPICTS BLOCK 50, PARK CITY SURVEY AND SURROUNDING AREAS.

16. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS CREATED BY THAT CERTAIN EASEMENT RELOCATION AGREEMENT, Recorded MARCH 11, 1985, as Entry No. 231552, in Book 334, at Page 551, SUMMIT County Recorder's Office.

17. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN THE

EASEMENTS CREATED BY THAT CERTAIN INTERLOCAL COOPERATION AGREEMENT, Recorded OCTOBER 2, 1985, as Entry No. 239615, in Book 356, at Page 454, SUMMIT County Recorder's Office.

18. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS CREATED BY THAT CERTAIN EASEMENT RELOCATION AGREEMENT PACIFIC AVENUE, Recorded DECEMBER 31, 1983, as Entry No. 244339 AND 244340, in Book 368, at Page 635 AND 643, SUMMIT County Recorder's Office.

19. A PERPETUAL CONSERVATION EASEMENT IN AND TO THE FACADE OF THE STRUCTURE IN FAVOR OF PARK CITY MUNICIPAL CORPORATION, Recorded DECEMBER 31, 1975, as Entry No. 244341, in Book 368, at Page 651, SUMMIT County Recorder's Office.

20. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN CONFIRMATION AND REFORMATION OF RESTRICTIVE COVENANT PRESERVATION EASEMENT, Recorded SEPTEMBER 17, 1987, as Entry No. 276572, in Book 444, at Page 69, SUMMIT County Recorder's Office.

21. THE TERMS, CONDITIONS, COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN GRANT OF EASEMENT IN FAVOR OF MCINTOSH MILL, LTD, Recorded APRIL 22, 1993, as Entry No. 377986, in Book 721, at Page 484, SUMMIT County Recorder's Office.

22. THE TERMS, CONDITIONS, COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS CREATED BY THAT CERTAIN GRANT OF EASEMENT (MAIN STREET SIDEWALK ADJACENT TO DEPOT BUILDING) IN FAVOR OF PARK CITY MUNICIPAL CORPORATION, Recorded APRIL 22, 1993, as Entry No. 377993, in Book 721, at Page 498, SUMMIT County Recorder's Office.

23. THE TERMS, CONDITIONS, COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN EASEMENT RELOCATION AGREEMENT ( PATHWAY FROM DEPOT TO 7TH STREET) IN FAVOR OF PARK CITY MUNICIPAL CORPORATION, Recorded JUNE 24, 1994, as Entry No. 408159, in Book 816, at Page 206, SUMMIT County Recorder's Office.

24. THE TERMS, CONDITIONS, COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS CREATED BY THAT CERTAIN GRANT OF EASEMENT (PATH, WEST SIDE OF MORI HEALTH CLUB PARCEL) IN FAVOR OF PARK CITY MUNICIPAL CORPORATION, Recorded JUNE 24, 1994, as Entry No. 408160, in Book 816, at Page 213, SUMMIT County Recorder's Office.

25. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS CREATED BY THAT CERTAIN EASEMENT IN FAVOR OF U.S. WEST COMMUNICATIONS INC., Recorded AUGUST 17, 1994, as Entry No. 412702, in Book 830, at Page 132, SUMMIT County Recorder's Office.

26. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN GRANT OF EASEMENT IN FAVOR OF SNYDERVILLE BASIN SEWER IMPROVEMENT DISTRICT, Recorded AUGUST 30, 1995, as Entry No. 436370, in Book 904, at Page 474, SUMMIT County Recorder's Office.

27. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN GRANT OF EASEMENT IN FAVOR OF SNYDERVILLE BASIN SEWER IMPROVEMENT DISTRICT, Recorded SEPTEMBER 8, 1995, as Entry No. 436959, in Book 906, at Page 508, SUMMIT County Recorder's Office.

28. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN, AND THE EASEMENTS CREATED BY THAT CERTAIN ENCROACHMENT PERMIT 660 MAIN STREET-ZOOM, Recorded OCTOBER 14, 1997, as Entry No. 489664, in Book 1084, at Page 46, SUMMIT County

Recorder's Office.

29. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN GRANT OF EASEMENT (BUILDING A-1 FIRE EXIT/STAIRWAY) IN FAVOR OF GKM LTD A UTAH LIMITED LIABILITY PARTNERSHIP, Recorded SEPTEMBER 8, 1998, as Entry No. 517126, in Book 1180, at Page 426, SUMMIT County Recorder's Office.

30. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN AND THE EASEMENTS CREATED BY THAT CERTAIN FLOATING SEWER EASEMENT DEED, Recorded NOVEMBER 12, 2002, as Entry No. 637956, in Book 1487, at Page 1522, SUMMIT County Recorder's Office.

31. RESERVATIONS CONTAINED IN THAT CERTAIN PATENT EXECUTED BY THE UNITED STATES OF AMERICA, Recorded OCTOBER 14, 1882, as Entry No. , in Book A, at Page 76, SUMMIT County Recorder's Office.
SUBJECT TO ANY VESTED AND ACCRUED WATER RIGHTS FOR MINING, AGRICULTURAL MANUFACTURING OR OTHER PURPOSES AND RIGHTS TO DITCHES AND RESERVOIRS USED IN CONNECTION WITH SUCH WATER RIGHTS AS MAY BE RECOGNIZED AND ACKNOWLEDGED BY THE LOCAL CUSTOMS, LAWS AND DECISIONS OF COURTS, AND ALSO SUBJECT TO THE RIGHT OF THE PROPRIETOR OF A VEIN OR LODE EXTRACT AND REMOVE HIS ORE THERE FROM, SHOULD THE SAME BE FOUND TO PENETRATE OR INTERSECT THE PREMISES HEREBY GRANTED AS PROVIDED BY LAW.

32. RESERVATIONS CONTAINED IN THAT CERTAIN PATENT EXECUTED BY THE UNITED STATES OF AMERICA, Recorded APRIL 14, 1877, as Entry No. , in Book F, at Page 205, SUMMIT County Recorder's Office.
SUBJECT TO ANY VESTED AND ACCRUED WATER RIGHTS FOR MINING, AGRICULTURAL MANUFACTURING OR OTHER PURPOSES AND RIGHTS TO DITCHES AND RESERVOIRS USED IN CONNECTION WITH SUCH WATER RIGHTS AS MAY BE RECOGNIZED AND ACKNOWLEDGED BY THE LOCAL CUSTOMS, LAWS AND DECISIONS OF COURTS, AND ALSO SUBJECT TO THE RIGHT OF THE PROPRIETOR OF A VEIN OR LODE EXTRACT AND REMOVE HIS ORE THERE FROM, SHOULD THE SAME BE FOUND TO PENETRATE OR INTERSECT THE PREMISES HEREBY GRANTED AS PROVIDED BY LAW.

33. RESERVATIONS CONTAINED IN THAT CERTAIN PATENT EXECUTED BY THE UNITED STATES OF AMERICA, Recorded APRIL 14, 1877, as Entry No. , in Book F, at Page 207, SUMMIT County Recorder's Office.
SUBJECT TO ANY VESTED AND ACCRUED WATER RIGHTS FOR MINING, AGRICULTURAL MANUFACTURING OR OTHER PURPOSES AND RIGHTS TO DITCHES AND RESERVOIRS USED IN CONNECTION WITH SUCH WATER RIGHTS AS MAY BE RECOGNIZED AND ACKNOWLEDGED BY THE LOCAL CUSTOMS, LAWS AND DECISIONS OF COURTS, AND ALSO SUBJECT TO THE RIGHT OF THE PROPRIETOR OF A VEIN OR LODE EXTRACT AND REMOVE HIS ORE THERE FROM, SHOULD THE SAME BE FOUND TO PENETRATE OR INTERSECT THE PREMISES HEREBY GRANTED AS PROVIDED BY LAW.

34. RESERVATIONS CONTAINED IN THAT CERTAIN SPECIAL WARRANTY DEED EXECUTED BY UNITED PARK CITY MINES COMPANY, Recorded APRIL 14, 1969, as Entry No. 108963, in Book 20, at Page 615, SUMMIT County Recorder's Office.
EXPRESSLY EXCEPTING AND RESERVING, HOWEVER UNTO THE GRANTOR ITS SUCCESSORS AND ASSIGNS ALL MINERALS INCLUDING OIL AND GAS UNDERLYING THE SURFACE OF THE ABOVE DESCRIBED PARCELS AND TRACTS OF LANDS, TOGETHER WITH RIGHT TO EXTRACT AND REMOVE THE SAME, PROVIDED HOWEVER THAT GRANTOR FOR ITSELF ITS SUCCESSORS AND ASSIGNS, COVENANTS AND AGREES TO AND WITH GRANTEE ITS SUCCESSORS AND ASSIGNS THAT GRANTOR ITS SUCCESSORS OR ASSIGNS IN THE EXTRACTION OR REMOVAL OF THE MINERALS HEREBY EXCEPTED AND RESERVED OR IN THE CONDUCT OF MINING OR OTHER OPERATIONS WILL NOT ENTER UPON THE SURFACE OF SAID PREMISES.

35. RESERVATION OF MINERAL RIGHTS AS RESERVED IN THE WARRANTY DEED FROM UNION PACIFIC LAND RESOURCES CORPORATION AS GRANTOR, IN FAVOR OF JOHN B. PRINCE AND WALLACE A .WRIGHT, JR., Recorded SEPTEMBER 22, 1977, as Entry No. 140531, in Book 100, at Page 441, SUMMIT County Recorder's Office.

EXCEPTING FROM THIS GRANT AND RESERVING UNTO THE GRANTOR ITS SUCCESSORS AND ASSIGNS ALL MINERALS AND ALL MINERAL RIGHTS OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OIL AND GAS AND RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO THE GRANTOR ITS SUCCESSORS OR ASSIGNS BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF THE LANDS CONVEYED AND IN SUCH MANNER AS NOT TO DAMAGE THE SURFACE OF SAID LANDS OR TO INTERFERE WITH THE USE THEREOF BY THE GRANTEE.

36. RESERVATIONS CONTAINED IN THAT CERTAIN QUIT-CLAIM DEED EXECUTED BY THE UNION PACIFIC RAILROAD COMPANY, Recorded OCTOBER 31, 1979, as Entry No. 160844, in Book 144, at Page 804, SUMMIT County Recorder's Office.
EXCEPTING FROM THIS GRANT AND RESERVING UNTO THE GRANTOR ITS SUCCESSORS AND ASSIGNS ALL MINERALS AND ALL MINERAL RIGHTS OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OIL AND GAS AND RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO THE GRANTOR ITS SUCCESSORS OR ASSIGNS BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF THE LANDS CONVEYED AND IN SUCH MANNER AS NOT TO DAMAGE SURFACE OF SAID LANDS OR TO INTERFERE WITH THE USE THEREOF BY THE GRANTEE.

37. THE TERMS, CONDITIONS COVENANTS, RESTRICTIONS AND PROVISIONS CONTAINED IN THAT CERTAIN NET LEASE AND PURCHASE OPTION AGREEMENT BY AND BETWEEN AURORA PARTNERS LIMITED AS LESSOR AND SUNDANCE ENTERPRISES INC. AS LESSEE, Recorded DECEMBER 20, 1996, as Entry No. 469890, in Book 1016, at Page 325, SUMMIT County Recorder's Office.
ASSIGNMENT OF LESSEE'S INTEREST IN LEASE TO SUNDANCE DEVELOPMENT, LTD, A UTAH CORPORATION, Recorded DECEMBER 20, 1996, as Entry No. 469891, in Book 1016, at Page 380, SUMMIT County Recorder's Office.

38. ALL MATTERS DISCLOSED BY THAT CERTAIN SURVEY PERFORMED BY ALLIANCE ENGINEERING AS JOB NO. 31-8-91 FILED DECEMBER 18, 1991 AS FILE NO. S-760.

39. ALL MATTERS DISCLOSED BY THAT CERTAIN SURVEY PERFORMED BY PARK CITY SURVEYING AS JOB NO. 02-234 DATED AUGUST 5, 2002

40. Discrepancies, conflicts in the boundary lines, shortage in area, encroachments, easements or any other facts which a correct ALTA survey would disclose, and which are not shown by the public records.

41. Subject to the rights of parties in possession of the subject property under unrecorded leases, contracts rental or occupancy agreements and any claims, rights, or interests arising thereunder.

42. DEVELOPMENT AGREEMENT FOR THE UNION SQUARE MASTER PLANNED DEVELOPMENT, PARK CITY, SUMMIT COUNTY, UTAH, Recorded JUNE 8, 2005, as Entry No. 738760, in Book 1706, at Page 346, SUMMIT County Recorder's Office.

43. Ordinance No. 06-_____, AN ORDINANCE APPROVING THE SKY LODGE PLAT AMENDMENT AND CONDOMINIUM PLAT LOCATED AT 201 HEBER AVENUE, PARK CITY, UTAH, recorded _____, as Entry No. _____, in Book _____, Page _____, Summit County Recorder's Office.

44. Declaration of Condominium for Union Square Project, recorded _____, as Entry No. _____, in Book _____, Page _____, Summit County Recorder's Office.

Schedule 2.26A

**Units under Agreement**

[See Attached.]

**[As of 3.29.06]**



## TWO BEDROOM HOMES

Saturday, March 3, 2001

| UNIT | Home Info Price | Name | Buyer's Agent Agency | Name | Initial Reservation Date Rec'd | Upgrade Amount | Contracted Purchases Date Rec'd/Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| #1 | 170,910 | J Jackson | Prudential | HerzQwid | | | 1-Mar-06 | 34,182 |
| #2 | 209,900 | McClellan | Prudential | Sholl/Petersen | | | 1-Mar-06 | 41,390 |
| #3 | 229,900 | Harris | Prudential | HerQwid | | | 16-Mar-06 | 45,990 |
| #4 | 239,900 | Althaner | Prudential | Harris | | | 24-Mar-06 | 47,990 |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 179,910 | Vandersluis | Prudential | Benson | | | 1-Mar-06 | 35,932 |
| #2 | 209,900 | Walton / Irvine | Prudential | Athens | | | 1-Mar-06 | 41,980 |
| #3 | | | | | | | | |
| #4 | | | | | | | | |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 189,910 | Heist | Prudential | Sholl/Petersen | | | 1-Mar-06 | 37,782 |
| #2 | 209,900 | Cook | Prudential | Beeson | | | 16-Mar-06 | 41,980 |
| #3 | 229,900 | DiGirlo | Prudential | Sholl/Petersen | 2-Mar-06 | 10,000 | 9-Apr-06 | |
| #4 | | | | | | | | |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |

| UNIT | Number of BRs Price | Name | Agency | Buyer's Agent Broker | Initial Investigation Date Rec'd | Amount | Contracted Purchases Date Rec'd | Amount |
|---|---|---|---|---|---|---|---|---|
| | | | | TWO BEDROOM UNITS | | | | |
| #1 | 168,910 | Whitney | Prudential | Sheri/Petersen | | | 1-Mar-06 | 27,762 |
| #2 | 168,910 | Sheri | Prudential | Sheri/Petersen | | | 1-Mar-06 | 37,782 |
| #3 | 168,910 | Connor | Prudential | Sheri/Petersen | | | 1-Mar-06 | 37,050 |
| #4 | 229,950 | Keeler / Clarkson | Prudential | Sheri/Petersen | | | 1-Mar-06 | 45,980 |
| #5 | 269,900 | Silverman | Prudential | Sheri/Petersen | | | 3-Mar-06 | 51,990 |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 219,990 | Stobbart LLC | Prudential | Nancy Enfi | | | 9-Mar-06 | 63,980 |
| #2 | 219,990 | Reid | LWD | Merde Davis | | | 1-Mar-06 | 43,980 |
| #3 | 299,990 | McClellan | Prudential | Sheri/Petersen | | | 1-Mar-06 | 51,980 |
| #4 | 229,990 | Denina | Prudential | Ramsee | | | 1-Mar-06 | 55,990 |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |



| UNIT | Membership | | Buyers Agent | | | Deposit Receivables | | Commenced / Purchase | |
| | Price | Name | Agency | Name | Date Rec'd | Amount | Date Rec'd | Amount |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | TRAILER THROUGH PHONE | | | | |
| #1 | 269,810 | Davis Pick | Prudential | Steel/Petersen | | | 1-Mar-06 | $4,000 |
| #2 | 269,810 | Grote | Prudential | McLaughlin | | | 1-Mar-06 | $3,962 |
| #3 | 269,900 | Claus | Prudential | Banyan | 21-Mar-06 | 50,000 | 5-Apr-06 | |
| #4 | | | | | | | | |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 269,810 | Guernsey | Prudential | Steel/Petersen | | | 1-Mar-06 | $3,962 |
| #2 | 269,810 | Davis, Scott | Prudential | Steel/Petersen | | | 1-Mar-06 | $4,000 |
| #3 | 264,900 | Keating | LWD | Keating | | | 1-Mar-06 | 72,990 |
| #4 | 264,900 | Dunnian | Prudential | Steel/Petersen | 28-Feb-06 | 10,000 | 24-Mar-06 | |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 269,810 | Pick | Prudential | Steel/Petersen | | | 1-Mar-06 | $3,962 |
| #2 | 269,810 | Coleman | Prudential | Steel/Petersen | | | 14-Mar-06 | $3,962 |
| #3 | | | | | | | | |
| #4 | | | | | | | | |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |





105570.159654  WMH  LIBD/1813681.4

03/29/06 10:52 pm

**Summary March 31, 2006**

**SKY POINTE**

| UNIT | Ownership Price | Name | Agency/ | Buyers Agents Name | Initial Reservation Date Rec'd | Unified Amount | Contingent Purchases Date Rec'd | Amount |
|---|---|---|---|---|---|---|---|---|
| #1 | 339,900 | D Taylor | Prudential | Beaton | | | 1-Mar-06 | 67,980 |
| #2 | 339,900 | Lundin | Prudential | Beaton | | | 1-Mar-06 | 67,980 |
| #3 | 369,900 | Ferguson | Prudential | Beaton | | | 1-Mar-06 | 71,900 |
| #4 | 379,900 | Hahn | Prudential | Beaton | 18-Feb-06 | 210,800 | 20-Mar-06 | |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 399,900 | Cassie | Prudential | Benton | | | 1-Mar-06 | 79,980 |
| #2 | 409,900 | BSW Lambin | Prudential | Benton | | | 1-Mar-06 | 81,980 |
| #3 | 409,900 | BSW Lambin | Prudential | Benton | | | 1-Mar-06 | 81,980 |
| #4 | 449,900 | Davidson | Prudential | Beaton | | | 2-Mar-06 | 89,980 |
| #5 | | | | | | | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |
| #1 | 399,900 | Wendebberner | Prudential | Frost | | | 6-Mar-06 | 79,980 |
| #2 | 399,900 | Velazquez | Prudential | Beaton | | | 1-Mar-06 | 79,980 |
| #3 | 399,900 | Bagatelli | Prudential | Benton | | | 1-Mar-06 | 79,980 |
| #4 | 419,900 | Lambin/Ackrell | Prudential | Benton | | | 1-Mar-06 | 83,980 |
| #5 | 479,900 | Coleman | Prudential | Frost | 22-Mar-06 | 40,900 | | |
| #6 | | | | | | | | |
| #7 | | | | | | | | |
| #8 | | | | | | | | |



<u>**Schedule 2.26B**</u>
**Approved Form of Unit Disposition Agreement**

**[See Attached.]**

Shared Interest Unit Number: _____

### THE SKY LODGE
### SHARED INTEREST
### REAL ESTATE PURCHASE CONTRACT

This is a legally binding contract. If you desire legal or tax advice, consult your attorney or tax advisor

Equity Title Insurance Agency, Inc. ("Escrow Holder")
1600 Snow Creek Drive, Suite E
Park City, Utah 84060
Phone: (435) 658-4801
Facsimile: (435) 658-4802

THIS SHARED INTEREST REAL ESTATE PURCHASE AGREEMENT (this "REPC" or, when referring to escrow instructions set forth herein, these "Escrow Instructions") is made as of this _____ day of _____, 200___, by and between EASY STREET PARTNERS, LLC, a Utah limited liability company, its successors and assigns ("Seller"), whose mailing address is 4780 Winchester Court, Park City, Utah 84098, Telephone Number (435) 649-6649, Facsimile (435) 604-6309, and the following Buyer(s) (whether one or more individuals or entities, collectively referred to herein as "Buyer"):

_____
Name

_____
Name

_____
Street Address

| | | |
|---|---|---|
| _____ | _____ | _____ |
| City | State | Zip Code |
| _____ | _____ | _____ |
| Home Telephone Number | Home Fax Number | Home E-mail Address |
| _____ | _____ | _____ |
| Business Telephone Number | Business Fax Number | Business E-mail Address |

1.    **Definitions.** Unless otherwise defined herein, capitalized terms shall have the meaning ascribed thereto in the Declaration of Condominium for Union Square (the "Declaration").

2.    **Agreement to Buy and Sell and Description of Buyer's Shared Interest.**

(a)    **Agreement to Buy and Sell.** For the consideration and subject to the terms and conditions set forth herein, Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, an undivided one-eighth shared interest (the "Shared Interest") in Hotel Residence Unit Number _____ ("Buyer's Shared Interest Unit") in The Sky Lodge (the "Lodge"), a condominium-hotel to be constructed on a parcel of real property located at approximately 201 Heber Avenue, Park City, Summit County, State of Utah. The Shared Interest is more particularly described as follows:

Page 1          Seller's Initials _____ Date _____ Buyer's Initials _____ Date _____

An undivided One-Eighth (1/8ᵗʰ) fee simple interest in Shared Interest Unit _____, according to the Declaration of Condominium for Union Square, a Utah Condominium Project, recorded in Book _____ at Page _____, on _____, 200__ in the official records of the Recorder of the County of Summit, State of Utah (the "Declaration").

TOGETHER WITH: The exclusive right to possession and occupancy of such Shared Interest Unit during the Vacation Times available for use or reserved by Buyer (i.e., the Shared Interest Owner) under the Reservation Policies and Procedures.

TOGETHER WITH: The appurtenant undivided ownership interest in and to the Common Areas and Facilities as more particularly described in the Declaration.

(b)     Conveyance by Special Warranty Deed.  Seller shall convey the Shared Interest to Buyer by Special Warranty Deed in the form attached hereto as Exhibit A.

(c)     Furniture, Fixtures & Equipment.  Buyer's Shared Interest Unit shall include all of the items listed on Exhibit B (the "FF&E"), which are all subject to the provisions of this Section 2(c). Buyer shall be afforded an opportunity to identify and confirm all such FF&E during Buyer's inspection of Buyer's Shared Interest Unit in accordance with Section 4(e). Buyer acknowledges and agrees that Seller has made no representations as to the brand, specifications or type of the FF&E. Buyer acknowledges that all of the FF&E included in Buyer's Shared Interest Unit is exclusively limited to those items set forth on Exhibit B. Subject to and in accordance with the terms and conditions of this REPC, Buyer, by execution of this REPC, acknowledges that the sale of the Shared Interest, including all FF&E included in Buyer's Shared Interest Unit, shall be on an "AS IS/WHERE IS" basis without any warranties from Seller to Buyer whatsoever except as may be otherwise expressly provided herein and Seller and Buyer acknowledge and agree that Seller has heretofore made no representations or warranties whatsoever regarding the FF&E and that SELLER EXPRESSLY DISCLAIMS WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR USE OR PURPOSE OR ANY WARRANTY OF HABITABILITY WITH RESPECT TO THE FF&E.

(d)     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ Shared Interest Unit, may increase substantially from that anticipated at the time this REPC is signed.  In order to more equitably share this risk, Seller reserves the right to increase the Purchase Price (as defined below) to reflect increases in the costs of key construction materials. The amount of such adjustment to the Purchase Price shall be equal to the increase in the Engineering News Record Building Cost Index (20-City Average) from the date of this REPC to a date which is not less than one hundred twenty (120) days prior to the Closing Date; provided, however, in no event shall the increase in the Purchase Price pursuant to this Section exceed five and one-half percent (5.5%).  Notice of any adjustment to the Purchase Price pursuant to this Section shall be provided with the notice of the Closing Date delivered to Buyer pursuant to Section 7(a), below.

(e)     Description of Buyer's Shared Interest.  The initial deposit referred to in Section 3(b) (the "Initial Deposit") is given to secure and apply on the purchase of Buyer's Shared Interest.  Buyer's Shared Interest Unit will be located within The Sky Lodge, which will be located on a parcel of real property between Heber Avenue and Lower Main Street in Old Town, Park City, Utah.  The floor plan of Buyer's Shared Interest Unit is described on the floor plans attached hereto as Exhibit C-1 (the "Buyer's Shared Interest Unit Floor Plans").  Buyer's Shared Interest Unit is located (as indicated by the corresponding Unit Number) on the floor and in the location specified in the level plans attached hereto as Exhibit C-2 (the "Buyer's Shared Interest Unit Level Plans").

(f)     Manner of Title.  Title to Buyer's Shared Interest shall be vested in Buyer as follows (check appropriate designation):

[ ]     A Single Person
[ ]     Husband and Wife as Tenants by the Entireties
[ ]     Joint Tenants with Right of Survivorship
[ ]     Tenants in Common (state the undivided interest of each Buyer next to each Buyer's name)

[ ]    Trust (state the name of trust, date of trust, and name of trustee under trust): _____
_____

or [ ] Certification of Trust to be delivered to Seller within ten (10) calendar days from the date of Buyer's
signature hereon

[ ]    Partnership
[ ]    Corporation
[ ]    Limited Liability Company
[ ]    Other _____
[ ]    Or as designated by Buyer no later than sixty (60) calendar days prior to the Closing Date.

**PLEASE NOTE THAT THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX
CONSEQUENCES TO BUYER, WHICH BUYER SHOULD DISCUSS WITH BUYER'S LEGAL AND TAX
PROFESSIONALS.**

3.    **Purchase Price.**  The purchase price of Buyer's Shared Interest is $_____ (the "Purchase Price").

(a)    **Reservation Deposits.**  Prior to entering into this          $ _____
REPC, Buyer deposited with the Escrow Holder (1) a
deposit (the "First Reservation Deposit") pursuant to the
terms of The Sky Lodge Reservation Agreement by and
between CloudNine Resorts, LLC ("CNR"), an affiliate
of Seller, and Buyer (the "First Reservation Agreement"),
whereby Buyer reserved the right to enter into this REPC
for the purchase of Buyer's Shared Interest, and (2) a
deposit (the "Second Reservation Deposit") pursuant to
the terms of The Second Sky Lodge Reservation
Agreement by and between CNR, an affiliate of Seller,
and Buyer (the "Second Reservation Agreement"),
whereby Buyer reaffirmed Buyer's interest in purchasing
the Shared Interest, and CNR established the purchase
price for Buyer's Shared Interest. Buyer will be credited
toward payment of the Purchase Price at the Closing with
the total amount of the First Reservation Deposit and
Second Reservation Deposit (collectively, the
"Reservation Deposits"). If Buyer provided an IRS Form
W-9 or similar form to the Escrow Holder and was
otherwise entitled to the accrual of interest on the
Reservation Deposits, any interest so accrued shall be
paid to Buyer within five (5) days following the
Acceptance of this REPC. No other interest shall accrue
on any deposited funds.

(b)    **Initial Deposit.**  On execution of this REPC by          $ _____
all parties, Buyer shall pay to Seller the Initial Deposit.
The Initial Deposit, when coupled with the Reservation
Deposits (collectively, the "Deposits"), shall equal twenty
percent (20%) of the Purchase Price. After the later of (i)
expiration of Buyer's rescission right period under
Section 23, (ii) the Effective Date of the Registration (as
defined below), and (iii) First Recordation (as defined
below) ("Conditions to Release of Deposits from
Escrow"), the Deposits shall immediately be delivered to
Seller in accordance with Section 9(c). The Deposits
shall be non-refundable to Buyer, unless Seller is unable
to close the transaction in accordance with the terms

Seller's Initials _____ Date _____ Buyer's Initials _____ Date _____

hereof, as the same may be modified by the parties hereto in writing, or Buyer terminates this REPC under Section 4(b).

(c)   Unpaid Balance.  Buyer agrees to deposit with   $ _____
Escrow Holder, on or before the Closing, the balance of the Purchase Price, excluding Closing costs, in cash, by wire transfer or in certified funds.

EXCEPT AS OTHERWISE AGREED IN WRITING, NEITHER THIS REPC NOR BUYER'S OBLIGATIONS HEREUNDER ARE CONTINGENT ON BUYER OBTAINING FINANCING OR UPON APPRAISAL OF BUYER'S SHARED INTEREST AT OR ABOVE ANY PARTICULAR AMOUNT.  BUYER UNDERSTANDS THAT BUYER MUST PAY "ALL CASH" AT THE CLOSING.  SELLER WILL COOPERATE WITH BUYER'S LENDER SO LONG AS SUCH LENDER MEETS SELLER'S CLOSING SCHEDULE AND PAYS THE PROCEEDS OF ITS LOAN AT THE CLOSING.

4.   Construction.

(a)   Plans and Specifications.  Seller shall construct Buyer's Shared Interest Unit in substantial compliance with the plans and specifications prepared by the Seller's architect, Elliott-Mahoney Architecture, as approved by the Planning and Building Departments of Park City, which are hereby incorporated into the REPC by this reference (the "Plans and Specifications").  A copy of the Plans and Specifications is available for review by Buyer during normal business hours at the offices of Seller, located at 364 Main Street, Park City, Utah.  Seller reserves the right, at its option, to make modifications and substitutions to the Plans and Specifications, including reducing the square feet in the public areas or back of house in the Project and other modifications as Seller determines necessary, if Seller's architects determine, in their reasonable judgment, that the quality and value of the Buyer's Shared Interest Unit remain substantially unaffected by such modifications or substitutions.

(b)   Square Footage.  The actual square footage comprising the Buyer's Shared Interest Unit is expected to be approximately _____ square feet.  Buyer understands and agrees that square footage calculations may change during the course of construction and that there are various methods for calculating the square footage of a Unit and, depending on the method of calculation, the quoted square footage of Buyer's Shared Interest Unit may vary by more than a nominal amount.  For example, architects often measure square footage from the outside edge of the exterior walls to the mid-point of the interior walls.  Another method, typically used in condominium plats, measures square footage from the inside edge of the exterior walls to the inside edge of the interior walls.  The actual unit area square footage of the airspace comprising a Unit, including Buyer's Shared Interest Unit, may be less than the unit area square footage set forth in the Declaration, and/or the marketing materials.  Accordingly, during the pre-Closing inspection, Buyer should review the size and dimensions of Buyer's Shared Interest Unit.  If the actual size of Buyer's Shared Interest Unit decreases by more than ten percent (10%), Seller shall advise Buyer of such change in writing (the "Change Notice").  If Buyer does not approve of such changes, Buyer shall notify Seller of such disapproval in writing within ten (10) days of receipt of the Change Notice, whereupon, Seller shall return the Deposits, with accrued interest, to Buyer, after which Buyer and Seller shall have no further contractual rights or obligations to each other with respect to the Shared Interest ("Buyer's Response Deadline").  If Buyer fails to respond by the Buyer's Response Deadline, Buyer's right to cancel this REPC based on such change shall be deemed waived.  At Closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of Buyer's Shared Unit, regardless of any variances in the square footage from that which may have been disclosed to Buyer at any time prior to Closing.  Seller does not make any representation or warranty as to the actual size, dimensions or square footage of Buyer's Shared Interest Unit, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damage resulting from any variances between any represented or otherwise disclosed square footage and the actual square footage.  The provisions of this Section 4(b) shall survive the Closing.

(c)   Construction Process.  Buyer acknowledges that control, direction and supervision of all construction personnel at the construction site will lie exclusively with Seller and that Buyer may not issue any instructions to, request construction modifications from, or otherwise interfere with, construction personnel.  Buyer shall not perform any work or contract with Seller's contractors or other builders, contractors, interior decorators, or others to perform work in or about the Lodge or Buyer's Shared Interest Unit.  Buyer shall not enter upon the construction site or the unfinished Buyer's Shared Interest Unit without prior notice to, and consent of, Seller.  Buyer agrees to and shall indemnify, defend and hold

harmless Seller, and its contractors, subcontractors, employees and agents against any claims, demands, loss, damages, liability, or other expense that they may incur by reason of Buyer's breach of any provision of this Section 4.

(d)    **No Change Orders.** Buyer clearly understands and agrees not to request any custom design or other changes to Buyer's Shared Interest Unit.

(e)    **Punch List and Inspection of Buyer's Shared Interest Unit.** Seller will schedule a time within five (5) days of Closing for Buyer to walk through Buyer's Shared Interest Unit and, at Buyer's option, to prepare a list (the "Punch List") of any incomplete items within Buyer's Shared Interest Unit and, subject to Section 2(c), to inspect and confirm the FF&E. Seller shall have sixty (60) working days after Closing to correct any reasonably required Punch List items identified in the notice from Buyer, which sixty (60) day period may, at the option of Seller, may be extended if Seller is delayed for reasons beyond Seller's control. Buyer understands that certain items within Buyer's Shared Interest Unit may not be completed when a temporary or conditional certificate of occupancy is issued or prior to Closing and that Seller will complete such items as soon as practicable thereafter. Buyer's refusal to close this transaction due to the need for reasonable further work (to be noted on the Punch List) shall constitute a default by Buyer under this REPC. If Buyer fails to take advantage of the walk through inspection on the date and time scheduled, Seller will not be obligated to reschedule a walk through prior to Closing and Buyer shall be deemed to have accepted Buyer's Unit in "AS-IS" condition. From and after the Closing, Buyer grants Seller and its agent's access to Buyer's Shared Interest Unit at reasonable times during normal business hours to complete Punch List items. Buyer hereby authorizes Seller, its agents, employees and contractors to enter Buyer's Shared Interest Unit for such purposes using a master key. Buyer hereby waives and releases Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, contractors, subcontractors, employees, agents designees and assigns) relating to damage to or theft of property from Buyer's Shared Interest Unit that is not due to the negligence or intentional act of Seller or its partners, contractors, subcontractors, employees, agents, designees and/or assigns. The provisions of this Section shall survive the Closing.

(f)    **Construction Completion.** Buyer's Shared Interest Unit shall be deemed "Substantially Complete" when a Temporary Certificate of Occupancy ("TCO") for the Shared Unit is issued by the Summit County and/or Park City Building Department to Seller. Seller estimates that the Shared Interest Unit will be Substantially Complete on or about Fall 2007; and will in all events be completed within twenty-four (24) months from the date of this REPC unless extended pursuant to Section 4(g) hereof ("Completion Date"). Buyer acknowledges and understands that TCO for the Shared Interest Unit does not require completion of all Common Areas and Facilities outside of the Lodge, including, but not limited to, landscaping, amenities, etc., and Buyer agrees not to delay settlement and/or closing until such common areas are completed.

(g)    **Unavoidable Delay.** In the event the construction of the Shared Interest Unit is delayed beyond the Completion Date provided in Section 4(f) as the result of work stoppages, material shortages, interruption of transport, non-availability of subcontractors, strikes, fire, flood, extreme weather, governmental regulations, delays caused by financing, acts of God, or other causes which Seller has made a good faith effort to ameliorate, the Completion Date shall automatically be extended for a reasonable period based on the nature of the delay, but in no event later than one hundred twenty (120) calendar days after the Completion Date. Buyer clearly understands and agrees that the nature of purchasing a new construction type property includes risks of delay beyond the direct control of Seller. While it is the intention of Seller to meet the Completion Date as set forth in Section 4(f), Buyer agrees that Seller will not be held in any way liable for any costs or expenses incurred or suffered by Buyer due to any of the foregoing events, including but not limited to the following, changes in interest rates, financing fees, or title fees.

5.    **Payments to the Association.** Buyer agrees to pay the Common Assessment and, to the extent property taxes levied on Buyer's Shared Interest Unit are sent to the Association or Seller, Buyer's pro rata share of the tax assessments against Buyer's Shared Interest Unit and all other applicable taxes for each Club Year to the Association in accordance with the Declaration. Buyer acknowledges and agrees that the Common Assessment will be in the amount set forth in Exhibit E, The Sky Lodge Statement of Understanding. The Common Assessment may be increased only as provided in the Declaration. At the Closing, Buyer shall reimburse Seller or the Association, as applicable, for Buyer's pro rata share of any portion of the tax assessment or any other taxes prepaid for periods after the Closing by Seller or the Association. Buyer shall also pay at the Closing the prorated amount of the Common Assessment for the Association's current quarter at the time of the Closing; provided, however, if the Closing occurs during the last month of the Association's current quarter, then Buyer shall pay the prorated amount of the Common Assessment for the Association's current quarter and the Common Assessment due for the Association's next succeeding quarter.

Seller's Initials _____ Date _____  Buyer's Initials _____ Date _____

6. **Offer and Time for Acceptance.** Buyer's signature hereon constitutes an offer to Seller to purchase the Shared Interest. The offer represented by this REPC shall not be deemed accepted unless this REPC is signed by Seller and a signed copy delivered to Buyer, either in person or by mail to the address shown below (the "Acceptance"). The parties acknowledge and agree that Seller's Acceptance of this offer is conditioned upon Seller's acquisition of the real property on which the Lodge will be constructed and Plat Recordation.

7. **Closing.**

   (a) **Closing Date.** Subject to the requirements and conditions set forth in Section 7(b) below, the completion of the purchase and sale of Buyer's Shared Interest (the "Closing"), shall be conducted by Escrow Holder. Seller shall send Buyer and Escrow Holder notice setting forth the closing date (the "Closing Date") designated by Seller, which date shall be thirty (30) days following the date on which Buyer's Shared Interest Unit is Substantially Complete. The notice shall further state the place of Closing or that the Closing will be conducted by mail, which shall be determined by Seller. Buyer must satisfy the requirements and conditions set forth in Section 7(b) that are applicable to Buyer no later than the Closing Date and otherwise must be ready, willing and able to close on the Closing Date.

   (b) **Conditions to Closing.** The Closing shall occur subject to the provisions of Section 17 and subject to the satisfaction or completion of the following:

      (i) Escrow Holder is prepared to issue the Title Policy described in Section 11(b);

      (ii) Buyer and Seller have signed and delivered to each other (or to Escrow Holder) all documents required by this REPC and, if different, by applicable law;

      (iii) Escrow Holder has received the monies required to be paid under this REPC in the form of collected funds or such other form acceptable to Escrow Holder and Seller;

      (iv) Escrow Holder has received notice from Seller to close escrow hereunder;

      (v) Escrow Holder has not received a notice or demand for termination as provided in Section 17;

      (vi) Escrow Holder has obtained a partial lien release under any and all mortgages and deeds of trust then recorded against Buyer's Shared Interest; and

      (vii) If Buyer wishes to take title to Buyer's Shared Interest in the name of Buyer's trust, and has elected to submit a certification of trust to Escrow Holder for purposes of identifying the grantee in Buyer's Special Warranty Deed, Escrow Holder has inserted the trust name, date and trustee identified in the certification of trust delivered by Buyer in Buyer's Special Warranty Deed.

   (c) The Closing shall take place in person or by mail at the office of Escrow Holder (or such other place as designated by Seller in writing to Buyer).

8. **Costs.** Seller shall pay one hundred percent (100%) of the cost of the title insurance premiums for an owner's title insurance policy for Buyer's Shared Interest, Buyer shall pay one hundred percent (100%) of the cost of the title insurance premiums for any lender's title insurance policy and Seller and Buyer shall each pay fifty percent (50%) of all other customary charges, Closing costs and fees including, without limitation, Escrow Holder's fees and costs, all documentary or similar transfer taxes (unless applicable law dictates otherwise), and the cost of the credit report fee and credit report processing fee for any credit check requested by Seller. Buyer authorizes Seller to perform a credit check and/or obtain a credit report on Buyer. An estimate of the actual Closing costs to be paid by Buyer will be specified on the "Estimated Settlement Statement", which document will be provided to Buyer before Closing. Closing costs shall be paid by Buyer at the Closing and shall be in addition to the Purchase Price and to any amounts paid by Buyer at Closing pursuant to Section 5. Buyer is responsible for paying the costs associated with any financing that Buyer may obtain.

Page 6                    Seller's Initials _____ Date _____ Buyer's Initials _____ Date _____

You understand that you have authorized Seller to perform a credit check and/or obtain a credit report on you. Buyer's Initials _____ Buyer's Initials _____.

9.    **Deposit of Funds.**

(a)    All amounts deposited by Buyer under the First Reservation Agreement and Second Reservation Agreement, if any, for the reservation of Buyer's Shared Interest and, without any action necessary by Escrow Holder, Seller or Buyer, become Deposits under this REPC, upon the execution of this REPC by Buyer and Seller.

(b)    Escrow Holder is hereby authorized to deposit any funds or documents delivered to it under these Escrow Instructions (including any Deposits described in Section 9(a)), or cause the same to be deposited, with any sub-agent, subject to Escrow Holder's order at or prior to the Closing, in the event such deposit shall be necessary or convenient for the consummation of this escrow. On the date of Closing, all funds remaining in escrow (including any interest earned thereon, if any), except funds deposited pursuant to Section 5 for payment to the Association and funds payable to Escrow Holder pursuant to Section 8, shall be delivered to Seller.

(c)    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ surrounding site improvements and landscaping, payment of real estate commissions, and related expenses.

10.    **Destruction.** If Buyer's Shared Interest Unit is materially destroyed or materially damaged prior to the Closing, then Seller shall have the option to repair such damage and to extend the Closing for up to three (3) months to complete such repairs or not. If Seller chooses not to repair such damage or if such damage is not repaired prior to the Closing, then on demand by Seller or Buyer, all amounts paid by Buyer pursuant to this REPC, including any interest earned thereon, if any, shall be returned to Buyer within fifteen (15) calendar days after the date of such demand, without deduction (unless such destruction or damage was caused by Buyer's act or omission, in which event Seller may retain all amounts paid by Buyer, including any interest earned thereon, if any, until Seller has collected from Buyer all damages due and owing from Buyer to Seller (as determined by the judgment of a court of competent jurisdiction) in connection therewith), and this REPC shall be null and void.

11.    **Title Insurance.**

(a)    **Title Exceptions.** Attached hereto as **Exhibit D** is a list of the exceptions (together with any standard exclusions from coverage in the Title Policy, the "Title Exceptions"), that will appear on the Title Policy (defined in Section 11(b)), such Title Policy being subject to the removal of certain exceptions and/or the addition of new exceptions as provided for in Section 11(b). Buyer acknowledges and agrees that copies of documents relating to the Title Exceptions have been delivered to Buyer prior to Buyer's execution of this REPC.

(b)    **Title Policy.** Within sixty (60) calendar days following the Closing and recording of the Special Warranty Deed, Seller shall cause Escrow Holder to deliver to Buyer a standard form ALTA Owner's Policy of Title Insurance (the "Title Policy") in the full amount of the Purchase Price showing title in Buyer's Shared Interest vested, as of the Closing, in Buyer, subject only to (i) the Title Exceptions (excluding any exceptions that have been removed from the list of Title Exceptions prior to the Closing) and any other exceptions to title that may arise in the ordinary course of developing the Lodge prior to the Closing (none of which will materially and adversely affect the rights or privileges of Buyer's Shared Interest), (ii) any financing obtained by Buyer to finance the purchase of Buyer's Shared Interest, (iii) any other exceptions to title or encumbrances created or caused to be created by Buyer, and (iv) other liens or encumbrances, so long as Seller has provided Buyer with an endorsement insuring Buyer from any losses incurred from such liens or encumbrances.

12.    **Buyer's Acknowledgment of Documents.**

(a)    **Received Documents.** Buyer's signature on this REPC constitutes Buyer's acknowledgment that Buyer has received, read and understood the documents listed below (together with the documents listed under Section 12(b), the "Seller Disclosure Documents").

(i)    Condominium Declaration, Articles and Bylaws;

(ii)    The Sky Club Reservation Policies and Procedures;

(iii)    Overview of The Sky Club;

(iv)    The Sky Lodge Rules and Regulations;

(v)    Property Disclosure Report (as required under Section 57-19-11 of the Utah Timeshare and Camp Resort Act); and

(vi)    Agency Disclosures.

(b)    Additional Documents.  Additional documents, including the documents listed below, will be executed and delivered to Buyer at or before the Closing in the form and substance approved by the Declarant.

(i)    List of Management Services;

(ii)    The Sky Lodge Management Agreement;

(iii)    Parking Area License Agreement;

(iv)    License Agreement between Easy Street Partners, LLC, as owner of certain condominium units in the Lodge, including the Amatsu Spa, Fitness Facilities, and The Sky Lounge, and the Association, for the use of the areas by Sky Club Members; and

(v)    Broker's Disclaimer.

(c)    Modifications to Documents.  Buyer hereby acknowledges and agrees that Seller reserves the right to make such modifications, additions, or deletions in or to the documents described in this Section 12 as may be deemed necessary, and to provide copies of any amendments of such documents at or before the Closing, provided that none of the same shall materially and adversely affect the rights or privileges of Buyer with regard to the Shared Interest and/or the lien of Buyer's lender.

13.    Covenants, Representations, Warranties and Understandings of Buyer.

(a)    Buyer covenants, represents and warrants to Seller as follows:

(i)    Buyer is purchasing the Shared Interest and the rights and privileges evidenced thereby for Buyer's own personal use and account and not for any other purpose and does not anticipate or expect that Buyer will make a profit from ownership of the Shared Interest.  Buyer understands that Seller may or may not offer any rental or resale services to persons acquiring Shared Interests (although, nothing in this Section shall prevent Buyer from renting Buyer's Shared Interest Unit to the general public during Buyer's Vacation Times in accordance with the Declaration and The Sky Lodge Rules and Regulations) and that the purchase of the Shared Interest should be based solely upon its personal use by Buyer and not for its potential liquidity or as an appreciating investment (including potential for rental income or for resale at a profit).

(ii)    Buyer is aware that no Federal or State agency has made any recommendation or endorsement of the Shared Interest, the Shared Interest Units or the Lodge.

(iii)    Buyer hereby agrees to indemnify, defend and hold Seller harmless from and against any and all loss, threat of loss, suits, claims, actions, liabilities, damages, obligations, demands, costs and expenses (including attorneys' fees) arising out of or in connection with any breach by Buyer of any covenant, representation or warranty contained in this Section 13 or any untrue statement made by Buyer in this Section 13.

(iv)    Buyer has full authority and capacity to enter into this REPC.

Page 8                              Seller's Initials _____ Date _____   Buyer's Initials _____ Date _____

(v)    The agreements, representations and warranties of Buyer set forth in this Section 13 shall survive the delivery and recordation of the Special Warranty Deed to Buyer.

(b)    Buyer acknowledges and agrees to the following:

(i)    All of the information called for in the blank spaces of this REPC was filled in and read and understood by Buyer prior to the date of this REPC.

(ii)    Buyer's Shared Interest is part of a Shared Interest Unit of a larger project known as Union Square, which includes and/or is expected to include (i) The Sky Lodge, a condominium-hotel containing the Shared Interest Units, the Amatsu Spa, The Sky Lounge, underground parking, fitness facilities and a meeting room; (ii) Easy Street Brasserie restaurant and the Bar Boheme; and (iii) the historic Depot building.

(iii)    Buyer acknowledges that certain Seller Disclosure Documents may not be in final form, and Buyer hereby covenants and agrees that acceptance of such documents shall constitute acceptance of the same documents in final form so long as the final form of such Seller Disclosure Documents does not differ from the draft versions approved by Buyer in a way that would materially and substantially change the rights and responsibilities of Buyer under such documents.

(iv)    The Shared Interest is an undivided one-eighth fractional interest in a Hotel Residence Unit in the Lodge. A Statement of Understanding regarding the legal characteristics of the Shared Interest is attached hereto as Exhibit F and incorporated herein by reference. You have read and understand the foregoing provision. Buyer's Initials _____  Buyer's Initials _____ .

(v)    Buyer's fee simple ownership interest being sold hereunder is in the interior airspace of Buyer's Shared Interest Unit only (and only during Buyer's Vacation Times) and, as a result thereof, Buyer will not acquire a fee simple ownership interest (undivided or otherwise) in the balance of the Lodge of any kind.

(vi)    Buyer may permit, at no charge, other persons to use Buyer's Shared Interest Unit during Buyer's Vacation Times (subject to payment of the daily access fee as provided in the Declaration), all in accordance with The Sky Club Reservation Policies and Procedures and The Sky Club Rules; provided, however, Buyer shall be responsible for any damage to the Lodge caused by Buyer and such other persons, including, but not limited to, Buyer's family, guests, tenants, invitees or licensees, during their stay at Buyer's Shared Interest Unit.

(vii)    The Commercial Units in the Lodge, which are the Amatsu Spa, fitness facilities and The Sky Club Lounge (including the outdoor sun deck and hot tub lounge) will be owned and operated by Seller (the "Amenities"); provided, however, pursuant to the Declaration, Shared Interest Owners have the right to use the Amenities so long as such Shared Interest Owners provide Declarant's Shared Interest Unit Use Period to Declarant, all as contemplated by the Declaration. Use of these Amenities is subject to the rules and regulations promulgated by The Sky Club from time to time. Buyer further acknowledges that Seller owns the remaining Lodge amenities (i.e., the meeting room and the lobby area), which are available for use by the Shared Interest Owners so long as Declarant receives from a Shared Interest Owner Declarant's Shared Interest Unit Use Period to such Owner's Shared Interest. Buyer further acknowledges the remaining amenities at the Project (i.e., restaurants and other retail areas) shall be available to Buyer only in his or her capacity as a member of the general public and only for so long as such amenities are available to the general public.

(viii)    As Owner of a Shared Interest, Buyer will automatically become a member of the Association and subject to and must comply with the Declaration, the Articles and the Bylaws. Because the Association has elected to participate in The Sky Club, Buyer will automatically become a member of The Sky Club, and will also be subject to and must comply with The Sky Club Rules and The Sky Club Reservation Policies and Procedures, and will be required to pay the assessments associated with membership in The Sky Club. The Association shall be governed by a board of directors that will consist of seven persons, each of whom shall initially be appointed by the Declarant.

(ix)    Buyer will have access to one (1) parking space located in the underground parking area while Buyer is in residence at the Lodge, the specific location of which shall be determined by Declarant or the Club

Manager and may change from time to time. Use of these spaces shall be subject to the Declaration and the Project Rules and Regulations.

(x)     If required by Escrow Holder, Buyer, if an organization other than a natural person, shall deliver to Seller at or prior to Closing a copy of a resolution of Buyer, duly adopted and certified by an authorized representative of Buyer as required by the laws of the state of Buyer's organization, authorizing the purchase of the Shared Interest, together with all certificates of organization, certificates of authority, trade name affidavits and other documents required by Utah law to enable Buyer to hold title to the Shared Interest. Buyer represents that at Closing Buyer will be in good standing and authorized, as necessary, to conduct its business in Utah.

(xi)    If Buyer is comprised of two or more parties, each party shall be jointly and severally obligated under this REPC.

(xii)   Each Shared Interest Owner is entitled to vote for purposes of voting on Association matters, based on the Shared Interest's undivided interest in the Common Areas and Facilities (as set forth in the Declaration), regardless of the number of parties jointly owning such Shared Interest.

(xiii)  Neither Seller, nor any representative or affiliate of Seller, has offered the Shared Interest with emphasis on the tax or other economic benefits to be derived from the managerial efforts of Seller or any third party from rental of Buyer's Shared Interest Unit.

(xiv)   Neither Seller nor any of its representatives has made any representation or reference as to rental of Buyer's Vacation Times in the Shared Interest Unit or any other Shared Interest Unit, income from Buyer's Shared Interest or any other economic benefit to be derived from the rental of Buyer's Shared Interest Unit, including, but not limited to, any reference or representation to the effect that Seller or any affiliate of Seller will provide, directly or indirectly, any services relating to the rental of Buyer's Shared Interest Unit. It is understood and agreed that rental or other disposition of Buyer's Shared Interest Unit and the provisions of management services in connection with any such rental is and shall be at the Buyer's option.

(xv)    Buyer is responsible for paying one-eighth of the taxes and any other applicable assessments that may be assessed on Buyer's Shared Interest Unit. If the bill for such taxes is sent directly to Buyer by Summit County, then Buyer shall pay the bill directly to Summit County. If the bill for such taxes is sent to the Association or Seller, Buyer shall reimburse the Association or Seller through a tax assessment levied by the Association.

(xvi)   Certain items in the FF & E list at Exhibit B are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by the manufacturer from those shown in the models or in illustrations or in various plans and specifications. Seller may omit certain items or make substitutions with items of equal or better quality.

(xvii)  Regardless of any existing view or view potential from Buyer's Shared Interest Unit and regardless of the pricing of Buyer's Shared Interest, Buyer acknowledges that there are no express or implied easements for views. Seller does not guarantee or make any representation whatsoever concerning the view, if any, from Buyer's Shared Interest Unit. Buyer further acknowledges that any view which Buyer's Shared Interest Unit may currently enjoy may be impaired or obstructed by construction or landscaping within the Project and/or on property near the Project. You have read and understand the foregoing view provision. Buyer's Initials _____  Buyer's Initials _____

(xviii) Ownership of real property in mountain areas involves certain inherent inconveniences. These include, but are not limited to, (1) dripping water onto decks and porches from snow melt, (2) snow and ice build-up on roofs, decks and porches during winter months, and the need to remove snow and ice to prevent leaking or damage to these structures, (3) the need to maintain adequate internal temperature of Buyer's Shared Interest Unit in order to prevent broken pipes, and (4) other inconveniences arising from the sometimes severe winter conditions in the Rocky Mountains.

(xix)   Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed

federal and state guidelines have been found in buildings in Utah.  Additional information regarding radon and radon testing may be obtained from the applicable county public health unit.

(xx)     Mold, mildew, fungi bacteria and microbiologic organisms (collectively, "Mold") are present in soil, air and elsewhere in the environment.  Molds can proliferate in various environments, including, without limitation, damp areas such as crawl spaces, attics, bathrooms, within walls and partitions and in basements.  Certain parties have expressed concerns about the possible adverse effects on human health from exposure to Molds.  Due to various reasons, including the varying sensitivities of different individuals to various types of Molds, there currently exists no state or federal standards regarding acceptable levels of exposure to Molds.  Buyer is advised to perform his or her own investigation regarding the presence of Molds in Buyer's Shared Interest Unit and acknowledges that Seller will not be responsible for damage caused by Mold.

(xxi)     Buyer acknowledges and agrees that if Buyer's Shared Interest Unit is designated as an "ADA Unit" then Buyer's Shared Interest Unit as well as all improvements therein, must at all times be in compliance with the Americans With Disabilities Act (42 U.S.C. 12101 et seq.) as well as all other laws, ordinances, building codes, rules, regulations, orders and directives of any governmental authority having jurisdiction now or in the future applicable to Buyer's Shared Interest Unit (collectively, "Applicable Laws").  Buyer agrees that Buyer shall be responsible, in concert with the other Shared Interest Owners in Buyer's Shared Interest Unit, to take all actions required to cause Buyer's Shared Interest Unit to comply in all respects with all Applicable Laws.

(xxii)     Listing Agent, Carrie Shouf, is the spouse of Bill Shouf, a principal of the Seller and CloudNine Resorts, LLC, the Developer and affiliate of Seller.

(xxiii)     Seller has submitted the Declaration and Condominium Plat for the Project to the City of Park City for approval.  Seller will not accept this REPC until such time as Seller consummates the acquisition of the Property and the City of Park City and Summit County have reviewed and approved the Declaration and Condominium Plat, and the Declaration and Condominium Plat have been recorded in the Summit County Recorder's Office (the "Plat Recordation").

(xxiv)     In order to sell the Shared Interests, Seller is required to register the Project and the sale of the Shared Interests under the Utah Timeshare and Camp Resort Act, Utah Code Ann. Sections 57-19-1 et seq. (the "Registration").  For purposes of this REPC, the "Effective Date of the Registration" shall mean the date on which the Registration is deemed effective by the Utah Division of Real Estate of the Department of Commerce under a one-year registration (as opposed to a temporary permit, as defined under the Timeshare Act).

14.     **Insulation of Premises.**  Seller and Buyer hereby acknowledge pursuant to Section 460.16 of the Federal Trade Commission Regulations regarding labeling and advertising of home insulation, that the types, thicknesses and R-Values of insulation installed in the Shared Interest Units are as set forth below:

| Location | Type of Insulation | Thickness | R-Value |
|----------|-------------------|-----------|---------|
| Exterior walls | Fiberglass Batt | 6" | R 19 |
| Ceiling/Roof | Except for the Units located on the top floor of the building, there is no insulation in the ceilings of the Units. | | |
| Floors | There is no insulation in the floors of Units. | | |

The "R-Value" indicates the resistance of insulation to heat flow.  The higher the R-Value, the greater the insulating power.  Seller has not made its own independent determination of the R-value data provided to Seller by the insulation manufacturer.

15.     **Seller/Broker Relationship.**  All sales of Shared Interest Units will be made by brokers and salespersons licensed by the state in which sales occur unless specifically exempted by applicable law.  Seller has engaged a broker as an intermediary for Seller.  Such broker has agreed to act as Seller's intermediary in connection with sales at the Lodge.  Seller's obligation, if any, to pay such broker shall be set forth in a separate written agreement and Seller shall defend, indemnify and hold Buyer harmless from and against any claims made by such broker.  Seller shall not owe a commission to any other

broker including brokers that are introduced by Buyer to the transactions contemplated herein (and Buyer shall be exclusively obligated to pay any such broker and shall defend, indemnify and hold Seller harmless from and against any claims made by such broker).

### LISTING AGENT & BROKERAGE:

[ ]    Ann MacQuaid for Prudential Utah Real Estate

[ ]    Suzanne Harris for Prudential Utah Real Estate

[ ]    Carrie Shouf for Prudential Utah Real Estate

[ ]    Heather Peterson for Prudential Utah Real Estate

Represents [ ] Seller [ ] both Buyer and Seller as a Limited Agent

### SELLING AGENT & BROKERAGE

[ ]    Other_____ for (Brokerage: _____ )

[ ]    Other_____ for (Brokerage: _____ )

Represents   [ ] Buyer [ ] both Buyer and Seller and a Limited Agent

16.    **Services.**  Buyer has received the list of Basic Services and Management Services set forth on **Exhibit E** and acknowledges that Club Manager may provide a list of A la Carte Services available to Buyer from time to time.  Buyer acknowledges and agrees that: (i) Basic Services will be provided to Buyer by or on behalf of Seller for the term of the Declaration regardless of the existence of a Hotel Management Agreement and regardless of the identity of the Club Manager and Seller's cost of providing such services will be assessed to Buyer as part of the Common Assessment, (ii) Management Services will be provided by or on behalf of Seller to Buyer to the extent negotiated from time to time between Seller and Club Manager, on the one hand, and the Association, on the other hand, and Seller's cost thereof will be charged to Buyer as part of the Common Assessment, and (iii) the A la Carte Services, if any, may be provided to Buyer by or on behalf of Seller at the discretion of Seller (or the Club Manager acting on behalf of Seller) and the cost thereof will be paid for by Buyer on a per use, per diem or other periodic basis established to from time to time by Seller (or Club Manager acting on behalf of Seller) and, if required by Club Manager, accepted by Buyer pursuant to an A la Carte Services Agreement.

17.    **Default and Termination.**

(a)    **Termination for Buyer's Default.**  If, after expiration of any rescission right period provided by law, as set forth in Section 23 below, Buyer (i) fails to complete the purchase of Buyer's Shared Interest by reason of any default of Buyer, or (ii) otherwise fails to perform any of Buyer's obligations hereunder within the time or in the manner required under any of the provisions of this REPC, then Seller shall be entitled to any available remedy at law or equity against Buyer and, in addition, Seller may elect to terminate this REPC by giving written notice of cancellation (the "Termination Notice") in duplicate to Buyer and to Escrow Holder.  Within five (5) calendar days after receipt of the Termination Notice, Escrow Holder shall mail one copy to Buyer by postage prepaid certified mail, return receipt requested. The Termination Notice shall contain a statement that Seller has determined that Buyer is in default hereunder and that if no written objection is received by Escrow Holder from Buyer within five (5) calendar days of receipt of the Termination Notice, Escrow is cancelling this REPC and, if Seller so chooses, electing to retain the amount of the liquidated damages provided in Section 19 below.  Unless written notice (the "Objection Notice") of Buyer's objection to Seller's determination of default is received by Escrow Holder within five (5) calendar days following the date on which the Termination Notice is received by Buyer, if Seller has elected the remedy of liquidated damages, Escrow Holder shall deliver to Seller the amount of liquidated damages set forth in Section 19 below; Seller shall be deemed to be released and discharged of any and all further obligation to Buyer, including the obligation to sell the Shared Interest to Buyer.  In the event that Buyer timely delivers to Escrow Holder the Objection Notice, the dispute regarding the disposition of Buyer's funds deposited with Seller,

and every other cause of action which has arisen between Seller and Buyer under this REPC, shall be settled by arbitration in accordance with Section 18.

(b)     **Seller's Default.** If Seller defaults under this REPC, Buyer will provide Seller with five (5) days notice of such default and if Seller has not cured the default within such period or if such default is not capable of being remedied within such period, if Seller has commenced the cure of such default and is diligently prosecuting the same to completion, Buyer will have such rights as may be available in equity and/or under applicable law; provided, however, that absent an intentional and willful default of Seller, Buyer shall not be permitted to seek to specifically enforce this REPC.

(c)     **Cessation of Development.** Regardless of any provision(s) in this REPC to the contrary, if: (i) any modification to the Seller Disclosures, (ii) any conditions imposed by Seller's lenders, or (iii) any terms of an agreement between Seller, or an affiliate of Seller, and the general contractor for the construction of The Lodge makes construction of the Lodge not viable for Seller, in Seller's reasonable determination, then Seller, in its sole discretion, may cancel this REPC by providing written notice to Buyer prior to the Closing referenced herein; whereupon the Deposits, together with accrued interest, if any, shall be released to Buyer, and neither party shall have any further rights or obligations under this REPC or otherwise.

18.     **Arbitration of Disputes.**

(a)     **Arbitration.** Any dispute, claim or controversy of any kind or description arising out of, or in any way relating to, the validity, construction, enforceability or performance of this REPC, or any other agreement, whether oral or written, which relates or refers to this REPC ("Related Agreements"), or the breach of this REPC or any such Related Agreements (collectively, "Disputes"), shall be settled by binding arbitration pursuant to the JAMS Comprehensive Arbitration Rules and Procedures, as those rules may be amended from time to time on and subject to the terms of this Section 18.

(b)     **Location.** The place of arbitration shall be Summit County, Utah.

(c)     **Acknowledgements.** The parties to an arbitration proceeding hereunder shall be entitled to discovery, including depositions, in the manner, and to the full extent permitted by, Federal Rules of Civil Procedure, as if the matter were pending in a United States District Court.

(d)     **Arbitrator.** No arbitrator shall be in the employ of, or otherwise affiliated with, Buyer or Seller.

(e)     **Decision.** The arbitrator's decision shall be rendered within ninety (90) days after the arbitrator is appointed.

(f)     **Jurisdiction.** Upon the application of any party to any arbitration proceeding, and whether or not an arbitration proceeding has yet been initiated, the United States District Court for the District of Utah and the District Court for the Third District of Utah, and no other courts, shall have in personam jurisdiction and hereby are authorized: (i) to issue and enforce in any lawful manner such temporary restraining orders, preliminary injunctions and other interim measures of relief as may be necessary to prevent harm to the interests of a party, or as otherwise may be appropriate, pending the conclusion of arbitration proceedings pursuant to this Section 18, (ii) to enter into and enforce in any lawful manner such judgments for permanent equitable relief as may be necessary to prevent harm to the interests of a party, or as otherwise may be appropriate, following the issuance of an arbitration award pursuant to this Section 18, and (iii) to enter a final award rendered pursuant to the arbitration proceeding as a final judgment in a court specified in this Section 18 and to enforce such judgment.

(g)     **Waiver.** Except as provided in Section 19(f), Buyer waives and relinquishes any and all rights to institute a proceeding in any federal, state or local court (and, without limiting the foregoing, further waives any and all rights to a trial by jury) with respect to any Dispute.

(h)     **Attorneys' Fees and Costs.** Any arbitration award shall include an award of reasonable costs and attorneys' fees (including the arbitrator's reasonable compensation and reimbursement of expenses and any collection costs) to the prevailing party from the non-prevailing party, as determined pursuant to the arbitration proceeding. Pending an award

of costs and fees hereunder, each party shall pay (i) its own expenses in connection therewith, and (ii) fifty percent (50%) of the arbitrator's fees and costs. On and subject to the terms of Section 18(i), a party to the arbitration that fails to timely pay its fifty percent (50%) share of the arbitrator's fees and costs shall be deemed to be in default and shall not be allowed to participate in the proceedings.

(i)     **Appearance.** Notwithstanding any provision of rules or statutes to the contrary, the refusal or failure of any party to the arbitration to appear at, or participate in, any hearing or other portion of any arbitration shall not prevent any such hearing or proceeding from going forward, and the arbitrators are empowered to make their decision and/or render an award ex parte, which shall be binding on the non-appearing party as fully as though that party had participated in the hearing or proceeding.

**YOU HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT ALL DISPUTES TO NEUTRAL ARBITRATION.**

Buyer's Initials _____     Buyer's Initials _____     Seller's Initials _____

19.    **LIQUIDATED DAMAGES.** BUYER UNDERSTANDS THAT AT THE EXECUTION OF THIS REPC, SELLER SHALL REMOVE BUYER'S SHARED INTEREST FROM THE LIST OF SHARED INTERESTS BEING OFFERED FOR SALE AND WILL INFORM PROSPECTIVE BUYERS THAT BUYER'S SHARED INTEREST IS NO LONGER AVAILABLE FOR SALE BECAUSE OF THE EXECUTION OF THIS REPC. IN SUCH EVENT, SELLER WILL THEREBY BE DEPRIVED OF AN OPPORTUNITY TO SELL BUYER'S SHARED INTEREST FROM AND AFTER THE DATE HEREOF. SELLER WILL ALSO HAVE INCURRED COSTS INVOLVED WITH BUYER'S FAILURE TO PERFORM THIS REPC, INCLUDING, BUT NOT LIMITED TO, LEGAL FEES AND REAL ESTATE BROKER COMMISSIONS. IT IS THEREFORE AGREED BY THE PARTIES THAT IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE DAMAGES WHICH MAY RESULT FROM ANY FAILURE ON THE PART OF BUYER TO PERFORM THIS REPC. ACCORDINGLY, SHOULD BUYER FAIL TO COMPLETE THE PURCHASE OF BUYER'S SHARED INTEREST BY REASON OF ANY DEFAULT OF BUYER HEREUNDER, SELLER SHALL BE RELEASED FROM ITS OBLIGATION TO SELL BUYER'S SHARED INTEREST TO BUYER AND SELLER MAY PROCEED AGAINST BUYER UPON ANY CLAIM OR REMEDY WHICH SELLER MAY HAVE IN LAW OR EQUITY. BUYER AND SELLER AGREE THAT SELLER MAY, IN ADDITION TO ANY OTHER REMEDIES TO WHICH SELLER MAY BE ENTITLED, RETAIN A SUM EQUAL TO THE AMOUNT OF THE DEPOSITS HEREUNDER, INCLUDING ANY INTEREST EARNED THEREON, IF ANY, AS SELLER'S LIQUIDATED DAMAGES AND NOT AS A PENALTY, WHICH AMOUNT SUBSTANTIALLY COMPENSATES SELLER FOR ANY DAMAGES SUSTAINED BY SELLER.

**YOU HAVE READ AND UNDERSTAND THE FOREGOING LIQUIDATED DAMAGES PROVISION.**

Buyer's Initials _____     Buyer's Initials _____     Seller's Initials _____

20.    **Notices.** All notices, demands, statements, requests, consents approvals and other communications required or permitted to be given hereunder, or which are to be given with respect to this REPC, shall be in writing and either personally delivered to any duly authorized representative of the party receiving such notice or sent by facsimile transmission (with original to follow by one of the following acceptable delivery methods), registered or certified mail with a return receipt requested, or by a nationally recognized courier service, return receipt requested. All notices shall be effective for all purposes upon personal delivery thereof or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip (provided that any facsimile delivered after 5:00 p.m. local time or on a day other than a business day shall be deemed to have been delivered on the next business day), or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt or courier records. All notices shall be delivered to the respective addresses and fax numbers for Buyer and Seller set forth on the first page of this REPC. The addresses for purposes of this Section 20 may be changed by giving written notice of such change in the manner herein provided for giving notice. Unless and until such written notice is given, the last address and address as stated by written notice or as provided herein, if no written notice of change has been sent or received, shall be deemed to continue in effect for all purposes hereunder.

21.    **Foreign National Status.** Buyer's Representations and Covenants as to Foreign National Status. The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), prohibits Seller from engaging

directly or indirectly, in transactions with individuals or entities on OFAC's list, as updated from time to time, of Specially Designated Nationals and Blocked Persons (the "SDN List"). OFAC also administers, from time to time, sanction and embargo programs involving certain designated countries (each an "Embargoed Country").

(a)     By signing below, Buyer represents and warrants to Seller as follows:

(i)     Buyer is not included on the SDN List, and is not owned or controlled by, or acting for or on behalf of, any individual, organization or other entity included on the SDN List.

(ii)     Buyer is not a resident or national of any Embargoed Country.

(iii)     Buyer is not affiliated with, and does not give support to or receive support from, any terrorist, terrorist organization, narcotics trafficker or person engaged in activities related to the proliferation of weapons of mass destruction.

(iv)     Buyer is not an individual, organization or other entity with whom Seller or its affiliates are prohibited from transacting business, or with whom they may transact business only subject to the imposition of significant fines or penalties.

(v)     Buyer hereby represents its compliance with all applicable anti-money laundering laws, including, without limitation, the USA Patriot Act, and the laws administered by OFAC, including, without limitation, Executive Order 13224.

(vi)     None of Buyer's employees, directors, officers, or others with a controlling interest in Buyer, nor any of its affiliates or the funding sources of either is on the SDN List.

(vii)     Neither Buyer nor any of its affiliates is directly or indirectly controlled by the government of any country or person that is subject to an embargo by the United States government that prohibits Seller from conducting the business activities contemplated by this REPC with Buyer.

(viii)     Neither Buyer nor any of its affiliates is acting on behalf of an Embargoed Country.

Buyer agrees that it will notify Seller in writing immediately upon the occurrence of any event which would render the foregoing representations and warranties of this Section 21(a) incorrect.

(b)     If at any time Buyer becomes, or is discovered to be, an individual, organization or other entity described by any of Sections 21(a)(i) through 21(a)(viii) above (a "Prohibited Buyer"), Buyer shall, immediately and without further action or notice on behalf of Seller, forfeit any use, voting and other rights attached to the property purchased hereby and shall not be entitled to a refund of any deposits, fees or other monies paid with respect to such property. Upon the occurrence of such an event, Buyer shall waive any claims it may have against Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors as a result of such forfeiture and will indemnify Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors for any losses incurred by them arising from Buyer's status as a Prohibited Buyer, including any breach of Buyer's representations and warranties set forth herein.

(c)     Buyer shall not transfer or attempt to transfer Buyer's interest in the property purchased hereby to any individual, organization or other entity which would be considered a Prohibited Buyer under the terms of this REPC (a "Prohibited Transferee"). Any such transfer or attempted transfer may subject Buyer to fines or other liabilities, and such transaction may be declared null and void. Buyer hereby agrees to indemnify and hold harmless Seller and its parent and sister companies, affiliates, subsidiaries, employees, agents, officers and directors from any losses incurred by them arising from Buyer's transfer or attempted transfer of Buyer's interest in the property purchased hereby to any Prohibited Transferee.

22.   **Miscellaneous**.

(a)   **Successors**.  The provisions of this REPC shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors, and assigns.

(b)   **Assignment**.  Buyer may not assign this REPC without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion.  Any purported assignment made without obtaining Seller's prior written consent may be voided at the option of Seller, in its sole discretion.  Seller may assign this REPC in its sole discretion.

(c)   **Merger of Agreement**.  The only representations, agreements and warranties made by Seller are those set forth in writing in this REPC and in the documents named in Section 12.  No representations, agreements or warranties, express or implied, not expressly set forth in writing in this REPC or in the documents named in Section 12 are made by Seller to or with Buyer.

(d)   **Further Assurances**.  Buyer agrees to execute and deliver any further instruments or documents and perform any additional acts which are or may become necessary to effectuate the Closing.

(e)   **No Additional Obligations; Irrevocability and Waiver of Right**.  Seller shall have no obligation to inspect, repair or replace any item or Alleged Defect (defined below) for which Seller is not otherwise obligated to do under applicable law or under the Declaration.  The right of Seller to enter, inspect, repair, and/or replace, reserved under the Declaration, shall be irrevocable and may not be waived or otherwise terminated except by a writing, in recordable form, executed and recorded by Seller in the Office of the Summit County Recorder.  "Alleged Defects" means any portion of the Project, including Buyer's Shared Interest Unit, and/or improvements constructed on the Property that Buyer claims, contends or alleges are defective or that Buyer claims, contends or alleges that Seller or its agents, consultants, contractors or subcontractors were negligent in planning, designing, engineering, grading or constructing.  The provisions of this Section 22(e) shall survive the Closing.

(f)   **Waiver**.  Seller hereby disclaims any representations and warranties in respect of, shall have no continuing liability to Buyer for, any design or construction defects (whether known or unknown) relating to the Lodge, including latent defects.  Further, to the maximum extent permitted by law, Seller hereby disclaims any and all and each and every express or implied warranties, whether established by statutory, common case law or otherwise, as to the design, construction, sound and/or odor transmission, existence and/or development of molds, mildew, toxins or fungi, furnishing and equipping of the Property, including, without limitation, any implied warranties of habitability, fitness for a particular purpose or merchantability, compliance with plans, all warranties imposed by statute and all other express and implied warranties of any kind or character.  Seller has not given and Buyer has not bargained for any such warranties.  However, at Closing, Seller shall assign to Buyer, on a non-exclusive basis, all assignable manufacturers' warranties applicable to the FF&E, if any.  As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above.  The provisions of this Section 22(f) shall survive the Closing.

(g)   **No Presumption**.  This REPC shall be construed without regard to any presumption or other rule requiring construction against the party causing this REPC to be drafted.

(h)   **Gender**.  All terms and words used in this REPC, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

(i)   **Litigation Expenses**.  In the event of any litigation between Seller and Buyer concerning the subject matter of this REPC, the breaching party shall pay all of the non-breaching party's costs and expenses, including, without limitation, reasonable attorneys' fees and reasonable costs incurred incident to such litigation.

(j)   **Counterparts**.  This REPC may be executed in more than one counterpart, each of which shall be deemed an original, but all together shall be only one document.  Signatures to this REPC may be delivered by facsimile transmission which transmission copy shall be considered an original and shall be binding and enforceable against the parties.

Seller's Initials _____ Date _____   Buyer's Initials _____ Date _____

(k)    Captions. The captions of this REPC are inserted for convenience of reference only and do not define, describe or limit the scope or intent of this REPC or any term hereof.

(l)    Time of the Essence. Time is of the essence hereof. If the time period for the performance of any act called for under this REPC expires on a Saturday, Sunday or any other day on which banking institutions in Utah are authorized by law or executive order to close (a "Legal Holiday"), the act in question may be performed on the next succeeding day that is not a Saturday, Sunday, or Legal Holiday.

(m)    Legally Binding Contract. THIS IS A LEGALLY BINDING CONTRACT. IF YOU DO NOT UNDERSTAND THE TERMS AND CONDITIONS, PLEASE CONSULT YOUR LEGAL COUNSEL BEFORE SIGNING.

**[SIGNATURE PAGE TO FOLLOW]**

Seller's Initials _____ Date _____ Buyer's Initials _____ Date _____

**[SIGNATURE PAGE TO SHARED INTEREST REAL ESTATE PURCHASE CONTRACT]**

23.     **Buyer's Right to Cancel.**  BUYER MAY CANCEL THIS AGREEMENT WITHOUT ANY CANCELLATION FEE OR OTHER PENALTY BY HAND DELIVERING OR SENDING BY CERTIFIED MAIL WRITTEN NOTICE OF CANCELLATION TO: EASY STREET PARTNERS, LLC C/O WILLIAM SHOAF, 4780 WINCHESTER COURT, PARK CITY, UTAH 84098.  THE NOTICE MUST BE DELIVERED OR POST MARKED BY MIDNIGHT OF THE FIFTH CALENDAR DAY FOLLOWING THE DAY ON WHICH THE AGREEMENT IS SIGNED.  IN COMPUTING THE NUMBER OF CALENDAR DAYS, THE DAY ON WHICH THE AGREEMENT IS SIGNED AND LEGAL HOLIDAYS ARE NOT INCLUDED.

EXECUTED as of the day and year first above written.

PRINT BUYER'S NAME                          BUYER'S SIGNATURE

_____              _____

_____              _____

_____              _____

                                     _____
                                     Date                    Time


                          SELLER:

                          EASY STREET PARTNERS, LLC

                          By:  AVG-SL, LLC
                          Its:  Manager


                          By: _____
                          Name: _____
                          Its:  Manager


_____              _____
Sales Associate                      Date                    Time