# EXHIBIT C

**Easy Street Mezzanine LLC**

**Promissory Note**

**$11,250,000**

**March 30, 2006**

**Table of Contents**

**Page**

1. **Basic Terms.** ....................1
   1.1 Promise to Pay ....................1
   1.2 Application of Payments ....................1
   1.3 Maturity ....................1
   1.4 Form of Payment ....................1

2. **Definitions.** ....................2

3. **Base Interest and Mandatory Prepayment** ....................3
   3.1 Calculation of Base Interest ....................3
   3.2 Payments of Base Interest ....................3
   3.3 Intentionally Deleted ....................3
   3.4 Monthly Application of Gross Receipts Net of Expenses ....................3
   3.5 Contingent Interest Upon Maturity ....................7
   3.6 Use of Gross Receipts ....................8
   3.7 Determined Property Value ....................9
   3.8 Determination of Fair Market Value by Appraisers ....................9

4. **Prepayment** ....................10
   4.1 Prepayment ....................10
   4.2 Prepayment Premium ....................10
   4.3 Waiver of Prepayment Premium in Certain Circumstances ....................11

5. **Default** ....................12
   5.1 Late Charge ....................12
   5.2 Events of Default ....................12
   5.3 Acceleration ....................12
   5.4 Interest After Event of Default ....................12

5.5 Waivers by the Borrower....13
5.6 Increase in Principal....13

**6. Miscellaneous....13**
6.1 Relationship of the Borrower and the Lender....13
6.2 Costs of Collection and Cure....13
6.3 Severability....14
6.4 Amendment, Waiver, Entire Agreement....14
6.5 Descriptive Headings; Interpretation....14
6.6 Successors and Assigns....14
6.7 Governing Law; Choice of Law....14
6.8 Usury Limitation....15
6.9 Consent to Jurisdiction....15
6.10 Waiver of Jury Trial....15
6.11 Service of Process....15
6.12 Notices....16
6.13 Time is of the Essence....17

Schedule 3.7 - Financial Projections of Proceeds and Costs

**Easy Street Mezzanine LLC**

**Promissory Note**

**$11,250,000**

**March 30, 2006**

1. **Basic Terms.**

1.1 Promise to Pay. Easy Street Mezzanine LLC, a Delaware limited liability company, with an address of c/o Alchemy Ventures Group, LLC, 1816 Prospector Avenue, Suite 100, Park City, Utah 84060 (together with its legal successors, the "**Borrower**") for value received, promises to pay to BayNorth Realty Fund VI, Limited Partnership (together with any successor holder of this Promissory Note, collectively, the "**Lender**"), at c/o BayNorth Capital, LLC, One Financial Center, Floor 23, Boston, MA 02111, or at such place as the Lender may from time to time designate in writing, the principal sum of Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000), as it may be increased from time to time pursuant to the terms of this Promissory Note (this "**Note**"), with interest thereon, as set forth in this Note. In connection with the delivery of this Note, the Lender and the Borrower have entered into a Loan Agreement dated as of the date hereof (as it may be amended from time to time, the "**Loan Agreement**," and together with this Note and all documents executed in connection therewith, collectively the "**Loan Documents**").

1.2 Application of Payments. Except as otherwise provided herein, all payments made on this Note shall be applied in payment of amounts then due on account of principal, interest and any other sums or amounts due under this Note or any of the other Loan Documents in such order as the Lender shall elect in its sole discretion.

1.3 Maturity. The entire outstanding principal balance of this Note, together with any accrued and unpaid interest and other amounts due hereunder or under any other Loan Document, if not earlier paid or due and payable in accordance with the terms of this Note or another Loan Document, shall be due and payable 60 months after the date of this Note.

1.4 Form of Payment. Any and all payments hereunder shall be made in lawful money of the United States of America by wire transfer of immediately available federal funds in accordance with such wire transfer or other payment instructions as the Lender may designate by written notice thereof delivered by or on behalf of the Lender to the Borrower. Until further instructions are given by a BayNorth Authorized Representative, all payments hereunder shall be made in accordance with the terms of this Note and the following

wiring instructions:

| | |
|---|---|
| Bank: | Citizen's Bank |
| ABA: | 011 500 120 |
| Account Name: | BayNorth Realty Fund VI, Limited Partnership |
| Account Number: | 130 317 2736 |
| Reference: | Sky Lodge Mezzanine Loan |

**2. Definitions.**

Capitalized terms used without definition in this Note shall have the respective meanings ascribed to them in the Loan Agreement. As used in this Note, the following terms shall have the meanings indicated or referred to below.

"Borrower" - See Section 1.1.

"Borrower's Interest Account" – means an account which shall be maintained and calculated as follows:

- The initial balance of the account as of the date of this Note shall be $60,000.
- There shall be added to such account on the last day of each month, interest at the rate of sixteen percent (16%) per annum on the weighted average balance of the sum of (i) the Borrower's Principal Account, and (ii) the Borrower's Interest Account during such month.
- There shall be deducted from such account such amounts as are made available for distributions to Borrower pursuant to Sections 3.4(d) and 3.5(d) at such time as such amounts are made available.

"Borrower's Principal Account" means an account which shall be maintained and calculated as follows:

- The initial balance of the account as of the date of this Note shall be One Million Five Hundred Thousand and No/100 Dollars ($1,500,000).
- There shall be added to such account the amount of the Development Fee that is not paid to the Developer but is deemed added to Borrower's Principal Account pursuant to Section 3.54 of the Loan Agreement up to the amount of Two Hundred fifty Thousand Dollars ($250,000).
- There shall be deducted from such account such amounts as are made available for distributions to Borrower pursuant to Sections 3.4(d) and 3.5(d) at such time as such amounts are made available.

"Contingent Interest" means the amounts payable as Contingent Interest pursuant to Sections 3.4 and 3.5.

"Default Rate" - See Section 5.4.

"Event of Default" - See Section 5.2.

"BayNorth Authorized Representative" means Charles J. Flint.

"Expenses" - See Section 3.4

"Gross Receipts" - See Section 3.4.

"Lender" - See Section 1.1.

"Loan Agreement" - See Section 1.1.

"Loan Documents" - See Section 1.1

"Minimum Payment Amount – See Section 3.4(g)

"Minimum Principal Amount" – See Section 3.4

"Note" - See Section 1.1.

"Overage Clawback Payments" – See Section 3.4.

"Payment Date" - See Section 3.2.

**3. Base Interest and Mandatory Prepayment.**

3.1 Calculation of Base Interest. The principal balance of this Note and any and all other amounts owing by the Borrower to the Lender under this Note or any other Loan Document shall bear interest ("**Base Interest**") at the rate of Sixteen and No Hundredths Percent (16%) per annum, compounded monthly in arrears, or such higher rate as is provided in Section 5.4. Interest shall be calculated on the basis of a three hundred sixty (360)-day year comprised of twelve (12) thirty (30)-day months. Base Interest for any partial month prior to full payment of this Note shall be calculated at a daily rate equal to one three-hundred-sixtieth (1/360th) of the applicable rate for the actual number of days in such partial month prior to the full payment of this Note.

3.2 Payments of Base Interest. Except as provided in the following sentence, the Borrower shall pay to the Lender on the first business day of each month (each a "**Payment Date**") all Base Interest accrued through such Payment Date. So long as no Event of Default has occurred, except as provided in Section 3.4, the Borrower may defer payment of Base Interest.

3.3 Intentionally Deleted.

3.4 Monthly Application of Gross Receipts Net of Expenses. On each Payment Date, the Borrower shall apply the aggregate amount of Gross Receipts remaining after payment

of Expenses, each for the month ending one month prior to such Payment Date, in the following priority:

(a) As a payment to the Lender of Base Interest accrued on the Note through such Payment Date.

(b) As a payment to the Lender as amortization of principal, until the principal balance of the Note has been reduced to $1,125,000 or such lesser amount as the Lender may determine in its sole discretion (the "**Minimum Principal Amount**").

(c) As a payment to the Borrower for its sole member to distribute to its member, Park City I, LLC, or its successors or assigns, until the aggregate amounts made available pursuant to this Section 3.4(c) and Section 3.5(c) is equal to the balance of the Borrower's Interest Account, or for other proper purposes as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

(d) As a payment to the Borrower for its sole member to distribute to its member, Park City I, LLC, or its successors or assigns, until the aggregate amounts made available pursuant to this Section 3.4(d) and Section 3.5(d) is equal to the balance of the Borrower's Principal Account, or for other proper purposes as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

(e) As a payment to the Borrower for its sole member to distribute to the seller of the Land, in its capacity as a member of the sole member of the Borrower, on account of the so-called "Overages" incurred by such seller in connection with its permitting and other predevelopment activities, until the aggregate amounts made available pursuant to this Section (e) and Section 3.53.5(e) is equal to $900,000 (the "Overage Reimbursement") (i.e., one half of the $1,800,000 deferred Overage payable to the seller of the Land) plus an amount determined as of the Closing equal to the interest accrued at 6.5% per annum on the $9,000,000 land purchase price from October 1, 2005 until the Closing, or for other proper purposes as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

(f) As a payment to the Lender as Contingent Interest, an aggregate amount which, when added to payments made to the Lender pursuant to Section 3.5(f), equals twenty-five percent (25%) of the Overage Reimbursement reserved for distributions by the Borrower pursuant to Sections 3.4(e) and 3.5(e) (the "**Overage Clawback Payments**"). For the avoidance of doubt, Lender shall not receive any percentage of the 6.5% interest paid on the land purchase price to such seller under Sections 3.4(e) or 3.5(e).

(g) 33% as a payment to the Lender as Contingent Interest and 67% as a payment to the Borrower for distributions or for other proper purposes, amounts in which payment may be distributed by Borrower to its members at Borrower's discretion, as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

Notwithstanding anything to the contrary provided in this Note or in any other Loan Document, the Lender shall have no liability or obligation whatsoever to any direct or indirect member in the Borrower related to any distribution or payment (or the failure of the Borrower or any direct or indirect member of that Borrower to make any distribution or payment) of any amounts made available for distribution by the Borrower pursuant to this Section 3.4 or Section 3.5 or any other provision of any Loan Document.

"**Gross Receipts**" means proceeds of the Loan, the Senior Loan or any other financing by the Borrower, and capital contributions made by the holders of equity interests in the Borrower and all income and receipts of every nature received by or on behalf of the Borrower or the Subsidiary Owner from or related to the ownership, operation, leasing, financing or sale or other disposition of all or any portion of or interest in the Units or the Property, including, without limitation, (i) all proceeds from sales of Units or interests therein and all fees, rent and other sums paid for the use or occupancy of all or any portion of the Property, including, without limitation, any license or other fees for the use or occupancy of any supplemental quarters, storage space, signs or billboards at the Property, (ii) all amounts received for management, administrative or other services provided to buyers, tenants, guests or users of any portion of the Property, (iii) proceeds of any casualty and business interruption insurance, (iv) all proceeds from any condemnation or taking of all or any portion of the Property, (v) all interest earned on any escrows and reserves, (vi) all refunds and rebates of real estate taxes or any amount previously taken into account as an expense and reimbursements to or for the benefit of the Borrower or the Subsidiary Owner from reserve or escrow accounts, (vii) all deposits made by prospective buyers of Units or of other portions of the Property when applied in payment of amounts owing by such prospective buyers, (viii) all interest earned on any such deposits held by the Borrower or the Subsidiary Owner (except interest which the Borrower or the Subsidiary Owner is required to pay to parties that made such deposits) and on any and all operating and other bank accounts and (ix) all damages or other settlement proceeds from disputes concerning damage to, or the loss of Gross Receipts from, the Property. However, in no event shall any specific item of Gross Receipts be included more than once in calculating Gross Receipts. Gross Receipts shall be accounted for and documented to the Lender's reasonable satisfaction. Notwithstanding the foregoing, for the purposes of payments to the Lender pursuant to Section 3.4(g) and Section 3.5(g) of this Note "Gross Receipts" shall include the proceeds, income or receipts with respect to the commercial space (which term "commercial space" shall not be deemed to include the Condominiums) at the Property initially designated to be occupied by the restaurants "Zoom" and "Easy Street Brasserie" (collectively, the "**Included Commercial Space**"), but shall not include the commercial space intended to be used for spa recreational facilities or any other commercial space at the Property (collectively, the "**Excluded Commercial Space**"), but "Gross Receipts" shall include the proceeds, income or receipts with respect to both the Included Commercial Space and the Excluded Commercial Space for the purposes of payments to the Lender pursuant to Sections 3.4(a) through 3.4(f) and Sections 3.5(a) through 3.5(f) of this Note.

"**Expenses**" means principal and interest paid to Senior Lender under the Senior Loan Documents, reserves and impounds paid under the Senior Loan Documents or otherwise approved by the Lender, and all expenditures made by the Borrower or the Subsidiary Owner in connection with the acquisition, ownership, development, construction, rental, use, occupancy, operation and sale of the Property in compliance with the Loan Documents and the Budget,

including, to the extent applicable and consistent with the Budget and Loan Documents, real estate taxes assessed against the Property, operating and maintenance expenditures, management fees paid pursuant to management contracts approved by the Lender, water and sewer charges, and insurance premiums, capital expenditures, tenant improvement costs, and leasing and sales commissions and expenditures made in the acquisition, ownership, development, construction, or renovation, restoration or repair of the Property and sale of the Units and/or Property or interests therein. In no event shall any expenditure included within the foregoing definition be taken into account more than once. In no event shall Expenses include any distributions to holders of equity interests in the Borrower, any payments under any loans made to the Borrower or the Subsidiary Owner by a Related Party, any payments under the Loan, any payment to a Related Party except to the extent expressly permitted pursuant to the terms of the Loan Agreement, any non-cash expenses such as depreciation or amortization, any federal, state, or local income taxes (including, without limitation, all federal, state or local taxes paid by Borrower, Subsidiary Owner or a Related Party in connection with the operation of the Project or the sale of Units), any amounts paid out of any reserve or escrow created or funded with deposits that were treated as Expenses or paid out of insurance proceeds which were not treated as Gross Receipts, and any general overhead expenses of the Borrower or the Subsidiary Owner or any Related Party of the Borrower or the Subsidiary Owner. Expenses shall be accounted for and documented to the Lender's reasonable satisfaction. Except as provided in the Budget, the net proceeds from the sale of Units or interests therein shall not be used to pay Expenses other than amounts then due and owing under the Senior Loan without the Lender's prior written consent, which consent may be withheld in the Lender's sole discretion. Notwithstanding the foregoing, for the purposes of payments to the Lender pursuant to Section 3.4(g) and Section 3.5(g) of this Note only, "Expenses" shall not include real estate taxes, operating and maintenance expenditures properly allocated to the Excluded Commercial Space.

Notwithstanding anything to the contrary set forth in Section 3.4 above:

1. if any amounts are made available for distribution by the Borrower pursuant to (c) through (g) above in this Section 3.4 and at maturity the Lender does not receive repayment of the full principal amount of this Note and all accrued Base Interest thereon as a result of the application of the Minimum Principal Amount, then the Borrower shall be required to pay all such amounts so made available for distribution by the Borrower to the Lender until the Lender has received repayment of the full principal amount of this Note and all accrued Base Interest thereon and, if any such amounts have been distributed to the sole member of the Borrower for distribution to its members, such members shall be obligated to recontribute such amounts for contribution to the Borrower in order to fund such payments to the Lender.

2. if any amounts are made available for distribution by the Borrower pursuant to (c) or (e) through (g) above in this Section 3.4 and at maturity (including repayment prior to the scheduled maturity date to the extent permitted under the Loan Documents or upon acceleration following an Event of Default) the Lender does not receive aggregate payments of principal and interest pursuant to this Note of at least Eighteen Million Five Hundred Sixty Two Thousand Five Hundred Dollars ($18,562,500) (the "**Minimum Payment Amount**"), then the Borrower shall be required to pay all such amounts so made available for distribution by the Borrower pursuant to (c) or (e) through (g) above to the Lender until the Lender has received aggregate payments under this Note equal to the Minimum Payment Amount and, if any such amounts

have been distributed to the sole member of the Borrower for distribution to its members, such members shall be obligated to recontribute such amounts for contribution to the Borrower in order to fund such payments to the Lender.

The obligations to make payments to the Lender pursuant to items 1 and 2 above are guarantied pursuant to a certain Guaranty and Non-Competition Agreement of even date herewith.

3.5 Contingent Interest Upon Maturity. On the maturity date or such earlier date as the principal balance is paid in full, the Borrower shall pay to the Lender as Contingent Interest the amount which would be payable to the Lender as Contingent Interest if the unsold Units (including related personal property and the parking spaces and the interests in the common areas allocated to such Units) and the Included Commercial Space, together with any related personal property, were sold at such time for its Determined Property Value, the Subsidiary Owner satisfied its obligations under the Senior Loan Documents by repaying outstanding principal and interest without any prepayment premium, and the remaining assets of the Borrower and the Subsidiary Owner were applied in the following order of priority:

(a) As a payment to the Lender, an amount equal to Base Interest through such date, for credit to such Base Interest.

(b) As a payment to the Lender, as amortization of principal, the remaining principal balance of the Note.

(c) As a payment to the Borrower for its sole member to distribute to its member, Park City I, LLC, or its successors or assigns, until the aggregate amounts made available pursuant to this Section (c) and Section 3.43.4(c) is equal to the balance of the Borrower's Interest Account, or for other proper purposes as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

(d) As a payment to the Borrower for its sole member to distribute to its member, Park City I, LLC, or its successors or assigns, an amount equal to the balance of the Borrower's Principal Account, or for other proper purposes as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

(e) As a payment to the Borrower for its sole member to distribute to the seller of the Land, in its capacity as a member of the sole member of the Borrower, on account of the so-called "Overages" incurred by such seller in connection with its permitting and other predevelopment activities, until the aggregate amounts made available pursuant to this Section 3.5(e) and Section 3.4(e) is equal to the amount of the Overage Reimbursement (i.e., $900,000) plus an amount determined as of the Closing equal to the interest accrued at 6.5% per annum on the $9,000,000 land purchase price from October 1, 2005 until the Closing, or for other proper purposes as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

(f) As a payment to the Lender as Contingent Interest, an aggregate amount which, when added to payments made to the Lender pursuant to Section 3.4(f), equals twenty-five

percent (25%) of the Overage Reimbursement reserved for distributions by the Borrower pursuant to Sections 3.4(e) and 3.5(e). For the avoidance of doubt, Lender shall not receive any percentage of the 6.5% interest paid on the land purchase price to seller under Sections 3.4(e) or 3.5(e).

(g) 33% as a payment to the Lender as Contingent Interest and 67% as a payment to the Borrower for distributions or other proper purposes, amounts in which payments may be distributed by Borrower to its members at Borrower's discretion, as determined by the Borrower consistent with Borrower's operating agreement or its sole member's operating agreement, as applicable.

Notwithstanding anything to the contrary set forth in Section 3.5 above:

1. if any amounts are made available for distribution by the Borrower pursuant to (c) through (g) above in this Section 3.5 and at maturity the Lender does not receive repayment of the full principal amount of this Note and all accrued Base Interest thereon as a result of the application of the Minimum Principal Amount, then the Borrower shall be required to pay all such amounts so made available for distribution by the Borrower to the Lender until the Lender has received repayment of the full principal amount of this Note and all accrued Base Interest thereon and, if any such amounts have been distributed to the sole member of the Borrower for distribution to its members, such members shall be obligated to recontribute such amounts for contribution to the Borrower in order to fund such payments to the Lender.

2. if any amounts are made available for distribution by the Borrower pursuant to (c) or (e) through (g) above in this Section 3.5 and at maturity the Lender does not receive aggregate payments of principal and interest pursuant to this Note at least equal to the Minimum Payment Amount, then the Borrower shall be required to pay all such amounts so made available for distribution by the Borrower pursuant to (c) or (e) through (g) above to the Lender until the Lender has received aggregate payments under this Note equal to the Minimum Payment Amount and, if any such amounts have been distributed to the sole member of the Borrower for distribution to its members, such members shall be obligated to recontribute such amounts for contribution to the Borrower in order to fund such payments to the Lender.

The obligations to make payments to the Lender pursuant to items 1 and 2 above are guarantied pursuant to a certain Guaranty and Non-Competition Agreement of even date herewith.

3.6 Use of Gross Receipts. All Gross Receipts shall be used to pay the following items to the extent due and owing in the following order of priority (unless and until an Event of Default has occurred and the Lender elects to require that Gross Receipts be applied in another priority):

(a) Expenses paid solely to: (i) parties other than Related Parties, or (ii) Related Parties pursuant to contracts specifically approved as contracts with Related Parties by the Lender.

(b) Principal and interest due and owing pursuant to the Senior Loan Documents; and

(c) Payments to the Lender required by this Note.

No insufficiency of Gross Receipts shall relieve the Borrower of any of its obligations under this Note or the other Loan Documents.

3.7 Determined Property Value. **"Determined Property Value"** means, except as provided below in this Section 3.7, the fair market value of the unsold Units (including the parking spaces allocated thereto) and related personal property, the interests in the common areas at the Property allocated to such Units, and the Included Commercial Space except that to the extent that any of the Included Commercial Space has been sold in accordance with the provisions of the Loan Documents (collectively the "**Appraisal Property**"), net of an amount in consideration of reasonably anticipated out-of-pocket costs which would be incurred in connection with a sale of the Appraisal Property, all as determined by mutual agreement between the Borrower and the Lender, or if no such agreement can be reached within ten (10) business days after the Lender or the Borrower has requested that the parties reach such agreement, the fair market value of the Appraisal Property as determined pursuant to the procedures set forth in Section 3.8 reduced by (i) two percent (2%) of such fair market value on account of anticipated reasonable out-of-pocket costs of sale, and (ii) the amounts paid by the Borrower to the appraisers selected pursuant to Section 3.8. If the Borrower is obligated to pay a prepayment premium pursuant to Section 4.2, the Determined Property Value shall not be less than the aggregate proceeds anticipated from the disposition of the Property in the projections of financial results attached as **Schedule 3.7** reduced by the remaining portion of anticipated costs of completing the construction of the contemplated improvements to the Property as shown in **Schedule 3.7**.

3.8 Determination of Fair Market Value by Appraisers. At any time after (i) the date this Note has been declared due and payable, (ii) the date which is ninety (90) days prior to the scheduled maturity date, or (iii) the date the Borrower notifies the Lender in writing of its intent to repay this Note in full as permitted hereunder, either the Borrower or the Lender may request that the other agree to the Determined Property Value. If the Borrower and the Lender fail to agree on the Determined Property Value within ten (10) business days after any such request, the fair market value of the Appraisal Property for purposes of calculating the Determined Property Value pursuant to Section 3.7 above shall be determined by a single appraiser satisfactory to both the Borrower and the Lender, if they are able to agree to such an appraiser within ten (10) business days after the request of the Lender or the Borrower. If no single appraiser is so selected, the Borrower and the Lender shall each appoint an independent appraiser who is a member of the Appraisal Institute and who has at least ten (10) years' experience appraising comparable fractional interest for sale residential properties and comparable hotel and restaurant properties in the Park City, Utah area and who is not then employed by the party selecting the appraiser, and in the case of the third appraiser contemplated below, either party. The two appraisers so appointed shall thereafter appoint a third appraiser within ten (10) business days of their appointment who meets the same qualifications. If they fail to do so, the Borrower or the Lender may request that the head of the Utah Chapter of the American Institute of Real Estate Appraisers (or other comparable recognized professional association of real estate appraisers if there is no such Utah Chapter of the American Institute of American Appraisers) designate a third appraiser with such qualifications. The three appraisers so appointed shall within forty-five (45) days thereafter render their judgment as to the fair market value of the Appraisal Property.

If one of the appraisals is within two percent (2%) of the average of the other two appraisals, the fair market value of the Appraisal Property for purposes of calculating the Determined Property Value shall be the numerical average of all three appraisals. Otherwise, the fair market value of the Appraisal Property for purposes of calculating the Determined Property Value shall be the numerical average of the two closest appraisals in absolute dollars. If the Borrower fails to select an appraiser within ten (10) business days of the request by the Lender that it do so, the fair market value of the Appraisal Property for purposes of calculating the Determined Property Value shall be the fair market value of the Appraisal Property as determined by an appraiser who meets the qualifications state above and who is selected solely by the Lender. If the Lender fails to select an appraiser within ten (10) business days of a request made by the Borrower, the fair market value of the Appraisal Property for purposes of calculating the Determined Property Value shall be the fair market value of the Appraisal Property as determined by an appraiser who meets the qualifications stated above and who is selected solely by the Borrower and who appraises the value of the Appraisal Property in accordance with this Section 3.8. Any appraisers appointed pursuant to this Section 3.8 shall be instructed not to take into account brokerage commissions, legal fees or any other costs which would be incurred by the Borrower or the Subsidiary Owner if it sold the Property. The Borrower shall pay the cost of the appraisers selected pursuant to this Section 3.8. If the full amount of Contingent Interest based on the Determined Property Value has not been paid within the sooner of (i) one hundred twenty (120) days after the date on which the Borrower or the Lender has requested the determination of the Determined Property Value, or (ii) sixty (60) days after the appraisers deliver to the Borrower their report setting forth the Determined Property Value, the Lender may require that the Determined Property Value be determined again and that Contingent Interest be based on such newly established Determined Property Value.

4. **Prepayment.**

4.1 Prepayment. The Borrower shall not be permitted to prepay the outstanding balance of this Note in whole or in part, except as otherwise specifically required or permitted under this Note. Notwithstanding the foregoing, Borrower shall have the right to prepay all, but not less than all, of the Loan from and after the fourth (4th) anniversary of the closing and funding of the Loan without premium or penalty, provided that (i) the Borrower provides not less than ninety (90) days prior written notice of such prepayment, which notice can be sent ninety (90) days prior to the 4th anniversary so that Borrower may exercise the prepayment right on the 4th anniversary, (ii) ninety-five percent (95%) of the Units have been sold pursuant to Unit Contracts in accordance with the Minimum Sales Prices as required in the Loan Agreement and otherwise in accordance with the provisions of the Loan Documents and (iii) the restaurants intended for occupancy in the Included Commercial Space (or such other commercial uses in the Included Commercial Space approved by the Lender pursuant to the Loan Documents) have been completed and open for operations for not less than eighteen (18) months.

4.2 Prepayment Premium. Subject to Section 4.1 above and Section 4.3 below, if (i) payment of this Note is required pursuant to any provision of the Loan Documents prior to the originally scheduled maturity date of this Note, including, without limitation, on account of any default remaining uncured after any applicable notice and cure period, or (ii) the Borrower prepays this Note prior to the originally scheduled maturity date of this Note without a waiver by

the Lender of the prepayment premium required by this Section 4.2, then the Borrower shall immediately pay to the Lender in addition to all other amounts due hereunder, and there shall be due and owing as additional interest, the Yield Maintenance Amount with respect to the principal to be paid. This payment shall be payable not as a penalty but on account of the loss of the Lender's opportunity to receive the payments of Base Interest and Contingent Interest which otherwise would have been payable through and including the originally scheduled maturity date of this Note. The Borrower acknowledges that it is very difficult to estimate the damages which would be suffered by the Lender if this Note is prepaid prior to the originally scheduled maturity date of this Note, and that the Yield Maintenance Amount is a reasonable estimate of the Lender's anticipated actual damages. Without limiting the foregoing, if the maturity of this Note is accelerated by reason of any default under this Note or any other Loan Document, including, without limitation, any "due on sale" provisions, the Borrower agrees that any tender to cure such default and any repayment of the indebtedness evidenced by this Note resulting from such default, shall constitute an evasion of the restrictions on prepayment set forth herein and shall be deemed a voluntary prepayment. Accordingly, to the extent permitted by law, the Lender may impose as a condition to accepting any such tender, and may bid at any sale under any instrument securing this Note, as part of the indebtedness evidenced hereby, the Yield Maintenance Amount.

"**Yield Maintenance Amount**" means, if the entire principal balance of this Note is prepaid, the sum of (i) the amount, if any, in addition to Contingent Interest then paid, sufficient to provide the Lender with a monthly compounded, rate of return of thirty percent (30%) per annum on the Lender's investment in this Note through the date of prepayment of this Note, and (ii) the further amount, if any, required to allow the Lender to invest such further amount, together with the outstanding principal balance, in United States government securities, in order to receive on the originally scheduled maturity date of this Note the amount of the principal amount of this Note outstanding immediately prior to such prepayment, and monthly payments of interest on the principal of this Note through the originally scheduled maturity date of this Note calculated at the rate of thirty percent (30%) per annum compounded monthly. If the Contingent Interest paid at the time of prepayment of this Note exceeds the amount required to provide the Lender with a monthly compounded, rate of return of thirty percent (30%) per annum on the Lender's investment in this Note through the date of prepayment of this Note, the amount calculated under item (ii) shall be reduced by any such excess (but in no event to an amount less than zero). If only a portion of the outstanding principal amount of this Note is prepaid, the Yield Maintenance Amount shall be that proportion of the Yield Maintenance Amount which would be applicable if the entire outstanding principal amount were prepaid which the portion of the outstanding principal prepaid bears to the entire principal balance outstanding immediately prior to the payment. The Lender's return on its investment in this Note shall be determined without regard to any interest payable at the Default Rate to the extent it exceeds the amount which would have been payable absent the application of the Default Rate. The Yield Maintenance Amount shall otherwise be determined by the Lender in its reasonable discretion.

4.3 Waiver of Prepayment Premium in Certain Circumstances. No Prepayment Premium shall be payable in connection with the prepayment of this Note in connection with a casualty or condemnation affecting the Property as provided in Section 3.30 of the Loan Agreement or in connection with any required payment of principal of this Note under Section 3.4(b) of this Note.

5. **Default.**

5.1 Late Charge. The Borrower recognizes that if it fails to make payments when due under the Loan Documents the Lender will incur additional expense and lose the opportunity to make use of the money not paid when due. The Borrower agrees that if the Borrower fails to pay when due any interest or principal due under this Note (other than the payment due at maturity) or any amounts due under the other Loan Documents, the Lender shall be entitled, as damages for the detriment caused thereby, to payment on demand of an amount equal to the lesser of (i)five percent (5%) of such delinquent sum (not to include the unpaid principal balance upon acceleration), and (ii) the maximum amount permitted by applicable law; provided, however, that if such failure to pay timely is due to the failure of the Senior Lender to the pay to the Lender amounts due and payable to the Lender in accordance with Senior Loan Documents or the Intercreditor Agreement or other causes beyond the reasonable control of Borrower (exclusive of the Borrower's inability to pay), then no late charge shall be payable unless such failure is not cured within five (5) business days after the Lender gives written notice of such failure to the Borrower; provided, further, that the foregoing proviso giving the Borrower a five (5) business day cure period for causes beyond the reasonable control of the Borrower shall not be applicable more than two (2) times in any calendar year and not more than four (4) times over the term of the Loan. The Borrower acknowledges that it is difficult and impractical to ascertain the extent of the Lender's actual damages and agrees that the amount provided above is a reasonable estimate of such damages to the Lender. Nothing contained in this Section 5.1 shall be deemed to modify or limit the Lender's rights and remedies in connection with any Event of Default.

5.2 Events of Default. Each of the following shall constitute an **"Event of Default"** under this Note:

(a) failure by the Borrower to pay or perform any obligation under this Note when due; provided, however, that if such failure is due to the failure of the Senior Lender to make payments to the Lender as may be required pursuant to the Senior Loan Documents or the Intercreditor Agreement or other causes beyond the reasonable control of Borrower (exclusive of the Borrower's inability to pay), then such failure shall not constitute an Event of Default under this Note until that date which is five (5) business days after the Lender gives written notice of such failure to the Borrower; provided, further, that the foregoing proviso giving the Borrower a five (5) business day cure period shall not be applicable more than two (2) times in any calendar year and not more than four (4) times over the term of the Loan;

(b) the occurrence of any event or circumstance which constitutes an "Event of Default" as defined in any Loan Document.

5.3 Acceleration. Following an Event of Default hereunder, the Lender may declare immediately due and payable the entire outstanding balance of this Note, including, without limitation, principal, interest, and all other amounts due hereunder or under any other Loan Document.

5.4 Interest After Event of Default. From and after the occurrence of an Event of Default, whether or not the Lender has declared due and payable all amounts payable hereunder,

interest shall accrue on all amounts outstanding under this Note and the other Loan Documents at a rate (the "**Default Rate**") equal to the rate specified in Section 3.1 plus five percent (5%) per annum, compounded monthly, (but in no event more than the highest rate permitted under applicable law) from the date of such Event of Default until (i) all Events of Default are waived in writing by the Lender or the cure thereof has been accepted in writing by the Lender, or (ii) all amounts owing by the Borrower to the Lender with respect to the Loan have been paid in full.

5.5 Waivers by the Borrower. Presentment for payment, demand, notice of dishonor, protest, notice of protest, stay of execution and all other suretyship and other defenses to payment generally are hereby waived by the Borrower and any guarantor or other person secondarily liable on this Note. No extension or acceptance of payment after expiration of applicable notice and cure periods, if any, or other indulgence or release of collateral granted from time to time shall be construed as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of any right of the Lender.

5.6 Increase in Principal. At any time while there exists an Event of Default other than one which has been waived in writing by the Lender or one as to which the Lender has accepted the cure thereof in writing, or while there exists any default under any of the Loan Documents, if a determination has been made in good faith by the Lender that failure to advance funds might jeopardize its rights or interests, as and when the Lender so elects in its sole discretion, the Lender shall be entitled to pay costs and expenses relating to the Property, the Subsidiary Owner or the Borrower, including, without limitation, to cure any defaults or satisfy any requirements under the Senior Loan Documents, the Loan Documents, any Material Contract, Lease or any encumbrance on the Property, or to pay any amount owing under the Senior Loan Documents, or any other obligation or liability of the Borrower or the Subsidiary Owner. Upon payment of funds to or for the benefit of the Borrower by the Lender, the principal balance of this Note shall automatically be increased by the amount so expended by the Lender. All such increases in principal shall be secured by all of the liens and security interests created by the Loan Documents, shall bear interest at the Default Rate, and shall be payable on demand.

**6. Miscellaneous.**

6.1 Relationship of the Borrower and the Lender. The relationship between the Borrower and the Lender is solely that of debtor and creditor. The Lender has no fiduciary or other special relationship with the Borrower, is not a partner or joint venturer of the Borrower, and is not an agent of the Borrower. No term of any Loan Documents shall be construed as creating any relationship between the Borrower and the Lender to be other than that of debtor and creditor.

6.2 Costs of Collection and Cure. In the event of any default on the part of the Borrower under this Note or any of the other Loan Documents, whether or not such default constitutes an Event of Default hereunder or under any of the other Loan Documents, the Borrower shall pay any and all reasonable out-of-pocket costs incurred by the Lender in connection with the cure of such default and the evaluation of its rights and remedies hereunder and actions taken by or on behalf of the Lender with a view to enforcing the provisions of this Note or any of the other Loan Documents, whether through the institution of legal proceedings,

foreclosure or otherwise. All such amounts shall bear interest at the Default Rate from the date paid by the Lender until payment is made by the Borrower to the Lender.

6.3 Severability. Any provision of this Note that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction.

6.4 Amendment, Waiver, Entire Agreement. This Note may be amended, and waivers or consents to departures from the provisions hereof may be given, only in a writing signed by the party against which enforcement is sought. This Note and the other Loan Documents contain the entire agreement and understanding between the Lender and the Borrower and supersede all prior agreements and understandings relating to the subject matter hereof. The Lender may accept partial payments of any amounts owing under this Note without waiving any of its rights arising from the Borrower's failure to pay the full amount due in a timely fashion.

6.5 Descriptive Headings; Interpretation. The headings in this Note are for purposes of convenience only and shall not be used in construing or interpreting this Note. References to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Note. References to an "Article" or "Section" are, unless otherwise specified, to an "Article" or "Section" of this Note, as the case may be. Notwithstanding that this Note was initially prepared by the Lender's counsel, this Note has been reviewed and negotiated by competent counsel on behalf of the Borrower. The parties to this Note agree that this Note shall not be construed against the Lender as a result of this Note having been so prepared. If the Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

6.6 Successors and Assigns. Whenever in this Note any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the respective parties which are contained in this Note shall bind and inure to the benefit of the successors and assigns of all parties originally benefited thereby. The terms and provisions of this Note and the other Loan Documents shall inure to the benefit of and shall be binding upon any assignee or transferee of the Lender, and in the event of such transfer or assignment, the rights and privileges herein conferred upon the Lender shall automatically extend to and be vested in, and become an obligation of, such transferee or assignee, all subject to the terms and conditions hereof.

6.7 Governing Law; Choice of Law. This Note shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of The Commonwealth of Massachusetts, without regard to principles of conflicts of law. This Note shall take effect as a sealed instrument. The terms and conditions of this Note and the other Loan Documents were negotiated by the Lender in The Commonwealth of Massachusetts, and delivered by the Borrower and accepted by the Lender in The Commonwealth of Massachusetts, and the proceeds of the Loan were disbursed from The Commonwealth of Massachusetts.

6.8 Usury Limitation. The Borrower and the Lender intend to conform strictly to any applicable usury laws. Accordingly, all agreements between the Borrower and the Lender, whether now existing or hereafter arising, and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of this Note or otherwise, shall the amount paid or agreed to be paid to the Lender for the use, forbearance or detention of the money advanced hereunder pursuant to the terms of this Note or the other Loan Documents, or for the payment or performance of any covenant or obligation contained herein or in any of the other Loan Documents exceed the maximum amount permissible under applicable law. If, from any circumstance or contingency whatsoever, fulfillment of any provision of this Note or of any other Loan Document at the time performance of such provision shall be due shall involve transcending any limit validly prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and, if from any such circumstance or contingency, the Lender shall ever receive as interest or otherwise an amount which would exceed the maximum rate of interest permitted by applicable law, the amount of such excess shall be applied to a reduction of the indebtedness evidenced by this Note, and not to the payment of interest. If such excessive interest exceeds such indebtedness, the amount of such excessive interest shall be refunded to the Borrower. If at any time this Note prescribes a rate of interest in excess of the maximum rate permitted by law, all sums paid or agreed to be paid to the Lender for the use, forbearance or detention of the money advanced hereunder pursuant to the terms of this Note or the other Loan Documents shall be amortized, prorated, allocated and spread throughout the term of such indebtedness until payment in full, so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof.

6.9 Consent to Jurisdiction. The Borrower submits to the jurisdiction of the courts of The Commonwealth of Massachusetts and to the jurisdiction of the United States District Court for the District of Massachusetts for the purpose of any suit, action or other proceeding arising out of or based upon the Loan Documents. The Borrower waives, to the fullest extent permitted by law, any objection which it may now or hereafter have that its property is exempt or immune from attachment or execution and to the venue or jurisdiction of any such suit, action or proceeding brought in any such court, including, without limitation, that any such suit, action or proceeding brought in any such court claim has been brought in an inconvenient forum. Final judgment beyond applicable appeal rights against the Borrower in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of the Borrower. Nothing in this Agreement will be deemed to preclude the Lender from bringing an action or proceeding against the Borrower in any court with jurisdiction, wherever located.

6.10 Waiver of Jury Trial. The Lender and the Borrower hereby waive, to the fullest extent permitted by law, the right to trial by jury in any action, proceeding or counterclaim, whether in contract, tort or otherwise, in connection with, or relating directly or indirectly to the Loan, the Property, or any guarantor of the Loan.

6.11 Service of Process. The Borrower consents to process being served in any suit, action or proceeding hereunder by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the Borrower at its address given in or pursuant to

Section 6.12 or to any other address which the Borrower shall have designated by written notice to the Lender. Nothing in this Section shall affect the rights of the Lender to serve process in any manner permitted by law.

6.12 Notices. All notices and other communications under this Note shall be in writing and shall be deemed delivered on the earlier to occur of (i) receipt or (ii) the date of delivery, refusal or non-delivery indicated on the return receipt, if deposited in a United States Postal Service depository, postage prepaid, sent registered or certified mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to the party to receive the same at the address of such party set forth below.

To the Lender:

c/o BayNorth Capital, LLC
One Financial Center, Floor 23
Boston, MA 02111
Attention: Charles J. Flint

and

Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Attention: Christopher B. Barker, P.C.

To the Borrower:

c/o AVG-SL, LLC
1816 Prospector Avenue,
Suite 100
Park City, Utah 84060

with a copies to:

Wrona & Parrish, P.C.
1816 Prospector Avenue
Suite 100
Park City UT 84060
Attn: S. Blake Parrish, Esq.

Park City I, LLC
c/o Michael Feder
379 W. Broadway
Suite 401
New York, NY 10012

Rhona J. Kisch, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

or, in each case, at such other address, or to the attention of such other officer, as the Borrower or the Lender, as the case may be, shall have furnished to the other party in writing.

6.13 Time is of the Essence. Time is of the essence with respect to each of the Borrower's obligations under this Note.

[Signatures on Following Page]

**Schedule 3.7**

~~Financial Projection of Proceeds and Costs~~

IN WITNESS WHEREOF, the Borrower has executed this Note as an instrument under seal as of the date and year first above written.

Easy Street Mezzanine LLC,
a Delaware limited liability company

By: Easy Street Holding, LLC, a Utah limited liability company, its sole member and manager

By: AVG-SL, LLC, a Utah limited liability company, its Manager

By: ______________________
Name: William Shoaf
Title: Manager

**Sky Lodge & Easy Street Plaza**
**Capital Requirements, Debt Financing and Equity Returns**

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| USES & SOURCES | | | | | | | | | | | |
| DEVELOPMENT COSTS | | | | | | | | | | | |
| Purchase Price | - | 9,000,000 | - | - | | | | | | | 9,000,000 |
| Closing Costs/Debt & Equity Fees | 86,604 | 1,980,203 | 22,955 | - | - | | | | | | 2,089,762 |
| Hotel Construction Costs | 801,252 | 18,709,839 | 15,544,894 | - | - | | | | | | 35,055,985 |
| Membership Marketing Costs | 341,320 | 866,081 | 6,255,525 | - | | | | | | | 7,462,926 |
| Pre Opening Expenses | - | - | 250,000 | - | - | | | | | | 250,000 |
| Total Development Costs | 1,229,176 | 30,556,122 | 22,073,375 | - | - | - | - | - | - | - | 53,858,673 |
| OPERATING INCOME | | | | | | | | | | | |
| Operating Revenues | 1,966,360 | 863,309 | 2,268,547 | 8,331,390 | 9,196,364 | 9,709,482 | 10,234,753 | 10,788,728 | 11,373,141 | 11,989,849 | 76,721,925 |
| Operating Expenses & Deductions | (2,065,241) | (1,269,760) | (2,436,976) | (6,934,870) | (7,572,366) | (7,912,987) | (8,519,404) | (8,944,742) | (9,391,695) | (9,861,454) | (64,909,493) |
| Net Profit (Loss) | (98,881) | (406,451) | (168,429) | 1,396,520 | 1,623,998 | 1,796,496 | 1,715,350 | 1,843,986 | 1,981,447 | 2,128,396 | 11,812,432 |
| OTHER COSTS | | | | | | | | | | | |
| Capital Reserve | | - | - | 339,193 | 339,193 | 339,193 | 339,193 | 339,193 | 339,193 | 339,193 | 2,374,350 |
| Asset Management Fee | | | 50,000 | 100,000 | 162,400 | 179,650 | 171,535 | 184,399 | 198,145 | 212,840 | 1,258,967 |
| CloudNine Resorts Incentive | | | (12,632) | 104,739 | 121,800 | 134,737 | 128,651 | 138,299 | 148,609 | 159,630 | 923,832 |
| Total Other Costs | - | - | 37,368 | 543,932 | 623,393 | 653,580 | 639,379 | 661,890 | 685,946 | 711,662 | 4,557,150 |
| TOTAL - DEV & OPS CASH | (1,328,057) | (30,962,574) | (22,279,171) | 852,589 | 1,000,606 | 1,142,916 | 1,075,971 | 1,182,096 | 1,295,501 | 1,416,734 | (46,603,391) |
| EQUITY & MEMBERSHIP | | | | | | | | | | | |
| ESP Equity | 1,328,057 | 284,490 | 137,453 | - | | | | | | | 1,750,000 |
| New Equity | - | 11,250,000 | - | - | | | | | | | 11,250,000 |
| Membership Deposits | - | - | 67,630,405 | - | | | | - | - | - | 67,630,405 |
| Total Equity & Membership | 1,328,057 | 11,534,490 | 67,767,857 | - | - | - | - | - | - | - | 80,630,405 |
| FINANCING | | | | | | | | | | | |
| Senior Debt | - | 19,756,756 | 17,025,870 | | - | - | - | - | | | 36,782,626 |
| Mortgage Debt | | | | - | - | | - | - | - | - | - |
| ANNUAL CASH AVAILABLE | (0) | 328,672 | 62,514,556 | 852,589 | 1,000,606 | 1,142,916 | 1,075,971 | 1,182,096 | 1,295,501 | 1,416,734 | 70,809,639 |
| DISTRIBUTIONS | | | | | | | | | | | |
| Less: Debt Payments | - | - | (36,782,626) | - | - | - | - | - | - | - | (36,782,626) |
| Working Capital Reserve | | | (350,000) | | | | | | | | (350,000) |
| Add: Cash Surplus Forward | | (0) | 328,672 | | | | | | | | |
| Cash Available for Distribution | (0) | 328,672 | 25,710,603 | 852,589 | 1,000,606 | 1,142,916 | 1,075,971 | 1,182,096 | 1,295,501 | 1,416,734 | |
| BN Repayments + Preferred | | | 16,400,161 | - | | | | | | | 16,400,161 |
| Real Estate Profit Distributions | | - | 7,722,939 | - | | | | | | | 7,722,939 |
| Profit Distributions | | | (405,796) | 852,589 | 1,000,606 | 1,142,916 | 1,075,971 | 1,182,096 | 1,295,501 | 1,416,734 | 7,580,615 |
| NET CASH FLOW | (0) | 328,672 | 1,993,300 | - | - | - | - | - | - | - | |