the (i) exercise or enforcement of any of the rights of the Mezzanine Lender against the Senior Agent or the Senior Lenders hereunder to the extent that the Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by the Senior Agent or the Senior Lenders to perform or observe any of the provisions hereof.

Section 33.  Injunction. The Senior Agent and the Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either the Senior Agent or the Mezzanine Lender hereunder would cause irreparable harm to the other. Accordingly, the Senior Agent and the Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34.  Mutual Disclaimer.

(a)    Each of the Senior Agent and the Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of the Senior Agent and the Mezzanine Lender deem relevant. Each of the Senior Agent and the Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein. Each of the Senior Agent and the Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of the Senior Agent and the Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement. Without limiting the foregoing, each of the Senior Agent and the Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)    Each of the Senior Agent and the Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan Documents are distinct, separate transactions and loans, separate and apart from each other.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

WESTLB AG, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By: _____
Name:  Bruce F. Davidson
Title:    Director

By: _____
Name:  Andrew B. Stein
Title:   Managing Director


MEZZANINE LENDER:

BAYNORTH REALTY FUND VI, LIMITED PARTNERSHIP

By:     BayNorth Realty Fund VI GP, Limited
        Partnership, its general partner

        By:     BayNorth Realty Fund VI, LLC, its
                general partner


                By: _____
                    Name:
                    Title:

Signature Page to Intercreditor Agreement

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

WESTLB, AG, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By: _____
    Name:  Bruce F. Davidson
    Title:  Director

By: _____
    Name:  Andrew B. Stein
    Title:  Managing Director


MEZZANINE LENDER:

BAYNORTH REALTY FUND VI, LIMITED PARTNERSHIP

By:   BayNorth Realty Fund VI GP, Limited Partnership, its general partner

    By:   BayNorth Realty Fund VI, LLC, its general partner

       By: _____
       Name:
       Title:

Signature Page to Intercreditor Agreement

The Mezzanine Borrower and the Borrower acknowledge the terms of this Agreement by their execution below:

MEZZANINE BORROWER:

EASY STREET MEZZANINE LLC,
a Delaware limited liability company,

By:    Easy Street Holding LLC,
      a Utah limited liability company,
      its sole member

      By:    AVG-SL, LLC,
            a Utah limited liability company,
            its manager

            By: _____
               Name:  William Shoaf
               Title:   Manager

BORROWER:

EASY STREET PARTNERS, LLC,
a Utah limited liability company

BY:    Easy Street Mezzanine LLC,
      a Delaware limited liability company,
      its sole member

      By:    Easy Street Holding LLC,
             a Utah limited liability company,
             its sole member

            By:    AVG-SL, LLC,
                  a Utah limited liability
                  company,
                  its manager

                By: _____
                   Name:  William Shoaf
                   Title:   Manager

EXHIBIT A

DESCRIPTION OF LAND

PARCEL NO. 1

BEGINNING AT A POINT SOUTH 4.73 FEET AND WEST 49.84 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH
19°54'51' EAST 18.50 FEET, THENCE NORTH 31°58'04" WEST 72.72 FEET, THENCE
SOUTH 58°02'07" WEST 81.41 FEET MORE OR LESS, THENCE SOUTH 32°25'56" EAST
128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 32°25'56" EAST 128.51 FEET,
THENCE EAST 13.75 FEET, THENCE SOUTH 23°38' EAST 64.90 FEET TO THE
NORTHERLY LINE OF HEBER AVENUE AS DEDICATED, THENCE SOUTH 81°17'
EAST 24.80 FEET ALONG SAID NORTHERLY LINE, THENCE NORTH 15°46'12" EAST
60.79 FEET TO THE POINT OF BEGINNING.

SUBJECT TO AND TOGETHER WITH A 20 FOOT RIGHT OF WAY AS CREATED IN
THAT CERTAIN EASEMENT RELOCATION AGREEMENTS RECORDED DECEMBER
31, 1973 AS ENTRY NO. 244339 AND 244340 IN BOOK 368 AT PAGE NO'S 635 AND 643
OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER,
SAID RIGHT OF WAY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS 65.21 FEET SOUTH AND 51.59 FEET WEST OF
THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, SAID POINT ALSO BEING 12.0 FEET NORHTWEST OF THE
SOUTHEAST CORNER OF LOT 15, BLOCK 50, OF THE PARK CITY SURVEY AND
RUNNING THENCE NORTH 10°18'32" EAST 66.28 FEET, THENCE EAST 3.38 FEET,
THENCE NORTH 31°58'00" WEST 77.00 FEET, THENCE NORTH 19°54'00" EAST 66.80
FEET, THENCE CONTINUING NORTH 19°54'00" EAST 123.47 FEET, THENCE NORTH
70°06'00" WEST 20.00 FEET, THENCE SOUTH 19°54'00" WEST 200.00 FEET, THENCE
SOUTH 31°58'00" EAST 73.76 FEET, THENCE SOUTH 10°44'00" WEST 63.67 FEET,
THENCE SOUTH 81°17'00" EAST 20.23 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-F

PARCEL 2

BEGINNING AT A POINT 50 FEET, NORTH OF THE SOUTHEAST CORNER OF THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP
2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING
THENCE NORTH 43.97 FEET, THENCE NORTH 66°11' WEST 142.63 FEET, THENCE
SOUTH 31°58' EAST 119.75 FEET, THENCE EAST 67.1 FEET TO THE POINT OF
BEGINNING.

EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN EASY STREET
BRASSERIE REPLAT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED
MARCH 12, 2003 AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE
OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO. SA-400-A

PARCEL 3

BEGINNING AT A POINT 38.85 FEET WEST OF THE SOUTHEAST CORNER OF THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP
2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING
THENCE WEST 7.93 FEET, THENCE SOUTH 06°02' EAST 67.70 FEET, THENCE NORTH
81°17' WEST 27.0 FEET, THENCE NORTH 15°46'12" EAST 60.79 FEET, THENCE NORTH
32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51" EAST 18.50 FEET, THENCE
SOUTH 31°58' EAST 25.40 FEET, THENCE SOUTH 19°54' WEST 3.18 FEET, THENCE
SOUTH 31°54' EAST 77.00 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-406

PARCEL 4 AND 4A

LOTS 1 AND 2, EASY STREET BRASSERIE REPLAT SUBDIVISION, ACCORDING TO
THE OFFICIAL PLAT THEREOF RECORDED MARCH 12, 2003, AS ENTRY NO. 650840
IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE
SUMMIT COUNTY RECORDER.

TAX PARCEL NO.'S ESB-1, AND ESB-2

PARCEL 5

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, IN PARK CITY, SUMMIT COUNTY, UTAH BOUNDED AND
DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS WEST, A DISTANCE OF 35.90 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SAID SECTION 16, THENCE CONTINUING WEST A DISTANCE OF 2.95
FEET, THENCE NORTH 31°58' WEST A DISTANCE OF 77.00 FEET, THENCE NORTH
19°54' EAST A DISTANCE OF 3.18 FEET, THENCE SOUTH 31°58' EAST A DISTANCE OF
80.53 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO TOGETHER WITH THE FOLLOWING DESCRIBED PROPERTY:

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN IN PARK CITY, SUMMIT COUNTY UTAH, BONDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS NORTH A DISTANCE OF 93.97 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE NORTH 66°11' WEST A DISTANCE OF 65.29 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 8.32 FEET, THENCE SOUTH 66°46'30" EAST A DISTANCE OF 193.50 FEET, THENCE SOUTH 7°16' EAST A DISTANCE OF 12.03 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 4.32 FEET, THENCE NORTH A DISTANCE OF 8.23 FEET, THENCE WEST A DISTANCE OF 18.65 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 109.15 FEET MORE OR LESS TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-425-UPL

PARCEL 6

LOT 15, BLOCK 50, PARK CITY SURVEY, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN THE PARCELS 1-5 LISTED ABOVE.

TAX PARCEL NO. EXEMPT

## EXHIBIT B

### Senior Loan Documents

1.      Loan and Security Agreement by and between Easy Street Partners, LLC and WestLB AG, New York Branch;

2.      Promissory Note from Easy Street Partners, LLC to WestLB AG, New York Branch;

3       Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing;

4.      Environmental Indemnity Agreement by Easy Street Partners, LLC and CloudNine Resorts, LLC to and for the benefit for WestLB AG, New York Branch;

5.      Recourse Liability Agreement by CloudNine Resorts, LLC to and for the benefit of WestLB AG, New York Branch;

6.      Consent and Subordination of Management Agreement by and between Easy Street Partners, LLC, CloudNine Resorts/Sky Lodge, LLC and WestLB AG, New York Branch;

7.      Consent and Subordination of Development Agreement by and between Easy Street Partners, LLC, CloudNine Resorts/Sky Lodge Development, LLC and WestLB AG, New York Branch;

8.      Pledge and Security Agreement by Easy Street Partners, LLC to WestLB AG, New York Branch;

9.      Consent to Pledge and Security Agreement (General Contractor) by and between Jacobsen Construction Company, Inc. to WestLB AG, New York Branch;

10.     Consent to Pledge and Security Agreement (Architect) by and between Elliott Mahoney Architecture, LLC, dba Elliott Merous Architecture to WestLB AG, New York Branch;

11.     Consent to Pledge and Security Agreement (Listing Agent) by and between Extreme Holding, LLC and WestLB AG, New York Branch;

12.     Intercreditor Agreement by and between WestLB AG, New York Branch and BayNorth Realty Fund VI, Limited Partnership;

13.     UCC-1 Financing Statement (Deed of Trust) to be recorded with the Secretary of State of Utah;

14.     UCC-1 Financing Statement (Deed of Trust) to be recorded in Summit County, Utah;

15.     UCC-1 Financing Statement (Pledge and Security Agreement) to be recorded with the
Secretary of State of Utah.

# EXHIBIT C

## Mezzanine Loan Documents

1. Loan Agreement by and between Easy Street Mezzanine, LLC and BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

2. Promissory Note from Easy Street Mezzanine, LLC to BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

3. Pledge Agreement of Easy Street Holding, LLC in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

4. Completion Guaranty of David L. Wickline and William Shoaf in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

5. Guaranty and Non-Competition Agreement of David L. Wickline and William Shoaf in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

6. Environmental Indemnification Agreement by and among Easy Street Mezzanine, LLC, David L. Wickline and William Shoaf in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

7. Power of Attorney from Easy Street Mezzanine, LLC in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

8. Closing Certificate of Easy Street Mezzanine, LLC, David L. Wickline and William Shoaf in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

9. Assignment of Contracts and Other Rights and Third Party Consent from Easy Street Mezzanine, LLC and others to BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

10. Cash Management Agreement by and between Zions First National Bank, Easy Street Mezzanine, LLC and BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith

11. UCC-1 Financing Statements

and neither party shall have any obligation to the other party under this Agreement.

## ARTICLE VI
### BUYER'S PRE-CLOSING ACTIVITIES

6.1    Overview of the Project.  The Master Planned Development Approvals grant Cloud Nine Resorts the authority to construct on the Property a six-story hotel, which will contain twenty-two (22) residential units (each, a "Condominium Unit"), a spa, heated outdoor pool, approximately 3,500 square feet of meeting space, and an underground parking garage (the "Project").  The tentative name for the Project is "The Sky Lodge."  After the Closing, Cloud Nine Resorts intends to assign its rights to the Master Planned Development Approvals to Buyer. Buyer intends to complete the Project.  Buyer's projected cost for the completion of the Project, inclusive of the Purchase Price for the Property, is approximately Fifty Million Dollars ($50,000,000.00) (the "Project Costs").  To finance the Project, Buyer is in the process of obtaining senior debt of Thirty-Six Million Seven Hundred Seventy-Nine Thousand Two Hundred Twenty-Four Dollars ($36,779,224.00), mezzanine financing of Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000.00), and additional equity of approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Project Financing").

6.2    Creation of Shared Interests.  Buyer desires to construct the Project as a form of private residence club to be known as "The Sky Lodge – A Destination ResortClub" ("The Sky Lodge Club").  Buyer desires to sell fractional ownership interests in Condominium Units (each, a "Shared Interest"), which shall provide owners of a Shared Interest with a fractional 1/8th ownership of a specific residential Condominium Unit together with rights and benefits that will include the short term, periodic use of a two-, three-, or four-bedroom Condominium Unit in the Project.

6.3    "Pre-Sale" Reservations.  Upon the execution of this Agreement by the parties, Sellers shall permit Cloud Nine Resorts or Buyer, as the case may be, to begin a "pre-sales" reservations (the "Reservations") marketing program for the Shared Interests, subject to compliance with all legal requirements relating to the marketing of reservations, and Buyer obtaining firm, written commitments for the Project Financing on terms acceptable to Buyer in its sole discretion.  All funds accepted by Buyer as deposits for Reservations must be payable to and deposited into an escrow account established at a financial institution or title/escrow company.  Because the Reservations are between Cloud Nine Resorts and the reservation holder, and are non-binding agreements in which a reservation holder can obtain a return of his or its deposit on demand, neither Sellers nor the Property shall be subject to any claim, lien or other legal involvement which might result from such Reservations.  Sellers have been, or will be,

10                                                            1/3/2008

provided a copy of the form of Reservation Agreement. The parties acknowledge and agree that any Reservations (and corresponding deposits) accepted by Cloud Nine Resorts or Buyer, as the case may be, will be subject to Buyer's acquisition of the Property as contemplated by this Agreement, and that Buyer and its members other than UCL or its assignee (by joining in this Section of this Agreement, or by separate Agreement) will indemnify, defend and hold Sellers harmless from any costs, losses or liabilities arising in connection with such Reservations or marketing efforts. Sellers recognize the "pre-sale" effort is a condition precedent to Buyer obtaining the Project Financing due to the common practice of senior mortgage lenders and equity investors requiring that prior to the funding of a mortgage for this type of project a predetermined number of Reservations or "pre-sales" of the shared interests offered for sale must be placed under reservation.

6.4    No Representations by Sellers. Nothing contained in Sections 6.1 or 6.2 shall be interpreted as being a condition to any obligation of Buyer under this Agreement or as being a representation or warranty by Sellers as to the statements contained therein, or of creating any obligations on behalf of Sellers.

## ARTICLE VII
## REPRESENTATIONS, COVENANTS AND AGREEMENTS OF SELLER

7.1    Representations of Sellers. Sellers represent and warrant to Buyer the following as of the Effective Date and as of the Closing Date, except where specific reference is made to another date or dates, in which case such date or dates shall be applicable:

(a)    That Sellers have not granted to any third party any lease, license, or other right relating to the use or possession of any portion of the Property after the Closing Date, which is not known to Buyer, including the right of first refusal to purchase the Smith Trust Property, granted to the tenant under the Depot Building Lease (the "Depot First Refusal Right"), or is not specified in this Agreement, the Commitment or otherwise disclosed to Buyer in writing;

(b)    That Sellers have full power and proper authority to execute this Agreement and to perform all of its terms and conditions without violation of Sellers' governing documents or other contractual or legal obligations, and that all required actions necessary to authorize Sellers to enter into this Agreement and to carry out their obligations hereunder have been taken, or prior to Closing will be taken; and

(c)    That Sellers shall not, prior to any termination of this Agreement, enter into or execute any easement, encumbrance, lease, or other agreement with respect to the

11                                        1/3/2008

Property, other than as may be required under the Depot First Refusal Right, without Buyer's prior written consent; provided, however, that Seller shall provide Buyer the right to review and approve any agreement relating to the Depot First Refusal Right, which approval shall not be unreasonably withheld, conditioned or delayed.

7.2    Operation of Property.  From the Effective Date through the Closing Date, Sellers shall continue the Tenant Leases as long as the Tenants are in compliance with the terms and conditions thereof.

ARTICLE VIII
REPRESENTATIONS, COVENANTS, AND AGREEMENTS OF BUYER

Buyer represents and warrants to Sellers the following, as of the Effective Date and as of the Closing Date:

(a)    That Buyer has full power and proper authority to execute this Agreement and to perform all of its terms and conditions without violation of Buyer's governing documents or other contractual or legal obligations, and that all required actions necessary to authorize Buyer to enter into this Agreement and to carry out its obligations hereunder have been taken;

(b)    That Buyer has obtained firm written commitments for the Project Financing from WestLB AG and BayNorth Realty Fund VI, Limited Partnership for the senior debt and mezzanine financing (each, a "Loan Commitment").  Each Loan Commitment has an expiration date of March 31, 2006, which may be extended by the parties ("Loan Commitment Expiration Date").  Notwithstanding the foregoing, for the purposes of this Agreement, the Loan Commitment Expiration Date shall not be extended past March 31, 2006, without the prior written consent of Sellers.

ARTICLE IX
CLOSING

9.1    Date and Place of Closing.  The Closing hereunder shall take place in the offices of the Title Company, or such other location as Buyer and Sellers shall agree.  The Closing shall be consummated upon the earlier of (i) five (5) business days after Buyer's receipt of Final Plat Approval and Buyer's consummation or waiver of the other Buyer's Conditions Precedent and (ii) the Loan Commitment Expiration Date (the "Closing Date").

9.2    Items to be delivered at the Closing.

12

(a)     <u>Sellers</u>.  On or before the Closing Date, Sellers shall deliver to the Title Company each of the following items, together with instructions to deliver the same to Buyer at the Closing:

(i)     Provided that the Depot First Refusal Right is not exercised, Special Warranty Deed to the Smith Trust Property in a form reasonably acceptable to Buyer and the Title Company, duly executed and acknowledged by the Smith Trust, conveying fee simple title to the Smith Trust Property to Buyer, subject only to the Permitted Exceptions (the "Smith Trust Warranty Deed");

(ii)    Provided that the Depot First Refusal Right is not exercised, Bill of Sale in a form reasonably acceptable to Buyer, duly executed by the Smith Trust, transferring to Buyer free and clear title (except to the extent leased under the Depot Building Lease) to all of the Smith Trust Personal Property;

(iii)   Special Warranty Deed to the UCL Property in a form reasonably acceptable to Buyer and the Title Company, duly executed and acknowledged by UCL, conveying fee simple title to the UCL Property to Buyer, subject only to the Permitted Exceptions (the "UCL Warranty Deed");

(iv)    Bill of Sale in a form reasonably acceptable to Buyer, duly executed by UCL, transferring to Buyer free and clear title (except to the extent leased under the Easy Street Brasserie Building Lease) to all of the UCL Personal Property;

(v)     Assignments of Service Contracts, if any, in a form acceptable to Buyer, duly executed by each of Sellers;

(vi)    Consents to Assignment of Service Contracts, if required, executed by such third party service providers for Service Contracts approved by Buyer;

(vii)   Provided that the Depot First Refusal Right is not exercised, an Assignment of the Depot Building Lease in a form reasonably acceptable to Buyer, executed by the Smith Trust, transferring to Buyer all of the Smith Trust's right, title and interest in the Depot Building Lease;

(viii)  An Assignment of the Easy Street Brasserie Building Lease in a form reasonably acceptable to Buyer, executed by UCL, transferring to Buyer all of UCL's right, title and interest in the Easy Street Brasserie Building Lease;

13                                        1/3/2008

(ix)    I.R.C. §1445 Certifications in a form reasonably acceptable to Buyer executed and properly acknowledged by each of Sellers, as required by Internal Revenue Code Section 1445(b)(2) (each, a "Certification"). If each Seller does not furnish the Certification, Buyer may withhold (or may direct Title Company to withhold) from the cash funds payable to Sellers at the Closing an amount equal to that required by Internal Revenue Code Section 1445(a), and such withheld funds shall be deposited with the Internal Revenue Service as required by said Section 1445(a) and the regulations promulgated thereunder;

(x)    Written evidence that this Agreement and the transaction have been authorized and approved by all necessary action of each Seller;

(xi)    The LLC Operating Agreement executed by UCL or its assignee; and

(xii)    Internal Revenue Service Form 8883, if required.

(xiii)    All additional documents and instruments reasonably necessary to the consummation of the transaction according to the terms of this Agreement.

(b)    Buyer. On or before the Closing Date, Buyer shall deliver to the Title Company each of the following items:

(i)    Cashier's check or bank-to-bank wire transfer to the Title Company for delivery to Sellers of funds in the sum of Five Million Dollars ($5,000,000.00) for the UCL Property, and, unless the Depot First Refusal Right is exercised, Four Million Dollars ($4,000,000) for the Smith Trust Property, plus the amount of the Advances and the closing costs and prorations to be paid by Buyer, as provided below, less all prorations to be paid by Sellers;

(ii)    The LLC Operating Agreement executed by Buyer and the other members;

(iii)    Internal Revenue Service Form 8883, if required; and

(iv)    All additional documents and instruments reasonably necessary to the consummation of this transaction according to the terms of this Agreement.

9.3    Closing Prorations. Ad valorem and similar taxes and assessments relating to the Property shall be prorated between Sellers and Buyer as of midnight of the Closing Date, subject

14

1/3/2008

to the effect on such prorations of the requirement in the Tenant Leases that real property taxes are paid by the tenants under the Tenant Leases. If such taxes are based on estimates, as soon as the actual amount of taxes and assessments on the Property for the calendar year of the Closing is known, Sellers and Buyer shall adjust the amount of taxes and assessments to be paid by each party so that Sellers shall pay for those taxes and assessments attributable to the period of time prior to and including the Closing Date, and Buyer shall pay for those taxes and assessments attributable to the period of time commencing with the day after the Closing Date. All other rents, revenues and expenses of the Property shall also be prorated as of midnight of the Closing Date, subject to the effect on such prorations of the requirement in the Tenant Leases that certain expenses are paid by the tenants under the Tenant Leases. Buyer shall be entitled to receive all deposits, if any, made by tenants under the Tenant Leases. Buyer shall be entitled to receive all advance client deposits, if any, associated with the operation of the Easy Street Brasserie & Bar Boheme. The provisions of this Section shall survive the Closing.

9.4    <u>Closing Costs</u>. All escrow and closing fees charged by the Title Company shall be paid by Buyer. Buyer shall pay all recording fees. Buyer shall pay the premium for the Title Policy. Buyer and Sellers shall each pay for the cost of their own counsel and other advisors in connection with this transaction.

9.5    <u>Possession</u>. Buyer will be entitled to possession of the Property as of the Closing Date.

## ARTICLE X
## DEFAULTS AND REMEDIES

10.1    Sellers' Default; Buyer's Remedies.

(a)    <u>Sellers' Default</u>. Sellers shall be deemed to be in default hereunder upon the occurrence of any one or more of the following events:

(i)    Any of Sellers' warranties, representations or covenants set forth herein shall be or become untrue in any material respect at any time on or before the Closing Date and are not waived by Buyer;

(ii)    Sellers shall fail to meet, comply with, or perform any covenant, agreement, or other obligation on its part required within the time limits and in the manner required in this Agreement.

(b)    <u>Buyer's Remedies</u>. In the event Sellers shall be deemed to be in default

15                                                              1/3/2008

hereunder and so long as Buyer is not then in default hereunder, Buyer may, at Buyer's sole option, exercise either of the following remedies:

(i)    Terminate this Agreement by written notice to Sellers, in which event the parties shall be released of all duties, obligations, or liabilities to each other hereunder; or

(ii)    Obtain specific performance of this Agreement and recover all attorneys' fees and costs incurred in connection with an action for specific performance.

10.2    Buyer's Default; Sellers' Remedy.   In the event any of Buyer's warranties or representations set forth herein shall be untrue as of the Closing Date, or if all of Buyer's conditions precedent have been either satisfied or waived and Buyer shall fail to close on its purchase of the Property as set forth herein, and so long as Sellers are not then in default hereunder, Sellers, as their sole and exclusive remedies, shall have the right to terminate this Agreement by written notice to Buyer and the Title Company, and the parties shall have no further duties or obligations to each other hereunder; provided, however, that Buyer shall pay to Sellers all of Sellers' legal and accounting fees and costs incurred as a result of the transactions contemplated by this Agreement.

## ARTICLE XI
### BROKERAGE COMMISSION

Sellers and Buyer represent and warrant to each other that neither has contacted any real estate broker, finder, or other party in connection with this transaction, to whom any real estate brokerage, finder, or other fees may be due or payable with respect to the transaction contemplated hereby.  Sellers and Buyer hereby indemnify and agree to hold each other harmless from any loss, liability, damage, cost, or expenses (including reasonable attorney's fees) related to anyone claiming a commission or fee with respect to the sale of the Property as a result of any statement, agreement, or other alleged act of the other.

## ARTICLE XII
### MISCELLANEOUS

12.1    References.   All references to "Article", "articles", "section", or "Sections" contained herein are, unless specifically indicated otherwise, references to Articles and Sections of this Agreement.

12.2   _Exhibits._  All references to "Exhibits" contained herein are references to exhibits attached hereto, all of which are made a part hereof for all purposes.

12.3   _Captions._  The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

12.4   _Number and Gender of Words._  Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.

12.5   _Attorneys' Fees._  If any action is brought or counsel otherwise employed to enforce this Agreement or any provision thereof, to collect damages for an alleged breach thereof, or for a declaratory judgment there under, the prevailing party in such action or the party forced to take action that does not involve litigation shall be entitled to an allowance for reasonable attorneys' fees in addition to costs of suit.

12.6   _Notices._  All notices, demands, requests, and other communications required or permitted hereunder shall be in writing, and shall be personally delivered, mailed by certified or registered mail, postage prepaid, or sent by overnight courier service and addressed as follows:

| | |
|---|---|
| If to Buyer: | Easy Street Partners, LLC |
| | 4780 Winchester Court |
| | Park City, Utah 84098 |
| | Fax: (435) 604-6309 |
| | |
| If to Sellers: | Diane Jordan Smith Trust |
| | 684 Glenneyre Street |
| | Laguna Beach, California 92651 |
| | Fax: (949)494-8845 |
| | |
| | Utah Coal & Lumber, Inc. |
| | 684 Glenneyre Street |
| | Laguna Beach, California 92651 |
| | Fax: (949)494-8845 |

1/8/2008

If to Title Company:   Equity Title Insurance Agency, Inc.
1600 Snow Creek Drive, Suite E
Park City, Utah 84060
Attention:  Kim Parr
Fax No. (435) 658-4802

If mailed, such communications shall be deemed to be delivered, whether actually received or not, three (3) days after deposit in a regularly maintained receptacle for the United States mail.  If sent by overnight courier such communications shall be effective on the date actually delivered.  If sent by facsimile, such communications shall be effective upon receipt of written confirmation by the transmitting party of successful transmission.

12.7    Governing Law; Jurisdiction.  The laws of the State of Utah shall govern the validity, construction, enforcement, and interpretation of this Agreement, unless otherwise specified herein.  Any dispute arising under this Agreement shall be brought in federal or state courts situated in Summit County, Utah.

12.8    Entirety and Amendments.  This Agreement embodies the entire agreement between the parties and supersedes any prior agreements and understandings, if any, relating to the Property, and may be amended or supplemented only by an instrument in writing executed by both Sellers and Buyer.

12.9    Invalid Provisions.  If any provision of this Agreement, except the provisions relating to Sellers' obligation to convey the Property and Buyer's obligation to pay the Purchase Price, the invalidity of either of which shall cause this contract to be null and void, is held to be illegal, invalid, or unenforceable under this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

12.10    Multiple Counterparts.  This Agreement may be executed by facsimile and in a number of identical counterparts.  If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one agreement, but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.11    Parties Bound.  Neither party shall assign this Agreement or its rights and

1/3/2008

obligations under this Agreement to any third party without the express written consent of the other party, which will not be unreasonably withheld, conditioned or delayed in the event of an assignment to an affiliate of Buyer. This Agreement shall be binding upon and inure to the benefit of Sellers and Buyer, and their respective heirs, successors and permitted assigns.

12.12  Further Acts. The parties will perform such further acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby. Time is of the essence in the performance of the obligations of the respective parties under this Agreement.

12.13  Survival. All of the covenants, agreements, representations and warranties set forth in this Agreement survive the Closing, and do not merge into any deed, assignment or other instrument executed or delivered under this Agreement.

[SIGNATURE PAGE FOLLOWS IMMEDIATELY]

Dec 22 05 04:01p   D. Wickline                7078743880              p.1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BUYER:

EASY STREET PARTNERS, LLC

By: Alchemy Ventures Group, LLC
Its: Manager

By: _____
     David Wickline
Its: Manager

SELLERS:

By: _____
Diane Jordan Smith, Trustee of the Diane Jordan
Smith Trust u/a/d August 27, 1987

UTAH COAL & LUMBER, INC.

By: _____
Name: _____
Its: _____

20                                          12/22/2005

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BUYER:

EASY STREET PARTNERS, LLC

By: Alchemy Ventures Group, LLC
Its: Manager

By: _____

    David Wickline
Its: Manager

SELLERS:

By: _____
Diane Jordan Smith, Trustee of the Duane
Jordan Smith Trust u/a/d August 27, 1987

UTAH COAL & LUMBER, INC.

By: _____
Name: PHILO M. SMITH, JR
Its: PRESIDENT

Exhibit A
to
Purchase and Sale Agreement

**EXHIBIT E**

Written Consent of Easy Street Holding LLC

7

**Divider**

# CERTIFICATION OF DOCUMENTS
## AND
## INCUMBENCY CERTIFICATE
## OF
## EASY STREET PARTNERS, LLC

### March 30 , 2006

Easy Street Mezzanine LLC, a Delaware limited liability company (the "Manager"), being the sole member and the Manager of Easy Street Partners, LLC, a Utah limited liability company (the "Company") hereby certifies that the following attached documents of the Company and of Easy Street Holding, LLC are true, correct and complete copies of such documents:

| | |
|---|---|
| **Exhibit A:** | Amended and Restated Articles of Organization; |
| **Exhibit B:** | Amended and Restated Operating Agreement; |
| **Exhibit C:** | Certificate of Existence and Good Standing; |
| **Exhibit D:** | Three Written Consents of the Sole Member of Easy Street Partners, LLC; and |
| **Exhibit E:** | Written Consent of the Members of Easy Street Holding, LLC. |

INCUMBENCY:  AVG-SL, LLC, a Utah limited liability, the manager of Easy Street Holding, LLC, a Utah limited liability, the member and manager of Manager, does hereby acknowledge and certify that the individuals identified below have been duly appointed to act on behalf of the Company for the purposes set forth in the Written Consent of the Sole Member of Easy Street Partners, LLC attached hereto, and that the signatures that appear next to their names are their true and correct signatures:

| Name | Title | Specimen Signature |
|---|---|---|
| William Shoaf | Manager of AVG-SL, LLC | |
| David Wickline | Manager of AVG-SL, LLC | |

### (The remainder of this page is intentionally left blank.)

1

# CERTIFICATION OF DOCUMENTS
## AND
## INCUMBENCY CERTIFICATE
## OF
## EASY STREET PARTNERS, LLC

### March ____, 2006

Easy Street Mezzanine LLC, a Delaware limited liability company (the "Manager"), being the sole member and the Manager of Easy Street Partners, LLC, a Utah limited liability company (the "Company") hereby certifies that the following attached documents of the Company and of Easy Street Holding, LLC are true, correct and complete copies of such documents:

| | |
|---|---|
| **Exhibit A:** | Amended and Restated Articles of Organization; |
| **Exhibit B:** | Amended and Restated Operating Agreement; |
| **Exhibit C:** | Certificate of Existence and Good Standing; |
| **Exhibit D:** | Three Written Consents of the Sole Member of Easy Street Partners, LLC; and |
| **Exhibit E:** | Written Consent of the Members of Easy Street Holding, LLC. |

INCUMBENCY:  AVG-SL, LLC, a Utah limited liability, the manager of Easy Street Holding, LLC, a Utah limited liability, the member and manager of Manager, does hereby acknowledge and certify that the individuals identified below have been duly appointed to act on behalf of the Company for the purposes set forth in the Written Consent of the Sole Member of Easy Street Partners, LLC attached hereto, and that the signatures that appear next to their names are their true and correct signatures:

| Name | Title | Specimen Signature |
|---|---|---|
| William Shoaf | Manager of AVG-SL, LLC | _____ |
| David Wickline | Manager of AVG-SL, LLC | _____ |

**(The remainder of this page is intentionally left blank.)**

IN WITNESS WHEREOF, the Manager has executed this Certification of Documents and Incumbency Certificate on behalf of the Company as of the date first written above.

EASY STREET MEZZANINE LLC,
a Delaware limited liability company

By:    EASY STREET HOLDING LLC,
       a Utah limited liability company
Its:   Sole member

     By:    AVG-SL, LLC,
         a Utah limited liability company
     Its:   Manager

        By: _____
           William Shoaf
        Its: Manager

2