(iii)    The Borrower acknowledges that: (A) the Construction Consultant has been retained by the Administrative Agent to act as a consultant and only as a consultant to the Administrative Agent and the Lenders in connection with the construction of the Additional Improvements and has no duty to the Borrower; (B) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon the Lenders; (C) the Administrative Agent reserves the right to make any and all decisions required to be made by the Administrative Agent under this Agreement or the other Loan Documents and to give or refrain from giving any and all consents or approvals required to be given by the Administrative Agent under this Agreement or the other Loan Documents and to accept or not accept any matter or thing required to be accepted by the Administrative Agent under this Agreement or the other Loan Documents, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto; (D) the Administrative Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Administrative Agent or any other Person or party; and (E) the Administrative Agent reserves the right to replace the Construction Consultant with another inspecting engineer at any time and without prior notice to or approval by the Borrower.

(b)    Development Agreement.

(i)    The Borrower shall perform the Borrower's obligations under the Development Agreement;

(ii)    The Borrower shall enforce the Development Agreement in the best interests of the Project using sound business judgment;

(iii)    The Borrower shall give the Administrative Agent prompt notice and a copy of any notice of default, event of default, termination or cancellation sent or received by the Borrower;

(iv)    The Borrower shall promptly deliver to the Administrative Agent executed copies of any amendment or modification of the Development Agreement;

(v)    The Borrower shall not waive any of the material obligations of the Developer thereunder without the Administrative Agent's prior written consent; and

89

(vi)   The Borrower shall not take any action that would relieve the Developer from its material obligations under the Development Agreement without the Administrative Agent's prior written consent.

(c)   General Contractor's Agreement.

(i)   The Borrower shall perform the Borrower's obligations under the General Contractor's Agreement;

(ii)   The Borrower shall enforce the General Contractor's Agreement in the best interests of the Project using sound business judgment;

(iii)   The Borrower shall give the Administrative Agent prompt notice and a copy of any notice of default, event of default, termination or cancellation sent or received by the Borrower;

(iv)   The Borrower shall promptly deliver to the Administrative Agent executed copies of any amendment or modification of the General Contractor's Agreement;

(v)   The Borrower shall not waive any of the material obligations of the General Contractor thereunder without the Administrative Agent's prior written consent; and

(vi)   The Borrower shall not take any action that would relieve General Contractor from its material obligations to construct the Additional Improvements according to the Plans and Specifications without the Administrative Agent's prior written consent.

(d)   Architect's Contract.

(i)   The Borrower shall perform the Borrower's obligations under the Architect's Contract;

(ii)   The Borrower shall enforce the Architect's Contract in the best interest of the Project using sound business judgment;

(iii)   The Borrower shall give the Administrative Agent prompt notice and a copy of any notice of default, event of default, termination or cancellation sent or received by the Borrower;

(iv)   The Borrower shall promptly deliver to the Administrative Agent executed copies of any amendment or modification of the Architect's Contract;

(v)   The Borrower shall not waive any of the material obligations of the Architect thereunder without the Administrative Agent's prior written consent; and

90

(vi)   The Borrower shall not take any action that would relieve the Architect from its material obligations under the Architect's Contract without the Administrative Agent's prior written consent.

(c)   Construction Manager's Agreement.

(i)   The Borrower shall perform the Borrower's obligations under the Construction Manager's Agreement;

(ii)   The Borrower shall enforce the Construction Manager's Agreement in the best interests of the Project using sound business judgment;

(iii)   The Borrower shall give the Administrative Agent prompt notice and a copy of any notice of default, event of default, termination or cancellation sent or received by the Borrower;

(iv)   The Borrower shall promptly deliver to the Administrative Agent executed copies of any amendment or modification of the Construction Manager's Agreement;

(v)   The Borrower shall not waive any of the material obligations of the Construction Manager thereunder without the Administrative Agent's prior written consent; and

(vi)   The Borrower shall not take any action that would relieve Construction Manager from its material obligations to manage the construction of the Additional Improvements according to the Plans and Specifications without the Administrative Agent's prior written consent.

(f)   Total Project Costs and Expenses. The Borrower shall promptly pay when due (without duplication and subject to the Borrower's right to contest set forth in the following sentence): (i) all Project Costs; (ii) all Taxes imposed upon or assessed against the Property, or any part thereof, or upon the revenue, rents, issues, income and profits of the Property, or any part thereof, or arising in respect of the occupancy, use or possession thereof; and (iii) all utility fees and charges in connection with the Property, and to provide the Administrative Agent with receipted bills therefore if requested in writing by the Administrative Agent as soon as said receipted bills are available. The Borrower will have the right to contest the validity or application of any of the above costs by appropriate legal proceedings, so long as: (A) such legal proceedings shall be prosecuted with diligence by the Borrower and shall operate to prevent any taking or closing or shutting down of the Property or any portion thereof, by any Governmental Authority and has the effect of staying any type of sale or forfeiture of the Property or any part thereof for failure to comply; (B) the Borrower will have deposited with the Administrative Agent cash collateral, a bond or such other security satisfactory to the Administrative Agent in each case, on such terms as may be satisfactory to the Administrative Agent, in an amount as may be deemed necessary by the Administrative Agent (in its reasonable judgment), sufficient to pay any fines, penalties, charges and interest thereon which may be awarded or assessed and

91

which may become a charge or Lien upon the Property or which may in any way take parity with or priority over the Lien of the Security Instrument, and subject to increase at the request of the Administrative Agent when the Administrative Agent reasonably determines a greater amount may be required to make such payments; (C) such proceeding shall not subject the Administrative Agent, any Lender or the Borrower to the risk of any criminal liability; (D) the Borrower gives the Administrative Agent (y) frequent notice upon the commencement and during the continuation of any such proceeding of the status thereof and (z) confirmation on such periodic basis as the Administrative Agent may request in writing of the continuing satisfaction of the conditions set forth in clauses (A) through (C) of this Section 6.2(f); and (E) the Borrower, upon a final determination of such contest, takes all steps necessary to comply with any requirements arising therefrom. If the Borrower shall fail at any time to comply with the above conditions to contest or the Property or any part thereof is, in the reasonable judgment of the Administrative Agent, in any imminent danger of being forfeited or lost or the value of the Collateral being materially adversely impacted, the Administrative Agent may require the Borrower to, and the Borrower will, thereupon make the payment which is the subject of the contest.   Upon the occurrence of an Event of Default under the Loan Documents, the Administrative Agent may, at its option, credit all or any part of any cash, bond or other security then held by it to the indebtedness and other sums secured by the Security Instrument in such order as the Administrative Agent may elect.

(g)   Completion of Construction.   The Borrower shall (i) cause the commencement of construction of the Additional Improvements to occur no later than one hundred twenty (120) days after the Closing Date, (ii) diligently pursue construction of the Additional Improvements in a good and workmanlike manner, (iii) achieve Substantial Completion on or prior to the Completion Date, (iv) achieve Final Completion within ninety (90) days after Substantial Completion and (v) provide a copy of the Certificate of Occupancy for the Improvements to the Administrative Agent within five (5) days of its receipt by the Borrower, all substantially in accordance with the Plans and Specifications and in material compliance with all restrictions, covenants and easements affecting the Property, all Laws, and all Permits, and with all terms and conditions of the Loan Documents, free from any Liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.

(h)   Correction of Defects.   The Borrower shall promptly correct all defects in the Additional Improvements or any material departure from the Plans and Specifications not previously approved by the Administrative Agent to the extent required hereunder

(i)   Right of Administrative Agent to Inspect Property.   The Borrower shall permit the Administrative Agent, the Construction Consultant and their representatives and designees, to enter upon the Property, inspect the Additional Improvements and all materials to be used in the construction thereof (without unreasonably disturbing patrons or otherwise interfering with the operation of the Property) and to examine the Plans and Specifications which are or may be kept at the construction site at all reasonable times and with reasonable advance notice and will cooperate, and use reasonable efforts to cause the Major Contractors and the Major Subcontractors to cooperate with the Construction Consultant to enable it to perform its functions hereunder; during construction, to permit the Administrative Agent and each Lender at

92

.their sole cost (subject to the last sentence of this Section 6.2(i)) to maintain a customary sign or signs on the Property in a location clearly visible to the public or otherwise publicize the Administrative Agent's and each Lender's role as construction lender by reference to the Administrative Agent and the Lenders in the Borrower's signage on the Property.   The Administrative Agent shall coordinate the placement and maintenance of signs on the Property, in each Lender's standard form, and no Lender shall have any independent right to display any signs on the Property.   The content, layout and format of all such signs shall be subject to the Administrative Agent's sole and absolute approval.

(j)     Plans and Specifications; Change Orders.   The Borrower has caused the Architect to prepare proposed Plans and Specifications for the Additional Improvements and has submitted such proposed Plans and Specifications to the Administrative Agent and Construction Consultant for review.     After the Plans and Specifications have been Approved by the Administrative Agent, the Borrower may request changes to the Plans and Specifications or to the Project Budget (each, a *Change Order*) consisting of additions to, deletions from or other revisions in the work provided for in the Plans and Specifications or changes in the Project Costs shown in the Project Budget, as applicable (each as modified from time to time in accordance with this Section). All Change Orders:

(i)     shall be in writing, numbered in sequence, and signed by the applicable contractor or subcontractor, include a description of the changes and a certification by the General Contractor that it has reviewed the proposed Change Order and that the applicable Additional Improvements, if constructed in accordance with the Plans and Specifications (as modified by the proposed Change Order and any prior Change Orders), will comply with all Laws; provided, that the Administrative Agent, upon receipt of any such Change Order may, in its reasonable discretion, require the Borrower to obtain from each of the Architect and the Construction Consultant, its review, approval and certification (in the same manner as required above of the General Contractor) with respect to such Change Order;

(ii)     shall contain estimates by the Borrower (supported by corresponding estimates by the applicable contractor or subcontractor) of (A) any increase or decrease in the Total Project Costs that would be caused by the Change Order (or, if the Change Order involves changes both increasing and decreasing such costs, both the amount of the increase and the decrease shall be stated) and whether such Change Order would result in any item of Project Cost exceeding any line item set forth in the Project Budget and (B) the aggregate amount of changes in estimated costs to complete the Improvements, both increases and decreases, previously made; provided, that the Administrative Agent, upon receipt of any such Change Order may, in its reasonable discretion, require the Borrower to obtain from each of the Architect and the Construction Consultant, its review, approval and certification with respect to such Change Order;

84076228_9_084291_69909

(iii)   shall require the Administrative Agent's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed, if such Change Order increases the Total Project Costs by ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) or more individually or in the aggregate with previous Change Orders or would result in a Shortfall; and

(iv)   shall require the Administrative Agent's prior written approval if such Change Order materially modifies any design element, adversely affects any structural element or adversely affects the Project Schedule.

(k)   Bonds. From and after the date on which the Borrower shall enter into the General Contractor's Agreement, the Borrower shall furnish to the Administrative Agent and maintain such Performance Bonds with respect to the obligations of (i) the General Contractor under such General Contractor's Agreement and (ii) each Major Subcontractor, as applicable.

(l)   Notice of Commencement. The Borrower shall cause General Contractor to record a notice of commencement of the work with the county recorder for the county or counties where the work is located within 30 days after commencement of the work, which notice of commencement shall include the information required by Subsection (10) of Section 38-1-27, Utah Code Annotated, as a condition of Owner's having the right to assert a defense of failure to comply with the preliminary notice requirements of such section.

Section 6.3   Reporting Requirements. The Borrower covenants and agrees, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed:

(a)   Financial Reports. The Borrower shall cause to be prepared and delivered to the Administrative Agent and each of the Lenders, the following financial statements, each of which shall be accompanied by a certificate from the Borrower that such items being delivered are true, accurate and complete in all material respects and that each financial statement fairly presents the financial condition of each Loan Party (as applicable) as of the date thereof (except with respect to financial information provided by the Hotel Operator; provided, that (x) the Hotel Operator certifies as to the accuracy of such information and (y) the Borrower certifies that it has no knowledge of any inaccuracy, inconsistency or omission with respect to such information):

(i)   Monthly. Reasonably detailed monthly operating reports to the Administrative Agent, based on information available to the Borrower, that reflect operational results of the Hotel for each Accounting Month (as defined in the Hotel Management Agreement). The Borrower shall deliver each operating report to the Administrative Agent on or before the 20th day of the Accounting Month following the Accounting Month(or partial month) to which such operating report relates. The reports shall be in the format (which may be amended from time to time) of operating reports provided to the Borrower by the Hotel Operator pursuant to the Hotel Management Agreement, and include such

94

additional information as may reasonably be required by the Administrative Agent. At a minimum, monthly operating reports shall include: (i) a balance sheet including current month and prior year-end comparisons and differences in reasonable detail; (ii) an income and expense statement for the month in question and for the elapsed portion of the current Operating Year through the end of such month; (iii) a statement of net cash flow from operations in reasonable detail for such month and such elapsed portion of the current Operating Year; (iv) a statement of the amount of the Hotel Operator's Fee, Impositions (as defined in the Hotel Management Agreement) and any other amounts payable or expenses reimbursable to Hotel Operator; and (v) a schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion. Such reports also shall set forth variances that have occurred and that are anticipated between the applicable Operating Budget (both the initially approved Operating Budget and any amendment thereof) and actual results in a monthly variance report (along with the statement mentioned above).

(ii)    Annual.  By April 30 of each Operating Year, audited financial statements for the preceding Operating Year, consisting, at a minimum, of a balance sheet, a statement of earnings and a statement of cash flows. The annual financial statements shall contain a certificate of the Approved Accountant in favor of the Administrative Agent to the effect that, subject to any qualifications contained therein, the financial statements fairly present, in conformity with GAAP, the financial position, results of operations and cash flows of the Hotel for the Operating Year then ended.

(iii)    No Default Certificate.  A certificate from an officer of the Borrower acceptable to the Administrative Agent certifying whether an Event of Default has occurred and is continuing under the Loan Documents shall be delivered to the Administrative Agent no later than fifteen (15) days after the last day of each of the first three (3) calendar quarters occurring during any Loan Year and no later than fifteen (15) days after the end of each Loan Year.

(iv)    Debt Service Coverage Ratio.  From and after the first (1st) anniversary of the Opening Date, together with the monthly financial statements required by subsection (i) above, a certificate from an officer of the Borrower acceptable to the Administrative Agent certifying as to the Debt Service Coverage Ratio for the Test Period ending as of the end of the applicable month.

(b)    Business Plan.  On or before November 1 of each calendar year during the term hereof, the Borrower shall prepare and submit to the Administrative Agent, for the calendar year beginning on the next following January 1, a proposed overall business and management plan setting forth the overall strategic plan for managing, operating, financing, and otherwise dealing with the Property, and which shall include all information specified in Exhibit DD. When approved in writing by the Administrative Agent, which approval shall not be unreasonably withheld, conditioned or delayed, such plan and updates thereof shall be the

95

84076228_9_084291_69909

*Business Plan.* The Borrower shall be bound by, and the Borrower shall use all commercially reasonable efforts to implement and comply with, the Business Plan. Any material changes to or material deviations from the Business Plan by the Borrower shall require the prior written consent of the Administrative Agent, which approval shall not be unreasonably withheld, conditioned or delayed.

(c)     Unit Sales.  The Borrower shall furnish to the Lender on a weekly basis a summary of the sales and prospective sales of Fractional Ownership Units, similar to the format set forth in **Exhibit EE**, which summary shall include (i) a list of Fractional Ownership Units under contract or reservation, identifying the unit, purchase price, Purchaser, amount of Deposit and specified closing date, (ii) a log of the number of inquiries made in person, telephonically or via email or website about the purchase of Fractional Ownership Units, (iii) a list of prospective Purchasers and (iv) such other information as the Administrative Agent may reasonably request from time to time.

(d)     Hotel Operator Reports.  The Borrower shall furnish to the Administrative Agent all written reports given to or received by the Borrower from the Hotel Operator pursuant to the Hotel Management Agreement within five (5) days of the Borrower's receipts thereof. The Borrower shall from time to time, upon written request by the Administrative Agent, cause the Hotel Operator to provide the Administrative Agent with reports in regard to the management of the Property, in such form and detail as reasonably requested by the Administrative Agent.

(e)     Governmental Notices.  Borrower shall furnish to the Administrative Agent all written notices given to or received from Governmental Authorities by the Borrower or the Hotel Operator and all written reports on the status of any Default or Event of Default under any Loan Document or any matter which could reasonably be expected to result in a Material Adverse Effect, shall be delivered within three (3) days of the Borrower's receipt of such notice or report;

(f)     Developer's Reports.  The Borrower shall from time to time, upon written request by the Administrative Agent, cause the Developer to provide the Administrative Agent with reports in regard to the status of the design, development and construction of the Project, in such form and detail as reasonably requested by the Administrative Agent

(g)     General Contractor's Reports.  The Borrower shall from time to time, upon written request by the Administrative Agent, cause the General Contractor to provide the Administrative Agent with reports in regard to the status of construction of the Additional Improvements, in such form and detail as reasonably requested by the Administrative Agent.

(h)     Architect's Reports.  The Borrower shall from time to time, upon written request by the Administrative Agent cause the Architect to provide the Administrative Agent with reports in regard to the status of construction of the Additional Improvements, in such form and detail as reasonably requested by the Administrative Agent.

(i)     Construction Manager's Reports.  The Borrower shall from time to time, upon written request by Administrative Agent, cause the Construction Manager to provide the

Administrative Agent with reports in regard to the management of the construction of the Additional Improvements, in such form and detail as reasonably requested by the Administrative Agent.

(j) <u>Laborers, Subcontractors and Materialmen</u>. The Borrower shall notify the Administrative Agent immediately, and in writing, if it receives any default notice, notice of Lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialmen.

(k) <u>Ownership of Personalty</u>. The Borrower shall furnish to the Administrative Agent, if the Administrative Agent so requests, photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which the Borrower claims title to the materials, articles, fixtures and other Personal Property used or to be used in the construction or operation of the Improvements.

(l) <u>Other Reports</u>. The Borrower shall furnish such other reports and information (including, without limitation, bank statements) as the Administrative Agent shall reasonably require in writing which shall be delivered to the Administrative Agent as soon as practicable but in no event later than thirty (30) days after the Administrative Agent's request therefore.

Section 6.4 <u>Negative Covenants</u>. The Borrower covenants and agrees, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed that it shall not (directly or indirectly) do any of the following:

(a) <u>No Amendments to Material Agreements</u>. Amend or otherwise modify any Major Contract, the Plans and Specifications, the Project Budget (except as provided in Section 6.2(j)), the Architect Contract, the General Contractor's Agreement or any organizational document of the Borrower.

(b) <u>No Debt</u>. Incur any Debt, other than Permitted Indebtedness. No other Debt other than the Loan may be secured (senior, subordinate or *pari passu*) by the Property.

(c) <u>No Transfers or Encumbrances</u>.

(i) Permit any direct or indirect sale, conveyance, grant, lease, pledge, transfer, assignment or encumbering of the Property, or any equitable or beneficial interest therein, to any Person (including to Affiliates of the Borrower) other than (A) the pledges securing the Mezzanine Loan pursuant to the Mezzanine Loan Documents), (B) any transfer of the ownership interests in the Borrower to the Mezzanine Lender or its Affiliate upon an exercise of remedies by the Mezzanine Lender under the Mezzanine Loan Documents, to the extent permitted by, and subject to the terms and conditions of, the Intercreditor Agreement.

(ii) Create, incur, assume or permit to exist any Lien on the Property (including negative pledges) except for (A) mechanic and materialmen liens that

97

are adequately bonded or with respect to which the Title Company has provided the Administrative Agent with affirmative insurance and are less than FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) in the aggregate, and (B) the Permitted Exceptions.

(iii)    Cause or permit any direct or indirect sale, conveyance, transfer, assignment, encumbrance, pledge, hypothecation or granting of any ownership interest in or right to receive distributions from the Borrower or any Person that owns an ownership interest in Borrower or any other "upper-tier entity". The Borrower shall not merge or consolidate with or into any other firm or corporation or enter into any partnership or joint venture with any other Person.

(iv)    Subject the Property or any part thereof to any easement, restriction or covenant (including any restriction or exclusive use provision in any Lease or other occupancy agreement) other than the Condominium Declaration without the prior approval of the Administrative Agent which shall not be unreasonably withheld, conditioned or delayed.

(d)    No Distributions. Make any distribution or other disbursements (including direct or indirect redemptions of membership interests) to Borrower's Member, Affiliates or Persons owned by or related to Borrower's Member until the Loan has been repaid in full. Notwithstanding the immediately preceding sentence, (i) pursuant to Article 4, the Borrower may use certain funds described therein to pay Operating Expenses, interest on the Outstanding Principal and the Amortization Amount, (ii) after the first anniversary of the Opening Date, the Borrower shall be permitted to make distributions of Net Operating Income (after payment of all Interest payable on the Outstanding Principal and all payable Amortization Amounts) so long as (a) no Default or Event of Default has occurred and is continuing, (b) all reserves required to be funded pursuant to any Loan Document have been funded prior to any distribution, and (c) the Debt Service Coverage Ratio for the Property for the applicable Reporting Period shall, both before and after giving effect to any distribution of Net Operating Income be at least equal to the Hurdle DSCR.

(e)    Limits on Guaranties. Guarantee any Obligation of any Person to any other Person other than the Administrative Agent and the Lenders, except for guaranties in favor of Persons providing construction or architectural or other services in connection with the construction and operation of the Additional Improvements and under other agreements approved by the Administrative Agent.

(f)    No Litigation. Initiate or participate in, without the written consent of the Administrative Agent, any material litigation, proceedings or investigations which (A) contest the consummation of the contemplated transaction or (B) could reasonably be expected to result in a Material Adverse Effect.

(g)    Leases. Without the prior written consent of Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed), in each instance, enter into, amend, modify, cancel or terminate or accept a surrender of any Lease.

98

(h)     Hotel Management Agreement.  Terminate, cancel, modify or amend the Hotel Management Agreement without the Administrative Agent's prior written approval, which may be granted or denied in the Administrative Agent's sole discretion.

Section 6.5    Single Purpose Entity.  The Borrower covenants and agrees, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed that it:

(a)     has not and shall not amend, modify or otherwise change, or permit any other party to amend, modify or otherwise change the Borrower's certificate of formation, operating agreement or other formation agreement or documents without the Administrative Agent's written consent;

(b)     has not and shall not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of, any Person;

(c)     has not and shall not guarantee or pledge its assets for the benefit of, or otherwise become liable on or in connection with, any Obligation of any other Person; provided, that the Borrower may establish an unsecured line of credit in the amount of $250,000.00 for use by the Hotel Operator in accordance with the terms of the Hotel Management Agreement;

(d)     has not and shall not own any asset other than (i) the Property, and (ii) incidental personal and intangible property necessary for the development or operation of the Property;

(e)     has not and shall not engage, directly or indirectly, in any business other than the acquisition, ownership, management, leasing, disposition, construction, renovation and operation of the Property as the Hotel;

(f)     except for the Hotel Management Agreement and the Development Agreement, has not and shall not enter into any contract or agreement with Borrower's Member or any Affiliate of the Borrower or Borrower's Member without the Administrative Agent's written consent;

(g)     has not and shall not make any loans or advances to any third party (including any Affiliate) other than trade debt incurred in the ordinary course of business;

(h)     has been, is and will be Solvent and able to pay its Debts from its assets as the same shall become due;

(i)     has and will conduct and operate its business as presently conducted and as is required by the terms of the Loan Documents;

(j)     has and will maintain financial statements, books and records and bank accounts separate from those of its Affiliates, including Borrower's Member;

99

(k)   has been, is and will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or of Borrower's Member);

(l)   has and will file any required tax returns;

(m)   has and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(n)   has not and will not seek the dissolution or winding up, in whole or in part, of the Borrower;

(o)   has not and will not commingle its funds and other assets with those of any Affiliate of Borrower or Borrower's Member or any other Person;

(p)   has and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate of Borrower or Borrower's Member or any other Person;

(q)   has not, does not and will not hold itself out to be responsible for the debts or obligations of any other Person;

(r)   has not and will not do any act which would make it impossible to carry on its ordinary business;

(s)   has not and will not possess or assign the Property or incidental personal property necessary for the operation of the Property for other than a business or company purpose;

(t)   has not and will not sell, encumber or otherwise dispose of all or any portion of the Property or incidental personal property necessary for the operation of the Property;

(u)   has not and will not hold title to its assets other than in its name; and

(v)   has not and will not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or a substantial part of the Borrower's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action.

## ARTICLE 7

## FRACTIONAL OWNERSHIP UNITS

100

Section 7.1    <u>Fractional Ownership Conversion Requirements</u>. The Borrower shall, within 30 days after the Closing Date, submit the Property to the provisions of the Condominium Act and the Timeshare Act by recording the Condominium Declaration and the final Condominium Plat meeting the requirements of applicable Law, the Condominium Documents and each Purchase Agreement, in the public records of Summit County, Utah, and satisfy all of the requirements thereof and of any other applicable Law or restriction necessary to create a valid condominium regime, provided that the form and substance of the Condominium Documents including the unit designations, descriptions, floor plans, sale prices and proposed form of Purchase Agreement for the Fractional Ownership Units, as well as the description of common elements and breakdown of common interests appurtenant to each Fractional Ownership Unit, shall be subject to the written Approval of the Administrative Agent and its counsel prior to the recordation of the Condominium Declaration and Condominium Plat in the public records of Summit County, Utah, such approval not to be unreasonably withheld. The Borrower shall, upon its receipt of same, deliver to the Administrative Agent a certified copy of the recorded Condominium Declaration and Condominium Plat. The Borrower shall not cause or permit any amendment, modification, supplement, waiver or termination of any Condominium Document or Fractional Ownership Document without the prior written approval of the Agent. Notwithstanding the preceding sentence, Borrower may make modifications to the Condominium Documents or Fractional Ownership Documents without the Administrative Agent's approval, provided that such modifications, individually and in the aggregate (i) are reasonable and nonmaterial and (ii) do not violate the Condominium Act or Timeshare Act or trigger any rescission rights of any Purchaser under applicable Law or any Purchase Agreement. The Borrower shall provide the Administrative Agent with copies of all such modifications within 10 Business Days of their execution. The Borrower shall not abandon or change its plan for submission of the Property to a condominium regime and shared interest form of ownership. Neither the Administrative Agent nor any Lender shall be required to join in any Condominium Documents or Fractional Ownership Documents, except to the extent required by applicable Law. The Borrower shall within 10 Business Days from receipt of the same, furnish to the Administrative Agent copies of all financials, reports, statements, information, reporting disclosures, budgets and other documents received under or pursuant to any of the Condominium Documents, Fractional Ownership Documents or Law, including the Condominium Act or Timeshare Act, including financial information relating to any Condominium Association or membership club. The Borrower shall pay all assessments for common charges and expenses and all real estate taxes and assessments and insurance premiums made against or relating to the portion of the Property then owned by Borrower as required by the Condominium Documents, whether pursuant to such Condominium Declaration, any by-laws of the Condominium adopted in connection therewith or otherwise, as the same shall become due and payable. The Borrower shall (1) comply in all material respects with all of the terms, covenants and conditions on such party's part to be complied with pursuant to such Condominium Declaration, by-laws of the condominium, any rules and regulations that may be adopted for the Condominium or any other Condominium Document, as the same shall be in force and effect from time to time (including, without limitation, all obligations of developers or sponsors under the Condominium Documents or Condominium Act), (2) promptly notify the Administrative Agent of all matters of which it has received written notice that a default by the Borrower under, or noncompliance with, any of the Condominium Documents or Fractional Ownership Documents exists, and shall do all such

101

acts and undertake all reasonable steps and institute all such proceedings as shall be reasonably necessary to cure or avert such default and shall forward to the Administrative Agent any notices it receives in regard to any of the foregoing matters within five days after receiving the same and (3) not, without the prior written consent of the Administrative Agent, exercise any right it may have to vote for or permit its representatives on the board of directors or other governing board for the Condominium Association to vote or take any action whatsoever respecting: (A) the nature and amount of any insurance covering all or a part of the Improvements and the disposition of any proceeds thereof in a manner contrary to the provisions of the Condominium Documents; the manner in which any condemnation or threat of condemnation of all or a part of the Property shall be defended or settled and the disposition of any award or settlement in connection therewith in a manner contrary to the provisions of the Condominium Documents, (B) any election to repair or restore the Improvements (excepting minor or ordinary repair or restoration), (C) any additions or improvements to the common elements of the Condominium in a manner contrary to the provisions of the Condominium Documents, (D) any partition of all or a part of the property subject to the Condominium Declaration, (E) the construction of any additions or improvements to the Property or any repair, rebuilding or restoration of all or a portion of the Property requiring an expenditure of more than $50,000, (F) the payment of any amount in excess of insurance or condemnation proceeds available in connection therewith in a manner contrary to the provisions of the Condominium Documents, (G) the assessment of any expenses contrary to the provisions of the Condominium Documents, (H) the acquisition of any interest pursuant to any purchase option or right of first refusal or offer in the applicable Condominium Documents, (I) any removal of all or any portion of the Property from the provisions of the Condominium Documents and (J) all questions relating to the amount of payment of common charges thereunder.

Section 7.2    <u>Fractional Ownership Units Marketing and Conversion</u>.    The Borrower shall on or before April 30, 2006, take all actions as shall be required under applicable Law or the terms of the Fractional Ownership Documents to (i) establish the hotel condominium units as "timeshare estates" under applicable Law (the *Fractional Ownership Units*) and (ii) permit the Borrower to enter into valid and binding Purchase Agreements with respect to the Fractional Ownership Units.

Section 7.3    <u>Sale of Units</u>.    The Borrower shall use commercially reasonable efforts to market and sell the Fractional Ownership Units or fractional interests therein in accordance with the terms of this Agreement, the Condominium Declaration and the other Fractional Ownership Documents. As soon as is practicable after the Closing Date, the Borrower shall use all reasonable efforts to convert all existing Reservations to Bona Fide Sales Contracts.

(a)    The Borrower shall comply in all material respects with all applicable Laws and the provisions of the Fractional Ownership Documents in connection with the offering and sale of Fractional Ownership Units.

(b)    Without the prior written consent of the Administrative Agent, the Borrower shall not, directly or indirectly:

102

(i)      enter into any Purchase Agreement with respect to any Fractional Ownership Unit unless (A) such purchase and sale agreement is a Bona Fide Sales Contract, (B) the sale price is greater than or equal to the Minimum Purchase Price, (C) the sale price is payable in full by bank or certified check or wire transfer at closing, (D) such Bona Fide Sales Contract shall require the purchaser to deposit with the Escrow Agent at contract execution, an Earnest Money Deposit in cash in an amount equal to not less than ten percent (10%) of the purchase price and shall provide that such amounts may be retained by the Borrower as liquidated damages upon default by the purchaser of its purchase obligation under such Bona Fide Sales Contract and (E) such Bona Fide Sales Contract shall be subject to no conditions upon the purchaser's obligation thereunder (other than financing contingencies, customary title conditions and rights of rescission required by Law and other matters contained in the Bona Fide Sales Contract form Approved by the Administrative Agent);

(ii)      amend, modify or supplement any Bona Fide Sales Contract in any material manner not permitted pursuant to clause (i) above, or terminate any Bona Fide Sales Contract (except for default on the part of a purchaser thereto, provided such termination does not have a material negative economic impact on the Hotel and Fractional Ownership Units taken together, or except as otherwise required by Law, but in either event with prompt notice to the Administrative Agent), or permit any of the foregoing actions to be taken; or

(iii)      release any deposit under any Bona Fide Sales Contract, except in each case, in accordance with the terms of such Bona Fide Sales Contract and this Agreement.

(c)      If the purchaser under any Bona Fide Sales Contract shall default in performance of its obligations thereunder and the Borrower shall retain the deposit thereunder as liquidated damages, the Borrower shall give prompt notice to the Administrative Agent of such retention and shall prepay the Outstanding Principal in an amount equal to such deposit (net of reasonable collection expenses).

(d)      The Borrower shall, in addition to the insurance required elsewhere in this Agreement, comply with any additional insurance requirements of the Borrower contained in the Fractional Ownership Units Documents. The Borrower shall cause the Fractional Ownership Units owners association created by the Fractional Ownership Documents to furnish to the Administrative Agent, at no cost or expense to the Administrative Agent, a blanket fire insurance policy with extended coverage naming the Administrative Agents and said association, as their respective interests may appear, as the insureds, covering all of the Improvements relating to the Fractional Ownership Units (other than foundations); said fire insurance shall at all times be in an amount equal to 100% of the insurable value of the Improvements relating to the Fractional Ownership Units (other than foundations) and shall otherwise comply with the applicable conditions contained herein and the other Loan Documents.

103

Section 7.4    Release of Fractional Ownership Units. (a) Provided    that    no Event of Default shall have occurred and be continuing, the Administrative Agent shall release the Lien of the Security Instrument with respect to one or more Fractional Ownership Units (which may be a fractional interest in the event the Fractional Ownership Unit being sold by the Borrower is a fractional interest, it being understood that in the event a fractional interest is being sold, the remaining fractional interests would continue to be subject to such Lien) and deliver to the Borrower duly executed release(s) or reconveyance(s) in recordable form, a UCC-3 release of security interest and other such documents as may be reasonably required to release with respect to the Fractional Ownership Unit(s) and the Fractional Ownership Units' interest in the common elements from the Lien of the Security Documents upon satisfaction of each of the following conditions:

(i)    the Borrower shall have fully complied with the provisions of this Article 7;

(ii)    the Administrative Agent shall have received a copy of an executed Bona Fide Sales Contract with reference to the Fractional Ownership Unit to be released ;

(iii)    the Administrative Agent shall have received not less than three (3) Business Days prior written notice of the proposed release or assignment;

(iv)    contemporaneously with such release or assignment there shall be a sale of such Fractional Ownership Unit pursuant to an approved form of Bona Fide Sales Contract and for a purchase price not less than the Minimum Purchase Price;

(v)    the Fractional Ownership Unit to be released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Property encumbered by the Lien of the Security Instrument;

(vi)    neither the release or assignment from the Lien of the Security Instrument nor the conveyance to the transferee of such Fractional Ownership Unit will violate any applicable zoning or subdivision laws;

(vii)    the Administrative Agent shall have received confirmation of payment by wire transfer of immediately available funds into the Sales Proceeds Account an amount equal to the Required Release Payment for such Fractional Ownership Unit; and

(viii) the Administrative Agent shall have received such other documents, certificates, instruments, opinions or assurances as the Administrative Agent may reasonably request.

(b)    Amounts received by the Administrative Agent under this Section 7.4, including Required Release Payments, shall be applied in accordance with Section 2.10(b).

84076228_9_084291_69909

Section 7.5    Purchaser Deposits.  (a)  As Deposits paid by Purchasers under the Purchase Agreements are made in connection with the execution of Purchase Agreements or additional Deposits are made by the Fractional Ownership Unit Purchasers from time to time, the Borrower shall cause such sums (other than the Construction Contingency Escrow) to be deposited with the Title Company or a title company reasonably acceptable to the Administrative Agent, who is the escrow agent holding the Deposits (the *Escrow Agent*), and shall cause the Escrow Agent to hold the Deposits in an account(s) (the *Deposit Escrow Account*) in escrow pursuant to the terms of the applicable Purchase Agreements and in accordance with the terms of the Fractional Ownership Documents and applicable Law, as escrow agent in accordance with the escrow agreements (which shall be subject to the Administrative Agent's prior review and approval) entered into by the Borrower and the Escrow Agent.  The Deposit Escrow Account shall bear interest at a passbook rate if and to the extent required by the applicable Purchase Agreements or applicable Law.   The Borrower shall instruct and shall use commercially reasonable efforts to cause Escrow Agent to deliver to the Administrative Agent within seven (7) days of the end of each calendar month a statement indicating the amount of funds on deposit representing the Deposits, together with information on the date of deposit, and to which Fractional Ownership Unit each such Deposit applies. The Borrower shall not modify or amend the provisions of the Purchase Agreements relating to the Deposits without the prior written consent of the Administrative Agent, which consent the Administrative Agent may grant or withhold in its sole discretion. The Borrower shall not accept any non-cash Deposits.

(b)    Without limiting the security interest in the Deposit Escrow Account granted pursuant to the other Loan Documents, to the extent permitted under applicable Law, the Borrower hereby grants to the Administrative Agent a security interest in the Borrower's interest in all Deposits, subject to the rights of Purchasers under the Purchase Agreements, the Condominium Documents and applicable Law. Upon request of the Administrative Agent, the Borrower shall provide the Agent with all documents necessary to perfect any such permitted security interest.

(c)    To the extent permitted by applicable Law, the terms of the applicable Purchase Agreements and the Fractional Ownership Documents, the Borrower shall be permitted to use Deposits paid under Purchase Agreements (other than the Construction Contingency Escrow, which will be governed by **Section 2.17**) to pay Construction Costs in accordance with the Approved Project Budget, provided that no Default or Event of Default shall have occurred and be continuing.  To the extent Construction Costs are paid from Deposits, the Lenders' obligation to make Advances of the remaining portion of the Loan Amount will be correspondingly reduced by the aggregate amount of Deposits utilized by the Borrower to pay Construction Costs.

(d)    Except as otherwise provided in this Section 7.5, Deposits shall be segregated from other funds and shall be held, applied or returned, as applicable, in accordance with the terms of the respective Purchase Agreement and applicable Law.  To the extent the Borrower becomes entitled to retain any Deposits that have not been previously applied in accordance herewith (*i.e.* upon the forfeiture of any deposit by a Purchaser), such amounts shall be paid to the Administrative Agent and applied to reduce the Outstanding Principal in accordance with Section 2.10(b).  To the extent that a Purchaser becomes entitled to return of its

84076228_9_084291_69909

105

Deposit under its Purchase Agreement or under applicable Law, so long as no Event of Default exists, the Borrower shall be entitled to notify the Escrow Agent, with a copy of such notice to be simultaneously sent to the Administrative Agent. The Escrow Agent may not be changed without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld. Notwithstanding the foregoing, the Administrative Agent hereby acknowledges and agrees that the Borrower's rights to the Deposits are subject to the requirements of applicable Laws, the rights of the Purchasers to such deposits as set forth in the Purchase Agreements and the escrow agreements with the Borrower, and that the Escrow Agent may be obligated to return the Deposits to such purchasers when and as so required even if an Event of Default exists.

Section 7.6    Additional Condominium Specific Covenants. The Borrower covenants and agrees as follows:

(a)    The Borrower shall not amend or permit the board of directors of any of the owners' associations, to the extent within the Borrower's control, to amend any of the Fractional Ownership Documents in any material respect without the Administrative Agent's prior written consent, except as may be required by a Governmental Authority, or as may be required to cause the Fractional Ownership Documents to comply with applicable Laws.

(b)    Any time the Borrower or the board of directors for any of the owners' associations has the right to act under or has consent rights under the Fractional Ownership Documents or applicable Law, the Borrower shall not take or permit any such action to be taken or consent to be given without first obtaining the consent of the Administrative Agent to the extent such action or consent is material or could have a material adverse affect on the value of the Fractional Ownership Units or the Hotel or the Borrower's ability to perform its obligations under the Loan Documents or the Administrative Agent's security interests thereunder.

(c)    The Borrower shall, or shall cause the board of directors for such owners' associations, to the extent within its reasonable control, to promptly report to the Administrative Agent:

(i)    any sixty (60) day delinquency in the payment of assessments due from the Borrower, or in any other obligation of the Borrower as a "unit owner" under the Fractional Ownership Documents,

(ii)    any material damage to the Fractional Ownership Units or any Fractional Ownership Unit owned by the Borrower therein, and of any condemnation or similar proceeding which may affect the Administrative Agent,

(iii)    any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained with respect to the Fractional Ownership Units, and

(iv)    any proposed action that requires the consent of the owners of the Fractional Ownership Units.

106

(d)     To the extent within the Borrower's control, the Administrative Agent shall be entitled to attend meetings of the owners' associations and shall have the right to speak thereat, and the Borrower or each of the owners' associations shall provide the Administrative Agent with reasonable prior written notice (but in any case not less than seven (7) days prior thereto) of any and all meetings of such association.

(e)     The annual budgets for each of the owners' associations and any material changes thereto, to the extent within the Borrower's control, shall not be adopted without the Administrative Agent's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(f)     The Borrower shall, to the extent within the Borrower's control, cause the owners' associations to deliver to the Administrative Agent within ten (10) days after the Administrative Agent's request an estoppel from such association in form and substance reasonably acceptable to the Administrative Agent, confirming among other things, that there are no unpaid assessments currently due and payable and that the Borrower is not in default of any of its obligations under the respective Fractional Ownership Documents or to such association.

(g)     Without having first received the Administrative Agent's prior written consent, which may be granted or denied in the Administrative Agent's sole discretion, the Borrower shall not and, to the extent within the Borrower's control, shall not permit any of the following to occur:

(i)     By act or omission, seek to abandon or terminate any of the Fractional Ownership Documents;

(ii)     Change the allocation of expenses or obligations between the Fractional Ownership Units and the Hotel, or change the allocation of interests between the Fractional Ownership Units and the Hotel with respect to distributions of hazard insurance proceeds or condemnation awards;

(iii)     Further partition or subdivide the Fractional Ownership Units or the Hotel or by act or omission, seek to abandon, partition, subdivide, encumber, sell or transfer the common elements;

(iv)     Change the number of Fractional Ownership Units or change, modify, relocate or further subdivide the boundaries of the Fractional Ownership Units, or designate any of the foregoing as a common element; or

(v)     Use hazard insurance proceeds for losses to any property of the Fractional Ownership Units (whether to Fractional Ownership Units or to common elements) for other than the repair, replacement or reconstruction of such property, or as may be required by applicable Laws or the applicable Fractional Ownership Documents, except as otherwise permitted herein or in any of the other Loan Documents.

107

## ARTICLE 8

## ADMINISTRATIVE AGENT

Section 8.1   Authorization and Action.   WestLB AG, a German banking corporation acting through its New York branch is hereby appointed Administrative Agent under this Agreement and the other Loan Documents and each Lender hereby authorizes the Administrative Agent to act as its agent in accordance with the terms of this Agreement and the other Loan Documents. The Administrative Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. Subject to the express terms of this Agreement, each Lender irrevocably authorizes the Administrative Agent to take such action on such Lender's behalf and to exercise such powers hereunder and under the Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.   The Administrative Agent has only those duties and responsibilities that are expressly specified in this Agreement and the other Loan Documents and it may perform such duties by or through its agents or employees. The Administrative Agent shall not have, by reason of this Agreement or any of the other Loan Documents, a fiduciary relationship in respect of any Lender; and nothing in this Agreement or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any of the other Loan Documents except as expressly set forth herein or therein. To the extent that the consent of the Lenders, or any of them, is not expressly required pursuant to this Agreement, then the Administrative Agent shall be permitted to take such actions as it deems necessary or appropriate to fulfill it duties under this Agreement and the other Loan Documents.   The Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or any Law. The provisions of this Article 8 are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party or any other Person shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement and the other Loan Documents, the Administrative Agent shall act solely as an agent of the Lenders and the Administrative Agent does not assume and shall not be deemed to have assumed any Obligation towards or relationship of agency or trust with or for the Borrower or any other Loan Party.

Section 8.2   Administrative Agent's Reliance, Etc.   Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.   Without limitation of the generality of the foregoing, the Administrative Agent: (a) may treat the Lender signatory to this Agreement as the holder of such Lender's Ratable Share of the Loan until the Administrative Agent receives and accepts an Assignment and Acceptance entered into by such Lender, as assignor, and an Eligible Assignee, as assignee, as provided in Section 11.5(b); (b) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to

84076228_9_084291_69909

any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or to inspect the Property (including the books and records) of any Loan Party; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any Lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability to any Lender under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, facsimile or telex) believed by it to be genuine and signed or sent by the proper party or parties.

Section 8.3   WestLB AG and Affiliates.   In respect of the Advance made by WestLB AG, New York Branch, and the Note issued to it, WestLB AG, New York Branch shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not the Administrative Agent. The terms "Lender" and "Lenders" shall, unless otherwise expressly indicated, include WestLB AG, New York Branch, in its individual capacity. WestLB AG, New York Branch and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, Borrower's Member, any Affiliate of the Borrower or of Borrower's Member, and any Person that may do business with or own securities of any such Person, all as if WestLB AG, New York Branch were not the Administrative Agent, and without any duty to account therefor to the Lenders.

Section 8.4   Lender Credit Decision.   Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on the financial statements referred to in Section 6.3(a) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

Section 8.5   Indemnification of Administrative Agent.   (a)   Each Lender severally agrees to indemnify the Administrative Agent (to the extent not promptly reimbursed by Borrower) from and against such Lender's Ratable Share of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted against such the Administrative Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such the Administrative Agent under the Loan Documents (collectively, the *Indemnified Costs*); provided, that no Lender shall be liable for any portion of such Indemnified Costs resulting from the Administrative Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its Ratable Share of any costs and expenses (including, without limitation, fees and expenses of counsel)

84076228_9_084291_69909

payable by Borrower under Section 6.1(l), to the extent that the Administrative Agent is not promptly reimbursed for such costs and expenses by the Borrower.

(b)     In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 8.5 applies whether any such investigation, litigation or proceeding is brought by the Administrative Agent, any Lender, any other Lender or a third party. The failure of any Lender to reimburse the Administrative Agent promptly upon demand for its Ratable Share of any amount required to be paid by the Lenders to the Administrative Agent as provided herein shall not relieve any other Lender of its Obligation hereunder to reimburse the Administrative Agent for its Ratable Share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's Ratable Share of such amount.

(c)     Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 8.5 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 8.6     Successor Administrative Agents.  The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Requisite Lenders shall have the right to appoint a successor Administrative Agent. . If no successor Administrative Agent shall have been so appointed by the Requisite Lenders and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation, the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least ONE HUNDRED MILLION AND 00/100 DOLLARS ($100,000,000.00). Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Loan Documents, if any, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Loan Documents, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents arising and accruing thereafter.  In no event shall any replacement Administrative Agent or any successor Administrative Agent result in any increased or additional cost or expense to the Borrower.  If within forty-five (45) days after written notice is given of the retiring Administrative Agent's resignation under this Section no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such forty-fifth (45th) day:  (i) the retiring Administrative Agent's resignation shall become effective; (ii) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under this Agreement and all other Loan Documents; and (iii) the Requisite Lenders shall thereafter perform all duties of the retiring Administrative Agent under this Agreement and all other Loan Documents until such time, if any, as the Requisite Lenders appoint a successor Administrative Agent as provided above.  After any

84076228_9_084291_69909

retiring Administrative Agent's resignation hereunder as Administrative Agent shall become effective, the provisions of this Article 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

Section 8.7    Collateral Documents; Secured Party Action.  (a)  Each Lender hereby further authorizes the Administrative Agent to enter into the Loan Documents as secured party on behalf of and for the benefit of the Lenders and agrees to be bound by the terms of the Loan Documents; provided that anything in this Agreement or the other Loan Documents to the contrary notwithstanding:

(i)    The Administrative Agent is authorized on behalf of all Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain a perfected security interest in, and Liens upon, the Property granted pursuant to the Loan Documents.

(ii)    Each Lender irrevocably authorizes the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral:  (A) upon payment in full of the Loan and all other Obligations payable under this Agreement and under any other Loan Document; (B) which is sold or to be sold or disposed of as part of or in connection with any disposition permitted under this Agreement, so long as the Borrower is entitled to be granted such a release pursuant to this Agreement; or (C) consisting of a guaranty or an instrument evidencing debt so long as the obligations under such guaranty or such debt evidenced by such instrument has been satisfied or paid in full.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 8.7.

(b)    Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Lender shall have any right individually to realize upon any of the Collateral under the Loan Documents or make demand thereunder (including without limitation through the exercise of a right of set-off against call deposits of such Lenders in which any funds on deposit in accordance with the Loan Documents may from time to time be invested), it being understood and agreed that all rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent for the benefit of the Lenders in accordance with the terms thereof.

Section 8.8    Certain Actions After an Event of Default.  (a)  Upon delivery to the Administrative Agent of notice of an Event of Default pursuant to this Agreement or the Administrative Agent's otherwise obtaining actual knowledge of the existence of an Event of Default, the Administrative Agent shall promptly deliver notice of such Event of Default to the Lenders.  The Administrative Agent may thereafter, from time to time, propose various actions (or forbearance from action) (*Proposed Default Response*) in response to such Event of Default, including, without limitation, foreclosure on all or portions of the Collateral, appointment of a receiver, or the exercise of other remedies provided in this Agreement and the other Loan

Documents, and the Lenders agree that the Administrative Agent may implement such Proposed Default Response upon approval of the Requisite Lenders; provided, that (i) in the absence of any pending Proposed Default Response, beginning thirty (30) days after the notice of the Event of Default has been delivered to the Lenders or was due thereto, the Requisite Lenders may direct the Administrative Agent to exercise specific remedies under the Loan Documents; and (ii) notwithstanding anything to the contrary contained herein, the Lenders agree that the Administrative Agent at all times shall be permitted to exercise such interim remedies (including (A) making Protective Advances, and (B) appointing a receiver) as the Administrative Agent may determine in good faith to be necessary or appropriate to protect the Collateral.

(b)    If the Requisite Lenders do not approve a pending Proposed Default Response within fifteen (15) Business Days after submittal, the Proposed Default Response shall be deemed rejected and the Requisite Lenders shall then be free to direct the Administrative Agent regarding the actions to be taken or not taken in response to the Event of Default, subject to the unanimous approval rights of the Lenders pursuant to Section 11.15.

(c)    Notwithstanding the foregoing and anything herein to the contrary, each Lender shall be obligated to fund its Ratable Share of any and all Protective Advances in the event such Protection Advances are deemed necessary by the Administrative Agent (in its sole and absolute discretion) to preserve the Lien of the Security Instrument, the Collateral or any of Lenders' rights under any of the Loan Documents. If and to the extent any Lender shall fund amounts in excess of the Loan Amount for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan

Section 8.9    Defaulting Lender.    (a)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Advance that such Lender will not make available to the Administrative Agent such Lender's Ratable Share of such Advance, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Advance in accordance with Article 2, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.

(b)    If and to the extent that any Lender (a *Defaulting Lender*) shall not have so made such Ratable Share available to Administrative Agent (individually, a *Deficiency*, and collectively, *Deficiencies*), and the Administrative Agent has advanced such amount to the Borrower, such Defaulting Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at the Default Rate. If such Defaulting Lender shall repay to the Administrative Agent such corresponding amount, such amount (excluding interest) so repaid shall constitute such Defaulting Lender's Ratable Share of the Advance and the Borrower shall have no further Obligation to repay such amount forthwith on demand, but such amount shall be treated as an Advance hereunder. Each of the Lenders agrees that the Borrower or any of the other Lenders shall have the right to proceed directly against any Defaulting Lender in respect of any right or claim arising out of the default of such Defaulting

112

Lender hereunder. If there shall be a Deficiency in respect of any Lender, one or more of the other Lenders shall have the right, but not the Obligation, to advance all or any part of the Ratable Share of an Advance that should have been made by the Defaulting Lender, and the Defaulting Lender agrees to repay upon demand to each of the Lenders (or the Borrower, if applicable), who has advanced a portion of the Deficiency the amount advanced on behalf of the Defaulting Lender, together with interest thereon at the Default Rate. If more than one Lender elects to advance a portion of the Deficiency, such Lenders' advances shall be made based on the relative Ratable Shares of the Loan of each advancing Lender or as otherwise agreed to by such Lenders. In the event the Defaulting Lender fails to advance or repay the Deficiency (with interest at the Default Rate, if applicable) on or prior to the date of the next succeeding Advance, the entire interest of said Defaulting Lender in the Loan shall be subordinate to the interests of the other Lenders, the Defaulting Lender shall have no voting rights under the Loan Documents and all payments otherwise payable to the Defaulting Lender shall be used to advance or repay the Deficiency, as applicable, until such time such Defaulting Lender advances or repays all Deficiencies (including interest at the Default Rate, if applicable).

## ARTICLE 9

## EVENTS OF DEFAULT

Section 9.1    Events of Default. The occurrence of any of the following events shall be an "Event of Default" hereunder (each, an *Event of Default*):

(a)    Failure to Pay. (i) The Borrower shall fail to pay any amounts due and payable under any Loan Document (except for Outstanding Principal), including any interest on the Outstanding Principal or any Amortization Amount, within five (5) days of when such payment shall be due and payable; or (ii) the Borrower shall fail to pay any amount of Outstanding Principal (other than any Amortization Amount) when due and payable; or

(b)    Misrepresentations. Any representation or warranty of any Loan Party under any of the Loan Documents or other materials submitted to the Administrative Agent or the Lenders in connection with the Loan shall have been untrue or incorrect when made in any material respect; or

(c)    Failure to Complete. The Borrower shall fail to achieve Substantial Completion or Final Completion in accordance with the terms of Section 6.2(g), subject to delays caused by Force Majeure not to exceed 180 days in the aggregate; or

(d)    Change of Control. A Change of Control shall occur other than in connection with a transfer permitted by Section 6.4(c)(i); or

(e)    Negative Covenants. The Borrower shall fail to perform, observe or comply with any covenant contained in Section 6.4; or

(f)    Bankruptcy. Any Loan Party becomes subject to a Bankruptcy Event; or

113

(g)    Insurance. The failure at any time to obtain, maintain and keep in force the insurance policies required by the Loan Documents; or

(h)    Attachment. The Property or any material portion thereof, shall be taken, attached or sequestered on execution or other process of law in any action against the Borrower and such taking, attachment or sequestration is not vacated to Borrower within thirty (30) days thereafter; or

(i)    Claim of Priority. Any claim of priority (except a claim based upon a Permitted Exception, any claims less than TWO HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) in the aggregate that are affirmatively insured by the Title Company or a claim asserted by any Trade Contractor for which the Borrower has, within thirty (30) days thereafter, deposited with the Administrative Agent cash collateral, a bond or such other security satisfactory to the Administrative Agent as being an amount sufficient to negate such claim) to the Security Instrument or any other document or instrument securing the obligations of Borrower under the Loan Documents by title, Lien or otherwise shall be upheld by any court of competent jurisdiction or the consenting by Borrower to any such claim of priority; or

(j)    Loss of Lien. Any Loan Document granting a Lien in favor of the Administrative Agent for the benefit of the Lenders shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien on the Collateral purported to be covered thereby (subject to the Permitted Exceptions and any claims less than TWO HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) in the aggregate that are affirmatively insured by the Title Company); or

(k)    Invalid Document. Any Loan Party shall claim in writing that any Loan Document shall for any reason cease to be valid or binding on or enforceable against a Loan Party, and within thirty (30) days thereof (i) such claim shall not be withdrawn in writing by such Loan Party, or (ii) the Borrower shall not provide a replacement for such Loan Document satisfactory to the Administrative Agent in Administrative Agent's sole and absolute discretion; or

(l)    Cross Default. (i) Any Debt of any Loan Party in an aggregate amount of over FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) shall be accelerated by reason of a default thereunder, or (ii) any event shall occur or condition shall exist and shall continue for more than the period of grace applicable thereto, if any, and shall have the effect of causing, or permitting the holder of any such Debt described in clause (i) above or any trustee or other Person acting on behalf of such holder to cause such Debt described in clause (i) above to become due prior to its stated maturity or to realize upon any collateral given as security therefore; or

(m)    Non-monetary Judgment. Any non-monetary judgment or order shall be rendered against any Loan Party or any Affiliate thereof that would reasonably be anticipated to have a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

114

(n)    ERISA.

    (i)    ERISA Event. Any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) exceeds FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00); or

    (ii)    ERISA Withdrawal Liability. Any Loan Party or any ERISA Affiliate of any Loan Party shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00) or requires payments exceeding ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) per annum; or

    (iii)    Notice of Reorganization or Termination of Multiemployer Plan. Any Loan Party or any ERISA Affiliate of any Loan Party shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and their respective ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00); or

(o)    Claim of Invalid Loan Documents. If the Borrower or the Borrower's Member or any Affiliate of the Borrower or any Affiliate of Borrower's Member shall take the position in a written communication with the Administrative Agent or in any litigation that any Loan Document is no longer the valid, binding and enforceable Obligation of the applicable Loan Party thereto, or that the Security Instrument no longer constitutes a valid and perfected first priority lien and security interest in any of the Collateral, subject only to the Permitted Exceptions and other liens and encumbrances expressly consented to by the Administrative Agent or the Lenders; or

(p)    Default of Sponsor. Any default by the Sponsor occurs under the terms of any of the Sponsor Documents to the extent not cured within the applicable cure period set forth therein, if any; the Sponsor shall be dissolved, liquidated, wound-up or merged; the Sponsor shall for any reason contest, repudiate, or purport to revoke any of the Sponsor Documents; or any of the Sponsor Documents for any reason (except pursuant to the express terms thereof) shall cease to be in full force and effect as to the Sponsor or shall be judicially declared null and void as to the Sponsor (except as a result of action or inaction of Lenders), and the Borrower shall fail

to provide within ten (10) days of any such event, a substitute Sponsor Document or the Sponsor, as the case may be, satisfactory to Administrative Agent in the Administrative Agent's sole and absolute discretion; or

(q)     Borrower's - SPE Status.  The Borrower shall fail to perform, observe or comply with any covenant contained in Section 6.5; or

(r)     Hotel Management Agreement.  The Hotel Management Agreement shall lapse, terminate or expire other than (i) with the Administrative Agent's consent or (ii) a termination of the Hotel Management Agreement by the Mezzanine Lender in accordance with the terms of the Mezzanine Loan Documents and Section 12 of the Intercreditor Agreement; or

(s)     Development Agreement.   The Development Agreement shall lapse, terminate or expire other than (i) with the Administrative Agent's consent or (ii) a termination of the Development Agreement by the Mezzanine Lender in accordance with the terms of the Mezzanine Loan Documents and Section 12 of the Intercreditor Agreement; or

(t)     ERISA Plan Assets.  The assets of Borrower or the Sponsor become "plan assets" as such term is defined in the regulations of the Department of Labor set forth in 29 C.F.R. §2510.3-101 or the United States Department of Labor or the Internal Revenue Service shall assert in writing that the transactions contemplated by any Loan Document constitute a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended from time to time; or

(u)     Construction Suspended.  Construction of any Improvements shall cease or be suspended for thirty (30) consecutive days (except as provided for in the Construction Schedule) for any reason other than a Force Majeure Event or any material breach by the Administrative Agent or Lenders of their obligation to make an Advance hereunder; or

(v)     Survey.  The appearance on any survey required hereunder of any material adverse condition not approved by the Administrative Agent and such condition is not remedied within sixty (60) days after notice thereof by the Administrative Agent to Borrower; or

(w)     Permits.  Any such permit, approval, or agreement obtained from or issued by any Governmental Authority is withdrawn, canceled, terminated or modified to the material detriment of the Borrower or the construction of the Improvements, unless the Borrower reinstates and confirms in all respects such permit, approval, or agreement previously in effect within a period of twenty (20) Business Days thereafter; or

(x)     Abandonment.  The Borrower requests a termination of the Loan, or confesses in writing its inability to continue or complete construction of the Improvements in accordance with this Agreement, or ceases to do business; or

(y)     Material Adverse Change.  The occurrence of any event or the existence of any fact or circumstance resulting in a Material Adverse Effect; or

116

(z)     Failure to Perform. The failure of the Borrower to perform any other term, covenant or condition of this Agreement or of any of the other Loan Documents (other than any such failure specifically enumerated in this Section 9.1) and the continuation of such default for more than thirty (30) days following the giving of notice of such default to the Borrower; provided, that (i) if such default is curable but cannot reasonably be cured within such thirty (30) day period, the Borrower shall have such reasonable period of time to cure such default, provided that (A) the Borrower shall submit to the Administrative Agent, within such thirty (30) day period, a detailed plan to cure such default reasonably satisfactory to the Administrative Agent and (B) the Borrower shall diligently pursue the curing of such default and (ii) no such extension shall be for a period in excess of ninety (90) days (*i.e.,* a total cure period of one hundred twenty (120) days), it being understood that the rights to notice and a cure period granted herein shall not be cumulative with any other rights to notice or a cure period in any other Loan Document and the giving of notice or a cure period pursuant to this paragraph shall satisfy any and all obligations of the Administrative Agent or the Lenders to grant any such notice or cure period pursuant to any of the Loan Documents.

## ARTICLE 10

## RIGHTS AND REMEDIES

Section 10.1   Remedies. (a) Upon the occurrence and continuance of any Event of Default, the Administrative Agent may, at any time thereafter, at its option, exercise any or all of the following rights and remedies:

(b)     The Administrative Agent may declare all unpaid principal of and accrued interest on the Notes, together with all other sums payable under the Loan Documents, to be immediately due and payable, whereupon same shall become and be immediately due and payable, anything in the Loan Documents to the contrary notwithstanding, and without presentation, protest or further demand or notice of any kind, all of which are expressly hereby waived by the Borrower; provided, that upon the occurrence of any Bankruptcy Event with respect to the Borrower or any other Loan Party under the Bankruptcy Code of the United States, the unpaid principal amount of the Loan and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

(c)     The Administrative Agent may cause the Additional Improvements to be completed and may enter upon the Property and construct, equip and complete the Additional Improvements in accordance with the Plans and Specifications, with such changes therein as the Administrative Agent may, from time to time, and in its sole discretion, deem appropriate. In connection with any construction of the Additional Improvements undertaken by the Administrative Agent pursuant to the provisions of this subsection, the Administrative Agent may:

(i)     use any funds held by the Administrative Agent as security or in escrow;

(ii)     employ existing contractors, subcontractors, including Major Contractors, agents, architects, engineers, and the like, or terminate the same and employ others;

(iii)    employ security guards to protect the Property;

(iv)    make such additions, changes and corrections in the Plans and Specifications as shall, in the reasonable judgment of the Administrative Agent, be necessary or desirable;

(v)     take over and use any and all Personal Property contracted for or purchased by Borrower, if appropriate, or dispose of the same as the Administrative Agent sees fit;

(vi)    execute all applications and certificates on behalf of Borrower which may be required by any Governmental Authority or Law or contract documents or agreements;

(vii)   pay, settle or compromise all existing or future bills and claims which are or may be liens against the Property, or may be necessary for the completion of the Improvements or the clearance of title to the Property, including, without limitation, all taxes and assessments;

(viii)  undertake marketing and advertising of the Hotel, and complete the marketing and leasing of leasable space in the Improvements, enter into new Leases and occupancy agreements and modify or amend existing Leases and occupancy agreements, all as Administrative Agent shall deem to be necessary or desirable;

(ix)    prosecute and defend all actions and proceedings in connection with the construction of the Additional Improvements or in any other way affecting the Property; and

(x)     take such other action hereunder, or refrain from acting hereunder, as Administrative Agent may, in its sole and absolute discretion, from time to time determine, and without any limitation whatsoever, to carry out the intent of this Section 10.1(c). The Borrower shall be liable to the Administrative Agent for all costs paid or incurred for the construction, completion and equipping of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section 10.1 or otherwise, and all payments made or liabilities incurred by the Administrative Agent hereunder of any kind whatsoever shall be deemed Advances made to the Borrower under this Agreement and shall be secured by the Security Instrument and the other Loan Documents.

To the extent that any costs so paid or incurred by the Administrative Agent pursuant to this Section 10.1(c), together with all other Advances made by the Lenders hereunder, exceed the Loan Amount, such excess costs shall be paid by the Borrower to the

118

Administrative Agent on written demand, with interest thereon at the Default Rate until paid; and the Borrower shall execute such notes or amendments to the Notes as may be requested by the Administrative Agent to evidence the Borrower's Obligation to pay such excess costs and until such notes or amendments are so executed by the Borrower, the Borrower's Obligation to pay such excess costs shall be deemed to be evidenced by this Agreement. In the event the Administrative Agent takes possession of the Property and assumes control of such construction as aforesaid, the Administrative Agent shall not be obligated to continue such construction longer than the Administrative Agent shall see fit and may thereafter, at any time, change any course of action undertaken by it or abandon such construction and decline to make further payments for the account of the Borrower whether or not the Property shall have been completed. For the purpose of this Section 10.1(c), the construction, equipping and completion of the Property shall be deemed to include any action necessary to cure any Event of Default by the Borrower under any of the terms and provisions of any of the Loan Documents.

(d)     The Administrative Agent may appoint or seek appointment of a receiver, without notice and without regard to the solvency of the Borrower or the adequacy of the security, for the purpose of preserving the Property, preventing waste, and to protect all rights accruing to the Administrative Agent or the Lenders by virtue of this Agreement and the other Loan Documents, and expressly to do any further acts as the Administrative Agent may determine to be necessary to complete the development and construction of the Additional Improvements. All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or improving the Property, shall be charged against the Borrower and shall be secured by the Security Instrument and enforced as a Lien against the Property.

(e)     The Administrative Agent may accelerate maturity of the Notes and any other Debt of the Borrower to the Lenders, and demand payment of the principal sum due thereunder, with interest, advances, costs and reasonable attorneys' fees and expenses (including those for appellate proceedings), and enforce collection of such payment by foreclosure of the Security Instrument or the enforcement of any other Collateral, or other appropriate action.

(f)     The Administrative Agent may, to the extent permitted by applicable Law, at any time and from time to time, without notice (any such notice being expressly waived), without regard to the adequacy of any Collateral, set off and apply any and all deposits (general or specific, time on demand, provisional or final, regardless of currency, maturity, or the branch of Administrative Agent where the deposits are held) at any time held or other sums credited by or due from Lenders to Borrower against any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Borrower to the Administrative Agent or the Lenders.

Section 10.2   Power of Attorney. For the purposes of carrying out the provisions and exercising the rights, powers and privileges granted by or referred to in this Agreement, after an Event of Default and during the continuance thereof, the Borrower hereby irrevocably constitutes and appoints the Administrative Agent its true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and do and perform any acts which are referred to in this Agreement, in the name and on behalf of the Borrower.

119

84076228_9_084291_69909

The power vested in such attorney-in-fact is, and shall be deemed to be, coupled with an interest and irrevocable.

Section 10.3   Remedies Cumulative.   Upon the occurrence and during the continuance of any Event of Default, the rights, powers and privileges provided in this Article 10 and all other remedies available to the Administrative Agent and the Lenders under this Agreement or under any of the other Loan Documents or at Law or in equity may be exercised by the Administrative Agent and the Lenders at any time and from time to time and shall not constitute a waiver of the Administrative Agent's or any of the Lenders' other rights or remedies thereunder, whether or not the Loan shall be due and payable, and whether or not the Administrative Agent shall have instituted any foreclosure proceedings or other action for the enforcement of its rights under the Loan Documents.

Section 10.4   Waivers.   The Borrower hereby waives to the extent not prohibited by applicable Law:   (a) all presentments, demands for payment or performance, notices of nonperformance (other than those expressly provided in the Loan Documents), protests and notices of dishonor;   (b) any requirement of diligence or promptness on the Administrative Agent's or the Lenders' part in the enforcement of its rights (but not fulfillment of its obligations) under the provisions of this Agreement or any other Loan Document; and (c) any and all notices of every kind and description which may be required to be given by any statute or rule of law.

Section 10.5   Course of Dealing, Etc.   No course of dealing and no delay or omission by the Administrative Agent or the Lenders in exercising any right or remedy hereunder shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.   A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.   No waiver or consent shall be binding upon the Lenders unless it is in writing and signed by the Administrative Agent.   The Administrative Agent's exercise of the Administrative Agent's right to remedy any default by the Borrower to the Lenders or any other Person shall not constitute a waiver of the default remedied, a waiver of any other prior or subsequent default by the Borrower or a waiver of the right to be reimbursed for any and all of its expenses in so remedying such default.

Section 10.6   Limitation of Liability.   The liability of the Borrower shall be limited to its assets.   The Lenders shall not be entitled to, and shall not enforce, the liability and obligation of the Borrower to perform and observe the Obligations contained in this Agreement, the Notes or in any of the other Loan Documents by any action or proceeding wherein personal liability shall be sought for the Borrower's obligations against any partners or members (or other constituent party(ies)), principals of the Borrower or any officers, shareholders, directors, agents, employees or servants thereof or of any Person comprising the Borrower (the *Exculpated Parties*).   The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any Obligation evidenced or secured by this Agreement, the Security Instrument, the Notes or any of the other Loan Documents; (ii) impair the right of the Administrative Agent or the Lenders to name the Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of the