Exhibit G

INTERCREDITOR AGREEMENT

By and between

WEST LB AG,
as Administrative Agent

As Senior Lender

And

BAYNORTH REALTY FUND VI, LIMITED PARTNERSHIP

As Mezzanine Lender

Dated as of March 30, 2006

Premises:      Sky Lodge Private Residence Club and Hotel

Park City, Utah

84088286v3

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT, (this "Agreement), dated as of March __, 2006 by and between WESTLB AG, a German banking corporation acting through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036, as agent (including any of its successors and assigns in such capacity, the *Senior Agent*) for itself, and such other co-lenders as may exist from time to time (collectively, *Senior Lenders*) under that certain Loan and Security Agreement, dated as of the date hereof (as the same may be amended from time to time the *Senior Loan Agreement*) between Easy Street Partners, LLC, a Utah limited liability company (the *Borrower*), the Senior Agent and Senior Lenders, and BayNorth Realty Fund VI, Limited Partnership, a Delaware limited partnership, having an office at One Financial Center, 23rd Floor, Boston, MA 02111 (the *Mezzanine Lender*).

### RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in the Senior Loan Agreement Senior Lenders have agreed to make a loan to Borrower in the maximum principal amount of $36,779,224.00 (the *Senior Loan*), which Senior Loan is evidenced by a certain Promissory Note, dated of even date herewith, made by the Borrower to WestLB AG, as Senior Lender in a principal amount equal to the amount of the Senior Loan (the *Senior Note*), and secured by, among other things, a Construction and Interim Loan Deed of Trust, Assignment of Leases, Security Agreement and Fixture Filing, dated as of the date hereof, made by the Borrower in favor of the Senior Agent for the benefit of the Senior Lenders (the *Senior Mortgage*), which Senior Mortgage encumbers the real property described on Exhibit A attached hereto and made a part hereof, and all improvements thereon and appurtenances thereto (collectively, the *Premises*); and

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Loan Agreement, dated of even date herewith, between Easy Street Mezzanine LLC, a Delaware limited liability company (the *Mezzanine Borrower*) and Mezzanine Lender (the *Mezzanine Loan Agreement*), Mezzanine Lender is the owner and holder of a loan to Mezzanine Borrower in the original principal amount of $11,250,000 (the *Mezzanine Loan*), which Mezzanine Loan is evidenced by a certain Promissory Note, dated of even date herewith, made by the Mezzanine Borrower in favor of Mezzanine Lender in the amount of the Mezzanine Loan (the *Mezzanine Note*), and secured by, among other things, a Pledge and Security Agreement, dated as of the date hereof, from Mezzanine Borrower pursuant to which Mezzanine Lender is granted a first priority security interest in all of the mezzanine Borrower's ownership interests in Borrower (the *Pledge Agreement*); and

WHEREAS, the Senior Agent and the Mezzanine Lender desire to enter into this Agreement to provide for the relative priority of the Senior Loan Documents (as such term is hereinafter defined) and the Mezzanine Loan Documents (as such term is hereinafter defined) on the terms and conditions herein below set forth, and to evidence certain agreement with respect to the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

NOW, THEREFORE, in consideration of the foregoing recitals and for other goods and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Senior Agent and the Mezzanine Lender hereby agree as follows:

Section 1.    Certain Definition; Rules of Construction.

(a)    As used in this Agreement, the following capitalized terms shall have the following meaning:

*Affiliate* means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common control with the Person or Persons in question.

*Agreement* means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

*Approved Manager/Developer* shall mean (i) CloudNine Resorts/Sky Lodge Management, LLC, (ii) Remington Hotels (Dallas, Texas), (iii) with respect to replacement of the Property Manager, any property manager with at least five years of experience managing commercial real estate or development projects, as applicable, similar in nature and quality to the Premises, or (iv) any other property manager or developer, as applicable, of the Premises that has been approved (including the terms and conditions of the management agreement or development agreement pursuant to which such manager or developer is engaged) by the Senior Agent in its reasonable discretion.

*Award* has the meaning provided in Section 9(d) hereof.

*Borrower* has the meaning provided in the Recitals hereto

*Borrower Group* has the meaning provided in Section 10(c) hereof.

*Business Day* means a day other than (a) Saturday, (b) Sunday, or (c) a day on which commercial banks in New York, Utah, or Germany are authorized or required by law to close.

*CDO* has the meaning provided in the definition of the term "Qualified Transferee."

*Continuing Senior Loan Event of Default* means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 11(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 11(a) of this Agreement has expired without such Event of Default having been cured.

*Control* means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise.

"Controlled by," "controlling" and "under common control with" shall have the respective correlative meaning thereto.

*Developer* means CloudNine Resorts/Sky Lodge Development, LLC or any successor thereto as developer of the Premises

*Directing Mezzanine Lender* has the meaning provided in <u>Section 4(c)</u> hereof.

*Eligibility Requirements* means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $500,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $200,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

*Enforcement Action* means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or Borrower, including, without limitation, the taking of possession or control of the Premises, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or the Premises.

*Equity Collateral* means all of the equity interests of Borrower pledged to the Mezzanine Lender pursuant to the Pledge Agreement including, without limitation, rights to distributions, all as more particularly described in the Pledge Agreement.

*Equity Collateral Enforcement Action* means any action or proceeding or other exercise of the Mezzanine Lender's rights and remedies commenced by the Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Equity Collateral.

*Event of Default* as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred, is continuing (i.e., has not been cured by the Borrower or-by the Mezzanine Lender in accordance with the terms of this Agreement) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by the Mezzanine Borrower).

*Loan Pledgee* has the meaning provided in <u>Section 15</u> hereof.

*Loan Purchase Price* has the meaning provided in <u>Section 13(a)</u> hereof.

*Mezzanine Borrower* has the meaning provided in the <u>Recitals</u> hereto.

*Mezzanine Lender* has the meaning provided in the <u>Preamble</u> to this Agreement.

*Mezzanine Loan* has the meaning provided in the <u>Recitals</u> hereto.

*Mezzanine Loan Agreement* has the meaning provided in the <u>Recitals</u> hereto.

*Mezzanine Loan Cash Management Agreement* means any cash management agreement executed in connection with, or the cash management provisions of, the Mezzanine Loan Documents.

*Mezzanine Loan Documents* means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with all documents and instruments set forth on <u>Exhibit C</u> hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

*Mezzanine Loan Modification* has the meaning provided in <u>Section 7(b)</u> hereof.

*Mezzanine Note* has the meaning provided in the <u>Recitals</u> hereto.

*Monetary Cure Period* has the meaning provided in <u>Section 11(a)</u> hereof.

*Permitted Fund Manager* means any Person that on the date of determination is (i) approved by the Senior Agent, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

*Person* means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

*Pledge* has the meaning provided in <u>Section 15</u> hereof.

*Pledge Agreement* has the meaning provided in the <u>Recitals</u> hereto.

*Premises* has the meaning provided in the <u>Recitals</u> hereto.

*Proceeding* has the meaning provided in <u>Section 10(c)</u> hereof.

*Property Manager* means Cloud Nine Resorts/Sky Lodge, LLC or any successor thereto as property manager of the Premises.

*Protective Advances* means all sums advanced for the purpose of payment of real estate taxes (including special payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including. capital items) reasonably necessary to protect the Premises or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, including, with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to <u>Section 11</u> hereof.

*Purchase Option Notice* has the meaning provided in <u>Section 13 (a)</u> hereof.

**Qualified Transferee** means (i) Mezzanine Lender, or (ii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C) above;

(E)    a Qualified Trustee in connection with a securitization of, the creation of collateralized debt obligations (**CDO**) secured by or financing through an "owner trust of, the Mezzanine Loan (collectively, **Securitization Vehicles**), so long as (A) the special servicer or manager of such Securitization Vehicle has the Required Special Servicer°Rating and (B) the entire "controlling class" of such Securitization Vehicle, other than with respect to a CDO Securitization Vehicle, is held by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition; provided that the operative documents of the related Securitization Vehicle require that (1) in the case of a CDO Securitization Vehicle, the "equity interest" in such Securitization Vehicle is owned by one or more .entities that are Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition and {2) if any of the relevant trustee, special servicer, manager fails to meet the requirements of this clause (E), such - Person must be replaced by a Person meeting the requirements of this clause (E) within thirty {30) days;

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager or an entity that is otherwise a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of this definition acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition.

**Qualified Trustee** means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to

accept the trust conferred, having a. combined capital and surplus of at least $100,000,000 and subject to supervision or-examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top three rating categories of each of the Rating Agencies.

*Rating Agencies* shall mean each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Senior Lender.

*Redirection Notice* has the meaning provided in <u>Section 15</u> hereof.

*Required Special Servicer Rating* means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P list of approved special servicers in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

*S&P* means Standard & Poors Ratings Services, a division of The McGraw-Hill Companies, Inc.

*Senior Lender* has the meaning provided in the <u>Preamble</u> to this Agreement.

*Senior Loan* has the meaning provided in the <u>Recitals</u> hereto.

*Senior Loan Agreement* has the meaning provided in the <u>Recitals</u> hereto.

*Senior Loan Cash Management Agreement* means Article 4 of the Senior Loan Agreement., together with any other cash management agreement or agreements executed in connection with, or cash management provisions of, the Senior Loan Documents from time to time.

*Senior Loan Default Notice* has the meaning provided in <u>Section 11(a)</u> hereof.

*Senior Loan Documents* means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on <u>Exhibit B</u> hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

*Senior Loan Liabilities* shall mean, collectively, all of the indebtedness, liabilities and obligations of the Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

*Senior Loan Modification* has the meaning provided in <u>Section 7(a)</u> hereof.

*Senior Mortgage* has the meaning provided in the <u>Recitals</u> hereto.

*Senior Note* has the meaning provided in the <u>Recitals</u> hereto.

*Separate Collateral* means (i) the Equity Collateral, (ii) the accounts (and monies therein from time to time) established pursuant to the Mezzanine Cash Management Agreement, and (iii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents, in each case not directly constituting security for the Senior Loan.

*Third Party Agreement* has the meaning provided in <u>Section 5(a)</u> hereof.

*Third Party Obligor* has the meaning provided in <u>Section 5(a)</u> hereof.

*Transfer* means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

(b)     For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)     all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)     terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Agreement;

(iii)     all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)     the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vi)     the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)    the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of the Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(viii)    the words "to Senior Agent's knowledge" or "to the knowledge of Senior Agent" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Agent with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

Section 2.    Approval of Loans and Loan Documents.

(a)    The Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) the Senior Lender is under no obligation or duty to, nor has the Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom the Senior Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    The Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) the Mezzanine Lender is under no obligation or duty to, nor has the Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom the Mezzanine Lender disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents. The Senior Lender hereby acknowledges and agrees that any conditions precedent to the Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.    Representations and Warranties.

(a)    The Mezzanine Lender hereby represents and warrants as follows:

(i)     Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To the Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)     The Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee (as hereinafter defined) as contemplated by the provisions of Section 15 hereof.

(iii)     There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)     The Mezzanine Lender has, independently and without reliance upon the Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)     The Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)     All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of the Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)     The Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of the Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)     To the Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with,. any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by the Mezzanine Lender of this Agreement or consummation by the Mezzanine Lender of the transactions contemplated by this Agreement.

(ix)     None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of the Mezzanine Lender, (w) to the Mezzanine Lender's

knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which the Mezzanine Lender is a party or to which any of its properties are subject, (x) to the Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of the Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that the Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, -order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which the Mezzanine Lender has knowledge against, or binding upon, the Mezzanine Lender or upon any of the securities, properties, assets, or business of the Mezzanine Lender or (z) to the Mezzanine Lender's knowledge, constitute a violation by the Mezzanine Lender of any statute, law or regulation that is applicable to the Mezzanine Lender.

(x)     The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan. The Premises do not secure any loan from the Mezzanine Lender to the Mezzanine Borrower or any other Affiliate of the Borrower.

(b)     The Senior Lender hereby represents and warrants as follows:

(i)     Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof. To the Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii)     The Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii)     There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

(iv)     The Senior Lender has, independently and without reliance upon the Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)     The Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to

execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)   All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of the Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)   The Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of the Senior Lender enforceable against the Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)   To the Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by the Senior Lender of this Agreement or consummation by the Senior Lender of the transactions contemplated by this Agreement.

(ix)   None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of the Senior Lender, (w) to the Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which the Senior Lender is a ,party or to which any of its properties are subject, (x) to the Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of the Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, the Senior Lender or upon any of the securities, properties, assets, or business of the Senior Lender or (z) to the Senior Lender's knowledge,- constitute a violation by the Senior Lender of any statute, law or regulation that is applicable to the Senior Lender.

(x)   The Senior Loan' is not cross-defaulted with any other loan. The Premises do not secure any other loan from the Senior Lender to the Borrower, the Mezzanine Borrower or any other Affiliate of the Borrower.

Section 4.   <u>Transfer of Mezzanine Loan or Senior Loan.</u>

(a)     The Mezzanine Lender shall not Transfer more than 49% of its beneficial interest in the Mezzanine Loan to any party other than an Affiliate of Mezzanine Lender without the prior written approval of the Senior Agent, which approval shall not be unreasonably withheld so long as the proposed Transfer is to a Qualified Transferee. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of the Senior Agent. Upon written request from the Mezzanine Lender, Senior Lender shall advise the Mezzanine Lender, within ten (10) Business Days after receipt of such request, whether or not a proposed entity is a Qualified Transferee provided that any such request by the Mezzanine Lender shall be accompanied by a description of such entity setting forth in reasonable detail the qualifications of such entity, the principals of such entity and the business of such entity and such other information as shall be reasonably necessary for the Senior Lender to determine whether the proposed transferee is a Qualified Transferee.

(b)     At least five (5) days prior to a transfer to a Qualified Transferee, the Mezzanine Lender shall provide to Senior Agent a certification that such transfer will be made in accordance with this Section 4, such certification to include the name and contact information of the Qualified Transferee.

(c)     If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan shall designate by written notice to the Senior Agent one of such Persons (the *Directing Mezzanine Lender*) to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to the Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to the Mezzanine Lender hereunder, including any approval rights of the Mezzanine Lender; **provided**, that until the Directing Mezzanine Lender has been so designated, the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, the Senior Agent shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

(d)     Any Senior Lender may, from time to time, in its sole discretion Transfer all or any of the Senior Loan or any interest therein, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement. In connection with such transfer: (i) the transferee shall assume in writing the obligations of Senior Lender and agree to be bound by the terms and provisions of this Agreement, and (ii) the Mezzanine Lender must be provided with written notice promptly following such transfer.

(e)     As of the date hereof, the Mezzanine Lender and the Senior Lenders agree that the Senior Agent (including any successor Senior Agent) shall act on behalf of all such Persons holding an interest in the Senior Loan until such time as the Mezzanine Lender receives

written notice from either the Senior Agent or from Senior Lenders holding more than 50% of the principal amount of the Senior Loan stating that the Senior Agent is no longer authorized to act on behalf of the Senior Lenders. In such event, the holder(s) of more than 50% of the principal amount of the Senior Loan shall designate by written notice to the Mezzanine Lender one of such Persons (the *Directing Senior Lender*) to act on behalf of all such Persons holding an interest in the Senior Loan. The Directing Senior Lender shall have the sole right to receive any notices which are required to be given or which may be given to Senior Lender pursuant to this Agreement and to exercise the rights and power given to Senior Lender hereunder, including any approval rights of Senior Lender; provided, that until the Directing Senior Lender has been so designated, the last Person known to the Mezzanine Lender to hold more than a 50% direct interest in the Senior Loan shall be deemed to be the Directing Senior Lender. Once the Directing Senior Lender has been designated hereunder, the Mezzanine Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Senior Loan of the designation of a different person to act as the Directing Senior Lender.

Section 5.    Foreclosure of Separate Collateral.

(a)    The Mezzanine Lender shall not exercise any rights it may have under the Pledge Agreement and the other Mezzanine Loan Documents or applicable law with respect to a foreclosure or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral) without the prior written consent of the Senior Agent unless (i) the transferee of title to the Equity Collateral is a Qualified Transferee, (ii) the Premises will be managed by an Approved Manager promptly after the transfer of title to the Equity Collateral, and (iii) if not in place prior to the transfer of title to the Equity Collateral, hard cash management and adequate reserves for taxes, insurance, debt service, ground rents, capital repair and improvement expenses, management fees, association charges and operating expenses will be implemented under the Senior Loan promptly after the transfer of title to the Equity Collateral in accordance with the terms of the Senior Loan Documents as of the date hereof. Additionally, if a non-consolidation opinion was delivered in connection with the closing of the Senior Loan, the transferee of the Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee acceptable to the Senior Agent within ten (10) business days of the transfer of title to the Equity Collateral. The Mezzanine Lender shall provide notice of the transfer and an officer's certificate from an officer of the Mezzanine Lender certifying that all conditions set forth in this Section 5(a) have been satisfied to the Senior Agent upon consummation of any Transfer of the Equity Collateral pursuant to this Section 5(a). The Senior Agent may request reasonable evidence that the foregoing requirements have been satisfied. In the event that such Transfer results in the removal of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan Documents (each, a *Third Party Obligor*), such transferee or an Affiliate thereof reasonably satisfactory to the Senior Agent shall execute and deliver to the Senior Agent a guaranty, indemnity, pledge agreement or other agreement which provides for the obligations of such obligor (each, a *Third Party Agreement*); in each case, in a form substantially similar to the Third Party Agreement that it is replacing, pursuant °to which the Third Party Obligor shall undertake the obligations set forth therein. The Senior Agent hereby agrees that any Affiliate of BayNorth having a minimum net worth of Twenty Million Dollars ($20,000,000) shall be an approved Third Party Obligor.

(b)     Nothing contained herein shall limit or restrict the right of the Mezzanine Lender to exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral.

(c)     In the event Mezzanine Lender or any purchaser at a UCC sale obtains title to the Separate Collateral, the Senior Agent hereby acknowledges and agrees that any such transfer shall not constitute a breach or default under the Senior Loan Documents, **provided** the conditions in Section 5(a) are met. The Senior Agent also acknowledges and agrees that it will not impose any unreasonable fees or delays in connection with such Transfer.

(d)     Senior Lender agrees to consider Mezzanine Lender's written request, from time to time, that it pre-approve one or more particular entities as a Qualified Manager or a Third Party Obligor, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 6.     <u>Intentionally Omitted.</u>

Section 7.     <u>Modifications. Amendments, Etc.</u>

(a)     The Senior Agent and Senior Lenders shall have the right without the consent of the Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a **Senior Loan Modification**) of the Senior Loan or the Senior Loan Documents provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan, (ii) modify in any other material respect any monetary obligations of the Borrower under the Senior Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit the Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (iv) shorten the applicable cure periods under the Senior Loan Documents, (v) add new events of default under the Senior Loan Documents, (vi) create any security interest in favor of the Senior Lender in any Separate Collateral, (vii) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of the Borrower, (viii) amend or modify the provisions limiting transfers of interests in the Borrower or the Premises, (ix) modify or amend the terms and provisions of the Senior Loan Cash Management Agreement with respect to the manner, timing and method of the application of payments under the Senior Loan Documents, (x) cross default the Senior Loan with any other indebtedness, (xi) obtain any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), or (xii) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or increase the amount of any such prepayment fee, premium or yield maintenance charge; <u>provided</u>, <u>however</u>, in no event shall the Senior Agent or any Senior Lender be obligated to obtain the Mezzanine Lender's consent to a Senior Loan Modification in the case of a work-out or other surrender, compromise, release, renewal, or indulgence relating to the Senior Loan during the existence of a Continuing Senior Loan Event of Default, except that under no conditions shall <u>clause (i)</u> (with respect to increase; principal amount only), or <u>clause (ix)</u> be modified without the written consent of the Mezzanine Lender. In addition and notwithstanding the foregoing provisions of this <u>Section 7(a)</u>, any amounts funded by the Senior Lenders under the Senior Loan Documents as a result of (A)

the making of any Protective Advances or other advances by the Senior Lenders, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(a).

(b)     The Mezzanine Lender shall have the right without the consent of the Senior Agent in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a *Mezzanine Loan Modification*) of the Mezzanine Loan or the Mezzanine Loan Documents **provided** that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount of the Mezzanine Loan, (ii) modify in any other material respect any monetary obligations of the Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that the Mezzanine Lender may permit the Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of the Mezzanine Borrower, (v) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises or (vi) cross default the Mezzanine Loan with any other indebtedness. Notwithstanding anything to the contrary contained. herein, if an Event of Default exists under the Mezzanine Loan Documents, the Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, renewal or modification of the Mezzanine Loan except that under no conditions shall clause (i) , with respect to increases in principal amounts only, clause (ii) , clause (iii) (with respect to shortening the maturity only); clause (iv) or clause (v) be modified without the written consent of the Senior Agent. In addition and notwithstanding the foregoing provisions of this Section 7(b), any amounts funded by the Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) the making of any Protective Advances or other advances by the Mezzanine Lender, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(b).

(c)     The Senior Agent shall deliver to the Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by the Senior Agent or the Senior Lenders) within a reasonable time after any of such applicable instruments have been executed.

(d)     The Mezzanine Lender shall deliver to the Senior Agent copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any side letters, waivers or consents entered into, executed or delivered by the Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed-by the Mezzanine Lender.

Section 8.     Subordination of Mezzanine Loan and Mezzanine Loan Documents.

(a)    The Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8(a). The Mezzanine Lender hereby acknowledges and agrees- that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of the Borrower.

(b)    Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents entered into in accordance with this Agreement.

(c)    Notwithstanding any other provisions of this Agreement, this Agreement shall not be construed as subordinating and shall not subordinate or impair the Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and. The Senior Agent hereby acknowledges and agrees that the Senior Agent does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by the Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

Section 9.    Payment Subordination.

(a)    Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by the Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of the Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of the Senior Agent's and the Senior Lenders' rights to payment by the Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents, and the Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from the Borrower and/or from the Premises prior to the date that all obligations of the Borrower to the Senior Lenders under the Senior Loan Documents are paid. If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, the Senior Agent and Senior Lenders shall be entitled to receive payment and performance in full of all amounts due or to become due to the Senior Agent or Senior Lenders before the Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan; provided, however, that if (A) the Senior Lenders and/or the Senior Agent have not commenced an Enforcement Action within one hundred eighty (180) days of receipt by Mezzanine Lender of a notice of Continuing Senior Loan Default and (B) the Senior Lender is not then prevented from commencing an Enforcement Action by virtue of the

Borrower being the subject of any Proceeding, then Mezzanine Lender may commence to receive payment on or in respect of the Mezzanine Loan. All payments or distributions upon or with respect to the Mezzanine Loan which are received by the Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of the Senior Lenders and shall be paid over to the Senior Agent in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral by Senior Agent (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

(b)     Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a), (i) provided that no uncured Event of Default or DSCR Trigger shall have occurred under the Senior Loan Documents, the Mezzanine Lender may accept payments of any amounts due and payable from time to time which the Mezzanine Borrower is obligated to pay the Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and the Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts and (ii) regardless of whether any Event of Default or DSCR Trigger shall have occurred under the Senior Loan Documents, the Mezzanine Lender may accept payments of any amounts due and payable from time to time which the Mezzanine Borrower is obligated to pay the Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents to the extent that such payments are funded by additional capital or equity contributions made by the direct or indirect owners of the Mezzanine Borrower and the Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts.

(c)     The Mezzanine Lender may take any Equity Collateral Enforcement Action that is permitted under Section 5 hereof; **provided** that (i) the Mezzanine Lender shall, prior to commencing any Equity Collateral Enforcement Action, give the Senior Agent written notice of the default which would permit the Mezzanine Lender to commence such Equity Collateral Enforcement Action and (ii) the Mezzanine Lender shall provide the Senior Agent with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep the Senior Agent reasonably apprised as to the status of any Equity Collateral Enforcement Action.

(d)     In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, the Senior Agent shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising- from any such event (the *Award*). If the amount of the Award is in excess of all amounts owed to the Senior Lenders under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or the Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to the Borrower shall be paid to or at the direction of the Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case the Senior Agent shall only be required to provide

written notice to the Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, the Senior Agent shall continue to hold such excess Award until the Senior Agent receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing the Senior Agent as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, the Senior Agent shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the Borrower for the repair or restoration of the Premises shall not be subject to attachment by the Mezzanine Lender.

Section 10.   <u>Rights of Subrogation; Bankruptcy.</u>

(a)   Each of the Mezzanine Lender and the Senior Agent hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of the Mezzanine Lender and the Senior Agent assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of the Borrower, the Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither the Senior Agent nor the Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. The Mezzanine Lender agrees that the Senior Agent owes no fiduciary duty to the Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and the Mezzanine Lender agrees not to assert any such claim.  The Senior Agent agrees that the Mezzanine Lender owes no fiduciary duty to the Senior Lenders in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and the Senior Agent agrees not to assert any such claim.

(b)   No payment or distribution to the Senior Agent or Senior Lenders pursuant to the provisions of this Agreement and no Protective Advance by the Mezzanine Lender shall entitle the Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and the Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

(c)   Subject to <u>Section 30</u> of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against the Borrower under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors, (a *Proceeding*).  For as long as the Senior Loan shall remain outstanding, the Mezzanine Lender

shall not, and shall not solicit any person or entity to, and shall not direct or cause the Mezzanine Borrower to direct or cause either the Borrower or any entity which controls the Borrower (the **Borrower Group**) to: (i) -commence any Proceeding; (ii) institute proceedings to have the Borrower adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against the Borrower; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of the Borrower; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for the Borrower, the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of the Borrower; (vii) seek to consolidate the Premises or any other assets of the Borrower with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing.

(d)      If the Mezzanine Lender is deemed to be a creditor of the Borrower in any Proceeding (i) the Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower without the prior consent of the Senior Agent, except to the extent necessary to preserve or realize upon the Mezzanine Lender's interest in the Equity Collateral; **provided** that any such filing shall not be as a creditor of the Borrower, (ii) the Senior Agent may vote in any such Proceeding any and all claims of the Mezzanine Lender, and the Mezzanine Lender hereby appoints the Senior Agent as its agent, and grants to the Senior Agent an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; **provided** that with respect to any proposed plan of reorganization in respect of which creditors are voting, the Senior Agent may vote on behalf of the Mezzanine Lender only if the proposed plan would result in the Senior Lenders being "impaired" (as such term is defined in the Bankruptcy Code) and (iii) the Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by any Senior Lender or the Senior Agent in good faith or any valuations of the Premises or other Senior Loan collateral submitted by the Senior Agent in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to the Senior Agent's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code). For avoidance of doubt, the foregoing provisions of this Section 10(d) shall apply to the Mezzanine Lender solely in its capacity as Mezzanine Lender and shall not in any way impair or restrict the rights of the Mezzanine Lender as owner of the Equity Collateral following the completion of any Equity Collateral Enforcement Action in any Proceeding by or against the Borrower.

Section 11.   Rights of Cure.

(a)      Senior Agent shall endeavor in good faith to deliver to Mezzanine Lender copies of all notices of default to Borrower contemporaneously with delivery of such notices to Borrower; **provided** that neither Senior Agent nor any Senior Lender shall be liable in any way

to Mezzanine Lender for failure to deliver such notice to Mezzanine Lender so long as such failure is not the result of bad faith or willful misconduct on the part of the Senior Agent. In addition, prior to the Senior Agent commencing any Enforcement Action under the Senior Loan Documents, the Senior Agent shall provide written notice of the default which would permit the Senior Agent to commence such Enforcement Action to the Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to Section 15 of this Agreement, whether or not the Senior Agent is obligated to give notice thereof to the Borrower (each, a *Senior Loan Default Notice*) and shall permit the Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this Section 11(a). If the default is a monetary default relating to a liquidated sum of money, the Mezzanine Lender shall have until fourteen (14) days after the later of (i) the giving by the Senior Agent of the Senior Loan Default Notice and (ii) the expiration of the Borrower's cure provision, if any, (a *Monetary Cure Period*) to cure such monetary default; **provided** that in the event it elects to cure any such monetary default, the Mezzanine Lender shall (x) defend and hold harmless the Senior Agent and the Senior Lenders for all cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements imposed on, incurred by or asserted against the Senior Agent or the Senior Lenders due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lenders for any interest charged by the Senior Lenders on any Protective Advances. The Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than four consecutive months unless the Mezzanine Lender has commenced and is continuing to diligently pursue an Equity Enforcement Action against the Separate Collateral. If the default is of a non-monetary nature, the Mezzanine Lender shall have the same period of time as the Borrower under the Senior Loan Documents to cure such non-monetary default plus an additional thirty (30) days; **provided** that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being continuously and diligently pursued by the Mezzanine Lender, the Mezzanine Lender shall be given an additional period of time as is reasonably necessary for the Mezzanine Lender in the exercise of due diligence to cure such non-monetary default for so long as (i) the Mezzanine Lender makes or causes to be made timely payment of the Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed thirty (30) days, unless such non-monetary default is of a nature that can not be cured within such thirty (30) days, in which case, the Mezzanine Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, (iii) such default is not caused by a bankruptcy, insolvency or assignment for the benefit of creditors of the Borrower and (iv) during such non-monetary cure period, there is no material impairment to the value, use or operation of the Premises. Any additional cure period granted to the Mezzanine Lender hereunder shall automatically terminate upon the bankruptcy (or similar insolvency) of the Borrower.

(b)    Additionally, Senior Agent further agrees (i) that the Senior Lenders will not accelerate the maturity of the Senior Loan, commence any proceedings to foreclose on the Senior Loan or exercise any of its other rights or remedies under the Senior Loan upon the occurrence of an Event of Default that, by its nature, cannot be cured by Mezzanine Lender unless such Event of Default (A) is an Event of Default described in Section 9.1(d), (f) or (q) of the Senior Loan Agreement or (B) otherwise results in a Material Adverse Effect and (ii) that following the cure by Mezzanine Lender of each Event of Default under the Senior Loan that the

Mezzanine Lender is capable of curing, the Senior Lenders shall automatically be deemed to have waived any Event of Default under the Senior Loan that cannot be cured by the Mezzanine Lender.

(c)     Senior Lenders shall accept performance by Mezzanine Lender under this Section as if performed by Borrower, and all payments so made and all things so done and performed by Mezzanine Lender shall be effective to prevent the exercise by Senior Lenders of any of their rights and remedies under the Senior Loan Documents to the same extent as would be the case if such payment were made or things were done by the Borrower. If a default under the Senior Loan Documents which is capable of cure by Mezzanine Lender is not cured within the applicable time period provided in this Section, then Senior Lenders may exercise any of their rights and remedies under the Senior Loan Documents, at law or in equity.

(d)     To the extent that any Qualified Transferee acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents for the balance of the term thereof, which shall not be accelerated by the Senior Agent solely due to such acquisition and shall remain in full force and effect; **provided** that (i) such Qualified Transferee shall have caused the Borrower to reaffirm in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, all of the terms, conditions and provisions of the Senior Loan Documents on the Borrower's part to be performed and (ii) all defaults under the Senior Loan which remain uncured as of the date of such acquisition have been cured by such Qualified Transferee or waived by the Senior Lenders except for defaults that are not susceptible of being cured by such Qualified Transferee; provided, that such defaults which are not susceptible of being cured do not materially impair the value, use or operation of the Premises.

(e)     So long as there exists no Continuing Senior Loan Event of Default, all funds held and applied pursuant to the Senior Loan Cash Management Agreement, shall continue to be applied pursuant thereto and shall not be applied by the Senior Agent to prepay outstanding principal balance of the Senior Loan.

(f)     Notwithstanding any cross-default provisions in the Senior Loan Documents, a default under the Mezzanine Loan Documents shall only be considered a default under the Senior Loan Documents, if the event giving rise to such default is also independently an Event of Default under the Senior Loan Documents. If there is an Event of Default under the Mezzanine Loan Documents beyond the expiration of any applicable cure period, the Mezzanine Lender shall have the right to commence an Enforcement Action under the Mezzanine Loan Documents to the extent permitted under this Agreement without the same, in and of itself, constituting an Event of Default under the Senior Loan Documents.

Section 12.   No Actions; Restrictive Provisions. (a) The Senior Agent consents to the Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager or Developer. In the event both the Mezzanine Lender and the Senior Agent shall have such rights at any time, and the Senior Agent shall fail to exercise such rights, the Mezzanine Lender may exercise such rights, **provided** such exercise may be superseded by any subsequent exercise of such rights by the

Senior Agent pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle the Mezzanine Lender to cause the termination of the Property Manager or Developer pursuant to the Mezzanine Loan Documents, the Mezzanine Lender shall have the right to select, or cause the selection, of a replacement property manager or developer, as applicable, for the Premises, which replacement manager or developer, shall be subject to the Senior Agent's approval. Notwithstanding anything in this Section 12 to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which the Senior Agent has the right to select any replacement manager or developer, pursuant to the Senior Loan Documents, the Senior Agent shall have the superior right to select any replacement manager or developer whether or not a new manager or developer, as the case may be, was retained by the Mezzanine Lender but shall consult with the Mezzanine Lender in good faith as to the selection or designation of such replacement manager or developer.

(b)     The Senior Agent further consents to the Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, to approve Change Orders and changes to the Project Budget, Construction Documents or Fractional Ownership Documents (collectively *Project Changes*). In the event that the Mezzanine Lender shall withhold or deny its consent to any proposed Project Change and the Senior Agent shall have approved such Project Change, the Senior Agent, after consultation with the Mezzanine Lender, may override the disapproval by the Mezzanine Lender of such Project Change if the Senior Agent determines in good faith that failure to implement such Project Change will adversely affect the ability of the Borrower to timely complete the Project and market or market and sell the Fractional Ownership Units. In such event, the implementation of such Project Change by the Borrower shall not constitute an Event of Default under the Mezzanine Loan Documents.

Section 13.  Right to Purchase Senior Loan.

(a)     If the Senior Loan has been accelerated or any Enforcement Action has been commenced and is continuing under the Senior Loan Documents (each of the foregoing, a *Purchase Option Event*), upon ten (10) Business Days prior written notice to the Senior Agent (the *Purchase Notice*), the Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the outstanding principal balance thereof, together with all accrued interest and other amounts due thereon (including, without limitation, any late charges, default interest, exit fees, advances and post-petition interest), any Protective Advances made by the Senior Agent or the Senior Lenders and any interest charged by the Senior Lenders on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances), including all costs and expenses (including legal fees and expenses) actually incurred by the Senior Agent or the Senior Lenders in enforcing the terms of the Loan Documents (the *Loan Purchase Price*). Concurrently with payment to the Senior Agent of the Loan Purchase Price, the Senior Lenders shall deliver or cause to be delivered to the Mezzanine Lender all Senior Loan Documents held by or on behalf of the Senior Lenders and will execute in favor of the Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to the Mezzanine Lender, at the sole cost and expense of the Mezzanine Lender to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to (i) the Senior Lenders' authority to assign the Senior Loan to the Mezzanine Lender and to execute and deliver any documents related thereto, (ii) the outstanding balance of the Senior Loan and (iii) that the

Senior Lenders have not assigned or encumbered its rights in the Loan). The right of the Mezzanine Lender to purchase the Senior Loan shall automatically terminate (A) upon a transfer of the Premises to a Person that is not an Affiliate of the Borrower by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure or (B) with respect to any particular Purchase Option Event, if such Purchase Option Event does not exist at the time Mezzanine Lender delivers its Purchase Notice.

(b)     The Mezzanine Lender covenants not to enter any agreement with the Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a prepayment fee or yield maintenance -charge in connection with a prepayment of the Senior Loan by the Borrower.

Section 14. Additional Understandings. For as long as the Mezzanine Loan remains outstanding:

(a)     Notices of Transfer: Consent. The Senior Agent promptly shall notify Mezzanine Lender in writing if the Borrower seeks or requests a release of the lien of the Senior Loan or seeks or requests the Senior Lender's consent to, or take any action in connection with or in furtherance of, a sale or transfer of all or any material portion of the Premises, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan. In the event of a request by the Borrower for the Senior Agent's consent to either (i) the sale or transfer of all or any material portion of the Premises or (ii) the granting of a further mortgage, deed of trust or similar encumbrance against the Premises, the Senior Agent shall, if the Senior Agent has the right to consent, obtain the prior written consent of the Mezzanine Lender prior to the Senior Agent's granting of its consent or agreement thereto.

(b)     Annual Budget. The Mezzanine Lender shall have the right to approve the annual operating budget of the Borrower in accordance with the terms of the Mezzanine Loan Documents. Notwithstanding anything contained herein, in the Senior Loan Documents or in the Mezzanine Loan Documents, the Mezzanine Lender may require the Borrower to submit the annual budget to the Mezzanine Lender for approval prior to any submission to the Senior Agent. Upon the Mezzanine Lender's approval, the Mezzanine Lender shall submit the approved budget to the Senior Agent for its approval. The Mezzanine Lender shall consent to any changes in the budget reasonably requested by the Senior Agent. In the event that the approval of the Mezzanine Lender is not obtained on a timely basis, the then current existing operating budget shall remain in effect with an increase in any non-discretionary expense item to either (i) the prior budgeted expense amount with a 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.

(c)     Consent Rights. If Mezzanine Lender's consent or approval is required pursuant to any Mezzanine Loan Document for any act or determination by Borrower or Mezzanine Borrower in connection with the construction of the Improvements (as defined in the Mezzanine Loan Documents), including without limitation amendments to the general contract, plans and specifications or budget for the construction of the Improvements, to the extent that such consent or approval is also required by the Senior Lenders under the Senior Loan

Documents, Mezzanine Lender hereby agrees that it shall first advise the Senior Agent of whether Mezzanine Lender objects to the requested consent or approval within five (5) Business Days after its receipt of both (i) a written request for a consent or approval from Mezzanine Borrower and (ii) delivery of all materials reasonably requested by Mezzanine Lender required to make any such decision. Senior Agent shall consult with Mezzanine Lender with respect to any such consent or approval right of Mezzanine Lender.

Section 15. <u>Financing of Mezzanine Loan</u>. Notwithstanding any other provision hereof, the Senior Agent consents to the Mezzanine Lender's pledge (a *Pledge*) of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility to the Mezzanine Lender that is a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by each Rating Agency (a *Loan Pledgee*), on the terms and conditions set forth in this <u>Section 15</u>; **provided** that a Loan Pledgee which is not a Qualified Transferee may not take title to the Equity Collateral without prior written consent of the Senior Agent. Upon written notice by the Mezzanine Lender to the Senior Agent that the Pledge has been effected, the Senior Agent agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee written notice of any default by the Mezzanine Lender under this Agreement of which default the Senior Agent has actual knowledge; (b) to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a non-monetary default) to cure a default by the Mezzanine Lender in respect of its obligations to the Senior Agent hereunder, but Loan Pledgee shall not be obligated to cure any such default; (c) that no amendment, modification, waiver or termination of this Agreement shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; (d) that the Senior Agent shall give to Loan Pledgee copies of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of <u>Section 11</u> of this Agreement as if -such cure were made by the Mezzanine Lender; and (e) that, upon written notice (a *Redirection Notice*) to the Senior Agent by Loan Pledgee that the Mezzanine Lender is in default, beyond applicable cure periods, under the Mezzanine Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between the Mezzanine Lender and Loan Pledgee (which notice need not be joined in or confirmed by the Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, the Senior Agent shall remit to Loan Pledgee and not to the Mezzanine Lender, any payments that the Senior Agent would otherwise be obligated to pay to the Mezzanine Lender from time to time pursuant to this Agreement, any Mezzanine Loan Document or any other agreement between the Senior Agent and the Mezzanine Lender that relates to the Senior Loan. The Mezzanine Lender hereby unconditionally and absolutely releases the Senior Agent and each Senior Lender from any liability to the Mezzanine Lender on account of the Senior Agent's compliance with any Redirection Notice believed by the Senior Agent to have been delivered by Loan Pledgee. Loan Pledgee shall be permitted to fully exercise its rights and remedies against the Mezzanine Lender, and realize on any and all collateral granted by the Mezzanine Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Agent shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to the Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and. any such Loan

Pledgee or Qualified Transferee shall assume in the writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this <u>Section 15</u> shall remain effective unless and until Loan Pledgee shall have notified the Senior Agent in writing that its interest in the Mezzanine Loan has terminated.

Section 16.  <u>Intentionally Omitted</u>.

Section 17.  <u>Obligations Hereunder Not Affected</u>.

(a)    All rights, interests, agreements and obligations of the Senior Agent, the Senior Lenders and the Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)    any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)    any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

(iii)    any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of the Borrower or the Mezzanine Borrower or any other Affiliates of the Borrower;

(iv)    any change, restructuring or termination of the corporate structure or existence of the Borrower or the Mezzanine Borrower or any other Affiliates of the Borrower; or

(v)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower, the Mezzanine Borrower or a subordinated creditor or a Senior Lender subject to the terms hereof.

(b)    This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by the Senior Agent or any Senior Lender or the Mezzanine Lender upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise,' all as though such payment had not been made.

Section 18.  <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party

may hereafter specify in accordance with the provisions of this <u>Section 18</u>. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of sending by facsimile if sent during business hours on a -Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during lousiness hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

To the Mezzanine Lender:

BayNorth Realty Fund VI, Limited Partnership
One Financial Center, Floor 23
Boston, MA 02111
Attention: Mr. Charles J. Flint
Telecopy (617) 570-4404

With a copy to:

Goodwin Procter LLP
Exchange Place
Boston, MA 02109
Attention: Christopher B. Barker, P.C.
Telecopy (617) 227-8591

To the Senior Agent:

WestLB AG,
New York Branch
1211 Avenue of the Americas
New York, New York 10036
Attention: Bruce F. Davidson, Global Structured Finance – Infrastructure
Telecopy (212) 921-5947

With a copy to:

Katten Muchin Rosenman, LLP
575 Madison Avenue
New York, New York 10022-2585
Attention: Sheri P. Chromow, Esq.
Telecopy (212) 894-5527

Section 19.  <u>Estoppel</u>

    (a)    The Mezzanine Lender shall, within ten (10) days following a request from the Senior Agent, provide the Senior Agent with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

(b)     The Senior Agent shall, within ten (10) days following a request from the Mezzanine Lender, provide the Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

Section 20.  Further Assurances. So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, the Mezzanine Lender and the Senior Agent will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof at the cost and expense of the party requesting the same.

Section 21.  No Third Party Beneficiaries; No Modification. The parties hereto do not intend the benefits of this Agreement to inure to the Borrower, the Mezzanine Borrower or any other Person. This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom' enforcement of any change is sought. If any Certificates are outstanding, this Agreement shall not be amended unless a Rating Agency Confirmation has been obtained with respect to such amendment.

Section 22.  Successors and Assigns. This Agreement shall bind all successors and permitted assigns of the Mezzanine Lender and the Senior Agent and Senior Lender and shall inure to the benefit of all successors and permitted assigns of the Senior Agent, the Senior Lenders and the Mezzanine Lender.

Section 23.  Counterpart Originals. This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

Section 24.  Legal Construction. In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

Section 25.  No Waiver; Remedies. No failure on the part of the Senior Agent to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 26.  No Joint Venture. Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 27.  Captions. The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 28. Conflicts. In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 29. No Release. Nothing herein contained shall operate to release the Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of the Borrower under the Senior Loan Documents or to release the Mezzanine Borrower from (x) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (y) any liability of the Mezzanine Borrower under the Mezzanine Loan Documents.

Section 30. Continuing Agreement. This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan, (b) transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the -power of - sale contained therein or by deed-in-lieu of foreclosure, (c) transfer of title to the Mezzanine Lender of the Separate Collateral or (d) payment in full of the Mezzanine Loan; **provided**, that any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination.

Section 31. Severability: In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable, provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

Section 32. Expenses.

(a)    To the extent not paid by the Borrower or out of or from any collateral securing the Senior Loan which is realized by the Senior Lenders, the Mezzanine Lender agrees upon demand to pay to the Senior Agent the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which the Senior Agent may incur in connection with the (i) exercise or enforcement of any of the rights of the Senior Agent or Senior Lenders against the Mezzanine Lender hereunder to the extent that the Senior Agent or any Senior Lender is the prevailing party in any dispute with respect thereto or (ii) failure by the Mezzanine Lender to perform or observe any of the provisions hereof.

(b)    To the extent not paid by the Mezzanine Borrower out of or from any collateral securing the Mezzanine Loan which is realized by the Mezzanine Lender, the Senior Lenders agree upon demand to pay to the Mezzanine Lender the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which the Mezzanine Lender may incur in connection with

the (i) exercise or enforcement of any of the rights of the Mezzanine Lender against the Senior Agent or the Senior Lenders hereunder to the extent that the Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by the Senior Agent or the Senior Lenders to perform or observe any of the provisions hereof.

Section 33. <u>Injunction</u>. The Senior Agent and the Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either the Senior Agent or the Mezzanine Lender hereunder would cause irreparable harm to the other. Accordingly, the Senior Agent and the Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34. <u>Mutual Disclaimer</u>.

(a)    Each of the Senior Agent and the Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of the Senior Agent and the Mezzanine Lender deem relevant. Each of the Senior Agent and the Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein. Each of the Senior Agent and the Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of the Senior Agent and the Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement. Without limiting the foregoing, each of the Senior Agent and the Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)    Each of the Senior Agent and the Mezzanine Lender acknowledges that the Senior Loan and the Mezzanine Loan Documents are distinct, separate transactions and loans, separate and apart from each other.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

WESTLB AG, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By: _____
    Name:  Bruce F. Davidson
    Title:   Director

By: _____
    Name:  Andrew B. Stein
    Title:   Managing Director


MEZZANINE LENDER:

BAYNORTH REALTY FUND VI, LIMITED PARTNERSHIP

By:    BayNorth Realty Fund VI GP, Limited
    Partnership, its general partner

    By:    BayNorth Realty Fund VI, LLC, its
    general partner


    By: _____
        Name:
        Title:

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

WESTLB, AG, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By: _____
    Name:  Bruce F. Davidson
    Title:   Director

By: _____
    Name:  Andrew B. Stein
    Title:   Managing Director


MEZZANINE LENDER:

BAYNORTH REALTY FUND VI, LIMITED PARTNERSHIP

By:    BayNorth Realty Fund VI GP, Limited Partnership, its general partner

      By:    BayNorth Realty Fund VI, LLC, its general partner

          By: _____
             Name:
             Title:

The Mezzanine Borrower and the Borrower acknowledge the terms of this Agreement by their execution below:

MEZZANINE BORROWER:

EASY STREET MEZZANINE LLC,
a Delaware limited liability company,

By:    Easy Street Holding LLC,
       a Utah limited liability company,
       its sole member

       By:    AVG-SL, LLC,
              a Utah limited liability company,
              its manager

              By: _____
              Name:  William Shoaf
              Title:    Manager

BORROWER:

EASY STREET PARTNERS, LLC,
a Utah limited liability company

BY:    Easy Street Mezzanine LLC,
       a Delaware limited liability company,
       its sole member

       By:    Easy Street Holding LLC,
              a Utah limited liability company,
              its sole member

              By:    AVG-SL, LLC,
                     a Utah limited liability
                     company,
                     its manager

                     By: _____
                     Name:  William Shoaf
                     Title:    Manager

EXHIBIT A

## DESCRIPTION OF LAND

PARCEL NO. 1

BEGINNING AT A POINT SOUTH 4.73 FEET AND WEST 49.84 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH
19°54'51' EAST 18.50 FEET, THENCE NORTH 31°58'04" WEST 72.72 FEET, THENCE
SOUTH 58°02'07" WEST 81.41 FEET MORE OR LESS, THENCE SOUTH 32°25'56" EAST
128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 32°25'56" EAST 128.51 FEET,
THENCE EAST 13.75 FEET, THENCE SOUTH 23°38' EAST 64.90 FEET TO THE
NORTHERLY LINE OF HEBER AVENUE AS DEDICATED, THENCE SOUTH 81°17'
EAST 24.80 FEET ALONG SAID NORTHERLY LINE, THENCE NORTH 15°46'12" EAST
60.79 FEET TO THE POINT OF BEGINNING.

SUBJECT TO AND TOGETHER WITH A 20 FOOT RIGHT OF WAY AS CREATED IN
THAT CERTAIN EASEMENT RELOCATION AGREEMENTS RECORDED DECEMBER
31, 1973 AS ENTRY NO. 244339 AND 244340 IN BOOK 368 AT PAGE NO'S 635 AND 643
OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER,
SAID RIGHT OF WAY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS 65.21 FEET SOUTH AND 51.59 FEET WEST OF
THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, SAID POINT ALSO BEING 12.0 FEET NORHTWEST OF THE
SOUTHEAST CORNER OF LOT 15, BLOCK 50, OF THE PARK CITY SURVEY AND
RUNNING THENCE NORTH 10°18'32" EAST 66.28 FEET, THENCE EAST 3.38 FEET,
THENCE NORTH 31°58'00" WEST 77.00 FEET, THENCE NORTH 19°54'00" EAST 66.80
FEET, THENCE CONTINUING NORTH 19°54'00" EAST 123.47 FEET, THENCE NORTH
70°06'00" WEST 20.00 FEET, THENCE SOUTH 19°54'00" WEST 200.00 FEET, THENCE
SOUTH 31°58'00" EAST 73.76 FEET, THENCE SOUTH 10°44'00" WEST 63.67 FEET,
THENCE SOUTH 81°17'00" EAST 20.23 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-F

PARCEL 2

BEGINNING AT A POINT 50 FEET, NORTH OF THE SOUTHEAST CORNER OF THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP
2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING
THENCE NORTH 43.97 FEET, THENCE NORTH 66°11' WEST 142.63 FEET, THENCE
SOUTH 31°58' EAST 119.75 FEET, THENCE EAST 67.1 FEET TO THE POINT OF
BEGINNING.

EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN EASY STREET
BRASSERIE REPLAT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED
MARCH 12, 2003 AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE
OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO. SA-400-A

PARCEL 3

BEGINNING AT A POINT 38.85 FEET WEST OF THE SOUTHEAST CORNER OF THE
SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP
2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING
THENCE WEST 7.93 FEET, THENCE SOUTH 06°02' EAST 67.70 FEET, THENCE NORTH
81°17' WEST 27.0 FEET, THENCE NORTH 15°46'12" EAST 60.79 FEET, THENCE NORTH
32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51" EAST 18.50 FEET, THENCE
SOUTH 31°58' EAST 25.40 FEET, THENCE SOUTH 19°54' WEST 3.18 FEET, THENCE
SOUTH 31°54' EAST 77.00 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-406

PARCEL 4 AND 4A

LOTS 1 AND 2, EASY STREET BRASSERIE REPLAT SUBDIVISION, ACCORDING TO
THE OFFICIAL PLAT THEREOF RECORDED MARCH 12, 2003, AS ENTRY NO. 650840
IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE
SUMMIT COUNTY RECORDER.

TAX PARCEL NO.'S ESB-1, AND ESB-2

PARCEL 5

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN, IN PARK CITY, SUMMIT COUNTY, UTAH BOUNDED AND
DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS WEST, A DISTANCE OF 35.90 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SAID SECTION 16, THENCE CONTINUING WEST A DISTANCE OF 2.95
FEET, THENCE NORTH 31°58' WEST A DISTANCE OF 77.00 FEET, THENCE NORTH
19°54' EAST A DISTANCE OF 3.18 FEET, THENCE SOUTH 31°58' EAST A DISTANCE OF
80.53 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO TOGETHER WITH THE FOLLOWING DESCRIBED PROPERTY:

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST
QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE
AND MERIDIAN IN PARK CITY, SUMMIT COUNTY UTAH, BONDED AND
DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS NORTH A DISTANCE OF 93.97 FEET FROM THE
SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF SAID SECTION 16, THENCE NORTH 66°11' WEST A DISTANCE OF 65.29
FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 8.32 FEET, THENCE SOUTH
66°46'30" EAST A DISTANCE OF 193.50 FEET, THENCE SOUTH 7°16' EAST A
DISTANCE OF 12.03 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 4.32 FEET,
THENCE NORTH A DISTANCE OF 8.23 FEET, THENCE WEST A DISTANCE OF 18.65
FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 109.15 FEET MORE OR LESS TO
THE POINT OF BEGINNING.

TAX PARCEL NO. SA-425-UPL

PARCEL 6

LOT 15, BLOCK 50, PARK CITY SURVEY, ACCORDING TO THE OFFICIAL PLAT
THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE SUMMIT COUNTY
RECORDER, EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN THE
PARCELS 1-5 LISTED ABOVE.

TAX PARCEL NO. EXEMPT

# EXHIBIT B

## Senior Loan Documents

1.     Loan and Security Agreement by and between Easy Street Partners, LLC and WestLB AG, New York Branch;

2.     Promissory Note from Easy Street Partners, LLC to WestLB AG, New York Branch;

3     Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing;

4.     Environmental Indemnity Agreement by Easy Street Partners, LLC and CloudNine Resorts, LLC to and for the benefit for WestLB AG, New York Branch;

5.     Recourse Liability Agreement by CloudNine Resorts, LLC to and for the benefit of WestLB AG, New York Branch;

6.     Consent and Subordination of Management Agreement by and between Easy Street Partners, LLC, CloudNine Resorts/Sky Lodge, LLC and WestLB AG, New York Branch;

7.     Consent and Subordination of Development Agreement by and between Easy Street Partners, LLC, CloudNine Resorts/Sky Lodge Development, LLC and WestLB AG, New York Branch;

8.     Pledge and Security Agreement by Easy Street Partners, LLC to WestLB AG, New York Branch;

9.     Consent to Pledge and Security Agreement (General Contractor) by and between Jacobsen Construction Company, Inc. to WestLB AG, New York Branch;

10.     Consent to Pledge and Security Agreement (Architect) by and between Elliott Mahoney Architecture, LLC, dba Elliott Merous Architecture to WestLB AG, New York Branch;

11.     Consent to Pledge and Security Agreement (Listing Agent) by and between Extreme Holding, LLC and WestLB AG, New York Branch;

12.     Intercreditor Agreement by and between WestLB AG, New York Branch and BayNorth Realty Fund VI, Limited Partnership;

13.     UCC-1 Financing Statement (Deed of Trust) to be recorded with the Secretary of State of Utah;

14.     UCC-1 Financing Statement (Deed of Trust) to be recorded in Summit County, Utah;

15.    UCC-1 Financing Statement (Pledge and Security Agreement) to be recorded with the
Secretary of State of Utah.

EXHIBIT C

Mezzanine Loan Documents

1.      Loan Agreement by and between Easy Street Mezzanine, LLC and BayNorth Realty
        Fund IV, Limited Partnership dated as of even date herewith.

2.      Promissory Note from Easy Street Mezzanine, LLC to BayNorth Realty Fund IV,
        Limited Partnership dated as of even date herewith.

3.      Pledge Agreement of Easy Street Holding, LLC in favor of BayNorth Realty Fund
        IV, Limited Partnership dated as of even date herewith.

4.      Completion Guaranty of David L. Wickline and William Shoaf in favor of BayNorth
        Realty Fund IV, Limited Partnership dated as of even date herewith.

5.      Guaranty and Non-Competition Agreement of David L. Wickline and William Shoaf
        in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even date
        herewith.

6.      Environmental Indemnification Agreement by and among Easy Street Mezzanine,
        LLC, David L. Wickline and William Shoaf in favor of BayNorth Realty Fund IV,
        Limited Partnership dated as of even date herewith.

7.      Power of Attorney from Easy Street Mezzanine, LLC in favor of BayNorth Realty
        Fund IV, Limited Partnership dated as of even date herewith.

8.      Closing Certificate of Easy Street Mezzanine, LLC, David L. Wickline and William
        Shoaf in favor of BayNorth Realty Fund IV, Limited Partnership dated as of even
        date herewith.

9.      Assignment of Contracts and Other Rights from Easy Street Mezzanine, LLC to
        BayNorth Realty Fund IV, Limited Partnership dated as of even date herewith.

10.     Cash Management Agreement by and between Zions First National Bank, Easy Street
        Mezzanine, LLC and BayNorth Realty Fund IV, Limited Partnership dated as of even
        date herewith

11.     UCC-1 Financing Statements