Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
Steven J. McCardell (smccardell@djplaw.com)(2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
Salt Lake City, UT 84111
Telephone: (801) 415-3000/Fax: (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com)
Bruce J. Zabarauskas (bzabarauskas @crowell.com)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 223-4000/Fax: (212) 223-4134
Counsel for Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EASY STREET HOLDING, LLC, *et al.* | ) | Bankruptcy Case No. 09-29905 |
| | ) | Jointly Administered with Cases |
| Debtors. | ) | 09-29907 and 09-29908 |
| | ) | |
| Address:  201 Heber Avenue | ) | Chapter 11 |
| Park City, UT 84060 | ) | |
| | ) | Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) | |
| 35-2183713 (East Street Holding, LLC), | ) | |
| 20-4502979 (Easy Street Partners, LLC), and | ) | |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) | |
| | ) | |
| EASY STREET PARTNERS, LLC, EASY STREET | ) | |
| MEZZANINE, LLC, AND EASY STREET | ) | Adversary Proceeding No. |
| HOLDING, LLC, | ) | |
| | ) | _____ |
| Plaintiffs, | ) | |
| | ) | |
| - against - | ) | |
| | ) | |
| BAYNORTH REALTY FUND VI, LIMITED | ) | **VERIFIED COMPLAINT** |
| PARTNERSHIP, | ) | |
| | ) | |
| Defendant. | ) | |

Easy Street Partners, LLC ("Partners"), Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding"), debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors" or "Plaintiffs"), as and for their verified complaint in the above-captioned adversary proceeding, respectfully allege as follows:

## OVERVIEW OF ADVERSARY PROCEEDING

1.      This is an adversary proceeding commenced by the Debtors, pursuant to §§ 105(a) and 362(a) of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors seek: (i) an order pursuant to § 105(a) of the Bankruptcy Code staying defendant BayNorth Realty Fund VI, L.P. ("BayNorth") from continuing the prosecution of an action against William Shoaf ("Shoaf") pending in Superior Court in the Commonwealth of Massachusetts entitled <u>BayNorth Realty Fund VI, L.P., v. William Shoaf and David L. Wickline</u>, (Civil Action No. 09-4303) (the "Massachusetts Action") during the course of the above-captioned Chapter 11 case or otherwise attempting to exercise remedies against Shoaf, (the operator of the Sky Lodge Hotel in Park City Utah through Cloud Nine SL-Management LLC) based on a "springing guaranty" executed in connection with certain alleged debts of Mezzanine; and/or (ii) a declaratory judgment determining that, in this particular case, the commencement and continuation of the Massachusetts Action against Shoaf violates the automatic stay provisions of the Bankruptcy Code because BayNorth's claims against Shoaf in the Massachusetts Action are so inextricably intertwined with BayNorth's claim against Mezzanine, that the Massachusetts Action essentially asserts a claim against Mezzanine.

2.      Relief against BayNorth under § 105 of the Bankruptcy Code is necessary because Shoaf's uninterrupted, daily management of the Debtors' business is

essential to the Debtors' reorganization.  Requiring Shoaf to defend a lawsuit in Massachusetts

which relates to the Debtors' business in Utah would cause a substantial disruption to the

Debtors' business at a critical period of time, to the detriment of all of the Debtors' creditors.

Additionally, in a separate adversary proceeding commenced before this Court (the "BayNorth

Loan Adversary Proceeding"), the Debtors' seek substantial damages against BayNorth and the

invalidation of certain provisions of the loan agreement and promissory note between

Mezzanine and BayNorth.  By proceeding against Shoaf in the Massachusetts Action, BayNorth

is seeking to preempt this Court from ruling on these important issues in the Debtors'

Chapter 11 case by having a Massachusetts state court first rule on BayNorth's actions and the

validity of the very loan provisions which are being attacked in the BayNorth Loan Adversary

Proceeding.

## <u>JURISDICTION AND PARTIES</u>

3.    This Court has jurisdiction over this adversary proceeding pursuant to

28 U.S.C. §§ 157 and 1334, and venue is proper pursuant to 28 U.S.C. § 1409.

4.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A), (E), (H) and (O).

5.    Plaintiff Partners is a Utah limited liability company, and has a principal

place of business at 201 Heber Avenue, Park City, Utah.

6.    Plaintiff Mezzanine is a Delaware limited liability company, and has a

principal place of business at 201 Heber Avenue, Park City, Utah.

7.    Plaintiff Holding is a Utah limited liability company, and has a principal

place of business at 201 Heber Avenue, Park City, Utah.

SLC_503108.3

8.      Defendant BayNorth is a Delaware limited partnership, with a principal

place of business c/o BayNorth Capital, LLC, One Financial Center, 23rd Floor, Boston,

Massachusetts 02111.

## BACKGROUND

9.      On September 14, 2009 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court under chapter 11 of the Bankruptcy Code.  An Official

Committee of Unsecured Creditors ("Committee") was appointed on October 6, 2009.  The

Debtors continue to operate their business and manage their property as debtors-in-possession.

10.     Plaintiff Partners is the owner and operator of the Sky Lodge in Park

City, Utah.  The Sky Lodge is a luxury boutique hotel located in the middle of historic Main

Street in Old Town Park City (the "Premises").  It is an ultra stylish resort hotel offering all of

Park City's amenities plus a restaurant offering both casual and fine dining, a bar and lounge, a

bakery, a spa, and meeting and event venues.  The Debtors have approximately 100 employees.

11.     Plaintiff Mezzanine is the 100% owner and managing member of

Partners.

12.     Plaintiff Holding is the 100% owner and managing member of

Mezzanine.

## MANAGEMENT OF THE DEBTORS

13.     The members of Holding are Park City I, LLC, Philo Smith Jr. Trust,

Alchemy Ventures Trust, and CloudNine Resorts, LLC.

14.     Shoaf, representing Cloud Nine Resorts, LLC, Michael Feder,

representing Park City I, LLC, and Philo Smith Jr., representing the Philo Smith Jr. Trust, are

the co-managers of the Debtors.

4

15.     Shoaf, as a co-manager of the Debtors, is the person responsible for day-to-day management activities at The Sky Lodge.  These daily duties include:

(i)     supervision of all Department Heads as it pertains to daily operations of the Rooms, Food and Beverage, Spa, and Property Facilities of the resort. This includes oversight to ensure that all guest services, amenity offerings, property upkeep and cleanliness, and delivery of overall product are maintained;

(ii)    review of daily departmental revenues centers, labor control by departments, cost of goods sold, and line items;

(iii)   review of daily guest arrivals and special events. Coordination of any VIP or special treatment of guests or groups on the property;

(iv)    interface with hotel and other property guests to ensure proper handling of any disputes, problems or questions;

(v)     monitoring of all guest comment outlets - Market Matrix, Trip Advisor, Expedia, Yelp, etc. to ensure problems or issues are handled within 24 hours;

(vi)    interface with any media, governmental, or regulatory inquiries;

(vii)   review and approve of all hotel expenditures for goods and services that are part of the overall purchase order process;

(viii)  review and approval of all payments made to vendors; and

(ix)    daily review with Sales and Reservations Departments as to current and advance bookings for lodging and special events.

16.     In additional to these daily duties, Shoaf is also responsible for:

(i)     the development of all annual budgets and any reforecast of such for the hotel operations;

(ii)    monitoring the performance of actual versus estimated departmental performances including the coordination of development of any cost savings or short term promotional programs needed to address issues arising in these areas;

(iii)   the constant review of all labor and staffing related expenditures and the coordination of any efforts to adjust or refine;

5

(iv)    the review and management – in conjunction with Account Department – of all cash flow related issues including all day-to-day cash management and longer term cash planning;

(v)    coordination of all efforts needed to provide monthly management reports to ownership. Execution and delivery of such reports;

(vi)    coordination with Sales Department for all marketing, special events, promotions and internet based initiatives;

(vii)    review and approval of all marketing related efforts and collateral materials development;

(viii)    review and approval of all restaurant menus, wine lists, and promotional programs;

(ix)    review and approval of all spa menus and promotional programs;

(x)    management of all issue and relationships with unit owners in the hotel rental program;

(xi)    management of all relationships with City and State government agencies;

(xii)    management of all social and non profit relationships;

(xiii)    management of all media and public relations related issues and efforts;

(xiv)    management of all travel consortium relations; and

(xv)    as the individual holder of the State Liquor Licenses for the property, Shoaf ensures that all regulations are followed and that reports and actions needed to retain such licenses are done in a timely basis; and

(xvi)    managing and signing all of the Debtors bank accounts, contracts, and lender accounts.

17.    With respect to the Debtor's reorganization efforts, Shoaf's responsibilities include the management of all aspects of the current Chapter 11 case, including:

(i)    acting as Management's representative to the U.S. Trustee and attending court hearings;

(ii)    being the point person for the coordination of all efforts of the legal team with the Debtors;

6

      (iii)    management of the development of and point person responsible for, the delivery of all reports (weekly and monthly) to WestLB as detailed in the Cash Collateral Stipulation;

      (iv)    coordination for all potential investment groups and operational consultants with various historic financial information, future looking financial pro forma, detailed reports on organizational structures and legal arrangements, and data related to land and property ownership, liens, and entitlements; and

      (v)    being the on-site person to provide site tours or attend meetings related to consultants, legal representatives, financial officers or investment advisors.

18.    Shoaf also takes an active role in the marketing and sales of fractional units at the Premises.  These efforts include:

      (i)    interfacing with real estate brokerage and sales team;

      (ii)    reviewing and approving of all real estate budgets and sales projections;

      (iii)    reviewing and approving of all real estate marketing programs and collateral materials;

      (iv)    coordinating all government-related issues and authorizations; and

      (v)    Managing all tax and financially related activities for the Partnership.

19.    Shoaf is also active in the homeowners association (the "HOA") at the Premises.  These activities include:

      (i)    acting as the point person for all issues related to the HOA as it pertains to the Chapter 11 process;

      (ii)    acting as the Manager of HOA - responsible for the development and management of the annual HOA operating budget;

      (iii)    management of the collection of all HOA receivables;

      (iv)    management of the HOA Owner Concierge which includes assistance in the resolution of members issues and addressing of members complaints;

    (v)      management of the owner usage allocation and reservation process;

    (vi)    communication to the HOA members on a consistent basis on HOA related issues; and

    (vii)   interfacing with owners of fractional units at the Premises.

## **INDEMNIFICATION OF SHOAF BY THE DEBTORS**

20.      Under applicable law and the operating agreements of the Debtors (the "Operating Agreements"), Shoaf is entitled to indemnification for his actions which are taken on behalf of the Debtors.  (Copies of the Operating Agreements are annexed hereto as Exhibit A.)  The Debtors' obligation to indemnify Shoaf includes advancement of legal fees and costs.

## **THE WEST LB SENIOR LOAN**

21.      On March 30, 2006, Partners entered into a Loan and Security Agreement (the "Senior Loan Agreement") for the initial amount of $36,779,224 (the "WestLB Senior Loan") with WestLB AG ("WestLB") to develop a condominium hotel mixed use project (the "Project") at 201 Heber Avenue, Park City, Utah (the "Premises").

22.      The WestLB Senior Loan is secured by, among other things, security interests evidenced by a Deed of Trust with Security Agreement on the Premises, Assignment of Leases and Rents and Fixture Filing, and a UCC Financing Statement, each filed in the Summit County Recorder's Office, State of Utah.

23.      Under the Senior Loan Agreement, the WestLB Senior Loan was to become due on or about March 30, 2009 (the "WestLB Maturity Date"), subject to extensions of the maturity date for an additional one or two years through the conversion of the WestLB Senior Loan to an "Interim Loan" (as defined in the WestLB Senior Loan Agreement),

8

provided, <u>inter alia</u>, that Partners was not in default of its obligations under the Senior Loan Agreement.

## THE BAYNORTH MEZZANINE LOAN

24.     On or about March 30, 2006, Mezzanine entered into a Loan Agreement (the "BayNorth Mezzanine Loan Agreement") in the initial amount of $11,250,000 (the "BayNorth Mezzanine Loan") with BayNorth.

25.     In connection with the BayNorth Mezzanine Loan, Mezzanine executed and delivered a promissory note to BayNorth in the amount of $11,250,000, dated March 30, 2006 (the "BayNorth Note").

26.     Under Article 3 of the BayNorth Note, interest accrues on the BayNorth Mezzanine Loan at the rate of 16% per annum, compounded monthly.  The payment of such interest may be, and was, deferred by the borrower so long as it was not in default of its obligations under the Mezzanine Loan Agreement and Mezzanine Note.

27.     The Mezzanine Loan Agreement also provides for a yield maintenance provision which, according to BayNorth, currently entitles it to interest in excess of 50% per annum plus default interest of an additional 20% per annum.

28.     The BayNorth Mezzanine Loan is what is known in the financing industry as a "mezzanine loan."

29.     The BayNorth Mezzanine Loan and the obligations under the BayNorth Note are secured by a pledge by plaintiff Holding of its 100% ownership interest in plaintiff Mezzanine (the "Pledge Agreement"), as evidenced by a UCC financing statement (the "UCC Filing") filed with the Secretary of State of Utah.

9

## THE SPRINGING GUARANTY OF BAYNORTH'S MEZZANINE LOAN

30.      On or about March 30, 2006, Shoaf and Wickline (each a "Guarantor")

entered into a springing guaranty and non-competition agreement (the "Springing Guaranty" or

the "Guaranty") in connection with the BayNorth Mezzanine Loan.  (A copy of the Springing

Guaranty is annexed hereto as <u>Exhibit B</u>.)

31.      Section 2 of the Springing Guaranty provides, in pertinent part, that:

> Except for recourse to assets of a Guarantor which serve as
> collateral for obligations under the Loan Documents, and
> except as provided in Section 3, there shall be no recourse
> to any Guarantor under this Guaranty unless and until a
> Limited Recourse Event or a Full Recourse Event shall
> have occurred.

32.      The Guaranty defines "Full Recourse Event" to mean, among other

things, the commencement of a bankruptcy case by Mezzanine without the prior written consent

of BayNorth.  Specifically, "Full Recourse Event" is defined in Section 2 of the Springing

Guaranty to mean the occurrence of, among other things the following:

> (e) Except as otherwise permitted under the Loan
> Documents, if [Mezzanine], the Subsidiary Owner or any
> Pledgor under the Pledge Agreement, without prior written
> consent of [BayNorth]. . . (iii) commences, seeks relief
> under, consents in writing to, or solicits or encourages
> others to commence, any bankruptcy, insolvency,
> reorganization, arrangement, readjustment of debt,
> dissolution, . . . liquidation, rehabilitation, or similar
> proceeding relating to it, all or part of its debt or to all or
> any part of the collateral granted to [BayNorth] as security
> for the Loan or any other assets of [Mezzanine] or the
> Subsidiary Owner (collectively, an "Insolvency
> Proceeding"). . . .

### THE COMPLETION GUARANTY OF THE BAYNORTH LOAN

33.     On or about March 30, 2006, Shoaf and Wickline (each a "Guarantor")

entered into a completion guaranty (the "Completion Guaranty") in connection with the

BayNorth Mezzanine Loan.  (A copy of the Completion Guaranty is annexed hereto as

Exhibit C.)

34.     Section 2 of the Completion Guaranty provides, in pertinent part, that:

> Each Guarantor hereby irrevocably and unconditionally
> guaranties to [BayNorth] and its successors and assigns the
> prompt, complete and timely performance of all of
> [Mezzanine]'s and the Subsidiary Owner's present and
> future obligations under the Loan Documents with respect
> to performance, construction and completion (as reasonably
> determined by the Construction Consultant) of, and
> payment of all costs of constructing the Improvements in
> accordance with all Legal Requirements, the Senior Loan
> Documents, the Loan Documents, the Business Plan and
> Plans and Specifications, and free of liens for services,
> materials or labor and free of all material defects (all of the
> foregoing liabilities, indebtedness and obligations, as they
> may be amended or supplemented from time to time,
> collectively the "Obligations"). … [BayNorth] expressly
> acknowledges and agrees that [BayNorth] will use the
> Deposits actually delivered to [BayNorth] in accordance
> with Section 3.51 of the Loan Agreement before any
> demands are made on a Guarantor hereunder….

### THE IMPROPER $5,600,000 BAYNORTH TRANSFER

35.     As of February 19, 2008, there was approximately $28,000,000 in the

Debtors' Real Estate Sales Proceeds Account, which is an account under the sole control of

WestLB.

36.     On February 15, 2008, at the direction and authorization of WestLB, a

partial principal repayment of $22,400,000 on the WestLB Senior Loan was made to WestLB

from Real Estate Sales Proceeds Account.

11

37.    On or about February 19, 2008, WestLB mistakenly transferred $5,600,000 from the Real Estate Sales Proceeds Account to BayNorth (the "BayNorth Transfer").

38.    Pursuant to the WestLB Senior Loan Agreement and an Intercreditor Agreement between WestLB and BayNorth, the funds consisting of the BayNorth Transfer were required to be paid to WestLB towards satisfaction of the outstanding principal and interest under the WestLB Senior Loan Agreement.

39.    The BayNorth Transfer resulted in: (i) an erroneous payment of $1,646,871 in principal under the BayNorth Mezzanine Loan in violation of the terms of the BayNorth Note and the Intercreditor Agreement; and (ii) an erroneous payment of $3,353,129 in interest, which was being deferred by the borrower pursuant to the terms of the BayNorth Note, all of which was received by BayNorth in violation of the Mezzanine Loan Agreement, BayNorth Note and Intercreditor Agreement.

40.    WestLB and the Debtors each demanded that BayNorth return the BayNorth Transfer.  Notwithstanding that BayNorth received the BayNorth Transfer in violation of the BayNorth Mezzanine Loan Agreement, the BayNorth Note, and the Intercreditor Agreement, BayNorth refused to return the BayNorth Transfer.

41.    BayNorth's refusal to return moneys that were erroneously sent to it in violation of the aforementioned agreements resulted in, *inter alia*: (i) WestLB refusing to permit Partners' exercise of its contractual right to extend the March 30, 2009 maturity date of the WestLB Senior Loan; and (ii) WestLB declaring a maturity default on such loan.

12

42.     BayNorth then took advantage of this default, which was caused by BayNorth's refusal to return money to which it was not entitled, by then declaring a default under the Mezzanine Loan and scheduling a UCC sale of the equity interests in plaintiff Mezzanine (which are owned by plaintiff Holdings), notwithstanding that there were no monetary defaults under the Mezzanine Loan.  BayNorth's actions were intentional and designed to clear the way for BayNorth to foreclose on its security interests and ultimately take control of the Sky Lodge following complete development and renovation of the Premises by the Debtors.

**BAYNORTH'S ACTIONS: (A) PREVENTED PARTNERS FROM CONVERTING THE WESTLB SENIOR LOAN INTO AN INTERIM LOAN AND EXTENDING THE WESTLB MATURITY DATE AND (B) RESULTED IN A DEFAULT UNDER THE WESTLB SENIOR LOAN AGREEMENT**

43.     On September 25, 2008, Partners formally notified WestLB of the exercise of its right under section 2.15 of the WestLB Senior Loan Agreement to convert WestLB Senior Loan into an Interim Loan and extend the WestLB Maturity Date.

44.     On or about March 4, 2009, WestLB sent a letter to Partners, asserting that, after reviewing the disposition of the net sales proceeds from sales of Fractional Units, it, as the Senior Lender, had been underpaid $4,899,104 from the distributions that occurred in February of 2008.

45.     This underfunding was the direct result of the erroneous payment of the BayNorth Transfer to BayNorth on account of the BayNorth Mezzanine Loan, which was in violation of the BayNorth Mezzanine Loan, the BayNorth Mezzanine Note and the Intercreditor Agreement.

46.     Realizing the mistake that had been made in making the BayNorth Transfer in February 2008, WestLB and the Debtors each demanded that BayNorth return the BayNorth Transfer.

47.     Notwithstanding that BayNorth received the BayNorth Payment in violation of the BayNorth Mezzanine Loan Agreement, the BayNorth Note and the Intercreditor Agreement, BayNorth refused to return the BayNorth Transfer.

48.     As a result of the underpayment of the WestLB Senior Loan caused by the erroneous BayNorth Transfer, WestLB took the position that Partners was in default of its obligations under the WestLB Senior Loan Agreement and was not entitled to: (i) convert the WestLB Senior Loan into an Interim Loan; and (ii) extend the WestLB Maturity Date beyond March 31, 2009.

49.     BayNorth's bad faith attempt to obtain control over the Plaintiffs and the Premises by declaring a default that was caused by BayNorth's own actions has: (i) required the Plaintiffs to seek bankruptcy protection under the Bankruptcy Code; (ii) resulted in WestLB refusing to release escrow funds under its control, which were to be used for a draw request in connection with the completion of construction and renovations at the Premises; (iii) resulted in WestLB charging plaintiff Partners with default interest under the WestLB Senior Loan; (iv) resulted in the filing of numerous mechanics liens against the Premises, even though there are funds in a frozen escrow account which were sufficient to pay such mechanics liens in full; and (v) eliminated the ability of the Plaintiffs to sell fractional units at the Premises, as potential purchasers have been chilled from buying units as a result of the imposition of substantial liens

14

on the Premises.  BayNorth's bad faith and predatory practices have resulted in substantial

damages to the Plaintiffs.

## THE BAYNORTH NOTICE OF DEFAULT
## AND SCHEDULED UCC SALE

50.     On May 5, 2009, BayNorth issued to Mezzanine a notice of default on

the BayNorth Mezzanine Loan (the "BayNorth Notice of Default").

51.     The principal default alleged in the BayNorth Notice of Default is a

violation of a cross-default provision, which provides that a default under the WestLB Senior

Loan Agreement is a default under the BayNorth Mezzanine Loan Agreement.   However, the

alleged default under the WestLB Senior Loan Agreement that BayNorth was relying upon was

caused by: (i) BayNorth's receipt of the BayNorth Transfer in violation of the BayNorth

Mezzanine Loan Agreement, the BayNorth Note and the Intercreditor Agreement; and

(ii) BayNorth's refusal to return such erroneously transferred funds.

52.     None of the alleged defaults under the BayNorth Notice of Default were

monetary defaults.  The alleged defaults, which purportedly occurred in the first quarter of

2008, were either fabricated, waived or cured.

53.     Mezzanine is not in default under the Mezzanine Loan Agreement or

BayNorth Note.

54.     The BayNorth Notice of Default was followed by the issuance of a

Notice of Acceleration and Demand for Payment, which was issued by BayNorth on June 23,

2009 (the "BayNorth Notice of Acceleration").

SLC_503108.3

55.    On July 5, 2009, after issuance of the BayNorth Notice of Default and

BayNorth Notice of Acceleration, WestLB issued a notice of default under the WestLB Senior

Loan Agreement ("WestLB Notice of Default").

56.    The alleged defaults set forth in the WestLB Notice of Default were

caused by BayNorth's failure to return the BayNorth Transfer.

57.    On July 28, 2009, a Notice of Sale was issued by BayNorth, which

purported to schedule a UCC sale of the ownership interests in Mezzanine on September 16,

2009.

### THE BANKRUPTCY FILING AND THE BAYNORTH
### LOAN ADVERSARY PROCEEDING

58.    On September 14, 2009, each of the Debtors filed a voluntary Chapter 11

bankruptcy petition with the Bankruptcy Court.

59.    As a result of damages inflicted upon the Debtors by BayNorth's actions,

including the declarations of default under the WestLB Senior Loan and on the BayNorth

Mezzanine Loan and the imposition of mechanic's liens on the Premises, Shoaf co-manager of

each of the Debtors, exercised his fiduciary duties to the Debtors and their creditors by voting

in favor of filing the Chapter 11 petition of Holding.

60.    On or about October 21, 2009, the Debtors filed in this Court a First

Amended Complaint against BayNorth Realty Fund VI, Limited Partnership, Adv. No.

09-02422 (the "BayNorth Loan Adversary Proceeding") seeking, *inter alia,* turnover of the

BayNorth Transfer, damages in excess of $5.6 million against BayNorth for its bad faith

actions, and the invalidation of *inter alia*, the yield maintenance and default interest

provisions of the BayNorth Mezzanine Loan.

16

**THE CASH COLLATERAL STIPULATION AND THE SUBSTANTIAL
PROGRESS TOWARDS REORGANIZATION**

61.     On or about October 9, 2009, the Debtors and WestLB entered into a

cash collateral stipulation which will form the cornerstone for a plan of reorganization (the

"Cash Collateral Stipulation").  (A copy of the Cash Collateral Stipulation is annexed

hereto as Exhibit D.)

62.     Paragraph 26(b) of the Cash Collateral Stipulation provides:

> No later than December 3, 2009, Easy Street shall submit to
> WestLB a term sheet of its proposed plan of reorganization.
> No later than December 23, 2009, Easy Street shall file a
> disclosure statement and plan of reorganization, both of
> which must be reasonably acceptable to WestLB with
> respect to any provisions that might have a material effect
> on WestLB's rights and claims in the chapter 11 case or its
> treatment under the plan, or might provide preferential or
> more favorable treatment to claims that are junior to or
> equal in priority to those of WestLB, and such plan shall, in
> any event, provide that (i) the maturity date of the
> restructured Loan will not be extended past December 31,
> 2011; (i) the nondefault interest rate applicable to the
> restructured Loan will be no less than LIBOR (as defined in
> the Loan Documents) plus 6%; (iii) Easy Street will make
> monthly interests payments until December 1, 2010 and
> thereafter monthly payments according to a 20-year
> amortization schedule provided, however, that the portion
> of the monthly payments constituting amortization of
> principal shall be reduced by payments to WestLB from the
> sale of Fractional Ownership Units; (iv) WestLB has
> approved the post-confirmation senior management team
> and/or any sales agent for unsold Fractional Ownership
> Units which approval will not be unreasonably withheld;
> and (v) WestLB will receive as paydown of principal not
> less than 80% of the net proceeds received by Easy Street
> from the sale of each Fractional Ownership Unit, which
> sales shall be in compliance with the minimum release
> price requirements contained in the restructured Loan
> Documents or as may be otherwise agreed to by WestLB
> and Easy Street, and the remaining 20% of net proceeds
> shall be deposited into a Sale Proceeds Account and remain

17

subject to a control agreement in favor of WestLB.  No
later than March 31, 2010, Easy Street shall obtain
confirmation of a plan of reorganization that is reasonably
acceptable to WestLB and meets the minimum
qualifications described in (i)-(v) above.  Further, Easy
Street agrees that, unless it receives the written consent of
WestLB, it shall not seek to extend the exclusive period
under Section 1121(c)(2) of the Bankruptcy Code to file a
plan and disclosure statement in accordance with this
Stipulation, WestLB will consent to extension of the time
to have a plan accepted under 1121(c)(3).

63.     The Cash Collateral Stipulation was approved by the Bankruptcy

Court by order dated October 13, 2009 (the "Cash Collateral Order").  (A copy of the Cash

Collateral Order is annexed hereto as <u>Exhibit E</u>.)

64.     Since the BayNorth Loan is a Mezzanine Loan, BayNorth is not a

creditor of Partners, which is the operating entity in this Chapter 11 case.  Consequently,

BayNorth would have no standing to vote on, or object to, any plan of reorganization.

## THE MASSACHUSETTS ACTION

65.     On or about October 8, 2009, BayNorth commenced the

Massachusetts Action.  The Massachusetts Action seeks to hold Shoaf and David Wickline

personally liable under the Springing Guaranty for the full outstanding amount of the

BayNorth Mezzanine Loan because, *inter alia*, the Debtors filed Chapter 11 petitions with

this Court.

66.     Additionally, BayNorth seeks to impose personal liability against Mr.

Wickline and Mr. Shoaf allegedly on the ground that the disbursement of certain revenues

on account of the Project were not approved in advance by BayNorth.  The Debtor's deny

this allegation.

67.     On or about November 4, 2009, Mr. Wickline's attorney wrote Easy Street Holding "to demand, pursuant to Section 5.5 of the Operating Agreement of Easy Street Holdings, LLC, that Easy Street Holding, LLC ('The Company') indemnify David L. Wickline to the maximum extent permitted under Utah law in the action entitled BayNorth Realty Fund VI, L.P. v. William Shoaf and David L. Wickline, Commonwealth of Massachusetts Superior Court Civil Action No. 09-4303."

68.     On or about November 11, 2009, BayNorth moved for partial summary judgment against the Defendants in the Massachusetts Action.

## COUNT I

## STAY UNDER SECTION 105(a)

69.     The Debtors repeat and reallege the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

70.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Relief under section 105 of the Bankruptcy Code is particularly appropriate in a chapter 11 case when necessary to protect a debtor's ability to effectively confirm a plan and to preserve the property of a debtor's estate.

71.     The Debtors are entitled to an order under section 105(a) of the Bankruptcy Code staying BayNorth from continuing the prosecution of the Massachusetts Action against Shoaf or seeking to collect from Shoaf based on the Springing Guaranty or to exercise other remedies against Shoaf.

72.     The Debtors have a reasonable likelihood of a successful reorganization.

19

73.     In the absence of an order staying BayNorth's prosecution of the
Massachusetts Actions, the Debtors will be irreparably harmed because key employees and
professionals of the Debtors, including Shoaf, will be diverted from the Debtors'
reorganization effort to respond to discovery and other demands of the ongoing litigation of the
Massachusetts Action.

74.     The Debtors will suffer irreparable harm if the Massachusetts Action or
any attempt by BayNorth to collect from Shoaf on the Springing Guaranty are not stayed,
because:

a.     The Debtors are litigating in this Bankruptcy Court various
aspects of the BayNorth claim, including the amount of the claim purportedly owed to
BayNorth, as well as affirmative claims seeking in excess of $5.6 million in damages.

b.     An adverse finding or judgment against Shoaf on the claims
made in the Massachusetts Action could substantially affect and damage the Debtors and
their creditors and diminish the value of the Debtors' estates, because pursuant to the
indemnification provisions under the Operating Agreements, Shoaf could assert a claim
against the Debtors for the amounts owed under the Springing Guaranty or Completion
Guaranty.

c.     Allowing BayNorth to proceed at this time in the Massachusetts
Action, or in any proceeding relating to the BayNorth Mezzanine Loan, puts the Debtors at
risk of inconsistent results.  For example, even if the Debtors succeed in eliminating or
substantially reducing BayNorth's claim and obtain a judgment against BayNorth for $5.6
million, the Debtors estates could nevertheless sustain liability for the BayNorth Mezzanine

20

Loan by virtue of the indemnification provisions of the Operating Agreements, if Shoaf is found liable in the Massachusetts Action.

        d.     The only way to avoid such an unfair and inequitable result is to allow the Debtors, as they are entitled under Chapter 11 of the Bankruptcy Code, to resolve the claims of BayNorth in this Court and in a plan of reorganization.

75.     As such, permitting any litigation of the Springing Guaranty or Completion Guaranty would nullify the benefits of the automatic stay to which the Debtors are entitled.

76.     The Debtors' resources will be unnecessarily utilized to advance expenses to Shoaf and satisfy any judgment against Shoaf under the indemnity provisions of the limited liability agreement of Mezzanine and the limited liability company operating agreements for Partners and Holding.

77.     Public policy supports advancing the interests of the Debtors over the interests of BayNorth on any claims asserted pursuant to the Springing Guaranty.

78.     For the reasons stated herein, the Court should apply section 105 of the Bankruptcy Code to enjoin the Defendant from demanding payment under the Springing Guaranty or Completion Guaranty because any such payments will diminish the Debtors' prospects of confirming a plan of reorganization.

## COUNT II

## DECLARATORY RELIEF UNDER SECTION 362(a)

79.     The Debtors repeat and reallege the allegations contained in paragraphs 1 through 77 as if fully set forth herein.

80.     Section 362(a)(1) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

81.     Section 362(a)(3) of the Bankruptcy Code operates as a stay, "applicable to all entities," of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

82.     The Massachusetts Action is a violation of the automatic stay because it is an "act … to exercise control over property of the estate" within the meaning of section 362(a)(3) of the Bankruptcy Code.

83.     The purpose of section 362(a)(3) is to preserve property of the estate for use in the reorganization efforts of chapter 11 debtors.

84.     As a result of the indemnification provisions in the Operating Agreements, there is an identity of interest between the Debtors and Shoaf such that the Debtors are the real parties in interest and that a judgment against Shoaf will in effect be a judgment or a finding against the Debtors.

85.     Indeed, allowing BayNorth to proceed at this time in the Massachusetts Action, or in any proceeding relating to the BayNorth Mezzanine Loan, puts the Debtors at risk of such inconsistent results, that even if the Debtors succeed in establishing BayNorth's unfair trade practices, the Debtors could nevertheless remain liable to BayNorth for the

BayNorth Mezzanine Loan, through the indemnification claims of Shoaf under the Operating Agreements.

86.     In addition, because of the indemnification provisions, the Debtors will be required to utilize funds that are property of the Debtors' estates to:  (i) defend Shoaf against the claims made by BayNorth in the Massachusetts Action; and (ii) satisfy any judgment against Shoaf resulting from the claims made by BayNorth in the Massachusetts Action.

87.     Defending the Massachusetts Action will be a burden on the Debtors and their senior management because many of the issues in the BayNorth Loan Adversary Proceeding and defenses to be raised by Shoaf in the Massachusetts State Court Action are identical.  These issues relate to, among other things, (i) the bad acts of BayNorth, which caused the Debtors to file for bankruptcy protection to protect the assets of their estates, (ii) the amount of the BayNorth claim, (iii) BayNorth's unjust enrichment, (iv) conversion, (v) BayNorth's tortuous interference with existing and prospective business relationships, (vi) the unenforceability of the provisions of the BayNorh Mezzanine Loan Agreement which provide for the Yield Maintenance Amount and the Default Rate, and (vii) BayNorth's unfair and deceptive acts and practices under Massachusetts G.L. c. 93A.

88.     Thus, it is imperative that BayNorth be stayed from prosecuting the Massachusetts Action during the course of the Debtors' Chapter 11 case, so there will not be inconsistent adjudications in these two litigations.  Moreover, the Debtors will bear the practical responsibilities of defending any such claims because of the broad indemnifications provided to Shoaf in the Debtors' operating agreements.

23

89.    For the reasons stated herein, the Debtors are entitled to a declaratory judgment extending the automatic stay under section 362 of the Bankruptcy Code to enjoin BayNorth from demanding payment from or otherwise exercising remedies against Shoaf and Wickline on the Springing Guaranty and Completion Guaranty.

**WHEREFORE**, for all of the foregoing reasons, the Debtors respectfully request:

(a) Entry of an order staying the Defendant from (i) taking any act or action to accelerate the maturity of, or otherwise enforce any rights in respect of, the Springing Guaranty, Completion Guaranty, or any Guaranty Claims, against Shoaf, (ii) obtaining possession of, or to exercise control over, property of Shoaf, or the proceeds of any such property; (iii) taking any act or action to create, perfect or enforce any lien against Shoaf, or his property, or the proceeds of such property; (iv) commencing or continuing any action or legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), including by way of counterclaim, against Shoaf, or any of his property, or the proceeds of such property, including, without limitation, the commencement of insolvency or similar proceedings against Shoaf in any jurisdiction whatsoever; and (v) enforcing any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order against Shoaf, and commencing or continuing any act or action or other legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever) or any counterclaim to create, perfect or enforce any lien, attachment, garnishment, setoff or other claim against Shoaf,

SLC_503108.3

or his property, or the proceeds of such property, or any action to commence insolvency or

similar proceedings against Shoaf in any jurisdiction whatsoever; and

      (b) declaratory judgment extending the automatic stay under section 362 of the

Bankruptcy Code to enjoin BayNorth from demanding payment from proceeding in the

Massachusetts Action or any other action or legal proceeding (including, without limitation, any

judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever),

including by way of counterclaim, against Shoaf, or any of his property, or the proceeds of

such property.

DATED:  December 1, 2009

                                 DURHAM JONES & PINEGAR, P.C.

                           By:   /s/  Kenneth L. Cannon II
                                   Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
                                   Steven J. McCardell (smccardell@djplaw.com)(2144)
                                   111 East Broadway, Suite 900
                                   P.O. Box 4050
                                   Salt Lake City, UT 84111-4050
                                   Telephone:  (801) 415-3000
                                   Facsimile:  (801) 415-3500

                                   and

                                   CROWELL & MORING LLP
                                   Michael V. Blumenthal (mblumenthal@crowell.com)
                                   *(admitted pro hac vice)*
                                   Bruce J. Zabarauskas (bzabarauskas@crowell.com)
                                   *(admitted pro hac vice)*
                                   590 Madison Avenue, 20th Floor
                                   New York, NY  10022
                                   Telephone:  (212) 223-4000
                                   Facsimile:  (212) 223-4134

                                   Counsel for Debtors and Debtors in Possession

## <u>VERIFICATION OF WILLIAM SHOAF</u>

I, William Shoaf, am authorized to make this verification on behalf of the Plaintiffs. I have read the foregoing Verified Complaint. I am informed and believe that the matters stated therein are true.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in Park City, Utah on November 25, 2009.

_____
William Shoaf