# EXHIBIT A

LIMITED LIABILITY COMPANY AGREEMENT
OF
EASY STREET MEZZANINE LLC

This Limited Liability Company Agreement (together with the schedules attached hereto, this "Agreement") of EASY STREET MEZZANINE LLC (the "Company"), is entered into by EASY STREET HOLDING LLC, as the sole equity member (the "Member"). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

The Member, by execution of this Agreement, hereby forms the Company as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. §18-101 et seq.), as amended from time to time (the "Act"), and this Agreement, and the Member hereby agrees as follows:

Section 1.    Name.

The name of the limited liability company formed hereby is EASY STREET MEZZANINE LLC.

Section 2.    Principal Business Office.

The principal business office of the Company shall be located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808 or such other location as may hereafter be determined by the Member.

Section 3.    Registered Office.

The address of the registered office of the Company in the State of Delaware is c/o 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

Section 4.    Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

Section 5.    Members.

(a)    The mailing address of the Member is set forth on Schedule B attached hereto. The Member was admitted to the Company as a member of the Company upon its execution of a counterpart signature page to this Agreement.

(b)    Subject to Section 9(b), the Member may act by written consent.

Section 6.    Certificates.

Corporation Service Company is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, his powers as an "authorized person"

ceased, and the Member thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act. The Member or an Officer shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in the State of Utah and in any other jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

Section 7.    Purposes.

The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)    to own membership interests in Easy Street Partners LLC, a Utah limited liability company ("Borrower") in accordance with that certain Amended and Restated Operating Agreement of Borrower dated as of March 15, 2006 (the "Borrower LLC Agreement");

(ii)    to enter into the Mezzanine Loan with the Lender and to execute, acknowledge and deliver the Mezzanine Loan Documents and other documents in connection therewith;

(iii)    to grant liens and other security interests in assets of the Company to secure the Mezzanine Loan and to take any and all other action in connection with the Mezzanine Loan, including, but not limited to, paying, repaying, prepaying, defeasing or substituting collateral under the Loan; and

(iv)    to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.

The Company and the Member may enter into and perform the Basic Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any Member or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Member to enter into other agreements on behalf of the Company.

Section 8.    Powers.

Subject to Section 9(b), the Company (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

2

Section 9.    Management.

(a)    Management by Member.  Subject to Section 9(b), the business and affairs of the Company shall be managed by or under the direction of the Member.

(b)    Limitations on the Company's Activities.

(i)    This Section 9(b) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)    The Member shall not, so long as any Obligation is outstanding, amend, alter, change or repeal Sections 7, 8, 9, 16, 20, 21, 22, 23, 24, 25, 26, 29 or 31 or Schedule A of this Agreement.  Subject to this Section 9(b), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 31.

(iii)    Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, or any other Person, so long as any Obligation is outstanding, the Member shall not be authorized or empowered, nor shall it permit the Company and/or the Borrower to take any Material Action.

(iv)    So long as any Obligation is outstanding, the Member shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises; provided, however, that the Company shall not be required to preserve any such right or franchise if the preservation thereof is no longer desirable for the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Company.  The Member shall not cause the Company or the Borrower to:

(A)    engage in any business or activity inconsistent with the purposes of the Company set forth in Section 7 of this Agreement or the purposes of the Borrower as set forth in the Borrower LLC Agreement;

(B)    acquire or own any material asset other than its interest in Borrower;

(C)    merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(D)    (1) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the State where the Property is located, if applicable, or (B) without the prior written consent of Lender, amend, modify, terminate or fail to comply with the material provisions of this Agreement;

3

(E)     own any subsidiary other than Borrower or make any
investment in, any Person without the prior written consent of Lender;

(F)     commingle its assets with the assets of any of its members,
general partners, Affiliates, principals or of any other Person or entity, participate
in a cash management system with any other entity or Person (other than the
Borrower pursuant to any cash management agreement) or fail to use its own
separate stationery, telephone number, invoices and checks;

(G)     incur any debt, secured or unsecured, direct or contingent
(including guaranteeing any obligations) other than the Mezzanine Loan;

(H)     become insolvent and fail to pay its debts and liabilities
(including, as applicable, shared personnel and overhead expenses) from its assets
as the same shall become due;

(I)     (1) fail to maintain its records (including financial
statements), books of account and bank accounts separate and apart from those of
the members, general partners, principals and Affiliates of the Borrower or the
Company, the Affiliates of a member, general partner or principal of the Borrower
or the Company, and any other Person, (2) permit its assets or liabilities to be
listed as assets or liabilities on the financial statement of any other Person or (3)
include the assets or liabilities of any other Person on its financial statements;
except that the Company and the Borrower's financial position, assets, liabilities,
net worth and operating results may be included in the consolidated financial
statements of an Affiliate, provided that such consolidated financial statements
contain a footnote indicating that the Company and Borrower are separate legal
entities and that they each maintain separate books and records;

(J)     enter into any contract or agreement with any member,
general partner, principal or Affiliate of Borrower or of the Company, or any
member, general partner, principal or Affiliate thereof, except upon terms and
conditions that are commercially reasonable, intrinsically fair and substantially
similar to those that would be available on an arms length basis with third parties
other than any member, general partner, principal or Affiliate of the Borrower or
the Company or any member, general partner, principal or Affiliate thereof;

(K)     seek the dissolution or winding up in whole, or in part, of
Borrower or the Company;

(L)     fail to correct any known misunderstandings regarding the
separate identity of Borrower, or of the Company, or any member, general partner,
principal or Affiliate thereof or any other Person;

(M)     guarantee or become obligated for the debts of any other
Person or hold itself out to be responsible for the debts of another Person;

4

(N)   make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower or the Company or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower or the Company or any member, general partner, or Affiliate thereof;

(O)   fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(P)   fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower or of the Company and not as a division or part of any other entity in order not (1) to mislead others as to the identity with which such other party is transacting business, or (2) to suggest that Borrower or the Company is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, the Company, or any member, general partner, principal or Affiliate thereof);

(Q)   fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(R)   share any common logo with or hold itself out as or be considered as a department or division of (A) any general partner, principal, member or Affiliate of Borrower or the Company as the case may be; (B) any Affiliate of a general partner, principal or member of Borrower or the Company or (C) any other Person;

(S)   fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate including paying for office space and services performed by any employee of an Affiliate;

(T)   pledge its assets for the benefit of any other Person other than with respect to the Loan;

(U)   fail to maintain a sufficient number of employees in light of its contemplated business operations;

(V)   fail to hold its assets in its own name;

(W)   have any of its obligations guaranteed by an Affiliate;

Failure of the Company, or the Member on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in

this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member.

(v)     So long as any Obligation is outstanding, the Member shall not cause or permit the Company to:

(A)     except as contemplated by the Basic Documents, guarantee any obligation of any Person, including any Affiliate;

(B)     engage, directly or indirectly, in any business other than the actions required or permitted to be performed under Section 7, the Basic Documents or this Section 9(b);

(C)     incur, create or assume any indebtedness other than as expressly permitted under the Basic Documents;

(D)     make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Company may invest in those investments permitted under the Basic Documents and may make any advance required or expressly permitted to be made pursuant to any provisions of the Basic Documents and permit the same to remain outstanding in accordance with such provisions;

(E)     to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of ownership interests other than such activities as are expressly permitted pursuant to any provision of the Basic Documents; or

(F)     form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other).

Section 10.     Intentionally Omitted.

Section 11.     Intentionally Omitted.

Section 12.     Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company.

Section 13.     Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto.

Section 14.   Additional Contributions.

The Member may make additional capital contributions to the Company at any time.  To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise Schedule B of this Agreement.  The provisions of this Agreement, including this Section 14, are intended to benefit the Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 15.   Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

Section 16.   Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  Except to satisfy the Company's or the Borrower's payment obligations to Senior Lender or Lender under the Loan and Loan Agreements, all monies received by the Company shall be distributed to Member in accordance with the terms of the Operating Agreement for the Member.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act or any other applicable law or any Basic Document.

Section 17.   Books and Records.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The books of the Company shall at all times be maintained by the Member.  The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours.  The Company's books of account shall be kept using the method of accounting determined by the Member.  The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 18.   Intentionally Omitted.

Section 19.   Intentionally Omitted.

Section 20.   Exculpation and Indemnification.

(a)    Neither the Member nor any employee or agent of the Company nor any employee, representative, agent or Affiliate of the Member (collectively, the "Covered Persons") shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner

reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 20 by the Company shall be provided out of and to the extent of Company assets only, and the Member shall not have personal liability on account thereof; and provided further, that so long as any Obligation is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under this Section 20 shall be payable from amounts allocable to any other Person pursuant to the Basic Documents.

(c)     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 20.

(d)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)     To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member to replace such other duties and liabilities of such Covered Person.

(f)     The foregoing provisions of this Section 20 shall survive any termination of this Agreement.

8

Section 21.    Assignments.

Subject to Section 22, the Member may assign in whole or in part its limited liability company interest in the Company.  If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 21, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  Such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.  Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Basic Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

Section 22.    Resignation.

So long as any Obligation is outstanding, the Member may not resign, except as permitted under the Basic Documents.  If the Member is permitted to resign pursuant to this Section 22, an additional member of the Company shall be admitted to the Company, in accordance with Section 23, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 23.    Admission of Additional Members.

One or more additional members of the Company may be admitted to the Company with the written consent of the Member.

Section 24.    Dissolution.

(a)    Subject to Section 9(b), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following:  (i) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member of the Company in the Company unless the business of the Company is continued in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.  Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member of the Company in the Company.

9

(b)     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(c)     Notwithstanding any other provision of this Agreement, the Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member, or the occurrence of an event that causes the Member to cease to be a member of the Company.

(d)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 25.    Waiver of Partition; Nature of Interest.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, the Member hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Section 16 hereof. The interest of the Member in the Company is personal property.

Section 26.    Benefits of Agreement; No Third-Party Rights.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person.

Section 27.    Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

10

Section 28.   Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 29.   Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, Sections 7, 8, 9, 20, 21, 22, 23, 24, 26, 29 and 31, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member, in accordance with its terms.

Section 30.   Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

Section 31.   Amendments.

Subject to Section 9(b), this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member.

Section 32.   Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 33.   Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 34.   Effectiveness.

Pursuant to Section 18-201 (d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation with the Office of the Delaware Secretary of State.

11

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the _____ day of March, 2006.

MEMBER:

EASY STREET HOLDING, LLC,
a Utah limited liability company

By:    AVG-SL, LLC,
       a Utah limited liability company
Its:   Manager

By: _____
       William Shoaf
Its:  Manager

12

SCHEDULE A

Definitions

A.    Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"Agreement" means this Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"Basic Documents" means this Agreement, the Mezzanine Loan Documents and all documents and certificates contemplated thereby or delivered in connection therewith.

"Borrower" means Easy Street Partners, LLC, a Utah limited liability company.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on March 2, 2006, as amended or amended and restated from time to time.

"Company" means Easy Street Mezzanine LLC, a Delaware limited liability company.

13

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Covered Persons" has the meaning set forth in Section 20(a).

"Lender" means BayNorth Realty Fund VI, Limited Partnership, together with its successors and assigns.

"Loan" means the Senior Loan and the Mezzanine Loan, collectively.

"Loan Documents" means the Senior Loan Documents and the Mezzanine Loan Documents, collectively.

"Material Action" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

"Member" means Easy Street Holding, LLC, a Utah limited liability company, as the sole equity member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company.

"Mezzanine Loan" means that certain loan in the aggregate principal amount of $11,250,000 to be made by Lender to the Company in accordance with the terms, conditions, and provisions of the Mezzanine Loan Documents.

"Mezzanine Loan Agreement" means that certain Loan Agreement (Mezzanine Loan) dated as of March ___, 2006 by and between Lender and the Company.

"Mezzanine Loan Documents" means (i) the Mezzanine Loan Agreement, (ii) the Mezzanine Note, (iii) a Pledge and Security Agreement, (iv) an Environmental Indemnity Agreement, (v) a Guaranty of Recourse Obligations from Guarantor, (iv) a Completion Guaranty, (vi) a Guaranty and Non-Competition Agreement, (vii) an Assignment of Contracts and (viii) UCC-1 Financing Statements, all dated as of March 30, 2006 and delivered in connection with the Mezzanine Loan, together with all other agreements, documents, instruments, certificates or papers executed and delivered in connection with the Mezzanine Loan.

14

"Mezzanine Note" means that certain Promissory Note (Mezzanine Loan) in the original principal amount of $11,250,000 dated as of March 30, 2006 evidencing the Mezzanine Loan.

"Obligations" shall mean the indebtedness, liabilities and obligations of the Company and the Borrower under or in connection with this Agreement, the other Basic Documents or any related document in effect as of any date of determination.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Senior Lender" means West LB AG.

"Senior Loan" means that certain loan in the aggregate principal amount of $36,799,224.00 to be made by West LB AG to the Borrower in accordance with the terms, conditions, and provisions of the Senior Loan Documents.

"Senior Loan Agreement" means that certain Loan and Security Agreement dated as of March ___, 2006 by and between Borrower and West LB AG.

"Senior Loan Documents" means (i) the Senior Loan Agreement, (ii) the Senior Note, (iii) a Deed of Trust and Security Agreement, (iv) an Environmental Indemnity Agreement, (v) a Pledge and Security Agreement, (vi) a Collateral Assignment of Interest Rate Protection Agreement, (vii) a Recourse Liability Agreement and (viii) UCC-1 Financing Statements, all dated as of March 30, 2006 and delivered in connection with the Senior Loan, together with all other agreements, documents, instruments, certificates or papers executed and delivered in connection with the Senior Loan.

"Senior Note" means that certain Promissory Note in the original principal amount of $36,799,224.00 dated as of March 30, 2006 evidencing the Senior Loan.

B.    Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

15

SCHEDULE B

Member

| Name | Mailing Address | Capital Contribution | Membership Interest |
|------|-----------------|----------------------|---------------------|
| EASY STREET HOLDING LLC | 1816 Prospector Avenue, Suite 100 Park City, UT  84060 | $1,500,000.00 | 100% |

16

# EASY STREET PARTNERS, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "**Agreement**") of Easy Street Partners, LLC (the "**Company**") is entered into by Easy Street Mezzanine, LLC, a Delaware limited liability company, as sole member (in its capacity as the sole member of the Company, the "**Member**").

WHEREAS, the Company has been formed as a limited liability company under the Utah Revised Limited Liability Company Act as set forth in Sections 48-2c-101 through 48-2c-1902, Utah Code Annotated, as amended from time to time (the "**Act**"), by the filing of Articles of Organization with the Utah Division of Corporations and Commercial Code; and

WHEREAS, the Member desires to amend, restate and replace in its entirety that certain Operating Agreement of Easy Street Partners, LLC dated July, 2005 (the "Original Operating Agreement") with this Agreement.

The Member hereby amends, restates and replaces in its entirety the Original Operating Agreement with this Agreement in accordance with Section 8.1(b) of the Original Operating Agreement. The Member hereby agrees as follows:

1.    **Name.** The name of the limited liability company is "Easy Street Partners, LLC."

2.    **Articles of Organization.** Articles of Organization were filed with the Utah Division of Corporations and Commercial Code at the time the Company was formed. The Member has prepared and will file Amended and Restated Articles of Organization with the Division of Corporations and Commercial Code to reflect the change in ownership of the Company. The execution and filing of the Amended and Restated Articles of Organization are hereby ratified and approved.

3.    **Purpose and Powers.**

    (a)    The Company's business and purpose shall consist solely of the acquiring, owning, operating, remodeling, improving, constructing, renovating, marketing, selling, leasing, managing and maintaining the real estate project known as Union Square (and associated structures, facilities, amenities and improvements), located in Park City, Utah (the "Property") and activities incidental thereto.

    (b)    Notwithstanding any other provisions of this Agreement and so long as any obligations of the Company remain unpaid or unperformed under that certain Loan and Security Agreement, dated March 30, 2006 (the "Loan Agreement") by and between the Company and WESTLB AG, a German banking corporation acting by and through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036, as

1

agent (including any of its successors and assigns in such capacity, the "Administrative Agent") for itself, and such other co-lenders as may exist from time to time (collectively, the "Lenders" and each individually, a "Lender"), (together with the other documents contemplated by the Loan And Security Agreement, the "Loan Documents"), the Company covenants and agrees that it:

(i)    shall not amend, modify or otherwise change, or permit any other party to amend, modify or otherwise change the Company's articles of organization, operating agreement or other formation agreement or documents without the Administrative Agent's written consent;

(ii)    shall not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of any individual, corporation, limited liability company, business trust, partnership, limited partnership, joint venturer, joint tenant or tenant-in-common, trust, unincorporated organization, or any other entity of whatever nature, or governmental authority (each a "Person");

(iii)    shall not guarantee or pledge its assets for the benefit of, or otherwise become liable on or in connection with, any obligation of any other Person;

(iv)    shall not own any asset other than (a) the Property, and (b) incidental personal and intangible property necessary for the development or operation of the Property;

(v)    shall not engage, directly or indirectly, in any business other than acquiring, owning, operating, remodeling, improving, constructing, renovating, marketing, selling, leasing, managing and maintaining the Property including, without limitation, its operation as a full-service, luxury resort hotel, which will consist of the existing improvements on the Property, as modified and supplemented by the additional improvements to be constructed on the Property (the "Hotel");

(vi)    except for a hotel management agreement and a development agreement, shall not enter into any contract or agreement with the Member or any affiliate of the Company without the written consent of the Administrative Agent;

(vii)    shall not make any loans or advances to any third party (including any affiliate) other than trade debt incurred in the ordinary course of business;

(viii)    is and will be solvent and able to pay its debts from its assets as the same shall become due;

2

(ix)   will conduct and operate its business as presently conducted and as is required by the terms of the Loan Agreement and related documents to which it is a party;

(x)   will maintain financial statements, books and records and bank accounts separate from those of its affiliates, including Company's member;

(xi)   will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Company or of Company's member);

(xii)   will file any required tax returns;

(xiii)   will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xiv)   will not seek the dissolution or winding up, in whole or in part, of the Company;

(xv)   will not commingle its funds and other assets with those of any affiliate of Company or Company's Member or any other Person;

(xvi)   has and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate of Company or Company's Member or any other Person;

(xvii)   will not hold itself out to be responsible for the debts or obligations of any other Person;

(xviii)   will not do any act which would make it impossible to carry on its ordinary business;

(xix)   will not possess or assign the Property or incidental personal property necessary for the operation of the Property for other than a business or company purpose;

(xx)   except for the marketing and sale of residential and commercial units in the ordinary course of business, will not sell, encumber or otherwise dispose of all or any portion of the Property or incidental personal property necessary for the operation of the Property;

(xxi)   will not hold title to its assets other than in its name; and

3

(xxii) will not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of the Company's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action.

4.    **Term: Fiscal Year.**    The term of the Company commenced on the date the Articles of Organization of the Company were filed with the Utah Division of Corporations and Commercial Code and will continue until December 31, 2099, or until dissolved as provided herein. The fiscal year of the Company shall be the same as its taxable year for U.S. federal income tax purposes, which shall end on December 31 unless otherwise required by applicable law.

5.    **Principal Business Office.**    The principal business office of the Company shall be 4780 Winchester Court, Park City, Utah 84098.

6.    **Registered Office and Agent.**    The registered agent for service of process and the registered office shall initially be Blake Parrish, Wrona & Parrish, P.C., 1816 Prospector Ave., Suite 100, Park City, Utah 84060. The Member may, from time to time, change the registered agent or office through appropriate filing with the Utah Division of Corporations and Commercial Code. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Member shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

7.    **Member.**    The name and the mailing address of the Member are as follows:

| Name | Address |
|------|---------|
| Easy Street Mezzanine, LLC | 4780 Winchester Court<br>Park City, Utah 84098 |

8.    **Limited Liability; Indemnification**.

    (a)    Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company by reason of being a member of the Company or exercising, or failing to exercise, any rights under this Agreement.

    (b)    To the fullest extent permitted by law, the Company shall indemnify the Member and the trustees, officers, directors, partners and shareholders of any such person which is a corporation, partnership, trust or other entity, against any and all liability incurred and/or for any act performed by them in good faith and/or for any act in good faith omitted to be performed by them (including, without limitation, reasonable legal and other professional fees and expenses as the same are incurred) as a Member (or affiliate thereof) of the Company.

    9.    **Admission**.    The Member is deemed admitted as the Member of the Company upon its execution and delivery of this Agreement.

    10.    **Capital Contributions**.    The Member has contributed its initial capital contribution in exchange for its interest in the Company; there are no additional capital contributions required of the Member.

    11.    **Distributions**.    Distributions may be made to the Member at the times and in the aggregate amounts determined by the Member.

    12.    **Federal Tax Status of Company**.    It is the intention of the Member that the Company be disregarded as an entity separate from the Member for federal income tax purposes under Section 7701 of the Internal Revenue Code of 1986, as amended, and Treasury Regulations Section 301.7701-2(c)(2)(i), for state income tax purposes under any applicable state or local income tax law or regulation and for any similar purposes.

    13.    **Management**.    The business and affairs of the Company shall be managed by the Member.    The Member shall have the power in its sole discretion to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Utah.    The Member is an authorized agent of the Company for the purpose of the Company's business, and the actions of the Member taken in the name of the Company and in accordance with such powers set forth in this Agreement shall bind the Company.

    14.    **Dissolution**.    The Company shall be dissolved without further action by the Member and its affairs wound up upon the first to occur of any of the following events:

5

(a)    December 31, 2099

(b)    if the Company does not have at least one member;

(c)    by written agreement signed by all members (after satisfaction of all obligations of the Company under the Loan Agreement);

(d)    any event that makes the Company ineligible to conduct its activities as a limited liability company under the Act;

(e)    any event or circumstance that makes it unlawful for the Company to carry on its business;

(f)    upon administrative dissolution of the Company under Article 48-2c-1207 of the Act, subject to right of reinstatement under Section 48-2c-1207; or

(g)    upon entry of a decree of judicial dissolution under Article 48-2c-1213 of the Act;

**15.    Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of Utah (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

**16.    Amendments.** This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member.

**17.    Binding Effect.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Member and its successors, transferees, and assigns.

**18.    Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**19.    Entire Agreement.** This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such matter.

**IN WITNESS WHEREOF,** the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first above written.

**SOLE MEMBER:**

EASY STREET MEZZANINE, LLC,
a Delaware limited liability company

By:    EASY STREET HOLDING, LLC,
       a Utah limited liability company
Its:    Sole Member

       By:    AVG-SL, LLC,
              a Utah limited liability company
       Its:    Manager

       By:    _____
              William Shoaf
       Its:    Manager

7

## OPERATING AGREEMENT

### OF

## EASY STREET HOLDING, LLC

THIS OPERATING AGREEMENT (the "Agreement") is among Park City I LLC, a New York limited liability company (the "Class A Accredited Investor"), UTAH COAL & LUMBER, INC., a Utah corporation ("UCL"), Alchemy Ventures Group, LLC, a Utah limited liability company ("AVG"), and CLOUDNINE RESORTS, LLC, a Utah limited liability company ("Cloud Nine").

### RECITALS

A.   The Class A Accredited Investor, AVG and Cloud Nine entered into an Operating Agreement, and became members of Easy Street Partners, LLC, a Utah limited liability company, on or about August 10, 2005.

B.   Concurrent with the execution of this Agreement, the Class A Accredited Investor, AVG and Cloud Nine have executed an Assignment Agreement, pursuant to which each of the foregoing has transferred their Units in Easy Street Partners to the Company.

C.   The Company is a limited liability company, which was formed under the Utah Revised Limited Liability Company Act.

D.   The parties intend by this Agreement to define their rights and obligations with respect to the Company's governance and financial affairs and to adopt regulations and procedures for the conduct of the Company's activities.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and with the intention of being legally bound, the parties hereto agree as follows:

### ARTICLE 1: DEFINITIONS

Section 1.1   **Scope.**  For purposes of this Agreement, unless the language or context clearly indicates that a different meaning is intended, capitalized terms have the meanings specified in this Article.

Section 1.2   **Defined Terms.**  Unless otherwise defined in this Agreement, capitalized terms shall have the following meaning:

(a)   "Act" means the Utah Revised Limited Liability Company Act, Utah Code Ann. §§ 48-2c-101, et seq.

(b)   "Agreement" means this Operating Agreement, including any amendments.

(c)    "Approved Affiliate" means any of the following: (a) with respect to a Member that is an Entity, a member or shareholder of such Entity; (b) with respect to a Member that is an individual, a member of such individual's immediate family, a trust for the benefit of such individual or a member of such individual's immediate family; or an estate planning or investment entity, such as a family limited liability company, over which such individual maintains control; or (c) any proposed transferee of Units approved by the Manager.

(d)    "Articles" means the Articles of Organization filed with the Division to organize the Company as a limited liability company, including any amendments.

(e)    "Available Funds" means the Company's gross cash receipts from operations, less the sum of:  (1) payments of principal, interest, charges and fees pertaining to the Company's indebtedness (exclusive of Capital Calls); (2) expenditures incurred incident to the usual conduct of the Company's business in accordance with the approved annual Operating Budget; and (3) amounts reserved to meet the reasonable needs of the Company's business in accordance with the approved annual Operating Budget.

(f)    "Bankruptcy" means the filing of a petition seeking liquidation, reorganization, arrangement, readjustment, protection, relief or composition in any state or federal bankruptcy, insolvency, reorganization or receivership proceeding.

(g)    "BayNorth Promissory Note" has the meaning set forth in Section 4.1(d)(ii) below and is attached hereto as Exhibit C.

(h)    "Capital Account" of a Member means the capital account maintained for the Member in accordance with Section 4.6.

(i)    "Capital Call" has the meaning set forth in Section 4.2(c) below.

(j)    "Cash Deficit" means the inability of the Company to pay its bills as they come due for a period of thirty (30) days or more, whether through liabilities incurred from the Company's operations or demands for additional contributions (i.e., special capital calls) made by the Company's Subsidiaries (as defined below).

(k)    "Cause" means:  (1) conviction of a felony crime or a crime of moral turpitude; (2) commission of any confirmed act of theft, fraud or falsification of any employment or Company records; (3) failure or inability to perform reasonably assigned duties after receipt of written notice from the Company of, and a reasonable opportunity to cure, such failure or breach; (4) breach of a material term of this Agreement, which breach is not cured within thirty (30) days following written notice of such breach; or (5) gross misconduct in connection with the performance of any reasonably assigned duties.

2

(l)    "Class A Accredited Investor" means Park City I LLC, a New York limited liability company.

(m)    "Class A Investment Amount" means the cash Contribution of the Class A Accredited Investor, which is set forth in Section 4.2(a)(i) below.

(n)    "Class A Member" means a Member holding one or more Class A Units.

(o)    "Class A Unit" means an interest in the Company, which is comprised of both an Economic Interest and a Voting Interest and enjoys the rights, preferences and restrictions set forth in Section 3.2; provided, however, that the Voting Interest is subject to forfeiture in the event a subsequent holder of a Class A Unit is not approved as a Member of the Company.

(p)    "Class A Preferred Return" has the meaning set forth in Section 3.2 (c)(i).

(q)    "Class B Member" means a Member holding one or more Class B Units.

(r)    "Class B Unit" means an interest in the Company, which is comprised of both an Economic Interest and a Voting Interest and enjoys the rights, preferences and restrictions set forth in Section 3.3; provided, however, that the Voting Interest is subject to forfeiture in the event a subsequent holder of a Class B Unit is not approved as a Member of the Company.

(s)    "Code" means the Internal Revenue Code of 1986, as amended.

(t)    "Company" means Easy Street Holding, LLC, and any successor limited liability company.

(u)    "Contribution" means anything of value that a Member contributes to the Company as a prerequisite for the Units, including any combination of cash, property, services rendered, a promissory note or any other obligation to contribute cash or property or render services.

(v)    "Designated Office" means the street address in the State of Utah at which the Company maintains a complete set of its records as required under Section 48-2c-112 of the Act, as set forth in Section 2.7.

(w)    "Development and Management Fees" means the development and management fees paid to William Shoaf, David Wickline, Cloud Nine, AVG, or any other Entities formed by any of the foregoing by Easy Street Partners, Easy Street Mezzanine or this Company. The Development and Management Fees shall be based on the percentages set forth in Exhibit A attached hereto and incorporated herein by reference, which have been approved by BayNorth Capital LLC and Class A Accredited

3

Investor. The Development and Management Fees are based on pro formas developed by Cloud Nine and AVG, which have been provided to the Initial Members, and are subject to change if the actual results vary from the assumptions for such pro formas.

(x)     "Disability" means the inability of a person to perform his assigned duties within the Company by reason of any medically determinable physical or mental impairment where such is expected to result in death or has lasted or can be expected to last for a continuous period of four (4) months or more.

(y)     "Distribution" means the Company's direct or indirect transfer of money or other property with respect to a Member's Units, whether in connection with a Liquidation Event or otherwise.

(z)     "Division" means the Division of Corporations and Commercial Code of the Utah Department of Commerce.

(aa)     "Economic Interest" means a Unit holder's percentage interest in the Profits and Losses of the Company based on the holder's Units. Changes in Economic Interests after the Effective Date, resulting from the issuance or redemption of Units, will be reflected in the Company's records.

(bb)     "Effective Date," with respect to this Agreement, means the later of (i) the date on which the Articles are filed with the Division, and (ii) the date on which this Agreement is executed by three (3) of the Initial Members.

(cc)     "Entity" means an association, relationship or artificial person through or by means of which an enterprise or activity may be lawfully conducted, including, without limitation, a partnership, trust, limited liability company, corporation, joint venture, cooperative or association.

(dd)     "Easy Street Mezzanine" means Easy Street Mezzanine LLC, a Delaware limited liability company and subsidiary of the Company, which will be the borrower under the Mezzanine Loan. This Company is the sole member and manager of Easy Street Mezzanine.

(ee)     "Easy Street Partners" means Easy Street Partners, LLC, a Utah limited liability company and subsidiary of the Company, which will hold title to the Property and be the borrower under the Senior Loan. Easy Street Mezzanine is the sole member and manager of Easy Street Partners.

(ff)     "Initial Members" means the Class A Accredited Investor, UCL, AVG and Cloud Nine.

(gg)     "Liquidation Event" means (1) any liquidation, dissolution or winding up, voluntary or involuntary, of the Company; (2) the acquisition of the Company by another Person by means of any transaction or series of related transactions (including without limitation, any reorganization, merger or consolidation, whether of

4

the Company with or into any other Person or Persons or of any other Person or Persons with or into the Company, but excluding any consolidation or merger following which holders of the Company's Voting Interests outstanding immediately prior to such merger or consolidation hold at least a majority of the voting power of the entity surviving such consolidation or merger or an entity controlling such surviving entity after such consolidation or merger); or (3) the sale or transfer by the Company of all or substantially all of its assets other than to a wholly-owned subsidiary of the Company.

(hh)    "Loss" or "Losses" means any and all losses, claims, lawsuits, causes of action, or proceedings of any kind or nature, and any judgments, liens, awards or benefits, including without limitation reasonable costs and attorneys' fees.

(ii)    "Manager" means an Entity controlled by William Shoaf and David Wickline or any other Person or Entity, whether or not a Member, who is vested with authority to manage the Company in accordance with Article 5.

(jj)    "Member" means an Initial Member, and any Person who subsequently is admitted as an additional or substitute Member after the Effective Date, in accordance with Article 3.

(kk)    "Mezzanine Lender" has the meaning set forth in Section 4.1(b) below.

(ll)    "Mezzanine Loan" has the meaning set forth in Section 4.1(b) below.

(mm)    "Minimum Gain" means minimum gain as defined in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(nn)    "Operating Budget" has the meaning set forth in Section 5.3(b) below.

(oo)    "Person" means a natural person or an Entity.

(pp)    "Profit," as to a positive amount, and "Loss," as to a negative amount, mean, for a Taxable Year, the Company's income or loss, as determined in accordance with the Regulations and tax accounting principles appropriate to the Company's method of accounting and consistently applied.

(qq)    "Project" has the meaning set forth in Section 4.1(b) below.

(rr)    "Protective Provisions" shall have the meaning set forth in Section 3.2(d)(ii).

(ss)    "Regulations" means proposed, temporary or final regulations promulgated under the Code by the Department of the Treasury, as amended.

(tt)   "Senior Lender" has the meaning set forth in Section 4.1(b) below.

(uu)   "Senior Loan" has the meaning set forth in Section 4.1(b) below.

(vv)   "Shoaf and Wickline Investment Amount" has the meaning set forth in Section 4.2(a)(iv) below.

(ww)   "Subsidiaries" means (i) Easy Street Mezzanine, and (ii) Easy Street Partners.

(xx)   "Supermajority Approval" shall have the meaning set forth in Section 5.3(b).

(yy)   "Taxable Year" means the Company's taxable year as determined in accordance with Section 6.2.

(zz)   "Transfer," as a noun, means a transaction or event by which ownership of Units is changed or encumbered, including, without limitation, a sale, exchange, abandonment, pledge or foreclosure; provided, however, Transfer shall exclude any conveyance to an Approved Affiliate or conveyance to any Person pursuant to the right-of-first refusal procedures set forth in Section 3.2(f) below. "Transfer," as a verb, means to effect a Transfer.

(aaa)   "Transferee" means a Person who acquires any Unit(s) by Transfer from a Member or another Transferee and is not admitted as a Member in accordance with Article 3.

(bbb)   "UCL Investment Amount" means One Million Eight Hundred Thousand Dollars ($1,800,000.00).

(ccc)   "Units" means the Class A Units and Class B Units.

(ddd)   "Voting Interest" means a Member's right to vote based on ownership of Units. A Member shall enjoy one (1) vote for each Unit owned by such Member. Changes in Voting Interests after the Effective Date shall be reflected in the Company's records.

## ARTICLE 2: THE COMPANY

Section 2.1   **Status.**   The Company is a Utah limited liability company organized under the Act.

Section 2.2   **Name.**   The Company's name is Easy Street Holding, LLC.

Section 2.3   **Term.**   The Company's existence as a limited liability company will continue until December 31, 2099, unless sooner terminated under the Act or this Agreement.

6

Section 2.4   **Purposes.**   The Company's purposes are (a) to engage in the business of developing, or owning real estate; and (b) to engage in any other lawful activity for which a limited liability company may be organized under the Act. The Company may take any action incidental and conducive to the furtherance of those purposes.

Section 2.5   **Principal Place of Business.**   The Company's principal place of business is located at 201 Heber Avenue, Park City, Utah 84060.

Section 2.6   **Registered Agent and Registered Office.**   The Company's registered office in Utah is located at 1816 Prospector Avenue, Suite 100, Park City, Utah 84060, and its registered agent at that location is Blake Parrish. The Company may change its registered agent or registered office at any time in accordance with the Act.

Section 2.7   **Designated Office.** The Company's designated office is located at 4780 Winchester Court, Park City, Utah 84098.

## ARTICLE 3: MEMBERSHIP CLASSES; MEMBERS

Section 3.1   **Classes of Membership.** As of the Effective Date, there shall be two classes of membership interests designated as "Class A Units" and "Class B Units." The rights, preferences and restrictions of the Class A Units and Class B Units are set forth below.

Section 3.2   **Rights, Preferences and Restrictions of Class A Units.**   Each Class A Unit shall have the following rights, preferences and restrictions:

(a)   <u>Economic Interest and Voting Interest.</u>   Each Class A Unit is an interest in the Company with both an Economic Interest and Voting Interest. In the event a Class A Unit is held by a Person that is not a Member, such Unit holder shall not enjoy a Voting Interest.

(b)   <u>Relative Seniority.</u>   The Class A Units shall, in respect of the right to participate in Distributions or payments upon the occurrence of a Liquidation Event, rank senior (as more particularly set forth below) and prior to the Company's Class B Units, until the Company's payment of the Class A Preferred Return (as defined below). After payment of the Class A Preferred Return, the Class A Units shall be treated in all respects as Class B Units.

(c)    <u>Distribution Provisions</u>.

(i)    <u>Preferred Return</u>. The Class A Accredited Investor shall be entitled to receive, out of the Available Funds, prior and in preference to any declaration or payment of any Distribution to the Class B Members, cash Distributions equal to two (2) times the amount of the Class A Investment Amount (the "Class A Preferred Return"). By way of illustration, if the Class A Accredited Investor invests $1.5 million in the Company, the Class A Accredited Investor will receive $3.0 million prior to the Company's payment of any Distributions to Class B Members.

(ii)    <u>Distributions After Payment of Class A Preferred Return</u>. After the Company has paid in full the (i) Class A Preferred Return, (ii) the Capital Calls (with accrued interest), if any, (iii) the Shoaf and Wickline Investment Amount (with interest on the Shoaf and Wickline Investment Amount at the rate of sixteen percent (16%) per annum from the date of the closing on the Property until paid in full), (iv) the UCL Investment Amount, and (v) the UCL Accrued Interest (as defined below) (subject to Section 3.3(b)(ii)), the Company shall distribute the remaining Available Funds, if any, to all Unit holders on a pro rata basis per Unit.

(d)    <u>Voting Rights</u>.

(i)    <u>General Voting Rights</u>. Each Class A Unit shall have one (1) vote when held by a Member. Except as otherwise expressly provided herein or as required by law, Class A Members (1) shall not have special voting rights, (2) shall have voting rights and powers equal to the voting rights and powers of the Class B Units, and (3) shall vote as a class with the Class B Members, except with respect to the Protective Provisions in Section 3.2(d)(ii).

(ii)    <u>Protective Provisions</u>. The Company and/or the Manager shall not, without the affirmative vote or written consent of a majority of the votes of the Class A Members (the "Protective Provisions"):

(1)    in any manner authorize, create or issue any securities in the Company; provided, however, that the Company may sell and issue additional Class B Units on terms established by the Manager in the event of a Cash Deficit;

(2)    make any changes in the rights, preferences or privileges of the Class A Units;

(3)    amend or repeal or add any provision to the Company's Articles or this Agreement, including, without

8

limitation, changing the terms and conditions or the amounts of the Development and Management Fees;

(4)    authorize a Liquidation Event;

(5)    issue additional Class A Units to any Member; or

(6)    appoint a Liquidator pursuant to Section 7.2(a).

(7)    amend our cause to be amended the Operating Agreement of Easy Street Mezzanine.

The provisions of this Section 3.2(d)(ii) shall expire upon the payment in full of the Class A Preferred Return.

(e)    Distribution Preference Upon Liquidation Event.    Upon a Liquidation Event, after payment or provision for payment of the debts and other liabilities of the Company, the holders of the Class A Units shall be entitled to receive out of the assets of the Company, before any Distribution shall be made on any other securities of the Company, cash in an amount equal to the Class A Preferred Return (with credit given for any prior partial payments of the Class A Preferred Return). After payment of the Class A Preferred Return, the Capital Calls (with accrued interest), if any, the Shoaf and Wickline Investment Amount (with interest on the Shoaf and Wickline Investment Amount at the rate of sixteen percent (16%) per annum from the date of the closing on the Property until paid in full), the UCL Investment Amount and the UCL Accrued Interest, the holders of the Units shall receive all of the assets and funds of the Company remaining and available for distribution. Such assets and funds shall be divided among and paid to the holders of the Units, on a pro-rata basis, according to the number of Units held by them. If, upon any Liquidation Event, the assets of the Company distributable to the holders of the Class A Units shall be insufficient to pay in full the Class A Preferred Return, then such assets shall be distributed ratably among such holders of the Class A Units in proportion to the full respective amounts to which they are entitled.

(f)    Right of First Refusal Upon Sale by a Member.

(i)    If at any time a Member proposes to sell any Units pursuant to a bona fide written offer from a third-party purchaser, the Member (the "seller") will make a written offer to sell the Units to the Company for the same price and on the same terms and conditions as those contained in the bona fide written offer from such third-party purchaser. If the Company declines to purchase, then the seller shall make a written offer to sell the Units to the Members for the same price and on the same terms and conditions as those contained in the offer from the third-party purchaser.

9

(ii)   The Company must accept the seller's offer by written notice delivered to the seller within fifteen (15) calendar days after the offer is received.

(iii)   If the Company declines to accept the seller's offer, the seller will then provide written notice to the Members. The Members must accept the seller's offer within fifteen (15) calendar days after the offer is received by the Members.

(iv)   The Members may divide the Units in any manner to which they all agree. In the absence of agreement, they will divide the Units in proportion to their Units as of the time the offer is received.

(v)   If the Company or the Members do not accept the seller's offer, the seller may sell the Units to the third-party purchaser on the terms specified in the original offer, provided the Company is reasonably satisfied that all of the other conditions prescribed by this Section 3.2(f) are met. However, if the Company or the Members do not accept the seller's offer and the seller does not complete the sale to the third-party purchaser within ninety (90) calendar days after the Company's and the Members' right to accept the offer terminated, the seller must make a new offer to the Company or the Members and the provisions of this Section 3.2(f) again will apply.

(vi)   Any proposed transfer of Units that does not constitute a Transfer (i.e., transfer to an Approved Affiliate) shall not be subject to the right of first refusal described in this Section 3.2(f).

(g)   Right to Information. The Company agrees to provide, or to cause its Subsidiaries to provide, all reports, budgets and other information required to be provided by Easy Street Mezzanine or Easy Street Partners under the Mezzanine Loan or the Senior Loan, as the case may be. The Company agrees to provide such information to the Class A Accredited Investor and UCL at the same time such information is delivered to the Mezzanine Lender and the Senior Lender.

(h)   Termination of the Rights and Preferences of the Class A Units. Notwithstanding any other provision in this Agreement to the contrary, all of the rights and preferences of the Class A Units, except for the right of first refusal granted under Section 3.2(f), shall terminate upon payment of the Class A Preferred Return.

Section 3.3   Rights, Preferences and Restrictions of Class B Units. Each Class B Unit shall enjoy the following rights and preferences:

(a)   Economic Interest and Voting Interest. Each Class B Unit is an interest in the Company with both an Economic Interest and Voting Interest. In the

10

event a Class B Unit is held by a Person that is not a Member, such Unit holder shall not enjoy a Voting Interest.

    (b)    <u>Distribution Provisions</u>.

        (i)    <u>Distributions to UCL</u>. After the Company has paid in full the Class A Preferred Return, the Capital Calls (with accrued interest), if any, the Shoaf and Wickline Investment Amount (with interest on the Shoaf and Wickline Investment Amount at the rate of sixteen percent (16%) per annum from the date of the closing on the Property until paid in full), the Company shall pay the UCL Investment Amount and the UCL Accrued Interest from Available Funds; provided, however, to the extent that the Available Funds arise from operation of the Project (as defined below), as opposed to the sale of Membership Interests (as defined below), then the Company shall apply only fifty percent (50%) of the Available Funds arising from the operation of the Project to the payment of the UCL Investment Amount and shall distribute the balance of Available Funds arising from the operation of the Project to the Unit holders on a pro rata basis per Unit.

        (ii)    <u>Distributions After Payment of UCL Investment Amount</u>. After the Company has paid in full the amounts identified in Section 3.3(b)(i), the Company shall pay the UCL Accrued Interest.

        (iii)    <u>Distributions after Payment of UCL Accrued Interest</u>. After the Company has paid in full the Class A Preferred Return, the Capital Calls (with accrued interest), if any, the Shoaf and Wickline Investment Amount (with interest on the Shoaf and Wickline Investment Amount at the rate of sixteen percent (16%) per annum from the date of the closing on the Property until paid in full), the UCL Investment Amount, and the UCL Accrued Interest, the Company shall distribute the remaining Available Funds, if any, to the Unit holders on a pro rata basis per Unit.

    (c)    <u>Voting Rights</u>. Each Class B Unit shall have one (1) vote when held by a Member. Class B Members (1) shall not have special voting rights, (2) shall have voting rights and powers equal to the voting rights and powers of the Class A Units, and (3) shall vote as a class with the Class A Members, except with respect to the Protective Provisions in Section 3.2(d)(ii).

    (d)    <u>Liquidation Rights</u>. After payment or provision for payment of the debts and other liabilities of the Company, and subject to any prior or superior rights of liquidation as may be conferred upon any Class A Units (including without limitation those set forth in Section 3.2(e) above), and payment of the Capital Calls (with accrued interest), if any, the Shoaf and Wickline Investment Amount (with interest on the Shoaf and Wickline Investment Amount at the rate of sixteen percent (16%) per annum from date of the closing on the Property until paid in full), the UCL Investment Amount and

the UCL Accrued Interest, upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, the holders of the Units shall receive all of the assets and funds of the Company remaining and available for distribution. Such assets and funds shall be divided among and paid to the holders of the Units, on a pro-rata basis, according to the number of Units held by them.

(e)    Right of First Refusal.    The Class B Units shall enjoy and be subject to the right of first refusal set forth in Section 3.2(f) above.

Section 3.4    **Initial Members.**    The names, addresses and number of Units of the Initial Members are as follows:

| Member's Name | Class A Units (and votes) | Class B Units (and votes) |
|---|---|---|
| Park City I LLC c/o Michael Feder 379 West Broadway, Suite 401 New York, NY 10012 | 12.5 | 0 |
| Utah Coal & Lumber, Inc. c/o Philo M. Smith, Jr. 684 Glenneyre Street Laguna Beach, California 92651 | 0 | 10 |
| Cloud Nine Resorts, LLC c/o Bill Shoaf 4780 Winchester Court Park City, Utah 84068 | 0 | 38.75 |

12

Alchemy Ventures Group, LLC          0                    38.75
c/o David Wickline
4780 Winchester Court
Park City, Utah 84068

Section 3.5    **Additional or Substitute Members.**

(a)    <u>Additional Members</u>.   The Company may admit additional or substitute Members only with the prior written Supermajority Approval of the Members in connection with such admission, which consent shall not be unreasonably withheld or delayed.   Notwithstanding the foregoing, any Approved Affiliate, and any Person acquiring Units pursuant to the right-of-first refusal provisions set forth in Section 3.2(f) above, shall become a Member without the requirement of any consent of the Members or any other Person, so long as such Person executes this Agreement and agrees to be bound by its terms.

(b)    <u>Rights of Additional or Substitute Members</u>.   A Person admitted as an additional or substitute Member and that agrees in writing to be a party to this Agreement has all the rights and powers and is subject to all the restrictions and obligations of a Member under this Agreement and the Act.

Section 3.6    **New Units, Changes and Verification of Units.**

(a)    <u>New Units</u>.   The Company may issue new or additional Units only with the prior written Supermajority Approval of the Members in connection with such issuance.

(b)    <u>Right of First Refusal Among Existing Members</u>.   If the Manager deems it to be in the best interest of the Company to issue and sell new Units, and the issuance of such Units is approved in accordance with Section 3.6(a), prior to offering any such Units to third parties, the Company shall offer such Units for sale to the existing Members in writing specifying the proposed issue price and any new or additional terms and conditions of such Units.   The Members must accept the Company's offer with fifteen (15) calendar days after the offer is received.   The Members may divide the Units in any manner to which they all agree.   In the absence of agreement, they will divide the Units in proportion to their Units as of the time the offer is received.

(c)    <u>Changes in Units</u>.   If the Members approve the admission of an additional Member in accordance with Section 3.5(a), the Members shall determine the consideration to be paid for the Unit(s) to be issued, and the Manager shall adjust the Members' Economic Interests and Voting Interests accordingly, subject to the approval of the Class A Members as part of the Protective Provisions set forth in Section 3.2(d)(ii).   The addition of a new Member shall cause an adjustment of the Economic Interests of all Members, based on the number of Units purchased by the additional Member in relation to the total number of Units outstanding.   An additional Member

13

shall receive Voting Interests equal to the number of Units issued to such additional Member.

(d)   Verification of Units.   Within ten (10) days after receipt of a Member's written request, the Manager will provide the Member with a statement of the Member's Units.   The statement will serve the sole purpose of verifying the Member's Class A Units or Class B Units, as the case may be, as reflected in the Company's records, and will not constitute for any purpose a certificated security, negotiable instrument or other vehicle by which a Transfer of a Unit may be effected.

Section 3.7   **Manner of Acting.**

(a)   Meetings.

(i)   Right to Call.   The Manager, or any Members holding Units representing ten percent (10%) of the total Units, may call a meeting of Members by giving written notice to all Members not less than five (5) nor more than thirty (30) calendar days prior to the date of the meeting.   The notice must specify the date of the meeting and the nature of any business to be transacted.   Notice of such meetings may be given by the noticing party by confirmed facsimile transmission, first class mail (in which case the minimum notice period must be increased by three (3) additional calendar days), overnight courier, personal delivery, or e-mail transmission that is confirmed to have been received by the recipient thereof.   The meeting shall be held in Park City, Utah or such other place as all of the Members agree.   A Member may waive notice of a meeting of Members orally, in writing or by attendance at the meeting.

(ii)   Proxy Voting.   A Member may act at a meeting of Members through a Person authorized by signed proxy; provided, however, that such proxy is filed with the Company before or at the time of the meeting, and such proxy shall not be valid more than ninety (90) calendar days after the date of its execution unless otherwise provided in the proxy.

(iii)   Quorum.   Members whose Units exceed fifty percent (50%) of all issued and outstanding Units will constitute a quorum at a meeting of Members.   No action may be taken in the absence of a quorum.   A Member may participate in and be considered present at a meeting by, or the meeting may be conducted through the use of, any means of communication by which all Members participating in the meeting may hear each other, or otherwise communicate with each other during the meeting.

(iv)   Required Vote.   Except with respect to matters for which a greater minimum vote is required by the Act or this Agreement, the vote of Members present whose Units exceed fifty percent (50%) of the aggregate

14

Units of all Members present will constitute the act of the Members at a meeting of Members.

(b)    Action Without Meeting.  The Members may act without a meeting; provided, however, that any action approved by the Members without a meeting shall be subject to unanimous approval of all Members.

Section 3.8    **Fractional Units.**  Fractional Units are permitted and fractions of a Unit shall entitle the holder to a fraction of a vote in addition to any other rights associated with such Units.

Section 3.9    **Limitation on Individual Authority.**  A Member who is not also a Manager has no authority to bind the Company.  A Member whose unauthorized act obligates the Company to a third party will indemnify the Company for any costs or damages the Company incurs as a result of the unauthorized act.

Section 3.10    **Negation of Fiduciary Duties.**  A Member who is not also a Manager owes no fiduciary duties to the Company or to the other Members solely by reason of being a Member.

Section 3.11    **Nature of Units.**  The interest in the Company represented by Class A Units and Class B Units is personal property and shall not be deemed realty or any interest in the Company's real or personal property or assets of any kind.

Section 3.12    **Transfer of Units.**

(a)    Restrictions on Transfer.  A Member may not Transfer, directly or indirectly, all or any Units without prior written consent of the Manager.  In determining whether to approve a Transfer, the Manager shall consider such factors as (i) the reputation and character of the potential Transferee; (ii) the financial capability of the potential Transferee; (iii) ability of the potential Transferee to perform its obligations under this Agreement; and (iv) whether the potential Transferee owns or operates other businesses or has other business interests that may conflict with the business or objectives of the Company or its affiliates.  An attempted Transfer of any Class A Units or Class B Units that is not in compliance with this Section 3.12 is null and void.  No Transfer under this Section 3.12(a) shall be deemed to include a transfer to an Approved Affiliate or any Person acquiring Units pursuant to the right-of-first refusal provisions set forth in Section 3.2(f) above, so long as such Person executes this Agreement and agrees to be bound by its terms.

(b)    Permitted Transfers.  Any Transfer approved by the Manager shall be subject to the following conditions:

(i)    the Transfer, alone or in combination with other Transfers, will not result in the Company's termination for federal income tax purposes;

15

(ii)  the Transfer is the subject of an effective registration under, or exempt from the registration requirements of, applicable state and federal securities laws; and

(iii)  the Company receives from the Transferee the information and agreements reasonably required to permit it to file federal and state income tax returns and reports.

(c)  <u>Transferor's Membership Status</u>.  If a Member Transfers less than all of such Member's Units, the Member's rights with respect to the transferred portion, including the right to vote or otherwise participate in the Company's governance and the right to receive Distributions, will terminate as of the effective date of the Transfer.

(d)  <u>Transferee's Status</u>.

(i)  <u>Admission as a Member</u>.  A Member who Transfers any Class A Units or Class B Units, as the case may be, has no power to confer on the Transferee the status of a Member.  A Transferee may be admitted as a Member only in accordance with the provisions of Section 3.5.  A Transferee who is not admitted as a Member has only the rights described in this Section 3.12.

(ii)  <u>Rights of Non-Member Transferee</u>.  A Transferee who is not admitted as a Member in accordance with the provisions of Section 3.5 (i) forfeits the Voting Interests that accompany his or her Units, (ii) is not entitled to receive information concerning the Company's affairs or inspect the Company's books and records, (iii) with respect to the transferred Units, is entitled to receive the Distributions to which the Member would have been entitled had the Transfer not occurred, but only at such times and in such amounts as the Company in its sole discretion may determine, and (iv) is subject to the restrictions imposed by this Article 3.12 to the same extent as a Member.

Section 3.13  **Involvement in Project**.  Cloud Nine and its principal William Shoaf and AVG and its principal David Wickline own various entities that will have contractual relationships with the Project (as defined below).  The Members acknowledge the existence or potential of such contractual relationships and approve the participation of Bill Shoaf and David Wickline in the Project through such contractual relationships, provided that the fees received by William Shoaf and David Wickline (or any Entities controlled by them) do not exceed the Development and Management Fees.

**ARTICLE 4: OVERVIEW OF COMPANY'S BUSINESS PLAN; FINANCE**

Section 4.1    **Summary of the Company's Business Plan.**

(a)  <u>Acquisition of the Property</u>.  UCL and Diane Jordan Smith, as Trustee of the Diane Jordan Smith Trust u/a/d August 27, 1987 (the "Smith Trust"), own

16

certain improved and unimproved real property located in Park City, Utah (the "Property"). The Property includes the Zoom Restaurant building, the Easy Street Brasserie building, the Salon Rouge building, and the site for a hotel-condominium. Easy Street Partners has entered into, or will enter into, a Purchase and Sale Agreement with UCL and the Smith Trust to acquire the land and buildings that comprise the Property (the "Land Purchase Agreement"). Under the terms of the Land Purchase Agreement, UCL will convey to Easy Street Partners the assets for the Easy Street Brasserie restaurant and private club operated in the Easy Street Brasserie building and Salon Rouge.

(b)    Development of Condominium-Hotel. With the consent of UCL and the Smith Trust, Cloud Nine obtained the requisite approvals from Park City to develop the Property as a master planned development (the "MPD Approvals"). The MPD Approvals grant Cloud Nine the right to construct on the Property a six-story hotel, which will contain twenty-two (22) residential units (each, a "Condominium Unit"), a spa, heated outdoor pool, approximately 3,500 square feet of meeting space, and an underground parking garage (the "Project"). The anticipated name for the Project is "The Sky Lodge." Cloud Nine will assign its right, title and interest to the MPD Approvals to Easy Street Partners. Cloud Nine – Sky Lodge Development, LLC, a Utah limited liability company, which is owned and controlled by William Shoaf and David Wickline or their affiliates ("CN-SLD"), will act as the developer of the Project. In consideration, CN-SLD will enter into a development agreement with Easy Street Partners, which will enable CN-SLD to manage the construction of the Project and obtain a development fee for providing such services (the "Development Agreement"). The projected cost for the completion of the Project, inclusive of the purchase price for the Property, is approximately Forty-Eight Million Dollars ($48,000,000) (the "Project Costs"). To finance the Project, Easy Street Partners has obtained commitments for funding. The senior debt will be provided by WestLB (the "Senior Lender") in the amount of Thirty Six Million Seven Hundred Ninety-Nine Thousand Two Hundred Twenty-Four Dollars ($36,799,224) (the "Senior Loan") and mezzanine financing will be provided by BayNorth Capital, LLC (the "Mezzanine Lender") in the amount of Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000.00) (the "Mezzanine Loan") (the Senior Loan and the Mezzanine Loan collectively, the "Project Financing").

(c)    Creation of Membership Interests. Easy Street Partners desires to construct the Project as a form of private residence club to be known as "The Sky Lodge – A Destination ResortClub" ("The Sky Lodge Club"). Easy Street Partners desires to sell ownership interests in Condominium Units at The Sky Lodge Club (each, a "Membership Interest"), which will provide owners of a Membership Interest with a fractional $1/8^{th}$ ownership of a specific residential Condominium Unit together with rights and benefits that will include the short term, periodic use of a two-, three-, or four-bedroom Condominium Unit in the Project.

(d)    Structure of the Transaction. The Senior Lender and the Mezzanine Lender have required the Company to utilize a specific structure in order to obtain the Project Financing. The Company has formed, or will form, two subsidiaries. The first

17

subsidiary is Easy Street Mezzanine. This Company is the sole member and manager of Easy Street Mezzanine. Easy Street Mezzanine is the borrower under the Mezzanine Loan. The second subsidiary is Easy Street Partners. Easy Street Mezzanine is the sole member and manager of Easy Street Partners. Easy Street Partners is the owner of the Property and the MPD Approvals. Easy Street Partners will enter into the Development Agreement and all other agreements relating to completion of the Project.

(i)     <u>Senior Lender's Terms</u>.  The Senior Loan has a five-year term, and accrues interest at a rate of 2.50 basis points over the 3-month LIBOR until paid in full.

(ii)     <u>Mezzanine Lender's Terms</u>.  The BayNorth Promissory Note is attached hereto as <u>Exhibit C</u> and incorporated herein by reference. All capitalized terms used in this subsection shall have the meanings ascribed to them in the BayNorth Promissory Note.  The Mezzanine Loan shall be repaid, from the Gross Receipts, as follows:

(a)     As a payment to BayNorth, an amount equal to Base Interest, for credit to such Base Interest.

(b)     As a payment to BayNorth, as amortization of principal, the remaining principal balance of the Note.

(c)     As a payment to Easy Street Mezzanine to its sole member for distribution to its member, Park City I, LLC, or its successors or assigns, until the aggregate amounts made available are equal to the balance of the Borrower's Interest Account.

(d)     As a payment to Easy Street Mezzanine to its sole member for distribution to its member, Park City I, LLC, or its successors or assigns, an amount equal to the balance of the Borrower's Principal Account.

(e)     As a payment to Easy Street Mezzanine to its sole member for distribution to its member, Park City I, LLC, or its successors or assigns, until the aggregate amounts made available pursuant to this Section is equal to the amount of the Overage Reimbursement (i.e., $900,000) plus an amount determined as of the Closing equal to the interest accrued at 6.5% per annum on the $9,000,000 land purchase price from October 1, 2005 until the Closing.

(f)     As a payment to BayNorth as Contingent Interest, an aggregate amount which equals twenty-five percent (25%) of the Overage Reimbursement reserved for distributions.  For the avoidance of doubt, BayNorth shall not receive any percentage of the 6.5% interest paid.

18

(g)    From the Gross Receipts, which shall also include the Zoom and Easy Street Restaurants, but exclude the hotel commercial units such as the spa, 33% as a payment to BayNorth as Contingent Interest and 67% as a payment to Easy Street Mezzanine, amounts in which payments may be distributed by Easy Street Mezzanine to its members at Easy Street Mezzanine's discretion.

Notwithstanding anything to the contrary set forth above:

1.    if any amounts are made available for distribution by Easy Street Mezzanine pursuant to (c) through (g) above and at maturity BayNorth does not receive repayment of the full principal amount of the Note and all accrued Base Interest thereon as a result of the application of the Minimum Principal Amount, then Easy Street Mezzanine shall be required to pay all such amounts so made available for distribution by Easy Street Mezzanine to BayNorth until BayNorth has received repayment of the full principal amount of this Note and all accrued Base Interest thereon and, if any such amounts have been distributed to the sole member of Easy Street Mezzanine for distribution to its members, such members shall be obligated to recontribute such amounts for contribution to Easy Street Mezzanine in order to fund such payments to BayNorth.

2.    if any amounts are made available for distribution by Easy Street Mezzanine pursuant to (c) or (e) through (g) above and at maturity BayNorth does not receive aggregate payments of principal and interest pursuant to the Note at least equal to the Minimum Payment Amount, then Easy Street Mezzanine shall be required to pay all such amounts so made available for distribution by Easy Street Mezzanine pursuant to (c) or (e) through (g) above to BayNorth until BayNorth has received aggregate payments under this Note equal to the Minimum Payment Amount and, if any such amounts have been distributed to the sole member of Easy Street Mezzanine for distribution to its members, such members shall be obligated to recontribute such amounts for contribution to Easy Street Mezzanine in order to fund such payments to BayNorth.

Contingent Interest Upon Maturity.  On the maturity date or such earlier date as the principal balance is paid in full, Easy Street Mezzanine shall pay to BayNorth as Contingent Interest the amount which would be payable to BayNorth as Contingent Interest if all of the Property then owned by Easy Street Mezzanine and Easy Street Partners, together with any related personal property, but excluding the Excluded Commercial Space, were sold at such time for its Determined Property Value, Easy Street Partners satisfied its obligations under the Senior Loan Documents by repaying outstanding principal and interest without any prepayment premium, and the remaining assets of Easy Street Mezzanine and Easy

Street Partners were applied in the order set forth in subsections (a) through (g) above.

(iii)   Distributions to Members. The Members acknowledge and agree that the Manager shall make all Distributions to the Members hereunder in accordance with the provisions set forth herein, regardless of whether the loan documents for the Senior Loan or the Mezzanine Loan contemplate the distribution of funds in a manner inconsistent with this Agreement. For the sake of clarity, this Agreement does not supercede the BayNorth Promissory Note, but simply clarifies the priority of Distributions to the Members after the Company receives funds from Easy Street Partners or Easy Street Mezzanine, as the case may be.

(e)   Sale of Membership Interests; Distributions to the Company. The Company intends to repay the Project Financing from the proceeds Easy Street Partners generates from the sale of Membership Interests. As the parent company, this Company will receive distributions from proceeds generated by the sale of the Membership Interests, consistent with the terms of the Senior Loan and Mezzanine Loan. The Company intends to distribute all proceeds received from the sale of Membership Interests in accordance with the distribution provisions set forth in this Agreement.

(f)   Ownership of Other Assets. Easy Street Partners intends to retain ownership of the Easy Street Brasserie building and the Zoom Restaurant building, and to retain ownership of the Easy Street Brasserie restaurant and private club. Easy Street Partners will enter into a long-term asset management agreement with Cloud Nine Resorts – Sky Lodge Development, LLC, a Utah limited liability company ("CN-SLD"), an entity controlled by William Shoaf and David Wickline for management of the Depot Building and other businesses or assets retained by Easy Street Partners (exclusive of The Sky Lodge and its affiliated commercial operations); provided, however, that such contract shall not provide for any fees in excess of the Development and Management Fees.

(g)   Management of The Sky Lodge. Easy StreetPartners will enter into a long-term hotel management agreement with Cloud Nine Resorts – Sky Lodge Management, LLC, a Utah limited liability company, an entity owned and controlled by William Shoaf and David Wickline or their affiliates ("CN-SLM"), which will enable CN-SLM to act as the operator/manager of The Sky Lodge; provided, however, that such contract shall not provide for any fees in excess of the Development and Management Fees.

(h)   Member Ratification of Business Plans and Related Actions. Each Initial Member, by executing this Agreement, ratifies all acts taken by the Company, Cloud Nine and AVG in connection with the business activities contemplated by the Company, including, without limitation, the Company's election to (1) participate in the Project, and (2) enter into agreements for the Senior Loan and the Mezzanine Loan, all on the terms established by the Manager and Cloud Nine. In addition, the Class A

20

Accredited Investor and UCL acknowledge and agree that CN-SLD, CN-SLM, William Shoaf, David Wickline and their affiliated entities will act as the developer of the Project, manager of the Project, and manager of the other assets of the Company and its Subsidiaries, and will receive fees for such services, which will be paid by Easy Street Partners and/or Easy Street Mezzanine from cash generated by operations before cash is distributed to this Company and will not exceed the amounts disclosed as the Development and Management Fees.

Section 4.2    Contributions.

(a)    Initial Members.    The Initial Members will make the Initial Contributions set forth in this Section 4.2.

(i)    Class A Accredited Investor.    The Class A Accredited Investor has made a cash Contribution in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) in accordance with the draw down schedule attached hereto as Exhibit B.

(ii)    UCL.    UCL has made Contributions toward the MPD Approvals in the amount of One Million Eight Hundred Thousand Dollars ($1,800,000.00). In addition, UCL has deferred payment of an amount due at the closing on the Property, which is equal to simple interest of six and one-half percent (6.5%) on the purchase price of $9,000,000 from October 1, 2005 until Easy Street Partners closes on the Property (the "UCL Accrued Interest").

(iii)    Cloud Nine Resorts and AVG.    Cloud Nine and AVG will assign all of their right, title and interest to the MPD Approvals to the Company (or Easy Street Partners, as the case may be), and will provide services to the Company such as obtaining the Project Financing.

(iv)    Shoaf and Wickline.    In order to satisfy the Mezzanine Lender's requirement for additional equity in the Project, William Shoaf and David Wickline agree to defer payment of Two Hundred Fifty Thousand Dollars ($250,000) in fees as they come due under the Development Agreement, on a pro rata basis with all the development fee due thereunder, until completion of construction of the Project (the "Shoaf and Wickline Investment Amount").

(b)    Additional Members.    A Person admitted as a Member in connection with the acquisition of any Class A Units or Class B Units directly from the Company after the Effective Date will make the Contributions specified in the agreement pursuant to which the Person is admitted as a Member.

(c)    Capital Calls.

(i) <u>Required Participants</u>. No Class A Member or UCL shall be required to provide cash, loans or other Contributions, other than such Member's initial Contribution set forth in Section 4.2(a). However, if the Company experiences a Cash Deficit, or if the Company is required to make an additional contribution to Easy Street Mezzanine or Easy Street Partners, then the Manager may make a capital call (the "Capital Call"). In such an event, Cloud Nine, AVG and any other Class B Members (other than UCL) (the "Required Participants") shall be required to provide loans to the Company in the amount of such Capital Call. Each Required Participant shall provide a cash loan in proportion to the percent by which their number of Units represents the total number of Units subject to the Capital Call. A Capital Call shall be treated as a loan to the Company, and shall bear interest at a rate equal to the prime rate (as published in the <u>Wall Street Journal</u> on the business day on which the Capital Call is made) plus three percent (3%), until the Capital Call, with interest, is paid. The right of the Company to make Capital Calls shall not be construed as conferring any rights upon any creditor or upon any other person not a party to this Agreement.

(ii) <u>Failure to Contribute</u>. In the event a Required Participant fails to make the Capital Call within thirty (30) days of receiving written notice from the Company, the Required Participant shall be in default of its obligation under Section 4.2(c)(i). In such an event, the other Members shall have the right to advance funds to the Company equal to the amount of the Capital Call in default. The amount advanced by the non-defaulting Member(s) pursuant to this Section shall be treated as a demand loan to the defaulting Member, and shall bear interest at a rate equal to the prime rate (as published in the <u>Wall Street Journal</u> on the business day which next follows the date on which the default occurs) plus three percent (3%), until the Capital Call, with interest, is made. Until the non-defaulting Member is repaid, it shall be entitled to all Distributions (including liquidating distributions) to which the defaulting Member would have been entitled up to an amount equal to the amount of the Capital Call in default (including unpaid interest). Effective upon a Member becoming a defaulting Member, such Member hereby grants to the non-defaulting Member who advances substitute funds to the Company a security interest in its Units in the Company for the purpose of securing its obligation to pay. The defaulting Member shall execute and deliver to the non-defaulting Member such instruments and documents as may be required to perfect such security interest. The non-defaulting Member shall have all the rights of a secured creditor with respect to such security interest under the Uniform Commercial Code.

(d) <u>No Return of Contribution</u>. Except for the Class A Investment Amount, the Capital Calls, if any, the Shoaf and Wickline Investment Amount, the UCL

22

Investment Amount, and the UCL Accrued Interest, a Member is not entitled to the return of any Contribution prior to the occurrence of a Liquidation Event.

Section 4.3    **Allocation of Profit and Loss.**

(a)    General Allocation.    After giving effect to the special allocations required by Section 4.3(b) (the "Special Allocations"), the Company's Profit or Loss for a Taxable Year, including the Taxable Year in which the Company is dissolved, will be allocated among the Members in accordance with the number of Units held by each.

(b)    Special Allocations.

(i)    If a Member unexpectedly receives an adjustment, allocation, or distribution described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations that creates or increases a deficit in the Member's Capital Account as of the end of a Taxable Year, a pro rata portion of each item of the Company's income, including gross income and gain for the Taxable Year and, if necessary, for subsequent years will be allocated to the Member in an amount and manner sufficient to eliminate the deficit in the Member's Capital Account as quickly as possible.

(ii)    If a Member would have a deficit in his or her Capital Account at the end of a Taxable Year that exceeds the sum of (i) the amount the Member is required to pay the Company pursuant to an obligation described in Article 1.704-1(b)(2)(ii)(c) of the Regulations and (ii) the Member's share of Minimum Gain, a pro rata portion of each item of the Company's income, including gross income and gain, for the Taxable Year will be allocated to the Member in an amount and manner sufficient to eliminate the deficit in the Member's Capital Account as quickly as possible.

(iii)    If there is a net decrease in the Company's Minimum Gain during a Taxable Year, the items of the Company's income, including gross income and gain, for the Taxable Year and, if necessary, for subsequent Taxable Years will be allocated to the Members in proportion to their shares of the net decrease in Minimum Gain. If the allocation made by this paragraph would cause a distortion in the economic arrangement among the Members and it is expected that the Company will not have sufficient income to correct that distortion, the Company may seek to have the Internal Revenue Service waive the requirement for the allocation in accordance with Article 1.704-2(f)(4) of the Regulations.

(iv)    Items of the Company's loss, deductions and expenditures described in Code Article 705(a)(2)(B) that are attributable to the Company's nonrecourse debt and are characterized as Member nonrecourse deductions under Article 1.704-2(i) of the Regulations will be

23

allocated to the Members' Capital Accounts in accordance with Article 1.704-2(i) of the Regulations.

(v)     Items of income, gain, loss and deduction with respect to property contributed to the Company's capital will be allocated between the Members so as to take into account any variation between book value and basis, to the extent and in the manner prescribed by section 704(c) of the Code and related Regulations.

(vi)     If the special allocations result in Capital Account balances that are different from the Capital Account balances the Members would have had if the special allocations were not required, the Company will allocate other items of income, gain, loss and deduction in any manner it considers appropriate to offset the effects of the special allocations on the Members' Capital Account balances. Any offsetting allocation required by this paragraph is subject to and must be consistent with the special allocations.

(c)     Effect of Transfers During Year. The Company will prorate items attributable to a Unit that is the subject of a Transfer during a Taxable Year between the transferor and the transferee based on the portion of the Taxable Year that elapsed prior to the Transfer.

Section 4.4     **Tax Allocations.** For federal income tax purposes, unless the Code otherwise requires, each item of the Company's income, gain, loss or deduction will be allocated to the Members in proportion to their allocations of the Company's Profit or Loss as represented by the Units.

Section 4.5     **Distributions.**

(a)     Minimum Distribution to Pay Tax. Within ninety (90) days after the close of each Taxable Year, the Company will distribute to each Member an amount equal to the Profit allocated to the Member for the Taxable Year multiplied by the highest marginal federal income tax rate applicable to any Member for the Taxable Year.

(b)     Distribution of Available Funds. The Company will distribute to the Members, not less frequently than quarterly, any Available Funds, after the Distributions contemplated by Section 4.5(a). The Company will make all Distributions of Available Funds to the Members in the following order of priority:

(i)     first, to the Class A Members until the Class A Members have received cumulative Distributions in an amount equal to the Class A Preferred Return;

24

(ii)    second, to the Required Participants, until such Required Participants have received an amount equal to the Capital Calls (inclusive of accrued interest);

(iii)    third, to Shoaf and Wickline, pro rata, until they have received an amount equal to the Shoaf and Wickline Investment Amount plus interest on such amount from the date of the closing on the Property until paid in full at a rate of sixteen percent (16%) per annum;

(iv)    fourth, subject to Section 3.3(b)(i), to UCL until UCL has received cumulative Distributions in the amount of the UCL Investment Amount and the UCL Accrued Interest on the purchase price for the Property required under Section 3.1(c) of the Land Purchase Agreement; and

(v)    fifth, the balance, if any, to the Members in proportion to their Units.

(c)    _Allocation_. Except as provided in Sections 4.5(a) and 4.5(b), the Company will make all Distributions to the Members in proportion to their Units.

(d)    _Liability for Distributions_. All of the Members, to the maximum extent permitted under the Act, waive or compromise the liability of any Member with regard to any Distributions made in accordance with this Agreement.

Section 4.6    **Capital Accounts.**

(a)    _General Maintenance_. The Company will establish and maintain a Capital Account for each Member. A Member's Capital Account will be:

(i)    increased by: (A) the amount of any money the Member Contributes to the Company's capital; (B) the fair market value of any property or entitlements the Member Contributes to the Company's capital, net of any liabilities the Company assumes or to which the property is subject; and (C) the Member's share of Profits and any separately stated items of income or gain; and

(ii)    decreased by: (A) the amount of any money the Company Distributes to the Member; (B) the fair market value of any property the Company Distributes to the Member, net of any liabilities the Member assumes or to which the property is subject; and (C) the Member's share of Losses and any separately stated items of deduction or loss.

(b)    _Adjustments for Distributions in Kind_. If at any time the Company distributes property in kind, it will adjust the Members' Capital Accounts to account for their shares of any Profit or Loss the Company would have realized had it sold the property at fair market value and distributed the sale proceeds.

(c)    <u>Adjustments for Acquisitions and Redemptions</u>.  If at any time a Person acquires a Unit from the Company or the Company redeems a Unit, the Company may adjust the Members' Capital Accounts to reflect any Profit or Loss the Company would have realized had it sold all of its assets at fair market value on the date of the acquisition or redemption.

(d)    <u>Transfer of Capital Account</u>.  A Transferee of any Units succeeds to the portion of the transferor's Capital Account that corresponds to the Units that are the subject of the Transfer.  A Member that has more than one Unit shall have a single Capital Account that reflects all his Units regardless of the time or manner in which those Units were acquired.  On the Transfer of a Unit, the Capital Account of the transferor that is attributable to the transferred Unit shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(l).

(e)    <u>Compliance with Code</u>.  The requirements of this Section 4.6 are intended and will be construed to ensure that the allocations of the Company's income, gain, losses, deductions and credits have substantial economic effect under the Regulations promulgated under Article 704(b) of the Code.

## ARTICLE 5: MANAGEMENT

Section 5.1    **Management**.  The Company shall be Manager-managed.  The name and business address of the Company's Manager are as follows:

> AVG-SL, LLC
> 4780 Winchester Court
> Park City, Utah 84098

Section 5.2    **Time Devoted to Business**.  The Manager will devote the amount of time to the Company's activities as is reasonably necessary to discharge the Manager's responsibilities.  The Manager, and its principals David Wickline and William Shoaf, may own or operate other businesses, or engage in other business activities, so long as such business activities do not violate the terms of Section 5.4(b) below.

Section 5.3    **Powers, Authority, Duties and Limits**.

(a)    <u>General Scope</u>.  Subject to Section 5.3(b), the Manager has full power, authority and discretion to manage and direct the Company's business, affairs and properties, including, without limitation, the specific powers referred to in Section 8.2; provided, however, that certain actions cannot be undertaken without the approval of the Class A Members, as set forth in Section 3.2(d)(ii).

(b)    <u>Operating Budget</u>.  No later than 45 days prior to the end of each calendar year (or in the case of the remainder of calendar year 2005, within 45 days of the date of this Agreement), the Manager shall prepare and submit to the Members for

26

their approval a detailed operating budget for the Company and the Project for the following calendar year (each, an "Operating Budget"). In order for an Operating Budget to be approved, Members whose Units exceed eighty-eight percent (88%) of the aggregate Units outstanding must approve ("Supermajority Approval") the Operating Budget, which approval shall not be unreasonably withheld, conditioned or delayed. Any objections to the Operating Budget must be submitted to the Manager in writing within fifteen (15) days of delivery of the draft Operating Budget, with an explanation of the reasons for the objection(s). If the Manager does not receive written objections from Members holding more than twelve and one-half (12.5) Voting Interests within the foregoing time period, the Operating Budget shall be deemed to have received Supermajority Approval. If the Manager receives timely written objections that demonstrate the lack of Supermajority Approval, the Manager and Members shall work in good faith to resolve their differences and approve the Operating Budget. The Manager may utilize that portion of the Operating Budget not subject to the Members' objections. Any line items objected to by the Members shall revert to the amount of such line item set forth in the Operating Budget for the previous year unless or until the Members resolve their differences with regard to such line item and up to twenty-five percent (25%) of such annual Operating Budget spent within a ninety day (90) period.. During the course of a calendar year, the Manager shall not approve and the Company shall not incur (i) any single expense that is not included in the Operating Budget for such calendar year in excess of $25,000 and (ii) aggregate expenses in excess of $100,000 that are not included in the Operating Budget, in either case, without the prior written Supermajority Approval.

(c)    Actions Requiring Consent of Members. Notwithstanding anything to the contrary contained in this Agreement, without prior written Supermajority Approval of the Members, the Company shall not: (i) incur debt in excess of the Project Financing; (ii) pledge, encumber, mortgage any of the Company's or Easy Street Mezzanine's or Easy Street Partners' assets for any purpose unrelated to the Project; or (iii) guarantee the obligations of any third party for any purpose unrelated to the Project.

(d)    Specific Powers.

(i)    Except as set forth in Sections 5.3(b) and 3.2(d)(ii) above, the Manager is authorized on the Company's behalf to make all decisions as to (1) the development, sale, lease or other disposition of the Company's assets; (2) the purchase or other acquisition of other assets of all kinds; (3) the management of all or any part of the Company's assets and business; (4) the borrowing of money and the granting of security interests in the Company's assets (including loans from Members); (5) the prepayment, refinancing or extension of any mortgage affecting the Company's assets; (6) the compromise or release of any of the Company's claims or debts; and (7) the employment of Persons for the operation and management of the Company's business.

27

(ii)    The Manager on the Company's behalf may execute and deliver (1) all contracts, conveyances, assignments, leases, subleases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; (2) all checks, drafts and other orders for the payment of the Company's funds; (3) all promissory notes, mortgages, deeds of trust, security agreements and other similar documents; (4) all articles, certificates and reports pertaining to the Company's organization, qualification and dissolution; (5) all tax returns and reports; and (6) all other instruments of any kind or character relating to the Company's affairs.

Section 5.4    **Fiduciary Duties.**

(a)    Standard of Care.

(i)    Exculpation.    The Manager will not be liable to the Company or any Member for an act or omission done in good faith to promote the Company's best interests, unless the act or omission constitutes gross negligence, intentional misconduct or a knowing violation of law.

(ii)    Justifiable Reliance.    The Manager may rely on the Company's records maintained in good faith and on information, opinions, reports or statements received from any Person pertaining to matters the Manager reasonably believes to be within the Person's expertise or competence.

(b)    Competing Activities.    The Members recognize that the Manager, and its principals David Wickline and William Shoaf, are engaged in a number of different business ventures. Neither the Manager, David Wickline, William Shoaf nor any of their affiliated entities, shall participate in any other business venture within the city limits of Park City that competes directly with the Project or the restaurants or other businesses owned and operated by the Company and its Subsidiaries on the Property without the prior written approval of the Class A Members. Neither David Wickline, William Shoaf nor the Manager shall have any restriction on their activities outside of the city limits of Park City.

(c)    Self-Dealing.    The Manager or a Member may enter into a business transaction with the Company if the terms of the transaction are no less favorable to the Company than those of a similar transaction with an independent third party. Approval or ratification by a majority of all Units owned by Members having no interest in the transaction constitutes conclusive evidence that the terms satisfy the foregoing condition.

Section 5.5    **Indemnification of Manager.**    The Company shall indemnify the Manager to the maximum extent permitted under the Utah law.   The Company shall

28

provide liability insurance for the Manager with terms of coverage that are reasonably satisfactory to the Manager.

Section 5.6    **Compensation.**    The Manager shall be entitled to receive any compensation for services that the Manager renders to the Company, pursuant to a written agreement approved by the Members.

Section 5.7    **Tenure.**

(a)    Term.    The Manager will serve until the earlier of:    (1) the Manager's resignation; (2) the Manager's sale of all of its or his Units; (3) the Manager's expulsion for Cause; (4) the Manager's Bankruptcy; and (5) if the Manager is a natural person, the Manager's death or Disability.

(b)    Resignation.    The Manager at any time may resign by written notice delivered to the Members at least thirty (30) days prior to the effective date of the resignation.

(c)    Removal.    The Members may remove a Manager only for Cause (as defined in Article 1 above).

(d)    Vacancy.    If a Manager for any reason ceases to act, the Members will promptly elect a successor.

## ARTICLE 6: RECORDS AND ACCOUNTING

Section 6.1    **Maintenance of Records.**

(a)    Required Records.    The Company will maintain at its Designated Office such books, records and other materials as are reasonably necessary to document and account for its activities, including, without limitation, those required to be maintained by the Act.

(b)    Member Access.    A current or former Member or Manager and their authorized representatives will have access to and may inspect and copy all books, records and other materials pertaining to the Company or its activities.    The requesting party shall pay all copying costs associated with such inspection and copying.

(c)    Confidentiality.    No current or former Member or Manager will disclose any information relating to the Company or its activities to any unauthorized person or use any such information for his or her or any other Person's personal gain.

Section 6.2    **Financial Accounting.**

(a)    Accounting Method.    The Company will account for its financial transactions using a method of accounting determined by the Manager in compliance with Sections 446 and 448 of the Code.

29

(b)    Taxable Year.    The Company's Taxable Year is the Company's annual accounting period, which is the calendar year.

Section 6.3    Reports.

(a)    Members.    As soon as practicable after the close of each Taxable Year, but in no event later than the last day of February immediately following the close of each Taxable Year, the Manager will cause the Company to prepare and send to the Members such reports and information as are reasonably necessary to (1) inform the Members of the results of the Company's operations for the Taxable Year and (2) enable the Members to completely and accurately reflect their distributive shares of the Company's income, gains, deductions, losses and credits in their federal, state and local income tax returns for the appropriate year.    Any failure of the Manager to timely prepare and send such reports and information to the Members shall constitute Cause for termination of the Manager as Manager of the Company; provided, however, that Cause shall not exist where the Manager is unable to perform his duties hereunder as the result of the failure of the Tax Matters Partner or any third-party tax professionals engaged by the Company to provide information required by the Manager upon request, or any Member to provide any required information.

(b)    Periodic Reports.    The Company will complete and file any periodic reports required by the Act or the law of any other jurisdiction in which the Company is qualified to do business.

Section 6.4    Tax Compliance.

(a)    Withholding.    If the Company is required by law or regulation to withhold and pay over to a governmental agency any part or all of a Distribution or allocation of Profit to a Member:

(i)    the amount withheld will be considered a Distribution to the Member; and

(ii)    if the withholding requirement pertains to a Distribution in kind or an allocation of Profit, the Company will pay the amount required to be withheld to the governmental agency and promptly take such action as it considers necessary or appropriate to recover a like amount from the Member, including offset against any Distributions to which the Member would otherwise be entitled.

(b)    Tax Matters Partner.    The Members will designate a Member to act as the "Tax Matters Partner" pursuant to Article 6231(a)(7) of the Code.    The initial Tax Matters Partner shall be the Manager.    The Members may remove any Tax Matters Partner, with or without cause, and designate a successor to any Tax Matters Partner who for any reason ceases to act.    The Tax Matters Partner will inform the Members of all administrative and judicial proceedings pertaining to the determination of the

30

Company's tax items and will provide the Members with copies of all notices received from the Internal Revenue Service regarding the commencement of a Company-level audit or a proposed adjustment of any of the Company's tax items. The Tax Matters Partner may extend the statute of limitations for assessment of tax deficiencies against the Members attributable to any adjustment of any tax item. The Company will reimburse the Tax Matters Partner for reasonable expenses properly incurred while acting within the scope of the Tax Matters Partner's authority.

## ARTICLE 7: DISSOLUTION

Section 7.1   **Events of Dissolution.**

(a)   <u>Enumeration</u>. The Company will dissolve upon the first to occur of:

(i)   December 31, 2099;

(ii)   the vote of the Class A Members and Class B Members, voting as separate classes, to dissolve the Company; provided, however, that after the Company's payment of the Class A Preferred Return, the Class A Members and Class B Members shall vote as a single class;

(iii)   any event that makes the Company ineligible to conduct its activities as a limited liability company under the Act;

(iv)   any event or circumstance that makes it unlawful for the Company to carry on its business;

(v)   upon administrative dissolution of the Company under Article 48-2c-1207 of the Act;

(vi)   upon entry of a decree of judicial dissolution under Article 48-2c-1213 of the Act;

(vii)   filing by the Company of a voluntary petition in Bankruptcy or a voluntary petition or any answer seeking reorganization, arrangements, readjustment of its debts or for any other relief under the Bankruptcy laws, or under any other insolvency act or law, state or federal, now or hereafter existing, or any action by the Company indicating its consent to, approval of or acquiescence in any such petition or proceedings; the application of the Company for, or the appointment by consent or acquiescence of, a receiver or trustee of the Company or for all or a substantial part of its properties; the making by the Company of an assignment for the benefit of creditors; the admission of the Company in writing of its inability to pay its debts as they may mature; or

(viii) filing an involuntary petition against the Company in Bankruptcy seeking reorganization, arrangements, readjustment of its debts or for any other relief under the Bankruptcy Code, as amended, or under any other insolvency act or law, state or federal, now or hereafter existing, if such petition or proceeding remains undismissed for a period of thirty (30) days after the same shall be filed; or the involuntary appointment of a receiver or trustee of the Company for all or a substantial part of its property; or the issuance of a warrant of attachment, execution or similar process against any substantial part of the properties of the Company.

Section 7.2    **Effect of Dissolution.**

(a)    <u>Manager as Liquidators</u>.    Upon the Company's dissolution, the Manager shall act as the liquidator (the "Liquidator"). The Liquidator will wind up and liquidate the Company in an orderly, prudent and expeditious manner in accordance with the following provisions of this Section 7.2.

(b)    <u>Final Accounting</u>. The Liquidator will make proper accountings (1) to the end of the month in which the event of dissolution occurred and (2) to the date on which the Company is finally and completely liquidated.

(c)    <u>Duties and Authority of Liquidator</u>. The Liquidator will make adequate provision for the discharge of all of the Company's debts, obligations and liabilities. The Liquidator may sell, encumber or retain for distribution in kind any of the Company's assets. Any gain or loss recognized on the sale of assets will be allocated to the Members' Capital Accounts in accordance with the provisions of Section 4.3. With respect to any asset the Liquidator determines to retain for distribution in kind, the Liquidator will allocate to the Members' Capital Accounts the amount of gain or loss that would have been recognized had the asset been sold at its fair market value.

(d)    <u>Satisfaction of Claims</u>.

(i)    <u>Disposition of Known Claims</u>. As part of the dissolution process, the Liquidator shall dispose of known claims against the Company. The Liquidator shall provide written notice to all claimants of known claims, which notice shall: (1) notify claimants that the Company is being dissolved; (2) provide an address to which written notice of any claim must be given to the Company; (3) state the deadline, which may not be fewer than one hundred twenty (120) days after the effective date of the notice, by which the Company must receive a claim; and (4) provide that, unless sooner barred by another statute limiting actions, the claim will be barred if not received by the deadline. Unless sooner barred by another statute limiting actions, a claim against the Company is barred if: (a) a claimant was given notice under this Article and the claim is not received

32

by the Company by the deadline, or (b) the Company delivers to the claimant written notice of rejection of the claim within ninety (90) days after receipt of the claim and the claimant whose claim was rejected by the Company does not commence a proceeding to enforce the claim within ninety (90) days after the effective date of the rejection notice. Claims that are not rejected by the Company in writing within ninety (90) days after receipt of a claim by the Company shall be considered approved.

(ii)     <u>Disposition of Claims by Publication</u>. The Liquidator, on behalf of the Company, may publish notice (the "Published Notice") of its dissolution and request that any Person with a claim against the Company present such claim to the Company in accordance with the Published Notice. The Published Notice shall: (1) be published once a week for three (3) consecutive weeks in a newspaper of general circulation in the county where the Company's Designated Office is located; (2) describe the information that must be included in a claim and provide an address to which written notice of any claim must be given to the Company; (3) state the deadline, which may not be fewer than one hundred twenty (120) days after the first date of publication of the Published Notice, by which the Company must receive the claim; and (4) state that, unless sooner barred by another statute limiting actions, the claim will be bared if not received by the deadline. Unless sooner barred by another statute limiting actions, a claim against the Company is barred if: (a) a claimant was given notice under this Article and the claim is not received by the Company by the deadline, or (b) the Company delivers to the claimant written notice of rejection of the claim within ninety (90) days after receipt of the claim and the claimant whose claim was rejected by the Company does not commence a proceeding to enforce the claim within ninety (90) days after the effective date of the rejection notice. Claims that are not rejected by the Company in writing within ninety (90) days after receipt of a claim by the Company shall be considered approved.

(e)     <u>Distribution of Assets</u>. After dissolution, and during winding up, the assets of the Company shall be applied as follows:

(i)     First, to satisfy liabilities to secured creditors in the order of priority as provided by law;

(ii)     Second, to satisfy liabilities to Members in their capacities as unsecured creditors, in the order of priority as provided by law;

(iii)     Third, the expenses and cost of winding up;

(iv)     Fourth, to the Class A Members to the extent that all or a portion of the Class A Preferred Return has not been paid;

(v)    Fifth, to the Required Participants to the extent that all or a portion of the Capital Calls (including accrued interest) have not been repaid;

(vi)    Sixth, to Shoaf and Wickline, pro rata, to the extent that the Shoaf and Wickline Investment Amount (including accrued and unpaid interest) has not been repaid;

(vii)    Seventh, to UCL to the extent that all or a portion of the UCL Investment Amount and the UCL Accrued Interest due under Section 3.1(c) of the Land Purchase Agreement have not been repaid; and

(viii)    Eighth, to the Members in proportion to their Units.

The Liquidator will distribute any assets distributable in kind to the Members in undivided interests as tenants in common. A Member whose Capital Account is negative will have no liability to the Company, the Company's creditors or any other Member with respect to the negative balance.

(f)    Required Filings. The Liquidator will file with the Division such statements, certificates and other instruments, and take such other actions, as are reasonably necessary or appropriate to effectuate and confirm the cessation of the Company's existence.

## ARTICLE 8: GENERAL PROVISIONS

Section 8.1    **Amendments.**

(a)    Required Amendments.    The Company, the Manager and the Members will execute and file any amendment to the Articles required by the Act. If any such amendment results in inconsistencies between the Articles and this Agreement, this Agreement will be considered to have been amended in the specifics necessary to eliminate the inconsistencies.

(b)    Other Amendments. The Manager or any Member may propose for consideration and action an amendment to this Agreement or to the Articles. A proposed amendment shall only become effective upon receiving the prior written Supermajority Approval of the Members.

Section 8.2    **Power of Attorney.** Each Member appoints the Manager with full power of substitution, as the Member's attorney-in-fact, to act in the Member's name to execute and file (a) all certificates, applications, reports and other instruments necessary to qualify or maintain the Company as a limited liability company in the states and foreign countries where the Company conducts its activities, (b) all instruments that effect or confirm changes or modifications of the Company or its status, including, without limitation, amendments to the Articles, and (c) all instruments of transfer necessary to effect the Company's dissolution and termination. The power of attorney

34

granted by this Section 8.2 is irrevocable, coupled with an interest and will survive the death of the Member.

Section 8.3    **Investment Representation.**    Each Member represents to the Company and the other Members that (a) the Member is acquiring one or more Units in the Company for investment and for the Member's own account and not with a view to their sale or distribution and (b) neither the Company nor any other Member has made any guaranty or representation upon which the Member has relied concerning the possibility or probability of profit or loss resulting from the Member's investment in the Company.

Section 8.4    **Notices.**    Notices contemplated by this Agreement may be sent by any commercially reasonable means, including hand delivery, first class mail, fax, e-mail or private courier. The notice must be prepaid and addressed as set forth in the Company's records. The notice will be effective on the date of receipt or, in the case of notice sent by first class mail, the fifth (5th) calendar day after mailing.

Section 8.5    **Resolution of Inconsistencies.**    If there are inconsistencies between this Agreement and the Articles, the Articles will control. If there are inconsistencies between this Agreement and the Act, this Agreement will control, except to the extent the inconsistencies relate to provisions of the Act that the Members cannot alter by agreement. Without limiting the generality of the foregoing, unless the language or context clearly indicates a different intent, the provisions of this Agreement pertaining to the Company's governance and financial affairs and the rights of the Members upon dissolution will supersede the provisions of the Act relating to the same matters.

Section 8.6    **Provisions Applicable to Transferees.**    As the context requires and subject to the restrictions and limitations imposed by Section 3.12, the provisions of this Agreement pertaining to the rights and obligations of a Member also govern the rights and obligations of the Member's Transferee.

Section 8.7    **Additional Instruments.**    Each Member will execute and deliver any document or statement necessary to give effect to the terms of this Agreement or to comply with any law, rule or regulation governing the Company's formation and activities.

Section 8.8    **Computation of Time.**    In computing any period of time under this Agreement, the day of the act or event from which the specified period begins to run is not be included. The last day of the period is included, unless it is a Saturday, Sunday or legal holiday, in which case the period will run until the end of the next day that is not a Saturday, Sunday or legal holiday.

Section 8.9    **Entire Agreement.**    This Agreement and the Articles comprise the entire agreement among the parties with respect to the Company. This Agreement and the Articles supersede any prior agreements or understandings with respect to the

35

Company. No representation, statement or condition not contained in this Agreement or the Articles has any force or effect.

Section 8.10  **Waiver.**  No right under this Agreement may be waived, except by an instrument in writing signed by the party sought to be charged with the waiver.

Section 8.11  **General Construction Principles.**  Words in any gender are deemed to include the other genders. The singular is deemed to include the plural and vice versa. The headings and underlined paragraph titles are for guidance only and have no significance in the interpretation of this Agreement.

Section 8.12  **Binding Effect.**  Subject to the provisions of this Agreement relating to the transferability of Units and the rights of Transferees, this Agreement is binding on and will inure to the benefit of the Company, the Members and their respective distributees, successors and assigns.

Section 8.13  **Rights of PCI.**  Notwithstanding anything to the contrary herein contained, in the event that PCI requests that the Manager enforce its rights under the Loan Agreement, BayNorth Promissory Note or other loan documents between Bay North and Easy Street Mezzanine, the Manager shall enforce such rights. In the event that the Manager fails to enforce such rights, the Manager expressly agrees to let PCI enforce such rights.

Section 8.14  **Governing Law; Venue.**  Utah law governs the construction and application of the terms of this Agreement. Any dispute arising under this Agreement shall be brought in federal or state courts located in Utah.

Section 8.15  **Counterparts.**  This Agreement may be executed by facsimile and in counterparts, each of which will be considered an original.

Section 8.16  **Attorneys' Fees.**  In the event of any dispute arising under this Agreement, the prevailing party or parties shall be entitled to receive reasonable costs and attorneys' fees from the non-prevailing party or parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Members have executed this Agreement, to be effective as of the Effective Date.

PARK CITY I LLC

By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


UTAH COAL & LUMBER, INC.


By: _____
Name: _____
Its: _____

CLOUD NINE RESORTS, LLC

By: _____
    William Shoaf
Its: Manager


Alchemy Ventures Group, LLC

By: Alchemy Ventures Trust
Its: Member

    By: _____
      David Wickline
    Its: _____

IN WITNESS WHEREOF, the Members have executed this Agreement, to be effective as of the Effective Date.

PARK CITY I LLC

By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


UTAH COAL & LUMBER, INC.


By: _____
Name: _____
Its: _____


CLOUD NINE RESORTS, LLC


By: _____
    William Shoaf
Its: Manager


Alchemy Ventures Group, LLC

By:  Alchemy Ventures Trust
Its: Member

    By: _____
        David Wickline
    Its: _____


37

03/29/2006  11:29    12129659994                THE FEDER GROUP, LLC                    PAGE  25/25

IN WITNESS WHEREOF, the Members have executed this Agreement, to be effective as of the Effective Date.

PARK CITY I LLC

By: _____
Name: Michael A. Feder
Its: Managing Member

By: _____
Name: Elizabeth Rad
Its: Managing Member

UTAH COAL & LUMBER, INC.

By: _____
Name: _____
Its: _____

CLOUD NINE RESORTS, LLC

By: _____
William Shoaf
Its: Manager

Alchemy Ventures Group, LLC

By: Alchemy Ventures Trust
Its: Member

By: _____
David Wickline
Its: _____

37