Jeffrey Weston Shields (Utah Bar No. 2948)
Lon A. Jenkins (Utah Bar No. 4060)
Troy J. Aramburu (Utah Bar No. 10444)
**JONES WALDO HOLBROOK & McDONOUGH, PC**
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
Telephone: (801) 521-3200
Facsimile: (801) 328-0537
Email:  jshields@joneswaldo.com
         lajenkins@joneswaldo.com
         taramburu@joneswaldo.com

*Counsel for Unsecured Creditors' Committee*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re: | |
| EASY STREET HOLDING, LLC, *et al.*, | Bankruptcy Case No. 09-29905 |
| | Jointly Administered with Cases |
| | 09-29907 KRM and 09-29908 KRM |
| Debtors. | Chapter 11 |
| | Honorable R. Kimball Mosier |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF EASY STREET PARTNERS, LLC, | Adversary Proceeding No. |
| Plaintiffs, | _____ |
| vs. | |
| WESTLB, AG, | **COMPLAINT** |
| | [Filed Electronically] |
| Defendant. | |

915656.3

The Official Committee of Unsecured Creditors of Easy Street Partners, LLC, ("**Committee**" or "**Plaintiff**"), duly appointed in the above-captioned chapter 11 case of Easy Street Partners, LLC, as and for its complaint in the above-captioned adversary proceeding, respectfully alleges as follows:

## OVERVIEW OF ADVERSARY PROCEEDING

1. This adversary proceeding revolves around a luxury boutique hotel in Park City, Utah, known as the Sky Lodge, and a dispute involving Easy Street Partners, LLC ("**Partners**"), its parent and grandparent companies, Easy Street Mezzanine LLC ("**Mezzanine**"), and Easy Street Holding, LLC ("**Holding**"), respectively, (collectively, the "**Debtors**"), and their lenders—WestLB, AG ("**WestLB**") and BayNorth Real Fund VI, Limited Partnership ("**BayNorth**").

2. Partners is indebted to WestLB in the approximate amount of $14,379,224 (the "**WestLB Senior Loan**"),[1] which loan is secured by a first deed of trust on Partners' Premises (defined below). Mezzanine is allegedly indebted to BayNorth pursuant to a $11,125,000 mezzanine loan (the "**Mezzanine Loan**"), which is secured by Holding's equity interests in Mezzanine, which is the sole owner of Partners.

3. WestLB, as Administrative Agent, erroneously and in violation of agreements among the parties, paid approximately $5.6 million of Partners' funds to BayNorth in February 2008, which resulted in, inter alia: (i) WestLB refusing to permit Partners' exercise of its contractual right to extend the March 31, 2009 maturity date of the WestLB Senior Loan; and (ii) WestLB declaring a maturity default on such loan.

---

[1] WestLB has filed a secured claim in Partners' chapter 11 case in the amount of $16,049,742.71.

2

915656.3

4. Because Partners was not permitted to extend the maturity date of the WestLB Senior Loan, BayNorth declared a default under the Mezzanine Loan and scheduled a UCC sale of the equity interests in Mezzanine (which are owned by Holding), notwithstanding that there were no monetary defaults under the Mezzanine Loan.

5. BayNorth's actions cleared the way for BayNorth to foreclose on its security interests and ultimately take control of the Premises (defined below) following development and renovation of the Premises.

6. WestLB's erroneous and subsequent inequitable conduct, including, without limitation declaring an event of default under the WestLB Senior Loan—a default that was caused by WestLB's erroneous payment to BayNorth—has (i) required the Debtors to seek bankruptcy protection under the Bankruptcy Code to the detriment of their creditors, and particularly the unsecured creditors of Partners; (ii) resulted in WestLB refusing to release escrow funds under its control, which were to be used for a draw request in connection with the completion of construction and renovations at the Premises; (iii) resulted in WestLB charging Partners with default interest under the WestLB Senior Loan; (iv) resulted in the filing of numerous mechanics liens against the Premises, even though there are sufficient funds in a frozen escrow account which were earmarked to pay such mechanics' liens and contractors in full; (v) resulted in WestLB forcing Partners to sign a Forbearance Agreement in which Partners was required to waive all claims against WestLB; and (vi) eliminated the ability of Partners to sell fractional units at the Premises, as potential purchasers have been chilled from buying units as a result of the imposition of substantial liens on the Premises. WestLB's inequitable conduct has resulted in substantial injury and damages to the unsecured creditors of Partners.

915656.3

7. By this Complaint, the Committee seeks, among other things, to equitably subordinate the claims of WestLB to the claims of all unsecured creditors of Partners, as well as to return and restore, for the benefit of the Partners estate, all claims against WestLB that were waived by Partners in connection with the Forbearance Agreement, as such waiver constitutes a fraudulent transfer under both state and federal bankruptcy law.

## JURISDICTION AND PARTIES

8. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and venue is proper pursuant to 28 U.S.C. § 1409.

9. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O).

10. This adversary proceeding relates to Partners' chapter 11 case (case no. 09-29907) currently pending before the Court.

11. The Committee was duly appointed as the official committee of unsecured creditors in the Partners case by the United States Trustee on October 2, 2009 (docket no. 73), and is comprised of the following members: Elliott Workgroup Architecture, LLC; Millcreek Consulting; Gateway Center, LLC; Klehr Harrison Harvey Branzburg & Ellers, LLP; Goodrich and Thomas, CPAs; and Shaner Design, Inc.

12. The Committee has made written demand on the Debtors for the Debtors to assert against WestLB the claims set forth in this Complaint. The Debtors have refused to assert such claims.

13. The Committee has standing to assert all claims asserted in this Complaint.

14. Upon information and belief, WestLB is a German banking corporation acting by and through its New York branch, as agent, whose address is 1211 Avenue of the Americas, New York, New York 10036.

### BACKGROUND

15. On September 14, 2009 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

16. Partners is the owner and operator of the luxury boutique hotel known as the Sky Lodge in Park City, Utah.

17. There are 22 residential units at the Sky Lodge. Units at the Sky Lodge are being sold as fractional shares with a total of 176 one-eighth shares offered (the "**Fractional Units**").

18. Mezzanine, is the 100% owner and managing member of Partners.

19. Holding, is the 100% owner and managing member of Mezzanine.

### THE WESTLB SENIOR LOAN

20. On March 30, 2006, Partners entered into a Loan and Security Agreement (the "**WestLB Senior Loan Agreement**") for the initial amount of $36,779,224 (the "**WestLB Senior Loan**") with WestLB to develop a condominium hotel mixed use project (the "**Project**") at 201 Heber Avenue, Park City, Utah 84060 (the "**Premises**").

21. The WestLB Senior Loan is secured by, among other things, security interests evidenced by a Deed of Trust with Security Agreement on the Premises, Assignment of Leases and Rents and Fixture Filing, and a UCC Financing Statement.

22. Article 4 of the Senior Loan Agreement is entitled "Accounts/Cash Management." Under Article 4 of the Senior Loan Agreement: (i) purchaser deposits for the sale

of Fractional Units were deposited into the Sky Lodge Deposit Account, which was under the exclusive custody and control of WestLB; (ii) proceeds from the closing of sales of Fractional Units were deposited into the Sky Lodge Sales Proceeds Account, which was in the name of Partners but was under the exclusive custody and control of WestLB; and (iii) all other revenues from the operation of the Sky Lodge (e.g., hotel, restaurant and spa revenues) were deposited into a Lockbox Account under the exclusive custody and control of WestLB.

23. WestLB distributed moneys to other accounts to fund real estate tax reserves, homeowner association dues, an interest reserve and operating expenses.

24. Upon information and belief, only the operating expense account is under the custody and control of Partners, and such account is subject to a security interest held by WestLB.

25. One of the accounts which was under the exclusive custody and control of WestLB was the Real Estate Sales Escrow Account, which was in the name of Partners and where proceeds from the sale of Fractional Units at the Premises were deposited.

26. Under the WestLB Senior Loan Agreement, the WestLB Senior Loan was to become due on or about March 30, 2009 (the "**WestLB Maturity Date**"), subject to extensions of the maturity date for an additional one or two years through the conversion of the WestLB Senior Loan to an "Interim Loan" (as defined in the WestLB Senior Loan Agreement), provided, inter alia, that Partners was not in default of its obligations under the WestLB Senior Loan Agreement.

27. Upon information and belief, as of on or about February 15, 2008, there was approximately $28,000,000 in the Real Estate Sales Proceeds Account.

28. Upon information and belief, on or about February 15, 2008, at the direction and authorization of WestLB, as Administrative Agent, a partial principal repayment of $22,400,000 on the WestLB Senior Loan was made to WestLB from the Real Estate Sales Proceeds Account.

29. On or about February 15, 2008, WestLB mistakenly authorized and directed the payment of $5,600,000 to BayNorth from the Real Estate Sales Proceeds Account.

30. Upon information and belief, WestLB made no formal demand to obtain the return of the $5,600,000 from BayNorth.

31. As of the Petition Date, the current balance of the WestLB Senior Loan was $14,379,224.

## THE BAYNORTH MEZZANINE LOAN

32. On or about March 30, 2006, Mezzanine entered into a Loan Agreement (the "**BayNorth Mezzanine Loan Agreement**") in the initial amount of $11,250,000 (the "**BayNorth Mezzanine Loan**") with BayNorth.

33. In connection with the BayNorth Mezzanine Loan, Mezzanine executed and delivered a promissory note to BayNorth in the amount of $11,250,000, dated March 30, 2006 (the "**BayNorth Note**").

34. Under Article 3 of the BayNorth Note, interest accrues on the BayNorth Mezzanine Loan and is compounded monthly. The payment of such interest may be, and was, deferred by Mezzanine so long as Mezzanine was not in default of its obligations under the Mezzanine Loan Agreement and Mezzanine Note.

35. Article 4 of the BayNorth Note expressly prohibited any prepayment of the principal balance of the BayNorth Note in whole or in part prior to the 4th anniversary of the BayNorth Note, which is March 30, 2010.

915656.3

36. Partners is neither an obligor, nor a guarantor of the BayNorth Mezzanine Loan or BayNorth Note.

37. The BayNorth Mezzanine Loan and the obligations under the BayNorth Note are not secured by any interest in the Premises.

38. The BayNorth Mezzanine Loan and the obligations under the BayNorth Note are secured solely by a pledge by Holding of its 100% ownership interest in Mezzanine.

## THE INTERCREDITOR AGREEMENT

39. On or about March 20, 2006, WestLB and BayNorth entered into an intercreditor agreement (the "**Intercreditor Agreement**"). Partners and Mezzanine both signed the Intercreditor Agreement.

40. Paragraph 9 of the Intercreditor Agreement provides that, except with respect to certain exceptions:

> the Mezzanine Lender [BayNorth] shall not accept or receive payments (including, without limitation, whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from the Borrower and/or from the Premises prior to the date that all obligations of the Borrower to the Senior Lenders [WestLB] under the Senior Loan Documents are paid…
>
> All payments or distributions upon or with respect to the Mezzanine Loan which are received by the Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by the Mezzanine Lender for the benefit of the Senior Lenders and shall be paid over to the Senior Agent in the same form as so received…

## THE IMPROPER $5,600,000 TRANSFER TO BAYNORTH

41. Pursuant to the terms of the WestLB Senior Loan Agreement, the net proceeds of sale of Fractional Units at the Premises were initially deposited into the Sky Lodge Sales

8

915656.3

Proceeds Account, which was in the name of Partners but was maintained under the exclusive custody and control of WestLB.

42. On or about February 15, 2008, WestLB as Administration Agent mistakenly transferred $5,600,000 from the Real Estate Sales Proceeds Account to BayNorth (the "**$5.6 Million Transfer**").

43. Pursuant to the WestLB Senior Loan Agreement and the Intercreditor Agreement, the funds consisting of the $5.6 Million Transfer were required to be paid to WestLB towards satisfaction of the outstanding principal and interest under the WestLB Senior Loan Agreement.

44. The $5.6 Million Transfer resulted in: (i) an erroneous payment of $1,646,871 in principal under the BayNorth Mezzanine Loan in violation of the terms of the BayNorth Note and the Intercreditor Agreement; and (ii) an erroneous payment of $3,353,129 in interest, which was being deferred by Mezzanine pursuant to the terms of the BayNorth Note, all of which was paid by WestLB and received by BayNorth in violation of the Mezzanine Loan Agreement, BayNorth Note and Intercreditor Agreement.

**WESTLB'S ACTIONS: (A) PREVENTED PARTNERS FROM CONVERTING THE WESTLB SENIOR LOAN INTO AN INTERIM LOAN AND EXTENDING THE WESTLB MATURITY DATE; AND (B) RESULTED IN A DEFAULT UNDER THE WESTLB SENIOR LOAN AGREEMENT**

45. Upon information and belief, on September 25, 2008, Partners formally notified WestLB of the exercise of its right under section 2.15 of the WestLB Senior Loan Agreement to convert WestLB Senior Loan into an Interim Loan and extend the WestLB Maturity Date.

46. On or about March 4, 2009, WestLB sent a letter to Partners, asserting that after reviewing the disposition of the net sales proceeds from sales of Fractional Units, it, as the

9

915656.3

Senior Lender, had been underpaid $4,899,104 from the distributions that occurred in February of 2008.

47. This underfunding was the direct result of the erroneous payment by WestLB of the $5.6 Million Transfer, which was in violation of the BayNorth Mezzanine Loan, the BayNorth Mezzanine Note and the Intercreditor Agreement.

48. Realizing the mistake that had been made in making the $5.6 Million Transfer in February 2008, WestLB, upon information and belief, spoke with BayNorth representatives about a return of the funds, but made no formal demand to BayNorth that it do so.

49. Notwithstanding that BayNorth received the $5.6 Million Transfer in violation of the BayNorth Mezzanine Loan Agreement, the BayNorth Note and the Intercreditor Agreement, BayNorth refused to return the $5.6 Million Transfer.

50. As a result of the underpayment of the WestLB Senior Loan caused by the erroneous $5.6 Million Transfer by WestLB, WestLB took the position that Partners was in default of its obligations under the WestLB Senior Loan Agreement and was not entitled to: (i) convert the WestLB Senior Loan into an Interim Loan; and (ii) extend the WestLB Maturity Date beyond March 30, 2009.

51. Upon information and belief, until sometime in March 2009, WestLB had never told Partners that the loan maturity date would not be extended as contemplated in the WestLB Senior Loan Agreement.

915656.3

**PARTNERS WAS REQUIRED TO WAIVE ALL CLAIMS
AGAINST WESTLB UNDER THE APRIL 13, 2009
<u>FORBEARANCE AGREEMENT</u>**

52. As a result of the WestLB payment of the $5.6 Million Transfer and WestLB's assertion that it had been underpaid, WestLB refused to extend the maturity of the WestLB Senior Loan beyond March 30, 2009.

53. There existed, therefore, an unanticipated maturity default under the WestLB Senior Loan following March 30, 2009.

54. Subsequently, WestLB required Partners to enter into a Forbearance Agreement dated April 13, 2009 (the "**Forbearance Agreement**") to obtain WestLB's agreement to forbear for a short period from exercising its rights and remedies under the WestLB Senior Loan arising from Partners' alleged defaults.

55. WestLB agreed under the Forbearance Agreement to forbear from exercising its rights and remedies under the WestLB Senior Loan until May 29, 2009 (5:00 p.m. New York time).

56. Under the Forbearance Agreement, Partners was required to waive any claims it had against WestLB, including any claims arising from the erroneous $5.6 Million Transfer and the consequence of that payment. The Forbearance Agreement states at paragraph 3:

> In consideration of the agreements of the Agent and the Lenders contained herein, and for other good and valid consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Recourse Guarantor on behalf of themselves and their respective successors, assigns and other legal representatives (Loan Party), hereby absolutely, unconditionally and irrevocably release, remise and forever discharge each of the Agent and the Lenders, and their respective successors and assigns, and their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (collectively, Released Parties) of and from all demands, actions, causes of action, suits,

11

915656.3

> covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Loan Party many now or hereafter own, hold have, claim or have against the Released Parties or any of them for, upon and by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with, the Loan Documents or any transactions thereunder or related thereto.

### THE FILING OF MECHANICS LIENS AND LOSS OF FRACTIONAL UNIT SALES CAUSED BY THE WESTLB ERRONEOUS PAYMENT OF THE $5.6 MILLION TRANSFER

57.    As a result of the alleged default under the WestLB Senior Loan, which was caused by WestLB's erroneous payment of the $5.6 Million Transfer, WestLB froze the Real Estate Sales Proceeds Account and the Real Estate Sales Deposit Account, which contained, as of the Petition Date, in excess of $3,200,000, from which all contractors, suppliers and professionals on the Project were to be paid, notwithstanding that, upon information and belief, WestLB had previously authorized the payment of such contractors, suppliers and professionals. As a result, creditors have filed mechanics' liens against the Premises (the "**Mechanics' Liens**").

58.    On or about September 8, 2009, the general contractor on the Project filed an action to foreclose its mechanics' lien on the Premises.

59.    As a result of the Mechanics' Liens, Partners, upon information and belief, has been unable to sell Fractional Units at the Premises.

60.    Potential purchasers have been chilled from buying Fractional Units because any title report issued in connection with a sale of a Fractional Unit shows that the purchase of such Fractional Unit would be subject to the claims of the holders of the Mechanics' Liens.

12

915656.3

61. Among other things, the disruption to Partners' business caused by (i) WestLB making the erroneous $5.6 Million Transfer, (ii) WestLB's control over Partners' funds (including the freezing of accounts and the refusal to fund Partners), (iii) WestLB's improper declaration of default under the WestLB Senior Loan, and (iv) Partners' inability to sell Fractional Units following WestLB's refusal to approve payment of the general contractor, has resulted in injury to Partners' creditors.

## THE BAYNORTH NOTICE OF DEFAULT AND SCHEDULED UCC SALE

62. On May 5, 2009, BayNorth issued to Mezzanine a notice of default on the BayNorth Mezzanine Loan (the "**BayNorth Notice of Default**").

63. The primary default alleged in the BayNorth Notice of Default is a violation of a cross-default provision, which provides that a default under the WestLB Senior Loan Agreement is a default under the BayNorth Mezzanine Loan Agreement. However, the alleged default under the WestLB Senior Loan Agreement that BayNorth was relying upon was caused by (i) WestLB's payment and BayNorth's receipt of the $5.6 Million Transfer in violation of the BayNorth Mezzanine Loan Agreement, the BayNorth Note and the Intercreditor Agreement; and (ii) BayNorth's refusal to return the erroneously paid $5.6 Million Transfer.

64. Mezzanine's alleged defaults under the BayNorth Notice of Default were not monetary defaults.

65. Upon information and belief, Mezzanine is not in default under the Mezzanine Loan Agreement or BayNorth Note.

915656.3

66. The BayNorth Notice of Default was followed by the issuance of a Notice of Acceleration and Demand for Payment, which was issued by BayNorth on June 23, 2009 (the "**BayNorth Notice of Acceleration**").

67. On July 5, 2009, after issuance of the BayNorth Notice of Default and BayNorth Notice of Acceleration, WestLB issued a notice of default under the WestLB Senior Loan Agreement (the "**WestLB Notice of Default**").

68. The alleged defaults set forth in the WestLB Notice of Default were caused by WestLB's erroneous payment of the $5.6 Million Transfer and BayNorth's refusal to return the funds.

69. On July 28, 2009, a Notice of Sale was issued by BayNorth, which purported to schedule a UCC sale of the ownership interests in Mezzanine on September 16, 2009.

70. Subsequently, on the Petition Date, the Debtors filed their chapter 11 cases.

71. The filing of the Debtors' chapter 11 bankruptcy cases has injured creditors, particularly Partners' unsecured creditors, because it further delayed payments to creditors, significantly impaired the Debtors' business operations from which creditors will be paid, and makes uncertain when and how payments, if any, will be made to unsecured creditors on account of their claims.

## FIRST CAUSE OF ACTION
### (Equitable Subordination under 11 U.S.C. § 510(c))

72. Plaintiff repeats and re-alleges the foregoing allegations of this Complaint as if fully set forth herein.

73. WestLB unilaterally and mistakenly paid to BayNorth the $5.6 Million Transfer.

915656.3

74. As a direct result of such erroneous transfer, WestLB notified Partners in March of 2009 that WestLB had been underpaid in the approximate amount of $4,800,000.

75. Because of the alleged underpayment to WestLB, WestLB asserted that Partners was in default and refused to extend the WestLB Maturity Date beyond March 30, 2009.

76. In order to prevent WestLB from exercising its rights resulting from the maturity default, Partners was required to enter into the Forbearance Agreement.

77. WestLB's refusal to extend the maturity of the WestLB Senior Loan and its declaration of an event of default, which default occurred because of WestLB's own mistake in making the $5.6 Million Transfer, constitutes inequitable conduct on the part of WestLB.

78. WestLB's inequitable conduct, including making the $5.6 Million Transfer, failing to recover from BayNorth the $5.6 Million Transfer, placing Partners in default under the WestLB Senior Loan, and the resulting disruption to Partners' business endeavors has caused significant injury to the unsecured creditors of Partners, in an amount to be proven at trial.

79. The Committee's request for equitable subordination is consistent with the provisions of the Bankruptcy Code.

80. Accordingly, the Committee requests that the Court determine, pursuant to 11 U.S.C. § 510(c), that WestLB's claims against the Debtors are subordinate to the claims of all unsecured creditors of Partners.

### SECOND CAUSE OF ACTION
**(Avoidance and Recovery of Fraudulent Transfer or Conveyance 11 U.S.C. §§ 548 & 550)**

81. Plaintiff repeats and re-alleges the foregoing allegations of this Complaint as if fully set forth herein.

82. Section 548(a) of the Bankruptcy Code authorizes the avoidance of a transfer that was made or occurred within two years of the Petition Date, if the debtor, voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer and

(a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

83. The waiver of claims given by Partners to WestLB under the Forbearance Agreement was a transfer of an interest of Partners in property within two years before the Petition Date.

84. Such transfer was made voluntarily or involuntarily by Partners.

85. Upon information and belief, Partners' waiver of claims against WestLB in the Forbearance Agreement was not made for reasonably equivalent value.

86. Upon information and belief, as a result of Partners' waiver of claims in the Forbearance Agreement, Partners was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Partners was an unreasonably small capital.

87. Upon information and belief, at the time of, and as a result of, the waiver of claims by Partners, Partners intended to incur debts, or believed that it would incur debts, that would be beyond its ability to pay as it matured.

915656.3

88. The Court should enter a judgment avoiding Partners' waiver of claims in the Forbearance Agreement, pursuant to 11 U.S.C. § 548, and recovering such claims for the benefit of the Partners estate, pursuant to 11 U.S.C. § 550.

**THIRD CAUSE OF ACTION**
**(Avoidance and Recovery of Fraudulent Transfer or Conveyance 11 U.S.C. §§ 544 & 550)**

89. Plaintiff repeats and re-alleges the foregoing allegations of this Complaint as if fully set forth herein.

90. Section 544 of the Bankruptcy Code authorizes the avoidance of a pre-petition transfer of property of the debtor under applicable state law to the extent that there exists a creditor of the debtor's estate with standing to pursue such claim under state law in the absence of a bankruptcy proceeding.

91. The Committee is comprised and acts on behalf of unsecured creditors of Partners that have standing to pursue state law fraudulent transfer or conveyance actions against transferees of Partners' assets in the absence of a bankruptcy proceeding.

92. Pursuant to Utah Code Ann. § 25-6-5, a transfer may be avoided as a fraudulent transfer where the transferor did not receive reasonably equivalent value in exchange for the transfer and either:

    (a) the transferor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining assets of the debtor were unreasonably small in relation to the business or the transaction; or

    (b) the transferor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond the transferor's ability to pay as such debts came due.

93. Partners' waiver of claims against WestLB in the Forbearance Agreement was a transfer of property of Partners.

94. Partners' waiver of claims against WestLB in the Forbearance Agreement was not made for reasonably equivalent value.

95. Upon information and belief, as a result of the $5.6 Million Transfer, Partners was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Partners was an unreasonably small capital.

96. Upon information and belief, at the time of, and as a result of, the waiver of claims by Partners, Partners intended to incur debts, or believed that it would incur debts, that would be beyond its ability to pay as it matured.

97. Partners' waiver of claims against WestLB in the Forbearance Agreement is avoidable under state law and, therefore, is avoidable under 11 U.S.C. § 544.

98. The Court should enter a judgment avoiding Partners' waiver of claims in the Forbearance Agreement, pursuant to applicable state law and 11 U.S.C. § 544, and recovering such claims for the benefit of the Partners estate, pursuant to 11 U.S.C. § 550.

**FOURTH CAUSE OF ACTION**
**(Turnover-11 U.S.C. § 542)**

99. Plaintiff repeats and re-alleges the foregoing allegations of this Complaint as if fully set forth herein.

100. WestLB is currently in possession, custody, or control of those claims Partners may have against WestLB that have been allegedly waived under the Forbearance Agreement.

101. Such claims are valuable property of Partners' bankruptcy estate under 11 U.S.C. § 541.

102. The Court should enter a judgment restoring such claims to Partners' estate for the benefit of the estate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully seeks judgment against WestLB as follows:

A.    On its *First Cause of Action*, for an order determining, pursuant to 11 U.S.C. § 510(c) or otherwise, that WestLB's claims against the Debtors are subordinate to the claims of all unsecured creditors of Partners.

B.    On its *Second Cause of Action*, a judgment avoiding Partners' waiver of claims in the Forbearance Agreement, pursuant to 11 U.S.C. § 548, and recovering such claims for the benefit of the Partners estate, pursuant to 11 U.S.C. § 550.

C.    On its *Third Cause of Action*, a judgment avoiding Partners' waiver of claims in the Forbearance Agreement, pursuant to applicable state law and 11 U.S.C. § 544, and recovering such claims for the benefit of the Partners estate, pursuant to 11 U.S.C. § 550.

D.    On its *Fourth Cause of Action*, judgment restoring Partners' claims against WestLB to Partners' estate for the benefit of the estate.

E.    For such other and further relief as the Court deems just and equitable under the circumstances.

DATED:  January 12, 2010.

JONES WALDO HOLBROOK
& McDONOUGH, PC

/s/ Lon A. Jenkins
Lon A. Jenkins
Jeffrey W. Shields
Troy J. Aramburu

*Counsel for Unsecured Creditors' Committee*