Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com) (admitted *pro hac vice*)
Steven B. Eichel (seichel@crowell.com) (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Counsel for Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>EASY STREET HOLDING, LLC, *et. al.*<br><br>    Debtors<br><br>Address:   201 Heber Avenue<br>          Park City, UT 84060<br><br>Tax ID Numbers:<br>35-2183713 (Easy Street Holding, LLC),<br>20-4502979 (Easy Street Partners, LLC), and<br>84-1685764 (Easy Street Mezzanine, LLC) | Bankruptcy Case No. 09-29905<br>Jointly Administered with Cases<br>09-29907 and 09-29908<br><br>Chapter 11<br><br>Honorable R. Kimball Mosier |

## DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION OF EASY STREET PARTNERS, LLC DATED JANUARY 15, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

  A.    Narrative Summary of the Debtors' Plans of Reorganization............................1

  B.    Purpose, Limitations and Structure of this Disclosure Statement .....................2

  C.    Voting on the Plan ............................................................................................4

    1.    Classes Entitled to Vote...........................................................................4

    2.    Tabulation of Votes .................................................................................5

    3.    Voting Instructions ..................................................................................5

  D.    Confirmation Hearing .......................................................................................6

II.   GENERAL INFORMATION ABOUT THE DEBTORS........................................6

  A.    Description and History of Debtors' Business ...................................................6

    1.    Background ..............................................................................................6

    2.    Relationship of Partners to the Other Debtors..........................................7

  B.    The Prepetition Debt.........................................................................................7

    1.    West LB Senior Loan...............................................................................7

    2.    BayNorth Mezzanine Loan ......................................................................8

    3.    Conversion (Extension) of the WestLB Senior Loan ...............................9

    4.    Jacobsen ..................................................................................................9

    5.    Other Indebtedness ..................................................................................9

  C.    Events Leading to Commencement of Chapter 11 Cases ................................10

III.  THE DEBTORS' CHAPTER 11 CASES .........................................................11

  A.    Filing and First Day Orders ............................................................................11

    1.    Certain First Day Orders........................................................................11

    2.    Retention of Debtors' Professionals.......................................................11

  B.    The Creditors' Committee................................................................................11

    1.    Appointment of the Creditors' Committee..............................................11

    2.    Creditors' Committee's Professionals.....................................................12

  C.    Use of Cash Collateral ....................................................................................12

  D.    Extensions of Exclusivity................................................................................13

  E.    Appointment of the Debtors' Professionals .....................................................13

1.  Initial Applications and Retentions...........................................................13
2.  Retention of Wrona Law Offices, P.C. ....................................................14
3.  Retention of BDRC 4 Site, LLC..............................................................14
4.  Retention of Gemstone Hotels and Resorts, LLC ...................................15
5.  Retention of Corbin Gordon ....................................................................15
6.  Retention of Appraisal Group, Inc...........................................................15
F.  The Debtors' Operating Performance During the Chapter 11 Cases .........................15
G.  BAYNORTH LITIGATION........................................................................16
H.  THE MASSACHUSETTS ACTION AND THE § 105 ADVERSARY PROCEEDING ......16
I.  THE COMMITTEE LITIGATION AGAINST WESTLB, AG ...........................17
J.  JACOBSEN LITIGATION............................................................................17
K.  Schedules, Bar Date and Summary of Claims ...........................................18
1.  Schedules and Statements ........................................................................18
2.  Bar Date ....................................................................................................18
3.  Summary of Claims...................................................................................18
L.  Partners' Plan Funder.................................................................................19

IV.   THE PLAN.........................................................................................................19
A.  Classification and Treatment of Claims and Interests................................20
B.  Tabular Summary of Treatment Including, When Applicable, Classification under the Plan 20
C.  Methods of Distributions Under the Plan...................................................33
1.  Distributions of Cash................................................................................33
2.  Distributions Free and Clear.....................................................................33
3.  Timing of Distributions ............................................................................34
4.  Delivery of Distributions..........................................................................34
5.  Distributions to Holders as of Record Date .............................................34
6.  Undeliverable and Unclaimed Distributions.............................................34
7.  Setoffs.......................................................................................................35
D.  Implementation of the Plan .......................................................................35
1.  Reorganized Debtor...................................................................................35
2.  Exit Funding..............................................................................................35
3.  Early Payment............................................................................................36
E.  Executory Contracts and Unexpired Leases ..............................................36

ii

    1.   Rejected Contracts and Leases..................................................................................36

    2.   Rejection Damages Bar Date...................................................................................37

    3.   Assumed Contracts and Leases................................................................................37

    4.   Payments Related to Assumption of Executory Contracts and Unexpired Leases ....................37

F.   Provisions for Treatment of Disputed Claims ...................................................................38

    1.   Resolution of Disputed Claims.................................................................................38

    2.   Other Provisions Relating to Disputed Claims................................................................38

G.   Summary of Other Provisions of the Plan ......................................................................39

    1.   Releases and Exculpations....................................................................................39

    2.   Injunction.....................................................................................................40

    3.   Modification of the Plan.......................................................................................40

    4.   Withdrawal or Revocation of the Plan........................................................................40

    5.   Effectuating Documents and Further Transactions ...........................................................40

    6.   Section 1146 Exemption.......................................................................................40

    7.   Dissolution of the Creditors' Committee......................................................................41

    8.   Severability...................................................................................................41

    9.   Governing Law................................................................................................41

    10.  Binding Effect.................................................................................................41

    11.  Payment of Statutory Fees ....................................................................................42

    12.  Discharge......................................................................................................42

    13.  Retention of Causes of Action/Reservation of Rights.........................................................42

    14.  Section 506(c) Reservation....................................................................................42

    15.  Plan Supplement..............................................................................................42

    16.  Injunction.....................................................................................................42

V.    CONFIRMATION AND CONSUMMATION PROCEDURE...................................................43

  A.  Voting Procedures and Solicitation of Votes.....................................................................43

  B.  The Confirmation Hearing .......................................................................................43

  C.  Confirmation ...................................................................................................44

    1.   Acceptance....................................................................................................45

    2.   Feasibility ....................................................................................................45

    3.   Best Interests Test.............................................................................................46

    4.   Cramdown.....................................................................................................47

NYIWDMS: 11417167_19

D.    Conditions Precedent ............................................................................................48

VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..............................49

A.    Consequences to Partners ....................................................................................50

1.    Partnership ....................................................................................................50

2.    Cancellation of Indebtedness Income ..........................................................50

B.    Consequences to the Holders of Certain Claims and Interests ............................51

1.    Holders of Allowed Class 1 Secured Claims ...............................................51

2.    Holders of Allowed Class 2 Secured Claim ................................................52

3.    Holders of Allowed Class 4 General Unsecured Claims .............................52

4.    Holders of Interests in Partners ...................................................................53

C.    Accrued but Unpaid Interest ................................................................................53

D.    Information Reporting and Withholding ..............................................................53

VII.    RISK FACTORS ...........................................................................................................54

A.    Certain Bankruptcy Considerations .....................................................................54

B.    Material United States Federal Income Tax Considerations ................................54

C.    Risks Associated with the Exit Funding ..............................................................55

VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..............55

A.    Liquidation Under Chapter 7 ...............................................................................55

IX.    CONCLUSION AND RECOMMENDATION .....................................................................56

iv

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN OF REORGANIZATION FOR EASY STREET PARTNERS, LLC, DATED JANUARY 15, 2010 (THE "PLAN").  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ ALL OF THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  A COPY OF THE PLAN IS ANNEXED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT (AS DEFINED BELOW).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, PARTNERS IN THIS CASE.

## I.    INTRODUCTION

### A.    Narrative Summary of the Debtors' Plans of Reorganization

Easy Street Partners, LLC ("Partners"), Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding"), debtors and debtors in possession in the above captioned cases (collectively, the "Debtors"), filed petitions under Chapter 11 of the Bankruptcy Code on September 14, 2009 (the "Petition Date").  Partners submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against Partners, and to Mezzanine

as the holder of interests in Partners.  Partners has prepared this Disclosure Statement to be able to solicit votes with respect to the chapter 11 plan of reorganization of Partners (the "Plan")[1], filed with the United States Bankruptcy Court for the District of Utah, Central Division (the "Bankruptcy Court") on January 15, 2010.

Generally, the Plan provides for the reorganization of Partners and its successful emergence from chapter 11 in these jointly-administered cases.  It does not provide for substantive consolidation of the Debtors' estates.  The Plan provides creditors with several payment options, including for the payment in full over time of all allowed claims against Partners.

### B.    Purpose, Limitations and Structure of this Disclosure Statement

The purpose of this Disclosure Statement is to provide the holders of Claims and Interest with adequate information to make an informed decision as to whether to accept or reject the Plan.  This Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability by any party, or be admissible in any other case or any bankruptcy or non-bankruptcy proceeding involving any of the Debtors or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

On February __, 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of Partners' creditors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The statements contained in this Disclosure Statement generally are made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement after that date does not mean that the information set forth in this Disclosure Statement remains unchanged since the date of this Disclosure Statement or the date of the materials relied upon in preparation of this Disclosure Statement.  Partners has prepared the information contained in this Disclosure Statement in good faith, based upon the information available to it.  No audit of the financial information contained in this Disclosure Statement has been conducted.  Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward-looking statements will turn out to be true.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself.  If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling.  The Plan is a legally binding agreement and should be read in its entirety.  No one should rely on a

---

[1] Unless otherwise defined, all capitalized terms contained in this disclosure statement shall have the meanings ascribed to them in the Plan.

2

summary of the Plan in determining whether to accept or reject the Plan. Each holder of an impaired Claim or Interest should read, consider and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.

The Disclosure Statement describes:

- background information on Partners, its prepetition businesses and finances, and the events leading to these cases (Section II);

- significant developments during these cases (Section III);

- Partners' proposed Plan (Section IV);

- the procedures and requirements for confirming the Plan (Section V);

- certain federal income tax consequences of the Plan (Section VI);

- certain risk factors to consider before voting on the Plan (Section VII);

- alternatives to confirmation and consummation of the Plan (Section VIII); and

- Partners' recommendation that holders of impaired Claims and Interests vote to accept the Plan (Section IX).

In addition, attached as Exhibits 1 and 2 to this Disclosure Statement are copies of the following documents:

Exhibit "1"    The Plan

Exhibit "2"    Partners' Projected Financial Information

All of the exhibits listed should be attached to this Disclosure Statement and should have been served on you with this Disclosure Statement. In addition, there are certain documents and other materials identified in this Disclosure Statement and/or the Plan that are not attached to the Disclosure Statement or the Plan. These documents or other materials will be contained in the Plan Supplement. The Plan Supplement will be filed with the Bankruptcy Court on the earlier of (a) ten (10) days prior to the hearing to confirm the Plan and (b) two business days prior to the deadline to vote on or object to the Plan. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. If any of the exhibits identified above were not attached to the Disclosure Statement served on you, or if you want to obtain a copy of the Plan Supplement, once filed, you may do so by sending a written request to the Debtors' counsel at the following address:

Steven B. Eichel, Esq
Crowell & Moring LLP
590 Madison Avenue
New York, New York 10022
(212) 803-4019
Attorneys for the Debtors and
Debtors in Possession

3

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorney listed above by mail or by phone.

## C.    Voting on the Plan

The Disclosure Statement Order (as defined below) also approved procedures governing the solicitation of votes on the Plan by holders of Claims against Partners, and Interest in Partners.[2]

### 1.    Classes Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests that are members of a Class that is (a) impaired under section 1124 of the Bankruptcy Code (an "Impaired Class") and (b) not deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject the Plan. Classes of Claims or Interests that are unimpaired under section 1124 of the Bankruptcy Code are deemed to have accepted the Plan and are not entitled to vote. Classes of Claims or Interests in which the holders of Claims or Interests will receive no recovery under the Plan are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Under the Plan, Classes 1, 2, 4 and 5 are impaired and, to the extent Claims and Interests in those Classes are Allowed, the holders of those Claims or Interests will receive distributions under the Plan. As a result, holders of Claims or Interests in those Classes are entitled to vote to accept or reject the Plan. In contrast, Class 3 of the Plan is unimpaired. Consequently, holders of Claims in that Class are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Only holders of record of Claims or Interests as of February __, 2010, the date of the entry of the order approving this Disclosure Statement (the "Disclosure Statement Order"), that otherwise are entitled to vote under the Plan, will receive a Ballot and may vote on the Plan. A Ballot accompanies this Disclosure Statement for your use in voting on the Plan.

A Ballot which may be used to vote for the acceptance or rejection of the Plan has been sent to the holders of Claims and Interest that are entitled to vote to accept or reject the Plan with this Disclosure Statement.

If you are a holder of a Claim or Interest entitled to vote on the Plan and you did not receive a Ballot with this Disclosure Statement, you received a damaged Ballot or lost your Ballot, or you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Steven B. Eichel, Esq., Crowell & Moring LLP, 590 Madison Avenue, New York, New York 10022, telephone number: (212) 803-4019.

---

[2] From this point forward in the Disclosure Statement, the phrase "holders of Claims" or "Allowed Claims" shall refer to holder of Claims or Allowed Claims against Partners. The phrase "holders of Interest," however, shall mean only the holder of the Interest in Partners.

4

## 2.    Tabulation of Votes

Pursuant to the Bankruptcy Code, a class of claims will be deemed to have accepted a plan of reorganization if, of the class members that <u>actually</u> <u>vote</u> on the plan, at least two-thirds in amount, and more than one-half in number, vote to accept it. Thus, Classes 1, 2 and 4 will be deemed to have accepted the Plan if the members of each Class that vote to accept the Plan hold more than one-half of the total number, and more than two-thirds of the total dollar amount, of all Claims in that Class for which a Ballot was properly submitted. A class of interests will be deemed to have accepted a plan of reorganization if, of the class members that <u>actually</u> <u>vote</u> on the plan, at least two-thirds in amount voted to accept it. Thus, Class 5 will be deemed to have accepted the Plan if its sole member votes to accept the Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code or in accordance with the Disclosure Statement Order. If a holder of a Claim or Interest does not properly submit a Ballot, or that holder's vote is disregarded in accordance with the previous sentence, the number and amount of that holder's Claim or Interest will not be included in deciding whether Class members voted to accept or reject the Plan. See Section V for a more detailed description of the requirements for confirmation of the Plan.

If one or more of the Classes of Claims or Interest entitled to vote on the Plan rejects the Plan, Partners reserves the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, without further notice to you. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. Holders of Claims and Interest should assume that, if one or more of the Classes of Claims or Interest entitled to vote on the Plan reject the Plan, the Partners will amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, at the currently scheduled Confirmation Hearing. Any such amendment could include cancellation of the Interest. See Section V for a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes.

## 3.    Voting Instructions

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. If you hold a Claims or Interest in more than one Class and you are entitled to vote a Claim and Interest in more than one Class, you will receive separate Ballots for each Claim or Interest, which must be used for each separate Class of Claims and Interests. Please refer to the Disclosure Statement Order, which is enclosed with this Disclosure Statement if you are entitled to vote, for more specific instructions on voting on the Plan.

NYIWDMS: 11417167_19

Please vote and return your Ballot(s) to:

**MICHAEL V. BLUMENTHAL, ESQ.**
**CROWELL & MORING LLP**
**590 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorney listed above by mail or by phone.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M., MOUNTAIN TIME, ON MARCH __, 2010.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, SHALL BE DEEMED TO ACCEPT THE PLAN.

**PARTNERS RECOMMENDS THAT YOU VOTE IN FAVOR OF CONFIRMATION OF THE PLAN.**

### D.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on March __, 2010, beginning at ____ a.m. (Mountain Time), before the Honorable R. Kimball Mosier, United States Bankruptcy Judge, in Room ___ of the Bankruptcy Court, 350 South Main Street, Salt Lake City, UT 84101.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before March __, 2010, at 4:00 p.m. (Mountain Time), in the manner described below in Section V of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    GENERAL INFORMATION ABOUT THE DEBTORS

### A.    Description and History of Debtors' Business

#### 1.    Background

The Sky Lodge is a luxury boutique hotel located in the middle of historic Main Street in Old Town Park City.  It is an ultra stylish resort hotel offering all of Park City's amenities plus a restaurant offering both casual and fine dining, a bar and lounge, the spa Amatsu, and meeting and event venues and more.

The Sky Lodge is being sold as fractional ownership with a total of 176 one-eighth shares (the "Units") offered.  There are 22 units in total.  The models range from 1260 to 2700 square feet for the penthouse model.  As of the Petition Date, 113 Units had been sold.  Owners buy

6

individual units and not just the rights to a stay. Cloud Nine Resorts, an affiliate of the Debtors, runs the homeowners association (HOA), manages the owner bookings and rotational intricacies of ownership. Each owner is guaranteed two ski weeks (mid Dec. — mid April) each year plus 21 other days throughout the year for their own use. Stays not used by the owner may be rented out by the hotel and proceeds are split equally with the owner.

### 2.    Relationship of Partners to the Other Debtors

The Debtors are limited liability companies and affiliates of one another. Partners, which owns the real estate and improvements constituting the Sky Lodge in Park City, Utah, is 100% owned by Mezzanine. Holding is the 100% owner and managing member of Mezzanine. Michael Feder, representing Park City I, LLC, Philo Smith, Jr. representing the Philo Smith, Jr. Trust, and William Shoaf, representing CloudNine Resorts, LLC are the co-managers of the Debtors. The members of Holding are Park City I, LLC holding 12.5%, Philo Smith Jr. Trust holding 10%, Alchemy Ventures Trust holding 38.75% and CloudNine Resorts, LLC holding 38.75%.

Partners' chapter 11 case has not been substantively consolidated with those of Mezzanine and Holdings (collectively, the "Other Debtors"); however, the cases of all the Debtors are being jointly administered.

### B.    The Prepetition Debt

### 1.    West LB Senior Loan

On March 30, 2006, Partners entered into a Loan (the "WestLB Senior Loan") and Security Agreement (collectively, the "Senior Loan Agreement") for the initial amount of $36,779,2241[3] with WestLB AG, New York Branch ("WestLB") to purchase and develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060. The WestLB Senior Loan is secured by, among other things, security interests evidenced by the Construction and Interim Loan Deed of Trust With Security Agreement, Assignment of Leases and Rents and Fixture Filing, and a UCC Financing Statement, each filed in the Summit County, Recorder's Office, State of Utah. On February 15, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a partial principal repayment of $22,400,000 was made to WestLB from the Real Estate Sales Escrow Account.[4] The balance of the WestLB Senior Loan as of the Petition Date (as hereinafter defined) was $15,164,331.17. WestLB has filed a proof of claim in the amount of $16,049,742.71; however, Partners disputes this amount. Pursuant to the Cash Collateral Stipulation (as hereinafter defined) and the order approving same, the amount of

---

[3] The proceeds of the WestLB Senior Loan (along with the proceeds of the BayNorth Mezzanine Loan, as hereinafter defined) were used to purchase, develop and construct the Sky Lodge.

[4] As Units are sold, the proceeds are swept into various escrow accounts maintained at Wells Fargo Bank pledged to WestLB as the Administrative Agent for WestLB and BayNorth (hereinafter defined).

NYIWDMS: 11417167_19

WestLB's claim (including all default and non-default interest) was stipulated to be no less than $15,164,331.17. Partners believes that the final amount of the WestLB Allowed Secured Claim, including reasonable attorneys fees and additional charges, if any, will be approximately $15.5 million.

### 2.    BayNorth Mezzanine Loan

On March 30, 2006, Mezzanine entered into a Loan Agreement (the "Mezzanine Loan Agreement") in the initial amount of $11,250,000 (the "BayNorth Mezzanine Loan") with BayNorth Realty Fund VI, LP ("BayNorth"). The funds were used to develop the Sky Lodge and the loan is a "mezzanine" loan a method of financing which became popular in the mid 90's. The BayNorth Mezzanine Loan is secured by a pledge of Holding's 100% interest in Mezzanine to BayNorth, and a UCC Financing Statement filed with the Secretary of State of Utah. BayNorth is **not** a creditor of Partners.

On February 19, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a $5,600,000 disbursement from the Real Estate Sales Escrow Account was made to BayNorth, which included a partial principal repayment and accrued interest (the "BayNorth Transfer"). It is the Debtors' position that the BayNorth Transfer was mistakenly and/or improperly made.[5]  It is the Debtors' position that the balance of the BayNorth Mezzanine Loan including principal and accrued interest was $12,045,586, as of the Petition Date[6], which amount is subject to setoff and claims asserted by the Debtors in the BayNorth Adversary Proceeding.

On March 30, 2006, WestLB, as Senior Lender, and BayNorth, as Mezzanine Lender, entered into an intercreditor agreement (the "Intercreditor Agreement") to provide, inter alia, for the relative priority of the Senior Loan Agreement between WestLB and Partners, and the Mezzanine Loan Agreement between BayNorth and Mezzanine, and administration of both loans by WestLB as the administrative agreement.

---

[5] This payment was incorrectly made. The Debtors assert that the erroneous payment has led to (a) a dispute between WestLB and BayNorth under the Intercreditor Agreement (as hereinafter defined) for its return, (b) failure of WestLB to extend the WestLB Senior Loan, (c) BayNorth alleging a default of the BayNorth Mezzanine Loan, (d) WestLB refusing to release additional escrowed funds resulting in imposition of liens by contractors and foreclosure suits, (e) the loss of Unit sales, and (f) foreclosure lawsuits being filed against Partners and owners of Units.  WestLB disputes the foregoing.

[6] BayNorth claims a substantially greater amount in excess of $31 million, based upon disputed assertions of rights under a yield maintenance provision and disputed default rate interest. Debtors dispute the amount of the BayNorth Mezzanine Loan and have instituted an Adversary Proceeding against BayNorth (the "BayNorth Adversary Proceeding") to (i) recover the BayNorth Transfer and additional damages and (ii) set aside and disallow the excessive interest charges as penalties. A more complete description of the BayNorth Adversary Proceeding is contained at pages 15-16 below.

8

### 3.   Conversion (Extension) of the WestLB Senior Loan

The original term of the WestLB Senior Loan was for three years with two one-year extensions available to Partners subject to the satisfaction of certain conditions. The initial term of the WestLB Senior Loan ended on March 29, 2009. On September 25, 2008, Partners notified WestLB of its request for a conversion of the WestLB Senior Loan into an Interim Loan, as provided in section 2.15 of the Senior Loan Agreement. Such a conversion would have extended the WestLB Senior Loan for an additional year. Partners asserts that WestLB refused to extend the WestLB Senior Loan under § 2.15, claiming that it had been underpaid $4,899,104 from the distributions that occurred in February 2008. It is the Debtors' position that this shortage was the direct result of the erroneous BayNorth Transfer because funds that were paid to BayNorth should have been paid to WestLB under the WestLB Senior Loan Documents.

### 4.   Jacobsen

Jacobsen National Group, Inc. ("Jacobsen") was employed by Partners as the general contractor by contract dated March 20, 2006 (the "Construction Contract"), to construct the Sky Lodge and related site improvements and outbuildings. Construction commenced on or about May 28, 2006 and was generally completed on approximately December 18, 2008. Jacobsen asserts that it and its subcontractors have completed their work under the Construction Contract and are owed $1,382,127.18 (exclusive of interest and costs).

Because it was not paid in full for its work under the Construction Contract, on or about March 17, 2009, Jacobsen recorded with the Summit County Recorder a notice of mechanic's lien against the Sky Lodge and related property. On or about September 4, 2009, Jacobsen commenced a civil action in the Third Judicial District Court for Summit County, State of Utah, to enforce its mechanic's lien. Named as defendants were Partners, Equity Title Insurance Agency, Inc., which acted as escrow agent on many or most of the sales of Units, and owners of the Units. That action was stayed pursuant to section 362(a) of the Bankruptcy Code as to Partners. Jacobsen asserts that its mechanic's lien is prior to the rights of the owners of the Units.

Under Article 5.2 of the Plan, all of the litigation commenced by Jacobsen against Partners is resolved and Jacobsen's claims against the owners of any Third Party Units will be stayed and dismissed when either (i) the owner of any particular Third Party Unit pays Jacobsen $4,500 for its release, or (ii) the Reorganized Debtor pays same. It is anticipated that on the Effective Date, the Plan Funder will pay Jacobsen an amount such that all liens filed by Jacobsen against the Third Party Units will be satisfied and released.

### 5.   Other Indebtedness

Partners scheduled the General Unsecured Claims in the aggregate amount of $2.5 million; however, if Partners rejects the executory contracts of CloudNine –SL Management LLC and CloudNine –SL Development LLC, an additional $1,160,000 of General Unsecured Claims will arise. Moreover, 103 proofs of claim were filed by owners of Third Party Units aggregating an additional $474,223,859. One of these owners filed a proof of claim in the amount of $435,606,000. Partners assumes that this Claim was inadvertently

9

filed in the wrong amount and should have been filed in the amount of $435,660. In that event, the 103 owners of Third Party Units filed claims in the aggregate amount of $39,053,465, which sum is the approximate aggregate purchase price paid for the Third Party Units. It is anticipated that these Claims will be expunged or substantially reduced based on the settlement of the Allowed Jacobsen Claim pursuant to Article 5.2 of the Plan.

### C.     Events Leading to Commencement of Chapter 11 Cases

On March 4, 2009, WestLB issued a letter to Partners asserting that after reviewing the disposition of the Net Sales Proceeds from sales of real estate, that it, as the Senior Lender, had been underpaid from the $28,000,000 lender distribution that occurred in February of 2008. WestLB demanded that Partners remit immediately the sum of $4,899,104 to it. Partners contends that the shortfall to WestLB was the direct result of the BayNorth Transfer from the Real Estate Sales Escrow Accounts on or about February 19, 2008.

On or about March 29, 2009, WestLB entered into a forbearance agreement with Partners (the "Forbearance Agreement"). Partners and its representative, Realty Financial Resources, understood that WestLB had met with BayNorth to demand the return of the $5,600,000. To date, BayNorth has wrongfully refused to return the BayNorth Transfer in violation of Section 9 of the Intercreditor Agreement.

On May 5, 2009, BayNorth issued to Mezzanine a notice of default on the BayNorth Mezzanine Loan, asserting that the WestLB Senior Loan had matured on March 30, 2009 and had not been repaid, and that the resulting default under the Senior Loan agreement was itself a default under the Mezzanine Loan. This default notice was followed by a Notice of Acceleration and Demand for Payment issued by BayNorth on June 23, 2009. On July 8, 2009, a Notice of Sale was issued by BayNorth for the membership interest of Holding to be executed and held on September 16, 2009. There are no payment defaults under the BayNorth Mezzanine Loan nor are any alleged. A more detailed recitation of the allegations against BayNorth is set forth in Section III.G. of this Disclosure Statement, which describes the litigation commenced by Partners against BayNorth.

On or about February 5, 2009, Partners submitted to WestLB a request to make the final payment to Jacobsen, which has not been paid. Jacobsen filed liens against the Sky Lodge property on March 16, 2009, and on September 8, 2009, Jacobsen filed a foreclosure action against Partners and the owners of Units.

The BayNorth Transfer resulted in WestLB having received approximately $4.9 million less than provided for under the Senior Loan Agreement, WestLB's refusal to extend the maturity date of the WestLB Loan from March 2009 to March 2010, and BayNorth's declaration of the alleged default of the BayNorth Loan. Due to the foregoing and the upcoming foreclosure sale of the membership interest in Holding by BayNorth, Partners and its affiliates, Mezzanine and Holding, had no option but to file for protection under Chapter 11 on September 14, 2009 (the "Petition Date"), to restructure its business and return to profitable operations.

NYIWDMS: 11417167_19

## III.    THE DEBTORS' CHAPTER 11 CASES

### A.    Filing and First Day Orders

On the Petition Date, Partners and the Other Debtors filed their bankruptcy petitions under chapter 11 of the Bankruptcy Code. The Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### 1.    Certain First Day Orders

Early in these cases, the Court entered a number of orders requested by the Debtors that were designed to minimize disruption to the Debtors' business operations as a result of the chapter 11 filings. Among other things, these orders authorized the Debtors (i) to pay prepetition wages, and (ii) to use cash collateral pursuant to Bankruptcy Code section 363 and granting adequate protection to WestLB in accordance with an agreed upon stipulation between WestLB and the Debtors. The Court also entered an order that the segregated account in favor of the utility companies provided the utilities with adequate assurance of payment so that the utilities could not alter, refuse or discontinue utility service to the Debtors.

The Court also entered orders intended to facilitate the administration of these cases, including orders that (i) authorized the joint administration of the Debtors' cases; and (ii) extended the time for the Debtors to file schedules and statements of financial affairs to October 15, 2009. On October 15, 2009, the Debtors filed their schedules and statements of financial affairs.

### 2.    Retention of Debtors' Professionals

Throughout these cases, the Debtors have sought authority to retain certain professionals in connection with their reorganization as appropriate for required tasks. The retention of the Debtors' professionals is discussed in more detail in Section III F. below.

### B.    The Creditors' Committee

### 1.    Appointment of the Creditors' Committee

On October 2, 2009, the United States Trustee appointed a committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Creditors' Committee").[7] The persons or entities appointed to the Creditors' Committee are set forth below:

---

[7] On October 6, 2009, the Office of the U.S. Trustee amended the appointment of the Creditors Committee to correctly designate Douglas J. Payne, Esq. an attorney for Gateway Center, LLC.

NYIWDMS: 11417167_19

| Elliott Workgroup Architecture, LLC-Chairman<br>Attn: Craig Elliott | Goodrich and Thomas, CPAs<br>Attn: Robert B. Goodrich |
|---|---|
| Gateway Center, LLC<br>Attn: W. James Tozer, Jr.<br><br>Douglas J. Payne<br>Counsel for Gateway Center, LLC | Millcreek Consulting<br>Attn: Stephen Brown |
| Klehr Harrison Harvey Brazburg & Ellers LLP<br>Attn: Heather I. Levine | Shaner Design, Inc.<br>Attn: Tom Shaner |

### 2.    Creditors' Committee's Professionals

In connection with these cases, the Creditors' Committee retained Jones Waldo Holbrook & McDonough, PC ("Jones Waldo") as its legal counsel.  On November 24, 2009, the Court entered the order approving the retention of Jones Waldo as counsel to the Creditors' Committee.

### C.    Use of Cash Collateral

On September 15, 2009, Partners filed a motion for interim and final orders: (i) authorizing use of cash collateral pursuant to 11 U.S.C. § 363 and granting adequate protection to WestLB, and (ii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) (the "Cash Collateral Motion").

On or about September 16, 2009, Partners and WestLB entered into that certain "Stipulated Interim Order on Motion of Easy Street Partners, LLC for Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)" (the "Interim Cash Collateral Stipulated Order").

On September 17, 2009, the Court entered the Interim Cash Collateral Stipulated Order, which approved Partners use of funds in various accounts, as well as revenues being collected from Sky Lodge's operations, all of which had been pledged to WestLB ("Cash Collateral") in accordance with an initial budget, and any subsequent approved budgets, and afforded WestLB certain rights and adequate protection.

Subsequently, Partners and WestLB reached an agreement regarding the continued use by Partners of WestLB's Cash Collateral until December 31, 2009 (or such later date as the Parties agree to in writing) under the terms and on the conditions set forth in the Stipulation Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG dated October 9, 2009 (the "Cash Collateral Stipulation").  Objections were filed to the proposed final order authorizing use of Cash Collateral.  On or about October 14, 2009, the Court entered an order approving the Cash Collateral Stipulation.

12

On November 25, 2009, the Debtors and WestLB filed a joint motion to approve certain technical and administrative amendments to the Cash Collateral Stipulation, and additional adequate protection payments to WestLB. Objections were filed to said motion and on December 14, 2009, the Court granted the motion and approved the amendments to the Cash Collateral Stipulation and allowed additional payments to WestLB's legal counsel from Cash Collateral.

On or about December 27, 2009, the Debtors filed an extension of certain deadlines with respect to the Cash Collateral Stipulation (the "Extension"). The proposed modifications to the Cash Collateral Stipulation set forth in the Extension include (i) extending the use of Cash Collateral from December 31, 2009 to April 30, 2010, (ii) authorizing the co-manager of the Sky Lodge Hotel to submit transfer request reports to WestLB, (iii) extending the deadline for Partners to submit a term sheet of its plan of reorganization from December 3, 2009 to December 23, 2009, (iv) extending the deadline for Partners to file a disclosure statement and plan of reorganization from December 23, 2009 to January 11, 2010[8], (v) extending the Cash Collateral Stipulation's termination date from December 31, 2009 to April 30, 2010, (vi) stipulating to the term of the co-manager, (vii) providing for the handling of refundable deposits, and (viii) providing for the payment of professional fees in connection with the BayNorth Adversary Proceeding.

On January 7, 2010, the Court entered an order approving the Extension.

### D.    Extensions of Exclusivity

On December 18, 2009, the Debtors filed a motion to extend their exclusive periods for filing chapter 11 plans of reorganization for approximately 60 days to and including March 15, 2010, and soliciting the acceptances of such plans for approximately 60 days to and including May 14, 2010 (the "Exclusivity Motion"). On January 12, 2010, the Bankruptcy Court entered an order extending Partners' exclusive period to file a plan of reorganization through January 15, 2010 and to solicit acceptances of the Plan, any amended plans of reorganization or any amendments thereto through March 31, 2010.

### E.    Appointment of the Debtors' Professionals

### 1.    Initial Applications and Retentions

On or about the Petition Date, the Debtors sought authority to retain Crowell & Moring LLP ("C&M") and Durham Jones & Pinegar P.C. ("Durham Jones") as Debtors' bankruptcy counsel. On October 22, 2009, the Court entered orders approving the retention of C&M and Durham Jones as Debtors' counsels.

---

[8] Subsequently, WestLB consented to extend the January 11, 2009 deadline to January 15, 2009.

NYIWDMS: 11417167_19

### 2.    Retention of Wrona Law Offices, P.C.

On October 19, 2009, the Debtors also filed an application to employ and retain Wrona Law Offices, P.C. ("Wrona") as special counsel for the Debtors with regard to, among other things, corporate governance issues, the complex relationships within the Debtors' organization and between the Debtors and fractional unit homeowners, effective as of September 14, 2009. The Court granted the application at the November 24, 2009 hearing. On December 2, 2009, the Court entered a final order approving the Wrona retention.

### 3.    Retention of BDRC 4 Site, LLC

Pursuant to the Cash Collateral Order and as condition to WestLB consenting to the use of Cash Collateral, Partners and WestLB were to collaborate in identifying, interviewing, and engaging a manager or consultant to serve as a co-manager of the Sky Lodge.

After interviewing several candidates, Partners selected BDRC 4 Site, LLC ("BDRC") to assist in co-managing the Sky Lodge Hotel. On or about November 13, 2009, Partners filed an application to retain BDRC as co-manager. On December 3, 2009, the Court granted the application to employ BDRC. As co-manager, BDRC is to provide certain services to Partners, including, but not limited to, the following:

(i)    supervisory assistance to the general manager.

(ii)    review, comment, and approval of programs in the marketing, promotion, and operation of the Debtor's hotel.

(iii)    supervise relations with the homeowners association; supervise public relations and public announcements.

(iv)    review and analyze room rates and charges.

(v)    provide accounting oversight, controls, and services; review and analyze operating costs and expenses.

(vi)    provide to WestLB and to the Debtor's senior management reports on the status of business operations, budgets, projections and business plans, as well as participate in periodic meetings with WestLB.

(vii)    assist Partners in developing a plan of reorganization, including a five year business plan, possible modification of operations, development of new strategies, attraction of new investors and restructuring existing debt; and

(viii)    assist in the development of a marketing program and re-engagement of a sales force to facilitate and pursue sales of the Units in the Sky Lodge.

### 4.    Retention of Gemstone Hotels and Resorts, LLC

On or about November 24, 2009, Partners also filed an application to employ Gemstone Hotels & Resorts, LLC ("Gemstone")[9] as a consultant to Partners and its co-manager, BDRC, with respect to, among other things, the development of business plan, spending projections, project management, and with respect to a 5-year business plan and operating proformas related thereto. On December 3, 2009, the Court entered an order approving Gemstone as a consultant to Partners.

### 5.    Retention of Corbin Gordon

On or about October 19, 2009, the Debtors filed an application to employ Crobin B. Gordon ("Gordon") as special counsel with respect to issues pertaining to the Gateway lease and related issues, effective as of September 14, 2009. On November 25, 2009, the Court granted the application to retain Gordon.

### 6.    Retention of Appraisal Group, Inc.

On November 5, 2009, Partners filed an application to employ Appraisal Group, Inc. ("AGI") as an expert appraiser to (i) prepare an appraisal of Partners' property located in Park City, Utah, (ii) provide any follow up testimony related to such appraisal, and (iii) render any other related services as may be necessary to accomplish the above. On December 8, 2009, the Court granted the application to retain AGI.

### F.    The Debtors' Operating Performance During the Chapter 11 Cases

For the period from the Petition Date through December 31, 2009, operations of the Sky Lodge have resulted in an actual cumulative profit of approximately $95,000 versus a projected estimate of $11,700. These projections were made in the budget that was annexed to the Cash Collateral Stipulation, and Partners has been tracking budget projections versus actual performance on a monthly basis. After taking into consideration the non-recurring legal fees and expenses of the Chapter 11 case, consolidated losses of approximately $311,000 occurred during the post-petition period; however, these losses are less than had been estimated in budgets.

For the entire year ended December 31, 2009, Partners posted a profit of $726,204 versus a loss in 2008 of $604,280. The swing of $1,330,484 to positive net operating income over the prior year was accomplished with $970,000 less gross revenue in 2009. Management has been vigilant at managing its costs. Looking forward to 2010, the projections are annexed to the Disclosure Statement as Exhibit 2 and discussed at pages 42-43 reflect continuous profitability.

The Skylodge continued to be ranked the number 1 hotel property in Park City on Trip Adviser and received extremely high guest satisfaction ratings in the various industry reports

---

[9] WestLB required the retention of Gemstone as a consultant as a condition to its consent to the retention of BDRC as co-manager.

NYIWDMS: 11417167_19

## G.    BAYNORTH LITIGATION

On September 15, 2009, the Debtors commenced an adversary proceeding in the Bankruptcy Court against BayNorth concerning primarily BayNorth's receipt of the $5,600,0000 BayNorth Transfer (the "BayNorth Adversary Proceeding"). According to the Debtors' amended complaint (the "Complaint") in the BayNorth Adversary Proceeding, BayNorth wrongfully received the BayNorth Transfer and refused to return such funds, which created a default under the WestLB Senior Loan Agreement. The Complaint further alleges (i) that BayNorth then relied upon the default it created under the WestLB Senior Loan Agreement to declare a cross-default under the BayNorth Mezzanine Loan, and improperly scheduled a UCC sale of Holdings' interests in Mezzanine, and (ii) BayNorth's action caused WestLB to freeze certain escrow accounts, from which the Debtors were to pay construction costs relating to the construction and development of the Sky Lodge Hotel. This, in turn, caused the general contractor, Jacobsen, on the project to impose a mechanics lien of approximately $1,400,000 on the property owned by Partners, as well as the existing owners of the Units.

The Debtors' Complaint asserts causes of action against BayNorth seeking the return of the BayNorth Transfer and additional monetary damages, including punitive damages, based on the legal theories of unjust enrichment, money had and received, conversion, tortious interference with contract, tortious interference with existing and prospective business relationships, breach of contract, fraudulent conveyance, turnover, and unfair and deceptive acts and practices in violation of Massachusetts G.L. Ch. 93A. The Debtors also seek a declaratory judgment determining that the yield maintenance and default interest provisions under the BayNorth Note, which seek to assess interest at approximately 70% per annum, are unenforceable.

On October 6, 2009, BayNorth moved to dismiss the complaint in the BayNorth Loan Adversary Proceeding for failure to state a claim. A hearing on the motion was held before the Bankruptcy Court on December 22, 2009, at which time, the court heard argument from the parties and reserved ruling on the motion. On December 29, 2009, the Bankruptcy Court entered an order denying BayNorth's motion to dismiss the complaint. The BayNorth Adversary Proceeding is being vigorously prosecuted by the Debtors.

## H.    THE MASSACHUSETTS ACTION AND THE § 105 ADVERSARY PROCEEDING

On or about October 8, 2009, BayNorth commenced an action in Superior Court of the Commonwealth of Massachusetts (the "Massachusetts Action") against William Shoaf ("Shoaf") and David Wickline ("Wickline") seeking an entry of a judgment against them in an amount in excess of $30,000,000 based upon a springing guaranty (the "Springing Guaranty") and completion guaranty executed by Shoaf and Wickline in connection with the BayNorth Mezzanine Loan. Under the Springing Guaranty, the BayNorth Mezzanine Loan, which was non-recourse in nature, would become fully recourse against Shoaf and Wickline if Partners or Mezzanine filed bankruptcy petitions.

16

On November 11, 2009, BayNorth filed a motion in the Massachusetts Action seeking partial summary judgment against Shoaf and Wickline under the Springing Guaranty based upon Partners and Mezzanine's filing of Chapter 11 petitions before the Bankruptcy Court.

On December 1, 2009, the Debtors commenced another adversary proceeding before the Bankruptcy Court against BayNorth, along with a motion, seeking to stay BayNorth from prosecuting the Massachusetts Action against Shoaf pursuant to §§ 105 and 362 of the Bankruptcy Code (the "105 Adversary Proceeding") on the grounds that the Debtors would be irreparably harmed in the absence of a stay because: (i) Shoaf would be distracted from his managerial duties on behalf of the Debtors at the busiest time of the year for The Sky Lodge if he were required to defend the Massachusetts Action; and (ii) the Debtors would be subject to possible inconsistent verdicts in the absence of a stay due to Shoaf's right to indemnification from the Debtors for any personal liability he incurred as a result of actions he took on behalf of any of the Debtors (the "Stay Motion").

A hearing on the Stay Motion was held before the Bankruptcy Court on December 22, 2009. On January 11, 2020, the Bankruptcy Court entered an order denying the Stay Motion. It is anticipated that Shoaf and Wickline will vigorously oppose the Massachusetts Action.

## I.    THE COMMITTEE LITIGATION AGAINST WESTLB, AG

On January 12, 2010, the Creditors' Committee commenced an adversary proceeding in the Bankruptcy Court against WestLB concerning primarily WestLB's payment of $5,600,000 to BayNorth (the "WestLB Adversary Proceeding"). According to the Creditor's Committee Complaint (the "Committee Complaint") in the WestLB Adversary Proceeding, WestLB's approximate $5.6 million payment of Partners' funds to BayNorth resulted in, *inter alia,* (i) WestLB refusing to permit Partners to exercise its contractual right to extend the March 31, 2009 maturity date of the WestLB Senior Loan, and (ii) WestLB declaring a maturity default on such loan.

The Committee Complaint further alleges that WestLB's erroneous and subsequent inequitable conduct, including, without limitation, declaring a default under the WestLB Senior Loan has resulted in, among other things, WestLB forcing Partners to sign a forbearance agreement in which Partners was required to waive all of its claims against WestLB.

The Committee Complaint seeks to (i) equitably subordinate the claims of WestLB to the claims of all unsecured creditors of Partners, and (ii) avoid Partners' waiver of claims in the forbearance agreement and recover such claims for the benefit of Partners' estate because such waiver constitutes a fraudulent transfer under both state and federal bankruptcy laws.

## J.    JACOBSEN LITIGATION

On September 4, 2009, Jacobsen commenced an action in the Third Judicial District Court, Summit County, State of Utah (the "Utah State Court") against, among others, Partners, certain of its lenders, the Union Square Condominium Owners Association, and other individuals or entities that have an interest in the SkyLodge, including the current

17

owners of the Units. The complaint asserts, among other things, that (i) Partners entered into a contract with Jacobsen to construct and manage the construction of the condominium project on the property, (ii) Jacobsen rendered services under the contract, and (iii) Jacobsen has not been paid the outstanding obligations under the contract. Pursuant to the complaint, Jacobsen seeks, among other things, (i) a decree of foreclosure against all defendants and declaring that their claims, rights, title and interest in the property and improvements are junior or subordinated to Jacobsen's lien on the property and (ii) the sale of the property to satisfy, in whole or in part, the amounts allegedly owed to him. The action is stayed as to Partners by virtue of the automatic stay pursuant to section 362 of the Bankruptcy Code. As set forth on pages 9-10, the Plan will resolve the litigation initiated by Jacobsen with respect to both Partners and the owners of the Third Party Units.

### K.      Schedules, Bar Date and Summary of Claims

#### 1.      Schedules and Statements

On October 15, 2009, the Debtors filed their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, the "Schedules").

#### 2.      Bar Date

Pursuant to Local Bankruptcy Rule 3003-1(a), "[i]n a chapter 11 case, a proof of claim or interest is timely filed if it is filed not later that 90 days after the first date set for the meeting for creditors under § 341 of the Code, or, if filed by a governmental unit, not later than 180 days after the date of the order for relief." LBR 3003-1(a). Thus, January 6, 2010 at 4:00 p.m. (the "Bar Date") is the date and time by which proofs of claim by all claimants (other than governmental units) are required to be filed. The deadline for a governmental unit to file a proof of claim is March 15, 2010.

#### 3.      Summary of Claims

As of January 14, 2009, 139 proofs of claim have been filed in these cases. The Debtors will be reviewing the proofs of claim and comparing them to their books and records and will object to proofs of claim when, and if, appropriate.[10]

As of January 14, 2009, $479,029,201.01 in General Unsecured Claims, $17,817,317.98 in Secured Claims and $4,445.64 in Priority Claims (totaling $496,851,421.31) against Partners have been scheduled or filed and not disallowed or expunged pursuant to Court orders. The bulk of the General Unsecured Claims are attributable to the owners of Third Party Units. As set forth on page 10 above, one of these owners filed a proof of claim in the amount of $435,606,000. Partners assumes that this Claim was inadvertently filed in the wrong amount and should

---

[10] Under Article 6.2 of the Plan, the Reorganized Debtor will have the exclusive right to object to claims for up to 120 days following the Effective Date, although this deadline can be extended by the Court.

have been filed in the amount of $435,606. In that event, the 103 owners of Third Party Units filed claims in the aggregate amount of $39,053,465, which sum is the approximate aggregate purchase price paid for the Third Party Units. It is anticipated that the Claims of the owners of the Third Party Units will be expunged or substantially reduced based on the settlement of the Allowed Jacobsen Claim pursuant to Article 5.2 of the Plan. If an order expunging the claims of the owners of the Third Party Units are expunged, then the amount of General Unsecured Claims filed against Partners would be slightly in excess of $4.8 million. Partners believes that the amount of Allowed General Unsecured Claims asserted against Partners will be approximately $4.06 million.

### L.    Partners' Plan Funder

The Debtors, through the assistance of BDRC, have been seeking one or more entities to fund the Plan of Partners to facilitate emerging from Chapter 11. On January 13, 2010, Partners executed a letter of intent ("LOI") with Strategic Capital Partners, LLC ("SCP"). SCP or an entity formed by SCP or an affiliate of SCP will be the plan funder (the "Plan Funder").

SCP is a local real estate investment management and development firm focused on investments in Utah and the intermountain west. SCP's principals have significant experience with resort hotels and fractional interest ownership programs.

SCP will provide up to $8 million of equity capital in cash sufficient to fund the Plan. Through its investor group, SCP believes it will also bring buyers for the remaining unsold fractional units in the project.

An entity formed by SCP will own 75% of the Reorganized Debtor. The remaining 25% will be owned by an entity to be formed in which William Shoaf will be a member and a manager. The balance of the ownership in this entity will be determined upon execution of definitive agreements.

Additionally, SCP is requiring that the Reorganized Debtor be managed by a new management company in which William Shoaf is a key employee. SCP or its designee will also be involved in management.

Pursuant to the LOI, definitive agreements should be executed prior to the hearing on this Disclosure Statement and will be fully discussed in the Disclosure Statement disseminated to the holders of Claims and Interests in connection with voting on and confirmation of the Plan.

## IV.    THE PLAN

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors with respect to the distribution of a debtor's assets.

NYIWDMS: 11417167_19

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a chapter 11 plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor whether or not such creditor or equity interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Partners believes that implementation of the Plan will provide holders of Allowed Claims and Interests a greater distribution than they would receive if these cases were converted to cases under chapter 7 of the Bankruptcy Code. The Plan is annexed as Exhibit 1 and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan. Unless otherwise provided, the holders of Allowed Secured Claims shall receive a General Unsecured Claim to the extent of any deficiency.

### A.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must provide certain treatment for Administrative Expense and Priority Tax Claims and otherwise classify claims and interests and provide for their treatment. As a result, the Plan (a) describes the treatment to be afforded to Administrative Expense Claims (which includes claims of compensation by professionals) and Priority Tax Claims and United States Trustee Quarterly Fees and Other Statutory Fees and (b) classifies Claims and Interests in separate Classes and provides different treatment for different Classes of Claims and Interests. As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration, thereby giving effect to the different rights of holders of Claims and Interests in each Class.

### B.    Tabular Summary of Treatment Including, When Applicable, Classification under the Plan

The following table summarizes the classification and treatment of Claims and Interests under the Plan.

NYIWDMS: 11417167_19

Unclassified Claims[11]

| Class | Description | Treatment Under the Plan | Estimated Aggregate Recovery | Status |
|-------|-------------|--------------------------|------------------------------|--------|
| -- | Administrative Expense Claims | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred after the Petition Date, or preserving the estates and operating the business of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims and all fees and charges assessed against the estates under chapter 123 of title 28, United States Code.<br><br>Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, Allowed Administrative Claims shall be paid (i) in the ordinary course of business or (ii) within thirty (30) days after the Effective Date if not an ordinary course claim, or (iii) within ten (10) days of entry of a Final Order allowing such Administrative Claim.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims will not be entitled to vote on the Plan. | 100% | N/A |

---

[11] None of the holders of Claims or expenses in this first category are entitled to be classified under, or to vote on, the Plan. See section 1123(a)(1) of the Bankruptcy Code. Thus, they are designated as neither impaired nor unimpaired for purposes of the Plan.

21

| -- | Priority Tax Claims[12] | Priority Tax Claims are those Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.<br><br>Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive equal quarterly Cash payments over a period not exceeding five (5) years from the Petition Date, with the first payment to occur on the first business day of the third month after the Effective Date, at an interest rate of 6% or a rate agreed upon between the Reorganized Debtor and the taxing authority or otherwise set by the Bankruptcy Court.<br><br>All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such claims will not be entitled to vote on the Plan. | 100% | N/A |
| -- | United States Trustee Quarterly Fees and Other Statutory Fees | Partners shall pay all fees due and payable under section 1930 of Title 28 within ten (10) days after the Effective Date. In addition, Partners or the Reorganized Debtor shall pay the United States Trustee quarterly fees due and payable on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business until entry of a Final Decree, dismissal of the case or conversion of the case under chapter 7 as such obligations become due. | 100% | N/A |

---

[12] All other Priority Claims shall be paid in full on the Effective Date. Partners does not believe that there are any other Priority Claims.

22

Classified Claims

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| 1 | West LB Secured Claim | Class 1 consists of the West LB Secured Claims against Partners.  With respect to Class 1, the Plan provides as follows:<br><br>a.    The Allowed Claim of WestLB shall accrue interest at 3-month LIBOR plus 6%, provided however, the maximum rate shall be capped at 8% ("Contract Rate"), until paid in full.<br><br>b.    WestLB shall retain a lien on all of Partners' assets and shall be provided with a lien on all of the Reorganized Debtor's assets and "Control Accounts" shall be established similar to those currently in effect.  Modified loan documents ("Modified Loan Documents") substantially similar to the existing loan documents reflecting the terms of this Plan shall be executed on or before the Effective Date, which shall be reasonably acceptable to Partners, WestLB and the Plan Funder.  The Modified Loan Documents will be annexed to the Plan Supplement and will become binding on the Reorganized Debtor on and after the Effective Date.<br><br>c.    The allowed amount of the claim shall be paid as follows:  Monthly interest payments subsequent to the Effective Date shall be paid on the first business day of each month, one month in arrears, on the outstanding principal balance of the Allowed WestLB Secured Claim through December 31, 2010 at the Contract Rate.  Thereafter, monthly payments shall be made according to a 20-year amortization schedule; | 100% | Impaired and entitled to vote |

23

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| | | provided, however, all or a portion of the monthly payments constituting amortization of principal (but not the portion of the monthly payments constituting interest) shall be reduced by payments previously made to WestLB after the Effective Date from the sale of Units until the loan is repaid.  Sums remaining due and owing on the maturity date, which shall be either (a) December 31, 2011 or (b) December 31, 2013 (the "Maturity Date") shall be paid in full.  The Maturity Date shall be extended from December 31, 2011 through December 31, 2013, if (i) the Reorganized Debtor amortizes the Allowed WestLB Claim pursuant to the five (5) year business plan annexed hereto as Exhibit 2, and (ii) the loan to value ratio is equal or greater than such ratio as of the Confirmation Date.<br><br>d.    WestLB shall receive 80% of the Net Sale Proceeds received by the Reorganized Debtor from the sale of each Unit, each of which sales must exceed a minimum release price to be reasonably acceptable to WestLB or otherwise ordered by the Bankruptcy Court.  The remaining 20% of Net Sale Proceeds shall be deposited into a Control Account, provided, however, said sums may be utilized in connection with costs of running the Property and other Plan payments.<br><br>e.    In the event of the sale of the restaurant Zoom, which sale must exceed a minimum price reasonably | | |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| | | acceptable to WestLB or as otherwise ordered by the Bankruptcy Court, along with the underlying property, WestLB shall receive 50% of the Net Sale Proceeds received by the Reorganized Debtor. The remaining 50% of the Net Sale Proceeds shall be utilized by the Reorganized Debtor for expenses relating to operations of the Sky Lodge, payments in connection with the Plan, or repayment of loans or distribution to the Plan Funder (provided all payments under the Plan are current). | | |
| | | f.  Prepayment of the loan to WestLB shall be allowed without penalty. | | |
| | | g.  The Reorganized Debtor or the Plan Funder shall have the right of first refusal to purchase or satisfy the WestLB Secured Claim at a discount or par, as the case may be, in the event WestLB seeks to sell or assign its claim to a third party for the price being offered by the third party, irrespective of whether the WestLB Secured Claim is being sold by itself or in a package with other loans. WestLB shall promptly notify the Reorganized Debtor and the Plan Funder of its intent to accept an offer for its outstanding loan balance and specify the amount (the "Redemption Price"), and the Reorganized Debtor and Plan Funder shall have sixty (60) days to purchase or satisfy said loan for the Redemption Price. | | |
| | | h.  Any Net Recovery received in connection with the BayNorth Transfer shall be paid 70% to | | |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| | | WestLB amortizing the outstanding indebtedness to WestLB and 30% to the Reorganized Debtor for utilization of Property expenses, payment to Allowed Claims of creditors pursuant to the Plan or used by the Reorganized Debtor as determined by the Plan Funder. To the extent claims of creditors, other than WestLB, have been fully paid, such remaining sums shall be free cash for utilization by the Reorganized Debtor. | | |
| | | i. Upon payment of the Allowed WestLB Secured Claim in full, the lien of WestLB on the Property shall be deemed released and satisfied and the holder of the Allowed WestLB Claim shall execute such documents releasing its liens on the Property and all Assets of the Reorganized Debtor as is requested by and reasonably acceptable to Partners. | | |
| | | j. Notwithstanding any other provision of the Plan to the contrary, the CloudNine Resorts LLC guaranty of WestLB's loan to Partners shall remain in place and shall be reaffirmed on the Effective Date, provided however, that the only triggering event of a default against CloudNine Resorts LLC shall be prospective defaults subsequent to the Effective Date. All prior defaults, if any, are waived. | | |
| | | k. The above payment is in full and complete satisfaction, settlement and release of and in exchange for the Allowed WestLB Claim. | | |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| 2 | Jacobsen Secured Claims | Class 2 consists of the Jacobsen Allowed Secured Claims against Partners.<br><br>a.   In full and complete satisfaction, settlement and release of and in exchange for the Allowed Jacobsen Secured Claim against Partners and the owners of Third Party Units pursuant to sections 5.2(a)(2), 5.2(d) and 5.2(e) of the Plan, the holder of the Allowed Jacobsen Secured Claim shall have an Allowed Secured Claim in the amount of $1.5 million, which shall accrue interest at 8% simple interest from and after the Confirmation Date on the outstanding principal balance of the Allowed Jacobsen Secured Claim, and the Claim shall be treated under one of the following two options to be elected by the holder of the Allowed Jacobsen Secured Claim on its Ballot in connection with voting on the Plan:<br><br>1.   Under option one, the holder of the Allowed Jacobsen Secured Claim (i) shall be granted a promissory note and second priority deed of trust and fixture filing on the real estate assets and related buildings and fixtures of the Reorganized Debtor, which promissory note and deed of trust and fixture filing shall contain standard terms and conditions typical for commercial loans, (ii) shall receive on the Effective Date $600,000 from the Sales Proceeds Account, and (iii) shall be paid an amount equal | 100% under Option 1 | Impaired and entitled to vote |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| | | to eight percent (8%) of the Net Sale Proceeds of the Units over a term not to exceed four (4) years from the Confirmation Date, at which time any remaining balance shall be paid in full. | | |
| | | 2. Under option two, Jacobsen may elect a discounted cash payment on the Effective Date equal to $1,330,000 in full and complete satisfaction, settlement and release of and in exchange for the Allowed Jacobsen Secured Claim against Partners, the Reorganized Debtor and any third parties who may also be liable on the claim or own real property securing the claim (including the Third Party Units), and shall promptly release its liens against any real estate assets securing such claim. | | |
| | | b. Jacobsen shall be enjoined from foreclosing on Assets of the Reorganized Debtor, provided that the Reorganized Debtor is current and making the payments provided in the Plan to Jacobsen, and is otherwise not in default of its obligations under the promissory note and deed of trust and fixture filing being granted to the holder of the Jacobsen Secured Claim to document and secure the Reorganized Debtor's performance hereunder. | | |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|-------------------------|--------------------|--------|
| | | c. All pending actions against Units owned by third parties (the "Third Party Units") and the third parties owning the Units shall be stayed for a period of six (6) months from the Confirmation Date. | | |
| | | d. Upon Jacobsen's receipt of $4,500 (the "Unit Release Price") for a particular Unit, (i) Jacobsen and the owner of the Unit for which the Unit Release Price is received by Jacobsen shall be deemed to have mutually released each other with respect to Jacobsen's lien on the particular Unit and Jacobsen's work on the particular Unit, (ii) the lien of Jacobsen on the particular Unit shall be deemed released and satisfied and Jacobsen shall execute such documents releasing its lien with respect to that particular Unit (irrespective of source of payment), and (iii) the owner of the Unit shall be dismissed with prejudice from the litigation commenced by Jacobsen to enforce its liens. | | |
| | | e. Upon payment of the Allowed Jacobsen Secured Claim in full, the lien of Jacobsen on the Property and the Third Party Units shall be deemed released and satisfied and the holder of the Allowed Jacobsen Secured Claim shall execute such documents releasing its liens on the Property, and all Assets of the Reorganized Debtor and all the Third Party Units, as is requested by and reasonably acceptable to the Reorganized Debtor. | | |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| | | f.  Upon payment of each Unit Release Price (irrespective of who made the payment), the Reorganized Debtor shall be credited for the amount paid and such amount shall reduce the principal amount of the Allowed Jacobsen Secured Claim accordingly, with such payment being applied first to accrued and unpaid interest (if any), and then to unpaid principal. | | |
| | | g.  The treatment provided herein to the holder of the Allowed Jacobsen Secured Claim shall be in full satisfaction, discharge and release of all of the obligations to the holders of the Allowed Jacobsen Secured Claim. | | |
| | | h.  Notwithstanding anything contained in the Plan, the Reorganized Debtor shall retain all warranty claims against Jacobsen. | | |
| | | i.  If the holder of the Allowed Jacobsen Secured Claim fails to vote or affirmatively elect option 1 or 2, then the holder of the Allowed Jacobsen Secured Claim shall be paid in accordance with option 1 as set forth in Article 5.2 (a)(1) of the Plan. | | |
| 3 | All Other Secured Claims Against Partners | Class 3 consists of the All Other Secured Claims against Partners.  With respect to Class 3, the Plan provides as follows:  In full and complete satisfaction, settlement and release of exchange for the Allowed Other Secured Claims, on the Effective Date, except to the extent that the holder of an Other Secured Claims agrees to less favorable treatment, all other holders of | 100% | Unimpaired Deemed to Accept |

30

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|--------------------------|--------------------|--------|
| | | secured claims (the "Other Secured Creditors") will be separately classified and their collateral will either be sold or the property against which the security interest is held will be assigned to such Other Secured Creditor as the indubitable equivalent of such claim or the secured claim will be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default.  If the property securing the Other Secured Creditor Claim is sold, the Other Secured Creditor will receive such net proceeds of sale with any remaining claim to be classified as an unsecured claim.<br><br>Partners does not believe that that there are any Claimants in this Class 3. | | |
| 4 | General Unsecured Claims against Partners | Class 4 consists of all Allowed Unsecured Claims against Partners.  With respect to Class 4, the Plan provides as follows:<br><br>1.  In full and complete satisfaction, settlement and release of and in exchange for Allowed General Unsecured Claims against Partners, each holder of an Allowed General Unsecured Claim, except to the extent such holder agrees to a less favorable treatment, shall have the option of electing one of the following alternatives, to be elected on their Ballot in voting on the Plan:<br><br>Option 1:<br><br>a.        Payment of 100% of their Allowed Claim, without interest, over four (4) years from the Effective Date from | 100% | Impaired and entitled to vote |

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| | | Excess Cash Flow. The first prospective payment will be made on the first business day on the third month after the Effective Date, with prospective payments to be made on the first business day of each successive three (3) month period. Excess Cash Flow shall mean cash remaining after all required payments to WestLB, Jacobsen and Allowed Administrative and Priority Claims are paid, with a reasonable reserve equal to the mandatory payments due to the foregoing senior creditors over the next three (3) months, plus thirty (30) days of necessary expenses to operate the project. On the fourth anniversary of the Effective Date, all remaining Allowed General Unsecured Claims shall be paid in full. | | |
| | | Option 2: | | |
| | | b.  Payment of a discounted amount equal to 50% of the allowed claim on the thirtieth (30th) day after the Effective Date. | | |
| | | c.  If the holder of an Allowed General Unsecured Claim does not vote or fails to make an election of either option 1 or 2 or attempts to elect to split its Allowed General Unsecured Claim between options 1 and 2, then such holder of an Allowed General Unsecured Claim shall be paid in accordance with Option 1 as set forth in Article 5.4(a) of the Plan. | | |
| 5 | Interest in Partners | Class 5 consists of the Interest in Partners, which is solely held by Mezzanine. With respect to Class 5, the Plan provides as follows: | | Impaired and entitled to vote |

NYIWDMS: 11417167_19

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|-------|-------------|---------------------------|--------------------|--------|
|       |             | a: In full and complete satisfaction, settlement and release of and in exchange for the Interest in Partners, the holder of the Allowed Interest in Partners shall receive an amount equal to the difference between the appraised value of Partners' assets as determined by the Bankruptcy Court and the allowed amount of all Claims against Partners, which shall be posted in the Mezzanine Escrow. On the Effective Date, the Interest in Partners shall be cancelled <br><br> b: The Mezzanine Escrow will be held by the Disbursing Agent for distribution pursuant to a plan of reorganization or liquidation to be filed by Mezzanine subsequent to the Confirmation Date or as otherwise ordered by the Bankruptcy Court. |  |  |

Notwithstanding the treatment set forth above, the holder of any Allowed Claim may elect to receive lesser and different treatment if so agreed with Partners.

### C. Methods of Distributions Under the Plan

#### 1. Distributions of Cash

Any payment of Cash made by the Reorganized Debtor, or the Disbursing Agent, pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

#### 2. Distributions Free and Clear

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of the Reorganized Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

33

NYIWDMS: 11417167_19

### 3.      Timing of Distributions

Unless otherwise provided in the Plan, any distribution to be made by the Reorganized Debtor or the Disbursing Agent shall be made to the extent and at the time provided in Article 5 of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 4.      Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules or on the books and records of Partners or its agents. The holder of an Allowed Claim must notify the Reorganized Debtor in writing of a change of address pursuant to the notice requirements set forth in Article 11.15 of the Plan or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. Neither the Reorganized Debtor nor the Disbursing Agent shall be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein or in the Plan.

### 5.      Distributions to Holders as of Record Date

As of the close of business on the Record Date, the claims register for Partners shall be closed pursuant to the order approving the Disclosure Statement, and there shall be no further changes made to the identity of the record holder of any Claim. Neither the Reorganized Debtor nor the Disbursing Agent shall have any obligation to recognize any transfer of any Claim occurring after the Record Date, provided, however, that the Reorganized Debtor and the Disbursing Agent will recognize transfers of Claims made after the entry of an order approving the Disclosure Statement but before the Confirmation Date for distribution purposes.

### 6.      Undeliverable and Unclaimed Distributions

(i)      If the distribution to the holder of any Allowed Claim is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Reorganized Debtor or the Disbursing Agent, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall be made, subject to the provisions of Article 6.10 of the Plan, as soon as is practicable to such holder, without interest.

(ii)      Checks issued by the Reorganized Debtor or the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check shall be made in accordance with the notice provisions of Article 11.15 of the Plan to the Reorganized Debtor or the Disbursing Agent, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued.

(iii)    **All claims for undeliverable distributions or voided checks shall be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made. After such dates, all such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become unencumbered Cash of the Reorganized Debtor. The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code shall not be entitled to any other or further distribution under the Plan on account of such Claim.**

   7.    **Setoffs**

   To the extent permitted under applicable law, the Reorganized Debtor may set off against or recoup from the holder of any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any nature that the Debtors have asserted in writing against the holder of such Allowed Claim, including, without limitation, any rights under section 502(d) of the Bankruptcy Code and in the absence of a written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of such a writing from Partners or the Reorganized Debtor, it will be conclusively presumed that the requirements for disallowance of a claim under section 502(d) of the Bankruptcy Code or setoff or recoupment under applicable law have been satisfied.

   **D.    Implementation of the Plan**

   1.    **Reorganized Debtor**

   (i)    <u>Reorganized Articles of Organization and Reorganized Operating Agreement</u>. The Reorganized Debtor shall adopt Reorganized Articles of Organization and a Reorganized Operating Agreement prior to, but effective as of, the Effective Date, which shall be included in the Plan Supplement. Prior to the closing of Partners Chapter 11 case, any amendments to Reorganized Debtor's Articles of Organization and Reorganized Operating Agreement shall be filed with the Bankruptcy Court.

   (ii)    <u>Managing Members and Officers</u>. The initial managing members and officers of the Reorganized Debtor shall be disclosed in the Plan Supplement and shall be in effect as of the Effective Date.

   2.    **Exit Funding**

   On or before the Effective Date, the Plan Funder shall contribute capital, loans and/or provide additional standby funds (either as additional capital or loans) on terms mutually acceptable to Partners and the Plan Funder sufficient to effectuate the Plan, as summarized on page 18 above. The Plan Supplement will provide additional details, the exact terms of such funding and structure of the Reorganized Debtor and its management.

35

### 3. Early Payment

Nothing herein or in the Plan shall prevent the Reorganized Debtor from making any payments prior to the date provided for in the Plan, and the Reorganized Debtor shall not suffer any penalty or prejudice from making any such payments.

## E. Executory Contracts and Unexpired Leases

Under section 365 of the Bankruptcy Code, Partners have the right, subject to Bankruptcy Court approval, to assume or reject any executory contract or unexpired lease. If Partners reject an executory contract or unexpired lease that was entered into before the Petition Date, the contract or lease will be treated as if it had been breached on the date immediately preceding the Petition Date, and the other party to the agreement will have a General Unsecured Claim for damages incurred as a result of the rejection. In the case of rejection of real property leases, damages are subject to certain limitations imposed by Section 502(b)(6) of the Bankruptcy Code.

### 1. Rejected Contracts and Leases

(i)     Each executory contract and unexpired lease to which Partners is a party shall be deemed automatically rejected as of the Effective Date, unless such executory contract or unexpired lease (1) will have been previously assumed by Partners, (2) is the subject of a motion to assume filed on or before the Confirmation Date or (3) is listed on the schedule of assumed contracts and leases annexed as an Exhibit to the Plan Supplement. Partners may at any time on or before the Confirmation Date (or, with respect to any executory contract or unexpired lease for which there is a dispute regarding the nature or the amount of any cure, at any time on or before the entry of a Final Order resolving such dispute) amend the Plan Supplement to delete therefrom or add thereto any executory contract or unexpired lease, in which event such executory contract or unexpired lease will be deemed to be rejected, assumed or assumed and assigned, as the case may be.

(ii)     Partners will provide notice of any amendments to the Plan Supplement to the parties to the executory contracts or unexpired leases affected thereby and counsel to the Creditors' Committee and WestLB. The fact that any contract or lease is listed in the Plan Supplement will not constitute or be construed as an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that the Reorganized Debtor or any successor to the Reorganized Debtor has any liability thereunder.

(iii)     The Reorganized Debtor reserves the right to file a motion on or before the Confirmation Date to assume and assign or reject any executory contract or unexpired lease whether or not identified in the Plan Supplement.

(iv)     The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

36

NYIWDMS: 11417167_19

### 2.    Rejection Damages Bar Date

If the rejection of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforeceable against Partners or the Reorganized Debtor or its properties unless a proof of claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized Debtor counsel to the Creditors' Committee and WestLB, no later than thirty (30) calendar days after the later of the Confirmation Date or the entry of an order of rejection.  Nothing in the Plan will extend any prior deadline to file a proof of claim for damages arising from the rejection of an executory contract or unexpired lease.

### 3.    Assumed Contracts and Leases

(i)    Except as otherwise provided in the Plan or the Confirmation Order, all executory contracts and unexpired leases identified in the Plan Supplement on an Exhibit listing assumed agreements will be deemed automatically assumed as of the Effective Date.

(ii)    Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupy of real property will include (1) all modifications, amendments, renewals, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other documents that in an manner affect such executory contract or unexpired lease and (2) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy or is otherwise rejected as a part of the Plan.

(iii)    To the extent Partners is party to the unexpired lease or executory contract and is to be merged or dissolved as a result of the Plan, any non-debtor party to such unexpired lease or executory contract will, upon assumption as contemplated herein, be deemed to have consented to the assignment of such unexpired lease or executory contract to the Reorganized Debtor.

(iv)    The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of such executory contracts and unexpired leases, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

### 4.    Payments Related to Assumption of Executory Contracts and Unexpired Leases

(i)    Any monetary amounts by which each executory contract and unexpired lease to be assumed under the Plan may be in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code by promptly curing same ("Cure Claim").

(ii)    In the event of a dispute regarding (1) the nature or the amount of any Cure Claim, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the amount of the Allowed Cure Claim shall be paid no later than thirty (30) calendar days following

37

the entry of a Final Order resolving the dispute and approving the assumption and, as the case may be, assigned.

### F.    Provisions for Treatment of Disputed Claims

If any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of that Claim unless and until, and only to the extent, such Claim becomes Allowed. At the time that a Disputed Claim becomes an Allowed Claim, the holder of that Allowed Claim will be entitled to receive from the Reorganized Debtor a distribution on its Allowed Claim equal in percentage to the distributions made to date on previously-allowed Allowed Claims.

### 1.    Resolution of Disputed Claims

The Reorganized Debtor shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims. The Reorganized Debtor shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event shall the service of such an objection be later than 120 days after the Effective Date, unless such date is extended by order of the Bankruptcy Court. The Bankruptcy Court, for cause, may extend the deadline on the request of the Reorganized Debtor. All objections shall be litigated to a Final Order except to the extent that the Reorganized Debtor elects to withdraw such objection, or the Reorganized Debtor and the holder of the Disputed Claim compromise, settle or otherwise resolve any such objections, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

### 2.    Other Provisions Relating to Disputed Claims

If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor, or the Disbursing Agent shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided in the Plan, distribute to the holder of such Allowed Claim an amount, without any interest thereon, that provides such holder with the same percentage recovery, as of such date, as holders of Claims in the class that were Allowed on the Effective Date.

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed. Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, shall be disallowed.

38

G.    **Summary of Other Provisions of the Plan**

The following subsections summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.[13]

1.    **Releases and Exculpations**

**Except as otherwise provided in the Plan or Confirmation Order, as of the Effective Date, Partners, the Reorganized Debtor, the Disbursing Agent, the Creditors' Committee, the members of the Creditors' Committee in their respective capacity as such, any of such parties' respective present or former members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, and agents, and any such parties' successors and assigns (collectively, the "Released Parties") shall be released by Partners and any successors-in-interest of Partners from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that Partners would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim, Interest, or other person or entity would have been legally entitled to assert on behalf of Partners or its estate, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date but occurring during the chapter 11 cases, except for acts constituting willful misconduct, gross negligence or bad faith, and, in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Without limiting the generality of the foregoing, to the extent permitted by law, Partners and any successors-in-interest of Partners shall waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.**

**Partners, the Committee, and the Released Parties, and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any Person or Entity for any act taken or omission, after the Petition Date, in connection with or related to these cases or the operations of Partners' business during the cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Chapter 11 Cases, and in all respects such parties shall be entitled to rely**

---

[13] All governmental entities with a potential interest in Partners' chapter 11 case were served with the Plan and Disclosure Statement.

upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### 2.     Injunction

The satisfaction, releases and discharge pursuant to Article 9 of the Plan will also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, recoup or recover any Claim or Cause of Action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.

### 3.     Modification of the Plan

The Reorganized Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Reorganized Debtor may, upon order of the Bankruptcy Court, amend and modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 4.     Withdrawal or Revocation of the Plan

Partners may withdraw or revoke the Plan at any time prior to the Confirmation Date. If Partners revokes or withdraws the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan or Disclosure Statement shall be deemed to constitute a waiver or release of any Claim by or against Partners or the Other Debtors or any other person or to prejudice in any manner the rights of Partners or the Other Debtors or any other person in any further proceedings involving Partners or the Other Debtors.

### 5.     Effectuating Documents and Further Transactions

Upon entry of the Confirmation Order, Partners, and the Reorganized Debtor, shall be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 6.     Section 1146 Exemption

Pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument or transfer under, in furtherance of, or in connection with, the Plan, will not be subject to any stamp tax, or similar tax held to be a stamp tax or other similar tax by applicable law.

NYIWDMS: 11417167_19

### 7.   Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention and employment of the Committee's attorneys shall terminate.  The Committee shall continue in existence after the Effective Date solely for the purpose of reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to applications for compensation and reimbursement of expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code.

### 8.   Severability

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Reorganized Debtor and the Committee, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Notwithstanding the foregoing, the provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan.

### 9.   Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable and except as may otherwise be provided in the Modified Loan Documents, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the State of Utah, without giving effect to Utah's principles of conflicts of law.

### 10.   Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in Partners and its respective successors and assigns, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the term of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Other Debtors under chapters 7 or 11 of the Bankruptcy Code).

41

### 11.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by Partners.  Any statutory fees accruing after the Confirmation Date also shall be paid by Partners.

### 12.    Discharge

The rights and treatment of all Claims against and Interests in Partners shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against Partners or its estate, assets, properties or interests in property.  The Reorganized Debtor shall not be responsible for any obligations of the Other Debtors or their estates except those expressly assumed in accordance with the terms of the Plan.

### 13.    Retention of Causes of Action/Reservation of Rights

Except as provided in Article 11.4 and 11.5 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim (as that term is defined in section 101(5) of the Bankruptcy Code), rights, causes of action, right of setoff, or other legal or equitable defense that Partners, the Reorganized Debtor or the Other Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against Partners or the Other Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code, (iii) the turnover of any property of Partners or the Other Debtors' estates, (iv) any and all claims against BayNorth, and (v) any and all claims against Jacobsen, which upon the Effective Date, shall be the warranty claims against Jacobsen.

### 14.    Section 506(c) Reservation

Except as provided in the Order On Stipulation Authorizing Use of Cash Collateral entered on October 14, 200, Partners and the Reorganized Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

### 15.    Plan Supplement

The documents comprising the Plan Supplement shall be filed with the Clerk of the Bankruptcy Court on the earlier of (a) ten (10) days prior to the hearing to confirm the Plan or (b) two (2) business days prior to the deadline to vote or object on the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to Partners' bankruptcy counsel.

### 16.    Injunction

The satisfaction, releases and discharge pursuant to Article 9 of the Plan will also act as an injunction against any Person commencing or continuing any action, employment of process

42

or act to collect, offset, recoup or recover any Claim or Cause of Action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.

## V.    CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Voting Procedures and Solicitation of Votes

The voting procedures and the procedures governing the solicitation of votes are described above in Section I, and in the Disclosure Statement Order, which has been sent to you simultaneously with this Disclosure Statement if you are entitled to vote on the Plan.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing on the Plan has been scheduled for March __, 2010, commencing at _:__ a.m. (Mountain Time), before the Honorable R. Kimball Mossier, United States Bankruptcy Judge, in Room __ of the Bankruptcy Court, 350 Main Street, Salt Lake City, Utah 84101. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before March _____2010, at 4:00 p.m. (Mountain Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest of Partners held by the objector. Objections must be timely served upon the following parties:

Michael V. Blumenthal, Esq.
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022

Kenneth L. Cannon II, Esq.
Durham Jones & Pinegar
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT 84110-4050

Office of United States Trustee
Attn:  John T. Morgan
Ken Garff Bldg.
405 South Main Street, Suite 300
Salt Lake City, UT 84111

NYIWDMS: 11417167_19