Annette Jarvis (1649)  
Peggy Hunt (6060)  
Benjamin J. Kotter (9592)  
**DORSEY & WHITNEY LLP**  
136 South Main Street, Suite 1000  
Salt Lake City, UT 84101-1685  
Telephone: (801) 933-7360  
Facsimile: (801) 933-7373  
Email: jarvis.annette@dorsey.com  
      hunt.peggy@dorsey.com  
      kotter.benjamin@dorsey.com  

Richard W. Havel (10759)  
**SIDLEY AUSTIN LLP**  
555 West Fifth Street, Suite 400  
Los Angeles, CA 90013-1010  
Telephone: (213) 896-6000  
Facsimile: (213) 896-6600  
Email: rhavel@sidley.com  

*Attorneys for WestLB, AG*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| EASY STREET HOLDING, LLC, *et al.*, | ) Bankruptcy Case No. 09-29905 |
| | ) Jointly Administered with Cases |
| Debtors. | ) 09-29907 and 09-29908 |
| | ) |
| Address: 201 Heber Avenue | ) Chapter 11 |
| Park City, UT 84060 | ) |
| | ) Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) DATE: February 18, 2010 |
| 35-2183713 (Easy Street Holding, LLC), | ) TIME: 1:30 P.M. MST |
| 20-4502979 (Easy Street Partners, LLC), and | ) PLACE: Courtroom 369 |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) 350 South Main Street, #301 |
| | ) Salt Lake City, Utah 84101 |

**OBJECTION TO DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF
REORGANIZATION OF EASY STREET PARTNERS, LLC DATED JANUARY 15, 2010**

     WestLB AG ("WestLB"), a secured creditor in the above-captioned bankruptcy proceeding, by and through its undersigned counsel, hereby objects to (the "Objection") the Disclosure Statement With Respect to Plan of Reorganization of Easy Street Partners, LLC

1

Dated January 15, 2010 [Docket No. 255] (the "Disclosure Statement").[1] In support of its Objection, WestLB has also filed contemporaneously herewith the Declaration of James Winikor in Support of WestLB, AG's Objection to Disclosure Statement With Respect to Plan of Reorganization of Easy Street Partners, LLC Dated January 15, 2010 (the "Winikor Decl."). The Disclosure Statement, which describes Easy Street Partners, LLC's ("Easy Street" or the "Debtor") proposed plan of reorganization ("Plan"), does not provide sufficient information to allow creditors to make an informed decision concerning the Plan for the reasons set forth in detail herein.

## FACTUAL BACKGROUND

1.  On September 14, 2009 (the "Petition Date"), Easy Street and two related entities commenced the above-captioned jointly-administered bankruptcy cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.  On September 15, 2009, Easy Street filed an adversary proceeding against BayNorth Realty Fund VI, Limited Partnership ("BayNorth") to recover funds paid prepetition by WestLB, which Easy Street alleges to be wrongfully withheld by BayNorth.

3.  Easy Street owns and operates certain real property and improvements and related facilities in Park City, Utah, commonly known as the "Sky Lodge Private Residence Club and Hotel" (the "Sky Lodge").

4.  WestLB is Easy Street's primary secured creditor, and WestLB has agreed to permit Easy Street to use WestLB's cash collateral pursuant to a stipulation. See Stipulation Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG [Docket No. 84] (as subsequently modified, extended, and/or

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Disclosure Statement.

2

amended, the "Stipulation"). In the Stipulation, Easy Street agreed that the allowed amount of WestLB's claim as of the Petition Date was no less than $15,164,331.17.

5. Easy Street also agreed in the Stipulation to provide the following minimum terms and treatment of WestLB's secured claim in any filed plan of reorganization:

> (i) the maturity date of the restructured Loan will not be extended past December 31, 2011; (ii) the nondefault interest rate applicable to the restructured Loan will be no less than LIBOR (as defined in the Loan Documents) plus 6%; (iii) Easy Street will make monthly interests payments until December 1, 2010 and thereafter monthly payments according to a 20-year amortization schedule provided, however, that the portion of the monthly payments constituting amortization of principal shall be reduced by payments to WestLB from the sale of Fractional Ownership Units; (iv) WestLB [will have approval rights over] the post-confirmation senior management team and/or any sales agent for unsold Fractional Units which approval will not be unreasonably withheld; and (v) WestLB will receive as paydown of principal not less than 80% of the net proceeds received by Easy Street from the sale of each Fractional Ownership Unit, which sales shall be in compliance with the minimum release price requirements contained in the restructured Loan Documents, and the remaining 20% of net proceeds shall be deposited into a Sale Proceeds Account and remain subject to a control agreement in favor of WestLB.

Stipulation ¶ 26(k).

6. Under the terms of the Stipulation, Easy Street is authorized to use WestLB's cash collateral until April 30, 2010 if, among other things, Easy Street filed a disclosure statement and plan of reorganization acceptable to WestLB on or before January 15, 2010 which contains the minimum treatment described above.

7. On January 12, 2010, the Official Committee of Unsecured Creditors (the "Committee") filed an adversary proceeding against WestLB seeking subordination of WestLB's claims and liens against Easy Street.

8.  Prior to January 15, 2010, the Debtors and WestLB discussed actual terms on which WestLB's secured claim could be treated in Easy Street's chapter 11 plan. During this period, the parties could not reach agreement as to certain repayment and other terms.

9.  On January 15, 2010, Easy Street filed the Plan and Disclosure Statement, which contained a treatment of WestLB's secured claim that did not conform with the minimum agreed-upon terms mandated by the Stipulation. The Plan violates Easy Street's agreement in the Stipulation by, among other things, imposing a cap on the interest rate payable to WestLB, purporting to reserve a right of first refusal with respect to WestLB's Secured Claim for the Reorganized Debtor or the Plan Funder, and extending the maturity date of the Loan past December 31, 2011.

10. A hearing to consider the adequacy of the Disclosure Statement has been scheduled for February 18, 2010 at 1:30 p.m. (Mountain Time).

**ARGUMENT**

11. Easy Street has failed to meet the minimum disclosure requirements necessary for approval of its Disclosure Statement under 11 U.S.C. § 1125. Section 1125(b) of the Bankruptcy Code requires that, before a plan proponent solicits acceptances or rejections of its proposed plan of reorganization, it must provide creditors with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). "Adequate information" is defined by Section 1125(a)(1) of the Bankruptcy Code as:

> Information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

12. The principle of disclosure is "[o]f prime importance in the reorganization process." Momentum Mfg. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994). Courts and commentators alike have noted that the preparation and filing of a disclosure statement is a "critical step" and a "pivotal concept" in reorganization. Oneida Motor Freight Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) (citing 5 *Collier on Bankruptcy* ¶ 1125.03 (15th ed. 1988)). Given the reliance placed upon the disclosure statement by creditors and the bankruptcy court, "the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information'" cannot be overstated. Id. Accordingly, a disclosure statement must contain sufficient information to allow creditors to evaluate independently their proposed treatment under the plan. See, e.g., In re Civitella, 15 B.R. 206, 207 (Bankr. E.D. Pa. 1981) (denying approval where voting parties were unable to "independently evaluate the merits of the proponent's plan" because assertions in the disclosure statement that the plan was superior to a forced sale were not accompanied by supporting factual information).

13. "Without information sufficient to allow parties voting on the plan the opportunity to arrive at an independent and informed judgment, the disclosure statement cannot be approved." In re East Redley Corp., 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982). Several courts faced with determining the adequacy of a disclosure statement have employed a list of the types of information that ordinarily must be included. See, e.g., In re Dakota Rail, Inc., 104 B.R. 138 (Bankr. D. Minn. 1989); In re Scioto Valley Mortgage Co., 88 B.R. 168 (Bankr. S. D. Ohio 1988); In re Jeppson, 66 B.R. 269 (Bankr. D. Utah 1986); In re Metrocraft Publ'g Servs., Inc., 39 B.R. 567 (Bankr. N. D. Ga. 1984); In re Malek, 35 B.R. 443 (Bankr. E.D. Mich. 1983). Courts

have employed such non-exclusive factors as: (i) the anticipated future of the debtor; (ii) the source of the information provided in the disclosure statement; (iii) the accounting and valuation methods used to produce the financial information in the disclosure statement; (iv) information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors and/or officers of the debtor; (v) an estimate of all administrative expenses, including attorney's fees and accountant's fees; (vi) any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan; and (vii) information relevant to the risks borne by creditors and interest holders. See, e.g., 7 *Collier on Bankruptcy* ¶ 1125.02[2] (16th Ed. Rev.) (listing nineteen factors); In re Scioto Valley Mortgage Co., 88 B.R. at 170-71 (same).

14. Applying the foregoing standards to the Disclosure Statement in this case leads to only one conclusion – the Disclosure Statement does not contain adequate information and, therefore, it cannot be approved, if at all, without certain modifications. The Disclosure Statement requires not only additional disclosure, but clear and meaningful disclosure, as certain of the facts asserted by Easy Street therein are inaccurate and/or misleading. To the extent the Debtor proposes to provide some or all such information in a "Plan Supplement" to be filed two days prior to the voting deadline or ten days prior to the Confirmation Hearing, WestLB objects to the fairness of the process and completeness and adequacy of disclosure. Accordingly, the Disclosure Statement should not be approved, or, alternatively, should only be approved as modified and supplemented with at least the factual clarifications and additional information requested and described below, and any Plan Supplement containing material terms or

information should be filed at least two weeks prior to the voting deadline and confirmation objection deadline.

**I.　　In Order For Creditors to Adequately Assess Risks and Feasibility, Easy Street Must Provide Further Information With Respect to the Sources and Uses of Funding to Effectuate the Plan, the Terms and Amount of the Exit Funding, and Payments Required on the Effective Date.**

15.　　At its most basic, the Disclosure Statement fails to inform creditors with respect to the total amount of claims and how they will be paid. Because the Disclosure Statement does not adequately explain which claims will be paid from operations, which claims will be paid from the Exit Funding, and which claims (if any) will be paid from cash collateral,[2] creditors cannot adequately assess the impact of any particular failure in Easy Street's projections on the payment of their claims. Easy Street should therefore include in its Disclosure Statement an analysis of the sources and uses of funding for its Plan, including (i) the total amount needed to pay all claims; (ii) what portion of that amount will be paid from (a) operating revenues and (b) the Exit Funding; (iii) a discussion of any proposed use of WestLB's cash collateral to fund (x) Plan payments to creditors or (y) post-confirmation operations; and (iv) all revenues by category tracked against all liabilities (including operating/sales expenses, payments to Jacobson and WestLB, and distributions to unsecured creditors). Easy Street should further differentiate in its exhibits the utilization of equity and cash collateral to cover operating shortfalls over the five-year budgeted period. As discussed further below, such information is also critical to determining whether the Plan is feasible.

---

[2] For the avoidance of doubt, WestLB may object to Easy Street's proposed use of WestLB's cash collateral, and disclosure of Easy Street's plans for this collateral bears on WestLB's decision of whether to support the Plan.

16. Easy Street's Disclosure Statement also provides inadequate information regarding whether, in light of the amount of Exit Funding contemplated therein, the proposed Plan meets the feasibility standard set forth in section 1129(a)(11) of the Bankruptcy Code. Although feasibility is often addressed at hearings on confirmation of a reorganization plan, the Court may also consider whether sufficient information regarding feasibility has been provided in deciding whether to approve the Disclosure Statement. See In re Atl. Terrace Apartment Corp., 226 B.R. 535, 537 (Bankr. E.D.N.Y. 1998) (noting that, "[f]or a number of reasons, including lack of feasibility and Debtor's failure to provide adequate information in its disclosure statement under 11 U.S.C. § 1125(a), Debtor's disclosure statement was denied").

17. Under section 1129(a)(11), Easy Street has the burden of demonstrating by a preponderance of the evidence that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1997) (noting that the debtor bears the burden of demonstrating by a preponderance of the evidence that all of the standards of section 1129 have been met). In particular, Easy Street must present "'concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.'" In re Trans Max Techs., Inc., 349 B.R. at 92 (quoting S&P, Inc. v. Pfeifer, 189 B.R. 173, 187 (N.D. Ind. 1995)); see also In re Hobble-Diamond Cattle Co., 89 B.R. 856, 858 (Bankr. D. Mont. 1988) (finding that projections for income that are speculative and visionary, rather than based on the Debtor's past or present operating records, cannot support a finding of

feasibility; factual support is required, so as to avoid reliance on unrealistic predictions of future performance). The amount and terms of the proposed Exit Funding is critical to this analysis.

18. Easy Street's prediction in its Disclosure Statement—that it will obtain sufficient value to meet its obligations under the Plan when it obtains "up to $8 million of equity capital in cash sufficient to fund the Plan"—provides inadequate information for voting creditors to assess whether the Plan is feasible. See Disclosure Statement 19 (emphasis added). The Disclosure Statement does not indicate how much the Plan Funder will actually fund on the Effective Date. Nor does the Disclosure Statement give creditors any estimate of the amount of funding needed to make the payments required by the Plan or any estimate of administrative claims likely to be asserted against the estate, including professional fees. Because such claims must be paid on the Effective Date, creditors cannot determine whether the as-yet undisclosed amount of Exit Funding proposed by the Plan Funder will be sufficient to effectuate the Plan, given the immediate outflow of cash from the Debtor's operating accounts and the Debtor's undisclosed working capital reserves on that date.

19. Moreover, the "disclosure statement should . . . contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization." In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990). The Disclosure Statement fails to explain the risks to creditors if the Exit Funding should fall through or if up to $8 million in financing should be insufficient to fund Easy Street's obligations under the Plan long-term. Assuming less than $8 million is funded on the Effective Date, the Disclosure Statement should reveal upon what conditions the balance of the $8 million in Exit Funding would be provided. Easy Street should also (i) explain why its Disclosure Statement

9

fails to provide a mechanism by which additional funding can be obtained if $8 million is insufficient to fund its obligations under the Plan and (ii) demonstrate whether the Plan Funder is capable of providing any necessary, additional funding.

## II. Easy Street Must Provide Further Information With Respect to the Plan Funder and the Process for its Selection.

20. The Disclosure Statement also provides insufficient information about the Plan Funder itself, its ability to provide the Exit Funding, and the process by which Easy Street selected the Plan Funder to provide the Exit Funding.

21. In order for the Plan to be confirmed, Easy Street must have proposed it in good faith. See 11 U.S.C. § 1129(a)(3). In this case, the Plan Funder selected by the estate has proposed an arrangement whereby William Shoaf, a principal of Easy Street's manager, is permitted to retain his management interest and will receive up to 25% of the equity in the Reorganized Debtor without providing any specific additional consideration for that benefit. Easy Street does not discuss how the Plan Funder's proposal was evaluated, whether any parameters were established in the search for exit financing, or whether Shoaf required that he remain in control of management as a condition to accepting any exit financing.

22. Easy Street also fails to discuss the breadth of its search for exit financing, or whether Easy Street considered any other equity partners who were not amenable to permitting Shoaf to continue in control of management or who would have provided a larger capital investment or better terms to the estate in exchange for the equity interest to be distributed to Shoaf. Easy Street has a fiduciary duty to maximize the value of the estate for the benefit of creditors. The Disclosure Statement does not reveal that this fiduciary duty may require Easy Street to entertain higher and better offers from other potential equity partners as part of the plan

10

process and does not discuss whether it intends to open the process to other investors, to the benefit of creditors and possible detriment of William Shoaf. Particularly in light of other undisclosed aspects of the Exit Funding (such as its amount, terms, ultimate source of funding, and timing of cash infusion), these disclosures are critical in assessing whether Shoaf – an insider of the Debtor – acted in violation of his fiduciary duties and whether Easy Street acted in good faith in proposing this Plan.

**III.  The Disclosure Statement Provides Inadequate Detail Respecting Easy Street's Post-Confirmation Business Plan and Projections.**

23.  As a general rule, "the information to be provided in the disclosure statement should be comprised of 'all factors presently known to the plan proponent' that bear upon the success or failure of the proposals contained in the Plan."  In re Microwave Products of America, Inc., 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989) (citing In re Stanley Hotel, Inc., 13 B.R. 926, 929 (Bankr. D. Colo. 1981)).  Easy Street's Disclosure Statement is deficient because it fails to elaborate the business plan Easy Street intends to follow in order to effectuate its Plan, which is a critical factor in determining whether to support the Plan.

24.  "Courts have emphasized that disclosure statements must contain factual support for any opinions contained therein since opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions."  7 *Collier on Bankruptcy* ¶ 1125.02[2][a] (15th Ed. Rev.) (citing In re Fierman, 21 B.R. 314 (Bankr. E.D. Pa. 1982); In re East Redley Corp., 16 B.R. at 429; and In re Civitella, 15 B.R. 206).  Although Easy Street provides superficial and perfunctory financial and operational projections in support of its ability to effectuate the Plan, certain projections deviate substantially from actual historical performance, and Easy Street provides no explanation or other basis for why such dramatically

increased performance is reasonable or attainable. See Winikor Decl. ¶ 7. Although WestLB has received, subject to a confidentiality agreement, certain additional information regarding Easy Street's business plan, because such information bears on the feasibility and good faith of Easy Street's Plan, the Disclosure Statement should lay out a process by which such additional information can be shared broadly upon request of any creditors and parties-in-interest.[3]

**A.    The Disclosure Statement Lacks a Discussion of Easy Street's Business Plan.**

25.    Easy Street's Disclosure Statement lacks both a general and specific discussion of how it will operate over the course of effectuating the Plan. Without such information, creditors cannot evaluate the likelihood that Easy Street will complete payments under its Plan. Indeed, a primary safeguard provided to creditors in this case was Easy Street's hiring of BDRC and Gemstone to provide management and financial advisory assistance to management. However, the Disclosure Statement contains no discussion of BDRC and Gemstone's analysis of Easy Street's business plan. Easy Street should specifically reveal whether its consultants agreed with and approved Easy Street's projections and business plan and, if not, the basis for any disagreement.

26.    Easy Street should also include in its Disclosure Statement additional information about particular aspects of its business plan. For example, the Plan depends upon the sale of Units and contemplates the sale of the Zoom restaurant, the proceeds of which, directly or indirectly, will be used to satisfy payments on WestLB's Secured Claim and other claims. Yet, Easy Street gives no meaningful information on how it plans to market these assets, other than to

---

[3] Certain of the specific objections raised by WestLB in this pleading may have been addressed by the WestLB's receipt of additional confidential information from the Debtor. However, WestLB presses such objections in an abundance of caution to the extent that the current Exhibits deviate from the figures shown to WestLB and to the extent that disclosure of this information to all parties in interest is necessary to meet the standard set by 11 U.S.C. § 1125.

12

coordinate with the Plan Funder in identifying potential purchasers for Units. This lack of disclosure or lack of a viable marketing plan calls into question the timing of cash flows, and therefore the feasibility of the Plan.

27.     Moreover, Easy Street projects that it will sell off its fractional Units within four years of confirmation, and that Units sold in 2010 will garner an average price of approximately $383,400, compared to an average price of approximately $362,000 for Units sold to date. See Winikor Decl. ¶ 8. Easy Street provides no explanation for why it reasonably expects to "sell out" its Units on this timetable or why it can reasonably expect a premium on Units in this economy and in the Park City market. To support its projections, Easy Street should provide recent sales data for Units sold or an analysis of fractional units recently sold in other comparable Park City properties.

28.     Easy Street's other revenue projections are likewise speculative and not in keeping with the historical performance of the Sky Lodge. For example, Easy Street projects that its revenues will increase from $4.9 million in 2009 to $7.1 million in 2010. See Disclosure Statement Exh. 2-2.[4] Easy Street further projects that its revenues in 2013 will increase by nearly 95% compared to revenues in 2010 (and an increase of 182% from 2009). See id. Net Operating Income is projected to increase from $992,354 in 2009 to $5.7 million in 2013. Easy Street gives no additional information regarding why, in light of the economy generally, the local Park City market, and the actual performance of Sky Lodge, such an aggressive increase is a reasonable projection. Nor does Easy Street explain why the year-over-year increases in net operating income it projects between 2009 and 2013 are justified.

---

[4] According to information received from the Debtor in December, revenues in 2009 were actually approximately $4.7 million. See Winikor Decl. ¶ 8.

29. Easy Street also seeks to use revenues from a new, untested property management business to effectuate its Plan. See, e.g., Exhibit 2-1. According to the Sky Lodge – Five Year Hotel Operation Pro Forma, this business is projected to begin generating revenue in 2010. However, Easy Street fails to separately reflect the expenses of this operation, including commissions due to property owners, to enable creditors to assess the value and viability of the business as it matures. Easy Street also fails to account in its budget for necessary start-up costs, capital expenditures, marketing, administrative costs, and other administrative costs required by that new endeavor. These failures call into question the profitability of the business and the reliability of Easy Street's otherwise-unsubstantiated revenue projections for this new business.

30. In the absence of concrete support for its projections, Easy Street's exhibits in support of the Plan are speculative at best and do not provide adequate information to creditors regarding whether to support the Plan. See, e.g., In re Trans Max Techs., 349 B.R. 80, 92 (Bankr. D. Nev. 2006) (The Debtor "must offer more than speculation about the source of funding for the plan[.]") (internal quotation marks omitted). Easy Street's failure to include a discussion of the issues referenced above, notwithstanding the projections, is a material omission.

31. A determination of the materiality of omissions or misrepresentations in a disclosure statement is "measured by an objective standard drawn from the definition of 'adequate information' at § 1125(a) that asks what the 'hypothetical reasonable investor typical of holders of claims or interests of the relevant class' would want to know in order to make an informed judgment about the plan." Official Comm. of Unsecured Creditors v. Michelson (In re Michelson), 141 B.R. 715, 725 (Bankr. E.D. Cal. 1992) (quoting 11 U.S.C. § 1125(a)). Here, the

factual underpinnings of Easy Street's business plan are material to WestLB's and other creditors' independent judgment regarding whether to accept or reject the treatment proposed by the Plan.  In re Reilly, 71 B.R. 132, 135 (Bankr. D. Mont. 1987) (rejecting disclosure statement because it lacked adequate information regarding the valuation of estate assets securing claim of objecting creditors and because, after court's valuation of those assets, the values given in the disclosure statement were erroneous); In re Cardinal Congregate I, 121 B.R. at 766-69 (denying approval of disclosure statement for failure to give sufficient detail and discussion of relevant issues).

### B.  The Disclosure Statement's Projections are Misleading and Deficient.

32. In addition to the deficiencies noted above, certain portions of Easy Street's projections are on their face misleading and missing necessary information.  For example, the Debtor's Five-Year Budget reports 2009 results that do not reconcile with financials provided to WestLB in December 2009 pursuant to the Stipulation.  See Winikor Declaration ¶ 9.  Moreover, Easy Street's 2010 Budget and Five-Year Projected Budget do not appear to reflect projected payments to Jacobson and estimated payments to unsecured creditors, both of which constitute substantial expenses in April 2010, nor do they account for the receipt of the Exit Funding.  And although the Plan contemplates the sale of the Zoom restaurant, Easy Street fails to project the timing of and forecasted revenues from any such sale, as well as a corresponding reduction in WestLB's claim.  Easy Street's projected breakdown of Unit sales is likewise flawed, in that Easy Street wrongfully accounts for marketing and administrative costs in calculating the Net Sales Price of Units, in contravention of prior practice and its prepetition loan documents with WestLB.  See Winikor Decl. ¶ 10.  Finally, while Easy Street discusses the continued

15

prosecution of the BayNorth litigation, it does not budget the expenditures needed to complete that action.

### IV. Information Regarding Post-Confirmation Management Must be Disclosed.

33. Sections 1129(a)(5)(A)(i) and 1129(a)(5)(B) of the Bankruptcy Code mandate the disclosure of any individual who will serve post-confirmation as an officer, director or in a similar capacity of the debtor or its successor, and the identity and compensation of any insider who will be employed post-confirmation. Here, the Plan and Disclosure Statement contain none of the mandated information, other than an acknowledgement that William Shoaf, who indirectly holds an equity interest in Easy Street, may continue to maintain his control of Easy Street post-petition. It is plainly insufficient to promise to provide this necessary information to creditors in a "Plan Supplement" two days before the voting deadline on the Plan.

34. Creditors are entitled to be provided with the information expressly required by the Code with sufficient time to assess whether to vote for or against the Plan. Therefore, the Disclosure Statement should be amended to disclose: (i) the identity and compensation of post-confirmation officers and directors; (ii) which current officers and directors will continue to manage Easy Street after confirmation; (iii) the identity and compensation of any other insider to be retained or employed post-confirmation; and (iv) whether insiders of Easy Street will be paid from the 3.5% management fee budgeted by Easy Street going forward and/or whether they will receive a salary. Easy Street should also clarify whether, in light of the elimination of projected amounts to BDRC and Gemstone, it intends for its management to conduct operations without the help of paid consultants or other management support.

V.  **The Disclosure Statement Contains Certain Background Factual Inaccuracies Which May Mislead Creditors.**

35. Easy Street continues to assert in its Disclosure Statement that it was forced to file for bankruptcy because of actions taken by WestLB. Such misstatements only fuel the Committee's adversary proceeding against WestLB, also described in the Disclosure Statement, and may mislead other creditors into believing that adversary proceeding is more viable than it is. For example, Easy Street alleges that certain actions, such as partial repayment of WestLB and the transfer to BayNorth, were taken "at the direction and authorization of WestLB." See, e.g., Disclosure Statement at 7-9. However, Easy Street fails to inform creditors that it was knowledgeable of and consented to the making of these payments. See Winikor Declaration ¶ 4.

36. Easy Street also implies that WestLB wrongly declared its loan in default, ultimately as a result of the BayNorth transfer for which Easy Street blames WestLB. See Disclosure Statement at 9. However, Easy Street fails to mention that Easy Street was also in default under the WestLB loan because it was delinquent on monthly interest payments, and fails to mention that WestLB permitted a significant forbearance period before declaring a default in order to facilitate a resolution of the various issues with BayNorth. See Winikor Declaration ¶ 5. These factual inaccuracies may mislead creditors in evaluating the merits of the Committee's action and may impact such creditors' decision whether to accept or reject the Plan.

VI. **The Disclosure Statement Fails to Inform Creditors that WestLB Will Likely Vote to Reject the Plan as Currently Proposed.**

37. The Disclosure Statement contains inadequate information because it fails to disclose that WestLB is not expected to accept the Plan as currently formulated. WestLB will object to its treatment based on, among other things, (i) the proposed 8% cap on the interest rate

17

provided to WestLB on repayment of WestLB's Secured Claim; (ii) the percentage of Net Sales Proceeds Easy Street proposes to pay to WestLB from the sale of the Zoom restaurant; (iii) the right of first refusal Easy Street purports to retain or bestow upon the Plan Funder with respect to satisfaction of WestLB's Secured Claim; (iv) the Debtor's Five-Year Budget, which impermissibly deducts marketing and administrative expenses from the Unit sales revenues from which WestLB will be paid and provides for aggregate principal payments of less than WestLB's claim; (v) the fact that the Plan does not provide for WestLB's right to review and explicitly approve the post-confirmation management and its compensation; and (vi) the fact that the Modified Loan Documents governing WestLB's restructured claim depend for repayment upon aggressive and unsubstantiated projections. See Winikor Decl. ¶ 11. Although the Disclosure Statement briefly describes the cram-down requirements under Section 1129(b)(1) with respect to a class of fully secured claims, the Disclosure Statement does not describe how Easy Street intends to comply with such requirements vis-à-vis WestLB.

38. Moreover, Easy Street's permission to use WestLB's cash collateral was conditioned upon Easy Street's filing of a plan and disclosure statement acceptable to WestLB, which provided certain minimum terms and consideration. The Plan as currently formulated fails to meet Easy Street's obligations under the Stipulation and provides for a materially worse treatment than what it had agreed throughout the case to provide to WestLB. And although the Plan refers to Modified Loan Documents through which, among other things, Easy Street purports it will remain able to use cash collateral, Easy Street has not disclosed these documents and should be required to do so before WestLB is required to vote on whether to accept or reject the Plan.

## VII. Certain Additional Disclosures Are Also Needed With Respect to the BayNorth Litigation and the Impact of Confirmation on Related Debtors.

39. Although the Plan by its terms does not contemplate payments to specific creditors from any recovery on the BayNorth litigation, because the Plan contemplates payments to creditors, including WestLB, for several years post-confirmation, certain logistical issues with respect to the adversary proceeding are relevant to Easy Street's operation. The Disclosure Statement should therefore discuss: (i) who will control this litigation post-confirmation; (ii) how the litigation will be funded; (iii) how the litigation proceeds will be used; and (iv) the consequences to the Reorganized Debtor and creditors not yet paid in full under the Plan if BayNorth prevails in the litigation.

40. Finally, the Disclosure Statement should disclose the impact on Mezzanine and Holdings of confirmation of this Plan. Such disclosure should include a discussion of: (i) the resolution of intercompany claims and any *de facto* releases (such as the cancellation of guarantees) effected by the Plan; (ii) the amount to be placed in the Mezzanine Escrow; (iii) who will appraise the assets of Easy Street in connection with determining the funds to be placed in the Mezzanine Escrow; (iv) what claims will be subtracted from the appraisal value and why certain amounts (such as administrative expense claims) were or were not included in calculating the funds to be placed in the Mezzanine Escrow; and (v) why the Debtor has not provided for a mechanism through which the value devolved to equity under its Plan could be made available to creditors if the Debtor's multitude of projections fail. Unless and until creditors are provided with adequate information and disclosure of, among other things, the additional risk they are being asked to bear by the outflow of assets – not only to senior creditors, but to junior equity – the Disclosure Statement should not be approved.

## RESERVATION OF RIGHTS

41. WestLB reserves its rights to amend, modify or supplement this Objection in response to, or as a result of, the filing of any amendment or supplement to the Disclosure Statement or the Plan, any discovery conducted in connection with confirmation of the Plan, and/or any submission in connection with the Disclosure Statement or Plan filed by any party-in-interest. In addition, WestLB reserves the right to file any and all objections to the confirmation of the Plan and/or any amended plan or supplement thereto. WestLB also reserves the right to adopt any other objections to approval of the Disclosure Statement filed by any party.

## CONCLUSION

**WHEREFORE**, the Disclosure Statement fails to provide adequate information for the purposes of Section 1125 and should not be approved until the omissions and misstatements discussed above are corrected. WestLB hereby requests this Court enter an Order (i) denying approval of the Disclosure Statement, (ii) directing Easy Street to provide all of the additional disclosures requested herein and to rectify all of the misstatements identified herein, and (iii) providing such other and further relief it deems good and proper.

DATED this 12th day of February, 2010.

**DORSEY & WHITNEY, LLP**

 */s/ Benjamin J. Kotter*
Annette W. Jarvis
Peggy Hunt
Benjamin J. Kotter

and

Richard W. Havel
**SIDLEY AUSTIN LLP**
 *Attorneys for WestLB, AG*