Jeffrey W. Shields (USB #2948)
Lon A. Jenkins (USB #4060)
Troy J. Aramburu (USB #10444)
**JONES WALDO HOLBROOK & McDONOUGH, PC**
170 South Main Street, Suite 1500
Salt Lake City, Utah  84101
Telephone:  (801) 521-3200
Email:  jshields@joneswaldo.com
          ljenkins@joneswaldo.com
          taramburu@joneswaldo.com

*Counsel to Unsecured Creditors' Committee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy No.09-29905 |
| **EASY STREET HOLDING, LLC et al.,**<br>Debtors. | (Jointly Administered with Cases<br>09-29907 and09-29908)<br><br>Chapter 11<br><br>Honorable R. Kimball Mosier<br><br>**OBJECTION OF UNSECURED CREDITORS' COMMITTEE TO DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION OF EASY STREET PARTNERS, LLC DATED JANUARY 15, 2010** |

The Official Unsecured Creditors' Committee for Easy Street Partners, LLC

("Committee") hereby files its Objection ("Objection") to the Debtor's Disclosure Statement

("Disclosure Statement") with respect to Easy Street Partners, LLC's ("Debtor") Plan of

920383.1

Reorganization Dated January 15, 2010 ("Plan").  In support of its Objection, the Committee states as follows:

## Background

1.     The Debtors in these jointly administered cases are limited liability companies and are affiliates of one another owning, through various corporate structures, The Sky Lodge, a luxury boutique hotel located on historic Main Street in Park City, Utah.  The Debtors are Easy Street Holding, LLC ("Holding"), Easy Street Mezzanine, LLC ("Mezzanine"), and East Street Partners, LLC ("Partners" or "Debtor") (collectively, sometimes, "Debtors").  Partners, which owns the real estate and improvements which comprise the Sky Lodge, is owned 100% by Mezzanine, which in turn is owned and managed by Holding.

2.     In the months prior to the Debtors' voluntary Chapter 11 filing, WestLB, AG ("WestLB"), Partners' primary secured lender, had erroneously paid to approximately $5.6 million to Mezzanine's primary lender, BayNorth Realty Fund VI, LP ("BayNorth").  As a result of the erroneous payment, WestLB notified Partners that payments to WestLB were short approximately $4.8 million and, on that basis, WestLB denied Partners' request to extend the March 30, 2009 maturity date under the loan.

3.     Partners' inability to obtain an extension of the maturity date of the loans (and WestLB's refusal to grant the extension) constituted a default under Mezzanine's loans with BayNorth and, as a result, BayNorth scheduled a foreclosure sale of the collateral securing its loan - - Holding's 100% ownership interest in Mezzanine - - for September 16, 2009.  The effect

2

920383.1

of BayNorth's foreclosure of its collateral would vest 100% ownership of Mezzanine in BayNorth which, in turn, would vest ownership of Partners' and its assets in BayNorth.

4.      To stave off the BayNorth foreclosure sale, the Debtors filed their voluntary Chapter 11 petitions on September 14, 2009.

5.      On October 2, 2009, shortly after the Debtors' Chapter 11 filing, the United States Trustee appointed an unsecured creditors' committee in Partners' case ("Committee").   The members of the Committee are:  Elliott Workgroup Architecture, LLC; Millcreek Consulting; Gateway Center, LLC; Klehr Harrison Harvey Branzburg & Ellers, LLP; Goodrich and Thomas, CPAs and Shaner Design.  After its formation, the Committee decided to employ the law firm of Jones Waldo Holbrook & McDonough, PC to represent the Committee in these cases. The Committee, through its counsel, has actively participated in all phases of the cases.

6.      On January 15, 2010, Partners filed and served on counsel for the Committee its Disclosure Statement with Respect to Plan of Reorganization of Easy Street Partners, LLC Dated January 15, 2010.  The Plan contemplates the reorganization of Partners only – reorganization plans for Mezzanine and Holding will be filed, if at all, in March 2010.  The Disclosure Statement describes the plan for the reorganization of Partners' business operations, restructuring of Partners' debts and the treatment of Partners' various classes of creditors.

7.      According to the Debtor's Disclosure Statement, unsecured claims against the estate aggregate approximately $2.5 million - - comprising the body of creditors on whose behalf the Committee is acting, not including additional damage claims from non-debtor parties to

3

920383.1

rejected executory contracts and unexpired leases.

8.      While the Disclosure Statement contains sufficient information for creditors and parties in interest in some respects, in other respects the Disclosure Statement is insufficient.  On that basis, the Committee lodges its objections and identifies its areas of concern respecting the Disclosure Statement as set forth below

**The Disclosure Statement Must Provide**
**Adequate Information as Required By 11 U.S.C. § 1125(b)**

1.      The Bankruptcy Code seeks to guarantee a minimum amount of information to creditors.  *Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94 (3d Cir. 1988).

2.      A disclosure statement must contain "information of a kind, and in sufficient detail . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . ."  11 U.S.C. § 1125(a)(1).

3.      Section 1125(b) of the bankruptcy Code provides that acceptance or rejection of a plan may not be solicited unless the disclosure statement contains such "adequate information." 11 U.S.C. § 1125(b).  A disclosure statement does not meet the "adequate information" standard of § 1125 if it fails to contain simple and clear language delineating the consequences of the proposed plan.  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973 (Bankr. N.D.N.Y. 1988).

4.      In evaluating the adequacy of disclosure, courts consider whether the disclosure

920383.1

statement contains information such as: (1) the events leading to the petition filing; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information provided in the disclosure statement; (5) the present condition of the debtor; (6) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (7) the collectability of accounts receivable, if applicable; (8) financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the proposed plan; (9) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; and (10) litigation likely to arise in non-bankruptcy context. *See e.g., In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996).

### The Disclosure Statement Fails to Provide Adequate Information

5.    As noted above, while the Disclosure Statement contains adequate information with respect to certain of the categories listed above, other categories of necessary information are either absent, insufficient, or not clearly articulated. Until such information is provided to enable creditors to make informed decisions whether to accept or reject the Plan, the Disclosure Statement should not be approved.

6.    The Disclosure Statement is deficient in at least the following respects:

a. Plan Supplement. The Debtor's Disclosure Statement states that there are certain important documents – the "Plan Supplement" – which have not yet been provided to creditors. Rather, the Plan Supplement will be made

5

920383.1

available to creditors on the earlier of two (2) days before the voting deadline or ten (10) days before the hearing on confirmation of the Plan.  It appears that critical information which may bear on a creditor's decision to accept or reject the plan will be contained in the Plan Supplement, including information concerning (i) the Reorganized Debtor's corporate structure, (ii) the Reorganized Debtor's management and officers, (iii) the terms and details of exit financing provided by SCP, and (iv) executory contracts to be assumed and rejected under the Plan.  Accordingly, it is incumbent on the Debtor to provide, at a minimum, a summary of the content of the information expected to be included in the Plan Supplement or to make the Plan Supplement available to creditors and parties in interest in sufficient time to allow a meaningful review of the Plan Supplement information before ballots are required to be cast.

b.  <u>Rejection Damage Claims, Amount of Unsecured Claims and Homeowners' Claims</u>.  The Debtor discloses its estimate of unsecured claims against the estate at $2.5 million and states also that if certain executory contracts with Cloud Nine LC Management and CloudNine SL Development are rejected, additional unsecured claims in the amount of $1,160,000 will arise.  The Debtor should disclose, as discussed below, how those additional unsecured claims will impact the amount and timing of anticipated distributions to unsecured creditors who elect to accept payment in full over time.  The Debtor

6

further discloses that claims of owners in the amount of $39,053,465 have been asserted. The Debtor should also disclose the impact of those claims on the timing and amount of distributions to unsecured creditors' claims, if those homeowners' claims are not "expunged," but rather are "substantially reduced," as contemplated in the settlement with Jacobsen Construction.

c.  Partners' Plan Funder. The Debtor identifies the Plan Funder as Strategic Capital Partners, LLC ("SCP") which, the Debtor represents, will provide up to $8 million of equity capital to fund the Plan, in addition to assisting in selling remaining Fractional Units. The Disclosure Statement refers to a January 13, 2010 Letter of Intent with SCP, but provides no details as to the terms and conditions of the Letter of Intent. While the Debtor states that it anticipates definitive agreements being signed prior to the Disclosure Statement hearing and a more detailed description of those in the final Disclosure Statement, it is imperative that, before solicitation packets are sent, such information is, indeed, included. More important, one of the conditions precedent to confirmation of the Plan is SCP's willingness to commit to fund the Plan. The Disclosure Statement should state in clear and unambiguous terms how SCP will obtain the funds necessary to fund the Plan, describe any contingencies in its ability to do so, as well as identify factors, occurrences and issues which would preclude or discourage SCP from providing the anticipated funding under the Plan. Further, the Disclosure Statement should

7

920383.1

make clear the circumstances under which an additional $2 million will be contributed by SCP, how those funds will be utilized by the Reorganized Debtor, and whether any such contribution will be available to make Plan payments to creditors. These matters bear directly on the feasibility of the Plan.

d. <u>Reorganized Debtors' Ownership and Management</u>. The Debtor discloses that SCP will own 75% of the Reorganized Debtor, and "an entity to be formed in which William Shoaf will be a member and manager" will own the remaining 25%. The Disclosure Statement should provide additional information respecting Mr. Shoaf's anticipated 25% ownership including what cash or other contribution he or his entity is making to receive a 25% ownership of the Reorganized Debtor. Similarly, the terms and conditions under which Mr. Shoaf's management company will manage the Reorganized Debtor should be disclosed.

e. <u>Administrative Claims and Cure Claims</u>. The Disclosure Statement lacks and clear and definitive estimate of administrative claims and anticipated cure claims to be paid on the Effective Date. This important information, which bears on distributions to unsecured creditors, should be included in the Disclosure Statement in a clear and accessible statement.

f. <u>Distributions to Unsecured Creditors – Pro Formas</u>. For those unsecured

8

creditors who elect to accept payments in full over time, the Disclosure Statement provides that quarterly distributions will be made to those creditors out of "Excess Cash Flow." While the Disclosure Statement describes generally the types of expenses which must be paid by the Reorganized Debtor before it generates Excess Cash Flow, nowhere is there a clear itemization of anticipated *amounts* of expenses which must be paid before Excess Cash Flow will be generated on a quarterly basis. Certainly, this is significant information for any unsecured creditor in determining whether to accept or reject the Plan. A review of the Debtors' pro formas and projections in Exhibit 2 does not provide any more meaningful information on this point. The projections do not provide a clear description for unsecured creditors of exactly what cash is expected to be available for distribution *to unsecured creditors* in any given quarter. The Disclosure Statement should articulate the impact of an increase in unsecured claims, through rejection damage claims or otherwise, on the timing and amount of distributions to unsecured creditors. Moreover, the Disclosure Statement should state clearly and unambiguously that unsecured creditors who elect payment over time will *only* receive distributions if Excess Cash Flow is generated and that, based on the projections contained in Exhibit 2, the Debtor projects no Excess Cash Flow during the year 2010, and hence no payments to unsecured creditors. Finally, the Debtor should provide the underlying basis for its 5-year projections,

9

including its projections for Fractional Unit Sales.

g.  <u>Liquidation Analysis and Appraisal</u>.  In the portion of the Debtor's

Disclosure Statement describing the "Best Interests Test," the Debtor states

generally that it has obtained an appraisal from AGI, valuing the Property (as

defined in the Disclosure Statement) at $22 million.  While a copy of the

appraisal need not necessarily be attached, further detail respecting the basis,

assumptions and components of the appraisal should be included in the

Disclosure Statement because valuation of the Property appears to determine

the amount to be paid to Class 5 interest holders, and therefore to Class 4

creditors.

h.  <u>Cramdown</u>.  The Disclosure Statement accurately recites the components of

the "absolute priority rule" - - that a plan is "fair and equitable" as to a non-

consenting class of unsecured creditors only if the junior class of interests

receives no distribution on account of interests or each member of the

unsecured creditor class receives payment of the value of such holders'

allowed claim, as of the effective date of the plan.  However, the Disclosure

Statement curiously states that such rule "is not applicable to a nonprofit case

like this one."  Whether that statement is a typographical error or otherwise

unintended, the Disclosure Statement must state that the Plan, as presently

proposed by Partners, is *not* confirmable over the dissent of the class of

10

unsecured creditors because unsecured creditors are not receiving distributions in accordance with section 1129(b)(2)(B)(ii) while Class 5 interests are receiving payment for their equity (appraised value minus total claims) in Partners.  The Debtors' erroneous statement should be stricken and replaced with a correct statement.

      i.    <u>Dissolution of Creditors' Committee</u>.  The Disclosure Statement provides that under the Plan, the Creditors' Committee shall be dissolved, its members discharged, and its counsel's employment terminated as of the Effective Date. The Disclosure Statement should state, instead, that because there exists pending litigation commenced by the Committee against WestLB, which litigation may not be resolved by the Effective Date, the Committee shall continue, and its counsel's employment continued, until such time as the litigation between the Committee and WestLB is concluded.

WHEREFORE, the Committee respectfully requests this Court to deny approval of the Debtor's Disclosure Statement until it is modified to include "adequate information" consistent with the foregoing.

11

920383.1

DATED this 12th day of February, 2010.

> **JONES WALDO HOLBROOK & McDONOUGH, PC**
>
> By: /s/ Lon A. Jenkins
>   Jeffrey W. Shields
>   Lon A. Jenkins
>   Troy J. Aramburu

12

920383.1