Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com)
Steven B. Eichel (seichel@crowell.com)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Counsel for Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| EASY STREET HOLDING, LLC, *et. al.* ) | Bankruptcy Case No. 09-29905 |
| ) | Jointly Administered with Cases |
| Debtors ) | 09-29907 and 09-29908 |
| ) | |
| Address:    201 Heber Avenue ) | Chapter 11 |
| Park City, UT 84060 ) | |
| ) | Honorable R. Kimball Mosier |
| Tax ID Numbers: ) | |
| 35-2183713 (Easy Street Holding, LLC), ) | |
| 20-4502979 (Easy Street Partners, LLC), and ) | |
| 84-1685764 (Easy Street Mezzanine, LLC) ) | |
| ) | |

## RESPONSE TO OBJECTIONS TO APPROVAL OF DISCLOSURE STATEMENT
## FILED BY (I) BAYNORTH REALTY FUND VI, LP, (II) THE OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS, AND (III) WESTLB, AG

Easy Street Partners, LLC, the debtor and debtor in possession herein ("Partners" or the

"Debtor"), by its undersigned counsel, files this response (the "Response") to the objections filed

to the Debtor's disclosure statement (the "Disclosure Statement") by: (i) BayNorth Realty

Fund VI, LP  ("BayNorth"); (ii) the official committee of unsecured creditors (the "Committee");

and (iii) WestLB, AG ("WestLB").  BayNorth, the Committee and WestLB are hereafter

collectively referred to the "Objectors."

## BACKGROUND

1.      On September 14, 2009 (the "Petition Date"), Partners, Easy Street Mezzanine,

LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding") (collectively the "Debtors")

each filed a voluntary petition in this Court under Chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"), and they continue to operate their business and manage their

properties as debtors-in-possession.

2.      On October 2, 2009, the Office of the United States Trustee appointed the

Committee to serve in these cases pursuant to Bankruptcy Code §§ 1102 and 1103.

3.      The Debtors are limited liability companies and affiliates of one another.  Partners

owns real estate and improvements constituting The Sky Lodge in Park City, Utah.  Mezzanine

is the 100% owner and managing member of Partners.  Holding is the 100% owner and

managing member of Mezzanine.

4.      On January 15, 2010, Partners filed its plan of reorganization (the "Plan") and the

Disclosure Statement.

5.      On February 12, 2010, the Objectors filed their objections to the Disclosure

Statement.  In large part, the objections are either confirmation objections or negotiating ploys,

or are easily resolved by including some additional information to the Disclosure Statement.

6.      Simultaneously herewith, Partners is filing an amended plan ("Amended Plan") and

an amended disclosure statement (the "Amended Disclosure Statement"), which resolve those

objections filed by the Objectors which are not otherwise dealt with by this Response.

## BAYNORTH HAS NO STANDING TO OBJECT
## TO PARTNERS' DISCLOSURE STATEMENT

7.      As an initial matter, BayNorth's objections should be overruled in their entirety

because it lacks standing in Partners' bankruptcy case.

8.      Similar to other federal courts, bankruptcy courts are subject to the constitutional

constraints of standing.  For example, in *In re Rismat, Ltd.,* 193 B.R. 499, 501 (Bankr. N.D. Ind.

1996), the court noted: "[L]imits on standing are vital in bankruptcy, where the clouds of persons

indirectly affected by the acts and entitlements of others may buzz about, denying final

resolution of cases." (internal citations omitted)

9.      The burden of establishing standing rests on the party seeking to invoke the

court's jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

10.     With respect to objections to disclosure statements in bankruptcy, courts have

repeatedly held that only holders of impaired claims or interests have standing to object to the

adequacy of a disclosure statement and even then, only as it affects their class.  *See, e.g., In re*

*Middle Plantation of Williamsburg, Inc.,* 47 B.R. 884, 891 (E.D. Va. 1984) ("[h]olders of

impaired claims who have been induced to vote in favor of a plan are the only ones who may

raise the issue of adequacy of the Disclosure Statement"), aff'd 755 F.2d 928 (4th Cir. 1985);  *In*

*re Snyder*, 56 B.R. 1007, 1010-1011 (D. Ind. 1986) ("The onus is therefore on the creditors to

assure that the disclosure statement is satisfactory to them.  Other classes of creditors should

therefore have no concern over the adequacy of a statement that does not apply to them.

3

Traditional principles of standing also support the view that a class can complain about a disclosure statement only as it affects that class.").

11.     Additionally, the mere fact that a lender has loaned money in connection with a building or project does not confer standing upon it with respect to disputes concerning the property when there exists no debtor-creditor relationship between the debtor and the lender.  In *In re Comcoach Corp.,* 698 F.2d 571 (2d Cir. 1983), the Court held that a bank that loaned money in connection with, and held a mortgage on, real property, was not a party in interest and lacked standing to lift the automatic stay in connection with a bankruptcy petition filed by the property's only tenant.  In reaching this result, the court noted that only creditors were parties in interest that had standing to seek stay relief.  However, the bank was not a creditor of the tenant because there was no contractual relationship between the lender and the tenant.  The mere fact that the bank held the mortgage on the property and that the mortgage was in default did not grant the bank any rights against the debtor-tenant.

12.     The instant case is similar to *Comcoach* and the standing cases concerning disclosure statements.  BayNorth has no contractual relationship with Partners and is not a creditor of Partners, as evidenced by its failure to file a proof of claim in Partners' bankruptcy case.  As a result, it is not treated as a creditor of Partners under the Plan, and it will not receive any distribution of property under the Plan.

13.     BayNorth merely has a claim against Mezzanine.  BayNorth's status as a creditor of Mezzanine, the parent of Partners, does not confer standing upon BayNorth in Partners'

4

bankruptcy case.[1]  Accepting BayNorth's assertion of standing in this case would require the

Court to recognize the standing of any party who is a creditor of an equity security holder of a

debtor.  The concept of standing under the Bankruptcy Code was never intended to include

creditors of parent entities.

14.     Moreover, in structuring the BayNorth Loan, BayNorth was meticulous in

requiring the separate corporate identities of Mezzanine and Partners.  For example, § 2.4 of the

BayNorth Loan Agreement expressly required that Mezzanine be a "Single Purpose Entity"

whose sole business would be the ownership of the equity interests in Partners.  Now, as a matter

of convenience, BayNorth improperly seeks to ignore, or at least blur the line between the

separate identities of Partners and Mezzanine, by asserting that its status as a creditor of

Mezzanine grants them standing in Partners' bankruptcy case.  BayNorth's attempt to change the

rules of corporate separateness now, when gamesmanship calls, should not be countenanced by

the Court.

15.     BayNorth cannot vote on the Plan because it is not a creditor or an equity security

holder.  Thus, it does not need additional information in order to decide how it will vote upon the

Plan.  Consequently, the objection of BayNorth was not filed for the legitimate purpose of

assisting it in determining how to vote upon the Plan (because it cannot vote).  Accordingly,

---

[1] Notwithstanding that BayNorth is not an equity holder of Partners, on or about January 5, 2010,
BayNorth filed a proof of interest to preserve and protect any and all of the rights it has, or may be
deemed to have, in and to the equity in Partners and Mezzanine pursuant to the terms of the Pledge
Agreement.  Partners is not a party to the Pledge Agreement and the equity interests in Partners were not
pledged under the Pledge Agreement.  On January 5, 2010, Partners filed an objection to BayNorth's
proof of interest on the ground that BayNorth is not an equity interest holder of Partners.  [Dkt. No. 271]
A hearing has been set for March 11, 2010 on Partners' motion to expunge BayNorth's proof of interest.

BayNorth has no standing to object to the Disclosure Statement, and its objections should be overruled.

## COMMON OBJECTIONS FILED BY THE OBJECTORS

16.     The Objectors assert similar objections relating to the following categories; (i) the plan supplement (the "Plan Supplement"); (ii) the plan funder (the "Plan Funder") and funding of the Plan; (iii) ownership and management of the reorganized debtor ("Reorganized Debtor"); (iv) claims; and (v) Partners' liquidation analysis and appraisal.  Each of these common objections is discussed below.[2]

### A.     The Plan Supplement

17.     The Objectors object to the Debtor's filing a Plan Supplement on the earlier of: (a) 10 days prior to the hearing to confirm the Plan; and (b) two business days prior to the deadline to vote on, or object to, the Plan.  In response to this objection, Partners has filed the Amended Plan and Amended Disclosure Statement, which now provide that the Plan Supplement will be filed seven (7) days prior to the deadline to vote on the plan and/or object to confirmation.

18.     Moreover, contrary to BayNorth's allegations, it is not unusual for a plan supplement to contain information regarding (i) articles of organization; (ii) operating agreements; (iii) identifying members and offices of the reorganized debtors; and (iv) additional detail regarding the funding and structure of the reorganized entity in the Plan Supplement.

19.     Furthermore, the assertion that the information to be included in the Plan Supplement relates to feasibility is incorrect; however, even if it were correct, the objection

---

[2] Partners' response to the separate objections of WestLB, the Committee and BayNorth are discussed *infra* at pp. 9-19.

NYIWDMS: 11482091_7

would be a confirmation objection, rather than an objection to the adequacy of information in the

Disclosure Statement and is therefore premature. *See In re Camann*, 2000 Bankr. LEXIS 1804

(Bankr. D.N.H. 2000) ("The issue of feasibility is a matter for confirmation that need not be

addressed at this [disclosure statement] stage of the Debtor's Case.")

### B.    Plan Funder/Funding

20.    The Objectors assert that the Disclosure Statement fails to provide adequate

information regarding the Plan Funder, its ability to provide exit financing and the process by

which Partners selected the Plan Funder.  The Amended Disclosure Statement, at pp. 19-20,[3]

specifically details the terms of the funding agreement (the "Funding Agreement") with Strategic

Capital Partners, LLC ("SCP"), which is the Plan Funder.  Now that the terms have been

negotiated, which was not possible when the initial Disclosure Statement was filed and only a

letter of intent was executed, the terms of the Funding Agreement are set forth in the Amended

Disclosure Statement.  See Amended Disclosure Statement at pp. 19-20.

21.    WestLB asserts that the Disclosure Statement provides insufficient information

about the process by which Partners selected the Plan Funder.  The Amended Disclosure

Statement at page 14 reflects that pursuant to the Cash Collateral Stipulations and as a condition

to WestLB consenting to the use of Cash Collateral, Partners reviewed several candidates and

selected BDRC to co-manage The Sky Lodge.  As part of their co-management responsibility,

BDRC, Shoaf (on behalf of Partners) and Debtor's various counsel spoke to approximately 15

groups of potential investors. Confidentiality stipulations were sent to prospective purchasers and

---

[3] A marked comparison between the Disclosure Statement and the Amended Disclosure
Statement without exhibits is annexed hereto as Exhibit A.  All references to the Amended Disclosure
Statement herein refer to the attached Exhibit A.

NYIWDMS: 11482091_7

discussions ensued with different potential purchasers.  At the end of the day, the only purchaser

that was willing to pay WestLB in full pursuant to the terms of the Plan, and thus could

maximize the value to the Partners' estate was SCP; therefore SCP was chosen to be the Plan

Funder.  See Amended Disclosure Statement at pp. 19-20.

C.      **Ownership and Management**

22.     The Objectors assert that the Disclosure Statement does not identify management

of the Reorganized Debtor, its compensation and any transactions with insiders.  The Amended

Disclosure Statement now provides that the Plan Funder (or its affiliate) with its investors will

own 100% of the Reorganized Debtor.  The Plan Funder (or its affiliate) will be the initial

managing member of the Reorganized Debtor, and Steven Sandholtz will be its principal officer.

See Amended Disclosure Statement at pp. 19, 40.  Neither William Shoaf ("Shoaf") nor any

other insider or affiliate of Partners will own any interest in the Reorganized Debtor.

23.     Shoaf will be retained by the Reorganized Debtor and will enter into an

employment agreement which provides for: (i) compensation in the amount of $185,000 per year

for six years; and (ii) the right to receive an incentive bonus of 15% of the net profit from the

sale of The Sky Lodge commercial operation, provided that certain benchmarks are reached.  See

Amended Disclosure Statement at pp. 19-20.  Shoaf's employment agreement is not on an

account of any prior equity interest in or against Partners.

24.     The Amended Disclosure Statement further provides that Shoaf will be an

employee in a new management company that will manage The Sky Lodge.  Mr. Sandholtz, or

an entity designated by him, will be involved in the new management company.  See Amended

Disclosure Statement at p. 20.

8

25.     The information required pursuant to §§ 1129(a)(5)(A)(i) and 1129(a)(5)(B) will be provided in the Plan Supplement seven (7) days before the voting deadline, to the extent it is not included in the Amended Disclosure Statement.

### D.     Claims/Distribution to Creditors

26.     The Objectors assert that the Disclosure Statement fails to contain sufficient information regarding claims against Partners.  The Amended Disclosure Statement now provides the approximate amount of claims for each class of claims and the sources of cash available to pay the claims.  See Amended Disclosure Statement at pp. 19-20, 22-37.  The objection that the Plan is not feasible is, at best, premature because it is a confirmation objection rather than a disclosure objection.  Moreover, the Amended Disclosure Statement demonstrates that the Plan is confirmable.

27.     The Amended Plan and Amended Disclosure Statement now provide that the holders of Class 4 Claims that elect to be paid in full over time are receiving equal quarterly payments commencing on October 15, 2010 and continuing through July 15, 2013 and their distribution is no longer contingent upon excess cash flow.  See Amended Disclosure Statement at pp. 34-36.  If no unsecured creditor elects to take a discount on confirmation, the aggregate distribution will be approximately $820,000, which will be approximately $70,000 per quarter.  Thus, any uncertainty is resolved.  The cash flow exhibit annexed to the Disclosure Statement shows that there are sufficient funds to make the payments required under the Amended Plan.  Moreover, the Plan Funder will contribute an additional $2 million in capital which will be available to pay Class 4 Claims.  See Amended Disclosure Statement at pp. 19-20.

NYIWDMS: 11482091_7

28.     The Amended Plan and Amended Disclosure Statement also provide that the

Class 5 homeowner claims will be fully satisfied, released and discharged upon payment of the

$1,330,000 to Jacobsen on the Effective Date of the Amended Plan.  The Amended Plan and

Disclosure Statement also provide that the claim of CloudNine Resorts – Sky Lodge

Management, LLC and CloudNine Resorts – Sky Lodge Development, LLC are excluded from

the options under Class 4 and will be paid over a term not less than four years from the Effective

Date.  See Amended Disclosure Statement at pp. 34-37.  Thus, these claims do not impact the

timing or amount of distribution to the holders of the Class 4 General Unsecured Claims.

### E.      Liquidation Analysis and Appraisal

29.     Although the Objectors acknowledge that a copy of the appraisal need not be

attached, the Objectors seek further detail with respect to the basic assumptions and components

of the appraisal.  The Amended Disclosure Statement provides this additional detail relating to

the appraisal.  See Amended Disclosure Statement at pp. 51-52.

### RESPONSES TO WESTLB'S OBJECTIONS

30.     The objection filed by WestLB (the "WestLB Objection") is disingenuous, at

best, because since the beginning of this Chapter 11 case, WestLB has been receiving detailed

financial information and has been working closely with Partners and Gemstone on Partners'

business plan.  Specifically: (i) WestLB has received Partners' monthly operating results as

compared to budgets agreed to with Partners, has received Partners' business plans as well as

back-up documentation to all of Partners' projections, including the five year plan, and thus does

NYIWDMS: 11482091_7

not need any further information regarding same;[4] (ii) Gemstone, the advisor that WestLB

required Partners to retain as a condition for it to be able to use its cash collateral, has approved

of Partners' 2010 business plan; and (iii) there have been continuing negotiations between

Partners and WestLB with respect to the treatment of WestLB as well as the terms of the Plan.

Thus, it is incomprehensible how WestLB could lack adequate information concerning Partners

and the Plan.

      31.     Moreover, in its objection, WestLB asserts that it has already decided to vote

against the Plan.  Thus, by its own admission, WestLB does not need any additional information

in order to determine how to vote on the Plan.  WestLB's objection was obviously filed for

another, ulterior, purpose and should therefore be stricken in its entirety.

      32.     Moreover, many of WestLB's objections to the Disclosure Statement assert

challenges to the confirmability of the Plan.

      33.     Challenges to confirmation of the Plan should be determined on the basis of an

appropriate record at the confirmation hearing, following solicitation and tabulation of the votes

and in a context where evidence is presented in support of the Plan.  *In re Waterville Timeshare*

*Group*, 67 B.R. 412 (Bankr. D. N.H. 1986) (holding that a conflict regarding the wisdom of a

litigation compromise that was an integral part of the plan did not render the debtor's disclosure

statement inadequate); *In re Featherworks Corp., Inc.,* 45 B.R. 455 (Bankr. E.D.N.Y. 1984)

(determining feasibility of the plan at the disclosure statement hearing is premature).

      34.     In *In re Waterville Timeshare Group*, 67 B.R. 412, the court recognizing the

inherent limitations of a disclosure statement hearing stated:

---

    [4]  WestLB has received all of the back up data to both the 2010 and five year business plan, and
has been provided the formulas (which are proprietary in nature) utilized in deriving same.

NYIWDMS: 11482091_7

> [A]pproval of a disclosure statement is an interlocutory action in the
> progress of a chapter 11 reorganization effort leading to a confirmation
> hearing at which all parties have ample opportunity to object to
> confirmation of the plan.

*Id.* at 413.

35.     Moreover, the court observed that Bankruptcy Code § 1125(a) excludes from a

disclosure statement hearing those strategic objections "designed to delay and hobble the efforts

of the [plan proponent] to put a plan before the court."  *Id.* at 414.

36.     The hearing on the adequacy of a disclosure statement should not be seized upon

by creditors to address the confirmability of a chapter 11 plan.  As one court stated, "[i]f

creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate

information, issues respecting the plan's confirmability will await the hearing on confirmation."

In *In re Matter of Featherworks Corp.*, the court approved the adequacy of an amended

disclosure statement filed in connection with a plan that almost exactly mirrored a previously

rejected plan.  *Id.* at 457.  In approving the adequacy of the disclosure statement the court held

that:

> [I]t is too early before the hearing on confirmation to conclude that the
> present plan cannot be confirmed.  That determination must await
> examination of the evidence offered at the hearing on confirmation.

45 B.R. (emphasis added).

37.     Many of WestLB's objections are confirmation, not disclosure statement, issues.

Objections to confirmation may only be raised at a disclosure statement hearing when the

proposed chapter 11 plan is "so fatally flawed that confirmation [is] impossible." *In re U.S.

Brass Corp.*, 194 B.R. 420, 428 (Bankr. E.D. Tex. 1996) (approving disclosure statements for

competing plans over objections that plan was "nonconfirmable on its face" where disclosures

12

were found to be sufficient).  Here, there can be no legitimate assertion that the Plan is

"nonconfirmable on its face."

38.     WestLB also raises informational objections concerning feasibility, risks to

creditors regarding exit financing, post-confirmation business plan and projections, purported

disagreements with statements in the Disclosure Statement, WestLB's vote under the Plan, the

BayNorth Litigation and the impact of confirmation of the Plan on Mezzanine and Holding's

bankruptcy cases.  Each of these objections is discussed below.

39.     Feasibility.  The WestLB Objection asserts that the Disclosure Statement provides

inadequate information regarding whether the proposed Plan meets the feasibility standard set

forth in § 1129(a)(11).  Notwithstanding that the objection is a confirmation objection and is

premature and thus should be overruled, the Amended Disclosure Statement provides additional

information regarding the claims, the Plan Funder and the proposed funding of the Plan,

including that the Plan Funder and its investors will fund approximately $6 million on the

Effective Date.  See Amended Disclosure Statement at pp. 19-20, 40, 51. Thus, the Disclosure

Statement contains adequate information on these points.

40.     Risks to Creditors Regarding Exit Financing.  WestLB asserts that there is

insufficient disclosure as to the risks to creditors if the exit funding should not materialize or if

there is insufficient money to fund Partner's obligations.  Although the Disclosure Statement

discusses the risks associated with exit financing, the Amended Disclosure Statement provides

that: (i) the current Plan is dependent upon the Plan Funder providing $6-6.5 million of equity

capital infusion sufficient to fund the Plan and pay Partners' obligations under the Plan; and

(ii) without the Plan Funder or if the total claims exceed $6.5 million, the terms of the existing

Plan would need to be modified under § 1127 of the Bankruptcy Code.  See Amended Disclosure

Statement at p. 61.

41.    Post-Confirmation Business Plan and Projections.  WestLB complains of a lack of

discussion of Partners' business plan; yet WestLB has received substantial financial information

from Partners, including a copy of its business plan.  WestLB has received monthly reports of

operations as compared to budget, monthly management reports and has continuously requested

and received detailed financial information in connection with Debtor's request for funding

under the Cash Collateral Stipulation.  Moreover, Gemstone, which WestLB required Partners to

retain as a condition of using WestLB's cash collateral, reviewed and approved the 2010

business plan.  There are some minor disagreements on the five year business plan; however

disagreement is not an objection to the Disclosure Statement.

42.    WestLB asserts that Partners' projections are speculative and that it has not

explained why: (a) its projections differ from actual historical performance; and (b) increased

performance is reasonable or attainable.  Partners believes that its projections are reasonable and

will provide evidence with respect to those projections at confirmation.  Moreover, as set forth

on pp. 51-52 of the Amended Disclosure Statement, the projections were done in connection

with AGI and its appraisal of the property.  WestLB ignores the fact that The Sky Lodge opened

for business in the middle of the worst recession in generations and people were saving money

rather than purchasing luxury items, such as interests in a boutique hotel.

43.    Purported Disagreements with Statements in Disclosure Statement.  WestLB

asserts that certain statements in the Disclosure Statement are not accurate and may mislead

creditors with respect to the viability of the adversary proceeding against it and may impact

NYIWDMS: 11482091_7

creditors' decisions whether to accept or reject the Plan.  As the Court is aware, Partners is in

litigation with BayNorth and the Committee has commenced a lawsuit against WestLB.  The

Amended Disclosure Statement is not the document to admit or deny allegations contained in

lawsuits.  Nevertheless, the Amended Disclosure Statement now expressly provides that WestLB

disagrees with certain of the factual statements made by Partners with respect to the filing of the

bankruptcy cases.  See Amended Disclosure Statement at p. 8, fn 5.

44.    WestLB's Vote.  WestLB contends that the Disclosure Statement contains

inadequate information because it fails to disclose that WestLB is not expected to accept the Plan

as currently formulated.  Whether or not WestLB intends to vote on the Plan is not an event that

needs to be disclosed in the Disclosure Statement.  If WestLB votes against the Plan, Partners

intends on cramming-down WestLB to confirm its Amended Plan.

45.    BayNorth Litigation. WestLB contends that the Disclosure Statement should

discuss:  (i) who will control the BayNorth litigation post-confirmation; (ii) how the litigation

will be funded; (iii) how the litigation proceeds will be used; and (iv) the consequences to the

Reorganized Debtor and the creditors not yet paid in full if BayNorth prevails in the litigation.

46.    The Amended Disclosure Statement provides that the Reorganized Debtor will

prosecute the litigation funded from the Mezzanine Escrow and, if successful, any net recovery

received shall be paid 70% to WestLB, amortizing its outstanding indebtedness, and 30% to the

Reorganized Debtor. The description of the distribution of proceeds is contained in the Amended

Plan and Amended Disclosure Statement.  There is no impact on Partners' creditors if BayNorth

is successful because BayNorth will only be entitled to the remaining assets in the Mezzanine

Escrow, after taking into consideration the expenses used to fund the BayNorth litigation.  <u>See</u>

Amended Disclosure Statement at pp. 27-28, 37-38.

47.     <u>Impact of Confirmation on Mezzanine and Holding.</u>  Finally, WestLB asserts that

the Disclosure Statement should disclose the impact of confirmation of the Plan on Mezzanine

and Holding, including a discussion of: (i) intercompany claims and any *de facto* releases (such

as the cancellation of guarantees); (ii) the amount to be placed in the Mezzanine Escrow;

(iii) who will appraise the assets in connection with determining the funds to be placed in the

Mezzanine Escrow; (iv) the claims to be considered in determining the amount of the escrow,

and (v) why there is no mechanism through which the value devolved to equity under the plan

could be made available to creditors if Partners' projections fail.

48.     This objection is another example of WestLB's gamesmanship.  <u>WestLB does not

hold any claim against either Mezzanine or Holding</u>.  Thus, WestLB has no legitimate interest in

the impact of the Plan on Mezzanine or Holding.  WestLB's objection on this point is interposed

as an interloper trying to obfuscate issues in this case in an attempt to delay a hearing on

confirmation of the Plan.

49.     Regardless as to lack of legitimacy of WestLB's objection, Partners is not aware

of any intercompany claims and thus there is nothing to disclose.  All claims against Partners are

disclosed.  With respect to the Mezzanine Escrow, § 1.35 of the Plan provides how the escrow is

calculated, and the court will determine the amount of the money that should be placed in escrow

(including determining the appraised value of the assets and the claims to be considered in

calculating the amount of the escrow).  Finally, the escrow, which is provided by the Plan

Funder, is not subject to WestLB's security interest.  WestLB is fully secured by the Debtors'

16

property, Jacobsen will be paid on the effective date and the unsecured creditors will either be

paid a discounted amount on the effective date or in full over time.  The Amended Disclosure

Statement now provides that the Mezzanine Escrow will not be distributed until the holder of

Class 4 general unsecured claims are paid in full.  See Amended Disclosure Statement at

pp. 37-38, 40.

**RESPONSE TO COMMITTEES' SEPARATE
OBJECTIONS TO DISCLOSURE STATEMENT**

50.    The Committee also asserts that the Disclosure Statement contains several

additional deficiencies concerning administrative and cure claims, cramdown and dissolution of

the Committee.  Each of these objections is discussed below.

51.    Administrative and Cure Claims.  The Committee asserts that the Disclosure

Statement lacks information as to the amount of administrative claims and cure claims to be paid

on the Effective Date.  The Amended Disclosure Statement provides that the estimated accrued

and allowed administrative claims will aggregate approximately $750,000 on the Effective Date.

See Amended Disclosure Statement at p. 22.  Partners does not believe that there are any cure

claims to be paid on the Effective Date.  The lease for the restaurant Zoom and a few minor

leases are the only leases being assumed under the Amended Plan.  There are no cure claims

associated with the assumption of that lease, and Partners believes that the cure claims for such

other, minor leases will be zero.

52.    Cramdown.  The Committee asserts that the Disclosure Statement must contain a

statement that the plan is not confirmable over the dissent of the unsecured creditors because

unsecured creditors are not receiving distributions in accordance with § 1129(b)(2)(B)(ii) while

Class 5 interests are receiving payment on account of equity (appraised value minus total

17

claims).  Under the Amended Plan, the Mezzanine Escrow will be posted with the Disbursing

Agent and utilized to fund the BayNorth Adversary Proceeding.  Any funds remaining upon

resolution of the BayNorth Adversary Proceeding shall not be disbursed until holders of Allowed

General Unsecured Claims of Partners have either received the discounted amount under the

Plan or payment in full on account of their claims, depending on their elected treatment.

See Amended Disclosure Statement at pp. 37-38.  Thus, equity will not receive any payment

before all the unsecured creditors are paid on account of their claims.

53.     Dissolution of Committee.  The Committee raised an issue as to its continuing

role in the bankruptcy case post-confirmation.  The Amended Plan and Amended Disclosure

Statement provide that the Committee shall be dissolved as of the Effective Date, except for:

(i) reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to fee

applications and (ii) prosecuting the WestLB Adversary Proceeding.  See Amended Disclosure

Statement at p. 46.

## RESPONSE TO BAYNORTH'S SEPARATE OBJECTIONS

54.     Even if BayNorth had standing to object to the Debtor's Disclosure Statement --

which it does not -- its objections should be overruled.

55.     Valuation.  Although the Objectors concede that a court may approve a disclosure

statement without a valuation of the debtor or an appraisal of the assets, the Objectors seek

additional information regarding the $22 million valuation of Partners set forth in the Disclosure

Statement.  The Amended Disclosure Statement adds additional information regarding the

$22 million valuation, including certain of AGI's assumptions and methodology.  See Amended

Disclosure Statement at pp. 51-52.

18

56.    <u>Additional Allegations</u>.  BayNorth also asserts that the Disclosure Statement is deficient because: (i) there are contingencies that if not satisfied may make the Plan unconfirmable; (ii) it contains unknowns regarding the exit strategy for Mezzanine and Holding; and (iii) it does not explain the details as to how distributions from the Mezzanine Escrow account will be made for Mezzanine creditors.

57.    BayNorth's objection that there is a contingency based on the requirement that Partners, WestLB and the Plan Funder must agree on the terms of the modified loan documents is moot because the Amended Plan provides that the Court can approve the terms of the modified loan documents.  <u>See</u> Amended Disclosure Statement at p. 24.

58.    The other purported contingencies – the sale of the premises underlying Zoom restaurant and recovery from litigation with BayNorth – are not contingencies that impact confirmation because the Plan Funder and Sales Proceeds Escrow Account will provide sufficient funds to allow Partners to emerge from bankruptcy and pay all the Allowed Claims filed against Partners regardless of a sale of Zoom or the outcome of the BayNorth Litigation. Furthermore, a description of the sources and uses of cash is now included in the Amended Disclosure Statement.  <u>See</u> Amended Disclosure Statement at pp. 19-20.

59.    The BayNorth Objection incorrectly asserts that the Disclosure Statement is deficient because there are unknowns regarding the exit strategy for Mezzanine and Holdings and there is no explanation as to how distribution from the Mezzanine escrow accounts will be made for Mezzanine creditors.  The Plan is a stand alone plan for Partners only.  Thus, the exit strategy for Mezzanine and Holdings is not relevant to Partners' Amended Plan.

NYIWDMS: 11482091_7

60.     Finally, § 1.35 of the Amended Plan defines the term "Mezzanine Escrow" and explains that it represents the amount of money held by the Disbursing Agent for distribution pursuant to a plan of reorganization or liquidation filed by Mezzanine subsequent to the confirmation date or as otherwise ordered by the Bankruptcy Court.  The Amended Plan and Disclosure Statement provides that the Mezzanine Escrow will be utilized to fund the BayNorth Adversary Proceeding and no distribution will be made to holders of Class 6 from the Mezzanine Escrow until holders of Allowed Class 4 General Unsecured Claims of Partners have either received the discounted amount under the Plan or payment in full, depending on their elected treatment.  See Amended Disclosure Statement at 37-38, 40.

61.     The Debtor submits that the Disclosure Statement contains adequate information within the meaning of § 1125 of the Bankruptcy Code and should be approved.

WHEREFORE, the Debtor respectfully requests entry of an order:  (a) overruling the Objections; (b) approving the Disclosure Statement; and (c) granting such other and further relief as is just and appropriate under the circumstances.

DATED this 17th day of February, 2010.

DURHAM JONES & PINEGAR, P.C.

By:   /s/  Kenneth L. Cannon II
     Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
     Steven J. McCardell (smccardell@djplaw.com)(2144)
     DURHAM JONES & PINEGAR, P.C.
     111 East Broadway, Suite 900
     P.O. Box 4050
     Salt Lake City, UT  84110-4050
     Telephone:  (801) 415-3000/Fax:  (801) 415-3500

     and

NYIWDMS: 11482091_7

Michael V. Blumenthal (mblumenthal@crowell.com)
Steven B. Eichel (seichel@crowell.com)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Counsel for Debtors and Debtors in Possession

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Response to Objections to Approval of Disclosure Statement Filed by (i) BayNorth Realty Fund VI, LP, (ii) The Official Committee of Unsecured Creditors, and (iii) WestLB, AG was served via electronic mail this 17th day of February, 2010, on the following parties and on all creditors and parties-in-interest who are included in the Bankruptcy Court's ECF e-mail notification system.

John T. Morgan tr
john.t.morgan@usdoj.gov

Adelaide Maudsley
maudsley@chapman.com

Brian W. Harvey
bharvey@goodwinprocter.com

Jeffrey Weston Shields
jshields@joneswaldo.com

Lon A. Jenkins
lajenkins@joneswaldo.com

Annette W. Jarvis
jarvis.annette@dorsey.com

Richard W. Havel, Esq.
rhavel@sidley.com

Michael R. Johnson
mjohnson@rqn.com

   /s/  Kristin Hughes

NYIWDMS: 11482091_7

# EXHIBIT A

NYIWDMS: 11482091_7

Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com) (admitted *pro hac vice*)
Steven B. Eichel (seichel@crowell.com) (admitted *pro hac vice*)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Counsel for Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EASY STREET HOLDING, LLC, *et. al*. | ) | Bankruptcy Case No. 09-29905 |
| | ) | Jointly Administered with Cases |
| Debtors | ) | 09-29907 and 09-29908 |
| | ) | |
| Address:   201 Heber Avenue | ) | Chapter 11 |
|                   Park City, UT 84060 | ) | |
| | ) | Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) | |
| 35-2183713 (Easy Street Holding, LLC), | ) | |
| 20-4502979 (Easy Street Partners, LLC), and | ) | |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) | |
| | ) | |

**AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO AMENDED PLAN OF REORGANIZATION OF EASY
STREET PARTNERS, LLC DATED ~~JANUARY 15,~~ FEBRUARY 17, 2010**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A
DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

    A.      Narrative Summary of the Debtors' Plans of Reorganization........................... 1

    B.      Purpose, Limitations and Structure of this Disclosure Statement .................... 2

    C.      Voting on the Plan ......................................................................................... 4

        1.      Classes Entitled to Vote....................................................................... 4

        2.      Tabulation of Votes ............................................................................. 5

        3.      Voting Instructions .............................................................................. 5

    D.      Confirmation Hearing .................................................................................... 6

II.     GENERAL INFORMATION ABOUT THE DEBTORS.................................... 6

    A.      Description and History of Debtors' Business ................................................ 6

        1.      Background........................................................................................... 6

        2.      Relationship of Partners to the Other Debtors ...................................... 7

    B.      The Prepetition Debt ..................................................................................... 7

        1.      ~~West LB~~WestLB Senior Loan ....................................................... 7

        2.      BayNorth Mezzanine Loan.................................................................... 8

        3.      Conversion (Extension) of the WestLB Senior Loan ......................... ~~9~~8

        4.      Jacobsen .............................................................................................. 9

        5.      Other Indebtedness .............................................................................. 9

    C.      Events Leading to Commencement of Chapter 11 Cases............................... 10

III.    THE DEBTORS' CHAPTER 11 CASES........................................................... 11

    A.      Filing and First Day Orders .......................................................................... 11

        1.      Certain First Day Orders ...................................................................... 11

        2.      Retention of Debtors' Professionals ..................................................... 11

    B.      The Creditors' Committee ............................................................................. 11

        1.      Appointment of the Creditors' Committee............................................ 11

        2.      Creditors' Committee's Professionals ................................................... 12

    C.      Use of Cash Collateral .................................................................................. 12

    D.      Extensions of Exclusivity ............................................................................. 13

    E.      Appointment of the Debtors' Professionals ................................................... 13

1. Initial Applications and Retentions.................................................................13

2. Retention of Wrona Law Offices, P.C..........................................................~~14~~13

3. Retention of BDRC 4 Site, LLC ...................................................................14

4. Retention of Gemstone Hotels and Resorts, LLC ........................................~~15~~14

5. Retention of Corbin Gordon ..........................................................................15

6. Retention of Appraisal Group, Inc. ...............................................................15

F. The Debtors' Operating Performance During the Chapter 11 Cases...................15

~~G.   BAYNORTH LITIGATION~~...........................................................................~~16~~

~~H.   THE MASSACHUSETTS ACTION AND THE § 105 ADVERSARY PROCEEDING~~............~~16~~

~~I.   THE COMMITTEE LITIGATION AGAINST WESTLB, AG~~ ...........................................~~17~~

~~J.   JACOBSEN LITIGATION~~.............................................................................~~17~~

G.   BayNorth Litigation ............................................................................15

H.   The Massachusetts Action and the § 105 Adversary Proceeding ...........16

I.   The Committee Litigation Against WestLB, AG................................17

J.   Jacobsen Litigation ............................................................................17

K. Schedules, Bar Date and Summary of Claims ...................................................18

1. Schedules and Statements ..............................................................................18

2. Bar Date ..........................................................................................................18

3. Summary of Claims ........................................................................................18

L. Partners' Plan Funder .........................................................................................~~19~~18

IV.   THE PLAN ...............................................................................................................~~19~~20

A. Classification and Treatment of Claims and Interests ......................................~~20~~21

B. Tabular Summary of Treatment Including, When Applicable, Classification under
the Plan ...............................................................................................................~~20~~21

C. Methods of Distributions Under the Plan .........................................................~~33~~35

1. Distributions of Cash .....................................................................................~~33~~35

2. Distributions Free and Clear ..........................................................................~~33~~35

3. Timing of Distributions ..................................................................................~~34~~35

4. Delivery of Distributions ...............................................................................~~34~~35

5. Distributions to Holders as of Record Date ...................................................~~34~~35

6. Undeliverable and Unclaimed Distributions ..................................................~~34~~36

7. Setoffs .............................................................................................................~~35~~36

D. Implementation of the Plan ...............................................................................~~35~~36

NYIWDMS: 11417167_19

1. Reorganized Debtor ..................................................................................... 3536

2. Exit Funding ............................................................................................... 3537

3. Early Payment ............................................................................................. 3637

4. Mezzanine Escrow ...................................................................................... 37

E. Executory Contracts and Unexpired Leases .................................................... 3637

1. Rejected Contracts and Leases .................................................................... 3637

2. Rejection Damages Bar Date ....................................................................... 3738

3. Assumed Contracts and Leases .................................................................... 3738

4. Payments Related to Assumption of Executory Contracts and Unexpired Leases ........ 3739

5. Proposed Assumption and Rejections ........................................................... 39

F. Provisions for Treatment of Disputed Claims .................................................... 3839

1. Disputed Claims ......................................................................................... 39

2. Resolution of Disputed Claims .................................................................... 3840

2. Other Provisions Relating to Disputed Claims ................................................ 38

G. Summary of Other Provisions of the Plan ....................................................... 3940

1. Releases and Exculpations .......................................................................... 3941

2. Injunction .................................................................................................. 4041

3. Modification of the Plan .............................................................................. 4042

4. Withdrawal or Revocation of the Plan ......................................................... 4042

5. Effectuating Documents and Further Transactions ......................................... 4042

6. Section 1146 Exemption .............................................................................. 4042

7. Dissolution of the Creditors' Committee ....................................................... 4142

8. Severability ................................................................................................ 4143

9. Governing Law ........................................................................................... 4143

10. Binding Effect ............................................................................................ 4143

11. Payment of Statutory Fees ........................................................................... 4243

12. Discharge ................................................................................................... 4244

13. Retention of Causes of Action/Reservation of Rights ...................................... 4244

14. Section 506(c) Reservation .......................................................................... 4244

15. Plan Supplement ......................................................................................... 4244

16. Injunction .................................................................................................. 4244

V. CONFIRMATION AND CONSUMMATION PROCEDURE ...................................... 4345

NYIWDMS: 11417167_19

A.   Voting Procedures and Solicitation of Votes ..................................................... ~~43~~45

B.   The Confirmation Hearing ................................................................................. ~~43~~45

C.   Confirmation ..................................................................................................... ~~44~~46

    1.   Acceptance ................................................................................................. ~~45~~47

    2.   Feasibility ................................................................................................... ~~45~~47

    3.   Best Interests Test ..................................................................................... ~~46~~48

    4.   Cramdown .................................................................................................. ~~47~~49

D.   Conditions Precedent ........................................................................................ ~~48~~50

VI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................... ~~49~~51

A.   Consequences to Partners ................................................................................. ~~50~~52

    1.   Partnership ................................................................................................. ~~50~~52

    2.   Cancellation of Indebtedness Income ........................................................ ~~50~~52

B.   Consequences to the Holders of Certain Claims and Interests .......................... ~~51~~53

    1.   Holders of Allowed Class 1 Secured Claims ................................................ ~~51~~53

    2.   Holders of Allowed Class 2 Secured Claim ................................................. ~~52~~54

    3.   Holders of Allowed Class 4 General Unsecured Claims .............................. ~~52~~55

    4.   Holders of Allowed Class 5 Claims ..............................................................55

    5.   Holders of Interests in Partners ................................................................. ~~53~~55

C.   Accrued but Unpaid Interest ............................................................................. ~~53~~56

D.   Information Reporting and Withholding ............................................................ ~~53~~56

VII.   RISK FACTORS ....................................................................................................... ~~54~~56

A.   Certain Bankruptcy Considerations ................................................................... ~~54~~57

B.   Material United States Federal Income Tax Considerations .............................. ~~54~~57

C.   Risks Associated with the Exit Funding ............................................................. ~~55~~57

VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............ ~~55~~57

A.   Liquidation Under Chapter 7 ............................................................................. ~~55~~58

B.   Alternative Chapter 11 Plan ...............................................................................58

IX.   CONCLUSION AND RECOMMENDATION ................................................................ ~~56~~58

iv

THIS AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR EASY STREET PARTNERS, LLC, DATED JANUARY 15, FEBRUARY 17, 2010 (THE "PLAN").  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ ALL OF THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  A COPY OF THE PLAN IS ANNEXED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT (AS DEFINED BELOW).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, PARTNERS IN THIS CASE.

## I.      INTRODUCTION

### A.      Narrative Summary of the Debtors' Plans of Reorganization

Easy Street Partners, LLC ("Partners"), Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding"), debtors and debtors in possession in the above captioned cases (collectively, the "Debtors"), filed petitions under Chapter 11 of the Bankruptcy Code on

September 14, 2009 (the "Petition Date").  Partners submits this Disclosure Statement pursuant
to section 1125 of the Bankruptcy Code to holders of Claims against Partners, and to Mezzanine
as the holder of interests in Partners.  Partners has prepared this Disclosure Statement to be able
to solicit votes with respect to the amended chapter 11 plan of reorganization of Partners (the
"Plan")[1], filed with the United States Bankruptcy Court for the District of Utah, Central Division
(the "Bankruptcy Court") on January 15,February 17, 2010.

Generally, the Plan provides for the reorganization of Partners and its successful
emergence from chapter 11 in these jointly-administered cases.  It does not provide for
substantive consolidation of the Debtors' estates.  The Plan provides creditors with several
payment options, including for the payment in full over time of all allowed claims against
Partners.

### B.    Purpose, Limitations and Structure of this Disclosure Statement

The purpose of this Disclosure Statement is to provide the holders of Claims and Interest
with adequate information to make an informed decision as to whether to accept or reject the
Plan.  This Disclosure Statement may not be relied upon for any other purpose, and nothing
contained in this Disclosure Statement shall constitute an admission of any fact or liability by
any party, or be admissible in any other case or any bankruptcy or non-bankruptcy proceeding
involving any of the Debtors or any other party, or be deemed conclusive advice on the tax or
other legal effects of the Plan.

On February __, 2010, after notice and a hearing, the Bankruptcy Court issued an order
(the "Disclosure Statement Order") approving this Disclosure Statement as containing adequate
information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical
of Partners' creditors to make an informed judgment whether to accept or reject the Plan.
APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A
DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS
OF THE PLAN.

The statements contained in this Disclosure Statement generally are made as of the date
hereof, unless another time is specified, and delivery of this Disclosure Statement after that date
does not mean that the information set forth in this Disclosure Statement remains unchanged
since the date of this Disclosure Statement or the date of the materials relied upon in preparation
of this Disclosure Statement.  Partners has prepared the information contained in this Disclosure
Statement in good faith, based upon the information available to it.  No audit of the financial
information contained in this Disclosure Statement has been conducted.  Moreover, certain of the
statements contained in this Disclosure Statement, by their nature, are forward-looking and
contain estimates, assumptions and projections, and there can be no assurance that these forward-
looking statements will turn out to be true.

The description of the Plan contained in this Disclosure Statement is intended as a
summary only and is qualified in its entirety by reference to the Plan itself.  If any inconsistency

---

[1] Unless otherwise defined, all capitalized terms contained in this disclosure statement shall have
the meanings ascribed to them in the Plan.

2

NYIWDMS: 11417167_19

exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. The Plan is a legally binding agreement and should be read in its entirety. No one should rely on a summary of the Plan in determining whether to accept or reject the Plan. Each holder of an impaired Claim or Interest should read, consider and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.

The Disclosure Statement describes:

- background information on Partners, its prepetition businesses and finances, and the events leading to these cases (Section II);

- significant developments during these cases (Section III);

- Partners' proposed Plan (Section IV);

- the procedures and requirements for confirming the Plan (Section V);

- certain federal income tax consequences of the Plan (Section VI);

- certain risk factors to consider before voting on the Plan (Section VII);

- alternatives to confirmation and consummation of the Plan (Section VIII); and

- Partners' recommendation that holders of impaired Claims and Interests vote to accept the Plan (Section IX).

In addition, attached as Exhibits 1 and 2 to this Disclosure Statement are copies of the following documents:

Exhibit "1"   The Plan

Exhibit "2"   Partners' Projected Financial Information

All of the exhibits listed should be attached to this Disclosure Statement and should have been served on you with this Disclosure Statement. In addition, there are certain documents and other materials identified in this Disclosure Statement and/or the Plan that are not attached to the Disclosure Statement or the Plan. These documents or other materials will be contained in a supplement (the "Plan Supplement. The Plan Supplement"), which will be filed with the Bankruptcy Court on the earlier of (a) ten (10) days prior to the hearing to confirm the Plan and (b) two business seven (7) days prior to the deadline to vote on or object to the Plan. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. If any of the exhibits identified above were not attached to the Disclosure Statement served on you, or if you want to obtain a copy of the Plan Supplement, once filed, you may do so by sending a written request to the Debtors' counsel at the following address:

Steven B. Eichel, Esq.
Crowell & Moring LLP
590 Madison Avenue, 20th Fl.
New York, New York 10022
(212) 803-4019

3

> Attorneys for the Debtors and
> Debtors in Possession

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorney listed above by mail or by phone.

### C.     Voting on the Plan

The Disclosure Statement Order ~~(as defined below)~~ also approved procedures governing the solicitation of votes on the Plan by holders of Claims against Partners, and Interest in Partners.[2]

### 1.     Classes Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests that are members of a Class that is (a) impaired under section 1124 of the Bankruptcy Code (an "Impaired Class") and (b) not deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject the Plan.  Classes of Claims or Interests that are unimpaired under section 1124 of the Bankruptcy Code are deemed to have accepted the Plan and are not entitled to vote.  Classes of Claims or Interests in which the holders of Claims or Interests will receive no recovery under the Plan are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Under the Plan, Classes 1, 2, 4 and ~~5~~6 are impaired and, to the extent Claims and Interests in those Classes are Allowed, the holders of those Claims or Interests will receive distributions under the Plan.  As a result, holders of Claims or Interests in those Classes are entitled to vote to accept or reject the Plan.  In contrast, ~~Class~~Classes 3 and 5 of the Plan is unimpaired.  Consequently, holders of Claims in that Class are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Only holders of record of Claims or Interests as of February __, 2010, the date of the ~~entry of the order approving this Disclosure Statement (the "~~Disclosure Statement Order~~")~~, that otherwise are entitled to vote under the Plan, will receive a Ballot and may vote on the Plan.  A Ballot accompanies this Disclosure Statement for your use in voting on the Plan.

A Ballot which may be used to vote for the acceptance or rejection of the Plan has been sent to the holders of Claims and Interest that are entitled to vote to accept or reject the Plan with this Disclosure Statement.

If you are a holder of a Claim or Interest entitled to vote on the Plan and you did not receive a Ballot with this Disclosure Statement, you received a damaged Ballot or lost your Ballot, or you have any questions concerning the Disclosure Statement, the Plan or the

---

[2] From this point forward in the Disclosure Statement, the phrase "holders of Claims" or "Allowed Claims" shall refer to holder of Claims or Allowed Claims against Partners.  The phrase "holders of Interest," however, shall mean only the holder of the Interest in Partners.

4

procedures for voting on the Plan, please contact Steven B. Eichel, Esq., Crowell & Moring LLP, 590 Madison Avenue, New York, New York 10022, telephone number: (212) 803-4019.

### 2.    Tabulation of Votes

Pursuant to the Bankruptcy Code, a class of claims will be deemed to have accepted a plan of reorganization if, of the class members that actually vote on the plan, at least two-thirds in amount, and more than one-half in number, vote to accept it.  Thus, Classes 1, 2 and 4 will be deemed to have accepted the Plan if the members of each Class that vote to accept the Plan hold more than one-half of the total number, and more than two-thirds of the total dollar amount, of all Claims in that Class for which a Ballot was properly submitted.  A class of interests will be deemed to have accepted a plan of reorganization if, of the class members that actually vote on the plan, at least two-thirds in amount voted to accept it.  Thus, Class 56 will be deemed to have accepted the Plan if its sole member votes to accept the Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code or in accordance with the Disclosure Statement Order.  If a holder of a Claim or Interest does not properly submit a Ballot, or that holder's vote is disregarded in accordance with the previous sentence, the number and amount of that holder's Claim or Interest will not be included in deciding whether Class members voted to accept or reject the Plan.  See Section V for a more detailed description of the requirements for confirmation of the Plan.

If one or more of the Classes of Claims or Interest entitled to vote on the Plan rejects the Plan, Partners reserves the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, without further notice to you.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or interests.  Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  Holders of Claims and Interest should assume that, if one or more of the Classes of Claims or Interest entitled to vote on the Plan reject the Plan, the Partners will amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, at the currently scheduled Confirmation Hearing.  Any such amendment could include cancellation of the Interest.  See Section V for a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes.

### 3.    Voting Instructions

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. If you hold a Claims or Interest in more than one Class and you are entitled to vote a Claim and Interest in more than one Class, you will receive separate Ballots for each Claim or Interest, which must be used for each separate Class of Claims and Interests.  Please refer to the Disclosure Statement Order, which is enclosed with this Disclosure Statement if you are entitled to vote, for more specific instructions on voting on the Plan.

Please vote and return your Ballot(s) to:

NYIWDMS: 11417167_19

**MICHAEL V. BLUMENTHAL, ESQ.**
**CROWELL & MORING LLP**
**590 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**

Furthermore, if you have any questions about the packet of materials that you have received, you may contact the attorney listed above by mail or by phone.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M., MOUNTAIN TIME, ON MARCH __, 2010.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN, SHALL BE DEEMED TO ACCEPT THE PLAN.

**PARTNERS RECOMMENDS THAT YOU VOTE IN FAVOR OF CONFIRMATION OF THE PLAN.**

**D.      Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the hearing to confirm the Plan (the "Confirmation Hearing") will commence on March —,30, 2010, beginning at —— a1:00 p.m. (Mountain Time), before the Honorable R. Kimball Mosier, United States Bankruptcy Judge, in Room ___ of the Bankruptcy Court, 350 South Main Street, Salt Lake City, UT 84101.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before March __, 2010, at 4:00 p.m. (Mountain Time), in the manner described below in Section V of this Disclosure Statement and as set forth in the Disclosure Statement Order.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**II.      GENERAL INFORMATION ABOUT THE DEBTORS**

**A.      Description and History of Debtors' Business**

**1.      Background**

The Sky Lodge is a luxury boutique hotel located in the middle of historic Main Street in Old Town Park City.  It is an ultra stylish resort hotel offering all of Park City's amenities plus a restaurant offering both casual and fine dining, a bar and lounge, the spa Amatsu, and meeting and event venues and more.

The Sky Lodge is being sold as fractional ownership with a total of 176 one-eighth shares (the "Units") offered.  There are 22 units in total.  The models range from 1260 to 2700 square feet for the penthouse model.  As of the Petition Date, 113 Units had been sold.  Owners buy individual units and not just the rights to a stay.  Cloud Nine Resorts- Sky Lodge Management, LLC ("Sky Lodge Management"), an affiliate of the Debtors, runs the homeowners association

6

~~(HOA),~~ manages the owner bookings and rotational intricacies of ownership.  Each owner is guaranteed two ski weeks (mid Dec. ~~—~~to mid April) each year plus 21 other days throughout the year for their own use.  Stays not used by the owner may be rented out by the hotel and proceeds are split equally with the owner.

## 2.    Relationship of Partners to the Other Debtors

The Debtors are limited liability companies and affiliates of one another.  Partners, which owns the real estate and improvements constituting the Sky Lodge in Park City, Utah, is 100% owned by Mezzanine.  Holding is the 100% owner and managing member of Mezzanine.  Michael Feder, representing Park City I, LLC, Philo Smith, Jr. representing the Philo Smith, Jr. Trust, and William Shoaf, representing CloudNine Resorts, LLC are the co-managers of the Debtors.  The members of Holding are Park City I, LLC holding 12.5%, Philo Smith Jr. Trust holding 10%, Alchemy Ventures Trust holding 38.75% and CloudNine Resorts, LLC holding 38.75%.

Partners' chapter 11 case has not been substantively consolidated with those of Mezzanine and Holdings (collectively, the "Other Debtors"); however, the cases of all the Debtors are being jointly administered.

## B.    The Prepetition Debt

## 1.    ~~West LB~~WestLB Senior Loan

On March 30, 2006, Partners entered into a Loan (the "WestLB Senior Loan") and Security Agreement (collectively, the "Senior Loan Agreement") for the initial amount of $36,779,2241[3] with WestLB AG, New York Branch ("WestLB") to purchase and develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060.  The WestLB Senior Loan is secured by, among other things, security interests evidenced by the Construction and Interim Loan Deed of Trust With Security Agreement, Assignment of Leases and Rents and Fixture Filing, and a UCC Financing Statement, each filed in the Summit County, Recorder's Office, State of Utah.  On February 15, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a partial principal repayment of $22,400,000 was made to WestLB from the Real Estate Sales Escrow Account.[4]  The balance of the WestLB Senior Loan as of the Petition Date (as hereinafter defined) was $15,164,331.17.  WestLB has filed a proof of claim in the amount of $16,049,742.71; however, Partners disputes this amount.  Partners is negotiating with WestLB to consensually resolve the amount of the Allowed WestLB Secured Claim.  Pursuant to the Cash Collateral Stipulation (as hereinafter defined) and the order approving same, the amount of WestLB's claim (including all default and non-default interest) was stipulated to be no less than $15,164,331.17.  Partners believes that the final amount of the

---

[3] The proceeds of the WestLB Senior Loan (along with the proceeds of the BayNorth Mezzanine Loan, as hereinafter defined) were used to purchase, develop and construct the Sky Lodge.

[4] As Units are sold, the proceeds are swept into various escrow accounts maintained at Wells Fargo Bank pledged to WestLB ~~as~~.  WestLB is the Administrative Agent for WestLB and BayNorth (hereinafter defined).

7

NYIWDMS: 11417167_19

WestLB Allowed Secured Claim as of the Confirmation Hearing, including reasonable attorneys fees, accrued and unpaid interest and additional charges, if any, will be approximately $~~15.5 million.~~15,700,000.00.

## 2.    BayNorth Mezzanine Loan

On March 30, 2006, Mezzanine entered into a Loan Agreement (the "Mezzanine Loan Agreement") in the initial amount of $11,250,000 (the "BayNorth Mezzanine Loan") with BayNorth Realty Fund VI, LP ("BayNorth"). The funds were used to develop the Sky Lodge and the loan is a "mezzanine" loan a method of financing which became popular in the mid 90's. The BayNorth Mezzanine Loan is secured by a pledge of Holding's 100% interest in Mezzanine to BayNorth, and a UCC Financing Statement filed with the Secretary of State of Utah. BayNorth is **not** a creditor of Partners.

On February 19, 2008, at the direction and authorization of WestLB, as the Administrative Agent, a $5,600,000 disbursement from the Real Estate Sales Escrow Account was made to BayNorth, which included a partial principal repayment and accrued interest (the "BayNorth Transfer"). It is the Debtors' position that the BayNorth Transfer was mistakenly and/or improperly made.[5] It is the Debtors' position that the balance of the BayNorth Mezzanine Loan including principal and accrued interest was $12,045,586, as of the Petition Date[6], which amount is subject to setoff and claims asserted by the Debtors in the BayNorth Adversary Proceeding.

On March 30, 2006, WestLB, as Senior Lender, and BayNorth, as Mezzanine Lender, entered into an intercreditor agreement (the "Intercreditor Agreement") to provide, inter alia, for the relative priority of the Senior Loan Agreement between WestLB and Partners, and the Mezzanine Loan Agreement between BayNorth and Mezzanine, and administration of both loans by WestLB as the administrative agreement.

## 3.    Conversion (Extension) of the WestLB Senior Loan

The original term of the WestLB Senior Loan was for three years with two one-year extensions available to Partners subject to the satisfaction of certain conditions. The initial term

---

[5] This payment was incorrectly made. The Debtors assert that the erroneous payment has led to (a) a dispute between WestLB and BayNorth under the Intercreditor Agreement (as hereinafter defined) for its return, (b) failure of WestLB to extend the WestLB Senior Loan, (c) BayNorth alleging a default of the BayNorth Mezzanine Loan, (d) WestLB refusing to release additional escrowed funds resulting in imposition of liens by contractors and foreclosure suits, (e) the loss of Unit sales, and (f) foreclosure lawsuits being filed against Partners and owners of Units. WestLB disputes the foregoing.

[6] BayNorth claims a substantially greater amount in excess of $31 million, based upon disputed assertions of rights under a yield maintenance provision and disputed default rate interest. Debtors dispute the amount of the BayNorth Mezzanine Loan and have instituted an Adversary Proceeding against BayNorth (the "BayNorth Adversary Proceeding") to (i) recover the BayNorth Transfer and additional damages and (ii) set aside and disallow the excessive interest charges as penalties. A more complete description of the BayNorth Adversary Proceeding is contained at pages 15-16 below.

8

of the WestLB Senior Loan ended on March 29, 2009.  On September 25, 2008, Partners notified
WestLB of its request for a conversion of the WestLB Senior Loan into an Interim Loan, as
provided in section 2.15 of the Senior Loan Agreement.  Such a conversion would have extended
the WestLB Senior Loan for an additional year.  Partners asserts that WestLB refused to extend
the WestLB Senior Loan under § 2.15, claiming that it had been underpaid $4,899,104 from the
distributions that occurred in February 2008.[7]  It is the Debtors' position that this shortage was
the direct result of the erroneous BayNorth Transfer because funds that were paid to BayNorth
should have been paid to WestLB under the WestLB Senior Loan Documents.

### 4.   Jacobsen

Jacobsen National Group, Inc. ("Jacobsen") was employed by Partners as the general
contractor by contract dated March 20, 2006 (the "Construction Contract"), to construct the
Sky Lodge and related site improvements and outbuildings.  Construction commenced on or
about May 28, 2006 and was generally completed on approximately December 18, 2008.
Jacobsen asserts that it and its subcontractors have completed their work under the
Construction Contract and are owed $1,382,127.18 (exclusive of interest and costs).

Because it was not paid in full for its work under the Construction Contract, on or
about March 17, 2009, Jacobsen recorded with the Summit County Recorder a notice of
mechanic's lien against the Sky Lodge and related property.  On or about September 4,
2009, Jacobsen commenced a civil action in the Third Judicial District Court for Summit
County, State of Utah, to enforce its mechanic's lien.  Named as defendants were Partners,
Equity Title Insurance Agency, Inc., which acted as escrow agent on many or most of the
sales of Units, and owners of the Units.  That action was stayed pursuant to section 362(a) of
the Bankruptcy Code as to Partners.  Jacobsen asserts that its mechanic's lien is prior to the
rights of the owners of the Units.

Under Article 5.2 of the Plan, all of the litigation commenced by Jacobsen against
Partners is resolved and Jacobsen's claims against the owners of any Third Party Units will
be stayed and dismissed when ~~either~~Jacobsen is paid an agreed upon discounted payment of
$1,330,000.  Under any circumstance, if (i) the owner of any particular Third Party Unit
pays Jacobsen $4,500 for its release, or (ii) the Reorganized Debtor pays same~~.  It is
anticipated that~~, the Third Party Unit will be released from the Jacobsen lien.  Under the
Plan, on the Effective Date, ~~the Plan Funder will pay~~ Jacobsen ~~an amount such that~~will be
paid $1,330,000 and all liens filed by Jacobsen against the Third Party Units, the Property
and Partners will be satisfied and released.

### 5.   Other Indebtedness

Partners scheduled the General Unsecured Claims in the aggregate amount of $2.5
million; however, if Partners rejects the executory contracts of CloudNine – SL
Management LLC and CloudNine – SL Development LLC, an additional
$~~1,160,000~~1,200,000 of General Unsecured Claims will arise.  To summarize, the claims

---

[7] WestLB asserts that there were other defaults under the WestLB Senior Loan; however, Debtors
dispute same.

NYIWDMS: 11417167_19

held by SL Management and SL Development are approximately $2,875,000.00 and the claims held by other General Unsecured Creditors are approximately $820,000.00.

Moreover, 103 proofs of claim were filed by owners of Third Party Units aggregating an additional $474,223,859.  One of these owners filed a proof of claim in the amount of $435,606,000.  Partners assumes that this Claim was inadvertently filed in the wrong amount and should have been filed in the amount of $435,660.  In that event, the 103 owners of Third Party Units filed claims in the aggregate amount of $39,053,465, which sum is the approximate aggregate purchase price paid for the Third Party Units.  It is anticipated that theseThese Claims will be expunged or substantially reduced based on the settlementeliminated, released and discharged upon payment of the Allowed Jacobsen Claim pursuant to Article 5.2 of the Plan.

### C.    Events Leading to Commencement of Chapter 11 Cases

On March 4, 2009, WestLB issued a letter to Partners asserting that after reviewing the disposition of the Net Sales Proceeds from sales of real estate, that it, as the Senior Lender, had been underpaid the $28,000,000 lender distribution that occurred in February of 2008.  WestLB demanded that Partners remit immediately the sum of $4,899,104 to it.  Partners contends that the shortfall to WestLB was the direct result of the BayNorth Transfer from the Real Estate Sales Escrow Accounts on or about February 19, 2008.

On or about March 29, 2009, WestLB entered into a forbearance agreement with Partners (the "Forbearance Agreement").  Partners and its representative, Realty Financial Resources, understood that WestLB had met with BayNorth to demand the return of the $5,600,000.  To date, BayNorth has wrongfully refused to return the BayNorth Transfer in violation of Section 9 of the Intercreditor Agreement.

On May 5, 2009, BayNorth issued to Mezzanine a notice of default on the BayNorth Mezzanine Loan, asserting that the WestLB Senior Loan had matured on March 30, 2009 and had not been repaid, and that the resulting default under the Senior Loan agreement was itself a default under the Mezzanine Loan.  This default notice was followed by a Notice of Acceleration and Demand for Payment issued by BayNorth on June 23, 2009.  On July 8, 2009, a Notice of Sale was issued by BayNorth for the membership interest of Holding to be executed and held on September 16, 2009.  There are no payment defaults under the BayNorth Mezzanine Loan nor are any alleged.  A more detailed recitation of the allegations against BayNorth is set forth in Section III.G. of this Disclosure Statement, which describes the litigation commenced by Partners against BayNorth.

On or about February 5, 2009, Partners submitted to WestLB a request to make the final payment to Jacobsen, which has not been paid.  Jacobsen filed liens against the Sky Lodge property on March 16, 2009, and on September 8, 2009, Jacobsen filed a foreclosure action against Partners and the owners of Units.

The BayNorth Transfer resulted in WestLB having received approximately $4.9 million less than provided for under the Senior Loan Agreement, WestLB's refusal to extend the maturity date of the WestLB Loan from March 2009 to March 2010, and BayNorth's declaration of the alleged default of the BayNorth Loan.  Due to the foregoing and the upcoming foreclosure

sale of the membership interest in Holding by BayNorth, Partners and its affiliates, Mezzanine and Holding, had no option but to file for protection under Chapter 11 on September 14, 2009 (the "Petition Date"), to restructure its business and return to profitable operations.

## III.  THE DEBTORS' CHAPTER 11 CASES

### A.  Filing and First Day Orders

On the Petition Date, Partners and the Other Debtors filed their bankruptcy petitions under chapter 11 of the Bankruptcy Code.  The Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

#### 1.  Certain First Day Orders

Early in these cases, the Court entered a number of orders requested by the Debtors that were designed to minimize disruption to the Debtors' business operations as a result of the chapter 11 filings.  Among other things, these orders authorized the Debtors (i) to pay prepetition wages, and (ii) to use cash collateral pursuant to Bankruptcy Code section 363 and granting adequate protection to WestLB in accordance with an agreed upon stipulation between WestLB and the Debtors.  The Court also entered an order that the segregated account in favor of the utility companies provided the utilities with adequate assurance of payment so that the utilities could not alter, refuse or discontinue utility service to the Debtors.

The Court also entered orders intended to facilitate the administration of these cases, including orders that (i) authorized the joint administration of the Debtors' cases; and (ii) extended the time for the Debtors to file schedules and statements of financial affairs to October 15, 2009.  On October 15, 2009, the Debtors filed their schedules and statements of financial affairs.

#### 2.  Retention of Debtors' Professionals

Throughout these cases, the Debtors have sought authority to retain certain professionals in connection with their reorganization as appropriate for required tasks.  The retention of the Debtors' professionals is discussed in more detail in Section III F. below.

### B.  The Creditors' Committee

#### 1.  Appointment of the Creditors' Committee

On October 2, 2009, the United States Trustee appointed a committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Creditors' Committee").[78]  The persons or entities appointed to the Creditors' Committee are set forth below:

---

[78] On October 6, 2009, the Office of the U.S. Trustee amended the appointment of the Creditors Committee to correctly designate Douglas J. Payne, Esq. an attorney for Gateway Center, LLC.

NYIWDMS: 11417167_19

| Elliott Workgroup Architecture, LLC-Chairman<br>Attn: Craig Elliott | Goodrich and Thomas, CPAs<br>Attn: Robert B. Goodrich |
| Gateway Center, LLC<br>Attn: W. James Tozer, Jr.<br><br>Douglas J. Payne<br>Counsel for Gateway Center, LLC | Millcreek Consulting<br>Attn: Stephen Brown |
| Klehr Harrison Harvey Brazburg & Ellers LLP<br>Attn: Heather I. Levine | Shaner Design, Inc.<br>Attn: Tom Shaner |

### 2.  Creditors' Committee's Professionals

In connection with these cases, the Creditors' Committee retained Jones Waldo Holbrook & McDonough, PC ("Jones Waldo") as its legal counsel. On November 24, 2009, the Court entered the order approving the retention of Jones Waldo as counsel to the Creditors' Committee.

### C.  Use of Cash Collateral

On September 15, 2009, Partners filed a motion for interim and final orders: (i) authorizing use of cash collateral pursuant to 11 U.S.C. § 363 and granting adequate protection to WestLB, and (ii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) (the "Cash Collateral Motion").

On or about September 16, 2009, Partners and WestLB entered into that certain "Stipulated Interim Order on Motion of Easy Street Partners, LLC for Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)" (the "Interim Cash Collateral Stipulated Order").

On September 17, 2009, the Court entered the Interim Cash Collateral Stipulated Order, which approved Partners use of funds in various accounts, as well as revenues being collected from Sky Lodge's operations, all of which had been pledged to WestLB ("Cash Collateral") in accordance with an initial budget, and any subsequent approved budgets, and afforded WestLB certain rights and adequate protection.

Subsequently, Partners and WestLB reached an agreement regarding the continued use by Partners of WestLB's Cash Collateral until December 31, 2009 (or such later date as the Parties agree to in writing) under the terms and on the conditions set forth in the Stipulation Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG dated October 9, 2009 (the "Cash Collateral Stipulation"). Objections were filed to the proposed final order authorizing use of Cash Collateral. On or about October 14, 2009, the Court entered an order approving the Cash Collateral Stipulation.

On November 25, 2009, the Debtors and WestLB filed a joint motion to approve certain technical and administrative amendments to the Cash Collateral Stipulation, and additional

12

adequate protection payments to WestLB.  Objections were filed to said motion and on December 14, 2009, the Court granted the motion and approved the amendments to the Cash Collateral Stipulation and allowed additional payments to WestLB's legal counsel from Cash Collateral.

On or about December 27, 2009, the Debtors filed an extension of certain deadlines with respect to the Cash Collateral Stipulation (the "Extension").  The proposed modifications to the Cash Collateral Stipulation set forth in the Extension include (i) extending the use of Cash Collateral from December 31, 2009 to April 30, 2010, (ii) authorizing the co-manager of the Sky Lodge Hotel to submit transfer request reports to WestLB, (iii) extending the deadline for Partners to submit a term sheet of its plan of reorganization from December 3, 2009 to December 23, 2009, (iv) extending the deadline for Partners to file a disclosure statement and plan of reorganization from December 23, 2009 to January 11, 2010[8][9], (v) extending the Cash Collateral Stipulation's termination date from December 31, 2009 to April 30, 2010, (vi) stipulating to the term of the co-manager, (vii) providing for the handling of refundable deposits, and (viii) providing for the payment of professional fees in connection with the BayNorth Adversary Proceeding.

On January 7, 2010, the Court entered an order approving the Extension.

**D.    Extensions of Exclusivity**

On December 18, 2009, the Debtors filed a motion to extend their exclusive periods for filing chapter 11 plans of reorganization for approximately 60 days to and including March 15, 2010, and soliciting the acceptances of such plans for approximately 60 days to and including May 14, 2010 (the "Exclusivity Motion").  On January 12, 2010, the Bankruptcy Court entered an order extending Partners' exclusive period to file a plan of reorganization through January 15, 2010 and to solicit acceptances of the Plan, any amended plans of reorganization or any amendments thereto through March 31, 2010.

**E.    Appointment of the Debtors' Professionals**

**1.    Initial Applications and Retentions**

On or about the Petition Date, the Debtors sought authority to retain Crowell & Moring LLP ("C&M") and Durham Jones & Pinegar P.C. ("Durham Jones") as Debtors' bankruptcy counsel.  On October 22, 2009, the Court entered orders approving the retention of C&M and Durham Jones as Debtors' counsels.

**2.    Retention of Wrona Law Offices, P.C.**

On October 19, 2009, the Debtors also filed an application to employ and retain Wrona Law Offices, P.C. ("Wrona") as special counsel for the Debtors with regard to, among other things, corporate governance issues, the complex relationships within the Debtors' organization and between the Debtors and fractional unit homeowners, effective as of September 14, 2009.  The Court granted the application at the November 24, 2009

---

[8][9]  Subsequently, WestLB consented to extend the January 11, 2009 deadline to January 15, 2009.

NYIWDMS: 11417167_19

hearing.  On December 2, 2009, the Court entered a final order approving the Wrona retention.

### 3.      Retention of BDRC 4 Site, LLC

Pursuant to the Cash Collateral Order and as condition to WestLB consenting to the use of Cash Collateral, Partners and WestLB were to collaborate in identifying, interviewing, and engaging a manager or consultant to serve as a co-manager of the Sky Lodge.

After interviewing several candidates, Partners selected BDRC 4 Site, LLC ("BDRC") to assist in co-managing the Sky Lodge Hotel.  On or about November 13, 2009, Partners filed an application to retain BDRC as co-manager.  On December 3, 2009, the Court granted the application to employ BDRC.  As co-manager, BDRC is to provide certain services to Partners, including, but not limited to, the following:

(i)      supervisory assistance to the general manager.

(ii)      review, comment, and approval of programs in the marketing, promotion, and operation of the Debtor's hotel.

(iii)      supervise relations with the homeowners association; supervise public relations and public announcements.

(iv)      review and analyze room rates and charges.

(v)      provide accounting oversight, controls, and services; review and analyze operating costs and expenses.

(vi)      provide to WestLB and to the Debtor's senior management reports on the status of business operations, budgets, projections and business plans, as well as participate in periodic meetings with WestLB.

(vii)      assist Partners in developing a plan of reorganization, including a five year business plan, possible modification of operations, development of new strategies, attraction of new investors and restructuring existing debt; and

(viii)      assist in the development of a marketing program and re-engagement of a sales force to facilitate and pursue sales of the Units in the Sky Lodge.

### 4.      Retention of Gemstone Hotels and Resorts, LLC

On or about November 24, 2009, Partners also filed an application to employ Gemstone Hotels & Resorts, LLC ("Gemstone")[910] as a consultant to Partners and its co-manager, BDRC, with respect to, among other things, the development of business plan, spending projections, project management, and with respect to a 5-year business plan and

---

[910] WestLB required the retention of Gemstone as a consultant as a condition to its consent to the retention of BDRC as co-manager.

NYIWDMS: 11417167_19

operating proformas related thereto.  On December 3, 2009, the Court entered an order approving Gemstone as a consultant to Partners.

### 5.        Retention of Corbin Gordon

On or about October 19, 2009, the Debtors filed an application to employ ~~Crobin~~Corbin B. Gordon ("Gordon") as special counsel with respect to issues pertaining to the Gateway lease and related issues, effective as of September 14, 2009.  On November 25, 2009, the Court granted the application to retain Gordon.

### 6.        Retention of Appraisal Group, Inc.

On November 5, 2009, Partners filed an application to employ Appraisal Group, Inc. ("AGI") as an expert appraiser to (i) prepare an appraisal of Partners' property located in Park City, Utah, (ii) provide any follow up testimony related to such appraisal, and (iii) render any other related services as may be necessary to accomplish the above.  On December 8, 2009, the Court granted the application to retain AGI.

### F.     The Debtors' Operating Performance During the Chapter 11 Cases

For the period from the Petition Date through December 31, 2009, operations of the Sky Lodge have resulted in an actual cumulative profit of approximately $95,000 versus a projected estimate of $11,700.  In January 2010, the Sky Lodge continued to improve financial performance and posted an operating profit of $451,898, which was $29,000 more than budget and represents a 44.2% profit margin.  Net profit, without the costs of professionals in the Bankruptcy Case, was $251,276, approximately $40,000 more than budgeted.  These projections were made in the ~~budget~~budgets that ~~was~~were annexed to the Cash Collateral Stipulation, and Partners has been tracking budget projections versus actual performance on a monthly basis. After taking into consideration the non-recurring legal fees and expenses of the Chapter 11 case, consolidated ~~losses~~profits of approximately $~~311,000~~88,000 occurred during the post-petition period~~; however, these losses are less than had been estimated in budgets.~~ through January 31, 2010; compared to a projected loss budgeted as approximately $110,000.

For the entire year ended December 31, 2009, Partners posted a profit of $726,204 versus a loss in 2008 of $604,280.  The swing of $1,330,484 to positive net operating income over the prior year was accomplished with $970,000 less gross revenue in 2009.  Management has been vigilant at managing its costs.  Looking forward to 2010, the projections are annexed to the Disclosure Statement as Exhibit 2 and discussed at pages 42~~47~~ -43~~48~~ reflect continuous profitability.

The ~~Skylodge~~trend of business operations is positive, and the 2010 projections, which reflect an operating profit of approximately $500,000, are conservative.  It should be noted that BDRC and Gemstone have signed off on the 2010 Budget.

The Sky Lodge continued to be ranked the number 1 hotel property in Park City on Trip Adviser and received extremely high guest satisfaction ratings in the various industry reports.

### G.     ~~BAYNORTH LITIGATION~~BayNorth Litigation

On September 15, 2009, the Debtors commenced an adversary proceeding in the Bankruptcy Court against BayNorth concerning primarily BayNorth's receipt of the $5,600,0000

15

BayNorth Transfer (the "BayNorth Adversary Proceeding").  According to the Debtors'
amended complaint (the "Complaint") in the BayNorth Adversary Proceeding, BayNorth
wrongfully received the BayNorth Transfer and refused to return such funds, which created a
default under the WestLB Senior Loan Agreement.  The Complaint further alleges (i) that
BayNorth then relied upon the default it created under the WestLB Senior Loan Agreement to
declare a cross-default under the BayNorth Mezzanine Loan, and improperly scheduled a UCC
sale of Holdings' interests in Mezzanine, and (ii) BayNorth's action caused WestLB to freeze
certain escrow accounts, from which the Debtors were to pay construction costs relating to the
construction and development of the Sky Lodge Hotel.  This, in turn, caused the general
contractor, Jacobsen, on the project to impose a mechanics lien of approximately $1,400,000 on
the property owned by Partners, as well as the existing owners of the Units.

     The Debtors' Complaint asserts causes of action against BayNorth seeking the return of
the BayNorth Transfer and additional monetary damages, including punitive damages, based on
the legal theories of unjust enrichment, money had and received, conversion, tortious
interference with contract, tortious interference with existing and prospective business
relationships, breach of contract, fraudulent conveyance, turnover, and unfair and deceptive acts
and practices in violation of Massachusetts G.L. Ch. 93A.  The Debtors also seek a declaratory
judgment determining that the yield maintenance and default interest provisions under the
BayNorth Note, which seek to assess interest at approximately 70% per annum, are
unenforceable.

     On October 6, 2009, BayNorth moved to dismiss the complaint in the BayNorth Loan
Adversary Proceeding for failure to state a claim.  A hearing on the motion was held before the
Bankruptcy Court on December 22, 2009, at which time, the court heard argument from the
parties and reserved ruling on the motion.  On December 29, 2009, the Bankruptcy Court entered
an order denying BayNorth's motion to dismiss the complaint.  The BayNorth Adversary
Proceeding is being vigorously prosecuted by the Debtors.

    **H.**    ~~**THE MASSACHUSETTS ACTION AND THE § 105 ADVERSARY
PROCEEDING**~~**The Massachusetts Action and the § 105 Adversary
Proceeding**

     On or about October 8, 2009, BayNorth commenced an action in Superior Court of the
Commonwealth of Massachusetts (the "Massachusetts Action") against William Shoaf ("Shoaf")
and David Wickline ("Wickline") seeking an entry of a judgment against them in an amount in
excess of $30,000,000 based upon a springing guaranty (the "Springing Guaranty") and
completion guaranty executed by Shoaf and Wickline in connection with the BayNorth
Mezzanine Loan.  Under the Springing Guaranty, the BayNorth Mezzanine Loan, which was
non-recourse in nature, would become fully recourse against Shoaf and Wickline if Partners or
Mezzanine filed bankruptcy petitions.

     On November 11, 2009, BayNorth filed a motion in the Massachusetts Action seeking
partial summary judgment against Shoaf and Wickline under the Springing Guaranty based upon
Partners and Mezzanine's filing of Chapter 11 petitions before the Bankruptcy Court.

NYIWDMS: 11417167_19

On December 1, 2009, the Debtors commenced another adversary proceeding before the Bankruptcy Court against BayNorth, along with a motion, seeking to stay BayNorth from prosecuting the Massachusetts Action against Shoaf pursuant to §§ 105 and 362 of the Bankruptcy Code (the "105 Adversary Proceeding") on the grounds that the Debtors would be irreparably harmed in the absence of a stay because: (i) Shoaf would be distracted from his managerial duties on behalf of the Debtors at the busiest time of the year for The Sky Lodge if he were required to defend the Massachusetts Action; and (ii) the Debtors would be subject to possible inconsistent verdicts in the absence of a stay due to Shoaf's right to indemnification from the Debtors for any personal liability he incurred as a result of actions he took on behalf of any of the Debtors (the "Stay Motion").

A hearing on the Stay Motion was held before the Bankruptcy Court on December 22, 2009.  On January 11, 2020, the Bankruptcy Court entered an order denying the Stay Motion.  It is anticipated that Shoaf and Wickline will vigorously oppose the Massachusetts Action.

I.    ~~THE COMMITTEE LITIGATION AGAINST WESTLB, AG~~**The Committee Litigation Against WestLB, AG**

On January 12, 2010, the Creditors' Committee commenced an adversary proceeding in the Bankruptcy Court against WestLB concerning primarily WestLB's payment of $5,600,000 to BayNorth (the "WestLB Adversary Proceeding").  According to the Creditor's Committee Complaint (the "Committee Complaint") in the WestLB Adversary Proceeding, WestLB's approximate $5.6 million payment of Partners' funds to BayNorth resulted in, *inter alia*, (i) WestLB refusing to permit Partners to exercise its contractual right to extend the March 31, 2009 maturity date of the WestLB Senior Loan, and (ii) WestLB declaring a maturity default on such loan.

The Committee Complaint further alleges that WestLB's erroneous and subsequent inequitable conduct, including, without limitation, declaring a default under the WestLB Senior Loan has resulted in, among other things, WestLB forcing Partners to sign a forbearance agreement in which Partners was required to waive all of its claims against WestLB.

The Committee Complaint seeks to (i) equitably subordinate the claims of WestLB to the claims of all unsecured creditors of Partners, and (ii) avoid Partners' waiver of claims in the forbearance agreement and recover such claims for the benefit of Partners' estate because such waiver constitutes a fraudulent transfer under both state and federal bankruptcy laws.

J.    ~~JACOBSEN LITIGATION~~**Jacobsen Litigation**

On September 4, 2009, Jacobsen commenced an action in the Third Judicial District Court, Summit County, State of Utah (the "Utah State Court") against, among others, Partners, certain of its lenders, the Union Square Condominium Owners Association, and other individuals or entities that have an interest in the ~~SkyLodge~~Sky Lodge, including the current owners of the Units.  The complaint asserts, among other things, that (i) Partners entered into a contract with Jacobsen to construct and manage the construction of the condominium project on the property, (ii) Jacobsen rendered services under the contract, and (iii) Jacobsen has not been paid the outstanding obligations under the contract.  Pursuant to the complaint, Jacobsen seeks, among other things, (i) a decree of foreclosure against all

17

defendants and declaring that their claims, rights, title and interest in the property and improvements are junior or subordinated to Jacobsen's lien on the property and (ii) the sale of the property to satisfy, in whole or in part, the amounts allegedly owed to him.  The action is stayed as to Partners by virtue of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As set forth on pages 9-10, the Plan will resolve the litigation initiated by Jacobsen with respect to both Partners and the owners of the Third Party Units.

### K.   Schedules, Bar Date and Summary of Claims

#### 1.   Schedules and Statements

On October 15, 2009, the Debtors filed their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, the "Schedules").

#### 2.   Bar Date

Pursuant to Local Bankruptcy Rule 3003-1(a), "[i]n a chapter 11 case, a proof of claim or interest is timely filed if it is filed not later that 90 days after the first date set for the meeting for creditors under § 341 of the Code, or, if filed by a governmental unit, not later than 180 days after the date of the order for relief."  LBR 3003-1(a).  Thus, January 6, 2010 at 4:00 p.m. (the "Bar Date") is the date and time by which proofs of claim by all claimants (other than governmental units) are required to be filed.  The deadline for a governmental unit to file a proof of claim is March 15, 2010.

#### 3.   Summary of Claims

As of January 14, 2009, 139 proofs of claim have been filed in these cases.  The Debtors will be reviewing the proofs of claim and comparing them to their books and records and will object to proofs of claim when, and if, appropriate.[~~10~~11]

As of January 14, 2009, $479,029,201.01 in General Unsecured Claims, $17,817,317.98 in Secured Claims and $4,445.64 in Priority Claims (totaling $496,851,421.31) against Partners have been scheduled or filed and not disallowed or expunged pursuant to Court orders. The bulk of the General Unsecured Claims are attributable to the owners of Third Party Units.  As set forth on page ~~10~~9 above, one of these owners filed a proof of claim in the amount of $435,606,000.  Partners assumes that this Claim was inadvertently filed in the wrong amount and should have been filed in the amount of $435,606.  In that event, the 103 owners of Third Party Units filed claims in the aggregate amount of $39,053,465, which sum is the approximate aggregate purchase price paid for the Third Party Units.  ~~It is anticipated that~~ Pursuant to the Plan, the Claims of the owners of the Third Party Units will be ~~expunged or substantially reduced~~ satisfied, released and discharged based on the settlement and payment of the Allowed Jacobsen Claim pursuant to Article 5.2 of the Plan.  ~~If an order expunging the claims of the owners of the Third Party Units are expunged, then the~~

---

[~~10~~11] Under Article 6.2 of the Plan, the Reorganized Debtor will have the exclusive right to object to claims for up to 120 days following the Effective Date, although this deadline can be extended by the Court.

NYIWDMS: 11417167_19

The remaining amount of General Unsecured Claims filed against Partners would be slightly in excess of $4.8 million.  Partners believes that the amount of Allowed General Unsecured Claims asserted against Partners will be, exclusive of the claims of SL Management and SL Development, will aggregate approximately $4.06 million.820,000.

### L.     Partners' Plan Funder

The Debtors, through the assistance of BDRC, have been seeking one or more entities to fund the Plan of Partners to facilitate emerging from Chapter 11.  Debtor's principals and attorneys assisted BDRC in locating interested investors and provided extensive historical and prospective financial data to approximately fifteen (15) groups of potential investors.  None of the groups, except for the ultimate investor chosen, was willing to fund a plan which repaid the Allowed WestLB Secured Claim in full.

Thus, Partners and BDRC, along with counsel, determined to complete negotiations with Strategic Capital Partners, LLC ("SCP").

On January 13, 2010, Partners executed a letter of intent ("LOI") with Strategic Capital Partners, LLC ("SCP")SCP.  SCP or an entity formed by SCP or an affiliate of SCP will be the plan funder (the "Plan Funder").

SCP is a local real estate investment management and development firm focused on investments in Utah and the intermountain west.  SCP's principals have significant experience with resort hotels and fractional interest ownership programs.

SCP will provide up tobetween $86-6.5 million of equity capital in cash sufficient to fund the Plan.  Through its investor group, SCP believes it will also bring buyers for the remaining unsold fractional units in the project.  The investor group that will join SCP to fund the Plan and ultimately own the Sky Lodge, are a consortium of high net worth individuals who have more than sufficient available funds to provide the funding necessary to fund the Plan without obtaining outside financing.  Moreover, several of the investors have previous and existing investments in the hospitality industry in Latin America and the United States.

AnPartners has successfully negotiated and executed a Funding Agreement, an entity formed by SCP will own 75100% of the Reorganized Debtor.  The remaining 25% will be owned by an entity to be formed in which William Shoaf will be a member and a manager. The balance of the ownership in this entity will be determined upon execution of definitive agreementsSCP will be the managing member of the Reorganized Debtor.  The exact percentages to be owned by SCP and its other investors has not yet been determined; however, none of the persons affiliated with Partners will own an interest in the Reorganized Debtor.

William Shoaf will be retained by the Reorganized Debtor for a period of six (6) years under an agreement which will pay him $185,000 per year.  Mr. Shoaf may also receive an incentive bonus of 15% of the net profit if the Sky Lodge commercial operation is ultimately sold by the Reorganized Debtor if certain benchmarks are reached.

19

The Funding Agreement commits SCP and its investors to fund approximately $6,000,000 on the Effective Date to be utilized as follows:

1.  $2 million as additional working capital

2.  Up to $2 million to fund the Mezzanine Escrow

3.  $410,000:  Payments to general unsecured creditors electing to take the discounted cash payment on the Effective Date.  This amount is the maximum amount necessary if 100% of Allowed General Unsecured Claims elect to take the discounted cash payment on the Effective Date.

4.  $730,000:  For payment to satisfy the Allowed Jacobsen Secured Claim pursuant to Article 5.2 of the Plan.  The other $600,000 will be paid from the Sales Proceeds Account currently held in a controlled account pursuant to the Cash Collateral Stipulation.

5.  $750,000:  To pay accrued unpaid Allowed Administrative Claims.

The Funding Agreement requires an initial good faith deposit of $25,000 upon execution and an additional $575,000 on or before March 15, 2010.

A copy of the Funding Agreement will be made available to holders of Claims or Interests upon written request to Debtor's counsel and execution of a confidentiality agreement.

Additionally, SCP is requiring that the Reorganized Debtor be managed by a new management company in which William Shoaf is a keyan employee.  SCP or its designee will also be involved in management of this entity.

Pursuant to the LOI, definitive agreements should be executed prior to the hearing on this Disclosure Statement and will be fully discussed in the Disclosure Statement disseminated to the holders of Claims and Interests in connection with voting on and confirmation of the Plan.

## IV.  THE PLAN

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A chapter 11 plan sets forth the means for satisfying claims against

NYIWDMS: 11417167_19

and interests in a debtor.  Confirmation of a chapter 11 plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor whether or not such creditor or equity interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Partners believes that implementation of the Plan will provide holders of Allowed Claims and Interests a greater distribution than they would receive if these cases were converted to cases under chapter 7 of the Bankruptcy Code.  The Plan is annexed as Exhibit 1 and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.  Unless otherwise provided, the holders of Allowed Secured Claims shall receive a General Unsecured Claim to the extent of any deficiency.

## A.     Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must provide certain treatment for Administrative Expense and Priority Tax Claims and otherwise classify claims and interests and provide for their treatment.  As a result, the Plan (a) describes the treatment to be afforded to Administrative Expense Claims (which includes claims of compensation by professionals) and Priority Tax Claims and United States Trustee Quarterly Fees and Other Statutory Fees and (b) classifies Claims and Interests in separate Classes and provides different treatment for different Classes of Claims and Interests.  As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration, thereby giving effect to the different rights of holders of Claims and Interests in each Class.

## B.     Tabular Summary of Treatment Including, When Applicable, Classification under the Plan

The following table summarizes the classification and treatment of Claims and Interests under the Plan.

21

Unclassified Claims[11][12]

| Class | Description | Treatment Under the Plan | Estimated Aggregate Recovery | Status |
|---|---|---|---|---|
| — | Administrative Expense Claims | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred after the Petition Date, or preserving the estates and operating the business of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims and all fees and charges assessed against the estates under chapter 123 of title 28, United States Code.<br><br>Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, Allowed Administrative Claims shall be paid (i) in the ordinary course of business or (ii) within thirty (30) days afteron the Effective Date (or as soon as practicable thereafter) if not an ordinary course claim, or (iii) within ten (10) days of entry of a Final Order allowing such Administrative Claim.<br><br>Allowed Administrative Claims of Professionals will be paid in full on the later of (i) the Effective Date or (ii) fourteen (14) days after entry of an order of the court approving the fees and expenses of such Professionals pursuant to section 330 of the Bankruptcy Code.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims will not be entitled to vote on the Plan.<br><br>Estimated accrued and unpaid Allowed Administrative Claims will aggregate approximately $750,000 on the Effective Date. | 100% | N/A |

---

[11][12] None of the holders of Claims or expenses in this first category are entitled to be classified under, or to vote on, the Plan. See section 1123(a)(1) of the Bankruptcy Code. Thus, they are designated as neither impaired nor unimpaired for purposes of the Plan.

NYIWDMS: 11417167_19