| -- | Priority Tax Claims[12][13] | Priority Tax Claims are those Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.<br><br>Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive equal quarterly Cash payments over a period not exceeding five (5) years from the Petition Date, with the first payment to occur on the first business day of the third month after the Effective Date, at an interest rate of 6% or a rate agreed upon between the Reorganized Debtor and the taxing authority or otherwise set by the Bankruptcy Court.<br><br>All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such claims will not be entitled to vote on the Plan.<br><br>The Debtor estimates unpaid Allowed Priority Claims will only be $4,445. | 100% | N/A |
| -- | United States Trustee Quarterly Fees and Other Statutory Fees | Partners shall pay all fees due and payable under section 1930 of Title 28 within ten (10) days after the Effective Date.  In addition, Partners or the Reorganized Debtor shall pay the United States Trustee quarterly fees due and payable on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business until entry of a Final Decree, dismissal of the case or conversion of the case to a case under chapter 7 as such obligations become due. | 100% | N/A |

---

[12][13] All other Priority Claims shall be paid in full on the Effective Date.  Partners does not believe that there are any other Priority Claims.

23

Classified Claims

| Class | Description | Treatment Under the Plan | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | ~~West LB~~WestLB Secured Claim | Class 1 consists of the ~~West LB~~WestLB Secured Claims against Partners.  With respect to Class 1, the Plan provides as follows:<br><br>a.  The Allowed Claim of WestLB shall accrue interest at 3-month LIBOR plus 6%, provided however, the maximum rate shall be capped at ~~8~~9% ("Contract Rate"), until paid in full.<br><br>b.  WestLB shall retain a lien on all of Partners' assets and shall be provided with a lien on all of the Reorganized Debtor's assets and "Control Accounts" shall be established similar to those currently in effect.  Modified loan documents ("Modified Loan Documents") substantially similar to the existing loan documents reflecting the terms of this Plan shall be executed on or before the Effective Date, which shall be reasonably acceptable to Partners, WestLB and the Plan Funder or as otherwise approved by the Bankruptcy Court.  The Modified Loan Documents will be annexed to the Plan Supplement and will become binding on the Reorganized Debtor on and after the Effective Date.<br><br>c.  The allowed amount of the claim shall be paid as follows:  Monthly interest payments subsequent to the Effective Date shall be paid on the first business day of each month, one month in arrears, on the outstanding principal balance of the Allowed WestLB Secured Claim | 100% | Impaired and entitled to vote |

24

| | | | | |
|---|---|---|---|---|
| | | through December 31, 2010 at the Contract Rate.  Thereafter, monthly payments shall be made according to a 20-year amortization schedule; provided, however, all or a portion of the monthly payments constituting amortization of principal (but not the portion of the monthly payments constituting interest) shall be reduced by payments previously made to WestLB after the Effective Date from the sale of Units until the loan is repaid.  Sums remaining due and owing on the maturity date, which shall be either (a) December 31, 2011 or (b) December 31, 2013 (the "Maturity Date") shall be paid in full.  The Maturity Date shall be extended from December 31, 2011 through December 31, 2013, if (i) the Reorganized Debtor amortizes the Allowed WestLB Claim pursuant to the five (5) year business plan annexed hereto as Exhibit 2, and (ii) the loan to value ratio is equal or greater than such ratio as of the Confirmation Date. | | |
| | d. | WestLB shall receive 80% of the Net Sale Proceeds received by the Reorganized Debtor from the sale of each Unit, each of which sales must exceed a minimum release price to be reasonably acceptable to WestLB or otherwise ordered by the Bankruptcy Court.  The remaining 20% of Net Sale Proceeds shall be deposited into a Control Account, provided, however, said sums may be utilized in connection with costs of running the Property and other Plan payments. | | |
| | e. | In the event of the sale of the | | |

25

NYIWDMS: 11417167_19

restaurant Zoom, which sale must exceed a minimum price reasonably acceptable to WestLB or as otherwise ordered by the Bankruptcy Court, along with the underlying property, WestLB shall receive 50% of the Net Sale Proceeds received by the Reorganized Debtor.  The remaining 50% of the Net Sale Proceeds shall be utilized by the Reorganized Debtor for expenses relating to operations of the Sky Lodge, payments in connection with the Plan, or repayment of loans or distribution to the Plan Funder (provided all payments under the Plan are current).

f.      Prepayment of the loan to WestLB shall be allowed without penalty.

g.      The Reorganized Debtor or the Plan Funder shall have the right of first ~~refusal~~offer to purchase or satisfy the WestLB Secured Claim at a discount or par, as the case may be, in the event WestLB seeks to sell or assign its claim to a third party ~~for the price being offered by the third party~~.  Upon the Reorganized Debtor or Plan Funder making an offer ("Offer") to purchase the WestLB Secured Claim, WestLB shall accept or reject such Offer within ten (10) days of receipt of the Offer.  If WestLB accepts the Offer, then the Reorganized Debtor or the Plan Funder shall pay the amount in the Offer to WestLB within sixty (60) days in full and complete satisfaction of the WestLB Secured Claim.  If WestLB rejects the Offer, then prior to WestLB attempting to sell the WestLB Secured Claim to any Third Party, it must make a

NYIWDMS: 11417167_19

| | | counter-offer ("Counter-Offer") to the Reorganized Debtor or the Plan Funder who shall have ten (10) days to accept or reject the Counter-Offer. If the Reorganized Debtor or Plan Funder rejects the Counter-Offer, then WestLB may sell the WestLB Secured Claim at an amount equal to or greater than the Counter-Offer to a third party.  If WestLB receives an offer from a third party to purchase the WestLB Secured Claim for an amount less than the Counter-Offer (the "Third Party Offer"), then WestLB must first offer the Reorganized Debtor or Plan Funder the opportunity to purchase or satisfy the WestLB Secured Claim irrespective of whether the WestLB Secured Claim is being sold by itself or in a package with other loans. WestLB shall promptly notify the Reorganized Debtor and the Plan Funder of its intent to accept ~~an offer~~a Third Party Offer for its outstanding loan balance and specify the amount ~~(the "Redemption Price"), and the~~of the Third Party Offer.  The Reorganized Debtor and Plan Funder shall have ten (10) days to elect to purchase the WestLB Secured Party Claim at the amount of the Third Party Offer and have sixty (60) days to close the purchase or ~~satisfy said loan for the Redemption Price~~satisfaction of the WestLB Secured Claim for the amount of the Third Party Offer. | | |
| | h. | Any Net Recovery received in connection with the BayNorth Transfer shall be paid 70% to WestLB amortizing the outstanding indebtedness to WestLB and 30% to the Reorganized Debtor for | | |

27

utilization of Property expenses, payment to Allowed Claims of creditors pursuant to the Plan or used by the Reorganized Debtor as determined by the Plan Funder.  To the extent claims of creditors, other than WestLB, have been fully paid, such remaining sums shall be free cash for utilization by the Reorganized Debtor.

i.      Upon payment of the Allowed WestLB Secured Claim in full, the lien of WestLB on the Property shall be deemed released and satisfied and the holder of the Allowed WestLB Claim shall execute such documents releasing its liens on the Property and all Assets of the Reorganized Debtor as is requested by and reasonably acceptable to Partners.

j.      Notwithstanding any other provision of the Plan to the contrary, the CloudNine Resorts LLC guaranty of WestLB's loan to Partners shall remain in place and shall be reaffirmed on the Effective Date, provided however, that(a) the only triggering event of a default against CloudNine Resorts LLC shall be prospective defaults subsequent to the Effective Date.  All and all prior defaults, if any, are waived, and (b) in the event WestLB accepts payment on its claim in an amount less than its Allowed Claim, the guaranty shall be cancelled and not enforceable.

k.      The above payment is in full and complete satisfaction, settlement and release of and in exchange for the Allowed WestLB Claim.

As set forth on page 7-8 above, the Debtor believes the Allowed WestLB Secured

NYIWDMS: 11417167_19

| 2 | Jacobsen Secured Claims | Claim will be approximately $15,700,000. | | |
| | | Class 2 consists of the Jacobsen Allowed Secured Claims against Partners. | 100% under Option 1 | Impaired and entitled to vote |
| | | a.    In full and complete satisfaction, settlement and release of and in exchange for the Allowed Jacobsen Secured Claim, as well as all claims of Jacobsen's Subcontractors, whether they filed mechanics' liens or any other claims against Partners, Easy Street Mezzanine, LLC, Easy Street Holding, LLC and the owners of Third Party Units pursuant to sections 5.2(a)(2), 5.2(d) and 5.2(e) of the Plan, the holder of the Allowed Jacobsen Secured Claim shall have an Allowed Secured Claim in the amount of $1.5 million, which shall accrue interest at 8% simple interest from and after the Confirmation Date on the outstanding principal balance of the Allowed Jacobsen Secured Claim, and the Claim shall be treated under one of the following two options to be elected by the holder of the Allowed Jacobsen Secured Claim on its Ballot in connection with voting on the Planas follows: | | |
| | | 1.    Under option one, theThe holder of the Allowed Jacobsen Secured Claim (i) shall be granted a promissory note and second priority deed of trust and fixture filing on the real estate assets and related buildings and fixtures of the | | |

NYIWDMS: 11417167_19

|  |  | Reorganized Debtor, which promissory note and deed of trust and fixture filing shall contain standard terms and conditions typical for commercial loans, (ii) shall receive on the Effective Date $600,000 from the Sales Proceeds Account, and (iii) shall be paid an amount equal to eight percent (8%) of the Net Sale Proceeds of the Units over a term not to exceed four (4) years from the Confirmation Date, at which time any remaining balance shall be paid in full.<br><br>2.  Under option two, Jacobsen may elect shall be paid a discounted cash payment on the Effective Date equal to $1,330,000 and shall utilize the funds it receives to pay its Subcontractors, including, but not limited to, Gunthers Comfort Air, in full and complete satisfaction, settlement and release of and in exchange for the Allowed all claims of Jacobsen Secured Claim against Partners, the Reorganized Debtor and any third parties who may also be liable on the claim or own real property securing the claim (including the Third Party Units), and shall promptly release its liens against any real estate assets securing such claim. and each of its Subcontractors. The $1,330,000 cash payment to Jacobsen may include $600,000 from the Sales Proceeds Account, |  |  |

NYIWDMS: 11417167_19

b.   Jacobsen and its Subcontractors shall be enjoined from foreclosing on Assets of the Reorganized Debtor, provided that the Reorganized Debtor ~~is current and making the payments~~ has made the $1,330,000 payment provided in the Plan to Jacobsen~~, and is otherwise not in default of its obligations under the promissory note and deed of trust and fixture filing being granted to the holder of the Jacobsen Secured Claim to document and secure the Reorganized Debtor's performance hereunder~~.

c.   All pending actions against Units owned by third parties (the "Third Party Units") and the third parties owning the Units shall be stayed ~~for a period of six (6) months~~ from the Confirmation Date~~.~~ to the date of payment of the $1,330,000.

d.   Upon Jacobsen's receipt of ~~$4,500 (the "Unit Release Price") for a particular~~ ~~Unit, (i) Jacobsen and the owner of the Unit for which the Unit Release Price is received by Jacobsen~~ the $1,330,000, Jacobsen, its Subcontractors and the owners of the Third Party Units shall be deemed to have mutually released each other with respect to Jacobsen's lien and any other lien of a Subcontractor on the particular Unit and Jacobsen's and the Subcontractor's work on the particular Unit, (ii) the lien of Jacobsen and any Subcontractor on the particular Third Party Unit shall be deemed released and satisfied and Jacobsen and the Subcontractor, as applicable, shall execute such

31

documents releasing its lien with respect to that particular Third Party Unit (irrespective of source of payment), and (iii) Partners and the owner of the Third Party Unit shall be dismissed with prejudice from the litigation commenced by Jacobsen to enforce its liens.

e.  Upon payment of the Allowed Jacobsen Secured Claim in full, the lien of Jacobsen and all Subcontractors on the Property and the Third Party Units shall be deemed released and satisfied and the holder of the Allowed Jacobsen Secured Claim and all Subcontractors shall execute such documents releasing ~~its~~their liens on the Property, and all Assets of the Reorganized Debtor and all the Third Party Units, as is requested by and reasonably acceptable to the Reorganized Debtor.

f.  Under any circumstance, upon payment to Jacobsen of $4,500 (the "Unit Release Price") for a particular Third PartyUnit, then (i) Jacobsen, its Subcontractors and the owner of the Third Party Unit for which the Unit Release Price is received by Jacobsen shall be deemed to have mutually released each other with respect to Jacobsen's lien and any other lien of a Subcontractor on the particular Third Party Unit and Jacobsen's and the Subcontractor's work on the particular Third Party Unit, (ii) the lien of Jacobsen and any Subcontractor on the particular Third Party Unit shall be deemed released and satisfied and Jacobsen and the Subcontractor, as applicable,

32

| | | | | |
|---|---|---|---|---|
| | | shall execute such documents releasing its lien with respect to that particular Third Party Unit (irrespective of source of payment), and (iii) the owner of the Third Party Unit shall be dismissed with prejudice from the litigation commenced by Jacobsen to enforce its liens. Upon payment of each Unit Release Price (irrespective of who made the payment), the Reorganized Debtor shall be credited for the amount paid and such amount shall reduce the principal amount of the Allowed Jacobsen Secured Claim accordingly, with such payment being applied first to accrued and unpaid interest (if any), and then to unpaid principal. . | | |
| | | g.  The treatment provided herein to the holder of the Allowed Jacobsen Secured Claim shall be in full satisfaction, discharge and release of all of the obligations to the holders of the Allowed Jacobsen Secured Claim as well as Claims of the Subcontractors. | | |
| | | h.  Notwithstanding anything contained in the Plan, the Reorganized Debtor shall retain all warranty claims against Jacobsen. | | |
| | | i.  If the holder of theThe Allowed Jacobsen Secured Claim fails to vote or affirmatively elect option 1 or 2, then the holder of the Allowed Jacobsen Secured Claim shall be paid in accordance with option 1 as set forth in Article 5.2 (a)(1) of the Plan.is $1,500,000. | | |
| 3 | All Other Secured Claims Against Partners | Class 3 consists of the All Other Secured Claims against Partners.  With respect to Class 3, the Plan provides as follows: | 100% | Unimpaired Deemed to Accept |

33

| | | | | |
|---|---|---|---|---|
| | | In full and complete satisfaction, settlement and release of exchange for the Allowed Other Secured Claims, on the Effective Date, except to the extent that the holder of an Other Secured Claims agrees to less favorable treatment, all other holders of secured claims (the "Other Secured Creditors") will be separately classified and their collateral will either ~~be sold or the property against which the security interest is held will~~ be assigned to such Other Secured Creditor as the indubitable equivalent of such claim or the secured claim will be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default.  If the property securing the Other Secured Creditor Claim is sold, the Other Secured Creditor will receive such net proceeds of sale with any remaining claim to be classified as an unsecured claim.<br><br>Partners does not believe that that there are any Claimants in this Class 3. | | |
| 4 | General Unsecured Claims against Partners | Class 4 consists of all Allowed Unsecured Claims against Partners.  With respect to Class 4, the Plan provides as follows:<br><br>~~1.~~  In full and complete satisfaction, settlement and release of and in exchange for Allowed General Unsecured Claims against Partners, each holder of an Allowed General Unsecured Claim, except to the extent such holder agrees to a less favorable treatment, shall have the option of electing one of the following alternatives, to be elected on their Ballot in voting on the Plan: | 100% | Impaired and entitled to vote |

34

Option 1:

a.　　Payment of 100% of their Allowed Claim, without interest, over four (4) years from the Effective Date from Excess Cash Flow.  The first prospective payment will be made on the first business day on the third month after the Effective Date, with prospective payments to be made on the first business day of each successive three (3) month period.  Excess Cash Flow shall mean cash remaining after all required payments to WestLB, Jacobsen and Allowed Administrative and Priority Claims are paid, with a reasonable reserve equal to the mandatory payments due to the foregoing senior creditors over the next three (3) months, plus thirty (30) days of necessary expenses to operate the project.  On the fourth anniversary of the Effective Date, all remaining Allowed General Unsecured Claims shall be paid in full.

a.　　Other than the Claims of CloudNine Resorts – Sky Lodge Management, LLC ("Sky Lodge Management") and CloudNine Resorts –Sky Lodge Development, LLC ("Sky Lodge Development"), holders of Allowed Class 4 Claims shall receive payment of 100% of their Allowed Claim, without interest, in equal quarterly payments, with the first payment due on October 15, 2010. Successor quarterly payments shall be on January 15th, April 15th and July 15th with the last payment July 15, 2013, which is approximately 3.5 years from the Effective Date.

Option 2:

b.　　PaymentOther than the Claims of

NYIWDMS: 11417167_19

| | | | | |
|---|---|---|---|---|
| | | Sky Lodge Management and Sky Lodge Development, holders of Allowed Class 4 Claims shall receive payment of a discounted amount (the "Discounted Amount") equal to 50% of the allowed claim on the thirtieth (30th) day after the Effective Date.<br><br>c.    If the holder of an Allowed General Unsecured Claim does not vote or fails to make an election of either option 1 or 2 or attempts to elect to split its Allowed General Unsecured Claim between options 1 and 2, then such holder of an Allowed General Unsecured Claim shall be paid in accordance with Option 1 as set forth in Article 5.4(a) of the Plan.<br><br>d.    The claim of Sky Lodge Management and Sky Lodge Development shall be paid pursuant to an agreement between the Plan Funder and the holder of the Claim, provided, however, that such Claim shall not be paid over a period less than four (4) years from the Effective Date.<br><br>Total General Unsecured Claims are approximately $3,695,000, of which $2,875,000 are held by Sky Lodge Management and Sky Lodge Development, and approximately $820,000 by all other General Unsecured Creditors. | | |
| 5 | Ownership of Third Party Units | a.    In full and complete satisfaction, settlement and release of and in exchange for the Allowed Claims of the Owners of the Third Party Units, upon payment of the Allowed Jacobsen Secured Claim, pursuant to section 5.2(a) of the Plan, all of the liens on the Third Party Units shall be released, the lawsuit by Jacobsen dismissed with prejudice, and the | 100% | Unimpaired and not entitled to vote |

36

| | | | | |
|---|---|---|---|---|
| | | Claims of the owners of the Third Party Units shall be fully satisfied, released and discharged.<br><br>b.     Class 5 is unimpaired by the Plan. Each holder of an Allowed Class 5 Claim is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. | | |
| 56 | Interest in Partners | Class 56 consists of the Interest in Partners, which is solely held by Mezzanine.  With respect to Class 5,6, the Plan provides as follows:<br><br>a:.     In full and complete satisfaction, settlement and release of and in exchange for the Interest in Partners, the holder of the Allowed Interest in Partners shall receive an amount equal to the difference between the appraised value of Partners' assets as determined by the Bankruptcy Court and the allowed amount of all Allowed Claims, Administrative Claims and Priority Claims against Partners, which shall be posted in the Mezzanine Escrow.  On the Effective Date, the Interest in Partners shall be cancelled.<br><br>b:.     The Mezzanine Escrow will be held by the Disbursing Agent for distribution pursuant to a plan of reorganization or liquidation to be filed by Mezzanine subsequent to the Confirmation Date or as otherwise ordered by the Bankruptcy Court posted with the Disbursing Agent and utilized to fund the BayNorth Adversary Proceeding.  Any funds remaining upon resolution of the BayNorth Adversary Proceeding shall not be disbursed until the holders of Allowed Class 4 General | | Impaired and entitled to vote |

37

| | | Unsecured Claims are either (1) paid a discounted amount equal to 50% of their Allowed Claim on the thirtieth (30th) day after the Effective Date, or (2) paid in full, depending upon their elected treatment. | | |
|---|---|---|---|---|
| | | | | |

Notwithstanding the treatment set forth above, the holder of any Allowed Claim may elect to receive lesser and different treatment if so agreed with Partners.

**C.     Methods of Distributions Under the Plan**

**1.     Distributions of Cash**

Any payment of Cash made by the Reorganized Debtor, or the Disbursing Agent, pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

**2.     Distributions Free and Clear**

Except as otherwise provided in the Plan, any distributions or transfers by or on behalf of the Reorganized Debtor under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

**3.     Timing of Distributions**

Unless otherwise provided in the Plan, any distribution to be made by the Reorganized Debtor or the Disbursing Agent shall be made to the extent and at the time provided in Article 5 of the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**4.     Delivery of Distributions**

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules or on the books and records of Partners or its agents.  The holder of an Allowed Claim must notify the Reorganized Debtor in writing of a change of address pursuant to the notice requirements set forth in Article 11.15 of the Plan or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules.  Neither the Reorganized Debtor nor the Disbursing Agent shall be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein or in the Plan.

NYIWDMS: 11417167_19

### 5.      Distributions to Holders as of Record Date

As of the close of business on the Record Date, the claims register for Partners shall be closed pursuant to the order approving the Disclosure Statement, and there shall be no further changes made to the identity of the record holder of any Claim.  Neither the Reorganized Debtor nor the Disbursing Agent shall have any obligation to recognize any transfer of any Claim occurring after the Record Date, provided, however, that the Reorganized Debtor and the Disbursing Agent will recognize transfers of Claims made after the entry of an order approving the Disclosure Statement but before the Confirmation Date for distribution purposes.

### 6.      Undeliverable and Unclaimed Distributions

(i)      If the distribution to the holder of any Allowed Claim is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Reorganized Debtor or the Disbursing Agent, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall be made, subject to the provisions of Article 6.10 of the Plan, as soon as is practicable to such holder, without interest.

(ii)      Checks issued by the Reorganized Debtor or the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Requests for re-issuance of any check shall be made in accordance with the notice provisions of Article 11.15 of the Plan to the Reorganized Debtor or the Disbursing Agent, as appropriate, by the holder of the Allowed Claim to whom such check originally was issued.

(iii)      All claims for undeliverable distributions or voided checks shall be made on or before one hundred and twenty (120) days after the date such undeliverable distribution was initially made.  After such dates, all such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become unencumbered Cash of the Reorganized Debtor.  The holder of any Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code shall not be entitled to any other or further distribution under the Plan on account of such Claim.

### 7.      Setoffs

To the extent permitted under applicable law, the Reorganized Debtor may set off against or recoup from the holder of any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any nature that the Debtors have asserted in writing against the holder of such Allowed Claim, including, without limitation, any rights under section 502(d) of the Bankruptcy Code and in the absence of a written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of such a writing from Partners or the Reorganized Debtor, it will be conclusively presumed that the requirements for disallowance of a claim under section 502(d) of the Bankruptcy Code or setoff or recoupment under applicable law have been satisfied.

NYIWDMS: 11417167_19

### D.    Implementation of the Plan

#### 1.    Reorganized Debtor

(i)    Reorganized Articles of Organization and Reorganized Operating Agreement.  The Reorganized Debtor shall adopt Reorganized Articles of Organization and a Reorganized Operating Agreement prior to, but effective as of, the Effective Date, which shall be included in the Plan Supplement.  Prior to the closing of Partners Chapter 11 case, any amendments to Reorganized Debtor's Articles of Organization and Reorganized Operating Agreement shall be filed with the Bankruptcy Court.

(ii)    Managing Members and Officers.  The initial managing members and officersmember of the Reorganized Debtor shall be SCP and Steven Sandholtz will be the principal officer.  Any other officers or changes will be disclosed in the Plan Supplement and shall be in effect as of the Effective Date.

#### 2.    Exit Funding

On or before the Effective Date, the Plan Funder shall contribute approximately $6 million of capital, loans and/or provide additional standby funds (either as additional capital or loans) on terms mutually acceptable to Partners and the Plan Funderwhich as set forth on pages 17-19 above, will be sufficient to effectuate the Plan, as summarized on page 18 above.  The Plan Supplement will provide additional details, the exact terms of such funding and structure of the Reorganized Debtor and its management.

#### 3.    Early Payment

Nothing herein or in the Plan shall prevent the Reorganized Debtor from making any payments prior to the date provided for in the Plan, and the Reorganized Debtor shall not suffer any penalty or prejudice from making any such payments.

#### 4.    Mezzanine Escrow

The Mezzanine Escrow will be posted with the Disbursing Agent and utilized to fund the BayNorth Litigation.  Any funds remaining upon resolution of the BayNorth Litigation shall not be disbursed until the holders of Allowed Class 4 General Unsecured Claims are either (a) paid the Discounted Amount, or (b) paid in full, depending upon their elected treatment.

### E.    Executory Contracts and Unexpired Leases

Under section 365 of the Bankruptcy Code, Partners have the right, subject to Bankruptcy Court approval, to assume or reject any executory contract or unexpired lease. If Partners reject an executory contract or unexpired lease that was entered into before the Petition Date, the contract or lease will be treated as if it had been breached on the date immediately preceding the Petition Date, and the other party to the agreement will have a General Unsecured Claim for damages incurred as a result of the rejection.  In the case of rejection of real property leases, damages are subject to certain limitations imposed by Section 502(b)(6) of the Bankruptcy Code.

40

1.      **Rejected Contracts and Leases**

(i)      Each executory contract and unexpired lease to which Partners is a party shall be deemed automatically rejected as of the Effective Date, unless such executory contract or unexpired lease (1) will have been previously assumed by Partners, (2) is the subject of a motion to assume filed on or before the Confirmation Date or (3) is listed on the schedule of assumed contracts and leases annexed as an Exhibit to the Plan Supplement.  Partners may at any time on or before the Confirmation Date (or, with respect to any executory contract or unexpired lease for which there is a dispute regarding the nature or the amount of any cure, at any time on or before the entry of a Final Order resolving such dispute) amend the Plan Supplement to delete therefrom or add thereto any executory contract or unexpired lease, in which event such executory contract or unexpired lease will be deemed to be rejected, assumed or assumed and assigned, as the case may be.

(ii)     Partners will provide notice of any amendments to the Plan Supplement to the parties to the executory contracts or unexpired leases affected thereby and counsel to the Creditors' Committee and WestLB.  The fact that any contract or lease is listed in the Plan Supplement will not constitute or be construed as an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that the Reorganized Debtor or any successor to the Reorganized Debtor has any liability thereunder.

(iii)    The Reorganized Debtor reserves the right to file a motion on or before the Confirmation Date to assume and assign or reject any executory contract or unexpired lease whether or not identified in the Plan Supplement.

(iv)    The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

2.      **Rejection Damages Bar Date**

If the rejection of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be ~~enforeceable~~ enforceable against Partners or the Reorganized Debtor or its properties unless a proof of claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized Debtor counsel to the Creditors' Committee and WestLB, no later than thirty (30) calendar days after the later of the Confirmation Date or the entry of an order of rejection.  Nothing in the Plan will extend any prior deadline to file a proof of claim for damages arising from the rejection of an executory contract or unexpired lease.

3.      **Assumed Contracts and Leases**

(i)      Except as otherwise provided in the Plan or the Confirmation Order, all executory contracts and unexpired leases identified in the Plan Supplement on an Exhibit listing assumed agreements will be deemed automatically assumed as of the Effective Date.

(ii)     Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupy of real property will include (1) all modifications,

41

amendments, renewals, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other documents that in an manner affect such executory contract or unexpired lease and (2) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy or is otherwise rejected as a part of the Plan.

(iii)    To the extent Partners is party to the unexpired lease or executory contract and is to be merged or dissolved as a result of the Plan, any non-debtor party to such unexpired lease or executory contract will, upon assumption as contemplated herein, be deemed to have consented to the assignment of such unexpired lease or executory contract to the Reorganized Debtor.

(iv)    The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of such executory contracts and unexpired leases, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

**4.    Payments Related to Assumption of Executory Contracts and Unexpired Leases**

(i)    Any monetary amounts by which each executory contract and unexpired lease to be assumed under the Plan may be in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code by promptly curing same ("Cure Claim").

(ii)    In the event of a dispute regarding (1) the nature or the amount of any Cure Claim, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the amount of the Allowed Cure Claim shall be paid no later than thirty (30) calendar days following the entry of a Final Order resolving the dispute and approving the assumption and, as the case may be, assigned.

**5.    Proposed Assumption and Rejections**

At this time, the only executory contracts being assumed are (i) lease with Sundance Partners, Ltd. for the restaurant premises at Zoom, (ii) and an equipment lease with Revco Leasing Co., LLC.  There are no defaults by Debtor requiring any cure or other payments.

The executory contracts being rejected are the development agreement with Sky Lodge Development and the management agreement with Sky Lodge Management, whose treatment is set forth as Article 5.3 of the Plan.  Additionally, the lease with Gateway Center, LLC concerning certain off site office space is being rejected.

**F.    Provisions for Treatment of Disputed Claims**

If any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of that Claim unless and until, and only to the extent, such Claim becomes Allowed.  At the time that a Disputed Claim becomes an

42

~~Allowed Claim, the holder of that Allowed Claim will be entitled to receive from the Reorganized Debtor a distribution on its Allowed Claim equal in percentage to the distributions made to date on previously-allowed Allowed Claims.~~

**1.** **Disputed Claims**

(i)      In connection with distributions to be made in respect of Allowed Claims, there shall be reserved from any distribution to the holder of a Disputed Claim the amount of distribution which then otherwise would be paid in respect to such Disputed Claim on the Effective Date if the full amount of such Claim were deemed to be an Allowed Claim or such lesser amount as the Bankruptcy Code may determine.

(ii)      Pending the determination of such Disputed Claim by the Bankruptcy Court, Partners shall deposit in a separate bank account funds equal to the amount so reserved or such lesser amount as the Bankruptcy Court may have determined within fifteen (15) business days after the date on which such amount would otherwise be distributed to the holder of such Claim.  Such funds shall be held by the Disbursing Agent in such separate bank account as long as such Claim remains a Disputed Claim.

(iii)      If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor, or the Disbursing Agent shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided in the Plan, distribute to the holder of such Allowed Claim an amount, without any interest thereon, that provides such holder with the same percentage recovery, as of such date, as holders of Claims in the class that were Allowed on the Effective Date.

(iv)      To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed.  Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, shall be disallowed.

(v)      Any monies remaining on deposit with respect to any Disputed Claim after its resolution or determination by the Bankruptcy Court shall be returned to the Reorganized Debtor.

**2.**      ~~1.~~ Resolution of Disputed Claims

The Reorganized Debtor shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims.  The Reorganized Debtor shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event shall the service of such an objection be later than 120 days after the Effective Date, unless such date is extended by order of the Bankruptcy Court.  The Bankruptcy Court, for cause, may extend the deadline

on the request of the Reorganized Debtor.  All objections shall be litigated to a Final Order except to the extent that the Reorganized Debtor elects to withdraw such objection, or the Reorganized Debtor and the holder of the Disputed Claim compromise, settle or otherwise resolve any such objections, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

2.        ~~Other Provisions Relating to Disputed Claims~~

~~If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor, or the Disbursing Agent shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided in the Plan, distribute to the holder of such Allowed Claim an amount, without any interest thereon, that provides such holder with the same percentage recovery, as of such date, as holders of Claims in the class that were Allowed on the Effective Date.~~

~~To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed. Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, shall be disallowed.~~

G.        **Summary of Other Provisions of the Plan**

The following subsections summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.[~~13~~14]

1.        **Releases and Exculpations**

**Except as otherwise provided in the Plan or Confirmation Order, as of the Effective Date, Partners, the Reorganized Debtor, the Disbursing Agent, the Creditors' Committee, the members of the Creditors' Committee in their respective capacity as such, any of such parties' respective present or former members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, and agents, and any such parties' successors and assigns (collectively, the "Released Parties") shall be released by Partners and any successors-in-interest of Partners from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that Partners would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim, Interest, or other person or entity would have been legally entitled to assert on behalf of Partners or its estate, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date but occurring during the chapter 11 cases, except for acts constituting willful misconduct, gross negligence or**

---

[~~13~~14]  All governmental entities with a potential interest in Partners' chapter 11 case were served with the Plan and Disclosure Statement.

NYIWDMS: 11417167_19

bad faith, and, in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  Without limiting the generality of the foregoing, to the extent permitted by law, Partners and any successors-in-interest of Partners shall waive all rights under any statutory provision purporting to limit the scope or effect of a general release, whether due to lack of knowledge or otherwise.

Partners, the Committee, and the Released Parties, and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any Person or Entity for any act taken or omission, after the Petition Date, in connection with or related to these cases or the operations of Partners' business during the cases, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (iii) any distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Chapter 11 Cases, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

2.    Injunction

The satisfaction, releases and discharge pursuant to Article 9 of the Plan will also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, recoup or recover any Claim or Cause of Action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.

3.    Modification of the Plan

The Reorganized Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

4.    Withdrawal or Revocation of the Plan

Partners may withdraw or revoke the Plan at any time prior to the Confirmation Date. If Partners revokes or withdraws the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained in the Plan or Disclosure Statement shall be deemed to constitute a

45

waiver or release of any Claim by or against Partners or the Other Debtors or any other person or to prejudice in any manner the rights of Partners or the Other Debtors or any other person in any further proceedings involving Partners or the Other Debtors.

### 5.    Effectuating Documents and Further Transactions

Upon entry of the Confirmation Order, Partners, and the Reorganized Debtor, shall be authorized and are instructed to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 6.    Section 1146 Exemption

Pursuant to Bankruptcy Code § 1146(ea), (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument or transfer under, in furtherance of, or in connection with, the Plan, will not be subject to any stamp tax, or similar tax held to be a stamp tax or other similar tax by applicable law.

### 7.    Dissolution of the Creditors' Committee

On the Effective Date, except for the specific purpose of prosecuting the WestLB Adversary Proceeding, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention and employment of the Committee's attorneys shall terminate.  The Committee shall continue in existence after the Effective Date solely for the purpose of (a) reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to applications for compensation and reimbursement of expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code, and (b) prosecuting the WestLB Adversary Proceeding.

### 8.    Severability

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Reorganized Debtor and the Committee, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Notwithstanding the foregoing, the

NYIWDMS: 11417167_19

provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan.

### 9. Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable and except as may otherwise be provided in the Modified Loan Documents, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the State of Utah, without giving effect to Utah's principles of conflicts of law.

### 10. Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in Partners and its respective successors and assigns, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the term of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Other Debtors under chapters 7 or 11 of the Bankruptcy Code).

### 11. Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date by Partners. Any statutory fees accruing after the Confirmation Date also shall be paid by Partners.

### 12. Discharge

The rights and treatment of all Claims against and Interests in Partners shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against Partners or its estate, assets, properties or interests in property. The Reorganized Debtor shall not be responsible for any obligations of the Other Debtors or their estates except those expressly assumed in accordance with the terms of the Plan.

### 13. Retention of Causes of Action/Reservation of Rights

Except as provided in Article 11.4 and 11.5 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim (as that term is defined in section 101(5) of the Bankruptcy Code), rights, causes of action, right of setoff, or other legal or equitable defense that Partners, the Reorganized Debtor or the Other Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against Partners

47

NYIWDMS: 11417167_19

or the Other Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code, (iii) the turnover of any property of Partners or the Other Debtors' estates, (iv) any and all claims against BayNorth, and (v) any and all claims against Jacobsen, which upon the Effective Date, shall be the warranty claims against Jacobsen.

### 14.    Section 506(c) Reservation

Except as provided in the Order ~~On~~on Stipulation Authorizing Use of Cash Collateral entered on October 14, 200, and in any subsequent orders approving amendments or extensions to the Stipulation Authorizing Use of Cash Collateral, Partners and the Reorganized Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

### 15.    Plan Supplement

The documents comprising the Plan Supplement shall be filed with the Clerk of the Bankruptcy Court on the earlier of (a) ten (10) days prior to the hearing to confirm the Plan or (b) two (2) business days prior to the deadline to vote or object on the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours or at the Court's website at www.utb.uscourts.gov.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to Partners' bankruptcy counsel.

### 16.    Injunction

The satisfaction, releases and discharge pursuant to Article 9 of the Plan will also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset, recoup or recover any Claim or Cause of Action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.

## V.    CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Voting Procedures and Solicitation of Votes

The voting procedures and the procedures governing the solicitation of votes are described above in Section I, and in the Disclosure Statement Order, which has been sent to you simultaneously with this Disclosure Statement if you are entitled to vote on the Plan.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing on the Plan has been scheduled for March ~~—~~,30, 2010, commencing at ~~—:—~~ ~~a~~1:00 p.m. (Mountain Time), before the Honorable R. Kimball Mossier, United States Bankruptcy Judge, in Room __ of the Bankruptcy Court, 350 Main Street, Salt Lake City, Utah 84101.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before March _____2010, at 4:00 p.m. (Mountain Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except

48

for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest of Partners held by the objector.  Objections must be timely served upon the following parties:

> Michael V. Blumenthal, Esq.
> Crowell & Moring LLP
> 590 Madison Avenue, 20th Floor
> New York, New York 10022

> Kenneth L. Cannon II, Esq.
> Durham Jones & Pinegar
> 111 East Broadway, Suite 900
> P.O. Box 4050
> Salt Lake City, UT 84110-4050

> Office of United States Trustee
> Attn:  John T. Morgan
> Ken Garff Bldg.
> 405 South Main Street, Suite 300
> Salt Lake City, UT 84111

> Lon A. Jenkins, Esq.
> Jones Waldo Holbrook & McDonough, PC
> 170 South Main Street
> Suite 1500
> Salt Lake City, UT 84101

> Richard W. Havel, Esq.
> Sidley Austin LLP
> 555 West Fifth Street, Suite 4000
> Los Angeles, CA 90013

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**C.      Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- Partners has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

49

- Any payment made or promised by the Debtors or by a person acquiring property under the plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the plan and incident to the chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the plan is reasonable or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as member, director or officer of the Reorganized Debtor, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy, and Partners has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider.

- With respect to each class of Claims or Interests, each holder of an impaired Claim or Interest has either accepted the plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the debtors were liquidated on the effective date under Chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test," below.

- Each class of Claims or Interests has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular Claim has agreed to different favorable treatment of such claim, the plan provides that administrative expense claims and priority tax claims will be paid in full as required by the Bankruptcy Code.

- At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor or any successor to the debtors under the plan, unless such liquidation or reorganization is proposed in the plan.  See discussion of "Feasibility," below, and the debtors' financial projections in **Exhibit 2**.

      **1.**      **Acceptance**

Classes 1, 2, 4, and 56 of the Plan are impaired under the Plan and are entitled to vote to accept or reject the Plan.  ClassClasses 3 and 5 of the Plan is unimpaired and, therefore, conclusively is presumed to have voted to accept the Plan.

NYIWDMS: 11417167_19

###### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the Plan is feasible.  A feasible plan is one that will not lead to a need for further reorganization or liquidation of the Debtor, unless such reorganization or liquidation is proposed in the Plan.  Partners believes that the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code, as described in more detail in the Debtors' projected financial information contained in **Exhibits 2-1, 2-2, and 2-3**.

As reflected on Exhibit 2-1, the Reorganized Debtor anticipates that it will sell 5 Units in 2010 and that revenue from operations will generate sufficient funds to operate its business; however, due to extraordinary costs of this Chapter 11 case, which will be non-recurring, the new capital supplied by the Plan Funder will enable the Reorganized Debtor to make all required payments under the Plan, including debt service to WestLB under the Modified Loan Documents.  Moreover, the cash required on the Effective Date for payments of the Allowed Jacobsen Claim and Allowed Claims of holders of General Unsecured Claims which elect the discounted cash option will be provided by the Plan Funder, as more fully set forth at pages 18-20 above.

Exhibit 2-2 is five (5) year pro forma reflecting revenue and expenses from operations and Unit sales, and demonstrates sufficient net operating profits to make all payments provided under the Plan, including required debt service to WestLB.

Exhibit 2-3 reflects capital expenditures to be made at the Sky Lodge with funds provided by the Plan Funder.

The 2010 business plan and five year pro forma have been prepared by Partners' management in consultation with BDRC and Gemstone, incorporates their comments and changes, and represent a conservative projection of operations and sales.  Moreover, the projection of Unit sales set forth on Exhibit 2-2 was developed in coordination with AGI and is consistent with the assumptions set forth in AGI's appraisal, including absorption rate in the current and projected market for fractional shares.  Market reports for the fractional industry prepared by Ragatz and NorthCourse both indicated that the fractional market has been both less impacted by the recent recession than traditional second homes, and will rebound quicker.  This is largely due to the fact that demand for the fractional segment is somewhat underserved (as the concept is still in its infancy) and that the product is more appealing from an economic standpoint where buyers are more interested in purchasing only what they use.  A fractional share today simply makes more economic sense than purchasing a whole-ownership unit in today's new economy.  Therefore, sales industry wide are actually projected to remain quite robust.

Although the absorption rate in AGI's appraisal is assumed to be 10 Units over the first after the Effective Date, 20 Units the following year, and then 33 Units in the third and forth years, the Debtor's business plan is more conservative and only projects 5 Units in 2010, 17 Units in 2011, 20 Units in 2012 and 21 Units in 2013.

51

### 3.    Best Interests Test

With respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if Partners was liquidated under chapter 7 of the Bankruptcy Code.  This requirement often is referred to as the "best interests" test.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of Partners' assets in the context of a chapter 7 liquidation.  These proceeds must then be reduced by the costs of such liquidation, including costs incurred during the chapter 11 cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a trustee's fees, and the fees and expenses of professionals retained by a trustee.  The potential chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to chapter 7.  In addition, inefficiencies in the claims resolution process in a chapter 7 would negatively impact the recoveries of creditors.  The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired Class is then compared to the recovery provided for in the Plan for that Class.  The liquidation analysis is set forth as follows:

(i)    As detailed in the appraisal prepared by AGI (the "Appraisal"), as of December 4, 2009, the value of the Property is $22 million, excluding all liens and other encumbrances on the Property.  This assumes a bulk sale of the Property after a reasonable marketing period.

(ii)    Upon liquidation, the value of the Property would be reduced by 25% to 35%, leaving a value of the Property ranging from $14,300,000 to $16,500,000.[14][15]

(iii)    Upon liquidation, if the value of the Property were reduced by only 25%, the value of the Property would be $16,500,000.  The WestLB Secured Claim is in the amount of not less than $15,164,331.17 (as of the Petition Date) plus additional legal fees and alleged default rate interest.  Partners estimates that the Allowed WestLB Claim should be approximately $15.5 million.  Thus, WestLB will be paid 100% on liquidation.  As a result of the reduction in the value of the Property, the Allowed Jacobsen Secured Claim in the amount of $1,500,000 is only a partially secured claim in the approximate amount of $1 million.[15][16]  Thus, the Allowed Jacobsen Secured Claim will be paid approximately 67% of its Allowed Claim on liquidation.

---

[14][15]  The range of the reduction in value of the Property due to liquidation was determined by AGI.

[15][16]  The $1 million claim amount is derived by subtracting the WestLB Secured Claim in the approximate amount of $15.5 million from the value of the Property in the reduced amount of $16.5 million.

52

(iv)    Prior to taking into consideration the fees and costs associated with a chapter 7 trustee, there will be no money left to pay Administrative Claims, Priority Claims and General Unsecured Claims.

(v)    Upon liquidation, if the value of the Property were reduced by 35%, the value of the Property would be $14.3 million.  The WestLB Secured Claim in the approximate amount of $15.5 million will be paid approximately 92% on liquidation.  As a result of the reduction in value of the Property, the holder of the Allowed Jacobsen Secured Claim in the amount of $1.5 million will not receive any payment on its Allowed Jacobsen Secured Claim.

(vi)    Moreover, prior to taking into consideration the fees and costs associated with a chapter 7 trustee, there will be no money left to pay Administrative Claims, Priority Claims and General Unsecured Claims.

In contrast, Classes 1, 2, 3~~3,4~~ and 4~~5~~ will recover 100% of their respective Allowed Claims under the Plan, unless the holders of Claims in Classes 2 (Jacobsen) and 4 (General Unsecured Creditors) voluntarily opt to receive a discounted amount in cash on or about the Effective Date.  In that event, Jacobsen would receive $1.33 million and the holders of the General Unsecured Claims would receive 50% of their Allowed Claims.  Partners, therefore, submits that each impaired Class will receive under the Plan a recovery substantially greater than the recovery such Class would receive pursuant to a liquidation of Partners under chapter 7 of the Bankruptcy Code.

### 4.    Cramdown

Partners will seek to confirm the Plan notwithstanding the rejection by any of Classes 1, 2, 3, and ~~5~~6.  To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, nonaccepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(i)    Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(ii)    Unsecured Creditors.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.  (This provision is often referred to as the "absolute priority" rule.)

53

NYIWDMS: 11417167_19

(iii)    Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

A plan does not "discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.

~~Accordingly, the requirements of section 1129(b)(2)(B)(ii) of the Bankruptcy Code that a plan is fair and equitable vis-à-vis non-consenting classes of unsecured claims that are not paid in full only if junior claims or interests do not receive any distribution "on account of such junior claim or interest," is not applicable to a nonprofit case like this one.  As a consequence,~~ Partners believes the Plan could be confirmed over the objections of a non-consenting class of unsecured creditors that are not paid in full pursuant to section 1129(b) of the Bankruptcy Code as matter of law.

**D.    Conditions Precedent**

The Plan will be consummated on the Effective Date.

(1)    Conditions to Confirmation.  The following are conditions precedent to confirmation of the Plan, each of which may be satisfied or waived in accordance with section 10.3 of the Plan.

(i)    The Bankruptcy Court shall have approved by Final Order a disclosure statement with respect to the Plan.

(ii)    The Plan Funder shall commit to providing sufficient funding to effectuate the Plan.

(iii)    The Confirmation Order shall be in form and substance reasonably acceptable to Partners.

(2)    Conditions to Effective Date.  The following are conditions precedent to the Effective Date, both of which may be satisfied or waived in accordance with Section 10.3 of the Plan.

(i)    Partners or the Reorganized Debtor shall have executed and delivered the Modified Loan Documents, in a form that is reasonably acceptable to WestLB.

(ii)    The Confirmation Order shall have been entered and have become a Final Order.

(iii)    Partners or the Reorganized Debtor shall have sufficient cash necessary to pay claims required to be paid on the Effective Date.

54

       (3)    <u>Waiver of Conditions</u>.  The conditions to confirmation at the Effective Date set forth above may be waived by Partners without any further notice to parties in interest or the Bankruptcy Court and without a hearing.

## VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

       The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Interests.  The following summary does not address the federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Administrative Expense Claims).

       The following summary is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), existing and proposed Treasury regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes or new interpretations of these rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

       The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested an opinion of counsel with respect to any of the tax aspects of the Plan.  In addition, the Debtors have not requested a ruling from the IRS concerning the federal income tax consequences of the Plan, and the consummation of the Plan is not conditioned upon the issuance of any such ruling.  Thus, no assurance can be given as to the interpretation that the IRS or a court of law will adopt.

       This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts and tax-exempt entities).

       This summary also assumes that the various third-party debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form, and that Claims and Interests are held as capital assets.

       *Accordingly, the following summary is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to a holder of a Claim or Interest.*

       **<u>IRS CIRCULAR 230 NOTICE</u>:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT:  (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE OR LOCAL TAX LAWS, (II)**

**SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.    Consequences to Partners

### 1.    Partnership

Partners is a limited liability company that is taxed as a partnership for U.S. federal income tax purposes.  A partnership is not itself a taxpaying entity for U.S. federal income tax purposes, and a partnership's income or loss (and items thereof) for each taxable period during which it is in existence is allocated among its partners, who are required to report the income or loss (and items thereof) allocated to them on their own tax returns.  Generally, a partner is not allowed to deduct his or her share of partnership losses for the year in excess of the adjusted tax basis of his or her interest in the partnership, determined as of the end of the partnership's taxable year in which the loss occurs.  Any excess is allowed in any subsequent year in which a partner's adjusted tax basis increases.  A partner's tax basis is initially equal to the amount of cash and the adjusted tax basis of property contributed to the partnership.

Thereafter, tax basis increases for such items as additional contributions and the partner's share of taxable and tax-exempt income and gain, and tax basis decreases for such items as distributions and the partner's share of losses.  An increase in a partner's share of partnership liabilities or a partner's assumption of partnership liabilities is treated as a cash contribution to the partnership that increases tax basis, and a decrease in a partner's share of partnership liabilities or the assumption by the partnership of a partner's liabilities decreases tax basis, but not below zero.  (Cash distributions, including a decrease in a partner's share of partnership liabilities, in excess of tax basis is taxable and generally treated as gain from the sale of a partnership interest.)  A partner shares partnership recourse liabilities to the extent the partner bears the economic risk of loss with respect to the liabilities, i.e., based on a hypothetical partnership liquidation at a time when the partnership has no assets, after taking into account any rights of contribution or reimbursement from other partners or third parties that are related to other partners.  A partner also shares partnership nonrecourse liabilities.

### 2.    Cancellation of Indebtedness Income

Under the Tax Code, cancellation of indebtedness income ("COD Income") is recognized by a partnership to the extent, and at the time, that certain debts are discharged for less than full payment.  The COD Income recognized at the partnership level is then allocated among the partners pursuant to the allocation provisions of the partnership agreement, if such provisions comply with the Tax Code regarding allocations, or, if not, in accordance with the partners' interests in the partnership.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new

56

NYIWDMS: 11417167_19

consideration (including partnership interests) given in satisfaction of such indebtedness at the time of the exchange.  COD Income also includes any interest that the taxpayer deducted under the accrual method of accounting but remains unpaid at the time the indebtedness is discharged.  COD Income generally does not include the discharge of indebtedness to the extent the payment of the liability would have given rise to a deduction.

All of Debtors COD Income that will be generated from the Plan will be allocated to the member of Partners.  Under the Tax Code, the tax treatment of that income will be determined with respect to each member at the member level.

### B. Consequences to the Holders of Certain Claims and Interests

### 1. Holders of Allowed Class 1 Secured Claims

On the Effective Date, the holder of Allowed Class 1 Secured Claims shall receive a Modified Loan reflecting the terms of the Plan (the "Modified Loan").

#### (i) Significant Modification

The U.S. federal income tax consequences of the exchange of an Allowed Class 1 Secured Claim for the Modified Loan will depend on whether the exchange results in a "significant modification" of the Allowed Class 1 Secured Claim (i.e., whether the terms of the Modified Loan are significantly different from the terms of the Allowed Class 1 Secured Claim exchanged therefor).  The Treasury Regulations under section 1001 of the Tax Code provide specific rules for determining whether certain modifications are "significant."  One such rule provides that the deferral of a scheduled payment will be considered 'significant' unless the deferred payments are unconditionally payable during the period that begins on the initial due date for such payment and extends for the lesser of five years or 50% of the original term of the debt instrument (the "Safe-Harbor Period").  For this purpose, the original term of an instrument is determined without regard to any option to extend the original maturity.  The exchange should result in a significant modification of the Allowed Class 1 Secured Claim because the maturity date of the Modified Loan is after the Safe-Harbor Period.  Therefore, the holders of the Secured Claims should have a taxable exchange under section 1001 of the Tax Code.

#### (ii) Recognition of Gain or Loss

A holder who receives the Modified Loan in exchange for an Allowed Class 1 Secured Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the stated principal amount of the Modified Loan (assuming the Modified Loan is not publicly traded nor deemed exchanged for publicly traded property) (the "Issue Price"), and (b) the holder's adjusted basis in its Allowed Class 1 Secured Claim.  Such gain or loss may be capital in nature and may be long-term capital gain or loss if the Allowed Class 1 Secured Claim was held for more than one year.  To the extent that a portion of the Modified Loan received represents accrued but unpaid interest that the holder has not already included in income, the holder may recognize ordinary interest income (as described in Section C below).  A holder's tax basis in any Modified Loan received should equal the Issue Price of the Modified Loan as of the date distributed to the holder, and a

57

holder's holding period for the Modified Loan should begin on the day following the exchange.

A holder of the Modified Loan will be required to include stated interest on the Modified Loan in income in accordance with the holder's regular method of accounting to the extent such stated interest is "qualified stated interest." All stated interest on the Modified Loan that is unconditionally payable in Cash or property at least annually should be generally treated as "qualified stated interest."

### 2. Holders of Allowed Class 2 Secured Claim

Pursuant to the Plan, the holder of an Allowed Class 2 Secured Claim can elect to receive either (i) a Cash payment upon confirmation of the Plan, plus a new note under which payments of eight percent (8%) of the Net Sale Proceeds of the Units will be made over a four year period with the accrual of interest at 8% per annum; or (ii) a discounted Cash payment on the Effective Date.

In general, each holder of an Allowed Class 2 Secured Claim will recognize gain or loss in an amount equal to the difference between (a) the "amount realized" by the holder in satisfaction of the Claim (other than any Claim for accrued but unpaid interest, as described below), and (b) the holder's adjusted tax basis in the Claim (other than any Claim for accrued but unpaid interest, as described in Section C below). The "amount realized" by a holder will equal the sum of any Cash received by the holder upon the Effective Date and/or the fair market value of the holder's right to receive subsequent distributions pursuant to the Plan (each depending on the option selected). The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of an Allowed Class 2 Secured Claim will be determined by a number of factors, including, among others the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was purchased at a discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

Any loss, and a portion of any gain, realized by a holder in respect of their Allowed Class 2 Secured Claim may be deferred until all distributions have been made with respect to Allowed Class 2 Secured Claim. As a result of subsequent distributions, a holder may recognize additional gain or loss. In addition, a portion of such a delayed distribution may be treated as interest accrued from the Effective Date to the date of distribution. All holders of Allowed Class 2 Secured Claims should consult their tax advisors as to tax consequences of the receipt of additional distributions subsequent to the Effective Date.

### 3. Holders of Allowed Class 4 General Unsecured Claims

Pursuant to the Plan, holders of Allowed Class 4 General Unsecured Claims will either receive (i) payment of 100% of their allowed claim, without interest, over four (4) years from the Effective Date from Excess Cash Flow, or (ii) a Cash payment of a discounted amount equal to 50% of the allowed claim on the Effective Date. In general, each holder of an Allowed Class 4 General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (a) the "amount realized" by the holder in

58

NYIWDMS: 11417167_19

satisfaction of the Claim (other than any Claim for accrued but unpaid interest, as described in Section C below), and (b) the holder's adjusted tax basis in the Claim (other than any Claim for accrued by unpaid interest). The "amount realized" by a holder will equal the sum of any Cash received by the holder upon the Effective Date and/or the fair market value of the holder's right to receive subsequent distributions pursuant to the Plan (depending on the payment option elected). The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of an Allowed Class 4 General Unsecured Claim will be determined by a number of factors, including, among others the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was purchased at a discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

Any loss, and a portion of any gain, realized by holder in respect of their Allowed Class 4 General Unsecured Claims may be deferred until all distributions have been made with respect to Allowed Class 4 General Unsecured Claims. As a result of subsequent distributions, a holder may recognize additional gain or loss. In addition, a portion of such a delayed distribution may be treated as interest accrued from the Effective Date to the date of distribution.

### 4.    Holders of Allowed Class 5 Claims

Pursuant to the Plan, the claims of the Owners of the Third Party Units are satisfied and released upon payment of the Allowed Jacobsen Secured Claim. It appears, therefore, that under the Tax Code the Owners of the Third Party Units should not recognize gain or loss upon satisfaction of their claims because the Owners (i) do not receive any present or future consideration under the Plan, and (ii) do not have any tax basis in their claim that would give rise to a deduction or loss.

### 5.    ~~4.~~ Holders of Interests in Partners

In general, holders of Allowed Interests in Partners should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of Cash and the fair market value of other property, if any, received in respect of their Interest pursuant to the Plan (whether on or after the Effective Date), and (y) their adjusted tax basis in their Interest. Such gain or loss generally will be capital gain or loss, and will be long-term if their Interest shall have been held for at least one year at the Effective Date.

### C.    Accrued but Unpaid Interest

A portion of the consideration received by holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes. Conversely, it is possible that a holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but was not paid in full by Debtors.

59

The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

### D.      Information Reporting and Withholding

All distributions to holders of Allowed Claims or Interests under the Plan are subject to any applicable withholding obligations (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate (currently 28%).  Backup withholding generally applies if the holder:  (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is such holder's correct number and that such holder is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, applicable Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among others, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' federal income tax returns.

*The foregoing summary has been provided for informational purposes only.  All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.*

## VII.    RISK FACTORS

HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, PARTNERS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION OR INVESTING IN ASSETS OF THE DEBTORS.

### A.      Certain Bankruptcy Considerations

Although Partners believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate a resolicitation of votes.  Finally, there can be no assurance that any or all of the conditions to the Effective Date of the Plan will be met (or waived).  Accordingly, even if

60

the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

### B.      Material United States Federal Income Tax Considerations

THERE ARE A NUMBER OF MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN.  INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN <u>SECTION VI</u> OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" FOR A DISCUSSION OF THE MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

### C.      Risks Associated with the Exit Funding

The Reorganized Debtor's operations are dependent on the availability and cost of working capital financing and may be adversely affected by any shortage or increased cost of such financing.  Partners' anticipates that the Plan funder will provide sufficient funds, in either capital or loans, to (i) fund the Mezzanine Escrow, (ii) make Effective Date and ongoing payments to the holders of Claims, and (iii) provide short-term working capital needs.

Partners believes that substantially all of its needs for funds necessary for post-Effective Date working capital financing will be met by projected operating cash flow or the funds provided by the Plan Funder.

The Amended Plan is dependent upon the Plan Funder providing a $6-6.5 million infusiuon of capital to fund the Plan.  Without these funds, the terms of the Amended Plan would need to be modified under section 1127 of the Bankruptcy Code.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, Partners' alternatives include (i) liquidation of Partners under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization or liquidation.

### A.      Liquidation Under Chapter 7

If the Plan or any other chapter 11 plan for Partners cannot be confirmed under section 1129(a) and (b) of the Bankruptcy Code, this chapter 11 case may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate any remaining assets of Partners for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code.  If a trustee is appointed or elected and the remaining assets of Partners is liquidated under chapter 7 of the Bankruptcy Code, all holders of Administrative Claims, Priority Claims and General Unsecured Claims will receive no

NYIWDMS: 11417167_19

distribution distributions on account of their Allowed Claims.  See "Best Interest Test" on pages 43-44, supra.

      **B.**      ~~B.~~      **Alternative Chapter 11 Plan**

      If the Plan is not confirmed, Partners, or any other party in interest, may attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation of Partners' remaining assets other than as provided by the Plan.  Any attempt to formulate an alternative chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Unsecured Claims and Interests than are currently provided for under the Plan.  Accordingly, Partners believes that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Interests with the least delay.

## IX.    CONCLUSION AND RECOMMENDATION

      Partners believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims and Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  Partners urges holders of impaired Claims and Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than 4:00 p.m., Mountain Time, on March _____, 2009.

**\*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK\***

NYIWDMS: 11417167_19

DATED this 15 17th day of January February, 2010.

EASY STREET PARTNERS, LLC

By: _____
William Shoaf

By: _____
Philo Smith

DURHAM JONES & PINEGAR, P.C.

By: _____
Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
Steven J. McCardell (smccardell@djplaw.com)(2144)
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT 84111-4050
Telephone:  (801) 415-3000
Facsimile:  (801) 415-3500

and

CROWELL & MORING LLP
Michael V. Blumenthal (mblumenthal@crowell.com)
(admitted pro hac vice)
Steven B. Eichel (sdeichel@crowell.com)
(admitted pro hac vice)
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000
Facsimile:  (212) 223-4134

Counsel for Debtors and Debtors in Possession

Document comparison by Workshare Professional on Wednesday, February 17, 2010
10:37:56 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://SLCDM1/WorksiteSLC/529286/1 |
| Description | #529286v1<WorksiteSLC> - January 15 Disclosure Statement |
| Document 2 ID | interwovenSite://SLCDM1/WorksiteSLC/552054/2 |
| Description | #552054v2<WorksiteSLC> - Amended Disclosure Statement, February 17, 2010 |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 320 |
| Deletions | 223 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 557 |