Kenneth L. Cannon II (kcannon@djplaw.com) (3705)
Steven J. McCardell (smccardell@djplaw.com) (2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com) (admitted pro hac vice)
Steven B. Eichel (seichel@crowell.com) (admitted pro hac vice)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134

Corbin B. Gordon (corbingordon@yahoo.com) (9194)
CORBIN B. GORDON, P.C.
345 West 600 South, Suite 108
Herber City, UT  84032
Telephone:  (435) 657-0984/Fax:  (888) 822-8796

Counsel for Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EASY STREET HOLDING, LLC, *et. al.* | ) | Bankruptcy Case No. 09-29905 |
| | ) | Jointly Administered with Cases |
| Debtors | ) | 09-29907 and 09-29908 |
| | ) | |
| Address:    201 Heber Avenue | ) | Chapter 11 |
| Park City, UT 84060 | ) | |
| | ) | Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) | |
| 35-2183713 (Easy Street Holding, LLC), | ) | |
| 20-4502979 (Easy Street Partners, LLC), and | ) | |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) | **[FILED ELECTRONICALLY]** |
| | ) | |

## EASY STREET PARTNERS, LLC'S OBJECTION TO
## PROOFS OF CLAIM FILED BY GATEWAY CENTER, LLC

Easy Street Partners, LLC ("Partners"), a debtor and debtor in possession in the above captioned cases, files this objection to proofs of claim no. 31-1 and 31-2 filed by Gateway Center, LLC ("Gateway") pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of an order disallowing the claims identified above, and respectfully represents as follows:

### Background

1.      On September 14, 2009 (the "Petition Date"), Partners, Easy Street Mezzanine, LLC and Easy Street Holding, LLC (collectively, the "Debtors") filed a voluntary petition in this Court under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their property as debtors-in-possession.

2.      On October 2, 2009, the Office of the United States Trustee appointed an official committee of unsecured creditors to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.      This Court has jurisdiction to consider this matter under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U. S. C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested are sections 502 of the Bankruptcy Code and Bankruptcy Rule 3007.

## Dispute with Gateway Center

5.      On August 3, 2007, Cloud Nine Resorts, L.L.C. ("Cloud Nine") signed a lease (the "Lease") with Gateway Center, L.L.C. ("Gateway" or "Landlord").  The Lease was for a period of two years and 11 months commencing as of January 1, 2008.

6.      On January 9, 2009, Cloud Nine and Partners entered into an Assignment and Assumption Agreement pursuant to which Partners assumed all obligations of Cloud Nine, as tenant, under the Lease.

7.      In the spring of 2009, a safety inspector from the Occupational Safety and Health Administration ("OSHA") (i) inspected Partners' leased space and raised concerns about the safety of the leased space and (ii) stated that the leased space appeared to violate the safety code for a common path of egress, which requires a person to be able to choose two divergent paths to fire exits within 100 feet.

8.      On April 13, 2009, Corbin Gordon, Partners' counsel, sent a letter to the Landlord asking the Landlord to resolve the above-referenced 100 foot safety issue.  The letter proposed that the Landlord (i) obtain confirmation from Park City that the space was compliant with the safety codes or (ii) indemnify the tenant for the additional liability associated with the safety violation.  Neither occurred.

9.      On May 5, 2009, Partners filed a formal complaint with OSHA, which identified the safety issues. OSHA indicated that the safety issues should be deferred to local authorities and therefore declined to proceed without expressing an opinion.  To date, Park City officials have not taken any action.

10.     On September 17, 2009, Mr. Gordon sent a second letter to the Landlord outlining additional concerns with respect to the safety of the building that had come to light during discussions with OSHA, including (i) non-ADA compliant access and egress points in the parking garage, and (ii) no recorded easements through the parking garage for emergency exits.[1] The letter also raised additional concerns about the use of common area maintenance charges ("CAM") for the parking garage in violation of the lease.

11.     On September 24, 2009, the Landlord responded, denying any safety violations and misuse of CAM.

12.     On October 20, 2009, Mr. Gordon sent a third letter to the Landlord that set forth, among other things, (i) specific concerns with the ingress and egress through the parking garage that was non-compliant with safety standards, (ii) problems with respect to the stairwells, and (iii) the misuse of CAM.  The letter included information regarding the safety violations that had come to light through additional investigation, such as the main fire exits from the tenants space having numerous safety violations, including an area in the back alleyway of the building that pinches down to just 41 inches as one of the major fire exits from the building.  Partners gave the Landlord notice that it needed to fix the safety problems or the Lease would be abandoned.

13.     The Landlord never responded nor made any attempt to resolve the safety issues.

14.     On February 19, 2010, Corbin Gordon sent a fourth letter to the Landlord indicating that due to the Landlord's failure to resolve the various safety issues, the Lease had been rejected.  Attached to the letter was an analysis performed by Michael Johnston, of the

---

[1]  The parking garage is owned by a separate company and is not a part of the Gateway Center, which sits above the parking garage.

Summit Engineering Group, L.L.C., setting forth the numerous safety violations in the building. A copy of that analysis is attached hereto as Exhibit A.

15.     Michael Johnston, a professional engineer, prepared a report dated January 13, 2010, in which he identified numerous violations of the building code.  He states in his report that these violations are substantial and material.  These violations could result in serious injury or even death in an emergency situation.

16.     While the report contains numerous violations, the most egregious are the two staircases on the third floor that serve as the only fire exits for the space leased by Partners, which raise serious safety issues.

17.     First, the east exit stairway, which has no area of refuge for a person in a wheelchair, walker, or with another disability.  The building code requires that the area of refuge be within the fire-protected exit corridor, and provide a space for a person with a disability to remove themselves from the general flow of traffic while waiting for rescue.  *See Report of Summit Engineering*, East Exit Stairway, paragraphs 1 and 2.

18.     The area of refuge is designed to allow a person in a wheelchair or other disability to move out of the way of rushing individuals attempting to get out of the building, so that panicked people will not push them down the stairs or attempt to scale over them, which would a situation akin to a death trap versus an exit from danger.

19.     Based on the opinion of Johnston, the situation is an obvious violation of safety code, and unacceptable.

20.     Similar problems exist for the west stairway. *See Report of Summit Engineering*, West Exit Stairway and Exit Discharge, paragraphs 1 through 4.  The west exit stairway descends three stories and discharges into a narrow alleyway on the west side of the building.

21.     The exit drops into a sunken staircase that is eight inches narrower than absolute code minimum.  The staircase delivers people into the alleyway, where it meets another  major exit from the building.

22.     Thus, two exits are emptying into a constricted area that is only 41 inches (three and a half feet) wide, which then further narrows to only 22 inches (less than two feet) of clear width in the winter time due to snow not being adequately cleared.  Absolute code minimum width is 44 inches.  *See Report of Summit Engineering*, West Exist Stairway and Exit Discharge, paragraph 3.  In an emergency, numerous people could be exiting into a 22-inch passageway, which is obviously very dangerous.

## Gateway Claim

23.     On January 6, 2010, Gateway filed proof of claim no. 31-1 asserting a claim in the amount of $16,577.98 (the "Initial Gateway Claim").[2]  On February 8, 2010, Gateway filed amended proof of claim no. 31-2 asserting an unsecured claim in the amount of $98,887.77 and a secured claim in the amount of $13,888.00 for a total of $112,775.77 (the "Gateway Claim").

## Relief Requested

24.     By this objection, Partners (a) objects to the Initial Gateway Claim, which was amended and superseded by the Gateway Claim, and the Gateway Claim on the ground that the

---

[2] The claim is comprised of a $13,888 secured claim and a $2,689.98 unsecured claim.  The Landlord holds a cash security deposit in the amount of $13,888.

Landlord breached the implied warranty of habitability and the covenant of quiet enjoyment

under the Lease and (b) seeks entry of an order disallowing and expunging the Initial Gateway

Claim and the Gateway Claim.

### Basis for Relief

25.    As a preliminary matter, the Initial Gateway Claim should be disallowed because

it was amended and superseded by the Gateway Claim.

26.    As set forth above and in the attached report, in the spring of 2009 and thereafter,

Partners became aware of certain violations of the building code and communicated these

violations to the Landlord in an effort to get them resolved.  Instead of seeking to resolve

Partners' concerns, the Landlord did nothing and denied that safety violations existed.  As a

result of the safety violations and the Landlord's failure to act, the Landlord breached the implied

warranty of habitability and the covenant of quiet enjoyment under the Lease, with the result that

Partners had to vacate the leased premises.  For the reasons set forth below, Gateway should not

be entitled to recover on its claims for rejection damages and for attorney's fees.

A.    Gateway Breached the Implied Warranty of Habitability

27.    The warranty of habitability is based on the theory that the landlord warrants that

the leased premises are habitable at the outset of the lease term and will remain so during the

course of the tenancy.  *Wade v. Jobe*, 818 P.2d 1006, 1010 (Utah 1991).  In *Wade*, the Utah

Supreme Court held that the warranty of habitability applied to residential leases.  *Id.* at 1010.

The Utah Supreme Court subsequently extended the warranty of habitability to commercial

leases in Utah.  *See Richard Barton Enterprises, Inc. v. Tsern*, 928 P.2d 368, 376 (Utah 1996).

28.     The *Richard Barton* case is instructive on what constitutes a breach of warranty of habitability.  In *Richard Barton*, the landlord agreed to fix an elevator in a commercial building as part of the lease.  The landlord failed to do so, the tenant abated rent, and subsequently sued for a declaratory judgment.  The trial court awarded judgment for the tenant, allowing for rent abatement, costs to repair the elevator, and attorney's fees. *Richard Barton*, 928 P. 2d at 378-381.

29.     On appeal, the Utah Supreme Court overturned pre-existing common law and adopted the doctrine of mutually dependent covenants in leases allowing a tenant to abate rent if the landlord has not performed its obligations.  The Court held that "the lessee's covenant to pay rent is dependent on the lessor's performance of covenants that were a significant inducement to the consummation of the lease or to the purpose for which the lessee entered into the lease." *Id.* at 378.

30.     In reaching its conclusion, the court focused on the materiality of the breach and noted that it may be relevant whether the breach has a significant effect on the rental value of the premises. *Richard Barton*, 928 P.2d at 377.

31.     "In determining whether there has been a breach of the implied warranty of habitability, courts should inquire whether the claimed defect has an impact on the safety or health of the tenant." *Hilder v. St. Peter*, 478 A.2d 202, 209 (Vt. 1984) (citation omitted). "Evidence of violations involving health or safety . . . will often sustain a tenant's claim for relief [of breach of the warranty of habitability]." *Wade,* 818 P.2d at 1011.  In *Hilder*, which involved a residential lease, the court stated that "courts may first look to any relevant local or municipal housing code" and that a "substantial violation of an applicable housing code shall constitute

8

prima facie evidence that there has been a breach of the warranty of habitability." *Hilder*, 478

A.2d at 208.  However, "a code violation is not necessary to establish a breach so long as the

claimed defect has an impact on the health or safety of the tenant." *Wade,* 818 P.2d at 1011

(citing *Hilder v. St. Peter*, 478 A.2d 202, 209 (Vt. 1984)).

32.     Partners bargained for and expected Class A commercial space that complied with

all existing safety codes.  Here, there are numerous safety code violations, which are prima facie

evidence of a violation of the warranty of habitability.  When Partners became aware of the

violations that affected the safety of its employees and any invitees, Partners was not willing to

assume the liability in the event an employee or an invitee in its office were injured or died as a

result of an emergency situation that required evacuation from the building.  See *Hilder v. St.

Peter*, 478 A. 2d at 208 fn. 2 (the warranty of habitability covers those facilities located in the

common areas that may affect the health or safety, such as common stairways).

33.     Had Partners known about these violations, it would not have entered into the

Lease.  The safety issues cannot be remedied without significant cost and time and, as such, the

space is uninhabitable.  Based on the foregoing, there is no value to Partners for the leased space;

therefore, Partners vacated the premises and should not pay future rent.  *Hilder v. St. Peter*, 478

A. 2d at 209-210 (where there has been a breach of warranty of habitability, a remedy available

to the tenant is to withhold the payment of future rent).  *See also Richard Barton*, 928 P. 2d at

378 ("lessee is entitled to abate rent by an amount equal to the reduced value of the premises due

to lessee's breach") (citing *Wade v. Jobe*, 818 P. 2d at 1012-1013).  Here, the value of the

premises is zero because Partners could not stay in the leased premises once it was aware of the

safety violations and the Landlord, despite being given notice of these issues, did nothing and denied their existence.

34.     Based on the above, the Court should not allow the Landlord to recover its claims for rejection damages and attorneys fees.  Any other holding would signal to landlords that they are not required to abide by the building codes, even if it puts tenants and invitees in harm's way.

B.     <u>Gateway's Failure to Fix the Violations Breached the Covenant of Quiet Enjoyment</u>

35.     The covenant of quiet enjoyment is a promise that the landlord will not interfere with the use that the property is being leased for, including taking care of any interferences that may infringe on that use.  *See Brown v. Johnston*, 85 P.3d 422, 430-432 (Wyo. 2004).

36.     A breach of the covenant of quiet enjoyment may constitute a "constructive eviction" and thus relieve a tenant of the obligation to pay rent.  *See Richard Barton Enterprises, Inc. v. Tsern*, 928 P.2d at 374 citing *Thirteenth & Washington Sts. Corp. v. Nielsen*, 123 Utah 70, 254 P. 2d 847 (1953); *Cherberg v. Peoples National Bank of Washington*, 564 P.2d 1137, 1141 (Wash. 1977) (breach of an implied covenant of quiet enjoyment resulted in actionable constructive eviction).  A tenant is constructively evicted when the tenant is deprived of the beneficial enjoyment of the demised premises or his enjoyment is materially impaired. *Barker v. Utah Oil Refining Co*., 111 Utah 308, 312, 178 P.2d 386, 388 (Utah 1947) (citing Black's Law Dictionary).

37.     Paragraph 22 of the Lease provides that: "[l]andlord promises to provide Tenant with quiet enjoyment of the Premises."  Here, the Landlord did not provide Partners with quiet enjoyment of the premises because the Landlord did not comply with the building code and failed to fulfill its duty to repair such building code violations, resulting in potential liability to

Partners or those who may be injured or die as a result of such violations in an emergency

evacuation of the building.  *See Cherberg v. Peoples National Bank of Washington*, 564 P.2d

1137, 1141  (Wash. 1977) (commercial landlord's refusal to repair structurally unsafe wall

breached an implied covenant of quiet enjoyment and resulted in actionable constructive

eviction).

38.     As set forth above, Partners sent multiple letters to the Landlord outlining the

safety concerns due to violations of the building code.  The Landlord took no action to correct

the problems.  As a result, the Landlord breached the covenant of quiet enjoyment and Partners

was constructively evicted from the leased premises.

39.     Section 502(b)(1) provides, in relevant part, that a claim may not be allowed to

the extent that "such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law."  11 U.S.C. 502(b)(1).

40.     As a result of the Landlord's breach of the warranty of habitability and covenant

of quiet enjoyment, the Landlord's claim for rejection damages and attorney's fees should be

disallowed.

## Reservation of Rights

41.     Partners expressly reserves the right to amend, modify, or supplement the

objections asserted herein and to file additional objections to the Initial Gateway Claim and the

Gateway Claim or any other claims (filed or not) which may be asserted against the Debtors.

Should one or more of the grounds of objections stated in this Objection be dismissed, Partners

reserves the right to (i) object to the Initial Gateway Claim and the Gateway Claim on any other

grounds and (ii) seek further reduction of the Gateway Claim to the extent such claim has been

paid.

WHEREFORE Partners respectfully requests entry of an order granting the relief

requested herein and such other and further relief as is just.

DATED this 1st day of March, 2010

DURHAM JONES & PINEGAR, P.C.

By:    /s/  Kenneth L. Cannon II
      Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
      Steven J. McCardell (smccardell@djplaw.com)(2144)
      DURHAM JONES & PINEGAR, P.C.
      111 East Broadway, Suite 900
      P.O. Box 4050
      Salt Lake City, UT  84110-4050
      Telephone:  (801) 415-3000/Fax:  (801) 415-3500

      Michael V. Blumenthal (mblumenthal@crowell.com)
       (admitted pro hac vice)
      Steven B. Eichel (seichel@crowell.com)
       (admitted pro hac vice)
      CROWELL & MORING LLP
      590 Madison Avenue, 20th Floor
      New York, NY  10022
      Telephone:  (212) 223-4000/Fax:  (212) 223-4134

      and

      Corbin B. Gordon  (corbingordon@yahoo.com) (9194)
      CORBIN B. GORDON, P.C.
      345 West 600 South, Suite 108
      Herber City, UT  84032
      Telephone:  (435) 657-0984/Fax:  (888) 822-8796

      Counsel for Debtors and Debtors in Possession

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Easy Street Partners, LLC's Objection to Proof of

Claim filed by Gateway Center, LLC was served this 1st of March , 2009, via ECF Notification

and/or first-class mail, postage prepaid, on the follow parties and on the parties listed on the

attached page:

>Gateway Center, LLC
>c/o Commerce
>32 West 200 South, Suite 501
>Salt Lake City, UT  84101
>
>Gateway Center, LLC
>c/o Vectra Management Group
>424 West 33rd Street, Suite 540
>New York, NY  10001-2641

  /s/  Kristin Hughes

NYIWDMS: 11495894_6

**ECF Notification**

- Troy J. Aramburu     taramburu@joneswaldo.com, sglendening@joneswaldo.com; rbush@joneswaldo.com

- Scott A. Cummings     cummings.scott@dorsey.com

- Mary Margaret Hunt     hunt.peggy@dorsey.com, wardle.gay@dorsey.com

- Annette W. Jarvis     jarvis.annette@dorsey.com, smith.ron@dorsey.com; slc.lit@dorsey.com;brown.patricia@dorsey.com

- Lon A. Jenkins     lajenkins@joneswaldo.com, krichardson@joneswaldo.com; ecf@joneswaldo.com;sglendening@joneswaldo.com

- Michael R. Johnson     mjohnson@rqn.com, agale@rqn.com

- Anthony C. Kaye     kaye@ballardspahr.com

- Benjamin J. Kotter     kotter.benjamin@dorsey.com

- Adelaide Maudsley     maudsley@chapman.com, jemery@chapman.com

- John T. Morgan tr     john.t.morgan@usdoj.gov, james.gee@usdoj.gov

- David W. Overholt     doverholt@rsolaw.com, abachman@rsolaw.com

- Douglas J. Payne     dpayne@fabianlaw.com, jshowalter@fabianlaw.com

- Knute Rife     karife@rifelegal.com

- Jeffrey L. Shields     jlshields@cnmlaw.com, njpotter@cnmlaw.com

- Jeffrey Weston Shields     jshields@joneswaldo.com, sglendening@joneswaldo.com

- Bradley L. Tilt     btilt@fabianlaw.com, rmellor@fabianlaw.com

- United States Trustee     USTPRegion19.SK.ECF@usdoj.gov

- Kim R. Wilson     bankruptcy_krw@scmlaw.com

SLC_529658

# EXHIBIT A

An Analysis of the Gateway Center in Park City, UT
Regarding Means of Egress and Accessibility Issues
Per the 1994 Uniform Building Code

Prepared by
Summit Engineering Group, Inc.
Michael P. Johnston, SE

January 13, 2010



Summit Engineering Group Inc.
Structural · Civil · Surveying

At the request of Mr. William Shoaf with Cloud Nine Resorts, a tenant in the Gateway Center at 136 Heber Ave., Summit Engineering Group, Inc. (SEG) performed a review and analysis of the building regarding compliance with the Means of Egress (chapter 10) and Accessibility (chapter 11) requirements of the 1994 Uniform Building Code.

Mr. Shoaf is currently leasing commercial tenant space on the top level (third floor) of the Gateway Center, and became concerned about emergency egress and accessibility issues after a site review by an OSHA inspector earlier this year. Subsequently, he hired SEG in December to assess the exiting routes available to his employees and clients, and prepare a report of the findings. The site reviews, photographs, and measurements for this assessment were completed by Michael P. Johnston, SE during December of 2009.



Since the construction permit for the Gateway Center office building was issued in April, 1995 (per Park City Building Dept.), the applicable building code for Park City at the time of construction was the 1994 Uniform Building Code (hereafter referred to as the Code.) A copy of chapter 10 (Means of Egress) and chapter 11 (Accessibility) are attached in the Appendix of this report.

Since the commercial space leased by Mr. Shoaf's business is on the third floor of the building, the site review was concentrated on the two emergency exiting routes available to occupants and visitors of the third floor. As required by the building code, there are two fire-protected stairways that provide direct access from the third floor down to an exit discharge connected to the public street. These two stairways also continue below ground to provide general access and emergency egress from the two levels of underground parking. The East Stairway allows people to move from the third floor down to the first floor exit onto Farrell Alley. The West Stairway allows people to move from the third floor down to the upper level of the underground parking garage, and then exit to an outside stairway that takes them back up to the ground level on the west side of the building. At this location, the space between the buildings is considered to be an Exit Court, which connects to Heber Avenue on the north.

**Egress and Accessibility Code Violations at the Gateway Center
Per the 1994 Uniform Building Code**

### East Exit Stairway

*1.*   Area of Refuge in the 3rd floor stairway is 33.5" x 46.5", which is too small.
**Code Sec. 1104.2.3** requires a space at least 30" x 48" for a wheelchair. *This
is dangerous to wheelchair-bound individual because they may not be able to
fit their chair into the refuge space, and will thus block access to the stairway
by others trying to escape the building during an emergency.*



Size of Area of Refuge in stairway is too small.

*2.*   Area of Refuge in the 3rd floor stairway is impossible to access by a person in
a wheelchair due to the swing of the door into the space. The clear distance
between the door swing and the opposite wall is only 23.5", and the clear
distance between the door swing and the top step is only 15. *A wheelchair-
bound or other disabled person cannot even attempt to enter the Area of
Refuge without toppling down the stairs. Imagine a wheelchair-bound person
trying to "back-up" from the stairway as others are pushing through the door
trying to exit the building during a fire!*



Exit Door blocks access to the Area of Refuge behind it.

3.  The pathway to the Area of Refuge in the stairway for Parking Level B2 is interrupted by a 4" high curb. **Code Sec. 1007** requires a ramp at least 44" wide and no steeper than 1V:12H slope *A wheelchair-bound person on this parking level cannot escape the area in an emergency (fire, smoke, explosion, chemicals, etc.) and enter the designated Area of Refuge*



Curb prohibits wheelchair access to the Area of Refuge / Exit.

4.  Area of Refuge for Parking Level B2 is not accessible due to long-term storage of trash cans and other building maintenance items. **Code Sec. 1009.6** requires that "Exit passageways shall not be used for any purpose other than as a means of egress." *A disabled person cannot access the communication system, and a wheelchair-bound person cannot safely get out of the way of others who are fleeing the building during an emergency.* Certainly, this violation of the Code can be easily remedied, but it shows a blatant lack of care and/or knowledge on the part of the building management for maintaining emergency egress routes.



Storage blocks access to the Area of Refuge.

5. **Code Sec. 1104.2.6** requires "In areas of refuge that have a two-way emergency communications system, instructions on the use of the area under emergency conditions shall be posted adjoining the communications system. The instructions shall include: 1) Directions to find other exits, 2) Advice that persons able to use the exit stairway do so as soon as possible, 3) information on planned availability of assistance . . . and how to summon such assistance, and 4) Directions for use of the emergency communications system." These required instructions are not posted at any of the communication boxes in any of the Areas of Refuge in the Gateway Center. *During an emergency situation, disabled individuals are often left behind in an Area of Refuge, as the able-bodied persons flee the building. It is critical that these individuals have necessary instructions for the communication system and information on what to expect from rescue personnel. Without proper instructions, panic can easily result.*



6. **Code Sec. 1009.6** requires that "the open space under (exit) stairways shall not be used for any purpose." The bottom of the East stairwell at Parking Level B2 is used for long-term storage of trash cans, furniture, and building maintenance items. *The storage of materials under the stairs is prohibited because the entire emergency exit stairwell must be kept free of any combustible and flammable materials. A fire in an Exit Stairway is a disaster.*



Storage under the Exit Stairs in dangerous.

**West Exit Stairway and Exit Discharge**

1.   Landing at bottom of the exterior stairs for the Exit Discharge of the west
     stairway violates **Code Sec. 1004.10** because the length is too small. Actual
     landing length is only 36" in the direction of travel. Required minimum
     length is 44"



Size of Landing at Exit Discharge is too small.

2.   The Width of the exterior concrete stairs for the West Exit Discharge is only
     36", which violates **Code Sec. 1006.2**. Required minimum width is 44 inches.



Width of Exit Stairway is too narrow.

3.    The Exit Court connecting both the west Exit Discharges to the Public Way is obstructed by a steel electrical box which reduces the passage width between the box and the stairway to only 41". Required minimum width of any exit route is 44" clear dimension per **Code Sec. 1010.2**. The picture below also shows that during the winter, the snow is shoveled off of the concrete walkway only, further narrowing the clear width to only 22" next to the stairs. *This Exit Court is the final element of the emergency egress route for all three floors of the building plus both underground parking levels. An emergency situation will result in approximately half of the building occupants using this exit route to quickly leave the building and move to the public street (Heber Ave.) The danger of this substandard width is obvious – people rushing from the building are often in a panic, and when the exit route is too narrow, falling, trampling, and other serious injuries can easily result.*



Exit stairs and power box constrict Exit Court width.

4.  The Exit Court connecting the both West Exit Discharges to the Public Way is less than 10 feet wide in many places (7'-6" between metal stairs and adjacent building.)  As required by **Code Sec. 1010.4**, Exit Court walls (including adjacent buildings) shall be at least one-hour fire-resistive construction for at least 10' above the ground, and all openings therein (windows, doors) shall be protected by fixed or self-closing ¾-hour fire assemblies.  The construction of the exterior walls of the adjacent buildings are not one-hour fire-resistive, nor are the windows fire-protected, hence the Exit Court walls violate this requirement.  *This code violation is dangerous due to the fact that a fire in any of the buildings surrounding the Exit Court can quickly render the Exit Court impassable and unusable.*



Adjacent buildings are not fire-rated for Exit Court.

**Central Elevators and Exit Corridor:**

1.  Elevators and West Exit Corridor on Parking Level B1 are not accessible to a
    person using a wheelchair due to configuration of parking stalls and railings.
    An employee or client in a wheelchair cannot access the elevators or exit door
    from the north if the parking stalls are occupied.  And coming from the south,
    the clear width between the wall and railing is only 28.5".  *In an emergency
    situation (fire, smoke, explosion) the wheelchair-using person cannot get to
    the Exit Corridor or Area of Refuge located across from the elevators here.*



Vehicles block wheelchair access to elevators and exit door.



Railing blocks wheelchair access to elevators and exit door.

In summary, there are numerous emergency egress and accessibility issues at the Gateway Center that pose a danger to employees and visitors to the third-floor space leased by Mr. Shoaf and his business. I have identified these issues in this report, and strongly recommend that each violation of the Building Code be properly addressed and rectified by the building owner.

Sincerely,


Michael P. Johnston, SE
Principal
Summit Engineering Group, Inc.
55 West Center Street
Heber City, UT 84032
435-654-9229