Douglas J. Payne (A4113)
Robert G. Crockett (A12067)
FABIAN & CLENDENIN,
  A Professional Corporation
215 South State, Suite 1200
Salt Lake City, Utah 84111-2323
dpayne@fabianlaw.com
rdale@fabianlaw.com
Telephone: (801) 531-8900
Fax: (801) 596-2814

*Attorneys for Gateway Center, LLC*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In Re:<br><br>EASY STREET HOLDING, LLC, *et al.*<br><br>Debtors. | Bankruptcy Case No. 09-29905<br>Jointly Administered with Cases 09-29907 and 09-29908<br><br>Chapter 11<br><br>Honorable R. Kimball Mosier<br><br>**RESPONSE OF GATEWAY CENTER, LLC TO OBJECTION TO PROOFS OF CLAIM** |

Gateway Center, LLC ("**Gateway**"), through its attorneys Fabian & Clendenin, hereby responds to and contests *Easy Street Partners, LLC's Objection to Proofs of Claim filed by Gateway Center, LLC* [Dkt. No. 335] (the "**Objection**"), as follows:

**BACKGROUND**

1.     Gateway filed Proof of Claim No. 31-1, on January 6, 2010 asserting a claim in the amount of $16,577.98 based upon an August 3, 2007, lease and lease amendment

(collectively, the "**Lease**") between Gateway, as the lessor, and Cloudnine Resorts, LLC ("**Cloudnine**") as the lessee, for space 303 of the real property located at 136 Heber Avenue, Park City, Utah 84060 (the "**Premises**"). Debtor Easy Street Partners, LLC ("**Partners**") assumed Cloudnine's interest in and obligations under the Lease through an Assignment and Assumption Agreement (the "**Assignment**") dated January 9, 2009.

2. The Assignment did not release Cloudnine as the original lessee from liability on the Lease. Cloudnine is an affiliate of Partners, and is controlled by Partners' principal and managing member, William Shoaf ("**Shoaf**").

3. Shoaf executed a personal guaranty of the obligations of Cloudnine and Partners under the Lease in which Shoaf obligated himself to Gateway in his individual capacity.

4. Partners took no action to assume or reject the Lease of the Premises within 120 days of the bankruptcy petition date (by January 12, 2010), and the Lease was deemed rejected under 11 U.S.C. § 365(d)(4)(A)(i). Following this deemed rejection, Gateway amended its earlier filed claim to include lease rejection damages in accordance with Section 502(b)(6) by filing Proof of Claim No. 31-2 on February 8, 2010 in the amount of $112,775.77, plus accruing post-petition attorney's fees and costs. (Gateway's proof of claim, as amended by Proof of Claim No. 31-2, is hereafter referred to as the "**Proof of Claim**").

5. On March 1, 2010, Partners, as one of the debtors-in-possession in the above-captioned jointly administered cases, filed *Easy Street Partners, LLC's Objection to Proofs of Claim filed by Gateway Center, LLC* [Dkt. No. 335].

**I.    THERE ARE NO CODE VIOLATIONS AT THE PREMISES**

6. In the Objection, Partners makes unfounded allegations that there are a number of safety and building code violations at the Premises that supposedly excuse Partners from any liability for future rent under the Lease. There are no such violations.

7. The allegations about supposed code violations contained in the Objection reflect what appears to be an ongoing unwarranted effort to attempt to dredge up some type of alleged code noncompliance to try to muddy the waters about the liability of original lessee (Cloudnine), the guarantor (Shoaf), or the assignee (Partners) under the Lease or the personal guaranty.

8. The series of baseless allegations about the Premises contained in a number of letters sent by attorney Corbin B. Gordon ("**Gordon**") has resulted in Gateway, its attorneys, and architect, being required to waste considerable time and expense in investigating and responding to the letters to refute the allegations.

9. Although Mr. Gordon is special counsel for Partners in its Chapter 11 bankruptcy, Gordon's correspondence with Gateway expressly identified himself as representing Partners' affiliate and insider Cloudnine: "I represent Cloudnine, L.L.C. . . ." Letter from Corbin B. Gordon to Gateway Center, LLC dated April 13, 2009, a copy of which is attached hereto as **Exhibit "1."** Mr. Gordon failed to advise the Court of this relationship.[1] Neither did Gordon

---

[1] Partners and Mr. Gordon failed to disclose Gordon's representation of Cloudnine in the application to employ Mr. Gordon as special counsel for Partners and supporting Declaration. [Dkt. Nos. 104 & 105] The undisclosed representation of Cloudnine (which is an affiliate of Partners and/or Partners' principal and the personal guarantor of the Lease, Shoaf) raises questions about the propriety of Mr. Gordon's employment, as well as whether Mr. Shoaf is attempting to improperly shift to the bankruptcy estate the costs of defending Gateway's claims against him as a guarantor and against Cloudnine as the original tenant. As noted in the Objection to Gordon's employment filed by Official Committee of Unsecured Creditors [Dkt. No. 144], employing special counsel for an issue such as the Gateway Lease was questionable even without considering Mr. Gordon's representation of insiders in connection with the Lease.

advise Gateway in subsequent correspondence over several months that he represented any client other than Cloudnine until less than a month ago when he declined to accept service in a state court lawsuit against Cloudnine and Mr. Shoaf.

10. Further, even if there are code violations (which there are not), that alone would not excuse Partners (and Cloudnine and Shoaf) from their obligations on the Lease. The tenants would have an obligation to advise the Gateway of a code violation, and Gateway as landlord would have the right to remedy any material noncompliance with code.

### Gordon Letter dated April 13, 2009

11. The Objection refers to an April 13, 2009 letter that Mr. Gordon sent Gateway on behalf of Cloudnine. Objection, ¶ 8. *See* copy attached **as Exhibit "1"** hereto.

12. The April 13, 2009 letter asserted that there was a safety code violation in the Premises relating to the requirement that a person must be able to choose two divergent paths [of egress] within 100 feet. Gordon attached correspondence from Phil Hahn, an architect who advised the International Code Council, in which he noted that a "right angle" measurement of 103'2" would violate this requirement.

13. Subsequent to Mr. Gordon's April 13, 2009 letter, in correspondence between Gateway's architectural firm, Cooper Roberts Simonsen, and Mr. Hahn, Mr. Hahn noted that the "right angle" measurement would normally be used only when measuring within rooms cluttered with furniture. Mr. Hahn confirmed that would not be the case with the hallways in the Premises, and that the rounded corner measurement was both reasonable and acceptable. That measurement was 95'4" to the elevator and another 2-3 feet to the point where a second exit route could be seen, well within the 100' limitation. In other words, Mr. Hahn verified there was

no code violation. Gateway provided Partners with copies of this e-mail correspondence. A copy of the email correspondence between Mr. Hahn and Cooper Roberts Simonsen Architects is attached hereto as **Exhibit "2."**

14.     In addition, Mr. Gordon's April 13, 2009 letter made the patently unreasonable demand that Gateway should provide Cloudnine as tenant with an indemnification from Park City for any safety issues relating to this alleged violation. It was unreasonable to expect that a municipality would provide an indemnification of a private party in any circumstance. Therefore, not only was there no code violation or any basis for Cloudnine to request the indemnification, but the demand would have been impossible to meet.

15.     Gordon's April 13, 2009 letter further asserted that OHSA had indicated that the Premises violated the safety code for ingress and egress. After learning of an alleged OSHA violation through this letter, Gateway contacted OSHA. OSHA informed Gateway that it had no record of any such violation, and that if such a violation had existed a written notice would have been provided. Gateway requested that Mr. Gordon provide Gateway with a copy of any such notice, if one exists. No copy of such a notice has been provided to Gateway.

16.     The April 13, 2009 letter also stated that Mr. Gordon's client was withdrawing from the Premises and would not pay further rent. However, Partners, Cloudnine, or someone affiliated with them continued to make Lease payments until just prior to Partners' September 2009 bankruptcy filing, made some post-petition Lease payments prior to rejection of the Lease, and continued to utilize space in the Premises until sometime in January or February 2010.

**Gordon Letter dated September 17, 2009**

17. The Objection also refers to a September 17, 2009 letter from Mr. Gordon to Gateway concerning alleged code violations.[2] Objection, ¶ 10. A copy of Mr. Gordon's September 17, 2009 letter is attached hereto as **Exhibit "3."**

18. In his September 17th letter, Mr. Gordon asserted that the above referenced issue regarding the 100' distance was unresolved, ignoring the fact that Gateway had clearly demonstrated that there was no code violation.

19. The additional allegations contained in Mr. Gordon's September 17th letter were that:

(a) CAMS (common area maintenance charges) were allegedly being used to pay for taxes, insurance and maintenance of the parking garage.

(b) The parking garage allegedly violated safety codes and allegedly did not comply with the Americans with Disabilities Act ("**ADA**").

20. Gateway responded with a letter from its attorney, Diane H. Banks, to Mr. Gordon dated September 24, 2009. A copy of Ms. Banks' September 24, 2009 letter is attached hereto as **Exhibit "4"**. In that letter, Gateway responded to the specific additional allegations as follows:

(a) Operational costs relating to the parking garage are not paid by the CAMS of tenants, but are paid by the condo parking stall owners, including Park City Municipal Corporation; and

---

[2] While Gordon's Sept. 17, 2009 letter does not expressly refer to the client on whose behalf he was sending it, it refers to the April 13th letter Gordon had sent concerning "my client's leased space," which client was Cloudnine.

6

    (b) The parking garage is not part of the leased Premises. Any alleged violation of safety codes or the ADA by the garage would not be a breach under the Lease. The Lease does not give Partners or Cloudnine any rights to the parking garage. Any use of the parking garage by Cloudnine or Partners is as a member of the general public using the public parking in condo stalls owned by Park City Municipal Corporation.

### Gordon Letter dated October 20, 2009

21. The Objection also refers to yet another letter from Mr. Gordon to Gateway (dated October 20, 2009) concerning alleged code violations.[3] Objection, ¶ 12. A copy of Mr. Gordon's October 20, 2009 letter is attached hereto as **Exhibit "5."**

22. In his October 20th letter, Mr. Gordon repeated prior allegations that CAMS were being used to pay garage expenses, that egress from the parking garage did not comply with the fire code, and that the garage was not ADA compliant. The October 20th letter also alleged that there were platting issues associated with the parking garage.

23. The Objection asserts that Gateway "never responded" to Mr. Gordon's October 20th letter. Objection, ¶ 13. Not so. Gateway's counsel sent Mr. Gordon a letter on November 6, 2009 refuting all of the contentions in Gordon's October 20th letter, and noting that Gordon had ignored Gateway's prior responses. Letter dated November 6, 2009 from Diane H. Banks to Corbin B. Gordon, a copy of which is attached hereto as **Exhibit "6."**

---

[3] The October 20, 2009 letter does not expressly identify the client on whose behalf Mr. Gordon was sending it, but Mr. Gordon refers to his "prior correspondence" sent on behalf of "my client." (*See* Oct. 20, 2009 letter, at pg. 4).

7

24. The responsive letter sent by Gateway's counsel pointed out that Mr. Gordon and his client(s) completely disregarded the fact that the parking garage is not a part of the Premises (even though Gordon's September 17th letter had expressly acknowledged that the Parking Garage was not part of the Premises when making the CAM allegation). *Id.* While the upper floor of the parking garage may be the most convenient parking for the Premises, Park City Municipal Corporation owns condo parking stalls that compose nearly the entire upper floor of the parking garage and the city maintains public parking on that level. The public parking is not part of the leased Premises.

25. Gateway's response to Mr. Gordon's October 20, 2009 letter also pointed out that the budget Mr. Gordon had attached to his letter to support the repeated allegation that the CAM charge for the building included parking lot expenses showed zero amounts in the parking lot section and that expenses of which Gordon complained appeared in the unreimbursed section of the budget, and hence were not included in CAM charges for the building. *Id.*

26. Gateway's responsive letter further notified Mr. Gordon that Park City Municipal Corporation and the other condo stall owners pay the incremental cost of operating the parking garage. Gateway also informed Mr. Gordon that the Park City Fire Service District had verified there were not any real fire safety issues. Most importantly, Gateway reminded Mr. Gordon that even if his allegations were accurate (which they are not), they would not justify abandonment of the premises or constitute a breach under the Lease. *Id.*

27. Cloudnine, Partners, or someone acting on their behalf continued to utilize the Premises throughout the fall of 2009.

**Gordon Letter dated February 19, 2010**

28. The Objection also refers to a February 19, 2010 letter from Mr. Gordon to Gateway concerning alleged code violations.[4] Objection, ¶ 14. A copy of Mr. Gordon's February 19, 2010 letter is attached hereto as **Exhibit "7."**

29. Mr. Gordon's February 19th letter again raised claims relating to the CAMS and alleged noncompliance with code. The letter incorrectly asserted that Gateway had not addressed the issues, when in fact, Gateway had spent a great deal of time and money responding to and refuting the baseless claims that had been asserted in Gordon's prior letters.

30. Mr. Gordon's February 19th correspondence repeated a number of the prior unfounded allegations, and proposed a settlement in what appeared to be an effort to obtain a release of Mr. Shoaf and Cloudnine from their obligations under Lease and the related personal guaranty, as well as a reduction in the bankruptcy claim filed by Gateway. The letter included a copy of a report prepared by Summit Engineering Group, L.L.C. ("**Summit Report**") dated January 13, 2010 (one day <u>after</u> the Lease was deemed rejected by operation of law under Section 365(d)(4)(A)(i)), which Partners also attached as Exhibit A to its Objection. *See* Objection, ¶ 14 and Exhibit A thereto.

---

[4] The Feb.19, 2010 letter again did not expressly identify the client on whose behalf Mr. Gordon was writing, but the letter does refer to Mr. Gordon's "previous correspondence" in which he "outlined my client's concerns." *See* Exhibit "F." As noted above, Mr. Gordon's Apr. 13, 2009 letter indicated that he represented Cloudnine. None of Mr. Gordon's subsequent correspondence over the next several months advised Gateway that he represented any client other than Cloudnine until Mr. Gordon sent an e-mail three weeks ago stating he would not accept service in a state court action against Cloudnine and Mr. Shoaf on the Lease and guaranty because Gordon had been employed as special counsel for Partners bankruptcy estate. A copy of Mr. Gordon's e-mail dated March 15, 2010 is attached hereto as Exhibit "H."

31. The Objection refers to two allegedly "egregious" fire code violations with respect to the third floor staircases of the Premises (Objection, ¶ 16) which were communicated to Gateway for the first time in Mr. Gordon's letter dated February 19, 2010:

(a) An alleged insufficient "area of refuge" at the east exit stairway for a person with a disability (Objection, ¶¶17-19); and

(b) An allegedly narrower than code sunken staircase at the bottom of the west stairway that empties into a constricted area (Objection, ¶¶ 20-22).

32. Gateway forwarded Mr. Gordon's February 19th letter and the Summit Report to the architectural firm of Cooper Roberts Simonsen Architects and asked them to analyze the allegations. As indicated by the March 4, 2010 letter from architect Wally Cooper attached hereto as **Exhibit "8,"** the alleged fire code violations were in fact not code violations for the following reasons:

(a) The current code (IBC 2006) does not require an area of refuge for a building that has a fire suppressions system and is less than five stories in height. The Gateway Center of which the Premises are a part is a fully sprinkled building that is less than five stories; and

(b) The west basement stairway complies with the 1984 UBC, which is the code under which the stairway was permitted. The west stairway empties into the public right-of-way along the west side of the building. Because it is a public right of way and not an "exit court," the Summit Report's comments about a narrow area not complying with code requirements for exit courts are inapplicable.

10

33. Gateway's counsel sent a letter to Mr. Gordon dated March 5, 2010 in which Gateway forwarded architect Wally Cooper's letter, and refuted the allegations of Gordon's February 19, 2010 and earlier letters. A copy of the March 5, 2010 letter (less attachments) is attached hereto as **Exhibit "9."**

34. The Park City Fire Service District inspected the Gateway Center building of which the Premises are a part in January 2009 and found no violations related to the Premises or the building in general. A copy of the Fire Service District inspection report is attached hereto as **Exhibit "10."**

## II. THE ALLEGED CODE VIOLATIONS DO NOT RISE TO THE LEVEL OF A BREACH OF THE IMPLIED COVENANT OF HABITABILITY.

Even if the issues identified by Partners did constitute code violations, the immateriality of the violations would not justify rent abatement. Only significant and material breaches of a covenant will justify a lessee in withholding rent. The Utah Supreme Court has stated that:

> Only a significant breach of a covenant material to the purpose for which the lease was consummated justifies a lessee in abating rent. Temporary or minor breaches of routine covenants by a lessor do not. Thus, if a breach has little effect on the essential objectives of the lessee in entering into the lease, the lessee may not withhold rent. Restatement (Second) of Property § 7.1, cmt. c (1977) states that a covenant is not a significant inducement if "the landlord's failure to perform his promise has only a peripheral effect on the use of the leased property by the tenant." A significant inducement means the "performance of [a] promise [that has] a significant impact on the benefits the tenant anticipated he would receive under the lease." Thus, in assessing whether a lessor's breach is sufficient to justify the withholding of rent, a lessee first and a court later, if necessary, must gauge the materiality of the breach in light of the lessee's purpose in leasing the premises.

*Richard Barton Enters., Inc. v. Tsern*, 928 P.2d at 377 (Utah 1996) (citations omitted).

While violations involving safety are relevant to a tenant's claim for relief of breach of the warranty of habitability, only a failure to "substantially" comply with code violations which

11

"materially" affect safety constitutes a breach. *Smith v. David*, 176 Cal. Rptr. 112, 116 (Ct. App. 1981). "[T]he warranty of habitability does not require the landlord to maintain the premises in perfect condition at all times, nor does it preclude minor housing code violations or other defects." *Wade v. Jobe*, 818 P.2d 1006, 1010 (Utah 1991).

In *Wade*, evidence showed the presence of raw sewage on sidewalks and stagnant water in the basement of the premises, creating a foul odor. 818 P.2d at 1011. Two city housing inspection reports detailed "numerous code violations which were, in the words of the trial judge, 'a substantial hazard to the health and safety of the occupants.'" *Id.* In *Hilder v. St. Peter*, 478 A.2d 202 (Vt. 1984), cited by Partners, the apartment suffered from the following: a broken window, clogged toilets, inoperable lighting, leaking pipes, falling plaster, and a broken pipe that caused raw sewage to litter the floor of the basement. *Id.* at 206. The landlord was labeled a "slumlord" by the court. *Id.* at 211. In *Richard Barton*, the tenant had specifically bargained for an operating elevator that was essential to its business operations, which was shut down by a state elevator inspector until it could pass a safety inspection. 928 P.2d at 372. In each case, only these material violations constituted a breach of the implied warranty of habitability.

The alleged violations here are minor and not material to the operation of Partners' business of operating a Resort Development Office. They certainly do not rise to the level of "slumlord" activity. The potential injuries identified by Partners' "expert" are abstract and remote. No municipal or state authority has issued any citation or violation of any building code provision. Accordingly, no material or significant breach of the implied warranty of habitability has occurred, and Partners is not justified in withholding rent or vacating the Premises.

**III.     PARTNERS DID NOT TIMELY VACATE TO SUPPORT A CLAIM FOR CONSTRUCTIVE EVICTION.**

Partners also argues that due to an alleged violation of the covenant of quiet enjoyment, it was constructively evicted from the Premises.  In order for constructive eviction to occur, a tenant "must abandon the premises within a reasonable time following the landlord's interference."  *Id.*  "'[T]he whole point of 'constructive eviction' is that the landlord basically drove the tenant out through the landlord's action or inaction.'" *Id.* (quoting *Kenyon v. Regan*, 826 P.2d 140, 142 (Utah App.1992)).  For example, a tenant who continues in possession for eight months after a first complaint has not been constructively evicted.  *Brugger v. Fonoti*, 645 P.2d 647, 648 (Utah 1982).

Here, Partners, or more accurately, its affiliate and insider Cloudnine, first complained of purported safety problems on April 13, 2009.  However, Partners, Cloudnine, or someone associated with them continued to utilize the Premises until sometime in January or February 2010, nine or ten months later.  *See* Objection, ¶¶ 8, 14.  Moreover, almost all of the conditions of which Partners complains in its Objection existed at the time Partners began using the Premises, but Partners or Cloudnine did not vacate the Premises for over one year after the Lease was assigned to Partners.  Accordingly, Partners' claim of constructive eviction fails as a matter of law.

## CONCLUSION

The Objection to Gateway Center's claim is the latest in a long series of efforts by Partners and its affiliate Cloudnine to come up with alleged code violations where there are none to get out of their lease obligations.  When Gateway Center refutes the allegations, Partners' (or Cloudnine's) pattern has been to totally ignore Gateway Center's response or to try to dig up new

13

allegations of code violations, all the while Partners, Cloudnine, or someone connected with them remains in the Premises. The Objection should be denied, and Gateway Center's Proof of Claim should be allowed in full.

DATED this 8th day of April, 2010.

/s/ Douglas J. Payne
Douglas J. Payne
Robert G. Crockett
**FABIAN & CLENDENIN**
 A Professional Corporation
*Attorneys for Gateway Center, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on of April 8, 2010, a true and correct copy of the foregoing

**RESPONSE OF GATEWAY CENTER, LLC TO OBJECTION TO PROOFS OF CLAIM**

was served via e-mail, first class mail and ECF notification as noted below:

> Corbin B. Gordon
> CORBIN B. GORDON, P.C.
> 345 West 600 South, Suite 108
> Heber City, Utah 84032
> (via e-mail; 'corbingordon@yahoo.com'; and first-class mail)

/s/ Douglas J. Payne

**ECF Notification**

- Kenneth L. Cannon, II        kcannon@djplaw.com
- Steven J. McCardell          smccardell@djplaw.com
- Jessica G Peterson           jpeterson@djplaw.com
- Michael V. Blumenthal        mblumenthal@crowell.com ,
- Steven B. Eichel             seichel@crowell.com
- Brian W. Harvey              bharvey@goodwinprocter.com
- Troy J. Aramburu             taramburu@joneswaldo.com, sglendening@joneswaldo.com; rbush@joneswaldo.com
- Scott A. Cummings            cummings.scott@dorsey.com
- Mary Margaret Hunt           hunt.peggy@dorsey.com, wardle.gay@dorsey.com
- Annette W. Jarvis            jarvis.annette@dorsey.com, smith.ron@dorsey.com, slc.lit@dorsey.com;brown.patricia@dorsey.com
- Lon A. Jenkins               lajenkins@joneswaldo.com, krichardson@joneswaldo.com; ecf@joneswaldo.com; sglendening@joneswaldo.com
- Michael R. Johnson           mjohnson@rqn.com, agale@rqn.com
- Anthony C. Kaye              kaye@ballardspahr.com
- Benjamin J. Kotter           kotter.benjamin@dorsey.com
- Adelaide Maudsley            maudsley@chapman.com,jemery@chapman.com
- John T. Morgan               john.t.morgan@usdoj.gov, james.gee@usdoj.gov
- David W. Overholt            doverholt@rsolaw.com, abachman@rsolaw.com
- Knute Rife                   karife@rifelegal.com
- Jeffrey L. Shields           jlshields@cnmlaw.com, njpotter@cnmlaw.com
- Jeffrey Weston Shields       jshields@joneswaldo.com, sglendening@joneswaldo.com
- United States Trustee        USTPRegion19.SK.ECF@usdoj.gov
- Kim R. Wilson                bankruptcy_krw@scmlaw.com

ND: 4823-1886-8485, v. 1