# EXHIBIT 6



**Diane H. Banks**

Direct Telephone: (801) 323-2202
Direct Facsimile: (801) 532-3370
dbanks@fabianlaw.com

November 6, 2009

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**
**#7008-3230-0003-5414-5328**

Corbin B. Gordon, P.C.
345 West 600 South, Suite 108
Heber City, Utah 84032

    **RE:**  Gateway Center

Dear Mr. Gordon:

    I received your October 20, 2009 letter on November 5, as you used the incorrect address. Please send any future correspondence to Fabian & Clendenin, 215 South State Street, Suite 1200, Salt Lake City, Utah 84111-2323.

    Please advise us as to whether you have been appointed by the bankruptcy court to represent Easy Street Partners, LLC, the tenant of Gateway Center, as we understand the firm of Durham Jones represents the debtor in the bankruptcy case. In your letter, you do not indicate the name of your client, so please confirm that it is the tenant under the Gateway Center lease.

    We are concerned about what result you appear to be attempting to obtain, as well as the threats you are making to accomplish that result. As in your prior letter of September 17, 2009, you threaten that your client (without identifying your client) will abandon the leased premises if the alleged "violations" are not cured before a date certain (as noted above, your correspondence was not even received prior to the given date). The bankruptcy code has specific provisions governing assumption or rejection of a lease in bankruptcy. More importantly, as I understand it, the debtor is prohibited from taking any action outside of the ordinary course of business without a court order. Please provide the order that would authorize the abandonment you threaten.

    Your threats that you will "bring the CAMS and fire issues to the attention of all tenants, and to pursue a collective case against the landlord for a refund of all overpaid fees through the years, as well as insistence that the building be brought into code compliance" are most troublesome. Your claims are spurious and there are several applicable points from our letter of September 24 that you have blatantly ignored. Specifically:

Corbin B. Gordon, P.C.
November 6, 2009
Page 2

1. There has been no violation by Landlord of the Lease.
2. Any alleged failure of the parking garage to conform to the recorded plat or any ADA violations would be irrelevant because the parking garage is not a part of the property leased by Easy Street Partners.
3. We provided your prior correspondence to Park City Municipal Corporation to enable them to address any alleged ADA violation within the garage (as you know, the entire upper floor is owned by the City). Any violation on the upper level would be addressed by the City, to whom we have sent both your letters and our responses.
4. The incremental costs of operating the parking garage are paid by the condo stall owners, including Park City Municipal Corporation.
5. There is nothing in either the lease or the bankruptcy code justifying abandonment of the premises.

Despite your conscious efforts to ignore the information previously provided to you, we will specifically respond to some of your allegations to again demonstrate some of the flaws in your conclusions.

First, let us look more carefully at the projected budget you attached. Although in the reimbursable section of the budget there is a section entitled "Parking Lot," all amounts in that section are zero. In other words, there is no projected amount for the parking lot because there is no management of the parking lot. Your conclusion that the parking garage is managed by the same manager as the building is not supported by the mere inclusion of that section in a projected budget.

You have also failed to understand that the budget includes both reimbursed items and unreimbursed items. In other words, some items are included in CAM (the reimbursed items) and other are not included in CAM (the unreimbursed items). A portion of the management fees of which you complain is in the unreimbursed category. Management fees included in CAM (a reimbursed item) are based on a percentage of the rent from Gateway Center. They are not based on any portion of rent from the parking garage. In other words, the manager's fee is based only on rents from the building because the manager is managing only the building. Further, no fees or expenses for maintenance or cleaning of the garage are included within the reimbursable expense budget. Your contention that the CAM fees are paying for management of the garage is without any support whatsoever. The same is true for accounting expenses.

Given your contentions regarding alleged safety issues, we have transmitted your recent letter to the Public Works Department of the Park City Municipal Corporation so that they can

Corbin B. Gordon, P.C.
November 6, 2009
Page 3


address the complaints relating to the top floor to the extent they believe the items you identify
are problematic. For your information, the Park City Fire Service District conducted its annual
Fire Safety Inspection of the building on January 27, 2009, and then returned on February 26,
2009, to verify and confirm that any flagged items of concern noted in the initial inspection had
been satisfactorily resolved. Their inspection verified the absence of any real fire safety issues.
Nonetheless, we believe some of your suggestions regarding signage are helpful, and we may
well follow through to implement them.

In the event you choose to follow through with your threat to advise the other tenants of
the building of the violations you have imagined, we will not hesitate to bring an action based on
intentional interference with economic relations, defamation and any other applicable basis. This
continued harassment will not be tolerated.

As with our last letter, we are providing a copy of your letter and this response to tenant's
bankruptcy counsel to enable coordination of any response you deem necessary.

Very truly yours,

Diane H. Banks

DHB/dcr
cc:    Kenneth L. Cannon, II
       Jerry Gibbs
       W. James Tozer, Jr.
       Paul Piper

ND: 4841-1091-4509, v. 1

# EXHIBIT 7

# CORBIN B. GORDON, P.C.
### ATTORNEY AT LAW
345 WEST 600 SOUTH, SUITE 108
HEBER CITY, UTAH   84032
PHONE (435) 657-0984 • FAX (888) 822-8796
CORBINGORDON@YAHOO.COM

February 19, 2010

Gateway Center, L.L.C.
c/o Vectra Management Group
424 West 33rd Street, Suite 540
New York, New York   10001
Attention: W. James Tozier, Jr.

Ms. Diane H. Banks
Fabian & Clendenin
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah   84151

### Re: Settlement Offer – Easy Street Partners, L.L.C./ Bill Shoaf

Dear Diane:

In my previous correspondence I outlined my client's concerns with the use of CAMS fees and non-compliant safety issues with the Gateway Center. My client put your client on notice that it would abandon the premises on October 31, 2009, if the issues raised were not addressed.

I have received no correspondence addressing the issues, and my client informs me no steps have been taken in the building to resolve my client's concerns. As such, my client has abandoned the premises, formally rejected the lease through the bankruptcy, and offers the following as complete settlement of all claims any and all of the parties have or may have against the other associated in any way with the Lease: 1) payment of $9,885.38, representing an additional month's rent; and 2) relinquishment of any claim my client may have to the security deposit already paid to your client at the beginning of the lease.

This settlement offer is subject to approval of the bankruptcy court, and will need to be submitted by formal motion, making the offer contingent upon court approval. In speaking with bankruptcy counsel for Easy Street Partners, L.L.C., it is likely to be approved. That said, I spoke with Steve Eichel, bankruptcy counsel today, who indicated that a formal objection will be filed on your claim for reimbursement based on the facts set forth below.

Diane H. Banks
February 19, 2010
Page 2 of 2

I am hopeful that settlement is possible, as my client will pay no further rent under the lease as it has been formally rejected and your client is in material breach. An expert report is attached as Exhibit "A" conducted by Mike Johnston of Summit Engineering, outlining the numerous code violations that exist in the building. The list is extensive, and reveals that the building is non-compliant in numerous and dangerous ways.

I remind you, that OSHA was the party that brought these concerns up, not my client. My client signed a lease that promised him Grade A office space, which it assumed was compliant with all safety codes. Once my client was given constructive notice by OSHA that its space and the building had safety issues, it had a duty to its employees and clients to investigate further. Not doing so would be grossly negligent, especially had one of these safety issues caused harm or death to one of its employees or clients.

My client has now done a full investigation, and the results cannot be disputed. The fire exits in this building are simply non-compliant, and the exit area out into the back alleyway is particularly troubling and dangerous.

My client cannot, in good faith, and with full knowledge that the building does not meet code, stay in this space any longer, particularly where, after sufficient notice, your client has done nothing to remedy the situation.

Of deeper concern is the fact that many of the violations can only be remedied, if at all, with major expense and reconstruction. This means that should my client win in its claim that the building is non-compliant your client will be left with a judicial decision declaring the building hazardous and for all intents and purposes unleaseable. A victory by my client gives automatic grounds for all other lease holders to make similar challenges and void their leases as well.

My client does not want this entanglement, and has no desire to show the findings of Mike Johnston to anyone. That said, they will be made public by March 1, 2010 through the formal objection filed by bankruptcy counsel. The wisest choice for all involved is to simply settle now, before the objection is made public, which is what my client offers.

This offer remains valid through the close of business on February 26, 2010, at which point it is withdrawn and my client will consider the matter closed. Any challenge will likely result in very public litigation over the safety issues of the building, and will surely involve an investigation into how Park City approved a building that clearly violates code. Litigation will also include the issue of the use of the CAMS fees.

I am hopeful we can move this issue to resolution.

Sincerely,

Corbin B. Gordon

# EXHIBIT A

**An Analysis of the Gateway Center in Park City, UT
Regarding Means of Egress and Accessibility Issues
Per the 1994 Uniform Building Code**

**Prepared by
Summit Engineering Group, Inc.
Michael P. Johnston, SE**

**January 13, 2010**



Summit Engineering Group Inc.

Structural · Civil · Surveying

At the request of Mr. William Shoaf with Cloud Nine Resorts, a tenant in the Gateway Center at 136 Heber Ave., Summit Engineering Group, Inc. (SEG) performed a review and analysis of the building regarding compliance with the Means of Egress (chapter 10) and Accessibility (chapter 11) requirements of the 1994 Uniform Building Code.

Mr. Shoaf is currently leasing commercial tenant space on the top level (third floor) of the Gateway Center, and became concerned about emergency egress and accessibility issues after a site review by an OSHA inspector earlier this year. Subsequently, he hired SEG in December to assess the exiting routes available to his employees and clients, and prepare a report of the findings. The site reviews, photographs, and measurements for this assessment were completed by Michael P. Johnston, SE during December of 2009.



Since the construction permit for the Gateway Center office building was issued in April, 1995 (per Park City Building Dept.), the applicable building code for Park City at the time of construction was the 1994 Uniform Building Code (hereafter referred to as the Code.) A copy of chapter 10 (Means of Egress) and chapter 11 (Accessibility) are attached in the Appendix of this report.

Since the commercial space leased by Mr. Shoaf's business is on the third floor of the building, the site review was concentrated on the two emergency exiting routes available to occupants and visitors of the third floor. As required by the building code, there are two fire-protected stairways that provide direct access from the third floor down to an exit discharge connected to the public street. These two stairways also continue below ground to provide general access and emergency egress from the two levels of underground parking. The East Stairway allows people to move from the third floor down to the first floor exit onto Farrell Alley. The West Stairway allows people to move from the third floor down to the upper level of the underground parking garage, and then exit to an outside stairway that takes them back up to the ground level on the west side of the building. At this location, the space between the buildings is considered to be an Exit Court, which connects to Heber Avenue on the north.

### Egress and Accessibility Code Violations at the Gateway Center
### Per the 1994 Uniform Building Code

**East Exit Stairway**

1. Area of Refuge in the 3rd floor stairway is 33.5" x 46.5", which is too small. **Code Sec. 1104.2.3** requires a space at least 30" x 48" for a wheelchair. *This is dangerous to wheelchair-bound individual because they may not be able to fit their chair into the refuge space, and will thus block access to the stairway by others trying to escape the building during an emergency.*



Size of Area of Refuge in stairway is too small.

2. Area of Refuge in the 3rd floor stairway is impossible to access by a person in a wheelchair due to the swing of the door into the space. The clear distance between the door swing and the opposite wall is only 23.5", and the clear distance between the door swing and the top step is only 15. *A wheelchair-bound or other disabled person cannot even attempt to enter the Area of Refuge without toppling down the stairs. Imagine a wheelchair-bound person trying to "back-up" from the stairway as others are pushing through the door trying to exit the building during a fire!*



Exit Door blocks access to the Area of Refuge behind it.

3.   The pathway to the Area of Refuge in the stairway for Parking Level B2 is
     interrupted by a 4" high curb.  **Code Sec. 1007** requires a ramp at least 44"
     wide and no steeper than 1V:12H slope  *A wheelchair-bound person on this
     parking level cannot escape the area in an emergency (fire, smoke, explosion,
     chemicals, etc.) and enter the designated Area of Refuge*



Curb prohibits wheelchair access to the Area of Refuge / Exit.

4.   Area of Refuge for Parking Level B2 is not accessible due to long-term
     storage of trash cans and other building maintenance items. **Code Sec. 1009.6**
     requires that "Exit passageways shall not be used for any purpose other than
     as a means of egress." *A disabled person cannot access the communication
     system, and a wheelchair-bound person cannot safely get out of the way of
     others who are fleeing the building during an emergency.* Certainly, this
     violation of the Code can be easily remedied, but it shows a blatant lack of
     care and/or knowledge on the part of the building management for
     maintaining emergency egress routes.



Storage blocks access to the Area of Refuge.

5.    **Code Sec. 1104.2.6** requires "In areas of refuge that have a two-way emergency communications system, instructions on the use of the area under emergency conditions shall be posted adjoining the communications system. The instructions shall include: 1) Directions to find other exits, 2) Advice that persons able to use the exit stairway do so as soon as possible, 3) information on planned availability of assistance . . . and how to summon such assistance, and 4) Directions for use of the emergency communications system." These required instructions are not posted at any of the communication boxes in any of the Areas of Refuge in the Gateway Center. *During an emergency situation, disabled individuals are often left behind in an Area of Refuge, as the able-bodied persons flee the building. It is critical that these individuals have necessary instructions for the communication system and information on what to expect from rescue personnel. Without proper instructions, panic can easily result.*



6.    **Code Sec. 1009.6** requires that "the open space under (exit) stairways shall not be used for any purpose." The bottom of the East stairwell at Parking Level B2 is used for long-term storage of trash cans, furniture, and building maintenance items. *The storage of materials under the stairs is prohibited because the entire emergency exit stairwell must be kept free of any combustible and flammable materials. A fire in an Exit Stairway is a disaster.*



Storage under the Exit Stairs in dangerous.

**West Exit Stairway and Exit Discharge**

1.  Landing at bottom of the exterior stairs for the Exit Discharge of the west stairway violates **Code Sec. 1004.10** because the length is too small. Actual landing length is only 36" in the direction of travel. Required minimum length is 44"



Size of Landing at Exit Discharge is too small.

2.  The Width of the exterior concrete stairs for the West Exit Discharge is only 36", which violates **Code Sec. 1006.2**. Required minimum width is 44 inches.



Width of Exit Stairway is too narrow.

3.  The Exit Court connecting both the west Exit Discharges to the Public Way is
    obstructed by a steel electrical box which reduces the passage width between
    the box and the stairway to only 41". Required minimum width of any exit
    route is 44" clear dimension per **Code Sec. 1010.2**. The picture below also
    shows that during the winter, the snow is shoveled off of the concrete
    walkway only, further narrowing the clear width to only 22" next to the stairs.
    *This Exit Court is the final element of the emergency egress route for all three
    floors of the building plus both underground parking levels. An emergency
    situation will result in approximately half of the building occupants using this
    exit route to quickly leave the building and move to the public street (Heber
    Ave.) The danger of this substandard width is obvious – people rushing from
    the building are often in a panic, and when the exit route is too narrow,
    falling, trampling, and other serious injuries can easily result.*



Exit stairs and power box constrict Exit Court width.

4.   The Exit Court connecting the both West Exit Discharges to the Public Way is less than 10 feet wide in many places (7'-6" between metal stairs and adjacent building.)  As required by **Code Sec. 1010.4**, Exit Court walls (including adjacent buildings) shall be at least one-hour fire-resistive construction for at least 10' above the ground, and all openings therein (windows, doors) shall be protected by fixed or self-closing ¾-hour fire assemblies.  The construction of the exterior walls of the adjacent buildings are not one-hour fire-resistive, nor are the windows fire-protected, hence the Exit Court walls violate this requirement. *This code violation is dangerous due to the fact that a fire in any of the buildings surrounding the Exit Court can quickly render the Exit Court impassable and unusable.*



Adjacent buildings are not fire-rated for Exit Court.

**Central Elevators and Exit Corridor:**

1.  Elevators and West Exit Corridor on Parking Level B1 are not accessible to a person using a wheelchair due to configuration of parking stalls and railings. An employee or client in a wheelchair cannot access the elevators or exit door from the north if the parking stalls are occupied. And coming from the south, the clear width between the wall and railing is only 28.5". *In an emergency situation (fire, smoke, explosion) the wheelchair-using person cannot get to the Exit Corridor or Area of Refuge located across from the elevators here.*



Vehicles block wheelchair access to elevators and exit door.



Railing blocks wheelchair access to elevators and exit door.

In summary, there are numerous emergency egress and accessibility issues at the Gateway Center that pose a danger to employees and visitors to the third-floor space leased by Mr. Shoaf and his business. I have identified these issues in this report, and strongly recommend that each violation of the Building Code be properly addressed and rectified by the building owner.

Sincerely,


Michael P. Johnston, SE
Principal
Summit Engineering Group, Inc.
55 West Center Street
Heber City, UT 84032
435-654-9229

# EXHIBIT 8



ARCHITECTURE · PLANNING · INTERIORS

649 E SOUTH TEMPLE · SLC, UT 84102 · 801.355.5915 · www.crsa-us.com

March 4, 2010

W. James Tozer, Jr.
Vectra Management Group
424 West 33rd Street, Suite 540
New York, NY 10001-2641

**RE:**    Gateway Center

Dear Mr. Tozer:

    I have been provided with a copy of the analysis prepared by Michael P. Johnston, SE of the Summit Engineering Group dated January 13, 2010. As the architect for the Gateway Center, please allow me to explain why none of the code violations asserted in that report are in fact violations.

1. The current code (IBC 2006) does not require an area of refuge for a building that has a fire suppression system and is less than five stories in height. Gateway Center is a fully sprinkled building and less than five stories. Hence none of the alleged violations relating to areas of refuge are applicable to Gateway Center.
2. The west basement stairway meets the 1984 UBC. That is the code under which the stairway was permitted. As a result there is no violation relating to the west basement stairway.
3. The West Exit Stairway which evacuates people from the upper levels of the Gateway Center empties into the public right-of-way along the west side of the building. Because it is a public right-of-way and not an Exit Court the comments do not apply.

    If you have any further questions, please do not hesitate to give me a call.

Very truly yours,
Cooper Roberts Simonsen

Wallace Cooper 2
Architect

# EXHIBIT 9



**Diane H. Banks**
Direct Telephone: (801) 323-2202
Direct Facsimile: (801) 532-3370
dbanks@fabianlaw.com

March 5, 2010

**VIA CERTIFIED MAIL - #7008 3230 9993 5414 8282**
**RETURN RECEIPT REQUESTED**

Corbin B. Gordon, P.C.
345 West 600 South, Suite 108
Heber City, Utah 84032

      **RE:**   Gateway Center

Dear Mr. Gordon:

      We are in receipt of your letter dated February 24, 2010 in which you allege code violations relating to Space 303 at the Gateway Center. As with your previous correspondence, the allegations are unfounded. Further, as we have previously advised, even if there were a code violation (which there is not), the existence of a code violation is not a basis for abandonment of the premises or a basis for the tenant (Cloud Nine Resorts, L.L.C.), the assignee (Easy Street Partners, L.L.C.) or the guarantor (Bill Shoaf) to declare a breach by landlord under the lease.

      In light of your repeated correspondence and spurious allegations, we're attaching copies of your prior letters and responses from the Landlord as Exhibit A in which the unfounded allegations have been refuted. We have also summarized and reviewed the major points of that correspondence below. We believe this exercise illustrates your persistence in apparently trying to either justify the recent abandonment of the premises when in fact no justification exists, or to extract some settlement concessions from the landlord.

      <u>Gordon Letter dated April 13, 2009.</u> In this letter, even though there had previously been an assignment of the lease from the tenant, Cloud Nine Resorts, L.L.C. ("Cloud Nine") to the assignee, Easy Street Partners, L.L.C. ("Easy Street"), you indicated that you represented Cloud Nine. You have never advised us in the subsequent correspondence that you represent any client other than Cloud Nine.

      You asserted in your April 13, 2009 letter that there is a safety code violation in the premises (Space 303 at Gateway Center) relating to the requirement that a person must be able to

Corbin B. Gordon, P.C.
March 5, 2010
Page 2

choose two divergent paths [of egress] within 100 feet. You attached correspondence from Phil
Hahn, an architect who advises the International Code Council, in which he noted that your
"right angle" measurement of 103'2" would violate this requirement. Subsequent to this letter,
in our correspondence with Mr. Hahn, he noted that the "right angle" measurement would
normally be used only when measuring within rooms cluttered with furniture. Mr. Hahn
confirmed that would not be the case with the hallways in space 303, and that the rounded corner
measurement was both reasonable and acceptable. That measurement was 95'4" to the elevator
and another 2-3 feet to the point where a second exit route could be seen, well within the 100'
limitation. In other words, Mr. Hahn verified there was no code violation. A copy of the email
correspondence with Mr. Hahn evidencing this exchange was previously provided to Mr. Shoaf
and is attached hereto as Exhibit B. In addition, you make the unreasonable demand in your
April 13 letter that the landlord should provide you with an indemnification from Park City for
any safety issues relating to this alleged violation. It is unreasonable to expect that a
municipality would provide an indemnification of a private party in any circumstance, hence not
only was there no violation or any basis for requesting the indemnification, but your demand was
impossible to meet.

Further, you have told us that you became aware of the alleged code violation in the
premises by OSHA. We have contacted OSHA who has informed us they have no record of any
such violation, and that if such a violation had existed a written notice would have been
provided. If you have such a notice we would appreciate receiving a copy.

Gordon Letter dated September 17, 2009. In this letter, you indicated that the above
referenced issue regarding the 100' distance was unresolved. That repetition rises to the level of
harassment based on the landlord's clear demonstration that there was no code violation. In this
letter you also alleged additional violations that are similarly without foundation. Those
allegations and the landlord's response, as set forth in our September 24, 2009, letter are outlined
below, with Landlord's response in italics.

1. You allege that CAMS were being used to pay for taxes, insurance and maintenance
   of the parking garage.
   *Operational costs relating to the parking garage are paid by the condo parking
   stall owners, including Park City Municipal Corporation.*
2. You allege that the parking garage violated safety codes and was not ADA compliant.
   *The parking garage is not part of the leased property. Any violation of safety
   codes or the ADA by the garage is not a breach under the lease.*

Corbin B. Gordon, P.C.
March 5, 2010
Page 3

In your September 17 letter you also demanded that the Landlord provide an audit of the Gateway Center.  Not only would such an audit be costly, there is no requirement in the lease that the Landlord do so.  Failure to provide you and your client with an audit is not a violation of the lease.

Gordon Letter dated October 20, 2009.  In this letter, you raised again your allegations that CAMS are being used to pay garage expenses, that egress from the garage is non-compliant with the fire code, and that the garage is not ADA compliant, and you raised a new allegation that there were platting issues associated with the garage.  In our responsive correspondence of November 6, 2009, we refuted all of your contentions and noted that you had ignored our prior responses.  You completely disregarded the fact that the parking garage is not a part of the premises (even though your earlier letter acknowledged that expressly when making the CAM allegation).  We also pointed out that the budget you attached to your letter to support the repeated allegation that the CAM charge for the building included parking lot expenses showed zero amounts in the parking lot section and that expenses you complained of appeared in the unreimbursed section of the budget, and hence were not included in CAM charges for the building.  We notified you that Park City Municipal Corporation owns the entire upper floor of the parking garage and that they and the other condo stall owners pay the incremental cost of operating the parking garage.  We also informed you that the Park City Fire Service District verified there were not any real fire safety issues.  Most importantly, we reminded you that even if your allegations were accurate (which they were and are not), they would not justify abandonment of the premises or constitute a breach under the lease.

Gordon Letter dated February 19, 2010.  In this letter you again raised claims relating to the CAMS and alleged noncompliance with code.  You falsely stated that the Landlord had not addressed the issues when in fact the landlord had spent a great deal of time and money refuting your baseless claims.  In your February 19 correspondence, you also proposed a settlement of claims.  You again harassed the landlord and repeated unfounded allegations in what appears to be an effort to obtain a release of Mr. Shoaf and Cloud Nine, from the lease as well as a reduction in the bankruptcy claim filed by Gateway Center.  You now support the allegations with an "Expert Report" attached as Exhibit A to the February 19, 2010 letter.

With respect to your "Expert Report", attached as Exhibit C is a letter from Wally Cooper, architect for Gateway Center, indicating why none of the alleged violations are code violations.

Three additional facts are relevant to this chronology.  First, Easy Street was obligated to "timely perform all of the obligations" of the lessee under the lease (11 U.S.C. § 365(d)(3)) up to

Corbin B. Gordon, P.C.
March 5, 2010
Page 4

the time the lease was automatically rejected due to the debtor's failure to assume it during the 120 day statutory period of Section 365(d)(4)(A) of the Bankruptcy Code. The debtor did not "timely perform" its obligations under the lease, although someone (apparently Cloud Nine), did make some lease payments during that period. Easy Street, or someone affiliated with it, continued to occupy the premises until recently. The Landlord's claims against Easy Street are dealt with as part of the claims process in the bankruptcy.

Secondly, a demand letter was sent to Cloud Nine (which continues to be obligated under the lease as the original tenant) demanding payments under the lease by March 5, 2010. A prior demand letter was sent to Mr. Shoaf, who personally guaranteed the lease. If Cloud Nine and/or Shoaf do not pay the amounts due by today, March 5, 2010, we have been instructed to commence a collection action against them. The Landlord's claims against them will be resolved in the litigation if the full payment is not timely made.

Third, the Park City fire inspector inspected Gateway Center and found no violations related to the premises or the building in general. See Exhibit D attached hereto and incorporated herein by this reference.

Based on all of the foregoing, there is no reason for the Landlord to accept anything less than the full amount due under the lease, including all late fees, penalty interest and attorneys' fees which are continuing to accrue. Not a single one of the items you allege as code violations in the premises is accurate, and more importantly, even if there was a code violation (which there is not), that would not justify abandoning the premises.

Very truly yours,

Diane H. Banks

DHB/dcr

cc:    Kenneth L. Cannon, II (with enclosures)
       Steven Eichel (with enclosures)
       W. James Tozer, Jr.
       Paul Piper
       Wally Cooper

ND: 4852-8246-1957, v. 1

# EXHIBIT 10

# PARK CITY FIRE SERVICE DISTRICT
## FIRE SAFETY INSPECTION REPORT

Business Name: GATEWAY BLDG.            Inspection Date: 1-27-09

Business Address: 136 HEBER AVE            Suite: ____    Business Phone: ____

| No. | | Violations | No. | Locations/Remarks | Cleared |
|---|---|---|---|---|---|
| | | **ACCESS** | 1 | CLEAR FIRE LANE ACCESS | 2-26-09 |
| 1 | ✓ | Maintain fire lane free of obstructions | | IN KITCHEN | |
| 2 | | Provide address numbering which is visible from street | | | / / |
| 3 | | Provide Supra box and/or keys for fire dept. access | 12 | SERVICE EXTINGUISHERS | 2-26-09 |
| | | **EXITING** | | | |
| 4 | | Remove obstructions at exits, doors, aisles, corridors, stairways, etc. | 13 | MOUNT EXTINGUISHER | 2-26-09 |
| 5 | | Exit door to open without a key or any special knowledge or effort | | IN NEON NAILS | |
| 6 | ✓ | Provide sign over main exit door(s) to remain open during business hours | 16 | CLEARANCE FOR PULL | 2-26-09 |
| 7 | | Repair non-operable exit door hardware | | STATION IN JEAN LUIS | |
| 8 | | Removed obstructions from door required to be closed | 25 | PATCH HOLE IN CLOSET | 2-26-09 |
| 9 | | Remove locks & latches from doors with panic hardware | | | |
| 10 | | Remove storage from attic, under-floor and concealed spaces | 27 | CORD IN JEAN LUIS | 2-26-09 |
| 11 | | Provide/maintain exit sign/emergency lighting | | | |
| | | **FIRE EXTINGUISHERS / ZANE / BUSINESS CENTER** | 29 | COVER PLATE INSIDE | 2-26-09 |
| 12 | ✓ | Have fire extinguisher serviced and tagged / NAILS / BACK DOOR / NEON | | ENTRANCE | |
| 13 | ✓ | Provide/mount fire extinguisher as indicated NEON | | | / / |
| 14 | | Provide clear access to fire extinguisher | | | |
| 15 | ✓ | Post a sign indicating fire extinguisher location  NEON/ZANE(I) | | | |
| | | **FIRE PROTECTION SYSTEMS** | | Emergency Contact Information & Telephone Number(s): | |
| 16 | | Maintain 3 foot clearance for access/use of fire appliances/equipment | | | |
| 17 | | Secure all system control valves in the open position | | | |
| 18 | | Replace damaged, corroded or painted sprinkler heads/ Fire department connection (FDC) caps | | | |
| 19 | | Provide annual certification for sprinkler/standpipe system | | Re-inspection dates | Inspector |
| 20 | | Provide sprinkler coverage in unprotected areas | | 1st FEB 26  / / | 38C |
| 21 | | Provide spare fire sprinkler heads and/or compatible wrench | | | |
| 22 | | Hood and duct extinguishing system to be serviced and tagged | | 2nd   / / | |
| 23 | | Remove grease from hood, duct, and filters ( keep clean) | | | |
| | | **FIRE ALARM SYSTEMS** | | Refer to FPB   / / | |
| 24 | | Maintain, repair, inspect, and/or test fire alarm system | | | |
| | | **FIRE SEPARATIONS** | | 3rd   / / | |
| 25 | ✓ | Repair holes in required fire resistive construction | | | |
| 26 | | Provide/repair self or automatic closing fire-rated assemblies | | Refer to PCBD   / / | |
| | | **ELECTRICAL** | | Refer to SCBD   / / | |
| 27 | ✓ | Discontinue use of extension cords | | | |
| 28 | | Install permanent wiring for fixed or stationary appliance | | | |
| 29 | ✓ | Provide cover plates for all junction boxes  2 | | Final clearance  2-26-09 | |
| 30 | | Remove exposed wiring or protect in approved conduit | | | |
| 31 | | Provide clear work space at all electrical panels. Label electrical room and breaker switches in electrical panel. | | Thank you for your assistance and cooperation in allowing the Park City Fire District to visit your facility and for minimizing The fire and life loss in your community. | |
| 32 | | Maintain wiring in good condition and protect from damage. | | | |
| | | **FLAMMABLE LIQUIDS – COMPRESSED GASES** | | The above items have been noted and need to be corrected. | |
| 33 | | Provide flammable liquid storage cabinet or reduce storage | | | |
| 34 | | Remove all fueled vehicles or equipment from buildings | | We would like to return in ____ days from the date of this notice to verify that these items have been corrected. | |
| 35 | | Secure compressed gas cylinders / Identify gas in cylinder | | | |
| | | **STORAGE – HOUSEKEEPING** | | If you have any questions, please contact us at (435) 940-2532 | |
| 36 | | Arrange storage in an orderly manner to provide access/egress | | | |
| 37 | | Remove combustible storage from boiler, mechanical, or electrical rooms | | SIGNATURE OF RECIPIENT: | |
| 38 | | Reduce storage to 24 " below ceiling or 18" below fire sprinklers | | | |
| 39 | | Provide approved metal container from oily rag storage | | | |
| 40 | | Remove waste & rubbish material from the premises daily | | | |
| 41 | | Keep dumpster 5-feet away from buildings | | RECIPIENT'S NAME: | |
| 42 | | Clearance from ignition sources | | _Owner  X_manager  _employee  _other | |
| | | **MISCELLANEOUS** | | | |
| 43 | | Other violations and comments | | Inspection Completed By: | |
| | | No violations noted this date – Thank you for being safe | | 38C | |