Annette Jarvis (1649)
Benjamin J. Kotter (9592)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
Email: kotter.benjamin@dorsey.com

Richard W. Havel (10759)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rhavel@sidley.com

*Attorneys for WestLB, AG*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EASY STREET HOLDING, LLC, *et al.*, | ) | Bankruptcy Case No. 09-29905 |
| | ) | Jointly Administered with Cases |
| Debtors. | ) | 09-29907 and 09-29908 |
| | ) | |
| Address: 201 Heber Avenue | ) | Chapter 11 |
| Park City, UT 84060 | ) | |
| | ) | Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) DATE: | May 14, 2010 |
| 35-2183713 (Easy Street Holding, LLC), | ) TIME: | 10:30 A.M. MST |
| 20-4502979 (Easy Street Partners, LLC), and | ) PLACE: | Courtroom 369 |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) | 350 South Main Street, #301 |
| | ) | Salt Lake City, Utah 84101 |

**OPPOSITION OF WESTLB, AG TO SECOND MOTION OF EASY STREET
PARTNERS, LLC TO EXTEND THE EXCLUSIVE PERIOD FOR SOLICITING AND
OBTAINING ACCEPTANCES OF ITS AMENDED CHAPTER 11 PLAN OF
<u>REORGANIZATION</u>**

WestLB AG ("WestLB"), a secured creditor in the above-captioned bankruptcy proceeding, by and through its undersigned counsel, hereby opposes (the "Opposition") the Second Motion of Easy Street Partners, LLC to Extend the Exclusive Period for Soliciting and Obtaining Acceptances of Its Amended Chapter 11 Plan of Reorganization [Docket No. 446] (the

"Motion"). WestLB opposes any further extension of exclusivity for Easy Street Partners, LLC ("Easy Street" or the "Debtor"), as Easy Street will either be able to demonstrate in its Plan Supplement due May 10, 2010 that it has obtained the financing needed to effectuate its Plan as formulated – and thus no extension of exclusivity is needed – or that it remains unable to find a Plan Funder able or willing to satisfy the current Plan – and thus its Plan is not feasible. In either scenario, continuing exclusivity is not in the best interest of the Debtor's estate because it prevents creditors from pursuing an alternative, value-maximizing solution, even as the Debtor descends into its cash-negative low season. WestLB also requests immediate termination of the current exclusivity period. In support of its Opposition, WestLB submits herewith the Declaration of Duncan Robertson ("Robertson Decl.") and respectfully states as follows:

## FACTUAL BACKGROUND

1. On September 14, 2009 (the "Petition Date"), Easy Street, Holding[1] and Mezzanine (the "Debtors") commenced bankruptcy cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2. Easy Street owns and operates certain real property and improvements and related facilities in Park City, Utah, commonly known as the "Sky Lodge Private Residence Club and Hotel" (the "Sky Lodge").

**Cash Collateral-Related Filings**

3. One day after the Petition Date, on September 15, 2009, Easy Street filed the Motion of Easy Street Partners, LLC for Interim and Final Orders: (i) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to West LB, AG, and

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

(ii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) [Docket No. 9] (the "Cash Collateral Motion").  As set forth more fully in the Cash Collateral Motion, on March 30, 2006, Easy Street entered into a loan (the "WestLB Senior Loan") and Security Agreement (collectively, the "Senior Loan Agreement"), for the initial amount of $36,779,224 with WestLB to purchase and develop a Condominium Hotel Mixed Use project at 201 Heber Avenue, Park City, Utah 84060.  The WestLB Senior Loan is secured by, among other things, security interests evidenced by the Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing, and a UCC Financing Statement, each filed in the Summit County, Recorder's Office, State of Utah.  WestLB, in its capacity as agent under the Senior Loan Agreement, and the Debtors then agreed upon the terms of a stipulated order permitting Easy Street's interim use of WestLB's cash collateral.  See Stipulated Interim Order on Motion of Easy Street Partners, LLC for Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) [Docket No. 39].

        4.        On or about October 9, 2009, WestLB and the Debtors executed and filed with the Court a stipulation for Easy Street's long-term use of cash collateral.  See Stipulation Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection to WestLB, AG [Docket No. 84].  That stipulation has been amended and/or extended by the following docket entries: [Docket No. 91], [Docket No. 95], [Docket No. 172], [Docket No. 219], [Docket No. 234] (the "First Extension"), [Docket No. 244], [Docket No. 272],[2] and

---

[2] By Order dated as of January 25, 2010, the Court required that, pending the Court's resolution of whether Jacobsen National Group, Inc. ("Jacobsen") holds an interest in the Sales Proceeds Accounts (as defined in that Order), the Debtor maintain at least $600,000 in a segregated bank account or accounts to resolve Jacobsen's objection to the consensual use of cash collateral.  See [Docket No. 272] ¶ 1.

3

[Docket No. 457][3] (the "Second Extension") (collectively as amended, the "Cash Collateral Stipulation").

5. Under the relevant terms of the Cash Collateral Stipulation, Easy Street is authorized to use WestLB's cash collateral until May 31, 2010 if, among other things, Easy Street obtains confirmation of a plan of reorganization that is reasonably acceptable to WestLB and meets the minimum qualifications described further in the Cash Collateral Stipulation. See Cash Collateral Stipulation ¶ 26(k) [Docket No. 84]. One such qualification is that Easy Street obtain a confirmation hearing on or before February 11, 2010, see [Docket No. 234] ¶ 1(c), and confirmation of its Plan by March 31, 2010, see [Docket No. 84] ¶ 26(k). WestLB agreed in the Cash Collateral Stipulation that it would consent to an extension of the Debtor's exclusive solicitation period if Easy Street filed a plan and disclosure statement in accordance with paragraph 26(k) of the Cash Collateral Stipulation. Easy Street's Plan does not comply with paragraph 26(k), however, because the Plan does not offer the minimum treatment mandated by that paragraph. See, e.g., Robertson Decl. ¶ 3. Nor has WestLB waived compliance with the Cash Collateral Stipulation's requirement that Easy Street obtain confirmation of its Plan by March 31, 2010. Rather, WestLB specifically reserved its right to declare a default under the Cash Collateral Stipulation for any failure by Easy Street to hold to deadlines not specifically amended through the Second Extension. See [Docket No. 234] ¶ 5; [Docket No. 457] ¶ 7.

---

[3] Although Jacobsen has filed a limited objection to the Second Extension, WestLB and Easy Street have agreed to inclusion of certain language in the Second Extension, which will resolve that limited objection.

**Plan-Related Filings**

6. On January 15, 2010, Easy Street filed its original plan of reorganization (the "Original Plan") [Docket No. 256] and original disclosure statement (the "Original Disclosure Statement") [Docket No. 255].

7. On February 12, 2010, WestLB filed an objection [Docket No. 297] to the Original Disclosure Statement setting forth various problems with the disclosures (or lack thereof) made therein, including Easy Street's failure to properly disclose sufficient detail regarding the source and process for obtaining the exit financing needed to fund the Original Plan.

8. On February 17, 2010, Easy Street filed its amended plan of reorganization [Docket No. 309] and amended disclosure statement [Docket No. 310]. At a hearing on February 18, 2010, the Court approved the amended disclosure statement, subject to certain further amendments made on the record at the hearing. On February 25, 2010, Easy Street filed another amended plan of reorganization (the "Plan") [Docket No. 323] and amended disclosure statement to reflect the changes made during the hearing (the "Disclosure Statement") [Docket No. 321].

9. Throughout this case, the Debtor has relied on the emergence of an independent investor (a "Plan Funder") to inject new money into the estate to fund Easy Street's reorganization. See, e.g., [Docket No. 255] at 19. The Debtor's Plan requires the Plan Funder to provide approximately $4,000,000 in cash for plan payments required on or around the Effective Date, including no less than $2,000,000 to fund operations throughout the summer months. See [Docket No. 321] at 20. Although the Disclosure Statement identified Strategic Capital Partners

("SCP") as the Plan Funder, the Debtor has been unable to negotiate the final terms of exit financing with either SCP or any other potential Plan Funder. The Debtor is obligated by an Order dated April 16, 2010 [Docket No. 433] to file a Plan Supplement on or before May 10, 2010, revealing the identity of the Plan Funder and the terms of the agreed-upon exit financing.

10. As of the filing of this Opposition, WestLB is not aware that Easy Street has identified a Plan Funder that has agreed to provide financing on the terms and in the amounts specified by the Plan. Although Easy Street may identify an investor willing to provide funds, WestLB believes that the treatment that would be proposed for WestLB's claim in any such scenario would require further discovery, litigation, and disclosure to WestLB, which would delay the currently-scheduled confirmation hearing and would involve certain factual disputes and substantive legal issues not yet brought before the Court in this case.

**Operating Projections and Recent Performance**

11. The Second Extension contains a revised budget for Easy Street's operations in April and May, 2010 (the "Budget"). See [Docket No. 457] Exh. A-1. The Budget projects a net reduction in cash by $-446,740 in April, 2010 and by $-410,882 in May, 2010.[4] [Docket No. 457] Exh. A-1. The substantial cash outflow is principally due to a seasonal decline in occupancy, which begins in April, 2010 and continues until the fall season. Robertson Decl. ¶ 8.

12. On May 3, 2010, Easy Street submitted a funding request ("Request U") to WestLB, seeking the transfer of $100,989.24 from Easy Street's "Lockbox" Account and, as needed, from certain escrow accounts (the "Escrow Accounts"), to Easy Street's operating

---

[4] In a subsequent monthly report provided to WestLB, Debtor revised its net reduction in cash for May, 2010 to $-285,882.

6

account (the "Operating Account").[5] See Robertson Decl. ¶ 5. Request U covered certain payables incurred from April 26, 2010 through April 30, 2010. See id. Exhibit A.

13. Request U revealed certain information regarding Easy Street's cash position after funds were released for expenses budgeted in April, 2010. Pursuant to Request U, the Escrow Accounts were reduced by $43,810.78, which was transferred to the Lockbox Account, and all funds were withdrawn from the Lockbox Account, except for certain third-party reserves. See id. After the amounts requested in Request U were so transferred or applied, the Lockbox Account would have contained $68,952.63, and the Escrow Accounts would have contained $764,190.45. These remaining amounts comprise the total funds available to pay accrued but unpaid expenses for April, 2010 and the projected operating losses for May, 2010 and thereafter.[6]

14. Request U also discloses those expense items that were budgeted to be paid in April, but for which no funds have, as of yet, been released (which are equivalent to accrued and unpaid administrative expenses). For example, Exhibit C-1 to Request U reveals that the Debtor has not yet obtained funds to pay the $61,277 budgeted in April for HOA and hotel rental-associated liabilities, the $125,000 budgeted in April for legal fees incurred by counsel for the Debtor, or the $67,244 for legal fees incurred in April by counsel for WestLB. See Robertson Decl. ¶ 7. These obligations, although not paid in April, constitute accrued obligations that should be deducted from the cash on hand to accurately measure the cash available to pay future

---

[5] WestLB's cash collateral is held in three levels of accounts – the Operating Account, which holds funds allocated to accrued and current payables; the Lockbox Account, which receives operating revenues and maintains a variable reserve; and the Escrow Accounts, which hold the remaining cash collateral until funding requests call for amounts in excess of then-available funds in the Lockbox Account. Robertson Decl. ¶ 4.

[6] As the Operating Account holds only funds which have already been earmarked for past and current payables, the cash on hand in that account is disregarded in determining the amount of cash collateral remaining to satisfy future obligations. See Robertson Decl. ¶ 6.

7

obligations. A conservative estimate is that the Debtor has at least $253,521 in accrued and unfunded expenses budgeted for April, which should reduce the amount available in the Lockbox Account and Escrow Accounts. See id.

15. Because of the dramatic cash outflows in April and May, there is a severe risk that, by the end of May, 2010, the amount of cash available to the Debtor in the Escrow Accounts (when adjusted for the accrued and unpaid administrative expenses in the Budget) will not sustain the Jacobsen reserve of $600,000. See id. ¶ 8. The Debtor further projects continuing cash deficits throughout the summer unless it can sell fractional units, the first sale of which is currently projected to occur in the third month after the Debtor confirms its Plan. See Plan Ex. 2-1 (2010 Budget Consolidated).

**Alternative Plan**

16. In light of the now-likely event that the Debtor will be unable to obtain exit financing for its Plan as proposed, WestLB has engaged in discussions with potential funders of an alternative plan of reorganization.[7] WestLB projects that, with a termination of exclusivity, pending review and approval from senior management at WestLB, an alternative plan could be negotiated and proposed by WestLB on or before May 31, 2010. Id. ¶ 9.

**ARGUMENT**

17. When WestLB and Easy Street initially agreed upon the terms of Easy Street's consensual use of cash collateral in September 2009, they agreed to a certain set of deadlines designed to motivate Easy Street to emerge from bankruptcy before seasonal declines in

---

[7] WestLB has already faced certain hurdles in further developing an alternative plan of reorganization for the Debtor, such as its inability to share information, due to a confidentiality agreement with Easy Street. WestLB will request that Easy Street permit WestLB to share this information with a potential Plan Funder, and may return to this Court for affirmative relief if Easy Street refuses.

8

occupancy drive down its cash flow to a dangerous level. Easy Street has now sought a third time to extend exclusivity beyond the agreed-upon timeline and beyond the exclusive solicitation period provided by the Bankruptcy Code. Easy Street seeks this further extension despite its swiftly declining cash position and lack of any commitment from a Plan Funder.

18. "The debtor has the burden of proving that cause exists" to extend exclusivity beyond the period provided in 11 U.S.C. § 1121. In re Curry Corp., 148 B.R. 754, 755 (Bankr. S.D.N.Y. 1992); see, e.g., In re Gen. Bearing Corp., 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors."). The Debtor has not carried its burden here; rather, cause exists to terminate Easy Street's current exclusivity period and to deny further extension of exclusivity. Unless Easy Street reveals in its Plan Supplement due May 10, 2010 that it has a commitment for exit financing from a Plan Funder, there is no reasonable prospect of Easy Street obtaining confirmation of its Plan or any other plan by the currently-scheduled May 26, 2010 confirmation hearing date or at any other time in the foreseeable future. Further extension of the Debtor's exclusivity period thus would not enhance the likelihood of prompt confirmation of an acceptable plan. Instead, the most effective way to produce a feasible and confirmable plan before the Debtor runs out of cash needed to fund its operations is to terminate the Debtor's exclusivity period now and allow other interested parties to submit alternative plans.

**The Debtor Has Had Ample Opportunity to Procure Exit Financing**

19. Easy Street has had nearly four (4) months to prosecute its Plan and nearly eight (8) months to find and come to terms with a Plan Funder willing to finance the Debtor's post-confirmation operations with the continued involvement of William Shoaf, Easy Street's

9

prepetition principal.  See Disclosure Statement at 19-20.  Despite its assurances that such a funder would be found in time to seek confirmation on March 30, 2010 – which was then extended to May 17, 2010 – the Debtor has failed.  Despite its continued failure, the Debtor has given no more than empty assurances that it will secure the needed exit financing at any point in the future.  If Easy Street has not managed to finalize documentation with a Plan Funder after eight (8) months of searching and months of negotiating, it will not likely find a funder for the current Plan.  Without this funding, the Plan is not feasible and cannot be confirmed.  Under these circumstances, a further extension of exclusivity – thus limiting the estate's options to the Debtor's pursuit of an infeasible Plan – would not be in the best interests of the Debtor's estate.

**Further Delay Jeopardizes the Debtor's Operations and Ability to Emerge**

20. Continued exclusivity also creates a damaging delay to Easy Street's ultimate chances of reorganization.  Because the Sky Lodge is essentially a ski resort, it experiences higher revenues – and thus a more robust cash flow – in the winter months than at any other time of year.  Such seasonal volatility provides a further basis for denying an extension of exclusivity. See, e.g., In re Mid-State Raceway, Inc., 323 B.R. 63, 69 (Bankr. N.D.N.Y. 2005) (denying further extension of the exclusive solicitation period after the debtor filed a plan not likely to be accepted by certain creditors because "any further delay in the confirmation process resulting from extension of the Debtors' exclusivity period could well damage the prospects of realizing the intrinsic economic value of the racetrack").  The Debtor has already begun to see decreasing revenues, and its revenues will only shrink further in the summer months.  If a plan is not confirmed promptly, the Debtor may run out of the funds it needs to keep the Sky Lodge operational.  Such an outcome would cause disproportionate injury to Easy Street's creditors and

estate, but the risk of such an eventuality event would be lessened if other parties were permitted to propose alternatives to the Plan.

**Other Factors Commonly Supporting Extension Do Not Support Extension Here**

21.     In deciding whether "cause" exists to extend exclusivity, courts also consider, among other things, (i) the size and complexity of the case, (ii) the cooperation of creditors in negotiating with the debtor, (iii) whether the extension of exclusivity was sought to pressure creditors to submit to the debtor's reorganization demands, and (iv) whether creditors have lost confidence in the debtor's management.  See, e.g., In re R.G. Pharm., Inc., 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (enumerating nine factors (citing In re Adelphia Comms. Corp., 352 B.R. 578, 586-87 (Bankr. S.D.N.Y. 2006)); In re All Seasons Indus., Inc., 121 B.R. 1002, 1005-06  (Bankr. N.D. Ind. 1990).

22.     Like other cases in which extension of exclusivity has been denied, this case does not involve a large number of debtors or a complicated restructuring.  See, e.g., In re Mid-State Raceway, Inc., 323 B.R. at 65, 69 (debtor owned and operated race track and "adjacent hotel, food and proposed video game business"); In re Curry Corp., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (nine closely-held and affiliated car dealerships).  In addition, WestLB has cooperated extensively with Easy Street in providing continuing use of cash collateral and in negotiating possible treatments of WestLB's claim.  See In re All Seasons Indus., Inc., 121 B.R. at 1006 (when delay is caused by a good faith difference of opinion, rather than a creditor's unwillingness to negotiate, exclusivity should be lifted).  However, continuing exclusivity would invite Easy Street to further delay the hearing on the current Plan or to propose a materially worse treatment for WestLB's claim, and thereby would undermine the intended "balance

[between] the bargaining positions of debtors and creditors in negotiating the terms of a reorganization." In re R.G. Pharm., Inc., 374 B.R. at 488.  Finally, an extension of exclusivity is not likely to resolve WestLB's objections to the Plan, including that the Plan is not presently confirmable, and therefore exclusivity is not "likely to significantly improve the progress of the case." Id.  In aggregate, these factors support an end to, rather than an extension of, exclusivity, so that this case can progress through evaluation of more than one plan of reorganization and a final resolution.

**Creditors Should Have Opportunity to Pursue Plan Alternatives**

23.     WestLB has been supportive of Easy Street's efforts thus far to confirm a Plan by negotiating the treatment of WestLB's claim and by providing continued access to cash collateral, despite the Debtor's multiple violations of the Cash Collateral Stipulation, including its continual requests for extension of exclusivity and inability to confirm a plan.  See Cash Collateral Stipulation ¶ 26(k) [Docket No. 234].  The Debtor has had ample time and opportunity to pursue its Plan without competition, and creditors should not be held hostage by its continued, unsuccessful attempts to resuscitate its Plan.  See In re Gen. Bearing Corp., 136 B.R. at 367 (noting that, because the debtor lacked equity in the assets and had been unable to demonstrate "any financial ability to propose a confirmable Chapter 11 plan or that any further delay will enhance its prospects," "the secured claimants should not continue as hostages in this Chapter 11 case").  Due to the time-sensitive nature of this case and in light of the foregoing, it is essential

and in the best interest of Easy Street's creditors and estate that other parties – including WestLB – be given the opportunity to propose and solicit acceptance of a viable plan of reorganization.[8]

24. As noted above, the Debtor's continued inability to secure exit financing has spurred WestLB to explore other possible resolutions to this case. Among such alternatives, WestLB has engaged in discussions with potential funders of an alternative plan of reorganization (which would not require as a condition to confirmation the continued involvement of Shoaf in the Debtor's post-confirmation operations). However, development of an alternative plan has been impeded because, among other things, of the Debtor's continuing exclusivity. WestLB therefore requests that, to promote the best interest of creditors in this case, the Court terminate exclusivity as of May 14, 2010.

## CONCLUSION

**WHEREFORE**, WestLB hereby requests that this Court deny the extension of exclusivity sought by Easy Street in the Motion, terminate exclusivity as of May 14, 2010, and grant any and other relief it deems good and proper.

DATED this 10th day of May, 2010

**DORSEY & WHITNEY LLP**

 /s/ Benjamin J. Kotter
Annette W. Jarvis
Benjamin J. Kotter
and
Richard W. Havel
SIDLEY AUSTIN LLP

*Attorneys for WestLB, AG*

---

[8] Even if the Debtor abandons its current plan and suggests an alternative plan structure, such a dramatic shift would further delay the Debtor's ultimate emergence from bankruptcy and present unacceptable risk to its creditors. WestLB requests that, if the Debtor shifts to another, not-yet vetted plan approach, exclusivity nevertheless be lifted to allow for the greatest likelihood of a confirmable plan in the shortest time.

13