**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) |
| EASY STREET HOLDING, LLC, *et. al*. | ) Bankruptcy Case No. 09-29905 |
| | ) Jointly Administered with Cases |
| Debtors | ) 09-29907 and 09-29908 |
| | ) |
| Address:    201 Heber Avenue | ) Chapter 11 |
| Park City, UT 84060 | ) |
| | ) Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) |
| 35-2183713 (Easy Street Holding, LLC), | ) |
| 20-4502979 (Easy Street Partners, LLC), and | ) |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) **[FILED ELECTRONICALLY]** |
| | ) |

**EASY STREET PARTNERS, LLC'S AND WESTLB, AG'S MEMORANDUM OF LAW**
**(A) IN SUPPORT OF CONFIRMATION OF THEIR JOINT AMENDED PLAN OF**
**REORGANIZATION AND (B) IN RESPONSE TO OBJECTIONS THERETO**

**SIDLEY AUSTIN LLP**
Richard W. Havel (10759)
Christina M. Craige (Cal. Bar No. 251103)
555 West Fifth Street, Suite 4000
Los Angeles, California  90013-1010
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

**DORSEY & WHITNEY LLP**
Annette W. Jarvis (1649)
Peggy Hunt (6060)
Benjamin J. Kotter (9592)
136 South Main Street, Suite 1000
Salt Lake City, Utah 84101-1685
Telephone:  (801) 933-8933
Facsimile:  (801) 933-7373

Counsel for WestLB, AG, as Administrative Agent

**CROWELL & MORING LLP**
Michael V. Blumenthal (admitted *pro hac vice*)
Steven B. Eichel (admitted *pro hac vice*)
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000
Facsimile:  (212) 223-4134

**DURHAM JONES & PINEGAR, P.C.**
Kenneth L. Cannon II (3705)
Steven J. McCardell (2144)
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT  84110-4050
Telephone:  (801) 415-3000
Facsimile:  (801) 415-3500

Reorganization Counsel for the Debtors and Debtors in Possession

## PRELIMINARY STATEMENT

On September 14, 2009 (the "Petition Date"), Easy Street Partners, LLC ("Partners"),

Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding", together

with Partners and Mezzanine, the "Debtors"), the debtors and debtors in possession, filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the District of Utah, Central Division (the "Bankruptcy Court").

On January 15, 2010, Partners filed its Chapter 11 Plan of Reorganization and an

accompanying Disclosure Statement.  A hearing on the adequacy of the Disclosure Statement

was scheduled for February 18, 2010.  On February 17, 2010, Partners filed its Amended Plan of

Reorganization and an accompanying Amended Disclosure Statement, resolving certain

objections to the Disclosure Statement.  On February 18, 2010, the Bankruptcy Court approved

the Disclosure Statement, as further amended and supplemented on the record at the hearing.

Partners made certain revisions to the Amended Disclosure Statement and filed same with a

proposed order approving the Amended Disclosure Statement.  By order dated February 26,

2010, the Bankruptcy Court approved the Amended Disclosure Statement with respect to the

Amended Plan of Reorganization of Easy Street Partners, LLC, dated February 18, 2010 (the

"Disclosure Statement").

After months of searching for exit financing and after extensive negotiations with

WestLB, AG ("WestLB") and other primary constituents of Partners' bankruptcy case, on June

16, 2010, Partners and WestLB jointly filed the Amended Plan of Reorganization of Easy Street

Partners, LLC and WestLB, AG dated June 16, 2010 (the "Plan"),[1] which amended the plan

proposed by Partners dated February 18, 2010. Partners and WestLB (collectively, the "Plan

Proponents") submit this memorandum of law in support of confirmation of the Plan. The Plan

is not only supported by the Plan Proponents, it is the result of extensive negotiations and

agreements reached with Jacobsen National Group, Inc. ("Jacobsen"), the Official Committee of

Unsecured Creditors (the "Committee") and numerous other parties in interest. The Plan

Proponents now seek confirmation of the Plan.[2]

There were only three (3) objections to the Plan, which were filed by: (1) Gunther's Inc.,

d/b/a Gunther's Comfort Air [Docket No. 425], (2) Park City I, LLC [Docket Nos. 442 and 579];

and (3) David Wickline, personally, and Alchemy Ventures Trust, LLC [Docket No. 578].

Additionally, the Committee filed a response to the Plan [Docket No. 580]. The objection filed

by Gunther's Inc. has been resolved and the issues address by the Committee's response have

likewise been resolved. The Plan Proponents response to the raised objections is set forth in this

confirmation brief and are specifically addressed beginning on page 35 below.

---

[1] Capitalized Terms not otherwise defined herein have the meaning ascribed to such terms in the Plan.

[2] On June 21, 2010, the Plan Proponents filed their Plan Supplement, which included, among other things, (i) a summary of the commitment from the Plan Funder; (ii) a term sheet containing the material terms of the Restructured Loan Documents; (iii) a form of Amended and Restated Note governing the restructured debt to be issued by the Reorganized Debtor in respect of the Allowed WestLB Secured Claim; (iv) a form of postconfirmation employment agreement to be entered into by the Reorganized Debtor and William Shoaf; (v) a form of operating agreement of Heber Avenue Partners, LLC, the special purpose entity into which the assets of Partners will be transferred pursuant to the Plan; (vi) a certificate of formation and good standing of Heber Avenues Partners, LLC, which will become the Reorganized Debtor; (vii) a list of executory contracts being assumed; and (viii) details regarding the management, ownership, and contact information for the Reorganized Debtor.

## <u>VOTING</u>

**I.    All Classes Entitled To Vote Have Accepted the Plan.**

Creditors in Classes 1, 2, and 4 are impaired under the Plan and are entitled to vote on the

Plan.  Holders of claims in Class 5 are being treated as impaired under the Plan and are entitled

to vote.  Class 3 creditors are unimpaired and deemed to accept the Plan.  Classes 6 and 7 will

receive no distribution under the Plan, and are deemed to have rejected the Plan.  Creditors in

Classes 1, 2, 4, and 5 have voted to accept the Plan.  In fact, only one Class 4 creditor (whose

Claim is $4,095) voted against the Plan, and that Claim represented less than one percent of the

dollar value of Claims voted in that Class.[3]

**II.    Modifications to the Plan Do Not Materially and Adversely Affect Any Holders of
Claims or Interests in Voting Classes.**

To resolve certain objections to the Plan and to ensure exit financing for the Plan, the

Plan contains certain modifications to the Plan as to which certain votes were solicited.  Except

as to Classes 1, 6, and 7, the treatment of which changed, these modifications were not material.

Section 1127(a) of the Bankruptcy Code provides a plan proponent the right to modify

the plan "at any time" before confirmation,[4] and section 1127(d) provides that all parties that

previously have accepted the plan also should be deemed to have accepted the modified plan

---

[3] The certification of Michael V. Blumenthal, which summarizes the ballots received by Partners' from holders of Classified Claims and Interests, which are listed in the voting report (the "<u>Ballot Report</u>") will be filed with the Court prior to the hearing.

[4] 11 U.S.C. § 1127(a) provides:

The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of section 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

unless such modifications would have changed a party's vote.[5]  Courts routinely allow

proponents to make non-material changes to a plan without requiring the proponent to re-solicit

the plan for acceptances.[6]

The Plan does not change the treatment to Classes 2, 3, 4, or 5, or to the extent that the

Court deems that there are changes with respect to those classes, their treatment was enhanced.

The Plan materially modifies the treatment of Class 1, but the holder of the only Claim in Class 1

is a Plan Proponent.  As a Plan Proponent, WestLB has received adequate notice of the material

change in its treatment and has voted to accept the new treatment proposed in the Plan.

The Plan also provides a material change in treatment to Holders of Claims in the newly-

created Class 6.  Holders of these Claims have been separately classified from other unsecured

creditors and are receiving no distribution due to pre-petition contractual subordinations among

those Holders, WestLB, and Partners.  Likewise, new Class 7, which consists of equity holders

that were previously referred to as Class 6 in prior iterations of the plan and which had been

---

[5] 11 U.S.C. § 1127(d) provides:

Any holder of a claim or interest that has accepted or rejected a plan is deemed to have
accepted or rejected, as the case may be, such plan as modified, unless, within the time
fixed by the court, such holder changes such holder's previous acceptance or rejection.

[6] See, e.g., In re New Power Co., 438 F.3d 1113, 1117-18 (11th Cir. 2006) ("the bankruptcy court
may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a
modified plan unless the modification materially and adversely changes the way that claim or interest
holder is treated"); In re Paige, 2007 WL 4143212 *6 (Bankr. D. Utah 2007) (Thurman, J.) ("The Court
has reviewed the [Joint Plan], and determines that the proposed changes do not contain a material
modification to the Joint Plan, . . ..  Therefore additional circulation and re-voting on the new Amended
Plan is not necessary"); In re Calpine, No. 05-60200 (Bankr. S.D.N.Y. Nov. 8, 2007) (approving
immaterial modification to plan without requiring the debtors to resolicit the plan); In re Kmart Corp., No.
02-02474, 2006 WL 952042, at *27 (Bankr. N.D. Ill. Apr. 11, 2006 (if modification does not adversely
change the treatment of claims, then resolicitation is not required); In re Winn-Dixie Stores, Inc., 356
B.R. 813, 823 (Bankr. M.D. Fla. 2006) (same).

entitled to a conditional and subordinated distribution, will receive no distribution under the

Plan.

The Plan Proponents submit that all modifications to the Plan are non-material, technical

changes that do not affect the recoveries of holders of Claims in voting Classes.  Both Class 6

and Class 7 are deemed to reject the Plan, and therefore resolicitation of these Classes is

unnecessary.  As such, the Plan Proponents are not required to re-solicit votes for Plan

acceptances and all holders of Claims that previously voted to accept the Plan should be deemed

to accept the Plan as modified.[7]

## ARGUMENT

The Plan satisfies all of the requirements for confirmation set forth in section 1129 of the

Bankruptcy Code.

**I.    The Plan Should Be Confirmed.**

To confirm the Plan, the Court must find that the Plan Proponents have satisfied the

provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[8]  The

Plan Proponents submit that the Plan complies with all relevant sections of the Bankruptcy Code,

Bankruptcy Rules, and applicable non-bankruptcy law.  In particular, the Plan fully complies

---

[7] See 11 U.S.C. § 1127(d).

[8] See Paige, 2007 WL 4143212 *7; F.H. Partners, L.P. v. Investment Co. of the Southwest, Inc., 341 B.R. 298, 310 (10th Cir. BAP 2006) (discussing burden of proof in the context of section 1129(a)(11)); In re Byrd Foods, Inc., 253 B.R. 196, 199 (Bankr. E.D. Va. 2000) (the debtor must demonstrate by a preponderance of the evidence that it meets all section 1129 requirements); In re DeLuca, Nos. 95-11924- AM, 95-11893, 1996 WL 910908, at *18 (Bankr. E.D. Va. Apr. 12, 1996) (a debtor's standard of proof for satisfying general confirmation requirements, including feasibility, is "the ordinary civil standard of preponderance of the evidence").

with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code. This

memorandum addresses each requirement individually.

> **A.      The Plan Complies with Applicable Provisions of the Bankruptcy Code
> (Section 1129(a)(1)).**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply

with the applicable provisions of the Bankruptcy Code.[9]  A principal objective of section

1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing

classification of claims and interests and the contents of a plan of reorganization.[10]  Accordingly,

the determination of whether the Plan complies with section 1129(a)(1) requires an analysis of

sections 1122 and 1123 of the Bankruptcy Code.  As explained below, the Plan complies with

sections 1122 and 1123 in all respects.

> **1.      The Plan Satisfies the Classification Requirements of Section 1122 of
> the Bankruptcy Code.**

The Plan satisfies section 1122's classification requirements.  Section 1122 of the

Bankruptcy Code provides:

> (a)      Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim or interest is
> substantially similar to the other claims or interests of such class.

---

[9] 11 U.S.C. § 1129(a)(1); In re Schwarzmann, 203 B.R. 919, 923 (Bankr. E.D. Va. 1995) (a
chapter 11 plan must meet all of the elements of section 1129 to be confirmed).

[10] See Paige, 2007 Wl 4143212 at *8, n.13; Colorado Mountain Express v. Aspen Limousine
Service (In re Aspen Limousine Service), 193 B.R. 325, 340 (D. Colo. 1996); Kane v. Johns-Manville
Corp., 843 F.2d 636, 648- 49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable
provisions' in this subsection to mean provisions of chapter 11 . . . such as section 1122 and 1123."); In re
Mirant Corp., No. 03-46590-DML-11, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007)
(objective of 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing
classification and the contents of a plan of reorganization); S. Rep. No. 989, 95th Cong., 2d Sess. 126
(1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977).

(b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.[11]

Plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.  Courts have identified grounds justifying separate classification, including where members of a class possess different legal rights[12] and where there are good business reasons for separate classification.[13]

The Plan's classification of Claims and Interests into seven (7) Classes satisfies the requirements of section 1122 because the Claims and/or Interests in each Class differ from the Claims and/or Interests in each other Class in a legal or factual nature or based on other relevant criteria.  The Plan classifies secured debt separately from unsecured debt.[14]  Moreover, WestLB and Jacobsen, each a secured creditor, are placed in their own separate Classes according to their relative priority and the collateral securing their Claims.[15]  All other secured creditors are separately classified as Class 3 claims, and their collateral will either be assigned to them as the

---

[11] 11 U.S.C. § 1122.

[12] See Mirant Corp., No. 03-46590-MDL-11, 2007 WL 1258932, at *7 (permitting separate classification because holders of claims had different legal interests in the debtor's estate); In re Kaiser Aluminum Corp., No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006 (permitting classification scheme after consideration of the diverse characteristics of each class and creditors' legal rights).

[13] See In re Chateaugay Corp., 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); In re Avia Energy Dev., L.L.C., No. 05-39339-BJH-11, 2007 WL 2238039, at *2 (Bankr. N.D. Tex. Aug. 2, 2007) (permitting separate classification based on valid business, factual and legal reasons).

[14] See Plan, Arts. III, V.

[15] See Plan, Art. V; In re Bugg, 172 B.R. 781, 784 (E.D. Pa. 1994) ("secured creditors may not be classified together when they have liens in different property . . . since their respective legal rights are not substantially similar.") (citation omitted).

indubitable equivalent of their claims, or such secured claim itself be reinstated and rendered

unimpaired.  The Plan Proponents believe that there are only one or two such Class 3 claimants.

Unsecured Claims are classified in Classes 4, 5, and 6, and equity interests are

represented in Class 7.  Claims in these Classes have been properly classified for purposes of

section 1122 because "such claim[s] or interest[s are] substantially similar to the other claims or

interests of such class[es]": Class 4 is comprised of general unsecured creditors.  Class 5

creditors are the owners of the Third Party Units.  Class 6 represents the interests of certain

insiders, CloudNine Resorts - Sky Lodge Development, LLC and CloudNine Resorts - Sky

Lodge Management, LLC, whose claims are contractually subordinated contractually to that of

WestLB.  Class 7 contains only Interests.

Thus, in each instance of separate classification, the Plan classifies Claims based upon

the different rights and attributes of such holders of Claims.  As such, valid factual and legal

reasons exist for classifying separately the various Classes of Claims and Interests under the

Plan.  Additionally, each of the Claims in each particular Class is substantially similar to the

other Claims or Interests in such Class.  Thus, the Plan satisfies section 1122 of the Bankruptcy

Code.

> **2.      The Plan Satisfies the Eight Mandatory Plan Requirements Contained in  Section 1123(a)(1)-(a)(8) of the Bankruptcy Code.**

The Plan meets the mandatory requirements contained in section 1123(a).  Specifically,

section 1123(a)(1)-(8) requires that a plan:[16]

(1)      designate classes of claims and interests;

---

[16] 11 U.S.C. § 1123(a)(8) only applies where the debtor is an individual and therefore does not apply in this case where the debtor is a limited liability corporation.

(2)     specify unimpaired classes of claims and interests;

(3)     specify treatment of impaired classes of claims and interests;

(4)     provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

(5)     provide adequate means for implementation of the plan;

(6)     provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(7)     contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.

Article III of the Plan satisfies the first two requirements of section 1123(a) by:

(a) designating Classes of Claims and a Class of Interests, as required by section 1123(a)(1); and

(b) specifying that all Classes of Claims are either impaired or unimpaired, as required by section

1123(a)(2).[17]  Article V of the Plan satisfies section 1123(a)(3) because it specifies the treatment

of the impaired classes.  For the reasons discussed above, the Plan also satisfies section

1123(a)(4) because the treatment of each Claim or Interest within a Class is the same as the

treatment of each other Claim or Interest within that Class.

Section 1123(a)(5) requires that a plan provide "adequate means for the plan's

implementation." 11 U.S.C. § 1123(a)(5).  Article VII of the Plan and the various documents and

agreements set forth in the Plan Supplement provide adequate and proper means for the

implementation of the Plan, including, without limitation, (i) the vesting of assets in the

Reorganized Debtor; (ii) the filing of the Reorganized Debtor corporate organizational

---

[17] See Plan, Arts. IV, V. Under the Plan, all classes of Claims are impaired or treated as impaired, except Class 3.

documents; (iii) the selection of new management of the Reorganized Debtor; and (iv) sufficient

financing to be provided by WestLB.  The transactions contemplated by the Plan are designed to

maximize the value of the Debtors' business and assets.  Accordingly, the Plan, together with the

documents and agreements contemplated thereby, provide adequate means for implementation of

the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

Section 1123(a)(6) prohibits the issuance of nonvoting equity securities, and

requires amendment of a debtor's charter to so provide. It also requires that a corporate

charter provide an appropriate distribution of voting power among the classes of securities

possessing voting power. The Plan does not provide for the issuance of non-voting equity

securities.  Although the form of Operating Agreement for the Reorganized Debtor appended to

the Plan Supplement did not contain an explicit restriction on the issuance of non-voting equity

securities, the Plan Proponents represent that the final form of Operating Agreement to be

executed for the Reorganized Debtor will contain such a restriction.  Accordingly, the Plan

satisfies section 1123(a)(6) of the Bankruptcy Code.

Section 1123(a)(7) of the Bankruptcy Court requires that the Plan "contain only provisions

that are consistent with the interests of creditors and equity security holders and with public

policy with respect to the manner of selection of any officer, director, or trustee under the plan

and any successor to such officer, director, or trustee."[18]  Section 7.2 of the Plan provides that the

initial managing members of the Reorganized Debtor shall be disclosed in the Plan Supplement

and shall be in effect as of the Effective Date.  In the Plan Supplement, the Plan Proponents

---

[18] See 11 U.S.C. § 1123(a)(7).

disclose that the Reorganized Debtor will be managed by its sole member, to be WestLB or an

affiliate of WestLB[19].  In addition, the Reorganized Debtor's post-Effective Date operations will

be managed by Gemstone Hotels & Resorts, LLC ("Gemstone"),[20] under the direct supervision

of Thomas Prins and Jeff McIntyre, both principals of Gemstone, both of whom are proposed to

serve as officers of the Reorganized Debtor.  Gemstone is located in Park City, Utah, the location

of the Reorganized Debtor's operations, and Gemstone has extensive experience in hotel

management and operations, including specific knowledge of the Debtor's operations arising

from its service as a consultant to the Debtor during the course of the Chapter 11 Case.

Gemstone will be hired on to serve as a manager of the Reorganized Debtor, and Prins and

McIntyre's service as officers of the Reorganized Debtor,  pursuant to a management agreement

to be entered into after good faith and  arms' length negotiations.  Therefore, the selection of new

management as provided for in the Plan and Plan Supplement is consistent with the interests of

creditors and equity security holders and public policy, and the Plan therefore satisfies section

1123(a)(7) of the Bankruptcy Code.

### 3.    The Discretionary Contents of the Plan Are Appropriate.

Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that

may be included in a plan of reorganization.  For example, a plan may impair or leave

unimpaired any class of claims or interests and provide for the assumption or rejection of

---

[19] WestLB reserves the right to make technical changes to the organizational structure of the Reorganized Debtor provided there are no changes in the substantive rights and obligations under the Plan.

[20] The Reorganized Debtor is still negotiating an acceptable management agreement with Gemstone. To the extent an acceptable agreement cannot be reached and a different management company is required, the Reorganized Debtor will provide notice of such to parties in interest and seek appropriate relief from this Court.

executory contracts and unexpired leases.  A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."[21]  A plan may also "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests.[22]  Finally, a plan may "modify the rights of holders of secured claims, other than a claim secured by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[23]

Here, the Plan employs various provisions in accordance with section 1123(b)'s discretionary authority.  For example, the Plan (i) leaves one Class of Claims unimpaired; (ii) proposes treatment for and settlement of executory contracts; (iii) provides a structure for Claim allowance and disallowance; (iv) provides for the settlement or adjustment of claims or interest belonging to Partners or its Estate, as discussed further below; and (v) sets forth a process to govern the distributions to Holders of Allowed Claims.[24]

---

[21] 11 U.S.C. § 1123(b)(3)(A), (B).

[22] 11 U.S.C. § 1123(b)(4).

[23] 11 U.S.C. § 1123(b)(5), (6).

[24] See, respectively, Plan, Art. III (Designation of Claims and Interests), Art. V (Treatment of and Methods of Distribution to Classes Under the Plan), Art. VI (Provisions as to Disputed Claims and Distributions), Art. VII (Means for Execution of the Plan), Art. VIII (Executory Contracts), Art. IX (Discharge of the Debtor), and Art. XI (General Provisions).

More specifically, in connection with the plan process, Partners and WestLB agreed to a

settlement of the Allowed WestLB Secured Claim embodied by certain discrete provisions of the

Plan.  For example, the Plan now contains (i) WestLB's commitment to provide certain exit

financing; (ii) general exculpation of WestLB and a general release of WestLB from Partners,

Partners' estate, the Committee and members of the Committee; and (iii) WestLB's indirect

receipt of Partners' causes of action, including avoidance actions, through the vesting of assets in

the Reorganized Debtor; and (iv) a revised treatment of the Allowed WestLB Secured Claim.[25]

### B.    The Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2))

The Plan Proponents have satisfied section 1129(a)(2) of the Bankruptcy Code, which

requires that the proponent of a plan of reorganization comply with the applicable provisions of

the Bankruptcy Code.  This section principally embodies the disclosure and solicitation

requirements of section 1125 of the Bankruptcy Code.[26]  The Plan Proponents have complied

with section 1129(a)(2) of the Bankruptcy Code by distributing the Disclosure Statement and

soliciting acceptances of the Plan in the manner (described in the Disclosure Statement) that was

approved by this Court.

Section 1125 prohibits the solicitation of acceptances or rejections of a plan of

reorganization "unless, at the time of or before such solicitation, there is transmitted to such

---

[25]   See, respectively, Plan, Section 7.3 (Exit Funding), Section 11.2-11.4 (Releases and Exculpation), Section 7.2(a) (Vesting of Assets), and Section 5.1 (Treatment of Allowed WestLB Secured Claim).

[26]   See In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

holder the plan or a summary of the plan, and a written disclosure statement approved, after

notice and a hearing, by the court as containing adequate information."[27]  The purpose of section

1125 is to ensure that parties in interest are fully informed regarding the condition of the debtor

so that they may make an informed decision whether to approve or reject the plan.[28]

Here, the Plan Proponents have satisfied the requirements under section 1125.  The

Bankruptcy Court approved the Disclosure Statement as containing adequate information of the

plan dated February 18, 2010, and, as discussed above, any modifications to the Plan are non-

material for parties other than Holders of Claims and Interests in Class 1, 6, and 7 (who have

either disclaimed the need for further disclosure or who are not entitled to vote).  The Plan

Proponents mailed the Plan, Disclosure Statement and the ballots.  Moreover, the Plan

Proponents tabulated the votes on the Plan and are filing that tabulation, along with the

underlying ballots, with the Court.

### C.    The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law (Section 1129(a)(3))

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be

"proposed in good faith and not by any means forbidden by law."[29]  In the context of section

1129(a)(3), a plan has been proposed in good faith where there is a "'reasonable likelihood that

the plan will achieve its intended results which are consistent with the purposes of the

---

[27] 11 U.S.C. § 1125(b).

[28] See In re A.H. Robins Co., Inc., No. 98-1080, 1998 WL 637401, at *3 (4th Cir. Aug. 31, 1998) ("The disclosure statement must contain 'adequate information,' i.e. sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan.").

[29] 11 U.S.C. § 1129(a)(3).

Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to

continue its business and pay its debts in accordance with the plan provisions.'"[30]

To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts

consider the totality of the circumstances surrounding the development of the plan.[31]

Accordingly, where the plan satisfies the purposes of the Code and has a good chance of

succeeding, the good faith requirement of section 1129(a)(3) is satisfied.[32]

Here, the Plan Proponents have proposed the Plan in good faith, with the legitimate and

honest purposes of reorganizing Partners' affairs and maximizing the value of the recovery to its

creditors.  Indeed, the joint Plan was the product of extensive negotiations with WestLB,

Jacobsen, the Committee, and a number of other parties.  Given that the Plan is the product of

negotiations among substantially all key constituents, there is ample evidence to support that the

Plan has been proposed in good faith as interpreted under the Bankruptcy Code.  Additionally,

the Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy

Code.

---

[30] In re Pikes Peak Water Co., 779 F.2d 1456, 1459 (10th Cir. 1985) (quoting underlying bankruptcy court opinion).

[31] See In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002); see also In re Madison Hotel Assoc., 749 F.2d 410, 425 (7th Cir. 1984) (stating that to determine compliance with section 1129(a)(3), the court examines the plan "in light of the totality of the circumstances surrounding confection of the plan.")  (citation omitted).

[32] See T-H New Orleans, 116 F.3d at 802 ("A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design . . .."); In re Briscoe Enters., Ltd., II, 994 F. 2d 1160, 1167 (5th Cir. 1993) ("This Court has held that, 'Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.'") (quoting In re Sun Country Dev., Inc., 764 F.2d 406, 408 (5th Cir. 1985)).

### D.   The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4))

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor or by a person issuing securities or acquiring property under the plan, be subject to approval of the bankruptcy court as reasonable. Specifically, section 1129(a)(4) provides that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable.[33]

This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the Court as to their reasonableness.[34]

Here, all payments made or to be made by Partners for services rendered and expenses incurred in connection with this Chapter 11 Case, including, without limitation, all fees of the Professionals, have been approved by, or are subject to approval of, the Court as reasonable. In particular, section 2.2 of the Plan provides for the payment of only <u>Allowed</u> Administrative Claims of Professionals.[35]  Moreover, the Bankruptcy Court will retain jurisdiction to hear and determine any motion for allowance of compensation and costs payable to Partners or its Estate,

---

[33] 11 U.S.C. § 1129(a)(4).

[34] <u>See, e.g.</u>, <u>Valley View Shopping Center</u>, 260 B.R. 10, 22-23 (Bankr. D. Kan. 2001); <u>In re Drexel Burnham Lambert Group, Inc.</u>, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992).

[35] <u>See</u> <u>In re Elsinore Shore Assocs.</u>, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed" administrative expenses).

17

and the Plan Proponents contemplate that a more specific procedure for the filing and

adjudication of Professional and other Administrative Claims will be set forth in the

Confirmation Order.[36]  Thus, the Plan complies fully with the requirements of section 1129(a)(4)

of the Bankruptcy Code.

>    **E.      The Plan Proponents Have Disclosed All Necessary Information Regarding
>             Management of the Reorganized Debtor (1129(a)(5))**

Section 1129(a)(5) of the Bankruptcy Code requires that (i) the plan proponent disclose

the identity and affiliations of the proposed management of the reorganized debtor, (ii) the

appointment or continuance of such managers be consistent with the interests of creditors and

equity security holders and with public policy, and (iii) there be disclosure of the identity and

compensation of any insiders to be retained or employed by the reorganized debtor.

Section 7.2 of the Plan provides that the initial managing members and officers of the

Reorganized Debtor shall be disclosed in the Plan Supplement and shall be in effect as of the

Effective Date.  The Plan Supplement at paragraph 9 discloses the identity of the sole member of

the Reorganized Debtor and the individuals who will act as "officers" of the Reorganized

Debtor.  Thus, as the initial managing members and officers are disclosed in the Plan

Supplement, the requirements of section 1129(a)(5)(a) of the Bankruptcy Code are satisfied.  The

Plan Supplement also reveals that William Shoaf, an insider of Partners, will be employed as a

consultant post-confirmation by the Reorganized Debtor, and the Plan Supplement includes as an

exhibit a form of Employment Agreement containing the material terms on which Mr. Shoaf will

be retained.  Therefore, the requirements of section 1129(a)(5)(B) have also been satisfied.

---

[36] See Plan, Section 12.1(b).

**F.  The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the debtor's plan.[37]  After confirmation of the Plan, the Debtor's business will not involve rates established or approved by, or otherwise subject to, any governmental regulatory commission. Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable.

**G.  The Plan Is in the Best Interest of Creditors and Interest Holders Who Have Not Accepted the Plan (Section 1129(a)(7)).**

Section 1129(a)(7) of the Bankruptcy Code, also known as the "best interest test," requires that, with respect to each class, each holder of a claim or an equity interest in such class either:

(i)     has accepted the plan;

(ii)    or will receive or retain under the plan property of a value, as of the effective date of the plan, which is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.[38]

The best interest test applies to individual dissenting holders of claims and interest rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[39]

---

[37] 11 U.S.C. § 1129(a)(6).

[38] 11 U.S.C. § 1129(a)(7)(A)(i)-(ii).

[39] See 203 N. LaSalle St., 526 U.S. at 441 n.13 ("The "best interests" test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); see also In re Adelphia Commc'ns. Corp., 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) satisfied

The Plan Proponents believe that the value of distributions if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of distributions under the Plan because, among other reasons, Partners' assets would be liquidated quickly rather than sold over time to maximize the value of the assets. Further, proceeds received in a chapter 7 liquidation are likely to be significantly discounted, due to the distressed nature of the sale of Partners' assets. In addition, Partners would incur the additional costs and expenses of a chapter 7 trustee and other professional fees relating to the chapter 7 wind-down. Furthermore, under the Plan, the creditors will receive a portion of the potential revenue stream of Partners.

As section 1129(a)(7) makes clear, the best interest test applies to all impaired classes unless all creditors in the class accept the plan. The Disclosure Statement demonstrates that the Plan is expected to provide vastly higher recoveries to Holders of most Claims than they would receive in a liquidation under chapter 7. Specifically, Holders of Claims in Class 4 will recover 100% of their respective Allowed Claims under the Plan, unless such holders voluntarily opt to receive a discounted amount in cash on or about the Effective Date. In that event, the Holders of such Claims would receive 60% of their Allowed Claims. Although Holders of Claims in Class 6 and Holders of Interests in Class 7 will receive no distribution under the Plan, they would have received no distribution under a chapter 7 liquidation of Partners' assets. As further discussed in the Disclosure Statement, in the event of a liquidation, WestLB would receive payment in full of its first priority secured claim. WestLB contends that the full amount of its claim, which it has

---

when impaired holder of claim would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

agreed for the purposes of compromise under this Plan to be Allowed in the amount of $16.2

million, would otherwise be $17.9 million as of July 31, 2010.  After payment in full of

WestLB's secured claim, any remaining value would be distributed to Jacobsen, on account of its

secured claim.  While Jacobsen has voluntarily agreed to accept $1,330,000 on account of its

Claim, such Claim might now be in excess of $1,700,000.  After payment of Chapter 7 fees and

expenses and other Allowed Priority and Administrative Claims, Holders of Claims and Interests

in Classes 4, 6, and 7 would receive no distribution.  The Plan Proponents, therefore submit that

each impaired and dissenting Holder will receive under the Plan a recovery no less than what it

would receive pursuant to a liquidation of Partners under chapter 7 of the Bankruptcy Code.

### H.    Acceptance by Impaired Classes (Section 1129(a)(8)).

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests

must either accept a plan or be unimpaired under a plan.[40]  Pursuant to section 1126(c), a class of

impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than

one-half in number of the claims in that class actually vote to accept the plan.[41]  A class that is

not impaired under a plan, and each holder of a claim or interest in such class, is conclusively

presumed to have accepted the plan.[42]  Conversely, a class is deemed to have rejected a plan if

---

[40] 11 U.S.C. § 1129(a)(8).

[41] 11 U.S.C. § 1126(c).

[42] 11 U.S.C. § 1126(f); see In re Econ. Cast Stone Co., 16 B.R. 647, 651 (J. Shelley) (Bankr. E.D.
Va. 1981);Drexel, 960 F.2d at 290 (an unimpaired class is presumed to have accepted the plan); S. Rep.
No. 989, 95th Cong. 2d Sess. 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no
acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the
order confirming the Plan.").

the plan provides that the claims or interests of such class do not receive or retain any property

under the plan on account of such claims or interests.[43]

The Impaired Classes entitled to vote under the Plan are:

- Class 1 (WestLB),

- Class 2 (Jacobsen)

- Class 4 (General Unsecured)

- Class 5 (Allowed Claims of Owners of Third Party Units)

As set forth in the Ballot Report, every voting impaired Class voted to accept the Plan.

Class 6 Claims[44] and Class 7 Interests are impaired but will receive no distribution under the

Plan and are therefore conclusively deemed to have rejected the Plan and are not entitled to vote

to accept or reject the Plan. Thus, section 1129(a)(8) is not satisfied, but as demonstrated below,

the Plan may be confirmed under section 1129(b). Nevertheless, as discussed more fully below,

the Plan Proponents have satisfied both section 1129(a)(10) of the Bankruptcy Code because at

least one Impaired Class accepted the Plan and section 1129(b) of the Bankruptcy Code, both of

which are alternatives to satisfaction of section 1129(a)(8).

---

[43] See 11 U.S.C. § 1126(g)

[44] Notwithstanding Class 6's deemed rejection of the Plan, Partners has received votes from both Holders of Claims in Class 6 accepting the Plan and the treatment of their Claims under the Plan. Therefore, the Plan Proponents request that this Class be treated as accepting the Plan for all purposes.

I.      **The Plan Complies with Statutorily Mandated Treatment of Administrative
        And Priority Tax Claims (Section 1129(a)(9)).**

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled

to priority under section 507(a) receive payment in full in cash unless the holder of a particular

claim agrees to a different treatment with respect to such claim.[45]

Pursuant to Article II of the Plan, and in accordance with section 1129(a)(9), the Plan

provides for the payment in full of Allowed Administrative Claims and Priority Claims. Under

section 2.1, Partners shall pay the Allowed Administrative Claims (i) in the ordinary course of

business, or (ii) on the Effective Date (or as soon as practicable thereafter) if not an ordinary

course claim, or (iii) within ten (10) days of entry of a Final Order allowing such Administrative

Claim. Under section 2.2, Partners will pay in full the Allowed Administrative Claims of

Professionals on the later of: (i) the Effective Date or (ii) fifteen (15) days after entry of an order

of the Court approving the allowance of such fees and expenses of such Professional on a final

basis pursuant to section 330 of the Bankruptcy Code. Pursuant to section 2.3, Partners shall pay

all fees due and payable to the Administrative Claim of the United States Trustee, under section

1930 of Title 28 within ten (10) days after the Effective Date. In addition, Partners or the

Reorganized Debtor shall pay the United States Trustee quarterly fees due and payable on all

disbursements, including plan payments and disbursements in and outside of the ordinary course

of business until entry of a Final Decree, dismissal of the case or conversion of the case to a case

under chapter 7, as such obligations become due.

-----

[45] 11 U.S.C. § 1129(a)(9).

Article II also provides for the payment of Allowed Priority Claims.  Specifically, under Section 2.4 of the Plan, each Holder of an Allowed Priority Tax Claim shall receive equal quarterly Cash Payments over a period not exceeding five (5) years from the Petition Date, with the first payment to occur on the first business day of the third month after the Effective Date, at an annual interest rate of 6% or a rate agreed upon between the Reorganized Debtor and the taxing authority or otherwise set by the Bankruptcy Court.

Moreover, under section 2.5, all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.  All other Priority Claims shall be paid in full on the Effective Date. Therefore, the Plan complies with the relevant provisions of section 1129(a)(9) of the Bankruptcy Code.

> **J.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).**

Section 1129(a)(10) of the Bankruptcy Code is an alternative requirement to section 1129(a)(8)'s requirement that each class of claims or interests must either accept the plan or be unimpaired under the plan.  Section 1129(a)(10) provides that, to the extent there is an Impaired Class of Claims, at one least Impaired Class of Claims must accept the Plan, excluding acceptance by any Insider.[46]  Here, Classes 1, 2, 4, and 5 voted to accept the Plan.[47]  Therefore, the Plan satisfies the requirement of section 1129(a)(10).

---

[46] 11 U.S.C. § 1129(a)(10); see also Econ. Cast Stone, 16 B.R. at 651 (at least one impaired class must affirmatively accept the plan).

[47] See Ballot Report.

### K.    The Plan Is Feasible (Section 1129(a)(11)).

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the bankruptcy court must determine that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[48]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed.[49] Rather, a plan must be workable and have a reasonable likelihood of success.[50]

As demonstrated below, the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization because Partners has determined, through financial analysis and by an appraisal, that with the Exit Funding and reasonably anticipated Unit sales, the Reorganized Debtor will be financially stable and able to pay the debt service payments and other amounts under the Plan.[51]  In connection with the development of the Plan

---

[48] 11 U.S.C. § 1129(a)(11).

[49] See In re Adamson Co., Inc., 42 B.R. 169, 174 (Bankr. E.D. Va. 1984).

[50] See  United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); Pikes Peak, 779 F.2d at 1460; Investment Co. of the Southwest, 341 B.R. at 310-11.

[51] WestLB has monitored and commented on Partners' Business Plan, projections, and budget and believes that there is a reasonable basis to proceed on the basis on these materials and that the Plan is feasible.  The Reorganized Debtor shall review and adjust the business plan after it has acquired the property, and shall make reasonable changes and adjustments in light of the current economic conditions and investment goals. In any event, it is anticipated that WestLB's restructured Junior Note will provide sufficient liquidity so that the Reorganized Debtor can pay its obligations under the Plan.

and for the purposes of determining whether the Plan satisfies this feasibility standard, the Plan

Proponents analyzed the ability to satisfy Partners' financial obligations.

As reflected on Exhibit 2-1 of the Disclosure Statement, Partners anticipates that the

Reorganized Debtor will sell five Units in 2010 and that revenue from operations will generate

sufficient funds to operate its business; however, due to extraordinary costs of this chapter 11

Case, which will be non-recurring, the new capital supplied by the Plan Funder will enable the

Reorganized Debtor to make all required payments under the Plan, including debt service to

WestLB under the Restructured Loan Documents.  Moreover, the cash required on the Effective

Date for payments to be made under the Plan will be provided by the Plan Funder.

Exhibit 2-2 of the Disclosure Statement is a five-year pro forma reflecting revenue and

expenses from operations and Unit sales, and Partners believes that it demonstrates sufficient net

operating profits to make all payments provided under the Plan, including required debt service

to WestLB.  Exhibit 2-3 to the Disclosure Statement reflects capital expenditures to be made at

the Sky Lodge with funds provided by the Plan Funder.

The 2010 business plan and five-year pro forma have been prepared by Partners'

management in consultation with BDRC and Gemstone, incorporate their comments and

changes, and represent a conservative projection of operations and sales.  Moreover, the

projection of Unit sales set forth on Exhibit 2-2 of the Disclosure Statement was developed in

coordination with AGI and is consistent with the assumptions set forth in AGI's appraisal,

including absorption rate in the current and projected market for fractional shares.  Market

reports for the fractional industry prepared by Ragatz and NorthCourse both indicated that the

fractional market has been both less impacted by the recent recession than traditional second

homes, and will rebound quicker.  This is largely due to the fact that demand for the fractional

segment is somewhat underserved (as the concept is still in its infancy) and that the product is

more appealing from an economic standpoint where buyers are more interested in purchasing

only what they use.  A fractional share makes more economic sense than purchasing a whole-

ownership unit in today's economy.  Therefore, sales industry-wide are projected to remain quite

robust.

Although the absorption rate in AGI's appraisal is assumed to be 10 Units over the first

year after the Effective Date, 20 Units the following year, and then 33 Units in the third and

fourth years, Partners' business plan is more conservative and only projects 5 Units in 2010, 17

Units in 2011, 20 Units in 2012 and 21 Units in 2013.  Thus, the Plan is feasible.

**L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930
          (Section 1129(a)(12))**

Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable

under 28 U.S.C. § 1930.[52]  Section 2.3 of the Plan provides that Partners shall pay all fees to the

U.S. Trustee within ten (10) days after the Effective Date.  In addition, Partners or the

Reorganized Debtor shall pay the United States Trustee quarterly fees due and payable on all

disbursements, including plan payments and disbursements in and outside of the ordinary course

of business until entry of a Final Decree, dismissal of the case or conversion of the case to a case

under chapter 7, as such obligations become due.  The Plan, therefore, complies with section

1129(a)(12) of the Bankruptcy Code.

---

[52] 11 U.S.C. § 1129(a)(12).

### M.  The Plan Does Not Modify Retiree Benefits (Section 1129(a)(13))

Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[53]  Partners does not have any obligations on account of retiree benefits (as such term is used in section 1114) and, therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable.

### N.  Section 1129(a)(14), (a)(15), and (a)(16) Are Inapplicable

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Partners is not subject to any domestic support obligations, and, as such, this section of the Bankruptcy Code does not apply. Section 1129(a)(15) applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). Partners is not an "individual."  Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with applicable provisions of non-bankruptcy law; however, as Partners is a business or commercial corporation, this section is not applicable.

### O.  The Plan Satisfies the "Cramdown" Requirements (Section 1129(b))

Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a), except for section 1129(a)(8), are met, a plan shall be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and

---

[53] 11 U.S.C. § 1129(a)(13).

interests that is impaired and has not accepted the plan.[54]  Thus, to confirm a plan that has not

been accepted by all impaired classes, the plan proponent must show that the plan "does not

discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired

classes.[55]  As discussed below, the Plan Proponents meet the "cram down" requirements in

section 1129(b) of the Bankruptcy Code to confirm the Plan.

> **1.      The Plan Is Fair and Equitable with Respect to Impaired Classes that Have Not Voted to Accept the Plan.**

Section 1129(b)(2) of the Bankruptcy Code defines the phrase "fair and equitable" as

follows:

(B)      With respect to a class of unsecured claims

   (i) that the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or. . .

   (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

(C)      With respect to a class of interests . . .

   (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

---

[54] See 11 U.S.C. § 1129(b)(1); see In re RUTI-Sweetwater, Inc., 836 F.2d 1263, 1265 (10th Cir. 1988).

[55] See In re Catron, 186 B.R. 194, 197 (Bankr. E.D. Va. 1995); Schwarzmann, 203 B.R. at 923, 925; Adamson, 42 B.R. at 173-74.

11 U.S.C. § 1129(b)(2).  Furthermore, in order to be "fair and equitable," a Plan must not

provide more than a 100% recovery to any Class of Claims or Interest senior to a dissenting

class.  See Winters v. Winters (In re Winters) 99 B.R. 658 (W.D. Pa 1989) (citing 5 COLLIER ON

BANKRUPTCY ¶ 1129.03[e], at 1129–56 to 1129–57 (15th ed. 1979)); In re Jartran, 44 B.R. 331,

365 n.63 (N.D. Ill. 1984) (stating that a plan pursuant to 1129(b)(2) may be fair and equitable so

long as no class senior to the dissenting class has received more than 100 percent of the amount

of its claims).

The Plan is "fair and equitable" with respect to Classes 6 and 7, the two Impaired Classes

which are deemed to reject the Plan.  No Holder of any Claims or Interests junior to a Claim or

Interest in Classes 6 and 7, respectively, will receive or retain any property under the Plan on

account of such junior Claim or Interest.  Furthermore, no holder of a Claim in a Class senior to

such Classes is receiving more than 100% recovery on account of its Claim.[56]

> **2.     The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes that Have Not Voted to Accept the Plan.**

The Plan does not discriminate unfairly with respect to Classes 6 and 7.  The Bankruptcy

Code does not provide a standard for determining when "unfair discrimination" exists.[57]  Rather,

courts typically examine the facts and circumstances of the particular case to determine whether

---

[56] Although Wickline claims in his Objection to the Plan that WestLB will recover more than 100% of its claim, as demonstrated in the Declaration of Duncan Robertson in Support of Confirmation, filed contemporaneously herewith, WestLB will recover less than 100% of its secured claim.

[57] See In re 203 N. LaSalle St. Ltd. P'ship., 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

unfair discrimination exists.[58]  Most courts generally inquire into whether there is a reasonable

basis for the discrimination and whether the debtor can confirm and consummate a plan without

the proposed discrimination.[59]

In the instant case, Holders of Claims and Interests are being paid in accordance with

their relative priority.  Class 7's classification and treatment do not amount to unfair

discrimination because all equity interests in the Debtor are classified together and receive the

same treatment, which is subordinated by the Bankruptcy Code to the treatment of creditors.

Likewise, Class 6's classification and treatment do not amount to unfair discrimination because

(i) the Bankruptcy Code subordinates the treatment of unsecured creditors to that of secured

creditors, and, as discussed below, (ii) Class 6 Claimants' prepetition subordination agreements

with WestLB provide a valid basis for separately classifying and treating their claims from those

of other unsecured creditors.

### a. Prepetition Subordination Agreements Provide a Reasonable and Acceptable Basis for the Separate Classification and Disparate Treatment of Class 6 Claims.

Class 6 contains two unsecured Claims: one held by CloudNine Resorts - Sky Lodge

Management, LLC ("Management") and one held by CloudNine Resorts - Sky Lodge

Development, LLC ("Development" and, together with Management, the "CloudNine

---

[58] See In re Bowles, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); see also In re Freymiller Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[59] In re Lernout & Hauspie Speech Prods., N.V., 301 B.R. 651, 661 (Bankr. D. Del. 2003); In re Crosscreek Aparts., Ltd., 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997) ("[A]t a minimum there must be a rational or legitimate basis for the discrimination and the discrimination must be necessary for the reorganization.").

Claimants")[60]   These Claims arise from amounts allegedly owed under two executory contracts

(the "CloudNine Contracts")  between the CloudNine Claimants and Partners, both of which will

be rejected as of the Effective Date.   At the time they entered into the CloudNine Contracts, the

CloudNine Entities also executed Consent and Subordination Agreements in favor of WestLB

(each, a "Subordination Agreement"), both of which are governed by New York law.[61]   In

Section 6.1(b) of their respective Subordination Agreements, Management and Development

agreed that "any right or remedy [it] may have to collect . . . fees, charges or indemnifications

from [Partners] shall be subordinated to the indefeasible payment in full in cash of all amounts

due to [WestLB] under the [WestLB] Loan Documents."  Because WestLB will neither be paid

in full, nor paid in full in cash under the Plan, the Plan merely enforces the agreement between

WestLB  and  the  CloudNine  Claimants  by  providing  the  CloudNine  Claimants  with  no

recovery.[62]

---

[60]   The CloudNine Claimants are insiders of William Shoaf, and therefore both CloudNine Claimants are also insiders of the Debtor.  See 11 U.S.C. § 101(31).  Separate classification and treatment of these creditors is also proper on the basis of their insider status.  See, e.g., In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (court found that while the debtor's proposed treatment of insiders was discriminatory, the discrimination was not unfair because the insiders knew they were putting their money at risk when they loaned money to the debtor and were in a unique position to influence the ongoing financial and business operations of the debtor).

[61]   The Subordination Agreement executed by Management, together with Management's underlying Executory Contract, will be submitted to the Court at the hearing.  The Subordination Agreement executed by Development, together with Development's underlying Executory Contract, will also be submitted at the hearing.

[62]   See In re Inter Urban Broadcasting of Cincinnati, Inc., 1994 WL 64176, at *1 (E.D. La. Nov. 16, 1994) (permitting plan to effectuate the terms of a prepetition subordination agreement through the separate classification and less favorable treatment of creditors who had agreed prepetition to subordinate themselves until a senior creditor was paid in full).  See In re Walnut Equip. Leasing, Co., Inc., 1999 Bankr. LEXIS 1460 (Bankr. E.D. Pa. Nov. 23, 1999) (same).

A prepetition subordination agreement is enforceable in bankruptcy "to the same extent that such agreement is enforceable under applicable nonbankruptcy law."[63]   The Subordination Agreements here were freely entered into among the CloudNine Claimants, WestLB, and the Debtor.  The Articles of Organization of both Management and Development designate William Shoaf as one of the two Managers for these entities and provide that "[e]ither Manager has the authority to bind the Company."[64]   Each Subordination Agreement was executed by William Shoaf in his capacity as Manager of the entity agreeing to be subordinated.[65]   The Subordination Agreements were also validly executed by the Debtor and WestLB, and are thus valid and binding upon both Management and Development in accordance with their terms.[66]   These Subordination Agreements provide a reasonable basis for both the difference in classification and treatment of the CloudNine Claims, because the CloudNine Claimants' underlying rights to recover against Partners outside of bankruptcy are materially different from the rights of other unsecured creditors.   Indeed, the legislative history of Section 1129(b)(1) recognizes that implementation of the terms of a subordination agreement through a difference in treatment is proper and not unfair discrimination.[67]

---

[63] 11 U.S.C. 510(a); see also In re 203 North LaSalle St. P'ship, 246 B.R. 325, 329 (Bankr. N.D. Ill. 2000).

[64] Partners will submit copies of the Articles of Organization into evidence at the hearing

[65] Copies of the subordination agreements will be submitted into evidence at the hearing.

[66] See id.; In re of the Liquidation of Associated Underwriters, Inc., 1978 U.S. Dist. LEXIS 20346, at *8 (D. Utah 1978) ("There is little dispute that subordination agreements are enforceable.").

[67] See H.R. 595, 95th Cong. (1977) (indicating that Congress considered  subordination agreements to be "one circumstance which would support disparate treatment" under 11 U.S.C. 1129(b)(1)).

Although David Wickline, purportedly on behalf of Management and Development, has objected to the Plan and to Management and Development's treatment under the Plan as unfair discrimination, the treatment provided by the Plan is proper because the Subordination Agreements binding the CloudNine Claimants are enforceable against them.

> [O]nce the burden of showing the existence and validity of a contractual subordination agreement has been met, unless the subordinated creditor can show some inequitable conduct which harmed the junior creditor, such as a subsequent fraudulent transfer or preference, the subordination agreement will be enforced, *even if the senior creditor has used its bargaining position, including its refusal to make further loans needed by the debtor, to improve the status of the senior creditor's existing claims.*[68]

Under the clear and unambiguous terms of the Subordination Agreements, the CloudNine Claimants are not entitled to any distribution from Partners' estate.  Because the terms of the Subordination Agreements are unambiguous, the CloudNine Claimants' rights are governed exclusively by those documents.[69]   Therefore, whether another Plan could have provided WestLB with a payment in full in cash is of no moment.  WestLB was under no obligation to propose such a Plan, was not in a position to do in any event,[70] and was under no obligation to act in such a way as to benefit the CloudNine Claimants.  WestLB engaged in extensive arms' length plan negotiations with the Debtor and other primary constituencies in this case.  WestLB agreed to arrange for the Exit Funding and agreed to a compromise of its secured claim in order to foster the consensus cultivated by the Debtor and to maintain the current confirmation

---

[68] In re Best Prods., Co., Inc., 168 B.R. 35, 69-70 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2nd Cir. 1995) (emphasis added).

[69] Id. at 69 ("Thus, under New York law, when a contractual subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement and the words of that agreement are given their plain, ordinary and usual meaning.")

[70] See Duncan Robertson Decl., at ¶¶ 9-11.

timeline.  It has chosen, as specifically permitted by the Subordination Agreements, to hold the

CloudNine Claimants to their agreement not to accept any payment from Partners until WestLB

is paid in full in cash.  Wickline has not alleged any facts to support inequitable conduct by

WestLB; the Subordination Agreements are enforceable according to their terms.[71]  Therefore,

the Subordination Agreements provide a valid and reasonable basis for the treatment provided to

the Class 6 Claims under the Plan.

> **b.  The Treatment of Class 6 Claims is Necessary to the Plan.**

Because WestLB's agreement to the treatment of the Allowed WestLB Secured Claim

and WestLB's facilitation of the Exit Funding are critical to the Debtor's ability to emerge from

bankruptcy, and because WestLB requires as a condition to the Exit Funding that the CloudNine

Claimants be bound by the terms of the Subordination Agreements through the treatment

proposed to Class 6 in the Plan, such treatment is necessary to the Plan.  The Plan therefore

satisfies the standard of 11 U.S.C. § 1129(b) as to Class 6.

**II.    Responses to the Remaining Objections**

Many of the issues raised in the objections to the Plan have been addressed above in this

Confirmation Brief and are incorporated herein by reference.

> **A.      The Objection of David Wickline's and Alchemy Ventures Trust, LLC**

David Wickline's and Alchemy Ventures Trust, LLC's, on Behalf of CloudNine Resorts

– Sky Lodge Development, LLC and CloudNine Resorts – Sky Lodge Management, LLC,

---

[71] Moreover, any alleged misconduct on the part of Shoaf or the Debtor would not in any way
affect the enforceability of the Subordination Agreements.  In re Walnut Equip. Leasing Co., Inc., 1999
Bankr. LEXIS 1460, at *23 ("More focused research would have uncovered the settled rule that fraud of
the debtor will not impair the enforceability of a subordination provision.").

Objection to Confirmation of Amended Plan or Reorganization of Easy Street Partners, LLC and

WestLB, AG Dated June 16, 2010 [Docket No. 578] (the "Wickline Objection") raises several

objections to confirmation of the Plan.  However, the Wickline Objection is in essence, the

restatement of a dispute between two former partners over the control of their limited liability

company, the origin of which predates this bankruptcy case.  This is a dispute that simply does

not belong before this court, especially in the context of a plan confirmation.  Tellingly, neither

Wickline nor Alchemy Ventures Trust, LLC has a direct interest in this case.  Indeed, Wickline

attempts to confer standing upon himself and the entity he controls by purporting to make their

objection on behalf of CloudNine Development and CloudNine Management – thereby

acknowledging the very lack of standing he attempts to hide.

### 1.        WestLB Will Not Be Paid in Full in Cash Under the Plan.

The Wickline Objection asserts that because WestLB will be paid in full under the

Plan Wickline is entitled to the same treatment as other Class 4 Claims.  However, that is simply

not the case.

WestLB holds an Allowed Claim against Partners, which is secured by a first priority,

perfected security interest in all of Partners' assets.  WestLB has timely filed a proof of claim

against Partners in an amount no less than $16 million as of  the Petition Date, plus accruing

interest, fees, and expenses [Claim No. 28], which under the WestLB Loan Documents, is it

estimated as of July 31, 2010 to total $17.9 million.  See Duncan Robertson Declaration, ¶ 3.

In recognition of certain potential disputes regarding the allowance of certain components

of WestLB's claim and in the interest of facilitating the Debtor's emergence from bankruptcy,

WestLB has acceded to the Debtor's request to compromise the Allowed WestLB Secured

Claim.  Partners and WestLB have agreed that, for the purposes of the Plan, the amount of the

Allowed WestLB Secured Claim will total $16.2 million if the Effective Date of the Plan occurs

on or before July 31, 2010.  Thus, WestLB is simply not being paid in full, is not being paid in

full in cash, nor has Wickline established that this is even possible.

### 2.     WestLB Has Not Breached the Implied Covenant of Good Faith and Fair Dealing

It is well settled that the implied covenant of good faith and fair dealing cannot be used to

create independent obligations beyond those agreed upon and stated in the express language of

the contract.  Warner Theatre Assoc. Ltd. Partnership v. Metropolitan Life Ins. Co., 1997 WL

685334 (S.D.N.Y. Nov. 4, 1997).  Indeed, the covenant "does not provide a court carte blanche

to rewrite the parties' agreement.  Thus a court cannot imply a covenant inconsistent with terms

expressly set forth in the contract. . . .  Nor can a court imply a covenant to supply additional

terms for which the parties did not bargain."  Hartford Fire Ins. Co. v. Federated Dep't Stores,

Inc., 723 F. Supp. 976, 991 (S.D.N.Y. 1989)); see also Murphy v. Am. Home Prods. Corp., 448

N.E.2d 86, 91 (N.Y. 1983) (the covenant is to be understood "[in] aid and furtherance of" the

express terms of a contract, and cannot create obligations inconsistent with those express terms).

Emblematic of its efforts to simply ignore its contractually agreed-upon obligations,

Wickline asks the Court to do what is proscribed under controlling case law, namely "add a

substantive provision for which the parties did not bargain."  Hartford Fire Ins. Co., 723 F. Supp.

at 992.  See Warner Theatre, 1997 WL 685334 at *7 (dismissing good faith and fair duty claim

brought against lender whose only obligation was to "consider and negotiate" a requested loan

and finding that "[n]othing in the duty of good faith requires that parties to a negotiation propose

only such terms as the other party is happy with; such a rule would turn the normal negotiating process on its head.").

Reading such an obligation into the Agreement "would not merely complement the express provisions contained in the [agreements], it would change those provisions and significantly alter the rights of the parties." CIBC Bank & Trust Co. Ltd v. Banco Central do Brasil, 886 F. Supp. 1105, 1115-16 (S.D.N.Y. 1995).   WestLB has done nothing that would breach the covenant of good faith and fair dealing in connection with the subordination agreements.

### 3. WestLB Does Not Need to Bring an Adversary Proceeding to Enforce the Subordination Agreements

Wickline complains that WestLB has not proven the existence or validity of the subordination agreements through an adversary proceeding as if the efforts to subordinate the claims was a claim for relief.  Rather, the subordination sought in connection with the Plan is merely the recognition of a contractual right of WestLB that neither CloudNine Management nor CloudNine Development are able to receive any payment from the Debtor unless and until WestLB's claim is paid in cash in full.  The enforcement of this contractual right, as set forth above, is appropriate in a Plan context.

### 4. The Plan Does Not Purport to Release any Claims Wickline May Have Against Shoaf

The Wickline Objection also misinterprets the releases being provided for under the Plan. Section 11.2 of the Plan provides that the release is only from defined claims by Partners (the Debtor), not any third party.  Section 11.3 is simply an exculpation clause that mirrors section 1125.  Section 11.4 is the release to WestLB from Partners, the Reorganized Debtor, and the

38

Committee who filed suit against WestLB on behalf of the Debtors, which is part of the

settlement reached with WestLB in the Plan.  There is nothing in the Plan purporting to release

any claim that Wickline (or any other third-party) may have against Shoaf for breaches of

fiduciary duties or any other claim for relief.  To the extent Wickline believes that he has viable

claims against Shoaf for his actions, Wickline may bring those claims at the appropriate time and

in the appropriate court.

> **5.      Wickline's Appeal to Fairness and Equitable Treatment Should be
> Rejected Because He Comes to This Court with Unclean Hands[72],**

In an extraordinary act of irony, Wickline, has the temerity to object to confirmation of

the Plan on the grounds that, inter alia, his treatment under the Plan is not fair, that Shoaf has

inequitably benefited under the Plan and Shoaf breached his fiduciary duties to Wickline.  In

making his Objection, Wickline conveniently fails to inform the Court of several critical facts.

Specifically, prior to the Petition Date, Wickline, in clear breach of his fiduciary duties to the

Debtors, began a series of highly improper communications with mezzanine lender BayNorth

Realty VI Limited Partnership ("BayNorth").  Moreover, while Wickline's allegations of breach

of fiduciary duty against Shoaf are general and conclusory in nature (e.g. "Shoaf improperly

blocked the Wickline Interest from participating in the management of Partners, and . . . engaged

in ill-advised business dealings that have resulted in the dire financial situation of Partners"),

Wickline's actual breaches of his fiduciary duty to the Debtors are well documented by his own

e-mails and voicemail messages, which are set forth in detail in, and attached as exhibits to, the

Debtors' complaint against Wickline and others in Adversary Proceeding No. 10-2401 RKM in

---

[72]   This section contains contentions and arguments solely from the Debtor.  WestLB has not taken
a position on the relative merits of the multiple disputes between Wickline and Shoaf.

this Court.  A redacted copy of the complaint is in the public docket and an unredacted copy of the complaint with exhibits has been filed under seal.

Based upon the overwhelming evidence of Wickline's wrongdoing when he was a member of the Debtors' management, Wickline's assertion that Shoaf breached his fiduciary duties by seeking Wickline's removal from the Debtors' management is frivolous.  Indeed, Shoaf would likely have breached his fiduciary duty if he had not taken action to remove Wickline from managerial duties.

Equally baseless is Wickline's assertion that Shoaf breached his fiduciary duty because the Plan provides that WestLB will release an entity allegedly controlled by Shoaf (CloudNine Resorts, LLC) from a guaranty of the WestLB Loan.  Wickline Objection at 34.  WestLB's agreement to release CloudNine Resorts LLC is not a breach of a fiduciary duty by Shoaf.  The decision to grant this release was clearly in the business judgment of WestLB (the sole beneficiary of the guaranty) as part of the overall restructuring of the Debtor.  The Reorganized Debtor is employing Shoaf for post-confirmation services, and it is not only logical but, as a practical matter, necessary for the guaranty to be released as part of the future relationship with Shoaf.  Furthermore, CloudNine Resorts, LLC is currently the entity that holds the liquor license for Sky Lodge.  A release of CloudNine Resorts LLC in exchange for assistance in transferring the liquor license for The Sky Lodge is permissible and supported by consideration.

Wickline was removed from the Debtor's management almost a year ago.  He has taken no action before this Court challenging his removal.  His assertion, two days prior to the confirmation hearing on the Plan, that he was improperly removed from management is barred by the doctrines of laches, estoppel, and waiver.  Moreover, Wickline has abused his trust and

breached his duties to Shoaf and to various other entities related to the Debtor.  With this record, the Court should not entertain his pleas for fairness to cure and remedy perceived inequities.

**B.     The Objection of Park City I, LLC**

In addition to the arguments in support of confirmation set forth above, there are several other grounds to overrule the Objection of Park City I, LLC including that Park City I, LLC lacks standing to object to the Plan, notice of the Plan was proper, and the settlement of the Committee's adversary proceeding against WestLB is appropriate.

**1.     Park City I Lacks Standing to Object to the Plan**

The Court should overrule Park City I's objection because Park City I lacks standing to object to the Plan.  Section 1109 provides that a "party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109.  Park City I is neither a creditor nor an equity holder of Partners, and does not qualify as a "party in interest" that would have standing to object to the Plan.[73]  Park City I has not filed a proof of claim against Partners and is not listed on Partners' Schedules as holding a claim.  Further, Park City I owns no direct interest in Partners, which is the entity being reorganized under the Plan, but is a part owner of Holding, which in turn owns Mezzanine, which owns Partners.[74]  Park City I, however, filed its objection in its individual capacity and not on behalf of Mezzanine, which is an equity holder in this case.  Indeed, Park City I has no direct interest in this case.  Therefore, Park City I is not a "party in interest" in this case and lacks standing to object to the Plan.  See also In re Bicoastal Corp., 164 B.R. 1009, 1015 (Bankr. M.D. Fla. 1993) (finding that persons acting in

---

[73]   In its objection, Park City I makes no effort to describe its role or interest in this case.

[74]   As set forth in the Plan, there will not be a distribution to equity holders in this case.

their individual capacities, rather than as general partners of limited partnership, lacked standing to object to proposed settlement and sale agreement).

## 2.    Notice of the Plan Was Proper

The Court should also overrule Park City I's objection because notice of the Plan was proper.  Section 1127(a) provides that the "proponent of a plan may modify such plan at any time before confirmation. . . ."  11 U.S.C. § 1127(a).  The Plan, which was filed on June 16, 2010 [Docket No. 566] is a non-material modification to the plan of reorganization filed by Partners on February 25, 2010 [Docket No. 323].  In fact, the primary differences between the Plan and Partner's plan are the voluntarily different treatment of WestLB's claim and the treatment of certain claims held by insiders of the Debtor, which are contractually subordinated to WestLB's claim, as described further in the Plan.  Because these insider entities with contractually subordinated claims will not receive any distribution under the Plan, they will be deemed to reject the Plan, and their votes have not be solicited.  Therefore, because the Plan is simply a non-material modification of Partner's plan filed in February, notice of the Plan was proper and greatly exceeded the 28 days required under Rule 2002(b).

## 3.    The WestLB Settlement was Fair and Does Not Create a Conflict

The Bankruptcy Appellate Panel for the Tenth Circuit has established a set of four factors (commonly known as the "Kopexa Factors") that bankruptcy courts should consider in determining the propriety of a settlement for purposes of approval under Rule 9019:

(1)    the probable success of the underlying litigation on the merits;

(2)    the possible difficulty in collection of a judgment;

(3)    the complexity and expense of the litigation; and

42

(4)      the interest of creditors in deference to their reasonable views.

C.K. Williams, Inc. v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.), 213 B.R. 1020,

1022 (B.A.P. 10th Cir. 1997); see also King Res., 556 F.2d at 478-79 (applying 10-factor test for

approval of settlement); Southern Med. Arts, 343 B.R. at 257 n.5 (recognizing that the Kopexa

Factors collapse and take into consideration the 10-point test established in *King Resources*).

The settlement with WestLB under the Plan provides full releases from the estate, an

agreement on the compromised allowed amount of WestLB's secured claim, and a release and

dismissal with prejudice of the Committee's current equitable subordination action. The releases

and settlements provided for herein are fair and in the best interest of creditors and satisfy the

Kopexa Factors.

With respect to the estate releases, WestLB has already obtained through prior

agreements and court orders a broad immunity from the estate claims. Prior to the chapter 11

case, the Debtor, after it was in default, signed pre-negotiation agreements that acknowledged

there were no claims against WestLB and granted releases to WestLB.  Subsequently, when the

Debtor and WestLB agreed on usage of Cash Collateral, the Court approved the Debtor's

acknowledgement that it had no claims against WestLB and had no defenses or rights of set off

against its claims. In light of the Debtor's prior agreements and waivers and the application of

the Kopexa Factors, the current settlement and broad releases under the Plan are reasonable and

justified in light of the benefits brought to the Plan by WestLB.

The Committee's action for equitable subordination is based, in large part, on WestLB's

conduct in February 2008 when BayNorth received $5.8 million of sales proceeds.  There are

several reasons why the settlement of this action is justified under the Plan.

43

First, WestLB has raised serious factual issues regarding the subject transactions. WestLB contends that the Debtor because of its open and knowing participation in the payment to BayNorth has either agreed to the payment (even if it was not otherwise authorized under the Loan Documents), or has waived and is now estopped from making the claim.  Furthermore, the recipient of the money was BayNorth – not WestLB, who received no benefit from the payment.

Second, the legal standard for the equitable subordination of a non-insider's claim is very high, and WestLB's conduct did not meet this standard, Indeed, WestLB did not receive preferential transfers, did not exercise control over the Debtor and did not abuse its rights and remedies.  WestLB asserts that there is no evidence of significant inequitable conduct, which is required to equitably subordinate a creditor's claim.

Third, the Plan gives the Committee the practical equivalent of what it sought in the legal action. The creditors have been offered a full payment, and WestLB is taking a restructured secured claim to be paid over time.  The equitable subordination action (if successful) would not provide the creditors with any better treatment.

Accordingly, under the Kopexa Factors, the likelihood of the Committee's success on the merits of the litigation is doubtful.  Furthermore, even if the Committee was eventually successful, because of the complexity of the claims and defenses involved and the corresponding substantial litigation expense that would be incurred, settlement of the litigation is appropriate. Finally, the Committee, representing the interests of creditors, has not objected to the release of WestLB as part of the Plan, and, in fact agreed to the dismissal of the action with prejudice if a plan that had not been opposed by the Committee was confirmed.  See Stipulation Setting Time to Answer or Otherwise Respond to Complaint and Conditions for Dismissal, Adv. Pro. No. 10-

2028 [Docket No. 3].  If the Plan is confirmed, this condition to dismissal with prejudice has

been satisfied.

## CONCLUSION

For the reasons set forth herein, the Plan Proponents submit that the Plan fully satisfies all

applicable requirements of the Bankruptcy Code and respectfully request that the Court overrule

the Objections and confirm the Plan.

DATED this 24th day of June, 2010.           DATED this 24th day of June, 2010.

**DORSEY & WHITNEY LLP**                      DURHAM JONES & PINEGAR, P.C.

/s/ Benjamin J. Kotter                        /s/ Kenneth L. Cannon
Annette Jarvis                                Kenneth L. Cannon II (3705)
Peggy Hunt                                    Steven J. McCardell (2144)
Benjamin Kotter                               111 East Broadway, Suite 900
136 South Main Street, Suite 1000             P.O. Box 4050
Salt Lake City, UT  84101-1685                Salt Lake City, UT 84111-4050

Richard W. Havel                              CROWELL & MORING LLP
Christina M. Craige                           Michael V. Blumenthal
SIDLEY AUSTIN LLP                             Steven B. Eichel
555 West 5th Street, Suite 4000               590 Madison Avenue, 20th Floor
Los Angeles, CA  90013                        New York, NY  10022

*Attorneys for WestLB, AG*                    *Attorneys for Easy Street Partners, LLC*

4824-9934-2598\1  6/24/2010 8:30 PM