# ORIGINAL TRANSCRIPT

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF UTAH

| | |
|---|---|
| CONFIRMATION HEARING<br><br>IN RE:  EASY STREET<br>HOLDING, LLC | ) Bankruptcy Case No.<br>) 09-29905<br>)<br>) Jointly Administered<br>) with Cases 09-29907<br>) and 09-29908<br>)<br>) Chapter 11<br>)<br>) Honorable R. Kimball<br>) Mosier<br>) |

June 25, 2010 * 10:04 a.m.

Location:   United States Bankruptcy Court
350 South Main Street
Salt Lake City, Utah 84102

Proceedings recorded by electronic sound recording,
transcript produced by certified transcriber/court
reporter:   Jennifer E. Garner, RPR
Notary Public in and for the State of Utah

2010 JUL 20 PM 4: 52
UNITED STATES
BANKRUPTCY COURT
DISTRICT OF UTAH



## CITICOURT
### THE REPORTING GROUP

170 South Main Street, Suite 300
Salt Lake City, Utah 84101

PH: 801.532.3441   FAX: 801.532.3414   TOLL FREE: 877.532.3441

|9|

1                    A P P E A R A N C E S

2    FOR THE DEBTOR IN POSSESSION:

3              Kenneth L. Cannon, II, Esq.
               DURHAM JONES & PINEGAR
4              Attorney at Law
               111 E. Broadway
5              Suite 900
               Salt Lake City, Utah 84111
6              Telephone:  801-415-3000
               Facsimile:  801-415-3500
7
               Michael Blumenthal, Esq.
8              CROWELL & MORING
               Attorney at Law
9              590 Madison Avenue, 20th Floor
               New York, New York 10022-2524
10             Telephone:  212-895-4241
               Facsimile:  212-223-4134
11
     FOR WESTLB:
12
               Annette W. Jarvis, Esq.
13             DORSEY & WHITNEY, LLP
               Attorney at Law
14             136 S. Main Street
               Suite 1000
15             Salt Lake City, Utah 84101
               Telephone:  801-933-8933
16             Facsimile:  801-933-7373

17             Richard W. Havel, Esq.
               SIDLEY AUSTIN
18             Attorney at Law
               555 West Fifth Street
19             Los Angeles, California 90013
               Telephone:  213-896-6000
20             Facsimile:  213-896-6600

21

22

23

24

25

1   **FOR THE UNSECURED CREDITORS:**

2           Lon A. Jenkins, Esq.
            Jeffrey W. Shields
3           JONES, WALDO, HOLBROOK & MCDONOUGH, PC
            Attorney at Law
4           170 S. Main Street
            Suite 1500
5           Salt Lake City, Utah 84101
            Telephone:  801-521-3200
6           Facsimile:  801-328-0537

7   **FOR BAY NORTH:**

8           Adelaide Maudsley, Esq.
            CHAPMAN AND CUTLER, LLP
9           Attorney at Law
            One Utah Center
10          201 S. Main Street
            Suite 2000
11          Salt Lake City, Utah 84111
            Telephone:  801-533-0066
12          Facsimile:  801-533-9595

13  **SPECIAL COUNSEL FOR DEBTOR:**

14          Joseph E. Wrona, Esq.
            WRONA LAW FIRM
15          Attorney at Law
            1745 Sidewinder Drive
16          Park City, Utah 84060
            Telephone:  435-649-2525
17          Facsimile:  435-649-5959

18          Corbin B. Gordon, Esq.
            CORBIN B. GORDON, PC
19          Attorney at Law
            345 West 600 South
20          Suite 108
            Heber City, Utah 84032
21          Telephone:  435-657-0984
            Facsimile:  888-822-8796

22

23

24

25

1    <u>FOR DAVID WICKLINE, ALCHEMY VENTURES TRUST, LLC</u>:

2             Kim R. Wilson, Esq.
          SNOW CHRISTENSEN & MARTINEAU
3             Attorney at Law
          10 Exchange Place
4             11th Floor
          Salt Lake City, Utah 84111
5             Telephone:  801-521-9000
          Facsimile:  801-363-0400
6
     <u>FOR PARK CITY I, LLC</u>:
7
              George B. Hofmann, Esq.
8             Matthew M. Boley, Esq.
          PARSONS, KINGHORN, HARRIS, PC
9             Attorneys at Law
          111 East Broadway
10            11th Floor
          Salt Lake City, Utah 84111
11            Telephone:  801-363-4300
          Facsimile:  801-363-4378
12
     <u>FOR GATEWAY CENTER, LLC AND VARIOUS UNIT OWNERS</u>:
13
              Douglas J. Payne, Esq.
14            FABIAN & CLENDENIN
          Attorney at Law
15            215 S. State Street
          Suite 1200
16            Salt Lake City, Utah 84111-2323
          Telephone:  801-531-8900
17            Facsimile:  801-596-2814

18   <u>FOR THE UNITED STATES TRUSTEE</u>:

19            Peter J. Kuhn, Esq.
          Attorney at Law
20            405 South Main Street
          Suite 300
21            Salt Lake City, Utah 84111
          Telephone:  801-524-5734
22            Facsimile:  801-524-5628

23

24

25

1    **FOR JACOBSEN NATIONAL GROUP:**

2                    Michael R. Johnson, Esq.
                    RAY QUINNEY & NEBEKER
3                    Attorney at Law
                    36 South State Street
4                    Suite 1400
                    Salt Lake City, Utah 84111
5                    Telephone:  801-532-1500
                    Facsimile:  801-532-7543
6
    **FOR GUNTHERS, INC.:**
7
                    Jeffrey L. Shields, Esq.
8                    CALLISTER NEBEKER & MCCULLOUGH
                    Attorney at Law
9                    10 East South Temple
                    Suite 900
10                    Salt Lake City, Utah 84133
                    Telephone:  801-530-7300
11                    Facsimile:  801-364-9127

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>I N D E X</u>

2                      <u>Direct</u>   <u>Cross</u>   <u>Redirect</u> <u>Recross</u>

3   <u>Witnesses</u>:

4   <u>Paul Throndson</u>

5   Proffer by
    Mr. Blumenthal:          51
6
    By Mr. Boley:                    56
7

8   <u>Duncan Robertson</u>

9   By Mr. Wilson:                   70
                                    114
10
    By Mr. Hofmann:                  77
11                                  103

12

13  <u>William Shoaf</u>

    By Mr. Blumenthal        142
14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2    NO.                DESCRIPTION                    RECEIVED

3

      1     Addendum to appraisal report_____      51
4
      2     6-16 Amended Plan_____      146
5
      3     Declaration of Richard Kirkham_____      148
6
      4     List of Class 4 Unsecured Trade
7           Creditors_____      149

8     5     Legal fees 2009-2010_____      153

9     6     Declaration of Duncan Robertson_____       66

10    7A    Re-forecast of remaining months of
            2010_____      166
11
      7B    Financial forecast 2010-2014_____      166
12
      9     Employment agreement_____      176
13
      10    Articles of Organization for Cloud 9
14          Resorts-Sky Lodge Management_____      181

15    11    Articles of Organization for Cloud 9
            Resorts-Sky Lodge Development_____      181
16
      12    Consent & Subordination Management
17          Agreement_____      183

18    13    Consent & Subordination Agreement
            Cloud 9 SL Development_____      183
19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2

3            THE BAILIFF:  Please be seated.  This is

4    in the matter of Easy Street Holding, LLC.

5            THE COURT:  Will counsel please note their

6    appearances.

7            MR. CANNON:  Your Honor, Kenneth Cannon of

8    Durham, Jones & Pinegar and Michael Blumenthal of

9    Crowell & Moring appearing on behalf of the Easy

10   Street Partners, debtor in possession, and one of the

11   plan proponents.

12           MR. BLUMENTHAL:  Good morning, your Honor.

13           MS. JARVIS:  Your Honor, Annette Jarvis of

14   Dorsey & Whitney and Rich Havel of Sidley Austin for

15   WestLB, also one of the plan proponents.

16           MR. JENKINS:  Your Honor, Lon Jenkins and

17   Jeffery Shields on behalf of the unsecured creditors

18   committee.

19           MR. WILSON:  Good morning, your Honor.

20   Kim Wilson appearing for David Wickline, a claimant,

21   and Alchemy Ventures Trust, LLC, which has, as a

22   member and manager, lodged an objection on behalf of

23   Cloud 9 Resorts-Sky Lodge Development, LLC and

24   Cloud 9 Resorts-Sky Lodge Management, LLC, claimants.

25           MR. BOLEY:  Your Honor, Matthew Boley of
```

1    the law firm Parsons, Kinghorn, Harris appearing on

2    behalf of Park City I, LLC, who have objected to the

3    confirmation.

4              MS. MAUDSLEY:  Your Honor, Adelaide

5    Maudsley of Chapman and Cutler on behalf of Bay

6    North.

7              MR. KUHN:  Peter Kuhn for the United

8    States Trustee.

9              MR. JOHNSON:  Good morning, your Honor.

10   Michael Johnson of Ray, Quinney & Nebeker on behalf

11   of Jacobsen National Group.

12             MR. JEFFERY L. SHIELDS:  Good morning,

13   your Honor.  Jeffery L. Shields -- the other Jeff

14   Shields -- representing Gunthers, Inc., who is a

15   subcontractor to Jacobsen.

16             MR. WRONA:  Good morning, your Honor.  Joe

17   Wrona, Wrona Law.

18             MR. GORDON:  Corbin B. Gordon with Corbin

19   B. Gordon, PC, special counsel for Easy Street

20   Partners.

21             MR. PAYNE:  Doug Payne of Fabian and

22   Clendenin on behalf of Gateway Center.

23             THE COURT:  Mr. Cannon, there are several

24   matters on the Court's calendar this morning.  The

25   way that they've been placed on the Court's calendar

1    has no particular significance.  You may take the

2    matters in the order you believe appropriate.

3             MR. CANNON:  Your Honor, I think we would

4    propose to proceed with the confirmation.

5             THE COURT:  All right.

6             MR. BLUMENTHAL:  May I approach, your

7    Honor?

8             THE COURT:  You may.

9             MR. BLUMENTHAL:  Your Honor, we're here on

10   the hearing to confirm the joint plan proposed by

11   Easy Street Partners and WestLB.  To use an

12   expression in a Beatles' song, it's been a long and

13   winding road, but we're here.  Easy Street, with

14   Mr. Shoaf at the forefront, has continuously and

15   tenaciously pursued reorganization with the principal

16   goal to pay creditors in full, maintain and maximize

17   the value of the Sky Lodge, keep and preserve jobs

18   for employees, maintain the project for the benefit

19   of its homeowners who already bought units at the Sky

20   Lodge -- 113 homeowners -- and maintain and maximize

21   value for the various constituencies in this case, as

22   well as maintain a -- one of the leading hotels in

23   this community, which will be a benefit to the Park

24   City resort community at large.

25             The plan that was originally filed by Easy

1    Street Partners back in January is -- and compared to

2    the plan that was -- the joint plan that's been

3    recently filed is -- basically the same plan, your

4    Honor, with the major exception that the plan funder

5    is now WestLB, our senior lender, who's also the

6    Class 1 creditor.

7              Mr. Shoaf will testify, your Honor, that

8    he met with over 60 potential plan funders, investors

9    concerning virtually every iteration of an investment

10   to get to confirmation and exit this bankruptcy.  He

11   has always maintained transparency with WestLB, the

12   committee, Jacobsen, and all other creditors and

13   constituents in this case who have asked for

14   information.

15             As your Honor is aware, the joint plan

16   that's before you today was filed on June 16th.  The

17   treatment of literally all classes, with minor

18   exceptions, but in particular the voting classes are

19   identical.  Obviously the treatment of WestLB has

20   changed.  However, they've voted in favor of the plan

21   and are the plan proponent.

22             The general unsecured Class 4 creditors

23   have identical treatment.  As you'll hear a bit

24   perhaps from Mr. Havel and Mr. Jenkins, there is --

25   there is some issues that they're trying to iron out.

1  The debtor -- in connection with the reply -- I

2  wouldn't call it an objection, but a reply filed by

3  the committee.

4           The Class 2 creditors, which is Jacobsen

5  as well as Gunthers, who has voted in the class,

6  identical treatment.  They're taking 1,330,000 to

7  satisfy a claim.  There's been a declaration filed by

8  Mr. Kirkham who's the principal of Jacobsen that

9  their actual claim is approximately 1,750,000.

10 They're taking 1,330,000, assuming we confirm here

11 today.

12          With regard to Gunthers, who initially

13 voted not to accept the plan and filed -- I'll call

14 it a limited objection -- they have now agreed to

15 consent to the plan, change their vote to an

16 acceptance and withdraw their objection.  Counsel for

17 Gunthers would like to, with Mr. Cannon, who worked

18 this out, announce that on the record at the outset

19 of the hearing so he doesn't need to stay here all

20 day.  And I would ask the Court to allow them to do

21 that in a moment.

22          The other secured class, which is a

23 catchall class, Class 3, the only creditor in that

24 class, which is a nonvoting class, is Wells Fargo.

25 There's a financing lease for two vans that's owned

1   by Easy Street Partners.  That is not impaired.

2   Payments are current.  It's going to be continued to

3   pay -- be paid under the plan.

4             The homeowners who are in Class 5, with

5   respect to them, again, identical treatment as was

6   the case in the original iterations of the plan that

7   started in January and finally filed under the joint

8   plan June 16th where -- when the Jacobs -- I'll call

9   it the Class 2 claims are satisfied, which occurs on

10  the effective date, the liens that were filed are all

11  removed and released and -- and I'll get to a ballot

12  certification in a moment.  But every Class 5

13  creditor who voted, voted to accept the plan.  In

14  fact, among the classes that have a right to vote,

15  only one creditor holding a $4,000 claim voted to

16  reject.  Everyone else has accepted the plan, your

17  Honor.

18            The Class 7, which is the equity, which is

19  Mezzanine -- Easy Street Mezzanine -- it used to be

20  Class 6.  It's now Class 7.  However, their

21  treatment, likewise, is identical.  Easy Street

22  Mezzanine, although insider votes don't count for

23  purposes of confirmation, actually voted to accept

24  the plan.

25            In any event, being that they're receiving

1    nothing under the plan, and you'll hear testimony

2    that there is no equity at -- beyond -- flow-up

3    beyond Easy Street Partners, they would be deemed to

4    reject the plan, and we'll -- the evidence will

5    reflect that they should be crammed down in any

6    event.

7              The one class that did change was the

8    Class 6, which are the two claims of Cloud 9 Resorts

9    SL Management, LLC and Cloud 9 Resorts Development,

10   LLC.  It was never evident that they were going to

11   receive anything.  However, under the WestLB

12   sponsored plan, WestLB has the right -- it's been

13   briefed, your Honor.  We'll address that during the

14   course of this hearing -- has invoked the

15   subordination agreement which the bankruptcy courts

16   generally enforce.  They are receiving nothing and

17   are deemed to reject the plan and really don't have a

18   right to vote in this -- in this case.

19             Before I go on -- that's sort of the

20   summary of the various classes -- I'd like for

21   Gunther's counsel and Mr. Cannon to address the Court

22   with regard to the settlement resolving the Gunther

23   claim.

24             THE COURT:  All right.

25             MR. CANNON:  Your Honor, this is a -- it's

1    a little bit of a funny issue.  Class 2 is classified

2    as Jacobsen.  Jacobsen is Jacobsen National Group.

3    Jacobsen was the general contractor on the

4    construction and development of -- construction of

5    the Sky Lodge facility and associated buildings and

6    has a subcontractor.  Jacobsen filed a mechanic's

7    lien and Gunther also filed a mechanic's lien.

8            Jacobsen worked out with the

9    subcontractors distribution of the million -- million

10   three-three under the plan that will be distributed

11   to it.  It has worked out agreements with all of its

12   subcontractors, including Gunthers, as to what

13   portions of that they will all receive.

14           Gunthers filed an objection basically

15   saying they should have been a part of this class or

16   separately classified; they should have been entitled

17   to vote.  Their claim is in there.  It's just really

18   under Jacobsen's now, and they've lodged a rejecting

19   ballot.

20           The agreement of the parties is that

21   Gunthers has agreed that if the plan proponents make

22   clear on the record what I'm going to do momentarily,

23   make two things clear on the record, that it would

24   withdraw its objections and either withdraw its

25   negative vote or change its negative vote to an

1    accepting vote.

2              Those two things are, first, that the

3    settlement of these mechanic's lien claims, as set

4    forth in the plan under -- under Class 2 treatment,

5    applies only to this plan and that there is no

6    prejudice to the rights of Gunthers, or for that

7    matter Jacobsen or other subcontractors, if this plan

8    is not confirmed or becomes effective -- or -- or

9    doesn't become effective or they don't get paid;

10   that, in other words, they are waiving no rights

11   other than under this plan.  The discounted treatment

12   in this plan applies only to it.  All issues are open

13   if this plan does not go forward.

14              The second understanding is that the

15   releases of the mechanic's liens and the claims

16   secured by those liens are not released until they

17   receive a distribution.  In other words, it can --

18   it's a contemporaneous exchange.  They're paid, they

19   release.  That's exactly the intent of the parties --

20   of the plan proponents.  Frankly, it was the intent

21   of the plan proponents that no one waives any rights

22   other than with respect to the plan.

23              Anyway, so my understanding at least, your

24   Honor, is with -- and those two statements, the plan

25   proponents are in agreement, the debtor certainly

1     takes this position it is their intent.  And now

2     having stated on the record, I hope that Gunthers,

3     with whatever clarification they want to make, would

4     withdraw their objection.

5               THE COURT:  So the settlement of the

6     Class 2 claims would be effective under the plan --

7               MR. CANNON:  Yes.

8               THE COURT:  -- but not outside the plan?

9               MR. CANNON:  That's correct, your Honor.

10              THE COURT:  And the second point is that

11    the plan provides for the release of liens, but it's

12    not the plan or the order that would release the

13    liens, it would be the payment of the liens?

14              MR. CANNON:  That's correct, pursuant to

15    the plan.

16              THE COURT:  All right.

17              MR. JEFFERY L. SHIELDS:  Thank you, your

18    Honor.  I think Mr. Cannon has accurately stated it.

19    Just so the Court understands, the reason we believe

20    Gunther has a direct claim, even though we don't have

21    a contract with the debtor, is that we did perform

22    work on property of the debtor.  Unlike other

23    subcontractors of Jacobsen, my client actually

24    pursued a mechanic's lien action pre-petition against

25    both property of the estate and the fractional

1   interests that were sold to third parties.

2          This is a practical solution.  We believe

3   we have the right to be separately classified,

4   separately voted, separately paid.  But as a

5   practical matter, we have an agreement with Gunthers

6   on a discounted -- excuse me, agreement with Jacobsen

7   that we will accept a discounted amount.

8          We do withdraw our objection to the plan.

9   We do vote in favor of the plan based on the

10  representations made by Mr. Cannon.  I think it is a

11  good practical solution.  But in the event this plan

12  doesn't get confirmed or is not effective or we don't

13  get paid, then we don't want this to be a waiver of

14  our rights in any future matters before this Court.

15         Hopefully we won't be here again.  We'll

16  be paid and out of the hair of the debtor.  That is

17  our -- that is our deal and it is a practical

18  solution that we've negotiated with Mr. Cannon and

19  Jacobsen.

20         THE COURT:  All right.  Thank you.

21         MR. BLUMENTHAL:  In any event, under the

22  plan, WestLB is funding on the effective date

23  approximately three million dollars to pay the

24  Jacobsen/Gunthers claim at the discounted amount of

25  1,330,000.  The sixty percent -- the unsecured

1    creditors who have elected, take 60 cents on the

2    dollar.  During the voting process, your Honor, on

3    the ballots that were approved by your Honor

4    before -- at the time the disclosure statement was

5    approved, unsecured creditors were given an option of

6    those who voted to elect either to take 60 cents on

7    the dollar on the effective date or receive 100 cents

8    on the dollar in equal quarterly payments over

9    approximately three years.

10              The administration claims, which will

11   aggregate approximately a million dollars by the time

12   we roll into the closing, likewise will be paid with

13   the funding by WestLB.

14              There is a priority claim from the -- the

15   Utah State sales tax, I believe, for 2008 that's

16   somewhere between 185 and $200,000.  When that gets

17   resolved, that likewise will be paid.

18              And the pending payables, which are

19   basically 30-day payables, your Honor, which as of

20   today are approximately 188,000, will be paid in the

21   ordinary course as they flow through in the ordinary

22   business operations of the Sky Lodge.

23              Additionally, WestLB is funding a million

24   five as additional working capital to the reorganized

25   debtor, which is -- the name of which is going to be

1    Heber Avenue, LLC, which is an affiliate of WestLB.

2             Therefore, with the sole exception of

3    Class 6, which is subordinated contractually, every

4    creditor is treated identically, and in some

5    instances somewhat better, from the funding by

6    WestLB.

7             Your Honor, this morning we filed a ballot

8    certification.  The ballots, which I signed -- the

9    ballots under the voting procedures were sent to my

10   attention in my office, and as of the close of the

11   voting deadline, which was June 17th, I, along with

12   my paralegal, looked at the ballots, counted them up

13   and the ballot report has been filed.

14            THE COURT:  Was that filed electronically,

15   do you know?

16            MR. BLUMENTHAL:  Your Honor, if you

17   haven't seen it, I can hand one to you.

18            THE COURT:  All right.  It doesn't appear

19   to be on the docket, so -- thank you.

20            MR. WILSON:  Excuse me, Mr. Blumenthal.

21            THE COURT:  It has been filed.  It was

22   docketed as an affidavit.

23            MR. BLUMENTHAL:  It's a declaration, your

24   Honor.

25            THE COURT:  Right.  But that's -- so it

1    has been filed.

2              MR. BLUMENTHAL:  Right.  And as you'll

3    note, the -- now that Gunthers has changed their

4    vote, the summary page summarizes it.  And then

5    behind the summary page I have the results in each of

6    the classes.  WestLB Class 1 voted to accept.  That's

7    a hundred percent number and amount.

8              Now, in Class 2, the two -- which was

9    footnoted that based upon the expected stipulation

10   which was announced, Gunthers would change their vote

11   to yes.  So there are now two yes votes, the only two

12   creditors in Class 2, which is a hundred percent

13   number and amount.

14             Class 4, which are the general unsecured

15   creditors, the vote was 24 to 1, and the amounts were

16   99.2 percent in favor, .7 percent rejecting.  So that

17   class has accepted.

18             The insider votes, which don't count, your

19   Honor, in Class 4, I separately broke out the insider

20   votes from Class 4 on their general unsecured claims.

21   Even though they don't count for confirmation, the

22   vote was three to one in favor.  The amounts were 75

23   percent in favor, 25 percent -- I'm sorry.  The

24   amount was 98.8 percent in favor, 1.1 percent

25   against.

1            The only -- then in Class 5, which were

2    the homeowners, all of the homeowners that voted for

3    the plan voted in favor of the plan -- 35 of them.

4            Class 7, as I indicated earlier, voted to

5    accept.

6            And in Class 6, we had -- although they're

7    deemed to reject the plan, what occurred and is

8    reflected on the actual summary of Class 6 is that

9    there were two votes cast for each of Cloud 9 Resorts

10   SL Management and Cloud 9 SL Development.  And as

11   your Honor is probably aware, that entity is owned 50

12   percent by Mr. Shoaf's entity, Cloud 9 Resorts,

13   and 50 percent by Mr. Wickline's entity, also --

14   Alchemy Ventures.  So the Wickline voted no.  Shoaf

15   voted yes.  We'll argue that.  I have the dates of

16   when the ballots were cast, but they're deemed to

17   reject.  In any event, I don't think they get to

18   vote, but I just wanted to disclose how the voting

19   went.

20           Later on in this case we will argue the

21   issues regarding Class 6, which we believe should

22   be -- are contractually subordinated under this plan

23   in light of the fact that WestLB is not getting paid

24   in full.  In fact, they have to come up with another

25   four and a half million dollars to fund this plan.

1        I will at some point in this hearing allow

2   Mr. Havel to -- well, it's not for me to allow, but

3   Mr. Havel will address the Court on the contractual

4   subordination issue.

5        In sum, however, we now only have one

6   person voting against the plan.  That's

7   Mr. Wickline's entities, who we think shouldn't vote.

8   Every other creditor in this case -- I'm sorry,

9   except for the one $4,000 unsecured creditor -- has

10  voted overwhelmingly to accept the plan.

11        And just to put it in perspective, we're

12  going to bring Mr. Throndsen back for some very brief

13  testimony, but as your Honor is aware, there's been a

14  valuation set for Easy Street Partners at 20.6

15  million.  The claims as they add up before they're

16  settled, so to speak, under the plan aggregate in

17  excess of 22 million without regard to the Cloud 9 SL

18  Management and Development claims.

19        WestLB filed in a declaration of Duncan

20  Robertson -- is it Robertson?  I want to get his name

21  correct on the record -- reflecting that their actual

22  claim is 17.9 million.  That would calculate all of

23  the attorney's fees and default rate, interest, and

24  other charges that they would be entitled to, absent

25  a settlement under the plan; the declaration of

1    Richard Kirkham, who's Mr. Jacobsen -- who's the

2    principal of Jacobsen, filed a declaration that their

3    claim is slightly in excess of a million 750; the

4    unsecured creditors will introduce a spreadsheet on

5    their claims for approximately $980,000.

6              As I said, the administration claims were

7    approximately a million, priority claims 200,000, and

8    the payables as of today, administration

9    claims, 188,000.  That adds up to in excess of 22

10   million.  Therefore, we think it's sort of an easy

11   conclusion that equity Class 7 should get nothing and

12   that the subordination agreement for Class 6 under

13   this plan should be enforced, particularly in light

14   of WestLB contributing an additional four and a half

15   million to make this plan work.

16             We believe the plan addresses and complies

17   with all of the requirements of 1129, is in the best

18   interest of this estate.  We'll get into that at

19   closing argument.  The evidence will address each of

20   those prongs.  We've briefed it.  We apologize for

21   getting the brief in late last night.  It's been our

22   experience -- at least my experience -- that your

23   Honor actually reads everything that's filed, and I

24   hope we got it to you early -- or late enough not --

25   so you could read it this morning, but we believe it

1    addresses all the elements.

2             Now, the committee reply is somewhat

3    unusual.  I think maybe the way to handle that is --

4    and at the end of the evidence we can argue that, but

5    what they're really asserting is that Class 4

6    creditors should be allowed to change their election.

7    The debtor's position is, we're somewhat agnostic on

8    that.  However, we feel strongly that creditors who

9    didn't vote should not be allowed to now come in and

10   reelect options.  That, frankly, is, I think -- you

11   know, it shouldn't be open.  Because the -- everyone

12   was on notice.  It's very clear.  The voting

13   instructions were that if you didn't vote, you took

14   the option that paid you a hundred cents on the

15   dollar in quarterly installments over time.  So they

16   will be receiving a hundred cents nevertheless.  It's

17   not for us to get into the minds of people who have

18   never shown up in this court and didn't vote.

19            So irrespective of what Mr. Havel and

20   Mr. Jenkins work out, hopefully throughout the course

21   of this hearing, the debtor believes that they should

22   not actually be allowed.  Those who have not voted

23   should not be allowed to now come back in after the

24   fact and make elections.  It's sort of like in our

25   system in America if -- you know, I always tell my

1    kids who are now voters that if you don't vote for

2    president, you can't complain about what the

3    president does.

4            THE COURT:  Well, are we talking about

5    hypotheticals or are there creditors who haven't

6    voted saying they want to vote?

7            MR. BLUMENTHAL:  No one has come in that

8    hasn't voted --

9            THE COURT:  Okay.

10           MR. BLUMENTHAL:  -- that says they want to

11   re-elect.  Nothing's been filed.

12           THE COURT:  All right.

13           MR. BLUMENTHAL:  Now, the only objections

14   that -- separate and apart from that issue -- I don't

15   really consider that an objection -- are from

16   basically two partners -- two partners up at the

17   Holdings level.  When you really cut through the 45

18   pages of the two objections, they're really disputes

19   among partners at the Easy Street Partner level.  As

20   your Honor is aware, the corporate structure here is

21   -- I'm sorry, let me correct that.  Thank you.  It's

22   really a Partner dispute at the Easy Street Holding's

23   level.

24           As your Honor remembers, the debtor before

25   you today, which is the owner of the Sky Lodge

1    operating company, Easy Street Partners, owned a

2    hundred percent by Easy Street Mezzanine, owned a

3    hundred percent by Easy Street Holdings.  The equity

4    security holders have either personally or through

5    their entities, their equity interest at the Easy

6    Street Holdings level.  That is not before you today.

7    Those cases are still pending before your Honor.

8    There are adversary proceedings where they're named

9    plaintiffs that will go forward before your Honor

10   after today.

11          And, you know, it's our position that

12   these people are -- or persons, as defined under the

13   code -- are totally out of the money, really have no

14   standing in here.  And we, frankly, question their

15   motivation in filing these objections today.

16          Their disputes, their disputes among

17   partners don't belong -- at the Holdings level -- do

18   not belong in this courtroom before your Honor.  If

19   this plan, for whatever reason, fails today,

20   creditors who are clearly creditors of Easy Street

21   Partners will receive nothing.  You'll hear that

22   testimony later.  WestLB will receive a fraction of

23   their claim.

24          As we proceed, your Honor, we -- what --

25   what I'd like to do now is talk about proceeding

1    through this hearing.  We would put on for very brief

2    testimony Paul Throndsen, who was our appraiser, and

3    then we would put on Bill Shoaf, who's the co-manager

4    of Easy Street Partners.  Duncan Robertson filed a

5    declaration on behalf of WestLB.  Whether you accept

6    that declaration or need his testimony is something

7    that is up to your Honor.

8             I just -- the order that's been previously

9    entered is in the exhibit book.  It's -- it's not

10   necessarily an exhibit.  It's an order of this Court

11   on valuation of the 20.6 million.

12            Mr. Throndsen will testify briefly on two

13   areas which would be liquidation value, if we had --

14   if we converted to a seven and had to do a quick sale

15   of his property, as well as the -- some brief

16   testimony which is contained in his supplemental

17   appraisal on feasibility.

18            All of this will reflect that the

19   confirmation requirements of 1129(a) have been

20   complied with and that the cram-down provisions

21   under 1129(b) with respect to Classes 6 and 7 are

22   clearly manifest and proven before your Honor.

23            The -- again, the confirmation brief

24   addresses all of this.  We will address all the

25   issues that his Honor wants to hear more about at

 1    closing or throughout this case.

 2              I would ask you how you would like to

 3    proceed.  I assume other people will have a few

 4    comments before we actually proceed, but I don't know

 5    if it's your wish to -- for us to make proffers of

 6    their testimony and they can be cross-examined if

 7    necessary, or whether you'll require them to actually

 8    take the witness stand and testify.

 9              THE COURT:  "They" being individuals other

10    than --

11              MR. BLUMENTHAL:  Mr. Throndsen and

12    Mr. Shoaf and Duncan Robertson.  Being -- instead of

13    a proffer, if you'd accept the declaration.

14              UNIDENTIFIED SPEAKER:  Yes, for

15    Mr. Robertson.  Because we have a declaration with

16    exhibits, we would suggest that his direct testimony

17    could be in the form of submitting the declaration,

18    but we would permit him to do cross if any wish to

19    cross-examine him.

20              THE COURT:  All right.  Well, why don't we

21    address that as we move forward and see if there are

22    objections to the Court accepting the proffers.

23              Mr. Havel, if you wish to make a statement

24    before we begin, and then I'll hear from the

25    objecting parties perhaps before we begin.

1          MR. HAVEL:  Yes, your Honor.

2          My series of comments is really going to

3    be much more of a general overview of the case in the

4    sense of what are the issues right now and where does

5    this case go and the importance of the plan that's

6    before you today.

7          As has been emphasized, and can be and

8    should be reemphasized again, the only objecting

9    parties at this point are people who have really

10   controversies up at a higher level in the corporate

11   structure, and their complaints are really about the

12   alleged mismanagement or non-management either by

13   Mr. Shoaf or by Mr. Wickline or both.  There are

14   serious questions of whether they are creditors at

15   all, and certainly the only attenuated potential

16   creditor role is that Mr. Wickline seems to be a

17   member of Skyline Management and Skyline Development,

18   but that management is shared with Mr. Shoaf.  So

19   there's really no clear sense that Mr. Wickline even

20   represents that interest.

21          This is a case where the parties have had

22   a substantial amount of time and a substantial amount

23   of opportunities to explore what kind of plan is

24   going to work here, as -- although we're working in

25   the context of a plan that's been on file since

1   January and February, we also know from the series of

2   extensions and delays and plan supplement filings,

3   it's one where the debtor has sought out more than

4   one plan funder, there have been multiple discussions

5   about structuring and alternative financing.  This is

6   a project that has been shopped from the investor

7   side extremely carefully and has been monitored very

8   carefully in operations during a very important

9   session.

10          Really, the case started at the beginning

11  of last ski season, September/October.  It's gone

12  through a ski season and is going to end hopefully in

13  the summer where we have a small upscale season

14  before we hit the fall when this hotel will again be

15  dark or quiet for a substantial number of months

16  before the next ski season arises.  This is clearly a

17  seasonal asset and it's one where the timing for its

18  emergence from the bankruptcy is going to be very

19  important.

20          It's a structured plan where not only has

21  the elements been fully considered, but all the

22  parties have made and are making substantial

23  concessions.  The WestLB debt restructure will be

24  revealed to be one that's been carefully and

25  extensively negotiated.  It's been structured in a

1    way to ensure feasibility and promote a successful

2    plan.  Jacobsen and the mechanic's lienholders are

3    taking a discount to get out of a case when they had

4    substantial claims against their parties, which are

5    also going to be released at this time.  The

6    creditors are either taking a note, although it's

7    for -- it's a hundred percent if there's no post

8    petition -- post confirmation interest.  And they can

9    take a 60 percent discount to reveal where creditors

10   may see this, so that all of the components here are

11   making sacrifices to make this plan work.  And

12   they're all in favor of doing it now.

13          Time is crucial for several, several

14   reasons.  The most important one is one that we,

15   WestLB, have been concerned about for months and

16   months.  And that is that this debtor has a limited

17   amount of cash available to operate.  It started this

18   case with over three million dollars of surplus cash

19   on hand.  It's been whittled down to clearly less

20   than $600,000 as of today.  There are several accrued

21   and unpaid professional fee claims that could cut

22   into that even substantially over the next 30 days.

23   If July and August aren't healthy enough, this hotel

24   may not even stay open through the summer, based on

25   the current cash availabilities.

1           Also, failure to confirm this plan and go

2    effective immediately is going to force the owner of

3    this property to lose the visages of the last part of

4    the summer season to sell fractional units.  If we

5    can confirm this and go effective in mid or late July

6    there will at least be an August and early September

7    sale opportunity to improve the project's operations.

8    Otherwise, we wait for the ski season.

9           The third problem of delay is cost.  One

10   example of the problem about the delay here is we

11   were given in the plan structure and in the plan

12   presentations with other funders that admin claims

13   are going to be $750,000, and we actually budgeted

14   for that in part of our commitments.  As

15   Mr. Blumenthal's already said, he now thinks it may

16   be as high as a million.  We have a limited amount of

17   capital that we can put into this company and no

18   more.  And a further delay and a further accrual of

19   additional costs could itself destroy any future plan

20   prospects and turn this into an insolvent

21   administration.

22           So we feel a great sense of urgency both

23   because of how much has been done and how far people

24   have gone to make the plan work today and because the

25   prospects of the alternative at this point are very

1    serious.

2           I will defer the discussion about the

3    enforcement of the subordination agreement against

4    the Class 6 claimants and the ability to classify

5    them separately and treat them in the manner that

6    we've had.  So that the -- I have no other comments

7    at this point, your Honor.

8           THE COURT:  All right.  Thank you.

9           MR. JENKINS:  Your Honor, Lon Jenkins for

10   the unsecured creditors committee.

11          Just briefly, your Honor, the committee,

12   as your Honor can tell from the pleadings we filed,

13   is supportive of the plan.  However, we did file a

14   response, not an objection as such.  The response

15   really not going to the merits of the plan, but

16   really to the issue of which, if any, unsecured

17   creditors may have the opportunity to change their

18   elections, not their votes.

19          I've had discussions both with

20   Mr. Blumenthal and Mr. Havel this morning respecting

21   that issue.  I expect that during the course of the

22   hearings today and during the break, we will conclude

23   those discussions and reach some agreement as to

24   really the scope of which creditors should or would

25   be able to reelect their option one or option two

1    election.

2              In addition, your Honor, the plan, in

3    essence, does embody a settlement of sorts of the

4    unsecured creditors committee's litigation that was

5    commenced against WestLB back in January. Under the

6    terms of the plan, if the plan is confirmed, that

7    lawsuit will be dismissed with prejudice.

8              In that regard, I do have with me in court

9    today the chair of the committee, Mr. Craig Elliot.

10   And in support of the settlement, such as it is under

11   the terms of the plan, I would like at some

12   appropriate time to offer his testimony -- to proffer

13   his testimony. And, of course, he is in the

14   courtroom and would be available for any

15   cross-examination. We would like, if possible, to

16   take that part of the presentation this morning so

17   that Mr. Elliot doesn't need to sit here all day and

18   hear the proceedings. So we -- we do have that one

19   additional item in addition to the individuals that

20   Mr. Blumenthal indicated would either be proffered or

21   presenting live testimony.

22             THE COURT: All right. Thank you.

23             MR. JENKINS: Thank you, your Honor.

24             THE COURT: Mr. Wilson or Mr. Boley, do

25   you wish to be heard before we proceed with evidence?

1      MR. WILSON:  Yes, your Honor.  Thank you.

2      I've personally found one tool to be

3  useful, and that's the ownership structures.  Does

4  the Court have that?  I'm wondering if we may -- I'm

5  happy to either mark it or disperse it, but I find

6  that this is a wonderful time-saving tool as we

7  discuss through the structure.  May I suggest that we

8  either mark it or have it generally available to

9  everybody?  I believe that would be the one that's

10  attached to the disclosure statement.

11      MR. BLUMENTHAL:  We don't mind it being

12  marked as -- not necessarily as evidence, but --

13      THE COURT:  Well, is it attached to the

14  disclosure statement?

15      MR. WILSON:  I hope so, your Honor.  I

16  believe it is.  It's -- it's certainly been before

17  the Court.  It's down in the pleading somewhere.

18      THE COURT:  Okay.  Well, if you have a

19  copy and --

20      MR. WILSON:  May I just mark it maybe W-1

21  or something like that?

22      THE COURT:  All right.

23      MR. BLUMENTHAL:  Your Honor, it's just --

24  you asked the question; it's not attached to the

25  disclosure statement, but we don't have a problem

1    with having it marked for whatever reason.

2              THE COURT:  Well, I guess -- clearly, it's

3    not evidence because we don't have any foundation.

4    But if it's instructional and helpful to the Court,

5    then --

6              MR. WILSON:  I offer it for no other

7    purpose, your Honor.

8              THE COURT:  All right.

9              MR. BLUMENTHAL:  We don't have a problem

10   with that, your Honor.

11             THE COURT:  Okay.

12             MR. WILSON:  It's going to -- I promise it

13   will save the sanity of a few of us by the end of the

14   day.

15             THE COURT:  As long as it's accurate,

16   maybe.

17             MR. WILSON:  I hope it is.  And whoever

18   prepared it deserves something, some recognition.

19             May I present -- may I just hand that to

20   the Court?

21             THE COURT:  Well, yes, you may.

22             MR. WILSON:  All right.  Thank you.

23             THE COURT:  It has been marked.

24             Do you want to give me another copy that's

25   not --

1           MR. WILSON:  No, I want to give you the

2    marked one.

3           THE COURT:  Okay.

4           MR. WILSON:  May I?

5           THE COURT:  All right.

6           MR. WILSON:  Thank you, your Honor.

7           I'm here -- thank you -- for objecting

8    parties, David Wickline and Cloud 9 Resorts-Sky Lodge

9    Development, LLC and Cloud 9 Resorts-Sky Lodge

10   Devel-- or, Management, LLC, who are scheduled

11   creditors.  And I stand here as counsel for Alchemy

12   Ventures Trust, LLC who controls 50 percent of those

13   two entities, which I would like to identify as

14   Development and Management.

15          May I -- let me just take a moment, if I

16   may, by referring to this ownership structure.  The

17   debtor, whose plan -- also joined in by WestLB -- is

18   Easy Street Partners, LLC, that I believe to be the

19   owner of the real estate -- the dirt -- which is the

20   hotel facility.  It is a wholly-owned entity of Easy

21   Street Mezzanine, which is a wholly-owned entity of

22   Easy Street Holdings, LLC.  Each of those two

23   entities are debtors before the Court, but not

24   proponents of the plan.

25          Easy Street Holdings, LLC is owned by --

1    there are really four ownership components.  One is

2    on the far right, Cloud 9 Resorts, LLC, which is

3    controlled 100 percent by Mr. William Shoaf.  That

4    represents a 38.75 percent equity ownership of

5    Holdings, which is the effective -- 38.75 percent

6    ownership of the venture -- the Easy Street venture.

7              Next, to the left of that is a box

8    representing ownership of an additional 38.75 percent

9    that is owned by Alchemy Ventures Group, LLC.  And

10   that -- the member is Alchemy Ventures Trust, owned

11   and controlled 100 percent by David Wickline.  So

12   that part of the structure represents two components

13   of 38.75 percent interest.

14             Going to the left, there's Utah Coal and

15   Lumber, ten percent owner of equity.  And lastly, to

16   the left of that, is Park City I, LLC, which is

17   Mr. Boley's client, representing 12.5 percent

18   ownership.

19             May I call the Court's attention then to

20   the bottom of the box -- or the bottom of the exhibit

21   where it says, "Sky Lodge Park City, Utah," and

22   emanating on the right is an entity Cloud 9

23   Resorts-Sky Lodge Development, which is separately

24   owned by Cloud 9 Resorts, which is owned by

25   Mr. Shoaf.  So that's 50 percent of the marbles.  And

1    the other 50 percent is owned by Alchemy Ventures

2    Trust, controlled by Mr. David Wickline, not debtors.

3    That entity is not a debtor.  It had a contract with

4    the debtor or debtors to perform certain services.

5    So not a debtor and -- but rather a claimant.

6              Development holds a scheduled claim, not

7    contested, not contingent, not disputed --

8              THE COURT:  Who holds a scheduled claim?

9              MR. WILSON:  This is Development.

10             THE COURT:  Okay.

11             MR. WILSON:  And -- and if -- if everybody

12   will go with this, I think from -- from here on out,

13   I would like to identify that particular entity,

14   Cloud 9 Resorts-Sky Lodge Development, as just plain

15   old Development.  Again, it holds a scheduled, not

16   disputed, not contingent claim of $1,268,213.  So as

17   I stand here, I stand here as a -- a rejecting

18   creditor of Development as to that claim.  There is

19   an accepting ballot to that as well, apparently, from

20   the tabulation that was made.  Mr. Wickline, through

21   his entity, which holds 50 percent of that claim --

22   effective 50 percent -- has voted to reject

23   Mr. Shoaf, who holds the other 50 percent votes to

24   accept.

25             Are we okay so far?

1          THE COURT:  Yes.

2          MR. WILSON:  Good.  Let's go just -- then

3    I'm about through with this little -- this little

4    experiment.

5          To the left then of -- of the bottom of

6    this exhibit is another entity called Cloud 9

7    Resorts-Sky Lodge Management.  The ownership of that

8    and the control of that and the structure of it and

9    its function is a mirror image of Development, and it

10   holds an -- a scheduled, undisputed, not contingent,

11   and not unliquidated claim of $366,631.39.  And

12   ballots have been apparently cast voting to both

13   accept and reject.  Those two claim aggregate,

14   $1,634,844.

15         In the former plan that was amended and

16   dressed up and submitted to the Court for

17   confirmation today on a very, very short string,

18   those claims formerly were to be paid, not

19   subordinated.  They were to be paid.  The treatment

20   was disparate from the other unsecured claims.  But

21   nonetheless, they were to be paid in full.

22         Then we had this little hurry-up

23   experiment on -- on a brand-new plan with a -- with a

24   joining plan proponent and -- and the treatment is

25   radically different.  And that is these claims are to

1   be subordinated, not paid a penny and, in fact, have

2   been relegated to a new Class 6, which does not even

3   contemplate that they would be allowed to vote and

4   participate in the plan.  I hope that lays a little

5   background for this.  In addition, Mr. Wickline holds

6   a likewise claim of about $4,600 unsecured claim in

7   his own right.

8               The -- if I may refer just one more time

9   to this organizational chart exhibit.  This will be

10  about my -- this is kind of my last one -- is if the

11  Court would look at the top box, "Debtor:  Easy

12  Street Holding," it will see a line immediately above

13  that to an entity called ABG-SL, LLC.  In former

14  times, that was the manager of Easy Street Holding,

15  which, of course, made it the effective manager of

16  the Easy Street venture.  Ownership and control of

17  ABG-SL, LLC was in two members:  Alchemy Ventures

18  Trust, owned 100 percent by David Wickline; Cloud 9

19  Resorts, owned 100 percent by William Shoaf, thereby

20  making them each 50 percent members and 50 percent

21  managers of that venture.

22               In August of 2009 Easy Street Holdings

23  conducted a meeting and voted to discontinue the

24  services or discharge the services of ABG-SL, LLC as

25  manager.  That effort was led by Mr. Shoaf.  And when

1    ABG-SL, LLC was removed as manager, I believe the

2    evidence will show that Mr. Shoaf, and perhaps

3    others, substituted themselves personally as

4    managers.  And at that point in time, Mr. Wickline

5    was effectively removed from management or

6    involvement.  I believe the evidence will show that

7    there was no consultation with Mr. Wickline or his

8    interests with regard to the bankruptcy filing or any

9    management activities occurring after that time.

10          The -- and I'm just really almost through

11   kind of outlining our -- our opening with regard to

12   the -- the objection.

13          Mr. Shoaf has continued as manager, and is

14   manager today, of, as I understand it, of the debtor

15   who seeks confirmation today.  So he has effectively

16   moved forward without consultation of 38 and

17   three-quarters percent of the equity of the venture

18   throughout.

19          We will show to the Court through evidence

20   and upon argument that Mr. Shoaf has, while

21   participating in an effort to disenfranchise -- by

22   participating in the formulation and filing of this

23   plan -- to disenfranchise $1,600,000 worth of

24   legitimate claims of which he himself would

25   participate in half, that the deal that he has cut is

1    that he's going to get it -- he's going to get his

2    half anyway through an employment contract and

3    through an interesting provision with regard to

4    assistance in the transferring of liquor licenses,

5    which we submit have been misappropriated by him and

6    is being used in this case for his personal gain, and

7    that the compensation which is contemplated will be

8    his personally under this new plan is $720,000 in

9    cold cash, plus an opportunity for some commissions

10   and other things.  So basically he gets his half of

11   the -- of the development and management claims

12   through the back door.  And what we submit that boils

13   down to is a plan that is not submitted in good

14   faith.

15            We'll have some -- the mechanism for

16   disenfranchising that million-six is the

17   subordination agreement issues raised by WestLB, and

18   I'm sure there will be some legal discussion about

19   that.

20            I hope that has at least been practically

21   helpful to the Court in framing the issues.  Thank

22   you.

23            THE COURT:  It has.  Thank you.

24            MR. BLUMENTHAL:  Your Honor, obviously

25   this is an opening statement; it's not evidence,

1    Mr. Wilson's not testifying, and I want you at the

2    end of the hearing to think if anything he said has

3    actually proven by evidence.

4              THE COURT:  All right.

5              MR. WILSON:  He doesn't ever buy anything

6    I say.

7              MR. BOLEY:  Your Honor, Matthew Boley

8    appearing on behalf of Park City I, LLC.

9              It's been my experience that this Court

10   does read papers, and I think ours were in long

11   enough ago that you're probably familiar with our

12   objection.  So let me summarize just a few key points

13   that might be helpful to the Court as it considers

14   the evidence today.

15             And I would start with the very words used

16   by the debtor's counsel as he started his opening

17   statement, which were this -- I wrote them down --

18   "This is basically the same plan with a major

19   exception."

20             Therein lies the rub, your Honor.  This is

21   not the same plan that was proposed months ago for

22   which there is an approved disclosure statement on

23   which creditors voted, voting closing the day after

24   this new plan was filed.

25             In this case, the major exception swallows

1     the plan.  And there are several problems, your

2     Honor.  One is that from my client's perspective,

3     WestLB was the architect and the cause of the

4     debtor's demise.  Under the former plan, and as

5     described in the disclosure statement, the creditor's

6     committee on behalf of creditors and the estates were

7     going to -- was going to pursue causes of action

8     against WestLB.  That is something that all creditors

9     who got to vote on this plan had in mind when they

10    voted on -- or chose not to vote on the plan.  Now

11    WestLB is receiving a release of any and all claims

12    and a release of that litigation.

13            Conspicuously absent in the existing

14    approved disclosure statement is any discussion of

15    the kind of factors that this Court would want to see

16    in a disclosure statement where claims of this nature

17    are being settled, discussion of the Copexa factors.

18    So the disclosure statement is wholly inadequate for

19    the plan before the Court.

20            The way this has come up procedurally, the

21    debtor and WestLB are putting the cart before the

22    horse.  They're asking the Court to approve a plan

23    based on votes for a different plan and a disclosure

24    statement for a different plan.

25            As just one illustration of this, your

1    Honor, I would point out that even the unsecured

2    creditors committee, although not objecting, have a

3    problem with the adequacy of the original disclosure

4    statement.  And you notice that the committee's

5    objection is that those who made a certain election

6    or chose not to vote, knowing that that would be a

7    deemed election, had inadequate information to make

8    that election because their treatment under this new

9    plan is different and because the feasibility of this

10   plan, given the different dollar amounts that are

11   being contributed, are different.  So even as to

12   those unsecured creditors who -- and I -- the

13   committee's in favor of the plan and wants now to

14   settle this litigation.  So even as to them, the

15   original disclosure statement was not adequate to

16   address to them which election they should make.

17          Your Honor, I'll reserve the remainder of

18   my comments for closing.

19          THE COURT:  Well, Mr. Boley, how is the

20   impact on your client under the old plan and the

21   amended plan different?

22          MR. BOLEY:  The impact, your Honor, is

23   that under the old plan with litigation against

24   WestLB and with the possibility of success in that

25   litigation either disallowing or subordinating that

1   claim, perhaps with an affirmative dollar recovery

2   from WestLB, my client, although only a creditor and

3   equity holder at the Holdings level, did have a

4   possibility of some recovery.

5          Now, with that litigation settled without

6   information or evidence that would satisfy the Copexa

7   factors, my client is absolutely denied any -- any

8   chance of recovery in this case.

9          THE COURT:  But your client does

10  understand the differences in the two plans and --

11  with respect to the effect it has on your client?

12         MR. BOLEY:  The --

13         THE COURT:  What I'm getting at,

14  Mr. Boley, is one of the objections you raised was

15  the notice requirements and that proper notice of

16  this confirmation hearing and the plan before the

17  Court today hasn't been given and that the Court can

18  change -- otherwise order and find notice

19  requirements sufficient.

20         So my question really goes to whether your

21  client is prejudiced by the Court considering this

22  plan or whether you're just saying technically they

23  haven't done what they're supposed to do.

24         MR. BOLEY:  I think both, your Honor.  I

25  think it's clear they've technically not done what

1    they're supposed to do.  And although I and my

2    partners at Parsons, Kinghorn, Harris consider

3    ourselves to be quick studies, I don't know that we

4    have yet figured out all the differences in how this

5    plan treats our client and how the old plan did.

6    Personally, I don't know --

7                THE COURT:  Well, under this plan, it's

8    pretty clear you don't get anything.

9                MR. BOLEY:  That's certain.  It's certain

10   that this plan is much worse for my client.

11               THE COURT:  Okay.  All right.  Thank you.

12               MR. BOLEY:  Thank you, your Honor.

13               THE COURT:  All right.  Mr. Shoaf, I guess

14   we're ready to proceed.  I'm going to need to take a

15   recess at 11:45 and then we can recommence at 1:15.

16               MR. BLUMENTHAL:  Okay.  I'm sorry, you're

17   going to break at eleven --

18               THE COURT:  Right.  Break -- oh, no, I'm

19   going to --

20               MR. BLUMENTHAL:  We would put

21   Mr. Throndsen on first so he doesn't have to stay

22   here all day.

23               THE COURT:  All right.  That would be

24   fine.

25               Mr. Throndsen?

1    MR. BLUMENTHAL:  And my question for

2  Mr. Throndsen is, would the Court entertain a proffer

3  of his testimony, which would be brief or would you

4  want him to actually testify?

5    THE COURT:  Well, it would seem to make

6  sense to -- for -- just to speed this along, to

7  accept the proffer.  Certainly parties can have an

8  opportunity to cross-examine.

9    So you -- why don't you go ahead and have

10  a seat for a minute, Mr. Throndsen, and we'll see

11  where we go.

12    MR. BLUMENTHAL:  Your Honor, I would first

13  point to, in your exhibit book, to Exhibit 1-A.  You

14  know, it's not actually -- I don't think it's

15  actually -- it's an order of this Court dated

16  April 15th, which at an April 14th hearing valued the

17  assets of Easy Street Partners, the Sky Lodge, a

18  combination of the commercial and the residential

19  units, at 26.6 million.

20    I would ask -- I mean, technically it's an

21  order of the Court.  It's part of the record.  That

22  hearing was done in connection with the valuation

23  hearing.  We bifurcated that from a confirmation

24  hearing.  I would just ask that it be marked, and I

25  think the Court can take judicial notice of its own