1    orders.

2            What I would also do, likewise, is in

3    Exhibit 1, which is the addendum to an appraisal

4    report dated April 7th, that, your Honor, was

5    admitted into evidence at the April 14th hearing

6    after an extensive proffer that no one objected to,

7    no one objected at the valuation hearing and it was

8    admitted into evidence, I would like that to be in

9    evidence for purposes of this hearing today also,

10   which Mr. Throndsen could testify to.

11           THE COURT:  Is there any objection to the

12   Court receiving Exhibit Number 1?

13           MR. WILSON:  May I have just a moment,

14   your Honor, to peruse through it?

15           THE COURT:  All right.

16           MR. BOLEY:  No objection, your Honor.

17           MR. WILSON:  No objection.

18           THE COURT:  Exhibit 1 is received.

19           (Exhibit-1 received.)

20

21           PROFFER RE:  PAUL THRONDSON

22   MR. BLUMENTHAL:

23           Your Honor, Mr. Throndsen, if he took the

24   witness stand, would testify that the value of the

25   Sky Lodge, a combination of the fractional shares --

1   the remaining fractional shares -- and commercial

2   hotel, which was appraised under Exhibit 1 as $20.6

3   million as of April 6th, that that appraised value

4   has not changed between then and today and that he

5   would have the same opinion of value of the assets

6   today.

7           He would further testify with respect to

8   page 5 of Exhibit 1 -- there's a grid cell, depending

9   upon how people refer to it, in the middle of the

10  page.  I'll wait until his Honor gets there.

11          THE COURT:  So we're counting both sides

12  of the pages as a page?

13          MR. BLUMENTHAL:  Well, I'm looking at the

14  actual numbered page --

15          THE COURT:  Okay.

16          MR. BLUMENTHAL:  -- which --

17          THE COURT:  All right.  I have it.

18          MR. BLUMENTHAL:  Okay.  In that middle

19  cell where you -- it has "2010, 2011, 2012, 2013"

20  across the top, that's a summary of if the

21  residential fractional shares -- and there are 63

22  remaining that are owned by Easy Street Partners, the

23  debtor -- were sold while the Sky Lodge was

24  maintained as a going concern over a three-and-a-half

25  year period between confirmation and 2013, that

1    taking into account the carrying charges, the

2    commissions, which are set forth in the middle of

3    that cell, as well as the rental revenue that would

4    be realized by renting those units out, the -- Easy

5    Street Partners, or whomever is the successor owner,

6    actually keeps 50 percent of the revenues that are

7    rented out from the units that are already sold, but

8    they would receive the revenue of the remaining 63

9    units.

10              He's taken that into account and he would

11   testify and conclude that his opinion today is the

12   same that was given at the April 14th hearing that

13   the units, if sold in an orderly fashion, marketed in

14   a commercially reasonable manner over a period of

15   time, would realize on a net basis approximately $19

16   million.

17              And if you look at the bottom line of

18   the 16 million, he backed out, to get a present-day

19   value of what someone would pay for that today and

20   investors, and set a profit.  But the actual

21   realization from these units, taking into account the

22   cost, the holding time, as well as the revenues that

23   you would receive from the remaining units, would net

24   approximately $19 million.  He would so testify --

25              THE COURT:  Right.  So the way you reached

1    the $19 million is the 16,168,000 that's net cash

2    flow --

3              MR. BLUMENTHAL:  Yes.

4              THE COURT:  -- and add to it the investor

5    incentive --

6              MR. BLUMENTHAL:  Yes.

7              THE COURT:  -- 3,558,000?

8              MR. BLUMENTHAL:  Correct.

9              THE COURT:  All right.

10             MR. BLUMENTHAL:  So in excess of 19

11   million.

12             THE COURT:  Okay.

13             MR. BLUMENTHAL:  Now, he would then

14   testify -- and in the disclosure statement that was

15   approved by your Honor at page 51 of the disclosure

16   statement, if this case was converted to a Chapter 7

17   and the property was sold at an auction in -- over a

18   period of 60 days -- a quick auction of the

19   property -- that the liquidation value of the

20   debtor's assets would decrease between 25 and 35

21   percent.  Therefore, the amount that would be

22   realized by a liquidation debt, not as a going

23   concern, would realize between 25 and 35 percent less

24   than the 20.6 million dollars.  I haven't done the

25   math, but it's approximately 13 million dollars.  He

1    would so testify to that today.

2           He would also testify that he's fully

3    aware of the various properties in the Park City area

4    that have been auctioned off and that the auction

5    values being realized are 40 percent off of their

6    going concern value.

7           He indicate -- would indicate and would so

8    testify that the Sky Lodge would be a better property

9    to auction off, and therefore, in his opinion, the

10   realization would be between 25 and 35 percent less.

11          And that, your Honor, would conclude his

12   testimony.  I would request the Court to accept the

13   proffer as evidence.

14          THE COURT:  Is there any objection to the

15   proffer?

16          MR. WILSON:  No objection to the proffer

17   and no desire to cross-examine on the part of the

18   Wickline parties.

19          THE COURT:  Mr. Boley, is there any

20   objection to the proffer?

21          MR. BOLEY:  No objection to the proffer.

22   I would like to briefly cross-examine.

23          THE COURT:  All right.  Mr. Throndsen, if

24   you would come forward.

25          THE BAILIFF:  Please step forward and

1    raise your right hand.

2

3                    **PAUL THRONDSEN,**

4              called as a witness, being duly sworn, was

5    examined and testified as follows:

6              THE BAILIFF:  Please take the witness

7    stand, state and spell your name.

8              MR. THRONDSEN:  Paul W. Throndsen,

9    T-H-R-O-N-D-S-E-N.

10

11                    **CROSS-EXAMINATION**

12   **BY MR. BOLEY:**

13        Q.    Mr. Throndsen, Matt Boley appearing on

14   behalf of Park City I, LLC.  Nice to see you here

15   today.

16              My question doesn't necessarily go to your

17   current appraisal.  I thought it would be helpful for

18   myself and for the Court to understand how today's

19   values differ from those that may have existed at the

20   time that a default was declared in this case and

21   this case went into bankruptcy.

22              So I would like you to first ask -- let me

23   ask you this first:  Have you previously attempted to

24   determine a value of this property back in the fall

25   of 2009?

1           MR. BLUMENTHAL:  Objection, your Honor.
2    It's beyond the scope.
3           UNIDENTIFIED SPEAKER:  Mr. Blumenthal, I
4    cannot hear you.
5           MR. BLUMENTHAL:  I'm sorry.  I'd rather --
6    okay.  I could sit when I speak, but objection, it
7    goes beyond the scope of direct, your Honor, and I
8    don't believe he laid a proper foundation for that
9    question.
10          THE COURT:  Both of the objections are
11   correct.  It is beyond the scope of direct, and I
12   don't think there's been adequate foundation yet.
13   What is the testimony you expect to elicit,
14   Mr. Boley?
15          MR. BOLEY:  Your Honor, I expect to elicit
16   some testimony that will be relevant to the Court's
17   consideration of WestLB's actions in this case, and
18   specifically the values at the time that a default
19   was declared and that this -- this was put in a
20   position where WestLB could acquire the assets --
21   were much different than today.  And I think
22   Mr. Throndsen's qualified and --
23          THE COURT:  Well, but -- okay.  So the
24   problem that I would have with that is, I could take
25   judicial notice that market conditions change

1    constantly, but the purpose of having an appraiser is

2    being able to come up with at least an appraisal as

3    of an exact date.

4            So I think Mr. Throndsen could testify

5    and, in fact, he already has, what his original

6    appraisal was at that date and that the value of the

7    property has gone down since that date.  And

8    Mr. Throndsen -- Mr. Throndsen could testify that as

9    of the date that this case was filed in September

10   that market conditions have changed, but I don't --

11   I'm pretty sure that Mr. Throndsen's going to say

12   that he doesn't know what the value of this property

13   was on that date.

14           So having -- going through all that

15   questioning, I'm not sure how it helps the Court.

16           MR. BOLEY:  Your Honor, what I -- what I

17   hope to establish first is -- I haven't been able to

18   ask the predicate question.  Maybe he's done an

19   analysis or done a valuation as of that date, I don't

20   know.

21           THE COURT:  All right.  Well, why don't

22   you lay some foundation then.

23           MR. BOLEY:  And then, your Honor, the

24   follow-up, even if he has not, I believe that in

25   formulating his current opinions, he's probably

1   looked at not just market conditions have changed,

2   but he'll probably be able to give the Court some

3   idea of how they've changed and what ratios based on

4   his analysis of market conditions.  So let me start

5   there.

6        Q.    (By Mr. Boley)  Have you examined

7   historical data, comparative market sales, going back

8   through the fall of 2009 in formulating this opinion

9   or in trying to evaluate the value of this property?

10       A.    Well, the original appraisal was in

11  December of '09.  Market data going back even up to

12  two years was used relative to market trends and

13  market data available.  Because of the dearth of

14  sales, we typically don't go back that far, but we

15  did in this case because the market had very little

16  activity because of the current economic and

17  financial conditions.  And so the December appraisal

18  represents a lot of that data through that period.

19       Q.    So both the December appraisal and the

20  current appraisal both look at market conditions in

21  the Park City area going back two years?

22       A.    No. The April appraisal only considered

23  market conditions that had changed between December

24  and April, which is the basic market for those type

25  of units during the ski season.

1          Q.     And based on your prior analysis, did you

2    formulate an opinion about the value of this property

3    as of December 2009?

4          A.     Yes, I did.

5          Q.     And what is your opinion of the value as

6    of two thousand -- December 2009?

7          A.     My opinion was 22 million dollars.

8          Q.     And based on your analysis of the

9    comparable sales in the two years leading up to

10   December 2009, do you have an opinion, yes or no, as

11   to whether the December 2009 value was less than the

12   value had been six months previously?

13         A.     I do not.  Analysis to the data could be

14   applied, but most of the sales ended at the

15   April 2009 ski season.  There was very little data

16   during the summer, and there was little -- very

17   little indication of how market trends were -- what

18   market trends were occurring at that time.  So the

19   December appraisal took a look at all that

20   information up to that point.

21         Q.     It sounds like you did carefully examine

22   comparable sales in April of 2009.

23         A.     Correct.

24         Q.     And how have -- how has the value of this

25   property changed since April of 2009?

1       A.      I do not know.  I did not perform an

2   appraisal as of April 2009.

3       Q.      Is it -- is it true that real property

4   values have declined significantly since April

5   of 2009?

6               MR. BLUMENTHAL:  Objection.  Again, no

7   foundation and it goes beyond the scope of the

8   direct.

9               THE COURT:  I -- I think that we are

10  talking about confirmation as of today's date.  I

11  think he can answer that question.  I'm going to

12  overrule the objection.

13              THE WITNESS:  Could you repeat the

14  question, please?

15      Q.      (By Mr. Boley)  My question was whether

16  it's true that the value of this property has

17  declined significantly since April of 2009.

18      A.      I do not know if it has or not.

19      Q.      Is it true, based on your analysis of all

20  of what you deem to be comparative sales going back

21  two years from today and actually two days -- two

22  years from December of '09, that there has been a

23  decline -- a significant decline in values

24  generally --

25              MR. BLUMENTHAL:  Objection.  Asked and

1    answered.

2         Q.    (By Mr. Boley)  -- for this type of

3    property?

4              MR. BLUMENTHAL:  I'm sorry.  The witness

5    said he did not know.

6              THE COURT:  Sustained.

7         Q.    (By Mr. Boley)  And you indicated that the

8    current appraisal takes into account changes in

9    market conditions between December and the present

10   and there is a corresponding change in value?

11        A.    Yes.

12        Q.    And what's the decline of value from

13   December through the present?

14        A.    Well, it was 22 million and it had been

15   reduced to 20,600,000.

16        Q.    Okay.  And what are the market conditions

17   that have changed -- which have caused that change?

18        A.    The beginning -- the beginning of the ski

19   season, December 2009 and in January/February 2010,

20   there started to be a shift in the market to some

21   auction sales.  And so there were several prime

22   projects, particularly up in Empire Pass and at The

23   Canyons, who started some pricing mechanisms based

24   upon auctions and selling to the lowest bidder.

25              So there was a significant shift in how

1    properties were being marketed and how they were

2    being sold, which is reflected in the April 2010

3    value.

4         Q.    So although you can't speak to changes

5    from a year ago until the present, it's -- it's your

6    opinion that, at a minimum, there's been a decline of

7    five to ten percent in the value since December?

8         A.    Correct.

9              MR. BOLEY:  Your Honor, that's all I have.

10             THE COURT:  All right.  Any --

11             MR. BLUMENTHAL:  No redirect.

12             THE COURT:  You may step down,

13   Mr. Throndsen.

14             THE WITNESS:  May I be excused?

15             THE COURT:  You may be excused.

16             MR. BLUMENTHAL:  Your Honor, we indicated

17   that Duncan Robertson would also be a witness.  He

18   filed a declaration.  Being that we -- you indicated

19   you were going to break in about 20 minutes, we would

20   suggest that we take him out of order.  Mr. Havel

21   will handle Mr. Robertson.  We would request that the

22   Court accept his declaration as evidence and that if

23   anyone wishes to cross-examine him, they may.

24             MR. WILSON:  Your Honor, may I just impose

25   an objection to proceeding by proffer?  The

1    declaration was filed last night at whatever 20:41

2    was, quite late.  And I believe under the

3    circumstances and because of the importance of his

4    testimony that -- and because I think we've probably

5    got a little time, I would propose that we simply

6    proceed in ordinary fashion for his testimony.

7              THE COURT:  Well, Mr. Havel, would

8    Mr. Robertson's testimony on direct exceed the 11

9    paragraphs in the declaration?

10             MR. HAVEL:  No, your Honor.  Our intention

11   would be that he would testify to the substance of

12   the statements in the declaration, identify or

13   authenticate the exhibits that are therein, and then

14   we would open it up for cross-examination at that

15   point.

16             THE COURT:  I guess my question is whether

17   it's going to be quicker to let Mr. Wilson and

18   Mr. Boley read the declaration and do their

19   cross-examination or whether we do it on --

20             MR. HAVEL:  No.  I don't believe that it

21   will be more efficient to ask them to do it

22   correctly.

23             THE COURT:  All right.

24             MR. HAVEL:  Obviously, whenever you're

25   doing a question and answer session things roam a bit

1    and people supplement, not intentionally.  But we

2    would be comfortable submitting the written

3    declaration and on cross, if they have a little bit

4    more scope, we could be lenient on that.  But the

5    purpose would be to expedite this.

6         And even though it came in last night, it

7    isn't that long.  It's, you know, 11 paragraphs but

8    we basically have three pages and none of the subject

9    matter is very controversial in there.

10        THE COURT:  All right.  Well, I think it's

11   going to be quicker, Mr. Wilson, if I just take a

12   recess and you read through it and then you can start

13   conducting your cross-examination.

14        MR. WILSON:  Well, you don't even have to

15   take a recess if you don't want to, your Honor.  I'll

16   read it while we're all here in the courtroom.  I

17   have very quickly perused it.

18        THE COURT:  I mean, it seems to me that on

19   cross-examination all the relevant information is

20   going to be brought out that you might have

21   objections to.  So I will receive the declaration of

22   Mr. Duncan (sic) as a proffer of his testimony and we

23   can have cross-examination.

24        MR. HAVEL:  Your Honor, I assume that that

25   will allow us to admit -- I think it was identified

1    as tab number 6 of our exhibit package as the next

2    exhibit in order?

3                    THE COURT:  Yes.  Exhibit 6 is received.

4                    (Exhibit-6 received.)

5                    MR. HAVEL:  Thank you, your Honor.

6                    THE COURT:  Mr. Robertson, would you come

7    forward?

8                    THE BAILIFF:  Please step forward and

9    raise your right hand.

10

11                    **DUNCAN ROBERTSON**,

12                    called as a witness, being duly sworn, was

13   examined and testified as follows:

14                    THE BAILIFF:  Please take the witness

15   stand, state and spell your name.

16                    MR. ROBERTSON:  Duncan Robertson,

17   R-O-B-E-R-T-S-O-N.

18                    THE COURT:  Mr. Wilson?

19                    MR. WILSON:  I'm finding myself wishing

20   that I had opted for the recess, and it simply is

21   mostly because of the attachments that are there.  Do

22   we still have the option of a recess, your Honor?

23                    THE COURT:  You do.

24                    MR. WILSON:  I was watching the clock and

25   I was understanding that the Court in 14 minutes is

1   going to go do something else, and I'm not sure how

2   to play that.  If I take a -- if I take ten minutes

3   to look at it and formulate some cross-examination,

4   we're going to have about five minutes left for

5   that -- for that to go.  So...

6                THE COURT:  All right.

7                MR. WILSON:  I'm not -- I'm not sure how

8   to --

9                THE COURT:  All right.  Is there anything

10  else we could address in 10 or 15 minutes,

11  Mr. Blumenthal or Mr. Cannon?

12               MR. BLUMENTHAL:  Well, I could use 15

13  minutes to proffer Mr. Shoaf's testimony in 15

14  minutes if you would accept his proffer.

15               MR. WILSON:  You know, have we got -- let

16  me -- there is -- there was another witness from one

17  of the creditors that was going to come up for a

18  minute or two, or is that off the table now?

19               THE COURT:  No.  Okay.

20               MR. BLUMENTHAL:  Let me ask the -- I'm

21  sorry.

22               THE COURT:  Maybe what I'll do is I'll

23  take a recess.  We can have some discussion with

24  Mr. Havel and Mr. Jenkins.  Mr. Wilson can formulate

25  his cross-examination.  I mean, basically, the

1    purpose of Mr. Robertson's testimony, as I understand

2    it, is to establish the amount of the debt due to

3    WestLB.  And so --

4                    MR. WILSON:  And I may not have any cross,

5    your Honor.  I -- I hope nobody gets mad at me if I

6    don't after all this -- all this wrangling here.

7                    THE COURT:  Oh, I -- they may --

8                    MR. WILSON:  It's just inherent in the

9    nature --

10                   THE COURT:  You know, they might not get

11   mad, but --

12                   MR. WILSON:  Well, they'll say bad things.

13                   THE COURT:  The Court will take a recess

14   until 1:15.

15                   MR. WILSON:  Thank you.

16                   THE COURT:  Oh, let me -- before I recess,

17   is there going to be -- there's going to be

18   Mr. Shoaf's proffer.  Perhaps we could discuss that

19   during the break to see whether there will be an

20   acceptance of the proffer or a requirement for direct

21   examination.

22                   Court is in recess.

23                   THE BAILIFF:  All rise.

24                   (Recess taken from 11:33 a.m. until

25                        1:19 p.m.)

1              THE BAILIFF:  All rise.  Court resumes in

2     session.  Please be seated.

3              THE COURT:  When we took a recess we were

4     on Mr. Robertson's declaration.  The Court had

5     accepted that into evidence as Exhibit Number 6.

6              Is there any desire to cross-examine,

7     Mr. Wilson?

8              MR. BOLEY:  Your Honor, may I deal with

9     one housekeeping issue?  Matthew Boley appearing on

10    behalf of Park City I, LLC, now joined by George B.

11    Hofmann.  And Mr. Hofmann will be handling the

12    proceedings for the rest of the afternoon.  I would

13    ask to leave, to be excused.

14             THE COURT:  All right.  You may be

15    excused, Mr. Boley.

16             Mr. Robertson?

17             THE CLERK:  Please step forward and raise

18    your right hand.

19

20             **DUNCAN ROBERTSON**,

21             called as a witness, being duly sworn, was

22    examined and testified as follows:

23             THE CLERK:  Please take the witness stand,

24    state and spell your name.

25             MR. ROBERTSON:  Duncan Robertson,

1    R-O-B-E-R-T-S-O-N.

2           MR. WILSON:  May I have one moment, your

3    Honor?

4

5                    CROSS-EXAMINATION

6    BY MR. WILSON:

7         Q.     Hi, Mr. Robertson.  I see from your

8    declaration that you are an executive director of

9    WestLB, AG.  What is an executive director?

10        A.     It is a senior title within WestLB.

11        Q.     And is it actually WestLB, comma, AG that

12   you are employed by?

13        A.     Yes.

14        Q.     So it's the -- it is the German bank

15   headquartered, I presume, in Germany, correct?

16        A.     Correct.  I'm actually employed by the New

17   York branch.

18        Q.     All right.  Is the New York branch a

19   separate entity from the German entity?

20        A.     It is.  It is a branch of the bank, so it

21   is not a separately --

22               THE BAILIFF:  Mr. Robertson, can you pull

23   the microphone a little closer to you?  Thank you.

24        Q.     (By Mr. Wilson)  And what is the New York

25   branch structure of WestLB?  Can you give that to us

1    generally?  I'm interested to know what the

2    management structure is in the New York branch and

3    then how you fit into it.  Is that a question that

4    you can understand?

5          A.     Yes.

6          Q.     Would you --

7          A.     I may -- I may ask for clarification, but

8    we have a branch manager.

9          Q.     Thank you.  And then beyond that?

10         A.     And then there are various executives,

11   which -- some of which report to the branch manager,

12   others which report directly to Germany.

13         Q.     Thank you.  And where in that structure do

14   you as an executive director fit?

15         A.     I report to the risk manager, who reports

16   to Germany -- to executives in Germany.

17         Q.     Thank you.  And have you been involved in

18   this Easy Street Partners loan for -- since inception

19   of the loan?

20         A.     No.

21         Q.     When did you become involved?

22         A.     In late 2008.

23         Q.     And what was the situation with the loan

24   when you became involved in late 2008?

25         A.     If I may rephrase, or if I may come

1    back --

2          Q.     You have permission.  As the Court and

3    everybody in here knows, if I don't ask a good

4    question, I'm always happy to get a good answer.

5               THE COURT:  The question was vague.  You

6    can rephrase it.

7               THE WITNESS:  The portfolio I took over in

8    December of 2008.  The account itself I became more

9    familiar with in late 2009.

10         Q.     (By Mr. Wilson)  So as executive director,

11   do you have responsibility for a portfolio of loans?

12         A.     Yes.

13         Q.     And I'm assuming that from your

14   conversation and -- that this was one of the loans in

15   your portfolio.

16         A.     Correct.

17         Q.     All right.  And when did this loan with

18   WestLB go into default, to the best of your

19   knowledge?

20         A.     I believe it was late 2009.

21         Q.     And what kind of a default was it that

22   occurred in late 2009?

23         A.     There was a missed interest payment.

24         Q.     Thank you.  And is this loan generally

25   secured by a trust deed on the physical real estate?

1        A.    We have a mortgage on the property.

2        Q.    Thank you.  And was that mortgage ever

3    placed into judicial or nonjudicial foreclosure

4    status?

5              MR. HAVEL:  Your Honor, unless there's a

6    foundation that this is -- unless this is a

7    foundation for something in the declaration, it seems

8    to go far field.

9              We have identified the exhibit that we

10   filed at the beginning of this case, which was an

11   extensive declaration with all of our loan documents

12   and the history that was filed by Mr. Winicker (ph),

13   a different party, and we filed a proof of claim

14   that's of record.  And so I'm wondering if this is

15   leading to a foundation for a question that relates

16   to this document or if we're just fishing around for

17   a while.

18             MR. WILSON:  Your Honor, it's probably

19   beyond the scope of direct, and I'm happy to recall

20   this gentleman at a later time on things.  And I'll

21   move into a few questions that are just very pointed,

22   directing -- directed to the declaration, if that's

23   the wish of the parties.

24             MR. HAVEL:  That would be preferable.

25   Yes, please.

1           THE COURT:  Let's do that.

2           MR. WILSON:  Okay.  Can do.

3      Q.    (By Mr. Wilson)  Would you -- do you have

4  your declaration before you?

5      A.    Yes.

6      Q.    Good.  Would you look at paragraph seven

7  and read with me the first sentence:  "The plan

8  proposed by Partners and WestLB substantially adopts

9  the plan previously proposed by Partners alone."

10          Is that your testimony?

11     A.    Yes.

12     Q.    Okay.  How did the -- the previous plan

13  proposed by Partners alone treat the claims of

14  Management and Development?  Do you know what I mean

15  by those two terms, Management and Development, the

16  two entities?

17     A.    Yes.

18     Q.    The question is, how did the previously --

19  the plan previously proposed by Partners treat the

20  approximate 1.6 million dollar claims of Management

21  and Development?

22     A.    I would have --

23          MR. HAVEL:  I object, your Honor.  What is

24  in the plan is self-evident and his recollection at

25  this point is irrelevant.

1          MR. WILSON:  I think a witness who makes a

2    declaration under penalty of perjury ought to know

3    what he's talking about, and it would be useful to

4    know what he thinks he is testifying to.

5          MR. HAVEL:  Your Honor, I'm sure he can

6    discuss the similarities and differences, but to

7    identify specific line items or specific sections

8    seems to me a little bit problematic.  That's our

9    objection.

10          MR. WILSON:  One side makes 1.6 million

11    dollars, which is a very simple difference

12    probably --

13          THE COURT:  Well, I think the question

14    wasn't a line-item question.  It was how the

15    treatment of Management and Development -- and you

16    understand what Mr. Wilson meant by Management and

17    Development, how it differs under the two plans, so

18    he may answer that question.

19          THE WITNESS:  I would need to have the

20    plan in front of me in order to refresh my memory on

21    that.

22          Q.    (By Mr. Wilson)  Okay.  So the answer is

23    you don't really know as you sit there on the witness

24    stand today what the differences are; is that

25    correct?

1          A.      Correct.

2          Q.      Thank you.  And so when you say, "The plan

3     proposed by Partners and WestLB substantially adopts

4     the plan previously proposed by Partners alone," you

5     don't know whether it's really substantially or not

6     substantially similar?

7          A.      I know that they are substantially similar

8     in that --

9          Q.      But you don't know exactly how they are

10    treated, specifically those two claims?

11         A.      Not on a line-item basis without the

12    document in front of me.

13         Q.      Thank you.

14         MR. WILSON:  Okay.  I have no further

15    questions, but subject to recall, please, so that I

16    may explore some other issues.  Thank you.

17         MR. HAVEL:  Your Honor, the recall issue

18    is related only to the fact that Mr. Robertson has a

19    flight out at five tonight to New York.  So I'm not

20    sure where he fits in with Mr. Shoaf's presentation,

21    but I would hope we could accommodate that travel

22    schedule.

23         MR. WILSON:  I hope we all can.

24         THE COURT:  Well, let's see how the

25    hearing goes and I'll keep that in mind, Mr. Havel.

1          MR. HAVEL:  Thank you, your Honor.

2          THE COURT:  Thank you.

3          MR. HOFMANN:  Your Honor, we would also

4     intend to recall Mr. Robertson, but in the interest

5     of accommodating the witness, I'd be happy to address

6     all my questions now if that's the preference of the

7     parties.  Otherwise, I would ask that the Court

8     direct the witness to be available for recall in

9     later stages of the proceeding.

10          THE COURT:  Well, I'll direct that he be

11     available today as long as we're in court.

12          MR. HOFMANN:  Okay.  Thank you, your

13     Honor.

14

15               CROSS-EXAMINATION

16     BY MR. HOFMANN:

17          Q.    Mr. Robertson, I'd like to direct you to

18     your declaration.  It is -- I believe it's under tab

19     six in the binder you have in front of you.

20          A.    I have it.

21          Q.    You have it there?

22          A.    Yes.

23          Q.    I'd like you to -- I'd like to ask you a

24     question concerning paragraph five of your

25     declaration, particularly the last sentence.

1           "WestLB's obligation to fund under the

2    plan is subject to approval of WestLB management in

3    Germany," true statement?

4           A.    For paragraph five, yes.

5           Q.    For any other purpose?

6           A.    I think you will see in paragraph six

7    the -- since the -- the filing of the plan

8    supplement, WestLB has received comments on the term

9    sheet from WestLB and debtor.  Attached hereto as

10   Exhibit 2 is the revised term sheet, which supersedes

11   in its entirety the term sheet.  Attached hereto as

12   Exhibit 3 is the redline comparison.  The revised

13   term sheet and note are no longer conditioned upon

14   approval of WestLB.

15          Q.    I see.  So if I turn to Exhibit 2, to your

16   declaration, that is the current term sheet on the

17   table, true?

18          A.    Yes.

19          Q.    So if I look at the first -- there's kind

20   of an area on the first page of Exhibit 2; it's a

21   block in bold print.  Do you see where I'm referring

22   at the top of the page?

23          A.    Yes.

24          Q.    And it indicates that it's a proposal to

25   provide exit financing.  Has the proposal been

1   approved by WestLB senior management?  Is that what

2   I'm hearing you say?

3        A.    Yes.

4        Q.    So it's not contingent on any approval?

5        A.    From Germany, correct.

6        Q.    Is it contingent on any approval from the

7   New York office?

8        A.    No.

9        Q.    Is it contingent upon any due diligence?

10       A.    I believe if -- further down you will see

11  there's conditions of closing.  Those are the

12  conditions which bind us.

13       Q.    So provided those conditions are

14  satisfied, WestLB is obligated to lend?

15       A.    Up to the amounts reflected in our

16  documents, yes.  And by the way, the -- yes.

17       Q.    So one of those conditions is item four,

18  dismissal of the pending committee litigation with

19  prejudice.  Do you see that item?

20       A.    Yes.

21       Q.    So WestLB's commitment to lend is

22  conditioned upon receiving a release of that

23  litigation?

24       A.    Yes.

25       Q.    If that litigation were not released,

1    would WestLB be willing to lend?

2         A.    We would consider situations as they come

3    up, as part of any normal negotiation which goes on

4    within our institution.

5         Q.    Is there any assurance that WestLB would

6    lend if that condition is not satisfied?

7         A.    WestLB has a substantial exposure in this

8    transaction.  We always weigh the pros and cons of

9    the decisions that we make.  We would have to cross

10   that bridge when we came to it.

11        Q.    So WestLB would consider funding even if

12   that release were not provided?

13        A.    At this point in time, that -- I do not

14   have an approval to do that.  I would not provide

15   that.

16        Q.    You can't assure the Court that you would

17   fund if that release is not provided?

18        A.    I do not have authorization to do this,

19   no.

20        Q.    Going to the first page of Exhibit 2, to

21   your declaration, there's a description of the

22   facility and it's broken into two parts:  A 6.2

23   million dollar senior loan piece and a second 10

24   million dollar junior loan piece.  Do you see that?

25        A.    Yes.

1          Q.     Why is the loan broken into two parts?

2          A.     It was the intention to provide the

3    greatest opportunity for this project to emerge from

4    the bankruptcy.

5                 The intention here was to have a current

6    pay and a pick portion which would allow sufficient

7    cash to meet the company's obligations as they become

8    due and payable, part of which is the payments to the

9    unsecured holders, which we are proposing here to

10   make sure they get paid.

11         Q.     So the second piece is riskier.  Is that

12   fair to say?

13         A.     Yes.

14         Q.     And it is priced accordingly; would you

15   agree with that?  There's a higher interest rate?

16         A.     It bears a higher interest rate.

17         Q.     But the payments are less certain to be

18   made?

19         A.     It is further down in the capital

20   structure.

21         Q.     Has there been any analysis done by WestLB

22   as to the likelihood of that second piece getting

23   paid?

24         A.     Yes.

25         Q.     Has that been provided to the Court

1    through your declaration or otherwise that you're

2    aware of?

3          A.    WestLB always provides -- undertakes its

4    own assessments and analysis, as we do in any

5    transaction.

6          Q.    But that hasn't been provided to the Court

7    or other parties to your knowledge?

8          A.    Correct.

9          Q.    Okay.  Under paragraph eight of your

10   declaration, there's -- you reference a contribution

11   of 2.9 million dollars on the effective date and up

12   to 1.5 million dollars in capital -- working capital

13   as needed after that, true?

14         A.    Yes.

15         Q.    Where did those figures come from?

16         A.    These figures have been in line and

17   consistent with what a number of other plan funders

18   have put forward and are in line with the obligations

19   to get this company a plan put forward.

20         Q.    But you are aware, I take it, that other

21   plan funders had proposed to fund greater

22   contributions than WestLB is proposing now?

23              MR. BLUMENTHAL:  Objection, your Honor.

24   That is an incorrect fact, for the record.  No one

25   had proposed that.  The only funding agreements filed

```
 1    with the Court were for amounts lower than that.

 2             MR. HOFMANN:  Your Honor, I think the

 3    witness can answer the question and counsel can

 4    address it in argument.

 5             THE COURT:  Well --

 6             MR. HAVEL:  I'm sorry, was the -- the

 7    question is whether he knew of any that were more

 8    lucrative than this?

 9             MR. HOFMANN:  Well, let me -- let me

10    withdraw the question and rephrase it.

11             MR. HAVEL:  That would be great.  Thank

12    you.

13        Q.    (By Mr. Hofmann)  You're aware of other

14    plan funding proposals that have been made in

15    connection with this bankruptcy case, correct?

16        A.    Yes.

17        Q.    And are you aware of the amounts of the

18    other plan funding proposals in terms of working

19    capital that would be provided to the debtor?

20        A.    Yes.  Exact amounts, no.  Approximate

21    amounts.

22        Q.    And some of those amounts are greater than

23    what WestLB has proposed here, aren't they?

24        A.    I don't recall the specifics.

25        Q.    Mr. Robertson, I'd like to direct you to
```

1    paragraph ten of your declaration; if you would focus

2    on that paragraph.  You reference there that, "This

3    loan has been allocated to a portfolio containing

4    distressed and other assets that are non-core to

5    WestLB's business."  Do you see that sentence I'm

6    referring to?

7              A.    Yes.

8              Q.    Is that a result of a decision that was

9    made in Germany?

10             A.    Yes.

11             Q.    Does this relate to what's commonly

12   referred to as a "bad bank" formed in Germany?

13             A.    Yes.

14             Q.    And the bad bank took certain of WestLB's

15   loans and put it into that portfolio?

16             A.    Yes.

17             Q.    And this loan is among the loans that's

18   been allocated to that bad bank portfolio?

19             A.    Yes.

20             Q.    And you mentioned in the second sentence

21   of this paragraph ten, "Only limited capital is

22   available to deal with all the assets allocated to

23   that portfolio."

24                   Where does that limited capital come from?

25   Is it WestLB or some other source?

1          A.     That has come from another source.

2          Q.     Do you know that other source?

3          A.     Generally, yes.

4          Q.     And what is it?

5          A.     It is -- it is obligations of its owners.

6          Q.     The owners of the bad bank or the owners

7    of WestLB?  I'm just trying to understand.

8          A.     The owners of WestLB.

9          Q.     So the owners of WestLB created the bad

10   bank?

11         A.     Correct.

12         Q.     And they put certain loans within the

13   purview of the bad bank?

14         A.     It should be noted that -- you keep

15   referring to it as a bad bank.  I would like to

16   clarify that this is a portfolio of assets which are

17   non-core to WestLB's business going forward.  That

18   does not necessarily mean that these are bad assets.

19         Q.     So what's the distinction between a core

20   and a non-core asset?

21         A.     Business lines which WestLB has determined

22   to pursue going forward.

23         Q.     So WestLB has determined not to purs --

24   not to pursue this business line going forward?

25         A.     Correct.

```
 1        Q.    When was the bad bank formed?

 2        A.    It was effective on January 1 of this

 3   year.

 4        Q.    When was it determined that this loan --

 5             THE COURT:  Excuse me, Mr. Hofmann.

 6             MR. HOFMANN:  Yes, your Honor.

 7             THE COURT:  Maybe everybody else here

 8   knows and I'm the only one, and I -- you keep

 9   referring to a bad bank.  I'm not sure I understand

10   the term or the meaning "bad bank."

11             Mr. Robertson, you seem to agree with

12   Mr. Hofmann when he said bad bank.

13             THE WITNESS:  Well, I will only say that

14   because the German name, I cannot pronounce.  It is

15   very long and literally translated, it means first

16   bad bank.

17             THE COURT:  Okay.  So that is the name of

18   the --

19             THE WITNESS:  So --

20             THE COURT:  -- bank where these assets --

21             THE WITNESS:  On a very literal

22   translation, it is, yes.

23             THE COURT:  Okay.

24        Q.    (By Mr. Hofmann)  Maybe you could -- for

25   the Court's benefit, what's the concept of a bad
```

1    bank?  Do you know understand what the concept of a

2    bad bank is?

3         A.    I mean, everybody's got -- I mean, I've

4    got my own interpretation, but that's --

5         Q.    And what's your interpretation?

6         A.    Typically these are assets which are --

7    are not core or potentially assets which are

8    impaired.

9         Q.    And is it your testimony this is in the

10   non-core group, not the impaired group; is that

11   correct?

12        A.    By virtue of them entering into

13   bankruptcy, I would consider them to be an impaired

14   asset.

15        Q.    But it -- so it's both impaired and

16   non-core.  Is that fair to say?

17        A.    That is correct.

18        Q.    And was the loan classified as a non-core

19   asset before it was classified as an impaired asset?

20        A.    I don't recall the exact dates as to when

21   one might have crossed the other.

22             MR. HAVEL:  Your Honor, may I object and

23   question the relevancy of -- the declaration does not

24   identify any of WestLB's decisions based on

25   characterizations of holdings or characterizations of

1   the questions we're going into now.  There are issues

2   that could come up, but I'm not sure where this is

3   going.

4            MR. HOFMANN:  It certainly refers to the

5   non-core -- I mean, WestLB filed this affidavit, your

6   Honor.  I think we're entitled to know what non-core

7   assets are and what its limitations and requirements

8   are.  This is how this debtor is proposing to exit

9   bankruptcy.

10           MR. HAVEL:  I thought that had been asked

11  and answered.  We were going much further afield, I

12  thought, your Honor.  I reassert my objection based

13  on the relevancy and the scope of the declaration.

14           THE COURT:  Well, Mr. Hofmann, I'm pretty

15  sure that we could spend a lot of time going through

16  the affidavit asking to expand every line of the

17  affidavit.  I guess the question is what -- what is

18  the relevancy of the questioning?

19           MR. HOFMANN:  The question is, is this

20  plan being proposed in good faith and is this plan

21  proponent acting in good faith.

22           MR. HAVEL:  Then I guess I reaffirm my

23  relevancy question because I have no idea how an

24  internal classification of the note is going to

25  affect the question of good faith or bad faith

1    treatment here, your Honor.

2            MR. HOFMANN:  It would be nice if we had

3    more than eight days to consider this plan, but

4    that's the amount of time we've had.  I could have

5    taken a deposition of this witness, know what I'm

6    going to hear before I hear it, but that -- we've

7    been provided eight days.

8            THE COURT:  Well, I'll allow the

9    questioning to continue for a while, but it would

10   seem that if what the -- we could get quickly to your

11   issue and how this classification relates to whether

12   the case has been filed -- or the plan has been filed

13   in good faith or not.  So you may proceed.

14           MR. HOFMANN:  Thank you.  I'll do my best

15   not to ask the same questions again.

16       Q.    (By Mr. Hofmann)  So it's your testimony

17   that the bad bank came into existence on January 1st

18   of this year, correct?

19       A.    Correct.

20       Q.    Was this loan immediately moved into the

21   bad bank's portfolio or was there a lag in time?

22       A.    The portfolio shift from WestLB to -- why

23   don't we refer to it as EAA, which is the short

24   acronym for the long German name that I still can't

25   pronounce -- was effective January 1, 2010.

1       Q.      So this loan moved into the bad bank

2    effective immediately when the bad bank was formed?

3       A.      Into EAA, yes.

4       Q.      Okay.  And EAA is the bad bank that we've

5    been referring to?

6       A.      Yes.

7       Q.      So was it moved -- on January 1st, was it

8    moved to the bad bank because it was non-core or

9    because it was impaired at that time?

10       A.      It had been decided a period before as to

11    which assets were non-core to the bank and which

12    assets were core.

13       Q.      And when was that determination made?

14       A.      I can't recall the exact date.

15       Q.      Was that determination made within the

16    year 2009?

17       A.      No.

18       Q.      Before 2009?

19       A.      Yes.

20       Q.      Was it made in 2008?

21       A.      Yes.

22       Q.      I believe you testified that you -- I

23    don't remember your exact relation to this credit,

24    but you became associated with this credit in

25    late 2008, true?

1          A.     It was in the portfolio that I took over,

2    which was at the very end of 2008.

3          Q.     Do you recall a month?

4          A.     It was probably December of 2008.

5          Q.     And was it at that same time that the loan

6    was determined to be a non-core asset?

7          A.     It was determined to be non-core prior to

8    my taking the portfolio --

9          Q.     I see.

10         A.     -- over.

11         Q.     I see.  Do you know on what basis this was

12   determined to be a non-core asset?

13         A.     It is a hospitality asset and the

14   hospitality sector was determined to be non-core to

15   the bank.

16         Q.     And do you know who made that

17   determination of what was non-core and that

18   hospitality was non-core?

19         A.     The senior executives at the bank.

20         Q.     But what effect did that have within

21   WestLB when in late 2008 it was determined to be a

22   non-core asset?

23         A.     Perhaps you can rephrase the question.

24         Q.     Well, in late 2008 before your association

25   with this portfolio and this loan, it was determined

1    that hospitality credits were non-core assets of the

2    bank?

3         A.    Correct.

4         Q.    Did the bank want to exit that line of

5    business?

6         A.    It was no longer core to the bank.  So by

7    extension, yes.

8         Q.    So the -- is it fair to say the bank would

9    do what it could to eliminate its exposure to these

10   credits, whether in the form of foreclosing its

11   interest, having some other bank take over the asset

12   and the credit, any means possible to exit exposure

13   to this non-core asset; is that fair?

14        A.    No.

15             MR. BLUMENTHAL:  Object to the form.

16             THE COURT:  The question was answered and

17   the answer was no.

18        Q.    (By Mr. Hofmann)  So then what would --

19   how would you treat a non-core loan differently than

20   any other loan within the bank?

21        A.    You wouldn't.

22        Q.    Then what's the effect of the designation

23   as a non-core loan?

24        A.    It happens to be a portfolio which

25   you're -- we're going to enter into no new assets in

```
 1    that asset class, and assets which are on the book
 2    will run off the book in due course.
 3         Q.    And there's a limited amount of capital
 4    set aside to run them off the books; is that fair to
 5    say?
 6         A.    The EAA was capitalized with a limited
 7    capital base or a specific capital base.
 8         Q.    Are all of the loans that -- within your
 9    portfolio non-core loans?
10         A.    With the exception of a few, they're all
11    non-core.
12         Q.    Explain to me how the limited
13    capitalization, as reflected in your testimony and
14    this declaration, affected the amount that WestLB was
15    willing to fund as part of this entity's emergence
16    from bankruptcy.
17         A.    These numbers were calculated on a basis
18    which we felt were appropriate and necessary for us
19    to protect our asset.
20         Q.    Taking into account the amount of capital
21    that's available to address the portfolio as a whole?
22         A.    We had to seek approval in order to move
23    forward on that.  Decisions are made on the basis of
24    adequate funding in order to be able to accommodate
25    such an approval.
```

1          MR. HOFMANN:  Your Honor, subject to

2    recalling this witness, I have no further questions.

3          THE COURT:  Any redirect?

4          MR. BLUMENTHAL:  Your Honor, I -- I would

5    request that -- I mean, he said this was going to be

6    part of his recall.  I would ask him to finish.

7          MR. HOFMANN:  I think we were asked not to

8    finish just a moment ago, your Honor.

9          MR. WILSON:  And from the Wickline

10   interest, that's the same dilemma we face is, I was

11   attempting to --

12         MR. HOFMANN:  The same thing, yeah.

13         MR. WILSON:  -- get out to some other

14   things and we were turned back.  So if we're going to

15   do him all at once we should do him all at once.

16         MR. HAVEL:  Your Honor, could I ask for a

17   moment to consult with the witness about (inaudible)?

18         THE COURT:  Yes.  Court will take a brief

19   recess and just the let the courtroom deputy know

20   when you're ready.

21         Court is in recess.

22         THE BAILIFF:  All rise.

23         (Recess taken from 1:53 until 1:57 p.m.)

24         THE BAILIFF:  All rise.  Court resumes in

25   session.  Please be seated.

1          THE COURT:  So what is the decision?  Are

2     we going to continue with the examination or --

3          MR. HAVEL:  Your Honor, we, after

4     discussing it with Mr. Robertson and his schedule,

5     would like the parties to proceed with their

6     additional questioning at this point.  We do -- I do

7     want to raise two prospective issues.  I'll let the

8     questioning start, but I think we should be sensitive

9     to them.  And they both relate to the status of Park

10    City and the line of questioning they've been

11    pursuing to date.

12          The first issue which I wish to reserve

13    for objection purposes is their standing to

14    participate in this at all.  Admitted by the schedule

15    that was put out by Mr. Wilson, they're an equity

16    holder up at the holding company's level and they

17    have purported to argue that they had some interest

18    in what was going on down here and they've suggested

19    that maybe there was a lawsuit against WestLB that

20    would get them value.  That is just not true.  The

21    fact of the matter is the plan has no basis for

22    WestLB to have suits go against them.  The debtor at

23    the cash collateral hearings released all of its

24    claims.

25          The committee litigation, which has been

1    discussed, is only a equitable subordination claim;

2    it's not an affirmative recovery lawsuit.  And the

3    committee has already filed a stipulation which says

4    if they don't oppose the plan they will agree to

5    dismiss the lawsuit.  So there is no basis in the

6    prior plans or in this plan for Park City to be

7    talking about lawsuits against WestLB for their

8    potential value.

9              With the reservation of rights on

10   relevancy and standing for those issues, I'd -- we'd

11   like the questioning to proceed.

12             THE COURT:  All right.  I'll let it

13   proceed a little further, but I'll be candid.  I

14   don't understand the -- the relevancy.  The -- I

15   understand that there's a loan that's been placed in

16   a portfolio and there's been some determination as to

17   the amount that WestLB is willing to put into the

18   plan.  Is the suggestion that there's supposed to be

19   more in the plan and therefore it's in bad faith?

20   I --

21             MR. HOFMANN:  Your Honor, that fact in

22   isolation -- and I -- may or may not be relevant,

23   what -- I think the greater relevancy is the claims

24   the estate through the committee at the present time

25   holds against WestLB.  Until nine days ago, there was

1    a plan on file which proposed to prosecute those

2    claims, which could have resulted in value to my

3    client.

4                    MR. BLUMENTHAL:  Your Honor, that's

5    just --

6                    MR. HOFMANN:  Nine days ago a different

7    plan was filed, which eliminates -- if I could -- if

8    I could just speak without interruption, please.  And

9    the relevancy goes to the -- two items:  One is the

10   good faith of this plan proponent in the proposal of

11   this plan, and the second is the proposed release of

12   these claims through the plan.  And I think the Court

13   should understand what is being released.

14                    MR. BLUMENTHAL:  If I may, your Honor.

15                    Easy Street Partners under every plan that

16   was filed and the amendments starting in the, I

17   think, third week in January, never preserved claims

18   against WestLB.  And as your Honor is aware, when the

19   cash collateral stipulation was approved at the

20   outset of this case, Easy Street Partners agreed that

21   it had no claims and waived -- and released any

22   claims against WestLB.  So the Easy Street Partners

23   estate has no claims.

24                    The lawsuit filed by the committee, as

25   Mr. Havel pointed out, was an equitable subordination

1   claim.  I don't believe it requested affirmative

2   release and that has been resolved.  The committee is

3   happy and satisfied with what they're getting.  And,

4   therefore, there is absolutely no relevancy

5   whatsoever as to Easy Street Partners releasing

6   WestLB.  That's been a fact in this case since the --

7   probably the first month of this case.  Therefore, we

8   think the whole line of questioning is just out of

9   sorts.

10          Moreover, the only evidence before your

11  Honor is that there is no equity in this debtor that

12  would float up to the equity security holders if the

13  claims were allowed in full.  And it's just off mark

14  and off center, your Honor.  I think it's just a

15  waste of everyone's time.

16          MR. HAVEL:  And, your Honor, I had made an

17  earlier reference to a stipulation with the

18  committee, and I think just for the purposes of

19  assisting counsel who may not have been aware of the

20  record, on February 9, 2010 before any plan was filed

21  by the debtor, in the committee's own adversary

22  proceeding, we stipulated with the committee to the

23  following:  "In the event that the plan is not

24  opposed by the committee and is confirmed by

25  partners, the committee shall, upon the plan becoming

1    effective, dismiss the Complaint, the adversary

2    proceeding with prejudice."

3            So we have had an absolute clear

4    understanding with the unsecured creditors and with

5    the committee since the commencement of their

6    litigation that this action was going to go away and

7    that has been a matter of public record.  And for

8    Park City I to now characterize themselves as being

9    the beneficiaries of an action that no one else has

10   even thought had any significant role in this case is

11   just misleading the Court and misstating what they

12   should know from the record.

13           MR. HOFMANN:  Then perhaps there's no need

14   for the committee's release as part of this plan.

15           THE COURT:  Well, Mr. Hofmann, how does

16   your client benefit -- how would your client benefit

17   from the litigation that the committee has brought?

18           MR. HOFMANN:  If WestLB's claim were

19   subordinated, then there's a chance of recovery for

20   those downstream, such as my client.

21           THE COURT:  Well, not subordinated to

22   unsecured creditors.  Wouldn't they have to be

23   unsubordinated to equity?

24           Mr. Jenkins, perhaps you could help us out

25   here since you filed the Complaint, right?

1          MR. JENKINS:  Your Honor, since we did

2     file the Complaint, my understanding -- and, as I

3     said, we did file it -- was that the effect of the

4     lawsuit was really a reordering of priorities.  We

5     alleged that WestLB had engaged in certain conduct

6     which we felt should result in WestLB having its

7     claims at least subordinated to unsecured creditors,

8     and that was our prayer for relief was the

9     subordination to unsecured creditors.

10          And as Mr. Havel pointed out, we did early

11    on enter into a stipulation which provided that if a

12    plan was confirmed in the case which the committee

13    had not opposed, that upon that plan becoming

14    effective the litigation would be dismissed with

15    prejudice.  And the intent, of course, was the

16    committee had filed this lawsuit and was hoping to

17    get a better treatment under any potential plan that

18    it might otherwise have gotten.  And that treatment,

19    in fact, has been arrived at through a consensual

20    process.

21          Your Honor, that was the effect of the

22    lawsuit, as the one who filed it.  Thank you.

23          MR. HOFMANN:  The only thing I would add,

24    your Honor, is that this -- this secured creditor is

25    requiring a release as a condition of lending.