1    Presumably, there's going to be some evidence offered

2    to satisfy the Copexa factors.  I don't know how a

3    release can otherwise be approved.

4              THE COURT:  Well, it's -- it's not a

5    release by --  well, first of all, this isn't a court

6    approval of a release in the same sense that the

7    court approves a debtor in possession's decision to

8    release a claim or a trustee's decision to release a

9    claim.  This is part of a proposed plan.

10             Secondly, this isn't a release by the

11   debtor, and I don't know that Copexa factors are

12   applicable to a release that the creditor's committee

13   is making.

14             MR. HOFMANN:  I think it does.  I think it

15   does.

16             MS. JARVIS:  Your Honor, we will be

17   putting on evidence as part of the confirmation

18   hearing on the Copexa standards --

19             THE COURT:  Oh, that helps.

20             MS. JARVIS:  -- applies.  You know, we

21   just haven't got to that point yet.

22             THE COURT:  All right.

23             MR. HOFMANN:  Your Honor, I think we're

24   entitled to challenge that evidence and test it.

25             MR. HAVEL:  I think that's going to come

1    from the creditor's committee chairman, not from

2    Mr. Robertson.

3              THE COURT:  Well, I hate to limit evidence

4    or exclude evidence or participation based on

5    standing but, I mean, I -- we -- we have a plan here

6    that all the creditors have voted for, and equity

7    that has questionable standing and questionable

8    benefit under any plan are the only ones opposing the

9    plan.

10             I'm going to allow the questioning, but

11   you're going to have to get to relevancy quickly.

12             MR. WILSON:  Your Honor, after all of

13   that, I believe we have determined that I was the

14   first to be turned away from broader --

15             MR. BLUMENTHAL:  Wait.  Wait.  Wait.

16   Wait.  Wait.  Your Honor, rather than do some

17   ping-pong today --

18             THE COURT:  Yeah, I think it would make --

19   yes, Mr. Blumenthal.  I think it would make more

20   sense if we just continue Mr. Hofmann's line of

21   questioning and then you can cover what he doesn't

22   cover, Mr. Wilson.

23             MR. WILSON:  I'm not offended, your Honor.

24   Thanks.

25

<u>CROSS-EXAMINATION CONTINUED</u>

<u>BY MR. HOFFMAN</u>:

Q.    (By Mr. Hofmann)  Mr. Robertson, are you familiar with the circumstances under which 5.6 million dollars was directed from certain sales proceeds to Bay North?  Are you familiar with those circumstances?

MR. HAVEL:  I object, your Honor.  That relates to a dispute which WestLB is not part of at all.

THE COURT:  Well, I think he's just asking if he's aware of that.

Q.    (By Mr. Hofmann)  Are you aware of that?

A.    I am aware of it.

Q.    And do you know who directed that payment?

A.    No.

Q.    Was it WestLB?

A.    As far as the actual direction of it, I don't know.

Q.    WestLB was involved in that transfer, wasn't it?

A.    Yes, we were involved.

Q.    Explain to me how WestLB was involved.

MR. HAVEL:  I object, your Honor.  This witness said that he didn't get involved in the

1    credit until late 2008.  These are questions about a

2    transaction in February of 2008.

3              MR. HOFMANN:  The witness clearly knows

4    that WestLB was involved.

5              MR. HAVEL:  The next question asked a lot

6    more than whether he knew about it.

7              THE COURT:  Okay.  He's testified that he

8    was aware that WestLB was involved.

9         Q.   (By Mr. Hofmann)  Do you know how WestLB

10   was involved?

11        A.   No.

12        Q.   How do you know that WestLB was involved?

13        A.   I know that this transaction took place.

14   I do not know the particulars of exactly who made

15   what decisions when or where.

16        Q.   You weren't involved in those decisions?

17        A.   That is correct.

18        Q.   How do you know that WestLB was involved

19   then?

20             MR. HAVEL:  Asked and answered, your

21   Honor.  Objection.

22             THE COURT:  Sustained.

23        Q.   (By Mr. Hofmann)  Were you told that

24   WestLB was involved?

25             MR. HAVEL:  Object.  Asked and answered.

1          THE COURT:  Mr. Hofmann, he's testified he

2     knows that WestLB was involved, but he doesn't know

3     any of the details of the involvement.

4          MR. HOFMANN:  Well, certainly there must

5     be some source of information, unless it's divined,

6     that would allow him to know how it was involved.  I

7     think I'm entitled to know that.

8          MR. BLUMENTHAL:  Your Honor, the other --

9     the other issue is, this case has been pending for

10    quite some time.  This is not the time and place for

11    a deposition to go fishing around for facts that have

12    absolutely no relevancy to this hearing.

13          The -- this particular equity security

14    holder who has doubtful hearing -- standing in this

15    particular hearing in this particular case had more

16    than enough time if they wanted to do any kind of

17    fishing expedition or depositions for the last nine

18    months.

19          MR. HOFMANN:  The plan was proposed eight

20    days ago.

21          MR. BLUMENTHAL:  And it hasn't changed

22    anything whatsoever as to equity.

23          MR. HOFMANN:  Then there should be no

24    reason we need a release.

25          THE COURT:  All right.  We don't need to

1    argue, counsel.

2              MR. HOFMANN:  Understood.

3              THE COURT:  I'll let the witness answer

4    the last question.

5              Mr. Robertson, the question was:  How do

6    you know WestLB was involved?

7              THE WITNESS:  I have inherited the

8    portfolio which comes with a history which indicates

9    that this is something that transpired.

10        Q.    (By Mr. Hofmann)  And what did that

11   history indicate transpired?

12        A.    It indicated that there was a payment

13   of -- I don't recall the specific amount.  Well,

14   first of all --

15             THE COURT:  Excuse me, Mr. Robertson.

16             Now I'm wondering what the relevancy is,

17   Mr. Hofmann.  I mean, Mr. Blumenthal has correctly

18   stated that early on in the case, the debtors' claims

19   against WestLB were released.  And at that time it

20   was made clear that that was only a release by the

21   debtor, not by other parties, but it was a release by

22   the debtor.

23             And is your line of questioning going to

24   potential claims that the debtor may have against

25   WestLB?

1          MR. HOFMANN:  It's claims the estate has

2     through the committee against WestLB.

3          MR. HAVEL:  Your Honor, the committee had

4     a deadline to file their Complaint.  The only

5     Complaint they filed was for equitable subordination.

6     There's never been a committee assertion of any of

7     these claims.  They were, in effect, abandoned when

8     the committee chose to pursue only equitable

9     subordination.

10          MR. HOFMANN:  There's been an equitable

11    subordination lawsuit filed.  The proponents have

12    proposed to compromise that litigation.  I think I'm

13    entitled to explore the nature of those claims that

14    they wish to release through this plan.

15          MR. HAVEL:  Your Honor, there -- there

16    either is a misunderstanding or mischaracterization

17    of equitable subordination.  An equitable

18    subordination case, even if successful, would not

19    generate any value for the equity holders.  It would

20    merely flip the priority, permit the unsecured

21    creditors to get paid ahead of WestLB, but WestLB

22    would get every cent of its claim paid before any

23    money flows upstream to the Mezzanine lender, let

24    alone all the way to Park City.

25          So, again, I see no economic interest and

1    no relevancy for this examination.

2              THE COURT:  I don't see the relevancy,

3    Mr. Hofmann.

4              MR. HOFMANN:  So -- so I understand the

5    Court's ruling, are you refusing to allow me to ask

6    questions that are related to the estate's lawsuit

7    against WestLB?

8              THE COURT:  The estate's lawsuit against

9    WestLB?

10             MR. HOFMANN:  The committee has filed a

11   lawsuit against WestLB.

12             THE COURT:  But that's not the estate's

13   lawsuit.

14             MR. HOFMANN:  The committee has filed a

15   lawsuit against WestLB.  And if the Court is -- is

16   directing me, you can't ask those questions, of

17   course, I'll abide.

18             THE COURT:  Well, it would probably make

19   more sense to have these questions asked in the

20   context of the Copexa factors and after the

21   committee's made its testimony.

22             MR. HOFMANN:  I'm happy to wait.

23             THE COURT:  So we're trying to --

24             MR. HAVEL:  Your Honor, Mr. Robertson

25   isn't here for any settlement testimony and he won't

1    be available after this session.

2          THE COURT:  Well, looking down the road, I

3    think it's going to be in everyone's best interest if

4    we let the testimony in, but will you please make it

5    quick, Mr. Hofmann?

6          MR. HOFMANN:  I'll do what I can, your

7    Honor.  Again, this has been proposed on eight days'

8    notice.

9          THE COURT:  I've heard that.  I've heard

10   that.  But I also don't believe that it has affected

11   equity, and that's going to be -- I'm going to have

12   to see more than what I've seen so far to show that

13   equity at the level that your client is at is

14   affected by this plan.

15         MR. HOFMANN:  Okay.

16   Q.     (By Mr. Hofmann)  Mr. Robertson, you

17   testified concerning the money that was received by

18   Bay North.  It was about 5.6 million dollars, true?

19   A.     Correct.

20   Q.     Is there an inter-creditor agreement

21   between WestLB and Bay North?

22   A.     Yes.

23   Q.     Did the inter-creditor agreement require

24   that payment to be made?

25   A.     I don't recall the specifics.

1     Q.    At the time the payment was made, did

2     WestLB maintain a lockbox related to this loan to the

3     debtor?

4         A.    I don't recall.

5         Q.    Before the bankruptcy filing, did WestLB

6     have a lockbox account related to this loan?

7         A.    Yes.

8         Q.    What's the purpose of that lockbox

9     account?

10        A.    To control the flow of funds.

11        Q.    You testified under questioning by

12    Mr. Wilson that this loan went into default in

13    late 2009, true?

14        A.    Correct.

15        Q.    What was the basis of the default?

16        MR. HAVEL:  Your Honor, sometimes

17    witnesses just make clearly obvious errors.

18        THE COURT:  I agree.

19        MR. HAVEL:  This debtor filed in September

20    of '09.  I don't know if that would influence the --

21    I mean, the record is clear, it was in default much

22    before the fall of '09 and I think Mr. Robertson just

23    got his years mixed up.

24        Q.    (By Mr. Hofmann)  Is that your testimony?

25        A.    Excuse me?

1      Q.    What is your testimony?  When did this

2  loan go into default the first time?

3      A.    September 2008.

4      Q.    And what was the basis that a default was

5  first declared on this loan?

6      A.    It was an interest payment default.

7      Q.    Do you know how much money was in WestLB's

8  lockbox at the time it declared that interest

9  default?

10          MR. HAVEL:  Your Honor, I'm not sure I

11  understand the relevancy of loan history for either

12  settlement purposes or good faith purposes.  This is

13  ancient history about a loan that had multiple

14  defaults.

15          MR. HOFMANN:  Your Honor, it would be a

16  lot faster if there weren't constant interruptions

17  and objections, recognizing counsel's right to do

18  that.  This bank forced this debtor into bankruptcy

19  and has now bought a release for very little to get

20  out of it.

21          MR. BLUMENTHAL:  Your Honor, again,

22  counsel's history is -- his belief of history is not

23  correct throughout this case.  We filed because there

24  was a UCC sale scheduled by Bay North.  I don't

25  believe WestLB had taken any judicial or nonjudicial

1    action against the debtor.

2              MR. HAVEL:  That's correct, your Honor.

3              MR. HOFMANN:  Well, perhaps counsel wishes

4    to testify.

5              THE COURT:  Well, it's history in the

6    case, Mr. Hofmann.  The bankruptcy was precipitated

7    because of the pending sale by Bay North, and the

8    characterization that WestLB forced the debtor into

9    bankruptcy, I mean, that is a characterization,

10   but --

11             MR. HOFMANN:  Admittedly.

12             THE COURT:  I'm going to allow just a

13   little -- a few more questions, Mr. Hofmann.

14             THE BAILIFF:  Mr. Robertson, we're having

15   a hard time hearing you, so you need to speak up and

16   see if you can pull that as close as you can to you.

17             THE WITNESS:  We'll -- we'll try and do

18   better here.

19             THE CLERK:  Thank you.

20        Q.   (By Mr. Hofmann)  So I believe my last

21   question was how much money was in the lockbox at the

22   time that WestLB declared the default.

23        A.   I do not know.

24        Q.   How much money was in the lockbox at the

25   time you took over this credit?

1       A.      I don't recall.

2       Q.      Was it about three million dollars?

3       A.      Not in the lockbox, to my recollection.

4       Q.      Was it over two million dollars in the

5   lockbox?

6       A.      I believe the number was closer to three

7   million dollars, but I don't believe it was in a

8   lockbox.

9       Q.      Okay.  And had the money been used in that

10  account before WestLB declared a default to pay the

11  interest payments to WestLB?

12      A.      I don't recall the specific applications

13  of funds and when they came and out of which accounts

14  they were paid.

15      Q.      You don't know that the money was used to

16  pay the interest from that account before?

17              MR. HAVEL:  Asked and answered, Judge.

18              THE COURT:  Sustained.

19      Q.      (By Mr. Hofmann)  Do you know why it is

20  that Bay North declared a default on this -- on the

21  debtor?

22              MR. HAVEL:  Objection.  Speculative.

23              MR. HOFMANN:  I asked if he knew.

24              THE WITNESS:  No, I don't know the

25  specifics.

1        Q.    (By Mr. Hofmann)  You don't know about a

2   cross-default provision?

3        A.    I don't know the specifics.

4              MR. HOFMANN:  I have no further questions.

5              THE COURT:  All right.  Mr. Wilson?

6              MR. WILSON:  Thank you, your Honor.

7

8                    CROSS-EXAMINATION

9   BY MR. WILSON:

10       Q.    Mr. Robertson, we need to get you home to

11  New York and in your -- so you can sleep in your own

12  bed tonight.

13             I at one time had pursued a line of

14  questioning about the structure of WestLB through its

15  New York office, and I'll try to resume somewhat

16  where we left off.

17             But first, there is this -- this name

18  Erste -- E-R-S-T-E -- Abwicklungsanstalt (ph).

19             Is that the EAA name that you had

20  difficulty pronouncing?

21       A.    I think you've done as well as I can do.

22       Q.    Thank you.  For somebody from Southern

23  Idaho that can't even speak English, that's my best

24  effort.  Is that -- is that --

25       A.    I believe it is.

1      Q.    All right.  And it is defined in the -- in

2   the plan supplement as the sole member of the company

3   West -- or the company Heber Avenue Partners, LLC

4   proposed to be the reorganized debtor.  Do you

5   understand that to be true?

6      A.    I understand that the -- that WestLB will

7   own that still on behalf of EAA who will retain the

8   credit risk associated with this asset.

9      Q.    I -- I'm going to explore that and you'll

10  have to just forgive me a little bit.  I'm -- I need

11  to make sure I clearly understand.

12         So I'm going to just read from paragraph

13  nine of the plan supplement, which is filed herein as

14  document 575 on June 21.  Paragraph nine, it just

15  says, "The reorganized debtor."  And this -- let me

16  ask this:  Is the reorganized debtor Heber Avenue

17  Partners, LLC?  Will it be?

18     A.    Yes.  It is intended to be, yes.

19     Q.    Thank you.  Don't have one yet, but if

20  everybody gets their wishes, that will be the result

21  of today's hearing, that the new company, Heber

22  Avenue Partners, LLC, will be the reorganized debtor,

23  correct?

24     A.    Correct.

25     Q.    Now, paragraph nine says, "The reorganized

1    debtor will be managed by its sole member, EAA, a

2    successor in interest for certain assets of WestLB."

3              All right.  Do you agree with that

4    sentence?

5         A.    It will be still owned by WestLB on behalf

6    of EAA.

7         Q.    When you say "it," what do you mean, "it"?

8              What does --

9         A.    Heber -- Heber will be the -- the

10   reorganized debtor will be owned -- or will be an

11   affiliate of WestLB for the benefit of EAA.

12             MR. HAVEL:  Mr. Wilson, I'm no -- I might

13   help this out a little bit.

14             MR. WILSON:  I'm willing to be --

15             MR. HAVEL:  Thank you.

16             MR. WILSON:  -- taught.  I just -- I don't

17   want to burden this --

18             MR. HAVEL:  I'll try to --

19             MR. WILSON:  If you need to clarify,

20   I'll --

21             MR. HAVEL:  No.  The plan -- the plan

22   supplement was accurate when it was filed on

23   the 21st.  The plan term sheet, which is attached

24   to -- I'm sorry, the term sheet for financing, which

25   is attached to Mr. Robertson's new declaration,

1    reflects structural changes in the ownership.  No

2    changes in the economics, but one of the structural

3    changes is that EAA is not going to be the direct

4    owner.  It is going to be WestLB through an affiliate

5    in a relationship with the EAA.

6              So when Mr. Robertson asks you for kind of

7    an elaborate explanation, it's only because of

8    internal structuring.  And that's either for

9    political or tax reasons.  I'm not sure I understand

10   why, but it's not meant to change any of the

11   substance or the fact that Heber Avenue Partners will

12   remain the reorganized debtor.

13             MR. WILSON:  Your Honor, I know it's

14   unusual to confer with counsel, but can I -- I need

15   to understand this and I'm not sure I do.

16             THE COURT:  Well, you can confer with

17   counsel if we can speed this up.

18             MR. WILSON:  I'm sorry, your Honor.  And I

19   hope --

20             THE COURT:  Well, I -- all right.  I'm --

21   I'm going to just tell you, I'm frustrated with --

22             MR. WILSON:  That makes two of us.

23             THE COURT:  Well, no.  I -- I don't want

24   any red herrings.  I don't -- I want to get to the

25   real substance of objections.  And if we can't keep

1    focused on that, then I'm going to address the

2    standing issue and I'm going to come back next week

3    and I'm going to have counsel argue it.  And that's

4    what we're going to do unless we can get moving

5    through this quickly.  So please consult with

6    Mr. Havel.

7               MR. WILSON:  I need to make sure I

8    understand what he --

9               Your Honor, could you give us a minute?

10   We're -- this -- this is going to inure for the

11   benefit of the Court.

12              THE COURT:  All right.  Court will take a

13   brief recess.

14              THE BAILIFF:  All rise.

15              (Recess taken from 2:28 until 2:33 p.m.)

16              THE BAILIFF:  All rise.  Court resumes in

17   session.  Please be seated.

18        Q.    (By Mr. Wilson)  Mr. Robertson?

19        A.    Yes.

20        Q.    Have I got the name correct?  Sorry.

21   Thank you for spending a few moments with me during

22   the break.

23              Is it true that EAA is a separately formed

24   and separately existing corporation from WestLB?

25        A.    Yes.

1      Q.    It's a German corporation; is that

2    correct?

3      A.    I don't know its exact legal standing.

4      Q.    It doesn't matter.  Thank you.  And it is

5    a separately capitalized, separately owned, legal

6    entity; is that correct?

7      A.    Yes.

8      Q.    All right.  And is it true that the loan

9    originally made by WestLB to the debtor is now owned

10   by EAA?

11     A.    Correct.

12     Q.    And that EAA being separately capitalized

13   and separately owned, that WestLB's only involvement

14   with this is in a capacity of a servicer of this

15   loan?

16     A.    There is a servicing agreement, yes.

17     Q.    All right.  Is there another capacity

18   besides servicing?

19     A.    I don't know if there's any other

20   arrangements --

21     Q.    All right.

22     A.    -- but that's the primary arrangement.

23     Q.    All right.  And -- and WestLB's stake in

24   this loan is as a servicer and that it has no upside

25   nor downside for this loan other than what it derived

1    from the servicing agreement; is that correct?

2          A.    Correct.

3          Q.    Are you employed by EAA?

4          A.    No.

5          Q.    Are you employed by WestLB?

6          A.    Yes.

7          Q.    And you have this position, executive

8    director --

9          A.    Correct.

10         Q.    -- have I got that correct?

11               And so you're not here as a

12   representative -- direct representative or an

13   employee of the owner of the loan; is that correct,

14   but rather -- excuse me -- but rather as a

15   representative of the servicer?

16         A.    Who is acting on behalf of EAA through the

17   servicing agreement.

18         Q.    Okay.  But is the answer to my question

19   then, yes, that you're here in your capacity for the

20   servicer of the loan, not the owner of the loan?

21         A.    I'm not sure I distinguished between those

22   two.

23         Q.    Okay.  That will be sufficient.  But your

24   paycheck comes from WestLB, not from EAA?

25         A.    Correct.

EASY STREET HOLDING, LLC * JUNE 25, 2010          121

1     Q.     Thank you.  Is there anybody in WestLB

2  more senior to you that has direct responsibility for

3  this -- what I'm going to call the WestLB loan?

4     A.     Can you rephrase?

5     Q.     Well, I don't know if I can.  What I'm

6  really trying to find out is -- well, I'll approach

7  it this way:  Do you have direct responsibility for

8  the WestLB loan?

9     A.     Again, I'm not exactly sure what --

10     Q.     Okay.  You're the executive director --

11          THE BAILIFF:  Mr. Robertson, we can --

12  we're recording and so we can't hear you.

13          THE WITNESS:  Sorry.  There we go.

14          THE BAILIFF:  Okay.  Thank you.

15     Q.     (By Mr. Wilson)  I'm just really -- I'm

16  really trying to find out what your role is with

17  regard to this credit.  And just -- I'll do the best

18  I can.

19          So you have -- you have direct

20  responsibility through your employment.  The scope of

21  your duties, does it give you direct responsibilities

22  for this loan?

23     A.     This loan is in my responsibility for my

24  capacity within WestLB.

25     Q.     Is there anybody in WestLB that is more

1  senior to you that has direct responsibility?

2      A.    Again, I guess I'm -- I'm not exactly

3  following as to what responsibility is.  I mean,

4  that's a very broad question.

5      Q.    Yeah, it really is, and I'm just not smart

6  enough to know --

7          Are you in charge of this -- this loan --

8  this WestLB loan?

9      A.    I do not make the -- or I'm not

10 responsible for final decisions on anything in this

11 portfolio.

12     Q.    Okay.  Who -- who is -- who is responsible

13 for making decisions with regard to the WestLB loan

14 claim filed in this case?

15     A.    The application was put forward and it was

16 recommended to EAA and EAA made the final decision.

17     Q.    So your -- your involvement, your personal

18 involvement, was to send a message or a proposal or

19 something over to EAA; is that correct?

20     A.    Through my team and with other colleagues,

21 yes.

22     Q.    Okay.  Where do -- where do you fit in on

23 the team?  The team leader --

24     A.    I'm exec -- I'm executive director within

25 the credit department.

1      Q.    How many people --

2      A.    I have -- I have one of my -- I have five

3    people on my team.  I have one person which has an

4    analytical responsibility within my team.  There are

5    other parts as well.  We have a workout group and we

6    have members on the workout group who are also

7    involved in this.  We take a team approach to

8    managing an asset.

9      Q.    Very good.  Are you the team leader?

10     A.    I would co-head --

11           THE COURT:  All right.  Mr. Wilson, what's

12    the relevancy of the questioning?

13           MR. WILSON:  The judge would probably like

14    to have me in chains and I'm frustrated, too.

15           Here -- we have a -- we have a plan

16    proposed by WestLB.  They don't own the note.

17           MR. HAVEL:  Your Honor, can I --

18           MR. WILSON:  There are some decisions --

19    excuse me -- there are some decisions that have been

20    made about the plan that -- on the table is good

21    faith.  I would just really like to find somebody who

22    is responsible for having made the decisions that

23    relate to the components of the plan.  This is the

24    gentleman who has been put forward, I hope, I assume

25    for that purpose.  And I don't see anybody else on

1    the roster who will speak on behalf of EAA or WestLB

2    on that subject.

3              And if the Court is frustrated, so am I.

4    But I -- I propose to have some questions about who

5    made the decision to -- as to the plan provisions.

6    That's where I'm going.  I can't seem to get there.

7    They're relevant.  If nothing else, we've elicited

8    that the proponent of this plan doesn't own the loan.

9    Let's start there and work our way down to a whole

10   series of other relevant issues and I can't get an

11   answer.  That's my speech.

12             MR. HAVEL:  Your Honor, the ownership of

13   the loan was never contended.  WestLB in the plan is

14   defined as the agent for parties that hold the loan.

15   And so to characterize this as something new or

16   different -- WestLB, as the agent for the loan,

17   obviously runs the loan but makes recommendations to

18   third parties.  I don't know why it's so complicated.

19             Mr. Wilson is now suggesting there's some

20   ultimate authority that he wants to talk to as

21   opposed to the agent who administers the loan and

22   obviously at some point seeks approval from senior

23   parties.  But Mr. Robertson is here as the

24   representative of WestLB, who is familiar with the

25   loan and the plan.

1       And, you know, if you want to find out if

2   recommendations were made and changed or if he

3   adopted recommendations, that's relevant.  But to

4   search up and down a corporate chart doesn't seem to

5   be where we want to go.  If he really wants to know

6   who made the decisions, we brought Mr. Robertson.

7           MR. BLUMENTHAL:  Your Honor, the other

8   point is, whatever the internal decisions were at

9   WestLB and EAA are -- are, frankly, irrelevant.  The

10  relevant issue before the Court today is whether the

11  4.5 million being contributed is sufficient funds to

12  confirm this plan.  And whether the plan as proposed

13  satisfies the elements of the code, this line of

14  questions on the -- purportedly in the guise of good

15  faith, I think, to use a phrase that your Honor had

16  used earlier, is somewhat of a red herring.

17          MR. WILSON:  May I respond briefly?

18          THE COURT:  Yes.

19          MR. WILSON:  Good faith is a crucial

20  element.  It's the core of the objection of my

21  clients.  And I'm going to say the plan's been on the

22  table for eight days and I'm going to run, but it's

23  true.  And this has not evolved in an ordinary

24  fashion with regard to many of the issues.  So

25  that's -- that's where I am.

```
 1              THE COURT:  Well, back -- back to your
 2   line of questioning.
 3              MR. WILSON:  Sure.  Please.
 4              THE COURT:  Why isn't Mr. Havel right that
 5   WestLB is the representative of the owner of the
 6   note, the servicer, and represents EAA with respect
 7   to the plan negotiations?
 8              MR. WILSON:  Well, I don't know that I've
 9   made that motion, but I'm -- my questions were trying
10   to get to the bottom of the ownership and
11   relationship of the parties, and I'm trying to find
12   out, maybe not very artfully and fairly
13   unsuccessfully, who's calling the shots within
14   WestLB.
15              THE COURT:  Well, and then why isn't
16   Mr. Blumenthal correct that -- that the issue before
17   the Court really is not how WestLB made its -- or EAA
18   made its decision, but here's what's proposed?
19              MR. WILSON:  I'd like to find out who made
20   the decisions so I can question them on the effort --
21   on the issues of good faith.  Somebody made a
22   decision to give a --
23              THE COURT:  All right.  So let's do this.
24   Why don't you articulate the elements and the claim
25   you have for bad faith.
```

1           MR. WILSON:  For bad faith?

2           THE COURT:  I'm not -- I'm not getting it

3    yet.

4           MR. WILSON:  Okay.  And then I'm not doing

5    my job very well.  At the end of the day, I might not

6    get there.  And -- and this is the broadest picture

7    ever.

8           THE COURT:  Well, I don't want the

9    broadest picture ever.  I want some elements that

10   constitute a legal basis for me to say that there's

11   not good faith.  I want to understand that.

12          MR. WILSON:  Okay.  Well, I haven't gotten

13   some of the evidence yet, but I fully expect --

14          THE COURT:  Well, so let's pretend that

15   this is a complaint and you're outlining your

16   complaint for me.

17          MR. WILSON:  Sure.  I'm going to do it.

18   Let's just pick one thing, and it has to do with the

19   liquor licenses.  Mr. Shoaf, who is a member of the

20   debtor -- manager of the debtor here and who filed to

21   put this case in and has been filing statement

22   schedules and proposals and filed the plan and signed

23   the plan, is equity.  Equity suffers the same fate as

24   is usual in Chapter 11s.  And that -- there's very

25   little for them.

1    He also is a holder of a 50 percent

2    interest in 1.6 million dollars in claims that he

3    holds jointly with what I'm going to call the

4    Wickline interest, just because it's a little bit of

5    a structure.  So Mr. Shoaf orchestrates an ouster

6    from management of his coequal partner, Mr. Wickline.

7         We'll -- we'll show that --

8         THE COURT:  These are -- these are

9    allegations, Mr. Wilson.

10        MR. WILSON:  These are allegations, okay.

11   Sure.  And then he puts it into bankruptcy without

12   consultation, and then he proposes a plan where he

13   gives up his half interest in the 1.6 million dollar

14   claims at the same time he gives away Mr. Wickline's

15   half interest in those claims.  And in exchange, he

16   gets a two-year employment contract for unspecified

17   duties -- probably won't be hardly anything -- and he

18   gets -- and that's -- that's part of it.

19        And then there are some liquor licenses

20   that belong to the entity, Management, that

21   Mr. Wickline and Mr. Shoaf held jointly.

22        I believe the evidence will show that,

23   just amazingly enough, after Mr. Wickline was booted

24   from management and ceased to be consulted with, that

25   Mr. Shoaf personally took efforts to transfer those

1    licenses into his own name to an entity under his --

2    totally under his control.  And then the plan

3    supplement says, okay, Mr. Shoaf, if you can help us

4    keep continuity until we get -- we get those licenses

5    transferred to us, the reorganized debtor, we shall

6    give you another 240,000.  And just amazingly enough,

7    the combination of that employment contract and that

8    sale of the liquor licenses, which we submit have

9    been misappropriated, are just -- and the little --

10              THE COURT:  Well, is it a misappropriation

11   of the debtor's asset?

12              MR. WILSON:  The answer is no, but -- but

13   he's selling it to this debtor for 240,000 bucks.

14              MR. BLUMENTHAL:  I object to that, your

15   Honor.

16              MR. WILSON:  Okay.

17              MR. BLUMENTHAL:  There will be zero

18   scintilla of evidence on that.  And by the way,

19   Mr. Wilson hasn't uttered one word on his bad faith

20   argument that relates to Mr. Duncan's testimony,

21   which I submit is one big filibuster.

22              MR. WILSON:  Well, I'll tell you what,

23   your Honor, there isn't one person in this courtroom

24   that wants to get out of here more than me, and

25   I'll -- but these are crucial issues.  And here's --

1    and let me just make one point --

2            THE COURT:  Well, they're crucial issues

3    for your client, Mr. Wilson, but it sounds to me like

4    it's a dispute between two equity holders.  And maybe

5    Mr. Shoaf has been more successful than Mr. Wickline.

6    I have no idea what's gone on or what's transpired.

7    But if I have a debtor in bankruptcy and -- I mean,

8    unless you can show that this is bad faith on the

9    part of the debtor, that's -- that's where I'm

10   struggling with.

11           MR. WILSON:  Well, I think the debtor is

12   controlled by Mr. Shoaf.  He's going to

13   profit 720,000-plus dollars, and here's the deal and

14   this is it and what I've got, what I hope to prove,

15   is that WestLB, when it decided to go over and join

16   in this plan, they have gone into league with this

17   debtor and its principal and that conduct is bad

18   faith.  And to perpetuate that -- those bad acts in

19   the context of a plan, I would submit is bad faith.

20   If the Court doesn't agree with me, I'm happy to

21   abide the Court's ruling because that's your job and

22   not mine.

23           THE COURT:  Well --

24           MR. HAVEL:  Your Honor, might I make an

25   observation or two in this regard?

1           I think there's two elements about the

2    characterization of Mr. Wilson that need testing, or

3    at least we would challenge.  The first is that these

4    facts relate to the issue of the plan and the bad

5    faith at all.  These facts are a claim by

6    Mr. Wickline that Mr. Shoaf breached his duties in

7    operating the management company.  Those are claims

8    that Mr. Wickline has and this plan does not purport

9    to take any of those claims away.  We do not create

10   any releases in favor of Mr. Shoaf.  We do not create

11   any injunctions against Mr. Wickline suing him.  We

12   don't even prevent Mr. Wickline from claiming maybe

13   he should get some of the liquor license money.  He

14   can do anything he wants between those two parties.

15   It does not constitute bad faith if those two parties

16   have a disagreement about whether Mr. Shoaf did the

17   right thing or not.

18           The second point -- and this is one where

19   I think we have to be careful about the words -- bad

20   faith or the absence of good faith in the

21   confirmation of the plan has developed case law.  And

22   the test for that is set forth in our brief in a much

23   more accurate way in that we point out that the

24   characteristics that go to the question of good faith

25   or bad faith are the level of participation of all

1    the parties, the fairness and openness of the

2    negotiations and the extent of it or whether the

3    parties all had a chance to participate.  It has

4    nothing to do with whether one party said another one

5    breached a duty among the two entities.

6              And I think that the word bad faith can

7    encompass a number of things, but in this case, bad

8    faith for the plan does not include a breach of duty

9    between two members.  I think that is our view as to

10   why this should be narrowed, and I join with

11   Mr. Blumenthal in the observation it doesn't involve

12   WestLB.  And to say after Mr. Shoaf has done, you

13   know, three pages of bad things, one sentence, oh,

14   and we think WestLB must have known about it, so

15   they're also in bad faith, that proves nothing and

16   there's no record to prove that.

17             MR. WILSON:  Okay.  And getting back to

18   the questions, and I just want to be as straight as I

19   can with the Court.  And where I was attempting to go

20   with my questions, if I could establish what role

21   Mr. Robertson played with regard to the negotiations

22   of the plan terms and the decisions, I was going to

23   ask him some questions about that and that would go

24   to the good faith because it would -- it's part of

25   the -- the party consultation and participation.  And

1    so that's -- that's it.  I can't -- I can be no more

2    clear.  I'm -- I'll --

3                THE COURT:  Well, I hope you can be more

4    clear.  If you can focus and limit your questions to

5    Mr. Robertson on the negotiations, how WestLB

6    determined to get in as a joint plan proponent, that

7    might be relevant.

8                MR. WILSON:  I was -- I was working my way

9    up.  I was trying to find out, unsuccessfully, what

10   role he -- what -- what his responsibility -- scope

11   of his responsibilities were.

12               THE COURT:  Well, just ask -- just ask him

13   if he got -- if he was part of the negotiations.

14               MR. WILSON:  I'm willing to -- all right.

15   I was trying to lay a little foundation, but I'm

16   willing to just take the Court's lead.

17        Q.    (By Mr. Wilson)  Were you involved in the

18   negotiations of the plan terms?

19        A.    There was a team together at WestLB.  I'm

20   part of the team which works together to -- has

21   worked together, with advice of counsel as well, to

22   come up with a recommendation to put forward which --

23        Q.    Good.

24        A.    -- which we did.

25        Q.    Are you part of that team?

1        A.     I am part of that team.

2        Q.     And there are five members, did you say on

3    the team -- or so?  Don't let me put words in your

4    mouth.

5               THE COURT:  He may not be talking about

6    the same team that he was talking about previously,

7    Mr. Wilson.

8               MR. WILSON:  I --

9               THE WITNESS:  There are roughly four

10   people on the team.

11              MR. WILSON:  Thank you.  I'm sorry, your

12   Honor.

13       Q.     (By Mr. Wilson)  Who besides you?  Just

14   very quickly.

15       A.     James Winicker (ph), Nancy Tafoya (ph),

16   Ranata Gonchico (ph).

17       Q.     Okay.  And -- and was your testimony that

18   you work as a team and nobody has really executive

19   responsibility --

20       A.     Myself and Nancy Tafoya take the lead

21   roles.

22       Q.     Thank you.  Okay.  Now, were you involved

23   in the negotiations of the terms that are found in

24   the amended WestLB, Easy Street Partners amended

25   plan?

1        A.      I was part of the team, yes.

2        Q.      Would the answer then be, yes, you were

3   involved?

4        A.      Yes.

5        Q.      Thank you.  And who made the decision to

6   extend to Mr. Shoaf a -- an employment contract

7   for $240,000 a year for two years?

8        A.      That has been an item which has been

9   negotiated over a period of several weeks.

10       Q.      The question is, who was involved -- or

11   were you involved?

12       A.      Yes.

13       Q.      Yes.  Good.  And were you involved in the

14   decision to propose to pay to Mr. Shoaf $240,000 for

15   services or involvement in the liquor license

16   transfer?

17            MR. BLUMENTHAL:  Objection.  That's a

18   total mischaracterization of what occurs under the

19   employment agreement, as well as the Utah laws

20   concerning liquor licensing, as well as his

21   categorization of what the employment agreement does.

22            THE COURT:  Can you rephrase the question,

23   Mr. Wilson?

24            MR. WILSON:  I can try.

25       Q.      (By Mr. Wilson)  Were you involved in

1    negotiating the provision of the employment contract

2    that would pay to Mr. Shoaf $240,000 for certain

3    services in connection with liquor licenses?

4         A.    Yes.

5         Q.    Thank you.  In the course of your

6    involvement in that particular term of the agreement

7    and plan, were you aware that -- that there was any

8    dispute with regard to the ownership of the liquor

9    licenses?

10                MR. BLUMENTHAL:  Objection, your Honor.

11   Liquor licenses aren't owned in the state of Utah.

12   There is no foundation for that question and I object

13   to it.

14                MR. WILSON:  How about if I say ownership

15   or control?

16                MR. BLUMENTHAL:  Same objection.

17                MR. WILSON:  If I just said liquor

18   licenses?  I'm negotiating.

19                MR. BLUMENTHAL:  If he asks an appropriate

20   question I won't object.

21                THE COURT:  All right.  Restate your

22   question.

23        Q.    (By Mr. Wilson)  In connection with your

24   negotiations -- involvement in negotiations on the

25   liquor license issues, are you aware that there was

1     any dispute as to Mr. Shoaf's ability to act on

2     behalf of the entity whose name is affiliated with

3     the licenses?

4          A.    No.

5          Q.    Thank you.  Do you know of one now?  Do

6     you know that there might be some dispute now?

7          A.    It has been raised in the court.

8          Q.    Very good.  Thank you.

9                Do you know Mr. Shoaf personally?

10         A.    I have met him on several occasions.

11         Q.    Very good.  And was -- is WestLB pleased

12    with Mr. Shoaf's management of the debtor

13    organization up to this point?

14         A.    I know he has had a long experience with

15    this.  We understand that.

16         Q.    What is your -- would you answer the

17    question?  Is WestLB pleased with his performance as

18    manager for this debtor and other debtor entities?

19         A.    We have had some question as to whether or

20    not --

21         Q.    Whether or not what?

22         A.    -- there -- there are other resources that

23    can be brought to bear, but we also recognize his

24    standing within the community and his relationship

25    with the property and understand that that is a

1    benefit.

2         Q.    And does WestLB have criticism or take

3    exception to the management of Mr. Shoaf prior to the

4    filing of the bankruptcy petition?

5              MR. BLUMENTHAL:  Objection.  I think

6    that's irrelevant.

7              THE COURT:  What's the relevancy,

8    Mr. Wilson?

9              MR. WILSON:  Something -- well, if -- if

10   he says yes, then I'll say, what's changed?  And the

11   Court can say, I -- I sustain the objection, and we

12   can move on.

13             THE COURT:  I sustain the objection.

14             MR. WILSON:  Thank you.

15             THE COURT:  Okay.

16             MR. WILSON:  Let me consult my notes

17   because I think I may be near the end of my inquiries

18   here.  One last question.

19        Q.    (By Mr. Wilson)  According to the plan, if

20   it is confirmed, is it not true that E -- I hope I

21   get the initials right --

22        A.    EAA?

23        Q.    -- EAA will hold notes and loans on the

24   property secured by the property?

25        A.    They will have -- it's unclear at this

1    point as to the exact structure, but they, at the end

2    of the day, have the risk of this asset, which is

3    still managed by WestLB.

4          Q.    Are you saying that there aren't to be

5    loans -- there aren't to be loans from the

6    reorganized debtor to the -- to EAA?

7          A.    Yes, there will be loans.

8          Q.    There will be loans.  All right.

9                MR. HAVEL:  I'm sorry.  Are you speaking

10   about the restructuring of the existing loan as

11   opposed to new advances?

12               MR. WILSON:  Yes.  That's what I'm --

13               MR. HAVEL:  Okay.  I'm sorry.  I just --

14   it wasn't clear to me whether you were talking about

15   new money.

16               MR. WILSON:  And I need all the help I can

17   get.  That's -- that's it.

18         Q.    (By Mr. Wilson)  Do you understand the

19   question relating to the restructuring of the

20   existing loans?  I want to be fair with you.

21         A.    Well, repeat the question and I will --

22         Q.    So EAA is going to be the lender for the

23   other restructured loans --

24         A.    Yes.

25         Q.    -- on properties secured by the assets of

1    the debtor and with the reorganized debtor being the

2    new borrower.

3              Is that -- have I got that right?

4         A.    Yes.

5         Q.    Thank you.  And also EAA will become 100

6    percent owner of the equity in the reorganized

7    debtor; is that correct?

8         A.    Directly or indirectly, yes.

9         Q.    Well, directly, right?

10        A.    Yes.

11        Q.    They're going to own it, right?

12        A.    They will own it.

13        Q.    Good.  So -- so EAA is going to be both

14   the holder of secured notes owed by an entity that it

15   will own 100 percent of; Have I got that right?

16        A.    Through -- I mean, recognizing there is --

17   it will be a separate company, which will be owned

18   probably by an affiliate of WestLB, again, for the

19   economic interest of EAA.  This will be based on tax

20   issues or structural issues.  But for all economic

21   purposes, the risk goes back to EAA.

22             MR. WILSON:  Okay.  Thank you.  You've

23   been kind and the Court's been generous.  Thank you.

24             MR. BLUMENTHAL:  I have no questions.  No

25   more -- no redirect.

1          THE COURT:  Mr. Robertson, you may be

2   excused.

3          MR. ROBERTSON:  Thank you.

4          THE COURT:  Not only do you step down, you

5   can go get your plane.

6          MR. BLUMENTHAL:  I'm ready to call the

7   next witness, your Honor.

8          THE COURT:  All right.

9          MR. BLUMENTHAL:  I would call Mr. Shoaf to

10   the witness stand.  We'd note that all of the parties

11   had agreed to the proffer except Mr. Wilson and

12   Mr. Hofmann's predecessor at counsel table, so we'll

13   just proceed and put him on.

14          THE COURT:  All right.

15          THE BAILIFF:  Please step forward and

16   raise your right hand.

17

18                    WILLIAM SHOAF,

19          called as a witness, being duly sworn, was

20   examined and testified as follows:

21          THE BAILIFF:  Please take the witness

22   stand, state and spell your name.

23          MR. SHOAF:  My name is William Shoaf,

24   S-H-O-A-F.

25

1                       DIRECT EXAMINATION

2       BY MR. BLUMENTHAL:

3              Q.    What is your address, sir?

4              A.    4780 Winchester Court, Park City, Utah.

5              Q.    And can you briefly describe for the Court

6       your education.

7              A.    I'm a graduate of the Cornell University

8       School of Hotel Administration with honors from 1975.

9       It's a bachelor of science degree.

10             Q.    And can you describe the curriculum at --

11      at that -- that that degree represents at the school

12      that you attended?

13             A.    It is a business school that specializes

14      in training people in hospitality, development and

15      management and finance.

16             Q.    And could you briefly describe to the

17      Court your business background?

18             A.    I have 35 years in hotel and resort

19      business, as well as the club business involving

20      management, redevelopment, and -- and reorganization.

21             Q.    And can you describe some of the projects

22      you've worked on leading up to today?

23             A.    I have worked for corporate entities such

24      as Rosewood Hotels in Dallas and Houston.  I've

25      worked for Auberge Resorts in Santa Barbara.  I've

1    worked for Princess Hotels abroad in Bermuda.

2    Individually, I've worked for Mr. Redford at Sundance

3    Resorts.  I've also been involved with the royal

4    family of Saudi Arabia in Elbow Beach and as well as

5    with Chairman Goto in the redoing of the Mauna Lani

6    Bay Hotel on the Big Island of Hawaii.

7         Q.     And when did you move to Park City?

8         A.     I came to Park City in 1990 -- well, in

9    Park City in 1994, came to Utah in 1991 to take over

10   Sundance Resort for Mr. Redford.

11        Q.     Okay.  And what have you done in Park

12   City?

13        A.     In Park City, I have been involved in

14   consulting on the Hotel Park City and also with the

15   Sky Lodge project in Park City.

16        Q.     Okay.  What is your current position with

17   Easy Street Partners?

18        A.     I am a co-manager.

19        Q.     And can you describe your duties at the

20   hotel -- at the Sky Lodge?

21        A.     At the Sky Lodge I have been providing the

22   general manager duties for the property since it

23   opened, which includes the general day-to-day

24   supervision of the property, managing the financials

25   of the property, P&Ls, being involved in all

1    regulatory and licensing issues, community relations,

2    homeowner association issues, as well as liaising

3    with the community and the owners.

4         Q.    So basically you run the Sky Lodge?

5         A.    That's correct.

6         Q.    Now, since this case was filed in --

7         A.    September.

8         Q.    -- September '09 -- I have to keep track

9    of the years, your Honor, they're going by quite

10   rapidly -- did you have additional duties then with

11   regard to financial reporting concerning Easy Street

12   Partners?

13        A.    Yes.  I was asked to take on the

14   additional responsibilities that related to providing

15   reports to the trustee appointed by the Court, to

16   providing the additional reporting for the bank

17   during this period, to oversee the weekly payment

18   draws that were required as a part of the cash

19   stipulation, to get involved with EDRC, which is a

20   co-manager that was placed in -- in the project with

21   Gemstone by the Court to develop a new business plan

22   and new pro formas and to get -- to provide them with

23   assistance with potential new investors.

24        Q.    And you've prepared and overseen the

25   monthly operating reports that get filed with the

1    Court?

2         A.    Every one of them, yes, sir.

3         Q.    And you oversee and prepare all of the

4    budgets that are submitted to WestLB, the weekly and

5    bimonthly reconciliations; is that correct?

6         A.    That is correct.

7         Q.    As such, is it safe to say that you are

8    intimately familiar with Easy Street Partner's

9    business operations?

10        A.    Yes, I am.

11        Q.    As well as their financial condition?

12        A.    Yes, I am.

13        Q.    And, by the way, with regard to managing

14   the Sky Lodge, is anyone else actually involved in an

15   executive capacity in management?

16        A.    No, sir.

17        Q.    I'd ask you to -- do we have -- you have

18   an exhibit book in front of you.  I would ask you to

19   turn to Exhibit 2.

20             Do you have that in front of you?

21        A.    Yes.

22        Q.    And could you identify it?

23        A.    This is the amended plan that was

24   submitted on June 16th.

25        Q.    And did you sign that document on behalf

1   of Easy Street Partners?

2          A.    Along with Philo Smith, yes.

3          Q.    And who is Philo Smith?

4          A.    He is the other co-manager.

5          Q.    And are you familiar with the terms of the

6   plan?

7          A.    Yes, I am.

8          Q.    And you were involved with counsel in

9   negotiating the terms of the plan?

10         A.    Yes, I was.

11         Q.    All right.  We're going to go through --

12               MR. BLUMENTHAL:  Your Honor, I would like

13  to just admit that as an exhibit, the joint plan.

14               THE COURT:  Is there any objection?

15               MR. WILSON:  No objection, your Honor.

16               MR. HOFMANN:  None.

17               THE COURT:  Has it been marked as an

18  exhibit?

19               MR. BLUMENTHAL:  Yeah.  It is Exhibit 2 in

20  the binder.

21               THE COURT:  All right.  Exhibit 2 is

22  received.

23               (Exhibit-2 received.)

24         Q.    (By Mr. Blumenthal)  Now, I want to go

25  through a general description of the plan and the

1   plan negotiations.  Are you familiar with the

2   treatment of Jacobsen, Class 2 creditor under the

3   plan?

4        A.    Yes.

5        Q.    Can you --

6        A.    They will receive 1.33 million dollars

7   upon confirmation and will, as a result of that,

8   remove the liens on the property and complete the

9   limited warranty work that's left.

10       Q.    Okay.  Were you involved directly in

11  negotiating those terms with -- I think it's

12  Mr. Kirkham, who's the principal of Jacobsen?

13       A.    Yes, sir, I was.

14       Q.    And do you know what their total claim is?

15       A.    Approximately 17 -- 1.75 million.

16       Q.    Okay.  And they've agreed and you've

17  negotiated a reduction of their claim to facilitate

18  confirmation of the plan?

19       A.    Yes.

20       Q.    With regard to Class 4 unsecured

21  creditors, are you familiar with that -- the --

22  strike that.

23            Are you familiar with their treatment

24  under the plan?

25       A.    Yes, I am.  They -- the -- the -- that

1    class of people have the option to either elect to be

2    paid 100 percent over three years or to be paid 60

3    percent at confirmation and -- and be taken care of.

4              MR. BLUMENTHAL:  Your Honor, Richard

5    Kirkham had filed a declaration concerning the amount

6    of the claim and that has been marked as Exhibit 3.

7    We would move that into evidence.

8              THE COURT:  Is there any objection?

9              MR. HOFMANN:  None.

10             MR. WILSON:  None, your Honor.

11             THE COURT:  Exhibit 3 is received.

12             (Exhibit-3 received.)

13        Q.    (By Mr. Blumenthal)  Sir, I turn your

14   attention to Exhibit 4 and I ask you to identify that

15   document, whether you're familiar with it.

16        A.    Yes.  It's a listing of all the Class 4

17   unsecureds.

18        Q.    Okay.  The general unsecured trade

19   creditors primarily?

20        A.    Yes.

21        Q.    And what -- and did -- who prepared that

22   schedule?

23        A.    I did in conjunction with our accounts

24   payable and controller and counsel.

25        Q.    And did you also look at the claims

1    register to see the amount of claims that had been

2    filed?

3          A.    Yes, we did.

4          Q.    And this is your best understanding of the

5    total amount of claims; is that correct?

6          A.    That is correct.

7          Q.    And what is the total amount of general

8    unsecured creditors in Class 4?

9          A.    $979,243.28.

10         MR. BLUMENTHAL:  Your Honor, I would ask

11   that this document be admitted into evidence.

12         THE COURT:  Any objection to Exhibit 4?

13         MR. HOFMANN:  None.

14         MR. WILSON:  None for what it is.

15   Obviously, it omits the Management and Development

16   claims.  I'm not going to -- I'll just -- I'll just

17   note that.

18         MR. BLUMENTHAL:  Your Honor, this is

19   Class 4.

20         MR. WILSON:  Class 4.

21         THE COURT:  Exhibit 4 is received.

22         (Exhibit-4 received.)

23         Q.    (By Mr. Blumenthal)  Sir, Class 5 in the

24   plan, which treats the homeowners, do you understand

25   what their treatment is under the plan?

1      A.     Yes.  The homeowners, due to the actions

2   with regards to paying off Jacobsen, will have the

3   liens on their properties removed and the limited

4   warranty work that has been agreed to be done by

5   Jacobsen but has been delayed up until now will be

6   completed.

7      Q.     And have you interacted with the

8   homeowners throughout this case?

9      A.     Yes.  On a -- sometimes on a daily basis.

10     Q.     And you've, in essence, kept them calm and

11  they haven't filed any lawsuits; is that correct?

12     A.     To date?

13     Q.     Yes.

14     A.     Yes.

15     Q.     And you heard me read the ballot report.

16  Every homeowner who's voted has voted to accept the

17  plan, correct?

18     A.     That's correct.

19     Q.     With regard to Class 3, which are -- was a

20  catchall for other secured creditors, is it correct

21  that Wells Fargo is the only creditor in that class?

22     A.     Yes.  That's for two vans that are on a

23  long-term purchase loan -- an auto loan basically for

24  the company.

25     Q.     And that loan is current, sir?