1          A.     Yes, it is.

2          Q.     And it will continue to be paid in the

3     ordinary course?

4          A.     Yes, it will.

5          Q.     And in that regard, they're unimpaired,

6     correct?

7          A.     That is correct.

8          Q.     The plan also provides for payment in full

9     of administration and priority claims; is that

10    correct?

11         A.     Yes, it is.

12         Q.     I would ask you to turn to Exhibit 5.  Do

13    you -- did you prepare that -- the document?

14         A.     Yes, I did.

15         Q.     And can you tell the Court what that is?

16         A.     Yes.  Hang on a minute, let me get

17    organized.

18                The first page is a -- basically the

19    remainder of 2010's operating budget.

20         Q.     Oh, I'm sorry.  Is this misnumbered?

21         A.     I'm just looking in the order I see --

22                MR. BLUMENTHAL:  Your Honor, my mistake.

23    I'm sorry.

24                THE WITNESS:  So number -- I'm sorry, this

25    is the --

1        Q.      (By Mr. Blumenthal)  We're looking at

2     Exhibit 5, the legal fees for 2009 and 2010.

3        A.      Right.

4        Q.      Is that what you have in front of you?

5        A.      Yes.  I'm sorry.

6        Q.      Did you prepare that document?

7        A.      Yes, I did.

8        Q.      And what are the aggregate -- and does

9     that reflect legal fees billed and incurred by the

10    debtor and committee professionals and what's been

11    paid to them?

12       A.      Yes.  It details both.

13       Q.      And as the end -- at the end of April 30th

14    what are the outstanding and unpaid legal fees to the

15    debtor professionals and the committee professionals?

16       A.      There are -- there are two documents.  One

17    is for 2009.  At the end of 2009, which is on -- if

18    we're counting just front and back -- page 3,

19    it's $312,521.  If you flip over, you will see

20    another document which details legal fees for 2010

21    for January, February, March, and April.  And if you

22    go to the end of that you will see an additional

23    $459,992.

24       Q.      So what's the approximate total

25    outstanding amount; about 750,000 approximately?

1          A.     Approximately, yes.

2          Q.     And what is the approximate accrual of

3    fees for May -- April, May, and June?

4          A.     Approximately 250,000.

5          Q.     So adding that, it would be a total of

6    approximately a million dollars --

7          A.     That's correct.

8          Q.     -- of outstanding administrative claims

9    unpaid as of the date hereof, correct?

10         A.     That's correct.

11              MR. BLUMENTHAL:  Your Honor, I would move

12   this exhibit into evidence.

13              THE COURT:  Is there any objection to

14   Exhibit Number 5?

15              MR. HOFMANN:  None.

16              MR. WILSON:  None, your Honor.

17              THE COURT:  Exhibit 5 is received.

18              (Exhibit-5 received.)

19         Q.     (By Mr. Blumenthal)  With respect to

20   priority claims, does the debtor owe taxes to the

21   State of Utah?

22         A.     It owes approximately $200,000.

23         Q.     And under the plan those taxes will be

24   paid?

25         A.     Yes, sir.

1          Q.     In addition to that are there regular

2     payables that are outstanding as of the date hereof

3     in conjunction with the operation of the Sky Lodge?

4          A.     Yes.  And we had those as a normal course

5     of business.  As of this morning it was $188,804.

6          Q.     And those are approximately 30-day

7     payables?

8          A.     Yes.

9          Q.     And --

10         A.     One to 30, depending on when they came in.

11         Q.     Okay.  And will those be paid in the

12    ordinary course of business under the plan?

13         A.     Yes, they will.

14         Q.     Now, will -- are you familiar with the --

15    you mentioned that WestLB -- are you familiar with

16    the fact that WestLB is funding 2.9 million dollars

17    for purposes of funding the payments necessary at

18    confirmation; is that correct?

19         A.     I am.

20         Q.     Will that funding be sufficient to pay the

21    claims of Jacobsen, the administrative creditors, the

22    unsecureds electing to take 60 percent priority

23    claims at confirmation?

24         A.     Yes, it will be.

25         Q.     Sir, how much cash will Easy Street

1    Partners have by the end of July, remaining?

2         A.    We estimate that it will be approximately

3    a quarter of a million dollars.

4         Q.    Okay.  So when you combine the cash that

5    the debtor will have with the cash infusion that

6    WestLB is making, there will be sufficient funds to

7    confirm this plan; is that correct?

8         A.    That is correct.

9         Q.    Now, how much is WestLB funding

10   additionally in capital?

11        A.    They are providing a 1.5 million dollar --

12   not a line of credit, but a working capital reserve.

13        Q.    Right.  All right.  Could you describe the

14   efforts to locate a plan funder, sir?

15        A.    Yes.  Between myself and BDRC -- I assume

16   everybody knows who BDRC is?

17        Q.    I think the Court is aware.

18        A.    So BDRC and -- worked in conjunction with

19   myself and also with Gemstone to review the operation

20   of the property early on.  We went through and

21   developed a new five-year operating plan and did

22   other financial restructurings.  Once all that was

23   put in place --

24        Q.    By the way -- and by the way, that was a

25   requirement under the cash collateral stipulation,

1    correct?

2         A.    That is correct.

3         Q.    Okay.

4         A.    Once that was circulated and improved by

5    all the required parties, we then put together a

6    presentation book which detailed the plan for exiting

7    bankruptcy.  And that book was circulated to over 60

8    qualified investment groups throughout the country.

9         Q.    And they contacted you and you

10   communicated with them?

11        A.    No.  They were actually actively contacted

12   by BDRC and ourselves.  And then from that initial

13   60-plus people that we went out to, we moved about 12

14   of them into second-phase due diligence.

15   Confidentiality agreements were issued, and a much

16   more deep exploration was done, which included site

17   visits, personal meetings with myself and BDRC or

18   phone meetings, or actually in a couple of occasions

19   we flew to meet people in New York City, made

20   presentations.

21             From that 12, that ended up with three

22   what I would call real players.  Two of those people

23   executed plan funding agreements.  One of those

24   players actually put $400,000 into escrow.

25        Q.    Now, ultimately, neither of these last two

1   or three groups materialized to go forward and

2   consummate and actually become a plan funder; is that

3   correct?

4          A.     That is correct.

5          Q.     And what was the primary issue or problem

6   that you encountered with respect to them?

7          A.     One of the potentials was their plan was

8   based upon buy-in by an international group of

9   investors -- real estate investors, which did not

10  occur.  The other two were domestically-oriented and

11  when they got through their analysis of the money

12  that would be needed to put in cash on confirmation

13  plus working reserves and put that against what the

14  payoff of the WestLB loan would be, it basically

15  added up that they were paying par for the property

16  according to the appraisal that came in at 20.6

17  million dollars.  And in today's environment, there's

18  no investment group that could justify paying par for

19  an investment.

20         Q.     By the way, were any suitors turned away?

21         A.     None.

22         Q.     And you spoke to -- you with BDRC -- any

23  and everyone who made inquiries; is that correct?

24         A.     Anyone that would fog a mirror.

25         Q.     Now, during these negotiations, did you

1    keep in touch and communication with WestLB as to the

2    negotiations that were going on?

3        A.    Yes.

4        Q.    And did some of these potential plan

5    funders actually sit down and have meetings with

6    WestLB?

7        A.    They had two of the funders that went

8    to -- of the three we spoke of -- met directly with

9    WestLB representatives, and the third one had some

10   telephone conversations.

11       Q.    Okay.  And all of these negotiations were

12   conducted at arm's length and in good faith, sir?

13       A.    Yes, sir.

14       Q.    What is the main objective of the plan?

15       A.    Well, the objectives of the plan were

16   first, to get Jacobsen paid so that the mechanic's

17   lien on the 113 current owners could be removed and

18   the warranty on their properties completed.

19            The second was to provide money so that

20   vendors that had performed work in the past and had

21   not been paid, even though they acted in good faith,

22   could be paid at 100 percent, at their election.

23            Thirdly, we wanted to make sure that we

24   tried to keep the property open and viable so that

25   the 80-plus employees and their families that this

1   provides income to and a job could -- could stay

2   there.

3          And lastly, we wanted to ensure that --

4   that Sky Lodge would survive the bankruptcy so that

5   the 113 owners that bought into a program would have

6   a solid and viable plan funder behind this to ensure

7   that things would continue forward as we had

8   promised.

9          Q.    And would the continued ongoing business

10  and viability and vibrancy of the Sky Lodge Hotel

11  also provide benefit to the Park City community --

12  business community in general?

13         A.    Yes.  It has become a point of honor for

14  much of the downtown organization.

15         Q.    Is the plan that's being proposed in the

16  best interest of creditors, sir?

17         A.    Yes, it is.

18         Q.    And the plan will enable the Sky Lodge to

19  emerge as a going concern and maximize value?

20         A.    Yes, it will.

21         Q.    Please turn to Exhibit 8.

22         A.    Yes.

23         MR. BLUMENTHAL:  Your Honor, this is the

24  plan supplement that was filed as required by the

25  court orders.  I would submit that that should be in

1   evidence and part of the record.  I would move it in.

2              THE COURT:  Is there any objection to

3   Exhibit 8?

4              MR. WILSON:  None, your Honor.

5              MR. HOFMANN:  No objection to coming into

6   evidence, but I don't think there's any -- certainly

7   we've argued that there's inadequate notice of the

8   plan supplement, but no objection to its admission

9   into evidence.

10             THE COURT:  Exhibit 8 is received.

11             (Exhibit-8 received.)

12       Q.    (By Mr. Blumenthal)  Could you turn to

13   tab 6 of Exhibit 8.

14       A.    Exhibit 6?

15       Q.    Six?

16       A.    Yes.

17       Q.    I'm sorry.  They're not tabbed -- wait.

18       A.    It's right at the back.

19             MR. BLUMENTHAL:  Yeah, it's Exhibit 6 to

20   Exhibit 8, your Honor, with the cover sheet,

21   "Executive Contracts."

22       Q.    (By Mr. Blumenthal)  Do you have that in

23   front of you, sir?

24       A.    Yes, I do.

25             MR. BLUMENTHAL:  And do you have that,

1    your Honor?

2              THE COURT:  Yes.

3              MR. BLUMENTHAL:  Okay.

4         Q.    (By Mr. Blumenthal)  What is -- excuse me.

5              Who prepared that document?

6         A.    I did.

7         Q.    And what is it, sir?

8         A.    It is a listing of all the leases and

9    contracts to be assumed going forward.

10        Q.    And what is the total amount of the amount

11   to cure the leases that are required to be assumed

12   under the plan?

13        A.    Approximately $3,000.

14        Q.    Okay.  And you, the debtor, has kept these

15   fairly current; isn't that correct?

16        A.    That's correct.

17        Q.    Now, I'd like you to turn to Exhibit 7 in

18   the book.

19        A.    Yes.

20        Q.    Now, there are basically two sub-exhibits

21   in that, Exhibit A and B.  Do you see those?

22        A.    Yes, I do.

23        Q.    And what is the first exhibit?  I'll call

24   it 7A.

25        A.    7A is the re-forecast of the remaining

1    five months of 2010 for the property, August through

2    December.  This is the consolidated top sheet, which

3    is basically a summary of approximately 52 back

4    worksheets that -- that roll forward into this.

5         Q.    And it reflects the revenues from hotel

6    operations from August through year end 2010.

7         A.    That is correct.

8         Q.    As well as all of the expenses from

9    operations of the Sky Lodge, correct?

10        A.    That is correct.

11        Q.    And that's the -- I'll quote the top half

12   of the page.  So from operations by the end of the

13   year, is it correct that there's a hundred and --

14   approximately $135,000 of excess cash?

15        A.    That is correct.

16        Q.    Now, the bottom half reflects real estate

17   sales of fractional units, correct?

18        A.    That's also correct.

19        Q.    And -- oh, this is two pages -- when you

20   go -- and it also reflects, I guess on the backside

21   of that, the -- after all sales that the debt service

22   of the senior note of 6.2 million will be serviced,

23   correct?

24        A.    That is correct.

25        Q.    It also reflects payments from unit sales

1   of the 10 million dollar -- what we are referring to

2   as junior note issued under the plan, correct?

3        A.    No, that would be detailed in the

4   following exhibit.

5        Q.    My apologies.  But it does reflect what

6   the net cash available would be per debt, correct?

7        A.    Yes.  The net cash available for debt

8   after -- from the hotel operation sales of real

9   estate and minus the A and G expenses of running the

10  business will provide 1.162 million dollars in free

11  cash flow to service debt.

12       Q.    Now I would ask you to turn to Exhibit 7B

13  and describe for the Court that what exhibit depicts.

14       A.    This exhibit, basically if you look at the

15  far left-hand column that says 2001 and there's a

16  notation on --

17       Q.    2010, you mean?

18       A.    2010.  I'm sorry -- August through

19  December only.  That is basically the sheet that we

20  were looking at before rolling forward on an

21  annualized basis.  And then going across is 2011

22  through 14, which is the estimation of these various

23  areas of a five-year period.

24             That gets you -- down at the bottom of

25  this page is a -- is a loan payment schedule for the

1  10 million dollar junior debt, which shows how the

2  projected real estate sales, net real estate sales

3  will be used to pay down that note plus its accruing

4  interest.

5         And then on the next page, or on the back

6  of this page, is a cash position statement for each

7  year, which shows where you are with incomes and adds

8  and pluses to get you to a cash position at the end

9  of the year.

10      Q.     And in year 2011 under the junior note

11  WestLB agreed that the -- only 90 percent of the net

12  sales proceeds would be applied to the junior debt

13  during that year, correct?

14      A.     That is correct.  And the hundred percent

15  all other years.

16      Q.     All other years.  And the other sheets,

17  are they backup to this cover sheet in Exhibit 7B?

18      A.     Yes.  The sheet afterwards that basically

19  states "Sky Lodge Five Year Hotel Operation Pro

20  Forma" is -- is the hotel operation.  And the next

21  sheet, or on the back of that sheet, is backup with

22  regards to that particular worksheet.

23         On the following page there's one that

24  says, "The Sky Lodge Real Estate Sales Pro Forma,"

25  and that is the estimated sale through -- of the

1    remaining 63 fractions.

2         Q.    Now, you have prepared budgets and cash

3    flows in this case since the inception, correct?

4         A.    That is correct.

5         Q.    And they were pro forma budgets and then

6    you had to compare your pro forma budgets with actual

7    performance, correct?

8         A.    Correct.

9         Q.    Could you tell the Court how accurate --

10   or the results of your projections and what actually

11   occurred?

12        A.    Our hotel operating net bottom line came

13   in at 22.3 percent better than the pro forma

14   projections.

15        Q.    So you've been more than accurate and

16   actually better -- your performance has been better

17   than projected, correct?

18        A.    That is correct.

19             MR. BLUMENTHAL:  Your Honor, I would move

20   these exhibits into evidence.

21             THE COURT:  Is there any objection to

22   Exhibits 7A and 7B?

23             MR. HOFMANN:  None.

24             MR. WILSON:  None, your Honor.

25             THE COURT:  Exhibit 7A and 7B are

1    received.

2              (Exhibits-7A and -7B received.)

3         Q.    (By Mr. Blumenthal)  Now, could you

4    compare the Sky Lodge's performance to other hotels

5    and resorts in the Park City area?

6         A.    Certainly.

7         Q.    Would you, please?

8         A.    The Sky Lodge is part of a reporting

9    consortium called Smith Travel Research, and every

10   month there is a report that's issued that they

11   compile and send out called the *Star Report*.  That

12   *Star Report* is a competitive set analysis.  In other

13   words, you are -- you are compared in key areas of

14   revenue generation against a cumulative average of a

15   competitive set.

16             Our competitive set is:  The St. Regis

17   Deer Crest; the Hotel Park City, which is a four

18   diamond leading hotel; Stein Eriksen, which is a five

19   star, five diamond; and The Canyons Resort out at The

20   Canyons, which is a four diamond.

21             Year-to-date, our performance is, is that

22   our occupancy is 98 percent of the competitive set,

23   which means we're running two percent below.  Our

24   average daily rate -- which is an industry number

25   that is basically saying, what is your average room

1    rate renting for that you actually sell on a daily

2    basis -- runs 142 percent above the competitive set.

3    And our rev par, which is revenue per available room,

4    which is another industry standard, runs 134 percent

5    above the competitive set.

6         Q.    Now, we touched upon it, but the two notes

7    that the Class 1 creditor is getting, there's a

8    senior note, which we call a senior note, of 6.2

9    million dollars, correct?

10        A.    That is correct.

11        Q.    And that is going to be paid on a monthly

12   basis based upon a ten-year amortization, correct?

13        A.    Yes.  And that's the number I used in the

14   schedules.

15        Q.    And that's the $65,000 a month number.

16        A.    And it was provided to me by WestLB.

17        Q.    Right.  And the junior note is a 10

18   million dollar note that's paid out of net sales of

19   the sale of the fractional units, correct?

20        A.    Yes.  And it has compounding -- it has

21   accruing interest.

22        Q.    Okay.  It accrues and then paid as the

23   sales occur.

24             Now, these restructured notes allow

25   sufficient cash flow -- is it correct that these

1   restructured notes will allow sufficient cash flow to

2   pay all operating expenses at the Sky Lodge?

3          A.    Yes, they will.

4          Q.    It will also allow payment of all

5   creditors that are getting paid out over time,

6   correct?

7          A.    That is correct.

8          Q.    As well as servicing the senior note on a

9   current basis?

10         A.    That is also correct.

11         Q.    And the sales will amortize the junior

12  note by 2013 under your projections, correct?

13         A.    According to our projections, yes.

14         Q.    Now, isn't it a fact that you've been

15  unable to sell units during this bankruptcy case?

16         A.    Yes.

17         Q.    And shortly -- as well as shortly before?

18         A.    Yes.

19         Q.    Okay.

20         A.    It is -- it's a near impossibility to sell

21  a second-home vacation product with -- that has liens

22  and is in a property that's in the middle of a

23  Chapter 11 reorganization and -- and there's no clear

24  direction out of the -- of where the property's going

25  in the future.

1      Q.      Now, have you been getting inquiries and

2      interest in actually purchasing fractional units?

3      A.      Yes.

4      Q.      And what is your opinion on the ability to

5      sell these units once the plan is confirmed and the

6      Sky Lodge emerges from bankruptcy with your continued

7      involvement in the project?

8      A.      I think it's quite good.

9      Q.      And do you believe the sales volume on the

10     exhibits you just testified can be achieved?

11     A.      Yes.  And that was also verified by the

12     appraiser.

13     Q.      Okay.  Who has the relationships or the

14     relationship with the homeowners association at the

15     Sky Lodge?

16     A.      I do.

17     Q.      Who has the relationship with the hundred

18     and seven -- 113 --

19     A.      113.

20     Q.      -- homeowners at the Sky Lodge?

21     A.      I do.

22     Q.      Who has the relationship with the 80-plus

23     employees who have been employed, some of them since

24     the inception of this project, at the Sky Lodge?

25     A.      I do.

1        Q.    Who has the relationships with the

2    community at large in Park City?

3        A.    I do.

4        Q.    And who has the relationship in

5    conjunction with the Sundance Film Festival that's

6    staged each year?

7        A.    I do.

8        Q.    And is that the most profitable time for

9    the Sky Lodge, during the Sundance Film Festival?

10        A.    Absolutely.

11        Q.    And who also has the relationships and

12    manages with -- the process with the various

13    licensing agencies for the Sky Lodge?

14        A.    I'm the designated agent.

15        Q.    Now, there are many licenses and permits

16    that exist in addition to and separate and apart from

17    the liquor licenses; isn't that correct?

18        A.    From the Utah liquor licenses?

19        Q.    Yes.

20        A.    Yes.  Absolutely.

21        Q.    And WestLB has requested that you stay on

22    board for the facilitation of the continuance of the

23    Sky Lodge, correct?

24        A.    That's correct.

25        Q.    And in connection with that, you have

1    entered into an employment agreement where you've

2    negotiated an employment agreement with them that's

3    acceptable to both you and WestLB; is that correct?

4          A.    That is correct.

5          Q.    Could you turn to tab number nine, please?

6    And do you recognize that document?

7          A.    Yes, I do.

8          Q.    Is that the employment agreement that will

9    be entered into between you and WestLB under the

10   plan?

11         A.    Yes.

12         Q.    And could you describe the duties that

13   you'll have with respect to the new owner, which will

14   be Heber Avenue, LLC -- pardon me if I have not

15   gotten the name correct -- on a going-forward basis

16   from the closing under the employment agreement?

17         A.    I believe that from the closing, in the

18   short term much of what I have been doing I will

19   continue to do in addition to beginning the process

20   of working with the new management company that

21   the -- that Heber Avenue is bringing in to begin the

22   transition, educate them on the nuances of the

23   building, and begin the process of turning over all

24   the licenses, the contracts, the agreements with the

25   employees, the issues in the contracts that are with

1   the current homeowners on the rental program -- of

2   which there's 113 -- going through the regulatory

3   agencies and introducing these people to them so that

4   there's a smooth transition, and communicating with

5   the homeowners and the community and everyone else at

6   large that -- that I am still there and that Sky

7   Lodge will continue to be going forward in a positive

8   way, and that they should have no doubt as to the

9   success and future of the project.

10          Q.     So, therefore, the transition will be a

11   continuation of what exists today in a seamless

12   transition, correct?

13          A.     That is the goal.

14          Q.     Now, at the very end of the employment

15   agreement, that's the list of all the various

16   permits, licenses, insurance agreements, contracts

17   and leases that you'll be responsible to, under the

18   employment agreement, transition over to the new

19   owner; is that correct?

20          A.     That's correct.

21          Q.     Now, let's turn to the liquor licenses

22   because there's been a lot of hullaballoo here about

23   the liquor license.  Could you please describe the

24   history of the liquor license, sir?

25          A.     Yes.  First I would like to state that I

1    have been approved by the State of Utah to be a

2    holder of the liquor license since 1992.  In the case

3    of the current liquor licenses, Easy Street Brasserie

4    was formed in 2002 as a restaurant, and I was the

5    owner and the holder of the initial license for that

6    property.

7         Q.     Right.  You were the holder of the -- you

8    were also the owner of Easy Street Brasserie?

9         A.     That is correct.

10        Q.     And that had -- at the time, Sky Lodge

11   wasn't even thought of, correct?

12        A.     It was a dirt parking lot.

13        Q.     Okay.  Continue.

14        A.     I think it is very important, as there

15   seems to be confusion, in the State of Utah the only

16   owner of the liquor license is the State of Utah.

17   Anyone who has gone through that process is well

18   educated on that because you are informed on that by

19   the State.  The license or your ability to continue

20   as the guardian and holder of that license is an

21   annually-renewable privilege that only happens after

22   you have had a full audit by the UDABC compliance

23   officers onsite and they review in the commission any

24   infractions, violations, or malfeasance that occurred

25   in the prior year.  If that's the case, then you as

1   the individual must go down to the committee, to the

2   council, and appear before them and plead your case.

3   Which, if you win, you may get it again and if you

4   don't, the license will disappear.

5          In the case of Easy Street Brasserie, we

6   held that license until April of 2005.  In 2005 we

7   surrendered it because under Utah Beverage Act unless

8   you are open and operating uninterrupted -- and you

9   can have a 90-day interruption, but if it's longer

10   than that you must surrender your license and reapply

11   when you are then able to go back into business.  In

12   November of 2007 I reapplied for the licenses

13   necessary to operate the Sky Lodge.

14          Another important point that everybody

15   must keep in mind is that every license in the state

16   of Utah for liquor consumption is done on a physical

17   red line.  By red line, that's nomenclature, but

18   basically they take -- they designate a physical

19   space in which liquor can be served under a specific

20   license, and we have four licenses at Sky Lodge:  Two

21   for Easy Street Restaurant, one for the Sky Club on

22   the fourth floor, and one for a banquet catering

23   license which allows us to do events in certain

24   areas.

25          Those licenses were issued and granted in

1    November of 2007.  We opened in December of 2007.

2    And they were renewed -- some were renewed.  Two of

3    them renew automatically in the middle of the year

4    and the other two renew in October of the year.

5         Q.    Why, at a certain point in time, was the

6    registration of the licenses changed from Cloud 9 SL

7    Management, LLC to Cloud 9 Resorts?

8         A.    That was done at the behest of the

9    partners after it became evident that there was

10   growing friction between the partners and

11   Mr. Wickline.

12        Q.    So you got Mr. Wickline on the one hand

13   and all the other partners on the other hand,

14   correct?

15        A.    That's correct.  And if, in fact, there

16   had been an action by the partners to either remove

17   Cloud 9 SL Management or something happened to

18   Cloud 9 SL Management and it became paralyzed as an

19   entity, those licenses would have immediately been in

20   jeopardy for the project.  And, therefore, that could

21   have been a serious problem for the partnership.  So

22   I was asked to have those licenses registered --

23   again, they were under my holding and they were

24   registered to a new physical entity.  And at that

25   point, they were there, therefore, protected from any

1    potential blowups within the partnership.

2         Q.    Okay.  And that was done for the

3    protection of Easy Street Partners as well as the

4    creditors of Easy Street Partners; is that correct?

5         A.    Yes.  It would be very hard to run the

6    business without a liquor license.

7         Q.    Now, when the closing occurs under the

8    plan, could you describe the process that will occur

9    with respect to the liquor license?

10        A.    Yes.

11             MR. BLUMENTHAL:  Your Honor, I would move

12   the employment agreement into evidence.

13             THE COURT:  Any objection?

14             MR. WILSON:  No objection, your Honor.

15             MR. HOFMANN:  None.

16             THE COURT:  Exhibit 9 is received.

17             (Exhibit-9 received.)

18        Q.    (By Mr. Blumenthal)  Go ahead.  I'm sorry

19   to interrupt you.  I asked you, could you describe

20   when the closing occurs the process that will occur

21   in conjunction with the liquor license.

22        A.    Yes.  This process, which I have been

23   through before in the state of Utah in the sale of an

24   ongoing resort property with the liquor license, is

25   fairly clear.  Utah requires that at the closing

1   date, when the ownership of an entity moves from one

2   person to another, that if the person who is the

3   custodian or agent of that licensee is not employed

4   by the new owner or there's not an arrangement made

5   for an interim agreement, that that license must be

6   surrendered by law by the holder immediately upon the

7   closing date.

8          Q.    What would occur if you were not employed

9   by Heber Avenue, LLC at the closing?

10         A.    I would comply with the law and take the

11   licenses to the UDABC on the closing date.

12         Q.    And they'd need to be surrendered,

13   correct?

14         A.    They would be surrendered and the property

15   would no longer be able to serve alcoholic beverages.

16         Q.    Okay.  Other than the UDABC liquor

17   licensing governing body that you've just described,

18   are there any other regulatory governmental agencies

19   that have jurisdiction over Easy Street Partners?

20         A.    No.

21         Q.    You indicated that you spoke to over 60

22   potential plan funders or persons that were

23   interested in acquiring the Sky Lodge, correct?

24         A.    Uh-huh, yes, sir.

25         Q.    Were there offers made to actually, rather

 1    than just fund the plan, to buy the project as is?

 2         A.    Approximately six people discussed that

 3    option with us.

 4         Q.    And what were the range of offers that

 5    were being received?

 6         A.    Between 10 and 13 million dollars.

 7         Q.    Okay.  What will occur, sir, if this plan

 8    is not confirmed and we're forced into a liquidation?

 9    Do you have an opinion as to what Easy Street

10    Partners would realize from a forced sale of Sky

11    Lodge's assets?

12         A.    You'd be lucky to get 10 million dollars

13    for the property.

14         Q.    However, if this plan is confirmed,

15    operations would continue and there would be no

16    material adverse change in the foreseeable future,

17    correct?

18         A.    That is correct.

19         Q.    Will there, if this plan is confirmed, be

20    any need for further financial reorganization?

21         A.    Not in my opinion.

22         Q.    Now, I'd ask you to turn to -- first of

23    all, are you familiar with two entities, Cloud 9 SL

24    Management, LLC and Cloud 9 SL Development, LLC?

25         A.    Yes, I am.

1        Q.     Could you describe for the Court those

2    entities.

3        A.     Both those entities are special-purpose

4    entities that were created for two specific tasks.

5    The Development entity was created to provide a

6    vehicle by which Cloud 9 Resorts and Alchemy Ventures

7    could contract with Easy Street Partners to provide

8    the development management.

9        Q.     Alchemy is owned by David Wickline, Cloud

10   9 Resorts is owned by yourself, correct?

11       A.     To be very precise, Cloud 9 is owned 100

12   percent by myself.

13       Q.     Yes.

14       A.     And to the best of my knowledge,

15   Mr. Wickline is the sole owner of Alchemy, but I

16   don't know that for a fact.

17       Q.     Okay.

18       A.     These two entities, Development was

19   created so that we could contract with Easy Street

20   Partners to provide the development management

21   oversight, and for that there was a contractual fee

22   arrangement that was made.

23              In addition, there was another entity

24   which was Management, which was created so that an

25   ongoing hotel management contract could be executed.

1    And so once the property was open, we would -- the

2    entity would then be the -- the designated manager of

3    the property.

4         Q.    Okay.  With respect to Management -- we'll

5    just call it SL Company Management -- the two

6    entities:  One, Management, one, Development.  With

7    respect to Management, who's the manager of that

8    company?

9         A.    I am.

10        Q.    And that's the company that does, in

11   essence, the day-to-day management of the Sky Lodge,

12   correct?

13        A.    That is correct.

14        Q.    When was the last time Mr. Wickline was at

15   the property?

16        A.    The last time that David Wickline was at

17   the property in an official capacity that I know of

18   was at the partners meeting in September of 2008.

19        Q.    And did Mr. Wickline ever participate in

20   management of the hotel?

21        A.    No.

22        Q.    I'd ask you to -- just to digress a

23   moment, are you allowed to sell the liquor license

24   under the laws of Utah?

25        A.    No.  The Beverage Act Commission is

1    absolutely specific; there is no sale of a license.

2         Q.    Could you please turn to Exhibit tab 10 in

3    your book.

4         A.    Yes, sir.

5         Q.    What are -- what is that exhibit -- what

6    is that exhibit?

7         A.    It's the articles of organization for

8    Cloud 9 Resorts-Sky Lodge Management, LLC.

9              MR. BLUMENTHAL:  Your Honor, I'd ask that

10   that be admitted into evidence.

11             MR. WILSON:  No objection, your Honor.

12             MR. HOFMANN:  No objection.

13             THE COURT:  Exhibit 10 is received.

14             (Exhibit-10 received.)

15        Q.    (By Mr. Blumenthal)  Now flip to

16   Exhibit 11.

17             What is that, sir?

18        A.    That is an articles of organization for

19   Cloud 9 Resorts-Sky Lodge Development, LLC.

20             MR. BLUMENTHAL:  Your Honor, I'd ask that

21   Exhibit 11 be admitted.

22             MR. WILSON:  No objection, your Honor.

23             MR. HOFMANN:  No objection.

24             THE COURT:  Exhibit 11 is received.

25             (Exhibit-11 received.)

1          Q.     (By Mr. Blumenthal)  Please turn now, sir,

2    to Exhibit 12.

3          A.     Yes.

4          Q.     What is that document?

5          A.     It reads "Consent and Subordination of

6    Management Agreement."

7          Q.     Have you -- are you familiar with that

8    document?

9          A.     Yes, I am.

10         Q.     Have you and Mr. Wickline executed that

11   document?

12         A.     I have -- I have executed that document.

13   In this form, I do not see one for Mr. Wickline.

14         Q.     All right.  I'm sorry.  So this was

15   executed by you on behalf of Easy Street Partners,

16   correct?

17         A.     That's correct.

18         Q.     And that was a requirement at the closing

19   of the WestLB loan, correct?

20         A.     It was -- I'm sorry.  To be very -- let me

21   back up.  It was executed on behalf of Cloud 9

22   Resorts Management.

23         Q.     I'm sorry.  My apologies.

24         A.     And it was also executed on behalf of

25   ABG-SL as the manager of Easy Street Partners.

 1          Q.    Okay.  And that was required at the time

 2   of the loan from WestLB, correct?

 3          A.    Absolutely.

 4                MR. BLUMENTHAL:  I'd move Exhibit 12 into

 5   evidence.

 6                MR. WILSON:  No objection.

 7                MR. HOFMANN:  None.

 8                THE COURT:  Exhibit 12 is received.

 9                (Exhibit-12 received.)

10          Q.    (By Mr. Blumenthal)  Exhibit 13, sir, what

11   is that?

12          A.    Hang on.  That is a -- sorry.  That is a

13   consent and subordination development agreement for

14   Cloud 9 SL Development.  And that is also signed by

15   me as ABG-SL and for Cloud 9 SL Development Company.

16                MR. BLUMENTHAL:  Your Honor, I'd move that

17   into evidence.

18                THE COURT:  Any objection?

19                MR. HOFMANN:  No.

20                MR. WILSON:  No objection, your Honor.

21   Sorry.

22                THE COURT:  Exhibit 13 is received.

23                (Exhibit-13 received.)

24          Q.    (By Mr. Blumenthal)  Sir, who -- who

25   prepares the tax returns for Easy Street Partners, as

1     well as Easy Street Mezz and Easy Street Partners --

2     Easy Street Holdings?

3          A.     Independent CPA firms.

4          Q.     And would those tax returns filed prior to

5     August of 2009, were there tax returns that had not

6     yet been filed?

7          A.     That's correct.  Yes.

8          Q.     Now they've all been filed; is that

9     correct?

10         A.     That's correct also.

11         Q.     And have all the members been treated

12    equally in accordance with the operating agreements

13    of all the various entities?

14         A.     Yes.  As the CPAs have done from the

15    operating agreement, yes.

16         Q.     And one last question.  Who caused the

17    removal of ABG-SL as the manager of ES -- Easy Street

18    Holdings back in August of 2009?

19         A.     That was at a formal meeting called by

20    Philo Smith of Smith Trust and PC I, and they both

21    put forward a motion and a vote for the removal of

22    ABG-SL for cause and it was brought to the members

23    for a vote.

24         Q.     And with the exception of Mr. Wickline,

25    all of the other members voted in favor of that; is

1    that correct?

2          A.    That is correct.

3                MR. BLUMENTHAL:  I have no further

4    questions, your Honor.

5                THE COURT:  All right.  Well, don't get

6    up, Mr. Wilson.

7                MR. WILSON:  Has it come to that, your

8    Honor?

9                THE COURT:  It has.  I think it's fairly

10   apparent that we're not going to finish today, and I

11   doubt, based on the cross-examination of the prior

12   witness, that our cross-examination would conclude

13   today.

14               MR. BLUMENTHAL:  Your Honor?

15               THE COURT:  Yes.

16               MR. BLUMENTHAL:  We don't actually have

17   any more witnesses in our case.  I think with some

18   jolting from the Court we could perhaps finish the

19   cross-examination of Mr. Shoaf.  But, of course, I

20   don't know what his Honor's schedule is this evening.

21               THE BAILIFF:  Step to the microphone.

22               MR. BLUMENTHAL:  I don't know what his

23   Honor's schedule is this evening, but we would hope

24   to finish today.

25               MS. JARVIS:  Your Honor, let me just add,

1  the committee does have one witness, as we -- that

2  also still needs to be heard.

3         THE COURT:  Well, unfortunately, I do have

4  a commitment, Mr. Blumenthal.  And with the

5  cross-examination and the additional witness by the

6  committee and then closing argument, I really doubt

7  we can get done today.

8         We could commence again Monday morning

9  at 9:30.  I do have the afternoon scheduled for

10 another contested matter, but we would have all of

11 the morning on Monday.  If that isn't convenient to

12 the parties --

13        MR. HOFMANN:  Your Honor, I don't --

14 shouldn't be driving the bus here at all, but I do

15 have a final fee application hearing at 10:30 before

16 Judge Thurman.  It's a fairly discreet, small matter.

17 It should take no more than a half an hour.  But if I

18 could be excused during that time and -- I think that

19 that could be feasible.

20        THE COURT:  That's fine.

21        MR. BLUMENTHAL:  Could we try to finish

22 the cross of Mr. Shoaf?

23        THE COURT:  Well, the Court will take a

24 recess and let me see if I can make some changes.

25        MR. WILSON:  Your Honor, I guess it's --

1   if we're expressing our druthers, we all know what

2   this week has been.  It would be --

3           THE COURT:  Well, I don't think we all

4   know.  You and I know.

5           MR. HOFMANN:  I know too, your Honor.

6           MR. WILSON:  We know half, at least.  It

7   would be -- I don't anticipate taking too long, but

8   it would be a great accommodation if we could begin

9   at 9:30.  I'll be as brief as I can.

10          MR. BLUMENTHAL:  Your Honor, if he's, in

11  fact, going to be brief, I'm flying back and forth

12  between New York and Salt Lake and I would appreciate

13  if we can take Mr. Wilson on his word and perhaps

14  after the recess, if your Honor can accommodate us to

15  be brief and go as far as we can go.

16          MR. WILSON:  Well, my promise of brief was

17  so that -- so that we would not be at risk of not

18  completing the matter Monday morning.  We're going to

19  be back in any event.  I don't anticipate that my

20  involvement will jeopardize completion of this matter

21  in the time allotted Monday.

22          THE COURT:  Well, let's do this.  I'll

23  take a very, very brief recess and we can get started

24  and see how it's going.

25          MR. BLUMENTHAL:  Thank you, your Honor.

1          THE COURT:  Okay.  Court is in recess.

2          THE BAILIFF:  All rise.

3          (Recess taken from 4:02 until 4:08 p.m.)

4          THE BAILIFF:  Please be seated.

5          THE COURT:  Have a seat here, Mr. Shoaf.

6          Apparently the parties didn't take me at

7     my word when I said a very brief recess, but...

8          MR. WILSON:  You were making your call and

9     we were making ours, your Honor.

10          THE COURT:  Well, my call wasn't

11     particularly successful.  I can go until 4:30.  I

12     doubt that that's going to be sufficient time and

13     I -- it's unfortunate for the parties, but on the

14     other hand, we have had numerous confirmation

15     hearings scheduled in this case and significant

16     blocks of time that have not been used.  And I

17     understand the reasons why, but the Court opened this

18     time on its calendar on very short notice a couple of

19     weeks ago, and at that time perhaps the parties

20     didn't anticipate that we were going to have the

21     contest that we have today.

22          I have, as I said, approximately half a

23     day Monday.  The rest of the week, I -- I don't have

24     a full day, other than I could make another party

25     unhappy and I could clear Friday completely.  So I'll

 1    take some feedback from parties.

 2              MR. WILSON:  I have conflicting matters on

 3    Monday, but I'm going to solve them and I'm happy to

 4    be here at 9:30.

 5              THE COURT:  Mr. Blumenthal and Mr. Havel,

 6    is there a preference for -- I mean, it sounds like

 7    we could conclude Monday morning.  And if we were

 8    close to concluding, you know, I'd even run into the

 9    afternoon and make some other people wait as well.

10              MR. WILSON:  Coal miners are a tough lot,

11    your Honor.

12              MR. BLUMENTHAL:  I would prefer Monday

13    morning, your Honor.

14              THE COURT:  All right.

15              MR. BLUMENTHAL:  I want to get this thing

16    confirmed.  As time passes, it becomes problematic.

17              THE COURT:  I understand.

18              MR. HAVEL:  Monday's fine, your Honor.

19              THE COURT:  Well, let's do -- let's

20    adjourn then and reconvene Monday morning at 9:30

21    and --

22              MR. BLUMENTHAL:  Well, I'm sorry.  Were

23    you going to do 20 minutes or --

24              THE COURT:  Well, yes, we can --

25              MR. WILSON:  It would be a great personal

1   accommodation if we didn't have to.  But I'm -- and I

2   don't mean professional accommodation.

3            THE COURT:  Well, I -- I don't anticipate

4   that we can get done in 20 minutes, and it probably

5   makes more sense to take the cross-examination in a

6   block rather than break it up for 20 minutes today

7   and then Monday.  All right.  I really don't think

8   20 -- I'll give 20 minutes Monday if we have to as

9   opposed to today, so...

10            All right.  Thank you.  Court is in

11   recess.

12            THE BAILIFF:  All rise.

13            (Court adjourned at 4:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                           REPORTER'S CERTIFICATE

2

3       STATE OF UTAH              )
                                   )    ss.
4       COUNTY OF SUMMIT           )

5

6                    I, Jennifer E. Garner, Registered
        Professional Reporter and Notary Public in and for
7       the State of Utah, do hereby certify:

8                    That on July 6, 2010 I transcribed an
        electronic sound recording at the request of Attorney
9       Annette Jarvis;

10

11                   That the statements and testimony of all
        speakers were reported by me in stenotype and
        thereafter transcribed, and that a full, true, and
12      correct transcription of said statements and
        testimony is set forth in the preceding pages,
13      according to my ability to hear and understand the
        electronic sound recording provided;

14

15                   That the original transcript was sealed
        and delivered to Attorney Annette Jarvis for
        safekeeping.

16

17                   I further certify that I am not kin or
        otherwise associated with any of the parties to said
        cause of action and that I am not interested in the
18      outcome thereof.

19

20                   WITNESS MY HAND AND OFFICIAL SEAL this 6th
        day of July, 2010.

21

22

23      Jennifer E. Garner, CSR, RPR
        Notary Public
24      Residing in Summit County

25

NOTARY PUBLIC
JENNIFER E. GARNER
578384
COMMISSION EXPIRES
MARCH 31, 2013
STATE OF UTAH