# ORIGINAL TRANSCRIPT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CONFIRMATION HEARING CONTINUED FROM JUNE 25, 2010<br><br>IN RE:  EASY STREET HOLDING, LLC | ) Bankruptcy Case No.<br>) 09-29905<br>)<br>) Jointly Administered<br>) with Cases 09-29907<br>) and 09-29908<br>)<br>) Chapter 11<br>)<br>) Honorable R. Kimball<br>) Mosier |

June 28, 2010 * 9:33 a.m.

Location:   United States Bankruptcy Court
350 South Main Street
Salt Lake City, Utah 84102

Proceedings recorded by electronic sound recording,
transcript produced by certified transcriber/court
reporter:  Jennifer E. Garner, RPR
Notary Public in and for the State of Utah

207



**CITICOURT**
THE REPORTING GROUP

170 South Main Street, Suite 300
Salt Lake City, Utah 84101

PH: 801.532.3441   FAX: 801.532.3414   TOLL FREE: 877.532.3441

1                      A P P E A R A N C E S

2    FOR THE DEBTOR IN POSSESSION:

3              Kenneth L. Cannon, II, Esq.
               DURHAM JONES & PINEGAR
4              Attorneys at Law
               111 E Broadway
5              Suite 900
               Salt Lake City, Utah 84111
6              Telephone:  801-415-3000
               Facsimile:  801-415-3500
7
               Michael Blumenthal, Esq.
8              Bruce Zabarauskas, Esq.
               CROWELL & MORING
9              Attorneys at Law
               590 Madison Avenue, 20th Floor
10             New York, New York, 10022-2524
               Telephone:  212-895-4241
11             Facsimile:  212-223-4134

12   FOR WESTLB:

13             Annette W. Jarvis, Esq.
               DORSEY & WHITNEY, LLP
14             Attorneys at Law
               136 S Main Street
15             Suite 1000
               Salt Lake City, Utah 84101
16             Telephone:  801-933-8933
               Facsimile:  801-933-7373.
17
               Richard W. Havel, Esq.
18             Kristina Craig, Esq.
               SIDLEY AUSTIN
19             Attorneys at Law
               555 West Fifth Street
20             Los Angeles, California 90013
               Telephone:  213-896-6000
21             Facsimile:  213-896-6600

22

23

24

25

**FOR THE UNSECURED CREDITORS:**

> Lon A. Jenkins, Esq.
> JONES WALDO HOLBROOK & MCDONOUGH, PC
> Attorneys at Law
> 170 S. Main Street
> Suite 1500
> Salt Lake City, Utah 84101
> Telephone:  801-521-3200
> Facsimile:  801-328-0537

**FOR BAY NORTH:**

> Adelaide Maudsley, Esq.
> CHAPMAN AND CUTLER, LLP
> Attorneys at Law City
> One Utah Center
> 201 So Main Street
> Suite 2000
> Salt Lake City, Utah 84111
> Telephone:  801-533-0066
> Facsimile:  801-533-9595

**SPECIAL COUNSEL FOR DEBTOR:**

> Joseph E. Wrona, Esq.
> WRONA LAW FIRM
> Attorneys at Law
> 1745 Sidewinder Drive
> Park City, Utah 84060
> Telephone:  435-649-2525
> Facsimile:  435-649-5959

> Corbin B. Gordon, Esq.
> CORBIN B. GORDON, PC
> Attorneys at Law
> 345 West 600 South
> Suite 108
> Heber City, Utah 84032
> Telephone:  435-657-0984
> Facsimile:  888-822-8796.

1   <u>FOR DAVID WICKLINE, ALCHEMY VENTURES TRUST, LLC:</u>

2            Kim R. Wilson, Esq.
         SNOW CHRISTENSEN & MARTINEAU
3        Attorneys at Law
         10 Exchange Place
4        11th Floor
         Salt Lake City, Utah 84111
5        Telephone:  801-521-9000
         Facsimile:  801-363-0400.
6
     <u>FOR PARK CITY I, LLC:</u>
7
             George Hofmann, Esq.
8        PARSONS KINGHORN HARRIS, PC
         Attorney at Law
9        111 E. Broadway
         11th Floor
10       Salt Lake City, Utah 84111
         Telephone:  801-363-4300
11       Facsimile:  801-363-4378

12   <u>FOR GATEWAY CENTER, LLC AND VARIOUS UNIT OWNERS:</u>

13           Douglas J. Payne, Esq.
         FABIAN & CLENDENIN
14       Attorneys at Law
         215 S. State Street
15       Suite 1200
         Salt Lake City, Utah 84111-2323
16       Telephone:  801-531-8900
         Facsimile:  801-596-2814
17

18                I N D E X

19            <u>Direct</u>  <u>Cross</u>  <u>Redirect</u> <u>Recross</u>

20   <u>Witnesses</u>:

21   <u>William Shoaf</u>

22   By Mr. Hofmann:                19

23   By Mr. Wilson:                 34                 91

24   By Mr. Blumenthal:                      64

25   By Mr. Havel:                  80

|  | Direct | Cross | Redirect | Recross |
|--|--------|-------|----------|---------|

**Proffer re. Craig Elliott**

By Mr. Jenkins:          97

**Closing Arguments:**

| By Mr. Blumenthal | 109 |
| By Mr. Havel | 129 |
| By Ms. Jarvis | 149 |
| By Mr. Jenkins | 154 |
| By Mr. Wilson | 158 |
| By Mr. Hofmann | 170 |

**RULING OF THE COURT:**     188


**E X H I B I T S**

| NO. | DESCRIPTION | RECEIVED |
|-----|-------------|----------|
| PC-1 | Amended disclosure statement | 22 |
| PC-2 | Creditors committee complaint against WestLB_____ | 29 |
| W-2 | Club liquor license renewal___ | 49 |
| 14 | Court order granting omnibus objection_____ | 95 |
| 15 | Debtor's application to employ Gemstone_____ | 95 |
| C-1 | Stipulation_____ | 98 |

P R O C E E D I N G S

1
2

3        THE BAILIFF:  All rise.  Court resumes in
4    session.  Please be seated.
5        This is in the matter of Easy Street
6    Holding, LLC.
7        THE COURT:  Will counsel please note their
8    appearances?
9        MR. CANNON:  Your Honor, Kenneth Cannon,
10   Durham, Jones & Pinegar.  With me is Michael
11   Blumenthal from Crowell & Moring.  On the telephone
12   with us is Bruce Zabarauskas from Crowell & Moring,
13   all co-counsel for the debtor in possession.
14       MS. JARVIS:  Your Honor, Annette Jarvis of
15   Dorsey & Whitney on behalf of WestLB, and shortly to
16   be joining me will be Rich Havel of Sidley Austin.
17   He is in transit and will -- begs the forgiveness of
18   the Court for slipping in later.  And also on the
19   phone, we have Kristina Craig from Sidley Austin, all
20   of us are counsel for WestLB.
21       MR. JENKINS:  Good morning, your Honor.
22   Lon Jenkins of the firm of Jones, Waldo, Holbrook &
23   McDonough on behalf of the unsecured creditors
24   committee.
25       MR. WILSON:  Good morning, your Honor, Kim

1    Wilson -- excuse me.  Addie, please go ahead.

2              MS. MAUDSLEY:  Your Honor, Addelaide

3    Maudsley of Chapman & Cutler on behalf of Bay North.

4              THE COURT:  Just keep coming.

5              MR. WRONA:  Your Honor, Joe Wrona, Wrona

6    Law Firm, special counsel for debtor.

7              MR. GORDON:  Corbin Gordon, of Corbin B.

8    Gordon PC, special counsel for the debtor as well.

9              MR. WILSON:  Good morning, your Honor.

10   Kim Wilson for David Wickline, for Alchemy Ventures

11   Trust, LLC as member and manager of and on behalf of

12   Cloud 9 Resorts, Sky Lodge Development LLC, and Cloud

13   9 Resorts, Sky Lodge Management, LLC.

14             MR. HOFMANN:  George Hofmann appearing on

15   behalf of Park City I, LLC.

16             MR. PAYNE:  Your Honor, Doug Payne on

17   behalf of Gateway Center, LLC and also on behalf of

18   various unit owners.

19             THE COURT:  Before we begin this morning,

20   I'd like to visit the standing issue.  At the last

21   hearing on Friday, Mr. Blumenthal and Mr. Havel

22   raised standing objections with respect to Park City

23   I and Alchemy Ventures Group, LLC.  And if the

24   parties have what Mr. Wilson introduced as Exhibit

25   W1, I'd like to look at that a minute and --

1          So the case before the Court is the

2    second-to-the-bottom box, Easy Street Partners, LLC,

3    and it is a wholly owned subsidiary of Easy Street

4    Mezzanine, LLC, which is in bankruptcy and is jointly

5    administered with this case.  Easy Street Mezzanine

6    is wholly owned by Easy Street Holding, LLC, which is

7    also in bankruptcy and is jointly administered with

8    this case.

9          In order for Park City I and Alchemy

10   Ventures Group, LLC to assert standing as a result of

11   their equity ownership in Easy Street Holding, LLC,

12   there must be at least some prospect of a

13   distribution to those parties.

14         Last Friday, Mr. Hofmann argued that one

15   of the changes in the amended plan is that the

16   litigation between the unsecured creditors committee

17   and WestLB was going to be compromised and settled,

18   and in the initial plan -- and because of that, there

19   would be no distribution to his client, and under the

20   initial plan, there may have been some distribution

21   to his client.  The litigation of the unsecured

22   creditors committee with WestLB is not a money

23   recovery, but even if it were seeking a money

24   recovery, all that would mean is that WestLB would

25   pay unsecured creditors but WestLB's claim would

1     still need to be paid in this case.

2          So the evidence before the Court is that

3     we have real property worth $20,600,000.  We have

4     mechanic's liens of approximately 1.7 million

5     dollars.  WestLB's secured claim is in excess of 17

6     million dollars, and unsecured creditors are owed in

7     excess of a million dollars.  So it's unlikely -- and

8     I say unlikely, but it looks like an impossibility,

9     but it's unlikely that any money would go to equity

10    of Easy Street Partners.  If any distribution was

11    made to Easy Street Mezzanine, the equity holder of

12    Easy Street Partners, it has a debt to North LB -- or

13    excuse me -- Bay North in excess of $12 million, and

14    it's unimaginable that Easy Street Mezzanine would

15    get more than $12 million out of this case.  So I

16    fail to see the economic interest or stake that Park

17    City I and Alchemy Ventures Group, LLC, as equity

18    holders of Easy Street Holding have in these

19    proceedings.

20          Well, Mr. Hofmann, if you want to address

21    that.

22          MR. HOFMANN:  I do, your Honor.  I

23    submitted to the Court this morning, and the parties,

24    an exhibit binder with two exhibits.  I think they

25    should be fairly noncontroversial.  One is the

1    approved disclosure statement dated February 25th and

2    the second exhibit is the Complaint of the unsecured

3    creditors committee against WestLB.  And I'd like to

4    focus on the second exhibit, which is the Complaint.

5    I think that is susceptible of judicial notice.  And

6    it's true that Complaint does seek the equitable

7    subordination of the claims of WestLB, but it seeks

8    more than that and I would direct the Court, in

9    particular, to pages 17, 18 of the Complaint.  And

10   the Complaint alleges that before the debtor's

11   bankruptcy filing, it entered into a forbearance

12   agreement with WestLB, and under that forbearance

13   agreement the debtor released claims against WestLB.

14   And I think that has been the basis of much

15   subsequent activity in this case and before it, for

16   that matter.  And the committee alleges that that

17   grant of a release of claims in favor of WestLB is a

18   fraudulent transfer and seeks the recovery of that

19   fraudulent transfer under Section 544 of the

20   Bankruptcy Code and applicable Utah state law.  And

21   then the fourth cause of action, the Complaint in

22   Paragraph 18 requests on behalf of the estate the

23   turnover of that cause of action to the estate.  Now,

24   if those claims were property of the bankruptcy

25   estate, then the estate would have at least a defense

1    to the breach of contract claim by WestLB, if not an

2    affirmative counterclaim in excess of the amount of

3    the claim if it even were allowed.  Essentially, the

4    allegation is, your Honor -- I can walk the Court

5    through the Complaint if it would be helpful, but the

6    basic allegation is that WestLB destroyed this

7    debtor.  It destroyed its business and as a result of

8    that, WestLB should pay the consequences.  It should

9    compensate the estate with damages.  And WestLB

10   forced the debtor before its bankruptcy filing to

11   give up those claims in a fraudulent transfer.

12          So if this judgment were granted as prayed

13   in this Complaint, you would have, at best, a

14   subordinated WestLB claim but possibly more.  You

15   could have them not have an allowed claim at all by

16   virtue of there being a defense to their breach of

17   contract claim because they breached their contract

18   to the debtor or an affirmative recovery against

19   WestLB.  So that is one point I'd make.

20          A secondary point -- I'm not as familiar

21   with the litigation against Bay North, but I am aware

22   there is a Complaint filed against Bay North that

23   would affect the Mezzanine level.

24          Beyond that, your Honor, I would ask the

25   Court who has standing on behalf of the equity

1    security holders to complain if this plan were

2    treated unfailure -- unfairly?  Excuse me.  But this

3    is, as the Court pointed out, the case of Easy Street

4    Partners.  Easy Street Mezzanine is the equity holder

5    of Easy Street Partners.  Does the Court think it's

6    likely that the equity security holder, Easy Street

7    Mezzanine, through the same counsel, controlled by

8    the same people is going to object to the plan it

9    filed in another case?  I don't think so.  I think

10   that given those conflicting interests that it's

11   appropriate to consider the objection of Park City I.

12   And I would note, looking at Exhibit W1, Park City I

13   and Alchemy Ventures, excuse me, combined hold 51

14   percent of the equity interest in Easy Street

15   Holding, which, in turn, owns 100 percent of the

16   holding in Easy Street Mez.  So the parties that are

17   objecting to the plan represent 51 percent of the

18   equity security holders that chose, for whatever

19   reason, not to object to this plan.

20           So I think that for those reasons, because

21   of the nature of the relief sought by the creditors

22   committee in its Complaint, and because of the

23   conflicts of interest that the debtor and its

24   affiliates hold, that it's appropriate to consider

25   Park City I's objection.

1          THE COURT:  Mr. Jenkins?

2          MR. JENKINS:  Your Honor, if I could be

3     heard briefly on this issue, having filed the

4     Complaint.  I do want to point out to the Court that

5     when we were all speaking about the Complaint on

6     Friday, we spoke of it in terms of an equitable

7     subordination action and that is -- that was the

8     primary thrust of the lawsuit.  We did, in fact --

9     and my first words out of my mouth today when I took

10    the podium to put Mr. Elliot on the stand were to

11    clarify for the Court and for anyone else in the

12    courtroom that the lawsuit did also include a

13    fraudulent transfer cause of action.  That fraudulent

14    transfer, as we alleged, was not an exchange of cash

15    as such.  It wasn't money that was fraudulently

16    transferred.  What it was, was our position that the

17    release that the debtor gave to WestLB in connection

18    with a forbearance agreement which was entered into

19    in March of 2009, that that release, in and of

20    itself, constituted a fraudulent transfer of whatever

21    claims the estate may or may not have had.

22          The result of the lawsuit, in our view,

23    even were we to prevail on the fraudulent transfer

24    cause of action would be that the causes of action,

25    whatever they may be, would then revest in the

1    debtor's estate and then the debtor presumably would

2    have the opportunity to determine whether or not it

3    wanted to pursue those claims against WestLB or,

4    alternatively, if the committee was unsatisfied with

5    the debtor's response to that, the committee perhaps

6    could move the Court to allow it to have standing to

7    pursue those causes of action, but that is down the

8    road.

9              But in any event, your Honor, I would

10   point out that if these claims and causes of action

11   that the debtor had waived somehow resulted in an

12   affirmative money judgment or some defenses that

13   could be asserted against the WestLB claims,

14   nevertheless, whatever funds that there would be

15   would have to go first, of course, into the Partners'

16   estate, which, as you noted, there are roughly 20 or

17   more million dollars' worth of claims against.  Any

18   residual that was left over for equity would then

19   have to go into the Mezzanine estate.  And I would

20   advise the Court and I believe that the Court can

21   take notice of the claims docket in the Mezzanine

22   case, but in the Mezzanine case, among other claims,

23   there is an asserted Bay North claim that is listed

24   at $44 million.  Now, whatever disputes there may be

25   to that amount would certainly have to be resolved.

1    But at the end of the day, if there was anything left

2    to go to the holding level, which seems unlikely with

3    the magnitude of claims, then, of course, any claims

4    that have been asserted against Holding would have to

5    be paid before Park City I would be allowed to

6    receive any distribution as part of its liquidation

7    preference.

8              I'd also note for the Court that Park City

9    I did file a claim in the Holding case representing

10   its claim for its liquidation preference, but that

11   operating agreement that gives Park City I the

12   liquidation preference also provides that all claims

13   of Holding would have to be paid before Park City I

14   can receive any return.

15             And so notwithstanding the suggestion

16   that, you know, maybe in some hypothetical

17   situation -- and we do have to deal with, I guess,

18   hypotheticals calls because the possibilities seem

19   quite remote, but even addressing those it seems

20   unlikely that Park City I could be anywhere near the

21   money in this case, and I believe the Court's ruling

22   was correct on that score.  Thank you, your Honor.

23             THE COURT:  Mr. Wilson?

24             MR. WILSON:  May I just be heard briefly?

25   Alchemy Ventures Group has equity through its member,

1    Alchemy Ventures Trust, with regard to the Court's

2    comments on equity, joins in the statements of

3    counsel for Park City I.  However, I need to advise

4    the Court that Alchemy Ventures Trust is a 50 percent

5    owner of claimants, Cloud 9 Resorts, Sky Lodge

6    Development, LLC.

7              THE COURT:  I'm aware of that.  I was

8    talking about --

9              MR. WILSON:  I presumed that to be the

10   case.  And with that clarification, that's all I

11   have.  Thank you, your Honor.

12             THE COURT:  Mr. Blumenthal?

13             MR. BLUMENTHAL:  A couple of brief points,

14   your Honor.  The -- when your Honor outlined the

15   claims, I would just like to also add that the

16   testimony was there was additionally --

17             THE COURT:  Administrated.

18             MR. BLUMENTHAL:  -- over a million dollars

19   of administration claims and 200 priority claims.

20   And I just would like to point out, someone made

21   mention of the Bay North adversary, well, Easy Street

22   Mez and Easy Street Holding were also plaintiffs in

23   that action.  No one is precluding anyone from

24   pursing those actions up at that level.  But -- and I

25   also would just remind the Court that Easy Street

1   Partners also released its claims against WestLB in

2   the cash collateral stipulation and order in the

3   beginning of this case, and we didn't hear a word

4   from PC I at that point in time.  Because for them to

5   come here ten months later, I think it is a bit late.

6          THE COURT:  Well, I guess that Mr. Hofmann

7   raises one point that does concern the Court, and

8   that is that all of these debtors are -- do have the

9   same counsel.  And the Court has approved the

10  employment of counsel for the debtors, believing that

11  there is some judicial economy in having these

12  estates administered jointly.  I don't know that

13  there are any issues relating to the equity interest

14  of Park City I, LLC and Alchemy Ventures Group as

15  equity that would not be raised by Mr. Wilson,

16  representing Alchemy Ventures Trust as a 50-percent

17  member of Development and Management.  So I will at

18  this point continue to let Park City I and Alchemy

19  Ventures Trust participate in the hearing, but let's

20  try to keep the matter narrowly focused.  And

21  Mr. Wilson, I think that Mr. Shoaf was on the witness

22  stand and Mr. Wilson was going to cross-examine.  So

23  Mr. Shoaf, if you would come forward.

24          You are still under oath, Mr. Shoaf, so

25  you just may take the stand.

1      MR. WILSON:  Your Honor, Mr. Hofmann was

2  just speaking to me.  He has an obligation in another

3  court at 10:30 and wonders, could he go first.  I

4  certainly think that is --

5      THE COURT:  All right.  That would be

6  fine.

7      MR. HOFMANN:  Your Honor, much of my

8  questioning for Mr. Shoaf is -- probably goes beyond

9  the scope of direct.  Depending on the Court's

10 ruling, I -- for the interest of making this as quick

11 as possible, I would like to ask my questions now.

12 But if the parties would object on that basis and the

13 Court would sustain those, then I would request that

14 Mr. Shoaf be available for examination during Park

15 City's direct case instead.

16      THE COURT:  All right.  So the way that

17 Park City I anticipates this proceeding is once the

18 debtors have submitted their evidence, then Park City

19 I wishes to present its evidence?

20      MR. HOFMANN:  I think that would be normal

21 course, but in the interest of efficiency and making

22 this as quick as possible, I'm happy to take the

23 witness now as part of Park City I's direct case.

24 That would go beyond the scope of direct.

25      THE COURT:  Is there any objection to

1    that, Mr. Blumenthal?

2         MR. BLUMENTHAL:  Depending upon the

3    questions he asks, none.

4         THE COURT:  But preceding, allowing

5    Mr. Hofmann's examination exceeds the scope of direct

6    examination --

7         MR. BLUMENTHAL:  That is not a problem,

8    assuming it's relevant to this confirmation hearing.

9         THE COURT:  You may proceed, Mr. Hofmann.

10        MR. HOFMANN:  Thank you.

11

12              CROSS-EXAMINATION

13   BY MR. HOFMANN:

14        Q.     Mr. Shoaf, do you recall when WestLB

15   declared this -- that their loan to be in default?

16        A.     To be very precise, the loan was declared

17   in default on July 2 of 2009 but was due on March

18   29th of 2009.  So they demanded payment at that time.

19        Q.     On July 2nd?

20        A.     No.  They demanded payment on the 30th of

21   March.

22        Q.     And are you aware that there was a payment

23   of about $5.6 million in February 2008 to Bay North?

24        A.     Yes.

25        Q.     Do you believe that payment was either

1    improper or mistaken?

2         MR. BLUMENTHAL:  Objection.  It has really

3    nothing to do with this hearing, your Honor.

4         MR. HOFMANN:  It has to do with whether

5    the release of WestLB should be approved, your Honor,

6    in good faith.

7         MR. BLUMENTHAL:  Your Honor, the debtor

8    has not -- had released WestLB approximately ten

9    months ago and PC I did not object at that point in

10   time.

11        THE COURT:  Well, I think what Mr. Hofmann

12   is arguing, and this is -- I guess, taking this

13   examination out of order creates a bit of the

14   confusion.  I think the anticipation would be the

15   committee would testify regarding the proposed

16   settlement and then Mr. Hofmann would call Mr. Shoaf

17   to challenge the advisability of that settlement.

18        MR. HOFMANN:  If the Court would prefer,

19   I'm happy to take it in that order.

20        MR. BLUMENTHAL:  I would have the same

21   objection then, your Honor, because Easy Street

22   Partners is the -- had previously released them.  And

23   I think PC I clearly waived any issues regarding that

24   about ten months ago -- about nine months ago.

25        THE COURT:  Well, but the question is

1    focusing on the settlement of the committee's

2    litigation.  So proceed, Mr. Hofmann.

3              MR. HOFMANN:  Thank you.

4         Q.    (By Mr. Hofmann)  The payment to Bay North

5    was either improper or mistaken, correct?

6         A.    I don't know that I have the right to

7    judge what happened other than it did happen.

8         Q.    Well, could I direct you, then, Mr. Shoaf,

9    to Exhibit 1.  That's the amended disclosure

10   statement.  It's in the black binder in front of you.

11        A.    Sure.

12        Q.    If you would, turn to page eight.  Well,

13   first of all, do you recognize the disclosure

14   statement?

15        A.    Yes.

16        Q.    Did you direct its filing with the

17   bankruptcy court?

18        A.    Yes.

19             MR. HOFMANN:  Your Honor, I'd request

20   admission of Exhibit 1.

21             THE COURT:  Well, perhaps we should

22   renumber it as Exhibit A.  We already have Exhibit 1

23   and Exhibit W1, so...

24             MR. HOFMANN:  I agree.  Perhaps when this

25   is done, we could renumber them PC-1.  I think the

1    debtor also has A and B.  That might be easiest.

2            THE COURT:  All right.  The Court will

3    receive Exhibit PC-1.

4            (Exhibit-PC-1 received.)

5        Q.   (By Mr. Hofmann)  Mr. Shoaf, I'm looking

6    at page eight of the disclosure statement, and I'm

7    looking at -- there is -- under Item 2, Bay North

8    Mezzanine loan, there is a second paragraph.  The

9    second sentence of that says, "It is the debtor's

10   position that the Bay North transfer was mistakenly

11   and/or improperly made."  Do you see that sentence?

12       A.   Yes.

13       Q.   Do you disagree with that statement?

14       A.   No.

15       Q.   Okay.  Did that payment lead to WestLB

16   declaring its loan to be in default?

17       A.   The loan was not renewed in March of 2009

18   and it was deficient by five million dollars

19   according to the records that WestLB provided me.

20   That money is one of the reasons that they did not

21   renew the loan.  It was due and payable on March 29th

22   and we were seeking a one-year renewal.

23       Q.   Did the debtor have the right under the

24   contract to extend the loan?

25       A.   If we had certain criteria, yes, sir.

1        Q.      Right.  Did the fact of the 5.6 million

2    dollar payment prevent the debtor from exercising the

3    right to extend the loan?

4        A.      It was one of the reasons, yes.

5        Q.      Did it lead to the failure to extend the

6    loan -- or the -- WestLB refusing to allow the debtor

7    to extend the loan?

8                MR. BLUMENTHAL:  Object to the form.

9                THE COURT:  Sustained.

10       Q.      (By Mr. Hofmann)  Did the 5.6 million

11   dollar payment to WestLB lead to the failure of

12   WestLB to extend the WestLB senior loan?

13               MR. BLUMENTHAL:  Object.  Same objection.

14   Form.  Also it calls for what was in WestLB's mind.

15               THE COURT:  I don't think it calls for a

16   question of what was in WestLB's mind.  So the

17   objection is overruled.

18               THE WITNESS:  The payment of the 5.6

19   resulted in the deficiency of the balance, which was

20   one of the reasons they cited for not renewing the

21   loan.

22       Q.      (By Mr. Hofmann)  Let me try it this way.

23   If you would turn back to that same page, Exhibit

24   1 -- PC-1, excuse me -- page eight, footnote five.

25       A.      Sure.

1       Q.      The second sentence starts, "The debtors

2    assert that the erroneous payment has led to -- " and

3    I'll skip some language.  "Item B, failure of WestLB

4    to extend the WestLB senior loan."  Do you see that?

5       A.      Yes.

6       Q.      Do you believe that is an accurate

7    statement?

8       A.      Yes.

9       Q.      Okay.  Thank you.

10              When WestLB declared its loan to be in

11   default, how much money was in WestLB's lockbox bank

12   account on behalf of the debtor?

13      A.      Well, three and a half million is my

14   recollection.

15      Q.      And was one of the purposes of that

16   lockbox account to pay interest due on the WestLB

17   loan?

18      A.      Well, we need to be clear.  There were

19   several accounts.  There was a lockbox account and

20   there were three escrow accounts.  The 3.5 million,

21   more or less, was in the escrow accounts, which was

22   from net proceed sales from real estate sales.  The

23   lockbox account was money that travels in the course

24   of doing -- operating business.

25              We would use money from a lockbox account

1   to pay interest, and if we had a deficiency in the

2   lockbox, we would request that funds be sent from the

3   escrow accounts to fill the lockbox up.

4           Q.    Did you request that those -- the money in

5   those accounts be used to pay WestLB's interest

6   payments?

7           A.    We made a distribution -- a request for

8   payment of three months of interest, yes.

9           Q.    Did WestLB grant that request?

10          A.    No.

11          Q.    Did the debtor request -- make that

12  request more than once?

13          A.    We made one formal request and I don't

14  remember how many times we may have asked on the

15  phone.

16          Q.    Several times?

17          A.    Yes.

18          Q.    And all of those requests were refused?

19          A.    Yes.

20          Q.    Were one of the purposes of one or more of

21  the accounts you just mentioned to pay for

22  contractors doing work on the property?

23          A.    Yes.  Those would be the escrow accounts.

24          Q.    With the 3.5 million dollars in it?

25          A.    Correct.

1    Q.    And did you request that that money be
2    made available to pay contractors working on the
3    property?
4    A.    Yes.   Distribution 23 was submitted in, if
5    I remember correctly, February of 2009.
6    Q.    And did WestLB agree to that distribution?
7    A.    It did not fund it, no.
8    Q.    Before WestLB had declared its default,
9    had it used funds from those accounts to pay interest
10   on its loan?
11   A.    Yes.
12   Q.    Do you know why Bay North declared its
13   loan to be in default?
14   A.    Yes.   Because the senior loan was not
15   renewed.   One of the conditions of our loan with the
16   Mezzanine was that that loan be current and in place
17   or paid off.   One or the other.
18   Q.    And was that declared default the basis of
19   Bay North attempting to foreclose its security
20   interest?
21   MR. BLUMENTHAL:   Objection.   I don't know
22   if he has the actual notice of default.
23   THE COURT:   What was the question,
24   Mr. Hofmann?
25   MR. HOFMANN:   My question was, was the

1    basis of Bay North attempting to foreclose its

2    security interests the cross default on the WestLB

3    that Mr. Shoaf described.

4                THE COURT:  That was the question?

5                MR. BLUMENTHAL:  That was a different

6    question.

7                MR. HOFMANN:  My memory is not perfect,

8    your Honor.  I do the best I can.  That is a

9    rephrasing of what I had intended to say.

10               THE COURT:  Is there an objection to that

11   question?

12               MR. BLUMENTHAL:  No, sir.

13               THE COURT:  All right.  Okay.  You may

14   answer that question.

15               THE WITNESS:  To the best of my

16   recollection, there was one -- I don't remember

17   exactly.  There were several reasons given.  That was

18   one of them.

19       Q.    (By Mr. Hofmann)  That was one of them.

20               When money was not paid out of the reserve

21   account to contractors on the properties, you

22   testified, did that lead to the question of

23   mechanic's liens against the debtor's real property?

24       A.    Yes.

25       Q.    Did you convince some mechanic's

 1    lienholders to hold off in asserting mechanic's liens

 2    against the property?

 3         A.    We have a -- I have a very good

 4    relationship with Jacobsen.  And as a result, they

 5    basically worked for as long as they could before

 6    compromising their position under the law.  So they

 7    took -- they took as much time as they could to try

 8    to not go to that step.

 9         Q.    And you encouraged them to do that?

10         A.    I asked them, yes.

11         Q.    Why did you ask them?

12         A.    Because if we got liens on the property,

13    it would not be good for anybody involved.

14         Q.    Would it impede the debtor's ability to

15    sell fractional units?

16         A.    Yes.

17         Q.    And eventually mechanic's liens were

18    asserted, correct?

19         A.    That's correct.

20         Q.    And that did, in fact, impede the sale of

21    fractional units?

22         A.    Yes.

23         Q.    Do you believe that WestLB had a

24    legitimate basis to declare this loan in default?

25         A.    Yes.

1    Q.    You don't believe their declaration of a

2  default was wrongful?

3    A.    We did not -- we were unable to provide

4  the five million dollars as a partnership to pay down

5  the loan to meet the criteria of their renewal, and

6  so we were compromised with regards to our ability to

7  get that renewal done.

8    Q.    So you believe WestLB was within its

9  rights when it declared the loan in default?

10    A.    I think so, yes.

11    Q.    Okay.  Are you aware that the unsecured

12  creditors committee in this case has sued WestLB?

13    A.    I'm aware they have sued it, yes.

14    Q.    Have you read the Complaint in that case?

15    A.    No.

16    MR. HOFMANN:  Okay.  Your Honor, at this

17  point, I'd like the Court to take judicial notice of

18  Exhibit 2, or PC-2, to be consistent.  That is the

19  creditors committees' Complaint against WestLB.

20    THE COURT:  Any objection?

21    MR. BLUMENTHAL:  No, your Honor.

22    THE COURT:  Exhibit PC-2 is received.

23    (Exhibit-PC-2 received.)

24    Q.    (By Mr. Hofmann)  Mr. Shoaf, could I

25  direct you to Exhibit PC-2?

1        A.     Yes, sir.

2        Q.     I'd like you to read to yourself, if you

3    would, Paragraph 6 that is on page three.

4        A.     Okay.

5        Q.     Do you believe that WestLB's conduct,

6    focusing on bullet point one, resulted in the debtors

7    being required to seek bankruptcy protection?

8        A.     No.   The debtor went under bankruptcy

9    protection on the 14th of September because they were

10   going to be foreclosed on on the 16th of September by

11   Bay North Apple Group.

12       Q.     And Bay North's default was a result of

13   WestLB declaring a default?

14              MR. BLUMENTHAL:  Object to form.  I'm

15   sorry.

16              THE COURT:  Sustained.

17              MR. HOFMANN:  I'll withdraw the question

18   anyway.

19       Q.     (By Mr. Hofmann)  Do you believe that

20   WestLB's conduct -- I'm going to focus on bullet

21   point one -- or Roman numeral -- Romanette II in

22   Paragraph 6 -- resulted in WestLB refusing to release

23   escrow funds under its control?

24       A.     I'm not sure I understood what -- say that

25   again.  I'm not sure I understood.

1      Q.     Do you believe that WestLB's conduct

2   resulted in WestLB refusing to release escrow funds

3   under its control?

4      A.     I don't understand what you mean by

5   WestLB's conduct.

6      Q.     Their conduct in declaring an event of

7   default under the loan and refusing to extend it.

8      A.     I believe that WestLB asserted that the

9   money in escrow was needed to pay the shortfall of

10  the five million dollars created by the transfer to

11  Bay North, and as a result, they would not let any of

12  that money go.

13     Q.     Do you know who directed the transfer to

14  Bay North?

15     A.     It was done by WestLB.

16     Q.     Okay.  Mr. Shoaf, do you hold a position

17  with Easy Street Mezzanine, LLC?

18     A.     Yes, I do.

19     Q.     What is your position with that entity?

20     A.     I'm one of the partners.

21     Q.     Are you the -- are you the member of that

22  entity -- or the manager of that entity?  Excuse me.

23     A.     That's a good question.  I don't really

24  know if I still am.  I was at one point, yes.

25     Q.     Okay.  And with respect to Easy Street

1    Holding, do you hold a position related to that

2    entity?  Are you the manager of that entity?

3          A.    I'm a partner and I -- the same answer

4    with regards to Mezzanine.  I'm not sure what I am at

5    this point.

6          Q.    Do you believe that the plan in the Easy

7    Street Partners case in any way benefits Easy Street

8    Mezzanine or Easy Street Holding?

9                MR. BLUMENTHAL:  Objection.  Calls for a

10   legal conclusion.

11               MR. HOFMANN:  I think on direct --

12               THE COURT:  Sustained -- or -- excuse me.

13   Overruled.  You may answer.

14               THE WITNESS:  I'm not sure -- I'm sorry.

15   Could you say that --

16         Q.    (By Mr. Hofmann)  Does the plan that's

17   proposed in the Easy Street Partners case, the plan

18   under consideration today, does it benefit in any way

19   Easy Street Mezzanine or Easy Street Holding, LLC?

20               THE COURT:  Okay.  Okay.  That wasn't your

21   question.  I think you asked what his -- if he

22   believed it benefited.

23               MR. HOFMANN:  As usual, the Court's memory

24   is better than mine.

25         Q.    (By Mr. Hofmann)  The question is, did you

1    believe that the plan under consideration benefits

2    either of those two entities?

3          A.    I don't know.

4          Q.    You don't know?

5          A.    I don't know.

6          Q.    Have you considered whether it benefits

7    them?

8          A.    No.

9          Q.    Okay.  Do you know if any of the entities

10   holding member interests in Easy Street Holding voted

11   to submit the plan under consideration to the Court?

12         A.    Yes.

13         Q.    They did?  And when did that occur?

14         A.    A formal vote?

15         Q.    Yes.

16         A.    Well, the two of us or three of us are all

17   managers of the events we're going through.  So Philo

18   Smith, myself, and Michael Fader of PC I are the

19   three managers that are running this process for

20   everybody.

21         Q.    And did Mr. Fader vote in favor of

22   submitting the current plan to the Court?

23         A.    He did not object.  I don't know -- we

24   didn't do a formal vote, sir.  But Philo and I have

25   agreed and it was distributed to Mr. Fader and we

1    haven't, frankly, heard from Mr. Fader in many

2    months.

3         Q.    Do you believe you are authorized to

4    propose the plan on behalf of Easy Street?

5         A.    Yes.  We have -- two out of three votes

6    authorizes us to proceed forward.

7              MR. HOFMANN:  No further questions, your

8    Honor.

9              THE COURT:  Thank you.  Mr. Hofmann, when

10   you need, you may be excused from the hearing.

11             MR. HOFMANN:  Thank you, your Honor.

12             THE COURT:  So, Mr. Wilson, hopefully we

13   won't retrace the questions that Mr. Hofmann asked.

14             MR. WILSON:  I'm not smart enough to

15   conduct that examination, your Honor.

16             THE COURT:  All right.

17             MR. WILSON:  We should not.

18

19                  CROSS-EXAMINATION

20   BY MR. WILSON:

21        Q.    Good morning, Mr. Shoaf.

22        A.    Good morning.

23        Q.    May I ask you to look at W1's chart?

24        A.    Uh-huh.

25        Q.    Would you look at the box "Easy Street

1   Holding, LLC" and then the line directly above that,

2   and do you note there the box designating ABG-SL,

3   LLC?

4          A.    Yes, sir.

5          Q.    And at the time this chart was prepared,

6   was ABG-SLC the designated manager of Easy Street

7   Holding?

8          MR. BLUMENTHAL:  Objection.  We don't know

9   who prepared or when this chart was prepared.  I

10  think it's -- and it's not in evidence.  He can ask

11  the witness whether it's correct or not, but I don't

12  believe that's an appropriate question.

13         MR. WILSON:  I'm just going to do that,

14  your Honor.

15         THE COURT:  Why don't you do that?

16         MR. WILSON:  I'm pleased to do that.

17         Q.    (By Mr. Wilson)  And let me just ask --

18         THE COURT:  I mean, I thought you were

19  just going to ask your question without referring to

20  the chart.

21         MR. WILSON:  No, I'm going to refer to the

22  chart.

23         THE COURT:  Oh, okay.

24         MR. WILSON:  If it weren't for the chart,

25  we'd all just not be having good days.  But I will

1    pose a question.

2         Q.    (By Mr. Wilson)  Was -- in the -- at the

3    time this venture was formed with regard to these

4    Easy Street entities, was ABG-SL, LLC the designated

5    manager of Easy Street Holding?

6         A.    At the time we formed?

7         Q.    Yes.

8         A.    Yes.

9         Q.    Good.  And who were the owners then of

10   ABG-SL, LLC?

11        A.    Alchemy Ventures Trust and Cloud 9

12   Resorts.

13        Q.    Okay.  Alchemy Ventures Trust was owned or

14   controlled wholly by David Wickline; is that correct?

15        A.    At that time, yes, that was my

16   understanding.

17        Q.    And Cloud 9 Resorts, which was a

18   50-percent owner was controlled by you?

19        A.    Still is, yes, sir.

20        Q.    Thank you.  And so the manager of Easy

21   Street Holding was controlled 50 percent by you and

22   50 percent by Mr. Wickline; is that correct?

23        A.    Yes.

24        Q.    Thank you.  In August of -- and I think

25   maybe August 2nd of 2009, was a meeting of the

1    members of Easy Street Holding held?

2         A.    I don't remember the exact date, but in

3    August we did have meetings, yes, sir.

4         Q.    Okay.  And at one such meeting, was a vote

5    taken to discharge ABG-SL, LLC as manager of Easy

6    Street Holding?

7         A.    Yes, it was.

8         Q.    Thank you.  And who was -- who were

9    appointed as managers to replace ABG-SL?

10        A.    Philo Smith and Elizabeth Rad.

11        Q.    Isn't it true that you were likewise a --

12   designated as a manager?

13        A.    Not until later, no, sir.

14        Q.    Okay.  When later did you become a

15   manager?

16        A.    When the partnership voted to move forward

17   with a bankruptcy.

18        Q.    Okay.  And who are the managers now of

19   Easy Street Holding, LLC?

20        A.    The managers of that, I would assume --

21   I'm still confused on that -- I would assume is Philo

22   Smith, myself, and Michael Fader.

23        Q.    Okay.  And isn't it true that you did, in

24   fact, sign the petition -- Chapter 11 petition -- in

25   this case as a manager?

1          A.    Yes, sir.

2          Q.    Thank you.  And when -- I think my

3    question was a little unfair.  You did sign the

4    petition of Easy Street Holding, the bankruptcy

5    petition of Easy Street Holding, as manager?

6          A.    I think I signed all three as manager.

7          Q.    Thank you.  All right.  I think I said

8    "this case" and this case is really Partners, so

9    thank you for your answers there.

10              When -- after ABG-SL was discharged as

11   manager, did that effectively terminate or cease the

12   managerial responsibilities or opportunities of

13   Mr. Wickline in the Easy Street venture?

14              MR. BLUMENTHAL:  Object to the form as he

15   used the word "opportunities."

16              MR. WILSON:  I think it's not a bad

17   question, your Honor.  It's very general.

18              THE COURT:  Well, it is maybe too general.

19              MR. WILSON:  Well, I'm always --

20              THE COURT:  I'm going to sustain the

21   objection and ask that you rephrase the question.

22              MR. WILSON:  Okay.

23         Q.    (By Mr. Wilson)  Okay.  Since the

24   termination of ABG-SL as manager, have you, as a

25   co-manager of the Easy Street entities, sought any

1    input from Mr. Wickline with regard to management

2    decisions?

3           A.    No, sir.

4           Q.    When the decision was made to file the

5    three petitions on behalf of Holding, Mezzanine, and

6    Partners, was a meeting of the members of those

7    three -- were meetings of the members of those three

8    entities held?

9           A.    There was a meeting of all four entities,

10   sir.

11          Q.    Which four?

12          A.    AB -- Alchemy Ventures, Cloud 9, PC 1, and

13   Smith Trust.  The form, by the way, is incorrect that

14   you have in the exhibit.

15          Q.    What is incorrect?

16          A.    This form is incorrect.

17          Q.    Oh.  Well, explain to me what is

18   incorrect.

19          A.    Philo Smith is a hundred percent owner of

20   an entity called the Philo Smith Junior Trust.

21          Q.    Yes.

22          A.    And Utah Coal and Lumber is no longer

23   involved in the property.

24          Q.    I see.  Okay.  And the -- well, so let's

25   just ask this.  Was a meeting of the members of Easy

1    Street Holding, LLC held prior to the filing of the

2    bankruptcy petition for Easy Street Holding?

3          A.    Yes, sir.

4          Q.    Was it noticed to all of the members?

5          A.    Yes, sir.

6          Q.    Was it noticed to Alchemy Ventures Group,

7    LLC?

8          A.    Yes.

9          Q.    All right.  And when was that meeting

10   held?

11         A.    I'd have to check my records.  It was

12   sometime in September.

13         Q.    Okay.  Did Mr. Wickline know about the

14   meeting?

15         A.    Yes, sir.

16         Q.    Did he participate?

17         A.    I think so, yeah.  Sure, yes.

18         Q.    Did he vote in favor of filing of the

19   bankruptcy petition of Easy Street Holding?

20         A.    No, he did not.

21         Q.    Did he vote against?

22         A.    Yes, he did.

23         Q.    Okay.  Now, there are two entities on this

24   chart:  Cloud 9 Resorts-Sky Lodge Development, LLC to

25   the right, and Cloud 9 Resorts-Sky Lodge Management,

1  LLC to the left.  And I think we've been talking

2  about them generally in this case as Management and

3  Development.  Are you comfortable with that

4  designation?

5       A.    Yes.

6       Q.    All right.  And are each of these two

7  entities, Resorts and Development --

8       A.    You mean Management and Development.

9       Q.    Management and Development, thank you --

10  are each of these two entities, Management and

11  Development, owned or controlled by an entity which

12  Mr. Wickline controls and an entity which you

13  control?

14       A.    They are owned 50-50 by two entities that

15  each of us own, and they are controlled with joint

16  decisions in a hundred percent vote.  Fifty doesn't

17  carry.

18       Q.    Thank you.

19            THE COURT:  Mr. Wilson, let me interrupt

20  you.

21            MR. WILSON:  Please.

22            THE COURT:  Try not to lose your train of

23  thought.  I know that Mr. Hofmann is going to need to

24  leave soon.  You and Mr. Hofmann are also

25  participants in a hearing currently set this

1    afternoon in another case.

2              MR. WILSON:  Is that right, your Honor?

3              THE COURT:  Well, it's currently right,

4    but I'm about to change it.  The hearing this

5    afternoon will be continued to tomorrow at noon.  And

6    so I'm going to take a brief recess.

7              Mr. Hofmann can -- what I'm going to do

8    is -- it looks like about the time Mr. Hofmann needs

9    to leave.  I'll take a brief recess.  You can contact

10   the parties associated with the CW Mining case and

11   inform them that they need not appear.

12             MR. WILSON:  That will be fine.  I'll see

13   that my office contacts that sphere.

14             MR. HOFMANN:  Your Honor, it's the

15   court -- I have Mr. Bollie whose appearance is

16   timely.  Depending on the Court's pleasure, we can

17   play it by ear.  We may very well finish this hearing

18   and my absence need not impede the progress.

19             THE COURT:  Well, I was skeptical Friday.

20   I'm skeptical today.  So I'm going to open the

21   afternoon so that -- it's not fair to make Mr. Havel

22   and Mr. Blumenthal come back.  I know that it's an

23   imposition on the CW Mining parties, but sometimes

24   the Court is forced to juggle.

25             If Mr. Bollie is here -- well, I need to

1    take a brief recess because I need to contact my -- I

2    need to let my judicial assistant -- give her some

3    instructions because I'm going to have to continue

4    another hearing tomorrow afternoon to accommodate the

5    CW Mining case.

6             So the Court will take a brief recess.

7             THE BAILIFF:  All arise.

8             (Recess at 10:24 until 10:41 a.m.)

9             THE BAILIFF:  All arise.  Court resumes

10   its session.  Please be seated.

11            THE COURT:  Just to keep parties advised,

12   as some of you may know, Judge Boulden is retiring

13   later this afternoon.  There is a formal recognition,

14   a retirement farewell.  So we'll need to conclude by

15   4:45.  I can't -- I'm hoping that wouldn't even be an

16   issue.  But there is also an informal recognition

17   with the court staff today, and so I'll need to

18   recess today about 11:45 and we'll reconvene at 1:00.

19   So hopefully that will -- we could reconvene at

20   12:45, but 1:00 probably is easier to remember.

21            So, Mr. Wilson, you may proceed.

22            MR. WILSON:  Thank you.

23        Q.    (By Mr. Wilson)  Mr. Wickline, the plan

24   that is currently before the Court for a

25   confirmation --

1           THE COURT:  Mr. Shoaf, I think.

2           Q.    (By Mr. Wilson)  Mr. Shoaf, I'm sorry.

3    Who did I call you?

4           A.    You called me David Wickline.

5           Q.    You know what --

6           MR. BLUMENTHAL:  He doesn't even know who

7    his own client is, your Honor.

8           THE COURT:  Which I will overlook as --

9           MR. WILSON:  And I'll admonish you and

10   everybody else around me, I have to -- you just have

11   to listen to what I'm thinking, not what I'm saying

12   and we'll be fine.

13          Thank you.  I do know who you are.

14          Q.    (By Mr. Wilson)  The plan that was

15   previously proposed by the debtor, Easy Street

16   Partners, did provide, did it not, for payment of the

17   Management and Development claims in excess of

18   $1,600,000 in full?

19          A.    The answer to that, Mr. Wilson, is that

20   there was a provision that after no sooner than four

21   years that those two -- that those two claims could

22   be paid at the option of the plan funder.  In that

23   particular plan, the plan funder was a third party,

24   and part of that structure was the payment of Bay

25   North's outstanding loans.  So, yes, it did --

1          MR. BLUMENTHAL:  Objection.  Go ahead.

2     I'm sorry.

3          THE COURT:  Well, I'm not sure that the

4     question was entirely responsive, but...

5          MR. WILSON:  I'm okay with it, your Honor.

6          THE COURT:  Okay.

7     Q.     (By Mr. Wilson)  Mr. Shoaf, yesterday --

8     on Friday, you testified somewhat about the liquor

9     licenses, and you had mentioned that -- that prior to

10    November of 2007 you had had some involvement with

11    liquor licenses in the Park City area.  Am I

12    remembering that correctly?

13    A.     From 2002 on, yes.

14    Q.     Thank you.  And then with regard to this

15    particular property, the Sky Lodge, it's true, is it

16    not, that the liquor license applications began

17    November 2, 2007?

18    A.     I don't know the exact date, but in

19    November, yes, sir.

20    Q.     Okay.  Thank you.  And were you involved

21    in that application process?

22    A.     I was in charge of it, yes, sir.

23    Q.     Thank you.  And the process does require

24    that principals of the applicant come forward and

25    present themselves and undergo a criminal history

1    background check; is that correct?

2         A.     Specifically anyone who owns more than 20

3    percent of whatever entity is involved must present

4    themselves to the alcoholic beverage commissions.

5         Q.     And then you did, in fact, undergo that

6    background check, did you not, in connection with the

7    initial November applications?

8         A.     Yes, sir.

9         Q.     Thank you.  And as did Mr. Wickline; is

10   that correct?

11        A.     That's correct.

12        Q.     All right.  And the original applications

13   were made in the -- on behalf of Cloud 9 Resorts-Sky

14   Lodge Management, LLC, were they not?

15        A.     The -- to be specific, those were issued

16   to Cloud 9 because we were the manager of the entity,

17   but the holders of the licenses are always the

18   individuals, which is why you have to submit yourself

19   personally.

20        Q.     Thank you.  Excuse me a moment.  Are you

21   familiar with a company by the name of Cloud 9 Resort

22   Clubs, LLC?

23        A.     Yes.

24        Q.     Tell me what entity that is.  Describe it,

25   please.

1      A.      It's a special entity that I own a hundred

2   percent of.

3      Q.      Thank you.  And the same question, please,

4   with regard to Cloud 9 Resorts-SRR Management, LLC.

5      A.      That is an entity that I no longer have

6   any holdings in.  That was formed when Elizabeth Rad

7   purchased Sorrel River Ranch and asked me to be

8   involved for a period consulting when she bought it

9   and to help her do certain efforts down there.

10     Q.      Okay.  The liquor licenses are renewed on

11  an annual basis, are they not?

12     A.      That's correct.

13     Q.      And the renewal period ends what date?

14     A.      It depends on the license.  There are

15  certain licenses that renew in July and certain that

16  renew in October.

17     Q.      Okay.

18     A.      October, November.

19     Q.      And there were licenses associated with

20  the -- with the Sky Lodge that are up for renewal

21  June 30, are there not?

22     A.      They have been renewed as far as I know.

23     Q.      And the process has been undertaken, has

24  it not?

25     A.      Yes.  It takes about 45 to -- days to do

1    the process.  You have to do an audit.  You have to

2    do a lot of application work.

3              MR. WILSON:  Okay.  May I have this

4    marked, your Honor?

5              THE COURT:  You may.

6              MR. BLUMENTHAL:  Do you have copies?

7              MR. WILSON:  Two, perhaps.

8              THE COURT:  All right.  Have you shared

9    that with counsel?

10             MR. WILSON:  No, but I'm going to.

11             THE COURT:  All right.

12             MR. WILSON:  May I approach, your Honor?

13             THE COURT:  You may.

14        Q.    (By Mr. Wilson)  Mr. Shoaf, may I show you

15   what has been marked as Exhibit W-2, please, and ask

16   if you are familiar with it.

17        A.    Yes, I am.

18        Q.    Tell me what it is or tell the Court what

19   it is, please.

20        A.    This is a club liquor license renewal

21   package for the bar that is located on the fourth

22   floor of the Sky Lodge.

23        Q.    Okay.  Thank you.  And what involvement

24   did you have with this document?

25        A.    As the holder of the renewing license, I

1    had to fill it out and provide the State with all the

2    data and information they requested.

3              MR. WILSON:  Okay.  I'll move the

4    admission of Exhibit W-2.

5              THE COURT:  Any objection?

6              MR. BLUMENTHAL:  No, your Honor.

7              THE COURT:  Exhibit W-2 is received.

8              (Exhibit-W-2 received.)

9              MR. WILSON:  Thank you.

10             Q.     (By Mr. Wilson)  If you would look at page

11   two.  And do you see that -- that -- the State of

12   Utah Department of Alcohol and Beverage Control

13   acknowledges receipt of this renewal on May 20, 2010?

14             A.     Uh-huh, yes.

15             Q.     Thank you.  Would you look at the next

16   page, Form A, please, and describe what that is,

17   please?

18             A.     It's basically my answering the questions

19   associated with renewal.

20             Q.     Thank you.  And would you look at the next

21   page, which I believe at the bottom right, I'm just

22   noticing, identifies itself as page four of nine.  Do

23   you have that?

24             A.     Yes, sir.

25             Q.     And do you see that your signature appears

1    on that document?

2         A.    Well, I know it did, but it's been blacked

3    out.

4         Q.    I see.  Thank you.  May I refer you to

5    page five of nine.  It's Form B.

6         A.    Uh-huh.

7         Q.    All right.  Look at Paragraph 2, please,

8    and do you see the words, "Cloud 9 Resorts-Sky Lodge

9    Management, LLC"?

10        A.    Yes, sir.

11        Q.    Good.  And you note that that has been

12   blacked out -- or excuse me -- lined out?

13        A.    That's correct.

14        Q.    And who lined that out?

15        A.    I did.

16        Q.    And what -- has it been replaced by, in

17   handwriting, another entity?

18        A.    Yes.  Cloud 9 Resorts Club, LLC.

19        Q.    And that is the entity that you control

20   100 percent?

21        A.    That is correct.

22        Q.    Thank you.  And Cloud 9 Resorts

23   Management, LLC is the entity, is it not, that

24   appears on Exhibit W1 in the lower right-hand corner;

25   is that correct?