1        A.     Yes.

2        Q.     That is the entity that is --

3               MR. BLUMENTHAL:  Your Honor, I'd just

4    correct the record.  I think it's in the lower

5    left-hand corner.  Didn't you say lower right-hand

6    corner?

7               MR. WILSON:  I did, but -- and you'll have

8    to just listen to what I'm thinking.

9        Q.     (By Mr. Wilson)  Lower left-hand corner,

10   please.

11       A.     That's correct.

12       Q.     Thank you.  We'll be okay if we don't get

13   any worse than that.

14              And that is an entity -- Management is,

15   again, the entity that is controlled 50 percent by an

16   entity you own and 50 percent by an entity

17   Mr. Wickline owns?

18       A.     That's correct.

19       Q.     Thank you.  And would you look at Form C,

20   please.

21       A.     I'm sorry?

22       Q.     Form C.  It's the next page.  Six of

23   eight.

24       A.     Oh, yes.

25       Q.     Thank you.  And do you find that, as in

1    the case of the previous page, that the name of one

2    entity has been lined out and another entity has been

3    written in its place?

4          A.     That's correct.

5          Q.     Thank you.  Was there any meeting of the

6    members or managers of Management in which the issue

7    of this liquor license application was discussed?

8          A.     No.

9          Q.     Thank you.  I'm wondering if you would

10   please reach for the white binder and turn, please,

11   to Exhibit 9 -- I believe that's been admitted -- and

12   describe briefly for the Court what Exhibit 9 is.

13         A.     This is a draft of an employment agreement

14   between myself and Heber Avenue, LLC for my continued

15   involvement, post confirmation.

16         Q.     Thank you.  Have you signed this document?

17         A.     No, I have not.

18         Q.     But has Heber Avenue Partners signed the

19   document?

20         A.     It appears so, yes, sir.

21         Q.     Are you in agreement with the terms of

22   this employment agreement?

23         A.     We are in agreement with most of the

24   terms.  There is one part that has not been

25   completed.

1      Q.      What part is that?

2      A.      It has to do with the management contract

3  for Gemstone as it relates to a clause that we have

4  not yet seen.

5      Q.      Okay.  Thank you.  Would you turn to page

6  three of Exhibit 9?

7      A.      Yes.

8      Q.      And I'll refer you to -- it will be

9  paragraph 4, but it's subparagraph (c), small c in

10  parenthesis.

11      A.      Yes.

12      Q.      It's short.  Would you just read that

13  provision, please?

14      A.      "In the event the employee is successful

15  in consummating the license transfer, employee shall

16  be entitled to a," quote, "'transition bonus,'" end

17  quote, "of $240,000 payable at employee's option,

18  either in lump sum within 30 days following the

19  license transfer or in equal monthly installments

20  over the balance of the employment term."

21      Q.      And you are the employee?

22      A.      That's correct.

23      Q.      All right.  So -- and do I understand this

24  correctly that if the liquor license issues are

25  resolved in favor of the Heber Avenue Partners that

1    you, as employee, will be entitled to a transition

2    bonus of $240,000?

3         A.    That is incorrect.

4         Q.    Okay.  What is wrong?  What did I -- what

5    do you --

6         A.    I think if you were to refer to Section 3,

7    "Duties and extent of services," basically, my

8    involvement, continued involvement, at the property

9    is on two levels.  The first level is initial, which

10   is during the time I am to work with Heber Avenue,

11   LLC and their appointed management company to

12   transition all of the necessary regulatory licensing

13   and other permits that are needed to run the

14   property.  During that time, I would remain in place

15   as a manager as per the code of the Alcoholic

16   Beverage Act to keep licenses such as the liquor

17   license and the license for Park City and other

18   licenses in place so that there is no disruption of

19   the business.  At that same time, I will be involved

20   in working with the homeowners who are part of the

21   rental program to facilitate their transition from

22   Cloud 9 and SL Management to the new entity that will

23   be running the property, as well as working with the

24   employees to keep them in a positive frame and

25   hopefully retain as many as possible.  In addition to

1    that, I will be involved in the community and with

2    government agencies to make the transition as

3    seamless as possible to retain the value of the

4    property.

5         Q.    Thank you.  And upon the successful

6    completion of the license transfer described here,

7    then you, as employee, would be entitled to the

8    transition bonus of $240,000; is that correct?

9         A.    Upon the completion of everything I just

10   told you.

11        Q.    That wasn't the question.

12        A.    Being very precise, there is no transfer

13   of any licenses in the state of Utah particularly --

14        Q.    Would you just -- if you would just please

15   answer my questions.  I'm going to try to make them

16   as simple as I can.

17        A.    Okay.

18        Q.    And so, let's just do that.  Upon

19   completing what is described in here as license

20   transfer, then you, as employee, will be entitled to

21   the transition bonus of $240,000; is that correct?

22        A.    Correct.

23        Q.    Thank you.  And that is, if I read this

24   correctly, at your option, the employee's option, you

25   can either have it in a lump sum within 30 days or in

1   equal monthly installments over the balance of the

2   employment term, which I believe to be 24 months; is

3   that correct?

4          A.     That's correct.

5          Q.     Thank you.  Mr. Shoaf, in this case -- and

6   I'm sorry, I do not have the docket entry, but

7   everybody else will have it but me -- there has been

8   filed a declaration of Michael B. Blumenthal, counsel

9   for the debtor, regarding tabulation of votes.  Are

10  you familiar with that document?  Did you happen to

11  see that as a participant in the hearing?

12         A.     I may have.  I'm not -- I don't have all

13  these documents sort of committed to memory.

14         Q.     I don't blame you.  Thank you.

15                MR. WILSON:  I'm going to -- I don't

16  propose to have it marked.  I suppose it would be

17  useful for the lawyer participants and the Court to

18  at least have access to it.  Does one of you have a

19  docket entry on that?  I believe it was lodged with

20  the Court yesterday morning -- Friday morning.

21                MR. BLUMENTHAL:  Your Honor, it was filed

22  the morning -- I believe Friday morning.  We can

23  stipulate that that document was filed Friday

24  morning.  We just don't know what the docket entry is

25  as we sit here.

1           MR. WILSON:  It's called "Declaration of

2    Michael B. Blumenthal."

3           THE COURT:  Actually it's filed, I think,

4    as an affidavit, but it is the docket entry 590.  It

5    appears to be the last docket entry.

6           MR. WILSON:  Thank you.

7      Q.    (By Mr. Wilson)  Mr. Shoaf, I'm going to

8    try to be fair, but you don't have a copy of this and

9    I've only got one.  But let's just -- let me try it

10   and -- the document filed by debtor's counsel is

11   really an administrative document.  It's not uncommon

12   in cases of this sort.  But it lists a Class 4 --

13   well, excuse me.  It lists Class 6 claims that have

14   voted on the plan, and it lists claims for

15   Development and Management.

16          THE COURT:  Mr. Wilson?

17          MR. WILSON:  Yes.

18          THE COURT:  I have a copy you could give

19   Mr. Blumenthal -- not Blumenthal -- Mr. Shoaf.  That

20   will be fairer.

21          MR. WILSON:  Thank you.  I don't think we

22   need to mark it.  Thank you.  I'm always happy to

23   have that help.

24      Q.    (By Mr. Wilson)  Would you please turn to

25   what has been nominated as Exhibit A11?  It's the

1    second-to-the-last document.

2                MR. BLUMENTHAL:  Are you referring to the

3    page that has the Class 6 ballots on it?

4                THE WITNESS:  Okay.

5        Q.    (By Mr. Wilson)  Thank you.  This will

6    make it easier.  Look at the first entry, "Cloud 9

7    Development."

8        A.    Uh-huh.

9        Q.    And it lists the address of the claimant,

10   William Shoaf, manager, and then a vote.  Do you see

11   the column in the middle, right in the middle,

12   "Accept, reject," and it lists that claim as having

13   been accepted?

14       A.    Uh-huh.

15       Q.    Did you, as manager of Cloud 9

16   Development, accept the treatment as reported in

17   Class 6 with regard to the --

18       A.    I'm sorry, did I what?

19       Q.    Let me try that again.

20               MR. BLUMENTHAL:  Your Honor, it's somewhat

21   confusing.  The witness is -- I don't believe has

22   ever seen this document.  It's my declaration.  I'd

23   be more than happy to clarify anything on this

24   document for Mr. Wilson.  But I'm not sure that --

25   it's relatively confusing to ask a witness to testify

1    about a document he has never seen or, in fact,

2    didn't prepare.

3                MR. WILSON:  My question -- excuse me --

4    oh, go ahead.

5                THE COURT:  Mr. Wilson, can't you ask

6    Mr. Shoaf the question without referring to a

7    document?

8                MR. WILSON:  Sure.  And --

9                THE COURT:  I mean, I understand

10   Mr. Blumenthal's point is that -- and I think you are

11   trying to help Mr. Shoaf, but --

12               MR. WILSON:  You've got it, your Honor,

13   and --

14               THE COURT:  I think you can just ask the

15   question --

16               MR. WILSON:  What I'm really interested in

17   is if this accurately reflects a vote which he cast.

18   So I'm going to go right there.

19        Q.    (By Mr. Wilson)  Mr. Shoaf, did you as

20   manager of Cloud 9 Development submit a rejecting --

21   excuse me -- an accepting ballot on the scheduled

22   claims of Development?

23        A.    Yes.

24        Q.    Thank you.  And it's a little confusing

25   because they -- it appears as though in certain

1     respects the claims of Development and Management

2     have been lumped and jumbled a little bit.  But did

3     you likewise --

4              A.     They have not.

5              Q.     They have not been jumbled?  Okay.

6                     But did you likewise submit on behalf of

7     Management an accepting ballot to the plan that is

8     before the Court for confirmation?

9              A.     Yes.

10             Q.     Thank you.  Did you -- was there any

11    meeting of members or any official meeting with

12    regard to the voting -- the voting or balloting with

13    regard to those two claims?

14             A.     No, because our bylaws allow for each

15    member to bind without meeting.

16             Q.     If you would look at, please, Class 7.

17             A.     Uh-huh.

18             Q.     Easy Street Mezzanine, LLC?

19             A.     Yes.

20             Q.     That would be the Class 7 equity security

21    holder -- in bankruptcy parlance, the owner of the

22    equity?

23             A.     Yes.

24             Q.     Are you the manager of Easy Street

25    Mezzanine?

1        A.     Along with Philo Smith and Michael Fader,

2    yes.

3        Q.     Okay.  And did you, in fact, submit as

4    reported in this declaration an accepting ballot on

5    behalf of Easy Street Mezzanine?

6        A.     Yes, I did.

7        Q.     Thank you.  By casting the ballots that we

8    have just talked about here, and if, in fact, the

9    casting of those ballots lead to confirmation of the

10   plan before the Court, isn't it true that that will,

11   in fact, implement the employment agreement?

12            MR. BLUMENTHAL:  Objection.  First of all,

13   casting of the ballot and the effect of casting of a

14   ballot of a class that gets no return under the plan,

15   which under the code is deemed to reject, will not

16   have a legal effect one way or another.  The question

17   is inappropriate, it's misleading, and I also object

18   to the form.

19            MR. WILSON:  I was fairly proud of that

20   question, your Honor, I can surely never duplicate

21   it.

22            MR. BLUMENTHAL:  Well, there is absolutely

23   no connection between the casting of the ballot and

24   the employment of --

25            THE COURT:  I think the question is

1    misleading.

2              MR. WILSON:  I'm going to -- let me

3    compartmentalize a little bit.

4              THE COURT:  I'm going to sustain the

5    objection.

6              MR. WILSON:  Thank you, your Honor.

7         Q.    (By Mr. Wilson)  Mr. Shoaf, did you, in

8    fact, cast the ballots that we have just discussed in

9    testimony today?

10             MR. BLUMENTHAL:  Objection.  Asked and

11   answered.

12             THE COURT:  Sustained.

13             MR. WILSON:  Thank you.

14        Q.    (By Mr. Wilson)  And if this plan is --

15   before the Court -- is confirmed today or pretty

16   soon, you agree that that will then implement the

17   employment agreement that is Exhibit 9?

18        A.    Along with many other things, yes, sir.

19        Q.    Thank you.  And that you will then be

20   entitled to such benefits personally as are outlined

21   in Exhibit 9, Employment Agreement?

22             MR. BLUMENTHAL:  Object.  The employment

23   agreement provides for when and if Mr. Shoaf will be

24   entitled to benefits.  It doesn't derive from the

25   plan.

1          MR. WILSON:  I hope my question --

2          MR. BLUMENTHAL:  It's a very misleading

3    question and it's just inappropriate.

4          MR. WILSON:  I hope my question was -- and

5    let me just try to again.  May I, your Honor?

6          THE COURT:  All right.

7          MR. WILSON:  Let me just see if I can

8    remedy it.  Well, you know, I'm --

9          THE COURT:  You probably have the evidence

10   in, Mr. Wilson.

11         MR. WILSON:  So do I.

12         THE COURT:  If the plan gets confirmed, we

13   have an employment agreement and it --

14         MR. WILSON:  You know, it's -- your Honor,

15   I've come to the same conclusion.  Not as soon as the

16   Court did, but shortly after and that concludes my

17   questions.

18         THE COURT:  All right.  Thank you.

19         MR. WILSON:  Thank you, Mr. Shoaf.

20         THE WITNESS:  Thank you, sir.

21         THE COURT:  Any redirect?

22         MR. BLUMENTHAL:  Well, I would wait to see

23   if anyone else has any cross-examination before I

24   conduct redirect.

25         THE COURT:  All right.  Is there any other

1    party wishing to cross-examine Mr. Shoaf?

2              And, actually, I guess it wouldn't be

3    redirect.  I guess it could also be

4    cross-examination.

5              MR. BLUMENTHAL:  Whatever.  And Mr. Havel

6    has a couple of questions, but he has agreed I'll go

7    first and he'll go second.

8              THE COURT:  That's fine.

9

10                   REDIRECT EXAMINATION

11   BY MR. BLUMENTHAL:

12        Q.    By the way, when Mr. Wilson showed you the

13   ballot certification, did you notice on there that it

14   was also a vote -- two votes:  One on behalf of --

15   for Class 6, one on behalf of Management to reject

16   the plan, and one on behalf of Development to reject

17   the plan that was filed by David Wickline?

18        A.    Where would I find that?

19        Q.    Can I...

20        A.    Oh, yes, sir.

21        Q.    It's actually reflected that it was filed

22   by Mr. Wilson on behalf -- do you see that?

23        A.    Yes, sir.

24        Q.    I would ask you the same question

25   Mr. Wilson asked you.  Did Mr. Wickline call you to

1    discuss or was there a meeting in conjunction with

2    him casting those two rejections?

3         A.    No, sir.

4         Q.    Would it be safe to say that both

5    Development and Management are effectively

6    deadlocked?

7         A.    Yes, sir.

8         Q.    Now, you testified that there was -- that

9    the employment agreement, there was one additional

10   item.  Isn't it correct that the employment agreement

11   won't change, but there was a requirement that you

12   had that there is a non-disparagement provision in

13   there, correct?

14        A.    With Gemstone, yes, sir.

15        Q.    No.  In the employment agreement, there is

16   no non-disparagement agreement, sir?

17        A.    I'm sorry.  Ask the question.

18        Q.    Isn't it a requirement that in the

19   Gemstone Management agreement that is going to be

20   executed, that they likewise agreed to a

21   non-disparagement?

22        A.    That is correct.

23        Q.    And you are simply waiting to see that

24   their management agreement, in fact, has an

25   appropriate non-disparagement provision before you

1    actually execute the employment agreement; isn't that

2    correct?

3            A.    That is correct.

4            Q.    Also attached to the employment

5    agreement --

6            A.    I think it's -- uh-huh.

7            Q.    I would ask you to turn to the schedule

8    next to that and that lists all of the permits,

9    contracts, and items that are defined as the

10   agreements that need to be effectively either

11   transferred or re-issued in the name of the

12   reorganized debtor prior to any entitlement to the

13   provision that you testified to, which would entitle

14   you to $240,000; is that correct?

15           A.    That is correct.

16           Q.    Isn't it also correct that under the -- I

17   think you testified to this on direct, but I just

18   wanted to make it clear -- that liquor licenses are

19   not transferred in the state of Utah; isn't that

20   correct?

21           A.    That is correct.

22           Q.    And isn't it also correct that no one is

23   allowed to receive any remuneration in conjunction

24   with passing liquor licenses in the state of Utah?

25           A.    That's correct.

1      Q.      When Easy Street Partners was formed along

2  with Easy Street Holdings in which the equity

3  security holders actually owned their equity, how

4  much money did David Wickline contribute?

5      A.      $50,000.

6      Q.      And how much has he taken out to date?

7      A.      $285,000.

8      Q.      So he has absolutely no money at risk in

9  this case; isn't that correct?

10      A.      Yes, sir.

11      Q.      And he is only to receive a promote if

12  there were eventually profits; is that correct?

13      A.      That is correct.

14      Q.      And what is a promote?

15      A.      A promote would be after all loans were

16  repaid and their interest and after the -- in this

17  particular case, PC I and Philo Smith Trust received

18  their repayments of their initial equity.

19      Q.      Okay.  And you testified on direct as to

20  all the claims that exist against this estate,

21  correct?

22      A.      That's correct.

23      Q.      Is there any likelihood that the equity

24  security holders would ever receive any money?

25      A.      No, sir.

1          Q.    Now, did you contribute anything when Easy

2     Street Partners and the related Easy Street Holdings,

3     Easy Street Mez were formed?

4          A.    Yes.  Under the Holdings operating

5     agreement, I was required to contribute the business

6     of Easy Street Brasserie Restaurant, which existed

7     prior to the formation of this company, which had 180

8     thousand --

9               MR. WILSON:  Objection, your Honor.  That

10    was a yes or no question.  We've gone well beyond yes

11    or no.

12               THE COURT:  Yes.

13         Q.    (By Mr. Blumenthal)  What were you

14    required to contribute?

15         A.    Two things.  The Easy Street Brasserie

16    business and trademarks and names had $180,000 net

17    operating income at the end of the last year it was

18    fully in operation.

19         Q.    How many years were left under the

20    lease --

21               MR. WILSON:  Your Honor, excuse me, your

22    Honor.  The questions are being answered well beyond

23    the question.  I know that happens, but there is a

24    tremendous amount of voluntary testimony being given.

25               THE COURT:  Well, I think the question

1    was, what was he required to --

2              MR. BLUMENTHAL:  Okay.  I can ask a

3    follow-up question, your Honor.

4              THE COURT:  All right --

5              MR. WILSON:  I think it's well in, but --

6              MR. BLUMENTHAL:  I'll ask the follow-up

7    question.

8         Q.   (By Mr. Blumenthal)  What was the value of

9    the Easy Street Brasserie lease that was

10   contributing?

11             MR. WILSON:  Object.  Foundation.

12        Q.   (By Mr. Blumenthal)  What was the net

13   operating income of the Easy Street Brasserie just

14   prior to its -- your contribution into the project?

15        A.   $180,000.

16        Q.   And how many years remained under the

17   lease?

18        A.   Seven.

19        Q.   And if you used a 12-percent cap rate,

20   what would that be?  What would the value have been?

21             MR. WILSON:  Objection.  Foundation.

22             THE COURT:  Sustained.

23        Q.   (By Mr. Blumenthal)  Do you have an

24   opinion as to how much that it was worth?

25        A.   1.5 million.

```
 1              MR. WILSON:  The answer to that question,
 2    I think, was yes or no.
 3              THE COURT:  All right.
 4              MR. WILSON:  It happens, but perhaps if
 5    the witness could be admonished to listen carefully
 6    and respond carefully.
 7              THE COURT:  Okay, Mr. Wilson.
 8              Just so we can get this moved along,
 9    Mr. Shoaf --
10         Q.    (By Mr. Blumenthal)  What is your opinion
11    as to how much that lease is worth?
12         A.    1.5 million.
13         Q.    Now, did you contribute anything else
14    besides the Easy Street Brasserie lease?
15         A.    Yes, sir.
16         Q.    What was that?
17         A.    The master plan development agreement
18    between Cloud 9 Resorts and Park City Municipal
19    Corporation for the development of Sky Lodge.
20         Q.    And, again, you were -- was that master
21    development plan contract ever valued?
22         A.    The property post-contract and
23    pre-contract were valued by Cushman & Wakefield.
24         Q.    How much was that?
25              MR. WILSON:  Objection.  Foundation.  Lack
```

 1    of foundation.

 2         Q.    (By Mr. Blumenthal)  Are you -- are you

 3    personally familiar with how much that was valued at?

 4         A.    Yes.

 5         Q.    How much?

 6         MR. WILSON:  Objection, your Honor.

 7    This -- the testimony is if it's been valued, is to

 8    bring in the people that valued it.

 9         MR. BLUMENTHAL:  No.  I asked him if he

10    was aware of how much it was valued at.

11         MR. WILSON:  Well, I think -- I think the

12    next question was --

13         THE COURT:  Well, I'm going to allow the

14    questioning, Mr. Wilson.  Go ahead, Mr. Blumenthal.

15         Q.    (By Mr. Blumenthal)  Could you answer the

16    question?

17         A.    18.6 million dollars after the master plan

18    development was approved.

19         Q.    Is it -- now, you answered a question by

20    Mr. Wilson about the prior plan and how it treated

21    the Management and Development claims.  You mentioned

22    that it would pay Bay North.  Was that a mistake?

23         A.    Yes.

24         Q.    Okay.  Now, under that plan, if WestLB --

25    WestLB was being paid in full under that prior plan;

1    isn't that correct?

2         A.    That was -- that is correct.

3         Q.    And they would have been paid over a

4    period of four years; is that correct?

5         A.    That is projected, yes.

6         Q.    Projected, right.  And the Management

7    Development claims would not have been paid prior to

8    that four years, and if, and only if, the plan funder

9    agreed to pay; is that correct?

10        A.    That's correct.

11        Q.    Oh, by the way, does Easy Street Partners

12   owe any retirement benefits to its employees?

13        A.    No.

14              MR. BLUMENTHAL:  Okay.  Your Honor, that

15   is not truly cross.  I just forgot to ask that one

16   question earlier.  To save time, I asked it now.

17        Q.    (By Mr. Blumenthal)  Okay.  Now, you had

18   testified that the members of Easy Street Holding

19   removed ABG-SL as a manager; isn't that correct?

20        A.    That's correct.

21        Q.    And why was that?

22        A.    For violation of 6.3(a) of the operating

23   agreement where ABG-SL was required to submit tax

24   returns and file tax returns by February of the

25   following year for the preceding year.

1       Q.      And why did ABG-SL not have the tax

2  returns filed?

3       A.      Because there was a disagreement as to the

4  treatment of the allocations in 2007 of the phantom

5  income.  Mr. Wickline wished to choose one path that

6  I disagreed with, in conjunction with the CPA, and,

7  therefore, I refused to sign the returns.

8       Q.      And you wanted to have the tax returns

9  reflect the terms of the operating agreements,

10  correct?

11      A.      Yes, sir, as the CPA detailed.

12      Q.      And what did Mr. Wickline want to do?

13      A.      He wished to offload the -- he wished to

14  allocate the phantom income predominantly to PC I and

15  then to Philo Smith Junior Trust.

16      Q.      And that was not in accordance with the

17  operating agreements; is that correct?

18      A.      It was not -- it was not what the CPA said

19  was the operating agreement's stipulation.

20      Q.      Okay.  Now, since ABG-SL was -- have the

21  latest tax returns been filed?

22      A.      Yes.  All of them through 2010.

23      Q.      And they were filed -- I'm sorry, they

24  were filed as the accounting firms suggested,

25  correct?

 1        A.      Yes, sir.

 2        Q.      Now, you testified that -- by the way,

 3   earlier on you mentioned that David Wickline has not

 4   shown up at the property since September 2008,

 5   correct?

 6        A.      That's correct.

 7        Q.      Has he ever taken any role in managing the

 8   Sky Lodge property on any day-to-day basis?

 9        A.      No, sir.

10        Q.      And back in -- strike that.

11               When the --

12               MR. BLUMENTHAL:  Your Honor, I may not

13   have any other questions.  Let me just confer with

14   counsel.

15        Q.      (By Mr. Blumenthal)  Now, you had just

16   testified that Cloud 9 SL Management, LLC was -- was

17   and still is virtually deadlocked; isn't that

18   correct?

19        A.      Yes, sir.

20        Q.      And was that of concern to the other

21   members of this enterprise?

22        A.      Yes, it was.

23        Q.      And was -- and if the -- and were they

24   contemplating removing Management as the manager of

25   the Sky Lodge?

1          MR. WILSON:  Objection.  Leading.  Lack of

2     foundation.

3          THE COURT:  Sustained.

4          MR. BLUMENTHAL:  I think that would be

5     cross-examination of his direct, which we agreed to

6     take.  I'll re-ask the question, your Honor.

7          MR. WILSON:  Well --

8          MR. BLUMENTHAL:  I'll re-ask the question.

9          MR. WILSON:  Yeah.  My --

10         THE COURT:  That's okay.  I sustained your

11    objection, Mr. Wilson.

12         MR. BLUMENTHAL:  Your Honor, I'll re-ask

13    the question.

14         MR. WILSON:  Your Honor, tell me, "When

15    you are ahead, shut up," and I will.

16         THE COURT:  Just when I put my hand up,

17    that means you can stop.

18     Q.   (By Mr. Blumenthal)  Could you explain to

19    the Court what, if any, concern -- strike that.

20         Could you explain to the Court what, if

21    any, concern the other members of Holdings and this

22    enterprise had regarding the deadlock of Management?

23         MR. WILSON:  Objection.  Foundation.

24         THE COURT:  Well, I think there is

25    adequate foundation to demonstrate that there was a

1    concern among members of these entities regarding

2    Management.

3              MR. WILSON:  I think that is true, but

4    whether he knew it or can speak for others is

5    hearsay.  It's beyond anything that he can testify

6    to.  He can testify as to his own experience, his own

7    feelings --

8              THE COURT:  So far, he hasn't asked

9    him to --

10             MR. BLUMENTHAL:  I asked him if he knew.

11             THE COURT:  He asked him if he knew.

12        Q.    (By Mr. Blumenthal)  And did you partake

13   in those meetings?

14        A.    On two occasions Liz Rad and one occasion

15   Michael --

16             MR. WILSON:  Objection, your Honor.

17             THE COURT:  Mr. Shoaf --

18             THE WITNESS:  I don't know how to answer

19   these.

20             THE COURT:  Well, as briefly as possible

21   and directly in response to Mr. Blumenthal's

22   question.

23             THE WITNESS:  Okay.

24             THE COURT:  He asked if you had

25   participated in meetings.

1          THE WITNESS:  Yes.

2          Q.    (By Mr. Blumenthal)  And what was the

3     concern?

4          MR. WILSON:  Objection --

5          Q.    (By Mr. Blumenthal) -- to your knowledge?

6          MR. WILSON:  -- foundation to the extent

7     it's founded in hearsay.

8          UNIDENTIFIED SPEAKER:  Join the objection

9     in regard to hearsay.

10          MR. BLUMENTHAL:  Your Honor, these are

11     discussions among members.  If there is so-called

12     hearsay, they would be parties and, therefore, it

13     would be an exception to hearsay.  But I'm asking him

14     of what his knowledge was of the concern if

15     Management was removed as the manager.  And he has

16     personal knowledge of that and he can testify to

17     that.

18          MR. WILSON:  Same objections, your Honor.

19     I think the objections are appropriate.

20          THE COURT:  Well, I think it is hearsay.

21     I mean, you are -- you are just in a roundabout way

22     asking him what they said.  So I'm going to sustain

23     the objection.

24          Q.    (By Mr. Blumenthal)  Okay.  What would

25     occur if management was removed as manager of Sky

1    Lodge with regard to the liquor licenses?

2         A.    They would have to be turned in.

3         Q.    And did you participate in meetings in or

4    about September of '09 when you and other members of

5    Easy Street Holdings were considering removing

6    Management as the manager of Sky Lodge?

7         A.    Yes.

8         Q.    Why were the liquor licenses, when they

9    were up for renewal, registered in the name of the

10   Cloud 9 entities?

11        A.    Cloud 9 SL Management is a deadlocked

12   entity whose contract will be rejected.  That is

13   common knowledge.

14             MR. WILSON:  Your Honor, this answer is

15   not responsive to a very simple, straightforward

16   question.

17             THE COURT:  Well, I guess the question I

18   have is, which liquor licenses are we --

19        Q.    (By Mr. Blumenthal)  How many liquor

20   licenses are there at the premises?

21        A.    Four.

22        Q.    The one that was identified in W2, which

23   is -- would be Sky Club, why was that license when it

24   was re-registered put in the name of the Cloud 9

25   Resort Clubs, LLC?

1        A.     To protect the Easy Street Partners'

2   ability to have continuous liquor service should

3   Cloud 9 Resorts Development or Cloud 9 Resorts SL

4   Management be terminated.

5        Q.     And under the plan, that agreement is

6   being rejected; is that correct?

7        A.     That is correct.

8        MR. BLUMENTHAL:  I have no further

9   questions -- oh, I have one other question.  I'm

10  sorry.

11       Q.     (By Mr. Blumenthal)  In your -- I can't

12  remember if it was in response to Mr. Hofmann or to

13  Mr. Wilson, but when the loan to WestLB matured in --

14  at the end of March 2009, did -- were they also

15  concerned or alleging that there were other covenant

16  defaults under the loan?

17       A.     Yes.

18       Q.     And they were asserting a loan to value

19  ratio covenant which would not enable Easy Street

20  Partners to extend the loan; isn't that correct?

21       A.     Yes.

22       Q.     And there were other financial covenants

23  that they claimed would also entitle them not to

24  renew or extend the loan beyond its maturity date; is

25  that correct?

1        A.    Yes.

2        Q.    Now, when -- do you know when the Jacobson

3    lien was ultimately filed, approximately?

4        A.    I honestly off the top of my head don't

5    know.

6        Q.    Do you know if it was in 2000 -- the fall

7    of 2009?

8        A.    It would --

9        Q.    Or later?  I'm not...

10       A.    I think it was two -- I don't recollect

11   exactly.

12       Q.    What was the state of the real estate

13   industry, particularly fractional shares, in Park

14   City in -- sometime in the middle of 2009?

15       A.    Very poor, as is the rest of the real

16   estate market.

17            MR. BLUMENTHAL:  I have no further

18   questions.

19            THE COURT:  Mr. Havel?

20

21                  CROSS-EXAMINATION

22   BY MR. HAVEL:

23       Q.    Good morning, Mr. Shoaf.

24       A.    Good morning.

25       Q.    I wanted to take us back to the project

1    which was originated in 2006; is that correct?

2         A.    Yes, it was.

3         Q.    And it was built from the ground up and

4    sold and marketed simultaneously through '06 and '07;

5    is that correct?

6         A.    Yes, sir.

7         Q.    And sometime in late 2007, you were

8    prepared to have a certificate of occupancy and to

9    close the pending sales for the fractional units you

10   had sold by that date; is that correct?

11        A.    To be specific, a temporary certificate of

12   occupancy, yes, sir, and to close.

13        Q.    And between November of '07 and February

14   of '08, you did close the contracts for fractional

15   units that had been negotiated during that first year

16   and a half; is that correct?

17        A.    Yes, sir.

18        Q.    And how many did you close in the first

19   wave up until February of '08?

20        A.    Up until February, 105.

21        Q.    And at that time, did you have other

22   escrows pending for closure of additional sales?

23        A.    Another five.

24        Q.    Another five. So you had 110 fractional

25   units, in effect, pre-sold up until February of '08;

1    is that correct?

2          A.    That's correct.

3          Q.    And you closed, you said, 105 of those; is

4    that correct?

5          A.    No, we closed all 110.

6          Q.    No, up to February of '08, I'm sorry.

7          A.    I'm sorry, yes.

8          Q.    Okay.  And so in February of '08 there was

9    a large amount of sales proceeds generated which went

10   into what we call generically the escrow accounts; is

11   that correct?

12         A.    That's correct.

13         Q.    And that is the account which there has

14   been much claim made about money being mistakenly or

15   improperly paid over to Bay North, approximately

16   about 5.8 million; is that correct?

17               MR. HOFMANN:  Object to the form of the

18   question.  Leading.  I don't mind on background but

19   when it gets to substance, I don't think it's

20   appropriate to lead this witness.

21               THE COURT:  Sustained.

22         Q.    (By Mr. Havel)  So do you recall how much

23   sales proceeds were approximately held at that time

24   in February of '08?

25         A.    Gross or net, sir?

1        Q.      In the escrow accounts at that point in

2   time.

3        A.      Approximately 32 million.

4        Q.      And of that, how much was ultimately

5   disbursed in February of '08 between payments to

6   WestLB and payments to Bay North?

7        A.      Twenty-eight million.

8        Q.      And how much of that went, again, to Bay

9   North?

10       A.      Five point six.

11       Q.      And that would be 20 percent of the 28

12  million?

13       A.      That would be correct.

14       Q.      And the other 22-plus went to the bank,

15  correct?

16       A.      Yes, sir.

17       Q.      Okay.  Now, at that point in February of

18  '08, there was clean-up work to be -- was there still

19  clean-up work to be done by the construction company

20  on the project?

21       A.      At what time frame?

22       Q.      In February of '08.

23       A.      Yes.

24       Q.      Okay.  So that was done over a continuing

25  period of time, and when did that finally get

1   completed?

2        A.    In the summer of '08.

3        Q.    And when did you get your final

4   certificate of occupancy or notice of completion?

5        A.    In November of '08.

6        Q.    Okay.  So between February of '08 and

7   November of '08, there was a continued effort to sell

8   fractional units; is that correct?

9        A.    Yes, sir.

10        Q.    And do you recall how many were sold in

11   that entire period?

12        A.    Three.

13        Q.    Three.  If you had sold during that period

14   fractional units at the rate you had been selling

15   before, would you have had surplus money at that

16   point in time?

17        A.    I'm sorry, I don't think I understand your

18   question.

19        Q.    Okay.  You sold three units between

20   February of '08 and November of '08; is that correct?

21        A.    That's correct.

22        Q.    Okay.  Before February of '08, within a

23   year and a half, you sold roughly 110 units?

24        A.    Yes.

25        Q.    Okay.  If between February of '08 and

1    November of '08 you could have continued to sell at

2    that pace, would you have had sufficient funds to

3    most likely renew the loan with WestLB?

4         A.    Oh, absolutely.

5         Q.    So the absence of money in February of '08

6    might have been remedied if you had had sales

7    continue during '08 similar to those you had

8    experienced earlier?

9         A.    Might have, yes.

10        Q.    Do you have an opinion as to why the

11   fractional units didn't sell at the same rate during

12   that year?

13             MR. WILSON:  Objection.  Foundation.

14             MR. HAVEL:  Your Honor, he --

15             THE COURT:  Overruled.

16             THE WITNESS:  I think we are all aware

17   that the economy of the world went into a tailspin

18   and vacation second homes are not a must-have, they

19   are a want.  So people retracted and simply paid for

20   what they needed to pay for and kept their money in

21   money in that period.  So we could not get buyers.

22        Q.    (By Mr. Havel)  And that economic decline

23   continued through '09; is that correct?

24        A.    Oh, yes.

25        Q.    There was some commentary earlier about a

1    fund -- we call them generally -- in the escrow

2    accounts and the possibility of getting money out of

3    those accounts for contractors.  Do you recall that

4    earlier testimony?

5          A.    Yes.

6          Q.    Were there contractual restrictions on an

7    obligation of WestLB to release money from the escrow

8    accounts for contractor expenses?

9          A.    I don't know that I know how to -- I don't

10   know one way or the another.

11         Q.    Were there budgetary restrictions in that

12   funds to be disbursed for the contractors had to be

13   within acceptable budgets for the construction of the

14   property?

15         A.    Yes.

16         Q.    Okay.  And if there -- if the requests for

17   disbursements to the contractors had been outside the

18   scope of approved budgets, that would have provided

19   the bank an acceptable basis to deny payment to

20   contractors; is that correct?

21         A.    I guess I really don't know how answer

22   that yes or no.  We had contingencies and we had

23   overruns and we had contingencies for overruns, and

24   those contingencies were paid out of the escrow

25   accounts.  So -- but I don't know sitting here that

1    there was an obligation or a contract that said what

2    anybody should do.  I just know that that is where

3    the money would come from if it was paid.

4          Q.    And you would be entitled to the money if

5    you otherwise satisfied all the contractual

6    restrictions for the withdrawal; is that correct?

7          A.    That's correct.

8          Q.    Okay.  The reference to payments in

9    February of '08 sometimes refers to it as a mistake

10   by the bank, sometimes as an improper payment by the

11   bank, and you today said that you believe the bank

12   made the payment of the 5.6 to Bay North; is that

13   correct?

14         A.    That's correct.

15         Q.    Okay.  Were the principals of Partners

16   aware of the payments in February of '08 when they

17   were made?

18              MR. HOFMANN:  Object.  Vague.  Specify who

19   the principals are.

20         Q.    (By Mr. Havel)  Did Mr. Wickline know

21   about the payments?

22         A.    Absolutely.

23         Q.    Did he encourage those payments?

24         A.    Absolutely.

25         Q.    Okay.  Were there email communications

1    between the principals of the company, including

2    yourself and Mr. Wickline --

3              MR. HOFMANN:  Object.  Vague and hearsay.

4              MR. HAVEL:  Let me finish the question,

5    please.

6         Q.    (By Mr. Havel)  Were there communications

7    between the bank, Bay North, and Partners regarding

8    the division of the funds 80-20 -- the 28 million

9    between 80 and 20?

10             MR. HOFMANN:  Same objection.

11             MR. WILSON:  And leading.

12             THE COURT:  Overruled.  You can answer the

13   question yes or no.

14             THE WITNESS:  Could you say that again?

15        Q.    (By Mr. Havel)  I said, were there email

16   communications between Bay North, the bank, and

17   Partners regarding the division of the 28 million as

18   an 80-20 split?

19        A.    Yes, sir.

20        Q.    And were you personally aware that that

21   split was being discussed and was going to be made in

22   February of '08?

23        A.    Yes, sir.

24             MR. HAVEL:  Okay.  Your Honor, could we

25   have the witness look at Exhibits 10 and 11 that we

1     had admitted earlier?

2                 THE COURT:  Those are the debtor's

3     exhibits?

4                 MR. HAVEL:  Yeah, debtor's exhibits, just

5     10 and 11.

6                 THE COURT:  So Exhibit 10 is the articles

7     of organization of Management?

8                 MR. HAVEL:  And the 11 is the articles of

9     organization for Development.

10                THE COURT:  Okay.  Do you have those,

11    Mr. Shoaf?

12                THE WITNESS:  Yes, I do, your Honor.

13                THE COURT:  Okay.

14          Q.    (By Mr. Havel)  Mr. Shoaf, could you look

15    to the second page of the exhibit, Paragraph 7?

16          A.    Yes, sir.

17          Q.    And could you read that paragraph into the

18    record?  It's very short.

19          A.    "Management.  The company will be

20    member-managed.  The names and addresses of the

21    initial managers are:  William Shoaf, 4780 Winchester

22    Court, Park City, Utah, 84098, David Wickline, 4780

23    Winchester Court, Park City, Utah 84098.  Either

24    manager has the authority to bind the company."

25          Q.    And in Exhibit 11 at the same Paragraph 7,

```
 1    does that in effect say the same substance?

 2         A.    Yes, sir, it does.

 3         Q.    Okay.  So based on these documents, did

 4    you believe at all times that you had the authority

 5    to bind Management and Development in the operation

 6    and conduct of its business?

 7              MR. WILSON:  Objection.  Leading.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Yes, sir.

10         Q.    (By Mr. Havel)  One last line here.  We

11    had discussed earlier what some prior plans had

12    contemplated giving to Management and Development,

13    and I believe it was disclosed that there had been

14    some concept of a subordinated note that would be

15    paid after the first four years of operation at the

16    discretion of the plan funder; is that correct?

17         A.    That is correct.

18         Q.    And based on your earlier testimony, isn't

19    it true that you could not find a plan funder that

20    would be willing to proceed with the plan with those

21    terms in it?

22         A.    We did not find a plan funder; that is

23    correct.

24         Q.    Okay.

25              MR. HAVEL:  No further questions, your
```

1    Honor.

2              THE COURT:  Any other questions,

3    Mr. Wilson?

4              MR. WILSON:  I'm looking at the clock and

5    I believe I can wrap up in about a minute.  Try?

6              THE COURT:  Yes.

7              MR. BLUMENTHAL:  Hold him to that.

8              MR. WILSON:  Thank you.

9

10                  RECROSS-EXAMINATION

11   BY MR. WILSON:

12        Q.    I think we've all been pretty careful to

13   not have this Court try the dispute between you and

14   Mr. Wickline, but certainly there is a flavor.

15              With regard to the tax returns, it's fair

16   to say, is it not, that there was a difference of

17   opinion among tax professionals about what the form

18   that tax return should take?

19        A.    No.

20        Q.    Okay.  With regard to the involvement of

21   you and Mr. Wickline in business together, in a very

22   general sense, you are the operations guy, are you

23   not, with regard to the hospitality industry?

24        A.    Yes.

25        Q.    All right.  And Mr. Wickline, his forte,

1    if you will, had to do with the financing of the

2    project, did it not?

3         A.    Yes.

4              MR. BLUMENTHAL:  Objection.  I don't

5    believe that relates to Management or Development.

6    And if it goes up to his involvement as an equity

7    security holder of Holdings, I would object on the

8    standing grounds.

9              MR. WILSON:  He answered it and I'm done.

10             THE COURT:  Mr. Wilson, overruled.  Answer

11   the question.

12             MR. WILSON:  He answered it, actually, and

13   I'm done with that.

14             How much time have I got left?

15             THE COURT:  Thirty seconds.

16             MR. WILSON:  I won't use it all.

17        Q.    (By Mr. Wilson)  Under this deadlock and

18   under the plan that is under consideration and for

19   which you have cast votes on behalf of Management --

20   or ballots on behalf of Management and Development,

21   Mr. Wickline will receive nothing; is that correct?

22             MR. BLUMENTHAL:  Objection.  I don't

23   believe it's pursuant to the deadlock.  It's pursuant

24   to the plan.

25             MR. WILSON:  Pursuant to the plan.

1        Q.      (By Mr. Wilson)  And I reform the question

2    so that it says to the plan.

3        A.      That is correct.

4        Q.      Okay.  And under the plan and under the

5    employment agreement, you got two years of employment

6    at $20,000 a month, this bonus -- what -- really

7    licenses and some other --

8                MR. BLUMENTHAL:  Objection.  That is not

9    pursuant to the plan.  It's -- we went through this

10   on direct -- pursuant to the employment agreement, if

11   we can confirm this case, your Honor.

12               MR. WILSON:  And I'll reform that

13   question.

14               THE COURT:  Well, the question has been

15   answered.

16               MR. WILSON:  Sure.  Good.  Your Honor, I'm

17   done.  And I apologize, I took a minute and a half

18   more but I'll get it back to you sometime.  Thanks.

19               THE COURT:  All right.  Court will take a

20   recess.  We'll reconvene at 1:00.

21               THE BAILIFF:  All arise.

22               (Recess from 11:48 a.m. until

23                1:04 p.m.)

24               THE BAILIFF:  All arise.  Court resumes

25   its session.  Please be seated.

1        THE COURT:  Mr. Blumenthal, do you have

2   any further evidence?

3        MR. BLUMENTHAL:  Your Honor, the only

4   other items -- and I don't think we need a witness

5   for this -- in the exhibit tab -- in the exhibit

6   binder, tabs 14 and 15, tab 14 was a court order

7   filed -- it was docketed on April 27, 2010 -- I'm

8   sorry, entered April 27, 2010 granting Easy Street

9   Partners omnibus objection expunging duplicate

10  claims.  We would ask that that be made part of the

11  record, and I would ask that that be marked as

12  Exhibit 14.

13        THE COURT:  Any objection?

14        MR. WILSON:  No objection, your Honor.

15        MR. BLUMENTHAL:  And I would have, also on

16  Exhibit tab 15 is debtor's application to employ

17  Gemstone, LLC as a consultant that was filed on

18  November 24, 2009.  I believe an order was entered

19  approving that.  I'm not sure the date of the order,

20  but we would like the application to go in.  It has

21  next to it the CVs of the individuals that have been

22  identified in the plan supplement.  So I would ask

23  that that application be admitted as Exhibit 15.

24        THE COURT:  Any objection?

25        MR. WILSON:  No objection.

1          THE COURT:  Exhibits 14 and 15 are

2     received.

3          (Exhibits-14 and -15 received.)

4          MR. BLUMENTHAL:  And the debtor has no

5     other evidence to enter at this time, your Honor.  I

6     believe WestLB has, at this point, has a couple of

7     clarifications.

8          THE COURT:  Mr. Havel?

9          MR. HAVEL:  Yes, your Honor, we do.  I

10    would call it some cleanup clarifications, but rather

11    than -- the committee has asked if they could proceed

12    with their witness ahead of time, and that is okay if

13    I can defer my comments until later, I think that

14    would be fine.

15          THE COURT:  All right.

16          MR. HOFMANN:  Your Honor, may I be heard

17    briefly?

18          THE COURT:  Yes.

19          MR. HOFMANN:  I apologize that my schedule

20    is not ideal today.  I have a 1:30 hearing in another

21    matter.  When I began the day, I thought that CW

22    Mining would be going on now.

23          THE COURT:  So did I.

24          MR. HOFMANN:  And that would have been a

25    reasonably acceptable time for me to vacate at 1:30

1    for a hearing before Judge Thurman.  The

2    circumstances are a little different now.  I'm doing

3    the best I can.  All I would ask is the opportunity

4    to address the Court in closing comments.

5              THE COURT:  All right.  Well, I thank

6    everyone.  I think we are all doing the best we can,

7    so -- I'll -- you will have that opportunity,

8    Mr. Hofmann.

9              Mr. Jenkins?

10             MR. JENKINS:  Thank you, your Honor.  I

11   don't believe the remaining matter that the committee

12   has to present should be too long.  I do have with me

13   in court today Mr. Craig Elliott, who has been

14   patiently waiting since Friday to testify or have his

15   testimony proffered with respect to the settlement

16   that is -- appears in the plan whereby the committee

17   dismisses its lawsuit against WestLB in exchange and

18   in consideration for the -- treatment under the plan.

19             If it would be appropriate and in the

20   interest of time, I would propose that I do a short

21   proffer of Mr. Elliott's testimony and then open him

22   to cross-examination by whichever parties wish to

23   cross-examine.  That may serve to expedite matters

24   and help us get out of here by 4:45 today.

25             THE COURT:  Is there any objection?

1      MR. BLUMENTHAL:  The debtor has no

2  objection.

3      MR. WILSON:  No objection, your Honor.

4      MR. HOFMANN:  No objection.

5      THE COURT:  You may proceed by proffer,

6  Mr. Jenkins.

7

8      <u>PROFFER OF TESTIMONY - CRAIG ELLIOTT</u>

9      MR. JENKINS:  Thank you, your Honor.  And

10  as an initial matter, I would like -- I don't believe

11  this has been made an exhibit to the hearing yet, but

12  I would like to do that at this time.  What I have is

13  the stipulation.  It is a matter of record in the

14  adversarial proceeding number 10102028.  This was

15  referred to on Friday, and if it would be appropriate

16  I'd like to have that marked as Exhibit -- I guess it

17  would be C-1.

18      THE COURT:  All right.

19      MR. BLUMENTHAL:  And the debtor has no

20  objection to this being admitted into evidence, your

21  Honor.

22      MR. JENKINS:  I would ask the Court to

23  admit this stipulation into evidence.  It is

24  two-sided, as the Court notes.  Do we need a

25  one-sided copy for the Court or a two-sided copy?

1           THE COURT:  I think on exhibits, two-sided

2    is fine.  Is there any objection to Exhibit C-1?

3           MR. HOFMANN:  No, your Honor.

4           MR. WILSON:  None, your Honor.

5           THE COURT:  Exhibit C-1 is received.

6           (Exhibit-C-1 received.)

7           MR. JENKINS:  All right, your Honor, in

8    that case, I'll proceed with the proffer of

9    Mr. Elliot's testimony.

10          Mr. Elliot is in the courtroom and if

11   called to testify would testify as follows:  That he

12   is a principal of Elliot Work Group Architects, which

13   is a creditor of Easy Street Partners, having

14   performed architectural services for Easy Street

15   Partners prior to its bankruptcy.  But he is the

16   chair of the unsecured creditors committee, which was

17   appointed on October 2nd of 2009, that the other

18   members of the committee are:  Shaner Design, Mill

19   Creek Consulting, Gateway Center, Claire Harrison and

20   Havrey, and Goodrich and Thomas CPAs; that on October

21   6th the committee determined to employ the law firm

22   of Jones, Waldo, Holbrook & McDonough as its legal

23   counsel in this case; that during the course of the

24   case, the committee has met virtually weekly with its

25   counsel either in telephonic meetings or on occasion

1    in face-to-face meetings to discuss the case,

2    developments in the case, and certain strategies that

3    might be employed in the case; that he would testify

4    that the committee has instructed its counsel to

5    actively participate in the bankruptcy case to ensure

6    that unsecured creditors receive a recovery in the

7    case.

8           He would further testify that he -- a

9    committee had instructed its counsel specifically to

10   investigate certain facts and issues surrounding the

11   pre-bankruptcy dealings of debtor partners with its

12   lender, WestLB, as well as the Bay North entity,

13   which was a lender at the Mezzanine level, and

14   specifically to investigate the circumstances

15   surrounding the payment of a certain 5.6 million

16   dollars which was made pre-bankruptcy from WestLB to

17   Bay North.

18          He would testify that after hearing the

19   results of that investigation, the committee

20   determined to commence a lawsuit against WestLB

21   seeking to equitably -- seeking to equitably

22   subordinate WestLB's claims to those of unsecured

23   creditors, as well as to allege the recovery or seek

24   the recovery of a fraudulent transfer, which the

25   committee alleged had been made in the form of a

1   release in connection with a forbearance agreement

2   entered into between WestLB and the debtors; that

3   over the past several months, the committee has

4   discussed with WestLB the resolution of the lawsuit

5   in various contexts and in employing various

6   strategies, including in the context of a plan of

7   reorganization in the case; that as a result of those

8   discussions between the committee and WestLB, the

9   current plan provides for a distribution for Class 4

10  unsecured creditors of either one cent on the dollar

11  on their claims payable over approximately three and

12  a quarter years in quarterly installments or a

13  discounted effective date payment of 60 percent of

14  the allowed amount of their claims in exchange for a

15  dismissal of the lawsuit; that in determining that a

16  dismissal of the lawsuit under the plan was

17  appropriate, the committee evaluated the following:

18  That the probability of success on the merits of this

19  lawsuit was uncertain because it was very

20  fact-intensive and it's uncertain what discovery

21  might show when facts -- all the facts are unearthed;

22  that the lawsuit would be very complex because of the

23  underlying facts, because it's very fact-intensive,

24  and because there may be conflicting circumstances of

25  what actually happened, and also that the lawsuit