1    would be very expensive to pursue because WestLB has

2    employed competent, aggressive counsel who would

3    undoubtedly vigorously defend the action, and in that

4    regard the litigation would become even more

5    expensive; that the settlement of the lawsuit is in

6    the best interest of creditors because the plan

7    offers unsecured creditors the opportunity to receive

8    100 cents on the dollar on a deferred payment basis,

9    which is essentially what the unsecured creditors

10   would get if they prevailed on their equitable

11   subordination action.  Alternatively, unsecured

12   creditors get 60 cents on the dollar if they so elect

13   on the effective date; that the committee is also

14   advised that a factor to consider is the

15   collectability of any judgment.  And while the

16   committee was not particularly concerned that a

17   judgment would be uncollectible, because WestLB is a

18   bank and a substantial German entity, but in

19   addition, that the lawsuit was really only requiring

20   or asking for a reordering of priorities with respect

21   to certain amounts that would already be in the

22   estate.  It wasn't requiring the payment of money

23   damages, and it was not requiring the payment of some

24   additional funds by WestLB.

25            That said, the fraudulent transfer action

1    could ultimately down the road lead to some money

2    damage recovery, although in the lawsuit that was

3    pending before the Court at this time, the only

4    request was for a return of the fraudulent transfer

5    of releases.

6              And that given the analysis that the

7    committee has engaged in, the committee has

8    determined that the settlement under the plan whereby

9    the lawsuit is dismissed in exchange for 100 cents on

10   the dollar in deferred payments or 60 percent payment

11   on the effective date, is in the best interest of

12   creditors of the Easy Street Partners estate.

13             And, your Honor, that would be the end of

14   Mr. Elliot's testimony, and I would now offer him for

15   cross-examination for any party that would like to

16   cross-examine.

17             THE COURT:  Is there any objection to the

18   proffer?

19             MR. WILSON:  No objection to the proffer.

20             MR. HOFMANN:  No objection, your Honor.

21             THE COURT:  The proffer is received.

22             Is there any desire to cross-examine?

23             MR. WILSON:  No cross-examination, your

24   Honor.

25             MR. HOFMANN:  No, your Honor.

1          THE COURT:  All right.

2          MR. JENKINS:  Thank you, your Honor.

3          THE COURT:  Thanks, Mr. Jenkins.

4          Mr. Havel.

5          MR. HAVEL:  Thank you, your Honor.  I

6    would like to just put into the record several

7    admissions or statements by WestLB as the plan

8    proponent that relate to items that had come up

9    during the course of the process.

10          First, the operating agreement that was

11   attached to the plan supplement did not contain

12   provisions required under Section 1129, and we will

13   state in open court and we will put in the

14   confirmation order that the operating agreement will

15   be amended to include a prohibition against the

16   issuance of non-voting securities in order to comply

17   with the Section 1129.

18          We had previously mentioned the fact

19   that -- and the testimony by Mr. Robertson that the

20   actual entity to own the reorganized debtor is

21   currently under consideration.  It will be either EAA

22   or WestLB or an affiliate.  But in any event, there

23   will be no change of the economic substance of the

24   reorganized debtor that has been presented here for

25   purposes of performing the plan, and structural

1    changes will only be driven either by other either

2    businesses or tax considerations but in no effort to

3    change the substance of the agreements made under the

4    plan.

5             Your Honor, on Friday we had arranged to

6    have Mr. Jeff McEntire, who is from Gemstone and was

7    one of the principals identified in the plan

8    supplement, available to address the issue of

9    appropriateness of him as a manager and operator of

10   the property.  That had been raised by an objection

11   by Park City I, and on Friday I obtained an agreement

12   that he did not have to be present for the testimony

13   or for that issue.  And I just wanted it on the

14   record that he had been here and with the

15   understanding that we had excused him with the

16   understanding of Park City I.

17             THE COURT:  What was his name again?

18             MR. HAVEL:  Jeff McEntire.

19             MR. HOFMANN:  I'm certainly not going to

20   retread anything that Mr. Boley may or may not have

21   said, but I will say that I did not have that

22   agreement.

23             MR. HAVEL:  No, it was with the

24   representative that was here at the time.

25             MR. HOFMANN:  Just to be clear, I was not

 1   a part personally of that agreement and I had not

 2   heard that until now.  I do not object to it if that

 3   was Mr. Boley's agreement, but that is news to me.

 4            MR. HAVEL:  Okay.

 5            I believe the last issue, your Honor, is a

 6   remaining comment by the creditors committee to the

 7   new plan and its potential impact on one aspect of

 8   the Class 4 treatment.  As noted here, the Class 4

 9   claimants start out with an option of either taking

10   the three-year note or taking the cash discount.  The

11   note is generally referred to as option number one

12   and the cash discount is generally referred to as

13   option number two.  The committee had raised the

14   prospect that perhaps there should be some

15   opportunity to re-elect options in light of the

16   change of the plan funder from a third party to the

17   bank.  We've been discussing the prospects of that

18   kind of an election, and there were some concerns on

19   behalf of the bank that reopening elections could

20   change the economics because we had planned only so

21   much cash on confirmation.  We had planned to pay

22   notes through operations.  I think we've worked out

23   an agreement, and I'll try to repeat it and ask

24   Mr. Jenkins to confirm if it's accurate.  We will

25   allow a certain number of the Class 4 claimants to

1    consider a change in their option.  It will be

2    extended only to those Class 4 claimants who

3    previously accepted the plan.  Therefore, those who

4    were only before aware or active enough to have

5    expressed the option.  Two, it will only be an

6    option -- or it will only be a choice to convert from

7    option one back down to option two.  And three,

8    insiders, if any, who currently are in that group

9    will not be permitted to elect.

10              And with those understandings, what we

11   would propose is concurrently with the filing of the

12   confirmation order, we would give a notice to that

13   group of Class 4 members and give them 14 days to

14   elect a shift in the treatment.  We don't believe

15   that that shift should have any material economic

16   effect in terms of how many people they are and the

17   dollar amount of claims that they hold.

18              MR. JENKINS:  Your Honor, just to complete

19   the loop here, yes, Mr. Havel and I have been engaged

20   in a series of discussions and have agreed that that

21   re-election option as he stated would be appropriate

22   under the circumstances here, particularly the

23   allowance of only those who have affirmatively voted

24   to accept the plan to reconsider their election.  The

25   thinking being that those individuals have understood

1    in their acceptance that they did have an option for

2    option one or two, whereas those who may have

3    rejected the plan, of course, knew by the plain terms

4    of the plan that they were going to be getting option

5    one.  In that circumstance, through their rejection

6    of the plan, would not have the opportunity to

7    re-elect.  And we do have that list of creditors who

8    did elect option one, and those will be the ones that

9    will be given the re-election notice.

10                 Any further questions, your Honor?

11                 THE COURT:  No.  Thank you.

12                 MR. HAVEL:  One more item, your Honor.  I

13   don't believe this is technically a confirmation

14   issue, but I thought to avoid any unanticipated

15   questions or concerns, we would disclose to the Court

16   that there are a couple of procedural matters that

17   the plan did not specify with great detail that we

18   are going to elaborate in the confirmation order.

19   One is going to be setting up a bar date for the

20   administrative claims and perhaps a timetable for fee

21   apps and hearings to occur.  We will circulate a form

22   of confirmation order and will let the parties have

23   input on that, but we are not asking today for your

24   Honor to fix an actual date.  We will propose it in

25   the confirmation order.  At least that is the way we

1    would propose to proceed unless others want to

2    discuss it further now.

3               Lastly, we did provide for the assumption

4    of a certain number of executory contracts.  We

5    really don't expect any issues over the cures on

6    those amounts because they are small contracts, but

7    we do need a bar date for the non-debtor party to

8    those executory contracts to object if they disagree

9    with the cure amounts.  And so we would insert that

10   deadline in the confirmation order as well, probably

11   giving them, you know, 21 or 30 days to object from

12   notice if they disagree with the cure amounts.

13              Those are the two procedural matters that

14   I wanted to at least alert parties to in case they

15   would have questions as to the substance of those.

16              THE COURT:  All right.  Is there any

17   further evidence that any parties wish to present on

18   the confirmation issue?

19              MR. BLUMENTHAL:  The debtor has none.

20              THE COURT:  Mr. Wilson or Mr. Hofmann?

21              MR. WILSON:  We have none, your Honor.

22              MR. HOFMANN:  Nothing beyond what has been

23   introduced.

24              THE COURT:  All right.  Legal argument,

25   yes.

1          MR. HOFMANN:  May I be excused for the

2   hearing in my other matter, your Honor?

3          THE COURT:  You may.

4          MR. HOFMANN:  Thank you.

5          THE COURT:  And if you are not back,

6   Mr. Hofmann, we'll take a recess.

7          MR. HOFMANN:  Thank you.

8

9                  <u>CLOSING ARGUMENT</u>

10  <u>BY MR. BLUMENTHAL</u>:

11          First, your Honor, I'd like to thank you

12  for your patience and indulgence in making available

13  the time to complete the hearing this afternoon.  I

14  also want to thank you for making me stay over the

15  weekend because I had a pretty enjoyable time in Park

16  City on Saturday and Sunday.

17          THE COURT:  Good.

18          MR. BLUMENTHAL:  Your Honor, as

19  you already know, the Gunther objection was resolved.

20  The committee response quasi objection was resolved.

21  All the classes entitled to vote have been accepted.

22  The modifications to the plan between the last

23  pending joint plan -- last pending plan of the debtor

24  and the joint plan did not materially affect any

25  voting classes.  Under 1127(a) there was the right to

1    modify and 1127(d), the prior votes of the Classes 2,

2    3 -- 2, 4, and 5, as well as the vote cast by WestLB

3    and Class 1 should not require any re-solicitation.

4            Class 7 and Class 6, which received

5    nothing under the plan are deemed to reject and will

6    be getting no distribution.  I'll address those

7    issues regarding those classes a little bit later.

8            With regard -- just, you know, sort of in

9    general, the equity, Class 7, I think the evidence is

10   pretty clear that there is no equity beyond the

11   aggregate amount of claims of Easy Street Partners.

12           As your Honor is aware, the standard of

13   proof in a confirmation hearing is a preponderance of

14   evidence.  I think what you have heard over the last

15   two days is that the evidence overwhelmingly supports

16   and satisfies all of the 1129, 1122, and 1123

17   requirements.  In fact, I believe it is the only

18   evidence that is before the Court.

19           Although our brief in support of

20   confirmation was filed late Thursday night, I'm

21   assuming by now his Honor -- past experience, has

22   probably already read the brief.  So I'll try to go

23   very quickly over what I call pro forma-type

24   confirmation issues.  1129(a)(1), which deals with

25   classification in 1122 and 1123, has been satisfied.

1    All similar claims were classified per class.  We

2    submit Class 6 differs legally and factually based

3    upon the subordination agreements.  I'll get to that

4    in a little bit when I talk about subordination.

5    Debtor is generally given flexibility in creating

6    separate classes where the holders have different

7    legal interests.  I know Mr. Havel is going to

8    address that in some detail later also.

9            The eight mandatory requirements of

10   1121 -- 1123(a) 1-8, I believe, have been clearly met

11   by the evidence.  That was in pages nine through ten

12   of our brief.  If we could just quickly click through

13   those.  The plan designated claims and interest in

14   separate classes as well as specifying unimpaired

15   claims and specified classes in Article 3, they

16   specified and treated impaired classes and claims of

17   interest in Article 5.  They -- I've already

18   addressed that they provided the same treatment for

19   each claim of interest of a particular class and

20   provided adequate means for implementation of the

21   plan.  That is in Article 7 as well as the plan

22   supplement for WestLB funding, which has been next to

23   the plan supplement as an exhibit, as well as the

24   testimony that you have heard from both Duncan

25   Robertson and Mr. Shoaf.  It likewise, as Mr. Havel

1    just announced, the reorganized debtor's bylaws and

2    operating agreement will prohibit the issuance of

3    non-voting equity securities.  And finally, contains

4    only provisions consistent with the interest of

5    creditors and public policy.  The only evidence

6    before your Honor, I think facially, the plan

7    supports that on its face.  The only evidence before

8    you was Mr. Shoaf's testimony relative to those

9    factors.

10           The 1129(a)(2), there was -- the

11   disclosure statement was approved, as you are aware,

12   overwhelming acceptance.  It was, of the voting

13   classes, only one creditor holding a $4,000 claim

14   voted to reject the plan.  The plan, 1129(a)(3) was

15   proposed in good faith and not by any means forbidden

16   by law.  And the courts, your Honor -- and your Honor

17   should consider the totality of the circumstances and

18   the legitimate purpose of reorganizing.

19           The only testimony that you have heard and

20   only evidence that you have heard is that it was

21   proposed in good faith.  Mr. Shoaf testified the

22   various things that he and DDRC did in trying to

23   solicit from among over 60 people or entities to fund

24   the plan, as well as negotiations of ultimately

25   arriving at the joint plan, the negotiations that

1    were conducted with WestLB, the committee, Jacobson

2    and the homeowners.  And, in fact, the plan protects

3    the interest of 117 homeowners, eliminates their

4    liens.  I've lost count of how many general unsecured

5    creditors there are, but there are over 50.  WestLB,

6    Jacobson and its subs will be satisfied, and also it

7    addresses additionally the public interest in that

8    the downtown Park City area will be best served by

9    the continuation of one of their premier properties,

10   the Sky Lodge.

11        All of this points to the absolute good

12   faith that the plan was -- that the -- that the plan

13   was both proposed and is -- and complies with the

14   good faith requirements of the code.

15        Mr. Wickline's unsubstantiated ramblings

16   in counsel's brief should be totally and absolutely

17   disregarded.  He sent his lawyers to this courtroom

18   to try to obfuscate and block a plan when he really

19   has no monetary stake in it and didn't have the

20   courtesy of appearing here to submit any testimony or

21   be subjected to cross-examination, which would have

22   been somewhat painful for him and perhaps the Court

23   in having to spend the time, and it is he who has

24   unclean hands.  The cries that the plan is not being

25   proposed in good faith is shallow and there is not

1    one scintilla of evidence before the Court to

2    controvert the good faith findings that we are going

3    to ask the Court to make when we submit a

4    confirmation order.

5              1129(a)(4), again everything was supported

6    by the testimony and the exhibits before you.  All

7    administrative claims will be paid in full.  The

8    (a)(5), we disclosed the necessary information

9    regarding management in both the plan, the testimony,

10   the plan supplement and the exhibits produced before

11   you, your Honor.  There are no rate change -- rate

12   changes necessary from any regulatory agency.  So,

13   therefore, 1129(a)(6) is inapplicable.

14             With regard to 1129(a)(7), to the extent

15   that it was necessary to present evidence, I think

16   the testimony of both Mr. Shoaf and Mr. Throndson

17   clearly showed that the best interest test was

18   satisfied because everyone will be getting at least

19   what they would have gotten in liquidation.  In fact,

20   the testimony was that in a liquidation, no one would

21   get any money other than WestLB being partially paid.

22             The -- 1129(a)(8), the -- all impaired

23   voting classes have accepted the plan -- that is

24   Classes 1, 2, 4, and 5 -- as evidenced by the ballot

25   report.  Also (8)(10) was satisfied because at least

1    one impaired class has accepted the plan.  And,

2    again, Classes 6 and 7 do not vote.  And to the

3    extent they are ever deemed to have a right to vote,

4    they would be crammed down in 1129(b), which I'll get

5    to in a moment.

6              I already covered that all admin and

7    priority claims are being paid in full.  That is 8

8    and 9, and (a)(11), the plan is feasible.

9              The various exhibits and testimony from

10   Mr. Shoaf and Mr. Robertson reflect that the four and

11   a half million dollars being contributed by WestLB is

12   sufficient to pay all the creditors as required under

13   the plan.  And the testimony, again, uncontroverted,

14   is that the operations of the Sky Lodge

15   post-confirmation -- you recall the five-year pro

16   formas -- would be sufficient to carry out the plans

17   and reorganization would not be necessary.

18              Again, although there was not testimony,

19   as debtor's counsel, we will make sure that all

20   trustee fees are paid under 1129(a)(12).  They are

21   current as we stand here today, and obviously any

22   that become due until there is a final decree will be

23   paid.

24              Again, 1129(a)(13) which deals with

25   retirement benefits is inapplicable because there are

1   none.  And 1129(a)(14) and (15) dealing with domestic

2   support in individual cases are inapplicable.

3            That brings me to the 1129(b) cram-down

4   provisions.  I already touched upon the fact that

5   under (b)(2) the plan is fair and equitable.  This is

6   better known as the absolute priority rule.  No

7   junior classes under the plan are retaining or

8   receiving property until all senior classes are paid

9   in full, and none of the senior classes are being

10  paid more than are allowed claim.  In fact, they are

11  being paid less.

12           WestLB is receiving the two notes:  The

13  6.2 million senior note, ten million dollar junior

14  note, Jacobson, of course, is receiving a million

15  three-thirty to satisfy both their claim and the

16  subcontracted claims which aggregate a million

17  seven-fifty, and WestLB is putting in the four and a

18  half million to pay unsecured admin priority claims

19  as well as fund the necessary capital going forward,

20  without which the debtor will run out of money by the

21  end of the summer and need to liquidate.  The plan

22  does not discriminate unfairly.

23           As far as Class 7, there's clearly no

24  equity in the debtor, and to have allowed them to

25  maintain or retain property would have violated the

1   absolute priority rule, which prohibits them from

2   receiving or retaining any assets.  And here the

3   property is being -- the assets are being transferred

4   to a reorganized debtor, which is owned differently

5   than the existing equity security holders.

6        The aggregate amount of the claims exceed

7   22 million, and that is before you would even

8   consider the claims of Management Development, which

9   is another two million.  So clearly Class 7 equity is

10  way out of the money.  And I know the committee is

11  going to argue vis-à-vis the 9019 issues and address

12  that regarding the settlement of the lawsuit.  But,

13  frankly, the debtor had released WestLB at the very

14  beginning of the case.  Partners no longer --

15  frankly, maybe never had -- but no longer has a claim

16  against them.  And I would note that under the

17  substantial case law that is out there, equity does

18  not have standing to bring fraudulent conveyance

19  actions.

20        And just as an aside, Easy Street Mez and

21  Easy Street Holding are actually plaintiffs in the

22  lawsuit against Bay North.  So if there is a

23  recovery, there needs to be some allocation of the

24  recovery between the reorganized debtor which is

25  stepping into that claim on behalf of Easy Street

1    Partners but also at Easy Street Mez and Easy Street

2    Holdings.  And perhaps our two adversaries who were

3    here today who have disappeared from this case from

4    the outset -- frankly, far beyond that in the past --

5    would become perhaps more active, perhaps they will

6    supply some funding for the litigation.  I doubt it.

7    That is not their style, which is to disappear and

8    then come back and stamp their feet and complain when

9    they don't like what is happening.

10            And, you know, what has occurred here,

11   particularly with Class 7 and probably the -- well,

12   in a horrendous real estate market and the worst real

13   estate downturn in my life -- and I think I'm

14   probably older than most people involved in this

15   case -- probably all of our lives -- should not stop

16   this plan, which supports the fact that there is no

17   equity.

18            Moreover, just touching upon the fair

19   equitable issues, you heard -- the only evidence

20   before you is that Mr. Wickline doesn't have one

21   penny invested, did not really participate in

22   Management, earned really no fees through his

23   efforts, and asks the Court to disregard a

24   subordination agreement, which is a pretty standard

25   subordination agreement, executed in virtually every

1   development loan where management development

2   companies subordinate their claims to a lender.  And

3   I think it's clear that WestLB is not, in fact, being

4   paid in full.  Their claim is in excess of 17

5   million.  They are accepting notes of 16.2 and may

6   get paid off over time.  And, therefore, I would

7   submit Classes 6 and 7 are being treated in

8   accordance with their relative priorities as required

9   under the bankruptcy code.  There has been no unfair

10  discrimination, which should be determined on a

11  case-by-case basis.  I have heard, and, in fact,

12  there is absolutely no evidence of why -- of any bad

13  faith of WestLB and why the subordination agreement

14  under this particular plan should not be enforced.

15  The legislative history, which is cited at footnote

16  67 of page 33 of our brief, indicates that bankruptcy

17  courts should recognize prepetition subordination

18  agreements.

19          Not only is WestLB not receiving payment

20  in full, they are putting in an additional 4.5

21  million, which further supports the subordination

22  provisions.

23          And in prior plans -- although there has

24  been some noise about this -- the claims that have

25  developed in Management were, in fact, effectively

1  subordinated to WestLB because they were not allowed

2  to be paid until four years after the plan, and that

3  was -- the prior plan -- and that was the time period

4  in which hopefully the WestLB claim, allowed claim,

5  would have been paid.  And, again, payments were

6  coming from a third-party plan funder.  I would also

7  remind the Court as well as Mr. Wickline's counsel

8  that there is an adversary proceeding, which I know

9  your Honor is aware about, against Mr. Wickline on

10  theories of breach of his fiduciary duties.  There

11  has been some testimony here today.  Frankly, this

12  confirmation hearing should not be the time and place

13  to litigate that -- as well as the fact that not only

14  should he not receive anything but perhaps return the

15  $285,000 that he received under the Faithful Servant

16  Doctrine that exists in most states, including the

17  state of Utah.

18          The other -- and I'll address them

19  briefly -- objections of Alchemy and PC I, I think,

20  could be addressed fairly simply.  I don't think

21  WestLB breached any covenant of good faith.  At least

22  there is no evidence of that before you.  Your Honor

23  should only listen to the evidence, and at the

24  beginning of this case during opening statement, I

25  asked the Court to remember all of the things that

1    counsel for Alchemy and Wickline said they were going

2    to prove.  There is not one scintilla of evidence of

3    anything that they have alleged in their briefs,

4    which are all without factual support.

5          The release provisions of the plan,

6    frankly, are pretty standard fare.  I think it

7    parrots the code section, and they are really just --

8    other than the committee release of WestLB, they're

9    exculpations for the actions of the parties that

10   participated in this case in proposing and confirming

11   the plan.  So certainly if his Honor, as is required

12   to confirm a case, makes good faith findings, there

13   is no reason that the parties involved in prosecuting

14   this case to a successful conclusion to confirm the

15   plan should not obtain the typical exculpation that,

16   frankly, I've seen in every case that has been

17   confirmed with my involvement, whether I'm standing

18   at the podium as debtor's counsel or as committee

19   counsel or as bank counsel.

20         Again, the other release is simply the

21   release of the committee lawsuit.  I don't believe

22   any of the objections have -- objections even have

23   standing to raise an objection to that.  Again, the

24   only evidence before you was the proffer of Mr.

25   Elliott, which clearly satisfies all of the elements

1    of the 9019 settlement and that should likewise be

2    approved.

3            I've mentioned many times throughout this

4    case in the last two days, Friday and today,

5    regarding Easy Street Partners' release of WestLB,

6    which occurred at the very outset of this case on

7    notice to everyone.  PC I never showed up, never

8    objected.  They were on notice.  Nor did any of --

9    Mr. Wickline or his entities.  On notice, didn't

10   object.  I would submit, in addition to the fact that

11   after investigation, debtor, along with their

12   counsel, didn't feel there was -- were good grounds

13   in pursuing it.  I also think that doctrines of

14   laches, waiver, estoppel, apply to their cries that

15   there is something wrong with the release of ESP

16   Partners of WestLB, which has been, in essence, the

17   law of this case for about eight months now.

18           Just to reiterate, there is no evidence to

19   support Wickline's, Alchemy's objections.  He is the

20   one who breached fiduciary duties.  There is no

21   evidence of any breach by anyone else.  He has

22   unclean hands.  Everyone else went forward with this

23   plan in good faith, arm's length, and thus negotiated

24   it open and transparently.  Everything was disclosed.

25   Everything was noticed.  Everyone had an opportunity

```
 1    to be heard.  Any allocations that they make are
 2    conclusionary without any evidence.
 3               I think I've touched upon the
 4    subordination agreement.  Mr. Havel is going to speak
 5    a little bit more to that in a moment.  There has
 6    been, again, some noise by Wickline about ABG-SL
 7    being removed as a manager.  That occurred almost a
 8    year ago, your Honor.  We've not heard anything about
 9    it, but the only evidence -- and, again, this Court
10    is constrained to only consider the evidence before
11    it, not statements of counsel.  That is not evidence.
12    Under Article 6.3 of the Easy Street Holdings',
13    Subsection A -- Easy Street Holding's operating
14    agreement -- when ABG-SL failed to file tax returns,
15    that in and of itself was cause to remove them.  In
16    any event, ABG-SL was removed, and ultimately the
17    managers of this enterprise became Michael Fader,
18    Bill Shoaf, Philo Smith, with a requirement that two
19    votes were necessary in order to take action.
20               And, again, all of those issues, your
21    Honor, are not plan objection issues.  They are not
22    relevant to this case as consideration.  Any
23    complaints that the partners have among themselves,
24    what occurred outside this case prior to the
25    bankruptcy, are unaffected by the plan.  They can
```

1    have the parties suing each other in another court,

2    but that is not appropriate in front of this Court,

3    which is considering the reorganization plan of Easy

4    Street Partners.  The plan does not release any such

5    claims.  That has been a misnomer asserted by -- in

6    certain of the papers.  There's about 48 pages of

7    objections filed by the two objecting creditors, I

8    think most of which is misplaced.

9              They also complain about a release that

10   WestLB is giving to Cloud 9 Resorts, LLC under the

11   plan.  That is a claim for WestLB to release, not

12   Easy Street Partners.  Again, that does not give rise

13   to any bad faith or otherwise, particularly in light

14   of the fact that WestLB now gives a completion

15   guarantee, is taking over the property, will, in

16   essence, through an affiliate own the property and

17   they are funding it.  And they are entering into an

18   employment agreement with Mr. Shoaf, which, again,

19   the only testimony and evidence before you, was

20   negotiated in good faith at arm's length and actually

21   will -- is a necessary element for the transition of

22   a successful reorganization in order to facilitate

23   the ongoing business at the Sky Lodge.  And Mr. Shoaf

24   has agreed, yes, with compensation -- he's worked

25   many years and many days in his life without

1    compensation.  The employment agreement has nothing

2    to do with the past.  He and his own independent

3    counsel negotiated the agreement with WestLB, who

4    will pay him.  It has absolutely nothing to do

5    whatsoever -- even though there has been innuendo

6    cast about with the subordination of the claims of

7    Management and Development or anything that went on

8    in the past.

9              Likewise, with regard to what has

10   attempted to have been made of the liquor licenses,

11   you don't sell liquor licenses in Utah.  In fact,

12   it's illegal to get money from the sale of liquor

13   licenses.  What is happening, and I believe the only

14   testimony and evidence before you, is that in order

15   to facilitate the transition and continued operation

16   of Sky Lodge, there has to be -- without the

17   employment agreement, without Mr. Shoaf being

18   employed by the debtor at closing, under Utah law,

19   the liquor licenses would have to be turned in to the

20   ABC and the Sky Lodge would not be able to sell

21   liquor.  And in the state of Utah, it's not too easy

22   to get liquor licenses.  So on a transitional basis,

23   not many people would start eating at the restaurant

24   there.  Business would be severely impacted.  It

25   would likewise impact the continued sales, which we

1     hope -- and actually, the evidence is that they will

2     start to sell the remaining unsold units, which is

3     part and parcel of paying down the WestLB note and

4     the continued operations at the Sky Lodge.

5              So there has been no misappropriation.

6     There has been no evidence of misappropriation

7     because legally, you are not allowed to transfer

8     licenses.  Now, they introduced one liquor license.

9     There is three -- there are three other liquor

10    licenses.  They are in evidence by virtue of being

11    next to various exhibits.  And those licenses, there

12    has been no evidence that there was anything improper

13    with those licenses, which will be maintained on an

14    interim basis so that there can be a transition until

15    the reorganized debtor procures licenses from the

16    Utah Alcoholic Beverage Commission.

17             I'll just raise for the last time that PC

18    I has no standing.  The equity security holders have

19    no standing.  Your Honor has given them a lot of

20    latitude.  However, I don't think any evidence has

21    come out that would change anything I've said or

22    militate against the overwhelming evidence to -- that

23    supports confirmation of this plan as well as all of

24    the other ancillary documents that will be executed

25    in connection with the plan.

1       Your Honor, during the worst economic

2   downturn of our lifetime, particularly in the real

3   estate hospitality industry, which has been

4   decimated, the Sky Lodge opened in December of 2007,

5   probably -- and everyone says location, location.

6   Well, probably not the best of times to open up a new

7   real estate venture.  The testimony was that

8   continuing into 2008, 2009, the real estate market

9   virtually collapsed.  Mr. Shoaf has expertly

10  navigated through this environment, literally

11  single-handedly, making getting here today a minor

12  miracle.  He has virtually stayed the course and

13  single-handedly looked out for the homeowners, the

14  creditors, approximately 100 employees at the Sky

15  Lodge, all who will keep their jobs, all of the

16  creditors will be paid, and what has happened?  All

17  the partners headed to the hills.  They fled.  They

18  hid.  And it's sort of -- it's like when you go into

19  battle, leading someone into war, you look behind you

20  and your troops were just gone.  That is basically

21  what happened here.  And they didn't resurface until

22  a few days ago, and only -- and two of them

23  resurfaced and really because they are unhappy.

24  Well, being unhappy is not grounds to not confirm a

25  plan.  All of their arguments are disingenuous and

1    shallow.  There is absolutely no evidence before you

2    to support any of their objections.  WestLB

3    particularly, they've raised a lot regarding the

4    employment agreement.  The only evidence is the

5    importance of keeping Mr. Shoaf on board, continue

6    its operations.  His presence in the community is

7    very high and respected, and the future success and

8    implementing the plan in large part is based upon his

9    continued participation at the Sky Lodge.

10            You have two choices today:  Disaster or

11    successful reorganization.  If this plan is not

12    confirmed, everything crumbles.  Within a few months,

13    the Sky Lodge will have to close its doors, tell

14    their employees, "You no longer have a job.  Go find

15    another job."  No creditors will get paid.  You are

16    going to have a hole in downtown Park City -- a

17    pretty hole -- but it will begin to deteriorate and

18    be a blight.

19            On the other hand, if we confirm this

20    plan, every creditor is going to be paid in full and

21    there are only going to be two unhappy people.  One

22    person who doesn't have one penny into this project

23    and probably is going to be required to return some

24    money.  That is Mr. Wickline, just in case you didn't

25    know who I was referring to.  And another security

1  holder who, you know, frankly, lost a little bit of

2  money in the context of this overall case.  And that

3  is -- you know, when you invest in ventures,

4  sometimes you win, sometimes you lose.  They lost

5  money.  If they think there are any other lawsuits

6  going on out there, this plan doesn't release any of

7  them.  And I would submit the overwhelming evidence

8  supports confirmation of this joint plan, and I

9  respectfully request that his Honor enter an order

10  confirming the same.

11             THE COURT:  Thank you.

12             Mr. Havel?

13

14             <u>CLOSING ARGUMENT</u>

15  <u>BY MR. HAVEL</u>:

16             Your Honor -- good afternoon, your Honor.

17  We are going to focus on just a couple specific

18  issues that we think are of particular importance to

19  us.  I will address the issue of the treatment of the

20  subordinated claims of Management and Development

21  under Class 6.  Ms. Jarvis is going to address some

22  of the remaining objections from Park City I to

23  supplement or clarify our position vis-à-vis those.

24             Before we start talking about the

25  treatment of Management and Development, we have to

1    make it clear that our position vis-à-vis the

2    treatment of these claims in the plan and our

3    expecting treatment of these claims in the plan have

4    nothing to do with the management dispute between

5    Mr. Shoaf and Mr. Wickline.  They have admitted they

6    both own half of both of those entities.  There has

7    been a suggestion that Mr. Wickline does not like

8    what Mr. Shoaf did with some of the entities.  That

9    is for them to battle.  Mr. Wickline can attempt to

10   sue Mr. Shoaf.  He can attempt to make a claim for

11   the value that Mr. Shoaf is getting out of this.  But

12   we are not part of that and that is not part of our

13   structure.

14            Now, back on to the treatment of Class 6.

15   It seems to me, your Honor that we should start by

16   focusing on the language in the subordination

17   agreement, which was admitted as an exhibit.  I think

18   it was 12 and 13.  At Section 6.1(b) it says, "The

19   borrower shall continue to be liable to the developer

20   for all the fees and charges and indemnifications

21   under the development agreement whether incurred

22   before or after the date."

23            So that basically says Partners will owe

24   money to Management and Development.  This is a

25   three-party agreement where the bank, the debtor, and

1    either Management or Development are involved.  It's

2    on about page -- it's not paginated.  But the eighth

3    page in, your Honor, down at the bottom of the page,

4    Subparagraph B, and it's the last sentence.  And I

5    read the first clause in the last sentence, which

6    identifies the claim that either Management or

7    Development may have against Partners.

8          And then it goes on to say, "Provided that

9    any right or remedy of the developer, slash, manager

10   may have to collect such fees, charges, or

11   indemnifications from the borrower or the resort

12   shall be subordinated to the indefeasible payment in

13   full, in cash, of all amounts due to the

14   administrative agent under the loan documents."

15         That is a specific, unequivocal agreement

16   by Management and Development to not accept a penny

17   on their claims until WestLB has received their

18   entire claim paid in cash, in full on an indefeasible

19   basis.  So we start with a very clear contractual

20   term and a very clear provision that we want to

21   enforce through the plan at this point.

22         It's noted, this is not an unusual type of

23   agreement between a lender and the insiders.  This is

24   different in -- not necessarily in nature, but in

25   context where you oftentimes have subordination

1    agreements between two creditors who are just

2    subordinating themselves because of a priority

3    dispute or something.  This is one where the owner,

4    the operator, the developer, the manager says, "I

5    want to borrow some money from you, and I'm not going

6    to take a penny out of this thing until you are paid

7    back in full."  That is the promise and it's not an

8    unusual promise for a lender to extract or an insider

9    borrower to provide in connection with the loan going

10   forward.

11            The comments that I'm going to make as

12   follows, your Honor, relate primarily as responsive

13   to the written objections by Wickline.  Curiously, a

14   number of the points in the written objections did

15   not seem to be addressed during the hearing in terms

16   of either evidence that was adduced or lines of

17   questioning.  I'm not sure if that means they think

18   these issues have been abandoned or if they felt that

19   they were adequately dealt with, but I'm going to

20   address them because they are in the brief.

21            Wickline starts their efforts to get out

22   of the effect of the subordination agreement by

23   saying, well, you have to establish the existence and

24   validity of a subordination agreement in order to ask

25   the Court to enforce it.  They have put in no

1    evidence regarding the existence or validity of these

2    subordination agreements. We, your Honor, in turn,

3    have now in Exhibits 10, 11, 12, and 13, the

4    following: We have the articles of formation for

5    Management and Development. We have both of those

6    articles of formation saying that Mr. Shoaf is one of

7    the two managers for these entities, and that he

8    alone has the power to bind the entity. So we have

9    clearly a corporate authority for Mr. Shoaf to sign

10    these. And then we have the actual agreements

11    themselves, which are now Exhibits 12 and 13, which

12    are signed by Mr. Shoaf on behalf of Management and

13    Development.

14            We submit that this constitutes undisputed

15    and uncontested proof of the existence and the

16    validity of the subordination agreements. If you

17    look at the case which is cited actually both in

18    Wickline's papers and in our reply, the Best Products

19    case, this is sufficient for the Court to treat the

20    subordination agreement as being in effect and fully

21    enforceable. We have, in effect, established a prima

22    facie case that can now be enforced.

23            Interestingly enough, Mr. Wickline in his

24    papers goes forward and makes a more difficult and

25    confusing argument where he states without any

1     citations that we should have filed an adversary

2     proceeding or gotten a declaratory judgment to

3     establish that the subordination agreement was in

4     effect.  Well, your Honor, that is not the law.  It

5     is not in -- not required by the rules.  I will cite

6     you to -- I'll refer you to Bankruptcy Rule 7001(8),

7     which as you may recall is the rule that lists what

8     kind of things should be brought by adversary

9     proceedings.  And that section says that, "Adversary

10    proceedings are to deal with subordination of claims

11    unless proposed in a plan."

12          So you have a specific rule that says you

13    do not have to follow an adversary proceeding and

14    that, in fact, you can do it as part of a plan.  And

15    interestingly, further, the Best Products case, which

16    was cited by Mr. Wickline, considered this issue as

17    well.  And there the bankruptcy judge said that, "The

18    objections, procedural argument that may deal with

19    the contractual subordination only by the context of

20    an adversarial proceeding is simply wrong."

21          So we have express case authority saying

22    we have established the validity and existence of the

23    claim.  The contention we need or should have done

24    more is unsupported by the bankruptcy rules and

25    unsupported by the cases that we have cited.

1      Now, having an agreement that we can

2   enforce, the reply papers of Mr. Wickline attempts to

3   raise a series of what I will call defenses, various

4   reasons they claim it should not be enforceable in

5   this particular case.  Although there are several

6   legal theories that I'm going to discuss in a moment,

7   when you read the brief, there are three factual

8   scenarios that keep getting thrown up as the basis

9   for the defenses.  Three legal -- I'm sorry -- three

10   factual scenarios for which Wickline has provided no

11   evidence in the record at all.  But I will discuss

12   them briefly because they have put no evidence in,

13   just to make sure that we understand that none of

14   these can support the alleged arguments in the paper

15   in the objections.

16      First was an argument that WestLB could

17   have and should have paid itself in cash rather than

18   restructuring its prepetition debt and putting in

19   only new money for its equity contribution.  When we

20   get to the legal theory of good faith and fair

21   dealing, we will see even more so that this is just

22   not a requirement at all as a legal matter.  But as a

23   factual matter, we have put in our declaration in

24   Mr. Robinson's paragraphs 9 and 10, which were not

25   impeached by cross-examination and not even

1  challenged, that given the restructuring and given

2  the operations of WestLB, it did not have unlimited

3  capital and it did not normally engage in the

4  business of using unlimited capital to pay off its

5  prepetition or its reorganized debt.  It not only is

6  something that they didn't do structurally, but it's

7  something that makes logical sense because the

8  treatment of your new equity is a very different

9  situation than what you do about restructuring debt

10  that you already have in the case.  And so it makes

11  perfect sense as to why WestLB would not and could

12  not just dip into its pockets and come up with 17 or

13  18 million dollars for its old debt, as well as throw

14  in four or five million dollars of new money to

15  reorganize this.

16          The history of this plan negotiation

17  through every other plan funder shows that there was

18  never a cashout of the WestLB claim.  This is not a

19  remedy that was available someplace else and WestLB

20  chose not to pay claims because of some perceived

21  advantage over the Management and Development claims.

22  It is a situation that has existed in the economics

23  of this case from the beginning.

24          And I would just note, your Honor, that it

25  would be rather extraordinary, even as a general

1    practice in Chapter 11, to find lenders that have

2    notes that are being restructured which make them

3    kind of an involuntary lender tapping into their

4    brand-new capital, basically refinance an old loan

5    rather than just restructuring it the way it was.

6          The second argument that was being made

7    here was WestLB is being paid in full, so gee, maybe

8    you shouldn't be enforcing the subordination.  First,

9    that contention doesn't match the contractual

10   language.  The contractual language says we had to

11   get paid in full in cash.  And quite frankly, that

12   should stop the investigation of the factual question

13   because as long as we are not getting paid in cash,

14   any argument about the purported value of instruments

15   or equity that we are getting is irrelevant because

16   it doesn't comply with the contractual language.

17          But nevertheless, your Honor, at

18   paragraphs 3, 4, and 11 of the Robertson declaration,

19   we again put in uncontested evidence that the fact is

20   that WestLB, by the end -- by the time of the

21   confirmation of this plan will have a claim well in

22   excess of 17 million, that it is settling for the

23   16.2 million so that it's not getting paid in full as

24   a creditor.  Further, we see that -- your Honor, the

25   notes that we are getting for the 16.2 are not even

1    market notes.  So these aren't the kind of

2    instruments that a party could turn around and even

3    sell on the open market for 16.2 tomorrow.  These are

4    going to take some patience and some time to repay,

5    part because of the pick element and part because of

6    the two-tiered structure of it all as well.

7              There is a secondary argument here that I

8    think we can dismiss quickly, and that is somehow

9    because WestLB is acquiring the equity, well, then

10   they really have gotten something worth 22 or 24

11   million and that is clearly paying their claim in

12   full.  And I think that improperly blends the steps

13   that WestLB is taking to structure its prepetition

14   debt and what WestLB is doing by investing new money

15   to acquire the new equity.  And the fact of the

16   matter is, WestLB is in no different position than

17   any of the other plan funders that the debtor tried

18   to bring to the table here in this case.  And that

19   money involves its own set of risks and rewards and

20   returns.  And to the extent there is surplus value in

21   this case -- and I would suggest there is not, based

22   on all the numbers we have seen.  But if there were

23   any such value, it doesn't belong to WestLB as a

24   prepetition secured creditor.  It's being acquired

25   solely because it goes the next step, puts the new

1  equity in, it becomes an investor, and should be

2  entitled to its return on that investment.

3         The third factual contention is by far the

4  most absurd, and that is an argument that, well,

5  WestLB could have done better here, but it

6  intentionally took less just to create a shortfall so

7  that we would trigger our rights under the

8  subordination agreement.  And, your Honor, I would

9  suggest that one is just entirely counterintuitive.

10 Lenders do not take less on the prospect that they

11 can have then a litigation advantage over someone

12 else down the line.  And, your Honor, I think it's

13 particularly noteworthy -- excuse me one moment.

14        I think it's particularly noteworthy when

15 you listen to this argument to look at the efforts of

16 Wickline to even support this argument, where in

17 pages 18 and 19 of their brief they go into this area

18 and they say, well, we even manipulated the estimated

19 value of the estate.  One time a year and a half ago

20 it was worth 40 million, and then, what do you know,

21 at one time it dropped down to high 20's and now it's

22 only worth 16 -- I'm sorry -- only worth 20.6.

23        They then go on to suggest while the

24 economic climate certainly could justify the steep

25 decline, but this much, it's impossible.  It says a

1    more plausible explanation for the reduced value,

2    other than the simple decrease in property value, is

3    that we are now intentionally undervaluing it so as

4    to justify not paying them in full.

5              Your Honor, we all know what has been

6    happening in the real estate market, and for a

7    property to drop 30 or 40 or 50 percent of this

8    nature is not really unheard of and it's the reality

9    of this case.

10             In addition to the idea that the structure

11   doesn't support the idea that there is some

12   conspiracy to manipulate the value, let's look at the

13   process that led to this restructuring.  There was an

14   extended series of negotiations over time.  These all

15   looked to values that were fairly consistent from the

16   beginning of the negotiations back in December and

17   January and February.  The current plan represents a

18   realistic view of the current value by all the

19   parties.  We are taking a risk by investing more

20   money and hopefully extracting a value, but the

21   negotiations with the junior creditors have been at

22   arm's length, where Class 4 is taking less, Jacobson

23   and the mechanic's lienholders are taking less.  They

24   are all doing this in order to make the plan work.

25   And to suggest that there is some sort of a

1    conspiracy or manipulation focused solely on the

2    Class 6 claim is just simply not tenable.

3              Those factual allegations are not put

4    forth in the record at all.  There has been no

5    evidence put in by Wickline on any of those bases.

6    We have rebutted all three of those grounds in our

7    declarations with Mr. Robinson.

8              I will briefly touch on what they say are

9    the legal theories that are supported or for which

10   they invoke these factual findings.  The first is

11   they cite a concept of -- a covenant of good faith

12   and fair dealing, and they suggest that WestLB should

13   not have done anything that made it -- made the

14   subordination agreement enforceable against the

15   Management and Development companies.  Your Honor,

16   this is a contract governed by New York law.  We have

17   given you several cites of New York cases dealing

18   with the good faith and fair dealing concept.  It

19   does not add substantive obligations to a contract.

20   In fact, it does not even come into play as long as

21   the parties are operating within the literal language

22   of their contract.  Here we have a contract that I

23   started out pointing out to you is absolutely clear,

24   and we are dealing with only the application of the

25   literal language.  And that is, until we get paid in

1    cash in full, they have agreed to accept nothing.

2    There is nothing in that agreement about procedures

3    or standards by which WestLB must seek it's cash

4    payment.  There is nothing in there that limits what

5    it can do to restructure its debt going forward.  I

6    submit that the doctrine has no application, or if it

7    applies, it doesn't require the conduct that Wickline

8    argues.  Because, frankly, we have enough flexibility

9    within the express language to do what we are doing

10   and what we are entitled to do.

11        There is a second defense which, quite

12   frankly, I think is good faith and fair dealing, and

13   actually it's little harder to recognize as a

14   doctrine that applies.  They use the word

15   "mitigation," which I think, because they cite the

16   same factual problems, comes to the same point, and

17   that is we should have done something harder to avoid

18   them suffering a harm under the subordination

19   agreement.

20        Frankly, I think in this instance, for the

21   same reasons of good faith and fair dealing, the

22   doctrine doesn't apply or has not been satisfied.

23   More importantly, we know that mitigation is a

24   concept that gets involved when there has been a

25   breach and the non-breaching party is dealing with

1    its damages.  That is not where we are here.  This is

2    an agreement by its terms we are enforcing the rights

3    to not pay them until we get cash in full.  This is

4    not a question of going after them for an affirmative

5    recovery.  Quite frankly, if they wanted to not be

6    subordinated, they could come up with the cash and

7    pay us as well.  They were the insiders and the

8    managers and they chose not to.  So for them to now

9    sit and say because we are stuck with another

10   restructuring that doesn't pay us cash, that we have

11   a duty to mitigate their subordination obligations.

12   It does not fit the doctrine and it does not fit the

13   documents itself.

14          The third and the fourth defenses are

15   arguing that there was a breach by WestLB of some

16   obligations to Partners and had something to do with

17   funding money out of an account.  There has been no

18   evidence that that breach occurred.  There has been

19   no evidence that there were damages that arose from

20   that breach.

21          As a legal matter, however, a breach of

22   contract between WestLB and Partners would not be a

23   basis for excusing them from their subordination

24   agreement.  It's -- at worst, it's a claim that

25   Partners has against WestLB for either damages or

1    reformation of the agreement or some other kind of

2    contractual dispute between the two of them.

3           We've cited at footnote 71 on page 35 of

4    our reply brief the Walnut Leasing case, which quite

5    extensively and clearly talks about the fact that

6    alleged breaches, alleged fraud conduct, alleged

7    damages to third parties cannot be used as a basis to

8    then reorder priorities that have been established by

9    subordination agreements.  And that case rather

10   thoroughly considered efforts by a subordinated

11   creditor to avoid its obligations and said they could

12   not do that by pointing to third-party breaches and

13   disputes.

14          The fourth defense is the last one.  It's

15   under the heading, quote, "Inequitable conduct,"

16   discussed at page 23 of the Wickline brief.

17   Interestingly enough, it goes on for about three

18   pages and doesn't mention the word "WestLB" at all.

19   It's Mr. Shoaf appropriates my liquor license rights.

20   And then there is a sentence at the end, and WestLB

21   must have surely been involved in this and so that is

22   a reason to not let them enforce the subordination

23   agreement.

24          Well, the fact of the matter is, your

25   Honor, as I said in the Walnut Leasing case, some

1    alleged harm between Mr. Shoaf and the debtor, or

2    alleged harm between Mr. Shoaf and Mr. Wickline, is

3    not going to be the basis for reordering our

4    subordination agreement.  And more importantly here,

5    there has been absolutely no evidence that WestLB

6    engaged in an aiding and abetting of some sort of

7    breach or duty.  If anything, we have stayed out of

8    that and let the parties resolve that dispute on

9    their own.  Therefore, I submit, your Honor, that the

10   subordination agreement is fully effective and that

11   there are no defenses to its enforceability in this

12   case.

13          The last two issues, and I'll touch on

14   them briefly because I think they are very quickly

15   and easily answered in the case law is, how do we

16   then put them in a separate class and give them

17   nothing?

18          Classification is pretty straightforward.

19   Section 1122 says you classify claims of a similar

20   nature together, but it also clearly contemplates

21   that you can create more than one class.  The

22   Wickline cases against classification are really

23   inapposite.  They are cases of sufficiency claims by

24   senior secured lenders and efforts to cram down new

25   value plans.  Instead, we cite the cases where you

1    can clearly classify insider claims, and you can

2    clearly classify subordinated claims in separate

3    classes.   The character of the claims are different

4    enough that the courts permit you to justify them.

5    They are not viewed as being a gerrymandering or an

6    improper purpose to put them in a separate class at

7    all.

8              And, your Honor, I mentioned briefly the

9    Walnut Leasing case a couple of times.  But I do, for

10   this purpose, want to point out that Walnut equipment

11   leasing case that I have cited, the judge had a

12   similar question there and he says, "I find it rather

13   obvious that the holders of subordinated debt do not

14   have claims substantially similar to the holders of

15   senior debt.  I do not view this to be an 1122 issue

16   and I will focus on treatment, not classification of

17   the claims."

18             So I think that our classification pretty

19   easily passes muster and is supported by the facts

20   and the numerous cases that have done this.

21             The last part is the treatment area, your

22   Honor, and here we have Section 510 that says,

23   "Subordination agreements are to be enforceable in

24   bankruptcy."

25             We have the express language that says,

1   "Management and Development are to receive nothing

2   until we have received everything in cash in full."

3          Those two provisions permit you to treat

4   them differently.  And in that context, it is not

5   unfair discrimination to give them less than you are

6   giving other people, based on the financial analysis

7   that neither of the senior classes are even getting

8   paid in full.  And to give them nothing in that

9   context passes the fair and equitable cram-down test.

10         Lastly, I want to come to a theme in the

11  paper of Wickline, which is wholly unjustified, and

12  that is a continued beseeching that they be treated

13  more equitably, how unfair it is to have a plan that

14  only gives them nothing and no one else zero, and how

15  they wish people had worried more about a fair

16  treatment of them vis-à-vis others.  And I want to

17  point out that this is not a question of inequitable

18  treatment.  It's a question of what are the legal

19  rights and what are the respective equities of the

20  parties with the legal rights.

21         As we pointed out, there is a legal

22  binding contract that they receive nothing in this

23  case.  It is not inequitable to ask this Court or the

24  plan to ask people to be bound by their contracts and

25  to perform them.  Further, as an insider, they are

1    not in a particularly sympathetic place.  They are

2    not innocent parties who were pulled into this case

3    and now find themselves subordinated.  These are

4    people who asked the bank to lend them money to help

5    build this project, and they in turn, quite normally

6    agreed, we are not going to take anything out of this

7    until you are paid in full in cash.  As an insider,

8    your Honor, they don't deserve any special equity or

9    consideration.  They are not innocent third parties.

10   If anything, they were parties who were in control of

11   the situation and to the extent it doesn't have

12   enough money to pay them in full now, they don't look

13   to anyone else but themselves.

14            And finally, as to who is going to suffer

15   if the Wickline equity plea comes in, what will

16   happen here if they are not subordinated?  Well, they

17   are not going to get 100 cents on the dollar.  There

18   is not enough money in this case for that.  We have

19   limits on capital and limits on funds.  So the

20   equitable result that they want is they get to step

21   into the pot with the Class 4 creditors -- which

22   right now are about 900,000 and they are about two

23   million -- and I guess they want two-thirds of the

24   pot over there.  They want to force unsecured

25   creditors that have already agreed to take 60 cents

1    on the dollar to drop it down to 20 cents on the

2    dollar.  There will be no notes for anyone because

3    the percentages won't be that big.  I submit, your

4    Honor, that would be the inequity in this case, to

5    impose on those innocent general unsecured creditors

6    that burden when the insiders agreed to subordinate

7    themselves and through this plan should be compelled

8    to comply with that obligation.

9            I believe Ms. Jarvis will address some of

10   the objections of Park City I.  Unless you have any

11   questions, those are my comments, your Honor.

12           THE COURT:  No, thank you, Mr. Havel.

13

14                   CLOSING ARGUMENT

15   BY MS. JARVIS:

16           Your Honor, I'll try to briefly address

17   just a few of the objections that were raised by Park

18   City I on behalf of WestLB.  I know this seems like a

19   repeating theme, but I would repeat again, they

20   clearly have no standing.  I think the evidence has

21   been clear that they have no economic interest or any

22   reasonable expectation of any impact at all by this

23   plan being confirmed.  Because they clearly are not

24   going to -- and even under the original plan -- were

25   not going to receive anything from -- as a result of

1    this plan being confirmed.

2            Even if the Court somehow construes that

3    they have standing under 1109, their objections are

4    not persuasive because they are objections for the

5    creditors and the equity holders of this estate to

6    raise, to make themselves, and no such objections

7    have been made.  The creditors, in addition, have

8    voted overwhelmingly in favor of the plan, which is

9    supported by the creditors committee as well.  Their

10   objections are not persuasive, nor are their

11   arguments they raise, a lack of notice persuasive

12   because Park City I could have no expectation of any

13   distribution -- not under the original plan, not

14   under the amended plan -- and in that sense, there is

15   no change.  And that is for four reasons.

16           The first is, the valuation testimony

17   demonstrates that there was no equity for Partners'

18   own equity holders much less the equity holders two

19   levels above Partners.  And that value that -- upon

20   which the no equity -- or no -- yeah, no equity was

21   based was established by an order entered in April --

22   April 15 of this year.  So it's been out there for

23   several months.

24           Secondly, the committee stipulation was

25   filed on February 9, 2010 and this was before the