1    filing of the original plan, which was filed on

2    February 18th of 2010.  And that provides that the

3    action against WestLB would be dismissed with

4    prejudice if the committee did not object to the

5    plan.  So parties looking at this, Park City I would

6    have known and should have known that nothing could

7    be expected from the litigation if the committee was

8    satisfied before the original plan was filed.

9            The committee supported the original plan.

10   The committee supported this plan.  That is no change

11   for the expectations of Park City and the other

12   ultimate equity plan holders since the first plan was

13   filed.

14           In addition, your Honor, this is

15   completely appropriate of the committee because the

16   status of that action is such that WestLB has never

17   filed an answer.  And as your Honor knows, under Rule

18   7041(a), the plaintiff can dismiss without even a

19   court order as long as no responsive pleading had

20   been filed.  So that's been out there.  It was

21   appropriately out is there.

22           Third, there is no claim unless the equity

23   and capital structure above the debtor at Mezzanine

24   and Holding are satisfied.  And as the Court has

25   heard, the -- with the claim of Bay North in excess

1    of 11 million -- maybe up to 44 million, as was

2    discussed today -- it is not reasonable that any

3    distribution should be expected at that level.

4          And the fourth thing is the evidence

5    supporting the 9019 settlement with WestLB has been

6    presented unrebutted, and it shows the standards, the

7    Copexa standards have been met.  It -- those

8    standards were gone by -- clearly, in the testimony

9    of Mr. Elliott, this is in the best interest of the

10   creditors as demonstrated by the evidence and the

11   committees' support of this -- this settlement.

12         There is -- there was no objection when

13   the original release was given to WestLB under the

14   cash collateral order eight months ago.  There was no

15   objection by these ultimate equity holders when the

16   committee was given standing to look into and pursue

17   any causes against WestLB, and there is no evidence

18   to support that the committee did not exercise

19   reasonably their review and consideration of Copexa

20   standards in settling this case.

21         And as a practical matter, it comes down

22   to the fact that if you look at the settlement,

23   WestLB is paying four and a half million dollars in

24   new money.  It's compromising its claim for less than

25   the full amount of its claim, and it's allowing

1    unsecured creditors, if they are paid over time, to

2    be paid a hundred cents on the dollar before they are

3    paid.  It is just very clear that the 9019 standard

4    has been met.

5            Dealing then with the issue of the third

6    party releases, I think the other objections raised

7    by Park City have been adequately addressed by

8    Mr. Blumenthal in his arguments, but just touching on

9    the third-party releases, they raised the specter of

10   third-party releases, but there are no third-party

11   releases in this plan.  If you look at the Western

12   Real Estate Fund case, the Tenth Circuit case, which,

13   you know, prescribes third-party releases, this does

14   not fit under that situation.  That prescribes

15   releases required involuntarily through the plan, and

16   those would be releases by somebody other than the

17   debtor, of a party other than the debtor and that is

18   not occurring here.  If you go through the releases,

19   Section 11.2 is a release by the debtor only with

20   respect to defined claims.  It is not a third-party

21   release.  Section 11.3 is an exculpation clause which

22   mirrors 1125, which is completely appropriate.

23   Section 11.4 is a release of WestLB as part of the

24   compromise supported under Rule 9019, and it is only

25   from estate causes of action.  It is entirely

1    appropriate.  And as I stated, the evidence

2    supporting it is unrebutted.

3              Then Section 11.5 is the injunction, and

4    this mirrors 524.  Again, completely appropriate and

5    allowed under the code.  And, in fact, to be even

6    more careful, that section says that that injunction

7    is only allowed to the fullest extent authorized or

8    provided by the bankruptcy code.  So clearly nothing

9    that is not allowed by the bankruptcy code, you know,

10   is included in this plan.

11             And based on these arguments, on the

12   evidence presented, and on the fact that this party

13   has no standing, we would ask the Court to overrule

14   those objections.

15             THE COURT:  Thank you.

16             Mr. Jenkins?

17

18             <u>CLOSING ARGUMENT</u>

19   <u>BY MR. JENKINS</u>:

20             Your Honor, just very briefly, and I will

21   not retread the ground Ms. Jarvis tread already with

22   respect to the settlement.  I just wanted to make a

23   concluding comment that with respect to the response

24   that the committee filed, that as we put on the

25   record earlier, there has been a resolution of that

1    issue reached, and that re-electing or

2    reconsideration of certain Class 4 creditors will be

3    allowed and the terms that were stated, that

4    Mr. Havel stated are acceptable to the committee.

5              There was one matter that we raised in our

6    pleading that we filed last Thursday which was not

7    addressed today, and that was our second point, which

8    indicated that we believe that the debtor should

9    have -- or WestLB should have to increase the amount

10   of its allocable cash to make payments to Class 4

11   unsecured creditors who elect on the effective

12   date -- to take the effective date payment.  The

13   resolution we reached on the voting issue or the

14   re-electing issue has resolved that and mooted that

15   issue, that the economics of the plan remain the same

16   as currently stated in the plan supplement.

17             And just as a final matter, with respect

18   to the settlement that Ms. Jarvis touched on, this is

19   a settlement that is embodied in a plan under Section

20   1123(b)(3), which does provide that a plan can

21   compromise or adjust claims held by the debtor or by

22   the estate.  Whether or not the Copexa standard

23   applies to such settlements when they are embodied in

24   a plan was something that the Court raised and,

25   frankly, something I was scratching my head over.

1    It, indeed, turns out based on a review of the case

2    law that the Copexa standard or something similar to

3    it is appropriately applied to a settlement even when

4    it's brought within a plan of reorganization, as

5    opposed to a separate 9019 settlement.

6         But looking at the standards, which are

7    very similar, the Court's charge is still the same,

8    and that is the Court doesn't need to determine the

9    issues.  The Court doesn't need to try the issues.

10   What the Court needs to do or is charged to do is to

11   canvass the settlement and determine -- canvass the

12   issues and determine whether the settlement falls

13   above the lowest point in the range of

14   reasonableness.  That is the standard and it's a

15   fairly flexible standard, of course.  And I would

16   submit to your Honor that the settlement that we

17   proposed here in the plan where the litigation will

18   be dismissed in exchange for essentially full payment

19   to unsecured creditors if they so elect, or a

20   discounted payment on the effective date, certainly

21   falls well within and well above that lowest point of

22   the range of reasonableness.

23        As the undisputed testimony which was

24   proffered of Mr. Elliott showed, there was certainly

25   some uncertainty as to the likelihood of the success

1    in this.  It's a complicated lawsuit, which would

2    have fact-intensive issues.  The issues would

3    certainly be expensive to litigate.  And as

4    Mr. Elliott's testimony indicated, WestLB is

5    represented by very aggressive and competent counsel

6    who no doubt would very vigorously defend the

7    lawsuit.

8               Finally, second -- or, I'm sorry -- on the

9    issue of the collectability of the judgment, while

10   that issue was not foremost in the committee's

11   consideration, certainly the collectability, with

12   WestLB being a bank and there really being no

13   affirmative claim for money damages, made that issue

14   certainly less prevalent, less dominant in the

15   consideration.

16              And finally, the settlement must take

17   account of the best interests of creditors, giving

18   due deference to their reasonable views.  I would

19   submit in this case, in this situation, unlike a

20   typical 9019 settlement which is brought by the

21   trustee or a debtor where the creditors are being

22   asked to express their views, in this situation, the

23   creditors have, indeed, expressed their views and as

24   the creditors that have entered into the settlement

25   and fully support that settlement.

1        And on that basis, your Honor, we would

2   ask the Court to approve the settlement as it's

3   embodied in the plan and confirm this plan.  Thank

4   you, your Honor.

5            THE COURT:  Thank you.

6            Mr. Wilson?

7

8                 <u>CLOSING ARGUMENT</u>

9   <u>BY MR. WILSON</u>:

10       Thank you, your Honor.  Counsel have been

11  fair and concise and I'll try to do the same.

12       This objection, the objection of the

13  Wickline parties, centers really on a couple of

14  things and I'll focus there, but they reverberate

15  throughout the case and the matters that the Court is

16  required to consider as it considers confirmation of

17  a claim.

18       The -- it has become abundantly clear that

19  Mr. Wickline and Mr. Shoaf had a falling out as

20  business associates.  I believe the parties have

21  understood generally that it's not this Court's

22  problem, and so we have not burdened the Court except

23  in a very general sense with the details or issues

24  relating to that.  But the existence of that and some

25  of the conduct pertaining to that is relevant to this

1    confirmation proceeding and the plan that is before

2    the Court.

3            First of all, the evidence is that

4    Mr. Wickline's interests were -- in August of last

5    year, his interest in Management were through certain

6    corporate or entity actions.  He was basically frozen

7    out of Management from that point on.  But what that

8    means is that Mr. Shoaf, who stayed on and who

9    continued and continues to have managerial

10   responsibility for this debtor and other entities

11   within the organization, does not -- having effected

12   an expulsion, is not able to expel fiduciary duties

13   as he acts for the entities, and particularly the

14   debtor entity here.  And there are issues relating to

15   the Management and Development claims that are here,

16   and I'll speak to those as briefly as I can.  But

17   basically, it is apparent that Mr. Shoaf will not,

18   with confirmation of this plan, leave that all behind

19   but he remains on and has significant future

20   involvement with this debtor -- employment for a

21   period of two years at $240,000 per year, the --

22   however, the unique term of that employment agreement

23   relates to the transfer of licenses.  We submit that

24   it is mostly about the liquor licenses.  There has

25   been some effort to obscure that with some other

1    licenses.  But may I just call the Court's attention

2    on that issue to just a couple of things in the

3    employment agreement?  And that is, there seems to be

4    a significant focus upon the liquor licenses

5    themselves and this is where I would like to focus

6    the Court.  It's on Exhibit 2.  It is the plan.  It's

7    page 22.  It's paragraph 7.2.  I think it gives

8    proper perspective to the role of the liquor license

9    that's here.  Paragraph 7.2, paragraph small b,

10   "Continuing use of liquor licenses on or after the

11   effective date, providing acceptable employment

12   agreements agreed upon and entered into between Shoaf

13   and the organized debtor," and "Shoaf and the

14   reorganized debtor will facilitate a transition under

15   which the reorganized debtor will have the ability to

16   use liquor licenses currently used in the debtor's

17   operations."  There is no other reference to anything

18   else there with regard to other licenses.

19            The conduct of Mr. Shoaf with regard to

20   that -- and the evidence is this, that the

21   applications were made.  Jointly, Mr. Wickline and

22   Mr. Shoaf were the responsible principals.  The

23   documentary evidence related to one license, however,

24   the testimony related to that license, of which there

25   are several, relating to this, the testimony of

1    Mr. Shoaf, and so the documentary evidence is just

2    indicative of, I think, the situation with the other

3    licenses.  And that is that Mr. Shoaf, through his

4    unilateral conduct in the renewal process, the

5    licenses were held by Management, and they are still

6    held by Management today.  Those licenses have two

7    more days to go.  But the Court will see on W-2 that

8    Mr. Shoaf lined out and acknowledged that he lined

9    out the entity that holds the licenses and

10   substituted not one that he owned and controlled only

11   half of, but he put in and substituted an entity

12   which he, himself, totally controls.  Unilateral

13   conduct.  Why did he do that?  240,000 big dollars is

14   why he did that because he has bargained for a handy

15   bonus if he can assure continuity and deliver those

16   licenses, and that required him to take unilateral

17   action to garner them all for his own name -- all in

18   his own name and under his control so that he can

19   effect whatever he needs to do to win this $240,000.

20               A couple of things, he's going to stay on.

21   He's going to get 20 grand a month for two years.

22   That is pretty good pay, given his involvement with a

23   failed organization.  If that is not enough and that

24   would be -- one would expect that in the performance

25   of those rather ordinary duties at that rather

1  unordinary compensation level that he would do

2  whatever he needed to do to protect the interests of

3  the entity, but what he is doing is, in addition to

4  that compensation is, he has taken steps to

5  unilaterally wrestle control of a significant asset.

6  And we all agree that you cannot sell liquor

7  licenses, except that here we are not selling them.

8  All we are doing is unilaterally exercising control

9  over them, and then we are not going to sell them; we

10  are going to market our services for a huge bonus to

11  deliver them, and of course it was negotiated with

12  his counsel and the debtors here.

13          But it's -- that alone, in addition to the

14  compensation of the other $480,000 -- all told, a

15  package of $720,000 that Mr. Shoaf gets as a reward

16  in this case is -- plus some perks, some additional

17  things that he gets based on some further sales and

18  so forth down the road -- is just really, amazingly

19  enough, about what he would get, should the

20  Development and Management claims have been paid in

21  full.  Well, that is a fact and I think I'll not say

22  more other than this is how -- this is what plays

23  into the objection, and it goes to the other -- to

24  the other issues here.  The plan must be submitted

25  and paid.  The debtor is Partners.  The manager of

1    debtor is Shoaf.  This is what Shoaf did.  This is

2    what the plan provides for Shoaf.  Is that good

3    faith?  We submit that it is not, under these

4    circumstances.

5           Let's turn just very quickly to the

6    Management and the Development claims.  WestLB has

7    presented and we have not -- we have not objected to

8    admission, nor do we take issue with the existence of

9    the two subordination agreements.  We appreciate

10   sometimes what hearings are all about is, especially

11   on these hurry-up ones, is you get to see what the

12   evidence is.  They are there.  They are probably

13   standard.  Their terms are what they are.  Wickline

14   submits, the Wickline interests submit, that the

15   subordination agreement is unenforceable for these

16   relatively easily articulated provisions, and I'll

17   just state that I think we've all read 510, and it

18   does make a specific reference to that in the

19   subordination agreements.

20          Here is why we submit that it is not

21   enforceable in this case, and it is a contract.  And

22   it can only be enforced in accordance with ordinary

23   contract principles.  Contracts are subject to

24   defense.  Point one.  When WestLB was a creditor, a

25   fellow creditor, Management and Development and

1    WestLB and Bay North were just creditors.  They were

2    just plain old creditors, and their rights were

3    determined.  This Court is called upon to determine

4    rights and priorities all day, every day.  When

5    WestLB chose to become -- instead of filing its own

6    plan -- when it chose to become a plan proponent and

7    joined with this debtor as a co-plan proponent, it --

8    the character of its involvement changed, I'd submit,

9    from just a plain old creditor to a plan proponent,

10   and it joins in and shares the duties of the debtor

11   of submitting a plan in good faith.

12           And this plan with this treatment of

13   Mr. Shoaf and the honoring of him through this

14   $720,000 compensation package, based on his conduct

15   to wrestle away, in contrary to his fiduciary duties,

16   the assets of Management, like it or not, WestLB

17   becomes a partner with the debtor and shares good

18   faith in there, and we submit there is not good faith

19   in that regard.

20           And we have submitted further arguments

21   with regard to the contractual defenses of --

22   independent from the bankruptcy code.  These are

23   ordinary contractual obligations -- the obligations

24   of good faith and fair dealing, which is written in

25   every contract; you just have to sprinkle lemon juice

1    on it to see its words, but it's there in every

2    contract in America.  And we submit that again

3    because of the partnership that has now been formed

4    basically and as plan proponents, that WestLB share

5    somewhat in the conduct of Mr. Shoaf because they

6    honor it under this plan.  And the same arguments are

7    made with regard to the state law arguments of

8    failure to mitigate.

9              We had a little exchange with

10   Mr. Robertson, and I'm not sure I'm precisely clear

11   on how that all shook out, but what is apparent is

12   that WestLB or a bad bank -- it's probably a bad

13   bank -- through its servicer, WestLB, proposes to

14   come out of this plan wearing two hats:  Lender with

15   the notes and equity holder.  Out in the world of --

16   out in the world outside bankruptcy merger of

17   interests is a principle that the -- which means that

18   WestLB walks away with everything.  They get all the

19   marbles.  In this case, we submit that under the

20   circumstances, that WestLB could have and should

21   have, and the law should deem that, that the

22   predicate to enforcement of the subordination

23   agreements have not been met because that treatment

24   constitutes the payment in full of the plan.  That is

25   our legal position.  We have submitted legal

1    authorities to the Court.  We submit it without

2    further argument on the matter.

3              I have one additional point and then I'll

4    be pleased to sit down.  And it has to do with the --

5    I'm taking the prerogative of ignoring the note he

6    just passed me.

7              THE COURT:  Good.  Thank you.

8              MR. WILSON:  We all agree.  It comes with

9    getting a little gray hair.

10             The final point really has to do with

11   procedural issues.  The bankruptcy code, we just deal

12   with procedure all day, every day on matters.  Number

13   one, it has been pointed out and will be again that

14   no greater than 50 percent of equity is -- appears in

15   this courtroom and objects.  We all know where equity

16   fits in the world of bankruptcy.  We always give it a

17   little piggy statement to my clients, and they get

18   numbered and the last little piggy is always equity

19   and that will never change.  But the way this thing

20   has unfolded is very unusual and this has been rushed

21   at the Court real fast, and I'm not sure that, at

22   least in my experience, I have seen its equal where a

23   plan was proposed, a disclosure statement was

24   approved, a solicitation period was given and voting

25   was done.  And then -- and then we got a different

1    plan and everybody likes to say it's really the same,

2    but it's materially different in significant ways.

3    At least two of the ways is that a million six in

4    claims just got jettisoned under the new plan, and a

5    principal of the debtor just got a promise of

6    $720,000-plus out of the deal.  Those are kind of

7    material.

8              The problem is that we have now rushed to

9    this, and we are confirming this on solicitations of

10   a different plan.  Procured votes, procured on a

11   different plan under a different timeline, and then

12   all of a sudden we get this new plan, and I'm not

13   going to say eight days, but someone else might, on

14   this thing.

15             May I just submit one consideration?

16   Don't the body of creditors get to have a say?  There

17   is $720,000 new in this deal.  We learned about it

18   when the plan supplement was filed, and then we all

19   just kind of scrambled and we've tried to respond to

20   it.  But these votes are solicited and now we find

21   there are $720,000 that could be -- that could go to

22   different creditors.

23             THE COURT:  Well, why do you suggest that

24   the $720,000 can go to other creditors, Mr. Wilson?

25             MR. WILSON:  WestLB is willing to pay it

1   somehow.

2              THE COURT:  Well, for services, aren't

3   they?

4              MR. WILSON:  Well, services or whatever it

5   has to take to --

6              THE COURT:  Well, one of the --

7              MR. WILSON:  -- sell something you can't

8   sell.

9              THE COURT:  There is no question that the

10  circumstances of this case are unique and unusual.

11             MR. WILSON:  Oh, certainly.

12             THE COURT:  And this is coming to the

13  Court very quickly.  I guess the question that I have

14  for your clients is, other than the fact that you've

15  had to scramble and you object to the plan, is there

16  an articulable prejudice, a fundamental denial of due

17  process to your client if the Court makes a ruling?

18             MR. WILSON:  Let me answer that as best I

19  can and very quickly.  The Wickline interests are 38

20  and a half -- 38 and three-quarters percent.  As

21  such, it's equity.  And this is the reorganization

22  process and they're interested in the process and in

23  the payment and treatment of the claims.  And those

24  who --

25             THE COURT:  Well, how was equity treated

1    under the first plan?

2         MR. WILSON:   I'm talking about -- I'm

3    trying to answer that.   The answer is, equity has

4    been out of the running, I think, in all plans.   But

5    I'll make my point and the Court can respond in its

6    ruling to it.   And that is, the pecuniary interest --

7    I don't think there is any difference between plan

8    one and plan two as far as the equity.   I'm talking

9    about the 38 and three-quarters percent.   And we make

10   no claim for that and it would be foolish and naive

11   for to us do that.   But when you're equity, that

12   doesn't mean that you cannot be concerned for the

13   outcome in the interest of everybody else.   The -- it

14   is of vital interest that the process work, that the

15   plan that is presented to the Court be a plan that is

16   submitted in good faith and based on good faith

17   treatment and good faith conduct and that is a point.

18   I'm not talking about -- the only way the Wickline

19   interest would be entitled to participate in any way

20   beyond David's personal claim for $4,600 -- and I

21   don't speak to that except in a very general way --

22   but the only way the Wickline interest would be able

23   to participate would be through the million six, and

24   of course that is a whole different set of arguments,

25   but that doesn't mean that the Wickline interests are

1    not vitally interested in the outcome of the case for

2    everybody.  And that requires good faith --

3    bankruptcy good faith in terms of the submission of

4    the plan -- good faith treatment of the creditors and

5    we would submit that there is a -- sort of a

6    last-minute interjection of a $720,000 component here

7    that the parties have not had an opportunity to fully

8    consider and comment upon, do discovery upon, and

9    vote upon.  If this were a Chapter 13 case involving

10   an old car and a couple of credit cards and a couple

11   of medical bills and we had this kind of a notice

12   problem, we'd re-notice it.

13          I think that concludes our comments.  The

14   Court has been very liberal with its time and

15   patience.  Thank you, your Honor.

16          THE COURT:  Thank you.  Mr. Hofmann?

17

18                  CLOSING ARGUMENT

19   BY MR. HOFMANN:

20          Thank you, your Honor.  I would echo, and

21   hopefully without repeating too much of what

22   Mr. Wilson said with respect to the importance of

23   notice and opportunity to be heard on this matter.

24   Notice is the cornerstone of the bankruptcy code and

25   I think that due process has not been met in this

1   case.

2          THE COURT:  So how has your client been

3   prejudiced, Mr. Hofmann?

4          MR. HOFMANN:  The plan that was on file up

5   until -- I don't want to say days ago.  I think it

6   was days ago last Friday -- did not provide for a

7   release of the claims against WestLB.  This plan

8   does.  The Court has had --

9          THE COURT:  Well, it does.  But

10  wouldn't -- the prejudice that I'm really focusing on

11  is, how has the shortened notice affected your

12  client's ability to address that issue?

13         MR. HOFMANN:  How it's affected it is, had

14  there been -- a normal plan process that is

15  contemplated by the rules, it's 56 days.  You see a

16  plan coming a mile and a half off.  And 56 days ago,

17  had a plan been filed that says, "We are going to

18  release the committee's claims and the estate's

19  claims against WestLB, then my client would have had

20  a reasonable opportunity to explore and assess those

21  claims through Rule 2004 motions, through other

22  discovery procedures, and my client did not have that

23  opportunity.

24         The Court has observed my questioning of

25  the various witnesses, including Mr. Shoaf and

1    Mr. Robertson.  And I did the best I could for my

2    client under the circumstances, but it has to be the

3    Court's clear observation that my questioning would

4    have been more effective had there been a reasonable

5    and normal amount of notice provided of these

6    proceedings, which there was not.  I had no idea what

7    Mr. Shoaf or Mr. Robertson were going to say on the

8    stand here today.  Given 56 days' notice, I think

9    there would have been quite possibly different

10   proceedings before the Court in the last two days of

11   this confirmation hearing.

12          In addition, your Honor, I would say that

13   myself and my firm have done the best we can under

14   these circumstances to read and understand the

15   various agreements that are being tossed about, but

16   the plan is changing on a daily basis.  The plan was

17   modified today in significant respects.  When the

18   Court heard counsel for WestLB state, "Well, these

19   are the additional modifications to the plan," that

20   did not even exist last week.

21          On the -- the confirmation hearing

22   obviously started last Friday.  On Thursday night

23   late, as usual, there is a plan supplement filed that

24   materially changes the terms, and I'll throw out one

25   striking example and there are doubtless others.  The

1    plan supplement that was filed last Thursday night

2    provided that WestLB's -- their commitment to fund

3    was no longer conditional.  That, of course, benefits

4    the estate.  But I prepared an objection on behalf of

5    my client based on the plan supplement that existed

6    just two days before.  And by the way, just two days

7    before the objection deadline.  So it's a moving

8    target, your Honor, and I'm doing the best for my

9    client to read these very, very, very voluminous

10   filings that the debtors made and reacting, but I

11   don't think it's been sufficient notice under the

12   circumstances.  This is too important.

13          Now, can be no doubt that in the

14   appropriate case, this Court has the equitable power

15   to shorten notice as is necessary under the

16   circumstances.  If this estate were a truck full of

17   rotting strawberries, there is no doubt this Court

18   could shorten the time and make sure those

19   strawberries were preserved for the benefit of

20   creditors before they go rotten.  But I'd ask the

21   Court, what is the reason -- what is the reason we

22   are here on these emergency circumstances?  And I

23   would submit that it's an emergency of WestLB's own

24   making.  What WestLB has done is they have tightened

25   the spigot of cash on this debtor and this estate.

1    They said, "We are done funding this estate.  Good

2    luck to you.  You can take our way or the highway."

3    And guess what?  The debtor took WestLB's way.  I

4    don't think there can be any great surprise in that.

5              Your Honor, this plan is very different in

6    material respects from the plan that was filed and

7    submitted in February, together with the disclosure

8    statement that was approved on February 25th.  That

9    plan had a couple more million dollars of funding

10   going into the estate.  That plan did not have a

11   release of the committee's claims and the estate's

12   claims against WestLB.  This plan has those two

13   things and also has the allowance of WestLB's claim

14   in a particular amount.  These are all material, very

15   material aspects of the plan, your Honor.  And if

16   they weren't material, then why are they being

17   proposed?  They are needed -- the plan proponents

18   require these changes.  Consider this by analogy.  If

19   in February, that plan on file in February had been

20   approved by this Court, had been confirmed, and then

21   this different plan, and questionably a different

22   plan that is before the Court today had been

23   submitted as a modification of the plan, would the

24   Court require that there be a re-solicitation of the

25   votes that approved the February plan?  Or would the

1    Court say, "Well, there is nothing materially

2    different in this plan.  Therefore, I'm not going to

3    require a re-solicitation"?  I think that that is

4    really the question before the Court this afternoon.

5           Your Honor, it's basic that a plan

6    proponent and a plan must be proposed in good faith,

7    and I don't think this one is.  This plans provides

8    for a release of estate's claims against WestLB, and

9    this debtor is in bankruptcy court only because of

10   the wrongful acts of WestLB.  And I would ask the

11   Court to contrast the evidence that it's heard

12   through WestLB and through Mr. Shoaf and through the

13   committee with what they said before back in February

14   and before.  Look at the disclosure statement.  Look

15   at how the debtor described WestLB's conduct at that

16   time.  Look at the committees' Complaint against

17   WestLB.  Compare that to the committee's position

18   today.  I think one of those two positions are too

19   incongruous to mesh, and I think the explanation is

20   simple.  WestLB destroyed this debtor's business,

21   forced this debtor into bankruptcy.  The testimony of

22   WestLB's representative --

23           THE COURT:  Well, Mr. Hofmann, isn't

24   another explanation the fact that complaints often

25   contain simple allegations that have to be proven?

1          MR. HOFMANN:  There is no doubt about it.

2     There is no doubt about that.  There are allegations

3     in the Complaint that, if proven, would lead one to

4     believe that there are substantial claims of this

5     estate against WestLB, and it's not just the debtor,

6     it's the committee that made even stronger

7     allegations.

8          THE COURT:  Well, but they've made --

9     according to you, changed their position today and I

10    didn't quite gather, but I -- well, I don't know if

11    it was clear, but I thought you might be suggesting

12    that the committee was acting in bad faith.

13         MR. HOFMANN:  I'm not suggesting that the

14    committee was acting in bad faith, and the committee

15    is not a plan proponent in any event.  The debtor and

16    WestLB are.

17         THE COURT:  All right.

18         MR. HOFMANN:  Your Honor, I think there is

19    evidence that through the disclosure statement and

20    through the filed Complaint of the committee that the

21    estate has substantial claims against WestLB, and the

22    estate, through the committee -- the committee

23    purported to act on behalf of the estate, and I think

24    the committee had authority -- sought not only the

25    subordination of WestLB's claims, but the recovery of

1    the estate's claims against WestLB as a fraudulent

2    transfer.  If that purpose were achieved, where would

3    we be?  The estate would be free to pursue its claims

4    against WestLB, which would undoubtedly be very

5    substantial under the facts of this case.

6              Is there 100 percent likelihood of success

7    against WestLB?  Certainly not.  I would agree that

8    the facts are complicated here.  But my client had a

9    chance, your Honor.  My client had an opportunity to

10   recover, where now there -- if this plan is

11   confirmed, there will be no chance for equity

12   recovery.

13             THE COURT:  Well, what opportunity would

14   your client have?

15             MR. HOFMANN:  The opportunity would be

16   through the affirmative claims the estate would

17   recover against WestLB, which would become property

18   of the estate after the fraudulent transfer were

19   avoided as requested by the committee -- the pursuit

20   of those claims.

21             THE COURT:  Well, how would those claims

22   ultimately result in any recovery down the line for

23   your client?

24             MR. HOFMANN:  Well, first of all, it could

25   be that WestLB receives no recovery on account of its

1    claim because its claim, as I understand it, is a

2    breach of contract claim.  To establish a breach of

3    contract claim, you have to establish that you,

4    yourself, didn't breach the contract.  And I think

5    that the allegations read in the Complaint would

6    suggest that WestLB breached its contract and,

7    therefore, is not entitled to a breach of contract

8    claim against the estate.

9          With respect to the Bay North claim, which

10   is in the millions and millions of dollars,

11   evidently, I know there is also very active

12   litigation against Bay North.  And is it assured that

13   Bay North will receive something?  No, I don't think

14   so under the current litigation.  So that is how my

15   client gets possibly something.

16          But, your Honor -- and this ties in very

17   closely obviously to the standing issue -- under

18   Section 1109 of the bankruptcy code, equity expressly

19   has standing.  There is no question about it.  The

20   only question is, who is equity?  Is equity the 51

21   percent of equity represented by my client and

22   Mr. Wilson's client who is here telling you they do

23   not support the plan?  Or is equity controlled by the

24   very proponents of the plan that would wipe them out?

25   I think that there are clear conflicts of interest at

1    work here, and I think the Court heard Mr. Shoaf

2    testify that he had not even considered the interests

3    of Mezzanine and Holdings in determining whether to

4    cast a ballot on behalf of them in support of the

5    plan.  I think that is a breach of fiduciary duty.

6          Now, unquestionably, Mr. Shoaf has a duty

7    to act on behalf of the best interests of Easy Street

8    Partners.  No question about it.  The problem is that

9    that duty is fundamentally at variance with his duty

10   as -- on behalf of the equity holders downstream.

11   And under those circumstances, especially where you

12   have 51 percent of equity advising the Court they do

13   not support the plan, well, my question:  How is this

14   debtor actually proposing this plan?  How does the

15   authority exist to propose the plan?  I think that is

16   a question that we're certainly not going to answer

17   today, but it raises questions as to the debtor's

18   good faith.

19          I don't believe this plan is proposed in

20   good faith.  It's an effort to railroad through a

21   release of the estate's claims against WestLB.  This

22   is the very company -- WestLB or the bad bank, one or

23   the other -- that through its own conduct is the

24   architect of the debtor's demise, and I think it

25   would be inequitable to approve a plan that releases

1   them and absolves the bad bank of its responsibility

2   for the failure of the debtor's business.  Thank you.

3            MR. BLUMENTHAL:  Your Honor, I have a few

4   brief comments.

5            THE COURT:  All right.

6            MR. BLUMENTHAL:  First of all, not to

7   belabor the point regarding PC I, Easy Street

8   Partners released WestLB under the cash collateral

9   stipulation in an order upon notice.  PC I didn't

10  object then.  All the plans on file provided that

11  they received nothing.  They never objected.  They

12  never called.  They never said anything.  The voting

13  issue is a red herring because they have always been

14  deemed to reject a plan.  And, frankly -- which was

15  admitted even under the prior plans under the

16  stipulation between WestLB and the committee, if they

17  supported the plan, which, they've been on notice

18  forever, since it was filed, the -- they would

19  dismiss the Complaint and release.

20           And I would submit that Sky Lodge is not a

21  truck full of rotting strawberries but it is,

22  proverbially, a melting ice cube.  This company, as

23  Mr. Shoaf testified, is running out of cash.  If this

24  plan is not confirmed, that hotel will ultimately

25  shut down.

1           We do have exigent circumstances

2    confronting this debtor.  Fourth of July weekend is

3    coming up -- a very big season, a very big time of

4    year.  And so the -- and PC I was never entitled to

5    vote, so the modifications under the code only deal

6    with re-soliciting votes of those who were entitled

7    to vote.  We haven't heard one complaint from any of

8    the creditors.

9           You know, I just want to address briefly,

10   your Honor, some of Mr. Wilson's statements.  I would

11   really ask the Court just to consider what the

12   evidence is before you.  There has been a lot of

13   throwing around the word "bad faith."  Well,

14   Mr. Shoaf negotiated with the committee, the

15   unsecured creditors, Jacobson, WestLB.  He dealt with

16   the homeowners.  This is not Mr. Shoaf's plan, as

17   Mr. Wilson indicated.  It's an amalgam of almost a

18   year of interaction and negotiation among all the

19   constituents in this case who were in the money.  And

20   the fact that there is an subordination agreement

21   that contractually subordinates the claims of

22   Management and Development is a totally different

23   issue and has absolutely nothing to do with good

24   faith.  And I think, your Honor, the -- and first --

25   second of all, the claims of Management and

1    Development are actually 2.8 million, including a

2    rejection of damage claim.  So he is actually wrong

3    on the amount of the claims.

4              And I think, your Honor, actually in your

5    colloquy with Mr. Wilson is -- was correct.

6    Mr. Shoaf is not getting paid under the employment

7    agreement for anything in the past.  He's getting

8    paid for services in the future by WestLB, not for

9    "whatever," which was the word that Kim Wilson used,

10   but for his services going forward.  The only

11   evidence is that his continued employment is

12   necessary for the continued feasibility of the

13   reorganized debtor.  He has become, in essence, the

14   centerpiece of the Sky Lodge Hotel.  If he was just

15   to be discarded, frankly, this reorganized debtor

16   would have a very difficult time to struggle through

17   the next couple of years.  It would be a loss of

18   continuity.  And by the way, I'm sure if Mr. Wickline

19   brought in people who could buy the unsold units, he

20   could negotiate finder's fees with WestLB if he

21   actually did some work for a change.  And, again,

22   everyone is complaining about -- it sounds like when

23   my kids were two-year-olds, frankly.  What I used to

24   tell them, frankly, is, "Don't stamp your feet unless

25   you have something to really stamp your feet about."

1          I call it sort of this is like a crybaby
2    objection.  It's sort of like, "I'm not getting
3    anything, so no one should get anything."  That is
4    basically their objection.  It's sort of sour grapes,
5    et cetera.  No one is -- and this plan, if there was
6    ever a plan that was proposed in good faith, that
7    is -- that is this particular plan.  There was no
8    shifting or transferring of liquor licenses.  You can
9    not transfer liquor licenses.  That was never an
10   asset of the estate.  There was only evidence of one
11   liquor license.  But, again, it would not have made
12   one iota of difference where the liquor licenses
13   stayed because they would need to be turned in.  And,
14   frankly, if they were still in management, those
15   liquor licenses would be over upon the signing of a
16   confirmation order, which, in essence, rejects those
17   agreements.  So I would submit to the Court that all
18   the -- the two objections, again, are misplaced,
19   shallow.  Not one support of evidence for their cries
20   of bad faith.  This plan, and the evidence supports,
21   was proposed in good faith and we ask that you
22   confirm the plan.
23          MR. HAVEL:  Just a few supplementary
24   comments, your Honor.  Regarding the arguments by
25   Mr. Wilson for Wickline, I would just make two

1    observations and arguments.  First is, I had in my

2    opening comment said, there was absolutely no

3    evidence submitted by Wickline to support the kind of

4    general arguments they made in their objection

5    papers.  Mr. Wilson, in his argument at closing,

6    reinforces that there is no evidence, and instead

7    asks your Honor to take wholly speculative,

8    unjustified, and quite frankly, not supported by the

9    law, leaps to find some sort of support for his

10   argument.  And there is only two, and I'll focus on

11   them quickly.

12            First, he repeats the allegations about

13   the liquor license movement being a conduct that

14   harms Mr. Wickline and his ownership of Management

15   and that then, therefore, transfers over to a bad

16   faith proposal of the entire plan because Mr. Shoaf

17   is getting some benefit.  That itself is clearly a

18   very disputed and murky area, and I don't think there

19   has been any competent evidence by Wickline to show

20   that that is, in fact, the case.

21            But then Mr. Wilson asked your Honor to

22   take a wholly unjustified and unsupportable leap,

23   which is because we are a co-plan proponent, we

24   automatically share the taint of that bad faith and

25   it is our bad faith as well, which is not the case.

1    We have through the record and the facts shown that

2    this has been an arm's-length extensive negotiations

3    and that these plan terms have been developed over a

4    fair amount of time with a lot of give and take.

5              Secondly, there was this attempt to

6    confuse or ignore the fact that the new hard money

7    equity is being put in by a WestLB affiliate or

8    related entity and that the restructure of its debt

9    is a separate and important step in the plan, but

10   separate.  And Mr. Wilson then again suggested to

11   your Honor, well, they are both kind of going to be

12   in this family, and we all know that when things are

13   in a family, there is a merger of interests.  Well,

14   quite frankly, that is exactly the wrong statement.

15   We all know that if there are two entities in an

16   affiliated relationship, as long as they are separate

17   entities and treated as such, there is no merger.  A

18   merger is an extraordinary remedy that you have to

19   get to by showing facts.  And so, again, he asked

20   your Honor to take a leap which he doesn't put in the

21   record and to take a leap that is not supported by

22   the facts that are before you.  Again, this all

23   supports the fact that there is just no basis for

24   these allegations in the Wickline objections.

25              As to the responses by Park City I, just a

1    couple of factual things.  WestLB has not, quote,

2    "tightened the spigot" and shut this business down.

3    If the attorney for Park City I knew the facts a

4    little more carefully, he would know that there has

5    always been 3.2 million of cash collateral.  There

6    has been a standing budget for office expenses.  And

7    the only cry WestLB has been making, and it's been

8    since March, is, "Let's get this case over because

9    the money is getting lower and lower."  We have come

10   in and three or four times suggested we are running

11   out of money.  We are not tightening the spigot.  We

12   don't control the budget.  We have not stopped

13   providing money for the budget.  And so to suggest we

14   are creating the crisis is wrong.  We've try to avert

15   the crisis instead of create it.

16          The other comment about the closing

17   argument by Mr. Hofmann, I think he finally did

18   acknowledge what is going on here for his client when

19   he said something to the effect of, "Well, we just

20   want possibly something.  This is possibly our last

21   hope for something."

22          Well, what he is really telling your Honor

23   is that he is out of the money.  He wants to

24   speculate with other people's monies and other

25   people's rights to try and exploit a very difficult

1    and a very speculative lawsuit with the hopes that

2    maybe something would flow up to him.  Well, he is

3    not the party who has to make the hard decision about

4    whether to spend the money of the estate or get more

5    money for the estate and take the chance that it's

6    going to be successful.  So his protestations are

7    like the businessman who is already out of money and

8    says, "Well, I guess I'll go to Vegas and roll the

9    dice.  Now, I'm using the bank's or I'm using the

10   creditor's money to do that, but I guess that's

11   okay."

12           That is what they are doing here by asking

13   you to give any credence to their argument that these

14   lawsuits have to be preserved for their benefit, when

15   the people who really have an interest in the

16   potential benefit of these lawsuits have agreed to

17   dismiss them in a settlement as part of a plan that

18   is very fair and may even be very generous.

19           THE COURT:  Thank you.  The Court will

20   take a brief recess.

21           THE BAILIFF:  All rise.

22           (Recess from 3:25 until 4:23 p.m.)

23           THE BAILIFF:  All rise.  Court resumes in

24   session.  Please be seated.

25

1                    **<u>RULING OF THE COURT</u>**

2          THE COURT:  This case is before the Court

3    on unusual circumstances and shortened notice in an

4    expedited hearing.  The objecting parties argue that

5    this an indication of bad faith and strong-arm

6    tactics by WestLB.  Given the history of this case,

7    these circumstances can just as easily be construed

8    as an indication of good faith.  The plan that is

9    before the Court is a collaborative effort between

10   the debtor, WestLB, the unsecured creditors

11   committee, Jacobson, and fractional unit owners, who

12   all support the plan.  The objecting parties are

13   either, one, parties who hold an equity interest but

14   not a direct equity interest in the debtor.  These

15   parties have no right to vote on the plan, which

16   right to vote is held by Easy Street Mezzanine and,

17   therefore, these parties have no standing.

18          The Court will hereafter refer to these

19   parties as the equity objectors.

20          The second party -- parties objecting to

21   the confirmation in the hearing are parties who have

22   an equity interest in unsecured creditors who are

23   insiders and subject to an express subrogation

24   agreement.  I will refer to these parties as

25   objecting creditors.

1          The objecting parties argue that this

2    expedited procedure has deprived them of due process.

3    Because the equity objectors do not have standing

4    with respect to voting in this plan, there is no

5    denial of due process since they have no right to be

6    heard.  The objecting creditors, as the Court stated,

7    are subject to an express subrogation agreement.

8    Their claims under the amended plan were effectively

9    subrogated to WestLB and unsecured creditors and

10   under the current plan, their claims are expressly

11   subrogated.  Subrogation agreements are enforceable

12   in bankruptcy cases and the subrogation agreement is

13   presumptively valid.  Other than vague assertions

14   that the agreement is unenforceable, the Court has no

15   credible evidence that gives rise to any defenses

16   with respect to the subrogation agreements.

17          The creditor objectors, the parties to the

18   subrogation agreement, is aware of the subrogation

19   agreements and the Court finds that there is no

20   denial of due process to the objecting creditors with

21   respect to this expedited hearing.

22          Objecting equity -- or the equity

23   objectors, although without standing, argue that the

24   litigation against WestLB may result in recovery on

25   their part.  This is not so.  The debtor waived

1    claims against the debtor in its initial -- in the

2    initial cash collateral hearing, which this Court

3    approved.  At that time, the release of claims was

4    addressed by the Court.  There were no objections to

5    the release of claims by the debtor against WestLB,

6    and as such, the release was approved.

7            The plan is not releasing claims of the

8    debtor or the estate.  The claim being settled is the

9    claim of the committee, and although the committee

10   claim asserts an avoidance action, that claim was

11   waived.  The only claim the committee has is limited

12   to subrogation.  Consequently, there would be no

13   recovery passing on to equity because of that

14   litigation.

15           Because this is not a claim of the debtor

16   or the estate that is being compromised or doesn't

17   believe that it's subject to what are commonly

18   referred to as the Copexa factors, but nevertheless,

19   the committee has presented the Court with evidence

20   of the Copexa factors, which would be applicable to

21   the settlement in this case.

22           The objecting parties also assert that the

23   plan is not proposed in good faith.  The arguments

24   that the plan is proposed in bad faith or without

25   good faith concentrate on either of compensation to

1    Mr. Shoaf or the actions of WestLB that have been

2    characterized as strong-armed tactics.  The Court

3    notes from the history and background of this case

4    that WestLB did not precipitate the filing of this

5    case.  The emergency giving rise to these unusual

6    circumstances has not been precipitated by WestLB

7    other than WestLB's indulgence of the debtor's

8    efforts to obtain alternative financing.  Evidence

9    before the Court is that the debtor was unable to

10   find any alternative financing and, hence, the only

11   alternative for reorganization was for WestLB to

12   participate as an alternative financier.

13          Compensation to Mr. Shoaf is for future

14   services.  Although the suggestion is that this

15   compensation is excessive, there has been no evidence

16   that the compensation is, in fact, excessive, that it

17   is out of line with previous compensation or that the

18   compensation adversely impacts creditors.  Any claims

19   that Mr. Wickline or his related or controlled

20   entities may have against Mr. Shoaf are not

21   compromised under this plan.  If Mr. Wickline

22   believes there has been a breach of fiduciary duty

23   with respect to him, he is at liberty to pursue those

24   actions.  But a plan proposing to pay creditors,

25   which is supported by creditors, is not filed in bad

1    faith or proposed in bad faith simply because

2    management or future management is compensated in an

3    amount that is excessive in the view of an adverse

4    party.  What we have before the Court is a plan that

5    has been worked out by the parties who have a

6    financial stake in the outcome and all have

7    compromised.

8                The property of the estate is valued at

9    $20,600,000.  The secured claim of WestLB is

10   approximately $17,900,000.  The secured claim of

11   Jacobson Construction is approximately $1,700,000.

12   Administrative and priority expenses exceed one

13   million dollars and unsecured claims are

14   approximately one million dollars.

15               These are the parties who have a financial

16   stake in the outcome of this case, and they have all

17   voted to accept the plan.  The plan is facilitated by

18   WestLB contributing additional capital in exchange

19   for equity.  Based on all of the circumstances and

20   the evidence presented to the Court, the objection of

21   Park City I and of Mr. Wickline and his related

22   entities are overruled.  The Court finds that the

23   debtor has met -- the debtor and WestLB have met the

24   requirements of the bankruptcy code for confirmation

25   and the plan will be confirmed.

1          Mr. Blumenthal and Mr. Cannon, you may

2     prepare proposed findings of fact and conclusions of

3     law consistent with the Court's ruling.

4          MR. CANNON:  Thank you, your Honor, and I

5     raise this only because I am very prone to do this;

6     the Court referred a number of times to a subrogation

7     agreement, and I think the Court meant subordination

8     agreement.

9          THE COURT:  The Court did mean

10    subordination agreement.  So I apologize for that.

11          The remaining matters before the Court, I

12    believe, are all applications for compensation.

13    Other than the application of the Wrona Law firm, the

14    Court is unaware of any objections to compensation

15    that have been filed.  Are there are objections that

16    have been filed?

17          MR. CANNON:  Your Honor, there are

18    objections to the applications of Mr. Wrona and

19    Mr. Gordon.  There are no objections -- there is a

20    reservations of rights, I believe, with respect to

21    all the applications.  There are objections filed by

22    Gateway to Mr. Wrona's and Mr. Gordon's applications

23    which have been joined in by the committee on a

24    limited basis and maybe there weren't any on an

25    unlimited basis.

1         THE COURT:  All right.  Well, with respect

2    to the applications of -- the application of the

3    Wrona Law Firm, if I understand it, the objection is

4    that the Wrona Law Firm represented Mr. Shoaf at the

5    same time that he was representing the debtor; is

6    that correct?  Mr. Wrona, if you want to --

7         MR. WRONA:  Thank you, your Honor.  What

8    happened in March, one of my roles as special counsel

9    for the debtor is to handle media relations.  There

10   was a lawsuit filed and I was asked on behalf of the

11   debtor to take a look at the lawsuit.  We thought

12   that there was going to be a story in the Park

13   Record.  As I got involved, then the debtor asked me

14   to basically increase my involvement and asked me to

15   determine if we could obtain some kind of extension

16   because we were coming up on the last sweet spot of

17   the season for the project, which is spring break.

18        I contacted Gateway Center and asked if I

19   could obtain an extension, and quite admittedly, I

20   said, "Look, Mr. Shoaf and Cloud 9 would like me to

21   get this extension."  They agreed to that extension.

22        They then contacted me three days later

23   and said, "Look, we're willing to enter into a stay

24   of the state court action."  They prepared the stay,

25   and I signed it on behalf of Mr. Shoaf and Cloud 9.

1           So I think it is fair to say on those

2    couple acts, I was asked by the debtor to undertake

3    those acts, but I was engaging in representation of

4    both Mr. Shoaf and Cloud 9 and the debtor.  And so,

5    you know, to the extent there was a violation of the

6    speed limit, if you will, your Honor, I hope the

7    Court views it as going a couple of miles an hour

8    over the speed limit.

9           THE COURT:  Well, if I were to view it as

10   miles over the speed limit, how many miles -- in

11   other words, how many dollars did you devote to --

12          MR. WRONA:  I submitted something to the

13   court -- and I was -- I erred really on the side of

14   Gateway.  My actual involvement on behalf of

15   Mr. Shoaf was probably less than hour, but I looked

16   at my billing records and what I reported to the

17   court was two and a half hours of time, which is

18   $875.

19          THE COURT:  And when did that occur?

20          MR. WRONA:  Looking at my billing records,

21   the -- I guess the critical acts, one I think was

22   April 5th, if I'm not mistaken, and that is when I

23   reached out to Gateway and asked for the extension.

24   Then on April the 8th was when I engaged in a

25   telephone conversation with a Gateway attorney and

1    they suggested the stay.  Then on April the 13th,

2    Gateway sent me the stipulation and the letter asking

3    me to sign it.

4             It's interesting, they are objecting to

5    the fee and it was Gateway that was actually

6    requesting that I sign the stay and I did that.

7             So that April 13th entry, it looks like

8    two-tenths of an hour.  The April 8th entry is

9    six-tenths of an hour, and I didn't even charge

10   actually for the April 5th email that I sent because

11   it was a matter of minutes.

12            THE COURT:  All right.  So the -- I'm

13   sorry -- you don't happen to know the docket number

14   on your application, do you?

15            MR. WRONA:  Judge, I don't know if I have

16   that in front of me.  I had it here on Friday.

17            THE COURT:  Oh, here, I found it.  So you

18   are seeking -- total compensation being requested is

19   34,715?

20            MR. WRONA:  Correct.  And a lot of that

21   money -- a lot of those fees were generated quite

22   some time ago because obviously my firm has never

23   been fully compensated really going back to, I think,

24   last fall.  Yeah, I think it's $34,718, if I'm not

25   mistaken -- $34,717.50.

1            THE COURT:  Well, it -- unfortunately,

2    Mr. Wrona, it's a little more than just going over

3    the speed limit.  I mean, the Court has a long

4    history and a pretty consistent and clear case law

5    that the counsel for the debtor cannot at the same

6    time represent principals of the debtor.  Now, in

7    this case, you were employed as special counsel?

8            MR. WRONA:  That's correct.  I'm an alien

9    to bankruptcy court.  That was part of the problem.

10           THE COURT:  Well, that is no excuse,

11   Mr. Wrona.

12           MR. WRONA:  Understood.

13           THE COURT:  I think it does allow the

14   Court some leniency if you are acting as special

15   counsel as opposed to general counsel.  So I'm going

16   to -- let me hear from Mr. Payne and see what amount

17   he believes was at issue.

18           MR. PAYNE:  Thank you, Judge.  Your Honor,

19   Doug Payne for Gateway Center, LC.  I think that the

20   fee application of Mr. Wrona indicates that on March

21   15th he spent one half an hour reviewing the copy of

22   the state law complaint, correspondence with Bill,

23   presumably Shoaf, on the same, a telephone conference

24   with Mr. Shoaf on how it impacts members of Easy

25   Street.  And then in paragraph -- that is paragraph

1    nine that goes on March 24th, there is time entries

2    on March 29, April 8th -- that is a telephone

3    conference with Mr. Crocket of my office about the

4    state court lawsuit.  And then paragraphs 12 and 13,

5    there are other time entries that total 4.4 hours,

6    your Honor.

7              But what is troubling about this is that

8    this lawsuit was not against the debtor, your Honor.

9    It was against Cloud 9 Resorts, LLC, which I think is

10   an insider of the debtor and against Mr. Shoaf,

11   individually.  It was on their obligations under a

12   lease as the original obligator, lessee, Cloud 9

13   Resorts, LLC and Mr. Shoaf as guarantor.  And by this

14   time, the debtor had rejected the lease.  Not only

15   was the debtor not a party, the debtor had rejected

16   the lease in January when the debtor failed to assume

17   or reject the lien within the 120 days.  So I don't

18   know that it's appropriate for the bankruptcy estate

19   to be billed for advising the debtor -- for someone

20   advising the debtor about how a lawsuit impacts

21   members of the debtors or potential disputes between

22   members, which is what some of these time entries

23   indicate.  On April 21st, telephone conference on

24   Gateway litigation, Bay North and other issues.

25   April 20th, working on how to keep Easy Street

1    members out of Gateway litigation.

2              I just don't think that is an appropriate

3    use of the debtor's funds, and I think it indicates

4    that Mr. Wrona was not disinterested.  And I don't

5    think that that should be allowed, and that would

6    total 4.4 hours, but I think there is a question:

7    Did he lose his disinterested status?

8              THE COURT:  Well, and I think that because

9    he's special counsel, it does allow me a little more

10   leniency because he doesn't have the same pervasive

11   disinterested requirements.  And so what I'm going to

12   do is I will approve fees except for those that are

13   detailed in Mr. Payne's objection and those fees will

14   be disallowed.

15             And I guess we have Mr. Gordon's?

16             MR. GORDON:  Yes, your Honor.  Your Honor,

17   what occurred in my case, I was approached in the

18   spring of last year and asked to represent the Sky

19   Lodge in its dispute with the Gateway Center and the

20   lease.  In the initial phases of that, it was

21   indicated that the client was Cloud 9 Resorts, which

22   I understood to be the managing entity of the Sky

23   Lodge.  Three or four months later, I was told that

24   the Sky Lodge was declaring bankruptcy and was asked

25   to continue in acting as counsel for the Sky Lodge

1    and represent it in the bankruptcy.  And so I was

2    appointed as special counsel for that one limited

3    purpose and continued forward in representing the

4    interests of Easy Street Partners.

5              It was not until March 15th that in an

6    attempt of service of the Complaint mentioned, that

7    Mr. Wrona took care of, wherein there was service

8    upon Bill Shoaf and Cloud 9 Resorts, and Gateway

9    wanted me to accept service to that.  At that time, I

10   looked closely at that and did not understood -- I

11   understood that Easy Street and Cloud 9 were the

12   managerial entities involved.  I recognized that

13   there was not a conflict of interest as to the lease.

14   The factual allegations between Easy Street Partners

15   and Gateway, and Cloud 9 and Gateway were identical.

16   The only issue would be that if, in fact, Bill Shoaf

17   or Cloud 9 lost in their state claim, there was the

18   potential for a contribution claim back against Easy

19   Street Partners.  So at that point, I did what I

20   would normally do in a civil case when I recognized

21   that there was a possibility of a conflict.  I got a

22   consent waiver, talked to my clients, and then moved

23   forward.

24             A formal objection to my fee application

25   did not come until April 23rd, which was just two

1    days before we actually held the two-day evidentiary

2    hearing before your Honor on the issue of whether the

3    Gateway lease was legitimate or not, and so did I not

4    have time to address it at that time.  Once we got

5    through the evidentiary hearing, I spoke with Ken

6    Canyon, who has helped me tremendously through the

7    ins and outs of bankruptcy law, and he indicated to

8    me that I needed to file a supplemental disclosure,

9    which I did at that time, explaining the situation.

10           I would like to point out to the Court

11   that every ounce of work -- really, the question for

12   the Court is this:  Had Partners prevailed in its

13   objection to Gateway's claim, would it have benefited

14   the bankruptcy estate?  And the answer is absolutely

15   yes.  Gateway's claim was for $113,000 and Partners

16   was primarily liable on the lease for that amount.

17           As seen in the evidentiary hearing on this

18   matter, Partners felt strongly that the lease had

19   been violated and that it owed nothing to Gateway,

20   and prevailing on the objection would have done away

21   with a large claim that would have freed up capital

22   to pay other creditors.

23           THE COURT:  All right.  Mr. Payne,

24   wasn't -- I guess the question I have is, is there

25   work that was done for Cloud 9 or Bill Shoaf that

1    would not have been done in objecting -- in

2    representing the estate in this matter?  I mean,

3    Mr. Gordon was employed specifically for this reason,

4    and the fact that Mr. Shoaf and Cloud 9 might have

5    been liable on the lease as well, I don't know that

6    that should disqualify Mr. Gordon.

7             MR. PAYNE:  Well, your Honor, that was not

8    disclosed, and certainly the attach -- one of the

9    attachments to our objection was Mr. Gordon saying he

10   represented Cloud 9 Resorts, LC.  Certainly he knew

11   that was a separate entity that had liability or

12   responsibility under the lease prior to accepting his

13   engagement as special counsel.

14             And I think that the question before the

15   Court is:  Was he -- did he hold an interest -- or

16   hold or represent an interest adverse to the debtor

17   or the estate on the matter of which he was employed?

18   And I think the answer to that is yes because he had

19   represented Cloud 9 --

20             THE COURT:  Why would his interest be

21   adverse?

22             MR. PAYNE:  Well, there would be claims

23   for contribution, plus, your Honor, I don't think

24   it's necessarily --

25             THE COURT:  Well, but he didn't represent

1     them in those claims, right?

2             MR. PAYNE:  Not during the bankruptcy, I

3     guess.  But I guess the question is:  Would the

4     interests of Mr. Shoaf and Cloud 9, were they

5     congruous with the interests of the estate?  I don't

6     think they were completely, your Honor.  For example,

7     it was probably in the interest of the guarantor,

8     Mr. Shoaf, and the initial lessee under the lease for

9     the debtor not to -- not to quickly reject the lease

10    so that the debtor's obligations under the

11    administrative claim would pay for, perhaps, four

12    months of rent under lease.  And, in fact, that is

13    what happened here.  It may have been in the best

14    interest of the estate for that to be quickly

15    rejected.  In fact, the debtor didn't intend to use

16    the space, which is what the debtor has represented.

17    But, in fact, that went for the entire 120 days and

18    was rejected as a matter of law.  If, of course, that

19    is paid from the bankruptcy estate as an

20    administrative claim, that would reduce the exposure

21    of Mr. Shoaf and of Cloud 9 Resorts.

22             And Mr. Gordon was engaged specifically to

23    deal with the lease and the debtor took no action to

24    reject the lease.  They said the debtor tried to

25    litigate it on the merits of the lease, claiming

1   there was some type of constructive eviction.  So I

2   don't think that the interest of the estate and of

3   the other obligated parties that were -- parties who

4   were obligated to the Gateway Center were congruous,

5   your Honor.  I think there is an adverse interest,

6   and I don't think that he's entitled to be

7   compensated.

8          THE COURT:  Well, I guess the question I

9   have is, if it's not congruous, does that mean that

10  it's not disinterested, I guess?

11         MR. PAYNE:  I think it's adverse.  If

12  there is a differentiation between --

13         THE COURT:  Yeah.

14         MR. PAYNE:  That would be my

15  interpretation and argument.

16         THE COURT:  Well, I don't know that the --

17  I think on the matter that Mr. Gordon was employed,

18  what he did was within the scope of his employment.

19  I understand your argument that there might be some

20  benefit for the debtor to occupy the premises.  But

21  under the circumstances, I'm going to find that

22  Mr. Gordon, as special counsel, was not -- did not

23  have an adverse interest on the matter for which he

24  was employed and I'll allow the fees.

25         With respect to all the other fees, with

1    the reservation of rights that WestLB has requested,

2    the fees will be allowed.

3           MR. CANNON:  Thank you, your Honor.  This

4    is one matter with respect to the order, and I don't

5    want into Judge Boulden's celebration of her time on

6    the bench.

7           We have an order prepared.  We're going to

8    revise it based on the Court's ruling today.  We

9    anticipate being prepared to circulate it and file it

10   tomorrow.  The only concern the debtor has is that

11   there is a -- the funding commitment deadline request

12   is Friday, July 2nd.  I hope that if it were

13   necessary, it could be extended, but I don't know

14   that.  And so what we would like to do is try to find

15   a way to get the order reviewed and entered by

16   Friday.

17          THE COURT:  Well, Local Rule 9021 states,

18   "Unless otherwise provided herein or directed by the

19   Court," so I'm going to waive the requirements of

20   Rule 9021 as far as approval by counsel.

21          MR. CANNON:  Thank you, your Honor.  We'll

22   submit it by midday tomorrow.

23          THE COURT:  Fine.  So I guess if the

24   parties will -- if you will be sure to give all

25   parties electronic notice, Mr. Cannon, so that,

1    knowing that I've waived the requirements of the

2    rule, if anybody does have an objection, they will

3    need to promptly file the objection.

4              MR. WILSON:  Mr. Hofmann and I will be in

5    this courtroom at noon and if you --

6              THE COURT:  So alert your staff.

7              MR. WILSON:  Meet midday or drop us off a

8    copy here, would you?

9              MR. CANNON:  We'll bring a copy down here.

10             MR. WILSON:  Awesome.  Thank you.

11             THE COURT:  All right.  Thank you,

12   everyone.  Court is in recess.

13             THE BAILIFF:  All arise.

14             (The hearing concluded at 4:52 p.m.)

15

16

17

18

19

20

21

22

23

24

25

<u>**REPORTER'S CERTIFICATE**</u>

1

2

3  STATE OF UTAH           )
                          )  ss.
4  COUNTY OF SUMMIT        )

5

6          I, Jennifer E. Garner, Registered
   Professional Reporter and Notary Public in and for
7  the State of Utah, do hereby certify:

8          That on July 6, 2010, I transcribed an
   electronic sound recording at the request of Attorney
9  Annette Jarvis;

10

11         That the statements and testimony of all
   speakers were reported by me in stenotype and
12 thereafter transcribed, and that a full, true, and
   correct transcription of said statements and
13 testimony is set forth in the preceding pages,
   according to my ability to hear and understand the
14 electronic sound recording provided;

15         That the original transcript was sealed
   and delivered to Attorney Annette Jarvis for
16 safekeeping.

17         I further certify that I am not kin or
   otherwise associated with any of the parties to said
18 cause of action and that I am not interested in the
   outcome thereof.

19

20         WITNESS MY HAND AND OFFICIAL SEAL this 6th
   day of July, 2010.

21

22

23                        Jennifer E. Garner, CSR, RPR
                          Notary Public
24                        Residing in Summit County

25

NOTARY PUBLIC
JENNIFER E. GARNER
578894
COMMISSION EXPIRES
MARCH 31, 2013
STATE OF UTAH