# ORIGINAL TRANSCRIPT

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) | Transcript of Proceedings |
| EASY STREET HOLDING, LLC, | ) ) ) ) | |
| Debtor. | ) ) ) | Bankruptcy Number 09-29905 Judge Mosier |

April 28, 2010 - 1:07 p.m.

### TRANSCRIPT FROM ELECTRONIC RECORDING

Reporter:  Robin Conk, RPR

FILED IN THE
UNITED STATES
BANKRUPTCY COURT
DISTRICT OF UTAH
2010 AUG 20  PM 3:27



**CITICOURT**

THE REPORTING GROUP

170 South Main Street, Suite 300
Salt Lake City, Utah 84101

PH: 801.532.3441   FAX: 801.532.3414   TOLL FREE: 877.532.3441



1                    A P P E A R A N C E S

2    FOR EASY STREET PARTNERS:

3            CORBIN B. GORDON
             Attorney at Law
4            345 West 600 South, #108
             Heber, Utah  84032
5            Tel:  435-657-0984

6            KENNETH L. CANNON, II
             DURHAM JONES AND PINEGAR
7            Attorney at Law
             111 East Broadway, #900
8            Salt Lake City, Utah  84111
             Tel:  801-415-3000

9

10   FOR GATEWAY CENTER:

11           DOUGLAS J. PAYNE
             FABIAN AND CLENDENIN
12           Attorney at Law
             215 South State Street, #1200
13           Salt Lake City, Utah  84111
             Tel:  801-531-8900

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGE</u>

     WALLACE COOPER

          Direct examination by Mr. Payne              5
          Cross-examination by Mr. Gordon             39
          Redirect examination by Mr. Payne           49

P R O C E E D I N G S

1
2
3      THE CLERK:  This is in the matter of Easy
4  Street Holding, LLC.
5      THE COURT:  Will counsel, please, note
6  their appearances.
7      MR. GORDON:  Corbin Gordon, special
8  appointed counsel for Easy Street Partners, LLC.
9      MR. CANNON:  Your Honor, Kenneth Cannon,
10  Durham, Jones and Pinegar, appearing on behalf of
11  Easy Street Partners as well.
12      MR. PAYNE:  Douglas Payne of Fabian and
13  Clendenin appearing on behalf of Gateway Center, LLC.
14      THE COURT:  This is the continued hearing
15  on the debtor's objection to the proof of claim filed
16  by Gateway Center, LLC.
17      When we adjourned yesterday Mr. Payne
18  indicated that he had at least one other witness.
19      MR. PAYNE:  That's correct, Your Honor.
20      THE COURT:  Mr. Payne, you may proceed.
21      MR. PAYNE:  Yes.  And, Your Honor, just
22  for procedure here, may I remain seated?  Is that the
23  preference here, or should I stand?
24      THE COURT:  Yes.  If you don't remain
25  seated, then you're towering over me and I don't like

1    that feeling, so --

2              MR. PAYNE:  I don't tower over too many

3    people, Your Honor.

4              Gateway Center would like to call Wallace

5    Cooper to the stand.

6              THE CLERK:  Please step forward and raise

7    your right hand.

8

9                       <u>WALLACE COOPER</u>,

10             called as a witness, having been duly

11   sworn, was examined and testified as follows:

12

13             THE CLERK:  Please take the witness stand.

14             State and spell your name.

15             THE WITNESS:  My name is Wallace Cooper,

16   W-A-L-L-A-C-E, C-O-O-P-E-R.

17

18                    <u>DIRECT EXAMINATION</u>

19   <u>BY MR. PAYNE</u>:

20        Q.    Mr. Cooper, can you tell us what your

21   occupation is?

22        A.    I'm an architect.

23        Q.    Okay.  And can you briefly describe for

24   the Court your formal education, credentials?

25        A.    Bachelor's in psychology, master's in

1    architecture, and 40 years in the practice, my

2    practice.

3            Q.      Okay.  Are you licensed as an architect in

4    the State of Utah?

5            A.      I am.

6            Q.      When were you licensed in Utah?

7            A.      1975.

8            Q.      Have you been continuously licensed in

9    Utah since that time?

10           A.      Yes.

11           Q.      Are you licensed in any other states?

12           A.      Yes.

13           Q.      Which states?

14           A.      Montana, Wyoming, California, Colorado,

15   Arizona, Missouri, New York.  I think that's it.

16           Q.      Okay.  Do you have any professional

17   memberships in connection with your profession of

18   being an architect?

19           A.      AIA, American Institute of Architects, and

20   LEED certified by the Green Building Council, USGBC.

21           Q.      All right.  In connection with being an

22   architect, do you receive any periodic training

23   that's required to maintain licensing or

24   certification?

25           A.      Yes.  Continuing education is prescribed

1    by each of those states.

2         Q.    Does that require a certain number of

3    hours?

4         A.    It does, in various areas of -- yeah.

5    Just various disciplines, ADA, energy, code, et

6    cetera.

7         Q.    Okay.  Do you have any experience as an

8    architect in working with local government building

9    and compliance, regarding complying with building

10   code requirements?

11        A.    Yes.

12        Q.    Is that something you do on a regular

13   basis as an architect?

14        A.    Yes.

15        Q.    Have you received training in connection

16   with building codes?

17        A.    More experience than training, but

18   training, yes.

19        Q.    Do you have any experience as an architect

20   with designing a new building addition or a major

21   remodel that's connected to an existing older

22   structure?

23        A.    Yes.

24        Q.    Tell us briefly some of those experiences.

25        A.    Gateway would be one of those projects.

1   This building, Moss Courthouse, and the buildings

2   going on behind it.  Multiple schools.  Quite a few

3   parks.  Projects in Park City.  Visitors center in

4   Washington, D.C.  Quite a few.  Quite a few.

5        Q.    Are you familiar with the Gateway Center

6   property in Park City?

7        A.    I am.

8        Q.    Can you tell me what your involvement --

9   history of involvement is with that, briefly?

10        A.    I'm the architect of record on that

11   project.

12        Q.    Architect of record?

13        A.    Meaning I stamped the drawings in 1994 and

14   was the project architect for that project in '94 and

15   '95.

16        Q.    Can you tell me, was this -- I think you

17   mentioned Gateway as one of the projects you had been

18   involved with that involved an existing structure or

19   a remodel.  Can you tell me about that, why you

20   included that?

21        A.    Gateway was originally a parking lot built

22   in 19 -- parking garage built in 1994.  It sat vacant

23   for ten years.  And the city, Park City, bought an

24   interest in it, Jim Tozier bought an interest in it,

25   the current owner, and -- in the parking garage.  And

1  then a building was built on top of that parking

2  garage.

3          Q.      Okay.  And I think you said the parking

4  garage was built in 1994?

5          A.      I'm sorry.  '84.  Thank you.

6          Q.      '84.

7          A.      '84, yes.  Thank you.

8          Q.      When did you become involved in connection

9  with building a building on top of that existing

10  parking garage?

11          A.      We started planning for that in '93.

12          Q.      Did you know, did Gateway -- so Gateway

13  Center owns the building; is that correct?  Is that

14  your understanding?

15          A.      That is my understanding.  I have not seen

16  documents that specifically --

17          Q.      Okay.

18          A.      -- reference the ownership.  Jim Tozier is

19  a client and friend, someone I've known for a long,

20  long time.

21          Q.      Is it your understanding that Gateway

22  Center did not buy the parking garage itself, but

23  just built on top?

24          A.      That is correct.

25          Q.      Mr. Cooper, have you been involved in

1    connection with any -- dealing with issues as to

2    whether there are building code violations of the

3    space that's 303 that was leased to Easy Street

4    Partners and Cloud Nine Resorts?

5         A.    Yes.

6         Q.    Can you tell me what your involvement with

7    that's been, you or your office's involvement?

8         A.    Quite some time ago we were contacted

9    about a potential violation of travel distance.

10        Q.    Okay.

11        A.    Arrin Holt, architect from the firm, who

12   has been handling the work in the Gateway for quite

13   some time, was contacted about that.

14             He subsequently went to the Gateway and

15   took some measurements, did some drawings and met

16   with the -- actually met with Bill, so -- and other

17   people relative to that.

18             And my involvement was I -- he and I

19   consulted about those issues each time he met.

20        Q.    Okay.  And have you been -- have you seen

21   a report that was prepared by Summit Engineering and

22   Michael Johnston in connection with this space?

23        A.    I have.

24        Q.    And that was the report that was dated, I

25   think, sometime in January of this year?

1      A.      I reviewed that report.

2      Q.      Okay.  I think that was marked as -- I

3  think that's Exhibit 6.

4              MR. PAYNE:  Is that available for the

5  witness to review?

6              THE WITNESS:  I have it.

7      Q.      (By Mr. Payne)  Okay.  Now, you've

8  reviewed that report and the opinions with respect to

9  different claimed violations; is that correct?

10     A.      That is correct.

11     Q.      Let me have you turn, if you would, to the

12  third page of Exhibit 6, which I think is the first

13  matter that's asserted to be a violation there.

14              Do you see that page where it talks about

15  east exit stairway?

16     A.      I do.

17     Q.      Okay.  First of all, before we get to

18  that, at the top of that page it refers to egress and

19  accessibility code violations per the 1994 Uniform

20  Building Code.

21              Is the 1994 Uniform Building Code the

22  building code that applies to the Gateway Center, in

23  your opinion?

24     A.      It does.  It applies to this part of the

25  Gateway Center.

1       Q.      Okay.

2       A.      The 1982 building code would apply to the

3   existing part of the Gateway Center, or the part that

4   existed when we started --

5       Q.      Okay.

6       A.      -- the Gateway construction.

7       Q.      Okay.  Are there any newer building codes

8   that would come into play now, analyzing code

9   compliance?

10      A.      There -- 2007 would also -- 2006 would

11  also come into play.

12      Q.      All right.  Let's go to number 1, the item

13  that's identified as number 1, area of refuge in the

14  third floor stairway.  Do you see that?

15      A.      I do.

16      Q.      Do you believe that the building is out of

17  compliance with respect to this as stated in this

18  report?

19      A.      Well, I think the information is correctly

20  stated as far as the 1994 building code is used as a

21  reference.  But in this particular case, the 1994

22  building code has been superseded by the 2006

23  building code and amendments to that code.

24      Q.      Okay.

25              MR. PAYNE:  I would like permission to

1     approach, if I may, Your Honor.

2              THE COURT:  You may.

3        Q.    (By Mr. Payne)  Mr. Cooper, I've handed

4     you what has been marked as Exhibits G-13 and G-14.

5              MR. PAYNE:  And I will represent to the

6     Court that these are copies of portions of the Utah

7     Administrative Code.  G-13 is part of volume II of

8     the 2007 supplement that deals with -- and includes

9     R156-56-801.  And G-14 is the 2010 Utah

10    Administrative Code for that same section.

11             And I will move for them to be admitted.

12             MR. GORDON:  No objection, Your Honor.

13             THE COURT:  Exhibits G-13 and G-14 are

14    admitted.

15       Q.    (By Mr. Payne)  Mr. Cooper, I'll call your

16    attention to -- is there a subsection in R156-56-801

17    that reflects an amendment that you think is

18    applicable to this situation in the Gateway Center?

19       A.    Subsection 27?

20             MR. GORDON:  I'm sorry, Your Honor, could

21    you restate that so I can find it?

22             THE COURT:  Which exhibit are you looking

23    at, Mr. Payne?

24             MR. PAYNE:  It's in -- I'm sorry -- G-13.

25             THE COURT:  G-13.

```
1                MR. PAYNE:  And it's section 801 --
2      R156-56-801.
3                MR. GORDON:  801.
4                THE WITNESS:  It's on page 79.
5      Q.    (By Mr. Payne)  Which subsection again?
6      A.    27.
7      Q.    Okay.  And can you read subsection 27?
8      A.       In section 1007.3, a new exception 6 is
9      added as follows:  Areas of refuge are not required
10     at exit stairways and buildings or facilities
11     equipped throughout with an automatic fire sprinkler
12     system installed in accordance with 903.3.1.1 or
13     903.3.1.2.
14     Q.       Okay.  Can you turn to Exhibit G-14?  And
15     in that same section number, regulation section
16     number, R156-56-801, does that contain that same
17     subparagraph 27?
18               THE COURT:  And, Mr. Cooper, if you
19     could --
20               THE WITNESS:  Yes, sir.
21               THE COURT:  -- the page number.
22               MR. GORDON:  Yes.
23               THE WITNESS:  I'm looking here myself.  It
24     would be the top of 2 -- well, let's -- wait a
25     minute.  215, the right-hand side, halfway down --
```

1    about a third of the way down.

2        Q.    (By Mr. Payne)  Is that the same language

3    that you just read that was in the 2007 code?

4        A.    That is.

5        Q.    Okay.  Do you believe that that -- that

6    change to the IBC exempts the Gateway Center property

7    in space 303 from the requirement of the (inaudible)

8    area of refuge?

9        A.    It does.  It negates the need for an area

10   of refuge in the Gateway Center.

11       Q.    Is the Gateway Center a sprinkled

12   building?

13       A.    It is.

14       Q.    And it is sprinkled in accordance with the

15   requirements of the IBC?

16       A.    It is.

17       Q.    All right.  So that -- so based on -- is

18   that the basis for your opinion that this number 1

19   with the -- dealing with the east exit stairway is

20   not a code violation?

21       A.    That is correct.  And that was also

22   confirmed by Park City building officials.

23       Q.    And in that comment there, you're

24   referring to --

25             UNIDENTIFIED:  Objection, Your Honor,

1    that's hearsay.  I'm sorry.  Objection, hearsay, Your

2    Honor.

3                MR. PAYNE:  What's the basis for you

4    saying that, Mr. Shoaf?

5                THE COURT:  Well, let me --

6                MR. GORDON:  I'm sorry.

7                THE COURT:  That's okay.  The objection is

8    sustained.

9                You may proceed, Mr. Payne.

10        Q.    (By Mr. Payne)  Okay.  Mr. Cooper, have

11    you seen any letter from the Park City building

12    official dealing with this space?

13        A.    Dealing with the area of refuge?

14        Q.    Dealing with the area of refuge and

15    violations or possible violations of code?

16        A.    I have seen the letter.

17        Q.    Is that Exhibit -- I believe that may be

18    Exhibit 5.  Is that the letter dated April 8th of

19    this year?

20                That's Exhibit 5, I believe.

21        A.    It is.  This letter -- I reviewed this

22    letter.

23        Q.    You have reviewed that letter?

24        A.    I have reviewed the letter.

25        Q.    Have you had any discussions with the Park

1     City building compliance department regarding this --

2     that letter?

3              MR. GORDON:  Objection, Your Honor,

4     hearsay.

5              THE COURT:  I don't think that's hearsay.

6              THE WITNESS:  I have had discussions with

7     Park City building officials, both Kurt Simister, Ron

8     Ivie, Roger Evans and Richard Carlisle about this

9     letter.

10             Q.    (By Mr. Payne)  Okay.  All right.  And

11    based upon those discussions and your review of the

12    letter and the building code, is it your opinion that

13    the -- the Gateway Center area of refuge -- excuse

14    me, that the Gateway Center complies with code with

15    respect to the items that are identified in

16    Mr. Johnston's report that doesn't refer to an area

17    of refuge?

18             A.    Based on those conversations and my

19    discussion about the amendment in the Utah

20    Administrative Code, the area of refuge for the

21    Gateway Center is not required.

22             Q.    And that's your opinion?

23             A.    That is my opinion.

24             Q.    Okay.  Thank you.  So let's go back to

25    Exhibit 6, Mr. Johnston's report.  And on the third

1   page there's paragraph 2 that refers to an area of

2   refuge.  Is that -- is your conclusion -- what's your

3   opinion with respect to that?

4              Is that item that's identified on

5   paragraph 2 on the third page, in your opinion, a

6   code violation?

7        A.    It would not be a code violation based on

8   the amendments in the Utah Administrative Code.

9        Q.    Okay.  All right.  Let's go to the next

10  page in the Johnston report, Exhibit 6.

11       A.    Item 3, Mr. Johnston states that the

12  four-inch-high curb prevents a wheelchair bound

13  person from reaching the area of refuge.  Again,

14  because the area of refuge is no longer required,

15  it's a moot point.

16       Q.    Okay.  Item 4 on that same page.

17       A.    That is a violation.

18       Q.    Okay.

19       A.    And it has been remedied.

20       Q.    Okay.

21       A.    And I personally viewed that space.

22       Q.    All right.  Let's go to the next page,

23  item 5.

24       A.    The same issue.  That is a device to

25  notify the fire department of someone who is in an

1    area of refuge, is what the photograph is.  And the

2    area of refuge is no longer required, and therefore,

3    his comments would not apply.

4         Q.    All right.  Okay.  What about item 6 on

5    that page?

6         A.    That is a violation and that has been

7    remedied.

8         Q.    Okay.  Let's turn to the next page.  West

9    exit stairway and exit discharge.

10        A.    Our drawings showed a 44-inch-wide stair

11   coming out of that door.

12        Q.    When you say your drawings, which --

13        A.    Our 1994 drawings that we submitted to the

14   building department showed a 44-inch-wide stair at

15   this location.

16        Q.    Okay.

17        A.    This is an existing situation and it is

18   governed by the 1982 UBC, not the 1994 UBC.

19              But we did show a wider stair.  I do not

20   recall why that was not required, but it was not

21   required by Park City at the time the building --

22   that is the change in the existing condition was not

23   required by Park City at the time the Gateway was

24   built.

25        Q.    Okay.  Now, you -- just to be clear, the

1   stairway that is shown in the photograph, the west

2   exit stairway, that stairway was there at the time

3   that the building was built on top of the parking

4   garage; is that correct?

5        A.     Right.  That stair was built in 1982 -- or

6   1984 and it was built under the 1982 building code.

7   Everything in that picture -- in fact, everything in

8   that picture was existing at the time we started the

9   Gateway project.

10       Q.     Okay.

11       A.     The ramp to the right that you just see a

12  piece of -- I mean everything.  Everything was

13  existing.

14            That is also true of number -- the

15  photograph number 2 just below it.  Everything you

16  see there was existing.

17       Q.     Is that -- are those two pictures of the

18  same stair?

19       A.     They are the same stair, uh-huh

20  (affirmative).

21       Q.     Okay.  All right.  So although -- just so

22  I'm clear, your drawing showed that you were going to

23  put in a wider stairway there?

24       A.     That is correct.

25       Q.     But that did not happen?

1        A.      That did not happen.

2        Q.      And the building was approved and

3    certified by the city and --

4        A.      And has been in operation.  And at no time

5    has Park City revisited that issue, as far as I'm

6    aware.

7        Q.      All right.  Let's go to the next page.

8        A.      Item 3, is that --

9        Q.      Item 3, yes.

10       A.      Item 3 deals with an exit court.  This is

11   not an exit court, it is a public right-of-way.

12   There is an easement for the public through this

13   space.

14           Everything you see in that photo was

15   existing except the stair on the right.

16           So this is a utility corridor.  The

17   transformer box on the left was existing.  We have

18   power, data, telephone, storm sewer, sanitary sewer,

19   everything is in this alley.

20           So we dropped the stair down onto the

21   alley, and it's the one on the right.

22           But the comments about exit corridor are

23   not applicable because it is not an exit corridor.

24       Q.      Exit court?

25       A.      Exit court.

1      Q.    What's the distinction between -- what

2   makes something an exit court versus a right-of-way?

3      A.    The best way I could answer that is to go

4   to the UBC or the IBC, one or the other, in which

5   both the exit court and an exit passageway or an

6   exit -- public right-of-way are defined.  That would

7   be the best way to give you that answer.

8      Q.    Okay.  All right.  But this is not -- this

9   is not an exit court?

10     A.    It is not an exit court.

11     Q.    Okay.  Let's go to the next page in item

12  4.

13     A.    Again, he deals with an exit -- or

14  Mr. Johnston is talking about an exit court and about

15  fire ratings on buildings adjacent.  These buildings

16  were all existing at the time that the Gateway was

17  built and those conditions are outside of our

18  jurisdiction -- my jurisdiction as an architect on

19  the Gateway.

20     Q.    Okay.  Let's go to the next page of the

21  Johnston report, Exhibit 6, if you would, please.

22     A.    Central elevators next to corridor?

23     Q.    Yes.

24     A.    The situation has been remedied.

25     Q.    Okay.  All right.

```
 1                THE COURT:  Which -- make sure I'm clear

 2      on that.

 3                THE WITNESS:  What needed to happen here

 4      was the concrete bumpers that you see in the top

 5      photo had to be moved back so that accessibility

 6      could be achieved.

 7                And so I think Paul yesterday testified

 8      that that had been -- that those -- the concerns that

 9      are identified had been resolved.

10                MR. PAYNE:  Permission to approach the

11      witness, Your Honor.

12                THE COURT:  You may.

13           Q.    (By Mr. Payne)  Mr. Cooper, I've handed

14      you what's been marked as Exhibit G-12.  Do you

15      recognize that document?

16           A.    I do.

17           Q.    Can you tell me what that is?

18           A.    This is a page out of the chapter 34 of

19      the 1994 Uniform Building Code for existing

20      structures.

21           Q.    Okay.

22                MR. PAYNE:  And I will move for admission

23      of G-12.

24                MR. GORDON:  No objection, Your Honor.

25                THE COURT:  Exhibit G-12 is received.
```

1    Q.    (By Mr. Payne)  Mr. Cooper, is there

2    somewhere in -- on this page, is there anything that

3    indicates that -- what you talked about earlier,

4    that -- if there's an existing structure that there

5    may not be a need to comply with the then current

6    building code on their additions or remodels?

7    A.    3403.2 is applicable.

8    Q.    Can you read the -- can you read the

9    portion that you think is relevant there?

10   A.    That whole thing is relevant, but I think

11   most germane is the very first paragraph.  It says

12   additions, alterations, repairs may be made to any

13   building or structure without requiring the existing

14   building or structure to comply with all the

15   requirements of this code provided the addition,

16   alteration or repair conforms to the required -- to

17   the -- that required for a new building or structure.

18        So, in other words, we could build on top

19   of the Gateway parking structure without going back

20   and upgrading the parking structure to the 1994 code.

21   Q.    Okay.  All right.

22        MR. PAYNE:  May I approach the witness

23   again?

24        THE COURT:  You may.

25        Mr. Payne?

1        MR. PAYNE:  Yes.

2        THE COURT:  Let's, before we move on,

3   clarify some issues with an exhibit.  Yesterday you

4   moved for admission and the Court admitted Exhibit

5   G-12, which was the Park City fire inspection report

6   dated March 5th, 2010.

7        MR. PAYNE:  Uh-huh (affirmative).

8        THE COURT:  And today you moved for and

9   the Court admitted Exhibit G-12, which is a different

10  G-12.

11       MR. PAYNE:  Oh.  Well, I apologize for

12  that.

13       THE COURT:  So the -- looking at the

14  second Exhibit G-12, which is chapter 34 existing

15  structures, chapter 34 of the 1994 Uniform Building

16  Code -- you're not going to go into the 20s, are you,

17  on your exhibits?

18       MR. PAYNE:  No.

19       THE COURT:  All right.  What if we marked

20  that exhibit as Exhibit G-22?

21       MR. PAYNE:  Okay.

22       THE COURT:  So the last exhibit you moved

23  for admission --

24       MR. PAYNE:  Okay.  I think I am going --

25  perhaps I may go to 21, but not 22.

```
 1              THE COURT:  Okay.
 2              MR. PAYNE:  Should we have the witness --
 3    it will be quick, Your Honor.  It will be quick.
 4    Should we have the witness mark the -- or someone
 5    make the change on the original exhibit there?  Maybe
 6    the court deputy.
 7         Q.   (By Mr. Payne)  Mr. Cooper, I think you've
 8    been handed a copy of Exhibit G-17.  Are you familiar
 9    with that document?
10         A.   I am.
11         Q.   Can you tell us what that is?
12         A.   These are -- both of these documents are
13    documents that we entered the base -- well, I have to
14    back up.
15              The first document is a document we
16    generated in its entirety, meaning my firm, CRSA,
17    generated that document.
18         Q.   Yes.
19         A.   The second document we generated the base
20    document, but I'm not sure who generated the
21    annotations.
22         Q.   Okay.  All right.  And do you know when
23    those were prepared?
24         A.   The top document was prepared April 30th
25    and the bottom document -- April 30th, 2009.  The
```

1    bottom document was prepared December 18th, 2008.

2         Q.    Okay.

3              MR. PAYNE:  I'll move for admission of

4    G-17, Your Honor.

5              MR. GORDON:  Your Honor, I would object to

6    the portion that contains the part below that he does

7    not know the common path of egress travel

8    measurement.  We would just object on that and say

9    that that portion of it should not be admitted.

10             It's on the front on G-17, Your Honor, on

11   the front copy down below.

12             MR. PAYNE:  Your Honor, my response to

13   that is that this page is part of docket number 449-2

14   filed -- which is the reply memorandum filed by the

15   debtor on April 22nd in this case.  And I think

16   that -- I think that counsel should know who made

17   those annotations because they were an exhibit to his

18   reply memorandum.

19             THE COURT:  Well, the objection,

20   Mr. Gordon, went to page 1 or 2?

21             MR. GORDON:  I'm sorry.  On page 1, on the

22   front page, Your Honor, there are Gateway Center,

23   common path of egress travel, and then it has a

24   measurement.  And the witness has testified that he

25   doesn't know --

1          THE WITNESS:  No, I didn't say that.

2          MR. GORDON:  I'm sorry, I misunderstood.

3   I thought that he was referring to that one.  So

4   based on that, I withdraw the objection, Your Honor.

5   I misunderstood what he testified to.

6          THE COURT:  All right.  Just to clarify

7   the Court's understanding, you were saying,

8   Mr. Cooper, with respect to page 2 of the exhibit,

9   you didn't know who had made the handwritten

10  annotations.

11         THE WITNESS:  That is correct.

12         MR. GORDON:  Okay.

13         THE COURT:  All right.  Exhibit 17 is

14  received.

15     Q.     (By Mr. Payne)  Mr. Cooper, did you see

16  a -- have you seen a version of the first page of

17  Exhibit G-17 during the course of this hearing and

18  going back to and including yesterday?

19     A.     Yes, I did.

20     Q.     Let me refer you to Exhibit 10.  And

21  compare Exhibit 10 with Exhibit G-17.

22     A.     Exhibit 10 is our document, except the

23  common path of egress -- except information at the

24  bottom of the page that has been covered over when it

25  was printed.

1      Q.     Okay.  And does the first page of Exhibit

2  G-17 reflect a measurement of a common path of egress

3  travel for that portion of this space that was leased

4  to Easy Street Partners?

5      A.     It does.

6      Q.     Was that measurement done by your office

7  and is that figure included by your office when this

8  document was prepared?

9      A.     Yes.

10         MR. GORDON:  Objection, Your Honor,

11  foundation on that as far as who prepared and who

12  actually conducted that measurement.

13         THE COURT:  Sustained.

14      Q.     (By Mr. Payne)  Mr. Cooper, did anyone

15  from your architectural firm -- which is CRSA; is

16  that correct?

17      A.     Yes.

18      Q.     Did anyone from your architectural firm

19  engage in a measurement of a common path of egress

20  travel in this space in or about April 2009?

21      A.     Yes.

22      Q.     And who was that?

23      A.     Arrin Holt.

24      Q.     How do you know that?

25      A.     I consulted with Arrin on that after he

1    came back from measuring the space.

2         Q.    Okay.  Was Arrin Holt involved in

3    preparation of the first page of Exhibit G-17?

4         A.    He prepared it.

5         Q.    And does the information regarding the

6    measurement for the common path of egress travel

7    reflect what Mr. Holt's measurement was?

8         A.    Yes.

9              MR. GORDON:  Objection, Your Honor,

10   hearsay.

11             MR. PAYNE:  Your Honor, I think this was a

12   document prepared in the ordinary course of business.

13             THE COURT:  Well, I don't think there's a

14   problem with the document and what the document says.

15   If the purpose of the exhibit and the testimony is to

16   establish that the distance is 95 feet and four

17   inches, I think it's hearsay.

18             MR. GORDON:  And that is the objection,

19   Your Honor.

20             THE COURT:  So the objection is sustained.

21        Q.    (By Mr. Payne)  Mr. Cooper, in connection

22   with your involvement as an architect representing

23   Gateway Center, do you have an understanding of what

24   a measurement of -- the measurement of common path of

25   egress travel was for the Gate -- this space in the

```
 1    Gateway Center in April 2009?

 2         A.    Yes.

 3         Q.    What's the basis for that understanding?

 4         A.    Numerous meetings with Arrin Holt.

 5               MR. GORDON:  Objection, Your Honor,

 6    hearsay.

 7               THE COURT:  The problem I have, Mr. Payne,

 8    is Mr. Cooper, with respect to this issue, isn't

 9    really testifying as an expert.  I think you're

10    eliciting testimony as to what the actual distance is

11    and I don't -- if it's not hearsay, it's foundation.

12               MR. PAYNE:  All right.  Okay.  I

13    understand.

14               THE COURT:  Objection is sustained.

15         Q.    (By Mr. Payne)  Mr. Cooper, do you have --

16    you were in court yesterday when there was testimony

17    about the methodology for measuring a common path of

18    egress --

19         A.    Yes.

20         Q.    -- in this space, were you not?

21         A.    Yes.

22               MR. PAYNE:  Your Honor, I would like to

23    approach the witness, if I may.

24               THE COURT:  Sure.

25         Q.    (By Mr. Payne)  Mr. Cooper, let me refer
```

1    you to what's -- I've handed you what's been marked

2    as Exhibit G-18.

3           A.    I have it.

4           Q.    Okay.  Can you tell me what that document

5    is?

6           A.    Chapter -- it's a copy of chapter 4 out of

7    the 1994 Uniform Building Code.  A part of chapter 4,

8    not all of chapter 4.

9           Q.    Okay.  Let me refer you to Exhibit G-19.

10          A.    I might also say it's included -- chapter

11   10 is also -- parts of chapter 10 are also included

12   in that exhibit.

13          Q.    Okay.  And let me refer you to G-19.

14          A.    G-19 is part -- a copy of chapter 10 out

15   of the 2000 IBC.

16          Q.    Okay.  The IBC being the --

17          A.    International Building Code.

18          Q.    What about Exhibit 20?

19          A.    Exhibit 20 -- I have two G-19s, if that --

20          Q.    Maybe that's --

21          A.    If someone is short one.

22          Q.    That would be me.

23          A.    G-20 is, again, chapter 10, only this time

24   it's out of the 2006 International Building Code.

25          Q.    Okay.  And then what about Exhibit G-21?

1        A.      G-21 is pages copied out of the 1982

2   Uniform Building Code.

3        Q.      Okay.

4                MR. PAYNE:  Your Honor, I'll move for

5   Exhibits G-18, 19 and 20.

6                MR. GORDON:  No objection, Your Honor.

7                THE COURT:  Exhibits G-18, 19 and 20 are

8   received.

9                MR. PAYNE:  Your Honor, I'm going to hold

10  off on G-21.

11               THE COURT:  Okay.

12       Q.      (By Mr. Payne)  Mr. Cooper, is there

13  any -- referring to Exhibit G-18, which is part of

14  the 1994 Uniform Building Code, is there some -- can

15  you point to a section in that that refers to travel

16  distance?

17       A.      The first page under section 402-A-3-F, it

18  would be 402.4.

19       Q.      Okay.  And that talks about -- what's the

20  distance there?

21       A.      100 feet.

22               Should I read it?

23       Q.      Sure.

24       A.      When a required exit enters the atrium

25  space, the travel distance from the doorway of the

1    tenant space to the enclosed stairway, horizontal

2    exit, exterior door or exit passageway shall not

3    exceed 100 feet.

4         Q.    Okay.  All right.  And has that -- has

5    that requirement changed since 1994?

6         A.    The definition for that requirement has

7    changed, yes.

8         Q.    Okay.  Can you point to anywhere on

9    Exhibits G-19 or G-20 that would reflect that?

10        A.    Both 19 and 20 under common path of egress

11   travel -- may I give a little bit of foundation here?

12        Q.    Yes.  Are you referring to the first page

13   of each of those?

14        A.    Of each of those, yeah.

15        Q.    Okay.

16        A.    Between 1994, the Uniform Building Code,

17   and 2000, the International Building Code, a huge

18   change was made in the code.  I mean, the code was

19   totally rewritten to appeal to more of an -- on an

20   international scale, and that's why it's called the

21   International Building Code.  So there are

22   definitions in the International Building Code that

23   did not exist in the Uniform Building Code, which is

24   Exhibit G-18.

25        Q.    Okay.

1     A.     So the ideas exist, but they were

2  relabeled, renamed and rewritten -- and rewritten, so

3  travel distance became common path of egress travel.

4     Q.     I see.

5     A.     And what -- the meaning of that changed.

6  And the change is that portion of the -- and I'm

7  reading from the first page, common path of egress

8  travel.  The portion of the exit access which the

9  occupants are required to traverse before two

10 separate and distinct paths of egress travel to two

11 exits are available.  That's the big change between

12 the two codes.

13    Q.     So in layman's terms, you --

14    A.     It means that if I were to leave this

15 room, I cannot travel more than 100 feet in an

16 unsprinkled building -- I'm sorry, in a sprinkled

17 building.  I'm talking about 2000 -- or 2006

18 International Building Code.  I cannot travel more

19 than 100 feet before I have the ability to move to

20 two separate exits.

21    Q.     Okay.  All right.  And that's what the

22 2000 IBC and 2006 IBC provide with respect to what

23 was formally referred to as travel distance; is that

24 correct?

25    A.     That is correct.  It changed in 2000 and

1    was carried through in 2006.

2         Q.    Okay.  Now, you heard discussion yesterday

3    about measuring travel distance or I guess common

4    path of egress, whatever it's referred to, with right

5    angles?

6         A.    Yes.

7         Q.    You heard Mr. Shoaf testify with respect

8    to that.

9         A.    Yes.

10        Q.    What do you think the proper method is for

11   measuring common path of egress or travel distance

12   for this -- for compliance with the code?

13        A.    Both methods are acceptable, but the --

14   the method that is highlighted, if that's the right

15   word, in the commentary for the 2006 building code is

16   a -- is what we call a natural path.  That is, if

17   there's a fire in this building and I have to leave

18   this room, I will take the shortest distance to the

19   exit.

20        Q.    Okay.

21        A.    Barring furniture and things in my way.

22        Q.    Okay.

23        A.    I won't travel at right angles.

24        Q.    Okay.  Is there anywhere in Exhibit 20

25   where that might be described or illustrated?

1          A.     Yes.  It's on the last page of Exhibit 20.

2     There's an illustration of that.

3          Q.     This illustration, is this from the code

4     or from some commentary of the code?

5          A.     It's from the commentary by the code

6     officials, commentary to the International Building

7     Code that is put out by code officials.

8          Q.     So this is part of the official

9     commentary?

10          A.     Yes.  It is part of the official

11     commentary.

12          Q.     Okay.  So you're referring to the last

13     page.  Can you describe or point us to the part that

14     you're referring to?

15          A.     Right.  And that demonstrates a path of

16     egress that is not at right angles.  It's sort of

17     the -- what we call the natural path, if you will.

18          Q.     Which diagram are you referring to?

19          A.     I'm sorry.  The top diagram.

20          Q.     On the last page of Exhibit 20?

21          A.     Page 1002.1.

22          Q.     Paren 3?

23          A.     Paren 3.

24          Q.     All right.  So, Mr. Cooper, in your

25     opinion, does the space on -- space 303 that Easy

1    Street Partners was leasing, does it comply with the

2    building code with respect to travel path distance or

3    a common path of egress distance, however that's

4    referred to?

5         A.    Yes, it does.

6         Q.    What's the basis for that opinion?

7         A.    The basis for that opinion is that when

8    measured, that distance to the point at which two

9    exits are available to the occupant is less than 100

10   feet.

11        Q.    Okay.

12        A.    And that is also substantiated by Park

13   City in a letter that they sent out relative to that

14   issue.

15        Q.    And you're referring to Exhibit 5, the

16   April 8th letter from the senior building official?

17        A.    Yes.

18        Q.    Mr. Cooper, in your opinion, is the space

19   303 in the Gateway Center safe to occupy?

20        A.    Yes.

21        Q.    Is it in substantial compliance with

22   building codes?

23        A.    Yes.

24        Q.    And do you have any reason to believe that

25   Park City considers this space to be unsafe?

1           A.     Again, Exhibit 5, I believe it's the last

2    paragraph, Kurt Simister, building official -- senior

3    building official, states that in his opinion the

4    building is safe.  In my opinion, the building is

5    safe as well.

6                  MR. GORDON:  Objection, Your Honor -- no,

7    I'm sorry.  I'm sorry, Your Honor, no.

8                  THE COURT:  It's your exhibit.

9                  MR. GORDON:  Yeah.  No.  I withdraw that,

10   Your Honor.

11                 MR. PAYNE:  No further questions.

12                 THE COURT:  All right.  Mr. Gordon?

13                 MR. GORDON:  Thank you, Your Honor.

14

15                  <u>CROSS-EXAMINATION</u>

16   <u>BY MR. GORDON</u>:

17          Q.     Mr. Cooper, you designed the Gateway

18   Center in 1994, correct?

19          A.     That is correct.

20          Q.     And you designed it under the 1994 code,

21   correct?

22          A.     That is correct.

23          Q.     And it was built under the 1994 code,

24   correct?

25          A.     Correct.

1    Q.    You have testified that the areas of

2    refuge are not compliant with the 1994 code, correct?

3    A.    That is correct.

4    Q.    You've testified that you drew the west

5    stairway at 44 inches, correct?

6    A.    Correct.

7    Q.    And that it was not built to code,

8    correct?

9    A.    It was --

10   Q.    It was not built the way you drew it,

11   correct?

12   A.    That is correct.

13   Q.    And that that was a violation of the 1994

14   code, correct?

15   A.    No.

16   Q.    It was not built in accordance with the

17   requirements of the 1994 code, correct?

18   A.    Correct.  For --

19   Q.    That's enough.  Thank you.

20   A.    Okay.  Very good.

21         THE COURT:  Well, he can clarify his

22   answer.

23         THE WITNESS:  That's okay.

24   Q.    (By Mr. Gordon)  Now, you've indicated

25   that the 2006 code now supersedes the 1994 code for

1    areas of refuge, correct?

2        A.    That is correct.

3        Q.    Are you implying that the entire building

4    is compliant with the 2006 code?

5        A.    I am not.

6        Q.    Are you saying that the entire building

7    should be analyzed under the present code?

8        A.    I am not saying that.

9        Q.    The 2006 code is less restrictive than the

10   1994 code for areas of refuge, correct?

11       A.    You know, the word less restrictive, I

12   can't answer that.

13       Q.    The building --

14       A.    You'll have to define that.

15       Q.    The building as it presently -- as it's

16   presently built does not comply with the 1994 code,

17   correct?

18       A.    That is correct.

19       Q.    But you're indicating that it does comply

20   with the 2006 code, correct?

21       A.    That is correct.

22       Q.    But there may be other areas in this

23   building that do not comply with the 2006 code,

24   correct?

25       A.    Definitely.  There are areas in every

1   building built prior to 2006 that will not comply

2   with the 2006 code.

3        Q.    Okay.  You've indicated that the 2006

4   analysis of the areas of refuge superseded the 1994

5   code, but you analyzed the west exit under the 1984

6   code, correct?

7        A.    When I did the drawings or when our firm

8   did the construction documents for the west exit into

9   the public right-of-way?

10        I'm trying to clarify my understanding of

11   your question.

12        Q.    I see.

13        A.    Can you restate the question?

14        Q.    Yes.  Okay.  So let's just take it in

15   pieces.  You've indicated that the 2006 code

16   supersedes the 1994 code, correct?

17        MR. PAYNE:  Objection, over --

18        THE WITNESS:  Relevant to areas of refuge

19   only.  That's the only thing that I testified to.

20        Q.    (By Mr. Gordon)  Okay.  And you've

21   testified that the west exit stairway ought to be

22   analyzed under the 1984 code, correct?

23        MR. PAYNE:  Objection, misstates the

24   witness's testimony.

25        THE WITNESS:  There was no 1984 code.

1    There's a 1982 code, 1985 code, a 1994 code.

2         Q.    (By Mr. Gordon)  In your letter, was that

3    a typo?

4         A.    That was a typo.

5         Q.    Okay.  But you are stating then that --

6    well, which one is it?  Is it the 1985 code that

7    you're analyzing the west exit under?  Which one is

8    it?

9         A.    Okay.  I'm not trying to be evasive, I

10   just want to understand.

11        Q.    That's okay.

12        A.    When we did our construction documents, we

13   used the 1994 code and we drew that stair as we

14   understood it to be required by the 1994 code.

15            Does that answer your question?

16        Q.    Uh-huh (affirmative).  And so -- yeah,

17   that answers my question.

18            Okay.  Now, the Gateway Center standing

19   alone requires the exit -- the west exit to be code

20   compliant with the 1994 code down through the parking

21   garage, correct?

22            MR. PAYNE:  Objection, vague.

23            THE COURT:  Sustained.

24            THE WITNESS:  I'm not sure what --

25        Q.    (By Mr. Gordon)  Okay.  The west exit in

1    the Gateway Center that comes down through the

2    Gateway Center and through the parking garage is a

3    main fire exit out of the Gateway Center, correct?

4         A.    It is one of the main fire exits out of

5    the Gateway Center, that is correct.

6         Q.    Without that exit the Gateway Center

7    standing alone does not comply with 1994 codes,

8    correct?

9         A.    If there were not a second exit out of the

10   Gateway Center, it would not comply with 1994 code,

11   that is correct.

12        Q.    I see.  And it is not built to 1994 codes?

13        A.    No.  It was -- I need to clarify that.

14   The parking garage, the part that was built in 1982,

15   would comply with the 1982 code.  The part that was

16   built under our jurisdiction above the parking garage

17   complies with the 1994 code.  I'm saying that there

18   are parts of the parking garage that do not comply

19   with the 1994 code.

20        Q.    Okay.  So you're saying that the 1994 code

21   does not supersede the 1985 code, correct?

22        A.    Or '82 code or --

23        Q.    Okay.

24        A.    I'll limit it to the '82 code.

25        Q.    And yet you're saying that the 2006 code

1   does supersede the 1994 code?

2        A.    That is the way the code is written.  And

3   that is why I read to you the paragraph on existing

4   buildings.

5        Q.    Have you ever seen in your analysis of

6   suite 303 a building permit for that space?

7        A.    I would not see it in the normal course of

8   my work.  I don't see building permits.

9        Q.    Okay.  So you don't know when the last

10  alteration of that space was?

11       A.    Not true.  I do have an idea of when that

12  was.  That last alteration took place -- I just had

13  this conversation -- in between Christmas and New

14  Year's of 2007, I believe.

15       Q.    But you don't have a building permit for

16  that, correct?

17       A.    I would not see a building permit for

18  that.

19       Q.    Now, you had all of this analysis -- well,

20  let's see here.  When did you first become aware of

21  the -- the issue with the 100-feet egress in suite

22  303?

23       A.    I would have to go back to the exhibit.

24  But the dates on the exhibit would be the dates

25  consistent with when I first became aware of that