1    issue.

2         Q.    And what exhibit are you referring to?

3         A.    The two exhibits -- one exhibit that Mr.

4    Payne just introduced and the exhibit that you

5    introduced as well relative to the floor plan.  I

6    think it's Exhibit --

7              MR. PAYNE:  I think it's Exhibit 17.

8              THE WITNESS:  17?

9         Q.    (By Mr. Gordon)  I see.

10        A.    There are dates on that exhibit and that

11   would coincide of when I became aware of that issue.

12        Q.    Okay.  Were you aware of the request from

13   the tenant to obtain some written verification from

14   the city confirming that this space was compliant?

15        A.    No.  I was not aware of that until I heard

16   it yesterday.

17        Q.    Okay.  Fair enough.  Now, in -- you've

18   indicated that the back alleyway is a public way,

19   correct?

20        A.    May I try to give some foundation for that

21   to answer your question?

22        Q.    Yes.  If you need to clarify, that's fine.

23        A.    If that's all right.  It is a public way

24   but the property actually is owned by Mr. Tozier.  It

25   was part of the -- now, I don't know that.  I have to

1    back up.  I don't know that that's the case.

2              It is a public way and I do know that it

3    is privately owned.  It is full of utilities.  All of

4    those utilities were there before the Gateway ever

5    started because all of the buildings to the west of

6    that -- of the right-of-way were built prior to the

7    Gateway being built.

8         Q.    And you were aware of their existence when

9    you were drawing in 1994?

10        A.    Correct.

11        Q.    Can you pull out Number 7, Exhibit Number

12   7?

13        A.    Okay.

14        Q.    If you can look down on -- it's marked on

15   the bottom of the first page, public way.

16        A.    Uh-huh (affirmative).  I see it.

17        Q.    Can you, please, read that for me?

18        A.    You bet.  Public way, any street, alley or

19   similar parcel of land essentially unobstructed from

20   the ground to sky which is deeded, dedicated or

21   otherwise permanently appropriated to the public for

22   the public use and having a fair width of not less

23   than ten feet.

24        Q.    And if you can now pull -- I just had it,

25   I've got a lot of exhibits here -- what is marked as

1    Exhibit Number 6.  And --

2         A.    The last page where he refers to ten feet?

3         Q.    Yes.  Well, it would be --

4         A.    Next to the last page.

5         Q.    I'm just going to refer to the picture --

6    the picture on point number 3, it's the picture that

7    says exit stairs and power box constrict exit court

8    width.  Okay?

9         A.    Yes.

10        Q.    Now, if this is indeed a public way, is it

11   your testimony that -- well, does this represent an

12   accurate condition of the alleyway presently?

13        A.    It shows that condition in one direction

14   only.  The alleyway goes all the way through.

15        Q.    If you'll turn back one page, there's

16   another picture that shoots back the other direction,

17   the bottom one.  Does that -- and you agree that

18   shows an accurate depiction of what this alleyway

19   looks like presently?

20        A.    It does.

21        Q.    And if it's a public way, it would require

22   ten feet ground to sky with clear width of ten feet,

23   correct?

24        A.    Correct.

25        Q.    And that alleyway does not comply with

1    that, correct?

2         A.    It does not.

3         Q.    Thank you.

4               MR. GORDON:  Let's see if I've missed

5    anything.

6               No further questions, Your Honor.

7               THE COURT:  Any redirect, Mr. Payne?

8               MR. PAYNE:  Just a little bit, Your Honor.

9

10                   REDIRECT EXAMINATION

11   BY MR. PAYNE:

12        Q.    Mr. Cooper, the alleyway that you just

13   were discussing that is less than ten feet wide, was

14   that in existence prior to the time that the Gateway

15   Center was built on top of the preexisting parking

16   structure?

17        A.    Yes.  Everything in that photograph -- in

18   both of those photographs I just commented on

19   existed, with the exception of one stair, prior to

20   the Gateway and are owned and operated by people

21   other than Gateway.

22        Q.    Okay.  And when the Gateway building was

23   constructed, did Park City require any conditions

24   with respect to widening that space, that alleyway?

25        A.    They did not.  The discussion was that

1    there are two means of egress out of the alley, that

2    the obstructions were controlled by and maintained by

3    other property owners.  I remember this discussion

4    quite well, actually.  And it was not under -- it was

5    not required by us to move those utilities, exit

6    stairs, et cetera, reconfigure it.

7                 MR. PAYNE:  No further questions.

8                 THE COURT:  You may step down, Mr. Cooper.

9                 Did you have an appointment this

10   afternoon, Mr. Gordon?

11                MR. GORDON:  I'm okay.

12                THE COURT:  Okay.

13                MR. GORDON:  (Inaudible.)

14                MR. PAYNE:  Your Honor, I would like to

15   just briefly re-call Mr. Paul Piper for just one or

16   two questions.

17                MR. GORDON:  Your Honor, I would object to

18   that.  We were told that we were only going to deal

19   with the expert today.  And the reason I would be

20   concerned about that is that obviously in this

21   proceeding none of the witnesses have had the benefit

22   of hearing one another's testimony.  Mr. Piper was

23   put on the stand yesterday.  He did hear testimony

24   and gave testimony.  My clients did not have that

25   same privilege of being able to go home and think

1   about it and come back on a redirect.  And so I would

2   object to re-calling him.  As we closed yesterday, my

3   understanding was we were only going to deal with the

4   expert and then move forward.

5            THE COURT:  What's the purpose for calling

6   Mr. Piper?

7            MR. PAYNE:  Your Honor, it's simple.

8   Maybe we don't need to do it if we can get agreement

9   of counsel.

10           There was some testimony yesterday that

11  the post petition rent payments were current through

12  the time that the lease was deemed rejected.  And I

13  think Mr. Piper was going to testify very briefly as

14  to that.  We just don't want to be bound on that

15  issue with respect to a potential future

16  administrative claim.  If that's not going to be a

17  part of --

18           THE COURT:  Well, if I don't rule on --

19  the intent of my ruling yesterday when you raised the

20  objection to the evidence regarding CAM charges that

21  I didn't accept evidence on was that --

22           MR. PAYNE:  Right.

23           THE COURT:  -- this hearing wasn't going

24  to address the issue of the amount of lease payments

25  or whether lease payments were current, so --

1              MR. PAYNE:  Okay.

2              THE COURT:  And I'll tell you whatever

3    ruling I'll make, and I'll make it clear on the

4    record, that I intend to limit the ruling to the

5    objection that was filed and -- consistent with my

6    ruling yesterday, I don't think the objection that

7    was filed put into issue the amount of the lease.

8              MR. PAYNE:  Thank you.  I just wanted

9    to -- out of an abundance of caution on that point,

10   but that -- we do not wish to call Mr. Piper.

11             THE COURT:  All right.

12             MR. PAYNE:  And that's -- that is all of

13   the evidence that we have, Your Honor.

14             THE COURT:  All right.  The Court will

15   take just a brief recess, maybe five minutes, and

16   then oral argument.

17             MR. GORDON:  Yes, Your Honor.  Thank you.

18             THE COURT:  Court is in recess.

19             THE CLERK:  All arise.

20   (Recess.)

21             THE CLERK:  All arise.

22             The court resumes its session.

23             Please be seated.

24             THE COURT:  All right.  Mr. Gordon.

25             MR. GORDON:  Yes.  Your Honor, the issue

1    before the Court today is whether the established

2    safety code violations within the Gateway Center rise

3    to the level of a breach of a warranty of

4    inhabitability or a breach of the covenant of quiet

5    enjoyment within the lease.

6              The evidence establishes the safety

7    code -- that safety code violations exist within the

8    building confirmed by Summit Engineering, Park City

9    building department and the opposing side's expert.

10             The evidence shows that the landlord has

11   been put on notice of the violations for many months

12   and that little has been done to remediate them.

13             Testimony from Bill Shoaf establishes that

14   his employees were pulled out of the space due to

15   concerns for their safety and due to an unknown risk

16   to assume the liability should a disaster occur.

17             The landlord argues that the violations

18   are minor and that the tenant should be required to

19   assume the liability for the violations.

20             The law does not require the tenant to do

21   so and firmly establishes that the safety code

22   violations that have gone unremediated constitute a

23   breach of the lease.

24             It is critical that the Court understand

25   that Gateway's allegations that Easy Street has

1    fabricated these claims to get out of the lease are

2    false.  The claims have been confirmed by Park City

3    building department.  The discovery of the problems

4    was a natural progression stemming from the initial

5    UOSH inspection.

6              When the city refused to put in writing

7    that the space was compliant, it left the tenant with

8    no choice but to vacate the premises to keep its

9    employees safe.

10             The discovery of no building permit, which

11   was being sought to get something in writing from the

12   city that the space was safe, and the further

13   discovery of no building plans raised additional

14   questions.

15             The only thing on record was the parking

16   garage plat, and that had obvious problems that led

17   to the discovery of the items included in the Park

18   City letter.

19             The question before the Court is this:

20   Why should the tenant be forced to assume the

21   liability and risk of these violations?  Case law

22   establishes that it should not be made to do so.

23             There are two theories under which this

24   Court can hold that the lease has been breached.  The

25   first is a warranty -- a breach of the warranty of

1    inhabitability.

2              In Richard Barton Enterprises v. Tsern,

3    which we have included in our brief, Your Honor, the

4    Utah Supreme Court stated that in order to prove a

5    breach of the warranty of inhabitability, the breach

6    much be material or significant, defined as follows:

7    Not minor, not temporary, must have an effect on the

8    essential objectives of the lease, meaning it cannot

9    have a peripheral effect, it must have a significant

10   impact on the lessee.

11             In looking at that issue, in determining

12   this, the Court must look at the purpose for which

13   the lease was entered and determine if that purpose

14   has been frustrated.

15             And the Court indicated that a good

16   indicator of this is whether the breach reduces the

17   value of the lease.

18             I will walk through that analysis, Your

19   Honor.

20             The first, these violations are major.

21   Case law establishes that in examining breaches of

22   the warning of inhabitability safety is paramount.

23             In Wade v. Jobe, which we cited in our

24   brief, it states:  Substantial compliance with

25   building and housing code standards will generally

1  serve as evidence of the fulfillment of the

2  landlord's duty to provide habitable premises.

3  Evidence of violations involving health and safety by

4  contrast -- let me read that again.  Evidence of

5  violations involving health and safety by contrast

6  will often sustain the tenant's claims.

7          Within that case the Court gives some

8  examples of what it considers minor deficiencies

9  stating malfunction of venetian blinds, minor water

10 leaks or wall cracks or in need of paint.

11         You will note that the Court did not

12 involve -- none of these minor deficiencies involve

13 anything to do with safety, which the Court said was

14 a different analysis.

15         And (inaudible) v. St. Peter, which was

16 cited in the case, that states:  In determining

17 whether there has been a breach of the implied

18 warranty of inhabitability, the courts may first look

19 to any relevant local or municipal housing code.

20 They may also make reference to the minimum housing

21 code standards.

22         A substantial violation of an applicable

23 housing code shall constitute prima facie evidence

24 that there has been a breach of a warranty of

25 inhabitability.

1              One or two minor violations standing

2     alone -- and this part is critical -- which do not

3     affect the health or safety of the tenant -- once

4     again carving out this area of health and safety --

5     shall be considered de minimis and not a breach of

6     the warranty.

7              There is no such thing, and case law

8     establishes this, as a minor violation of a safety

9     code.  Why?  Because every safety violation has a

10    possibility of resulting in catastrophic result.  The

11    codes are absolute minimums.  If you don't meet the

12    code, it is, per se, unsafe.

13             What may seem like inches in a normal

14    situation becomes a difference between serious injury

15    and death in an emergency.

16             Just because the chance of -- the chance

17    of injury is remote does not mean the violation is

18    minor.  It is the potential for injury that should be

19    focused on.  And in the analysis, the case law

20    establishes that safety is paramount.

21             It should be noted that under the lease,

22    Your Honor, the tenant is required to do any tenant

23    improvements in accordance with all local codes.

24    That's paragraph 10-A.

25             If the tenant improved its space not in

1    accordance with local codes, I don't think the

2    landlord would deem this a minor violation.  Why?

3    Because that would -- they would not want to assume

4    the potential liability of that violation.

5             And the same is true here for the

6    landlord.  How can anyone tell Easy Street that the

7    possibility of severe injury to its employers -- or

8    its employees is a minor thing?

9             Further evidence that these are not minor,

10   Your Honor, is the Park City building department will

11   require that all of these issues be fixed, meaning

12   that the city -- meaning that to the city they are

13   not minor either, they are going to require them to

14   be fixed.

15            Moving to the next standard, Your Honor,

16   the violations are not temporary.  A temporary

17   violation would be something like a loss of power, a

18   flood, an atrocious smell, something that comes and

19   goes.  These violations are obviously not that.

20            The west exit stairway is built of

21   concrete, and you've heard testimony, has existed for

22   many, many years.

23            The back alleyway contains tripping

24   hazards and a power box.

25            I don't think there's any dispute that

1   these are of a permanent nature.

2              The next level is do these affect the

3   essential purpose of the lease?

4              The purpose of the lease was to operate an

5   office.  No one has been in area 2 for almost a year.

6   You've heard testimony on that.  And the rest of the

7   space was -- of the employees was pulled out of area

8   1 back in November.

9              The questions about safety, Your Honor --

10  and you've heard testimony -- this is very

11  important -- that my client was put in a no-win

12  situation.  They were asking for someone, please, to

13  give them something from the city saying their space

14  was compliant.  And it's taken a full year to get

15  that letter, and that did not come from the landlord.

16             The next step is significant impact on the

17  tenant.  Has this had -- have the violations had

18  that?

19             And there's two parts under that.  Has the

20  purpose of the lease been frustrated?

21             Well, as stated above, they haven't been

22  in the space, a portion of it for over a year and for

23  all of it for the past four or five months.  They

24  haven't been able to use space at all entirely, you

25  know, in frustrating it.

1           Has the breach affected the value of the

2     lease?

3           The question here, Your Honor, is who in

4     the world would lease this space knowing that it's

5     noncompliant?

6           This lease at this point is unassignable

7     based on the situation of that building.  Until these

8     issues get resolved, these would have to be

9     disclosed.  And so right now that lease has no value

10    to my client.  And that's one of the major

11    determinations in trying to determine if a violation

12    of the warranty of inhabitability has been -- has

13    occurred.

14          Under the second theory, Your Honor, under

15    breach of the covenant of quiet enjoyment, the lease

16    does contain that covenant.  And the covenant is

17    basically stating that the landlord will not

18    interfere with the proposed use of the tenant.

19          In Thirteenth versus Nelson -- that's also

20    a case that we have cited in our brief, Your Honor --

21    it establishes that a failure to act constitutes a

22    breach of the covenant.  The failure to do some act

23    or to adequately perform it may render a building

24    just as untenable as affirmative interference.

25          It also states that we don't have to prove

1     an intent to oust.  An attempt to evict may be

2     implied whenever the landlord's conduct substantially

3     deprives the tenant of the use of the premises.

4               We've also cited to the case (inaudible)

5     v. Peoples National Bank of Washington in our brief,

6     Your Honor.  In this case there was a wall in the

7     building that was unsafe, the landlord refused to

8     fix.  The Court stated that the lessor has a duty to

9     make repairs when they are mandated by a public

10    authority, which we have in this case.

11              Second, the Court said that even absent

12    public authority, the landlord has a duty to maintain

13    the premises in a manner that is safe for occupancy

14    for both the tenant and its invitees.

15              The Court held that the failure to fix the

16    wall was a violation of the covenant and constituted

17    constructive eviction and therefore a breach of the

18    covenant of quiet enjoyment.

19              Based on that analysis, Your Honor, the

20    question is what did the landlord fail to do?  It's

21    really a failure to act that we are talking about

22    here, which is a breach of this covenant.

23              The landlord has failed to fix the

24    violations.  And it's clear that they were put on

25    notice and have been for many months and nothing has

1   been done.

2          They failed to approach the city over a

3   year ago and obtain documentation confirming that the

4   lease space was safe, which seems to be a simple

5   thing and a simple request from tenant.

6          Both of these constitute a constructive

7   eviction and thus a violation of the covenant of

8   quiet enjoyment.

9          And you've also heard testimony that there

10  were -- that the space was abandoned due to the

11  failure to act.

12         I will close, Your Honor, in an analogy.

13  I've thought a lot about this case.  It's similar

14  to -- if any of us went and bought a brand new car,

15  Your Honor, with full written and implied warranties

16  that the car meets safety standards.  After a year of

17  driving the car, we find out through a mechanic that

18  the air bags are missing and that the antilock brakes

19  haven't been installed properly and wouldn't

20  potentially work in an emergency situation.

21         After knowing this, there's two questions:

22  Is the car functional?  Which I think is what the

23  opposing side is going to argue.  Yes, it's

24  functional.  Yes, it will get me around town.

25         Is it safe?  Absolutely not.  Don't hit

1     the brakes too hard because if you do, you're going

2     to be in serious trouble.

3                 The safety code violations are created,

4     Your Honor, to protect against the worst case

5     scenario.  This is an issue about safety.

6                 You wouldn't certainly keep driving the

7     car once you knew about those types of violations.

8     And you certainly wouldn't let people that you know

9     drive the car.

10                My client was put in that same situation,

11    and has been for the last year.  He's been asking for

12    certification from the city and never received it.

13    Has been putting them on notice for months and months

14    and nothing has occurred.  He had no choice but to

15    withdraw his people based on safety concerns that

16    have proven to be legitimate.

17                Park City building department confirmed

18    that these issues are real and that my client was

19    wise in pulling his people out of the space when he

20    did.

21                Based on that, Your Honor, we would submit

22    that the evidence supports a finding that there has

23    been a breach of both the warranty of inhabitability

24    and the covenant of quiet enjoyment.  And based on

25    that, there is no further obligation under the lease

1    to pay rent.

2              MR. PAYNE:   Your Honor, if it please the

3    Court.  This is an interesting case.  There is a long

4    history between the parties.  But I don't believe

5    it's quite as has been characterized by my opponent

6    here today.

7              The notice that my client first received

8    in writing from Mr. Gordon referred to one alleged

9    safety violation.  That was the 100-foot ingress,

10   egress alleged violation.  That was in April of 2009.

11             The testimony was -- from Mr. Shoaf

12   himself, was that Arrin Holt of Mr. Cooper's

13   architecture firm, another principal in that firm,

14   physically measured that space a couple of different

15   ways and one of the ways he measured it was -- where

16   he did not take right angles but took a more natural

17   course, and he indicated that it was less than 100

18   feet and that the space was compliant.

19             Notwithstanding that, the tenant for

20   whatever reason wrote a letter to UDOT (sic), filed a

21   complaint with UDOT (sic) asking them to find a

22   violation.  And they came back and said this isn't in

23   UOSH's -- UOSH's purview.

24             They also -- it's also interesting that

25   the testimony from Mr. Shoaf was that -- and what's

1   indicated in the reply brief, is that they became

2   aware of problems with safety in the space, in this

3   100-foot ingress, egress as a result of the UOSH or

4   OSHA inspection in the fall of 2008.

5           And the reply brief expressly states that

6   -- on page 7 -- Partners would not have signed the

7   lease had it known of the safety violations.  Once

8   the safety violations became apparent, coupled with

9   Gateway's refusal to remedy the problem, Partners was

10  trapped.

11          Well, that's simply not true at the time

12  Partners signed the document legally obligating

13  itself on the space.  The inspection happened two or

14  three months earlier.

15          Furthermore, if you look at the UOSH

16  inspection, there's nothing in that inspection that

17  expressly -- clearly refers to the space at issue

18  here.

19          And furthermore, what was pointed out by

20  the human resources director for Easy Street was

21  simply a sign above an exit.  There was nothing about

22  100 feet ingress and egress.

23          So it simply doesn't add up.  And it does

24  appear to be a case where they keep throwing things

25  out trying to find an excuse, something that would

1      get them out of a lease, maybe help them in some

2      negotiating position, is what it really appears to

3      be.

4              In the fall of last year, Mr. Gordon sent

5      a couple more letters to my client.

6              In September he sent a letter that, again,

7      referred to the 100-foot ingress and egress.  It also

8      referred to ADA issues in connection with the parking

9      garage.  In October, another letter.  100 foot, ADA

10     issues.

11             The ADA parking issue has been resolved.

12             Most of the issues that we've been dealing

13     with the last couple of days here, Your Honor, are

14     issues that were raised for the first time in a

15     letter that Mr. Gordon sent in February of this year

16     and to which he attached the Michael Johnston Summit

17     Engineering report.

18             If I may point out, that is after the

19     lease had been rejected by operation of law.  They

20     didn't take any action to try to reject this lease

21     early.  Instead, they let it go.  And then after the

22     proof of claim's filed, then we get this letter that

23     says, oh, by the way, here are these other alleged

24     violations.

25             I think the testimony and evidence shows

1    that nearly all of the matters raised -- if not all

2    in Mr. Johnston's report, are not really violations.

3            Mr. Cooper testified and read sections

4    from the building code indicating that as a general

5    rule, modifications to prior building codes -- excuse

6    me -- that modifications to existing structures do

7    not require compliance with the current building

8    code.  They are basically a preexisting condition

9    exclusion.  And further, that if there's another

10   change in building code subsequent that makes

11   something less stringent and if the building complies

12   with that, then that's all right.  And that's what

13   this case is with respect to the area of refuge.

14           So we do not believe there are any

15   material, substantial building violations.  And

16   certainly if there were, the ones that are identified

17   in the Johnston report, those were only made aware to

18   my client -- those were made known to my client in

19   late February after the lease had been deemed

20   rejected, not while the debtor was occupying the

21   space.

22           With respect to the debtor's occupancy of

23   the space, Mr. Piper's testimony was they did not

24   vacate the space.  There were still people in all

25   areas of the space up through January of this year.

1          The kitchen, conference room, were all in

2     the area that was identified as area 2.  And there

3     were things stored in there as well.  And the other

4     part of the space was being actively used.

5          With respect to the 100-foot travel or

6     path of egress, Your Honor, I think that the evidence

7     is clear that right angles are not required.  The

8     comments to the building code themselves indicate a

9     more natural path.  That was something that was

10    communicated.  Mr. Shoaf admitted that he was told by

11    the architects that that was how they measured and

12    they believed the space was compliant.  So that's

13    really not an issue.

14         I think that the law on this point, Your

15    Honor, is -- in Utah, does not justify them being

16    excused from their obligations to pay rent under the

17    lease.

18         In the Richard Barton Enterprises versus

19    Tsern case, the Court there did recognize an implied

20    covenant of inhabitability with respect to commercial

21    leases.

22         However, the specific facts of that case

23    were that in the lease itself, one of the expressed

24    conditions was that the lessor, landlord, would

25    repair an elevator that was essential to the tenant,

1    which was an antique dealer's operation, because they

2    needed to take things up to the second floor that had

3    a higher ceiling to store large items.

4              We do not believe that there's -- there's

5    no evidence of any significant inducement in

6    connection with this case that -- similar to that

7    one.

8              With respect to safety issues, Your Honor,

9    I think that the best evidence of that, besides

10   Mr. Cooper's testimony, who is a very experienced

11   architect, is in Exhibit 5 where -- even -- going

12   through concerns here, and also noting that no notice

13   of violations had been issued as of April 10th,

14   Mr. Kurt Simister, who is the senior inspector for

15   the Park City building department, says, in

16   conclusion, I believe the space occupied by Mr. Shoaf

17   is safe to occupy.

18             I believe the space occupied by Mr. Shoaf

19   is safe to occupy.

20             This here is the public official whose job

21   it is to enforce the code who says, well, there may

22   be some violations, but it's safe.

23             Mr. Cooper's testimony was that many of

24   the things here identified as violations are not

25   because of this exclusion that -- that's (inaudible)

1    in the Utah Administrative Code -- that we pointed

2    the Court to -- adopted in 2007 that says if it's a

3    fully sprinkled building, it does not need an area of

4    refuge.

5          And most of the items identified in the

6    Johnston report and some of the items that are listed

7    in this letter fall into that category.

8          But there is simply no evidence, Your

9    Honor, or no credible evidence, we think, that there

10    is a problem with safety in occupying this space.

11    The Park City building inspector has weighed in and

12    he's weighed in heavily to the contrary, Your Honor.

13          With respect to the covenant of quiet

14    enjoyment and the constructive eviction, the case law

15    we cite in our papers indicates that basically the

16    tenant has to be driven out.

17          Here the claim is they were driven out

18    because they thought that there was some violation,

19    even though an architecture firm told them no

20    problem.  Even though the city would not say there

21    was a problem.  They pleaded with UOSH to tell them

22    there was a problem.  UOSH did not tell them that

23    there was a problem.  It said that's not our area.

24          And then they wait until after the lease

25    is deemed rejected and come up with something and

1    say, oh, here we have these violations.

2           Well, number one, I think that the law

3    typically requires that a landlord be given a

4    reasonable opportunity to cure a defect, unless it's

5    an extremely imminent health and safety hazard.  And

6    number two, this case is distinguishable from the

7    other cases that are cited by them in their brief.

8           This is simply not a case where they've

9    been deprived of the use of the space.  The evidence

10   is they have been using -- did use the space up

11   through about the time that it was deemed rejected.

12   And the evidence is also that there's just been a

13   series of attempts to come up with alleged

14   violations.

15          We think it's not well founded, we think

16   the lease should be enforced according to its terms,

17   and we ask the Court to overrule the objection to the

18   claim.

19                THE COURT:  Okay.  Anything further?

20                MR. GORDON:  No.  I think we're good, Your

21   Honor.

22                THE COURT:  All right.  I'm going to take

23   a recess.  It might be a few minutes, but I will be

24   back.

25                MR. GORDON:  Thank you, Your Honor.

1              THE CLERK:  All arise.

2    (Recess.)

3              THE CLERK:  All arise.

4              Court resumes its session.

5              Please be seated.

6              THE COURT:  The matter before the Court is

7    Easy Street Partners, LLC's objection to proofs of

8    claim filed by Gateway Center, LLC.

9              The relief requested in the objection and

10   the Court's ruling will be limited to this relief

11   requested.

12             It's stated as follows:  By this

13   objection, Partners, A, objects to the initial

14   Gateway claim which was amended and superseded by the

15   Gateway claim and the Gateway claim on the ground

16   that the landlord breached the implied warranty of

17   habitability and the covenant of quiet enjoyment

18   under the lease, and, B, seeks entry of an order

19   disallowing and expunging the initial Gateway claim

20   and the Gateway claim.

21             The basis for arguing that the landlord,

22   Gateway, has breached the implied warranty of

23   habitability and the covenant of quiet enjoyment is

24   essentially code violations.

25             The issue of alleged code violations began

1    in approximately April of 2009 regarding a dispute

2    over whether the premises had two divergent paths of

3    egress within a 100-foot egress requirement.

4            That issue was raised again specifically

5    in September of 2009.  And at that time there was

6    additionally an issue raised about noncompliance with

7    certain ADA requirements in the parking premises.

8            Those same issues were raised again in

9    October of 2009.

10           Most of the issues argued, which are code

11   violations, were raised in a letter of February 2010

12   and were based on a report prepared by Michael

13   Johnston dated January 13, 2010.

14           The Court notes that this date of this

15   report and the date of Mr. Johnston's -- excuse me,

16   the report and the letter of February postdate the

17   deadline for the debtor to assume or reject leases

18   and the lease had been rejected by operation of law.

19           The issues in dispute are raised by

20   Mr. Johnston's -- in addition to the 100-foot issue

21   is what I'll refer to it as, the egress issue, are

22   raised in Mr. Johnston's report and relate to an east

23   exit stairway and issues relating to the area of

24   refuge there, pathway to the area of refuge in the

25   parking level B-2, specifically with respect to a

1    four-inch-high curb requiring a ramp, a storage of

2    trash or maintenance items in certain stairwells, and

3    failure to have a two-way emergency communication

4    system in an area of refuge.  And with respect to the

5    west exit stairway and exit discharge, that the

6    stairwell landing and the width of the stairwell are

7    noncompliant.

8          Mr. Johnston also raised an issue with

9    respect to the exit court, concluding that the exit

10   court was not with the -- did not comply with the

11   required width.

12         Finally, Mr. Johnston raised -- well, not

13   finally.  He also raised an issue with adjacent

14   buildings not fire rated.  And then finally, certain

15   access issues with respect to the central elevator

16   and the exit corridor.

17         Based on his report and his opinion,

18   Mr. Johnston concluded that these were code

19   violations per the 1994 Uniform Building Code.

20         The similar issues were also addressed by

21   Park City in a letter from Kurt Simister to Kim T.

22   Solinger, which has been marked as Exhibit --

23   Debtor's Exhibit Number 5.

24         The landlord, Gateway, expert Mr. Cooper

25   testified with respect to each of the issues raised

1    in Mr. Johnston's report and disagreed with the

2    conclusions of Mr. Johnston, specifically with

3    respect to the east exit stairway and the area of

4    refuge.

5            Mr. Cooper testified that under the

6    existing codes, this area of refuge is compliant

7    because the building is -- has an automatic

8    sprinkling system.

9            He acknowledged that the area -- the

10   parking area on level B-2 with the four-inch-high

11   curb should have a ramp.

12           The area of refuge and storage of

13   materials have been remedied.

14           That the two-way emergency communication

15   system is not required because the area of refuge is

16   not required.

17           And testified that the west exit stairway

18   and exit discharge were -- the original drawings were

19   to provide for a 44-inch exit, but the stairway

20   remains as originally constructed at 36 inches.

21           He testified that the exit court is not an

22   exit court but is a public right-of-way and that the

23   adjacent buildings are not fire rated -- that are not

24   fire rated are not under the control of the debtor.

25           Finally, he testified that the issues

1    relating to the central elevator and exit corridors

2    had been remedied.

3              The evidence is that there are conflicting

4    expert reports.

5              The Court finds of particular value, given

6    the conflict of the expert opinions, the letter from

7    Park City dated April 8th, 2010, which is Exhibit

8    Number 5.

9              First paragraph numbered 1 of that letter

10   addresses the 100-foot egress issue.

11             Mr. Simister in that letter states that he

12   personally measured the travel distance at 97 feet.

13             He further concluded that the 1994 Uniform

14   Building Code limits travel distance through the area

15   at 100 feet, that all tenants have access to one of

16   the enclosed stairways that comply with this

17   requirement.

18             He further noted that section 1003.4

19   allows 150-feet travel distance because the building

20   has an automatic fire sprinkler system.

21             Based on this letter and the conflicting

22   testimony of the experts, the Court cannot find that

23   the building fails to comply.  In fact, the evidence

24   is that there is -- that the building does comply

25   with respect to the 100-foot easement -- excuse me,

1   egress requirement.

2             The second matter raised in the Park City

3   letter is the area of refuge on level 3 is

4   obstructed, but knows that compliance can be achieved

5   by changing the hinge side of the door.

6             Paragraph 3 of the Park City letter states

7   that all areas of the refuge shown on the drawings

8   require instructions with approved signage.

9             The drawings -- I assume, he's referring

10  to the original drawings.

11            Paragraph 4, parking level B-2 has a step

12  of four inches in height and that section 1001.4

13  requires a ramp.

14            Number 5, the area of refuge at parking

15  level B-2 located within the enclosed stairs had

16  storage that was in violation of the building codes

17  and fire code but has been removed.

18            Number 6, the existing -- the exiting from

19  the west stairway to the exterior of the building was

20  not constructed as per the approved plans and shows

21  the drawing showing a width of 44 inches and the

22  constructed width is 36 inches.

23            Paragraph 7, the west exit area is not an

24  exit court, which states that an exit court is

25  bounded on three sides.  The area is open to the --

1    on the north and south ends.  The walk area must be

2    maintained to eliminate any trip hazards that lead

3    the public away -- excuse me, that lead to the public

4    way.

5              Finally, the central elevators had

6    handicapped parking.  He reviewed the approved plan

7    and the configuration of the parking stalls has been

8    rearranged without building department approval.  And

9    that the parking is located as per the approved

10   plans, the railing will not block the accessible

11   route to the elevators.

12             Based on the expert opinion rendered by

13   Mr. Cooper, there is, in his opinion, questions

14   whether -- in fact, he believes there are no

15   violations other than the ramp and the improper

16   storage.

17             There was testimony regarding the west

18   stairway exit.

19             The Court's conclusion from that evidence

20   is that the building, the stairway exit was

21   originally constructed in compliance with the 1982

22   code.

23             The drawings for the construction in 1994

24   indicated a 44-inch-wide stairway, which was not

25   constructed, but it may not have been required to be

1    constructed.

2           Therefore, based on the evidence before

3    it, the Court makes the following findings:  There is

4    no violation or code violation with respect to the

5    100-foot egress requirement.  There is a question,

6    and in Mr. Cooper's opinion the refuge -- area of

7    refuge on level 3 is not a violation of the current

8    code.

9           There has been no citation issued by Park

10   City or any other public entity indicating or stating

11   that this is not in compliance -- the area of refuge

12   is not in compliance with the code.

13          The areas of refuge do not have signage as

14   the drawings require.  But, again, there is no formal

15   citation other than an indication -- a general

16   indication by Park City that they will be contacting

17   the building owner to issue a notice of violations.

18          Parking level B-2 with the ramp appears to

19   not be an issue in dispute, that there should be a

20   ramp in that location.

21          The violation of improper storage has been

22   remedied.

23          The issue with respect to the west

24   stairway and the exit and the width of the exit is,

25   at best, in dispute and there is no violation that --

1   citation that has been issued by Park City or any

2   other public entity.

3            The Court concludes that the west exit

4   area is not an exit court and that there is no

5   violation with respect to the exit area.

6            The central elevators and handicapped

7   parking, Mr. Cooper's testimony is that those issues

8   have been remedied.

9            So in summary, the Court, number one,

10  finds that there are no citations that have been

11  issued by Park City.

12           The Court finds that the only possible

13  violations -- well, I shouldn't say only possible,

14  but the only reasonable violations based on the

15  evidence are the area of refuge on level 3, the

16  signage on the areas of refuge, the ramp on parking

17  level B-2, and the issue respecting the width of the

18  exit of the west stairway.  So violations are limited

19  to those four -- potential violations are limited to

20  those four.

21           The -- I think I can -- I think those are

22  my factual findings.

23           Now, the argument by the debtor is that

24  the code violations rise to a level of the breach of

25  implied warranty of habitability or the covenant of

1   quiet enjoyment.

2           Debtor's counsel noted in closing

3   arguments that there is no building permit.  The

4   Court finds that is not the evidence.  The evidence

5   is that a building permit was requested but was not

6   provided.  That's not evidence that there is no

7   building permit.

8           The violations -- the only violation that

9   was raised prior to the rejection of this lease,

10  which was a safety issue -- the ADA issue the Court

11  finds is not a safety issue.  So the ramp on the

12  parking structure, on the four-inch step is -- I

13  don't see how that's a safety issue.

14          The 100-foot egress alleged violation was

15  raised, but the Court has found that there is no

16  violation with respect to that alleged violation.

17          All of the other issues were raised after

18  the debtor had vacated the premises and prior to any

19  citations, prior to giving the landlord a reasonable

20  opportunity to cure any of the violations.

21          And the debtor argues that the violations

22  raise substantial or significant safety concerns.

23          The Court doesn't believe that the

24  violations that it has identified that are the only

25  remaining potential violations raise significant

1    safety concerns.

2         That fact is, in fact, borne out by

3    Mr. Simister's conclusion where he states, I believe

4    the space occupied by Mr. Shoaf is safe to occupy.

5         Debtor's argument asks this Court to

6    essentially hold that any time a tenant can find or

7    identify a code violation that raises a safety issue

8    or a potential safety issue, that the tenant may

9    essentially void the lease.

10         Any code violation poses a potential

11   health or safety risk.  That's why we have codes.

12         Mr. Cooper testified in his expert

13   capacity -- and if it's not -- it may not be quite to

14   the level of judicial notice, but it's not surprising

15   that Mr. Cooper stated that any building has some

16   code violations.

17         The other problem that the Court has with

18   accepting the argument that these code violations --

19   alleged code violations allow the tenant to avoid the

20   lease is that that position would clearly undermine

21   the validity and parties' contracts to enter into

22   lease agreements, not to mention that it is

23   inconsistent with Utah law.

24         The cases cited by the debtor are clearly

25   distinguishable from the present case.  In the

1    Carlisle v. Morgan case, the city had taken action

2    and actually had issued a notice of close to

3    occupancy because of numerous health code violations,

4    including plumbing leaks, cockroach and rodent

5    infestations, unsafe stairs, missing windows, glass

6    and smoke detectors.

7              In the Barton v. Tsern case, which the

8    debtor cites and relies on, the remedy, assuming

9    there had been breaches of the covenant of

10   habitability, is not to void a lease but to give the

11   landlord a reasonable opportunity to remedy those

12   breaches.  And if those are not remedied, an

13   abatement of rent may be appropriate.

14             The Wade v. Jobe case states that a breach

15   of warranty of habitability is not shown by evidence

16   of minor deficiencies.

17             And while the debtor's argument is that

18   these are major deficiencies, the Court finds that

19   the only deficiencies with which the Court believes

20   there is any remaining issue are minor.

21             And, secondly, the landlord was not given

22   an opportunity to, number one, address any of these

23   issues with the Park City building engineer and

24   planning department, for example, arguing or at least

25   asserting that the areas of refuge are compliant

1    under the 2006 code.

2         Therefore, based on the evidence before it

3    and the applicable case law, the Court finds that

4    there are not grounds for the Court to find that

5    Gateway has breached the implied warranty of

6    habitability and covenant of quiet enjoyment.  And

7    the objection to the claim with respect to that issue

8    is overruled and denied.

9         The court is in recess.

10        THE CLERK:  All arise.

11   (Concluded at 3:28 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              <u>REPORTER'S CERTIFICATE</u>

2

3    STATE OF UTAH              )
                                ) ss.
4    COUNTY OF SALT LAKE        )

5

6         I, Robin Conk, Registered Professional
     Reporter, do hereby certify:

7

8         That on August 19, 2010, I produced a
     transcript from electronic media at the request of
     Douglas Payne;

9

10        That the testimony of all speakers was
     reported in stenotype and thereafter transcribed, and
11   that a full, true, and correct transcription of said
     testimony is set forth in the preceding pages,
12   according to my ability to hear and understand the
     tape provided;

13

          That the original transcript was sealed
14   and delivered to Douglas Payne for safekeeping.

15        I further certify that I am not kin or
     otherwise associated with any of the parties to said
16   cause of action and that I am not interested in the
     outcome thereof.

17

18        CERTIFIED this 19th day of August, 2010.

19

20

21

22   _____
          ROBIN CONK, RPR

23

24

25