# ORIGINAL TRANSCRIPT

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| In re:<br><br>EASY STREET HOLDING,<br>LLC,<br><br>  Debtor. | ) Transcript of<br>) Proceedings<br>)<br>)<br>)<br>)<br>)<br>) Bankruptcy Number<br>) 09-29905<br>) Judge Mosier |

April 27, 2010 - 1:32 p.m.

## TRANSCRIPT FROM ELECTRONIC RECORDING

Reporter:   Robin Conk, RPR

FILED IN THE
UNITED STATES
BANKRUPTCY COURT
2010 AUG 20  PM 3: 27
DISTRICT OF UTAH



# CITICOURT
### THE REPORTING GROUP

170 South Main Street, Suite 300
Salt Lake City, Utah 84101

PH: 801.532.3441   FAX: 801.532.3414   TOLL FREE: 877.532.3441

121

```
1                    A P P E A R A N C E S

2    FOR EASY STREET PARTNERS:

3            CORBIN B. GORDON
             Attorney at Law
4            345 West 600 South, #108
             Heber, Utah  84032
5            Tel:  435-657-0984

6            KENNETH L. CANNON, II
             DURHAM JONES AND PINEGAR
7            Attorney at Law
             111 East Broadway, #900
8            Salt Lake City, Utah  84111
             Tel:  801-415-3000
9

10   FOR GATEWAY CENTER:

11           DOUGLAS J. PAYNE
             FABIAN AND CLENDENIN
12           Attorney at Law
             215 South State Street, #1200
13           Salt Lake City, Utah  84111
             Tel:  801-531-8900
14

15

16

17

18

19

20

21

22

23

24

25
```

1

<u>I N D E X</u>

2 <u>WITNESS</u>                                                              <u>PAGE</u>

3        MICHAEL P. JOHNSTON

4            Direct examination by Mr. Gordon                    13
             Cross-examination by Mr. Payne                      32
5
         WILLIAM SHOAF
6
             Direct examination by Mr. Gordon                    39
7            Cross-examination by Mr. Payne                      69
             Redirect examination by Mr. Gordon                  77
8
         MARINA SOTO
9
             Direct examination by Mr. Gordon                    80
10           Cross-examination by Mr. Payne                      84

11       PAUL PIPER

12           Direct examination by Mr. Payne                     85
             Cross-examination by Mr. Gordon                    101
13           Redirect examination by Mr. Payne                  110

14

15

16

17

18

19

20

21

22

23

24

25

1

P R O C E E D I N G S

2

3          THE CLERK:  Please be seated.

4          This is in the matter of Easy Street

5  Holding, LLC.

6          THE COURT:  Will counsel, please, note

7  their appearances?

8          MR. CANNON:  Your Honor, Kenneth Cannon of

9  Durham, Jones and Pinegar, Corbin Gordon who is

10  special counsel to the debtors and will be handling

11  the hearing on behalf of Easy Street Partners, LLC,

12  debtor in possession.

13          MR. PAYNE:  Douglas Payne of Fabian and

14  Clendenin on behalf of Gateway Center, LLC.

15          THE COURT:  Counsel.

16          MR. GORDON:  Thank you, Your Honor.

17          We recognize that we've got some

18  scheduling things going on this afternoon, Your

19  Honor.  We will attempt to be as direct as possible

20  as we present the evidence today.

21          The procedural background to this matter

22  is as follows:  Easy Street Partners was lessee under

23  a lease for office space with Gateway Partners.

24          The partners had largely abandoned the

25  space by December of 2009.

1          On or about January 12, 2010, the lease

2  was deemed rejected.  The lease was current at the

3  time of its deemed rejection.

4          The landlord filed a claim for damages

5  from a rejection of the lease.

6          Partners believes that it should owe

7  nothing under the lease because of the landlord's

8  breaches of the lease.

9          And this hearing is on Partners' objection

10  to claim for rejection damages asserted by Gateway.

11          Your Honor, this is a case of profits over

12  safety.  The landlord, Gateway Center, was notified

13  of numerous safety violations over a 12-month period

14  and chose to ignore these violations in favor of

15  making profits over fixing the problems and

16  maintaining the safety of its tenants.

17          In contrast, Easy Street Partners, LLC,

18  knowing of the safety violations that came as a

19  result of an inspection performed by UOSH, the State

20  of Utah Labor Commission workplace and health

21  consultation, and then a subsequent independent

22  investigation by Summit Engineering, could not let

23  its employees work in a building where there were

24  safety code violations, specifically where those

25  safety code violations could result in serious injury

1    or death in a case of an emergency.

2            Working in a building with safety code

3    violations was not part of the bargain with the

4    landlord and the risk associated with such violations

5    should not be shifted to the tenant, Easy Street.

6            You're going to hear from two witnesses

7    today, Your Honor.  Depending on time, shortly from,

8    possibly, another one.

9            Mr. Shoaf, Easy Street -- manager of Easy

10   Street Partners, will testify that the UOSH

11   inspection raised the issue of his leased space

12   exceeding safety code for egress which states that a

13   person must reach an exit within 100 feet of any spot

14   in the rented space.

15           Shoaf will testify that over the next four

16   months he did everything in his power to address the

17   egress issue, including meeting with the city

18   building department, speaking with Phillip Hahn, an

19   expert he was referred to by the landlord, who told

20   him the space was noncompliant, several meetings with

21   the landlord's engineer, Aarin Holt, and finally

22   asking UOSH to take formal action, which it claimed

23   it had no jurisdiction to do.

24           The result was that the city would not put

25   in writing that his space was compliant, forcing Easy

1    Street to withdraw out of safety concerns.

2              Attempts to obtain a building permit on

3    the leased space led to additional discoveries of

4    safety violations that were later confirmed by Summit

5    Engineering and a recent inspection by Park City

6    building department.

7              Shoaf will testify that he did not go

8    looking for these violations, that the discovery of

9    violations arose while he was doing due diligence and

10   resolving the egress issue raised by UOSH.

11             He will testify he withdrew his employees

12   out of the space due to concern for their safety and

13   that he will not assume the liability of using the

14   space with the present violations.

15             Mike Johnston, from Summit Engineering,

16   will testify that he conducted an inspection and

17   created a report and his conclusions are that there

18   were numerous safety code violations that could

19   result in injury or death in an emergency situation

20   in the Gateway Center where the leased space is.

21             If there is time, Your Honor, we will have

22   Marina Soto, human resource director, testify that

23   the UOSH inspection was supposed to be initially on

24   the Gateway -- or on the Sky Lodge, which is across

25   the street from the leased space.  When the inspector

1    arrived, to everyone's surprise, he went across the

2    street.  He asked them, do you have any other space

3    that you're occupying?  And then did an inspection of

4    the leased space, and that's where the initial

5    problems came from and all of the things that we're

6    talking about today flow from that.

7              And so her testimony would be that she

8    will not -- that they did not go looking for the

9    violations, Your Honor.

10             And based on that, we will proceed with

11   putting forth our evidence.

12             THE COURT:  All right.  Mr. Payne.

13             MR. PAYNE:  Your Honor, I think the

14   evidence will show that there's been a history of

15   this tenant, Easy Street Partners -- which is not the

16   original tenant, by the way.  Easy Street Partners

17   assumed -- entered into an assumption and assignment

18   agreement with the original tenant, Cloud Nine

19   Resorts, LLC, in January 2009.  And within a few

20   months after doing so, started peppering the landlord

21   with claims of alleged violations, the first being a

22   claim that there was -- that an exit was too far away

23   from some of the space, that it needed to be less

24   than 100 feet.  And there was more than that.  And

25   that was resolved by an architect and the city as

1   well.  And it was measured and remeasured and found

2   not to be a violation.

3         Notwithstanding that fact, that violation

4   was reasserted and reasserted and reasserted and

5   additional violations or claimed violations were also

6   asserted.  None of the violations that were asserted

7   are significant violations.  We believe that if there

8   are any violations, they are technical, they are not

9   material, they are not a threat to health and safety.

10         And we believe that the evidence will

11   establish that, in fact, this UOSH violation, or OSHA

12   violations, that was never provided -- that

13   information was never provided in written form to the

14   landlord.

15         The landlord attempted to get that

16   directly from OSHA, or UOSH, and was told that there

17   was no such written report.  We made request on the

18   tenant.  That was never provided until last Friday,

19   or late Thursday night, when there was an attachment

20   of some report document to the reply memorandum.

21         And, interestingly enough, although the

22   reply memorandum said had Easy Street Partners been

23   aware of this problem that they were tipped off to by

24   the OSHA violation, they would never have entered

25   into the lease.

1          Well, the problem with that is that the

2     date of the inspections by UOSH, or OSHA, was in the

3     fall of 2008, which predates Easy Street becoming the

4     substitute tenant in this space.

5          I think there's a clear pattern of just

6     trying to identify some technical violation to

7     attempt to escape their responsibility under the

8     lease, Your Honor.

9          And we think the evidence will also

10    indicate that they remained in the space until

11    January of this year.

12         Thank you.

13         MR. GORDON:  Your Honor, if I may.

14         THE COURT:  You may.

15         MR. GORDON:  We've got a couple of

16    housekeeping matters before I call my first witness,

17    Your Honor.  I spoke with Mr. Payne and we have

18    stipulated that the correspondence that went back and

19    forth between counsel will be admitted into evidence.

20    None of the attachments will be admitted.  And we're

21    not admitting it for purposes of truthfulness of

22    those things asserted in it, but that the letters

23    were sent back and forth, so they will come on the

24    record as such.

25         Has that been accurate?

```
1              MR. PAYNE:  That's correct.

2              MR. GORDON:  Okay.

3         THE COURT:  All right.

4              MR. GORDON:  So if I may, Your Honor, I

5    will approach with the four copies of correspondence.

6              May I approach, Your Honor?

7              THE COURT:  If you'll hand those to the

8    clerk.

9              Have they been marked as exhibits yet?

10             MR. GORDON:  They have not, Your Honor.

11        THE COURT:  All right.

12             MR. GORDON:  Your Honor, as a secondary

13   matter, I would move to admit the letter from Park

14   City building department that we received last week

15   into evidence.  We have spoken with the department

16   and we have obtained a certified copy of that letter

17   that I can present to the Judge.

18             THE COURT:  Was the letter attached as

19   Exhibit A to your reply memorandum?

20             MR. GORDON:  Yes, Your Honor, it was.  And

21   I have -- and this is -- if I may approach, Your

22   Honor.

23             THE COURT:  You may.

24             THE CLERK:  Do you want these each marked

25   as an exhibit?
```

1          Okay.  And I'm marking these as numbers.

2          MR. PAYNE:  What number exhibit is that?

3          THE COURT:  I think that will be Exhibit

4    Number 4?

5          MR. GORDON:  Number 5.  There will be four

6    letters and then that will be Number 5.

7          So unless there was any objection, Your

8    Honor, I would move to admit the letter from Park

9    City into the record.

10          THE COURT:  Any objection, Mr. Payne?

11          MR. PAYNE:  The certified copy, no

12    objection.

13          THE COURT:  Did you move to admit the

14    first four exhibits?

15          MR. GORDON:  Oh, I'm sorry, Your Honor.

16    Can I move -- I would move to admit the first four

17    exhibits, which are correspondence that I've sent to

18    opposing counsel.

19          THE COURT:  Any objection, Mr. Payne?

20          MR. PAYNE:  No objection.

21          THE COURT:  All right.  Exhibits 1 through

22    5 are admitted.

23          MR. GORDON:  Thank you, Your Honor.

24          I will call as my first witness today

25    Mr. Mike Johnston.

1       If you will please take the stand.

2       THE CLERK:  Please step forward and raise

3    your right hand.

4

5              MICHAEL P. JOHNSTON,

6       called as a witness, having been duly

7    sworn, was examined and testified as follows:

8

9       THE CLERK:  Please take the witness stand.

10      State and spell your name.

11      THE WITNESS:  My name is Michael P

12   Johnston.  M-I-C-H-A-E-L, middle initial P, Johnston,

13   J-O-H-N-S-T-O-N.

14      THE COURT:  Excuse me just a minute.

15      I guess if it's connected, we can --

16      MR. GORDON:  Okay.  May I proceed, Your

17   Honor?

18      THE COURT:  You may.

19      MR. GORDON:  Thank you.

20

21              DIRECT EXAMINATION

22   BY MR. GORDON:

23      Q.    Mr. Johnston, who do you work for?

24      A.    I'm employed by Summit Engineering Group

25   in Heber City, Utah.

1        Q.      Are you a principal in that company?

2        A.      Yes.

3        Q.      How long have you worked as an engineer?

4        A.      I began working as an engineer in 1993.

5        Q.      What licenses or certifications do you

6    presently hold?

7        A.      I'm licensed as a professional structural

8    engineer in the State of Utah.

9        Q.      What is your educational background?

10       A.      I received a bachelor of science in civil

11   engineering from Brigham Young University, a master's

12   of civil engineering from the University of Michigan.

13       Q.      In your work, are you familiar with the

14   Uniform Building Code and the International Building

15   Code?

16       A.      Yes, I am.

17       Q.      What type of engineering work do you do?

18       A.      I'm primarily a structural engineer.  I do

19   design and review of building structures,

20   residential, commercial, industrial.

21       Q.      Have you been asked to perform an

22   inspection of the Gateway Center located at 136 Heber

23   Avenue, Park City, Utah?

24       A.      Yes.

25       Q.      What were you asked to do?

1    A.    I was asked to review the tenant's leased

2    space on the third floor of the Gateway Center and

3    also to review the public spaces pertaining to

4    exiting and accessibility issues per the building

5    code.

6        Q.    Did you perform this work?

7        A.    Yes, I did.

8        Q.    When did you do that?

9        A.    I did this in December of last year, 2009.

10       Q.    Did you analyze any building permits or

11   building plans for the building in creating your

12   report?

13       A.    No, I did not.

14       Q.    Why not?

15       A.    I attempted to obtain construction plans

16   and permit plans from Park City building department.

17   They could not produce them.  I also attempted to

18   obtain then tenant permit plans for unit 303, the

19   leased space, and they did not have any on record.

20       Q.    Did you prepare a report?

21       A.    Yes.

22       MR. GORDON:  Your Honor, may I approach?

23       THE COURT:  You may.

24       Q.    (By Mr. Gordon)  Mr. Johnston, I'm handing

25   you what is marked as Exhibit Number 6.  Do you

1    recognize it?

2         A.    Yes.

3         Q.    What is it?

4         A.    A copy of my report I prepared of my

5    findings.

6         Q.    Did you personally prepare everything in

7    the report?

8         A.    Yes, I did.

9         Q.    Did you take the pictures in the report?

10        A.    Yes, I did.

11        Q.    Are those pictures an accurate depiction

12   and representation of the Gateway Center as it

13   existed on the date you conducted your report?

14        A.    Yes.

15        Q.    How did you obtain the facts of data -- or

16   data you used in preparing your report and drawing

17   your conclusions?

18        A.    I made two different site visits to the

19   Gateway Center personally, visually inspected the

20   lease space and the public areas.

21        Q.    How did you apply the facts that you

22   gathered to the Uniform Building Code?

23        A.    I'm familiar with the code.  I

24   particularly addressed chapter 10, which is means of

25   egress, and chapter 11, accessibility pertaining to

1    the lease space and the public space, but primarily

2    the two required emergency exit stairwells.

3         Q.    Are the methods that you used in obtaining

4    the data and applying it to the code generally

5    accepted in the field of engineering?

6         A.    Yes.

7         Q.    Based on your physical inspection of the

8    Gateway Center and the analysis of the Uniform

9    Building Code, is it your opinion that the building

10   contains code violations?

11        A.    Yes, it is my opinion.

12        Q.    Are those code violations set forth in

13   your report?

14        A.    Yes, they are.

15             MR. GORDON:  I would move, Your Honor, to

16   admit the report into evidence.

17             MR. PAYNE:  No objection.

18             THE COURT:  Exhibit Number 6 is received.

19             MR. GORDON:  Your Honor, may I approach?

20             THE COURT:  You may.

21        Q.    (By Mr. Gordon)  Mr. Johnston, I've handed

22   you what has been marked as Exhibit Number 7.  Do you

23   recognize it?

24        A.    Yes.

25        Q.    What is it?

1      A.      This is a copy of chapter 10 and chapter

2   11 of the 1994 Uniform Building Code.  This was

3   included in the appendix of my report.

4      Q.      Is this the code you used to form your

5   conclusions?

6      A.      Yes.

7      Q.      Is what I've handed you a correct and

8   accurate copy of those sections of the code?

9      A.      I believe so, yes.

10      MR. GORDON:  Your Honor, I move to admit

11   Exhibit 7.

12      MR. PAYNE:  Your Honor, I'll object, at

13   least for the time being.  I don't have a copy of

14   that.  And I wasn't provided with a copy of Exhibit

15   6, which I assume has the appendix.

16      MR. GORDON:  I can provide those.  I'm

17   sorry, Your Honor, I did not hand those to him.  I

18   can do so.

19      THE COURT:  All right.

20      MR. PAYNE:  No objection, Your Honor.

21      THE COURT:  Exhibit 7 is received.

22      Q.      (By Mr. Gordon)  Mr. Johnston, if you'll

23   turn to your report.  Could you, please, give me a

24   brief overview of the space that you were asked to

25   analyze?

1          A.     Sure.  The Gateway Center consists of

2     three floors of retail lease space above the street

3     level.  Below that is two levels of underground

4     parking space.

5               The leased space from Easy Street Partners

6     is on the top, third floor, northwest corner.

7          Q.     If you could turn to page -- I guess it

8     would be 3 of your report.  We'll just walk briefly

9     through it.  On this page --

10              MR. GORDON:  And, Your Honor, would you

11     like a copy of this to follow as we go?

12              THE COURT:  It probably would be a good

13     idea.

14              MR. GORDON:  May I approach, Your Honor?

15              THE COURT:  You may.

16          Q.     (By Mr. Gordon)  Mr. Johnston, can you,

17     please, explain to us what your findings were in

18     section number 1 of your report?

19          A.     Yes.  I primarily concentrated on the

20     emergency exiting for the third floor leased space,

21     which consists of two stairwells, fire protected

22     stairwells.  One of them is on the east, one is on

23     the west.

24              Let's start with the east.  I started with

25     that, number one.  I quickly noted that there's an

1    area of refuge within this -- top of the stairwell.

2    The area of refuge was undersized and did not meet

3    the minimum requirements of the building code.

4         Q.    Can you explain, what is the purpose of an

5    area of refuge?

6         A.    An area of refuge is required to provide

7    temporary refuge, a place to get out of the -- if

8    there's a problem, to get out of the way into a fire

9    protected enclosure so that they can wait for rescue

10   personnel to assist them.  They can communicate with

11   rescue personnel.  This would be for people that are

12   disabled, such as in a wheelchair or with an elderly

13   person with a walker, someone that is on crutches,

14   someone that is slow, visually impaired, any of that

15   kind of stuff.

16        Q.    Okay.  Based on how this area of refuge is

17   built, can a wheelchair access it?

18        A.    No.

19        Q.    What types of danger does this type of

20   violation create?

21        A.    Well, the area of refuge -- in this

22   particular case, I've noted in item 1 and 2 -- is

23   inaccessible if you -- if you open this door, this

24   access door into the safe stairwell -- there is a

25   sign that says area of refuge, identifies it as such.

1    You open the door and perchance wheel yourself in in

2    your wheelchair, you're going to be faced with the

3    stairs in front of you.  You cannot get around the

4    door.  And so -- well, you can't access it.  It's

5    undersized.  You would have to back out and stay in

6    the hallway or something.

7         Q.    Okay.  Did the Park City building

8    inspector agree with you on your analysis in points 1

9    and points 2?

10        A.    Yes, he did.

11        Q.    Let's turn on the next page.  On number 3,

12   can you walk us through the analysis there?

13        A.    Again, there's an area of refuge at the

14   bottom of this stairwell, down in the parking garage.

15   It must be accessible with a level surface or with a

16   ramp in order to allow someone to get into it that's

17   disabled.  There is a four-inch curb that is in the

18   way -- that should be a ramp -- and so it's not

19   accessible.

20        Q.    Did the Park City inspector agree with you

21   on this point?

22        A.    Yes, he did.

23        Q.    Can you walk us through number 4?

24        A.    Number 4, I noticed bottom of east

25   stairwell the area of refuge was filled with garbage

1    cans and furniture and other debris blocking the area

2    of refuge.  And so someone that would enter this

3    space would just be sitting at the bottom of the

4    stairs in the way of everybody else trying to use the

5    stairs.

6         Q.    Let me back up on the first three.  When

7    was the last time that you were in the building?

8         A.    I was there -- I visited yesterday --

9         Q.    On points --

10        A.    -- afternoon.

11        Q.    On points 1 and 2, have those issues been

12   remedied?

13        A.    They were not remedied yesterday.

14        Q.    Point 3, has that been remedied?

15        A.    That has not been remedied.

16        Q.    Point 4, has that been remedied?

17        A.    That was remedied, and the items were

18   removed.

19        Q.    Okay.  Can you walk us through section 5

20   of your report?

21        A.    Section 5 deals with two-way emergency

22   communication systems in all areas of refuge.  And

23   throughout this building there would be at least six

24   areas of refuge that I can remember.  None of them

25   have the required posting of instructions that would

```
1    tell somebody how to use the equipment, what other --
2    what assistance might be provided, how to communicate
3    with rescue personnel.
4            Q.    Did the Park City inspector agree with you
5    on this point?
6            A.    Yes, he did.
7            Q.    Can you walk me through number 6?
8            A.    Number 6, down in the east stairwell,
9    again, trash cans under the stairs, furniture.  It's
10   a violation of -- there cannot be anything within an
11   exit stairwell, anything particularly that's
12   combustible or flammable.
13           Q.    I see.  Why is this dangerous?
14           A.    If you had a fire in your fire protected
15   exit stairwell, that would cause a lot of problems.
16           Q.    I see.  Had this one been remedied?
17           A.    This had been remedied, yes.
18           Q.    And did the Park City inspector agree with
19   you on this one?
20           A.    He did.
21           Q.    Okay.  Let's turn over to the west exit
22   stairway and exit discharge, point number 1.  Can you
23   walk us through your analysis there?
24           A.    Yes.  Now moving to the west exit
25   stairway --
```

1          Q.     And let me ask one question.  Which exit
2   stairway is closest to the leased space?
3          A.     The west stairway.
4          Q.     Okay.  So would this one be the primary --
5   you would expect this to be the primary exit from the
6   leased space?
7          A.     Yes, I would expect that.
8          Q.     Okay.  Very well.  Proceed with number 1.
9          A.     So this -- through this door you're seeing
10  would exit people from the third floor and the second
11  floor and possibly from the main level and from the
12  parking garages entering the stairwell and coming to
13  this exit discharge location.  I noticed quickly
14  that, one, the stairs were not wide enough, they did
15  not meet the 44-inch minimum width requirement and
16  they also had -- the landing was -- did not meet the
17  44-inch width minimum.
18             In addition, there are no handrails or
19  things that would assist people to climb those
20  stairs.
21         Q.     Okay.  What type of danger does a
22  violation of this code create?
23         A.     Well, the code would identify a minimum
24  width that provides enough -- enough area for --
25  let's say panicking people to get out without

1    tripping and climbing over each other.  44 inches is

2    identified as the minimum width.  It could be larger

3    than that depending on occupancy, but 44 is the

4    minimum.  These stairs are 36, which is a residential

5    standard.

6              In addition, we've talked about areas of

7    refuge.  This stairwell will connect to those areas

8    of refuge and provide access for rescue personnel to

9    remove and assist people, say, carry them out in a

10   fireman's carry or a wheelchair, and you need enough

11   room to do that.  So 44 inches is the minimum.

12        Q.    I see.  Did the Park City inspector agree

13   with you in points 1 and -- can you explain to me, is

14   point 2 similar to point 1?

15        A.    Yes.  I'm sorry.  I just did them both.

16        Q.    Okay.  And the Park City inspector agreed

17   with you on both points 1 and points 2?

18        A.    Yes, he did.

19        Q.    Can you explain point number 3?

20        A.    Number 3 at the top of the stairs, we just

21   discussed there is an alley that -- on the west side

22   of the building.  There's also -- you can see some

23   metal stairs coming down from the main level.  They

24   enter this alleyway here, which is an exit court.

25   And then there needs to be a clear path to the public

1   way.  This is blocked, you can see, by the stairs,

2   blocked part of the sidewalk.  And also there's a

3   power box that's been installed that there -- that

4   instantly reduces the width here and causes a jam,

5   which is prohibited by the building code.

6        Q.    What is the measurement on the actual

7   cement there between the stairs and the snow?

8        A.    22 inches.

9        Q.    What's the measurement between the stairs

10  and the power box?

11       A.    41 inches.

12       Q.    Can you turn back one page and look with

13  me at the picture on point 2?  Is that picture

14  pointing back up the alleyway the opposite direction?

15       A.    Yes.

16       Q.    Is the Gateway Center the only place

17  that's exiting down through this alleyway?

18       A.    No, it's not.

19       Q.    Okay.  What additional dangers does that

20  create?

21       A.    Well, there are four, maybe five other

22  buildings that exit out into this alleyway on the

23  west side of the Gateway Center.  These are buildings

24  along Park City's Main Street.  They're older

25  buildings.  You can kind of tell by the stairs.

1    They're -- so there's a lot more exiting into this

2    alleyway.

3         Q.    And what type of danger does this

4    condition create?

5         A.    Well, certainly if there was a problem, a

6    fire or an earthquake or explosion or something, you

7    would have a lot of people fleeing into this area and

8    trying to get out.

9         Q.    Okay.  What types of danger does that

10   create?

11        A.    Well, the danger would be slower people

12   get trampled, the kind of thing you hear about in the

13   news sometimes.

14        Q.    Okay.  Very good.  On points 1, 2 and 3,

15   did the Park City inspector agree with you?

16        A.    Yes.

17        Q.    Have any of these been remedied?

18        A.    Not as of yesterday.

19        Q.    Okay.  Let's go to point number 4.

20        A.    Number 4.  I noted that since this was an

21   exit court that was less than ten feet wide, that the

22   building code would require the walls of the

23   buildings on both sides to be one-hour fire resistive

24   in order to provide additional safety for that area.

25   And I noted that the Gateway Center does have

1    one-hour fire resistive walls, but the adjoining

2    buildings do not.

3         Q.    I see.  Did the Park City inspector agree

4    with you on this?

5         A.    No.  He -- he said that this -- he would

6    not call this an exit court.

7         Q.    Okay.

8         A.    I don't know what he would call it.

9         Q.    Okay.  But he disagreed with you on that

10   one?

11        A.    Yeah.

12        Q.    Okay.  Number -- central elevators and

13   exit corridor, point number 1.

14        A.    I was asked also to look at accessibility

15   issues.  And I did note that from the public parking

16   garage it was not able to access the elevators from

17   either side of the garage.  There's a -- you can see

18   that there's a striping and cars in the way on the

19   top picture.  If there's a car parked there, you

20   wouldn't be able to get in in a wheelchair.  And on

21   the bottom picture there's a railing that narrows the

22   width to 28 and a half inches.

23        Q.    Did the Park City inspector agree with you

24   on this point?

25        A.    Yes, he did.

1          Q.    Mr. Johnston, I'm now going to move away

2    from the report.

3                Have you seen a letter that was written by

4    Mr. Cooper Roberts Simonsen (sic) indicating that

5    some of your analysis may not be correct?

6          A.    I saw that letter.

7          Q.    To the allegation that the current code

8    IBC 2006 does not require an area of refuge for a

9    building that has a fire suppression system and is

10   less than five stories in height, how do you respond?

11         A.    I respond he's incorrect.  There is no

12   exception in the 2006 IBC that would alleviate the

13   need for areas of refuge.

14         Q.    To the allegation that the west basement

15   stairway meets the 1984 UBC, how do you respond?

16         A.    I responded that the 19 -- there is no

17   1984 UBC.  There's a 1994.  And if that's what he's

18   referring to, the 1994 UBC absolutely does require

19   that the stairwells be 44 inches or wider.

20         Q.    And did the city inspector agree with you

21   on your analysis?

22         A.    Yes, he did.

23         Q.    And on point number 1, did he agree with

24   you on your analysis that --

25         A.    Yes, he did.

1      Q.    And then in the final, the west exit

2   stairway which evacuates people from the upper levels

3   of the Gateway Center empties into a public

4   right-of-way along the west side of the building,

5   because of the public right-of-way and it is not an

6   exit court, the comments do not apply.  How do you

7   respond to that?

8      A.    Well, if he's saying it's not a -- if it's

9   not an exit court and he's calling it a public

10   right-of-way -- which it is dedicated for public

11   access, that's true -- then it would need to be ten

12   feet -- minimum ten feet wide, unobstructed for the

13   full length, open to the air, unobstructed for ten

14   feet to the street, which it is not.

15      Q.    Okay.  So under his analysis, if it is, in

16   fact, a public right-of-way, is it compliant with

17   what would be required?

18      A.    Then it's not compliant with the

19   requirements.

20      Q.    Okay.

21      A.    And if it's -- since -- okay.

22      MR. GORDON:  I'm sorry, Your Honor.  No

23   further questions.

24      THE COURT:  Mr. Payne, any desire to

25   cross-examine?

1        MR. PAYNE:  Yes, Your Honor.

2        THE COURT:  Maybe before you begin, Mr.

3    Payne.

4        I apologized for the scheduling conflict.

5    It's not this hearing's fault.  Judge Boulden recused

6    herself in a fairly significant case with a number of

7    pending matters, and so the Court set a status

8    conference on that case.  There's also one other

9    matter, I'm not sure when it got put on the calendar,

10   but I would like to take that matter now.  It's

11   simply a pretrial scheduling conference.

12       MR. GORDON:  I have no objection to that,

13   Your Honor.

14       MR. PAYNE:  I have no objection.  We're

15   fine with that, Your Honor.

16       THE COURT:  Will you call that matter?

17   (Recess.)

18       THE COURT:  Let me just indicate to

19   counsel and the parties present that you'll have

20   adequate time to present your evidence in your case

21   today.  I propose that we proceed for a while.

22   Depending upon how the cross-examination of

23   Mr. Johnston goes, perhaps it would be appropriate to

24   take a break in this case and come back in 30 minutes

25   or so, proceed at your leisure, or we can forge

1    ahead.

2              So why don't we go ahead and finish up

3    with Mr. Johnston and see where we're at.

4

5                    CROSS-EXAMINATION

6    BY MR. PAYNE:

7         Q.    Mr. Johnston, I believe you stated that

8    you had been licensed as an engineer in the State of

9    Utah for some period of time; is that correct?

10        A.    Yes.

11        Q.    How long have you been a structural

12   engineer, a licensed structural engineer with the

13   State of Utah?

14        A.    The State of Utah, last year -- previous

15   to 2009 had -- didn't clarify too much in the

16   engineering community between the difference of a

17   professional engineer and a structural engineer.  So

18   I was operating as a structural engineer under the

19   professional engineering license, or a PE as it's

20   commonly known.

21        Q.    Okay.

22        A.    Last year they converted all of us to an

23   SE, or a structural engineering, separate licensure.

24        Q.    Did a professional engineering license

25   include land surveying and that sort of thing as

1  well?

2      A.    No.   A professional engineer is not a

3  professional land surveyor.

4      Q.    Okay.   In connection with the Gateway

5  Center premises you were asked to inspect, did you

6  review the lease under which Easy Street Partners was

7  occupying the space?

8      A.    I did not review a lease.

9      Q.    Were you aware that the parking garage was

10  not specifically -- was specifically excluded from

11  the property that they had -- that they had a right

12  to under the lease?

13      A.    I was aware that park -- let's see.   Park

14  City -- the first tier is public parking for the

15  building and the bottom tier is leased -- you can

16  rent a space in that parking area.

17      Q.    Are you familiar with any building codes

18  that predate 1994?

19      A.    Yes.

20      Q.    You mentioned that you believe the 1994

21  building code applied to this property.   Why is that?

22      A.    From Park City building department.

23      Q.    Okay.   Are you aware that the parking

24  garage was in place prior to 1994?

25      A.    Yes.   I'm aware of that.

1     Q.     Do you know what building code that would

2  have been built under?

3     A.     No, I don't.

4     Q.     Do you have any experience in dealing with

5  application of building codes to preexisting

6  buildings?

7     A.     Yes.

8     Q.     What experience do you have in that area?

9     A.     I do structural investigations of historic

10  buildings, of buildings that are being converted --

11  the use will be changing, such as from commercial to

12  residential or residential to commercial.

13     Q.     In connection with your review of the area

14  of refuge issue, you stated that there was no update

15  to the building code.  Did you check the current

16  version of the administrative regulations in Utah

17  Administrative Code R156-56?

18     A.     Yes, actually, I did, for the 2006

19  building code, which is the current code right now.

20     Q.     You didn't find anything in that code that

21  would indicate that there's an exception for fully

22  sprinkled buildings?

23     A.     Correct.  There's no exception for an area

24  of refuge in fully sprinkled building in the 2006

25  code.  I did check that.

1          Q.     Is there in any code?

2          A.     Right now I can't -- I wouldn't know.

3          Q.     In the current code -- is the 2006 code

4     the current code then?  Is that what you're --

5          A.     It is right now.  In July it will be the

6     2009.

7          Q.     Do you believe that the Gateway Center

8     space that was leased by Easy Street Partners is

9     dangerous to occupy?

10               It's unsafe to occupy?  Yes or no, please.

11         A.     Yes.

12         Q.     Isn't it true that Park City building

13    inspection department disagrees with you?

14         A.     I don't have -- I don't have his letter to

15    tell you the exact wording.

16         Q.     I would like to refer you to Exhibit 5,

17    please.

18         A.     Do I have -- I don't have 5.

19               Thanks.

20         Q.     You've seen this letter before, haven't

21    you?

22         A.     Yes, I have.

23         Q.     Okay.  It goes through a number of issues

24    that were presented to the city by or on behalf of

25    Easy Street Partners; is that correct?

1        A.     Yes.

2        Q.     I call your attention to page 2 of the

3    letter.

4        A.     Uh-huh (affirmative).

5        Q.     The concluding paragraph.  Can you read

6    that first sentence, page 2, that paragraph?

7        A.     Yeah.  Mr. Simister wrote, in conclusion I

8    believe the space occupied by Mr. Shoaf is safe to

9    occupy.

10       Q.     Okay.  Thank you.

11              So, in fact, Park City does disagree with

12   your assessment of that; isn't that right?

13       A.     Kurt Simister does.

14       Q.     And you're familiar that he is a senior

15   inspector in the building department of Park City,

16   are you not?

17       A.     Uh-huh (affirmative).  Yes.

18       Q.     Okay.

19              MR. PAYNE:  May I just have one moment?

20              I think those are all the questions I have

21   for this witness, Your Honor.

22              THE COURT:  Any desire for redirect?

23              MR. GORDON:  No, Your Honor, I don't think

24   so.

25              THE COURT:  All right.  Mr. Johnston, you

1    may step down.

2               THE WITNESS:  Do you want these back?

3               THE COURT:  You can just leave them there.

4               THE WITNESS:  Okay.

5               MR. GORDON:  I don't know if your desire

6    is to proceed at this point or go to the other

7    matter.

8               THE COURT:  Well, so the scheduling

9    conference that I've set I think should probably take

10   about 30 minutes, no more.  I'm not addressing any

11   substantive matters.  It would appear that on this

12   matter we're probably going to need more than 20

13   minutes.

14              MR. GORDON:  Yes, Your Honor.

15              THE COURT:  And so if you don't have any

16   objection, I would like to take a recess.  I need to

17   get an individual on the telephone.  We'll take that

18   matter -- the scheduling conference and then come

19   back to this matter.

20              MR. GORDON:  Thank you, Your Honor.  No

21   objection to that.

22              THE COURT:  All right.  The court is in

23   recess.

24              THE CLERK:  All arise.

25   (Recess.)

1          THE CLERK:  All arise.

2          Court resumes its session.

3          Please be seated.

4          THE COURT:  All right.  Well, thank you,

5    counsel.  I apologize for that interruption, but

6    hopefully we'll get through your hearing today.

7          You may proceed.

8          MR. GORDON:  Thank you, Your Honor.  Do we

9    have other time constraints or do we have -- what are

10   we up against for the rest of the afternoon, Your

11   Honor?

12         THE COURT:  5:00.

13         MR. GORDON:  Okay.  And we'll be done

14   certainly before then.  So --

15         THE COURT:  Okay.

16         MR. GORDON:  Thank you.  If I may, Your

17   Honor, if I can call my next witness, which is Bill

18   Shoaf.

19         THE CLERK:  Please step forward and raise

20   your right hand.

21

22              **WILLIAM SHOAF**,

23         called as a witness, having been duly

24   sworn, was examined and testified as follows:

25                   * * *

1          THE CLERK:  Please take the witness stand.

2     State and spell your name.

3          THE WITNESS:  My name is William Shoaf,

4     W-I-L-L-I-A-M, S-H-O-A-F.

5

6                    DIRECT EXAMINATION

7     BY MR. GORDON:

8          Q.    Is it okay if I call you Bill?

9          A.    Sure.

10         Q.    What is your association with Easy Street

11     Partners?

12         A.    I am the managing partner.

13         Q.    What is your association with Cloud Nine

14     Resorts?

15         A.    I'm the managing director.

16         Q.    What interest does Cloud Nine hold in Easy

17     Street Partners?

18         A.    It is one of the partners of Easy Street

19     Partners.

20              MR. GORDON:  May I approach, Your Honor?

21              THE COURT:  You may.

22         Q.    (By Mr. Gordon)  Bill, I'm handing you

23     what has been marked as -- and I actually did not

24     look.  Is it Exhibit Number 10?

25         A.    Number 8.

1        Q.      Number 8.  Do you recognize it?

2        A.      Yes, I do.

3        Q.      What is it?

4        A.      It is the lease for the Gateway offices.

5        Q.      Is this a true and correct copy of the

6   lease that Cloud Nine Resorts entered into with

7   Gateway Center in August 3rd, 2007?

8        A.      Yes, it is.

9                MR. GORDON:  Your Honor, I would move to

10  enter this exhibit into evidence.

11               MR. PAYNE:  No objection.

12               MR. GORDON:  Your Honor, may I approach?

13               THE COURT:  You may.

14               Exhibit 8 is received.

15       Q.      (By Mr. Gordon)  Bill, what is the lease

16  term?

17       A.      The lease term is up in December of this

18  year.  And it was a three-year lease that commenced

19  in January of 2008.

20       Q.      Where is the leased space?

21       A.      It's on the third floor of the Gateway

22  Center on Heber Avenue.

23       Q.      What is the monthly rent?  And please

24  distinguish for me between rent and CAMs.

25               MR. PAYNE:  Objection for relevance.  I'm

1   not -- they didn't object to the amount of the lease,

2   of the calculations.  They just objected to it based

3   on -- they said it wasn't enforceable.  There's no

4   objection to any of the particular claimed amount

5   other than under -- an asserted breach of covenant of

6   inhabitability or basically constructed eviction.

7   There's nothing about the calculation that I saw in

8   the objection to the proof of claim, Your Honor.

9            MR. GORDON:  In the correspondence back

10  and forth -- and that is probably correct, Your

11  Honor.  We have raised the issue of breach of

12  warranty and inhabitability and breach of quiet

13  covenant.  We have put them on notice in prior

14  correspondence of issues with CAMs.  And I will rely

15  on Ken with the possibility of bringing a separate

16  action in this case.  And that may or may not be

17  relevant with what we're dealing with today.

18            Ken, is that --

19            MR. CANNON:  Honor, what's before the

20  Court today is just the objection to claim.  There

21  are other issues with respect -- depending on how

22  this goes.  And obviously there are other issues with

23  respect to rent and common area charges paid in the

24  past, which are not before the Court today.  And so

25  the relevancy -- you know, I don't know -- if they're

1  not relevant to the objection, I don't think they're

2  relevant to the hearing today.

3       THE COURT:  Mr. Payne, are common area

4  charges, CAM charges, part of the proof of claim?

5       MR. PAYNE:  Yes, they are, Your Honor.

6  But, again, there was no objection to the amount.

7  There was no allegation that it was misstated.  They

8  simply -- the only bases that I can see in the

9  objection were an alleged breach of covenant of

10  implied habitability and a breach of covenant of

11  quiet enjoyment that was asserted relieve them of any

12  responsibility to pay.  So we're not on notice that

13  any issue with calculations or particular charges

14  would be before the Court because that wasn't

15  asserted as a basis for -- one of the bases for the

16  objection.

17       THE COURT:  Is there any objection, Mr.

18  Payne, if the Court reserves any challenge to the CAM

19  charges for a later date?

20       MR. PAYNE:  Could I have just a moment to

21  speak with the property manager, Your Honor?

22       THE COURT:  All right.

23       MR. GORDON:  While he's doing that, Your

24  Honor, may I approach and get an exhibit marked?

25       THE COURT:  You may.

1          MR. PAYNE:  Your Honor, the property

2     manager, not being aware that that might be an issue

3     with the Court today -- I guess our preference would

4     be to let the Court reserve that rather than try to

5     address it today where we are not fully prepared on

6     that since we didn't believe we had notice of it.

7          THE COURT:  In reviewing the response

8     there -- some of the response does go to CAM charges,

9     but I think -- I mean at least references CAM

10    charges.

11         MR. PAYNE:  That's true.

12         THE COURT:  I think that -- why don't we

13    limit -- I mean, I don't know that the evidence is

14    not admissible, I just don't know that it's really

15    relevant.  Isn't the only dispute really the CAM

16    charges, it's not really the amount under the lease

17    or the calculation other than the CAM charges?

18         MR. GORDON:  Right.  There would be a

19    claim potentially for, you know, a chargeback or

20    something like that.  I don't think there's a dispute

21    as far as what CAM have been paid.

22         THE COURT:  All right.  Well, based on

23    that and if the Court reserves the issue of CAM

24    charges, I guess what's the relevancy of the question

25    then?

1            MR. GORDON:  Just establishing the

2    distinction between the cost of rent and the amount

3    of CAMs that was paid, Your Honor.  And what I could

4    do -- let me just rephrase the question.

5            Q.    (By Mr. Gordon)  Bill, what is the monthly

6    rent under the lease?

7            A.    In total?

8            Q.    Uh-huh (affirmative).

9            A.    Approximately $9600.

10           Q.    And does that include rent and CAMs?

11           A.    Yes, it does.

12           Q.    Can you read paragraph -- just the first

13   line of paragraph number 22 in the lease?

14           A.    Covenant of quiet enjoyment.  For as long

15   as a tenant is faithfully performing its obligations

16   under this lease, landlord promises to provide tenant

17   with quiet enjoyment of the premises.

18           Q.    Thank you.

19           MR. GORDON:  May I approach, Your Honor?

20           THE COURT:  You may.

21           Q.    (By Mr. Gordon)  Bill, I'm handing you

22   what's been marked as Exhibit Number 9.  Do you

23   recognize it?

24           A.    Yes, I do.

25           Q.    What is it?

1      A.     It's an assignment between Cloud Nine

2  Resorts and Easy Street Partners with regards to the

3  lease at Gateway.

4      Q.     When was this signed?

5      A.     On the 9th day of January, 2009.

6          MR. GORDON:  Your Honor, I would move to

7  have this admitted into evidence.

8          MR. PAYNE:  No objection.

9          THE COURT:  Exhibit Number 9 is received.

10          MR. GORDON:  Your Honor, may I approach?

11          THE COURT:  You may.

12      Q.     (By Mr. Gordon)  Bill, when did -- when

13  did -- when was the space first occupied under the

14  lease?

15      A.     In December of -- well, in January of

16  2009 -- eight, sorry.  2008.

17      Q.     How many employees were occupying the

18  space?

19      A.     Approximately upwards -- at the most,

20  about 18.

21      Q.     Did the space have room for clients and

22  visitors?

23      A.     Yes, it did.

24      Q.     How were you using the space?

25          MR. PAYNE:  Objection, ambiguous.  "You,"

1    who is that referring to?  Is it referring to --

2              MR. GORDON:  I'm sorry.

3         Q.    (By Mr. Gordon)  How was the tenant --

4              THE COURT:  Just -- objection sustained.

5              MR. GORDON:  Oh, sorry, Your Honor.

6         Q.    (By Mr. Gordon)  How was the tenant using

7    the space?

8              MR. PAYNE:  Objection, I think it's

9    ambiguous.  Which tenant?  We've got two tenants with

10   an assignment and assumption here.

11             THE COURT:  Sustained.

12        Q.    (By Mr. Gordon)  How was the tenant --

13   were you involved with both Cloud Nine and Easy

14   Street Partners?

15        A.    Yes, I was.

16        Q.    Are you aware of how both of those

17   entities was using space?

18        A.    Yes.

19        Q.    How was Easy Street Partners and Cloud

20   Nine Resorts using the space?

21        A.    Which one would you like me to address

22   first?

23             THE COURT:  I think that's called a

24   compound question.

25             MR. PAYNE:  Objection, compound.  I'll

1   object on that basis, Your Honor.

2        Q.    (By Mr. Gordon)  Okay.  How was Easy

3   Street Partners using the space?

4        A.    Easy Street Partners housed the human

5   resource, the accounting, the spa director, the

6   sales -- the hotel sales force and storage of

7   material, collateral material and other things in

8   that space.

9        Q.    When Easy Street Partners was using the

10  space, what was the maximum number of people at any

11  given time that would be in this space?

12       A.    You could probably get up to as many as

13  30, 35 when we were doing orientation classes for our

14  employees.

15            MR. GORDON:  May I approach, Your Honor?

16            THE COURT:  You may.

17       Q.    (By Mr. Gordon)  Bill, I've handed you

18  what has been marked as Exhibit Number 10.  Do you

19  recognize it?

20       A.    Yes, I do.

21       Q.    What is it?

22       A.    It's a schematic floor plan of our office

23  space along with other office spaces on that half of

24  the floor.

25       Q.    Is this an accurate depiction of the space

1    at the time that Cloud Nine Resorts entered into the

2    lease?

3         A.    No.

4         Q.    What is different about it?

5         A.    This drawing was done by the architect or

6    the landlord after he visited the site.  The actual

7    land -- the actual floor plan that was attached to

8    the lease was incorrect.

9         Q.    And let me clarify.  Is this the one that

10   was -- if you'll look at it closely.  Is this the one

11   that was attached to the lease or is this one that

12   was subsequently created?

13        A.    This is the subsequently created floor

14   plan which reflected the actual space.

15        Q.    I see.  So let me clarify then.  Does this

16   schematic represent the actual -- the property at the

17   time that Cloud Nine entered the lease?

18        A.    That is correct.

19        Q.    Okay.

20              MR. GORDON:  May I approach, Your Honor?

21              THE COURT:  You may.

22        Q.    (By Mr. Gordon)  I'm handing you two

23   markers, Bill.  Would you, please, mark for me in red

24   the space that was built out in offices?

25              For purposes of clarity, can you mark that

1    or assign area 1 to that?

2         A.    Uh-huh (affirmative).

3         Q.    With the green marker, can you, please,

4    outline what constitutes the -- all other space --

5    all other leased space?

6              And for purposes of clarity, can you mark

7    that area area number 2?

8         A.    Okay.

9              MR. GORDON:  Your Honor, I would move to

10   have Exhibit Number 10 admitted into evidence.

11             MR. PAYNE:  Your Honor, I'll object.  I

12   haven't had an opportunity to see any markings on the

13   document.

14             MR. GORDON:  Can I show it to opposing

15   counsel, Your Honor?

16             THE COURT:  You may.

17             Attached to Easy Street Partners' reply

18   memorandum was an Exhibit C, which was a schematic

19   drawing.  Is that the same schematic drawing?

20             MR. GORDON:  It is, Your Honor.  I've just

21   re-created that for the Court.

22             THE COURT:  Except the colors are re --

23             MR. PAYNE:  Okay.  That saves me some

24   time.

25             THE COURT:  Except I think the colors are

1    re-created just the opposite.

2                MR. GORDON:   The red and green was

3    switched.

4                Okay.   So any objection on the admission

5    of Exhibit Number 10?

6                MR. PAYNE:   No objection.

7                THE COURT:   Exhibit Number 10 is received.

8                MR. GORDON:   Your Honor, would you like me

9    to hand that to you or --

10               THE COURT:   Well, I think you'll need to

11   leave it with the witness.

12        Q.     (By Mr. Gordon)  Let's focus on area 2

13   first, Bill, which is the long, open room.   During

14   the course of the lease, did you become concerned

15   with this space?

16        A.     Yes, I did.

17        Q.     Why?

18        A.     We had an inspection of our office and an

19   inspection of our hotel across the street by the Utah

20   occupational safety hazard -- safety and health

21   administration.   During that inspection the officer

22   in charge of that learned that we had offices in the

23   Gateway and, as a result, he included the leased

24   space as part of his overall inspection of the

25   property.

1          MR. GORDON:  Your Honor, may I approach?

2          THE COURT:  You may.

3          Q.    (By Mr. Gordon)  Bill, I've handed you

4   what has been marked as Exhibit 11.  Do you recognize

5   it?

6          A.    Yes.

7          Q.    What is it?

8          A.    It's the report from the occupational

9   safety and -- board.

10         Q.    Is this a true and correct copy of the

11  report that you received from UOSH?

12         A.    Yes, it is.

13         MR. PAYNE:  Object.  I'm sorry.  Object on

14  "you" and ambiguity as to who "you" is.  Is it

15  Mr. Shoaf personally or one of the entities who was

16  the lessee?

17         THE WITNESS:  It was actually delivered to

18  Ms. Marina Soto, who is our human resource director.

19         Q.    (By Mr. Gordon)  Okay.  Was this

20  delivered -- okay.  Was this delivered to Cloud Nine

21  Resorts?

22         A.    No.  It was delivered to the Sky Lodge.

23         MR. GORDON:  Your Honor, I would move to

24  admit this into evidence.

25         MR. PAYNE:  Objection, foundation, hearsay

1     and relevance.  I don't believe there's any reference

2     to the property address of the leased property here

3     or any mention of Gateway Center in this entire

4     document that I've been able to find, Your Honor.

5                    MR. GORDON:  I can lay that foundation,

6     Your Honor.

7            Q.     (By Mr. Gordon)  If you'll --

8                    THE COURT:  What about the hearsay?

9                    MR. GORDON:  I'm sorry.  What specifically

10    is objected to on the hearsay?

11                   THE COURT:  That the document is hearsay.

12                   MR. GORDON:  It would be admitted under

13    rule 8038, I believe.  Rule 8038, public records and

14    reports.  And this states, Your Honor, that the

15    following are not excluded by the hearsay rule even

16    though the declarant is available as a witness.

17    Records, reports, statements or data compilations of

18    any form of public offices or agency setting forth

19    the activities of the officer, agency -- which this

20    clearly is -- or matters observed pursuant to duty

21    imposed by law as to which matters there was a duty

22    to report.

23                   So I would move to have it admitted under

24    that exception to the hearsay rule.

25                   THE COURT:  Mr. Payne?

1          MR. PAYNE:  I think there's still an

2     issue, Your Honor, with respect to foundation as far

3     as its preparation and tying it to the state agency

4     that has purported to prepare this.  And I think

5     there's also a question as to relevance because I

6     don't believe it refers -- there's no indication here

7     that it refers to the property in question, that

8     identifies that property or Gateway Center or the

9     street address.

10          THE COURT:  All right.  I'll sustain the

11     objection.

12          MR. GORDON:  Okay.

13          Let me lay some additional foundation,

14     Your Honor, and see if we can get it in with this

15     witness.  If not, we'll use another one.

16          THE COURT:  You may.

17     Q.     (By Mr. Gordon)  Bill, would you turn to

18     page 9?

19     A.     Yes.

20     Q.     Is there any reference on page 9 to part

21     of the inspection that the UOSH individual did on the

22     Gateway?

23     A.     Yes.

24     Q.     Where is it?

25          MR. PAYNE:  Objection.  I move to strike

1    on foundation, how he knows that this refers to an

2    inspection on the Gateway Center, that particular

3    part of this report.  And also based on the parol

4    evidence rule, Your Honor.  I'm not sure why -- if

5    it's not in the document, why are we going outside

6    the document to say what the document refers to?

7                 MR. GORDON:  Well, the document is

8    obscure, Your Honor, but actually refers to -- and do

9    you know what?  I can probably have Marina Soto

10   testify to this, who actually did the walk-through

11   with the OSHA individual.  And we may have an easier

12   time getting it in through her.

13                 THE COURT:  All right.  I'm going to

14   sustain the objection.

15                 MR. GORDON:  Very good.

16        Q.    (By Mr. Gordon)  We will move off of this,

17   Bill, and I'll reintroduce this through Marina.

18        A.    Sure.

19        Q.    Did you meet with the UOSH inspector on

20   the day that he conducted the inspection?

21        A.    Yes, I did.

22        Q.    What happened?

23        A.    The inspector basically informed me of

24   a -- of his findings.

25                 MR. PAYNE:  Objection, hearsay, Your

1    Honor.

2              THE COURT:  I guess the real issue is

3    what's the purpose of the question?  That he spoke

4    with the --

5              MR. GORDON:  The relevance, Your Honor, is

6    that there have been claims made that my client has

7    been trying to dig up problems with this space.  And

8    we're trying to establish that UOSH actually was the

9    party that created the doubt in the first place and

10   that all things led from there.  And so what occurred

11   with the UOSH report and the representations made

12   concerning the safety of the space really was the

13   spark that started what we're here talking about

14   today.

15             THE COURT:  Well, and I think -- isn't

16   that classic hearsay?  I mean, isn't the person that

17   would say we're the ones who started this someone

18   from UOSH?

19             So I'm going to sustain the objection.

20             I mean, the fact that Mr. Shoaf had

21   discussions with the representative of UOSH is not

22   hearsay.  But I think your question was going to the

23   substance of the conversations he had regarding these

24   violations.

25             MR. GORDON:  Okay.

1    Q.    (By Mr. Gordon)  Mr. Shoaf, after your

2    discussions with the UOSH inspector, what was your

3    impression of the safety of your space?

4    A.    That there were potential violations and

5    fire and safety issues that we needed to address.

6    Q.    When you found out -- when you became

7    concerned about this, what did you do?

8    A.    The first thing I did was have my

9    facilities manager get involved with this report and

10   begin to address all of the issues that had been

11   raised.

12   Q.    After you looked at the issues that had

13   been raised, did you have a concern that the space

14   was safe?

15   A.    Yes.

16   Q.    Did you notify the city?

17   A.    Yes.

18   Q.    When?

19   A.    Within a week of this report, of our

20   meeting with this gentleman.

21   Q.    Okay.  What happened?

22   A.    We had measured from -- what we understood

23   was the proper way, from the back of space number 2

24   to the doors, the exit doors of the facility to the

25   fire (sic), and had ascertained that they were well

1    in excess of 100 feet.

2         Q.    During the meeting with the city, did you

3    ask the city inspector for anything?

4         A.    Yes, I did.

5         Q.    What did you ask him for?

6         A.    I asked him if he could provide us with

7    some kind of document that would clearly state that

8    the concerns raised to us were not founded and that

9    the city was -- felt we were in a compliant space

10   that was safe and that we could use that document to

11   indemnify us against any future liabilities.

12        Q.    Did the city ever issue you the requested

13   letter?

14        A.    No.

15        Q.    What happened after you met with the city?

16        A.    Well, after we met with the city, we then

17   notified the landlord and his agent of our concerns.

18        Q.    Okay.  Did you propose solutions at the

19   time?

20        A.    Yes, we did.

21        Q.    What were they?

22        A.    There were several.  One that we reviewed

23   with the landlord's architect, which was a

24   modification of the interior space to in effect allow

25   us to get under the 100-foot issue that seemed to be

1    the problem.  We also suggested that we could move to

2    an additional -- a different space in the building if

3    that would help solve the problem.

4            Q.    Was there ever an agreement on either of

5    those suggestions?

6            A.    No.

7            Q.    Did the landlord send anyone to meet with

8    you to address the issues?

9            A.    Yes.  He sent his architect Aarin, Aarin

10   Holt.

11           Q.    And what happened in that meeting?

12           A.    In the first meeting was when -- when

13   Aarin came is when it became -- he also had the

14   incorrect floor plan, the one that's attached to the

15   original lease.  So the first thing that had to

16   happen was he did a new drawing and an as-built.  But

17   during that first meeting we discussed the potentials

18   of sort of bifurcating the office and moving the

19   egresses and how that might solve the problems here.

20           Q.    After your meeting with him, what

21   happened?

22           A.    Well, after that meeting he came back with

23   the new drawing and brought a mechanical measuring

24   device and we walked off the lineage twice.  One

25   method he used we came to 98.9 inches -- 98.8 feet.

1      Q.      What method was that?

2      A.      Basically he -- he just sort of walked as

3   closely to the walls and around the corners as he

4   could.

5           In the other measurement, it was done

6   using right angles, which was our understanding of

7   what the code requires.

8      Q.      And what was the result of the right angle

9   measurement?

10      A.      It was 103 plus feet.

11      Q.      Okay.  Did you ask Aarin Holt for anything

12   during that meeting?

13      A.      I asked him what I could do to get some

14   document that would certify that we were in

15   compliance and that the space was fit for use and we

16   wouldn't be liable.  And he said that could only be

17   issued by Park City.

18      Q.      Did the landlord offer any other

19   individual to offer an opinion on the egress issue?

20      A.      The -- Aarin Holt reached out to a

21   gentleman who works as a senior architect for the IBC

22   and then those conversations were via e-mail and

23   phone calls in which he was asking this gentleman

24   about the code and the 100 feet and how you measured

25   it and what was the proper interpretation of the

1   code.

2        Q.    After your -- did you communicate directly

3   with Mr. Hahn?

4        A.    I did.

5        Q.    After your communication with Mr. Hahn,

6   what was your impression concerning the compliance of

7   your leased space?

8            MR. PAYNE:  Objection as far as foundation

9   for an impression.  I think what he's trying to do is

10  do an end run around the hearsay rule, Your Honor.

11           THE COURT:  Well --

12           MR. GORDON:  It's based on --

13           THE COURT:  I'm going to let him testify

14  as to what his impression was and give it the weight

15  that is appropriate.

16       Q.    (By Mr. Gordon)  So what was your

17  impression after your -- after communicating with

18  Mr. Hahn concerning the space and whether it was

19  compliant or not with safety code?

20       A.    Mr. Hahn wrote me an e-mail that said it

21  was not compliant based upon the measurements that he

22  asked me to do.

23       Q.    After meetings with the city, meetings

24  with their architect and communicating with Mr. Hahn,

25  did you ever receive any verification from the city