1    that your space was actually compliant?

2         A.    Not at that time, no.

3         Q.    After those meetings, what happened next?

4         A.    Well, after those meetings we were in a

5    bit of a quandary, so we decided that maybe the best

6    recourse would be to get a building permit so that we

7    could verify that the city had at least signed off on

8    a -- on the renovation of our office space which

9    happened right before we came and therefore have at

10   least that bit of documents in our files.

11        Q.    And how did you go about doing that?

12        A.    Well, we have a gentleman, Tom Shaner, who

13   has been employed by Easy Street since 2005, he does

14   all of our plat surveys, he's very familiar with how

15   to go get that kind of information.  So I asked Tom

16   if he could go up to the city and pull the building

17   permits.

18        Q.    Did he deliver to you the building permit

19   for your space?

20        A.    No.

21        Q.    Why not?

22        A.    He could not find one.

23        Q.    What did he find?

24        A.    He found a plat that was --

25              MR. PAYNE:  Your Honor, I'll object and

1    move to strike here based on foundation, hearsay.

2    He's testifying not from his personal knowledge, but

3    from someone else's, apparently.

4              THE COURT:  The objection is sustained.

5              What are you seeking to strike?

6              MR. PAYNE:  Just that last response.

7              THE COURT:  Okay.  The last response is

8    stricken.

9         Q.    (By Mr. Gordon)  Did Mr. Shaner deliver to

10   you a copy of the plat for the parking garage?

11        A.    Yes, he did.

12        Q.    Did you review that plat?

13        A.    Yes, I did.

14        Q.    Did that plat create any concerns in your

15   mind concerning the safety of the building?

16        A.    Yes, it did.

17        Q.    What were those concerns?

18        A.    First of all, the plat was not at all

19   similar to the actual structure that is existing.

20   And the plat clearly showed egress and ADA accessing

21   that had been -- that was no longer in place.

22             MR. PAYNE:  Object as far as the comment

23   about ADA accessing and foundation and qualification

24   of this witness to make that determination, Your

25   Honor.  I move to strike that portion of the answer.

1          MR. GORDON:  We're not offering it for the

2    truth of the matter asserted, Your Honor, only that

3    those were the concerns that were created when he

4    reviewed the plat.

5          THE COURT:  All right.  I'll admit it.

6      Q.    (By Mr. Gordon)  At any time did you

7    contact or attempt to contact UOSH, the party that

8    kind of started this process?

9      A.    Yes.  We asked -- formally asked UOSH if

10   they would come back and reinspect the facility to

11   either clarify their position or rescind their

12   position.

13         MR. GORDON:  Your Honor, may I approach?

14         THE COURT:  You may.

15     Q.    (By Mr. Gordon)  Bill, I'm handing you

16   what is marked as Exhibit Number -- I forgot to look

17   again.  Is it number 11?

18     A.    Number 12.

19     Q.    Number 12.  Do you recognize it?

20     A.    Yes, I do.

21     Q.    What is it?

22     A.    It's the documentation relative to our

23   request to UOSH.

24     Q.    On page 2, is that your signature?

25     A.    Yes, it is.

1        Q.    And was this submitted to UOSH, Utah

2   Occupational Safety and Health division?

3        A.    Yes, it was.

4              MR. GORDON:  Your Honor, I would move to

5   have this admitted into evidence.

6              MR. PAYNE:  May I have just a moment to

7   review it, Your Honor?

8              THE COURT:  You may.

9              MR. PAYNE:  I have no objection.

10              THE COURT:  Exhibit 12 is received.

11              MR. GORDON:  Your Honor, may I approach?

12              THE COURT:  You may.

13              MR. GORDON:  Your Honor, if I may approach

14   again.

15        Q.    (By Mr. Gordon)  I hand you what has been

16   marked as Exhibit Number 13, Bill.  Do you recognize

17   it?

18        A.    Yes, I do.

19        Q.    What is it?

20        A.    It is the response from UOSH.

21        Q.    Very good.  And did this come directly to

22   you?

23        A.    Yes, it did.

24        Q.    Is this a true and correct copy of the

25   letter they sent in response to your request?

```
1        A.    Yes, it is.
2              MR. GORDON:  Your Honor, I would move to
3   admit this into evidence.
4              MR. PAYNE:  Your Honor, may I have a
5   moment to review it?
6              THE COURT:  You may.
7              MR. PAYNE:  Object on the grounds of
8   hearsay, Your Honor.
9              MR. GORDON:  I would move under 8038
10  again, Your Honor, that this is a -- the same basis
11  as before, Your Honor, that this is, once again, a
12  public report and that based on that it should be
13  admitted.
14             THE COURT:  I might need to see a copy of
15  it.
16             MR. GORDON:  Oh, I'm sorry, Your Honor.
17  I've been withholding.
18             THE COURT:  So Exhibit 13 is a letter from
19  Mr. Daniel King, State of Utah Labor Commission, to
20  Mr. Shoaf basically informing him that the complaint
21  concerning Cloud Nine is invalid.
22             MR. GORDON:  Yes.  That they were not
23  going to exercise jurisdiction, took no action at the
24  time.
25             THE COURT:  Why wouldn't this be
```

1    admissible under 8038?

2              MR. GORDON:  8038, Your Honor.

3              THE COURT:  I mean, it is a letter, but it

4    does appear to be a statement in any form, civil

5    action.

6              I'm going to admit it.

7              MR. GORDON:  Thank you, Your Honor.

8              THE COURT:  Exhibit 13 is received.

9         Q.    (By Mr. Gordon)  Bill, in that letter, did

10   UOSH choose to exercise jurisdiction over the safety

11   issues?

12        A.    No.

13        Q.    After UOSH decided not to take

14   jurisdiction, where did that leave you in trying to

15   determine what you were going to do with the space?

16        A.    Well, we could not find a building permit,

17   we couldn't get anyone to give us a letter telling us

18   that we were in a compliant space, and to therefore

19   provide us with the necessary liability coverage

20   indemnification that we thought was important.  We

21   had reservations of where we were, so we had no

22   choice but to try to, again, ask the landlord for a

23   further letter of indemnification, which did not

24   happen.  And that's when we went ahead and hired an

25   engineer to see if the issues that we thought we had

1    before us were, in fact, true or not.

2          Q.    At some point did you pull your people out

3    of what has been marked on Exhibit (inaudible)?

4                MR. PAYNE:  Objection, leading.

5                THE COURT:  Sustained.

6          Q.    (By Mr. Gordon)  What did you choose to do

7    with your employees based on the concerns that you

8    had?

9          A.    In May of 2009 we made a decision, as we

10   could not make headway with regards to any kind of

11   letter from anybody of -- regarding the safety of the

12   back area, to move all of our people out of area 2,

13   which we did.

14               And then basically in October of -- well,

15   after we had gone through the issues of trying to get

16   a building permit and had seen the plat and had

17   further concerns about the overall safety of the

18   building, then in October of '09 we made a decision

19   to move everybody out of the building because it now

20   was -- we were now concerned about the overall access

21   and egress from our space in the event of a fire.

22         Q.    How long was rent paid on the space?

23         A.    Until the end of last year.

24         Q.    Bill, the landlord claims that you're

25   doing nothing but raising false claims about the

1    safety of the building in order to get out from

2    underneath personal liability on the lease.  Is this

3    true?

4        A.    No.

5        Q.    Why not?

6        A.    Compared to the other liabilities that I

7    have relative to the bankruptcy, this is a very minor

8    issue to worry about on a financial or any other

9    basis, personally.

10       Q.    When did you first raise -- or when did

11   Cloud Nine first raise safety issues with the lease?

12       A.    In October of 2008.

13       Q.    When did Easy Street Partners actually

14   file bankruptcy?

15       A.    September the 14th of 2009.

16       Q.    Bill, why did you move your employees out

17   of the space?

18       A.    On two levels.  I am a -- I am financially

19   and fiduciarily responsible to the partnership with

20   regards to liabilities.  So on a financial level,

21   unless I could get some form of letter from the city

22   stating categorically that we had a compliant and

23   safe space, I felt that I was at risk if anything did

24   happen.  And so we acted accordingly and continued to

25   try to get that letter.

1          On a moral level I have a responsibility

2  to my employees to not put them into an environment

3  that I feel is unsafe or could potentially result in

4  harm to themselves.

5          MR. GORDON:  Thank you, Your Honor.  No

6  further questions.

7          THE COURT:  Mr. Payne, any desire to

8  cross-examine?

9          MR. PAYNE:  Yes, Your Honor.

10

11                CROSS-EXAMINATION

12  BY MR. PAYNE:

13     Q.    Mr. Shoaf, Doug Payne on behalf of Gateway

14  Center.

15          Let me have you look at -- if you would,

16  at Exhibit 8, which is the lease.  And would you look

17  at the front -- the first page of that document,

18  paragraph 1 under property?

19     A.    Uh-huh (affirmative).

20     Q.    Will you start reading -- would you read

21  the two sentences that begin with -- the second

22  sentence which begins on line two, with the property

23  consists?

24     A.    The property consists of the building,

25  land, common areas, landscaping and all other

1    improvements to the land including the premises.  The

2    property does not include the lower levels of the

3    building which consist of a parking garage owned or

4    controlled by third parties.

5         Q.    Okay.  So that was your understanding, was

6    it not, that the parking garage was not among the

7    common areas that was part of the leased property; is

8    that right?

9         A.    That's correct.

10        Q.    Okay.  When did this UOSH inspection

11   occur?

12        A.    In October of 2008.

13        Q.    When did UOSH provide a written report of

14   that inspection?  Was it about that time?

15        A.    They provided the report -- it looks like

16   in November, but there's no -- there's no time on

17   this.

18        Q.    All right.

19        A.    There's no date.

20        Q.    All right.  Let me refer you to Exhibit 9.

21   Do you see that document?

22        A.    Uh-huh (affirmative).

23        Q.    What's that document?

24        A.    That's an assignment between Cloud Nine

25   Resorts and Easy Street Partners relative to --

1          Q.    Was Easy Street Partners obligated on the

2     lease to Gateway Center before it executed this

3     document?

4          A.    No.

5               MR. GORDON:  Objection, Your Honor, that's

6     calling for a legal conclusion.

7               THE COURT:  Sustained.

8          Q.    (By Mr. Payne)  Was it your understanding

9     that Easy Street Partners had any legal obligation to

10    Gateway Center on a lease of space 303 in Gateway

11    Center prior to the execution of Exhibit 9?

12         A.    I don't know that I can tell you legally

13    what it was obligated to do.

14         Q.    I'm not saying legally.  I'm just saying

15    did you have an understanding as to whether --

16    whether it was obligated.

17         A.    The understanding I have is that Easy

18    Street Partners paid the rent from day one for this

19    lease.

20         Q.    Okay.  Do you have any basis to believe

21    that there may have been a legal obligation for Easy

22    Street to pay rent prior to executing Exhibit 9?

23               MR. GORDON:  Objection, Your Honor, the

24    document speaks for itself.

25               MR. PAYNE:  I'm not asking about the

1   document.  I'm asking if he has any basis other than

2   that document prior to that time.

3               MR. GORDON:  Objection, parol evidence

4   then.

5               THE COURT:  Overruled.

6               THE WITNESS:  Do I believe it has a legal

7   responsibility?

8         Q.    (By Mr. Payne)  Is there any basis you

9   have to believe that Easy Street Partners may have

10  been obligated to Gateway Center on the lease before

11  Exhibit 9 was signed?

12        A.    Yes.

13        Q.    What's that?

14        A.    Easy Street Partners was provided that

15  space so that it could conduct its business prior to

16  and after the opening of the hotel.  It housed the

17  employees, it paid the rent.  And that obligation was

18  made by me on behalf of the partnership as the

19  managing partner of the entity and executed by me

20  under Cloud Nine when it first happened because there

21  really wasn't an entity under Easy Street that was

22  acceptable.

23        Q.    So are you saying that in your mind Cloud

24  Nine and Easy Street were basically interchangeable?

25        A.    Cloud Nine was the representative partner

1   for Easy Street.  And during our discussions with the

2   landlord and his representative, Candice Colus, it

3   was their desire that I personally guarantee this on

4   behalf of the partnership and that it be executed

5   with Cloud Nine Resort.  At the time this was

6   executed there was no hotel open.

7        Q.     And you said -- I believe you said earlier

8   that you had concerns about the safety of the space

9   at or about the time of the UOSH inspection; is that

10  right?

11       A.     Yes.

12       Q.     And notwithstanding that concern, you

13  executed on behalf of Easy Street Partners Exhibit 9

14  in January of 2009, some two or three months after

15  the UOSH inspection; isn't that correct?

16       A.     That's correct, because our auditors at

17  that time asked that that lease be transferred over

18  because it was, in fact, something that they did not

19  like to see.

20            MR. GORDON:  Object and move to strike the

21  last portion of that as nonresponsive.

22            THE COURT:  Sustained.

23       Q.     (By Mr. Payne)  And you also signed a

24  personal guarantee or -- at least acknowledging the

25  assumption and assignment as a personal guarantor as

1       part of Exhibit 9; isn't that correct?

2           A.      That was required.

3           Q.      But you signed that, that's your signature

4       on the second page of Exhibit 9, correct?

5           A.      That's correct.

6           Q.      Were you ever made aware that Gateway

7       Center took the position that Mr. Hahn had indicated

8       that the right angle measurement was not the correct

9       way to measure the distance?

10          A.      I was aware of that, yes.

11          Q.      You chose not to believe that though; is

12      that right?

13          A.      No.  Mr. Hahn actually stated to me that

14      there were two ways to measure and one was the way

15      that was 98.8 and the other was 103.

16          Q.      Isn't it true that Park City has never

17      issued a violation for this space with respect to

18      that 100-foot issue as far as distance from exits?

19          A.      That's correct.

20          Q.      And isn't it also true that Park City has

21      indicated that that exit is in compliance?

22          A.      I don't believe that they have issued

23      anything about the exit being in compliance.  They

24      did issue something regarding the 100 feet.

25          Q.      Well, the 100-feet distance to the exit or

1   elevator, correct?

2        A.    Well, to be very clear, 100 feet does not

3   get you to the exit.  You're 103 feet to the exit.

4        Q.    Let me refer you to Exhibit 5.  Do you see

5   that document?

6        A.    Uh-huh (affirmative).

7        Q.    You've seen that before, haven't you?

8        A.    Yes, I have.

9        Q.    In paragraph numbered number 1, can you

10  read -- can you read through that paragraph and tell

11  me if you still take the position that the city's

12  never indicated that the 100-foot requirement was

13  satisfied?

14       A.    Mr. Shoaf contacted the Park City building

15  department to discuss his concern of exiting within

16  the office space 303.

17            Roger Evans, plan examiner, and myself

18  measured the distance at 97 feet at which point you

19  have direct access to an enclosed stairway or front

20  entry door.

21            In the current 2006 International Building

22  Code, this situation is divined as the common path of

23  egress -- I'm sorry, the common path of egress

24  travel.

25            The 1994 Uniform Building Code limits the

1    distance through the atrium at 100 feet as per

2    section 402.4.

3              All tenants have access to one of the

4    enclosed stairways that complies with this

5    requirement.

6              Section 1003.4 allows 150 travel distance

7    because the building has an automatic fire sprinkler

8    system.

9         Q.    Okay.  All right.  Thank you.

10             So do you still take the position that the

11   city's never indicated that that 100-foot requirement

12   is satisfied?

13        A.    This is the first document we've ever

14   received where they put it in writing that we are

15   compliant.

16        Q.    Did you ever provide a copy of the UOSH

17   report to Gateway Center prior to the reply brief

18   that was -- had as an attachment that was served last

19   week?

20        A.    I did not, no.

21        Q.    Where did you move the employees of Easy

22   Street Partners who had been housed in the Gateway

23   Center space when you pulled employees out?

24        A.    We sequestered what was the employee

25   locker room and lunchroom area and converted it into

1    offices.

2           Q.    And where is that?

3           A.    In the basement.

4           Q.    Of which building?

5           A.    Of the Sky Lodge.

6           Q.    Of the Sky Lodge.  So you were able to

7    find space to house employees there; is that correct?

8           A.    At the harm of other employees, yes.

9           Q.    I would appreciate a yes or no answer to

10   the question.

11          You didn't ever ask Paul Piper or Gateway

12   Center to help you get a copy of the building permit,

13   did you?

14          A.    I don't think I did.  I don't know if

15   anyone else did.

16          MR. PAYNE:  May I have just one moment,

17   Your Honor?

18          THE COURT:  You may.

19          MR. PAYNE:  That's all I have of this

20   witness, Your Honor.

21          THE COURT:  Any desire to redirect?

22          MR. GORDON:  I will be brief, Your Honor.

23

24              REDIRECT EXAMINATION

25   BY MR. GORDON:

1          Q.     Bill, why did you sign the assignment?

2          A.     I'm sorry?

3          Q.     Why did you sign the assignment of the

4    lease?

5          A.     To put the lease in the proper structure

6    of Easy Street Partners.

7          Q.     When was the first time that you received

8    any correspondence from the city indicating that your

9    space was compliant for purposes of the egress issue?

10         A.     April 8th of this year.

11         Q.     When did you first ask the landlord to

12   obtain a letter from the city?

13         A.     In October of 2009 -- eight -- nine.

14         Q.     How many months had passed in between your

15   first request and when you finally received something

16   from the city?

17         A.     It looks like about 14 or -- 14 or more

18   months.

19         Q.     Did the landlord deliver this letter?

20         A.     No.

21         Q.     How did you receive the letter?

22         A.     The letter was received due to our asset

23   manager meeting with Ron Ivie and with our engineer

24   to present his report and asking the city on behalf

25   of the asset manager and the bankruptcy situation to

1   clarify the situation.

2            MR. GORDON:  No further questions, Your

3   Honor.

4            MR. PAYNE:  None, Your Honor.

5            THE COURT:  You may step down.

6            THE WITNESS:  Do I just leave all this

7   here, Your Honor?

8            THE COURT:  You can just leave that there,

9   yes.

10           MR. GORDON:  Your Honor, this will be my

11   last witness.

12           We'll call Marina Soto.

13           THE CLERK:  Please step forward and raise

14   your right hand.

15

16                  <u>**MARINA SOTO**</u>,

17           called as a witness, having been duly

18   sworn, was examined and testified as follows:

19

20           THE CLERK:  Please take the witness stand.

21           State and spell your name.

22           THE WITNESS:  My name is Marina Soto,

23   M-A-R-I-N-A, S-O-T-O.

24                        ***

25                        ***

1                    DIRECT EXAMINATION

2       BY MR. GORDON:

3            Q.    Marina, where do you work?

4            A.    I work for Easy Street Partners.

5            Q.    What do you do?

6            A.    I'm the human resources director.

7            Q.    What is your official -- well, you just

8       told me your official title.

9                  How long have you worked for Easy Street

10      Partners?

11           A.    It will be three years in July of this

12      year.

13           Q.    Do you remember what happened on September

14      18th, 2008?

15           A.    Yes, I do.

16           Q.    What happened?

17           A.    I had a meeting with an agent from the

18      UOSH.

19           Q.    Did you -- what happened when you met with

20      the agent from UOSH?

21           A.    We first met at the Gateway Center where

22      my office was.  We had a previous meeting where he

23      explained to me what he was going to walk through the

24      hotel across the street.  When we were leaving across

25      the street he asked me about my office.  And I said,

1    well, this is our office here.

2          Q.     And which -- where was your office

3    located?

4          A.     At the Gateway Center.

5          Q.     Okay.

6          A.     And he told me that he needed to inspect

7    that as well.  And I told him that I only wanted him

8    to inspect the hotel.  And he said, well, this is

9    part of where employees are, so this will be part of

10   the overall inspection.

11         Q.     I see.

12         A.     So he inspected the Gateway and then we

13   moved forward to the hotel.

14         Q.     Were you with him when you walked through

15   the Gateway Center space?

16         A.     Yes, sir.  I was with him at all times.

17         Q.     Did he comment on the safety of the space?

18         A.     Yes, he did.

19         Q.     Did any of those comments or concerns make

20   it into the official report that he later issued?

21                MR. PAYNE:  Objection, leading and it's

22   characterizing it as concerns.  There's no evidence

23   that there were any concerns expressed.

24                THE COURT:  I'm going to overrule the

25   objection.

1    Q.    (By Mr. Gordon)  Did any of the things

2    that you discussed make it into the report?

3    A.    Yes.

4    MR. GORDON:  Your Honor, we have

5    recently -- we have previously marked as Exhibit 11

6    the UOSH report.  And let me approach and see if we

7    can find that for Ms. Soto, if I may.

8    THE COURT:  All right.

9    Q.    (By Mr. Gordon)  Ms. Soto, I'm handing you

10   what is marked as Exhibit 11.  Do you recognize it?

11   A.    Yes, I do.

12   Q.    What is it?

13   A.    This is the report that was sent back to

14   me from the UOSH agent.

15   Q.    Is there any place in this report that

16   contains analysis of your walk-through of the Gateway

17   Center with the UOSH inspector?

18   A.    Yes.

19   Q.    Can you tell me where?

20   A.    Let me find -- in page 9.

21   Q.    Can you, please, explain what the analysis

22   is there?

23   A.    It says the description exit sign not

24   close enough to office stairs.  Do you want me to

25   explain what this is?

1        Q.     Yes.

2        A.     When we were leaving to the hotel, the

3    UOSH agent pointed out to me that the door to the

4    stairways didn't have an exit sign, so he didn't know

5    it was an exit.  So he pointed out that we needed to

6    put an exit sign in there.  So I corrected him.  I

7    said that we do have an exit sign in the glass doors.

8    And he corrected me back and he says the glass doors

9    will take you to a common area.  In your office, this

10   is the emergency door that will take you to the

11   stairs in case of an emergency, like a fire, he

12   mentioned.

13       Q.     I see.

14       A.     And he says and this door doesn't have any

15   signs that it will take you outside.

16       Q.     Okay.  Very good.  Is this a true and

17   correct copy of the report that you received from the

18   UOSH inspector?

19       A.     Yes, it is.

20              MR. GORDON:  Your Honor, I would move to

21   admit this into evidence.

22              MR. PAYNE:  Same objection, hearsay.

23              MR. GORDON:  Same response, Your Honor.

24              THE COURT:  I think with the testimony

25   from Ms. Soto, the Court finds adequate foundation

1    and Exhibit 11 will be received.

2              MR. GORDON:  Thank you, Your Honor.  No

3    further questions.

4              THE COURT:  You may -- oh, Mr. Payne.

5

6                   CROSS-EXAMINATION

7    BY MR. PAYNE:

8         Q.    Ms. Soto, you referred to the top of page

9    9 of this UOSH report, which is Exhibit 11, as being

10   the part of that report that talks about an

11   inspection of the Gateway Center; is that right?

12        A.    Yes.

13        Q.    And the lack of an exit sign over a

14   stairway; is that right?

15        A.    Yes, sir.

16        Q.    Is there anything in this report that you

17   are aware of that reflects any concern or possible

18   violation because an exit is more than 100 feet from

19   some of the space?

20             In this report.  Can you point to anything

21   in the report that says that?

22        A.    Not in the report.

23        Q.    Okay.  So page 9 -- okay.

24             MR. PAYNE:  No further questions.

25             MR. GORDON:  Nothing further, Your Honor.

1          THE COURT:  You may step down.

2          THE WITNESS:  Do you want me to leave this

3     here?

4          MR. GORDON:  Your Honor -- I'm sorry.  I

5     have no further witnesses, Your Honor.

6          THE COURT:  Mr. Payne, do you have any

7     witnesses?

8          MR. PAYNE:  Yes.  I would like to call

9     Mr. Paul Piper.

10          THE CLERK:  Please step forward and raise

11     your right hand.

12

13                    PAUL PIPER,

14          called as a witness, having been duly

15     sworn, was examined and testified as follows:

16

17          THE CLERK:  Please take the witness stand.

18          State and spell your name.

19          THE WITNESS:  Paul Piper, P-A-U-L,

20     P-I-P-E-R.

21          MR. PAYNE:  The break didn't do me any

22     favors, Your Honor.  I shuffled my papers.

23

24                DIRECT EXAMINATION

25     BY MR. PAYNE:

86

1        Q.      Would you, please, state your full name?

2        A.      Paul Piper.

3        Q.      What is your occupation, Mr. Piper?

4        A.      I am a property manager.

5        Q.      For whom are you employed?

6        A.      CRG.  CRG Utah Management.

7        Q.      And where are you employed?

8        A.      Our office is at 614 Main Street, Park

9  City, Utah.

10       Q.      Park City, Utah.  Are you familiar with

11 the Gateway Center property?

12       A.      Yes, I am.

13       Q.      Do you have any involvement with respect

14 to that property?

15       A.      Yes.  I am the property manager.

16       Q.      How long have you been the property

17 manager for Gateway Center?

18       A.      Since September 1st, 2008.

19       Q.      Okay.  Are you familiar with the space

20 in -- that's been labeled as space 303 in the Gateway

21 Center?

22       A.      Yes, I am.

23              MR. PAYNE:  Permission to approach the

24 witness, Your Honor.

25              THE COURT:  You may.

1          Q.      (By Mr. Payne)  Mr. Piper, I've handed you

2     what's been marked as G-1, G for Gateway.  Do you

3     recognize this document?

4          A.      Yes, I do.

5          Q.      Is that your signature on that document?

6          A.      Yes, it is.

7          Q.      Did you assist in the preparation of this

8     document?

9          A.      Yes, I did.

10         Q.      Was it based upon the business records

11    that you maintain as the property manager of Gateway

12    Center in the ordinary course of business?

13         A.      Yes, it was.

14              MR. PAYNE:  I'll move for admission of

15    Exhibit G-1, Your Honor.

16              THE COURT:  Any objection?

17              MR. GORDON:  I'm just looking through it.

18              Is it this entire packet that we're

19    admitting?  Is that correct?

20              MR. PAYNE:  Yes.  It's the proof of claim

21    that's on file with the Court.

22              THE COURT:  Yes.

23              MR. GORDON:  Okay.

24              No objection, Your Honor.

25              THE COURT:  Exhibit G-1 is received.

1      Q.     (By Mr. Payne)  Mr. Piper, does Park City

2  conduct periodic inspections of the Gateway Center

3  building?

4      A.     Yes, they do.

5      Q.     How often does it do that?

6      A.     Annually.  It's the -- usually the --

7             MR. GORDON:  Objection, Your Honor.

8  Clarification.  When he says "Park City," who does he

9  mean?

10            THE WITNESS:  It's usually the fire

11  authorities.

12     Q.     (By Mr. Payne)  Fire authorities, okay.

13  And how long have you been -- you personally, been

14  managing the Gateway Center property?

15     A.     Well, since -- since September 1st, 2008,

16  so --

17     Q.     Okay.  That's fine.  That's good enough.

18  And during the time that you've been managing the

19  property, have there been such inspections by the

20  Park City fire authorities?

21     A.     Yes, there has.

22     Q.     And when have those occurred?

23     A.     They usually occur in January.

24     Q.     Okay.

25     A.     Or you could say the winter.

1          Q.     Have you ever been given notice by the

2     city fire inspectors of any material violations of

3     the fire code?

4          A.     When you say material, you mean just any

5     violation or --

6          Q.     Major.  Major.

7          A.     Major violation.  No.

8          Q.     No.  Okay.  And in connection with those

9     reports -- excuse me.  In connection with those

10    inspections, have you received a report -- report

11    from the city?

12         A.     Yes, I have.

13         Q.     All right.

14              MR. PAYNE:  May I approach the witness,

15    Your Honor?

16              THE COURT:  You may.

17         Q.     (By Mr. Payne)  Mr. Piper, I've handed you

18    two documents.  One -- let's look at G-5 first.  And

19    the other one is G-12.  But let's look at G-5.  Do

20    you recognize that document?

21         A.     Yes, I do.

22         Q.     Can you tell me what that is?

23         A.     That's the fire safety inspection report

24    from January 27th, 2009 for Gateway Center.

25         Q.     This was received by you as the

1   building -- the property manager for Gateway Center?

2        A.    It was actually received by another

3   employee of CRG.

4        Q.    Okay.  But -- well, your office?

5        A.    Right.

6        Q.    Is that correct?

7        A.    Right.

8        Q.    And in connection with this inspection,

9   did you understand that there were any significant

10  problems with fire safety in connection with the

11  Gateway Center property?

12       A.    Not significant, no.

13       Q.    Okay.

14            MR. PAYNE:  Your Honor, I will offer

15  Exhibit G-5.

16            THE COURT:  Is there any objection?

17            MR. GORDON:  I know the response, Your

18  Honor.  I'll just make it as part of the record, as

19  hearsay.

20            MR. PAYNE:  And I will rely on 8038.

21            THE COURT:  8038, yes.

22            The objection is overruled.  Exhibit G-5

23  is received.

24       Q.    (By Mr. Payne)  Let me refer you to

25  Exhibit G-12, Mr. Piper.

1          A.      Okay.

2          Q.      Have you seen that document before?

3          A.      Yes, I have.

4          Q.      Can you tell me what that is?

5          A.      This is the fire inspection report --

6     Where's the date on this one?  The inspection date

7     was 3-5-2010.

8          Q.      Was this something that was provided to

9     your office by Park City fire department?

10         A.      Yes, it was.

11              MR. PAYNE:  I'll offer Exhibit G-12, Your

12    Honor.

13              MR. GORDON:  Same objection, Your Honor,

14    hearsay.

15              MR. PAYNE:  Same argument in support.

16              THE COURT:  Same ruling.  Exhibit G-12 is

17    received.

18         Q.      (By Mr. Payne)  Mr. Piper, what -- do you

19    have a practice when you become aware of code

20    violations for a building, whether they're fire code

21    or other code violations?

22         A.      We try to remedy any violations or any

23    wrongdoings.

24         Q.      You try to -- you try to remedy the

25    violations; is that what you said?

1      A.      Right.  We remedy the violations.

2      Q.      Your voice trailed off a little bit there.

3  I'm sorry.

4      A.      Sorry.

5      Q.      Other than the violations asserted here

6  on -- in -- minor fire code violations in G-5 and

7  G-12, have you become -- been made aware of any code

8  violations for the Gateway Center property while

9  you've been managing it?

10     A.      Not by the city.

11     Q.      Not by the city.  Okay.  From another

12  source, have you?

13     A.      Yes.

14     Q.      Tell me about that.

15     A.      The other source was from the tenant, Easy

16  Street Partners.

17     Q.      Okay.  What violations are you referring

18  to?

19     A.      The first violation was the amount of --

20  the 100 feet or more or less it took to either see or

21  get to an exit in their space.

22     Q.      Okay.  Did you believe that to be a

23  violation or an alleged violation?

24     A.      I believed it to be an alleged violation.

25     Q.      But you took some action to try to get

1    into that, to address that?

2         A.    Yes.  I contacted the architect.

3         Q.    Okay.  And after -- okay.  Any other

4    violations or issues that you've dealt with in

5    that -- regarding violations or claimed violations?

6         A.    The other alleged violations.  There was

7    some debris in a stairwell in the parking garage, and

8    we had that removed.

9         Q.    Okay.  When did you become aware of that

10   being an issue?

11        A.    That was in a letter from Easy Street's

12   architects.  It's Summit -- is it Summit --

13        Q.    Summit Engineering?

14        A.    Summit Engineering.  And that was in

15   February of 2010.

16        Q.    And how long after learning of that did it

17   take you to take action?

18        A.    It was immediately.

19        Q.    Immediately.  Okay.  All right.  Any other

20   issues with any code violations or alleged code

21   violations that you have been made aware of that were

22   not of the minor type in the fire inspection reports?

23        A.    Any major?

24        Q.    Yes.

25        A.    No, not that I'm aware of.

1        Q.      Are you aware of there being an allegation
2   that there was noncompliance with respect to ADA
3   parking in the parking garage?
4        A.      Yes, I was.
5        Q.      And when did you become aware of that?
6        A.      With the letter, the same letter that was
7   given to me from Summit Engineering in February 2010.
8        Q.      Did you do anything after learning of that
9   alleged violation?
10       A.      The first thing I did was actually
11  contacted the city because it was referring to their
12  portion of the garage.
13       Q.      When you say "their portion," explain
14  that.  Does the city own part of the garage?
15       A.      Yes.  The city owns the majority of the
16  upper level garage with the exception of two parking
17  spaces.
18       Q.      Is the other -- is the rest of the parking
19  garage also privately owned?
20       A.      The lower parking garage is privately
21  owned.
22       Q.      And is that why it's not part of the
23  leased property on the leases?
24       A.      I would imagine.
25       Q.      All right.  So what did you do after --

1   you contacted Park City.  Then tell me what happened.

2        A.      Well, to remedy the alleged code, we moved

3   the parking barricades back to make space for someone

4   to egress if they needed to.

5        Q.      Okay.  And you did that shortly after

6   learning of the ADA issue?

7        A.      Yes.

8        Q.      All right.  Have you ever been provided a

9   copy of a UOSH, Utah Occupational Safety and Health

10  administration, or OSHA inspection of Sky Lodge's or

11  any part of the Gateway?

12       A.      Not before the one I saw yesterday.

13       Q.      Okay.  And that was one that I showed you;

14  is that correct?

15       A.      That's correct.

16       Q.      That had been provided as part of a

17  document -- papers filed with the court by Easy

18  Street Partners?

19       A.      Correct.

20       Q.      I indicated that; is that right?

21       A.      I never received it before that, no.

22       Q.      Okay.  You were here in the courtroom and

23  heard Mr. Shoaf testify, did you not?

24       A.      Yes, I did.

25       Q.      Did you hear him testify that Easy Street

1    Partners vacated the area that he had marked as, I

2    think, area 2 on Exhibit Number -- I would have to

3    refer to that exhibit number.  Is that Exhibit 12?

4    With the diagram and the map.

5              THE COURT:  I think 10.

6         Q.    (By Mr. Payne)  Excuse me, Exhibit 10.

7    Why don't we refer to Exhibit 10.

8         A.    Okay.

9         Q.    Do you see the area that's been

10   highlighted and colored, I think, in green on this

11   version?

12        A.    Yes.

13        Q.    Marked area 2?

14        A.    Yes, I see it.

15        Q.    And you're familiar with that entire space

16   there that's space 303, are you not?

17        A.    Yes, I am.

18        Q.    You heard Mr. Shoaf testify that Easy

19   Street Partners vacated that space in March 2009, did

20   you hear that?

21        A.    In March -- yes, I did.

22        Q.    And do you agree with that?

23        A.    No, I do not.

24              MR. GORDON:  Objection, Your Honor, that

25   was incorrect.  I believe the testimony was May of

1    2009.

2              MR. PAYNE:  May.  Okay.  Let me correct

3    the question then if that was the testimony.  I

4    apologize.

5         Q.    (By Mr. Payne)  May -- you heard testimony

6    May 2009 and that space was vacated, area 2.  Do you

7    agree with that?

8         A.    No, I did not.

9         Q.    Tell me why you do not.

10        A.    They still had equipment, they still met

11   in the conference room, which is in area 2.  They

12   also used the small kitchen which is in area 2.

13        Q.    Okay.

14        A.    And they also had a copier in area 2.

15        Q.    Okay.  Can you point to -- hold up Exhibit

16   10 like this sideways so that maybe the Judge can see

17   it.

18        A.    Oh, sure.

19        Q.    And point to the part of it that is the

20   conference room.

21        A.    This is the conference room.

22        Q.    Okay.  You're pointing -- okay.  And can

23   you point to the area where the kitchen is?

24        A.    This is where the kitchen is.

25        Q.    Okay.  Can you point to where a copy

1    machine was?

2         A.    Right in this area.

3         Q.    Okay.  So the record should reflect for

4    the conference room you pointed to a square portion

5    of that.  Maybe what we ought to do is have you get a

6    pen and mark that, if you would.

7         A.    Sure.

8         Q.    Hold on.  Maybe just write C-O-N-F or

9    something where the conference room is.

10        A.    Okay.

11        Q.    And where the kitchen is, K-I-T-C-H,

12   maybe.

13             And then just write copier in the area

14   where the copier was.

15        A.    Okay.

16        Q.    All right.  Thank you.  And can you tell

17   me how you knew that that area was still being used

18   after May 2009, Mr. Piper?

19        A.    On occasion I will come into the spaces to

20   either talk to tenants or if the tenants need any

21   information from me, say, a billing statement,

22   something like that.  And I've noticed that they were

23   still in the space.  And also when I went into Hunter

24   Capital, which is the adjacent space --

25        Q.    Adjacent to --

1      A.      Adjacent to Easy Street's place.

2      Q.      Okay.

3      A.      They actually have, like, frosted windows

4  in their conference room and you can see if someone

5  is in there.  And you can see if the lights are on or

6  if they're having a meeting.

7      Q.      So you observed activity in the conference

8  room --

9      A.      Right.

10     Q.      -- is that correct?

11     A.      Correct.

12     Q.      Is there any other kitchen facility in the

13  space number 303 other than the one you've

14  identified?

15     A.      No.

16     Q.      And I think you also heard Mr. Shoaf

17  testify that the space in its entirety was vacated

18  in, I think, November of 2009, I believe he said.

19     A.      I think he said October.

20     Q.      October.  Okay.  Do you agree with that?

21     A.      No, I do not.

22     Q.      Why?

23     A.      They had equipment and some personnel in

24  the space at least through January 2010.

25     Q.      Okay.  How do you know that?

1      A.     I'm always in Gateway Center and I --

2  well, the main reason I know that they still had

3  equipment is because it wasn't all moved out.  You

4  could see it.

5      Q.     Okay.

6      A.     And when walking through Gateway Center,

7  you can tell if someone is in the space or not, if

8  the lights are on or -- you know, it wasn't vacated.

9      Q.     Since January of this year, has that

10  equipment been removed?

11      A.     Yes.

12      Q.     And do you know when that was,

13  approximately?

14      A.     Approximately -- I had the space -- this

15  space was for sure empty in March, of everything.  I

16  would say it was probably in February 2010.

17      Q.     Okay.

18      A.     They've got -- every -- all the desks, all

19  the equipment out.

20      Q.     Did anyone on behalf of Easy Street

21  Partners or Cloud Nine or Bill Shoaf ever ask you to

22  assist them in getting -- obtaining a copy of the

23  building permit that had been obtained from Park City

24  to remodel their space before they moved in?

25      A.     No.

1        MR. PAYNE:  That's all I have, Your Honor.

2        THE COURT:  Any cross-examination?

3        MR. GORDON:  Yes, Your Honor.

4

5                    <u>CROSS-EXAMINATION</u>

6    <u>BY MR. GORDON</u>:

7        Q.    Good afternoon, Mr. Piper.

8        A.    Good afternoon.

9        Q.    I want to refer to you -- or you to

10   Exhibits 1 through 4.  If you can pull those up.

11   Those should be letters from my office.

12       A.    Oh.  Thank you.

13       Q.    You testified that you've been the

14   property manager since September 1 of 2008; is that

15   correct?

16       A.    That's correct.

17       Q.    I'm going to refer to Exhibit 1, which is

18   a letter dated April 13, 2009.  Have you ever seen

19   this letter?

20       A.    It looks familiar.

21       Q.    Okay.  Have you read it?

22       A.    Yes.  But there's -- if I'll read through

23   it, I'll tell you.  Hold on.

24       Q.    That's fine.

25       A.    Yes.  I've read this letter.

1      Q.    Very good.  So you've seen this letter.

2            Let's move to the next one, September 17,

3      2009, Exhibit Number 2.  Have you seen that letter?

4      A.    Yes, I've seen this letter.

5      Q.    When did you see it?

6      A.    The exact date?

7      Q.    Even a ballpark.

8      A.    I would say September 2009.

9      Q.    Okay.  Very good.

10           Let's go to October 20th, the next letter,

11     Number -- let's see here.  The October 20th letter.

12     Have you seen this letter?

13     A.    Yes, I've seen this letter.

14     Q.    When did you receive it or when did you

15     first see it?

16     A.    I don't believe I saw this one until

17     November, but -- I have seen it.  November 2009.

18     Q.    Okay.  So it would have been around

19     November is when you received it?

20     A.    Yeah.

21     Q.    Fair enough.  And then finally, the last

22     one, February 19th, 2010, Exhibit Number 4, have you

23     seen this one?

24     A.    Yes.

25     Q.    When did you see this one?

1          A.      I would say around February 2010.

2          Q.      Okay.  And I did not ask you on the first

3     one, Exhibit Number 1, when did you first see this

4     one?

5          A.      April 2009.  It may have been May.  But it

6     would have been around April 2009.

7          Q.      Okay.  Very good.  Now, you've testified

8     today that the first time that you became aware of

9     major violations in the building was from the

10    February 19 letter; is that correct?

11         A.      February 19 letter.

12         Q.      And that's --

13                 MR. PAYNE:  Objection, I think that

14    mischaracterizes his testimony.  He indicated that he

15    was aware of the 100-foot issue.

16                 THE COURT:  What was the question?

17                 MR. GORDON:  I'm sorry.  I indicated that

18    his testimony was that the first time he became aware

19    of major violations was through the February 19th,

20    2010 letter.

21                 THE COURT:  Is that your testimony?

22                 THE WITNESS:  Are you talking about

23    alleged violations or just any violation?

24         Q.      (By Mr. Gordon)  Alleged violations.

25         A.      Alleged violations from the tenant,

1   correct?

2        Q.    Uh-huh (affirmative).

3        A.    The first one was actually October 2008.

4        Q.    Uh-huh (affirmative).  Okay.

5        A.    Not February 2010.

6        Q.    Okay.  Very good.  I'm going to walk

7   briefly through these letters.  In the first letter

8   on April 13th, 2009, if you turn over --

9        A.    Which exhibit?

10       Q.    I'm sorry.  Exhibit Number 1.  And I will

11  slow down.

12       A.    I'm ready.

13       Q.    There was a request made in this letter to

14  obtain a letter from the city inspectors.  Did the

15  landlord ever obtain a letter from the city

16  inspectors indicating that the space was compliant?

17       A.    We've never obtained that letter until --

18  or a letter even remotely talking about that until

19  April 2010.

20       Q.    Okay.  So just in this last week?

21       A.    Right.

22       Q.    In the September 17th letter there were

23  issues raised concerning CAMs in that letter,

24  correct?

25       A.    It's Exhibit 2?

1       Q.      Exhibit 2, I'm sorry, yes.

2       A.      Yes, there were.

3       Q.      Okay.  And the landlord never provided any

4   documentation confirming or addressing these issues

5   to the tenant, correct?

6       A.      I am yet to be specific with -- are you

7   talking about any documentation for CAM?

8       Q.      Yes, for CAMs and how they were being

9   used.

10      A.      Like a CAM reconciliation?

11      Q.      Uh-huh (affirmative).

12              MR. PAYNE:  Your Honor, I'll object on

13  relevance here, again.  I think we're veering back

14  into --

15              THE COURT:  I think we decided we're going

16  to reserve that for another time.  So I'm going to

17  sustain the objection on relevancy.

18              MR. GORDON:  Okay.

19      Q.      (By Mr. Gordon)  Let's see here.  There

20  were also issues raised in this letter concerning ADA

21  compliance, correct?

22      A.      Exhibit 2?

23      Q.      Exhibit 2 on the second page under

24  violation number 2.

25      A.      Yes.

1          Q.     And you have, I believe, testified that

2   you did go over and move barricades in an attempt to

3   try to get the space to be compliant; is that

4   correct?

5          A.     That's correct.

6          Q.     So you admit that there were some concerns

7   there about ADA compliance and you responded to those

8   concerns?

9          A.     Yes.

10         Q.     Okay.  Let's see here.  We also put the

11  landlord on notice in this one that there were some

12  concerns concerning the way that the parking stalls

13  were arranged in the parking garage, correct?

14         A.     Are we talking about the upper level?

15         Q.     Well, the parking garage just as a parking

16  garage.

17         A.     As a whole?

18         Q.     As a whole.

19         A.     Yeah.  You're asking did you raise

20  concerns.  Yes, in this letter.

21         Q.     And the Park City building inspector in

22  April, months later, indicated that there was a

23  confirmation that those concerns were legitimate,

24  correct?

25                MR. PAYNE:  I'm -- objection, I think he's

```
 1    asking the witness to testify from documents that are

 2    in the record and --

 3              MR. GORDON:  Okay.  I'm sorry, Your Honor.

 4              MR. PAYNE:  The documents speak for

 5    themselves.

 6              THE COURT:  Sustained.

 7         Q.    (By Mr. Gordon)  The letter from Park

 8    City, from the inspector, referenced the parking

 9    stall issue, correct?

10         A.    Which letter?

11         Q.    The April 15 letter.

12         A.    From Park City?

13         Q.    Yes.

14         A.    Which exhibit is that?

15         Q.    Number 5.

16         A.    Number 5.

17              MR. PAYNE:  That letter is dated April 8,

18    if that's Exhibit 5.

19              MR. GORDON:  I'm sorry.  Exhibit 8, Your

20    Honor.

21              THE WITNESS:  Can I have the question

22    again?

23         Q.    (By Mr. Gordon)  Yes.  So the letter from

24    Park City referenced the issue with the parking

25    stalls and the parking garage, correct?
```

1          A.     One second.

2              THE COURT:  Maybe if you could direct the

3      witness's attention to the --

4              MR. GORDON:  To a specific -- I apologize.

5              Item number 8, Your Honor.

6              THE COURT:  Item number 8.

7              THE WITNESS:  I'm looking at Exhibit 5.

8      Sorry, I was looking at the wrong one.

9              Which exhibit?

10             MR. GORDON:  May I approach?

11             THE COURT:  Yes.

12             THE WITNESS:  Oh, item 8.  Okay.  Okay.

13     Your question one more time.  I'm sorry.

14         Q.     (By Mr. Gordon)  That letter refers to

15     issues with the parking stalls, correct?

16         A.     Yes, it does.

17         Q.     Let's move to Exhibit Number 3, the

18     October 20 letter.  This letter raised issues

19     concerning the west fire exit.  If you can turn over

20     to page 3 with me.  On page 3 of 4, there were issues

21     raised and the landlord was put on notice of concerns

22     concerning the fire exit in the west -- the west fire

23     exit, correct?

24         A.     Let me find the passage.

25             So, yes, it is talking about the west --

1     west stairwell.

2         Q.    Okay.  Very good.  And then --

3         MR. PAYNE:  Your Honor, is there a

4     question here other than to point to documents?  Is

5     this summing up through a witness?  I'm not sure what

6     the question really is, other than to have an

7     opportunity to identify particular parts of documents

8     that are in evidence.

9         MR. GORDON:  Your Honor, this document --

10    I want to confirm that this witness saw these

11    documents, that notice was given to the landlord --

12        THE COURT:  Well, I think that's not the

13    question.  Now, on your previous ones you asked a

14    question.  On this one you haven't asked a question,

15    so if you --

16        MR. GORDON:  Oh, I'm sorry.  Okay.  I

17    apologize.  I thought that I had asked a question,

18    Your Honor.  Very good, I will ask the question.

19        Q.    (By Mr. Gordon)  And I thought I had asked

20    the question, the letter refers to issues or concerns

21    with the west fire exit, correct?

22        A.    Yes, it does.

23        Q.    Okay.  Thank you.  Let's see here.  The

24    evidence that you have provided to the Court -- you

25    provided a fire inspection in 2009, correct?

```
 1          A.     Yes.

 2          Q.     No fire inspection for 2008, correct?

 3          A.     I could retrieve that.  But, yes, there

 4     should be one.

 5          Q.     It hasn't come into evidence, correct?

 6          A.     Not that I know of, no.

 7          Q.     And you're not really in a position to

 8     testify as to the difference between fire code and

 9     engineering code, correct?

10          A.     No.

11          Q.     Let's see here.

12                 MR. GORDON:  No further questions, Your

13     Honor.

14                 THE COURT:  Any redirect, Mr. Payne?

15                 MR. PAYNE:  Very briefly, Your Honor.

16                 THE COURT:  All right.

17

18                 REDIRECT EXAMINATION

19     BY MR. PAYNE:

20          Q.     Mr. Piper, are you aware of whether or not

21     Gateway Center responded to letters from Mr. Gordon

22     that expressed alleged violations and problems with

23     the leased space?

24          A.     By responding, do you mean contacted

25     counsel?
```

1          Q.     Whether counsel communicated with

2     Mr. Gordon.

3          A.     Yes, they did.

4               MR. PAYNE:  Your Honor, permission to

5     approach.

6               THE COURT:  All right.

7               MR. PAYNE:  Your Honor, I've handed the

8     witness what's been marked as Exhibits G-7 and G-9,

9     respectively.  And one's -- G-7 is a September 24th,

10    2009 letter from Diane Banks to Corbin Gordon.  G-9

11    is a March 5th, 2005 letter from Ms. Banks to

12    Mr. Gordon.  And pursuant to stipulation with the

13    parties, I think that we've agreed that these can be

14    received into evidence.  I would offer them into

15    evidence.

16               THE COURT:  Any objection?

17               MR. GORDON:  No, Your Honor, just subject

18    to the stipulation.

19               THE COURT:  Exhibit G-7 and G-9 are

20    received.

21               And the stipulation was not going to the

22    truth of the matter, just that the correspondences

23    were exchanged?

24               MR. PAYNE:  Yes.

25          Q.     (By Mr. Payne)  So, Mr. Piper, have you

1      seen Exhibits G-7 and G-9 before?

2           A.    Yes, I have.

3           Q.    Did Gateway Center rely on its counsel and

4      other professionals to investigate and respond to

5      letters from Mr. Gordon about alleged violations?

6           A.    Yes, it did.

7                 MR. PAYNE:  That's all I have, Your Honor.

8                 THE COURT:  All right.  Well, we're 5:00,

9      and I'm sorry, I do have to leave.  But I have time

10     on my calendar tomorrow afternoon if parties are

11     available at that time.

12                Do you need time for additional testimony,

13     Mr. Payne?

14                MR. PAYNE:  Yes, I do, Your Honor.

15                And I have with me here Mr. Wallace

16     Cooper, who is an architect whose schedule is

17     probably tighter than mine is in the next foreseeable

18     time.

19                So what time tomorrow afternoon, Your

20     Honor?

21                THE COURT:  Any time.

22                MR. PAYNE:  Any time?

23                No, afternoon.  He said morning is okay.

24                1:00 or 1:30.

25                THE COURT:  1:00 would work for the Court.

113

1           MR. GORDON:  That's fine with me, Your
2   Honor.
3           MR. PAYNE:  It works with me, too, Your
4   Honor.
5           THE COURT:  All right.  Well, we'll -- is
6   that your last witness, Mr. Payne?
7           MR. PAYNE:  Yes.  He's our last witness.
8           THE COURT:  All right.  I'll receive that
9   testimony and then oral argument after that.
10          MR. PAYNE:  Thank you.
11          THE COURT:  All right.  Thank you.
12          MR. GORDON:  Thank you.
13          THE COURT:  The court is in recess.
14   (Concluded at 5:03 p.m.)
15
16
17
18
19
20
21
22
23
24
25

1                    REPORTER'S CERTIFICATE

2

3    STATE OF UTAH              )
                                )  ss.
4    COUNTY OF SALT LAKE        )

5
              I, Robin Conk, Registered Professional
6    Reporter, do hereby certify:

7
              That on August 19, 2010, I produced a
8    transcript from electronic media at the request of
     Douglas Payne;

9

10             That the testimony of all speakers was
     reported in stenotype and thereafter transcribed, and
11   that a full, true, and correct transcription of said
     testimony is set forth in the preceding pages,
12   according to my ability to hear and understand the
     tape provided;

13
               That the original transcript was sealed
14   and delivered to Douglas Payne for safekeeping.

15             I further certify that I am not kin or
     otherwise associated with any of the parties to said
16   cause of action and that I am not interested in the
     outcome thereof.

17

18             CERTIFIED this 19th day of August, 2010.

19

20

21

22                    _____
                           ROBIN CONK, RPR
23

24

25

April 27, 2010

## #

**#108** [1] 2:4

## $

**$9600** [1] 44:9

## *

**\*\*\*** [3] 38:25 79:24,25

## 0

**09** [1] 67:18

## 1

**1** [21] 12:21 19:18 20:22 21:8 22:11 23:22 24:8 25:13,14, 17 27:14 28:13 29:23 49:1 69:18 75:9 101:10,14,17 103:3 104:10
**1:00** [2] 112:24,25
**1:30** [1] 112:24
**10** [11] 16:24 18:1 39:24 47: 18 49:10 50:5,7 96:5,6,7 97:16
**100** [9] 6:13 8:24 57:1 59:24 74:24 75:2 76:1 84:18 92: 20
**100-feet** [1] 74:25
**100-foot** [5] 57:25 74:18 75: 12 76:11 103:15
**1003.4** [1] 76:6
**103** [3] 59:10 74:15 75:3
**11** [8] 16:25 18:2 51:4 63:17 82:5,10 84:1,9
**110** [1] 3:13
**12** [5] 5:1 63:18,19 64:10 96: 3
**12-month** [1] 5:13
**13** [5] 3:4 64:16 65:18 66:8 101:18
**136** [1] 14:22
**13th** [1] 104:8
**14** [2] 78:17,17
**14th** [1] 68:15
**15** [1] 107:11
**150** [1] 76:6
**17** [1] 102:2
**17th** [1] 104:22
**18** [1] 45:20
**18th** [1] 80:14
**19** [3] 29:16 103:10,11
**1984** [1] 29:15,17
**1993** [1] 14:4
**1994** [4] 18:2 29:17,18 33:18, 20,24 75:25
**19th** [3] 102:22 103:19 114: 18
**1st** [2] 86:18 88:15

## 2

**2** [26] 20:22 21:9 22:11 25:14, 17 26:13 27:14 36:2,6 49: 7 50:12 56:23 63:24 67:12 96:2,13 97:6,11,12,14 102: 3 104:25 105:1,22,23,24
**20** [2] 37:12 108:18
**2005** [2] 61:13 111:11
**2006** [6] 29:8,12 34:18,24 35: 3 75:21
**2007** [1] 40:7
**2008** [11] 10:3 40:19 45:16 68:12 70:12 80:14 86:18 88:15 101:14 104:3 110:2
**2009** [26] 4:25 8:19 15:9 32: 15 35:6 45:5,16 67:9 68: 15 73:14 78:13 89:24 96: 19 97:1,6 98:18 99:18 101: 18 102:3,8,17 103:5,6 104: 8 109:25 111:10
**2010** [11] 5:1 93:15 94:7 99: 24 100:16 102:22 103:1, 20 104:5,19 114:18
**20th** [2] 102:10,11
**22** [2] 26:8 44:13
**24th** [1] 111:9
**27th** [1] 89:24
**28** [1] 28:22

## 3

**3** [9] 19:8 21:11 22:14 25:19, 20 27:14 108:17,20,20
**3-5-2010** [1] 91:7
**30** [3] 31:24 37:10 47:13
**303** [6] 15:18 71:10 75:16 86: 20 96:16 99:13
**345** [1] 2:4
**35** [1] 47:13
**36** [1] 25:4
**3rd** [1] 40:7

## 4

**4** [9] 12:4 21:23,24 22:16 27: 19,20 101:10 102:22 108: 20
**402.4** [1] 76:2
**41** [1] 26:11
**435-657-0984** [1] 2:5
**44** [4] 25:1,3,11 29:19
**44-inch** [2] 24:15,17

## 5

**5** [12] 12:5,6,22 22:19,21 35: 16,18 75:4 107:15,16,18 108:7
**5:00** [2] 38:12 112:8
**5:03** [1] 113:14

**5th** [1] 111:11

## 6

**6** [5] 15:25 17:18 18:15 23:7, 8
**600** [1] 2:4
**614** [1] 86:8
**69** [1] 3:7

## 7

**7** [3] 17:22 18:11,21

## 8

**8** [9] 39:25 40:1,14 69:16 107: 17,19 108:5,6,12
**8038** [7] 52:13,13 65:9 66:1,2 90:20,21
**84** [1] 3:10
**84111** [2] 2:8,13
**85** [1] 3:12
**8th** [1] 78:10

## 9

**9** [14] 44:22 45:9 53:18,20 70: 20 71:11,22 72:11 73:13 74:1,4 82:20 84:9,23
**97** [1] 75:18
**98.8** [2] 58:25 74:15
**98.9** [1] 58:25
**9th** [1] 45:5

## A

**Aarin** [6] 6:21 58:9,9,13 59: 11,20
**abandoned** [1] 4:24
**ability** [1] 114:12
**able** [4] 28:16,20 52:4 77:6
**above** [1] 19:2
**absolutely** [1] 29:18
**acceptable** [1] 72:22
**accepted** [1] 17:5
**access** [9] 20:17,24 21:4 25: 8 28:16 30:11 67:20 75:19 76:3
**accessibility** [3] 15:4 16:25 28:14
**accessible** [2] 21:15,19
**accessing** [1] 62:20,23
**according** [1] 114:12
**accordingly** [1] 68:24
**accounting** [1] 47:5
**accurate** [4] 10:25 16:11 18: 8 47:25
**acknowledging** [1] 73:24
**across** [5] 7:24 8:1 50:19 80: 24,24
**acted** [1] 68:24
**action** [6] 22 41:16 65:23

**66:5 92:25 93:17 114:16
**activities** [1] 52:19
**activity** [1] 99:7
**actual** [6] 26:6 48:6,7,14,16 62:19
**actually** [13] 34:18 39:23 51: 17 54:8,10 55:8 61:1 68: 13 74:12 90:2 94:10 99:3 104:3
**ADA** [6] 62:20,23 94:2 95:6 105:20 106:7
**addition** [2] 24:18 25:6
**additional** [7] 7:3 9:5 26:19 27:24 53:13 58:2 112:12
**address** [9] 6:16 43:5 46:21 52:2 53:9 56:5,10 58:8 93: 1
**addressed** [1] 16:24
**addressing** [2] 37:10 105:4
**adequate** [1] 31:20 83:25
**adjacent** [3] 98:24,25 99:1
**adjoining** [1] 28:1
**administration** [2] 50:21 95: 10
**administrative** [2] 34:16,17
**admissible** [2] 43:14 66:1
**admission** [2] 50:4 87:14
**admit** [12] 11:13 12:8,13,16 17:16 18:10 51:24 63:5 65: 3 66:6 83:21 106:6
**admitted** [9] 10:19,20 12:22 45:7 49:10 52:12,23 64:5 65:13
**admitting** [2] 10:21 87:19
**affirmative** [10] 36:4,17 44:8 49:2 69:19 70:22 75:6 104: 2,4 105:11
**afternoon** [8] 4:18 22:10 38: 10 101:7,8 112:10,19,23
**agency** [3] 52:18,19 53:3
**agent** [5] 57:17 80:17,20 82: 14 83:3
**agree** [13] 21:8,20 23:4,18 25: 12 27:15 28:3,23 29:20,23 96:22 97:7 99:20
**agreed** [2] 25:16 111:13
**agreement** [2] 8:18 58:4
**ahead** [3] 32:1,2 66:24
**air** [1] 30:13
**allegation** [3] 29:7,14 42:7 94:1
**alleged** [13] 8:21 42:9 92:23, 24 93:6,20 94:9 95:2 103: 23,24,25 110:22 112:5
**alleviate** [1] 29:12
**alley** [1] 25:21

April 27, 2010

cement [1] 26:7
CENTER [49] 2:10 4:14 5:12 7:20 14:22 15:2 16:12,19 17:8 19:1 26:16,23 27:25 30:3 33:5 35:7 40:7,22 52:3 53:8 54:2 69:14 71:2,10, 11 72:10 74:7 76:17,23 77:12 80:21 81:4,15 82:17 84:11 86:11,17,21 87:12 88:2, 14 89:24 90:1,11 92:8 100:1,6 110:21 112:3
central [1] 28:12
certainly [2] 27:5 38:14
CERTIFICATE [1] 114:1
certifications [1] 14:5
certified [3] 11:16 12:11 114:18
certify [3] 59:14 114:6,15
challenge [1] 42:18
changing [4] 34:11
chapter [4] 16:24,25 18:1,1
characterizing [1] 81:22
charge [1] 50:22
chargeback [1] 43:19
charges [10] 41:23 42:4,4,13, 19 43:8,10,16,17,24
check [2] 34:15,25
choice [1] 66:22
choose [2] 66:10 67:6
chose [2] 5:14 74:11
City [68] 2:8,13 6:17,24 7:5 8:25 11:14 12:9 13:25 14:23 15:16 21:7,20 23:4,18 25:12,16 27:15 28:3,23 29:20 33:14,22 35:12,24 36:11, 15 56:16 57:2,3,9,12,15, 16 59:17 60:23,25 61:7,16 68:21 74:16,20 75:14 78:8, 12,16,24 86:9,10 88:1,8, 20 89:2,11 91:9 92:10,11 94:11,14,15 95:1 100:23 104:14,15 106:21 107:8, 12,24
City's [3] 26:24 75:11 76:11
civil [3] 14:10,12 66:4
claim [8] 5:4,10 8:22 41:8,20 42:4 43:19 87:20
claimed [4] 6:22 9:5 41:4 93:5
claims [4] 8:21 55:6 67:24,25
Clarification [1] 88:8
clarify [5] 32:15 48:9,15 63:11 79:1
clarity [2] 48:25 49:6
classes [1] 47:13
classic [1] 55:16

clear [3] 10:5 25:25 75:2
clearly [3] 52:20 57:7 62:20
Clendenin [1] 4:14
CLERK [13] 4:3 11:8,24 13:2, 9 37:24 38:1,19 39:1 79:13,20 85:10,17
client [1] 55:6
clients [1] 45:21
climb [1] 24:19
climbing [1] 25:1
close [1] 82:24
closely [2] 48:10 59:3
closest [1] 24:2
Cloud [18] 8:18 39:13,16 40:6 45:1 46:13,19 48:1,17 51:20 65:21 68:11 70:24 72:20,23,25 73:5 100:21
code [52] 5:24,25 6:2,12 7:18 14:14,15 15:5 16:22,23 17:4,9,10,12 18:2,4,8 20:3 24:22,23 26:5 27:22 29:7 33:21 34:1,15,17,19,19,20,25 35:1,3,3,4 59:7,24 60:1,19 75:22,25 89:3 91:19,20,21 92:6,7 93:20,20 95:2 110:8,9
codes [2] 33:17 34:5
collateral [1] 47:7
colored [1] 96:10
colors [2] 49:22,25
Colus [1] 73:2
combustible [1] 23:12
come [7] 10:23 31:24 37:18 63:10 64:21 98:19 110:5
coming [2] 24:12 25:23
commenced [1] 40:18
comment [2] 62:22 81:17
comments [2] 30:6 81:19
commercial [3] 14:20 34:11,12
Commission [2] 5:20 65:19
common [7] 41:23 42:3 69:25 70:7 75:22,23 83:9
commonly [1] 32:20
communicate [3] 20:10 23:2 60:2
communicated [1] 111:1
communicating [2] 60:17,24
communication [2] 22:22 60:5
community [1] 32:16
company [1] 14:1
Compared [1] 68:6
compilations [1] 52:17
complaint [1] 65:20
compliance [5] 59:15 60:6

74:21,23 105:21 106:7
compliant [13] 6:25 30:16,18 57:9 60:19,21 61:1 66:18 68:22 76:15 78:9 104:16 106:3
complies [1] 76:4
compound [2] 46:24,25
concentrated [1] 19:19
concern [5] 7:12 56:13 73:12 75:15 84:17
concerned [3] 50:14 56:7 67:20
concerning [10] 55:12 60:6, 18 62:15 65:21 104:23 105:20 106:12 108:19,22
concerns [9] 7:1 57:8,17 62:14,17 63:3 67:7,17 73:8 81:19,22,23 106:6,8,12,20, 23 108:21 109:20
Concluded [1] 113:14
concluding [1] 36:5
conclusion [2] 36:7 71:6
conclusions [3] 7:17 16:17 18:5
condition [1] 27:4
conduct [2] 72:15 88:2
conducted [5] 7:16 16:13 54:20
conference [11] 31:8,11 37:9, 18 97:11,20,21 98:4,9 99:4,7
confirm [1] 109:10
confirmation [1] 106:23
confirmed [1] 7:4
confirming [1] 105:4
conflict [1] 31:4
connect [1] 25:7
connected [1] 13:15
connection [6] 33:4 34:13 89:8,9 90:8,10
consist [1] 70:3
consists [4] 19:1,21 69:23, 24
constitutes [1] 49:4
constraints [1] 38:9
constructed [1] 41:6
construction [1] 15:15
consultation [1] 5:21
contact [2] 63:7,7
contacted [5] 75:14 93:2 94:11 95:1 110:24
contains [2] 17:10 82:16
continued [1] 68:24
contrast [1] 5:17
controlled [1] 70:4
conversations [2] 55:23 59:

22
converted [3] 32:22 34:10 76:25
Cooper [2] 29:4 112:16
copier [3] 97:14 98:13,14
copies [1] 11:5
copy [19] 11:16 12:11 16:4 18:1,8,13,14 19:11 40:5 51:10 62:10 64:24 65:14 76:16 77:12 83:17 95:9 97:25 100:22
CORBIN [3] 2:3 4:9 111:10
corner [1] 19:6
corners [1] 59:3
correct [51] 11:1 18:7 29:5 32:9 34:23 35:25 40:5 41:10 48:18 51:10 64:24 70:9 73:15,16 74:1,4,5,8,19 75:1 77:7 83:17 87:19 90:6 95:14,15,19 97:2 99:10,11 101:15,16 103:10 104:1, 24 105:5,21 106:4,5,13,24 107:9,25 108:15,23 109:21,25 110:2,5,9 114:11
corrected [2] 83:6,8
correspondence [6] 10:18 11:5 12:17 41:9,14 78:8
correspondences [1] 111:22
corridor [1] 28:13
cost [1] 44:2
couldn't [1] 66:17
counsel [4] 4:6,10,15 10:19 12:18 31:19 38:5 49:15 110:25 111:1 112:3
COUNTY [1] 114:4
couple [1] 10:15
course [2] 50:14 87:12
COURT [149] 4:6,15 8:12 10:14 11:3,7,11,18,23 12:3, 10,13,19,21 13:14,18 15:23 17:18,20 18:19,21 19:12,15 25:24 27:21 28:6 30:6,9,24 31:2,7,16,18 36:22, 25 37:3,8,15,22,22 38:2,4, 12,15 39:21 40:13 41:20, 24 42:3,14,17,18,22,25 43:3,4,7,12,22,23 44:20 45:9, 11 46:4,11,23 47:16 48:21 49:16,21,22,25 50:7,10 51:2 52:8,11,25 53:10,16 54:13 55:2,15 60:11,13 62:4, 7 63:5,14 64:8,10,12 65:6, 14,18,25 66:3,8 67:5 69:7 71:7 72:5 73:22 77:18,21 79:5,8 81:24 82:8 83:24, 25 84:4 85:1,6 86:25 87:

CitiCourt, LLC
801.532.3441

April 27, 2010

110:18
examined [4] 13:7 38:24 79:
18 85:15
examiner [1] 75:17
exceeding [1] 6:12
Except [2] 49:22,25
exception [5] 29:12 34:21,23
52:24 94:16
excess [1] 57:1
exchanged [1] 111:23
excluded [2] 33:10 52:15
Excuse [3] 13:14 89:9 96:6
executed [5] 71:2 72:19 73:4,
6,13
executing [1] 71:22
execution [1] 71:11
exercise [2] 65:23 66:10
Exhibit [72] 11:19,25 12:2,3
15:25 17:18,22 18:11,14,
21 35:16 39:24 40:10,14
42:24 44:22 45:9 47:18 49:
10,18 50:5,7 51:4 63:16
64:10,16 65:18 66:8 67:3
69:16 70:20 71:11,22 72:
11 73:13 74:1,4 75:4 82:5,
10 84:1,9 87:15,25 90:15,
22,25 91:11,16 96:2,3,3,6,
7 97:15 101:17 102:3,22
103:3 104:9,10,25 105:1,
22,23 107:14,18,19 108:7,
9,17 111:19
exhibits [7] 11:9 12:14,17,21
101:10 111:8 112:1
existed [1] 16:13
existing [1] 62:19
exit [38] 6:13 8:22 17:2 23:11,
15,21,22,24 24:1,5,10,13
25:24 26:22 27:21 28:6,13
30:1,6,9 56:24 74:21,23,
25 75:3,3 82:23 83:4,5,6,7
84:13,18 92:21 108:19,22,
23 109:21
exiting [5] 15:4 19:20 26:17
27:1 75:15
exits [1] 74:18
expect [2] 24:5,7
experience [2] 34:4,8
expert [1] 6:19
explain [7] 19:17 20:4 25:13,
19 82:21,25 94:13
explained [1] 80:23
explosion [1] 27:6
expressed [2] 81:23 110:22

**F**

Fabian [1] 4:13

faced [1] 21:2
facilities [1] 56:9
facility [3] 56:24 63:10 99:12
fact [7] 9:3,11 30:16 36:11
55:20 67:1 73:18
facts [2] 16:15,21
Fair [1] 102:21
fairly [1] 31:6
faithfully [1] 44:15
fall [1] 10:3
false [1] 67:25
familiar [9] 14:13 16:23 33:
17 36:14 61:14 86:10,19
96:15 101:20
far [6] 8:22 43:21 53:2 60:8
62:22 74:18
fault [1] 31:5
favor [1] 5:14
favors [1] 85:22
February [9] 93:15 94:7 100:
16 102:22 103:1,10,11,19
104:5
feel [1] 69:3
feet [17] 6:13 8:24 27:21 30:
12,12,14 57:1 58:25 59:10,
24 74:24 75:2,3,18 76:1
84:18 92:20
felt [2] 57:9 68:23
few [1] 8:19
fiduciarily [1] 68:19
field [1] 17:5
file [2] 68:14 87:21
filed [2] 5:4 95:17
files [1] 61:10
filled [1] 21:25
final [1] 30:1
finally [1] 6:21 78:15 102:21
financial [2] 68:8,20
financially [1] 68:18
find [9] 34:20 52:4 61:22,23
66:16 77:7 82:7,20 108:24
findings [3] 16:5 19:17 54:24
finds [1] 83:25
fine [4] 31:15 88:17 101:24
113:1
finish [1] 32:2
fire [32] 19:21 20:8 23:14,14
27:6,23 28:1 29:9 56:5,25
67:21 76:7 83:11 88:10,12,
20 89:2,3,23 90:10 91:5,9,
20 92:6 93:22 108:19,22,
22 109:21,25 110:2,8
fireman's [1] 25:10
first [37] 8:21 10:16 12:14,16,
24 22:6 33:14 36:6 44:12
45:13 46:22 50:13 55:9 56:

8 58:12,15,17 62:18 68:10,
11 69:17 72:20 76:13 78:7,
11,15 80:21 89:18 92:19
94:10 102:15 103:2,3,8,18
104:3,7
fit [1] 59:15
five [2] 26:21 29:10
fixing [1] 5:15
flammable [1] 23:12
fleeing [1] 27:7
floor [11] 15:2 19:6,20 24:10,
11 40:21 47:22,24 48:7,13
58:14
floors [1] 19:2
flow [1] 8:6
focus [1] 50:12
follow [1] 19:11
following [1] 52:15
follows [5] 4:22 13:7 38:24
79:18 85:15
force [1] 47:6
forcing [1] 6:25
foreseeable [1] 112:17
forge [1] 31:25
forgot [1] 63:16
form [5] 9:13 18:4 52:18 66:
4 68:21
formal [1] 6:22
formally [1] 63:9
forth [6] 8:11 10:19,23 17:12
41:10 52:18
forward [5] 13:2 38:19 79:13
81:13 85:10
found [3] 9:1 56:6 61:24
foundation [9] 51:25 52:5 53:
2,13 54:1 60:8 62:1,23 83:
25
founded [1] 57:8
four [6] 6:15 11:5 12:5,14,16
26:21
four-inch [1] 21:17
Friday [1] 9:18
front [3] 21:3 69:17 75:19
frosted [1] 99:3
full [3] 30:13 86:1 114:11
fully [2] 34:21,24 43:5
furniture [2] 22:1 23:9
further [11] 30:23 66:23 67:
17 69:6 79:2 84:3,24,25
85:5 110:12 114:15
future [1] 57:11

**G**

G-1 [3] 87:2,15,25
G-12 [5] 89:19 90:25 91:11,
16 92:7

G-5 [5] 89:18,19 90:15,22 92:
6
G-7 [4] 111:8,9,19 112:1
G-9 [4] 111:8,10,19 112:1
garage [19] 21:14 28:16,17
33:9,24 62:10 70:3,6 93:7
94:3,12,14,16,19,20 106:
13,15,16 107:25
garages [1] 24:12
garbage [1] 21:25
GATEWAY [59] 2:10 4:14,23
5:10,12 7:20,24 14:22 15:
2 16:12,19 17:8 19:1 26:
16,23 27:25 30:3 33:4 35:
7 40:4,7,21 45:3 50:23 52:
3 53:8,22 54:2 69:13 71:2,
10,10 72:10 74:6 76:17,22
77:11 80:21 81:4,12,15 82:
16 84:11 86:11,17,20 87:2,
11 88:2,14 89:24 90:1,11
92:8 95:11 100:1,6 110:21
112:3
gathered [1] 16:22
generally [1] 17:4
gentleman [4] 56:20 59:21,
23 61:12
getting [2] 54:12 100:22
give [3] 18:23 60:14 66:17
given [4] 47:11 89:1 94:7
109:11
glass [2] 83:7,8
GORDON [153] 2:3 3:4 4:9,16
10:13,15 11:2,4,10,12,20
12:5,15,23 13:16,19,22 15:
22,24 17:15,19,21 18:10,
16,22 19:10,14,16 30:22
31:12 36:23 37:5,14,20 38:
8,13,16 39:7,20,22 40:9,
12,15 41:9 42:23 43:18 44:
1,5,19,21 45:6,10,12 46:2,
3,5,6,12 47:2,15,17 48:20,
22 49:9,14,20 50:2,8,12
51:1,3,19,23 52:5,7,9,12
53:12,17 54:7,15,16 55:5,
25 56:1 60:12,16 62:9 63:
1,6,13,15 64:4,11,13,15
65:2,9,16,22 66:2,7,9 67:6
69:5 71:5,23 72:3 73:20
77:22,25 79:2,10 80:2 82:
1,4,9 83:20,23 84:2,25 85:
4 87:17,23 88:7 90:17 91:
13 96:24 101:3,6 103:17,
24 105:18,19 107:3,7,19,
23 108:4,10,14 109:9,16,
19 110:12,21 111:2,10,12,
17 112:5 113:1,12

April 27, 2010

## L

labeled [1] 86:20
Labor [2] 5:20 65:19
lack [1] 84:13
Lake [3] 2:8,13 114:4
land [3] 32:25 33:3 48:7 69:25 70:1
landing [1] 24:16
landlord [22] 5:4,12 6:4,19 8:20 9:14,15 44:16 48:6 57:17 58:7 59:18 66:22 67:24 73:2 78:11,19 104:15 105:3 106:11 108:21 109:11
landlord's [3] 5:7 6:21 57:23
landscaping [1] 69:25
largely [1] 4:24
larger [1] 25:2
last [16] 9:18 11:14 15:9 22:7 32:14,22 62:6,7 67:23 73:21 76:18 79:11 102:21 104:20 113:6,7
late [1] 9:19
later [4] 7:4 42:19 81:20 106:22
Law [3] 2:7,12 52:21
lay [2] 52:5 53:13
leading [2] 67:4 81:21
learned [1] 50:22
learning [3] 93:16 94:8 95:6
lease [42] 4:23 5:1,2,5,7,8 9:25 10:8 16:20 17:1 19:2 33:6,8,12 40:4,6,15,17,18 41:1 43:16 44:6,13,16 45:3,14 48:2,8,11,17 50:14 58:15 68:2,11 69:16 71:2,10,19 72:10 73:17 78:4,5
leased [2] 6:11 7:3,20,25 8:4 15:1,19 19:5,20 24:2,6 33:15 35:8 40:20 49:5 50:23 52:2 60:7 70:7 94:23 110:23
leases [1] 94:23
least [7] 18:13 22:23 43:9 61:7,10 73:24 99:24
leave [7] 37:3 50:11 66:14 79:6,8 85:2 112:9
leaving [2] 80:24 83:2
led [2] 7:3 55:10
legal [4] 71:6,9,21 72:6
legally [2] 71:12,14
legitimate [1] 106:23
leisure [1] 31:25
length [1] 30:13
less [4] 8:23 27:21 29:10 92:20

## M

M-A-R-I-N-A [1] 79:23
M-I-C-H-A-E-L [1] 13:12

lessee [2] 4:22 51:16
letter [60] 11:13,16,18 12:8 29:3,6 35:14,20 36:3 57:13 64:25 65:18 66:3,9,17,23 67:11 68:21,25 78:12,19,21,22 93:11 94:6,6 101:18,19,25 102:1,3,4,10,11,12,13 103:10,11,20 104:7,13,14,15,17,18,22,23 105:20 106:20 107:7,10,11,17,23 108:14,18,18 109:20 111:10,11
letters [6] 10:22 12:6 101:11 104:7 110:21 112:5
level [8] 19:3 21:15 24:11 25:23 68:20 69:1 94:16 106:14
levels [4] 19:3 30:2 68:18 70:2
liabilities [3] 57:11 68:6,20
liability [3] 7:13 66:19 68:2
liable [1] 59:16
license [2] 32:19,24
licensed [3] 14:7 32:8,12
licenses [1] 14:5
licensure [1] 32:23
lights [2] 99:5 100:8
limit [1] 43:13
limits [1] 75:25
line [2] 44:13 69:22
lineage [1] 58:24
little [1] 92:2
LLC [5] 4:5,11,14 5:17 8:19
located [2] 14:22 81:3
location [1] 24:13
locker [1] 76:25
Lodge [4] 7:24 51:22 77:5,6
Lodge's [1] 95:10
long [9] 14:3 32:11 44:14 50:13 67:22 80:9 86:16 88:13 93:16
longer [1] 62:21
look [9] 26:12 28:14 39:24 48:10 63:16 69:15,16 89:18,19
looked [1] 56:12
looking [5] 7:8 8:8 87:17 108:7,8
looks [3] 70:15 78:17 101:20
lot [3] 23:15 27:1,7
lower [2] 70:2 94:20
lunchroom [1] 76:25

machine [1] 98:1
made [9] 9:17 16:18 55:6,11 67:9,18 72:18 74:6 92:7 93:21 104:13
main [6] 24:11 25:23 26:24 86:8 100:2
maintain [1] 87:11
maintaining [1] 5:16
Major [6] 89:6,6,7 93:23 103:9,19
majority [1] 94:15
Management [1] 86:6
manager [12] 6:9 42:21 43:2 56:9 78:23,25 86:4,15,17 87:11 90:1 101:14
managing [6] 39:12,15 72:19 88:14,18 92:9
many [3] 45:17 47:12 78:14
map [1] 96:4
March [4] 96:19,21 100:15 111:11
Marina [8] 7:22 51:18 54:9,17 79:12,16 80:3
mark [4] 48:23,25 49:6 98:6
marked [18] 11:9,24 15:25 17:22 39:23 42:24 44:22 47:18 51:4 63:16 64:16 67:3 82:5,10 87:2 96:1,13 111:8
marker [1] 49:3
markers [1] 48:23
marking [1] 12:1
markings [1] 49:12
master's [1] 14:11
material [5] 9:9 47:7,7 89:2,4
matter [12] 4:4,21 11:13 31:9,10,16 37:7,12,18,19 63:2 111:22
matters [5] 10:16 31:7 37:11 52:20,21
maximum [1] 47:10
mean [8] 43:9,13 55:16,20 66:3 88:9 89:4 110:24
means [1] 16:24
measure [2] 74:9,14
measured [4] 9:1 56:22 59:24 75:18
measurement [5] 26:6,9 59:5,9 74:8
measurements [1] 60:21
measuring [1] 58:23
mechanical [1] 58:23
media [1] 114:8
meet [5] 20:2 24:15,16 54:19 58:7
meeting [13] 6:17 56:20 57:2

58:11,12,17,20,22 59:12 78:23 80:17,22 99:6
meetings [5] 6:20 60:23,23 61:3,4
meets [1] 29:15
memorandum [4] 9:20,22 11:19 49:18
mention [1] 52:3
mentioned [2] 33:20 83:12
met [5] 57:15,16 80:19,21 97:10
metal [1] 25:23
method [2] 58:25 59:1
methods [1] 17:3
MICHAEL [3] 3:3 13:5,11
Michigan [1] 14:12
middle [1] 13:12
might [4] 23:2 43:2 58:19 65:14
Mike [2] 7:15 12:25
mind [2] 62:15 72:23
mine [1] 112:17
minimum [4] 20:3 24:15,17,23 25:2,4,11 30:12
minor [3] 68:7 92:6 93:22
minute [1] 13:14
minutes [3] 31:24 37:10,13
mischaracterizes [1] 103:14
misstated [1] 42:7
modification [1] 57:24
moment [9] 36:19 42:20 64:6 65:5 77:16
monthly [2] 40:23 44:5
months [6] 6:16 8:20 73:14 78:14,18 106:22
moral [1] 69:1
morning [1] 112:23
most [1] 45:19
move [31] 11:13 12:8,13,16,16 17:15 18:10 29:1 40:9 45:6 49:9 51:23 52:23 53:25 54:16 58:1 62:1,25 64:4 65:2,9 67:12,19 68:16 73:20 76:21 83:20 87:14 102:2 106:2 108:17
moved [4] 81:13 95:2 100:3,24
moving [2] 23:24 58:18
Ms [6] 51:18 82:7,9 83:25 84:8 111:11
much [1] 32:15
must [2] 6:13 21:15
myself [1] 75:17

## N

name [8] 13:10,11 39:2,3 79:

April 27, 2010

9 84:10 90:18 94:14,22 95:11,16 97:19
particular [5] 20:22 41:4 42:13 54:2 109:7
particularly [2] 16:24 23:11
parties [4] 31:19 70:4 111:13 112:10
partner [3] 39:12 72:19,25
PARTNERS [42] 2:2 4:11,22, 23,24 5:6,17 6:10 8:15,16 9:22 19:5 33:6 35:8,25 39:11,17,18,19 45:2 46:14,19 47:3,4,9 68:13 70:25 71:1, 9,18 72:9,14 73:13 76:22 78:6 80:4,10 92:16 95:18 96:1,19 100:21
Partners' [2] 5:9 49:17
partnership [3] 68:19 72:18 73:4
parts [1] 109:7
party [2] 55:9 63:7
passage [1] 108:24
passed [1] 78:14
past [1] 41:24
path [3] 25:25 75:22,23
pattern [1] 10:5
PAUL [6] 3:11 77:11 85:9,13, 19 86:2
pay [2] 42:12 71:22
PAYNE [115] 2:11 3:7,10,12, 13 4:13,13 8:12,13 10:17 11:1 12:2,10,11,19,20 17:17 18:12,20 30:24 31:1,3, 14 32:6 36:19 40:11,25 42:3,5,18,20 43:1,11 45:8,25 46:8,25 49:11,23 50:6 51:13,25 52:25 53:1,25 54:25 60:8 61:25 62:6,22 64:6,9 65:4,7 67:4 69:7,9,12,13 71:8,25 72:8 73:23 77:16, 19 79:4 81:21 83:22 84:4, 7,24 85:6,8,21,25 86:23 87:1,14,20 88:1,12 89:14, 17 90:14,20,24 91:11,15, 18 96:9 97:2,5 101:1 103:13 105:12 106:25 107:4, 17 109:3 110:14,15,19 111:4,7,24,25 112:7,13,14, 22 113:3,6,7,10 114:14
PE [1] 32:19
pen [1] 98:6
pending [1] 31:7
people [11] 20:11 24:10,19, 25 25:9 27:7,11 30:2 47:10 67:2,12
peppering [1] 8:20

per [2] 15:4 76:1
perchance [1] 21:1
perform [2] 14:21 15:6
performed [1] 5:19
performing [1] 44:15
perhaps [1] 31:23
period [2] 5:13 32:9
periodic [1] 88:2
Permission [2] 86:23 111:4
permit [9] 7:2 15:16,18 61:6, 18 66:16 67:16 77:12 100:23
permits [2] 15:10 61:17
person [3] 6:13 20:13 55:16
personal [4] 62:2 68:2 73:24, 25
personally [2] 16:6,19 51:15 68:9 73:3 88:13
personnel [5] 20:10,11 23:3 25:8 99:23
pertaining [2] 15:3 16:25
Phillip [1] 6:18
phone [1] 59:23
physical [1] 17:7
picture [4] 26:13,13 28:19,21
pictures [2] 16:9,11
Pinegar [1] 4:9
PIPER [16] 3:11 77:11 85:9, 13,19 86:2,3 87:1 88:1 89:17 90:25 91:18 98:18 101:7 110:20 111:25
place [4] 20:7 26:16 33:24 55:9 62:21 82:15 99:1
plan [5] 47:22 48:7,14 58:14 75:17
plans [4] 15:11,15,16,18
plat [9] 61:14,24 62:10,12,14, 18,20 63:4 67:16
Please [21] 4:3,6 13:1,2,9 18:23 19:17 35:10,17 38:3,19 39:1 40:23 48:23 49:3 79:13,20 82:21 85:10,17 86:1
plus [1] 59:10
point [21] 21:21 22:14,16 23:5,22 25:14,14,19 26:13 27:19 28:13,24 29:23 37:6 67:2 75:18 84:20 97:15,19,23, 25 109:4
pointed [3] 83:3,5 98:4
pointing [2] 26:14 97:22
points [9] 21:8,9 22:9,11 25:13,17,17 27:14
portion [5] 62:25 73:21 94:12,13 98:4
position [6] 63:1,11,12 74:7 75:11 76:10 110:7

possession [1] 4:12
possibility [1] 41:15
possible [3] 4:19 84:17
possibly [2] 6:8 24:11
posting [1] 22:25
potential [1] 56:4
potentially [2] 43:19 69:3
potentials [1] 58:17
power [3] 6:16 26:3,10
practice [1] 91:19
predate [1] 33:18
predates [1] 10:3
preexisting [1] 34:5
preference [1] 43:3
premises [3] 33:5 44:17 70:1
preparation [2] 53:3 87:7
prepare [3] 15:20 16:6 53:4
prepared [2] 16:4 43:5
preparing [1] 16:16
present [6] 4:20 7:14 11:17 31:19,20 78:24
presented [1] 35:24
presently [1] 14:6
pretrial [1] 31:11
previous [3] 32:14 80:22 109:13
previously [1] 82:5
primarily [3] 14:18 17:1 19:19
primary [2] 24:4,5
principal [1] 14:1
prior [7] 33:24 41:13 71:11,22 72:2,15 76:17
privately [2] 94:19,20
probably [8] 19:12 37:9,12 41:10 47:12 54:9 100:16 112:17
problem [6] 9:23 10:1 20:8 27:5 58:1,3
problems [7] 5:15 8:5 23:15 55:7 58:19 90:10 110:22
procedural [1] 4:21
proceed [7] 8:10 13:16 24:8 31:21,25 37:6 38:7
process [1] 63:8
produce [1] 15:17
professional [6] 14:7 32:17, 19,24 33:2,3
professionals [1] 112:4
profits [2] 5:11,15
prohibited [1] 26:5
promises [1] 44:16
proof [3] 41:8 42:4 87:20
proper [3] 56:23 59:25 78:5
property [4] 33:11,21 42:21 43:1 48:16 50:25 52:2,2

53:7,8 69:18,22,24 70:2,7 86:4,11,14,15,16 87:11 88:14,19 90:1,11 92:8 94:23 101:14
propose [2] 31:21 57:18
protected [3] 19:21 20:9 23:14
provide [9] 18:16 20:6 25:8 27:24 44:16 57:6 66:19 70:13 76:16
provided [13] 9:12,13,18 18:14 23:2 70:15 72:14 91:8 95:8,16 105:3 109:24,25
provides [1] 24:24
public [14] 15:3 16:20 17:1 25:25 28:15 30:3,5,9,10, 16 33:14 52:13,18 65:12
pull [3] 61:16 67:2 101:10
pulled [1] 76:23
purported [1] 53:4
purpose [2] 20:4 55:3
purposes [4] 10:21 48:25 49:6 78:9
pursuant [2] 52:20 111:12
put [9] 6:24 31:9 41:13 69:2 76:14 78:5 83:6 106:10 108:21
putting [1] 8:11

## Q

qualification [1] 62:23
quandary [1] 61:5
question [21] 24:1 43:24 44:4 46:24 53:5,7 55:3,22 77:10 97:3 103:16 107:21 108:13 109:4,6,13,14,14, 17,18,20
questions [7] 30:23 36:20 69:6 79:2 84:3,24 110:12
quickly [2] 19:25 24:13
quiet [4] 41:12 42:11 44:14, 17

## R

R156-56 [1] 34:17
railing [1] 28:21
raise [7] 13:2 38:19 68:10,11 79:13 85:10 106:19
raised [10] 6:11 7:10 41:11 56:11,13 57:8 104:23 105:20 108:18,21
raising [1] 67:25
ramp [2] 21:16,18
rather [1] 43:4
re [1] 49:22
re-created [2] 49:21 50:1
reach [1] 6:13

April 27, 2010

25 82:13
sentence [2] 36:6 69:22
sentences [1] 69:21
separate [2] 32:23 41:15
September [9] 68:15 80:13
86:18 88:15 101:14 102:2,
8 104:22 111:9
sequestered [1] 76:24
serious [1] 5:25
served [1] 76:18
session [1] 38:2
set [3] 17:12 31:7 37:9
setting [1] 52:18
several [2] 6:20 57:22
Shaner [2] 61:12 62:9
shifted [1] 6:5
Shoaf [17] 6:9,15 7:7 36:8 38:
18,22 39:3 51:15 55:20 56:
1 65:20 69:13 75:14 95:23
96:18 99:16 100:21
shortly [1] 6:7 95:5
show [2] 8:14 49:14
showed [2] 62:20 95:13
shuffled [1] 85:22
sic [2] 29:4 56:25
side [4] 25:21 26:23 28:17
30:4
sides [1] 27:23
sidewalk [1] 26:2
sideways [1] 97:16
sign [3] 20:25 78:1,3 82:23
83:4,6,7 84:13
signature [3] 63:24 74:3 87:
5
signed [5] 45:4 61:7 72:11
73:23 74:3
significant [4] 9:7 31:6 90:9,
12
signs [1] 83:15
similar [2] 25:14 62:19
Simister [2] 36:7,13
Simonsen [1] 29:4
simply [2] 31:11 42:8
since [9] 27:20 30:21 43:6
61:13 86:18 88:15,15 100:
9 101:14
sir [2] 81:16 84:15
site [2] 16:18 48:6
sitting [1] 22:3
situation [4] 7:19 75:22 78:
25 79:1
six [1] 22:23
Sky [5] 7:24 51:22 77:5,6 95:
10
slow [2] 20:14 104:11
slower [1] 27:11

small [1] 97:12
snow [1] 26:7
solutions [1] 57:18
solve [2] 58:3,19
somebody [1] 23:1
someone [4] 20:13,14 21:16
22:2 55:17 62:3 95:3 99:4
100:7
sometimes [1] 27:13
sorry [4] 12:15 18:17 25:15
30:22 45:16 46:2,5 51:13
52:9 65:16 75:23 78:2 85:
4 92:3,4 103:17 104:10
105:1 107:3,19 108:8,13
109:16 112:9
sort [3] 32:25 58:18 59:2
Soto [8] 7:22 51:18 54:9 79:
12,16,22 82:7,9 83:25 84:
8
source [2] 92:12,15
South [1] 2:4
spa [1] 47:5
space [104] 4:23,25 6:11,14,
20,25 7:3,12,14,20,25 8:2,
4,23 10:4,10 15:2,19 16:
20 17:1,1 18:24 19:2,4,5,
20 22:3 24:2,6 33:7,16 35:
8 36:8 40:20 45:13,18,21,
24 46:7,17,20 47:3,8,10,
11,23,25 48:14,24 49:4,5
50:15,24 55:7,12 56:3,13,
23 57:9,24 58:2 59:15 60:
7,18 61:1,8,19 66:15,18
67:21,22 68:17,23 71:10
72:15 73:8 74:17 75:16 76:
23 77:7 78:9 81:15,17 84:
19 86:19,20 92:21 95:3 96:
15,16,19 97:6 98:23,24 99:
13,17,24 100:7,14,15,24
104:16 106:3 110:23
spaces [4] 15:3 47:23 94:17
98:19
spark [1] 55:13
speakers [1] 114:10
speaking [1] 6:18
speaks [1] 71:24
special [1] 4:10
specific [2] 105:6 108:4
specifically [4] 5:24 33:10,10
52:9
spell [1] 13:10 39:2 79:21 85:
18
spoke [2] 10:17 55:3
spoken [1] 11:15
spot [1] 6:13
sprinkled [2] 34:22,24

sprinkler [1] 76:7
square [1] 98:4
stairs [15] 21:3 22:4,5 23:9
24:14,20 25:4,20,23 26:1,
7,9,25 82:24 83:11
stairway [3] 23:22,25 24:2,3
29:15 30:2 75:19 84:14
stairways [2] 76:4 83:4
stairwell [11] 20:1,24 21:14,
25 23:8,11,15 24:12 25:7
93:7 109:1
stairwells [4] 17:2 19:21,22
29:19
stall [1] 107:9
stalls [3] 106:12 107:25 108:
15
stand [5] 13:1,9 39:1 79:20
85:17
standard [1] 25:5
start [2] 19:24 69:20
started [5] 8:20 19:24 55:13,
17 63:8
State [14] 5:19 13:10 14:8 32:
8,13,14 39:2 53:3 57:7 65:
19 79:21 85:18 86:1 114:3
stated [3] 32:7 34:14 74:13
statement [2] 66:4 98:21
statements [1] 52:17
states [2] 6:12 52:14
stating [1] 68:22
status [1] 31:7
stay [1] 21:5
step [7] 13:2 37:1 38:19 79:5,
13 85:1,10
still [8] 53:1 75:11 76:10 97:
10,10 98:17,23 100:2
stipulated [1] 10:18
stipulation [3] 111:12,18,21
storage [1] 47:6
stories [1] 29:10
STREET [59] 2:2 4:4,11,22 5:
17 6:5,9,10 7:1,25 8:2,15,
16 9:22 10:3 19:2,5 26:24
30:14 33:6 35:8,25 39:10,
17,18 45:2 46:14,19 47:3,
4,9 49:17 50:19 53:9 61:
13 68:13 70:25 71:1,9,18,
22 72:9,14,21,24 73:1,13
76:22 78:6 80:4,9,24,25
86:8 92:16 95:18,25 96:19
100:20
Street's [2] 93:11 99:1
stricken [1] 62:8
strike [5] 53:25 62:1,5,25 73:
20
striping [1] 28:18

structural [8] 14:7,18 32:11,
12,17,18,23 34:9
structure [2] 62:19 78:5
structures [1] 14:19
stuff [1] 20:15
subject [1] 111:17
submitted [1] 64:1
subsequent [1] 5:21
subsequently [2] 48:12,13
substance [1] 55:23
substantive [1] 37:11
substitute [1] 10:4
suggested [1] 58:1
suggestions [1] 58:5
summing [1] 109:5
Summit [9] 5:22 7:4,15 13:
24 93:12,12,13,14 94:7
support [1] 91:15
supposed [1] 7:23
suppression [1] 29:9
surface [1] 21:15
surprise [1] 8:1
surveying [1] 32:25
surveyor [1] 33:3
surveys [1] 61:14
sustain [4] 53:10 54:14 55:
19 105:17
sustained [7] 46:4,11 62:4
67:5 71:7 73:22 107:6
switched [1] 50:3
sworn [4] 13:7 38:24 79:18
85:15
system [2] 29:9 76:8
systems [1] 22:22

## T

talked [1] 25:6
talks [1] 84:10
technical [2] 9:8 10:6
Tel [1] 2:5
telephone [1] 37:17
temporary [1] 20:7
ten [4] 27:21 30:11,12,13
tenant [16] 6:5 8:15,16,18 9:
18 10:4 15:18 44:15,16 46:
3,6,9,12 92:15 103:25 105:
5
tenant's [1] 15:1
tenants [5] 5:16 46:9 76:3 98:
20,20
term [2] 40:16,17
testified [7] 13:7 38:24 79:18
85:15 101:13 103:7 106:1
testify [6] 10:15 7:7,11,16,
22 54:10 60:13 95:23,25
96:18 99:17 107:1 110:8