Blake D. Miller (4090)
James W. Anderson (9829)
**MILLER GUYMON, P.C.**
165 Regent Street
Salt Lake City, Utah 84111
Telephone: (801) 363-5600
Facsimile: (801) 363-5601
e-mail: miller@millerguymon.com
e-mail: anderson@millerguymon.com

Attorneys for Luxury Residence Group

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>**EASY STREET HOLDING, LCC, et al.,**<br><br>**Debtors.** | **Bankruptcy Case No. 09-29905**<br>**(Jointly Administered with Cases**<br>**09-29907 and 09-29908)**<br><br>**Chapter 11**<br><br>**Honorable R. Kimball Mosier**<br><br>**(Filed Electronically)** |

**RESPONSE TO HEBER AVENUE PARTNERS LLC'S OBJECTION TO CLAIM NO. 22
OF LUXURY RESIDENCE GROUP**

Luxury Residence Group ("LRG"), by and through counsel, hereby responds to Heber

Avenue Partners LLC's Objection to Claim No. 22 of Luxury Residence Group Pursuant to

Section 502(b) of the Bankruptcy Code and Bankruptcy Rules 3001, 3003 and 3007 (the

"Objection").  The Objection seeks a denial of LRG's claim for the claimed assertion that it

"contains insufficient information and documentation to support a legal basis for the amount

claimed."  Objection, ¶ 8.

Notably, the objection admits LRG's full cooperation by providing Heber Avenue Partners' counsel with documentation and information supporting LRG's claim.  See Objection ¶ 7.  However, Heber Avenue Partners now tries to allege that there is not documentation to show that the Debtor owes the claim.  Id.  Quite to the contrary, LRG has demonstrated to Heber Avenue Partners, and will demonstrate to the Court at the hearing on this matter, that the Debtor is clearly responsible to pay LRG's claim.  For the benefit of the Court, LRG has also attached hereto documents supporting the its claim.

On June 11, 2005 Prudential Utah Real Estate, as broker, and Cloud Nine Resorts, LLC, as seller, entered into an Exclusive Right to Sell Listing Agreement, a copy of which is attached hereto in Exhibit "A" (the "Listing Agreement").  LRG is Prudential Utah Real Estate's agent in this Listing Agreement.  Pursuant to paragraph 9(a) of this Listing Agreement, Cloud Nine Resorts, LLC was required "to provide [Prudential] a dedicated sales office at [Cloud Nine]'s sole cost and expense."  A sales office was then leased on Main Street in Park City for LRG to operate.

Cloud Nine Resorts, LLC then formed the Debtor, and assigned to the Debtor its rights and obligations in this Listing Agreement.  In March 30, 2006, the Debtor granted to WESTLB AG a security interest in the Listing Agreement as reflected in the Consent and Agreement Regarding Pledge and Security Agreement, a copy of which is attached hereto as Exhibit "B" (the "Consent Agreement").  As clearly stated in recitals B and C and paragraph 1 of the Consent Agreement, the Debtor succeeded to all of Cloud Nine's rights and obligations in the Listing Agreement, which included the obligation to provide LRG a sales office.

2

The Debtor missed several rent and utility payments on the sales office which were covered by LRG, with the understanding that the Debtor would reimburse LRG. However, the Debtor was ultimately unable to fully reimburse LRG and LRG was left with a claim of $74,721.12 owed for rent and utilities paid on behalf of the Debtor for the sales office. Attached hereto as Exhibit "C" are copies of invoices from LRG reflecting the expenses paid.

Wherefore, LRG prays that its claim in the amount of $74,721.12 be allowed in full, and paid pursuant to the confirmed plan of reorganization in this case.

DATED this 23rd day of December, 2010.


Miller Guymon, P.C.

*/s/ James W. Anderson*
Blake D. Miller
James W. Anderson
*Attorneys for Luxury Residence Group*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of Miller Guymon, P.C., and that on this 23rd day of December, 2010, I caused true and correct copies of the foregoing **RESPONSE TO HEBER AVENUE PARTNERS LLC'S OBJECTION TO CLAIM NO. 22 OF LUXURY RESIDENCE GROUP** were served by electronic mail to the individuals and entities identified below:

Annette W. Jarvis
jarvis.annette@dorsey.com

Peggy Hunt
Hunt.peggy@dorsey.com

Benjamin J. Kotter
Kotter.benjamin@dorsey.com

Richard W. Havel
rhavel@sidley.com

*/s/ James W. Anderson*

**EXHIBIT "A"**

# PRUDENTIAL UTAH REAL ESTATE

EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT et AGENCY DISCLOSURE

THIS EXCLUS          LISTING AGREEMENT (the "Agreement") is made and entered into this _/(_ day of _____ , 2005 (the "Effective Date") by and between PRUDENTIAL UT EAL ESTATE (the "Company") and CLOUD NINE RESORTS, LLC, a Utah limited liability company (the "Seller"). The Company and Seller are sometimes referred to herein individually, as a "Party" and collectively, as the "Parties."

## RECITALS

A.      Seller is the developer, but not yet the owner, of certain unimproved real property located in Park City, Utah, which is more particularly described on Exhibit A attached hereto (the "Property"). The Company is a sophisticated and experienced brokerage company.

B.      Seller has obtained governmental approval, and approval from the owner of the Property ("Owner"), of a Master Plan for the construction of a six-story hotel, which will contain twenty-three (23) residential units (each, a "Condominium Unit"), a spa, heated outdoor pool, approximately 3,500 square feet of meeting space, and an underground parking garage (the "Project"). The tentative name for the Project is "The Sky Lodge."

C.      Seller, as owner or with the consent and cooperation of the Owner, will cause to be recorded a Condominium Plat and Condominium Declaration for the Property before Membership Interests (as defined below) are sold for the Condominium Units.

D.      A copy of the Site Plan for the Project is attached hereto *as* Exhibit B and incorporated herein by reference.

E.      Seller, with Owner's consent and approval, desires to develop the Project as a private residence club to be known as "The Sky Lodge – A Destination Resortelub" ("The Sky Lodge Club").

F.      Seller, with Owner's consent and approval, desires to sell ownership interests in Condominium Units at The Sky Lodge Club (each, a "Membership Interest"), which shall provide owners of a Membership Interest with a fractional 118th ownership of a specific residential Condominium Unit together with rights and benefits that will include the short term, periodic use of a two-, three-, or four-bedroom Condominium Unit in the Project (the "Club Sales Program"). Such Membership Interests shall constitute "time period interests" under Utah law.

G.      Seller desires to have the Company market and sell the Membership Interests. Preliminarily, the Company will obtain commitments and fully-refundable deposits for Membership Interests (the "Reservations").

Seller recognizes that the Company will invest a substantial amount of time and effort to market the Membership Interests, Accordingly, Seller agrees to retain the Company to exclusively market and sell the Condominium Units, as Seller's real estate broker in an exclusive agency relationship with Seller.

H. The Company is willing to market and sell the Membership Interests or Condominium Units, as the *case* may be, for Seller so long as the Company maintains an exclusive right to perform in accordance with the terms of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained in this Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1. **EXCLUSIVE LISTING.** Seller hereby grants to the Company, including the Listing Agents (as defined below), the exclusive right to represent Seller in soliciting Reservations and to sell Membership Interests in the Project. Seller also hereby grants the Company the exclusive right to sell Condominium Units, in the event that Seller elects to terminate the Club Sales Program and sell any portion of the Property as Condominium Units (the "Club Termination"). Seller also hereby grants the Company the exclusive right to represent Seller regarding any "Transfer" *(as* that term is defined below) of part or all of the Property. In the event that Seller elects to sell Condominium Units or engage in a Transfer of all or part of the Property, the Parties will negotiate in good faith to modify the terms of this Agreement to reflect the shift in marketing focus from Membership Interests; provided, however, that this Agreement shall continue in full force and effect regardless of whether the Parties reach agreement on modifications relating to the Club Termination. if the Parties are unable to reach agreement on modified terms within thirty (30) days of the date of the Club Termination, Section 4 of this Agreement shall be automatically revised, retroactive to the date of the Club Termination, to provide that the Commission shall be six percent (6%) for each Transfer of a Condominium Unit or for any Transfer of all or part of the Property. Nothing in this Agreement shall be construed as granting the Company the right to sell or lease any portion of the Property or the Project that is designated as commercial units or commercial space on the plat(s) for the Property.

**TERM OF LISTING.**

a, <u>Initial Term.</u> The exclusive listing period shall commence on the Effective Date and shall end on the third anniversary of the Effective Date, unless terminated earlier in accordance with the terms of this Agreement (the "Listing Period"). The Company shall have the right to extend the Listing Period *as* set forth in Section 2(b) below.

b+ <u>Extension of Term.</u> The Listing Period shall be extended, on the same terms and conditions, for additional extension periods of one (1) year each, provided that the Company is not then in default under this Agreement and submits a written request to the Seller to extend this Agreement at least sixty (60) days prior to the expiration date of the then current term, and

2

the Seller provides its consent to the extension, which consent shall not be unreasonably withheld, conditioned or delayed.

   c, <u>Termination Right.</u> Seller and the Company shall each have the right to terminate this Agreement at any time, by written notice to the non-breaching party, in the event of a material breach of the material terms and conditions of this Agreement (other than the Company's satisfaction of the Sales Quotas, which is governed by 2.c. above), provided that the breaching party fails to cure such breath within ninety (90) days following written notice from the non-breaching party. The non-breaching party shall not unreasonably withhold its approval or consent of the breaching party's curative actions. Notwithstanding the termination of this Agreement, the Company shall be entitled to its Commissions for any Sale of Membership Interests or Condominium Units, as the case may be, pursuant to Section 4.a below, and during the Protection Period (as defined below), all in accordance with Section 5 below.

   **3.**   **LISTING PRICES.** The listing price for each Membership Interest is set forth in <u>Exhibit C</u> attached hereto (each, a "Listing Price"), In the event that Seller elects to terminate the Club Sales Program, the Company and Seller shall cooperate in good faith to establish the Listing Prices for the Condominium Units, Neither the Listing Prices for the Membership Interests nor the Listing Prices for the Condominium Units, once agreed upon by the Parties and set forth in an addendum to this Agreement, can be changed without the prior written consent of Seller.

   **4.**   **BROKERAGE FEE/COMIVIISSION.**

    <u>a.</u>  <u>Presentation</u> of Offers/Third  Party Commissions. The Parties agree that any and all Reservations and offers to purchase Membership Interests and/or Condominium Units ("Purchase Offers") must be presented to the Company, and that the Company shall act as the Seller's listing brokerage on all Purchase Offers. In that connection, the Company acknowledges and agrees that other realtors may solicit and obtain Reservations, provided that those Reservations are submitted to the Company for signature and approval as the Seller's agent. In the event that any real estate sales commission or referral fee is earned by a third party ("Third Party Commission") as a result of any Transfer or presentation of a Purchase Offer by the Company, Seller acknowledges that the Company may be liable for that Third Party Commission and Seller agrees to pay the Company for any Third Party Commission that must be paid by the Company to a third party so long as the Company does not agree to pay any Third Party Commission in excess of the Cooperating Brokerage Fee *(as* defined below), or agree to terms of payment for the Third Party Commission that differ from the terms of payment for the Cooperating Brokerage Fee.

    b.  Commission.. The Company shall earn a brokerage fee of seven percent (7%) of the gross transaction price (the "Commission") for each sale, *lease,* option, exchange or other transfer (including any transfer into a partnership, joint venture or merger of companies, including a transfer into an entity in which the Seller maintains an ownership intereat)(collectively "Transfer") of a Membership Interest or Condominium Unit that occurs during the Listing Period or that is subject to the Protection Period (as defined below). In

SEP-23-2005 FRI 03:10 PM Wrona & Parrish, PC          FAX NO. 4356495959              P. 05

addition to the foregoing, in the event that the Company obtains a Reservation from an individual or entity ("Pre-Sale Reservation Holder") during the Listing Period, the Company shall be entitled to a Commission, if the Pre-Sale Reservation Holder purchases a Membership Interest within five (5) years of the expiration of the Listing Period.

c, Refusal to Close. If the Company produces a ready, willing and able buyer of a Membership Interest or a Condominium Unit that has been offered for sale, and Seller refuses to contract or close on the Transfer of that Membership Interest or Condominium Unit, then Seller's refusal ("Refusal") shall be deemed a Transfer and the Company's right to a Commission shall vest upon Seller's expression of Refusal. For purposes of this Section 4.c, a "ready, willing and able buyer" shall mean an individual or entity who: (1) has the financial ability to close on the Membership Interest or Condominium Unit; and (2) has completed a thorough review of the rules, regulations and obligations relating to ownership of a Membership Interest or Condominium Unit, including, without limitation, the Condominium Declaration, bylaws, rules and regulations for the Project and the bylaws, rules and regulations for The Sky Lodge Club, and agrees to be bound by the terms of such documents.

d.   Withdrawal or Transfer of Property. Except as provided herein, if within the Listing Period, or any extension of the Listing Period, Seller withdraws front sale or otherwise Transfers any of the Membership Interests or Condominium Units, as the case may be, without the written consent of the Company, the Commission shall be immediately due and payable to the Company. The Company shall not withhold its consent, and no Commission shall be due, if Seller Transfers the Membership Interests, Condominium Units or Property, as the case may be, to a third party that either assumes Seller's obligations under this Agreement or enters into a Listing Agreement with the Company on substantially the same terms or other terms satisfactory to the Company. The Company acknowledges and agrees that the terms of the Club Sales Program permit Seller to rent each Condominium Unit. Nothing in this Section 4.d, shall require Seller to pay any Commission for Seller's lease or rental of any Condominium Units in accordance with the terms of the Club Sales Program. The Company acknowledges that Seller does not currently own the Property. Pursuant to the terms of Seller's agreement with Owner, Seller has an option to acquire the Property and the right to accept Reservations for Membership Interests. Seller has entered into letters of intent with several potential debt and equity partners for the acquisition and development funds required to complete the Project. If Seller is unable to obtain fifty (50) Reservations, which are ultimately converted to Purchase Agreements for Membership Interests, Seller will be unable to obtain the financing necessary to acquire the Property and complete the Project ("Seller's Financing Contingency"). In the event that Seller is unable to satisfy Seller's Financing Contingency, the Company agrees to terminate this Listing Agreement. The Company also acknowledges that Seller may transfer the Property to another entity. In such an event, the Company agrees not to demand a Commission so long as such other entity enters into a Listing Agreement on substantially the same terms as this Agreement.

e.  Coo mfimroiag,cer e Fee. The Company is authorized to share the Commission with another brokerage participating in any transaction arising out of this Agreement, The Company agrees to offer as the cooperating brokerage fee three percent (3%) of the Listing Price, or actual acquisition price approved by Seller, if different (the "Cooperating Brokerage Fee"). Any Cooperating Brokerage Fee that may be payable to any third party for a

4

given transaction shall be the responsibility of the Company, so long as Seller pays the Commission for such transaction to the Company. Nothing in this Section 4 shall prevent the Company or its affiliates from receiving or retaining the Cooperating Broker Fee if Company, its agents or any affiliate of Company acts as both Seller's and buyer's agent in connection with the sale of a Membership Interest. The Company agrees to indemnify, defend and hold Seller harmless from any claim, loss or damage arising from the Company's failure to pay a Cooperating Brokerage Fee after receiving the Commission for such transaction from Seller.

f. Payment of CommissiorBroker e Fee. Seller agrees to pay fifty percent (50%) of the Commission to the Company after (i) Seller has entered into a binding purchase contract with a buyer for a Membership Interest, and (ii) Seller has received a non-refundable earnest money deposit from such buyer equal to or greater than twenty percent (20%) of the gross Listing Price for such Membership Interest (the "Commission Advance"). Upon receipt of the Commission Advance, the Company agrees to deliver to the buyer's broker, if any, fifty percent (50%) of the Cooperating Brokerage Fee to be paid at the closing for such Membership Interest, The Company's right to the remaining fifty percent (50%) of a given Commission ("Remaining Commission") shall vest when the particular Transfer actually occurs. With regard to any Transfer that occurs by way of option, that Transfer shall be deemed to occur when an option is exercised. Upon receipt of the Remaining Commission, the Company agrees to deliver to the buyer's broker, if any, the remaining fifty percent (50%) of the Cooperating Brokerage Fee.

5. **PROTECTION PERIOD,** If within six (6) months after the termination or expiration of this Agreement (the "Protection Period"), any Membership Interest is sold to any party introduced by the Company, the Seller's Agents, Seller, or another real estate agent during the Listing Period, or any extension of the Listing Period, Seller agrees to pay to the Company the Commission set forth in Section 4, and Seller acknowledges that it is Seller's obligation to disclose the existence of this Protection Period to any brokerage that Seller engages during the Protection Period. In that connection,. the Company agrees to maintain a list of all individuals or entities with whom the Company has contact during the Listing Period concerning a Membership Interest, and the Company's right to receive a Commission shall be limited to those names appearing on the list provided by the Company. This Section 5 does not curtail or limit in any way the Company's right to a Commission as procuring cause for Reservations that result in Transfers in accordance with Section 4.b above,

6, **DESCRIPTION OF CLUB SALES PROGRAM.** Seller desires to market and sell the Membership Interests in The Sky Lodge Club. Each Membership Interest shall consist of a fractional I/8th fee simple ownership interest in a specific Condominium Unit in the Project, or such other fraction as Seller shall determine in its sole discretion, together with the right to the short term, periodic use of a two-, three-, or four-bedroom Condominium. Unit in the Project. Each Membership Interest will be evidenced by, among other things, a Special Warranty Deed, Seller is working closely with its legal counsel to develop the precise legal structure for the sale of the Project as Membership Interests in a private residence club. Seller shall register the sale of the Membership Interests under the Utah Timeshare and Camp Resort Act (the "Timeshare Act"), and shall assume all responsibility to ensure that the structure of The Sky Lodge Club as a private residence club and the Membership Interests comply with the Timeshare Act. Once

5

Seller has finalized the features of the Membership Interests and The Sky Lodge Club, Seller shall provide the Company and the Seller's Agents all legal and technical information concerning Seller and The Sky Lodge Club that the Company may reasonably deem necessary to market and sell the Membership Interests. Seller also shall make its representatives and legal counsel available to the Company and the Seller's Agents to respond to questions or concerns regarding the Membership Interests. Unless and until Seller holds legal title to the Property, Seller shall make the following disclosures: (i) Seller has an option to acquire the Property, (ii) Seller has obtained commitments from lenders arid equity participants that will enable Seller to obtain the funds necessary to acquire the Property and complete the Project (the "Financing Commitments"); and (iii) Seller's Financing Commitments are contingent upon Seller (1) obtaining Reservations for fifty (50) Membership Interests in the Project, and (2) converting such Reservations into binding Purchase Agreements with earnest money deposits. Seller shall make disclosures to that effect in its Reservation Agreement or other appropriate legal documents, and shall indemnify the Company against any and all liability, loss, fine, cost or expense that arises from Seller's failure to adequately disclose its lack of ownership of the Property.

7. **TRANSACTION DOCUMENTS.** Seller's counsel, at Seller's sole cost and expense, shall prepare for use by the Company all Seller disclosures, conveyance instruments and legal documents required or necessary to complete the sale of the Membership Interests or Condominium Units, as the ease may be (the "Transaction Documents"). Such Transaction Documents shall be subject to review and approval by the Company's counsel, which approval shall not be unreasonably withheld, conditioned or delayed. In that connection, Seller acknowledges that all disclosures regarding the Club Sales Program, Membership Interests and Project are the sole responsibility of Seller. Seller agrees to indemnify, defend and hold the Company harmless from any losses, claims or damages relating to Seller's failure to provide proper or legally-sufficient disclosure in the Transaction documents, or for Seller's misrepresentation of facts or other matters in such Transaction Documents. The Company's review and approval of the Transaction Documents shall not be construed as any waiver of or defense to Seller's obligations hereunder. Unless and until Seller holds legal title to the Property, Seller shall make the disclosures and provide the indemnification set forth in Section 6 above.

8. **THE COMPANY'S SALES TEAM.** The Company's primary listing agents for the Club Sales Program shall be Carrie Shoaf, Heather Peterson, Ann MacQuoid and Suzanne Harris (the "Listing Agents"). In addition, the Company reserves the right to appoint additional agents, subject to the Seller's approval (the Listing Agents and additional agents, collectively, the "Seller's Agents"). The Company acknowledges that Carrie Shoaf is the spouse of Bill Shoaf, a principal of Seller,

In addition, the Company hereby represents and warrants that all of the Seller's Agents will be registered under the Timeshare Act as timeshare salespersons. As stated herein, Company may offer the Membership Interests through the MLS of the **Park** City Board of RealtorsZ Multiple Listing Service and the Wasatch Front Regional Multiple Listing Service (the "PCBR-MLS"); and provide a referral commission to local real estate agents who refer their clients to the Seller's Agents.

9. **SALES OFFICES.**

6

a.  Dedicated Sales Office, Seller agrees to provide the Company a dedicated sales office at Seller's sole cost and expense (the "Dedicated Sales Office"), commencing on a date mutually acceptable to the Parties. Seller shall provide the Company and the Seller's Agents with twenty-four hour access to the Dedicated Sales Office, and the Company shall have the right to secure the Dedicated Sales Office and restrict after-hours access to individuals designated by the Company.

b.  Hours of Operation. During Park City Resort's ski season, the Company will staff the Dedicated Sales Office with one (1) of the Seller's Agents Monday through Saturday from 8:30 a.m. until 6:00 p.m. and Sunday from 1:00 p.m. until 5;30 p.m. Notwithstanding the foregoing, the Company or the Seller's Agents reserve the right to amend the Dedicated Sales Office hours based on holidays, and such other factors to achieve optimum sales coverage. The Company reserves the right to permit other Company sales agents to participate in floor time at the Dedicated Sales Offices, provided that such sales agents are approved by Seller.

10. **SALES AND MARKETING.** The Company shall use commercially reasonable efforts to market the Membership interests in accordance with the terms of this Agreement.

a.  Seller's Marketing Materials, Seller shall provide, at its sole cost and expense, all marketing materials reasonably required by the Company to effectively market and promote The Sky Lodge Club and the Membership Interests (collectively, the "Marketing Materials"). The Company will provide input to Seller, as needed, during the creation of the Marketing Materials. Prior to production and distribution, all Marketing Materials shall be subject to the review and approval of the Company, which approval shall not be unreasonably withheld, conditioned or delayed. All Marketing Materials must comply with the Company's franchise agreement and other contractual obligations and the Timeshare Act. The Company's review and approval of the Marketing Materials shall not be construed as any waiver of Seller's obligation to ensure compliance with the Timeshare Act. Prudential Utah Real Estate must be prominently referenced in all Marketing Materials. Unless and until Seller holds legal title to the Property, Seller shall make the disclosures and provide the indemnification set forth in Section 6 above.

b. The Company's Marketing Materials. The Company shall promote, at its sole cost and expense, The Sky Lodge Club and the Club Sales Program in regular and customary sales and marketing materials utilized by the Company, including, without limitation, the Company's book, product guide and other promotional materials, All advertisements shall be subject to the prior approval of Seller.

c. Advertisements in Non-Com«an$^y$ Publications. Seller may direct the Company to place advertisements in publications of Seller's choice, subject to the Company's approval, which approval will not be unreasonably withheld, conditioned or delayed, and the cost of such advertisements shall be paid by Seller. The Company agrees to provide Seller with Company's direct negotiated rate, if any. The Company shall bill Seller for such costs, if any, monthly. Seller agrees to pay all such invoices within ten (10) days after the date of invoice.

d. Prudential Sales Offices, The Company shall provide, at its **sole cost and expense**, space in the gallery located in the outer lobby of its office located at 625 Main Street, Park City, Utah. for a display for The Sky Lodge Club and the Club Sales Program in size and format consistent with existing development pieces, which display shall be subject to the review and approval of the Company. If Seller desires to place a display in the inside of the Company's sales office located at 625 Main Street, the Company will make space available for a fee of [$600.00] per month for a one (I) year contract, plus the cost of the display. The Company also shall make available display space in its other sales offices for this Project on the most favorable terms and conditions the Company offers such space to other clients of the Company.

e.   Sales Activities.

i.     The Company and the Seller's Agents shall assume responsibility for ensuring that all of the Transaction Documents are distributed, reviewed and executed by the relevant parties, and that the activities of title companies and other service providers involved in closings are coordinated to ensure timely and efficient closings.

ii.    The Company agrees to provide Seller with written reports regarding sales activity and market conditions on or before the 5th day of each month, and such other information as Seller may reasonably request.

iii.   The Company will at all times keep Seller fully apprised of (i) the identity and status of any potential purchasers, (ii) the existence, status and course of any offers pertaining to the sale of the Membership Interests or Condominium Units, as the case may be, and (iii) any problems which arise in connection v'ith the sale of the Membership Interests or Condominium Units; and Company will report the status of the foregoing, together with the status of Company's efforts under this Agreement, in accordance with this Agreement.

iv.   The Company will perform such other services as are reasonably requested by Seller in furthering the listing and marketing the sale of the Membership Interests or Condominium Units, as the *case* may be.

11. **SELLER WARRANTIES/DISCLOSURES.** Seller warrants that it has, or will have at the time that Transaction Documents are executed, insurable title and an established right to sell, lease, or exchange the Membership Interests or Condominium Units, as the case may be, Seller warrants that the Club Sales Program, Membership Interests and the Transaction Documents will comply with the Timeshare Act. Seller, or an affiliate of Seller, agrees to execute the necessary documents of conveyance. Seller agrees to furnish buyer(s) with good and marketable title, and to pay at each closing, for a standard coverage owner's policy of title insurance for any buyer(s) in the amount of the purchase price. Seller agrees to fully inform the Seller's Agents regarding Seller's knowledge of the condition of the Property. Seller agrees to indemnify, defend and hold the Company harmless against any losses, claims or damages that may arise from: (i) any incorrect or inaccurate information provided by the Company or the Seller's Agents regarding the Property, the Club Sales Program or the Membership Interests that the Company or the Seller's Agents receive from Seller, its agents or representatives; (ii) Seller's failure to properly structure oᵣ register the Club Sales Program or failure to comply with the

8

Timeshare Act governing the Club Sales Program or the sale of the Membership Interests; and (iii) any actions of Seller, its employees, agents or representatives (other than the Seller's Agents) relating to the Club Sales Program. Seller warrants that the document entitled "Easy Street Plaza & The Sky Lodge," which is dated April 19, 2005 and is by and among Utah Coal & Lumber, Inc. ("UCL"), Diane Jordan Smith, Trustee of the Diane Jordan Smith Trust u/a/d August 27, 1987 (the "Smith Trust"), Cloud Nine Resorts, LLC and Pacific Holdings Trust, LLC, and the Amendment to Letter of Intent, which is dated May 27, 2005 and by and among the same parties (collectively "LOT"), accurately reflects the current agreement between the signatories to the LOI regarding consent by the Owner to allow Seller to market and offer for pre-sale reservations for Membership Interests. A copy of the LOI is attached hereto as Exhibit -E." The Parties acknowledge that the LOI contains sensitive and private information and the the Company and the Listing Agents agree to maintain the confidentiality of the LOT unless otherwise required by law, court order or demand by a governmental authority. Seller agrees to indemnify the Company against any and all liability, loss, fine, cost or expense that arises from claims asserted by UCL or the Smith Trust regarding Seller's lack of right to solicit the Reservations.

12. **AGENCY RELATIONSHIPS.** By signing this Agreement, Seller designates the Seller's Agents and the Principal/Branch Broker for the Company (the "Broker"), as agents for Seller to undertake the Club Sales Program. Subject to Seller approval, Seller also authorizes the Seller's Agents or the Broker to appoint another agent, or agents, in the Company to represent Seller in the event the Seller's Agents or the Broker will be temporarily unavailable to market the Club Sales Program. As agents for the Seller, the Seller's Agents have fiduciary duties to Seller that inelude loyalty, full disclosure, confidentiality, and reasonable care. Seller understands, however, that the Seller's Agents and the Broker may now. or in the future, be agents for a buyer who may wish to negotiate a purchase of a Membership Interest or Condominium Unit. Then the Seller's Agents and the Broker would be acting as Limited Agents – representing both Seller and buyer at the same time. A Limited Agent has fiduciary duties to both Seller and the buyer. However, those duties are "limited" because the agent cannot provide to both parties undivided loyalty, full confidentiality and full disclosure of all information known to the agent. For this reason, the Limited Agent is bound by a further duty of neutrality. Being neutral, the Limited Agent may not disclose to either party information likely to weaken the bargaining position of the other          – or example, the highest price the buyer will offer, or the lowest price Seller will accept.          ELLER IS ADVISED THAT NEITHER SELLER NOR BUYER IS REQUIRED TO  CCEPT A LIMITED AGENCY SITUATION IN TIE COMPANY, AND EACH PA Y ENTITLED TO BE REPRESENTED BY ITS OWN AGENT. By initialing here [                         3 Seller authorizes the Seller's Agents and the Broker to represent both Selle  an d the buyer(s) as Limited Agents when Seller's Agents and the Broker also represent the buyer for a Membership Interest or the Property. If initialed above, Seller further agrees that when another agent in the Company represents the buyer, that agent will exclusively represent the buyer, the Seller's Agents will exclusively represent Seller, and the Broker will act as Limited Agent. In either event, if initialed above, Seller and the buyer will be asked to sign a separate Limited Agency Consent Agreement at the time the limited agency situation arises.

9

13. **PROFESSIONAL ADVICE.** The Company and the Seller's Agents are trained in the marketing of real estate. Neither the Company nor the Seller's Agents are trained to provide Seller or any prospective buyer with legal or tax advice, or with technical advice regarding the Club Sales Program. Seller acknowledges that the Company and the Seller's Agents are relying solely on Seller and its legal counsel with regard to the structure, legality and technical aspects of the Club Sales Program.

14, **COMPLIANCE WITH LAWS.** The Company, the Broker and all Seller's Agents shall at all times throughout the Listing Period maintain in good standing all licenses necessary to act as a real estate brokerage, principal real estate broker, sales agent or as otherwise appropriate to carry out the duties and obligations of such person or entity set forth herein. The Seller, Company, the Broker and all Seller's Agents shall comply with the Timeshare Act and all laws, ordinances, rules and regulations applicable to the exercise of their respective duties and obligations set forth herein_ Neither Seller, Company, the Broker nor any Seller's Agents shall make any misrepresentation, fraudulent statement, misstatement of fact, or take any other action subjecting Seller or the Company to liability.

15.   **DISPUTE RESOLUTION.** The Parties agree that any dispute related to this Agreement shall first be submitted to mediation through a mediation provider mutually agreed upon by Seller and the Company. If the Parties cannot agree upon a mediation provider, the dispute shall be submitted to the American Arbitration Association. Each party agrees to bear its own costs of mediation. If mediation fails, the other remedies available under this Agreement shall apply.

16.   **ATTORNEY FEES.** Except as provided in Section 15, in *ease* of the employment of an attorney in any matter arising out of a breach of this Agreement, the prevailing party in any dispute related to such breach shall be entitled to receive from the other party reasonable costs and attorney fees, whether the matter is resolved through court action or otherwise,

      a.   Indemnification by the Seller. In addition to the indemnification provided by Seller to the Company under other provisions of this Agreement, Seller agrees to indemnify, save and hold harmless Company, the Broker and all Seller's Agents, their employees, officers, directors, members, managers, owners or agents, from and against claims, losses, damages, causes of action and all other liabilities (including costs and attorneys fees) arising from the negligence, misrepresentation, breach of contract or other misconduct of the Seller.

      b.   IndemnifleatiellyCompany, The Company agrees to indemnify, save and hold harmless the Seller, its employees, officers, directors, members, managers, owners or agents, from and against claims, losses, damages, causes of action and all other liabilities (including costs and attorneys fees) arising from the negligence, misrepresentation, breach of contract or misconduct of Company, the Broker and all Seller's Agents.

10

**17.   GOVERNING LAW.** This Agreement and the performance thereof shall be governed, interpreted, construed and regulated by the laws of the State of Utah. Jurisdiction and venue shall be in the Third District Court, Summit County, Utah.

**18.   SELLER AUTHORIZATIONS.** Seller authorizes the Company or the Seller's Agents to (a) obtain financial information from any mortgagee or other party holding a lien or interest on the Property; (b) offer the Membership Interests through **PCBR-MLS;** (c) have a key-box installed on Condominium Units; (d) hold open-houses at the Property; (e) place a sign on the Property; (f) order a Preliminary Title Report on a Condominium Unit or the Property; and (g) advertise the Property via the Internet on the Company's website. Seller acknowledges that the Company is not an insurer against the loss of or damage to personal property with the exception of acts caused by Company or the Seller's Agents. Seller acknowledges that all listings posted on the PCBR-MLS shall comply with the rules and regulations governing the PCBR-MLS. Furthermore, marketing of the Membership Interests shall be in compliance with the Timeshare Act. The methods and procedures for advertising the Membership Interests through the PCBR-MLS, and the methods and procedures for reporting final sales of Membership Interests shall be subject to approval of Seller, which approval shall not be unreasonably withheld, and the requirements of the PCBR-MLS. Notwithstanding the foregoing, Seller acknowledges that the Company and the Seller's Agents intend to engage in pre-selling activities before the final plat for the Project is recorded, and Seller authorizes the Company and the Seller's Agents to undertake pre-selling activities that do not violate the Timeshare Act.

**19.   EXHIBITS.** The following Exhibits are attached to this Agreement and incorporated herein by this reference:

> Exhibit "A's: Description of Property
> Exhibit "B": Site Plan
> Exhibit "C": Listing Prices
> Exhibit "D": Letter of Intent/Amendment to Letter of Intent

**20.   EQUAL HOUSING OPPORTUNITY.** Seller and the Company shall comply with the Federal, State, and local fair housing laws,

**21.   TERRORISM AND MONEY LAUNDERING.** The Company shall be responsible for compliance with all provisions of federal, state and local law relating to the identification and avoidance of any transaction involving any persons or entity identified as a potential terrorist or terrorist organization, or engaged, or believed to be engaged, in any money laundering scheme in connection with the acquisition of a Membership Interest. Without limiting the generality of the foregoing, such obligation includes the duty to assure compliance with all applicable provisions of the USA Patriot Act and all Executive Orders of the President of the United States relating to such matters.

22, **FAXES.** Facsimile (fax) transmissions of a signed copy of this Agreement, and retransmission of a signed fax, shall be the same as delivery of an original. If this transaction involves multiple owners, this Agreement may be executed in counterparts.

11

23. **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding on, and inure to the benefit of, the successors and assigns of the Parties hereto. The Company shall not have the right to assign this Agreement without the prior written consent of Seller, which may be withheld at Seller's sole discretion. Any attempt to do so shall be void, and constitute a default hereunder, entitling Seller to terminate this Agreement.

24., **ENTIRE AGREEMENT.** This Agreement, and Exhibits "A", "B", "C", "D" and "E" contain the entire agreement between the Parties relating to the subject matter of this Agreement.  This Agreement may not be modified or amended except in writing signed by the Parties hereto.

**[SIGNATURE PAGE FOLLOWS!**

IN WITNESS WHEREOF, the Parties hereto do hereby agree to the terms of this Agreement as of the Effective Date,

ACCEPTED by the SELLER:

CLOUD NINE RESORTS, LLC

By: Bill Shoaf
Its: Manager

June 11, 2005
Date

ACCEPTED by the COMPANY: PRUDENTIAL

UTAH REAL ESTATE

6 it
Date

By: Carrie Shoaf
   Listing Agent t        Real. Estate
   Prudential Utah

By: Heather Peterson
   Listing Agent, Prudential Utah Real Estate

6/11/05
Date

By: Suzanne Harris,
   Listing Agent, Prudential Utah Real Estate

6/11/2005
Date

By: Dougan T. Jones
   Chief Executive Office and Principal Broker
   Prudential Utah Real Estate

6-11-01
Date

13

**EXHIBIT "B"**

### CONSENT AND AGREEMENT
### REGARDING PLEDGE AND SECURITY AGREEMENT

#### (Listing Agent)

THIS CONSENT AND AGREEMENT REGARDING PLEDGE AND SECURITY AGREEMENT (this *Consent*) is made as of March 20 , 2006, by and between EXTREME HOLDING, LLC, a Utah limited liability company doing business as Prudential Utah Real Estate, having an address at 635 Main Street, Suite 200, Park City, Utah 84060 (the *Consentor*), and WESTLB AG, a German banking corporation acting through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036, as administrative agent (the *Administrative Agent*) for itself and such other co-lenders as may exist from time to time (collectively, the *Lenders* and each individually, a *Lender*) pursuant to the terms of that certain Loan and Security Agreement, dated as of March ___, 2006 by and between EASY STREET PARTNERS, LLC, a Utah limited liability company (the *Borrower*), the Administrative Agent and the Lenders (as the same may hereinafter be amended, restated, modified, extended and/or assigned from time to time, the *Loan Agreement*).

### RECITALS

A.      Borrower, having an address at 4780 Winchester Court, Park City, Utah 84098, the Administrative Agent and the Lenders are entering into the Loan Agreement pursuant to which the Lenders have agreed to make a loan to the Borrower in the maximum principal sum of THIRTY SIX MILLION SEVEN HUNDRED SEVENTY-NINE THOUSAND TWO HUNDRED TWENTY-FOUR AND NO/100 DOLLARS ($36,779,224.00) (the *Loan*) pursuant to the terms and conditions set forth therein.

B.      In connection with the use and/or operation of the Property, the Borrower has entered into that certain Exclusive Right to Sell Listing Agreement, dated as of June 11, 2005, between the Borrower, as the Owner, and the Consentor, as the listing agent (the *Contract*), pursuant to which (i) the Consentor, among other things, agreed to market and sell ownership interests in the Fractional Ownership Units to be constructed on the Property (as such terms are defined in the Loan Agreement) and (ii) in consideration of performing such services, the Consentor shall receive certain commissions and fees thereunder (the "Consentor's Fees").

C.      As a condition precedent to the Lenders making the Loan and as additional security for the repayment of the Loan and all other Obligations arising under the Loan Documents (each as defined in the Loan Agreement), the Administrative Agent has required that the Borrower assign to the Administrative Agent for the benefit of the Lenders, all of its right, title and interest, in, to and under the Contract and all other Operating Agreements (as defined in the Pledge and Security Agreement) pursuant to the terms and conditions of that certain Pledge and Security Agreement, dated as of March ___, 2006, by the Borrower, as the Assignor, to the Administrative Agent, as the Assignee (the *Pledge and Security Agreement*).

D.      The Borrower has requested that the Consentor acknowledge and consent to the assignment of the Contract pursuant to the Pledge and Security Agreement, subject to and in accordance with the terms hereof.

E.     The Consentor shall derive a substantial benefit from the Lenders making the Loan to the Borrower in accordance with the terms of the Loan Agreement.

F.     Capitalized terms not expressly defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Consentor hereby consents, agrees and certifies as follows:

1.     CONSENT.     The Consentor hereby acknowledges the execution and delivery of the Pledge and Security Agreement and irrevocably consents to the assignment of all of the Borrower's right, title and interest in, to and under the Contract contained therein.

2.     THE ADMINISTRATIVE AGENT'S RIGHT TO CURE.

(a)     In the event of any default or breach by the Borrower under the Contract, the Consentor shall not, without the prior written consent of the Administrative Agent, terminate the Contract or exercise any other remedy thereunder for a period of (a) 30 days in the case of a breach by the Borrower of any of its monetary obligations under the Contract or (b) 90 days in the case of a breach by the Borrower of any of its non-monetary obligations under the Contract, in each case after the Consentor has given the Administrative Agent written notice of such breach describing in reasonable detail the nature of the breach and the action necessary to cure such breach. In the case of a breach described in the preceding clause (b), if such breach cannot, with reasonable diligence, be cured within such 90-day period, such period shall be extended for such time as is necessary for the Administrative Agent to complete the cure, provided, that the Administrative Agent commences the cure within such 90-day period and thereafter proceeds with reasonable diligence to affect the cure. If the Administrative Agent elects to cure such monetary or non monetary breach within the prescribed period, or if the Borrower cures such breach within the same period, then such breach shall be deemed to have been fully cured for all purposes, and the Consentor shall take no further action with respect thereto. Notwithstanding anything to the contrary contained herein or in any other Loan Document, in no event shall the Administrative Agent or any Lender be obligated to cure any breach by the Borrower under the Contract.

3.     THE ADMINISTRATIVE AGENT'S OPTIONS.

(a)     If the Administrative Agent or any Lender (in it's own name or in the name of a designee) acquires title to the Property through foreclosure, deed in lieu of foreclosure or otherwise, then the Administrative Agent or any purchaser or transferee of the Property pursuant to a foreclosure sale, deed in lieu of foreclosure or otherwise that is an Affiliate or a nominee of the Administrative Agent or any Lender (the *Purchaser*) may, at its sole option, either (i) terminate the Contract immediately upon notice or as of such date as the Purchaser may specify by written notice to the Consentor or (ii) elect to keep the Contract in full force and effect for all or such portion of the remainder of the term thereof as such Purchaser may specify by notice to the Consentor. A notice given by the Purchaser pursuant to the preceding sentence may be given either before or after such Purchaser's acquisition of title to the Property. If the

84085562_5

2

Purchaser elects to keep the Contract in full force and effect, the Consentor will continue to perform its obligations under the Contract, subject only to performance by such Purchaser of those obligations of the Borrower under the Contract which arise or accrue after such Purchaser's acquisition of title to the Property; provided, that such Purchaser shall in no event be required to pay any fee or reimbursement due the Consentor with respect to any period preceding such Purchaser's acquisition of title to the Property or any commission due the Consentor with respect to any sale of a Fractional Ownership Unit (or interest therein) closing prior to the date upon which such Purchaser acquired title to the Property, regardless of the time at which such fee, reimbursement or commission is first payable under the terms of the Contract. In no event shall any Purchaser be liable for any amounts due and payable under or in connection with the Contract in excess of such Purchaser's interest in the Property.

(b)     Without limiting the rights of the Administrative Agent under Section 3(a), the Administrative Agent shall have the right to terminate the Contract on behalf of the Borrower (with or without the consent of the Borrower) (i) during any time that an Event of Default (as defined in the Loan Agreement) shall have occurred and is continuing or (ii) in the event of the Consentor's gross negligence, willful misconduct or violation of applicable law, in any such case, upon at least five days' written notice to the Consentor.

(c)     Notwithstanding the provisions of this Section 3, if the Purchaser elects to terminate the Contract, then the Contract shall terminate as of the applicable date set forth in the Purchaser's notice and neither the Purchaser nor the Consentor shall have any obligations under the Contract except that the Consentor shall be entitled to any commissions payable under the Contract with respect to sales of any Fractional Ownership Units (or interests therein) that were under contract at the time of such termination and subsequently closed in accordance with the terms of the applicable Purchase Agreements.

(d)     If the Purchaser elects to terminate the Contract under Section 3(a) or the Administrative Agent elects to terminate the Contract under Section 3(b), then the Consentor shall, within three days of such termination, assign to or at the direction of the Administrative Agent or the Purchaser, as the case may be, all books, records, accounts, documents, agreements, licenses, permits, drawings and all other tangible and intangible property in the Consentor's possession related to or arising from the marketing or sale of any ownership interests in the Fractional Ownership Units. In no event shall the Administrative Agent, the Lenders or the Purchaser be subject to or bound by any claim or defense which the Consentor may have against the Borrower, by any obligation of the Borrower to the Consentor or any third party or by any amendment, modification or assignment of, or supplement to, the Contract made in contravention of Section 5.

4.     NO OBLIGATION; INDEMNITY.  Notwithstanding anything in this Consent to the contrary, the Consentor agrees that, unless (and except to the extent) the Administrative Agent shall expressly assume the obligations of the Borrower under the Contract by written notice to such effect, the Administrative Agent shall not be deemed, solely by virtue of the Pledge and Security Agreement, to have assumed any of the obligations of the Borrower under the Contract, nor, unless expressly assumed, will be under any liability of any kind to the Consentor under the Contract by reason of any services furnished by the Consentor to or for the

3

84085562_5

Borrower. Neither the Pledge and Security Agreement nor this Consent shall be deemed to release or in any way affect the obligations of the Borrower to the Consentor under the Contract.

5.    **PERFORMANCE OF OBLIGATIONS.**    The Consentor agrees to faithfully observe and perform each and every one of the obligations and agreements imposed upon it under the Contract. Notwithstanding anything in the Contract to the contrary, from and after the date hereof, without the written consent of the Administrative Agent and subject to the terms hereof:

(a)  no waiver, modification or amendment by the Borrower of any material provision or right under the Contract shall be binding on the Administrative Agent;

(b)  the Consentor shall not assign or transfer, directly or indirectly, by operation of law or otherwise any interest, right or obligation under the Contract, other than to an entity that is the transferee of substantially all of the Consentor's assets and may legally use the Consentor's name, or any person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control of the Consentor; and

(c)  the Consentor shall not consent to any assignment or transfer by the Borrower of any interest, right or obligation under the Contract.

Any of the acts set forth in this Section, if done without such consent of the Administrative Agent, shall be null and void *ab initio.*

6.    **REPRESENTATIONS.**

(a)    The Consentor is a validly existing limited liability company and is in good standing under the laws of the State of Utah. The Consentor is duly licensed as a real estate broker under the laws of the State of Utah.

(b)    As of this date, the Consentor has no legal interest in or to the Property, and is not entitled to any commissions with respect to transactions contemplated by Purchase Agreements entered into prior to the date hereof other than as set forth in the Contract.

(c)    Attached hereto as Exhibit A is a true and complete copy of the Contract, which is in full force and effect and has not been amended, modified, supplemented, restated or superseded.

(d)    There are no actions, suits or proceedings at law or in equity or before or instituted by any Governmental Authority pending or, to the Consentor's knowledge, threatened against or affecting the Consentor that would be reasonably likely to have a material adverse effect on the Consentor's ability to perform under the Contract.

(e)    The Consentor has no defense, offset, lien, claim or counterclaim against the Borrower under the Contract or against the obligations of the Consentor under the

4

Contract (including, without limitation, charges due or to become due under the Contract) and the Consentor is not contesting any obligations under the Contract.

(f)     The Borrower has performed all of its obligations to date under the Contract, and the Consentor is not aware of any default now existing of the Consentor or of the Borrower under the Contract, nor of any event which, with the giving of notice or the passage of time or both, would constitute a default of the Consentor or of the Borrower under the Contract.

7.     SUBORDINATION. The Contract, the Consentor's Fees and all liens, rights, interests and privileges (whether choate or inchoate) owned, claimed or held by the Consentor are, and at all times shall be, unconditionally subject, junior and subordinate to the lien of, and the Administrative Agent's and the Lenders' right to payment under, and all the terms and conditions of, the Loan Agreement and the other Loan Documents, and all extensions, renewals, modifications, replacements and substitutions thereof. The Consentor agrees that, following the occurrence and during the continuation of an Event of Default under the Loan Agreement, the Consentor shall not accept payment of any fees, commissions or other sums payable under the Contract other than for services rendered on behalf of the Administrative Agent and the Lenders. The Consentor shall not at any time in any proceeding challenge the validity, enforceability or perfection of any of the security interests granted to the Administrative Agent or the Lenders. This provision shall be self operative and no further instrument or subordination shall be required. If requested, however, the Borrower or the Consentor shall execute and deliver such further instruments as the Administrative Agent may deem reasonably necessary to effectuate this subordination.

8.     COOPERATION BY THE CONSENTOR.  If the Contract shall be terminated by the Administrative Agent or any Purchaser pursuant to this Consent, the Consentor hereby agrees to cooperate with the Administrative Agent or the Purchaser, as the case may be, to ensure the smooth transition to the new listing agent for the marketing or sale of the Fractional Ownership Units.

9.     DELIVERY OF REPORTS TO ADMINISTRATIVE AGENT. The Consentor hereby agrees, upon written request of the Administrative Agent, to deliver to the Administrative Agent a copy of all executed Purchase Agreements, contracts, reservations, statements, notices and other items delivered by the Consentor to the Borrower with respect to the marketing or sale of the Fractional Ownership Units, simultaneously with the delivery of such items to the Borrower.

10.     SUCCESSORS/ASSIGNS.  Subject to Section 5 hereof, this Consent shall be binding upon the respective permitted successors and assigns of the Consentor and the Administrative Agent and shall inure to the benefit of and be enforceable by each and their respective permitted successors and assigns.

11.     CHOICE OF LAW.  This Consent shall be construed in accordance with, and this Consent and all matters arising out of or relating in any way whatsoever to this Consent (whether in contract, tort or otherwise) shall be governed by, the law of the State of Utah.

5

84085562_5

12.   WAIVER OF JURY TRIAL.   THE CONSENTOR AND THE ADMINISTRATIVE AGENT HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING OF ANY KIND ARISING OUT OF, IN CONNECTION WITH OR OTHERWISE RELATING TO THIS CONSENT, THE CONTRACT, ANY RELATED AGREEMENT OR THE PLEDGE AND SECURITY AGREEMENT.

13.   NOTICES.   All communications and notices concerning this Consent shall be in writing and addressed as follows:

If to the Administrative Agent at:

> WestLB AG, as administrative agent
> for itself and other co-lenders
> 1211 Avenue of the Americas
> New York, New York 10036
> Attention: Bruce F. Davidson
> Director – Infrastructure
> Global Structured Finance
> Facsimile: (212) 403-3974

with required copy to:

> Katten Muchin Rosenman LLP
> 575 Madison Avenue
> New York, New York 10022
> Attention: Timothy G. Little, Esq.
> Facsimile: (212) 894-5794

If to the Consentor at:

> Extreme Holding, LLC dba
> Prudential Utah Real Estate
> 635 Main Street, Suite 200
> Park City, Utah 84060
> Attention: Dougan Jones
> Facsimile: (435) 615-0725

with required copy to:

> Wrona & Parrish, P.C.
> 1816 Prospector Avenue, Suite 100
> Park City, Utah 84060
> Attention: Joseph Wrona
> Facsimile: (435) 649-5959

6

84085562_5

Communications to be given to the Administrative Agent shall only be effective when set forth in writing and actually received by the Administrative Agent at the address indicated above, except that delivery by facsimile transmission shall be deemed effective upon such delivery. Communications to be given to the Consentor shall be effective when actually received, delivered or rejected by the Consentor or when set forth in writing and mailed or delivered to the Consentor's address as stated above. Communications may be delivered by facsimile transmission, provided confirmation of such transmission is obtained upon such delivery. The Administrative Agent and the Consentor may change their respective address for receipt of notices by submitting the change in writing to the other in compliance with the notice requirements of this Section.

14.     **COUNTERPARTS.** This Consent may be executed in any number of counterparts. All such counterparts will be deemed to be originals and will together constitute but one and the same instrument.

15.     **HEADINGS.** The headings and captions of various paragraphs of this Consent are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

16.     **NO ORAL CHANGE.** This Consent may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of the Borrower, the Consentor or the Administrative Agent, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

17.     **THE ADMINISTRATIVE AGENT'S ACTIONS.** All actions to be taken by the Administrative Agent hereunder shall be subject to the Loan Agreement.

18.     **INCONSISTENCIES.** It is expressly understood and agreed that in the event of any conflicts or inconsistencies between (a) the terms and conditions of this Consent, and (b) the terms and conditions of the Contract, the terms and conditions of this Consent shall control and be binding.

19.     **RECITALS.** The Recitals set forth above are incorporated herein and made a part of hereof.

20.     **PARTIAL INVALIDITY.** In the event any term or provision of this Consent or the application thereof to any person or entity or circumstance, shall, for any reason or to any extent be invalid or unenforceable, the remaining terms and provisions of this Consent, or the application of any such provision to persons, entities or circumstances other than those as to whom or which it has been determined to be invalid or unenforceable, shall not be affected thereby, and every provision of this Consent shall be valid and enforceable to the fullest extent permitted by law.

21.     **DEFINITIONAL PROVISIONS.** For purposes of this Consent, (a) defined terms used in the singular shall import the plural and vice-versa; (b) the words "hereof," "herein," "hereunder" and similar terms when used in this Consent shall refer to this Consent as

7

a whole and not to any particular provision of this Consent; (c) the words "include" and "including" wherever used in this Consent shall be deemed to be followed by the words "without limitation"; (d) the word "or" shall be construed to be inclusive; (e) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Consent; and (f) all of the agreements or instruments referred to in this Consent shall mean such agreements or instruments as the same may, from time to time, be supplemented or amended, or the terms thereof waived or modified, to the extent permitted by, and in accordance with, the terms and conditions thereof and of this Consent.

**(The remainder of this page is intentionally left blank.)**

84085562_5

**IN WITNESS WHEREOF,** the undersigned have each executed this Consent as of the date first written above.

**CONSENTOR:**

**EXTREME HOLDING, LLC** dba
Prudential Utah Real Estate,
a Utah limited liability company

By: _____
    Name:  Dougan Jones
    Title:  Chief Executive Officer and
           Principal Broker

**ADMINISTRATIVE AGENT:**

**WESTLB AG,** acting by and through its
New York Branch, individually as lender
and as Administrative Agent

By: _____
    Name:  Andrew B. Stein
    Title:   Managing Director

By: _____
    Name:  Bruce F. Davidson
    Title:   Director

Signature Page to Consent and Agreement Regarding Pledge and Security Agreement (Listing Agent)

IN WITNESS WHEREOF, the undersigned have each executed this Consent and Agreement Regarding Pledge and Security Agreement, as of the date first written above.

<u>CONSENTOR:</u>

**EXTREME HOLDING, LLC,**
a Utah limited liability company doing business as Prudential Utah Real Estate

By: _____
    Name:
    Title:

By:_____
    Name:
    Title:

<u>ADMINISTRATIVE AGENT:</u>

**WESTLB AG,** acting by and through its New York Branch, individually as Lender and as Administrative Agent

By: _____
    Name:  Andrew B. Stein
    Title:   Managing Director

By:_____
    Name:  Bruce F. Davidson
    Title:   Director

Signature Page to Consent and Agreement regarding Pledge and Security Agreement (Listing Agent)

**EXHIBIT A**

**THE CONTRACT**

(See attached)

2

**EXHIBIT "C"**

Luxury Residence Group

# Invoice

693 Main Street
Park City, UT 84060

| Date | Invoice # |
|------|-----------|
| 7/31/2008 | 15 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | July 08 Rent | 3,751.25 | 3,751.25 |
| 1 | July 08 Common Area Charges | 966.00 | 966.00 |
| 1 | July Qwest | 397.58 | 397.58 |
| 1 | July Rocky Mtn Power | 111.79 | 111.79 |
| 1 | July Questar | 13.51 | 13.51 |

COMPLETED

| Total | $5,240.13 |
|-------|-----------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/31/2008 | 16 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | August 09 Rent | 3,751.25 | 3,751.25 |
|   | August 09 Common Area Fees | 966.00 | 966.00 |
|   | August Qwest | 396.19 | 396.19 |
|   | Aug Rocky Mtn Power | 106.89 | 106.89 |
|   | August Questar | 5.69 | 5.69 |

*KRS STATED - TYPO SHOULD BE Aug 08 not Aug 09.*

COMPLETED

| **Total** | $5,226.02 |
|-----------|-----------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
| --- | --- |
| 9/30/2008 | 17 |

**Bill To**

Cloudnine Resorts

| P.O. No. | Terms | Project |
| --- | --- | --- |
| | | |

| Quantity | Description | Rate | Amount |
| --- | --- | --- | --- |
| | September 08 Rent | 4,007.82 | 4,007.82 |
| | September 08 Common Area fees | 966.00 | 966.00 |
| | Sept Qwest | 757.46 | 757.46 |
| | Sept Rocky Mtn Power | 118.71 | 118.71 |
| | Sept Questar | 11.43 | 11.43 |

COMPLETED

| **Total** | **$5,861.42** |
| --- | --- |

Luxury Residence Group

# Invoice

693 Main Street
Park City, UT 84060

| Date | Invoice # |
|------|-----------|
| 10/31/2008 | 18 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | October 08 Rent | 4,007.82 | 4,007.82 |
|  | October 08 Common Area Charges | 965.00 | 965.00 |
|  | Oct Qwest | 713.89 | 713.89 |
|  | Oct RMP | 0.00 | 0.00 |
|  | Oct Questar | 0.00 | 0.00 |

COMPLETED

| | | **Total** | $5,686.71 |

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/30/2008 | 19 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | November 08 Rent | 4,007.82 | 4,007.82 |
| | November 08 Common Area charges | 965.00 | 965.00 |
| | Nov Qwest | 715.82 | 715.82 |
| | Nov RMP | 124.07 | 124.07 |
| | Nov Questar | 54.42 | 54.42 |

COMPLETED

| | **Total** | $5,867.13 |
|---|-----------|-----------|

Luxury Residence Group

# Invoice

693 Main Street
Park City, UT 84060

| Date | Invoice # |
|------|-----------|
| 12/31/2008 | 20 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | December 08 Rent | 4,007.82 | 4,007.82 |
| | December 08 Common Area charges | 965.00 | 965.00 |
| | December Qwest | 516.12 | 516.12 |
| | DEC RMP | 159.57 | 159.57 |
| | DEC Questar | 102.56 | 102.56 |

COMPLETED

| | Total | $5,751.07 |
|---|-------|-----------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/31/2009 | 21 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | January 09 Rent | 4,007.82 | 4,007.82 |
| | January 09 Common Area charges | 938.00 | 938.00 |
| | Jan 09 Qwest | 698.85 | 698.85 |
| | Jan 09 Rocky Mtn Power | 215.18 | 215.18 |
| | Jan 09 Questar | 138.19 | 138.19 |

COMPLETED

| | **Total** | $5,998.04 |
|--|-----------|-----------|

Luxury Residence Group

# Invoice

693 Main Street
Park City, UT 84060

| Date | Invoice # |
|------|-----------|
| 2/28/2009 | 22 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | February 09 Rent | 4,007.82 | 4,007.82 |
|  | Feb 09 Common Area charges | 938.00 | 938.00 |
|  | Feb 09 Qwest | 742.21 | 742.21 |
|  | Feb 09 Rocky Mountain Power | 210.18 | 210.18 |
|  | Feb 09 Questar | 113.78 | 113.78 |

COMPLETED

| | Total | $6,011.99 |
|---|-------|-----------|

Luxury Residence Group

# Invoice

693 Main Street
Park City, UT 84060

| Date | Invoice # |
|------|-----------|
| 3/31/2009 | 23 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | March 09 rent | 4,007.82 | 4,007.82 |
| | March 09 Common Area charges | 938.00 | 938.00 |
| | Mar 09 Qwest | 667.51 | 667.51 |
| | Mar 09 Rocky Mountain Power | 181.40 | 181.40 |
| | Mar 09 Questar | 72.97 | 72.97 |

COMPLETED

| | **Total** | **$5,867.70** |
|--|-----------|---------------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/30/2009 | 24 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | April 09 Rent | 4,007.82 | 4,007.82 |
|  | April 09 Common Area charges | 938.00 | 938.00 |
|  | Apr 09 Qwest | 671.12 | 671.12 |
|  | APr 09 Rocky Mountain Power | 168.85 | 168.85 |
|  | Apr 09 Questar | 50.97 | 50.97 |

COMPLETED

| | Total | $5,836.76 |
|--|-------|-----------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/31/2009 | 25 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | May 09 Rent | 4,007.82 | 4,007.82 |
| | May 09 Common Area fees | 938.00 | 938.00 |
| | May 09 Qwest | 671.43 | 671.43 |
| | May 09 Rocky Mtn Power | 161.67 | 161.67 |
| | May 09 Questar | 0.00 | 0.00 |

COMPLETED

| | Total | $5,778.92 |
|---|-------|-----------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/30/2009 | 26 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | Jun 09 Rent | 4,007.82 | 4,007.82 |
| | June 09 Common Area charges | 938.00 | 938.00 |
| | Jun 09 Qwest | 671.12 | 671.12 |
| | Jun 09 Rocky Mtn Power | 173.01 | 173.01 |
| | Jun 09 Questar | 0.00 | 0.00 |

COMPLETED

| Total | $5,789.95 |
|-------|-----------|

Luxury Residence Group

693 Main Street
Park City, UT 84060

# Invoice

| Date | Invoice # |
|------|-----------|
| 7/29/2009 | 27 |

| Bill To |
|---------|
| Cloudnine Resorts |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | July 09 Rent | 4,007.82 | 4,007.82 |
|  | July 09 Common Area fees | 966.00 | 966.00 |
|  | Jul 09 Qwest | 674.83 | 674.83 |
|  | Jul 09 Rocky Mtn Power | 149.91 | 149.91 |
|  | Jul 09 Questar | 6.71 | 6.71 |
|  | **Total** | | **$5,805.27** |