# EXHIBIT 1

## CONSENT AND SUBORDINATION OF MANAGEMENT AGREEMENT

**THIS CONSENT AND SUBORDINATION OF MANAGEMENT AGREEMENT** (the *Consent*) is made as of March 28, 2006 by and between **EASY STREET PARTNERS, LLC**, a Utah limited liability company, having an address at 4780 Winchester Court, Park City, Utah 84098 (the *Borrower*), **CLOUDNINE RESORTS/SKY LODGE MANAGEMENT, LLC**, a Utah limited liability company, having an address at 4780 Winchester Court, Park City, Utah 84098 (the *Manager*) and **WESTLB AG**, a German banking corporation acting by and through its New York Branch (the *Administrative Agent*), as agent for itself and such other lenders as may exist from time to time (collectively, the *Lenders* and each individually, a *Lender*) under the Loan Agreement (as hereinafter defined), having offices at 1211 Avenue of the Americas, New York, NY 10036.

### RECITALS:

A.     The Borrower is the owner of a certain condominium resort hotel to be known as the "Sky Lodge Private Residence Club and Hotel" and located in Park City, Utah, on property more particularly described on **Exhibit A**.

B.     The Borrower, the Administrative Agent and the Lenders intend to enter into that certain Loan and Security Agreement, dated as of the date hereof (as the same may be amended, restated, modified or supplemented from time to time, the *Loan Agreement*), pursuant to which the Lenders will agree, subject to the satisfaction of conditions therein, to make a loan to the Borrower in the aggregate original principal amount of THIRTY-SIX MILLION SEVEN HUNDRED SEVENTY-NINE THOUSAND TWO HUNDRED TWENTY-FOUR AND NO/100 DOLLARS ($36,779,224.00) (the *Loan*) for the uses and purposes set forth in the Loan Agreement (all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement).

C.     The Borrower and the Manager have entered into that certain Sky Lodge Management Agreement, effective as of January 1, 2007 (the *Management Agreement*) pursuant to which the Borrower has retained the Manager to provide certain services with respect to the management and operation of the Resort.

D.     As a condition precedent to the Lenders making the Loan and as additional security for the repayment of the Loan and all other Obligations arising under the Loan Documents (each as defined in the Loan Agreement), the Administrative Agent has requested that the Borrower assign to the Administrative Agent for the benefit of the Lenders, all of its right, title and interest, in, to and under the Management Agreement pursuant to the terms and conditions of that certain Pledge and Security Agreement, dated as of March ___, 2006, by the Borrower, as the Assignor, to the Administrative Agent, as the Assignee (the *Pledge and Security Agreement*).

E.     The Borrower has requested that the Manager acknowledge and consent to the assignment of the Management Agreement pursuant to the Pledge and Security Agreement, subject to and in accordance with the terms hereof.

F.    The Manager shall derive substantial benefit from the Lenders making the Loan to the Borrower.

**NOW, THEREFORE**, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Manager hereby consents, agrees and certifies as follows:

## ARTICLE I

## DEFINITIONS

1.1    Definitions.  As used herein, the following terms shall have the meanings ascribed to them below:

*Beneficiary* shall mean any of the following: (i) the Administrative Agent; (ii) any successors or assigns of that entity; (iii) any nominee or designee of that entity (or any other entity described in this definition); (iv) any initial or subsequent assignee of all or any portion of the interest of that entity in the Security Instrument; or (v) any Lender or other entity which is a participant in the financing secured by the Security Instrument, or otherwise acquires an equitable interest in the Security Instrument; **provided**, that the holder of the Security Instrument then of record shall have the power to act as the Lender hereunder for the purpose of giving or receiving notices, consents or waivers or otherwise exercising the rights of the Lenders hereunder.

*Consent* shall have the meaning set forth in the first sentence of this Consent.

*Fees* shall mean the Basic Management Fee and the Annual Incentive Fee (each as defined in the Management Agreement).

*Foreclosure* shall mean any exercise of the remedies available to the holder of the Security Instrument upon an Event of Default, which exercise results in a transfer of title to or possession of all or substantially all of the Resort to such holder, its designee, a purchaser in foreclosure or any other third party. The term "Foreclosure" shall include, without limitation: (i) a transfer by judicial foreclosure; (ii) a transfer by private sale pursuant to an exercise of power of sale; (iii) a transfer by deed in lieu of foreclosure; (iv) a transfer resulting from an order given in a bankruptcy, reorganization, insolvency or similar proceeding; or (v) any similar judicial or non-judicial exercise of the remedies held by the holder of the Security Instrument.

*Foreclosure Date* shall mean the date on which title to and possession of the Resort is transferred to a Subsequent Owner by means of a Foreclosure.

*Land* shall mean the interest in real property described in **Exhibit A** hereto, together with all easements, servitudes, rights of way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances whatsoever, in any way now or hereafter belonging, relating or appertaining to the Land, and the revisions, remainder, rents, issues and profits thereof, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of the Borrower of, in and to the same.

*Loan* shall have the meaning set forth in the Recitals of this Consent.

*Loan Documents* shall have the meaning set forth in the Loan Agreement.

*Lockbox Account* shall have the meaning set forth in Section 4.1 of the Loan Agreement.

*Manager* shall have the meaning set forth in the first sentence of this Consent.

*Manager's Notice Address* shall mean:

CloudNine Resorts/Sky Lodge Management, LLC
4780 Winchester Court
Park City, Utah 84098
Attention: William Shoaf

with a copy to:

Wrona & Parrish
1816 Prospector Avenue, Suite 100
Park City, Utah 84060
Attention: Blake Parrish

*New Agreement* shall have the meaning set forth in **Section 6.1(a)(2)** of this Consent.

*Notice* shall have the meaning set forth in **Section 11.1** of this Consent.

*Obligations* shall have the meaning set forth in the Loan Agreement.

*Operating Account* shall have the meaning as set forth in Section 4.1 of the Loan Agreement.

*Operating Budget* shall have the meaning as set forth in Section 6.1(t) of the Loan Agreement.

*Person* shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether territorial, national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

*Purchaser* shall have the meaning set forth in **Section 6.1(a)** of this Consent.

*Resort* shall mean the Land and all buildings, structures, improvements and appurtenances located or to be developed on the Land consisting of (a) a 22-key luxury, private residence club with full service, five-star equivalent resort destination amenities, (b) two restaurants, (c) a spa and fitness center, (d) a meeting space, (e) a rooftop owners club with heated outdoor spa grotto area, (f) outdoor plaza areas, (g) a climate-controlled underground

parking garage, (h) public grounds and gardens located on or constituting all or a portion of the Land and (i) any other rooms, public or private areas or garage space which are now present or may be added to the Land or to any of the foregoing in the future.

*Security Instrument* shall mean that certain Construction and Interim Loan Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the date hereof, between the Administrative Agent, as the Beneficiary, Equity Title Insurance Agency, Inc., as Trustee, and the Borrower, as the Trustor.

*Subsequent Owner* shall mean any Person which acquires title to or possession of the Resort at or through a Foreclosure (together with any successors or assigns thereof), and which may include, without limitation, (i) Beneficiary (or any Affiliate of Beneficiary), (ii) any purchaser of the Resort from Beneficiary (or any Affiliate of Beneficiary) or any lessee of the Resort from Beneficiary (or any Affiliate of Beneficiary) or (iii) any Purchaser of the Resort at Foreclosure.

*Termination Period* shall mean the period of time which begins on the date on which an Event of Default occurs and ends on the 180th day after the Foreclosure Date.

## **ARTICLE II**

## **REPRESENTATIONS REGARDING THE MANAGEMENT AGREEMENT**

2.1     Representations as to Management Agreement. The Manager represents to the Administrative Agent that:

(a)     The Management Agreement has been executed, has not been modified and is in full force and effect without default.

(b)     Attached as **Exhibit B** hereto is a correct and complete copy of the Management Agreement.

(c)     The Manager has not made any assignment, pledge, delegation or other transfer of any interest, right or obligation under or in the Management Agreement, and the Manager is not under any restriction or prohibition in regard to entering into or undertaking the obligations of this Consent.

(d)     As of the date of this Consent, no fees under Section 8 of the Management Agreement are due and payable.

(e)     Except as set forth in the Management Agreement, neither the Manager, nor any other Person related to Manager, has any right or claim to any fees, commissions, compensation or other remuneration in connection with or arising out of the management or operation of the Resort.

**ARTICLE III**

**COVENANTS OF THE MANAGER**

3.1    Covenants of the Manager as to the Management Agreement. The Manager covenants to the Administrative Agent that:

(a) The Manager shall observe and perform all of its respective obligations under the Management Agreement on behalf of the Borrower and shall not by agreement or conduct permit the Borrower to alter, modify, terminate or waive any material term or provision of the Management Agreement without the prior consent of the Administrative Agent. No amendment or modification of the Management Agreement shall become effective without the Administrative Agent's consent. Any modifications, supplements, replacements and extensions of the original Management Agreement, which are made without the Administrative Agent's prior written consent, shall be voidable at the option of the Administrative Agent or any Subsequent Owner.

(b) The Manager shall not consent to or permit the Borrower to assign, pledge, delegate, waive or transfer any interests, rights or obligations under the Management Agreement, including any proceeds, to any other Person. The Manager shall not, and shall not permit any affiliate to, loan or forebear to collect any amount due to them from the Borrower without the prior written consent of the Administrative Agent.

(c) In the event that the Manager asserts or obtains knowledge of a default by the Borrower in performance or breach under the Management Agreement, or for any other reason gives notice to the Borrower pursuant to the Management Agreement, the Manager, as the case may be, shall send a copy of any notice or statement sent by it to the Borrower pursuant to the Management Agreement simultaneously to the Administrative Agent and by the same manner of transmittal. On the occurrence of any event giving the Manager the right to terminate the Management Agreement for any reason, the Manager shall promptly deliver notice to the Administrative Agent detailing such occurrence with reasonable specificity and stating its intended date of termination.

(d) The Administrative Agent shall be entitled, without obligation to do so, to tender a cure or to cure any default or purported default in the obligations of the Borrower in accordance with the provisions of the Management Agreement to which the Borrower may cure any such default or other cause for termination. No termination of the Management Agreement shall be effective until the Manager has given notice to the Borrower and the Administrative Agent, pursuant to the notice requirements set forth in **Section 11.1** hereof, and 45 days have elapsed since the receipt of such notice by the Borrower and the Administrative Agent and cure has not been effected. The Manager agrees to accept such tender of cure if made. Notwithstanding anything else to the contrary, the cure period to be afforded the Administrative Agent with respect to a default by the Borrower in the

payment of any Fees shall be 10 Business Days, and the Manager shall be entitled to keep all payments made to it during such default period.

(e) In the event that the Administrative Agent informs the Manager that the Administrative Agent elects to commence a Foreclosure or otherwise enforce its remedies against the Borrower, the Manager shall not thereafter seek to declare a default or otherwise pursue the termination of the Management Agreement during the pendency of such Foreclosure or other enforcement proceedings, and shall cease and suspend any action to enforce a remedy or terminate then underway, **provided,** that, unless otherwise stated herein, the Manager is paid all Fees and reimbursable expenses under the Management Agreement during the pendency of such Foreclosure. The Manager shall continue to operate the Resort pursuant to the Management Agreement and this Consent during that action's pendency.

## ARTICLE IV

## SUBORDINATION OF RIGHTS OF THE MANAGER

4.1    Subordination of Rights of the Manager. The rights of the Manager under the Management Agreement, including the right to receive payment of Fees and all other amounts, shall be and continue to be subordinate and inferior to the Security Instrument and any amendment, renewal, substitution, extension or replacement thereof and each advance made hereunder as though the Security Instrument, and each such amendment, renewal substitution, extension or replacement were executed and recorded, and all advances made, before the execution of the Management Agreement.

4.2    Subordination of Rights of the Manager and Affiliates to Payment from Accounts. The Manager, the Borrower and the Administrative Agent agree that the establishment of the Lockbox Account and the Reserve Accounts (each as defined in the Loan Agreement) of the Resort and the control of those Accounts by the Administrative Agent is essential to the creation and maintenance of the Administrative Agent's perfected security interest. Notwithstanding anything to the contrary contained in Section 6.3 of the Management Agreement, the Manager acknowledges and agrees hereby (i) that all Gross Revenues collected or received by the Manager on behalf of the Borrower shall be deposited into the Lockbox Account as required by Article 4 of the Loan Agreement and (ii) to comply with the cash management system established pursuant to Article 4 of the Loan Agreement.

4.3    Subordination of Interest of the Manager in other Assets of the Borrower. The Manager agrees that its interest in the assets of the Borrower shall be subordinate as follows:

(a) The Manager agrees that any judgment lien obtained by it or any Affiliate upon any asset of the Borrower shall be junior and subordinate to the interests of the Administrative Agent in the Collateral. The Administrative Agent shall not be required to join or name the Manager and its Affiliates as parties in any Foreclosure or other proceeding to effect such subordination, although the

6

Administrative Agent may choose to do so for avoidance of doubt or for the benefit of title insurers.

(b) In the event of any transfer of personal property including, without limitation, inventory, intangibles, contracts, accounts and interests in cash included in the Collateral to the Administrative Agent or its designee after a Default by the Borrower, or to any purchaser in a UCC or common law foreclosure, such transferee shall acquire such property free and clear of any lien of the Manager or any affiliate of Manager.

(c) Notwithstanding the foregoing, the Manager shall continue to have an unsecured claim against the Borrower for any amount accrued and unpaid to it under the Management Agreement. Such claim shall be enforceable by the Manager against the assets of the Borrower, if any, remaining after satisfaction of the Obligations of the Borrower under the Loan Documents.

## ARTICLE V

## CONSENT

5.1    The Manager hereby acknowledges the execution and delivery of the Pledge and Security Agreement by the Borrower and irrevocably consents to the assignment by the Borrower of the rights of the Borrower in, to and under the Management Agreement contained therein.

## ARTICLE VI

## CONTINUATION AFTER TRANSFER

6.1    Continuation after Transfer.  The Manager and the Administrative Agent agree:

(a) In the event that the Administrative Agent, at its sole option and discretion, intends to exercise its remedies under the Loan Documents or by any other means allowed under the Loan Documents or permitted by Law, to acquire possession and title to the Resort through Foreclosure, the Administrative Agent or any purchaser who acquires the Resort directly as a result of such Foreclosure or upon a conveyance by the Administrative Agent after its own Foreclosure, including, without limitation, any purchaser who is an Affiliate of the Administrative Agent or any of the Lenders (any of the same being hereinafter referred to as the *Purchaser*), shall have the right, at its sole option and discretion, to:

(1)    elect by notice to the Manager delivered at any time within the Termination Period, stating that the Administrative Agent or the Purchaser, as the case may be, does not intend to enter into a New Agreement (as hereinafter defined) with the Manager and such notice shall result in the termination of the Management Agreement as of 30 days after

the receipt of such notice or such later date as is set forth in such notice and is within the period of the Termination Period plus thirty 30 days; or

(2)    elect by notice to the Manager delivered at any time within the Termination Period, requiring that the Manager enter into a new Management agreement (the *New Agreement*) with the Administrative Agent or the Purchaser, as the case may be, for the further management of the Resort, which New Agreement shall be on the same terms as the Management Agreement except that (i) the term of the New Agreement shall be for a term equal to the remainder of the term of the Management Agreement, (ii) all references to the Borrower or to any control of the Resort by the Borrower shall be deleted and replaced by references to the Administrative Agent or the Purchaser, as applicable, (iii) the definition of "Gross Revenues" provided in Section 1.21 of the Management Agreement shall be deleted in its entirety and replaced with the definition of "Gross Revenues" set forth in the Loan Agreement and (iv) the Subsequent Owner shall not be bound by the terms of Section 8.5 of the Management Agreement, which Section shall be of no further force or effect; **provided**, that notwithstanding anything to the contrary in this Consent, in no event will the Administrative Agent or the Purchaser, as the case may be, be obligated to (A) change, modify or alter any existing condition of the Resort unless the Administrative Agent has previously received a notice indicating an intention to terminate from the Manager with respect to such condition as required by **Section 11.1** hereof prior to commencing exercise of its remedies or (B) make advances to the Manager or to the Resort pursuant to Sections 3.4 or 3.5 of the Management Agreement.

(3)    The failure of the Administrative Agent or the Purchaser, as the case may be, to deliver notices as required under either (1) or (2) above shall be deemed the equivalent of a notice under (1) above made as of the last day of the Termination Period, **provided**, that in such case the deemed termination of the Management Agreement shall be effective as of the 30th day after the Termination Period.

(b)    In the event that the Administrative Agent or the Purchaser, as the case may be, elect not to enter into a New Agreement with the Manager as provided above, no termination fees shall be owed by the Administrative Agent or the Purchaser to the Manager following any such election. The Manager's rights to compensation for services rendered after the Foreclosure Date shall be limited to collection from the Accounts of Basic Management Fees and Annual Incentive Fees accruing for that period under the Management Agreement. The Borrower shall continue to be liable to the Manager for all fees, charges and indemnifications under the Management Agreement, whether accruing before or after the Foreclosure Date, **provided**, that any right or remedy the Manager may have to collect such fees, charges or indemnifications from the Borrower or the

Resort shall be subordinated to the indefeasible payment in full in cash of all amounts due to the Administrative Agent under the Loan Documents.

(c) Unless and until the Administrative Agent or the Purchaser, as the case may be, elect to require the Manager to enter into a New Agreement as provided in **Section 6.1(a)(2)** hereof and the Manager does enter into such New Agreement, the Administrative Agent or the Purchaser shall have no liability or obligation to the Manager. Any such liabilities or obligations of the Administrative Agent or the Purchaser shall be limited to those expressly contained in the New Agreement and accruing after the effective date thereof. In no event shall the Administrative Agent or the Lenders be responsible for any fees, costs, reimbursements, termination fees, or other fees, charges and indemnifications, or for any costs of maintenance, remodeling or upgrades to the Resort, or loans or advances or other amounts that were owed by the Borrower to the Manager or were the obligation of the Borrower, as the case may be, under the terms of the Management Agreement prior to the effective date of the New Agreement. The Manager shall not be deemed to have waived any rights it may have to collect such outstanding fees, charges and indemnifications from the Borrower which shall continue to be liable for such fees, charges and indemnifications; **provided**, that the Manager agrees that such outstanding fees, charges and indemnifications and any right or remedy the Manager may have to collect such outstanding fees, charges and indemnifications shall be subordinated to the indefeasible payment in full in cash of all amounts due under the Loan Documents (irrespective of any reduction of same as an allowed amount in any bankruptcy proceeding), nor shall the Manager place a lien on, attach or otherwise encumber the Resort or the proceeds thereof. Should any payment on account of, or any collateral for, any obligation which is subordinated by the preceding sentence be received by the Manager during the continuance of a Default or Event of Default under the Loan Documents, such payment or collateral shall be delivered forthwith to the Administrative Agent by the Manager for application to the loans outstanding under the Loan Documents. Until so delivered, any such payment or collateral shall be held by the Manager in trust for the Administrative Agent and shall not be commingled with other funds or property of the Manager.

(d) Notwithstanding any of the provisions of this Consent to the contrary, the Administrative Agent or the Purchaser, at any time after (i) receiving a notice of intention to terminate from the Manager, or (ii) any Event of Default has occurred under the Loan Documents, may elect to, or require the Borrower to, cancel and terminate the Management Agreement effective as of 30 days after written notice to the Manager, and neither the Administrative Agent nor the Purchaser shall have any liability to the Manager for any costs, Fees, reimbursements or termination fees owed by the Borrower to the Manager under the Management Agreement, and such outstanding Fees and any right the Manager may have to collect such outstanding Fees shall be subordinated in full to the repayment of the Obligations under the Loan Documents as set forth in **Section 4.1** hereof, and prior to such repayment in full, the Manager will not place a lien on, attach, or otherwise encumber the Resort or any proceeds thereof.

(e) Notwithstanding anything else to the contrary, upon the termination of the Management Agreement for any reason, the Manager shall remit to the Administrative Agent the balance of any amounts then on deposit in operating accounts related to the Resort; **provided,** that the Manager shall be entitled to receive, to the extent amounts then on deposit in such operating accounts, sufficient monies to meet then-existing payroll obligations.

## ARTICLE VII

## RELATIONSHIPS

7.1     Relationships. For avoidance of doubt and notwithstanding anything to the contrary stated or implied from the Management Agreement, this Consent, or any other course of dealing between any of the parties, the parties agree:

(a) The Borrower enters into this Consent only as (i) the owner of the Land and the Resort and (ii) the Borrower under the Loan Agreement.

(b) The Administrative Agent enters into this Consent only as an agent for the Lenders to the Borrower and holder of a security interest in the Collateral. No relationship of partner or joint venturer is intended or should be implied.

(c) The Manager enters into this Consent only in regard to its engagement as agent of the Borrower under the Management Agreement. No relationship of guarantor, partner, tenant, joint venturer or indemnitor of obligations of the Borrower to third parties is intended or should be inferred. The Manager undertakes no obligation to advance its own funds to the Borrower or otherwise for the continued operation of the Resort except as set forth in the Management Agreement.

(d) All books, plans, contracts, accounts, receipts, tapes, records and the like maintained by the Manager with respect to the management, operation, leasing or maintenance of the Resort shall, at all times, be and constitute the property of the Borrower subject to the Loan Documents as part of the Collateral and shall be surrendered to the Borrower or the Administrative Agent in accordance with the terms hereof, without charge or expense. Nothing herein shall create an agency coupled with an interest and the Manager and the Borrower expressly waive any such interest.

## ARTICLE VIII

## INSURANCE

8.1    <u>Insurance</u>. Notwithstanding the provisions of Article 7 of the Management Agreement, the insurance coverages to be provided by the Borrower for the Resort, together with the required amounts of such coverages, shall be governed by Exhibit Y to the Loan Agreement; however, if Article 7 of the Management Agreement imposes additional insurance requirements on the Borrower, the Administrative Agent shall not object to the Borrower or the Manager obtaining such additional coverages, so long as, during the continuance of an Event of Default, the aggregate costs of all insurance does not exceed the amount allocated for such expense in the Operating Budget.

## ARTICLE IX

## CONDEMNATION

9.1    <u>Condemnation</u>.    Notwithstanding the Management Agreement, the collection and distribution of insurance proceeds and condemnation awards, as well as the Borrower's obligations to rebuild and repair, and the Borrower's or the Administrative Agent's right to terminate the Management Agreement, in the event of any casualty or condemnation, shall be governed by Article 12 of the Loan Agreement.

## ARTICLE X

## BINDING EFFECT

10.1    <u>Binding Effect</u>.  This Consent shall be binding on and, to the extent such successors or assigns are permitted, inure to the benefit of the successors and assigns of the Borrower, the Manager and the Lenders.

## ARTICLE XI

## MISCELLANEOUS

11.1    <u>Notices</u>.

(a)    All notices required or which either party herein may desire to give to the other (each, a *Notice*) shall be in writing addressed to the applicable party at the address set forth in **Section 1.1** of this Consent and otherwise made pursuant to Section 11.4 of the Loan Agreement.

(b)    The foregoing Notice provision shall in no way prohibit a Notice from being given as provided in the rules of civil procedures of the state in which the Resort is located, as the same may be amended from time to time.

11.2 <u>Right to Inspect</u>.    The Administrative Agent or its designated representative shall have access to the Resort at any reasonable time during normal business hours for the purpose of inspecting the Resort or any portion thereof, protecting same against fire or other casualty, prevention of damage in the Resort or any portion thereof or showing the Resort to prospective purchasers or mortgagees.

11.3 <u>Partial Invalidity.</u>    In the event that any portion of this Consent shall be declared by order, decree or judgment of a court or governmental agency having jurisdiction to be invalid, illegal or unenforceable in any respect, this Consent shall be construed as if such portion had not been inserted herein, except when such construction would operate as an undue hardship on the Manager or the Borrower or constitute a substantial deviation from the general intent and purpose of such parties as reflected in this Consent.

11.4 <u>Time of the Essence.</u>    It is expressly agreed that time is of the essence with respect to the obligations of the Manager under this Consent.

11.5 <u>Gender.</u>    The use of the neuter gender in this Consent shall be deemed to include any other gender, and words in the singular number shall be held to include the plural, when the sense requires.

11.6 <u>Modification, etc.</u>    The provisions of this Consent shall not be modified, amended, waived, discharged or terminated except by a written document signed by all of the parties hereto.    In the event the Management Agreement shall be amended, modified or supplemented, the Management Agreement, as so amended, modified or supplemented, shall continue to be subject to the provisions of this Consent without the necessity of any further act by the parties hereto.

11.7 <u>Further Assurances.</u>

(a) The Manager shall execute such documents, estoppels and agreements as the Administrative Agent, or any third party specified by the Administrative Agent, may require to evidence the Manager's consent to or waiver of any claim against the transfer of the Resort and its undertaking to (i) continue to operate the Resort pursuant to the terms of the Management Agreement or New Agreement and (ii) grant each Subsequent Owner the same rights as the Borrower holds under the Management Agreement or New Agreement to implement an orderly transfer of the books, records and reservations in the event of any transfer to such successor, in each case, subject to the terms of this Consent.

(b) The parties hereto agree to execute, acknowledge, deliver and record such certificates, amendments, instruments and documents, and to take such other action, as may be necessary to carry out the intent and purposes of this Consent.

11.8 <u>Estoppel Certificates.</u>    The Manager shall, at any time and from time to time upon not less than 30 days' prior written notice from the Administrative Agent, execute, acknowledge and deliver to the Administrative Agent, or to any third party specified by the Administrative Agent, a statement in writing: (A) certifying (i) that the Management Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications) and (ii) the date through which

the Fees due under the Management Agreement have been paid; (B) stating whether or not to the best knowledge of the Manager (i) there is a continuing default by the Borrower in the performance or observance of any covenant, agreement or condition contained in the Management Agreement or (ii) there shall have occurred any event which, with the giving of notice or passage of time or both, would become such a default, and, if so, specifying each such default or occurrence of which the Manager may have knowledge; and (C) stating such other information as the Administrative Agent may reasonably request.   Such statement shall be binding upon the Manager and may be relied upon by the Administrative Agent or such third party specified by the Administrative Agent as aforesaid.

      11.9    Counterpart Execution.   This Consent may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Consent may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Consent identical in form hereto but having attached to it one or more additional signature pages.

      11.10   No Third Party Beneficiaries.   The Borrower, the Manager and the Administrative Agent acknowledge that this Consent is solely for their own benefit and that of their successors and assigns, and that no third party shall have any rights or claims arising hereunder, nor is it intended that any third party shall be a third party beneficiary of any provisions hereof.

      11.11   Waiver, Entire Agreement.   No modification, amendment, discharge or change of this Consent, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, amendment, discharge or change is sought.  No waiver of any breach of any covenant, condition or agreement contained herein shall be construed to be a subsequent waiver of that covenant, condition or agreement or of any subsequent breach thereof of this Consent.  This Consent contains the entire agreement between the parties relating to the transaction contemplated hereby, and all prior or contemporaneous agreements, understandings, representations or statements, oral or written, are merged herein.

      11.12   Captions.   Titles or captions contained in this Consent are inserted only as a matter of convenience, and for reference only, and in no way limit, define or extend the provisions of this Consent.

      11.13   Interpretation.   In interpreting this Consent, the provisions in this Consent shall not be construed against or in favor of either party on the basis of which party drafted this Consent.

      11.14   Governing Law.   This Consent shall be construed in accordance with, and this Consent and all matters arising out of or relating in any way whatsoever to this Consent (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

11.15  <u>Compliance with Equal Opportunity Law and Regulations.</u>  During the term of this Consent, the Manager and anyone authorized to act for the Manager shall comply with the provisions of Title VII of the Civil Rights Act of 1968, as amended, and Executive Order 11063; Titles VI and VIII of the Civil Rights Act of 1964 and where applicable, Executive Order 11246, as amended, and all applicable state and local news.  Neither the Borrower, the Manager nor anyone authorized to act for such parties shall, in the rental, lease, sale, provision of services or any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, national origin, or any other basis prohibited by law.

11.16  <u>Jury Trial Waiver.</u>  THE PARTIES HERETO HEREBY WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS CONSENT.

11.17  <u>Liens.</u>  This Consent shall not create an interest in real property and it shall not be recorded in the public records of any jurisdiction.  Notwithstanding anything to the contrary contained herein, neither the Manager nor any officer, partner, representative or agent thereof shall be entitled to place, file or record a lien against the Resort on account of any sums alleged to be due and payable to the Manager hereunder.

11.18  <u>Definitional Provisions.</u>  For purposes of this Consent: (a) defined terms used in the singular shall import the plural and vice-versa; (b) the words "hereof," "herein," "hereunder" and similar terms when used in this Consent shall refer to this Consent as a whole and not to any particular provision of this Consent; (c) the words "include" and "including" wherever used in this Consent shall be deemed to be followed by the words "without limitation"; (d) the word "or" shall be construed to be inclusive; (e) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Consent; and (f) all of the agreements or instruments referred to in this Consent shall mean such agreements or instruments as the same may, from time to time, be supplemented or amended, or the terms thereof waived or modified, to the extent permitted by, and in accordance with, the terms and conditions thereof and of this Consent.

**[The remainder of this page is intentionally left blank.]**

**IN WITNESS WHEREOF** the parties have executed this Consent as of the date first written above.

<u>BORROWER:</u>

**EASY STREET PARTNERS, LLC,**
a Utah limited liability company

By:    EASY STREET MEZZANINE LLC,
        a Delaware limited liability company,
        its sole member

        By:    EASY STREET HOLDING LLC,
            a Utah limited liability company,
            its sole member

            By:    AVG-SL, LLC,
                a Utah limited liability company,
                its manager

                By:_____
                  Name:  William Shoaf
                  Title:   Manager

<u>ADMINISTRATIVE AGENT:</u>

**WESTLB AG**, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By:_____
    Name:  Andrew B. Stein
    Title:   Managing Director

By:_____
    Name:  Bruce Davidson
    Title:   Director

<u>MANAGER:</u>

**CLOUDNINE RESORTS/SKY LODGE MANAGEMENT LLC,**
a Utah limited liability company

By:_____
    Name:  William Shoaf
    Title:   Manager

Signature page to Consent and Subordination of Management Agreement

**IN WITNESS WHEREOF** the parties have executed this Consent as of the date first written above.

<u>**BORROWER:**</u>

**EASY STREET PARTNERS, LLC,**
a Utah limited liability company

BY:_____
_____

By:_____
      Name:
      Title:

<u>**ADMINISTRATIVE AGENT:**</u>

**WESTLB AG**, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By:_____
  Name:    Andrew B. Stein
  Title:    Managing Director

By:_____
  Name:    Bruce Davidson
  Title:    Director

<u>**MANAGER:**</u>

**CLOUDNINE RESORTS/SKY LODGE MANAGEMENT, LLC,**
a Utah limited liability company

BY:_____
_____

By:_____
      Name:
      Title:

Signature page to Consent and Subordination of Management Agreement

# EXHIBIT A

## LEGAL DESCRIPTION OF THE LAND

PARCEL NO. 1

BEGINNING AT A POINT SOUTH 4.73 FEET AND WEST 49.84 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51' EAST 18.50 FEET, THENCE NORTH 31°58'04" WEST 72.72 FEET, THENCE SOUTH 58°02'07" WEST 81.41 FEET MORE OR LESS, THENCE SOUTH 32°25'56" EAST 128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 32°25'56" EAST 128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 23°38' EAST 64.90 FEET TO THE NORTHERLY LINE OF HEBER AVENUE AS DEDICATED, THENCE SOUTH 81°17' EAST 24.80 FEET ALONG SAID NORTHERLY LINE, THENCE NORTH 15°46'12" EAST 60.79 FEET TO THE POINT OF BEGINNING.

SUBJECT TO AND TOGETHER WITH A 20 FOOT RIGHT OF WAY AS CREATED IN THAT CERTAIN EASEMENT RELOCATION AGREEMENTS RECORDED DECEMBER 31, 1973 AS ENTRY NO. 244339 AND 244340 IN BOOK 368 AT PAGE NO'S 635 AND 643 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, SAID RIGHT OF WAY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS 65.21 FEET SOUTH AND 51.59 FEET WEST OF THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, SAID POINT ALSO BEING 12.0 FEET NORHTWEST OF THE SOUTHEAST CORNER OF LOT 15, BLOCK 50, OF THE PARK CITY SURVEY AND RUNNING THENCE NORTH 10°18'32" EAST 66.28 FEET, THENCE EAST 3.38 FEET, THENCE NORTH 31°58'00" WEST 77.00 FEET,T HENCE NORTH 19°54'00" EAST 66.80 FEET, THENCE CONTINUING NORTH 19°54'00" EAST 123.47 FEET, THENCE NORTH 70°06'00" WEST 20.00 FEET, THENCE SOUTH 19°54'00" WEST 200.00 FEET, THENCE SOUTH 31°58'00" EAST 73.76 FEET, THENCE SOUTH 10°44'00" WEST 63.67 FEET, THENCE SOUTH 81°17'00" EAST 20.23 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-F

PARCEL 2

BEGINNING AT A POINT 50 FEET, NORTH OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE NORTH 43.97 FEET, THENCE NORTH 66°11' WEST 142.63 FEET, THENCE SOUTH 31°58' EAST 119.75 FEET, THENCE EAST 67.1 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN EASY STREET BRASSERIE REPLAT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MARCH 12, 2003 AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO. SA-400-A

PARCEL 3

BEGINNING AT A POINT 38.85 FEET WEST OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE WEST 7.93 FEET, THENCE SOUTH 06°02'

EAST 67.70 FEET, THENCE NORTH 81°17' WEST 27.0 FEET, THENCE NORTH 15°46'12" EAST 60.79 FEET, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51" EAST 18.50 FEET, THENCE SOUTH 31°58' EAST 25.40 FEET, THENCE SOUTH 19°54' WEST 3.18 FEET, THENCE SOUTH 31°54' EAST 77.00 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-406

PARCEL 4 AND 4A

LOTS 1 AND 2, EASY STREET BRASSERIE REPLAT SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED MARCH 12, 2003, AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO.'S ESB-1, AND ESB-2

PARCEL 5

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, IN PARK CITY, SUMMIT COUNTY, UTAH BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS WEST, A DISTANCE OF 35.90 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE CONTINUING WEST A DISTANCE OF 2.95 FEET, THENCE NORTH 31°58' WEST A DISTANCE OF 77.00 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 3.18 FEET, THENCE SOUTH 31°58' EAST A DISTANCE OF 80.53 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO TOGETHER WITH THE FOLLOWING DESCRIBED PROPERTY:

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN IN PARK CITY, SUMMIT COUNTY UTAH, BONDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS NORTH A DISTANCE OF 93.97 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE NORTH 66°11' WEST A DISTANCE OF 65.29 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 8.32 FEET, THENCE SOUTH 66°46'30" EAST A DISTANCE OF 193.50 FEET, THENCE SOUTH 7°16' EAST A DISTANCE OF 12.03 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 4.32 FEET, THENCE NORTH A DISTANCE OF 8.23 FEET, THENCE WEST A DISTANCE OF 18.65 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 109.15 FEET MORE OR LESS TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-425-UPL

PARCEL 6

LOT 15, BLOCK 50, PARK CITY SURVEY, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN THE PARCELS 1-5 LISTED ABOVE.

TAX PARCEL NO. EXEMPT

## EXHIBIT B

## MANAGEMENT AGREEMENT

(See attached)

## SKY LODGE MANAGEMENT AGREEMENT

THIS SKY LODGE MANAGEMENT AGREEMENT (the "Agreement") made and entered this ___ day of March, 2006, to be effective as of the Commencement Date (as defined below), by and between EASY STREET PARTNERS, LLC, a Utah limited liability company (hereinafter called "Owner"), and CLOUDNINE RESORTS - SKY LODGE MANAGEMENT, LLC, a Utah limited liability company (hereinafter called "Operator").

### RECITAL

A.      Owner desires to retain Operator to exclusively manage, operate and promote the hotel operations of The Sky Lodge, a condominium resort hotel (the "Property"), located in Park City, Utah as more fully described in Exhibit A attached hereto and made a part hereof (the "Hotel Commercial Units"), and the Operator desires to exclusively manage, operate and promote the Hotel Commercial Units, all in accordance with the terms and conditions hereinafter set forth.  The hotel operations shall include all conference facilities, food and beverage, bar, club rooms, recreational, lodging and spa operations and all Concessions.

NOW, THEREFORE, in consideration of the promises and of the mutual covenants herein contained, the parties agree as follows:

### ARTICLE 1
### DEFINITIONS

Capitalized terms not defined elsewhere in this Agreement shall have the meanings set forth below:

1.1      Accounting Month.  At the election of Operator (provided such election shall be consistently applied so as not to distort revenues, costs, or other such accounting matters) a full calendar month (or partial calendar month if at the beginning or end of the term hereof).

1.2    <u>Additional Facilities</u>. Any capital improvements, additions or facilities added to the Hotel Commercial Units and ancillary to the operation of the Hotel Commercial Units which require the construction and installation of exterior roof space additional to that now existing at the Hotel Commercial Units. Said Additional Facilities may include, but not be limited to, conference facilities, health spa, new or additional bars, club rooms, restaurants, lounges, recreational, and athletic facilities.

1.3    <u>Alterations to Existing Facilities</u>. Any alteration, renovation, repair, or rebuilding to the improvements, landscaping and facilities now existing at the Hotel Commercial Units, whether structural or otherwise except for Additional Facilities as the same are herein defined. The cost of said Alterations to Existing Facilities shall be treated as a capital cost or an expense of the operation of the Hotel Commercial Units in accordance with GAAP.

1.4    <u>Annual Budget</u>. As defined in Section 4.2.

1.5    <u>Annual Incentive Fee</u>. As defined in Section 6.1.

1.6    <u>Base Rate</u>. The term "Base Rate" shall mean the highest prime rate of major money center banks as published from time to time in the Money Rates Section of the Wall Street Journal, plus 2%.

1.7    <u>Basic Management Fee</u>. As defined in Section 6.1 hereof.

1.8    <u>BayNorth</u>. BayNorth Realty Fund VI, Limited Partnership, together with its successors and assigns.

1.9    <u>Business Plan</u>. As defined in Section 4.1.

1.10    <u>Capital Budget</u>. As defined in Section 4.2.

1.11    <u>Capital Improvements</u>. All Alterations to Existing Facilities, as defined in Section 1.3 hereof.

2

1.12   <u>Commencement Date</u>.  The date on which Operator receives written notice from Owner that the Date of Substantial Completion is approximately nine (9) months away.

1.13   <u>Compensation (as applied to employees of Operator engaged in providing services at and for the benefit of the Hotel Commercial Units)</u>.  The reasonable salaries or other compensation including annual bonuses and fringe benefits payable to or in respect of such employees, prorated where applicable to take into account the portion of such employees' time directly devoted to providing such services at, and in service of, the Hotel Commercial Units. The term "fringe benefits" shall, without limitation, include all employee benefits, statutory or other, including the employer's contributions of payroll or employment taxes, worker's compensation insurance, group life, health and accident insurance premiums, vacation accrual, pension and profit sharing plan contributions, disability benefits and any other benefits available to such employees by virtue of their employment by Operator prorated to take into account the portion of such employees' time directly devoted to providing such services at and in service of the Hotel Commercial Units.

1.14   <u>Concessions</u>.   All accessory concessions, businesses and entertainment establishments in the Hotel Commercial Units.

1.15   <u>Condemnation</u>.  The condemnation or taking of the Hotel Commercial Units by the exercise of the power of eminent domain, by compulsory acquisition, conveyance in lieu or under threat of condemnation or like procedures.

1.16   <u>Cumulative Period in Respect of Any Accounting Month Included in an Operating Year</u>.  The period commencing on the first day of such Operating Year and ending on the last day of such Accounting Month.

3

1.17    Date of Substantial Completion.    The date on which the Property receives a Certificate of Occupancy from the City of Park City.

1.18    Equipment.    A collective term for the Furniture, Fixtures and Equipment and the Operating Equipment.

1.19    Extended Term.    As referenced in Section 2.2 hereof.

1.20    Force Majeure.    Strikes, lockouts, labor disputes, acts of God, fire, flood or other casualty, pestilence, war, civil strife, riot, embargo, shortages of labor, energy or materials, governmental restrictions, emergency acts or any other circumstances or cause (except financial inability or problems whether of Owner or financial markets) beyond the reasonable control of Owner or Operator whichever shall be applicable, provided such affected party exercises reasonable diligence to remove or solve such circumstance or cause.

1.21    Furniture, Fixtures and Equipment.    All new and replacement furniture, furnishings, fixtures and equipment required for the operation of the Hotel Commercial Units and the Guest Rooms.

1.22    General Manager.    The person hired by Operator, subject to the approval of the Owner, pursuant to Section 3.3(a) hereof, who shall be responsible for the overall operation of the Hotel Commercial Units as provided in Section 3.3(a).

1.23    Guest Room.    A separable guest room or suite of rooms situated on the Property, all of which are part of the "Hotel" Hotel Commercial Unit.

1.24    Gross Revenues During or with Respect to any Period.    All revenue and income properly accrued during such period and derived directly or indirectly (if billed through an approved Concession) from the Hotel Commercial Units and their operations including by way of example, but without limitation, all revenue derived from the rental of Guest Rooms, the sale

4

of food and beverages in or from the Hotel Commercial Units (without taking into account any costs incurred in respect to such sales), sales from shops in the Hotel Commercial Units which are operated by Operator for Owner, any commissions or payments paid with respect to the Hotel Commercial Units in connection with food and beverage catering services provided to persons or groups utilizing the Hotel Commercial Units, all rents or fees payable by tenants, licensees and concessionaires, proceeds from use and occupancy or business interruption insurance, but only to the extent actually collected during such period (after the deduction of expenses of adjustment and collection), subsidy payments, governmental allowances and awards, and other forms of incentive payments or awards from any source whatsoever, properly attributable to such period and determined in accordance with generally accepted accounting principles (using the current Uniform System, as referenced in Section 1.46 below) consistently applied, excluding, however:

      (a)    Sales and other receipts of tenants, licensees and concessionaires (but including, as above indicated, rents, fees and charges received from such tenants, licensees and concessionaires);

      (b)    Federal, state, county and municipal excise, sales, use, and room taxes collected directly from patrons or guests as a part of the sales price of any goods, services or displays, such as (but not limited to) sales and use taxes, occupancy taxes, gross receipts, room admission, cabaret or equivalent taxes;

      (c)    Proceeds from the sale or other disposition (otherwise than in the ordinary course of business of the Hotel Commercial Units) of any of the assets used in connection with or forming a part of the Hotel Commercial Units;

      (d)    Proceeds from damage recoveries and casualty insurance proceeds, other than proceeds from loss of income and/or business interruption insurance, which shall be

5

included, except to the extent such proceeds from loss of income and/or business interruption insurance shall be required by the Mortgagee to be applied to pay sums due under the obligation(s) secured in whole or in part by the Mortgage;

(e)    Proceeds from any financing or refinancing (in whole or in part) or sale (in whole) of the Hotel Commercial Units;

(f)    Condemnation awards, other than awards for Condemnation for temporary use; and

(g)    Amounts deposited by Owner in the Operating Accounts or the fund.

1.25    <u>Hotel Commercial Units</u>.    The following commercial units, as labeled and described in the Declaration of Condominium for Union Square:  Hotel, Easy Street Brasserie, Spa and Sky Club Lounge, and Zoom restaurant.

1.26    <u>Impositions</u>.  All (real property and otherwise) taxes, assessments, water, sewer or other rents, rates and charges, levies, license fees, permit fees, inspection fees and any other authorization fees and charges, which at any time may be assessed, levied, confirmed or imposed on or with respect to the Hotel Commercial Units (including any portion thereof and including permit or license fees or the construction, furnishing, equipping or operation thereof).

1.27    <u>Initial Term</u>.  As defined in Section 2.1 hereof.

1.28    <u>Insurance Requirements</u>.  All terms of each insurance policy and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) applicable to the Hotel Commercial Units (including any portion thereof) or the construction, furnishing, equipping or operation thereof; such phrase shall not include recommendations of the insurance carriers.

6

1.29.  Legal Requirements.  All laws, statutes, ordinances, orders, rules, regulations, permits, licenses, authorizations, directions and requirements of all government, governmental authorities and quasi-governmental authorities (including, without limitation, all appropriate alcoholic beverage control authorities) which now or hereafter may be applicable to the Hotel Commercial Units (including any portion thereof) or the construction, furnishing, equipping or operation thereof.

1.30  Mortgage.  Any mortgage, deed of trust, trust deed in the nature of a mortgage, security agreement, sale-leaseback, ground lease or other instrument creating a lien or security interest in or upon the Hotel Commercial Units, any portion thereof or interest therein and including any loan agreement or other documents entered into in connection therewith; provided, however, that the term "Mortgage" shall not include mortgages on Guest Rooms obtained by owners of fractional interests in such Guest Rooms other than Owner.

1.31  Mortgagee.  The holder of, or beneficiary under, any Mortgage.

1.32  Operating Accounts.  As defined in Section 3.4.

1.33  Operating Budget.  As defined in Section 4.2.

1.34  Operating Equipment.  All chinaware, glassware, linens, silverware, flatware and hollowware, uniforms, kitchen utensils and other items of a similar nature, required for or used in the operation of the Hotel Commercial Units.

1.35  Operating Fee.  As defined in Section 6.1.

1.36  Operating Line.  As defined in Section 3.4(b).

1.37  Operating Standard.  The standard at which the Hotel Commercial Units will be maintained and operated (except as otherwise specifically excused herein), which standard is generally described as "five star" in the Mobil Travel Guide attached as Exhibit "B." Such

Guide shall not apply where it is clearly inconsistent with the layout/site plan of the Property (e.g. the Guide makes reference to golf for which the Property has no facilities).

1.38    Operating Supplies. The following items and inventories thereof: food and beverage and other items, the cost(s) of which is/are expensed when, according to the Uniform System, used in the operation of a hotel, including by way of example, but without limitation, immediately consumable items, fuel, soap, light bulbs, mechanical stores, cleaning material, matches, stationery, paper supplies, and similar items.

1.39    Operating Year. A calendar year or other 12-month period as otherwise agreed upon by Owner and Operator.

1.40    Out-of-Pocket Costs. All costs, expenses and disbursements paid by Operator directly in connection with managing, operating and promoting the Hotel Commercial Units for: (i) reasonable out-of-pocket costs and travel expenses, and (ii) such ordinary reasonable and necessary expenses, including, by way of example, but without limitation, long-distance telephone and telecopy costs, blueprinting, copying and printing, all as set forth in the Annual Budget.

1.41    Property. The condominium hotel located in Park City, Utah commonly known as The Sky Lodge.

1.42    Renewal Benchmark. The criteria to be met by the Operator as one of the conditions to the Operator's right to extend (or to further extend) the Term; renewal shall be based on satisfaction of three of the following four criteria:

(a)    The actual income received by the Owner from the Hotel Commercial Units (after undistributed operating expenses, as defined in the Uniform System) must equal or exceed the amount of income (after undistributed operating expenses) budgeted in the Annual

8

Budget for three of the immediately preceding five years and the average of such actual income over such five (5) year period must equal or exceed the average of the budgeted amount of such income over such five year period;

(b)     The Hotel Commercial Units must receive an average score of 80% or better on each annual third-party service and facility inspection report during the immediately preceding five year period; provided, however, that to the extent a deduction for substandard facilities is the result of the Owner's decision, or, with respect to the Guest Rooms, the decision of the owners of such rooms (including, but not limited to, a lack of funding), then such deductions shall be ignored for purposes of calculating the score;

(c)     The Hotel Commercial Units must achieve a stabilized index score of 90 versus the agreed upon competitive set in average daily rate ("ADR"), as set forth in the Smith Travel Research Report (or equivalent) each year during the immediately preceding three year period; and

(d)     The Hotel Commercial Units must achieve a stabilized index score of 90 versus the agreed upon competitive set in occupancy, as reported in the Smith Travel Research Report (or equivalent) each year during the immediately preceding three year period.

(e)     In the event that the Owner and the Operator are not able to agree upon the composition of the "agreed upon competitive set" referred to in clauses (c) and (d) above, or are otherwise in dispute over scoring issues, the matter shall be submitted to arbitration as set forth in Section 12.6 hereof, with the arbitrators being charged with the task of determining a commercially reasonable "competitive set" and/or otherwise resolving scoring issues.  The parties further agree that in connection with scoring the Operator's performance, all scoring shall

be equitably adjusted to take into account the effect of any construction work which could reasonably be expected to materially adversely affect scoring.

1.43    Purchasing Services. As defined in Section 3.11.

1.44    Restoration. The repairing and rebuilding of the Hotel Commercial Units in case of damage or destruction by fire, act of God, earthquake, flood or other casualty and the restoration thereof to its condition and character immediately prior to the occurrence of such casualty.

1.45    Room Rental Contract. The rental contract to be utilized by Operator and owners of fractional interests in Guest Rooms, which shall be subject to the reasonable review and approval by Owner, the Mortgagee and BayNorth prior to the Date of Substantial Completion.

1.46    Term. As defined in Article 2.

1.47    Transfer. Any sale, assignment, transfer, leasing or other disposition, for value or otherwise, voluntary or involuntary, by operation of law or otherwise.

1.48    Uniform System. The Uniform System of Accounts for Hotels (9th Revised Edition), without regard to any supplements thereto hereafter adopted if such supplements would alter the basic economics of this Agreement.

1.49    Working Capital. Funds required to be available in the Operating Accounts as specified in Section 3.5.

## ARTICLE 2
## TERM

2.1    Initial Term. This term of this Agreement shall commence on the Date of Substantial Completion and shall continue for an initial period of ten (10) years thereafter (the "Initial Term"), unless this Agreement shall be sooner terminated as herein provided.

10

2.2    <u>Extended Term</u>.  Subject to there being no event of default under this Agreement and no event which with notice or lapse of time or both could become an event of default under this Agreement and subject to the Operator's achieving the Renewal Benchmark, Operator shall be entitled, at Operator's option, by providing Owner with written notice not less than 180 days nor more than 360 days prior to the end of the Initial Term or an Extended Term, to extend the Initial Term for two (2) additional periods of ten (10) years each.  An Extended Term shall begin on the day immediately following the expiration of the Initial Term or the Initial Term, as extended, as the case may be.  Upon the expiration or termination of this Agreement, any and all options to extend or further extend shall terminate.  When the second Extended Term shall have expired, the Operator shall have no further option to extend the Term of this Agreement.  The Operator shall exercise its option to extend (or further extend) the Initial Term by providing Owner with written notice not less than 180 days nor more than 360 days prior to the expiration of the Initial Term (or the Initial Term as extended).  In order to extend the Initial Term, the Operator must meet the Renewal Benchmark during the Initial Term and to further extend the Initial Term, the Operator must meet the Renewal Benchmark during the first extension of the Initial Term.

2.3    <u>Term Definition</u>.  As used herein, the "Term" shall mean the Initial Term and any Extended Terms.

**ARTICLE 3**
**OPERATION OF THE HOTEL COMMERCIAL UNITS**

3.1    <u>Use and Standard of Operation</u>.

(a)    Owner hereby grants to Operator the sole and exclusive right during the Term to manage and operate the Hotel Commercial Units pursuant to the terms and provisions of this Agreement.  Except as provided in Section 3.1(b) hereof, Operator agrees that Operator will,

11

as agent of Owner, operate the Hotel Commercial Units during the Term in conformity with the Operating Standard and all Legal Requirements and will endeavor to maximize the net profits from the operation of the Hotel Commercial Units. Except as otherwise limited under this Agreement and subject to compliance with the terms and covenants contained in this Agreement, Operator, as sole and exclusive agent of Owner, shall have absolute authority, control and discretion in the operation of the Hotel Commercial Units. Such authority, control and discretion shall include, without limitation, (i) the right, authority and power, either by itself or as part of an association, to negotiate and enter into such reasonable contracts (including collective bargaining agreements or labor contracts), leases, concession agreements, and similar such agreements, in each case, in the name and at the expense of Owner as may be reasonably necessary or advisable in connection with the operation of the Hotel Commercial Units (subject, however, to Owner's right to approve contracts with Affiliates of Operator), Owner hereby agreeing to execute any such lease, contract or agreement upon request of Operator, (ii) the right, authority, and power to determine the terms of admittance, charges and rack rates for rooms and discounts thereon and commercial space, charges for entertainment, food and beverages, labor policies (including wage rates, the hiring and discharging of employees, and the adoption of employee retirement or other benefit plans), credit policies (including arrangements with credit card organizations, catering operations, and other such business organizations), and all phases of advertising, promotion and publicity relating to the Hotel Commercial Units and the Property and (iii) the right, authority and power to name and do business with respect to the Hotel Commercial Units. Notwithstanding anything in this Agreement to the contrary, the Operator shall have no right, authority or power to (i) enter into any contract, lease or other agreement or to establish any policy which would extend beyond the then current Term without the prior written consent of the

12

Owner or (ii) establish any labor policy (including without limitation any retirement plan) which fails to prorate the contributions received from and to be made by the Owner so as to take into account the actual time the employees work at and in the service of the Hotel Commercial Units.

(b)    Notwithstanding anything contained in this Section 3.1 or elsewhere in this Agreement, Operator shall be excused from its obligation to operate the Hotel Commercial Units in conformity with the Operating Standard (i) to the extent and whenever Operator shall be prevented from compliance with such Operating Standard by Force Majeure, (ii) to the extent of any breach by Owner of any provision hereof, including, without limitation, a breach of Owner's obligations under Section 3.5 hereof, and (iii) to the extent and whenever there is herein provided a limitation upon Owner's obligation to provide funds or upon Operator's ability to expend funds in respect of the Hotel Commercial Units (for example, the limitations contained in Sections 3.5(b) and 5.3 hereof);provided that such Force Majeure, default by the Owner, or failure of the availability of such funds reasonably prevents Operator from meeting such Operating Standard. Notwithstanding the foregoing, in the event that there arises an event of the type described in clause (i), (ii) or (iii) of this Section 3.1(b) which prevents the operation of any particular facility within the Hotel Commercial Units to the Operating Standard but allows the operation of the balance of the Hotel Commercial Units to that standard, then Operator shall only be excused from its obligation to operate the Hotel Commercial Units to said Operating Standard as to such particular facility unless the inability to operate such particular facility will have a direct cause and effect as to the failure of operation of the entire the Hotel Commercial Units to such Operating Standard.

(c)    From time to time as either party deems necessary, Operator and Owner shall consult as to the advisability of Owner adding Additional Facilities (as defined in Paragraph

13

1.2 hereof) to the Hotel Commercial Units. If the Operator and Owner mutually agree that any Additional Facilities are to be added to the Hotel Commercial Units by the Owner, then the Operator shall operate and manage such facilities pursuant to this Agreement.

(d)    Customer Charges and Complimentary Use of Guest Rooms and Facilities. Operator shall be allowed (subject to compliance with all Legal Requirements) to charge varying rates to different customers or groups of customers. Operator may, in its discretion, for promotion, advertising and publicity of the Hotel Commercial Units and the Property, as well as quality assurance purposes, permit persons to occupy Guest Rooms owned or controlled by Owner at rates lower than customary rates or free of charge or permit persons to use the lounges or recreational facilities located at the Hotel Commercial Units free of charge or at discounted rates and Guest Rooms owned by others as regulated by the Room Rental Contract.

3.2    Leases and Concessions.

(a)    The rights granted to Operator under Section 3.1 shall, without limitation, include the right to operate in Operator's name all Concessions so long as (i) the rentals or fees payable by Operator with respect to the Hotel Commercial Units for the privilege of operating such Concessions shall be at least equal, in the Owner's reasonable judgment, to the rentals or fees which would have been received by the Hotel Commercial Units in an "arms-length" transaction with a third party not affiliated with Operator and (ii) any consents required under the terms of any Mortgage are obtained by Operator. The right of Operator to operate all such Concessions shall automatically end upon the expiration or termination of the Term.

(b)    Operator shall have no power or authority to arrange any leases or concession agreement for any Concession (i) for which consent of any lender under a Mortgage is required or (ii) for over five (5) years in duration (including any options or rights to renew) or

14

for an amount in which the Lessee or concession holder is obligated to pay with respect to any such lease or concession agreement, in excess of $25,000 per year without in each case obtaining the prior written approval of Owner and, as applicable, the holder of any Mortgage. Any permitted lease or concession agreement shall be entered into in Owner's name and shall be executed by Owner or Operator, as Owner's agent.

(c)    Operator, shall during the Term, use due diligence and reasonable efforts to perform, as agent for Owner, all of the obligations of Owner as landlord or concessionaire under all present or future leases of the Concessions made or granted with respect to the Hotel Commercial Units.

(d)    Operator shall exercise due diligence and best efforts to collect all rents and other sums falling due during the Term under any present or future leases of the Concessions, and shall promptly deposit the same in the Operating Accounts.

(e)    Notwithstanding anything in this Agreement to the contrary, the Operator shall have no right, power or authority to enter into any lease or concession agreement which obligates the Owner to make improvements or otherwise pay or incur costs, without in each case, the prior written consent of the Owner.

3.3    Personnel.

(a)    General Manager. Operator shall be responsible for and shall have the exclusive right to hire (subject to the approval of the Owner), promote, discharge, supervise, train and determine the terms of employment for the General Manager of the Hotel Commercial Units and other members of the Hotel Commercial Units' management. It is understood that the General Manager will be required to work effectively with the overall operation of the Hotel Commercial Units.

15

(b)    The Hotel Commercial Units Employees.  Operator shall utilize its own employees in performing its duties under this Agreement and through the General Manager, shall be responsible for and shall have the exclusive right to hire, promote, discharge, supervise, train and determine the terms of employment for all such employees.  Such employees shall be paid their regular Compensation by Operator, and Operator shall be promptly reimbursed with respect to each payroll period for the aggregate Compensation so paid to such employees, if and to the extent that, such Compensation is within the amount specified therefor in the Annual Budget.

3.4    Operating Accounts and Operating Line.

(a)    There shall be deposited in a bank or banks designated by Owner and located in Utah and reasonably acceptable to Operator and any lender under any Mortgage in accounts bearing the name of the Hotel Commercial Units ("Operating Accounts") all moneys advanced to the Hotel Commercial Units as Working Capital by Owner as provided in Section 3.5 hereof, all moneys received by Operator from the operations of the Hotel Commercial Units, and all advances, if any, made by Operator.  All monies in the Operating Accounts shall be the property of the Owner; provided, however, that for as long as this Agreement remains in effect, Operator shall have sole control of the Operating Accounts and shall pay out of the Operating Account, to the extent of the funds from time to time therein and in accordance with the priorities of Section 6.4 hereof, all costs and expenses properly incurred in connection with the operation of the Hotel Commercial Units to the extent such costs and expenses are within the amounts budgeted for in the Annual Budget, including, without limitation, all Compensation of the Hotel Commercial Units employees, all reasonable costs and expenditures which Operator is permitted or required to make pursuant to this Agreement, and all reasonable fees, charges, reimbursements and other amounts due Operator under this Agreement.  Checks or other documents drawn upon

16

the Operating Accounts shall be signed by representatives of Operator or the Hotel Commercial Units employees designated by Operator, as agent for Owner. In addition to such Operating Accounts, Operator shall be entitled to maintain such funds as it deems proper in its reasonable discretion in house banks or in petty cash funds at the Hotel Commercial Units; all monies in such funds shall be the property of the Owner, but may be disbursed by the Operator as provided in this Agreement.

(b)     Owner shall establish a line of credit in the amount of Two Hundred and Fifty Thousand Dollars ($250,000), to cover any potential deficits in cash flow required for operation of the Hotel Commercial Units and reserves for emergency repairs ("Operating Line"); provided, that such Operating Line is not secured by a lien against the Property. Operator shall have the right, power and authority upon written notice to Owner to draw on such Operating Line in order to pay all costs and expenses in connection with the Hotel Commercial Units, but only to the extent such costs and expenses are within the amounts budgeted therefor in the Annual Budget, or to be paid under terms of this Agreement in the event there are insufficient funds in the Operating Accounts.

3.5     Working Capital.

(a)     Subject to Section 3.5(b) hereof, Owner shall at all times during the Term cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all costs and expenses incurred in connection with the operation, maintenance, renovation and repair of the Hotel Commercial Units (including all fees, charges and reimbursements payable to Operator hereunder) and the uninterrupted and efficient operation of the Hotel Commercial Units and the performance by Operator of its other obligations hereunder. Owner and Operator shall use their best efforts to establish, as part of the Business Plan for the operation of the Hotel

17

Commercial Units, monthly cash flow forecasts and shall establish as part of said monthly cash flow forecasts target dates for the Owner as to furnishing Working Capital. To the extent that Working Capital is required for the operation as specified by such Business Plan, then the Owner shall furnish said Working Capital within 15 days of notification from the Operator that such Working Capital is required. In the event Owner fails to supply required Working Capital in accordance with the above, Operator may draw on the Operating Line.

(b)    To the extent Working Capital is needed which is not specified in said Business Plan, then the Owner shall make such Working Capital available to Operator as may be necessary for the uninterrupted and efficient operation of the Hotel Commercial Units within 30 days after notice from the Operator that such funds are needed.

3.6    Owner to Bear All Expenses. In performing its duties hereunder and in managing and operating the Hotel Commercial Units during the Term, including, without limitation, in entering into any contracts or agreements, Operator shall act solely for the account of and as agent of Owner and not in its own capacity. All expenses incurred by Operator, in accordance with this Agreement and the Annual Budget, in performing its duties and in managing and operating the Hotel Commercial Units shall be borne exclusively by Owner. To the extent that the funds necessary therefore are not generated by the operation of the Hotel Commercial Units, they shall promptly be supplied by Owner in the manner provided in (and subject to the limitations contained in) Section 3.5 hereof. Operator shall in no event be required to advance any of its funds or utilize Operator's credit for the operation of the Hotel Commercial Units, nor shall Operator be required to incur any liability in connection therewith, unless Owner shall have furnished Operator with funds necessary for the discharge thereof. Operator shall have the right, but not the obligation (i) to advance funds in payment of any expenditure which Owner is

18

obligated to make pursuant to this Agreement, (ii) to take any action which Owner is obligated to take under this Agreement, or (iii) to utilize funds from the Operating Line, as provided in Section 3.5. If, in accordance with this Section 3.6, Operator pays any amount out of its own funds or takes any such action under Section 3.6, then, subject to Section 3.5(b) hereof, Owner shall repay Operator on demand all amounts so expended, with interest thereon at the Base Rate (but not to exceed the highest rate allowed by law) from the date of expenditure by Operator to the date of repayment by Owner.

3.7    <u>Payment of Impositions</u>.  Subject to the terms of any Mortgage, including any cash management system implemented thereby, during the Term, Operator shall pay from the Operating Accounts in the name and as agent for Owner, prior to delinquency, as long as Operator has been supplied with bills and invoices, to the extent funds are available in such Accounts, all Impositions assessed against the Hotel Commercial Units to the extent that the same are properly allocable to the Term.

3.8    <u>Additional Rights and Responsibilities of Operator</u>.  Operator shall have the right and responsibility to do the following at the expense of Owner:

(a)    Institute, prosecute, settle and defend in its name or in the name of Owner, any and all legal actions or proceedings required to collect charges, rent or other income for the Hotel Commercial Units or to dispossess guests, tenants or other persons in possession of Guest Rooms therefrom, or to cancel or terminate any lease, license or concession agreement (provided that no action shall be taken without Owner's consent with respect to any such lease, license or agreement having a then unexpired term in excess of one (1) year), or otherwise required in the normal course of operating the Hotel Commercial Units, and Owner shall cooperate with Operator in connection therewith.  Operator shall notify Owner of legal disputes involving more

19

than Five Thousand Dollars ($5,000) and shall keep Owner apprised as to the status of such suits.

Regarding any action or proceedings involving a claim against the Owner, the Owner shall be

entitled to conduct its own defense as to any such matter if the Owner chooses to do so at

Owner's sole cost and expense without prejudice to Operator's rights. Owner shall indemnify,

defend and hold Operator harmless regarding any loss or expense to Operator occasioned by

Owner so conducting such defense. In no event shall the Operator have the power or authority to

settle any suit if by the terms of the settlement, the Owner would be liable to pay more than

$5,000. Operator shall indemnify Owner for legal expenses incurred by Owner in connection

with any misconduct or gross negligence on the part of Operator.

  (b)  Make all reasonable efforts to do, or cause to be done, in its own name or

in the name of Owner, all such acts and things in and about the Hotel Commercial Units as shall

be necessary to comply with Legal Requirements or Insurance Requirements, or to discharge any

lien, encumbrance or charge, other than those permitted under Section 11.1 hereof, on or with

respect to the Hotel Commercial Units or the operation thereof. Prior to the discharge of any

lien, encumbrance or charge against the Hotel Commercial Units, the Operator shall notify the

Owner; the Owner shall have the right to review and contest any such lien, encumbrance or

charge and be entitled to instruct the Operator not to discharge any such lien, encumbrance or

charge. Owner shall defend, indemnify and hold Operator harmless from any expense, claim or

lien which Owner choses to so contest.

  (c)  Establish service standards consistent with the Operating Standard.

  (d)  Establish detailed employee training programs and operational standards

manuals.

(e)   Assist Owner in the development of capital projects to upgrade the Hotel Commercial Units and oversee implementation of the same to assure both financial and aesthetic compliance.

(f)   Create a coordinated marketing and public relations program to promote the Hotel Commercial Units and the Property in the public domain.

(g)   Establish a targeted and ongoing promotional effort for the Hotel Commercial Units and the Property through both on and off site sales staff.

(h)   With the prior written consent of the Owner and BayNorth (not to be unreasonably withheld), as Operator deems appropriate and in the best interests of the Hotel Commercial Units, establish an affiliation with hotel representation organizations such as (by way of example only) preferred hotels, leading hotels, etc.  BayNorth's approval right hereunder shall expire upon the satisfaction of all obligations under the BayNorth Loan Agreement.

(i)   Manage all landlord/tenant and concession relations.

(j)   Maintain accounting and internal control systems in compliance with the guidelines of the Uniform System and GAAP.

(k)   Make all reasonable efforts to do, or cause to be done, in its own name or in the name of Owner, all such acts and things in and about the Hotel Commercial Units as shall be necessary to comply with the requirements of any Mortgage relating to the operation and maintenance of the Hotel Commercial Units.

(l)   All other matters incidental to the operation of the Hotel Commercial Units in accordance with all Legal Requirements and the Operating Standard, except as otherwise provided in this Agreement.

3.9   <u>Negation of Partnership or Joint Venture or Lease</u>.  Nothing contained in this Agreement shall constitute, or be construed to constitute or create, a partnership, joint venture or lease between Owner and Operator with respect to the Hotel Commercial Units.

3.10   <u>Owner's Covenant</u>.   Subject to the terms of this Agreement, Owner shall cooperate fully with Operator, in connection with Operator's exercise of the rights and performance of the obligations set forth in this Agreement, including without limitation, by executing and delivering such further documents as Operator may from time to time reasonably request.

3.11   <u>Purchasing Services</u>.  Operator shall, in the normal course of business of the Hotel Commercial Units, provide the following purchasing services to Owner in accordance with the following procedure:

(a)   Operator shall, acting on behalf of and in the name of Owner, purchase the items of Furniture, Fixtures and Equipment, and the cost of such Furniture, Fixtures and Equipment to Owner shall be the supplier's invoice cost to Operator, so long as the supplier is not an Affiliate of the Operator.  If the supplier is an Affiliate of the Operator, then the cost shall be the amount which would have been customarily charged in an "arm's length" transaction with a third party not affiliated with the Operator.

(b)   Owner agrees that, in the acquisition of all Equipment, Operator shall be acting as agent for and on behalf of Owner and solely for Owner's account and upon Owner's credit, and Operator shall not be required to pledge its own credit therefore.  Without limiting the foregoing, any bonuses, rebates, discounts, gifts or similar concessions (whether in the form of money, services or property) offered by any vendor shall belong to the Owner and not the Operator or any Affiliate of the Operator.  The foregoing is not intended to apply to gifts (not to

22

exceed $500 in value annually) received by employees of the Operator from hotel guests in appreciation for outstanding service.

3.12    Operator's Right to Close the Hotel Commercial Units.  If at any time during the Term hereof it becomes necessary in Operator's reasonable opinion to cease operation of the Hotel Commercial Units in order to protect the Hotel Commercial Units and/or the health, safety and welfare of the guests and/or employees of the Hotel Commercial Units for reasons of Force Majeure, then in such event Operator may close and cease operation when Operator deems that such may be done without jeopardy to the Hotel Commercial Units, its guests and employees, and shall provide Owner notice of such closure.  Operator shall use its best efforts to operate the balance of the Hotel Commercial Units if any particular facilities must cease to be operated with the balance of such facilities being run to the Operating Standard, unless the necessity of ceasing operation of any particular facility, in the judgment of Operator, will require the cessation of the operation of the entire Hotel Commercial Units.

3.13    Operator's Responsibility to Obtain Guest Room Revenue.    The parties acknowledge (a) that the Owner's intention is to sell all the residential units in the Property (the Guest Rooms) to third party purchasers in a condominium fractional interest format; (b) that some of such third party purchasers may desire, from time to time, to rent their fractional interests for certain periods of time; and (c) that it will be the Operator's (and not the Owner's) responsibility to enter into as many Room Rental Contracts  with such third party purchasers as reasonably possible. Notwithstanding the foregoing, under the terms of the Declaration of Union Square, the condominium declaration governing the Project (the "Declaration"), third party purchasers are required to permit Owner to utilize a certain number of days per year as rental

23

days in exchange for access to the Project's amenities. Owner shall assist Operating in enforcing such rights, if required.

3.14    Guest Room Shared Days.    Owner agrees to engage Operator as the exclusive rental agent for the Guest Rooms for the rental days that Owner will obtain in the Guest Rooms known as "Declarant's Shared Interest Unit Use Period" under the Declaration.

## ARTICLE 4
## BUSINESS PLANS, BUDGETS AND FINANCIAL REPORTS

4.1    Business Plans and Operational Meetings.    The Owner and Operator shall meet once each Operating Year at an Annual Business Plan Meeting ("Annual Meeting") to review the Business Plan, which plan shall include, the Annual Budget, an annual cash flow projection and such other items as Owner shall reasonably request ("Business Plan").    In addition to the Business Plan, the Operator shall, at the Annual Meeting, be prepared to discuss the overall operation and direction of the Hotel Commercial Units including projections of competition, recommendations on capital improvements, marketing concepts and changes in operating procedures.    The Owner and Operator shall meet at least once each quarter at the Hotel Commercial Units during each Operating Year at operating meetings ("Operating Meetings") to review the actual operations of the Hotel Commercial Units as such actual operations compare to the Business Plan.    During the first two years of the term of this Management Agreement, if either Operator or Owner so request, the Operator and Owner shall hold Operating Meetings more frequently than once each quarter; provided, however, that neither party shall be required to meet more often than once each month during said initial term unless emergency situations arise which require more frequent meetings.    The Annual Meeting shall be held at the Hotel Commercial Units on the third Friday in November of each Operating Year. By the fifteenth day

24

of October of each Operating Year, the Operator shall submit the following documentation to the Owner:

    (a)    The Annual Budget shall be prepared as specified in Paragraph 4.2 below which sets forth not only annual budget figures, but in addition, projections based upon monthly operations of the Hotel Commercial Units.

    (b)    Cash flow projections shall be prepared annually estimating on a monthly basis the receipt of cash and the expenditure of cash based upon the Annual Budget and the Business Plan. Said cash flow projections shall reference expenditures to be made for Capital Improvement and Fixtures, Furnishings and Equipment and from additional Working Capital, if any, which may be required for purchases or work.

    4.2    Budgets. Approximately one hundred twenty (120) days prior to the end of each Operating Year, Operator will consult with Owner regarding the preparation of the estimated "Annual Budget" for the next Operating Year. Approximately ninety (90) days prior to the end of each Operating Year, Operator shall submit to Owner the estimated "Annual Budget" for the next Operating Year for Owner's approval, which shall be deemed given unless objection thereto is made by Owner to Operator within thirty (30) business days of its submission; provided, however, that if approval of the Annual Budget by the holder of any Mortgage is required by the terms of that Mortgage, the Annual Budget shall not be deemed to be approved until such lender approval is obtained. The Annual Budget for any Operating Year shall consist of (i) the "Operating Budget," showing, in reasonable detail, the projected or estimated revenue and expenses for such Operating Year; (ii) the "Capital Budget," showing estimated expenditures required for Capital Improvements during such Operating Year, including the purchases of Equipment to be funded in cash and (iii) such other items as Owner shall reasonably request.

It is expressly agreed and understood by both parties that:

(a)    The Annual Budget (including, without limitation, any Operating Budget adopted pursuant to Section 4.3(a) hereof) is intended as, and will represent, only an estimate of the results for the Operating Year in question, based upon assumptions believed by Operator and Owner to be reasonable at the time of the preparation of such Budget. Operator will use its best efforts to achieve the budgetary goals reflected in the Operating Budget. Owner acknowledges that Operator is not representing, promising or assuring that the budgetary goals will actually result during any particular Operating Year.

(b)    The Capital Budget shall be based on reliable estimates, and Operator shall use its best efforts to assure that the aggregate amount of expenditures authorized shall not be exceeded. Subject to Section 5.3(c) hereof and to the terms of any Mortgage (with respect to restrictions on expenditures), Operator shall obtain Owner's prior written approval of expenditures exceeding one hundred ten percent (110%) of the aggregate amount authorized under the then approved Capital Budget. Unless such expenditure is required on an emergency basis, Operator shall use its best efforts to notify Owner at each Operating Meeting of the requirement, as such can be reasonably forecasted, of expending amounts greater than those authorized in the Capital Budget. Notwithstanding the foregoing, Operator agrees that it will not expend funds in excess of the amount set forth in the Capital Budget without the consent of Owner, such consent not to be unreasonably withheld.

(c)    Operator agrees that the approved Capital Budget may be reduced at the request of Owner if, subsequent to the approval of such Capital Budget, there should occur events beyond the control of Owner and Operator that materially and adversely affect the operations of the Hotel Commercial Units, such that making expenditures under the approved

Capital Budget would not be prudent or feasible. Operator and Owner agree to work together under such circumstances to create and approve an amended Capital Budget for that year. Owner agrees that unless such events continue to affect the Hotel Commercial Units, all reduced or deferred items expenditure shall be included within the next two (2) years' Capital Budgets.

(d)    Owner acknowledges that the Hotel Commercial Units may need to be renovated during the Initial Term of the Agreement. Owner further acknowledges that the reserve established in Section 5.3(a) below, may not be sufficient to fund the cost of renovation. Accordingly, in connection with the preparation of the Capital Budget for the year in which that renovation is to take place, Operator agrees that the expense and timing of that renovation are subject to the approval of Owner, such approval not to be unreasonably withheld.

4.3    Failure to Agree Upon Business Plans or Budgets.

(a)    (1)    If Owner indicates objection to any portion of the Business Plan including the Annual Budget within thirty (30) business days of its submission by Operator, Owner shall, within such thirty (30) day period, deliver to Operator a reasonably detailed explanation of the items to which Owner objects. Owner and Operator shall meet at the Hotel Commercial Units to resolve the specific points of disagreement specified by Owner in such notice. All items or portions of the submitted Business Plan or Annual Budget to which objection is not made shall be deemed approved by Owner, unless (i) the resolution of any objected item or portion of the Business Plan or Annual Budget would require an upward revision of another item or portion of the Business Plan or Annual Budget to which Owner did not originally object or (ii) such portions of the submitted Business Plan or Annual Budget require consent of the holder of any Mortgage.

27

(2)    Should Owner and Operator not reach agreement on any disputed item or portion of the Business Plan, including the Annual Budget on or before the first day of the applicable Operating Year, (A) the Owner's decision shall control and (B) if the disputed item or items are necessary to allow the Hotel Commercial Units to be operated in accordance with the Operating Standard, then the Operator, by written notice delivered to the Owner no later than the 30th day of the applicable Operating Year, shall have the right to terminate this Agreement on the date set forth in such notice, which date shall be at least 120 days from the date of the notice.

(b)    With respect to the Capital Budget, Operator shall be entitled to make the capital expenditures in accordance with the proposed Capital Budget submitted to Owner for such Operating Year other than those items which have been objected to by Owner or the holder of any Mortgage.

4.4    Books and Records.    Operator shall cause to be maintained at the Hotel Commercial Units full and adequate books of account and such other records as are necessary to reflect the results of the operation of the Hotel Commercial Units.  Such books of account shall be kept in all material respects in accordance with the Uniform System.  Operator hereby agrees that Operator and Operator's successors and assigns shall keep all such information and make such information available as provided in Section 4.5 below.

4.5    Inspection of Books and Records.    Operator shall upon five (5) business days' notice, accord to Owner and the holder of any Mortgage, and their respective accountants, attorneys and agents, the right at reasonable times during the Term to inspect, examine, and make extracts from, the books and records of the Hotel Commercial Units. Upon the expiration or termination of this Agreement, all such books and records (including without limitation,

computer disks and programs) shall forthwith be turned over to the Owner so as to insure the orderly continuation of the operation of the Hotel Commercial Units; provided, however, that all such books and records shall thereafter be available to Operator at the Hotel Commercial Units for a period of two (2) years for inspection, audit, examination and extracting, at all reasonable times upon five (5) business days' notice. Upon five (5) business days' written notice, Owner shall have the right, from time to time, to audit the books and records of the Hotel Commercial Units by an independent accounting firm selected by Owner, which audit shall be done at Owner's expense. Any books and records of the Hotel Commercial Units kept on computer shall be kept on disks and in programs reasonably approved by the Owner.

4.6    Financial Reports.

(a)    Operator shall deliver to Owner, within fifteen (15) days after the end of each Accounting Month, an unaudited financial statement prepared from the books of account maintained by Operator and containing (i) a balance sheet for the Hotel Commercial Units as of the end of such Accounting Month, (ii) an income statement for the Hotel Commercial Units for such Accounting Month and for the Cumulative Period in respect of such Accounting Month, (iii) a comparison of budgeted versus actual results for such Accounting Month and for the Cumulative Period in respect of such Accounting Month, and (iv) a statement of cash flows for such Accounting Month and for the Cumulative Period in respect of such Accounting Month.

(b)    Within ninety (90) days after the end of each Operating Year, Operator shall deliver to Owner audited financial statements for such Operating Year (herein referred to as the "Annual Statement"), containing a balance sheet for the Hotel Commercial Units as of the end of such Operating Year, an income statement for the Hotel Commercial Units for such Operating Year, a comparison of budgeted versus actual results for such Operating Year and a

29

statement of cash flows for such Operating Year. Such Annual Statement shall also set forth the Gross Revenues.

4.7    <u>Accounting and Financial Adjustments for First Operating Year</u>. If the first Operating Year commences prior to January 1, 2008, the parties agree that all accounting and financial matters will be adjusted and prorated in a reasonable manner for such first Operating Year to reflect that such first Operating Year is not a full year of operation.

4.8    <u>Location of Bank Accounts</u>. Any and all accounts and funds pertaining to the Hotel Commercial Units shall be maintained in a bank or banks selected by the Owner which are licensed to do business in Utah and which are reasonably acceptable to the Operator; provided, however, that to the extent the terms of any Mortgage require that accounts and funds pertaining to the Hotel Commercial Units be maintained at any particular bank or in any particular manner, such accounts and funds shall be maintained in accordance with the terms of such Mortgage.

### ARTICLE 5
### REPAIRS AND ALTERATIONS

5.1    <u>Repairs and Maintenance</u>. Except to the extent prevented by Force Majeure, Operator shall, as agent of Owner, throughout the Term, to the extent monies are made available, take good care of the Hotel Commercial Units (other than such portions thereof as are leased to tenants who undertake a duty of repair and maintenance) and maintain the same in good order and condition and in compliance with all Legal Requirements and Insurance Requirements and make all repairs thereto as may be necessary to maintain the Operating Standard. Subject to the applicable Annual Budget, Operator shall also make all alterations required in Operator's discretion for the proper maintenance and operation of the Hotel Commercial Units in accordance with the Operating Standard.

30