5.2   Emergency Repairs.  If Operator shall, at any time, believe that (a) a dangerous condition exists at the Hotel Commercial Units, (b) repairs or alterations are required to comply with any applicable Legal Requirement or Insurance Requirements or (c) expenditures are required arising out of fire, acts of God, flood, earthquake or other casualty or other emergency, Operator may take all steps and make, on behalf of and at the expense of Owner, all expenditures necessary to cure such condition, and make such repairs or alterations which are otherwise required, whether or not provided for in the applicable Annual Budget, so long as the cost of such repairs do not exceed $20,000.  Should such repairs exceed $20,000, Operator shall take reasonable steps to get prior approval for such repairs from Owner, which will not be unreasonably withheld.  Owner shall immediately, and in no case later than twenty (20) days after notice from Operator, provide Operator with all funds necessary pursuant to this Section. In the event Owner fails to timely provide Operator with said necessary funds, Operator shall have the right, power and authority to utilize portions of operating receipts or draw upon the Operating Line for the making of such repairs or alterations.  Operator agrees to notify Owner as soon as possible of any such emergency condition or situation.

5.3   Owner's Obligation With Respect to the Operating Standard.  Owner recognizes that there may be unforeseen or unanticipated changes in specific replacement or alteration requirements, costs, timing or required acquisitions, replacements or Capital Improvements which may require funds in excess of those set forth in the Capital Budget, thereby requiring additional funds of Owner.  Subject to Section 3.5(b) hereof, it is expressly understood and agreed that Owner shall at all times provide in a timely manner the funds necessary to enable Operator to maintain and operate the Hotel Commercial Units in accordance with the Operating Standard including the financing or funding of appropriate Capital Improvements and the

31

financing or funding of appropriate replacements of, and additions to, the Furniture, Fixtures and Equipment if existing funds are insufficient.

## ARTICLE 6
## OPERATING FEE AND OWNER'S REMITTANCE

6.1    Operating Fee.  For each Operating Year, Operator shall be paid, in respect of its management services hereunder, an amount (the "Operating Fee") equal to the sum of the following:

(a)    a "Basic Management Fee" equal to the greater of $180,000.00 per annum or three and one half percent (3.5%) of the Gross Revenues for the first eighteen months from and after the Commencement Date, and thereafter three and one half percent (3.5%) of the Gross Revenues for the applicable Operating Year; and

(b)    an "Annual Incentive Fee" equal to seven and one half percent (7.5%) of the Hotel Commercial Units' income after undistributed operating expenses (as the term "income after undistributed operating expenses" is defined in the Uniform System) for each Operating Year during the term of this Agreement, provided that the Basic Management Fee earned during such Operating Year shall be included as an expense for purposes of the foregoing calculation.

6.2    Method of Determining Operating Fees.

(a)    With respect to any Operating Year and each Accounting Month included therein, the Basic Management Fee shall be paid in tentative monthly installments of the amount hereinafter provided, which tentative monthly installments for any such Accounting Month shall be paid by Operator withdrawing the same from the Operating Account at the close of such Accounting Month.  The tentative monthly installment on account of the Basic Management Fee shall be equal to the greater of $15,000 or (i) the then applicable Basic Management Fee percentage of the Gross Revenues for the Cumulative Period set forth in Section 6.1(a) in respect

32

of such Accounting Month less (ii) the aggregate amount of the tentative monthly installments having theretofore become payable for such Operating Year on account of such Basic Management Fee. For example, tentative monthly installments of the Basic Management Fee for January, February and March in the first Operating Year (assuming that the Operating Year commences on January 1) would be calculated as follows:

(1)   January.   Assume that the Gross Revenue for the Cumulative Period between January 1 and January 31 is $400,000. The tentative monthly installment of the Basic Management Fee paid year to date would be zero. The tentative monthly installment of the Basic Management Fee for January would be equal to the greater of $15,000 or the then applicable Basic Management Fee percentage, which is three and one half percent (3.5%) of the Gross Revenues for the Cumulative Period ($400,000). Three and one half percent (3.5%) of $400,000 equals $14,000. Accordingly, $14,000 less the aggregate amount of the tentative monthly installments having theretofore become payable for such Operating Year on account of such Basic Management Fee (zero) equals $14,000. Thus, the tentative monthly installment of the Basic Management Fee for January would be $15,000, which is greater than $14,000.

(2)   February.   Assume that the Gross Revenue for the Cumulative Period between January 1 and February 28 is $900,000. Further assume that the total tentative monthly installment of the Basic Management Fee paid for the month of January equaled $15,000. The tentative monthly installment of the Basic Management Fee for February would be equal to the greater of $15,000 or the then applicable Basic Management Fee percentage, which is three and one half percent (3.5%) of the Gross Revenues for the Cumulative Period, $900,000, less the tentative monthly installment of the Basic Management Fee paid year to date ($15,000). Three and one half percent (3.5%) of $900,000 equals $31,500. Accordingly, $31,500 less the

aggregate amount of the tentative monthly installments having theretofore become payable for such Operating Year on account of such Basic Management Fee ($15,000) equals $16,500. Thus, the tentative monthly installment of the Basic Management Fee for February would be $16,500, because $16,500 is more than $15,000.

(3)    March. Assume that the Gross Revenue for the Cumulative Period between January 1 and March 31 is $1,200,000. Further assume that the total tentative monthly installment of the Basic Management Fee paid for the months of January and February equaled $31,500. The Basic Management Fee for March would be equal to the greater of $15,000 or the then applicable Basic Management Fee percentage, which is three and one half percent (3.5%) of the Gross Revenues for the Cumulative Period ($1,200,000), less the tentative monthly installment of the Basic Management Fee paid year to date ($31,500). Three and one half percent (3.5%) of $1,200,000 equals $42,000. Accordingly, $42,000 less the aggregate amount of the tentative monthly installments having theretofore become payable for such Operating Year on account of such Basic Management Fee ($31,500) equals $9,500. Thus, the tentative monthly installment of the Basic Management Fee for March would be $15,000, which is greater than $9,500.

(b)    Notwithstanding anything in this Agreement to the contrary, the Operator shall not be entitled to any tentative monthly installment payments of the Basic Management Fee in excess of $180,000 in any given Operating Year unless and until the Gross Revenue for that Operating Year exceeds $5,100,000.

(c)    If, for any Operating Year, the aggregate amount of the tentative monthly installments paid to Operator on account of the Basic Management Fee shall be less than such Fees actually due and payable for such Operating Year based upon the final determination of

34

Gross Revenues as reflected in the Annual Statements for such Operating Year referred to in Section 4.6 hereof, then, within fifteen (15) days after the delivery of such Annual Statements to Owner, Owner shall pay into the Operating Account the amount of any such underpayment.

(d)    If, for any Operating Year, the aggregate amount of the tentative monthly installments paid to Operator on account of the Basic Management Fee shall be more than such Fees actually due and payable for such Operating Year based upon the final determination of Gross Revenue as reflected in the Annual Statement for such Operating Year referred to in Section 4.6 hereof, then the excess shall be credited (dollar for dollar) against the tentative monthly installments of the Basic Management Fee next due and payable or, if no such payments are due, the Operator shall within 15 days of demand therefor by Owner pay the overage to the Owner.

With respect to any Operating Year included herein, the Annual Incentive Fee shall be computed and earned annually and shall be paid, if due, twenty (20) days after the end of each Operating Year.

6.3    Asset Management Fee.   Owner also shall pay an asset management fee to Operator in the amount of One Hundred Thousand Dollars ($100,000) per Operating Year (the "Asset Management Fee") (appropriately pro rated for partial years) commencing on the date that the Property generates sufficient positive cash flow from operations to pay such Asset Management Fee after the payment of all required debt service on all Mortgages, all currently accruing Base Interest on the BayNorth Loan (but without any requirement to pay previously accrued Base Interest on such BayNorth Loan) (as such Base Interest is defined in the BayNorth Promissory Note), and operating expenses.

35

6.4    <u>Distribution of Gross Revenues</u>. Subject to the terms of any applicable Mortgage encumbering the Hotel Commercial Units, Operator shall distribute the Gross Revenues of the Hotel Commercial Units, to the extent funds are available in the Operating Accounts, for the payment of the following in accordance with the following priorities:

(a)    Impositions and fire and extended coverage insurance.

(b)    All costs of sales and operating expenses (including out-of-pocket costs of operator and other reasonable expenses of Operator for which it is entitled to reimbursement hereunder) excluding all components of the Operating Fee deducted from Gross Revenues.

(c)    debt service on any Mortgage.

(d)    Basic Management Fee.

(e)    Actual expenditures made for Capital Improvements and for acquisition and replacement of Furniture, Fixtures and Equipment.

(f)    The Annual Incentive Fee due Operator under this Agreement.

(g)    Asset Management Fee.

(h)    The balance to Owner.

Distribution of items a, b, c, d and e shall be made monthly or, if more frequently, on a frequency dictated by sound business practice. Distribution of item (h) shall be made quarterly. All other distributions shall be made annually on the last day of the last Accounting Month in each Operating Year. Notwithstanding anything to the contrary being stated herein, Operator shall be paid by Owner its Basic Management Fee and Annual Incentive Fee (if and to the extent due) whether or not such funds are available in the Operating Account of the Hotel Commercial Units, as well as any accounts for Working Capital.

. If and for so long as all Mortgagees consent, then item (d) above shall be distributed prior to item (c) above.

## ARTICLE 7
### INSURANCE

7.1    <u>Insurance to be Maintained During Term</u>.  At all times during the Term, Owner shall maintain at least the following insurance respecting the Hotel Commercial Units with responsible and properly licensed companies in amounts designated by Owner and reasonably approved by Operator:

(a)    Comprehensive public liability insurance, including products and innkeepers liability and property damage against claims for personal and bodily injury or death and property damage, such liability insurance to afford protection to the limit of not less than three million dollars ($3,000,000) in respect of bodily injury to death to any number of persons in any one occurrence and five million dollars ($5,000,000) for property damage in any one occurrence;

(b)    Fire and extended coverage insurance in an amount to cover replacement costs, against fire and other risks included in the broad form extended coverage endorsement;

(c)    Use and occupancy insurance or business interruption insurance in an amount of not less than the total of two (2) Operating Years of (i) the Property's fixed operating expenses and charges and (ii) the Operating Fee.

(d)    Statutory workers' compensation and employer's liability insurance;

(e)    Fidelity bonds or insurance in amount equal to at least $250,000; and

(f)    Such other insurance as Operator shall deem necessary for protection against claims, liabilities and losses arising from the operation of the Hotel Commercial Units and as shall be approved by Owner.

The premiums for all policies maintained pursuant to this Section 7.1 shall be charged to the operation of the Hotel Commercial Units in accordance with the Uniform System. It is specifically understood by Owner that Owner assumes all risks in connection with the adequacy of any insurance program adopted or followed in this Article 7.

7.2   <u>Endorsements</u>. Each policy of insurance provided for in this Article 7 shall have attached thereto (a) an endorsement that such policy shall not be cancelled or materially changed without at least thirty (30) days' prior written notice to Owner and Operator and (b) an endorsement to the effect that no action or omission of a party thereto shall affect the obligation of the insurer to pay the full amount of any loss sustained to the other party hereto and any other parties insured under such policy.

7.3   <u>Parties Insured</u>. All policies of insurance obtained under Section 7.1(b) shall be carried in the name of Owner and Mortgagee and losses thereunder shall be payable to the parties as their respective interest may appear. All liability insurance shall name Owner and Operator and their respective officers, agents and employees as insureds. Any policy of business interruption insurance shall name Owner and Mortgagee as insureds.

7.4   <u>Waiver of Liability</u>. Neither Operator nor Owner shall assert against the other, and each does hereby waive with respect to the other, any claims, losses, damages, liabilities and expenses (including attorneys' fees and disbursements) incurred or sustained by it on account of damage or injury (including death) to persons or property (including the Hotel Commercial Units itself) arising out of the ownership, operation or maintenance of the Hotel Commercial Units. Notwithstanding the foregoing, such waiver shall not apply to the willful misconduct or gross negligence of Operator or Owner nor shall it be construed as limiting Owner's or Operator's rights in the event of a default of the other party under this Agreement.

7.5   <u>Allocation of Business Interruption Insurance Proceeds</u>.   Notwithstanding anything to the contrary in this Agreement, in connection with the occurrence of any event resulting in the payment of occupancy insurance or business interruption insurance proceeds with respect to the Hotel Commercial Units, such proceeds shall be included within or treated as Gross Revenues for the purposes of calculating the Basic Management Fee pursuant to Sections 6.1 and 6.2, which shall continue to be payable to Operator hereunder.

7.6   <u>Inconsistency with Mortgage</u>.   Anything to the contrary provided in this Article 7 notwithstanding, to the extent that the terms of any Mortgage impose insurance requirements that are inconsistent with the insurance requirements set forth in this Article 7, the terms of such Mortgage shall control.

## ARTICLE 8
## TERMINATION

8.1   <u>Termination Based Upon Events of Default</u>.

(a)   <u>Events of Default on the Part of Either Party</u>.   The following shall constitute events of default hereunder on the part of either party:

(1)   The failure of either party (the "defaulting party") to pay to the other party (the "non-defaulting party") any sum which may become due to the other party hereunder (other than those referred to in Section 8.1(b) ) within thirty (30) days after receipt by the defaulting party of a notice from the non-defaulting party specifying such failure; or

(2)   The failure by either party (the "defaulting party") to perform, keep or fulfill any of the terms, covenants, undertakings, obligations or conditions set forth in this Agreement (other than those referred to in the foregoing paragraph (a) or Section 8.1(b)), and the continuance of such failure for a period of thirty (30) days after receipt by the defaulting party of notice thereof from the other party hereto (the "non-defaulting party") specifying such

39

failure.  Notwithstanding the foregoing, if such failure is of a nature that cannot, with due diligence and in good faith, be cured within thirty (30) days, it shall not constitute an event of default unless such defaulting party fails to proceed promptly and with due diligence and in good faith to cure the same, and thereafter to prosecute the curing of such failure with due diligence and in good faith, it being intended that, in connection with a failure not susceptible of being cured with diligence and in good faith within thirty (30) days, the time of such defaulting party within which to cure the same shall be extended for such period as may be necessary for the curing thereof with due diligence and in good faith but not more than 120 days.  Pursuant to Section 8.1(c), Operator shall specify a time period and plan by which Operator will attempt to cure any failure or event of failure which cannot be cured within 30 days.  If the parties cannot agree that such plan is reasonable as to its extent and the time in which it is to be effected, then the Operator shall either establish a plan that is acceptable to Owner and diligently perform under such plan or the Owner may terminate this Agreement; or

> (3)     If either party (the "defaulting party") shall apply for or consent to the appointment of a receiver, trustee or liquidator of such party or of all or a substantial part of its assets, file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or agreement with creditors or take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating such party a bankrupt or insolvent or approving a petition seeking reorganization of such party or appointing a receiver, trustee or liquidation of such party or all or a substantial part of its assets

and such order, judgment or decree shall continue unstayed and in effect for a period of sixty (60) consecutive days.

(b)    Events of Default on the Part of Owner.  In addition to any other events set forth herein which are deemed to be an event of default on the part of Owner, the following shall also constitute events of default hereunder on the part of Owner (and upon the occurrence of any such event Owner shall be deemed to be the "defaulting party" and Operator the "non-defaulting party"):

(1)    Subject to Section 3.5(b) hereof, if Owner shall fail to provide any funds required to be provided for deposit in the Operating Accounts in response to a notice from Operator pursuant to, and within the time limit provided in, Section 3.5 and such failure shall continue for a period of ten (10) days after another notice from Operator.

(2)    If through the sole fault of Owner, and despite efforts of Operator to maintain or secure the same, any license required for the operation of the Hotel Commercial Units, including any liquor license, is not issued or is, at any time suspended, terminated or revoked and such suspension, termination or revocation continues for a period of more than ninety (90) consecutive days;

(3)    If, because of a default by Owner under any Mortgage, the Mortgagee shall declare a default, or take any other action in pursuance of any remedies arising as a result of such default which adversely affects the rights or obligations of the Operator under this Agreement.

(c)    Consequence of Event of Default.  If either party believes that a failure has occurred which constitutes a potential event of default under this Agreement, then the party alleging such default (the non-defaulting party) may give notice to the other party (the defaulting

41

party) of the nature of said event of failure which the non-defaulting party alleges as constituting a potential event of default. The non-defaulting party shall specify in said notice as to whether such default is to be cured within 30 days of the date of such notice or within such other time period. Such notice of a potential default shall specify that the term of the Agreement shall terminate at the expiration of the time period specified in said notice or upon such longer expiration period as may be expressed in said notice. The defaulting party shall notify the non-defaulting party within ten days in writing that either the defaulting party agrees or disagrees as to there being any such default or that any such claimed default cannot be cured within 30 days of the notice. If the defaulting party claims that the default cannot be cured within 30 days, the provisions of Section 8.1(a)(2) shall apply. Any termination effected pursuant to the provisions of this Section 8.1 shall be without prejudice to any right to damages which the non-defaulting party may have against the defaulting party under applicable law. To the extent not inconsistent with the foregoing, the defaulting party shall not be deemed to be in default under this Agreement, if a bona fide dispute with regard to any of the foregoing events of default has arisen between the parties and such dispute has been submitted to arbitration pursuant to section 12.6 by the other party.

8.2     Termination Due To Property Not Opening. The Owner intends to open the Hotel Commercial Units. However, if for any reason the Owner does not receive a permanent Certificate of Occupancy for the Hotel Commercial Units on or before March 2008, then, notwithstanding anything in this Agreement to the contrary (including, without limitation, Section 8.1.(a)(2) hereof), this Agreement shall terminate on such date and be of no further force and effect and neither party shall have liability to the other hereunder; provided, however, that Owner shall reimburse Operator for reasonable costs and expenses paid or incurred by Operator

on or after April 2007 pursuant to the Annual Budget(s) in preparing to open the Hotel Commercial Units.

8.3   <u>Certain Rights on Termination</u>.  In addition to, and without limiting, the rights of a party pursuant to the provisions of this Article 8 or any other provision of this Agreement, upon the termination of this Agreement for any reason under this or any other Article (including expiration of the Term) the following shall be applicable (provided, however, that Section 8.3(b) below shall not apply in the case of a termination due to Operator's default):

(a)   To the extent assignable, Operator shall assign and transfer to Owner all of Operator's right, title and interest in and to all liquor, restaurant and other licenses and permits with respect to the Hotel Commercial Units; provided, however, if Operator has expended any of its own funds in the acquisition of such licenses or permits, Owner shall reimburse Operator therefore.

(b)   Owner shall indemnify, defend and hold Operator harmless from all costs, expenses, claims, damages and liabilities, including without limitation, reasonable counsel fees and disbursements, paid or incurred by the Operator and arising out of, in connection with or resulting from the ownership, operation or use of the Hotel Commercial Units after the date of termination, including, without limitation, the failure of Owner following the expiration or earlier termination (for whatever cause, other than the default of the Operator) of this Agreement to provide all of the services contracted for in connection with the business booked for the Hotel Commercial Units on or prior to the date of such expiration or termination, but excluding any cost, expense, claim, damage, or liability relating to the willful misconduct or gross negligence of the Operator.  The provisions of this paragraph (b) shall survive any such termination or

expiration and shall be binding upon Owner, its successor or assign who becomes the "Owner" after the effective date of any such expiration or termination.

8.4 <u>Events of Default on Part of Operator</u>. In addition to any other events set forth herein which are deemed to be an event of default on the part of Operator, the following shall also constitute events of default on the part of Operator (and upon the occurrence of any such event Operator shall be deemed the "defaulting party" and Owner the "non-defaulting party"):

(a) If Operator operates the Hotel Commercial Units in any manner or causes the Hotel Commercial Units to be operated in a manner that is not in substantial compliance with all Legal Requirements or causes any of the necessary or desirable operating licenses or permits (including without limitation any liquor licenses) to be terminated, suspended or revoked and such termination, suspension or revocation continues for a period of more than ninety (90) consecutive days.

(b) Operator transfers, sells or assigns (or attempts to transfer, sell or assign) its rights under this Agreement in a manner which is not in compliance with the provisions of this Agreement.

(c) If in any two consecutive full Operating Years (the "Measurement Years"), on a cumulative basis for those years, the Hotel Commercial Units have failed to achieve at least three of the four following criteria:

(1) The actual income received from the Hotel Commercial Units (after undistributed operating expenses) must equal or exceed the amount of income (after undistributed operating expenses as defined in the Uniform System) budgeted in the Annual Budget.

44

(2)    The Hotel Commercial Units must receive a score of 80% or better on each annual third-party service and facility inspection report (D. Richey or equivalent) during the immediately preceding five year period; provided, however, that to the extent a deduction for substandard facilities is the result of the Owner's decision, or with respect to the Guest Rooms, the decision of owners of such Guest Rooms (including, but not limited to, a lack of funding), then such deductions shall be ignored for purposes of calculating the score;

(3)    The Hotel Commercial Units must achieve a stabilized index score of 90 versus the agreed upon competitive set in ADR, as set forth in the Smith Travel Research Report (or equivalent) each year during the immediately preceding five year period; and

(4)    The Hotel Commercial Units must achieve a stabilized index score of 90 versus the agreed upon competitive set in occupancy, as reported in the Smith Travel Research Report (or equivalent) each year during the immediately preceding five year period.

In the event that the Owner and the Operator are not able to agree upon the composition of the "agreed upon competitive set" referred to in clauses (3) and (4) above, or are otherwise in dispute over scoring issues, the matter shall be submitted to arbitration as set forth in Section 12.6 hereof., with the arbitrators being charged with the task of determining a commercially reasonable "competitive set" and/or otherwise resolving scoring issues. The parties further agree that in connection with scoring the Operator's performance, all scoring shall be equitably adjusted to take into account the effect of any construction work which could reasonably be expected to affect scoring.

Notice of termination, to be effective, must be given in writing not later than 45 days after the Owner receives the Annual Statements for the second Measurement Year, to be effective 30 days thereafter.

45

8.5    Termination After Sale by Owner.

(a)    If the Owner sells the Hotel Commercial Units to a party which is unrelated to the Owner prior to the expiration of the Term, then this Agreement shall terminate on the earliest of (1) the end of the Term or (3) three years after the closing of the sale.

(b)    In connection with any sale of the Hotel Commercial Units to a party which is unrelated to the Owner prior to the expiration of the Term, Owner shall not close upon such sale unless the purchaser assumes and agrees in writing to perform all obligations of Owner hereunder.  Alternatively, if the purchaser does not agree in writing to assume and perform all obligations of Owner hereunder, then Owner shall, immediately upon the closing of such sale, pay to Operator an amount equal to 300% of all fees earned by Operator under Article 6 hereof during the full calendar year immediately preceding the year in which such sale takes place.  If any such sale shall take place, however, during the first full calendar year of the Term hereunder, then such amount shall be $540,000 ($180,000 X 300%).

(c)    Any termination pursuant to this Section 8.5 (other than due to the default of the Operator) shall be governed by Section 8.3 hereof.

## ARTICLE 9
## OPERATOR'S RIGHT TO PERFORM COVENANTS ON BEHALF OF OWNER

If Owner should fail to make any payment or to perform any act required to be made or performed by Owner pursuant to this Agreement or any Mortgage, then Operator may, after not less than 30 days notice to Owner, and without waiving or releasing Owner from any condition under this Agreement, make such payment or perform such act.  If Operator receives written notice from the Owner within 20 days that Owner has made such payment or that Owner has a valid right to contest the making of such payment or undertaking such act and that Owner has established that he has implemented reasonable steps to contest such payment or act and has

provided necessary financial assurances to the reasonable satisfaction of Operator that it has the financial capability of making the required payments or for performing the required act, then the Operator shall not make said payment. Owner agrees to indemnify, defend and hold harmless Operator from any claims by third parties if it does not make such payment or perform such act. All reasonable sums paid by Operator (except for non-interest bearing advances of Operator set forth herein) and all necessary incidental costs and expenses incurred by Operator in connection with the performance of any such act, together with interest thereon at the Base Rate (but not to exceed the highest rate allowed by law) from the date of making such expenditure or expenditures by Operator shall be payable to Operator upon demand. Any amounts payable hereunder to Operator may, at the option of Operator, be withdrawn from the Operating Accounts. The rights provided in this Section are granted to Operator in addition to the rights provided in Section 8.1 hereof.

## ARTICLE 10
## DESTRUCTION AND CONDEMNATION

10.1    <u>Substantial Damage</u>. If the Hotel Commercial Units are destroyed or substantially damaged by fire or other casualty, either party may, within sixty (60) days after the occurrence of such event, give notice to the other terminating this Agreement. For purposes of this Section 10.1, the Hotel Commercial Units shall be deemed to have been substantially damaged if either (a) the estimated cost of the Restoration shall exceed sixty percent (60%) of the estimated cost (excluding foundation, footing and excavation cost) of replacing the Hotel Commercial Units by constructing, furnishing and equipping, in accordance with the Legal Requirements and Insurance Requirements then in effect, new Hotel Commercial Units at the same location which shall be substantially the same as the Hotel Commercial Units, as it was immediately prior to such casualty or (b) the length of time required for Restoration shall be in excess of twenty-four

47

(24) months from the date of such casualty. In the event Operator or Owner elects to terminate

this Agreement as provided in this Section 10.1, Owner shall deposit all proceeds of casualty

insurance and other proceeds actually received by the Owner on account of such damage in

escrow, the proceeds shall first be applied to satisfy Owner's Mortgage. The balance of any such

proceeds shall next be allocated to Owner in respect of Owner's equity interest in the Hotel

Commercial Units. Any proceeds from insurance in addition to casualty insurance proceeds and

attributable to loss of income, revenues, profits or loss of occupancy shall be applied to the

payment of the remaining unpaid items and in the priority set forth in Section 6.4 above.

10.2   Partial Damage. In the event of (a) any damage to the Hotel Commercial Units by

fire or other casualty which does not amount to substantial damage as described above, or (b) the

destruction or substantial damage to the Hotel Commercial Units and the failure of either party to

terminate this Agreement pursuant to Section 10.1 hereof, then (subject to Section 10.7 hereof)

this Agreement shall not terminate, and Owner shall, at its own expense, promptly commence

and expeditiously complete the Restoration. In the event that the insurance proceeds shall

exceed the cost of Restoration, the excess shall be retained by Owner as its property. Subject to

Sections 1.25 and 10.7 hereof, any proceeds from insurance attributable to loss of income,

revenues, profits or loss of occupancy shall be applied to the payment of the items and in the

priority set forth in Section 6.4 above.

10.3   Substantial Condemnation. If all or a substantial portion of the Hotel Commercial

Units shall be taken, or a perpetual easement granted with respect thereto, by Condemnation,

other than for temporary use, this Agreement shall terminate as of the date of such taking or

granting. A substantial portion of the Hotel Commercial Units shall be deemed taken if in the

reasonable opinion of Owner or the Mortgagee the part not taken may not be repaired, restored,

replaced, rebuilt or utilized so as to enable the Hotel Commercial Units to be operated at the level of the Operating Standard. If this Agreement shall terminate pursuant to the foregoing provision of this Section 10.3, Owner and Operator shall each have the right to proceed against the condemning authority as their interests may appear.

10.4    Partial Condemnation. If a portion of the Hotel Commercial Units shall be taken by Condemnation and this Agreement is not terminated pursuant to Section 10.3 hereof, the Condemnation award relating to damage to or the taking of the Hotel Commercial Units, including any interest thereon, shall be applied to the Alteration of the Hotel Commercial Units made necessary by such taking, which Alteration, after approval of plans and specifications therefore by Operator, shall be promptly commenced and expeditiously effected by, and at the expense of, Owner so as to restore the Hotel Commercial Units as nearly as possible to its value, condition, and character immediately prior to the Condemnation. In the event that the Condemnation award relating to the damage to or the taking of the Hotel Commercial Units shall be less than seventy percent (70%) of the cost of the Alteration, Owner may, within sixty (60) days of the determination of deficiency in such Condemnation award, give notice to Operator terminating this Agreement, in which case Owner shall deposit all condemnation proceeds in escrow and they shall be distributed as set forth in section 10.1 above.

10.5    Condemnation for Temporary Use. In the event of a Condemnation of all or part of the Hotel Commercial Units for temporary use, this Agreement shall remain in full force and effect, and the following shall be applicable:

(a)    If the Condemnation is for a period not extending beyond the Term, the Condemnation award, including any interest, shall be paid to Owner and included in Gross Revenue for the Operating Year or Years in which received. When and if during the Term the

period of temporary use shall terminate, Owner shall, after the approval of plans and specifications by Operator, promptly commence and expeditiously effect all alterations necessary to restore the Hotel Commercial Units to its condition prior to the Condemnation for temporary use and the moneys so expended shall be charged as operating expenses for the Operating Year in which the monies are so expended.

(b)    If the Condemnation is for a period extending beyond the Term, that portion of the Condemnation award which is for the period up to the expiration of the Term shall be paid to Owner and included in Gross Revenue of the Operating Year or Years in which received.  The remainder of the Condemnation award shall be paid to Owner as its absolute property.  If moneys are expended during the Term to restore the Hotel Commercial Units to its condition prior to the condemnation for temporary use, the moneys so expended shall be charged as operating expenses for the Operating Year or Years in which they are expended.

10.6    Effect of Termination.  This Agreement shall terminate as of the date fixed in any notice of termination given pursuant to this Article 10, which date shall be not less than thirty (30) days after the date notice is given.  Upon such termination neither party shall have any further rights hereunder or liability to the other hereunder, except as provided in this Article 10 and except with respect to obligations accrued prior to the effective date of such termination.

10.7    Subject to Rights of Mortgagee.  Notwithstanding anything in this Agreement to the contrary, all rights and duties of the Owner and Operator set forth in this Article 10 are subject to the rights of the Mortgagee contained in any Mortgage.

### ARTICLE 11
### ASSIGNMENT

11.1    Assignment by Operator.

(a)     Operator shall have the right, upon the prior written consent of Owner, not to be unreasonably withheld, to assign this Agreement and its rights and obligations hereunder (i) to any successor or assignee of Operator which may result from any merger, conversion, consolidation or reorganization so long as the such successor or assignee is owned and controlled by William Shoaf and David Wickline.  With respect to any assignee under the foregoing sentence, duplicate originals of the assignment and assumption shall be delivered to Owner and, thereupon, Operator's liability hereunder shall terminate except as to obligations accrued prior to the effective date of such assignment and assumption.

(b)     Except as otherwise provided in Section 11.1(a) hereof, the Operator may not, without the Owner's prior written consent, which consent may (except as herein provided) be withheld in the Owner's sole discretion, sell, transfer, assign, mortgage or pledge this Agreement or its rights or obligations hereunder and any such purported sale, transfer, assignment, mortgage or pledge without such consent shall be void.  A Change in Ownership of Operator shall be considered an assignment of this Agreement requiring the consent of Owner. The phrase "Change in Ownership" for purposes of this Agreement shall mean any change in the ownership, management or control of Operator the effect of which is that William Shoaf and David Wickline do not, in the aggregate, retain a majority of the equity ownership in, and control of and profits from, Operator.  Notwithstanding the foregoing, from and after the expiration of the Initial Term, the Owner shall not unreasonably withhold its consent to any such proposed sale, transfer, assignment, mortgage or pledge.

11.2    Assignment by Owner.  The Owner may sell, transfer, mortgage, pledge, or assign its rights and obligations under this Agreement to any purchaser, successor in interest, or mortgagee of the Hotel Commercial Units without the consent of the Operator.  In any sale of the

51

Hotel Commercial Units by Owner, Owner shall require the buyer to agree in writing to honor this Agreement for a period of three (3) years or the remaining balance of the Term (whichever is shorter). Upon any such transfer, sale or assignment, Owner shall have no further rights or liabilities hereunder.

11.3    Remedies. Any assignment by the Operator of this Agreement in violation of the provisions of this Article 11 shall be void. In addition to any other remedies available to the parties, the provisions of this Article 11 shall be enforceable by injunction proceeding or by a suit for specific performance.

## ARTICLE 12
## MISCELLANEOUS

12.1    Severability. If any term or provision of any Article or Section of this Agreement or the application thereof to any persons or circumstances shall to any extent or for any reason by invalid or unenforceable, the remainder of this Agreement and the application of such term or provision to persons or circumstance other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of any Article and Section of this Agreement shall be valid and enforced to the fullest extent permitted by law.

12.2    Approvals. Whenever either party hereto is requested hereunder to give its consent or approval to a matter, such consent or approval shall be given in writing and shall not be unreasonably withheld or delayed, except as otherwise provided in this Agreement. If a party shall desire the consent or approval of the other party hereto to any matter, such party may give notice to such other party that it requests such consent or approval, specifying in such notice the matter as to which such consent or approval is requested and reasonable detail respecting such matter. Except as otherwise herein provided, if such other party shall not respond negatively in

52

writing to such notice within thirty (30) days after receipt thereof, such other party shall be deemed to have consented to or approved the matter referred to in such notice.

12.3    No Waiver.  No failure by Operator or Owner to insist upon strict performance of any covenant, agreement, term or condition of the Agreement, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument.  No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term or condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

12.4    Successors and Assigns.  Subject to the provisions of Article 11 hereof, this Agreement shall be binding upon the heirs, personal representatives, successors and permitted assigns of the parties hereto.

12.5    Arbitration.

(a)    Except as otherwise herein provided, if any controversy shall arise between the parties in the performance, interpretation or application of this Agreement, either party (the "requesting party") may, within 120 days of the date a summons has been served on either party hereto with respect to such controversy, serve upon the other party hereto a written notice stating that the requesting party desires to have such controversy reviewed by a board of three (3) arbitrators in accordance with the commercial arbitration rules of the American Arbitration Association and setting forth the name and address of the person whom such party has designated to act as an arbitrator.  Within fifteen (15) days after receipt of such notice, the other party shall designate a person to at as arbitrator by a notice to the requesting party setting

forth the name and address of the person so designated. The two (2) arbitrators designated as aforesaid shall meet within ten (10) days after the second arbitrator shall be appointed and if within such ten (10) day period they shall not have agreed upon the question in dispute, they shall promptly select a third arbitrator; if they shall not be able to agree on such third arbitrator within fifteen (15) days after the second arbitrator shall be appointed, then either arbitrator, on five (5) days' notice in writing to the other, or both arbitrators, shall apply to the American Arbitration Association or its successor to designate and appoint such third arbitrator. If the party upon whom such written request for arbitration is served shall fail to designate its arbitrator within fifteen (15) days after receipt of such notice, then the arbitrator designated by the requesting party shall act as the sole arbitrator and shall be deemed to be the single, mutually approved arbitrator to resolve such controversy.

(b)    The decision and award of a majority of the arbitrators or of the sole arbitrator, as the case may be, shall be binding upon both Operator and Owner and shall be enforceable in any court of competent jurisdiction. Such decision and award may allocate the costs of such arbitration to one of the parties or disproportionately between the parties.

(c)    The decision of the arbitrators or the sole arbitrator selected in the manner herein before provided shall be given within a period of thirty (30) days (i) after the appointment of the third arbitrator or (ii) in the case of a sole arbitrator, after the date when it is first established that he is the sole arbitrator. All hearings and proceedings held and all investigations and action taken by the arbitrators shall take place in Park City, Utah. Any arbitrator designated to serve in accordance with the provisions of this Agreement shall be qualified by training and experience for the matter in dispute.

54

12.6    Estoppel Certificates.  Upon written request of either party, the other party shall execute a certificate attaching a true and correct copy of this Agreement (and any amendments) and stating whether or not this Agreement is in full force and effect, whether or not there are any uncured defaults hereunder, whether such party claims any off-sets, counterclaims or defenses to an action by the other party, and whether or not all sums due and owing hereunder have been paid.  Failure of the other party to deliver such certificate to the requesting party within twenty (20) days after such request is made shall mean that such other party certifies that this Agreement is in full force and effect, that there are no uncured defaults of the requesting party and that the requesting party has paid to the other party all sums due and owing the requesting party.

12.7    Indemnification.  The Owner shall indemnify and hold the Operator harmless from and against any claims, losses, damages, liabilities, costs and expenses (including without limitation, reasonable attorney's fees) incurred by or asserted against the Operator arising out of any personal injury (including death) or loss of or damage to property arising out of the Operator's carrying out its duties under this Agreement, except to the extent that such claims, losses, damages, liabilities, costs or expenses are incurred by or asserted against the Operator because of the gross negligence or willful misconduct of the Operator or any of its employees.

12.8    Warranties and Covenants.  Operator represents and warrants that Operator is a limited liability company duly organized and existing under the laws of the State of Utah and qualified to do business in the State of Utah with full power and authority to enter into this Agreement and to carry out of the transactions herein contemplated; further that the undersigned Manager of the Operator has all necessary authority to execute this Agreement on behalf of Operator.

12.9   _Notices._   All notices, demands, requests or other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given or served, if delivered by messenger or sent by registered or certified mail, postage prepaid, addressed to the party intended, at its address set forth below (or such other address as it may designate by notice given to the other party in the manner aforesaid), to wit:

Owner:

> Easy Street Partners, LLC
> P.O. Box ____
> Park City, Utah 840__
> Attention:  David Wickline

With a copy to:

> Blake Parrish
> Wrona & Parrish
> 1816 Prospector Avenue, Suite 100
> Park City, Utah 84060

> Charles Flint
> BayNorth Capital LLC
> One Financial Center, Floor 23
> Boston, MA  02111-2651

Operator:

> CloudNine Resorts / Sky Lodge Management, L.L.C.
> 4780 Winchester Court
> Park City, Utah 84098
> Attention:  William Shoaf

With a copy to:

> Blake Parrish
> Wrona & Parrish
> 1816 Prospector Avenue, Suite 100
> Park City, Utah 84060

In the case of a mailed notice, the return slip shall be conclusive evidence of the mailing of any such notice, and such notice shall be deemed to have been given on the second business day after the date of such mailing.

12.10 <u>Amendments</u>.  This Agreement, or any provision thereof, may not be modified, altered or changed except by another written instrument executed by the parties hereto.

12.11 <u>Entire Agreement</u>.  This writing contains the entire agreement of the parties hereto concerning the subject matter hereof, and this Agreement supersedes all other agreements and understandings (whether oral or written) heretofore made by the parties.

12.12 <u>Applicable Law</u>.  This Agreement shall be governed in all respects by the laws of the State of Utah.

12.13 <u>Attorney's Fees</u>.  In the event of any litigation between Owner and Operator concerning the rights and obligations of the parties under this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and court costs.

12.14 <u>No Party Deemed Drafter</u>.  Owner and Operator agree that no party shall be deemed to be the drafter of this Agreement and further that in the event that this Agreement is ever construed by a court of law, such court shall not deem either party to be the drafter of this Agreement.

12.15 <u>Jurisdiction and Venue</u>.  Any action or proceeding arising out of or related to this Agreement (which is not subject to arbitration) shall be brought in any court of competent jurisdiction located in Summit County, Utah and both parties hereto submit to the exclusive jurisdiction of and the laying of venue in such court.

12.16  Headings; Construction.  The headings appearing in this Agreement are for the purpose of easy reference only and shall not be considered a part of this Agreement or in any way to modify, to amend, or to affect the provisions hereof.

IN WITNESS WHEREOF, the parties hereunto have executed and delivered this Agreement as of the date first hereinabove set forth.

> EASY STREET PARTNERS, LLC,
> a Utah limited liability company
>
> By: Easy Street Mezzanine LLC,
>     a Delaware limited liability
> Its: Sole Member and Manager
>
> > By: Easy Street Holding, LLC,
> >     a Utah limited liability company
> > Its: Sole Member and Manager
> >
> > By: _____
> >     David Wickline
> > Its: Manager

CLOUDNINE RESORTS, LLC – SKY LODGE MANAGEMENT, LLC

By: _____
    William Shoaf
Its: Manager

12.16  Headings; Construction.  The headings appearing in this Agreement are for the purpose of easy reference only and shall not be considered a part of this Agreement or in any way to modify, to amend, or to affect the provisions hereof.

IN WITNESS WHEREOF, the parties hereunto have executed and delivered this Agreement as of the date first hereinabove set forth.

EASY STREET PARTNERS, LLC,
a Utah limited liability company

By: Easy Street Mezzanine LLC,
     a Delaware limited liability
Its: Sole Member and Manager

     By: Easy Street Holding, LLC,
        a Utah limited liability company
     Its: Sole Member and Manager

        By:_____
           David Wickline
        Its: Manager

CLOUDNINE RESORTS, LLC – SKY LODGE
MANAGEMENT, LLC

By:_____
    William Shoaf
Its: Manager

58

## EXHIBIT A

### Description of the Property

PARCEL NO. 1

BEGINNING AT A POINT SOUTH 4.73 FEET AND WEST 49.84 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51' EAST 18.50 FEET, THENCE NORTH 31°58'04" WEST 72.72 FEET, THENCE SOUTH 58°02'07" WEST 81.41 FEET MORE OR LESS, THENCE SOUTH 32°25'56" EAST 128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 32°25'56" EAST 128.51 FEET, THENCE EAST 13.75 FEET, THENCE SOUTH 23°38' EAST 64.90 FEET TO THE NORTHERLY LINE OF HEBER AVENUE AS DEDICATED, THENCE SOUTH 81°17' EAST 24.80 FEET ALONG SAID NORTHERLY LINE, THENCE NORTH 15°46'12" EAST 60.79 FEET TO THE POINT OF BEGINNING.

SUBJECT TO AND TOGETHER WITH A 20 FOOT RIGHT OF WAY AS CREATED IN THAT CERTAIN EASEMENT RELOCATION AGREEMENTS RECORDED DECEMBER 31, 1973 AS ENTRY NO. 244339 AND 244340 IN BOOK 368 AT PAGE NO'S 635 AND 643 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, SAID RIGHT OF WAY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS 65.21 FEET SOUTH AND 51.59 FEET WEST OF THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, SAID POINT ALSO BEING 12.0 FEET NORHTWEST OF THE SOUTHEAST CORNER OF LOT 15, BLOCK 50, OF THE PARK CITY SURVEY AND RUNNING THENCE NORTH 10°18'32" EAST 66.28 FEET, THENCE EAST 3.38 FEET, THENCE NORTH 31°58'00" WEST 77.00 FEET,T HENCE NORTH 19°54'00" EAST 66.80 FEET, THENCE CONTINUING NORTH 19°54'00" EAST 123.47 FEET, THENCE NORTH 70°06'00" WEST 20.0 FEET, THENCE SOUTH 19°54'00" WEST 200.00 FEET, THENCE SOUTH 31°58'00" EAST 73.76 FEET, THENCE SOUTH 10°44'00" WEST 63.67 FEET, THENCE SOUTH 81°17'00" EAST 20.23 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-F

PARCEL 2

BEGINNING AT A POINT 50 FEET, NORTH OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE NORTH 43.97 FEET, THENCE NORTH 66°11' WEST 142.63 FEET, THENCE

SOUTH 31°58' EAST 119.75 FEET, THENCE EAST 67.1 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN EASY STREET BRASSERIE REPLAT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MARCH 12, 2003 AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO. SA-400-A

PARCEL 3

BEGINNING AT A POINT 38.85 FEET WEST OF THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND RUNNING THENCE WEST 7.93 FEET, THENCE SOUTH 06°02' EAST 67.70 FEET, THENCE NORTH 81°17' WEST 27.0 FEET, THENCE NORTH 15°46'12" EAST 60.79 FEET, THENCE NORTH 32°06'28" WEST 91.14 FEET, THENCE NORTH 19°54'51" EAST 18.50 FEET, THENCE SOUTH 31°58' EAST 25.40 FEET, THENCE SOUTH 19°54' WEST 3.18 FEET, THENCE SOUTH 31°54' EAST 77.00 FEET TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-400-406

PARCEL 4 AND 4A

LOTS 1 AND 2, EASY STREET BRASSERIE REPLAT SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED MARCH 12, 2003, AS ENTRY NO. 650840 IN BOOK 1517 AT PAGE 1307 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

TAX PARCEL NO.'S ESB-1, AND ESB-2

PARCEL 5

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, IN PARK CITY, SUMMIT COUNTY, UTAH BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS WEST, A DISTANCE OF 35.90 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE CONTINUING WEST A DISTANCE OF 2.95 FEET, THENCE NORTH 31°58' WEST A DISTANCE OF 77.00 FEET, THENCE NORTH

19°54' EAST A DISTANCE OF 3.18 FEET, THENCE SOUTH 31°58' EAST A DISTANCE OF 80.53 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO TOGETHER WITH THE FOLLOWING DESCRIBED PROPERTY:

A PARCEL OF LAND SITUATED IN THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 16, TOWNSHIP 2 SOUTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN IN PARK CITY, SUMMIT COUNTY UTAH, BONDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT THAT IS NORTH A DISTANCE OF 93.97 FEET FROM THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 16, THENCE NORTH 66°11' WEST A DISTANCE OF 65.29 FEET, THENCE NORTH 19°54' EAST A DISTANCE OF 8.32 FEET, THENCE SOUTH 66°46'30" EAST A DISTANCE OF 193.50 FEET, THENCE SOUTH 7°16' EAST A DISTANCE OF 12.03 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 4.32 FEET, THENCE NORTH A DISTANCE OF 8.23 FEET, THENCE WEST A DISTANCE OF 18.65 FEET, THENCE NORTH 66°11' WEST A DISTANCE OF 109.15 FEET MORE OR LESS TO THE POINT OF BEGINNING.

TAX PARCEL NO. SA-425-UPL


PARCEL 6

LOT 15, BLOCK 50, PARK CITY SURVEY, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE SUMMIT COUNTY RECORDER, EXCEPTING THEREFROM ANY PORTIONS LYING WITHIN THE PARCELS 1-5 LISTED ABOVE.

TAX PARCEL NO. EXEMPT

## EXHIBIT B

Operating Standard

[Attached.]

Search Mobil Travel Guide and the
>> Advanced Tr

Hotels | Restaurants | Spas | Attractions | Destinations | Travel Tips | About the
Ratings

Main > Mobil Travel Guide > Hotels

# Mobil Stars: Lodging Star Criteria

by the editors of Mobil Travel Guide

A Mobil One-Star Lodging Establishment is a limited service Hotel/Motel that is considered a clean, comfortable
reliable establishment.

A Mobil Two-Star Lodging Establishment is a Hotel/Resort that is considered a clean, comfortable and reliable
establishment, but also has expanded amenities, such as a full-service Restaurant on the property.

A Mobil Three-Star Lodging Establishment is a Hotel/Resort which is well-appointed, with a full-service Restaur
expanded amenities, such as, but not limited to: fitness center, golf course, tennis courts, 24-hour room service
optional turndown service.

A Mobil Four-Star Lodging Establishment is a Hotel/Resort/Inn which provides a luxury experience with expand
amenities in a distinctive environment. Services may include, but are not limited to: automatic turndown service
room service, and valet parking.

A Mobil Five-Star Lodging Establishment provides consistently superlative service in an exceptionally distinctive
environment with expanded services. Attention to detail is evident throughout the Hotel/Resort/Inn from the bed
staff uniforms.

Mobil Travel Guide recognizes the individualized nature of many different types of lodging establishments, such
and-breakfasts, limited service inns, guest ranches and other unique hotel properties. For that reason, we have
to place our stamp of approval on the properties that fall into this category in lieu of applying our traditional Mob
Five Star rating.

**Lodging Criteria and Expectations**

*Note: The following criteria are suggested criteria of what a guest can generally expect at each star level. They individually mandated nor are they limited to those items listed below. These are merely a representative samp hundreds of points covered during our inspection process. Additionally, at each level the lodging establishment required to meet or exceed the requirements of the previous star rating. For example, a Two-Star hotel meets tl expectations of a Two-Star hotel as well as the One-Star hotel. A Three-Star hotel meets the criteria expectatic Three-Star hotel, a Two-Star hotel and One-Star hotel, and so forth.*

For the information on One-Star criteria see the next section.

One-Star Lodging Establishment is a clean, comfortable, and reliable, limited service establishment. Courteous and good housekeeping, including daily maid service, are standard. Characteristics of a One-Star Hotel or Mote

**Services Detail**

- Staff is well-groomed with professional, neat and well-maintained attire.
- All staff encountered are pleasant and professional in their demeanor.
- Coffee, hot tea and breakfast pastry are available on-site (could be in-room).

**Facilities Details**

- Self parking area is free of debris, good condition; surfaces, curbs, paths.
- All outdoor walkways and approaches are well-maintained and cleaned.
- Outdoor awnings, signs, marquees, flags, and plantings are clean and in good condition.
- Public spaces are free of obvious hazards.
- Lobby floors, walls and ceiling are free of debris, marks and damage.
- Elevator landings, cars and doors/tracks are clean and in good condition.
- Guest room corridor floors, walls and ceilings are free of debris, marks, and damage.
- Vending and/or ice machines are located within one floor of guest room.
- Vending and/or ice areas and equipment are clean, well-lit, and well-maintained.
- All furniture, fixtures and equipment are clean, neat and well-maintained.
- Ashtrays throughout public areas are well-maintained and free of excessive debris.
- Temperature in all interior public areas are maintained in general comfort range.
- If public phonebook present, it is neat and in good condition.
- Public washrooms very hygienic and neat, with well-stocked paper and soap.
- Public washroom fixtures, walls and floors are in very good condition.
- If available, meeting rooms are well-signed so that it is easy to find and arrive at a specific room.
- If available, meeting room doors are in good condition, free of nicks and damage.
- If available, meeting room interiors are in generally good condition, including walls, floors and ceiling.
- Televisions feature cable TV (four networks plus four other channels).
- Direct dial phones with direct long distance dialing are available in each guest room.

**Guest Room Detail**

- Hardware and hangings (door locks, racks, artwork, etc.) are secure and in good condition.
- Carpet/floor is free of debris, stains, wear, loose threads, open seams, etc.
- Walls and ceilings are free of marks, stains and damage.
- Drapes are free of stains, damage; pull easily and hang properly.
- Furniture is free of dust, marks and damage.
- All printed material including collateral, phonebooks and stationery are neat, crisp and current.
- Drawers and shelves are clean, free of dust and debris.
- All light bulbs operate; all light fixtures and lamps are in good condition, clean.
- Mirrors and windows are free of smudges and damage throughout.
- If safe is provided, it is clean, functional and convenient.
- Room equipped with accurate, functional clock and radio/stereo.
- Color television works and is equipped with remote control, and is minimum 19".
- Ice bucket and glasses (may be molded plastic) are clean, hygienic.

- If minibar is present, it is hygienic, free of spills and damage, all products are sealed, price list present.
- If coffeemaker is present, it is hygienic, contains ample, sealed supplies and cups.
- All bedding and linens are free of debris, hairs, damage and stains.
- Room heating and air conditioning is easily controlled by guest and is quiet.
- Air is fresh and clean, no stuffiness or odors.
- Sink, tub, shower, toilet, bidet are very clean, free of hairs, stains and discoloration.
- Bathroom tile and grouting is clean, not discolored, cracked or mildewed.
- Faucets and drains operate smoothly and easily.
- Hygienic soap and shampoo is provided.
- Minimum bath linen is present: one bathmat; two each of facecloth, hand towel and bath towel.
- Towels are free of spots, stains, tears and obvious frays.
- If robes are provided, they are free of spots, stains and loose threads.

**Specialized Facility Detail**

- Pool/beach furniture is clean, hygienic and well-maintained.
- Pool deck or beach/sand is clean and free of excessive debris.
- Pool deck and tiling are in good condition, free of excessive damage or wear.
- Pool water is clean, free of debris and free of notable odors.
- Pool fittings and equipment (ladders, dive boards) are secure and in good condition.
- Tennis court surfaces are in good condition, free of damage and well-marked.
- Tennis courts and surrounding areas are clean and free of debris.
- Fixtures, nets, lights, fences are well-maintained and good condition.
- Pro shop/clubhouse interior are clean and well-maintained; displays and counters neat and tidy.
- Pro shop/clubhouse and surrounding areas are clean with well-maintained appearance.
- Golf carts are clean, well-organized and maintained.
- Rental equipment is clean and good condition, including bags.
- Floors throughout the casino are well-maintained and free of excessive debris.
- Air circulation in casino is adequate, not stuffy or smoky.
- Slot banks are free of excessive debris, soiled glassware and soiled ashtrays.
- Slot chairs are in good condition, clean and free of rips and stains.
- Cashier and change booths are tidy, well-organized and well-signed.
- Table game tops are well-maintained, free of damage and wear.

For information on the Two-Star criteria see the next section.

Two-Star Lodging Establishment provides clean, comfortable and reliable accommodations along with expanded amenities and services, such as a full-service restaurant on-site. Guests at a Two-Star Hotel, Resort or Inn can find all of the qualities for a One-Star Hotel, or Resort plus the following characteristics:

**Services Detail**

- Front desk staff are articulate, smile and make eye contact.
- Staff is attired in well-fitting, consistent uniforms.
- Baggage assistance is available on request.
- The front desk is staffed twenty-four hours.
- Restaurant on-site serving three meals daily.
- If Inn, twenty-four hour guest service available on-call

**Facilities Detail**

- Lobby provides a comfortable seating area.
- Notices are professional, matching décor, not "homemade".
- Vending and/or ice machines are located on each guest floor.
- Service doors are clean, free of marks and damage, and closed.
- Public phones are convenient, clean and well-maintained.

- Guest rooms equipped with data ports (guest can connect laptop to the Internet).
- A variety of different sized and appointed rooms available in hotel.

**Guest Room Detail**

- Guest room door and frame free of marks, scratches and scuffs.
- Comfortable seating for two people (other than bed). .
- Guest service directory, pad and pen/pencil present and conveniently placed.
- Enclosed closets (means closets must have doors).
- There are a minimum six non-captive hangers.
- There are three spacious drawers or enclosed shelves (inside closet).
- A Luggage rack or bench provided; and adequate space to leave suitcase.
- Extra clean and hygienic blanket and pillow provided in room.
- Lighting throughout the room is adequate.
- The room can be fully darkened.
- Full-length mirror present in room.
- A hairdryer present in room, clean and functional.
- Hygienic soap, shampoo and two other bath amenities are provided.

**Specialized Facility Detail**

- Guest can pick up e-mail and access the Internet from a Business Center workstation.
- Business Center working areas are clean, tidy and professional.
- Comfortable office-style chairs at the Business Center guest workstations.
- All fitness, treatment and relaxation areas are hygienic, neatly organized and maintained.
- Spa reception area is well-defined, neat and professional.
- Fitness equipment is clean, in very good condition, conveniently laid out.
- Fitness/workout area is well-ventilated, with comfortable temperature.
- Sound system or television provided in fitness/workout areas.
- Towels are provided in locker and fitness areas.
- Grooming area equipped with hairdryers; soap and shampoo conveniently placed.
- All amenities are neatly and professionally presented; very hygienic.
- Locker room, showers, sauna and hot tub extremely clean, hygienic appearance.

For information on the Three-Star criteria see the next section.

Three-Star Lodging Establishment is an establishment that is well-appointed, with full services and expanded ar
Guests at a Three-Star Hotel, Resort or Inn can expect to find all of the qualities for a Two-Star Hotel or Resort
following characteristics:

**Services Detail**

- Turndown service is available upon request.
- Valet parking is available.
- Baggage assistance is automatic.
- Same day laundry and dry cleaning available five days/week.
- Complimentary newspapers are delivered to room automatically.
- Complete room service is available.
- Workstation is available where guest can access Internet.
- Basic fitness equipment is provided, including treadmills and cycles.
- If Inn, restaurant on-site which serves full breakfast is available.
- If Resort, complimentary newspapers (or newsfaxes) are delivered to room automatically.

**Facilities Detail**

- High quality, varied, and major brand sundry selections are available in an on-site store.

- If public phonebook present, it is displayed in attractive cover.
- Pay-Movie selections are available through television.
- Suite (separate bedroom and living areas) accommodations are available.

**Guest Room Detail**

- Each guest room has two phones (one could be in the bathroom).
- Comfortable desk and chair are available for working, complete with telephone, data port, and light.
- Insulated ice bucket, vinyl or better, as well as glass glassware; clean and hygienic are present in room.
- Minibar is present (defined as selection several beverages and snacks).
- If Inn, refreshments present in room or readily available.
- If coffeemaker is present, ceramic mugs and napkins are available.
- Pillows are plush and full, no foam.
- Framed artwork or interesting architectural features exist in room.
- Excellent lighting is provided in bathroom for makeup and shaving.
- Hygienic soap, shampoo and four other bath amenities are provided.
  Amenities are presented attractively, thoughtfully (not simply lined up on counter).
- Towels are of absorbent quality, with soft nap and no discoloration.
- If Inn, Pay-Movie selections available through television OR VCR/DVD in-room.
- If Resort, guest room is of generous size, and provides ample seating for more than two persons.

**Specialized Facility Detail**

- If Business Center is present, a semi-private working area with workstation and telephone is available for
- If a spa exists on site, robes and slippers or spa sandals are available in variety of sizes, and they are cle
  good condition.
- If spa or fitness center exists on site, complimentary amenities to include body lotion, shower caps, talc/c
  and combs.
- If spa exists on site, at least two types of massage and either body treatments or facials are also offered.
- If tennis is available on site, water is available courtside.
- If pool or beach service is present, ample towels are available poolside or at the beach.

For information on the Four-Star criteria see the next section.

Four-Star Lodging Establishment indicates an outstanding hotel providing the guest with a luxury experience in distinctive setting, including expanded amenities and exceptional service. Guests at a Four-Star Hotel, Resort c expect to find all of the qualities for a Three-Star Hotel, Resort or Inn plus the following characteristics:

**Services Detail**

- Written confirmation is automatic or offered, either by mail, fax or e-mail.
- Guests name is used effectively, but discreetly, as a signal of recognition.
- The time from arriving at the reception area until registration is complete does not exceed five minutes (i
  queuing).
- Bed is plush and inviting with oversized or numerous pillows.
- Bedcovers are elegant and stylish and with linens of exceptional quality and comfort.
- All written information is provided on good quality paper or pads, custom-printed or logoed.
- Bathroom presentation and placement of amenities and linens is thoughtful, careful, and elegant.
- Fresh ice is provided during evening service or at another time during the day.
- Turndown service is automatically provided.
- During turndown service, guest clothing is neatly handled and guest toiletries are neatly arranged and dis
  on a cloth or shelf.
- Room service is delivered within 30 minutes.
- Room service order is delivered within five minutes of quoted time.
- One hour pressing is available.
- If resort, two hour pressing available

- Same day laundry and dry cleaning is available seven days/week.
- Wake-up call is personalized with guest's name and time of day.
- Wake-up call is delivered within two minutes of requested time.
- Special service desk identified as concierge/guest service is situated apart from reception/front desk.
- If Inn, Workstation where guest can access Internet (may be "borrowed" office) is available.
- If spa services are present, treatments are begun and ended on schedule, within five minutes of expected booked time.
- If spa services are present, during treatment, therapist appears to be genuinely expert, moving seamless through the treatment as described and expected.
- If casino services are present, when playing slots for more than 20 minutes, drink service is offered.
- If casino services are present, when playing a table game for more than 15 minutes, drink service is offer

### Facilities Detail

- Lobby areas feature elegant live plants and/or fresh floral displays.
- A dedicated and secure luggage storage area is available.
- Public phones are equipped with seats, privacy panels and pad/pens.
- Public washrooms are furnished with upgraded materials and appointments/luxurious design.
- Televisions feature premium cable TV (two movie channels, two all-news, two financial).
- Guest room telephones have two lines.

### Guest Room Detail

- Selection of at least 10 hangers including a variety of bars, clips and padded.
- In-room safe is present.
- If Inn, in-room safe is present or readily accessible on-site.
- If minibar is present, it is non auto-charge, and premium products are attractively displayed.
- Bed is triple sheeted or features washable duvets.
- Live plants are present in guest rooms.
- Shaving/makeup, lighted magnifying mirror is present.

### Specialized Facility Detail

- Fitness equipment is available with personal headphones/televisions.
- Current newspapers and national-title magazines are provided in fitness and locker areas.
- If spa, treatment rooms are equipped with individually controlled temperature and sound systems.

For information on the Five-Star criteria see the next section.

Five-Star Lodging Establishment has consistently superlative service and expanded amenities in a luxurious, di environment, making this establishment one of the best in the country. Guests at a Five-Star Hotel, Resort or In expect to find all of the qualities for a Four-Star Hotel, Resort or Inn plus the following characteristics:

### Services Detail

- Staff is extremely well spoken, polite and clear, avoids slang and phrase-fragments.
- Staff is extremely well informed about requirements within their department.
- Overall service is flawless from initial reservation call to departure service.
- Choice of at least two complimentary newspapers is distributed.
- Twenty-four hour room service is available, including hot food.
- Any work undertaken by the staff is handled with complete professionalism, as would be expected by pro secretaries; and returned to guests neatly, in folders or envelopes.
- If Inn, choice of at least two complimentary newspapers are offered on-site.
- If Inn, a restaurant on-site, serving full breakfast and dinner is available.
- If pool service is available, guests are proactively greeted and escorted to their chairs, and set-up assista provided or offered.

- If pool service is available, during a 90 minute period and in warm conditions, some sort of complimentar refreshment is offered (for example, mineral water, fresh fruit, water spritz).

**Facilities Detail**

- Public washrooms feature well-maintained cloth towels, fresh plants or flowers.

**Guest Room Detail**

- Each guest room has three phones, including one in the bathroom.
- CD player/stereo is present and functional.
- Ice bucket and glasses are high quality (glass, metal, stone etc.), with tongs which are clean and hygien
- Fresh flowers are present in guest rooms.
- Separate shower and tub are present in bathroom.

©*Exxon Mobil Corporation*

<< Prev Page    Intro    Next Page >>

🏠 HSW Home

**Table of Contents**
› Mobil Stars: Lodging Star Criteria
› One-Star Lodgings
› Two-Star Lodgings
› Three-Star Lodgings
› Four-Star Lodgings
› Five-Star Lodgings

Home   Store   Newsletter   Search   Advertising   Privacy   Terms & Conditions   Contact   About   Help   XML
© 1998 - 2006 HowStuffWorks, Inc.                        Content © Publications International, Ltd.

# EXHIBIT 2

## Easy Street Partners

**UPDATED  6/22/2010**

**Proof of Claims UNSECURED**
*Less: Homeowners, Priority &  Secured Claims*

| | |
|---|---:|
| Millcreek Consulting | 100,044.00 |
| Elliot Workshop Group | 105,200.00 |
| Shoes For Crews, LLC | 170.92 |
| Step Saver Inc. | 835.49 |
| Frank Rimerman & Co. LLP | 4,180.65 |
| Target Labels & Packaging | 400.00 |
| A.W. Marshall Company | 510.24 |
| Luxury Residence Group | 74,721.11 |
| Water Reclamation District | 747.60 |
| Air Filter Sales & Service Inc | 672.88 |
| Gentry Finance | 318.13 |
| EM Systems | 1,105.86 |
| Qwest Corp. | 1,126.57 |
| Qwest Communications Company | 818.30 |
| Squire | 540.00 |
| Whitney Advertising & Design | 6,263.39 |
| Rocky Mountain Power | 745.00 |
| Nicholas Co | 1,074.57 |
| Philo Smith | 237,000.00 |
| Virtuso Ltd | 4,725.00 |
| Baker Tile Co | 5,689.00 |
| Ecolab | 561.43 |
| William Shoaf | 123,399.04 |
| David L. Wickline | 4,607.90 |
| Acme | 439.41 |
| ADT | 126.60 |
| Alpine Adventures | 15.90 |
| Alsoc | 1,218.69 |
| Amex Travel | 31.80 |
| Amex Travel | 239.60 |
| Am Hotel Register | 117.92 |
| Am Ski & Board Assoc | 2,100.00 |
| Appliance Sales | 1,159.63 |
| ATIV | 59.80 |
| ATT | 375.39 |
| S Bacon | 190.15 |
| Bellow Glas | 51.47 |
| Bevco | 131.11 |
| Borg | 96.20 |
| Business Technology | 1,350.00 |
| Cameron | 91.62 |
| CBIZ | 36,146.00 |
| Comcast | 1,394.62 |
| CRC Design | 1,097.25 |
| Curb It Recycling | 695.00 |

| | |
|---|---:|
| Dex West | 100.25 |
| Drieman | 81.88 |
| Ecolab | 602.00 |
| Fog River | 300.00 |
| Five V's Communication | 679.06 |
| Collins Skin Care | 890.60 |
| Gateway Center | 144,009.60 |
| Get Fresh | 252.62 |
| Goodrich & Thomas | 48,300.00 |
| HD Supply | 1,012.56 |
| E Hill | 747.97 |
| C Hindle | 1,565.57 |
| Home Depot | 22.92 |
| Hood Cleaners | 675.00 |
| Hotel Amenities Resources | 888.62 |
| HYKO | 1,413.50 |
| Intermountain Drug Testing | 1,035.00 |
| C Johnson | 263.61 |
| Klehr, Harrison, Harvery | 55,602.50 |
| Les Olsen | 2,062.52 |
| S Lewis | 12.32 |
| Liqour Leasing | 320.55 |
| Mascioni | 233.80 |
| McGladrey | 15,000.00 |
| Media One | 13.50 |
| Merrit & Harris | 3,200.00 |
| S Monticone | 96.10 |
| Muir | 3,283.36 |
| Night Vision | 88.65 |
| M Prado | 239.23 |
| Park Ave Travel | 159.00 |
| PC Auto | 12.88 |
| PC Chamber | 2,000.00 |
| PC Lock & Key | 148.04 |
| PC Municipal | 1,348.16 |
| PC Surveying | 1,915.00 |
| PC Win Electric | 364.68 |
| PayChex | 759.20 |
| Peak Mobile | 135.53 |
| Peets Coffee | 560.09 |
| Pitnery Bowes | 161.58 |
| Porter Paint | 142.00 |
| Renegade Oil | 375.00 |
| Revco | 729.01 |
| Safeguard | 109.81 |
| Schindler | 3,870.00 |
| S Boberek | 60.00 |
| James Jewelry | 4.25 |
| Shaner | 4,095.00 |

| | | |
|---|---:|---:|
| Seimens | 673.00 | |
| SLH | 2,299.10 | |
| Stone Ground Bakery | 167.47 | |
| Sugar House Awning | 57.70 | |
| Staples | 978.39 | |
| Summitt Business | 25.00 | |
| Swire | 596.86 | |
| Aspen Times | 906.75 | |
| Park Record | 295.75 | |
| Union Sq HOA | 10,409.80 | |
| Universal Companies | 215.35 | |
| USA Today | 105.70 | |
| Utah Fire Equip | 225.28 | |
| P Wagner | 5.79 | |
| Wasatch Audio | 490.25 | |
| Wasatch Meats | 1,561.69 | |
| Wells Fargo | 3,015.08 | |
| A Wesser | 300.00 | |
| SUBTOTAL - POC  LESS CLOUDNINE ENTITIES | | 1,044,856.72 |
| | | |
| Cloudnine Resorts-Sky Lodge Development | 1,305,413.00 | |
| | | |
| Cloudnine Resorts-Sky Lodge Development ** | 516,900.00 | |
| CloudNine Resorts SL- Management | 372,193.00 | |
| CloudNine Resorts SL- Management ** | 680,946.00 | |
| SUBTOTAL CLOUDNINE ENTITIES | | 2,875,452.00 |
| ** Fees due when contracts rejected | | |
| **GRAND TOTAL** | | **3,920,308.72** |

| | | |
|---|---:|---:|
| **TOTAL GROSS UNSECURED LESS INSIDER CLAIMS** | | **1,044,856.72** |
| | | |
| **Gross Unsecured Paid @ Confirmation** | | |
| Discount Factor | 609,736.57 | |
| Net Unsecured Paid @ Confirmation | 60% | |
| **Total Unsecured Claims Paid @ Confirmation** | | 365,841.94 |
| **Unsecured Paid over Three Years** | | 435,120.15 |
| **Total Unsecured Claims Paid** | | 800,962.09 |

# EXHIBIT 3

## Easy Street Partners                **UPDATED  2/10/2010**

### Proof of Claims UNSECURED
*Less: Homeowners, Priority &  Secured Claims*

| | |
|---|---:|
| Millcreek Consulting | 100,044.00 |
| Elliot Workshop Group | 105,200.00 |
| Shoes For Crews, LLC | 170.92 |
| Step Saver Inc. | 835.49 |
| Frank Rimerman & Co. LLP | 4,180.65 |
| Target Labels & Packaging | 400.00 |
| A.W. Marshall Company | 510.24 |
| Luxury Residence Group | 74,721.11 |
| Water Reclamation District | 747.60 |
| Air Filter Sales & Service Inc | 672.88 |
| Gentry Finance | 318.13 |
| EM Systems | 1,105.86 |
| Qwest Corp. | 1,126.57 |
| Qwest Communications Company | 818.30 |
| Squire | 540.00 |
| Whitney Advertising & Design | 6,263.39 |
| Rocky Mountain Power | 745.00 |
| Nicholas Co | 1,074.57 |
| Philo Smith | 237,000.00 |
| Virtuso Ltd | 4,725.00 |
| Baker Tile Co | 5,689.00 |
| Ecolab | 561.43 |
| William Shoaf | 43,385.20 |
| David L. Wickline | 4,607.90 |
| Acme | 439.41 |
| ADT | 126.60 |
| Alpine Adventures | 15.90 |
| Alsoc | 1,218.69 |
| Amex Travel | 31.80 |
| Amex Travel | 239.60 |
| Am Hotel Register | 117.92 |
| Am Ski & Board Assoc | 2,100.00 |
| Appliance Sales | 1,159.63 |
| ATIV | 59.80 |
| ATT | 375.39 |
| S Bacon | 190.15 |
| Bellow Glas | 51.47 |
| Bevco | 131.11 |
| Borg | 96.20 |
| Business Technology | 1,350.00 |
| Cameron | 91.62 |
| CBIZ | 36,146.00 |
| Comcast | 1,394.62 |
| CRC Design | 1,097.25 |

| | |
|---|---:|
| Curb It Recycling | 695.00 |
| Dex West | 100.25 |
| Drieman | 81.88 |
| Ecolab | 602.00 |
| Fog River | 300.00 |
| Five V's Communication | 679.06 |
| Collins Skin Care | 890.60 |
| Get Fresh | 252.62 |
| Goodrich & Thomas | 48,300.00 |
| HD Supply | 1,012.56 |
| E Hill | 747.97 |
| C Hindle | 1,565.57 |
| Home Depot | 22.92 |
| Hood Cleaners | 675.00 |
| Hotel Amenities Resources | 888.62 |
| HYKO | 1,413.50 |
| Intermountain Drug Testing | 1,035.00 |
| C Johnson | 263.61 |
| Klehr, Harrison, Harvery | 55,602.50 |
| Les Olsen | 2,062.52 |
| S Lewis | 12.32 |
| Liqour Leasing | 320.55 |
| Mascioni | 233.80 |
| McGladrey | 15,000.00 |
| Media One | 13.50 |
| Merrit & Harris | 3,200.00 |
| S Monticone | 96.10 |
| Muir | 3,283.36 |
| Night Vision | 88.65 |
| M Prado | 239.23 |
| Park Ave Travel | 159.00 |
| PC Auto | 12.88 |
| PC Chamber | 2,000.00 |
| PC Lock & Key | 148.04 |
| PC Municipal | 1,348.16 |
| PC Surveying | 1,915.00 |
| PC Win Electric | 364.68 |
| PayChex | 759.20 |
| Peak Mobile | 135.53 |
| Peets Coffee | 560.09 |
| Pitnery Bowes | 161.58 |
| Porter Paint | 142.00 |
| Renegade Oil | 375.00 |
| Revco | 729.01 |
| Safeguard | 109.81 |
| Schindler | 3,870.00 |
| S Boberek | 60.00 |
| James Jewelry | 4.25 |
| Shaner | 4,095.00 |

| | | |
|---|---:|---:|
| Seimens | 673.00 | |
| SLH | 2,299.10 | |
| Stone Ground Bakery | 167.47 | |
| Sugar House Awning | 57.70 | |
| Staples | 978.39 | |
| Summitt Business | 25.00 | |
| Swire | 596.86 | |
| Aspen Times | 906.75 | |
| Park Record | 295.75 | |
| Union Sq HOA | 10,409.80 | |
| Universal Companies | 215.35 | |
| USA Today | 105.70 | |
| Utah Fire Equip | 225.28 | |
| P Wagner | 5.79 | |
| Wasatch Audio | 490.25 | |
| Wasatch Meats | 1,561.69 | |
| Wells Fargo | 3,015.08 | |
| A Wesser | 300.00 | |
| SUBTOTAL - POC  LESS CLOUDNINE ENTITIES | | 820,833.28 |
| Cloudnine Resorts-Sky Lodge Development | 1,305,413.00 | |
| Cloudnine Resorts-Sky Lodge Development ** | 516,900.00 | |
| CloudNine Resorts SL- Management | 372,193.00 | |
| CloudNine Resorts SL- Management ** | 680,946.00 | |
| SUBTOTAL CLOUDNINE ENTITIES | | 2,875,452.00 |
| ** Fees due when contracts rejected | | |
| **GRAND TOTAL** | | **3,696,285.28** |

**Insider Claims**

| | | |
|---|---:|---:|
| Philo Smith | 237,000.00 | |
| William Shoaf | 43,385.20 | |
| David L. Wickline | 4,607.90 | |
| Cloudnine Resorts-Sky Lodge Development | 1,305,413.00 | |
| Cloudnine Resorts-Sky Lodge Development ** | 516,900.00 | |
| CloudNine Resorts SL- Management | 372,193.00 | |
| CloudNine Resorts SL- Management ** | 680,946.00 | |
| | | 3,160,445.10 |

| | |
|---|---:|
| **NET UNSECURED LESS INSIDER CLAIMS** | **535,840.18** |

## Easy Street Partners

### Chart of Proof of claims (PRIORITY, SECURED, JACOBSEN, WLB)

| | |
|---|---:|
| Pacific Seafood - Utah | 947.76 |
| Jacobsen National Group, Inc. | 1,477,718.22 |
| Living Creations Inc | 2,970.43 |
| Sysco Intermountain Food Services, Inc. | 11,381.53 |
| | |
| Water Images | 666.00 |
| WestLB AG | 16,049,742.71 |
| Gateway Center, LLC | 16,577.98 |
| **GRAND TOTAL SECURED** | **17,560,004.63** |

### NET PRIORITY CLAIMS

| | |
|---|---:|
| Pacific Seafood - Utah | 947.76 |
| Living Creations Inc | 2,970.43 |
| Sysco Intermountain Food Services, Inc. | 11,381.53 |
| | |
| Water Images | 666.00 |
| Gateway Center, LLC | 16,577.98 |
| **TOTAL NET PRIORITY** | **32,543.70** |

# EXHIBIT 4

## Easy Street Partners                    UPDATED 5/27/2010

**Proof of Claims UNSECURED**
*Less: Homeowners, Priority & Secured Claims*

| | |
|---|---:|
| Millcreek Consulting | 100,044.00 |
| Elliot Workshop Group | 105,200.00 |
| Shoes For Crews, LLC | 170.92 |
| Step Saver Inc. | 835.49 |
| Frank Rimerman & Co. LLP | 4,180.65 |
| Target Labels & Packaging | 400.00 |
| A.W. Marshall Company | 510.24 |
| Luxury Residence Group | 74,721.11 |
| Water Reclamation District | 747.60 |
| Air Filter Sales & Service Inc | 672.88 |
| Gentry Finance | 318.13 |
| EM Systems | 1,105.86 |
| Qwest Corp. | 1,126.57 |
| Qwest Communications Company | 818.30 |
| Squire | 540.00 |
| Whitney Advertising & Design | 6,263.39 |
| Rocky Mountain Power | 745.00 |
| Nicholas Co | 1,074.57 |
| Philo Smith | 237,000.00 |
| Virtuso Ltd | 4,725.00 |
| Baker Tile Co | 5,689.00 |
| Ecolab | 561.43 |
| William Shoaf | 65,795.20 |
| David L. Wickline | 4,607.90 |
| Acme | 439.41 |
| ADT | 126.60 |
| Alpine Adventures | 15.90 |
| Alsoc | 1,218.69 |
| Amex Travel | 31.80 |
| Amex Travel | 239.60 |
| Am Hotel Register | 117.92 |
| Am Ski & Board Assoc | 2,100.00 |
| Appliance Sales | 1,159.63 |
| ATIV | 59.80 |
| ATT | 375.39 |
| S Bacon | 190.15 |
| Bellow Glas | 51.47 |
| Bevco | 131.11 |
| Borg | 96.20 |
| Business Technology | 1,350.00 |
| Cameron | 91.62 |
| CBIZ | 36,146.00 |
| Comcast | 1,394.62 |
| CRC Design | 1,097.25 |
| Curb It Recycling | 695.00 |

| | |
|---|---:|
| Dex West | 100.25 |
| Drieman | 81.88 |
| Ecolab | 602.00 |
| Fog River | 300.00 |
| Five V's Communication | 679.06 |
| Collins Skin Care | 890.60 |
| Gateway Center | 136,000.00 |
| Get Fresh | 252.62 |
| Goodrich & Thomas | 48,300.00 |
| HD Supply | 1,012.56 |
| E Hill | 747.97 |
| C Hindle | 1,565.57 |
| Home Depot | 22.92 |
| Hood Cleaners | 675.00 |
| Hotel Amenities Resources | 888.62 |
| HYKO | 1,413.50 |
| Intermountain Drug Testing | 1,035.00 |
| C Johnson | 263.61 |
| Klehr, Harrison, Harvery | 55,602.50 |
| Les Olsen | 2,062.52 |
| S Lewis | 12.32 |
| Liqour Leasing | 320.55 |
| Mascioni | 233.80 |
| McGladrey | 15,000.00 |
| Media One | 13.50 |
| Merrit & Harris | 3,200.00 |
| S Monticone | 96.10 |
| Muir | 3,283.36 |
| Night Vision | 88.65 |
| M Prado | 239.23 |
| Park Ave Travel | 159.00 |
| PC Auto | 12.88 |
| PC Chamber | 2,000.00 |
| PC Lock & Key | 148.04 |
| PC Municipal | 1,348.16 |
| PC Surveying | 1,915.00 |
| PC Win Electric | 364.68 |
| PayChex | 759.20 |
| Peak Mobile | 135.53 |
| Peets Coffee | 560.09 |
| Pitnery Bowes | 161.58 |
| Porter Paint | 142.00 |
| Renegade Oil | 375.00 |
| Revco | 729.01 |
| Safeguard | 109.81 |
| Schindler | 3,870.00 |
| S Boberek | 60.00 |
| James Jewelry | 4.25 |
| Shaner | 4,095.00 |

| | | |
|---|---:|---:|
| Seimens | 673.00 | |
| SLH | 2,299.10 | |
| Stone Ground Bakery | 167.47 | |
| Sugar House Awning | 57.70 | |
| Staples | 978.39 | |
| Summitt Business | 25.00 | |
| Swire | 596.86 | |
| Aspen Times | 906.75 | |
| Park Record | 295.75 | |
| Union Sq HOA | 10,409.80 | |
| Universal Companies | 215.35 | |
| USA Today | 105.70 | |
| Utah Fire Equip | 225.28 | |
| P Wagner | 5.79 | |
| Wasatch Audio | 490.25 | |
| Wasatch Meats | 1,561.69 | |
| Wells Fargo | 3,015.08 | |
| A Wesser | 300.00 | |
| SUBTOTAL - POC  LESS CLOUDNINE ENTITIES | | 979,243.28 |
| | | |
| Cloudnine Resorts-Sky Lodge Development | 1,305,413.00 | |
| | | |
| Cloudnine Resorts-Sky Lodge Development ** | 516,900.00 | |
| CloudNine Resorts SL- Management | 372,193.00 | |
| CloudNine Resorts SL- Management ** | 680,946.00 | |
| SUBTOTAL CLOUDNINE ENTITIES | | 2,875,452.00 |
| ** Fees due when contracts rejected | | |
| **GRAND TOTAL** | | **3,854,695.28** |

| | | |
|---|---:|---:|
| **TOTAL GROSS UNSECURED LESS INSIDER CLAIMS** | | **979,243.28** |
| | | |
| **Gross Unsecured Paid @ Confirmation** | | |
| Discount Factor | 365,682.97 | |
| Net Unsecured Paid @ Confirmation | 60% | |
| **Total Unsecured Claims Paid @ Confirmation** | | 219,409.78 |
| **Unsecured Paid over Three Years** | | 613,560.31 |
| **Total Unsecured Claims Paid** | | 832,970.09 |